1  HILARY POTASHNER
   Federal Public Defender
2  Central District of California
   MARTA VANLANDINGHAM (Cal. Bar No. 251661)
3  E-Mail:  Marta_VanLandingham@fd.org
   Deputy Federal Public Defender
4  CELESTE BACCHI (Cal. Bar No. 307119)
   E-Mail:  Celeste_Bacchi@fd.org
5  Deputy Federal Public Defender
   321 East 2nd Street
6  Los Angeles, California 90012-4202
   Telephone:  (213) 894-2854
7  Facsimile:  (213) 894-0081

8  Attorneys for Petitioner
   PAUL BRADLEY SPEER
9

10          **UNITED STATES DISTRICT COURT**

11           **FOR THE DISTRICT OF ARIZONA**

12

13  Paul Bradley Speer,                    No. CV-16-04193-PHX-GMS

14          Petitioner,

15          v.                             <u>DEATH PENALTY CASE</u>

16  Charles L. Ryan, *et al.*,

17          Respondents.

18

19          **PETITION FOR WRIT OF HABEAS CORPUS**

20                  **28 U.S.C. § 2254**

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION .................................................................................. 1

II.   FACTUAL AND PROCEDURAL BACKGROUND ................................. 1

    A.   Family and Personal History ................................................... 1

        1.   The Cates Family ....................................................... 1

        2.   Sabrina's Marriage to Mike Speer .......................... 4

        3.   Sabrina's Marriage to William (Bill) Womble ......... 6

    B.   Familial Discord and Childhood Protective Services ............. 9

    C.   Exposure to Drugs and Toxins and a Multigenerational History of Addiction ................................................................. 13

    D.   Multigenerational Mental Health Impairments ................... 18

    E.   Sexual Abuse ........................................................................ 19

    F.   The Impact of Complex Trauma on Paul Speer .................. 20

    G.   The Crime ............................................................................ 21

        1.   The Burglary on March 14, 2002 ........................... 21

        2.   The Telephone Calls and the Shooting of the Sotos by Brian Womble on May 25, 2002 ................... 21

    H.   Procedural History .............................................................. 23

        1.   Evidentiary Hearing on Motion to Suppress .......... 24

        2.   Trial ......................................................................... 24

            a.   Guilt Phase ................................................... 24

            b.   Aggravation Phase ....................................... 26

            c.   Penalty Phase ............................................... 27

        3.   Juror Issues .............................................................. 30

        4.   Rule 11 and Competency Proceedings ................... 32

        5.   Direct Appeal .......................................................... 32

        6.   State Post-Conviction Proceedings .......................... 33

        7.   Current Proceedings ................................................ 35

III.  EXHAUSTION ................................................................................... 35

IV.  INCORPORATION OF FACTS AND LAW ....................................... 37

# TABLE OF CONTENTS

**PAGE**

V.     STATE COURT PRESUMPTION OF CORRECTNESS ...........................37

VI.    INEFFECTIVENESS CLAIMS MUST  BE CONSIDERED
       CUMULATIVELY ........................................................................................38

VII.   THE AEDPA IS UNCONSTITUTIONAL ....................................................39

      A.     AEDPA Suspends the Writ of Habeas Corpus ..................................40

      B.     AEDPA Violates the Separation of Powers Doctrine........................40

      C.     Conclusion ........................................................................................41

VIII. FEDERAL CONSTITUTIONAL CLAIMS .................................................42

CLAIM 1
      DEFENSE COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY
      FAILING TO PROPERLY PROVIDE LEGAL SUPPORT AND
      ARGUMENT FOR THE MOTION TO SUPPRESS EVIDENCE .............42

      A.     Legal Basis for All Ineffective Assistance of Counsel Claims .........42

      B.     Factual Basis of Claims Relating to Tapes of Jail Phone Calls
           Subpoenaed by State but Not Preserved or Presented at Trial ..........45

      C.     Trial Counsel Were Ineffective in Failing to Present a Reasonable
           Argument to Suppress the Only Evidence of Speer's Guilt ...............47

      D.     The State Court's Denial of the Claim Is an Unreasonable
           Application of Clearly Established Federal Law ................................49

CLAIM 2
      DEFENSE COUNSEL WERE INEFFECTIVE BY ALLOWING
      THIRTY-ONE CALLS TO BE DESTROYED, THUS DEPRIVING
      SPEER OF IMPORTANT EVIDENCE ........................................................50

      A.     Trial Counsel Provided Ineffective Assistance When They
           Allowed Thirty-One Recordings of Relevant Phone Calls to Be
           Destroyed Without Review..................................................................50

      B.     The State Court's Denial of the Claim Is Unreasonable....................53

CLAIM 3
      TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO
      PROPERLY DEVELOP AND ARGUE THE RULE 15 DISCOVERY
      ISSUE ..........................................................................................................55

      A.     Trial Counsel Were Ineffective, to Speer's Prejudice, with Regard
           to Discovery ......................................................................................55

      B.     The State Court's Denial of the Claim Is Unreasonable....................56

# <u>TABLE OF CONTENTS</u>

**PAGE**

CLAIM 4
TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO
ADEQUATELY SUPPORT THEIR REQUEST FOR A WILLITS
INSTRUCTION WITH ADEQUATE LEGAL AUTHORITY ..................57

    A.    Trial Counsel's Failure to Support the Requested Instruction Was
Deficient and Prejudiced Speer.........................................................58

    B.    The State Court's Denial of the Claim Constitutes an
Unreasonable Determination of Fact .................................................60

CLAIM 5
TRIAL COUNSEL WERE INEFFECTIVE BY FAILING TO CROSS-
EXAMINE DETECTIVE OLSON WITHIN THE PARAMETERS SET
BY THE TRIAL COURT .............................................................................61

    A.    Factual Basis ......................................................................................61

    B.    Counsel's Unreasonable Failure to Cross-Examine the Lead
Detective on Past Shoddy Investigations Prejudiced Speer ...............62

    C.    The State Court's Denial of the Claim Is Unreasonable....................67

CLAIM 6
DEFENSE COUNSEL WERE INEFFECTIVE FOR FAILING TO
OBJECT TO THE COURT'S ACCOMPLICE INSTRUCTION AND
FOR FAILING TO OFFER A CORRECT ACCOMPLICE
INSTRUCTION .............................................................................................68

    A.    Speer Raised a Colorable Claim of Ineffective Assistance for
Failure to Correct a Highly Damaging Instruction ...........................69

    B.    The State Court Was Unreasonable in Its Denial of the Claim .........72

CLAIM 7
TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO MOVE
TO VACATE SPEER'S CONVICTION AND SENTENCE AFTER
THE SAME PROSECUTOR PRESENTED A CONFLICTING
THEORY OF THE CRIME AT WOMBLE'S TRIAL ...............................74

    A.    Relevant Facts ...................................................................................75

        1.    The Prosecutor Convinced the Jury to Convict and Sentence
Speer to Death by Portraying Him as the Mastermind Who
Manipulated His Vulnerable Younger Brother into the
Crime ......................................................................................75

        2.    In Turn, in Womble's Trial, Womble Was the Mastermind
with the Plan, the Gun, and the Evil Intent...............................77

        3.    These Facts Should Have Been Known to Trial Counsel
Within the Statutory Time to File a Motion to Vacate.............79

    B.    Relevant Law .....................................................................................79

# TABLE OF CONTENTS

**PAGE**

    1.    Rule 24.2, Motion to Vacate Judgment ...................................... 79

    2.    There Is a Reasonable Probability that a Motion to Vacate Would Have Been Granted ...................................... 80

**CLAIM 8**

THE TRIAL COURT VIOLATED SPEER'S DUE PROCESS RIGHTS WHEN IT DENIED HIS MOTION TO SUPPRESS INCULPATORY JAIL RECORDINGS AFTER THE STATE HAD ALLOWED OTHER MITIGATING RECORDINGS TO BE DESTROYED ............................. 82

A.    Legal Basis for the Claim ................................................. 82

B.    The Trial Court Erred in Denying Speer's Motion to Suppress the Selected Calls .................................... 83

C.    This Claim Warrants Relief Under § 2254(d) ................................. 85

    1.    Unreasonable Application of and/or Contrary to Clearly Established Law ............................................ 86

        a.    The Destroyed Calls Were Exculpatory ........................ 86

        b.    The State Acted in Bad Faith in Allowing Twenty-Two Phone Calls to Be Destroyed ......................... 88

    2.    Unreasonable Determination of Facts ..................................... 90

**CLAIM 9**

THE TRIAL COURT'S FAILURE TO GIVE THE JURY A WILLITS INSTRUCTION VIOLATED SPEER'S RIGHT TO DUE PROCESS ....... 91

A.    Factual Basis ........................................................ 92

B.    The Trial Court's Error Denied Speer His Due Process .................... 92

C.    The State Court's Denial of the Claim Was Unreasonable ................ 96

**CLAIM 10**

SPEER WAS DENIED HIS RIGHT OF CONFRONTATION UNDER THE SIXTH AND FOURTEENTH AMENDMENTS IN HIS CROSS-EXAMINATION OF DETECTIVE OLSON ............................... 97

A.    Speer's Right to Confront the Key Witness Against Him Was Denied Him by the Court's Erroneous Ruling ................... 98

B.    The State Court's Denial of this Claim Is Based on an Unreasonable Application of Clearly Established Federal Law ....... 100

**CLAIM 11**

THE TRIAL COURT ERRED IN FAILING TO GRANT SPEER'S MOTION FOR MISTRIAL FOR PROSECUTORIAL MISCONDUCT THAT SO INFECTED THE PROCEEDINGS AS TO RENDER SPEER'S TRIAL UNFAIR ................................................. 101

# <u>TABLE OF CONTENTS</u>

**PAGE**

CLAIM 12
SPEER WAS DEPRIVED OF HIS RIGHT TO A FAIR AND
IMPARTIAL JURY BECAUSE VOIR DIRE FAVORED THOSE
WHO LEANED TOWARD AUTOMATIC DEATH PENALTY............104

A.   The Jury Was Not Impartial Because a Juror Was Seated Who
Substantially Leaned in Favor of Death, Rendering the Verdict
and Sentence Unfair...............................................................................104

    1.   Relevant Law...........................................................................105

    2.   Relevant Facts.........................................................................106

    3.   The Trial Court's Decision to Not Strike a Biased Juror
Was Contrary to the Due Process Clause of the United
States Constitution..................................................................106

    4.   The Error Was Structural and the Judgment Must Be
Reversed..................................................................................107

B.   The Trial Court Failed to Excuse for Cause Jurors Who Leaned
Toward Automatic Imposition of the Death Penalty, Forcing
Defense Counsel to Exercise Peremptory Challenges.....................107

    1.   Juror 5....................................................................................107

    2.   Juror 19..................................................................................108

    3.   Juror 55..................................................................................108

    4.   Juror 90..................................................................................108

    5.   Juror 400................................................................................109

    6.   Juror 242................................................................................109

C.   The Trial Court Excused for Cause Jurors Who Leaned Against
the Death Penalty but Who Would Have Followed the Law ...........109

    1.   Relevant Law...........................................................................109

    2.   Relevant Facts.........................................................................110

        a.   Juror 136........................................................................110

        b.   Juror 250........................................................................110

        c.   Juror 427........................................................................111

D.   The Trial Court's Exclusion of Anti-Death-Penalty-Leaning Jurors
While Not Excusing for Cause Those Who Would Not Follow the
Law Violated Speer's Rights Under the United States Constitution 111

E.   The State Court Did Not Adjudicate the Federal Question..............112

v

# <u>TABLE OF CONTENTS</u>

**PAGE**

CLAIM 13
PROSECUTORIAL MISCONDUCT PERVADED ALL PHASES OF
THE TRIAL ............................................................................................... 113

    A.    Legal Basis of the Claim ................................................................. 113

    B.    Before Trial, the State's Non-Compliance with a Discovery
    Request to Produce the Recorded Conversations of Speer and His
    Co-defendant Denied Speer His Right to a Fair Trial and Due
    Process ............................................................................................. 114

        1.    The State Committed Misconduct by Denying Speer
        Material Evidence in Discovery ............................................. 116

        2.    The State Court's Denial of the Claim Was Based on an
        Unreasonable Determination of Facts .................................... 119

    C.    During the Guilt Phase, the Prosecutor Made Inflammatory
    Statements and Engaged in Egregious Misconduct that So Infected
    the Pre-Trial and Guilt Phase Proceedings as to Render Speer's
    Trial Unfair ..................................................................................... 119

        1.    Prosecutorial Misconduct So Infected the Guilt Phase with
        Unfairness as to Render the Resulting Conviction a Denial
        of Due Process ...................................................................... 120

            a.    Legal Basis ................................................................. 120

            b.    Instances of Prosecutorial Misconduct During Guilt
            Phase of Trial.............................................................. 121

    D.    During the Penalty Phase, Egregious and Varied Instances of
    Prosecutorial Misconduct Rendered the Trial Unfair and Resulted
    in a Death Sentence in Violation of Speer's Constitutional Rights..127

        1.    The Prosecutor Committed Misconduct by Using Speer's
        Mental Health History and Other Mitigation as Non-
        Statutory Aggravating Evidence............................................. 127

        2.    The Prosecutor Engaged in Misconduct When She Solicited
        and Failed to Correct Testimony that She Knew to Be False
        in Violation of *Napue v. Illinois* and Speer's Rights Under
        the Fifth and Fourteenth Amendments ................................... 131

        3.    The Prosecutor Committed Misconduct by Using
        Inflammatory Language, Misstating the Evidence, and
        Making Improper Comments During Closing Argument ...... 133

    E.    Conclusion ...................................................................................... 136

CLAIM 14
SPEER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL
DURING THE PENALTY PHASE IN VIOLATION OF HIS SIXTH,
EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS .................... 137

# TABLE OF CONTENTS

**PAGE**

A.   Legal Standards ....................................................................... 137

B.   Trial Counsel Unreasonably Failed to Investigate and Present
     Available Mitigating Evidence ............................................... 140

    1.   What the Jury Did Not Hear .................................... 140

    2.   The State Court Denial of this Claim Was an Unreasonable
     Application of Clearly Established Law and Based on an
     Unreasonable Interpretation of the Facts................................ 146

C.   Trial Counsel Unreasonably Failed to Present Effective Expert
     Testimony on Speer's Difficult History as a Victim of Domestic
     and Sexual Violence, Neurocognitive Deficits, and Complex
     Trauma ................................................................................... 150

D.   Trial Counsel Unreasonably Failed to Investigate and Present
     Evidence of Co-Defendant Brian Womble's Mental Illness ........... 153

E.   Trial Counsel Unreasonably Failed to Object and/or Seek
     Necessary Remedies to Protect Speer from Repeated Instances of
     Prosecutorial Misconduct...................................................... 154

F.   Trial Counsel Failed to Raise the Proper Objections During
     Penalty Phase Deadlock ........................................................ 155

**CLAIM 15**
COUNSEL WERE INEFFECTIVE BY STIPULATING TO
AGGRAVATING FACTORS ......................................................... 156

A.   Facts in Support of the Claim ............................................... 157

B.   Trial Counsel Were Ineffective, and the State Court's Decision to
     the Contrary Was Unreasonable ........................................... 158

**CLAIM 16**
DEFENSE COUNSEL WERE INEFFECTIVE BY ADMITTING
IRRELEVANT PRIOR CONVICTIONS AT THE AGGRAVATION
PHASE ......................................................................................... 159

A.   Facts and Argument ............................................................. 159

B.   The State Court's Denial of this Claim Was Unreasonable ............. 161

**CLAIM 17**
DEFENSE COUNSEL WERE INEFFECTIVE IN PERMITTING
DISSEMINATION OF TWO DOCTOR'S REPORTS THAT WERE
USED BY THE STATE IN THE PENALTY PHASE............................ 163

A.   Factual Basis ....................................................................... 163

B.   Trial Counsel's Decision to Disclose Dr. Potts's and Dr. Toma's
     Reports During Competency Proceedings Prejudiced Speer, and
     the State Court Was Unreasonable in Finding No *Strickland* Error. 165

# TABLE OF CONTENTS

**PAGE**

CLAIM 18
        DEFENSE COUNSEL WERE INEFFECTIVE FOR FAILING TO
        OBJECT TO THE STATE'S CAUSAL NEXUS ARGUMENT ............... 168

        A.      Facts in Support of the Claim ............................................ 168

        B.      The State Court's Denial of this Claim Was Unreasonable
                Because the Record Clearly Showed that the State Made a Causal
                Nexus Argument Which Prejudiced Speer, and Trial Counsel
                Were Ineffective for Not Objecting to the Argument ...................... 171

CLAIM 19
        SPEER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL
        DURING THE PENALTY PHASE OF HIS CAPITAL MURDER
        TRIAL IN VIOLATION OF THE SIXTH AND FOURTEENTH
        AMENDMENTS TO THE UNITED STATES CONSTITUTION
        BECAUSE COUNSEL FAILED TO IMPEACH THE STATE'S KEY
        WITNESS IN THE PENALTY PHASE WITH READILY
        AVAILABLE INFORMATION, FAILED TO UTILIZE A
        PSYCHOLOGICAL EXPERT'S ASSISTANCE IN THE CROSS-
        EXAMINATION OF THE STATE'S MENTAL HEALTH EXPERT,
        AND FAILED TO PRESENT A PSYCHOLOGIST TO REBUT THE
        STATE EXPERT'S MISLEADING PENALTY PHASE TESTIMONY . 173

        A.      Introduction ............................................................... 173

        B.      Trial Counsel Unreasonably Failed to Present Readily Available
                Evidence that Would Have Exposed the Unreliability of Dr.
                Bayless's Test Results and Opinions ................................. 176

                1.      Shipley Institute of Living Scale (SILS) ................. 177

                2.      The Williamson Sentence Completion Test ............ 179

                3.      The MMPI-2 ....................................................... 181

        C.      The State Court's Denial of this Claim Was Contrary to Clearly
                Established Federal Law ................................................. 185

        D.      The State Court's Denial of this Claim Was Based on an
                Unreasonable Determination of the Facts in Light of the Evidence
                Presented .................................................................. 188

CLAIM 20
        SPEER WAS DENIED HIS RIGHT TO A FAIR SENTENCING AND
        DUE PROCESS OF LAW WHEN THE ARIZONA SUPREME
        COURT AFFIRMED HIS DEATH SENTENCE UNDER
        INDEPENDENT REVIEW ...................................................... 190

        A.      Procedural History ....................................................... 191

# TABLE OF CONTENTS

**PAGE**

B.     The Arizona Supreme Court's Independent Review of the Sentencing Verdict Engaged in the Exact Causal Nexus Analysis Found to Be Unconstitutional in *Tennard* and *McKinney* and Therefore Was an Unreasonable Application of Clearly Established Federal Law ....................................................................193

C.     The Arizona Supreme Court's Independent Review Resulted in a Decision that Was Based on an Unreasonable Interpretation of the Facts; Contrary to the State Court's Findings, Speer Established that His Mitigation Evidence Was More than Sufficient to Require a Life Sentence ..................................................................198

D.     Speer Is Entitled to a Life Sentence .................................................201

CLAIM 21
WHEN EVALUATING SENTENCING ERRORS AT TRIAL, THE ARIZONA SUPREME COURT APPLIED A CAUSAL NEXUS TEST WHICH WAS CONTRARY TO AND AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW AS SET FORTH IN EDDINGS AND TENNARD ..................................................203

A.     Introduction and Applicable Law .................................................203

B.     The Prosecutor's Closing Argument Improperly Limited the Jury's Consideration of Mitigating Factors by Urging the Jury to Disregard Evidence Lacking a Causal Nexus to the Crime...............203

1.     Procedural History .................................................................203

2.     What the Jury Heard .............................................................203

3.     The Prosecutor's Misstatement of the Law Violated Speer's Constitutional Rights and Had a Substantial and Injurious Effect on the Penalty Phase Verdict .......................................204

C.     A.R.S. § 13-751(G) Unconstitutionally Limits Mitigation by Requiring a Causal Nexus .............................................................207

D.     The Lack of Special Verdict Forms for Mitigation Findings Is Unconstitutional Because It Impedes the Full Consideration of Mitigation Evidence .....................................................................209

E.     Speer Was Denied Due Process in the Penalty Phase when the Trial Court Improperly Restricted Mitigation and Refused to Instruct the Jury on Residual Doubt .................................................210

CLAIM 22
SPEER'S RIGHTS TO A FAIR TRIAL AND DUE PROCESS UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS WERE DENIED DURING THE PENALTY PHASE WHEN A JUROR OBSERVED HIM IN HANDCUFFS ..................................................211

A.     Legal Basis for the Claim .............................................................211

B.     Facts in Support of the Claim .......................................................213

# TABLE OF CONTENTS

**PAGE**

C.   The Trial Court Abused its Discretion by Not Ordering a Mistrial, and the Arizona Supreme Court's Finding to the Contrary Was Unreasonable Under § 2254(d) ............................................................ 214

**CLAIM 23**
THE TRIAL JUDGE IMPROPERLY COERCED THE JURY AFTER IT REPORTED BEING DEADLOCKED AT PENALTY ........................ 216

A.   Introduction ............................................................ 216

B.   Procedural History ............................................................ 216

C.   Legal Bases for the Claim ............................................................ 217

D.   Facts Supporting the Claim ............................................................ 219

E.   The Trial Judge's Responses to the Jurors' Announced Deadlock Were Coercive ............................................................ 222

F.   All Prior Counsel Were Ineffective for Failing to Challenge the Above Acts and Omissions by Trial Counsel and the State ............. 225

**CLAIM 24**
THE TRIAL COURT'S FAILURE TO INSTRUCT THE JURY THAT IT HAD TO FIND THAT THE AGGRAVATING CIRCUMSTANCE OUTWEIGHED MITIGATING CIRCUMSTANCES BEYOND A REASONABLE DOUBT VIOLATED SPEER'S SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS ........................ 226

A.   Under Clearly Established Supreme Court Precedent at the Time of Speer's Appeal, He Was Entitled to Relief Based on the Instructional Error Regarding the Burden of Proof at the Penalty Phase 226

B.   If *Hurst v. Florida* Instead Announced a New Rule of Constitutional Law, It Is Retroactive to Cases on Collateral Review ............................................................ 230

C.   *Ring* and *Hurst* Errors Are Structural when They Deprive a Defendant of His Right to a Beyond-a-Reasonable-Doubt Jury Finding ............................................................ 232

**CLAIM 25**
JURORS CONSIDERED INADMISSIBLE AND PREJUDICIAL EXTRINSIC EVIDENCE DURING THE PENALTY PHASE IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS ............................................................ 234

A.   Legal Bases for the Claim ............................................................ 234

B.   Juror Exposure to Extrinsic Evidence Creates a Presumption of Prejudice ............................................................ 235

C.   Facts in Support of the Claim ............................................................ 236

# TABLE OF CONTENTS

**PAGE**

    1.    At Least Two Jurors Committed Misconduct by Considering Extrinsic Evidence Concerning the Criminal Justice System and the Death Penalty ................................... 236

    2.    The Jury Contemplated Impermissible and Prejudicial Extrinsic Evidence by Considering the Consequences of Deadlock ................................................................. 243

D.    All Prior Counsel Were Ineffective for Failing to Challenge the Above Acts and Omissions by Trial Counsel and the State ............ 244

CLAIM 26

SPEER WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL ON DIRECT APPEAL IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION .................................................................. 245

A.    Legal Basis for the Claims ................................................ 246

B.    Appellate Counsel Was Ineffective for Failing to Raise Meritorious Claims Under Federal Law ........................................... 247

    1.    Failure to Raise a Claim Challenging the Faulty Accomplice Instruction and Trial Counsel's Failure to Object and Correct the Erroneous Instruction ....................... 247

    2.    Failure to Raise a Claim that Trial Counsel Were Ineffective for Failing to Move to Vacate Speer's Conviction and Sentence on the Basis of Conflicting Theories of Prosecution ......................................... 247

    3.    Failure to Raise a Claim that the Trial Court Erred in Violating Speer's Rights Under the Confrontation Clause .... 248

    4.    Failure to Raise a Claim of Prosecutorial Misconduct .......... 249

    5.    Failure to Present an Independent Review Argument ............ 250

    6.    Failure to Raise Claim of Juror Misconduct for Considering Extrinsic Evidence ...................................................... 251

    7.    Failure to Raise a Claim of Jury Coercion ............................ 252

CLAIM 27

SPEER'S POST-CONVICTION COUNSEL WERE CONSTITUTIONALLY INEFFECTIVE BY FAILING TO RAISE MERITORIOUS CLAIMS OF INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL .................................................................. 253

A.    Speer's Post-Conviction Counsel Were Ineffective ................. 253

B.    The Ineffective Assistance of Post-Conviction Counsel Is Cause to Overcome the Procedural Default of the Claims Raised in this Petition; this Court May Thus Consider the Merits of Any Defaulted Claims .......................................................... 256

# TABLE OF CONTENTS

**PAGE**

CLAIM 28
     SPEER'S CONVICTION AND SENTENCE MUST BE VACATED
     DUE TO THE CUMULATIVE PREJUDICIAL EFFECT OF THE
     ERRORS IN THIS CASE ..................................................................... 259

CLAIM 29
     SYSTEMIC CLAIMS ......................................................................... 262

    A.    Arizona's Death Penalty Scheme Does Not Sufficiently Channel
        the Jury's Sentencing Discretion ...................................................... 262

    B.    The Death Penalty Is Irrational and Arbitrarily Imposed; It Serves
        No Purpose that Is Not Adequately Addressed by Life in Prison .... 265

    C.    The Fact-Finder in Capital Cases Must Be Able to Consider All
        Relevant Mitigating Evidence ........................................................... 266

    D.    The "Especially Heinous, Cruel or Depraved" Aggravating Factor
        Is Unconstitutionally Vague and Overbroad ..................................... 267

        1.    The Cruelty Aggravator Is Vague Because It Fails to
              Channel Jurors' Sentencing Discretion ................................... 268

        2.    The Cruelty Aggravator Is Overbroad Because It Does Not
              Narrow the Class of Death-Eligible Offenders ....................... 270

    E.    The Court's Instruction that the Jury "Must Not Be Influenced by
        Mere Sympathy" Limited the Mitigation the Jury Could Consider . 271

    F.    The Death Penalty Is Cruel and Unusual Under Any
        Circumstances and Violates the Eighth and Fourteenth
        Amendments ...................................................................................... 273

    G.    The Prosecutor's Unfettered Discretion to Seek the Death Penalty
        Violates the Constitution ................................................................... 276

    H.    The Death Penalty Discriminates Against Poor, Young, and Male
        Defendants ......................................................................................... 276

    I.    The Absence of Proportionality Review Violates Defendants'
        Constitutional Rights ........................................................................ 278

    J.    Arizona's Capital Sentencing Scheme Is Unconstitutional Because
        It Does Not Require that the State Prove that the Death Penalty Is
        Appropriate ........................................................................................ 279

    K.    Arizona's Death Penalty Scheme Unconstitutionally Requires
        Imposition of the Death Penalty Whenever at Least One
        Aggravating Circumstance and No Mitigating Circumstances
        Exist  281

    L.    Arizona's Capital Sentencing Scheme Violates the Constitution
        Because It Does Not Set Forth Objective Standards to Guide the
        Sentencer in Weighing the Aggravating Circumstances Against
        the Mitigating Circumstances ........................................................... 283

# <u>TABLE OF CONTENTS</u>

**PAGE**

M. Speer Will Be Denied a Fair Clemency Process in Violation of the Eighth and Fourteenth Amendments ................................................. 283

N. It Would Violate Speer's Right to Be Free from Cruel and Unusual Punishment for the State of Arizona to Execute Him After He Has Spent Over Ten Years on Its Death Row ................... 284

O. Execution by Lethal Injection Is Cruel and Unusual Punishment in Violation of the Eighth and Fourteenth Amendments ..................... 287

    1. Arizona Has a Troublesome History of Carrying Out Lethal-Injection Executions ................................................. 288

    2. Illegal Importation ................................................. 289

    3. Protocol Violations ................................................. 290

    4. Human Experimentation ................................................. 292

    5. Lethal Injection as Carried Out by Arizona Is Cruel and Unusual ................................................. 293

IX. VERIFICATION ................................................. 295

X. PRAYER FOR RELIEF ................................................. 296

# I.  INTRODUCTION

Pursuant to 28 U.S.C. § 2254, Paul Bradley Speer respectfully petitions this Court for a writ of habeas corpus freeing him from the custody of Respondents, pursuant to the judgments and sentences of an Arizona state court, on the grounds that those judgments and sentences were obtained and affirmed in violation of his rights under the United States Constitution.  Speer is in the custody of the Arizona Department of Corrections on a death sentence following his conviction in 2007 for first-degree murder.

# II.  FACTUAL AND PROCEDURAL BACKGROUND[1]

## A.    Family and Personal History[2]

Paul Speer was born on November 13, 1978 to Paul Michael Speer, Sr. and Sabrina Womble (née Cates) in Phoenix, Arizona.  From the moment he was born, addicted to heroin and wailing from the pain of withdrawal, Speer's life was severely plagued by a multi-generational history of poverty, substance abuse, mental illness, parental neglect and abandonment, and physical, sexual, and emotional abuse.  This history is crucial to an understanding of Speer and the claims set forth in this Petition.

### 1.    The Cates Family

Paul Speer's mother, Sabrina, came from a family with a long history of addiction, mental illness, and violence.  Sabrina was born in 1958 to Sylvia and George Cates in

---

[1] The facts described herein, and in the rest of this Petition, are based on undersigned counsel's review of the state court record, trial and post-conviction counsel's files, and information uncovered to date by the Office of the Federal Public Defender of the Central District of California ("FPD").

Where facts are found in the state court record, Speer cites to that record evidence. However, when necessary, Speer relies upon facts that are outside the state-court record in this section and throughout the Petition.  In accordance with this Court's Case Management Order (dkt. no. 12), he will seek to expand the record to include documentation in support of these facts when he files his Notice and Request for Evidentiary Development.

To the extent that extra-record facts could have been but were not investigated and presented in Speer's state petition for post-conviction review, that omission is due to the ineffective assistance of post-conviction counsel.  (*See infra* Claim 27.)

[2] In this section discussing Petitioner's personal and family background, where last names are shared, first names will often be used for the sake of clarity and economy.  No lack of respect is intended.

1

Phoenix.  George Cates was a drug addict who abused heroin, pills, and alcohol. George's father, Arthur, was an alcoholic, as was George's brother, Gene.  George was often violent when he was impaired, especially toward his wife Sylvia.  Family members recall that George would fly into violent rages, and would padlock Sylvia in the house when he went to work.  At some point during their broken marriage, both Sylvia and George began sleeping with other people, and Sylvia became pregnant.  Sabrina recalls that when George found out that Sylvia was pregnant, he attacked her with a butcher knife, and Sylvia fled.  George then asked Sabrina whether he should go after her mother, beat her up, and make her return home.  Eleven-year-old Sabrina told her father to leave her mother alone.  Sylvia abandoned the family shortly thereafter, leaving Sabrina and her younger brother Steve at the mercy of their unstable father.

After Sylvia left, everything went downhill in the Cates home.  George's heroin addiction spiraled out of control, and he overdosed many times when Sabrina was a young girl.  Sabrina soon learned how to help her father when he overdosed by pulling the syringes out of George's arm and applying pressure before calling the paramedics.  In addition to heroin, George abused synthetic morphine pills, pain medication, and alcohol. When heroin was unavailable or the local supply was not very good, George would crush Dilaudid, mix it with water, and shoot it like heroin.  (RT 2/27/07 at 17.)[3]  His addictions

---

[3] Citations:  Trial proceedings for the Maricopa County Superior Court are docketed under CR2002-010926.  Reporter's transcripts are designated "RT" followed by the relevant date and page number.  "ROA" followed by the docket number designates the indexed documents from the record on appeal of Speer's trial.  "Womble ROA" and "Womble RT" are used for citations to Brian Womble's trial transcripts and record. Exhibits from the trial and sentencing proceedings are designated "Trial Ex." followed by the exhibit number.  Since there was no separate docket for the post-conviction documents, they are referred to by the appropriate pleading name and the date filed, and include the designation "PCR" where appropriate.  There was no post-conviction evidentiary hearing in this case.  Docket number CR-07-0103-AP identifies Speer's direct appeal to the Arizona Supreme Court.  Documents from this docket will be referred to as "DA dkt."  The Arizona Supreme Court docket for Speer's petition for review from the Maricopa County Superior Court's denial of his petition for post-conviction relief is docket number CR-15-0273-PC; documents from these proceedings will be referred to as "PR dkt."

were so consuming that he traded his house for heroin, moved the family to his mother Thelma's home, and hid his drug stash in the children's swing set in the backyard.

Without a mother to keep house or protect her from her father's rages, Sabrina ran away from home.  While hitchhiking, she was picked up by a diesel driver who raped her.  Sabrina managed to escape her assailant at a truck stop, flagged down passing drivers for help, and returned home.  As Sabrina would explain nearly fifty years later, that kind of sexual violation never leaves a person; the assault haunts her to this day.  Unfortunately, Sabrina would be sexually assaulted again in her life, as a teenager and as an adult.  Her sons would witness their mother being raped in their own home.  (RT 2/5/07 at 41-43.)

When she returned home after running away, Sabrina reluctantly took on the role of housewife to her addicted and increasingly violent father.  She prepared the family meals, and would suffer verbal and physical abuse from her father if they were not prepared to his liking.  According to Sabrina, George considered females as "less than males," and demanded that they be subservient to men.  This meant that Sabrina's brother Steve was treated with much more affection and tolerance than Sabrina.  While Sabrina was routinely beaten by George, Steve was rarely physically abused by his father.

Due in large part to the incredible dysfunction that existed in her family life, Sabrina grew into an impulsive, emotionally immature, and violent young woman.  Not surprisingly, Sabrina began using drugs at the age of fifteen in an effort to escape some of the pain and anxiety she experienced at home.  She first experimented with speed, cocaine, and barbiturates, but soon progressed to heroin, Sherm, hallucinogens, opioids, and crack.  Sabrina became addicted to heroin as a teenager, and has used heroin and/or methadone routinely since then.  (RT 1/4/07 at 93.)

In another effort to escape her abusive family, Sabrina married Michael Smith when she was only fifteen.  However, that relationship had its own share of violence and dysfunction, including an incident in which Sabrina stabbed Smith with a knife.  (RT 2/22/07 at 6.)  The marriage was very short-lived, and shortly thereafter, Sabrina began dating Paul Speer's father, Paul Michael (Mike) Speer, Sr.

3

1

2.      **Sabrina's Marriage to Mike Speer**

2       Mike Speer and Sabrina knew each other from elementary school.  When they got

3   together as young adults (Sabrina was only eighteen years old), they had a whirlwind

4   romance, a tumultuous marriage, and a stormy divorce.  They married on New Year's

5   Day 1978, and Paul Speer is their only child.  Sabrina's heroin use was in full swing by

6   the time she became pregnant with Paul, and she used significant amounts of heroin and

7   methadone during her pregnancy.  (PCR 9/26/14 Ex. 17 at ¶ 3.)  As a result, Paul was

8   born addicted to heroin, and had to stay in the hospital for several days after he was born

9   in order receive detox treatment.  (*Id.*)

10      According to Sabrina, there was a "trauma" with Paul's birth due to a mistake

11  made by the doctors during delivery, and Sabrina lost a large amount of blood.  (*Id.* at

12  ¶¶ 4, 6, 11.)  In addition to being born addicted to heroin, Paul was jaundiced, sustained

13  an eye injury during birth, and had to be kept in an incubator after he was born.  (*Id.* at

14  ¶ 6.)  His Aunt Debra, Mike's sister, recalls seeing Paul in the pediatric intensive care

15  unit, on a ventilator, wailing and twitching uncontrollably as he suffered the excruciating

16  pain of heroin withdrawal.  (PCR 9/26/14 Ex. 18.)  Debra brought Paul home with her

17  when he was able to be released from the hospital because Sabrina's heroin withdrawals

18  were so debilitating that she was unable or unwilling to take care of the baby.  That

19  turned out to be a pattern that Sabrina would repeat for each of her next three children:

20  The infants would be born addicted to either heroin or methadone and taken away from

21  Sabrina, and then she would have to prove she could take care of them before they could

22  go home with their parents.  In Debra's mind, Sabrina "should never have been allowed

23  to take the kids home.  Each kid was born very ill.  Each one of them. . . .  Why the state

24  of Arizona ever let her take the children home, I don't know."  Debra thought it would

25  have been better if Child Protective Services (CPS) "had stepped in and taken the kids,"

26  but for some reason they never did.

27      Like Sabrina, Mike was a heroin addict at the time of Paul's birth, and both he and

28  Sabrina prioritized heroin over their marriage or their child.  Their neglect of Paul began

virtually from the moment he was born.  For example, while Sabrina was in the hospital

preparing to deliver Paul, Mike disappeared after calling his drug connection, and Sabrina

4

did not see him again for a couple of days.  (*Id.* at ¶ 10.)  When he finally returned, he admitted that he had left her as she gave birth to their son so he could go do drugs.  (*Id.*)

When Debra was sixteen, she went to live with Mike and Sabrina for a summer to help take care of Paul, who was six months old.  Debra recalls one morning when Sabrina woke her up and told Debra that she needed to run an errand for Sabrina, and that she should take Paul with her.  Sabrina gave her money and an address, and told Debra to pull up in front of the house and "the man will know what to do."  Debra took Paul and drove to the address, which turned out to be in a gang-infested area of South Phoenix.  "That's when I realized that Sabrina had sent me to buy her heroin with Paul."  Debra got the heroin and rushed back to the house.  In her haste to park, she accidentally hit a pole with Sabrina's car.  "Sabrina saw it and, with Paul in my arms, once I'd given her the heroin, she knocked me right on my ass."  Debra took Paul with her into her bedroom, crawled out the window, walked to a Circle K, and called her father to come get her and Paul.

Debra was frequently frightened of Sabrina, who "was often mad" and would take out her anger through physical violence toward Debra, Mike, and eventually, Paul.  Mike and Sabrina's marriage was fraught and filled with dysfunction.  Sabrina was violent toward Mike, and frequently went into emotional rages.  Sabrina put her fist through a glass window during one altercation; another time, Mike came home and found a machete in their bed with a note from Sabrina saying that she was leaving him and she hoped he died.  Mike described Sabrina's behavior as unpredictable:  she "got set off pretty quick, and she would just swing at you."

Mike and Sabrina owned a furniture store during their marriage, and for a while the business was successful, and the couple made a good living.  However, with the extra money, they were able to buy more drugs, and Sabrina believes that time period is when her addiction really took hold.  Soon Sabrina and her father began stealing money from the store to buy heroin.  According to Mike, Sabrina took anything she could get her hands on in order to sell it and support her addiction.  Similarly, according to Sabrina,

Mike became an alcoholic, and Sabrina left him because she could not bear to live with an alcoholic.  After just two years, Mike and Sabrina divorced.

### 3.    Sabrina's Marriage to William (Bill) Womble

After leaving Mike Speer, Sabrina and Paul moved into the home shared by George Cates and his mother, Thelma.  (RT 2/22/07 at 8-9.)  In the absence of his father, Paul grew very attached to George.  (*Id.* at 16-17.)  Although George still routinely abused heroin and pain medications, and was abusive to his daughter and other family members, he appeared to treat Paul relatively well.  In return, Paul "thought George was the greatest thing in the world."  (RT 2/22/07 at 17.)  George gave Paul the attention and affection he so desperately craved.

Sabrina's brother, Steven, also lived with George and Thelma at that time.  Like Sabrina, Steven became addicted to drugs at a young age.  His primary drug of choice was methamphetamine, although he also abused heroin, Valium, and pain medications.  And like his father, Steven would often become extremely violent when he was high.  For years, George recognized that his son was dangerous—and shortly before George died, he begged his sister Doris to get Steven out of Thelma's home because he feared Steven's rages and knew that Steven could not be trusted.  Unfortunately, her father's caution did little to protect Sabrina from her brother's abuse.  On one occasion while Sabrina and Paul were staying with George, Steven became enraged when Paul woke him up from a nap.  He retaliated by splitting Sabrina's head open with a Billy club, causing memory and language loss for a time.

It was shortly after this incident, in 1981, that Bill Womble saw Sabrina standing outside her home "with her head bandaged up."  (RT 2/22/07 at 10.)  Bill asked her out, and they married later that year.  (*Id.*)  Paul was about three years old at the time.  (*Id.*)  If Sabrina hoped to escape a life of being married to an addict by leaving Mike Speer, those hopes were dashed when she reconnected with Bill Womble.  Bill grew up in the same poverty-stricken, drug-infused, violent neighborhood where Sabrina spent her formative years.  (*Id.* at 4.)  Like Sabrina, Bill came from a family plagued by addiction, violence, and mental illness.  Bill's father, John Sr., suffered from serious depression following a roofing accident in 1965 that left him paralyzed from the neck down.  John Sr. asked his

6

children to end his life on multiple occasions.  When John Sr. developed pneumonia in 1970, he committed suicide by pulling out his life-sustaining IV.  By the time family members realized what John Sr. had done, it was too late to save him.  Bill Womble was eighteen years old when his father committed suicide.  After John Sr.'s death, Bill's older brother, Rob, began drinking heavily, became extremely paranoid, and eventually had a complete mental breakdown.  Bill's brother John, Jr. also struggled with alcoholism.

Bill Womble was (and is) a heroin, morphine, and methadone addict.  (RT 2/22/07 at 11.)  From the moment they got together, he and Sabrina used drugs together daily.  Despite his addiction, Bill was a hard worker and was usually employed as a laborer and roofer, often for his brother John's roofing company.  However, Bill spent most of his money on drugs for himself and Sabrina, and frequently had to borrow money from his family in order to pay the rent.  In contrast to Bill's work ethic, Sabrina would spend her days at home, usually in bed, consuming heroin or Valium and sleeping much of the day.  Paul felt the loss and neglect of his mother keenly, and began acting out at a very young age in order to try and get her to pay attention to him and give him some affection.  Bill remembers coming home one day to find water running out of the front door of the house.  (RT 2/22/2007 at 15.)  Four-year-old Paul had attempted, unsuccessfully, to wake his mother from her Valium-induced sleep.  He was frightened and upset when she would not wake up, and thought if he stopped up the sink and ran water until it flooded the house, it might bring her out of her stupor.  (*Id.*)

Meanwhile, Mike Speer still struggled with his own addiction.  He started using methadone during his divorce from Sabrina in an effort to get off heroin, and continued using methadone for several years.  At first, Mike Speer paid Sabrina child support, and he would occasionally take Paul with him on weekend visits.  However, after a while Mike stopped paying child support because Sabrina used all the money to buy drugs rather than clothes or food for Paul.  According to Mike's sister Debra, Mike told Sabrina that if Paul needed anything, he would buy it for Paul directly.  Yet even that arrangement was not always sufficient to protect Paul's needs from Sabrina's addiction.  When Mike and his family would buy clothing for Paul (and, later, Paul and his siblings), they would leave the tags on the clothes and include the receipts in case the clothes did

not fit.  But rather than give the clothes to the children, Sabrina would return the clothes for cash and then use the cash to buy drugs.

Although Mike would profess that he wanted to spend time with his son, he would routinely neglect Paul, or say that he was going to take Paul for a visit and then never show up.  Bill Womble recalled one occasion when Mike promised to take Paul out of town for the weekend.  (RT 2/22/07 at 20.)  He and Sabrina got Paul "dressed up to go, really cute," and packed him a little suitcase for his trip.  (RT 2/22/07 at 20.)  However, when the time came, Mike "didn't show up, and he wouldn't answer the phone. . . . we just did the best we could to play if off."  (*Id.*)  Bill tried to distract Paul by taking him to Encanto Park that weekend instead, but Paul "would constantly be wanting to call and see if Mike is back, see if daddy Mike is there."  (*Id.* at 20.)  Finally, on Sunday evening, Paul managed to get Mike on the phone, and Mike agreed that Paul could come over and see him.  Yet when Bill arrived at Mike's house with four-year-old Paul, Mike had disappeared yet again, and refused to return to his house until Bill and Paul had left.  (*Id.* at 20-21.)  According to Bill, this was typical behavior for Mike at that time; as Bill told Sabrina, "Just leave it.  It causes problems.  If [Mike] wants to see [Paul], he knows where he is."  (*Id.* at 21.)  Unfortunately, Mike never did try and re-establish a connection with Paul.  Paul felt his father's abandonment deeply.

About a year after marrying, Bill and Sabrina had their son, Chris Womble.  Like Paul, Chris was born addicted to opiates and had to stay in the hospital after his birth to recover.  Their second son together, Brian, was also born addicted to drugs; Sabrina did not realize she was pregnant until she was five months into the pregnancy.  Brian had to stay in the hospital for about two weeks after he was born to be treated for his addiction.  Their daughter Delilah was born five years later, in 1988.  Like Brian, Delilah's birth was unplanned and undesired.  Thus, by the time Paul was ten years old, he was being raised in a neighborhood rife with drugs, gangs, and violence by two drug-addicted, impoverished parents who, in the words of other family members, "had no idea how to raise a child."

**B.    Familial Discord and Childhood Protective Services**

As a young child, Paul was described by family members as extremely active (and sometimes over-reactive), but also as a smart, bright, funny, highly verbal child.  This changed as Paul grew older and was exposed to daily trauma in the form of addiction, domestic violence, mental instability, neglect, and abuse.

Sabrina and Bill continued to prioritize their addictions over the health, safety, and welfare of their children.  The children would often come home to a locked house, as Sabrina slept off her heroin or methadone high inside.  The Womble home was "a disaster area."  Dirty laundry, trash, and dirty dishes were piled up throughout the house, and the lawn was covered in trash and debris.  (RT 2/7/07 at 26-27.)  The bathtub and toilets were filled with dirt and mildew, and the tiles on the walls would be falling off from rot.  (*Id.*)  Neighboring parents refused to come over or let their children play inside the Womble home because it was so filthy.  Paul and his siblings often lacked even the most basic necessities, such as food and clothing.  (RT 2/27/07 at 124-29.)  Sabrina rarely helped the children get dressed or fed before they were sent off to school, and Paul would often arrive to class hungry and upset.  Much of the time, the children "weren't clean, their clothes didn't fit, they didn't have shoes on."  On more than one occasion, when Sabrina and Bill would be given shoes or other items for the kids to wear to school, Sabrina would bring the items back for a refund and then spend the money on drugs.  Paul started taking clothes from other people's clothing lines so he and his brothers would have decent clothes to wear.  Chris soon followed suit, taking clothes from local stores instead.  The children were frequently dirty, unkempt, overtired, and agitated.  According to Debra Corral, "If there was no food in the refrigerator, they stole to eat.  They needed to eat, and it was survival of the fittest in that house."

Domestic violence was rampant in the Womble household, and Paul learned to act out in violent and aggressive ways because that is what was modeled for him at home on a daily basis.  Sabrina and Bill fought often, with physical and emotional abuse exhibited on both sides.  With the children, Sabrina insisted that Bill be the "disciplinarian," and would demand that Bill hit them with a belt in response to some transgression.  Sabrina

was violent with the children as well, and would use her fists, a belt, a broom, "whatever was around." (RT 2/5/07 at 44-45.) However, Sabrina's beatings "would be more severe on Paul than it would on [Chris] or Brian." (*Id.* at 46.) Sabrina hit Paul "harder" and "more frequently." (*Id.* at 47.) The same was true for Bill, who would use his fists or a belt to beat Paul more intensely and frequently, even though many times his brothers were guilty of the same wrongdoings. (*Id.* at 48-50.) After years of observing and learning criminal and aggressive behaviors from the adults around him, Paul (and later Chris) began getting in trouble at home and at school. Between 1985 and 2002, police and/or Child Protective Services came to the Womble home at least eighteen times due to complaints of extreme violence and neglect.[4] On twelve of those occasions, Sabrina and/or Bill were accused of abusing, neglecting, or otherwise harming the children. At different times, Paul, Chris, and Brian informed the authorities that the situation in their home was, to put it mildly, problematic:

- November 23, 1988: Paul and other witnesses raise allegations against Bill and Sabrina for potential abuse or neglect.

- November 29, 1988: Allegations against Paul and Sabrina for physical abuse; at school, a teacher notices that one of the boys has red welt marks on his stomach; source who reported the abuse says the family is "very rough."

- October 4, 1989: "Paul slapped in his face for wiping his hands on stepfather's sheet. . . . Child fearful of stepfather due to history of abuse in home."

- September 7, 8, 14, and 18, 1991: Paul is allegedly hit by a family member with a stick on three separate occasions; the source says the other kids are abused as well.

- April 23, 1992: Paul informs CPS that his mother abuses drugs; Sabrina says that Paul hit her.

---

[4] Because the CPS and juvenile records are so extensive, and in an attempt at brevity, Speer does not repeat their findings in detail here. Speer respectfully directs the Court to the records contained in Trial Exs. 189, 197, and 200. As with other documentation Speer has relied upon in this section of the Petition, Speer will submit this and other relevant extra-record evidence along with his Motion for Evidentiary Development.

- May 1, 1992:  Sabrina threatens the children with a baseball bat and "appears to have lost her mind."  Sabrina believes her dreams are real life and is possibly hallucinating; she abuses Valium.  Sabrina threw Paul out and gave him his birth certificate and told him not to return.

- August 2, 1994:  Court is concerned with Womble's household and doesn't think Bill or Sabrina is providing "the necessities of life" for Chris or the other children.

There were also a number of reports of Paul acting aggressively toward his family members, running away from home, and committing theft.  There is no question that Paul engaged in violent, unpredictable behavior as a young child and young adult.  However, those who worked with him at that time—social workers, juvenile justice officers, and child psychologists—all recognized that Paul Speer's behavior came directly from the traumatic, violent, and deviant environment in which he grew up.  Paul was officially diagnosed with depression and anxiety at only eleven years old, but the clinician working with him at that time, Dr. Roger Martig, determined that Paul "has likely been depressed from the first six to eight months of his life."  (*See* Trial Ex. 192, Rpt. of L. Hoyt-Croft, at 4.)  Dr. Martig believed that Paul's hyperactivity and depression developed at such an early age because he was deprived of necessary connection and contact with infantile caretakers.  (*Id.*)  At eleven years old, Paul was already exhibiting symptoms of depression, low self-esteem, guilt, and anxiety to such a severity that he had thoughts of suicide.  (*Id.*)  Another psychologist who evaluated him at that time, Dr. Stan Cabanski, conducted extensive psychological testing and determined that Paul's high levels of impulsivity and acting-out behavior stemmed from his emotionally unstable background.  (*Id.*)  Dr. Cabanski believed that Paul acted out as a prominent defense against the depression and mood swings that he so often felt.  (*Id.* at 5.)  Dr. Cabanski advised that "restrictive education programming" and "a structured and controlled living environment" were necessary therapies to help Paul become a more stable, self-assured, and healthy young man.  Dr. Cabanski—along with every other social worker or

11

probation officer who came in contact with the family—highly recommended that the parents get involved in treatment and therapy and adjust their parenting style in order to give Paul and his siblings the best chance at normal, healthy development.  (*See id.* at 5, 8.)

As Dr. Cabanski predicted, on the occasions that Paul was placed in a highly structured environment, he tended to do very well.  (*See id.* at 15-17 (includes excerpts of reports from probation officers and psychologists over a three year period describing Paul's positive adjustment and growth when placed in structured treatment programs).)  Unfortunately, without a significant and lasting change in Paul's home environment, averting further emotional and psychological damage to Paul was virtually impossible.  Nearly everyone who evaluated Paul's family dynamic and living situation made a recommendation along this theme.  For example:

- "Family functioning exhibits poor parenting skills.  Paul appears to be the best behaved of all the children in the home.  Paul's younger half brothers frequently aggravate Paul and are sometimes disruptive during probation officer visits.  Neighbors report that Paul's younger brothers are not welcome at their homes because 'they are terrors,' being disrespectful and using profanity."  (Report of Probation Officer Jim Roper, 9/22/90.)
- "It is important to note that the parents have been very uncooperative in cooperating with treatment and have really excluded themselves, so the home situation has not been supportive and, as a matter of fact, has been highly detrimental to Paul's adjustment."  (Report of Dr. Stan Cabanski, 7/31/91.)
- "Paul cannot be fixed in a vacuum. . . .  It is becoming apparent that his delinquent behavior has begun in the home and has not escalated to the same degree outside the home."  (Report of Karen Wahl, JIPS, 8/21/91.)
- "Mr. and Mrs. Womble's parenting style leaves a lot to be desired.  It consists of yelling and screaming at their children. . . .  It should be noted that Mr. Womble does seem to give 'favored' treatment to his own children in the

12

home. . . .  Paul has been identified within the family as the problem child."
(Report of Karen Wahl, JIPS, 8/21/91.)

- Paul's family "have [sic] not been active in dealing with significant family issues."  (Report of Probation Officer Scharlene DeHorney, 2/26/92.)

(*See* Trial Ex. 197, Rpt. of L.Hoyt-Croft, at 7-8.)

Even Paul's family members—including Bill Womble's relatives—recognized that Paul's behavior was directly due to Bill and Sabrina's neglect, abuse, criminal behavior, and lack of parenting skills.  Bill's brother, John Jr., recalls that Paul and his siblings were never "raised right," and as a result learned how to be criminals from the behaviors they saw around them.  On one occasion when Paul was in elementary school, John Jr. and his then-wife took Paul to stay with them for a week.  Sabrina gave them a bottle of pills and instructed John Jr. to make sure Paul took them, because otherwise "he went crazy and you couldn't control him."  However, Paul never acted out when he was with them, so they did not administer the pills.  "And he was just fine, just a normal kid."  John Jr. believes that Bill and Sabrina ruined their children.  Sabrina's aunt Doris Donithan puts it even more bluntly:  "Sabrina's kids didn't have a chance."  Paul was a strong personality, but not a bad child; he just needed structure and wanted attention and love.  Unfortunately, the dysfunction and abuse in the Womble household was too entrenched, and Paul's parents were too resistant to change.  By his late teens, Paul was a depressed, anxious, volatile, and seriously traumatized individual who retreated into a life of drug use, domestic violence, and crime—the same life he had always known as a child.

## C.   Exposure to Drugs and Toxins and a Multigenerational History of Addiction

As noted above, Paul comes from a family where drug and alcohol addiction are pervasive.  His maternal great-grandfather Arthur was an alcoholic; his maternal grandfather George was addicted to heroin and painkillers and routinely abused alcohol and other drugs; his mother and maternal uncle are addicted to opiates and prescription drugs; and his father was a long-time heroin and methadone addict and alcohol abuser

13

(who has since managed to break his addiction to opiates).  In addition to Paul's biological history of addiction, he was exposed to drug use and drug culture from his earliest moments, and learned at a very young age that drug use was "normal."  He also learned as a very young child how to negotiate the fraught and sometimes dangerous world of addicts.  Before he was out of elementary school, Paul knew that heroin and methadone made his mother happy, and prescription drugs made her mean.  (RT 2/7/07 at 32.)  With a mother as violent and unpredictable as Sabrina, it was better, in Paul's mind, that she be "happy."  Similarly, Paul was taught that his Uncle Steve would act happier, and treat Paul more kindly, if Paul helped Steve get his meth and other drugs.  And his grandfather George was nicer and happier as long as he was on methadone.

It is little wonder, then, that Paul gravitated toward drug abuse and addiction:

> People like Paul who are genetically predisposed to use drugs have a lower baseline endorphin level than those who are not genetically predisposed.  Even as children, people with this condition are more concerned and reactive to their environment.  Their experience of emotions is intense and their first drinking or drug using experience solidifies what is ultimately their 'relationship' with drugs and/or alcohol.  For these people, the feeling they have when they drink or drug is the closest thing to normal they have ever felt.  For them, it is the solution to feeling 'negative emotions' on a continual basis.

(Trial Ex. 197 (5/21/04 L. Hoyt-Croft Rpt. at 19.)  Paul's path toward serious addiction was set for him by both nature and nurture, and also in an attempt at self-preservation and survival.  "After watching his family's positive emotional reactions to opiates and marijuana, he decided that he also wanted to feel happy."  (RT 2/7/07 at 32.)  Paul was so starved for connection and affection, and struggled so much with intense feelings of rejection and low self-esteem, that the minimal comfort he got from using drugs felt, at times, like happiness.  This understandable coping mechanism, coupled with Paul's genetic predisposition toward addiction, had profound effects on Paul's developing brain.

In addition to prenatal opioid addiction, Speer's brain was affected by environmental toxins and recreational drugs from a very young age.  At approximately age four (and perhaps younger), Speer was put on Ritalin by his mother, Sabrina, because

14

he was "hyperactive." (RT 2/22/07 at 76-77.) Debra Corral recalls that Sabrina wanted Paul to be on Ritalin so "he would sit and sleep." Even though the drug made Paul, according to Debra, "[sit] there like a zombie," Sabrina felt it was not working sufficiently and had Paul be placed on "the highest dose they had, and Paul was just standing, like mesmerized in a corner, high as a kite." (*Id.* at 76.) That "freaked out" Bill and Sabrina, so they discontinued the medication without consulting a physician. (*Id.*) Sabrina then refused to pay the $10 co-pay for a different medication designed to help with Paul's hyperactive behaviors. (RT 2/7/07 at 52.) However, by the time Paul was in 5th grade, he was back on Ritalin again for treatment of ADHD. (RT 2/7/07 at 40-44.)

There is a strong possibility that Paul and his siblings were exposed to environmental toxins as young children, specifically trichloroethylene (TCE). TCE is a common industrial solvent and contaminant of hazardous waste sites, groundwater, and drinking water. (*See* Agency for Toxic Substances and Disease Registry, *Case Studies in Environmental Medicine (CSEM)* - Trichloroethylene Toxicity (Nov. 8, 2007).)[5] It is also a known neurotoxin, with numerous studies showing both short-term and long-term neurological effects from chronic exposure to TCE, including behavioral changes, memory loss, and impaired cognitive function. (*See id.* at 31, 35.) In 1982, the Phoenix government permanently closed two water wells in Maryvale because they contained high levels of TCE. *See* Phoenix New Times, *The Pain of Maryvale* (Oct. 24, 1996).[6] As Bill recalls, Paul was approximately six years old when Bill learned about possible water contamination from a chemical plant that leaked chemicals into the local water supply. At the time, the Womble family, including Paul, lived about one mile from the area where the leaks had occurred. Bill was concerned about Paul and Chris being exposed to chemicals, so he bought bottled water for the children to drink. According to Bill, it was not long before he started noticing a change in their behavior, particularly Paul's. Paul's

---

[5] Available online at https://www.atsdr.cdc.gov/csem/tce/docs/tce.pdf.

[6] Available online at http://www.phoenixnewtimes.com/news/the-pain-of-maryvale-6432988.

1    "behavior improved"—he was not as hyperactive or volatile, and seemed happier and

2    able to pay attention more easily.  Bill does not recall how long the children relied on

3    bottled water rather than tap water, but he remembers being pleased that Paul's behavior

4    was so improved.  It is not possible now, these many years later, to test the extent of

5    Paul's TCE exposure, as the chemical would long have broken down in his system.

6    However, there is no question that homes in the neighborhood where Paul and his family

7    lived were exposed to toxic levels of TCE during Paul's early childhood.

8         Paul Speer's recreational drug use history includes alcohol, inhalants, marijuana,

9    cocaine, crack, LSD, amphetamines, crystal methamphetamine, prescription drugs,

10   methadone, and heroin.  (Trial Ex. 197 (5/21/04 L. Hoyt-Croft Rpt. at 3, 18.)  He began

11   drinking alcohol at approximately eight years old; by the time he was twelve or thirteen,

12   he had been drunk twenty or thirty times.  (*Id.*)  Like his mother, father, and stepfather,

13   Speer was addicted to heroin by the time he was a teenager.  Speer's first heroin use

14   occurred with his mother Sabrina when he was about twelve years old.  According to

15   Sabrina, "I introduced my sons to heroin because using methamphetamine was dangerous

16   because they had to run across the freeway to buy [meth]. . . .  I did not think this was

17   good for them so I offered them heroin."  (PCR 9/26/14 Ex. 17 at ¶ 7.)  Other family

18   members had knowledge of Sabrina's twisted perspective on drug use, including Debra

19   Corral.  According to Debra, "Sabrina introduced [the kids] to drugs, she gave them the

20   drugs, she made sure they shared their drugs with her—but she wouldn't share with

21   them."  Sabrina encouraged Paul and Chris to burglarize places and then fence what they

22   had taken so she could buy heroin; she would get angry if the boys failed to get enough

23   money from fencing to support her addiction.

24        Speer was about twelve years old when he first used methamphetamine with

25   Sabrina's brother, Steve.  Steve was a meth addict who routinely committed crimes in

26   order to support his habit.  Like his sister, Steve recruited Paul to help him commit the

27   crimes.  One of his schemes involved Speer crawling through dog doors so he could rob

28   the neighbor's homes for items that would later be fenced for drugs.  Speer felt proud of

     himself when he did this because his uncle would praise him; sadly, this praise was the

                                         16

closest thing Speer experienced to affection in the dysfunctional Womble household. (Trial Ex. 197 (5/21/04 L. Hoyt-Croft Rpt. at 5).)  The uncle would sell the stolen items for methamphetamine and give Speer a cut.  (*See id.*; *see also* Trial Ex. 197 (10/6/92 Rpt. by PO Carpenter).)  On one occasion, Steve ordered Speer to steal a .357 magnum from Bill's brother John Jr. so Steve could trade the gun for speed.  (RT 2/22/07 at 68-69 (testimony of Bill Womble).)  Speer did as he was told, and was given some speed from Steve for his efforts.  (*Id.*)  However, "[a]fter [Steve] had Paul do speed, as little as [Paul] was and he did so much, . . . [i]t did something [to his heart] and he had to go to the hospital [for an overdose]."  (*Id.*)  Bill Womble visited Speer in the hospital after the overdose.  (*Id.*)  At that point, Bill became aware that Speer was injecting methamphetamine.  (*Id.* at 70.)  Speer was twelve years old at the time.  (*Id.*)

By the time Speer was in his early teens, he already had "a very extensive substance abuse history."  (Trial Ex. 197 (10/6/92 Rpt. by PO Carpenter); *see also* 5/21/04 L. Hoyt-Croft Rpt. at 18.)  Dr. Cabanski, who evaluated Paul in 1991, reported, "I have real concern about his very serious substance abuse, and he needs to be in an intensive drug rehabilitation program."  (Trial Ex. 197 (5/21/04 L. Hoyt-Croft Rpt. at 18).)  Eventually, in order to get drugs, Steve would pimp Speer out to some guys he knew, and Speer would have sex with them in exchange for money or drugs.  (Trial Ex. 197 (*Id.* at 5).)  Speer did not like it, but "he was a kid addicted to drugs and how else was he going to get money?"  (*Id.*)

Paul Speer's half-brother Chris was also given his first sample of heroin from Sabrina.  (RT 2/5/07 at 12.)  Like Sabrina and his father Bill, Chris soon became a full-blown heroin addict.  By the time of his testimony at Speer's trial, Chris had been injecting heroin every day since he was seventeen or eighteen years old.  (*Id.* at 8-9.)  Chris also burglarized homes for years as a means of supporting his crippling addiction.  (*Id.* at 19, 22-24.)  According to Chris, Sabrina knew that Speer and Chris were stealing to subsidize their heroin addiction and "she didn't really care," especially when she used the heroin that Speer and Chris obtained.  (*Id.* at 22-24.)  This practice continued

throughout Paul's teenage years and early adulthood, up to and including March 22, 2002—the day Chris and Paul burglarized the Soto residence.  That morning, Chris and Speer were experiencing severe heroin withdrawal.  Chris described the feeling as "Cold sweats.  Your bones hurt.  You can't think straight . . . everything's like cloudy."  (RT 2/5/07 at 16-18.)  According to Sabrina, the burglary was Chris's idea, and "he bugged Paul about it for three hours before Paul caved."  At first, Paul told Chris that he did not want to participate, because he had just gotten out of prison and "he had a son to think about."  However, as he started feeling worse and worse from the lack of heroin, he eventually gave in to Chris.  Later, while in jail awaiting trial on the burglary charges, Paul would get illicit substances when and where he could in an effort to stave off the physical and emotional pain of heroin withdrawal.  However, for most of the time he was in jail he experienced withdrawal symptoms and paranoia.

**D.    Multigenerational Mental Health Impairments**

Speer's family history is rife with evidence of mental and psychological impairment.  The many CPS and police reports which make up Speer's history document that Sabrina likely suffers from some form of mental illness, as evidenced by extreme impulsivity, violent aggression, delusions, and hallucinations.  (*See, e.g.*, Trial Ex. 197 (L. Hoyt-Croft Rpt. at 9).)  Over the years, probation officers and social workers noted that Sabrina "can't complete a thought while conversing with the officer" (7/28/88); "threaten[ed] kids with a baseball bat and appears to have lost her mind" (5/1/92); "has dreams and then believes they are real"; "had an outburst with a knife and tried to stab [the children]."  (*Id.*)  Chris Womble observed his mother "slugging" Speer in the face, "talking about that she wanted the demons to leave Paul."  (RT 2/5/07 at 39.)  In April 1981, Sabrina was arrested and charged with aggravated assault of two police officers in Glendale, Arizona.  During the assault, she grabbed one officer by the throat and bit another officer on the finger.  According to one of the officers, Sabrina "is an unstable individual who needs some type of psychiatric intervention."  John Womble Jr., Bill's brother, witnessed Sabrina engage in "bizarre" behavior and described her as "not in tune

all the time with reality." He observed her writing on the walls and saying there was something in the walls coming for her.

Sabrina also exhibited signs of serious depression throughout Paul's life, although, due to her extreme heroin addiction, it is not clear whether the depression was primarily situational (e.g., when she was unable to get drugs to satisfy her addiction) or long-term. (RT 2/7/07 at 55-58.) According to Paul, Sabrina would scream at him and hit him when she was depressed or not stoned on heroin, and therefore as he grew older there were times when he preferred that she just stay stoned, because "there was more safety when it was quiet." (*Id.*) Sabrina's father, George, also exhibited signs of mental illness, including depression, mania, and volatility.

Paul's brothers have both suffered from mental illness as well. Chris experiences severe depression and anxiety. Brian has complex, long-standing mental illness, and has been diagnosed with schizoaffective disorder (bipolar type) and PTSD.

As for Paul, the vast majority of clinicians who have evaluated him over the last thirty years believe that Paul suffers from depression, PTSD, polysubstance abuse, and a personality disorder, as well as moderate to significant impairment in brain functions. (*See, e.g.*, Trial Ex. 197, 223, 224.)

## E.   Sexual Abuse

From the beginning, Sabrina proved herself completely incapable of parenting Paul in a healthy way. As a result, she farmed Paul out to relatives on several occasions. On one of these extended stays, Paul was sexually abused by a female relative. He was five or six years old at the time. Not coincidentally, this is around the same time that Paul first started to exhibit behavioral problems in school. (*See* Trial Ex. 197, Rpt. of L. Hoyt-Croft at 3, 5.) Like many child victims of sexual abuse, Paul began acting out in sexually inappropriate ways. At age seven, he exposed himself on the school playground; at age ten, he was forced to perform oral sex on a male cousin; at age twelve, he engaged in sexual activity with a female cousin of the same age. (*See id.* at 5; *see also* RT 2/22/07 at 63-64.) As noted above, he was also pimped out by his Uncle Steve and

19

1   "encouraged" to have sex with gay men in order to get money for drugs.  Later, as a

2   young teenager at Adobe Mountain (a juvenile residential facility), Paul was befriended

3   by Al Heitzman, who was about twenty-five years older than Paul.  Al and Paul

4   eventually developed a sexual relationship, which Paul says he did in order to get money,

5   drugs, and other benefits for himself and his family.  (Trial Ex. 197, Rpt. of L. Hoyt-Croft

6   at 6; RT 2/1/07 at 56-57.)  Sabrina was aware of Paul's relationship with Al (as well as

7   Brian's subsequent relationship with Al), but never advised Paul to stay away from Al.

8   **F.    The Impact of Complex Trauma on Paul Speer**

9        Complex trauma disorder is a psychological disorder that occurs as a result of

10  repetitive, prolonged trauma that is typically caused by someone in a caregiver or

11  interpersonal relationship role.  The term "complex trauma" describes both children's

12  exposure to multiple traumatic events (which can include, *inter alia*, sexual abuse,

13  physical abuse, profound neglect, and witnessing domestic violence), as well as the wide-

14  ranging, long-term impact of this exposure.  Complex trauma can have devastating

15  impacts on a child's physiological and mental development, and is linked to addiction,

16  depression, anxiety, aggression, and self-harming behaviors.

17       In Paul Speer's case, he experienced near daily traumatic events of unusual, and

18  very harmful, intensity and duration.  Unfortunately, the people who should have guided,

19  protected, and nurtured him were the source of some of his greatest trauma, as well as his

20  most destructive and painful learned behaviors.  This traumatic history—combined with a

21  genetic tendency toward addiction and mental illness, neurotoxin exposure, serious

22  substance abuse, sexual abuse, and significant neurocognitive deficits—resulted in a

23  young man who, from his earliest moments, "never had a chance" at living a normal life.

24  Paul Speer had an unusually high concentration of adverse childhood experiences which

25  seriously compromised his chances for successful adjustment.  Unfortunately, Paul's jury

26  never heard about how his history of repetitive and complex trauma impacted Paul's

27  personality, mental health, and behavior.

28

## G.     The Crime

### 1.     The Burglary on March 14, 2002

On March 14, 2002, Paul Speer and his half-brother Chris Womble broke into the residence of Adan and Enriqueta Soto to steal items they could sell or trade to feed their heroin addiction.  (RT 2/5/2007 at 17-18.)  The Sotos were not at home at the time of the burglary.  (RT 12/5/2006 at 113.)  A neighbor who had witnessed the break-in called the police and relayed a description of the burglars.  (*Id.* at 114.)  Officers en route to the scene of the burglary saw two men similar to those described walking toward a nearby apartment complex.  (RT 12/6/2006 at 24-27.)  They tracked the men to the apartment of Sabrina and Bill Womble, Speer's mother and stepfather.  Sabrina Womble allowed a search; police found Speer and Chris Womble hiding.  (*Id.* at 30-32, 50.)  They also found items belonging to the Sotos.  (RT 12/5/2006 at 152-56.)  The half-brothers were arrested.

### 2.     The Telephone Calls and the Shooting of the Sotos by Brian Womble on May 25, 2002

Speer was held at the Madison Street jail pending trial on the burglary charge. While in jail it does not appear that his addiction and withdrawal from heroin were acknowledged or treated.  His phone calls to friends and family were recorded as a matter of course by the Maricopa County Sheriff's Office ("MCSO").  (RT 5/19/2006 at 10.) Many of Speer's calls were to Al Heitzman, with whom Speer's other half-brother, Brian Womble, lived.

On March 18, Speer asked Heitzman to post his $7,000 bond, stating that he could not win his case unless he could talk to the victims and convince them not to testify. (ROA 376, Supp. 40.)  On April 28, Speer told Heitzman about a plea offer of six-and-a-half to thirteen years of imprisonment.  (*Id.*)  Heitzman connected Speer's stepfather Bill Womble to the call; Speer asked if the family would be willing to post bond.  Bill declined.  (*Id.*)

Speer called again on April 29, asking Brian to sell his two handguns to raise the bond money.  (ROA 376, Supp. 42.)  Speer also said that, instead of accepting a plea offer, he wanted to convince the witnesses not to testify.  Speer suggested that Brian offer the victims his handgun as an inducement to not testify.  Speer told Brian that if the witnesses testified, he would get the maximum sentence.  (*Id.*)

On April 30, Brian told Speer that he would retrieve his guns from Heitzman's safe deposit box.  Speer told Brian to tell the victims that Speer was not involved.  Brian said that instead he would go to what he called "Plan B."  (ROA 376, Supp. 42.)  Brian later asked Speer if he should talk to the victims or do his other plan.  Answering his own question, Brian said he was going to do his other plan.  Speer replied, "Okay.  Yeah, yeah.  Go ahead."  (ROA 376, Supp. 83.)

On May 5, Speer spoke with Brian and Heitzman at length.  (ROA 376, Supp. 81, 82.)  Initially, Speer tried to pressure Heitzman into posting the bond money by warning that Brian might do something violent.  Heitzman, however, refused, and Speer replied that he and Brian would have "to go to Plan B."  (*Id.*)  After more calls in which the details of "Plan B" were discussed, Brian took action.

On May 25, 2002, at 3:00 a.m., the Sotos returned home from a party.  (RT 12/6/2006 at 115.)  At approximately 5:00 a.m., Enriqueta Soto placed a 911 call.  When the EMTs arrived, they found Enriqueta on the living room couch; she had been shot, but her wounds were not fatal.  (*Id.* at 85-86.)  An EMT found Adan Soto lying in bed with his arm around an infant.  Adan was dead from a gunshot wound; the infant was unharmed.  (*Id.* at 87-88.)  When police arrived, they found the screen for the front window to the apartment removed.  (*Id.* at 102-03.)  Brian's palm prints were later identified on the screen.  (RT 12/12/2006 at 21-22.)

In June 2002, acting on information from an informant regarding communication between Speer and Brian, the police subpoenaed recordings of phone calls made to Heitzman's home.  (RT 5/19/06 at 15, 37.)  The State identified a total of fifty-eight calls made during the time period relevant to the case.  (PCR 9/26/14 Ex. 3.)  The case agent,

22

Detective Dennis Olson, later testified that his intention had been to review all the targeted calls.  (RT 5/19/06 at 76-77.)  But in fact, detectives listened to only thirty-six of them.  The detectives both tagged and copied onto separate cassette tapes twenty-seven calls that they deemed relevant to their murder investigation.  (*Id.* at 36-37, 40.)  These twenty-seven calls were played for the jury at Speer's trial.  Nine of the calls were reviewed but not preserved.  Twenty-two calls were destroyed without ever being reviewed.  (PCR ME 5/21/15 at 4 & n.1.)

Brian was arrested on June 21, 2002, and on June 28 he was indicted on six counts, including first-degree murder.  (Womble ROA 2.)

**H.    Procedural History**

Speer was also indicted on June 28, 2002, on nine counts:  first-degree murder, attempted first-degree murder, conspiracy to commit first-degree murder, burglary in the first degree, misconduct involving weapons, two counts of tampering with a witness, and two counts of aggravated assault.  (ROA 48.)  The State noticed its intent to seek the death penalty, alleging four aggravating factors:  Speer was previously convicted of a serious offense (armed robbery); in the commission of the offense, Speer knowingly created a grave risk of death to the Soto's infant; the murder was committed in a heinous or depraved manner (witness elimination); and Speer committed the murder while in custody.  (ROA 83, 87.)

Robert Storrs was appointed to represent Speer in August 2002.  (ROA 38.)  During the time he represented Speer, he also handled seven other capital cases.  Bruce Blumberg was assigned to assist Storrs, and close to trial, Pamela Nicholson was assigned as well, so that she would gain capital experience before being assigned her own cases.  Storrs and Blumberg were experienced criminal defense lawyers, though they were overburdened by cases in the death-heavy county.  Nicholson had very little criminal experience.  Dave Wilcox, a former probation officer, was eventually assigned as a mitigation specialist, though Storrs opines he was not qualified for that work.

1    Paul Speer's and Brian Womble's cases were severed on March 28, 2006.  (ME

2    ROA 328.)

3        **1.    Evidentiary Hearing on Motion to Suppress**

4        Within six months of the date of the phone calls Speer made from jail, Brian

5    Womble's attorney filed a standard discovery motion, requesting "[a]ll statements of the

6    defendant and anyone who will be tried with defendant."[7]  (Womble ROA 24.)  In

7    response, the State produced the twenty-seven recordings it intended to introduce at trial.

8    Shortly thereafter, the nine recorded calls which the State had not marked to be

9    preserved, and the twenty-two calls the detectives had targeted but had not listened to,

10   were destroyed.  Speer moved to suppress the twenty-seven calls that were entered into

11   evidence.  (ROA 248.)

12       The trial court held an evidentiary hearing.  (RT 5/19/2006.)  The court denied the

13   motion to suppress, finding that Speer had made no showing that the unpreserved

14   conversations contained relevant or exculpatory information.  The court also found no

15   bad faith by the State.  (PCR 9/26/17 Ex. 5.)

16       **2.    Trial**

17           **a.    Guilt Phase**

18       Jury selection began on November 2 and ended on December 4, 2006.  (RT

19   11/2/2006 to RT 12/4/2006.)  The trial itself began on December 5.  (RT 12/5/2006.)  The

20   prosecutor, Jeanette Gallagher, focused in her opening on the recordings of the calls

21   between Speer and Brian Womble, reading selected quotes.  (*Id.* at 26-75.)  In its case-in-

22   chief the State presented testimony from law enforcement personnel who were involved

23   in the investigations into both the March 14 burglary and the May 25 shootings.  They

24   attested as to issues including the property found at the Womble residence belonging to

25   the Sotos, and the discovery of Brian Womble's palm print left at the Soto residence at

26   

27           [7] Brian Womble's and Paul Speer's cases had not yet been severed; thus the
28   discovery motion covered Speer's statements.

24

the time of the shootings.  The State also called to the stand the neighbor who had witnessed the break-in on March 14, to testify about her identification of Speer and Chris Womble in relation to the burglary.  The State called members of Speer's family about his requests that they provide him an alibi for the burglary.  Gallagher also questioned Al Heitzman, whose major points included receiving Speer's phone calls during the time before the shootings, his own recordings of some of the calls, and his retrieval of Brian Womble's guns from his safe deposit box.  He also testified at both Speer's and Brian Womble's trials that he saw Womble asleep at his home at the time of the murder; Heitzman was later convicted of perjury for that testimony when given in Womble's trial.

The State also called to the stand a number of witnesses in relation to the recordings of the phone calls.  One was the informant who revealed Speer's calls to the police; he described how they were made.  Another was the staff member at the Maricopa County jail who administered the recording, labeling, and preservation or destruction of calls from inmates.

But the only evidence presented that directly linked Speer to the killings came from the phone calls.  Detective Dennis Olson presented to the jury excerpts from the twenty-seven calls he had deemed worth preserving and using against Speer.  As described above, the calls as presented reflected Speer's growing, perhaps-addiction-fueled desperation at the long sentence he faced on the burglary charge.  The excerpts showed him attempting to get bond money from his friends and family, and trying to think of ways to convince the Sotos to not testify against him—as Speer believed that, without their testimony, the case against him would disappear.  The calls reflected his suggestion that his half-brother go to the Sotos, talk to them, tell them that Speer had not been involved in the burglary, and, if necessary, try to buy them off with Womble's guns.  The calls also clearly revealed that it was Brian Womble, not Speer, who came up with "Plan B"—a plan to kill the Sotos.  Speer was shown to keep attempting to find other ways, until he eventually acceded, and finally entered into Brian's plan.

The defense attacked the investigation in a number of ways.  They questioned the identification of Brian Womble's palm print at the screen where the shooter putatively entered the Soto residence.  They directed the jury's attention to all the investigation avenues the police did not take—such as all the people who were often in and around the Sotos—including a man who was asleep on the floor in the Soto residence at the time they were shot—who were not fingerprinted or investigated.  They pointed out evidence that was missing, such as Brian Womble's shoe prints that were not discovered at the site.  More importantly, they focused the jury's attention on the State's selection of choice phone call recordings, and the subsequent destruction of the rest.  And they elicited the testimony from a neighbor who said she saw a man very unlike Brian Womble smoking outside the Soto residence just at the time of the shooting.  Finally, the defense attempted to highlight how much Paul Speer loved his family, as reflected in the phone calls presented to the jury.

In the end, however, after about three and a half days of deliberation (*see* RT 1/18/2007 to RT 1/24/2007 at 41), the jury found Speer guilty on all charges.  (ROA 595-604.)

**b.    Aggravation Phase**

The aggravation phase of trial took place on January 29, 2007.  The State noticed four aggravating factors:  (1) prior serious felony (armed robbery) in violation of A.R.S. § 13-703(F)(2); (2) knowing creation of a grave risk of death to another person, in violation of A.R.S. § 13-703(F)(3); (3) the heinous, cruel, or depraved aggravator, to wit, witness elimination, in violation of A.R.S. § 13-703(F)(6); and (4) the murder was committed while Speer was on parole from the Department of Corrections, in violation of A.R.S. § 13-703(F)(7).  The defense contested the (F)(3) aggravator, arguing that Speer could not have known that the Soto's infant son would be sleeping between his parents on the night of the shooting.  (RT 1/25/07 at 18.)  Additionally, Speer argued that he was not vicariously liable for Brian Womble's judgment.  (RT 1/29/07 at 5, 38, 40.)  The trial court denied Speer's request to dismiss the (F)(3) aggravator.  (*Id.* at 40.)  The defense

26

1    conceded the remaining aggravators, and the State presented no additional evidence in

2    support of these allegations.  (RT 1/25/07 at 21; RT 1/29/07 at 35; ROA 8/29/07 at 88.)

3    At the close of the aggravation phase, the jury unanimously found the presence of all four

4    aggravating factors.[8]  (RT 1/31/07 at 5.)

5                    c.    **Penalty Phase**

6          The penalty phase was held over 14 days between February 1 and March 29, 2007.

7    In mitigation, trial counsel called three mental health experts, Drs. Parrish, Miller, and

8    Stewart; Speer's half-brother Chris Womble; Speer's stepfather, William Womble; and

9    Speer's cousin, Carla Lujan.

10         Dr. Paul Miller, an associate professor psychology, was hired by defense counsel

11   to prepare a developmental report focusing on risk factors that Speer experienced from

12   before birth until the age of fourteen.  (RT 2/6/07 at 27, 35-37.)  Dr. Miller met with

13   Speer on two occasions, and reviewed Speer's mental health records, school records,

14   probation officer and Child Protective Services reports, and police reports for Speer and

15   his family members.  (*Id.* at 38.)  He prepared a report listing over a dozen risk factors in

16   Speer's life that "pile[d] on top of one another" and "create[d] an increasingly negative

17   environment" around Speer.  (*Id.* at 40-46; *see also* Trial Ex. 197.)  Using a Power Point

18   presentation, Dr. Miller laid out these risk factors for the jury, which included, *inter alia*,

19   substance abuse in the home and the impact of substance abuse on the developing fetus

20   (RT 2/6/07 at 47-55, 72-82); maternal depression (*id.* at 55-63); paternal history of

21   substance abuse (*id.* at 63-65; RT 2/7/07 at 30-34); abusive treatment by his stepfather

22   Bill Womble (RT 2/6/07 at 65-67); inter-parental conflict and other parental risk factors

23   including neglect, harsh discipline, and scapegoating (*id.*at 70-71, 89-134); sexual abuse

24   (*id.* at 135-42; RT 2/7/07 at 4-9); childhood depression (*id.* at 10-17); and Speer's

25   substance abuse (*id.* at 33-38).  With regard to sexual abuse, Dr. Miller testified that

26

27         _____

           [8] The Arizona Supreme Court struck the (F)(3) aggravator on appeal.  *State v.*
28   *Speer*, 212 P.3d 787, 460 (Ariz. 2009).

                                        27

1   Speer was sexually assaulted by an aunt at age five or six; was pimped out by an uncle as

2   a preteen; and was involved in a sexual relationship with a much older staff member, Al

3   Heitzman.

4        Psychologist Susan Parrish, Ph.D., a specialist in the administration of the

5   Halstead-Reitan Neuropsychological Test Battery, evaluated Speer's neurocognitive

6   functioning.  (RT 2/27/07 at 113, 126-27; *see also* Trial Exs. 194, 219.)  She administered

7   the Halstead-Reitan, the Wechsler Adult Intelligence Scale (WAIS-III), and the Wide

8   Range Achievement Test-3 (WRAT-3).  Based on these tests and a review of mitigation

9   and mental health records, Dr. Parrish determined that Speer exhibited moderate

10   impairment in brain functions, with test results only one point away from the "severely

11   impaired" range.  (RT 2/27/07 at 155.)  Because other experts (Dr. Potts and Dr. Toma)

12   had opined that Speer malingered during their tests for competency and IQ, respectively,

13   Dr. Parrish re-tested Speer to include a malingering index and found that his test results

14   were valid.  (RT 3/19/07 at 37-38; Trial Ex. 224.)

15        Dr. Pablo Stewart, a psychiatrist, diagnosed Speer with Posttraumatic Stress

16   Disorder (PTSD), Attention Deficit Hyperactivity Disorder (ADHD), major depressive

17   disorder, and Polysubstance Abuse Dependence, as well as moderate to severe

18   impairment in brain function.  (RT 2/28/07 at 10; Trial Ex. 223.)  This "constellation of

19   disorders" all contributed to a neurocognitive impairment that inhibited his ability to

20   process information, deliberate options, and adapt to changing environmental cues.  (*Id.*

21   at 14, 16.)  According to Dr. Stewart, Speer's exposure to drugs in utero was a significant

22   contributor to his brain dysfunction, as well as "the depravity of [sic] which he grew up."

23   (*Id.* at 15.)  On cross, the prosecutor was able to successfully impeach Dr. Stewart with

24   his lack of recollection and misstatements about the record evidence, as well as his failure

25   to interview percipient witnesses about Speer's complicated social history.  (*See, e.g.*, RT

26   2/28/07 at 75, 79, 86, 88, 93.)  The jury noticed Dr. Stewart's lack of preparation as well.

27   (*See, e.g.*, ROA 691 (Juror Question:  "Do you feel that you where [sic] prepared too [sic]

28   testify in this case?  Or did you need more time to know the facts about trial.").)

1    The only lay and/or family witnesses presented by the defense were Speer's half-

2    brother Chris Womble, his stepfather Bill Womble, and his cousin Carla Lujan.  Chris

3    Womble described the family's battle with heroin addiction and the impact of that on

4    Speer's childhood.  (ROA 2/5/07 at 8-14, 22-33.)  Bill Womble testified about Speer's

5    difficult childhood and the drug addiction suffered by various family members, including

6    Speer's mother, Sabrina, and himself.   He also described the violence and instability of

7    the Womble home.  (RT 2/22/07 at 3-89.)  Carla Lujan provided testimony about how

8    Speer stayed with her family when he was a child and did not exhibit the same kind of

9    difficult or aggressive behavior as he did when he was around his mother.  (RT 2/20/07 at

10   146-54.)

11   In rebuttal, the prosecution's goal was to attack the credibility of Speer's expert

12   witnesses and their diagnoses.  Dr. Michael Bayless, the State's mental health expert and

13   only witness for the penalty phase, disputed the diagnoses of Speer's testifying experts.

14   According to Dr. Bayless, Speer had antisocial personality disorder and dysthymia, with

15   little to no cognitive impairment.  Additionally, the prosecutor impeached Speer's expert

16   witnesses by impugning their reliance on Speer's statements about his own social,

17   psychological, and medical history.  (*See, e.g.*, RT 2/28/07 at 75, 79, 86, 88, 93

18   (repeatedly asking for "objective" evidence of Speer's drug use, medical issues, mother's

19   substance abuse, and history of sexual abuse); *see also* RT 3/27/07 AM (prosecution's

20   penalty-phase closing argument).)

21   Just before defense closing argument, the State sought to admit a series of letters

22   between Speer and Al Heitzman, three of which were sexually graphic.  (RT 3/26/07 at

23   4.)  The State argued that the letters negated Speer's claim that he has PTSD "as a result

24   of sex," and that "defendant was somehow taken advantage of" by Heitzman.  (*Id.*)  The

25   defense argued unsuccessfully that the letters were more prejudicial than probative, in

26   part because "they're offering to show that Paul's a bad guy, he's homosexual or he is

27   gay [and] he, in effect, prostitutes himself."  (*Id.* at 8.)  The trial court admitted the letters

28

1   in unredacted form, finding that they "may relate to reasons why [the jury] shouldn't be

2   lenient." (*Id.* at 9.)

3       During penalty-phase jury instructions, the trial court read the jury a lengthy

4   excerpt from Arizona's "dynamite charge," also known as an *Allen*[9] charge. (RT 3/27/07

5   PM at 26-27.) This instruction had been read to the jury three other times during the

6   course of the trial. (RT 3/28/07 at 6.)

7       Penalty-phase deliberations began on March 28, 2007. After several hours of

8   deliberations, the jury sent questions to the trial judge informing him that they were

9   unable to reach a unanimous sentence and inquiring about the consequences to sentencing

10  if their verdict was not unanimous. (RT 3/28/07 at 4; ROA 757 and 758 at 2.) The trial

11  court announced its desire to respond to the jury's questions with an excerpt from the

12  dynamite instruction. (RT 3/28/07 at 6.) The defense originally objected on the grounds

13  that the jury had already heard the dynamite instructions four times previously, and the

14  judge would be infringing on the jury's deliberations if he made such a statement again.

15  (*Id.* at 5-9.) After a lengthy discussion—and for reasons not clear from the record—

16  defense counsel ultimately acquiesced to the trial court's wishes; an excerpt of the

17  dynamite charge was given to the jury. (*Id.* at 20-21; ROA 757.) The court did not

18  respond to the jury's two queries regarding the consequences to sentencing of a non-

19  unanimous verdict. Less than forty-five minutes later, the jury returned with a sentence

20  of death. (Minutes ROA 766 at 2.)

21      **3.    Juror Issues**

22      In addition to the juror questions submitted during penalty-phase deliberations,

23  there were a number of other unusual incidents involving members of the jury during the

24  aggravation and penalty phases. For example, during the aggravation phase, a deputy

25  county attorney informed the court that Juror 15, who was her uncle, contacted her after

26

27      [9] *Allen v. United States*, 164 U.S. 492 (1896) (permitting supplemental instructions

28  designed to encourage a jury to come to a unanimous verdict).

trial one evening and asked, "We are currently deliberating and I know I can't discuss any of the facts of the case, but what if one of the jurors won't listen to anyone."[10]  (Trial Ex. 180.)  Juror 15 explained that he decided to pose that question to his niece because "a couple other [jurors] were asking in there, also. . . ."  (RT 1/24/07 at 11.)  After extensive argument with a reluctant trial judge, the defense ultimately succeeded in getting Juror 15 removed from the jury.  (*Id.* at 27.)

Subsequently, midway through the penalty phase, the bailiff discovered a questionnaire, developed by the American Bar Association, that included ten questions and detailed answers regarding the criminal justice system, the death penalty, and the role of juries.  (Trial Ex. 210.)  After individual questioning of each juror, it was determined that Juror 13 brought the quiz into the courtroom and shared it with at least one other juror, Juror 5.  (RT 2/22/07 at 90-118.)  Juror 13 had been given the document by a friend of her father's who was aware Juror 5 was serving on a capital jury.  (*Id.* at 115.) Defense counsel moved for a mistrial based on the jury's exposure to extrinsic evidence. (*Id.* at 118-19.)  The defense motion was denied.  (Trial ME 2/22/07.)

Four days later, it was discovered that Juror 7 met and talked at length with a deputy county attorney at her church's fish fry.  (RT 2/26/07 AM at 4-6.)  As Juror 7 was being questioned in the courtroom about the fish fry incident, she observed Speer being brought into the courtroom in handcuffs.  (*Id.* at 13-14, 27.)  Defense counsel moved for a mistrial and was denied.  The State thought the best course of action was to remove Juror 7 from the jury.  However, defense counsel objected to her removal as they believed she was possibly leaning toward a life sentence.  Juror 7 remained on the jury.  (*Id.* at 16-32.)

Another juror issue arose during the direct testimony of defense expert Dr. Susan Parrish, when Juror 2 was observed "making a prayer formation [with his hands],

---

[10] Juror 15 testified that he asked his niece "what happens if, you know, the majority of the vote is one way and there is a holdout or two or something."   (RT 1/24/07 at 7.)

31

indicating [Speer] ought to be praying for [his] life." (RT 3/1/07 at 7.)  Juror 2 was also

seen laughing, sleeping, and engaging Juror 3 in conversation during testimony.  (*Id.*)

Defense counsel requested that Juror 2 be brought before the court to be questioned about

his behavior.  (*Id.* at 7-8.)  The court stated for the record that he had not seen Juror 2

acting in the way defense counsel described.  (*Id.* at 11.)  Rather than questioning Juror 2

independently, the court stated that he would watch for improper behavior and would

admonish the entire jury again about the importance of staying fair and impartial.  (*Id.* at

14-15.)

### 4.    Rule 11 and Competency Proceedings

Speer was evaluated for competency under Rule 11 (or a modified Rule 11

proceeding) on three separate occasions during his trial.  Each time, Speer was ultimately

found competent to proceed, though evaluators noted mental impairments.

### 5.    Direct Appeal

Speer was initially assigned appellate counsel from the office of the Maricopa

County Public Defender, but the office withdrew October 2007 due to a conflict of

interest.  (DA dkt. 80.)  Kerrie M. Droban was appointed to represent Speer; she filed his

appeal on March 26, 2008.  (DA dkt. 87.)

The direct appeal brief raised nineteen claims, seven challenging errors occurring

at various phases of Speer's trial and twelve challenging the constitutionality of

Arizona's death penalty scheme more generally.  Direct appeal counsel challenged the

death qualification of Speer's jury, arguing that some potential jurors should have been

excused for cause and that other jurors were improperly excused over defense objection.

She also raised guilt phase claims focused on the government's spoliation of evidence

arising from the government's failure to preserve several recorded jail phone calls

between Speer and his co-defendant, despite using twenty-seven other such calls as

evidence.  In addition, appellate counsel raised claims of prosecutorial misconduct related

to the prosecutor's inappropriate comments to defense counsel and arguments to the jury.

(*Id.*)

Appellate counsel raised only one claim related to the aggravation phase, arguing that there was insufficient evidence that Speer knowingly created a grave risk of death to the child.  (*Id.*)  The Arizona Supreme Court concluded that the State had not proved this aggravator beyond a reasonable doubt.  *State v. Speer*, 212 P.3d 787, 798 (Ariz. 2009). The three other aggravators were not challenged and were conceded at trial.  *Id.*  As to the penalty phase, appellate counsel argued that Arizona law, the prosecutor's closing argument and the instructions to the jury worked in combination to prevent the jury from giving full effect to the mitigating evidence.  Appellate counsel also argued that Speer's due process rights were violated when a juror observed Speer in handcuffs.  (DA dkt. 87.)

The Arizona Supreme Court also engaged in an independent review of Speer's death sentence.  *Speer*, 212 P.3d at 801-03.  The court noted that appellate counsel failed to brief the propriety of the death sentence despite the court's recent admonitions to capital defense counsel to brief this issue.  The Arizona Supreme Court also noted that appellate counsel had challenged only one of the four aggravators (related to grave risk of death).  The court determined that the State had proved the remaining three aggravators and independently determined that the aggravation outweighed the mitigation.  *Id.*

The United States Supreme Court denied Speer's petition for a writ of certiorari on February 22, 2010.  (DA dkt. 99.)

### 6.    State Post-Conviction Proceedings

On May 10, 2011, Nathaniel J. Carr, III was appointed to represent Speer on state post-conviction proceedings.  (DA dkt. 104.)  It should be noted that Carr was the subject of a *Phoenix New Times* article involving fraudulent billing practices and ineffective assistance in one of his capital trial cases, and several other cases later came to light where his billing was in question.  For example, according to the *Phoenix New Times* article, Carr billed the county $2.4 million dollars between 2006 and 2012, including $450,000 for a single death penalty case, some of which was for work that appears to not have happened.  These investigations resulted in a complete overhaul of Maricopa County's billing practices.  Carr was under this investigation by the courts, the press, and

33

the state bar association during the time he represented Speer.  In 2016, after the completion of at least two state bar investigations, Carr was suspended from the practice of the law for four years, effective January 1, 2017.

At the time of his appointment to the Speer case, Carr was ordered to bring on associate counsel.  (*Id.*)  In June of 2011, Brent E. Graham agreed to assist as associate counsel in an informal, unpaid capacity, to answer Carr's questions as needed.  (PCR 8/8/12 [Sup. Ct. dkt. 733].)  In November of that year, however, the court appointed Graham formally, and ordered him to take a more active role—over Graham's objections. (*Id.*)  Graham moved to withdraw in August 2012.  (*Id.*)  The motion was denied.

After numerous extensions of time were granted, Speer's first petition for post-conviction relief was filed on October 25, 2013.  After a response was filed, another, longer petition was filed on September 5, 2013.  (PCR 9/5/13.)  The final, operative amended petition for post-conviction relief was filed on September 26, 2014 (PCR 9/26/14 Pet.)—though the court did allow counsel for Speer to file an amended version of Claim Fourteen on March 8, 2015.  (PCR ME 5/21/15 at 1.)

Post-conviction counsel raised eighteen claims before the Arizona superior court—the same court that had presided over Speer's trial.  (PCR 9/26/14 Pet.)  Several post-conviction claims alleged trial court errors related to the lost or destroyed recordings of phone calls between Speer and Brian Womble.  (*Id.*)  The superior court concluded that these claims were procedurally defaulted because they were either raised on direct appeal or could have been raised on direct appeal, and alternatively ruled that the claims also failed on the merits.  (PCR ME 5/21/15 at 3-11.)  Post-conviction counsel also raised a confrontation clause claim and argued that appellate counsel was ineffective in failing to raise the claim on direct appeal.  The superior court concluded that the confrontation clause claim was meritless.  (*Id.* at 11-12.)

In addition, post-conviction counsel raised several claims related to the ineffective assistance of trial counsel, including that trial counsel:  failed to adequately raise issues related to the destroyed jail recordings; failed to adequately cross-examine state

34

witnesses; stipulated to three of the four aggravators; admitted evidence of prior criminal offenses; failed to make an adequate mitigation presentation; permitted the dissemination of experts' reports; failed to ensure the court used a proper accomplice liability instruction; failed to object to the state's causal nexus argument; and rendered deficient performance that was cumulatively prejudicial.  Post-conviction counsel also asserted that lethal injection is cruel and unusual punishment.  (PCR 9/26/14 Pet.)  The Superior Court denied the claims related to trial counsel's ineffectiveness on the merits and denied the lethal injection claim as premature and not colorable.  (PCR ME 5/21/15 at 27.)

Post-conviction counsel raised these same eighteen claims in the Petition for Review ("PFR") to the Arizona Supreme Court, filed on August 7, 2015.  The PFR was denied on November 15, 2016.

### 7.    Current Proceedings

The Office of the Federal Public Defender for the District of Arizona was appointed to represent Speer on December 7, 2016.  (Dkt. no. 5.)  However, due to a conflict of interest, the Office of the Federal Public Defender for the Central District of California was substituted in as counsel for Speer on December 8, 2016.  (Dkt. no. 7.)

Prior to a case management conference held on March 17, 2017, counsel for Speer informed this Court that they had made numerous attempts to contact Carr about the files in this case, but had received no response.  (*See* dkt. no. 10 at 9.)  Since that time, counsel has continued diligently attempting to make contact with Carr.  Counsel and their investigators, however, have been unable to locate Carr or his files.  Counsel will continue to attempt to make contact and locate the files—that include trial counsel's files—and, if need be, include any relevant information therein in an amended petition and/or expanded record.

## III.  EXHAUSTION

Most of the federal constitutional claims alleged herein have been exhausted in proceedings before the Arizona courts.  Some claims, however, were not fully presented to the state court due to post-conviction counsel's failures (*see infra* Claim 27), or

because they were not ripe for review, or because they could only be raised in this forum. For the reasons explained under the individual grounds for relief, this Court should still review these claims.

If appropriate, however, this Court may stay the pending case to allow the state courts to review the claim in the first instance. *See Rhines v. Weber*, 544 U.S. 269, 277 (2005). This stay-and-abeyance procedure would "enable all constitutional claims to be settled in one federal habeas proceeding," thereby promoting judicial economy, reducing piecemeal litigation, and facilitating Speer's ability to have a federal court pass on the merits of his constitutional claims. *Thompson v. Wainwright*, 714 F.2d 1495, 1499 (11th Cir. 1983). Should this Court find any claim unexhausted, Speer asks this Court to allow him the opportunity to demonstrate cause, at a hearing if necessary, for failing to exhaust those claims before it exercises its discretion to deny him a stay. *See Rhines*, 544 U.S. at 277. The Ninth Circuit has held that ineffective assistance of post-conviction counsel can constitute "good cause" under *Rhines*. *See Blake v. Baker*, 745 F.3d 977, 983 (9th Cir. 2014). Because Speer would be asking this Court to grant a stay in his initial petition, concerns that he would be using the stay-and-abeyance procedure for purposes of delay do not exist.

Speer expressly reserves his right to amend this petition. In *McCleskey v. Zant*, the Supreme Court reaffirmed the "principle that [a] petitioner must conduct a reasonable and diligent investigation aimed at including all relevant claims and grounds for relief in the first federal habeas petition." 499 U.S. 467, 498 (1991). Referring to Habeas Rule 6 (discovery), Habeas Rule 7 (expansion of the record) and Habeas Rule 8 (evidentiary hearing), the Supreme Court held that a habeas petitioner has to have reasonable means and the ability to investigate in order to form a sufficient basis to allege a claim in the first petition. *Id.* Speer believes additional claims may be identified following a thorough review of the record, thorough investigation, after discovery is conducted and completed, or after an evidentiary hearing is held. At the appropriate time during these

36

proceedings, Speer will present any additional claims through amendments to the petition.

## IV.  INCORPORATION OF FACTS AND LAW

While Speer has endeavored to specifically state all facts and law supporting each claim herein, additional supporting facts and law may have been stated in separate claims. For this reason, Speer incorporates by reference each and every paragraph of this Petition into each and every claim presented as if fully set forth therein.  In addition, Speer incorporates by reference each and every fact included in Section II, Factual and Procedural Background, into each claim as if fully set forth therein.

## V.  STATE COURT PRESUMPTION OF CORRECTNESS

Speer hereby provides notice of his intention to challenge the presumption of correctness of specific findings of fact made by the state court in his case.  Certain factual findings of the state court in Speer's case, if they are found to exist, are not entitled to the presumption of correctness under 28 U.S.C. § 2254(e)(1).  These include, but are not limited to, factual findings made by the trial court in Speer's trial and sentencing, and the opinion by the Arizona Supreme Court on direct appeal.  Pursuant to 28 U.S.C. § 2254(e)(1), Speer asserts that the findings of fact by the state court at trial, resentencing, or on direct appeal, if they are found to exist, are not fairly supported by the record.  Speer also intends to assert other exceptions to the presumption of correctness, including, but not limited to:  the procedures employed by the state courts in making findings of facts were not adequate to afford him a full and fair hearing of his claims; material facts were not adequately developed in state court proceedings; Speer did not receive a full, fair, and adequate hearing of his claims in the state court proceedings; and Speer was otherwise denied due process of law in the state-court proceedings.

In addition, Speer asserts that the findings of fact by the state court in regard to his state post-conviction proceedings, if any are found to exist, are not entitled to the presumption of correctness under 28 U.S.C. § 2254(e)(1).  These include, but are not limited to:  any and all factual findings made by the trial court in regard to Speer's state

37

post-conviction proceeding, as well as the decision of the Arizona Supreme Court on petition for review.  Pursuant to 28 U.S.C. § 2254(e)(1), Speer asserts that the findings of fact by the state court concerning his state post-conviction proceedings, if any are found to exist, are not fairly supported by the record.

## VI.  INEFFECTIVENESS CLAIMS MUST BE CONSIDERED CUMULATIVELY

Speer's claims regarding his counsel should be considered cumulatively.  This Court should not conduct a piecemeal analysis, addressing each contention of deficient performance and prejudice in a vacuum, without considering the spillover effect of all the various errors.  Speer's right to counsel and a fair trial were violated because of counsel's overall deficient performance.  It was the sum total of multiple errors, not just a single error, that resulted in the violation of the Sixth Amendment.  *See Lord v. Wood*, 184 F.3d 1083, 1085 (9th Cir. 1999) (in assessing counsel's performance, "it is impossible to judge any one piece of evidence without understanding the rest of the case").

The Ninth Circuit recognizes that the cumulative effect of counsel's errors may result in prejudice.  *See Harris By and Through Ramseyer v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995) ("We have previously recognized that 'prejudice may result from the cumulative impact of multiple deficiencies.'") (citing *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978) (en banc)).  In *Harris*, the Ninth Circuit found that the eleven errors made by counsel—including failure to investigate and prepare adequately, failure to investigate defendant's mental and emotional state, failure to conduct proper voir dire, and presenting an inadequate closing argument—infected the defense such that the trial was rendered "fundamentally unfair."  64 F.3d at 1438.

The notion of conducting a cumulative review of counsel's deficiencies is also consistent with *Strickland v. Washington*, 466 U.S. 668 (1984).  There, the Supreme Court repeatedly explained that lower courts must consider whether trial counsel's errors impacted the trial in a manner that violated the Sixth Amendment; it did not instruct that each individual error should be reviewed for prejudice, but rather the opposite.  *See* 466

U.S. at 687 (stating that prejudice "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable"); *see also id.* at 693 ("[I]f a defendant shows that particular errors of counsel were unreasonable . . . the defendant must [also] show that they actually had an adverse effect on the defense."); *id*. at 694 (noting that "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"); *id*. at 695 ("The governing legal standard plays a critical role in defining the question to be asked in assessing the prejudice from counsel's errors."). In *Sanders v. Ryder*, 342 F.3d 991, 1001 (9th Cir. 2003), it was explained that "[s]eparate errors by counsel at trial and at sentencing should be analyzed together to see whether their cumulative effect deprived the defendant of his right to effective assistance." "They are in other words, not separate claims, but rather different aspects of a single claim of ineffective assistance of trial counsel." *Id.* Even if prejudice does not result from an individual error, it may nevertheless result from cumulative errors. *See Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005) (quotation omitted).

## VII.  THE AEDPA IS UNCONSTITUTIONAL

Speer's case is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA").  28 U.S.C. § 2254.  However, AEDPA is unconstitutional and its strictures should not apply here.  Central to fundamental fairness and the integrity of the United States' justice system is that every prisoner must have all of his constitutional claims heard by a court.  *See Bounds v. Smith*, 430 U.S. 817, 822-23 (1977).  One method of ensuring that a prisoner's constitutional claims are heard is through the writ of habeas corpus.  However, the passage of AEDPA substantially changed the law that governs habeas petitions.  *See Felker v. Turpin*, 518 U.S. 651, 654 (1996). AEDPA's restrictions suspend the writ of habeas corpus and violate the separation of powers, which results in prisoners remaining in prison without review of alleged constitutional defects in their convictions and sentences.

## A.  AEDPA Suspends the Writ of Habeas Corpus

Congress cannot define prisoners' habeas rights so narrowly that Congress, in effect, suspends the writ.  The writ of habeas corpus is guaranteed by the United States Constitution in the Suspension Clause, which provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."  U.S. Const. art. I, § 9, cl. 2.  The Suspension Clause is a structural limitation on the power of Congress.  Like bills of attainder and ex post facto laws, which are also prohibited in Article I, section 9, the suspension of habeas (except in cases of rebellion or invasion) belongs to a "category of Congressional actions which the Constitution barred."  *United States v. Lovett*, 328 U.S. 303, 315 (1946).  The writ "can be preserved in practice no other way than through the medium of the courts of justice; whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void."  *Id.* at 314 (quoting The Federalist No. 78 (Alexander Hamilton)).

Because AEDPA prevents federal courts in certain circumstances from granting relief when it is undisputed that the conviction or sentence was unconstitutional, it suspends the writ of habeas corpus.  *See* 28 U.S.C. § 2254.  Under the tenets of AEDPA, the federal court must determine whether a federal constitutional violation, in a capital case, was a "reasonable" or "unreasonable" constitutional violation.

## B.  AEDPA Violates the Separation of Powers Doctrine

Congress cannot impinge on the courts' duty to say what the law is, but Congress does so when it requires Article III courts to ignore any part of the Constitution and to instead give effect to a contrary law.  *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178 (1803).

Congress has the power to constrain courts' authority.  *See Keene Corp. v. United States*, 508 U.S. 200, 207 (1993).  "The judicial Power of the United States shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."  U.S. Const. art. III, § 1.  However, Congress must not manipulate the "test for determining the scope of [habeas corpus]" because the writ "is

40

designed to restrain" Congress, and because the writ is "an indispensable mechanism for monitoring the separation of powers." *Boumediene v. Bush*, 553 U.S. 723, 765-66 (2008).

The separation of powers doctrine found in Article III "serves both to protect the role of the independent judiciary within the constitutional scheme of tripartite government . . . and to safeguard litigants' right to have claims decided before judges who are free from potential domination by other branches of government." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848 (1986) (internal citations and quotation marks omitted). When it was confronted with an unconstitutional provision, the Supreme Court in *Marbury* asked whether courts are bound by "an act of the legislature" that is "repugnant to the constitution"; the Court answered that "[i]t is emphatically the province and duty of the judicial department to say what the law is." 5 U.S. at 177.

"[I]f Congress does provide for habeas in the federal courts, Congress cannot . . . instruct the federal courts, whether acting in a federal or in a state case, how to think, how to ascertain law, how to judge." *Irons v. Carey*, 505 F.3d 846, 855 (9th Cir. 2007) (Noonan, J., concurring). Because AEDPA requires courts to ignore unlawful detentions if the prisoner does not meet certain provisions, it unconstitutionally violates the separation of powers doctrine. The question before the federal court should simply be whether Speer's constitutional rights were violated in such a way that he is entitled to habeas relief. Adding the gloss of "unreasonable" versus "reasonable" constitutional violations robs the courts of their ability to remedy constitutional wrongs.

## C.   Conclusion

AEDPA suspends the writ of habeas corpus and violates the separation-of-powers doctrine because it dictates that courts must not "grant relief to citizens who are being held in prison in violation of their constitutional rights unless the constitutional error that led to their unlawful conviction or sentence is one that could not have been made by a reasonable jurist." *Irons*, 505 F.3d at 859 (Reinhardt, J., concurring). Also, AEDPA

1    does not allow an appellate judge to correct an unlawful detention if a lower court's

2    "error is understandable," which is inconsistent with a judge's duty "to enforce the laws

3    and protect the rights of our citizens against arbitrary state action." *Id.*  Therefore,

4    AEDPA is unconstitutional, and this Court should review Speer's claims de novo.

## VIII.  FEDERAL CONSTITUTIONAL CLAIMS

6    **CLAIM 1**

7    **DEFENSE COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY
     FAILING TO PROPERLY PROVIDE LEGAL SUPPORT AND**

8    **ARGUMENT FOR THE MOTION TO SUPPRESS EVIDENCE**

9    **A.    Legal Basis for All Ineffective Assistance of Counsel Claims**

10         Speer's ineffective assistance claims are based on *Strickland v. Washington*, 466

11   U.S. 668 (1984), which under AEDPA is "clearly established Federal law, as determined

12   by the Supreme Court." *Williams (Terry) v. Taylor*, 529 U.S. 362, 391, (2000).  "An

13   ineffective assistance claim has two components: A petitioner must show that counsel's

14   performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v.*

15   *Smith*, 539 U.S. 510, 521 (2003).

16         There is a reasonable probability that, but for counsel's deficient performance, the

17   result of Speer's trial would have been different.  *Strickland*, 466 U.S. at 687-96;

18   *Wiggins*, 539 U.S. at 534-38.  A reasonable probability is a probability sufficient to

19   undermine confidence in the outcome.  *Strickland*, 466 U.S. at 694.  Counsel's

20   performance impaired the proper functioning of the criminal justice system to the point

21   "that the trial [court] cannot be relied on as having produced a just result." *Id.* at 686; *see*

22   *Wiggins*, 539 U.S. at 534.

23         "Counsel has a duty to make reasonable investigations or to make a reasonable

24   decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.

25   In other words, "counsel must, at minimum, *conduct a reasonable investigation* enabling

26   him to make informed decisions about how best to represent his client." *Sanders v.*

27   *Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994) (emphasis in original).  Counsel is deemed to

28   have rendered ineffective assistance "where he neither conducted a reasonable

investigation nor made a showing of strategic reasons for failing to do so." *Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1999) (quoting *Sanders*, 21 F.3d at 1456). Further, any tactical decisions made by an attorney must be reasonable.  According to Supreme Court precedent, this means an attorney's "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91; *see also Reynoso v. Giurbino*, 462 F.3d 1099, 1112 (9th Cir. 2006).  While the inquiry into ineffective assistance involves a presumption that counsel's conduct is within the "wide range of professionally competent assistance," *Strickland*, 466 U.S. at 690, that presumption does not excuse counsel's failure to investigate and prepare a defense. *Turner v. Duncan*, 158 F.3d 449, 456 (9th Cir. 1998).  Any presumption that counsel reasonably exercised professional judgment is rebutted when, as in this case, the challenged acts and omissions were not informed tactical decisions, but resulted from a lack of diligence in preparation and investigation.  *Id.*

In all criminal defense investigations, the American Bar Association Standards for Criminal Justice are "guides to determining what is reasonable." *Rompilla v. Beard*, 545 U.S. 374, 375 (2005); *Wiggins*, 539 U.S. at 524.  At the time of Speer's trial, these standards provided in part:

> Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction.  The investigation should include efforts to secure information in the possession of the prosecution and law enforcement authorities.  The duty to investigate exists regardless of the accused's admissions or statements to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty.

ABA Standards for Criminal Justice 4-4.1 (3d ed. 1993).  In capital cases, the American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (Rev. Feb. 2003) (hereinafter, "2003 ABA Guidelines") provide the "well defined norms" that govern counsel's duties.  The Guidelines require that "Counsel at

43

1    every stage have an obligation to conduct thorough and independent investigations

2    relating to the issues of both guilt and penalty."  2003 ABA Guidelines, 10.7(A).

3         In cases applying the clearly established federal law set forth in *Strickland* and its

4    progeny, counsel's conduct has been found deficient where counsel failed:  (a) to

5    investigate, and introduce into evidence, information demonstrating the defendant's

6    innocence; *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999); (b) to interview and

7    present defense witnesses; *Lord v. Wood*, 184 F.3d 1083, 1096 (9th Cir. 1999); (c) to

8    investigate and evaluate mental health issues that may have supported defenses; *Daniels*

9    *v. Woodford*, 428 F.3d 1181 (9th Cir. 2005); *Jennings v. Woodford*, 290 F.3d 1006 (9th

10   Cir. 2002); *Franklin v. Johnson*, 290 F.3d 1223 (9th Cir. 2002); *Seidel v. Merkle*, 146

11   F.3d 750 (9th Cir. 1998); (d) to interview and present testimony of witnesses who would

12   corroborate defendant's testimony; *Riley v. Payne*, 352 F.3d 1313 (9th Cir. 2003); (e) to

13   investigate and present exculpatory evidence; *Rios v. Rocha*, 299 F.3d 796 (9th Cir.

14   2002); (f) to conduct adequate research; *Hoffman v. Arave*, 455 F.3d 926 (9th Cir. 2006);

15   and (g) to impeach prosecution witnesses by conducting an effective cross-examination,

16   informed by an adequate investigation; *Reynoso*, 462 F.3d at 1114.  As alleged and

17   demonstrated below, all of these deficiencies, and others, are present in this case.

18        When assessing the second prong, a court must decide whether "counsel's errors

19   were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."

20   *Strickland*, 466 U.S. at 687.  A petitioner does not have to demonstrate by a

21   preponderance of the evidence that "the result in his case would have been different but

22   for counsel's errors," but only that there was a reasonable probability that the errors

23   undermined confidence in the outcome of his trial.  *Brown v. Myers*, 137 F.3d 1154, 1157

24   (9th Cir. 1998) (citing *Strickland*, 466 U.S. at 694); *Lord v. Wood*, 184 F.3d 1083, 1085

25   (9th Cir. 1999).  And "despite the strong presumption of reliability," the question to be

26   asked is whether "the result of the particular proceeding is unreliable because of a

27   breakdown in the adversarial process that our system counts on to produce just results."

28   *Strickland*, 466 U.S. at 696.  Moreover, "deficient performance and prejudice questions

                                                44

may be closely related." *Correll v. Ryan*, 539 F.3d 938, 951 (9th Cir. 2008) (citations omitted). Indeed, counsel's performance in and of itself could undermine a court's confidence in the outcome of the trial. *Id.*

"In making this [prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695; *see also Terry Williams*, 529 U.S. at 397-98; *Alcala v. Woodford*, 334 F.3d 862, 882-83 (9th Cir. 2003) (granting relief on basis of cumulative impact of multiple errors by counsel); *Harris By & Through Ramseyer v. Wood*, 64 F.3d 1432, 1439 (9th Cir. 1995) (holding that the cumulative impact of numerous deficiencies in defense counsel's performance was prejudicial to the defense, rendering the proceedings improper and warranting habeas relief). Even if this Court finds that no single error amounts to prejudice, it should nonetheless apply cumulative error principles to grant relief. *See Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005), as amended on reh'g, 421 F.3d 1154 (9th Cir. 2005).

Claims 1 through 7 below demonstrate the ways in which Speer's trial counsel failed to render reasonably effective assistance of counsel before and throughout the guilt phase of Speer's trial, while Claims 14 through 19 detail the instances of ineffective assistance during the penalty phase. These errors "were so serious as to deprive [Speer] of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687.

This claim was raised in Speer's state post-conviction petition and Petition for Review at Claim Two. (PCR 9/26/14 Pet. at 20-22; PFR at 12-13.) The state court denied the claim on the merits. (PCR ME 5/21/15 at 6-7.)

Speer incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

**B.    Factual Basis of Claims Relating to Tapes of Jail Phone Calls Subpoenaed by State but Not Preserved or Presented at Trial**

The jail where Paul Speer was held before the crime kept the recordings of phone calls made by prisoners on digital cassette tapes. (RT 5/19/06 at 10.) After being stored

1    for six months, tapes were reused and the old data was recorded over.  A database was

2    kept with information about prisoner calls, from which recordings could be located.

3    Either law enforcement or a defendant could request that a cassette be "tagged," in which

4    event the tape was not recorded over.  (*Id.* at 19, 23-24.)

5          In June 2002, acting on information from an informant regarding communication

6    between Speer and his half-brother Brian Womble, the police subpoenaed recordings of

7    phone calls made to the home of Al Heitzman, with whom Womble was staying.

8    (RT 5/19/06 at 15.)  The State identified a total of fifty-eight calls made and received

9    during the time period relevant to the case.  Though the case agent, Detective Dennis

10    Olson, testified that his intention had been to review all the targeted calls (*Id.* at 76-77),

11    detectives listened to only thirty-six of them.  The detectives both tagged and copied onto

12    separate cassette tapes the twenty-seven of these calls that they deemed relevant to their

13    murder investigation.  These twenty-seven calls were played for the jury at Speer's trial.

14    Nine of the calls were reviewed but not preserved.  Twenty-two calls were destroyed

15    without being reviewed.  (PCR ME 5/21/15 at 4 & n.1.)

16          Within six months of the date of the phone calls, Brian Womble's attorney filed a

17    standard discovery motion, requesting "[a]ll statements of the defendant and anyone who

18    will be tried with defendant."[11]  (Womble ROA 24.)  In response, the State produced the

19    twenty-seven recordings.  Shortly thereafter, the nine recorded calls which the State had

20    not marked to be preserved, and the twenty-two calls the detectives had targeted but had

21    not listened to, were destroyed.  Speer moved to suppress the twenty-seven calls that

22    were selectively entered into evidence.  (ROA 248.)  The defense asserted that by

23    preserving only the calls unfavorable to Speer and permitting the others to be destroyed,

24    the State acted in bad faith.  (*Id.* at 1.)  The trial court denied the motion.

25

26

---

27          [11] Brian Womble's and Paul Speer's cases had not yet been severed; thus the

28  discovery motion covered Speer's statements.

1

2

## C.     Trial Counsel Were Ineffective in Failing to Present a Reasonable Argument to Suppress the Only Evidence of Speer's Guilt

Paul Speer was incarcerated in the Maricopa County Jail when Adan Soto was killed.  He clearly did not, and could not, have committed the murder himself.  Nonetheless, he sits on death row for that killing.  The only evidence linking him in any way to the murder was garnered by the State from a series of phone calls between Speer and his half-brother Brian Womble.  Without the recordings of the calls, there would have been no trial of Paul Speer.

Yet that evidence was deeply flawed.  The twenty-seven calls used in the trial were cherry-picked by police detectives.  But thirty-one calls—over half the total calls that the police had targeted as relevant to the investigation—were destroyed without the defense having the opportunity to listen to them.  The police themselves did not listen to twenty-two of them.  And there is clear evidence that many, if not all, of those calls would have included exculpatory and/or mitigation evidence.

While trial counsel moved before trial to suppress the twenty-seven recordings (ROA 248), they failed to provide reasonable support for that motion and subsequent argument, and thus their performance fell below the objective standard of reasonableness.  Regarding support in the law for the motion, trial counsel presented a basic spoliation claim under *Brady v. Maryland*, 373 U.S. 82 (1963), and *Arizona v. Youngblood*, 488 U.S. 51 (1988).  (ROA 248 at 5-6.)  They failed, however, to present the argument that was key to this issue:  that the prosecutor did in fact have a "duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."  *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

> [A]ctual awareness (or lack thereof) of exculpatory evidence in the government's hands, . . . is not determinative of the prosecution's disclosure obligations.  Rather, the prosecution has a duty to learn of any exculpatory evidence known to others acting on the government's behalf.  Because the prosecution is in a unique position to obtain information known to other agents of the government, it may not be excused from disclosing what it does not know but could have learned.

47

1    *Carriger v. Stewart*, 132 F.3d 463, 479-80 (9th Cir. 1997) (en banc) (citations omitted).

2          Because of this failure, the prosecutor was able to argue that she was not required

3    to preserve every piece of evidence potentially relevant to the defendant.  (RT 7/28/06 at

4    55-56, 71.)  She also stated that the State was not obligated to keep calls police did not

5    listen to.  Defense had the independent obligation to collect them.  (*Id.* at 72.)  In

6    addition, she argued that "I'm not going to take Mr. Blumberg's [defense co-counsel]

7    word for it since he told you the other day with all certainty that I had a duty to seek out

8    exculpatory evidence for him, which the case law says I don't."  (RT 1/17/07 at 10.)  Had

9    trial counsel performed a reasonable investigation into the actual case law and presented

10   it to the court, the prosecutor's argument would have been shown to be wrong—that she

11   did in fact have a duty to learn of the evidence in the possession of the police and disclose

12   it to the defense—and the motion to suppress would have been granted.

13         In addition, trial counsel failed to provide reasonably available factual support that

14   would have illustrated the probable exculpatory and mitigation value of the destroyed

15   recordings.  Twenty-six of the twenty-seven preserved tapes, or 96% of the retained calls,

16   contained mitigation evidence.  In several calls, Speer encouraged Womble to just talk to

17   the victims and offer them money or a gun to not come to court.  (ROA 376, Supp. 42,

18   43, 44, 77.)  Speer committed property crimes to help his family—such as to pay for

19   Womble's college courses and Delilah's clothes—so they could "sit proper."  (*Id.* at

20   Supp. 77.)  In all but one of the twenty-seven preserved phone calls Speer expressed his

21   love for his family and friends.  (ROA 376.)  Tellingly, the two calls recorded by Al

22   Heitzman were not included in the calls the police preserved; but both contained

23   mitigation.  Trial counsel could have, but failed to, show that a statistically significant

24   amount of mitigation existed on the preserved calls.  Had they done so, they would have

25   made a showing that the destroyed calls also contained at least mitigation.  By failing to

26   connect what was known mitigation on the twenty-seven preserved calls, to the statistical

27   probability of mitigation on at least the twenty-two calls that were destroyed without

28   review, defense counsel failed to show the court the evidentiary value of the destroyed

48

calls.  Instead, defense counsel admitted they had not proven the destroyed calls contained exculpatory evidence.  (RT 7/28/06 at 42.)

In these respects, the failure to know and cite the relevant case law, and the failure to identify the evidentiary value of the destroyed calls, trial counsel's conduct fell below reasonable objective standards.  Speer was deeply prejudiced by the failure.

## D.     The State Court's Denial of the Claim Is an Unreasonable Application of Clearly Established Federal Law

The state trial court, in its opinion denying Speer's petition for post-conviction review, denied this claim on the basis that Speer had not shown the destroyed tapes contained material exculpatory evidence.  (PCR ME 5/21/15 at 6-7.)  However, under *Youngblood*, a defendant does not have to show the destroyed evidence was material. Rather, the evidence need only be "potentially exculpatory."  *Youngblood*, 488 U.S. at 57-58.  In fact, it is the difference between "material exculpatory evidence" and "potentially exculpatory evidence" that distinguishes the *Brady* line of cases from the *Trombetta/Youngblood* line of cases.  *Fisher*, 540 U.S. at 547-48.  It is the distinction between "exculpatory evidence" and "potentially useful evidence" that caused the *Youngblood* Court to require a defendant to show bad faith by police in order to prevail. *Id.* at 548.

It is well-nigh impossible to prove definitively what actual evidence was contained in material that the police had in their possession but then allowed to be destroyed before being reviewed by anybody else.  But Speer did demonstrate the likelihood that the destroyed tapes were potentially exculpatory, on the basis of the content of the few recording the police did select to use against Speer at trial.  Thus, because Speer, on post-conviction review, showed both that the evidence was potentially useful, and was destroyed in bad faith, trial counsel's deficiency was prejudicial to Speer.  The state court's finding otherwise was both an unreasonable application of clearly established federal law and an unreasonable determination of the facts.  Because the bar imposed by 28 U.S.C. § 2254(d) has been met, this Court may review the claim de novo.  Speer will

49

demonstrate at an evidentiary hearing that counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced Speer.

**CLAIM 2**

> **DEFENSE COUNSEL WERE INEFFECTIVE BY ALLOWING THIRTY-ONE CALLS TO BE DESTROYED, THUS DEPRIVING SPEER OF IMPORTANT EVIDENCE**

This claim was raised in Speer's state post-conviction petition and Petition for Review as Claim Three.  (PCR 9/26/14 Pet. at 22-25; PFR at 13-15.)  The state court denied the claim on the merits.  (PCR ME 5/21/15 at 7-8.)

Speer incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

**A.   Trial Counsel Provided Ineffective Assistance When They Allowed Thirty-One Recordings of Relevant Phone Calls to Be Destroyed Without Review**

At the hearing on the motion to suppress evidence, a jail administrator testified that the recordings of inmate phone calls were available to defense attorneys as well as to the State.  (RT 5/19/06 at 32.)  Speer's attorneys were ineffective in failing to seek out, review, and preserve the recordings of the thirty-one destroyed phone calls.  Their duty was clear:  "Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Strickland*, 466 U.S. at 691.  In other words, "counsel must, at minimum, *conduct a reasonable investigation* enabling him to make informed decisions about how best to represent his client."  *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994) (emphasis in original).  At the very least, "[t]he investigation should include efforts to secure information in the possession of the prosecution and law enforcement authorities."  ABA Standards for Criminal Justice 4-4.1 (3d ed. 1993).

Any presumption that counsel reasonably exercised professional judgment is rebutted when, as in this case, the challenged acts and omissions were not informed tactical decisions, but resulted from a lack of diligence in preparation and investigation.  *Turner v. Duncan*, 158 F.3d 449, 456 (9th Cir. 1998); *see also Kimmelman v. Morrison*,

50

1   477 U.S. 365, 373, 385 (1986) (affirming holding that counsel's performance was

2   "grossly ineffective" where, among other things, "[c]ounsel's failure to request

3   discovery, again, was not based on 'strategy,' but on counsel's mistaken beliefs that the

4   State was obliged to take the initiative and turn over all of its inculpatory evidence");

5   *Thomas v. Chappell*, 678 F.3d 1086, 1096-97 (9th Cir. 2012) (holding counsel ineffective

6   in murder case for failing to adequately investigate evidence in support of its defense

7   theory); *Dugas v. Coplan*, 428 F.3d 317, 328-32 (1st Cir. 2005) (holding that counsel's

8   failure to investigate the most crucial aspect of the state's case constituted deficient

9   performance).

10        The attorneys' deficient performance was best described by the trial court itself, at

11   the time it ruled on the defense's motion to suppress the recordings chosen by the State to

12   enter into evidence against Speer:

> More importantly, the defense has known since mid-2002 which calls were recorded and which were not, yet waited until April 29, 2005, almost 3 years later, to file a motion to suppress evidence stemming from those intercepted telephone calls. More specifically, the 9 calls the Detectives chose not to record were known to the defense on or about July 18, 2002 when the State disclosed a DR supplement that detailed those calls that Detective Olson did not separately tape record.
>
> It apparently is the practice of the Maricopa County jail to preserve inmate telephone calls for a period of 6 months. During this 6 month interval, those calls are as accessible to defense counsel as they are to the State. Accordingly, defense counsel had all the information they needed to make an informed and intelligent decision concerning whether to request their own copy of all the telephone calls from the jail <u>before</u> any of those calls were destroyed. That they chose not to do so is not the State's fault.

(PCR 9/26/14 Ex. 5 at 3.)

        There is no question but that the failure to preserve the twenty-two calls

reasonably shown to include at least mitigation evidence, was unreasonable. If it was not

the State's fault, then it was defense counsel's faulty performance that caused the loss of

the evidence. Storrs acknowledged the failure when he admitted that he was aware that

1   jail-recorded calls would be destroyed after six months, but that fact did not register with

2   him in this case.  (RT 12/13/06 AM at 14.)  In arguing for a *Willits* instruction, Storrs

3   admitted that in June 2002, he had just finished a death penalty case, and did not know

4   how many capital cases he had.  (RT 1/16/07 at 19.)  He had a lot of catching up to do at

5   the time, and did not understand the significance of evidence before it was destroyed.

6   (*Id.* at 19.)

7        In addition, in the declaration Storrs affirmed to state post-conviction counsel, he

8   admits that he should have obtained and listened to the phone calls.  (PCR 9/26/14 Ex. 1

9   at ¶ 2.)  He also admits he knew phone call recordings were destroyed after six months,

10  per jail policy.  (*Id.*)  In a revised declaration that current federal post-conviction counsel

11  plan to file after moving for evidentiary expansion, Storrs admits also that he should have

12  investigated this issue as soon as he was appointed, and that he has no reasonable

13  explanation for his failure to do so.

14       Before Storrs, Richard K. Miller from the Office of the Legal Defender

15  represented Speer.  Miller likewise did nothing to preserve the calls.  Rather he spent his

16  short time on the case trying to withdraw.  (PCR 9/26/14 Ex. 9.)  As the prosecutor noted

17  in her Objection to the Motion to Suppress, Supplement 39 had originally been disclosed

18  to Miller.  (*Id.* Ex. 7.)  Like Storrs, Miller did nothing to preserve the entirety of the fifty-

19  eight phone calls.

20       Miller and Storrs both failed to timely review what discovery there was and take

21  steps to prevent the calls from being destroyed.  Just as the prosecutor had the duty to

22  preserve known evidence, the defense attorneys also had a duty to timely review

23  discovery and take steps to ensure evidence was not lost.  The failure to do so constitutes

24  deficient performance below the objective standard of reasonableness.  Thus, Speer has

25  demonstrated the first prong of *Strickland* on this issue.

26       As to prejudice, had trial counsel properly investigated these tapes when they

27  learned of their existence, a reasonable probability exists that the outcome of Speer's

28  guilt and penalty phases at trial would have been different.  Speer incorporates by this

52

reference his arguments set forth in Claims 1 and 8 regarding his showing that the evidence was potentially exculpatory.  Because twenty-six out of the twenty-seven preserved calls contained mitigation evidence, Speer has shown that the twenty-two destroyed calls reasonably also contained mitigation.

Moreover, the issue was one of interest to the jury.  One juror asked if there were any other tapes or transcripts from the Madison jail to the Heitzman/Womble residence other than those in evidence.  (RT 1/10/07 at 101.)  The trial judge misinterpreted the question; he simply re-read a stipulation by the parties saying parts of the calls had been deleted for "legal reasons."  (*Id.* at 102.)  The question was not about deleted portions of calls.  The juror plainly asked if there were other tapes or transcripts of calls that were not in evidence.  The issue was clearly of concern to the jury.

Defense counsel's failure to preserve these calls denied Speer the opportunity to present this mitigation to the jury.  Thus, Speer has shown a reasonable probability that defense counsel's failure to preserve the twenty-two calls, as well as the nine calls Olson listened to but did not preserve, prejudiced Speer by eliminating the opportunity to present mitigation to the jury.  Consequently, Speer has shown his attorneys were ineffective in failing to preserve the phone calls.

## B.     The State Court's Denial of the Claim Is Unreasonable

In denying the defense motion to suppress the preserved tapes before trial, as detailed above, the trial court excoriated the defense, blaming trial counsel for the destruction of the tapes:

> During this 6 month interval, those calls are as accessible to defense counsel as they are to the State. Accordingly, defense counsel had all the information they needed to make an informed and intelligent decision concerning whether to request their own copy of all the telephone calls from the jail before any of those calls were destroyed.  That they chose not to do so is not the State's fault.

(PCR 9/26/14 Ex. 5 at 3.)

1    However, when the very same trial court reviewed the state PCR petition, it made

2    a one-hundred-and-eighty-degree turnaround in its analysis.  When the spotlight was

3    turned away from the State's malfeasance to the unreasonable failure by trial counsel,

4    suddenly, trial counsel was blameless.  In rejecting this claim, the trial court found that,

5    "[g]iven the content and context of the calls that were preserved, trial counsel's actions

6    were not unreasonable [in failing to take steps to preserve the destroyed calls]."  (PCR

7    ME 5/21/15 at 8.)

8    In addition, the court's denial of the claim was based on a finding that there was

9    no prejudice, because "[t]rial counsel would be justified in concluding that the additional

10   tapes, which were eventually destroyed . . . would not be helpful, either in the case-in-

11   chief or as mitigation."  (PCR ME 5/21/15 at 8.)  Trial counsel, however, could not

12   reasonably have made any such decision about the contents of the lost evidence without

13   first conducting the minimum reasonably-required investigation.  Clearly established

14   federal law under *Strickland* imposed on trial counsel "a duty to make reasonable

15   investigations or to make a reasonable decision that makes particular investigations

16   unnecessary."  *Strickland*, 466 U.S. at 691.  Counsel is deemed to have rendered

17   ineffective assistance "where he neither conducted a reasonable investigation nor made a

18   showing of strategic reasons for failing to do so."  *Caro v. Calderon*, 165 F.3d 1223,

19   1226 (9th Cir. 1999).  Per the prevailing standards of practice, "[t]he investigation should

20   include efforts to secure information in the possession of the prosecution and law

21   enforcement authorities."  ABA Standards for Criminal Justice 4-4.1 (3d ed. 1993).  *See*

22   *also Rompilla v. Beard*, 545 U.S. 374, 383 (2005) (trial counsel's failure to examine the

23   State's file on the petitioner fell below the level of reasonable performance).

24   Here, trial counsel did not make a decision to not acquire and review the tapes;

25   even if he had, such a decision would have been unreasonable under prevailing standards.

26   Instead, trial counsel merely failed to perform the required investigation because of lack

27   of diligence.  The state court failed to analyze the claim as per the requirements of

28

54

*Strickland* and its progeny; its decision is therefore an unreasonable application and/or contrary to clearly established federal law.

The destruction of twenty-two seized telephone calls without any review for evidentiary value was a colossal error in the case. The trial court's findings that no one is at fault for the destruction of these calls is an unreasonable determination of fact. Accordingly, Speer is entitled to evidentiary development and habeas relief.

## CLAIM 3

### TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO PROPERLY DEVELOP AND ARGUE THE RULE 15 DISCOVERY ISSUE

While counsel for co-defendant Brian Womble moved for discovery under Arizona Rules of Criminal Procedure Rule 15.1, Speer's trial counsel failed to make any request at all for discovery in this case, and failed to join in Womble's discovery motion arguments. Trial counsel thus failed in their duty to conduct the most basic investigation necessary under prevailing professional standards, to Speer's prejudice in the loss of potentially exculpatory calls. Speer's constitutional right to the effective assistance of counsel was thus violated.

This claim was raised in Speer's state post-conviction petition and Petition for Review as Claim Five. (PCR 9/26/14 Pet. at 30-31; PFR at 16-17.) The state court denied the claim as non-cognizable as a habeas claim, and on the merits. (PCR ME 5/21/15 at 9.)

### A.   Trial Counsel Were Ineffective, to Speer's Prejudice, with Regard to Discovery

Speer hereby incorporates the arguments set forth in Claims 1, 2, and 8 into this claim by this reference. For the reasons set forth in Claims 1, 2, and 8, counsel were ineffective for: (1) failing to properly cite the applicable rules and cases to refute the prosecutor's claim that she had complied with her discovery obligations; (2) failing to specifically join in Brian Womble's discovery motion arguments; (3) failing to show there were not thirty-six calls, but fifty-eight calls; and (4) failing to show by reference to the contents of the preserved calls that the unpreserved calls almost certainly also

1   contained mitigation evidence.  These failures constituted performance below the

2   objective standard of reasonableness.  Trial counsel admits in the sworn declaration he

3   provided to state PCR counsel that he failed to file a discovery motion or join in co-

4   defendant's motion for discovery.  (PCR 9/26/14 Ex. 1 at ¶ 3.)  In a revised declaration

5   that current federal post-conviction counsel plan to file after moving for evidentiary

6   expansion, Storrs admits also that he is aware that the calls may have included

7   exculpatory and/or mitigating evidence.  In addition, the *Strickland* expert who provided

8   a declaration to state PCR counsel attests that the failure of trial counsel to obtain and

9   review all discovery was conduct below the prevailing objective norm.  (PCR 9/26/14 Ex.

10  2 at ¶ 10.)

11       Similarly, for the reasons set forth in Claims 1, 2, and 8, Speer was prejudiced by

12  counsel's subpar performance.  Had defense counsel properly briefed and argued the

13  Rule 15 discovery issue, there is a reasonable probability that the outcome would have

14  been different.  Therefore, Speer has stated a colorable claim of ineffective assistance of

15  counsel as to this issue.

16  **B.    The State Court's Denial of the Claim Is Unreasonable**

17       Speer claimed his attorneys were ineffective for failing to properly litigate the

18  Rule 15 discovery issue.  The trial court found that trial counsel were not ineffective,

19  quoting from *Canion v. Cole*, 115 P.3d 1261, 1263 (Ariz. 2005). "While improper, a

20  violation of Rule 15.1, without more, is not a ground that would entitle [a PCR petitioner]

21  to post-conviction relief." (PCR ME 5/21/15 at 9.)  But, in his state petition, Speer

22  incorporated related claims 1, 2, and 8 into this claim.  That information constitutes the

23  "more."  These claims must be analyzed together.

24       In addition, the state court failed to analyze the claim under the applicable clearly

25  established federal law.  It dismissed the claim as not cognizable on habeas review, as

26  Rule 15 is limited to state law procedural considerations.  However, when a state

27  provides rules or procedures designed to protect a defendant's liberty interests, and then

28  deprives a person of the protection of those rules, the Due Process Clause of the

1    Fourteenth Amendment is violated.  *Hicks v. Oklahoma*, 447 U.S. 343, 344 (1980).

2    *Hicks* refers to a state-created "liberty interest," but in death penalty cases an even more

3    compelling interest is at stake:  the right not to be deprived of life without due process.

4    Separate from any consideration of state law, the Fourteenth Amendment due process

5    clause is also violated by errors that taint the fairness of the trial and present an

6    "unacceptable risk . . . of impermissible factors coming into play."  *Estelle v. Williams,*

7    425 U.S. 501, 505 (1976).

8         Thus, trial counsel's failure to pursue this state procedure, established to safeguard

9    a defendant's liberty interest, violated Speer's right to due process and a fair trial, and

10   therefore constituted ineffective assistance of counsel.  The state court's failure to

11   analyze the claim under federal constitutional law was unreasonable; Speer should be

12   granted an evidentiary hearing and habeas relief.

13   **CLAIM 4**

14           **TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO**
             **ADEQUATELY SUPPORT THEIR REQUEST FOR A WILLITS**
15           **INSTRUCTION WITH ADEQUATE LEGAL AUTHORITY**

16         In Arizona, a defendant is entitled to a *Willits* jury instruction when evidence that

17   is potentially beneficial to the defendant is lost or destroyed while in the control of the

18   State, to the defendant's prejudice.  There is a reasonable probability that, had trial

19   counsel succeeded in their attempt to have the jury instructed under *Willits*, the outcome

20   of Speer's trial would have been different.  But trial counsel failed, because their

21   argument for the instruction was deficient.  Thus Speer's constitutional right to the

22   effective assistance of counsel was violated.

23         This claim was raised in Speer's state post-conviction petition and Petition for

24   Review as Claim Seven.  (PCR 9/26/14 Pet. at 37; PFR at 20-22.)  The state court denied

25   the claim on the merits.  (PCR ME 5/21/15 at 10-11.)

26

27

28

1

2

## A.     Trial Counsel's Failure to Support the Requested Instruction Was Deficient and Prejudiced Speer

Speer hereby incorporates the arguments set forth in Claims 1, 2, 3, 8, and 9 into this claim by this reference.  In short, the factual basis includes the facts that police investigators targeted a total of fifty-eight phone calls between Speer and his half-brother Brian Womble that they believed inculpated Speer in the killing of Adan Soto.  The police failed to preserve thirty-one of these calls; they claimed nine included no relevant information, but failed entirely to listen to twenty-two.  They twenty-seven they selected to preserve provided all of the evidence at trial of Speer's guilt.  The calls also included, however, copious mitigation evidence—leading to a colorable conclusion that the destroyed tapes also included exculpatory and/or mitigating evidence.

A *Willits* instruction is available to an Arizona defendant upon a showing that:  (1) the State failed to preserve material evidence that was accessible and might have tended to exonerate the defendant; and (2) there was resulting prejudice.  *See State v. Willits*, 393 P.2d 274 (Ariz. 1964); *State v. Reffitt*, 702 P.2d 681, 690 (Ariz. 1985).  Trial counsel requested the following *Willits* instruction:

> If you find that the state has lost, destroyed, or failed to preserve evidence whose contents or quality are important to the issues in this case, then you should weigh the explanation, if any, given for the loss or unavailability of the evidence.  If you find that any such explanation is inadequate, then you may draw an inference unfavorable to the state, which in itself may create a reasonable doubt as to the defendant's guilt.

(ROA 549 at 5, quoting Standard Criminal 11, RAJI Criminal Standard, 2d. ed. (1989).)  Had the jurors been given such an instruction, there is a reasonable probability that the outcome of Speer's trial would have been different.

Counsel were ineffective, however, in that they failed to support a request for a *Willits* instruction with proper case law.  Counsel included the *Willits* instruction in their instruction requests filed on January 8, 2007.  (ROA 549.)  The instructions are discussed in court on January 16, 2007.  (RT 1/16/07 at 4-22.)  During that discussion the trial court

58

makes incorrect statements of law and fact.  He states that, for a *Willits* instruction to be given, there must "be a showing that the evidence is of an exculpatory value that had to have been apparent before the evidence was destroyed."  (RT 1/16/07 at 6; *see also id.* at 21-22.)  He also states that there was "testimony from Detective Olson that nothing in the unpreserved tapes, in his opinion, was exculpatory or in any way relevant to the issues."  (RT 1/16/07 at 6.)  Thus the court does not take into account the fact that Detective Olson could not have formed an opinion regarding the twenty-two tapes he targeted as relevant but did not listen to.

That afternoon trial counsel filed a memorandum of slightly over one page in support of his motion for a *Willits* instruction.  (ROA 583.)  They did not, however, cite to case law that would have corrected the trial court's understanding of the showing necessary for a *Willits* instruction.  For example, they failed to cite to *Willits* itself, and its explanation of the need for such an instruction:

> the State cannot be permitted the advantage of its own conduct in destroying evidence which might have substantiated the defendant's claim regarding the missing evidence.  But the damage to the defendant is equally great because the evidence was no longer available at the trial by which the facts with certainty could be determined.

*Willits*, 393 P.2d at 279.  Trial counsel could also have supported their argument with citations to cases such as *State v. Hunter*, 664 P.2d 195, 201 (Ariz. 1983) ("To be entitled to a *Willits* instruction . . . an accused need not prove that evidence destroyed by the state would have conclusively established a defense. An accused need only show that 'if the evidence had not been destroyed, it might have tended to exonerate [him or her].'  *State v. Garrison*, . . . 585 P.2d [563] at 567 [(Ariz. 1978)]."  Trial counsel should also have directly addressed the trial court's incorrect statement of the necessary showing by citing to cases finding that a defendant need not prove that the evidence had absolute exculpatory value, evident before its destruction.  For example, the Arizona Supreme Court had instructed this approach:  "A *Willits* instruction is appropriate when the state destroys or loses evidence *potentially helpful* to the defendant."  *State v. Lopez*, 786 P.2d

959, 964 (Ariz. 1990) (emphasis added).  Had trial counsel corrected the trial court with reasonably available legal support, the showing that the destroyed evidence was potentially helpful would have been made.

Speer was prejudiced by his attorneys' failures.  On initially denying Speer's pretrial motion to suppress the tapes, the trial court noted that the jury would hear that some tapes were destroyed and the defense would still be able to argue it was a selective presentation.  (RT 5/19/06 at 83-84.)  But, because the jury was not given a *Willits* instruction, it did not have a guide to accurately assess that information, or to meaningfully decide the destruction issue.  Speer was denied having a properly instructed jury decide if the State should profit from its own dereliction in destroying tapes that had been seized, but not reviewed or preserved.

Using the correct test set forth for giving a *Willits* instruction, and with an accurate understanding that the State was responsible for the destruction of evidence whose contents were at issue, there is a reasonable probability that but for Speer's attorneys' performance below the objective standard of reasonableness, the jury would have found reasonable doubt.  A juror asked if there were any other tapes or transcripts from the Madison Street jail to the Heitzman/Womble residence other than those in evidence.  (RT 1/10/07 at 101.)  Thus this issue was important to at least one juror.

**B.     The State Court's Denial of the Claim Constitutes an Unreasonable Determination of Fact**

In his state petition for post-conviction review, Speer claimed his attorneys were ineffective in failing to properly provide legal authority in support of their request for a *Willits* instruction.  The state court—comprised of the same judge who had ruled against Speer at trial—denied this claim, stating he was satisfied that "trial counsel performed competently in connection with the lost tapes."  (PCR ME 5/21/15 at 11.)  This comment is completely at odds with the judge's strong criticism of counsel at the time of trial as set forth in its 7/28/06 minute entry.  (PCR 9/26/14 Ex. 5 at 3.)

The court found that Speer had not identified additional authority that trial counsel could have cited.  (PCR ME 5/21/15 at 10.)  That is incorrect.  In his petition, Speer cited at length from *State v. Willits*, 393 P.2d 274 (Ariz. 1964).  (PCR 9/26/14 Pet. at 33-35.) Speer's petition also cited *State v. Youngblood*, 844 P.2d 1152 (Ariz. 1993).  (PCR 9/26/14 Pet. at 32-33, 36.)  Speer thus cited accurate Arizona authority that supported the *Willits* instruction in his petition, claiming that trial counsel was deficient in citing none. The state court made an unreasonable finding of fact that Speer did not identify additional authority that accurately set forth *Willits* doctrine.

**CLAIM 5**

> **TRIAL COUNSEL WERE INEFFECTIVE BY FAILING TO CROSS-EXAMINE DETECTIVE OLSON WITHIN THE PARAMETERS SET BY THE TRIAL COURT**

This claim was raised in Speer's state post-conviction petition and Petition for Review as Claim Nine.  (PCR 9/26/14 at 42-50; PFR at 24-25.)  The state court denied the claim on the merits.  (PCR ME 5/21/15 at 12-14.)

**A.  Factual Basis**

Detective Dennis Olson was the police investigator who, among other things, was responsible for reviewing and selecting the phone call recordings the provided the evidence on which Speer was convicted and sentenced to death.  He was also the State agent who did not mark the majority of the targeted calls for preservation, and who testified as to the process.  (*See* RT 5/19/06.)

On September 14, 2006, counsel for Speer requested production of Detective Olson's internal affairs records.  (ROA 359 at 2.)  Speer based his request on Olson's involvement in the Kim Ancona murder, for which Ray Krone was erroneously convicted and sentenced to death.  (*Id.*)  Olson had appeared on a television program about the murder of Ancona and said that detectives had found sheets with Ancona's blood in the trunk of Krone's car.  These bloody sheets proved to be fictitious.  (ROA 359, Ex. 1.) After his exoneration, Krone filed a civil suit.  (*Id.*)

The trial court found no disciplinary actions in Olson's records.  (RT 12/13/06 AM at 11.)  The prosecutor wanted the court to preclude any questioning regarding Krone's case.  (*Id.*)  The defense wanted to cross-examine Olson regarding mistakes he had made and his failure to conduct a complete investigation in the Krone murder case.  (*Id.*)  The court deferred ruling.  (*Id.* at 13.)

On January 8, 2007, Speer filed a motion to specifically permit cross-examination of Olson concerning his involvement in the Krone case.  (ROA 548.)  Noting the Sixth Amendment right to confront and cross-examine, Speer sought to use answers Olson gave in a deposition in the Krone civil suit to impeach him.  Counsel cited Arizona Rules of Evidence, Rule 608, which permits inquiry into specific instances of conduct for purposes of attacking character for truthfulness or untruthfulness.  (*Id.* at 3.)  He also noted that impeachment on a collateral matter differs significantly from proving motive and bias, citing *State v. Gertz*, 918 P.2d 1056, 1060 (Ariz. Ct. App. 1995.)  The court ruled:

> Detective Olson may be questioned about comments he made about investigation techniques in general.  I'm sure all detectives have their own investigation techniques, and if you want to ask him about comments he's previously made without identifying cases, you can.  He can also be questioned about any acknowledgment he may have made that detectives, like all of us, are human and have made mistakes before, even mistakes in previous investigations.  But the Krone case can't be mentioned.  Facts specific to that case can't be mentioned.  The outcome of that case can't be discussed.  TV segments can't be introduced, and transcripts from previous testimony don't come in either.

(RT 1/9/07 at 17.)

## B.   Counsel's Unreasonable Failure to Cross-Examine the Lead Detective on Past Shoddy Investigations Prejudiced Speer

Although the judge's ruling on cross-examining Detective Olson about his investigational errors in the Krone case denied Speer the right of confrontation (*see* Claim 10, below), the court did not issue a blanket denial.  Instead, using *State v. Murray*, 906 P.2d 542 (Ariz. 1995), as a guide, the judge told the defense they could examine

1   Olson more generally as to mistakes he had made in cases.  The judge opined that

2   mistakes made in the Krone case would not be probative for truthfulness in the Speer

3   case.  (RT 1/9/07 at 18.)  Thus, Rule 608 did not apply.  The judge also thought Rule

4   404(B) did not apply because the other acts Speer sought to prove would show Olson's

5   character and that he was acting in conformity therewith.  (*Id.*)  Furthermore, the judge

6   would not let the defense attorneys use Olson's deposition transcript in the Krone case to

7   impeach him, although they could ask if he admitted making mistakes in a deposition

8   given in another case.  (*Id.* at 19.)  They would, however, be stuck with whatever Olson's

9   answer was, though the judge opined that, as a man of integrity, Olson would tell the

10  truth.  (*Id.* at 19-20.)  Thus, Speer could be questioned on cross-examination about his

11  investigative techniques and approach, but not about how he had applied them in the

12  Krone case.  (*Id.* at 20.)

13        In cross-examination the defense asked no questions whatsoever about the many

14  mistakes they knew existed in the Krone case, which they could have done without

15  naming the case itself.  (RT 1/10/07 at 26-85.)  Yet, review of the deposition obtained by

16  Speer's attorneys shows they had a powerful weapon in their hands—a weapon that they

17  failed to use in their defense of Speer.  (PCR 9/26/14 Ex. 14.)

18        For instance, in his deposition Detective Olson said did not see any mistakes he

19  made in the Ancona-Krone murder investigation.  The only thing he may have done

20  differently was to tape-record some interviews he conducted.  (PCR 9/26/14 Ex. 14 at

21  11.)  But later, Olson admitted it was an oversight for him to fail to mention in his crime

22  scene report that footprints were present near the body.  (*Id.* at 96.)  In fact, his original

23  crime scene diagram did not show the presence of footprints.  (*Id.* at 96-97.)  Olson said it

24  was important to have an accurate crime scene diagram with respect to shoe prints and

25  where they are located to show direction of travel, size, and wear pattern, to connect a

26  possible suspect to the scene or connect the location of the prints to the body.  (*Id.* at 97-

27  98.)  Olson had not seen any shoe prints in connection with Ancona's body.  (*Id.* at 98.)

28  Yet, Olson was the person in charge of ensuring that relevant items were photographed.

63

1   (*Id.* at 98-99.)  Olson never tried to get anyone to put together a composite diagram that

2   would show the relationship of the footprints to Ancona's body.  (*Id.* at 99.)  Olson did

3   not think there were any photographs of shoe prints in the bathroom.  (*Id.* at 100.)  But,

4   after reviewing an exhibit, Olson said it accurately depicted the area where Ancona's

5   body was found, and he admitted seeing a shoe print in the photograph on the tile floor

6   near the corner of Ancona's blouse.  (*Id.* at 101-02.)

7        Olson said a shoe print discovered at the scene by the body would likely have been

8   left by somebody involved with the homicide.  (PCR 9/26/14 Ex. 14 at 148.)  But none of

9   the shoes seized from Krone's house had a pattern similar to the shoe pattern left at the

10  murder scene.  (*Id.* at 149.)  Olson also said that if people were excluded as contributors

11  to the shoeprints found next to Ancona's body and in the kitchen, Krone would have been

12  eliminated.  (*Id.* at 255-56.)

13       There were several shoeprints at the scene that appeared to be fairly complete,

14  attributed to a Converse shoe.  Yet, Olson did not measure the dimensions of the shoe.

15  (PCR 9/26/14 Ex. 14 at 260-61.)  Nor did Olson record the length of the best shoe

16  impression found at the crime scene.  (*Id.* at 262-63.)

17       Another reckless error involved a palm print left at the murder scene on a condom

18  machine in the men's room.  In Olson's crime scene diagram, he did not list a condom

19  machine in the men's room.  (PCR 9/26/14 Ex. 14 at 108.)  Olson said that was a mistake

20  on his part, an oversight.  (*Id.* at 110.)  This mistake escaped Olson's memory when he

21  said at the beginning of the deposition that he had made no mistakes that he was aware

22  of.  (*Id.* at 11.)

23       In addition, Olson agreed at the deposition that if Krone's Corvette were in the

24  parking lot of the bar after closing, that fact would have supported the theory that Krone

25  was the murderer.  (PCR 9/26/14 Ex. 14 at 164.)  A witness described a green car in the

26  parking lot, but Olson was not sure if they described it as a Corvette.  (*Id.* at 164-65.)

27  Nevertheless, Olson represented in his report that the witness thought she saw a Corvette

28  parked in the Fry's parking lot.  (*Id.* at 165.)  While agreeing that accuracy is an

1   important part of any police report—especially when a person is accused of murder and is

2   standing trial for his life—Olson said he misunderstood the witness; he admitted his

3   report was in error.  (*Id.* at 167-68, 171.)

4        Olson did not remember a time when the investigative team met to compare notes

5   on the progress of the case even though it was general protocol.  (PCR 9/26/14 Ex. 14 at

6   94.)  He speculated the team members may have met without Olson because he did the

7   crime scene investigation, but he did not do follow-ups.  (*Id.* at 95.)  The record,

8   however, showed that Olson did do follow up investigation in the case, and later became

9   the case agent in charge of the case.

10       Confusion, mistakes, oversights, omissions, sloppy investigation, not following

11  protocols—the information from Olson's deposition in the Krone civil suit provided a

12  stunning array of missteps by Olson in that investigation.  Even within the limitations

13  demanded by the court, the deposition provided powerful fodder to show that Olson was

14  simply not a thorough, contemplative, detail-oriented detective.  And, this line of cross-

15  examination fit precisely with Speer's theory that Olson committed investigational errors

16  in failing to properly preserve the phone call evidence.

17       The Olson deposition provided incredible insight into a disorganized, ungainly,

18  and inept investigation that bungled not one, but two cases—that of the innocent

19  defendant, Krone, and that of the actual perpetrator, who remained unprosecuted for

20  Ancona's murder during the ten years Krone was wrongly imprisoned.  It is an abject

21  primer on case investigation.  It would have provided powerful insight to the jury by

22  which to judge the credibility of the witness and the efficacy of the Speer investigation.

23       It was entirely unreasonable for defense counsel to fail to use this information to

24  cross-examine Olson within the strictures set by the court.  Even within those limitations,

25  there was significant, compelling information to be gained that bore directly on Olson's

26  credibility.  Without a doubt, cross-examination using the Krone case deposition would

27  have brought to the forefront the "shoddy police investigation or failure to follow up

28  leads" that were rife in the Speer case.  (RT 12/11/06 at 84.)

1    Counsel's decision to forego this critical line of cross fell below the objective

2    standard of reasonable conduct.  The *Strickland* expert who provided a declaration in

3    state post-conviction attested that the failure to cross examine Detective Olson using his

4    deposition in the Krone case constitutes conduct that falls below prevailing professional

5    objective norms.  (PCR 9/26/14 Ex. 2.)

6    Speer was prejudiced by his attorneys' decision to not cross-examine Olson using

7    his deposition in the Krone civil suit.  The prosecutor emphasized Olson's experience as

8    a veteran homicide detective.  The prosecutor elicited that he had been an officer for

9    thirty-one years, twenty-one of those as a detective.  (RT 12/6/06 at 126.)  He spent

10   fourteen of those years in the homicide division.  (*Id.*)  Olson took over as the case agent

11   when Detective Ullrich retired.  (RT 1/8/07 at 6.)  Olson's testimony highlighted all of

12   the work he did on the case.  For instance, he prepared the search warrant.  (RT 12/6/06

13   at 130.)  He served the warrant.  (*Id.* at 131.)  He directed photos be taken at the crime

14   scene.  He collected evidence.  (*Id.* at 131-32.)  He interviewed the jailhouse snitch who

15   helped break the case.  (RT 1/8/07 at 6.)  He took co-defendant Brian Womble's

16   fingerprints.  (*Id.* at 7.)

17   Defense counsel's strategy was to emphasize Olson's shoddy investigative

18   practices.  No better evidence of that existed than what they had in front of them—

19   concrete evidence of Olson's prior shoddy investigative work in the Krone civil-suit

20   deposition.

21   Even jurors asked about Olson's practices.  One juror questioned if there was a

22   policies and procedures manual for investigating homicides.  Olson replied that there was

23   not a detailed manual per se, but there was a directive saying officers will process scenes

24   correctly and thoroughly.  (RT 12/11/06 at 101.)  Olson added that there were many

25   seminars police attend that trained in different aspects of crime scene investigation.  (*Id.*

26   at 101.)

27   The defense attempted to attack Olson's investigation with regard to the selective

28   preservation of jail call recordings.  (RT 1/10/07 at 38-84.)  This cross-examination was

ineffective.  Olson testified that he gathered the evidence he thought was important to the case, and those were the calls he recorded.  (*Id.* at 84.)

By not using the most potent weapon to attack Olson's credibility—his own admissions of mistakes in the Krone case—the defense left the jury with only a view of a well-seasoned veteran homicide detective following his directive to "correctly and thoroughly" process his crime scenes and deftly conduct his investigation.  That image simply was not accurate given the information provided in Olson's deposition.  Given the contentiousness of the investigation surrounding the phone calls, this defense failure was a critical error.

Consequently, there is a reasonable probability that, but for his attorneys' decision to not cross-examine Olson with this powerful evidence, the result of the case may have been different.  This failure unquestionably undermines confidence in the outcome.

## C.    The State Court's Denial of the Claim Is Unreasonable

After the trial court set constraints on defense counsel's use of Detective Olson's civil suit deposition, Speer's attorneys used none of the deposition testimony to impeach Olson.  That deposition included powerful impeachment and credibility evidence against Olson.

In denying Speer's claim, the trial court observed that Arizona Rule of Evidence 608(b) "forbids extrinsic evidence to be used to prove specific instances of a witness' conduct in order to attack or support the witness' character for truthfulness."  (PCR ME 5/21/15 at 12.)  But that is not accurate.  The very next sentence of Rule 608(b) states, "But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of:  (1) the witness . . . " Ariz. Rev. Stat. Ann. § 608(b).  More importantly, the trial court did not forbid the use of Olson's civil deposition testimony; he merely restricted its use.

Olson could have been cross-examined within the parameters of both the evidence rule and the trial court's restrictions.  That trial counsel sought to do nothing in this regard to attack Olson's credibility established deficient performance.

67

1    Speer was prejudiced by this unreasonable failure.  Because of trial counsel's

2    deficient performance, the jury did not hear about Detective Olson's shoddy investigative

3    work in another case.  As a result jurors were denied critical information with which to

4    accurately evaluate and judge Detective Olson's credibility in Speer's case.  The bar to

5    federal review imposed by 28 U.S.C. § 2254(d) is therefore met, and this Court may

6    order evidentiary development and rule on the claim de novo.

7    **CLAIM 6**

8    **DEFENSE COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT
     TO THE COURT'S ACCOMPLICE INSTRUCTION AND FOR FAILING**

9    **TO OFFER A CORRECT ACCOMPLICE INSTRUCTION**

10   The trial court instructed the jury that Paul Speer could be convicted of capital

11   murder if they found he was an accomplice in *any* of the offenses charged, not just if he

12   were an accomplice to murder.  Trial counsel's failure to object to this instruction and

13   offer a correct accomplice instruction fell well below reasonable professional standards,

14   and prejudiced Speer, in violation of his constitutional right to the effective assistance of

15   counsel.

16   This claim was raised as Claim Fourteen in Speer's amended state post-conviction

17   petition and his Petition for Review.  (PCR 9/26/14 Pet. at 67-72; PFR at 34-48.)  The

18   state court denied the claim on the merits.  (PCR ME 5/21/15 at 21-23.)  With the claim

19   Speer charged that appellate counsel provided ineffective assistance by failing to present

20   the issue on direct appeal.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).

21   Speer will demonstrate at an evidentiary hearing that appellate counsel fell below the

22   standards of minimally competent capital attorneys and that those failures prejudiced

23   Speer.

24   In addition, the claim below, while framed as ineffective assistance of counsel,

25   should also be viewed in the light of trial court error, for failing to ensure due process and

26   a fair trial in violation of Speer's constitutional rights.  While the factual and legal bases

27   of the trial court error claim were presented on post-conviction review in Claim Fourteen

28   (PCR 9/26/14 Pet. at 67-72; PFR at 34-48), and the trial court error claim was denied by

68

the state court on post-conviction review (PCR ME 5/21/15 at 23), any procedural default which might be found can be excused in light of the ineffective assistance of state appellate and post-conviction counsel.  *See Strickland*, 466 U.S. at 687; *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985); *Martinez v. Ryan*, 566 U.S. 1, 9 (2012).

## A.   Speer Raised a Colorable Claim of Ineffective Assistance for Failure to Correct a Highly Damaging Instruction

The trial court's accomplice liability instruction reduced the State's burden of proof, thus denying Speer a fair trial and due process of law.

Pursuant to the Arizona Revised Statutes, Criminal Code § 13-301, "accomplice" means:

> a person, other than a peace officer acting in his official capacity within the scope of his authority and in the line of duty, who with the intent to promote or facilitate the commission of an offense:
> 1.  Solicits or commands another person to commit the offense; or
> 2.  Aids, counsels, agrees to aid or attempts to aid another person in planning or committing an offense.
> 3.  Provides means or opportunity to another person to commit the offense.

A.R.S. § 13-301 (1977).  A person is criminally accountable for the conduct of another if the person is an accomplice in the commission of an offense.  A.R.S. § 13-303(A), (A)(3).  Thus, in Arizona an accomplice is "a person . . . who with the intent to promote or facilitate the commission of an offense . . . [a]ids, counsels, agrees to aid or attempts to aid another person in planning or committing the offense."  *State v. Phillips*, 46 P.3d 1048, 1056 (Ariz. 2002).  In other words, the principal and the accomplice must have the same intent for the commission of the same planned crime, not simply any crime.  The *mens rea* between the two must coincide.  *See also State v. Noriega*, 928 P.2d 706, 710 (Ariz. Ct. App. 1996) ("In Arizona, proof of accomplice liability requires a showing not only that the defendant intended the behavior that is alleged to have aided, abetted, or provided means or opportunity, but also that the defendant intended that this behavior have the effect of promoting or facilitating the crime being committed.").

69

1    The accomplice instruction given in this case was the State's requested instruction

2    number six.  (RT 1/16/07 at 31-33.)  The State's proposed instruction was a correct

3    statement of the law as set forth in *Phillips*, 46 P.3d at 1057 (accomplice must intend to

4    facilitate or aid commission of the charged offense).  Also, as part of the discussion, the

5    prosecutor noted that the last paragraph was "added for the benefit of the defendant,

6    which is to say I have to prove they intended that specific crime committed, not just some

7    general crime."  (RT 1/16/07 at 32.)

8    However, the instruction actually given by the court to the jury read:

9    A person is criminally accountable for the conduct of
10    another if: One, acting with the culpable mental state
      sufficient for the commission of the offense, such person
      causes another person to engage in such conduct; or, two, the
11    person is an accomplice of the other person in the
      commission of *an* offense.
12    "Accomplice" means a person who, with the intent to
      promote or facilitate the commission of an offense, does any
13    of the following:
      1.  Solicits or commands another person to commit *an*
14    offense; or
      2.  Aids, counsels, agrees to aid, or attempts to aid
15    another person in planning or committing *an* offense; or
      3.  Provides means or opportunity to another person to
16    commit *an* offense.
      A defendant is criminally accountable for the conduct
17    of another if the defendant is an accomplice of such other
      person in the commission of the offense.  This criminal
18    liability extends only to offenses that the defendant intended
      to aid, solicit, facilitate, or command.

19

20   (RT 1/17/07 at 23 (emphasis added); *see also* ROA 585 at 18.)

21   The problem is the exchange of the words "the" and "an" between the statute and

22   the instruction read to the jury.  The statute permits accomplice liability if a person

23   solicits or commands another, or provides means or opportunity to another, to commit *the*

24   offense.  But here, the jury was instructed that it was sufficient to provide means or

25   opportunity to another to commit *an* offense, meaning, of course, *any* offense the

26   principal commits.

27   The words are small but the differences in their meanings could not be greater.

28   The statute references "the" offense, consistent with *Noriega* and *Phillips* in that the

70

principal and accomplice must have the same intent for the same offense in order for the accomplice to be criminally responsible.

But the court's instruction here changed that meaning by using the word "an" in place of "the."  Because Speer and Womble were charged with multiple offenses, this instruction permitted the jury to find, for instance, that Speer was Womble's accomplice for murder if their intents coincided just for the burglary charge.  Even shockingly, this instruction permitted Speer's conviction for capital murder as an accomplice if the jury found that Speer's and Womble's intents were the same for only the *conspiracy* charge.

Trial counsel presented the defense that Speer did not control Womble, and merely acquiesced in Womble's actions.  They argued that Speer did not share in Womble's criminal intent for the murder.  Given the instruction here, the jury was free to find Speer guilty of first-degree murder as long as his and Womble's intent coincided for *any* of the charged offenses.  The jury should have been properly instructed that the intent of the principal and accomplice must be the same for each of the offenses in order for Speer to be convicted as an accomplice to each of the offenses separately.  Instead, the accomplice instruction, which was so central to the trial, was deficient and failed to adequately inform the jury of what was legally required to properly find that Speer was Womble's accomplice.  Consequently, this deficient instruction denied Speer a fair trial and due process under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

Defense counsel never objected that the court's instruction did not track the language of the State's requested instruction, and, more importantly, did not track the law of accomplice liability.  Defense counsel did not object that the court's instruction was not a correct statement of the law, even after the court offered to provide the statute to defense counsel to compare to the instruction.  (RT 1/16/2007 at 32.)  Nor did defense counsel offer a correct instruction.

The failure to object to the incorrect instruction or to offer a correct instruction constituted conduct below the reasonably objective standard for the professional norm.

71

The failure to object to an erroneous jury instruction that constitutes the core of Speer's capital conviction constitutes ineffective assistance of counsel. *Strickland*, 466 U.S. 668.

Speer was prejudiced by counsel's failure to object to the erroneous instruction. Speer was in jail at the time of the offenses. The State's entire case revolved around Speer's criminal responsibility based on accomplice liability. Without this basis, the State would have been unable to convict Speer of any of the offenses other than the original burglary and, perhaps, tampering with a witness. He certainly could not have been convicted of capital murder. Thus, Speer was prejudiced by his attorneys' failure to object to the faulty accountability instruction. The incorrect instruction denied him a fair trial. Accordingly, Speer has demonstrated that he received ineffective assistance on this claim in violation of his constitutional rights.

## B.     The State Court Was Unreasonable in Its Denial of the Claim

In reviewing and denying this claim in Speer's state habeas petition, the trial court asserted that the accomplice liability instruction was intended to "advise the jury that, as to First Degree Murder, Defendant could be found guilty of the charged offense OR (*sic*) could be found guilty as an accomplice to First Degree Murder." (PCR ME 5/21/15 at 21.) The capitalization of the word "OR" was meant to emphasize that the court was instructing in the disjunctive. This factual finding is unreasonable, however. In light of the fact that Speer was in jail at the time of the killing, accomplice liability was the *only* option for conviction. This error warrants relief.

The trial court relied on *State v. Rojo-Valenzuela*, 334 P.3d 1276 (Ariz. Ct. App. 2014), to support its erroneous accomplice liability instruction. (PCR ME 5/21/15 at 21-22.) But, reliance on *Rojo-Valenzuela* is unreasonable.

In *Rojo-Valenzuela*, the appellant argued that, because the trial court instructed the jury that the "[defendant] engaged in conduct intended to aid another person to commit a crime," the jury was allowed to find the defendant guilty of attempted first-degree murder if it found that he had attempted to commit *any* crime, meaning any conceivable crime. 334 P.3d at 1285 (emphasis added). The court of appeals rejected this argument,

observing that, throughout his closing, the prosecutor focused on the connection between the charge of attempted first-degree murder and Rojo-Valenzuela's intent to commit first-degree murder. *Id*. at 1286-87.

In contrast, here, Speer was charged with other crimes—first-degree murder, attempted first-degree murder, conspiracy to commit first-degree murder, burglary in the first degree, and two counts of tampering with a witness. His trial also included two counts stemming from the original burglary for which he was in jail at the time of the murders. Those offenses were thus before the jury at the time of trial. Unlike the jury in *Rojo-Valenzuela*, Speer's jury had several other specific offenses before it to consider in its deliberations. For that reason, an absolutely precise accomplice instruction was necessary. Thus, *Rojo-Valenzuela*'s logic—that use of the word "a" in the accomplice instruction permitted the jury to convict if they found he committed any conceivable crime—is inapposite in a review of Speer's claim.

The trial court next observed that the accomplice instruction was read immediately "before" the first-degree murder instruction. (PCR ME 5/21/15 at 22.) The placement of the instruction, however, is meaningless to a jury; they are instructed to consider the content of the instructions, not their order. Moreover, the jury was instructed to consider all of the instructions. A faulty instruction is faulty whenever it might be given.

The trial court, on habeas review, then said that, at the time of trial, it consciously "guarded against possible misuse of the accomplice instruction" by instructing the jury that, "[a] defendant is criminally accountable for the conduct of another if the defendant is an accomplice of such other person in the commission of *the* offense." (PCR ME 5/21/15 at 22 (emphasis in original).) However, both the court in its instructions and the prosecutor in closing went back and forth between "an offense" and "the offense"—thus further confusing the requirements for accomplice liability for the jury.

The trial court acknowledged that its instruction was "not as clear as it could have been." (PCR ME 5/21/15 at 23.) Nevertheless, the court found the error harmless. (*Id.*) By extension, the court found that trial counsel's failure to object to the instruction was

also without prejudice. (*Id.*) Such a finding, made by the trial court on collateral review in its own defense, is unreasonable.

There is a reasonable probability that the accomplice liability instruction, as given to the jury, coupled with the fact that Speer was charged with multiple crimes at his trial, would have led reasonable jurors to conclude it was permissible to convict Speer for first-degree murder if they found he was an accomplice to other offenses, such as burglary or the conspiracy.

Had trial counsel objected, there is a reasonable probability of a different outcome. Thus, both trial and appellate counsel were prejudicially deficient in failing to object to the erroneous instruction at trial, offer a correct instruction, and raise the issue on direct appeal.

## CLAIM 7

### TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO MOVE TO VACATE SPEER'S CONVICTION AND SENTENCE AFTER THE SAME PROSECUTOR PRESENTED A CONFLICTING THEORY OF THE CRIME AT WOMBLE'S TRIAL

Under the Arizona Rules of Criminal Procedure Rule in place at the time of Speer's trial, Rule 24.2(a) made provision for a motion to vacate a judgment no later than sixty days after the entry of judgment and sentence if the conviction was obtained in violation of the constitution. Ariz. R. Crim. P. 24.2(a). Brian Womble was tried by the same prosecutor within that time period. Trial counsel for Speer knew that Womble had come up with the plan to, and had actually killed, the victim in the trials. They also knew that the prosecutor had painted Speer as the mastermind in his trial. Finally, trial counsel were aware of the prosecutor's questionable ethical standards when it came to capital convictions and sentences. Yet Speer's trial counsel failed to follow the linked Womble trial in any way. They failed to attend, they failed to request and review daily transcripts, and they failed to follow media reports on the Womble trial. Thus they missed the clear fact that the prosecutor presented the contradictory theory of the crime at the linked trial; where in the Speer trial Speer had been responsible, in the Womble trial Womble was the

74

responsible party, the instigator of the crime.  Had they performed according to reasonable professional standards, they would have filed a strong motion to vacate Speer's conviction and sentence because of the State's violation of Speer's rights to due process and a fair trial.  There would have been a reasonable probability of a changed outcome.  Thus, because Speer's constitutional right to the effective assistance of counsel was violated, his conviction and sentence must be overturned.

Speer did not present this claim to the state court as a result of appellate and post-conviction counsels' deficient performance.  The deficient performance of state appellate and post-conviction counsel prejudiced Speer and provides cause to excuse any procedural default.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985); *Martinez v. Ryan*, 566 U.S. 1, 9 (2012).  Speer will demonstrate at an evidentiary hearing that both his appellate and post-conviction counsel were ineffective and that both counsel fell below the standards of a minimally competent capital attorney when they failed to raise this meritorious claim.

Speer incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

## A.    Relevant Facts

### 1.    The Prosecutor Convinced the Jury to Convict and Sentence Speer to Death by Portraying Him as the Mastermind Who Manipulated His Vulnerable Younger Brother into the Crime

In the Speer trial, the prosecutor, Jeanette Gallagher, had to contend with a defendant who had been in prison at the time of the shooting.  She did not have to prove that he was the prime mover in the murder—just proving he was an accomplice could just as surely result in a first-degree murder conviction—but she wanted to ensure she got a death sentence even for the non-shooter defendant who was less culpable.

From her opening statement she portrayed Speer as the responsible party.  She informed the jury that Speer was four years older than his half-brother.  (RT 12/5/2006 at 34.)  She stated that Womble was depressed and suicidal, but Speer did not care.  (*Id.* at 35.)  Instead, Speer continued to pressure his emotionally vulnerable kid brother.  (*Id.* at

75

41, 58.)  He did this because "[h]e [Speer] decided that his freedom was more important than the lives of Adan and Enriqueta Soto.  So he ultimately decided that the Sotos had to die."  (*Id.* at 32-33.)

In closing argument Gallagher was more explicit, repeating the strengthened allegations.  For example, she made the following statements to the jurors:

- "This case is all about manipulation.  And as you've seen, the defendant is very good at it. . . .  He manipulated his younger half-brother, Brian Womble, into shooting two innocent people in cold blood."  (RT 1/17/07 at 32.)
- "[Speer is] guilty of those crimes because he is accountable for the actions of his half-brother, Brian Womble."  (*Id.* at 33.)
- "He caused Brian to shoot the Sotos."  (*Id.* at 34.)
- "Paul Speer is a manipulator, and he manipulated his own brother into committing a murder.  Knowing that Brian was depressed over being dumped by some girl, knowing that Brian was contemplating suicide, defendant guilted him into doing his dirty work."  (*Id.* at 120.)
- "He didn't care about Brian.  He guilted him: 'I did all this for you.  Now you got to do something for me.'"  (*Id.* at 121.)
- "The next day after Brian brings up plan B, the defendant said to him:  'If it goes down like this, bro', I'm putting my fucking life in your hands, bro'.  My life's in your hands.'  In a depressed, suicidal 19-year-old."  (*Id.*)

Thus, Gallagher pounded the argument—only ambiguously supported by any evidence—that Speer ruthlessly and mercilessly manipulated his needy little brother into committing murder.  She made the jury believe that Speer emotionally blackmailed a suicidal family member, for whom he should have been caring, into committing the worst of crimes.  She made it appear that Speer committed a crime not only by conspiring in the murder, but also by emotionally killing his kid brother's mind, heart, and future.  She did this to ensure a death sentence against a non-shooter.

### 2. In Turn, in Womble's Trial, Womble Was the Mastermind with the Plan, the Gun, and the Evil Intent

Yet, at closing in Womble's trial, the same prosecutor, Jeanette Gallagher, interpreted the same jail tapes to make the polar opposite argument—sometimes even using the same words and phrases, but with regard to different brothers. While of Speer she had said: "He [Speer] decided that his freedom was more important than the lives of Adan and Enriqueta Soto" (RT 12/5/2006 at 32-33), she turned this sentiment around in the second trial and stated, "He [Womble] decided that his half-brother's freedom was more important than the lives of the people that Paul Speer had stolen from" (Womble RT 4/25/2007 at 25). She unironically ascribed the same motivation and power to decide to two different people.

In closing she really pushed the idea of Brian Womble as the prime mover and mastermind, who manipulated his "loser" brother because he enjoyed the idea and reality of taking lives:

- "Plan B was [Womble's] idea, and it was [he] who decided to go ahead with that plan rather than just talk to the Sotos, as Paul Speer had suggested." (Womble RT 4/25/2007 at 48.)

- And the bottom line is that there is only one person responsible for the fact that [Womble] now sits at the defense table facing the death penalty, and that person is [Womble] himself. He made the choices and decisions that put him where he is today." (Womble RT 5/3/2007 at 58.)

- "Now, what else do you know about the defendant's character? You know that he wanted to see what .45-caliber bullets do to a person's skull." (*Id.* at 59.)

- "How much influence did Paul Speer have over his brother? The jail tapes that you've listened to suggest that he didn't have much, if any, influence over him. [Womble] was perfectly capable of saying no to his brother, and he did so on more than one occasion." (*Id.* at 61.)

- "The defendant also knew that his brother, Paul Speer, was a loser . . . you're supposed to believe that Paul Speer managed to exercise undue influence over the defendant and hound him into doing something he didn't want to do.  Well, remember whose idea it was to murder the Sotos.  It was the defendant's idea.  Paul Speer didn't even ask Brian Womble to help him.  The defendant volunteered his help . . . Brian Womble volunteered his help."  (*Id.* at 66-67.)

- "The defendant unilaterally made the decision to kill Adan and Enriqueta Soto.  He came up with the plan and he decided that's what he was going to do.  You have every call that Speer made, from the one on April 29th when the defendant first offered to go talk to the Sotos, to the one on April 30th where the defendant decided to kill them.  So that you know, listen to all of them.  You know that Paul Speer didn't suggest killing anyone.  The defendant came up with that idea all on his own."  (*Id.* at 69.)

- "Paul Speer was not a very successful criminal.  He'd already spent four years in prison for armed robbery and he'd gotten caught within an hour of breaking into the Sotos' apartment on March 14th, so why would the defendant listen to him?  He didn't.  Brian Womble came up with his own plan for eliminating the Sotos as witnesses."  (*Id.* at 71.)

- "[Womble] didn't murder Adan Soto because his brother hounded him or pressured him into doing it, he did it because he wanted to.  Shooting the Sotos was his idea, and he did it because he thought shooting the Sotos would be fun."  (*Id.* at 72.)

In Brian Womble's trial, Gallagher shamelessly disparaged and disproved the arguments that she herself had used in Speer's trial to convince the jury to convict Speer to capital murder.  She crossed the bounds requiring prosecutors to be more concerned with justice than with harsh marks tallying wins.

78

### 3. These Facts Should Have Been Known to Trial Counsel Within the Statutory Time to File a Motion to Vacate

The Arizona Rules of Criminal Procedure allow a defendant to move to vacate "no later than 60 days after the entry of judgment and sentence."  Ariz. R. Crim. P. 24.2.  The jury handed down Speer's verdict on March 29, 2007; the court set the date for entry of judgment of guilt and sentencing at May 11, 2007.  (RT 3/29/2007 at 9.)

Speer's counsel therefore had until July 10, 2007—sixty days after the entry of judgment—in which to file a motion to vacate.  The trial of Brian Womble began on April 10, 2007.  The prosecutor gave her closing statements, referenced above, on May 3, 2007.  Speer's trial counsel therefore had more than two months after the constitutional violation was made clear in which to request transcripts, review the State's statements, and move to vacate Speer's sentence.  They failed to do so.  They left Speer's death sentence unchallenged.

## B. Relevant Law

### 1. Rule 24.2, Motion to Vacate Judgment

The Arizona Rules of Criminal Procedure allow the following:  "Upon motion made no later than 60 days after the entry of judgment and sentence . . . , the court may vacate the judgment on any of the following grounds: . . . (2) That newly discovered material facts exist . . . ; or (3) That the conviction was obtained in violation of the United States or Arizona Constitutions."  Ariz. R. Crim. P. 24.2(a).  In this situation, the constitutional violation occurred after trial, in the course of Womble's trial.  Effective counsel should have discovered that violation and moved to vacate judgment.

Arizona courts have granted motions to vacate in a number of cases where new evidence was discovered after trial.  *See, e.g.*, *State v. Fisher*, 859 P.2d 179 (Ariz. 1993) (petitioner's wife disclosed that petitioner had been extremely intoxicated at time of crime); *State v. Hickle*, 650 P.2d 1216 (Ariz. 1982) (co-defendant admitted to having lied at trial); *State v. Orantez*, 902 P.2d 824 (Ariz. 1995) (newly discovered evidence that the state's sole witness was using illegal drugs at the time of the underlying incident); *State v.*

*Nettz*, 560 P.2d 814 (Ariz. Ct. App. 1977) (posttrial showing that evidence on which the State had relied to convict had been invalid).

Here, trial counsel will admit that the standard of practice required him to gather information on the trial that was so closely linked to his client's, that was being prosecuted by the same prosecutor, and whom trial counsel knew to be ruthless in pursuing her goals.  He has no reasonable strategic explanation for his failure to do so.

**2.      There Is a Reasonable Probability that a Motion to Vacate Would Have Been Granted**

Speer was prejudiced by trial counsel's failure to file a motion.  The case law supported a grant of the motion, because the prosecution engaged in misconduct by arguing at Speer's trial that he was the one person who made the crime happen, while arguing at his co-perpetrator's trial that *he* was the one person responsible for bringing about the tragedy.  By presenting incompatible, inconsistent theories regarding what the same evidence showed about ultimate responsibility for the crime in separate trials, the prosecution violated its duty under *Brady* "to prevent fraud upon the court, and to elicit the truth."  *Morris v. Ylst*, 447 F.3d 735, 744 (9th Cir. 2006) (quoting *Northern Mariana Islands v. Bowie*, 243 F.3d 1109, 1117 (9th Cir. 2001)).

The specific type of misconduct at issue here, *i.e.*, manipulating evidence and arguing inconsistent theories of culpability at seriatim capital trials, has been specifically condemned in other capital cases as a violation of due process.  In *Drake v. Kemp*, 762 F.2d 1449 (11th Cir. 1985), the court condemned prosecutorial misconduct in arguing at a co-defendant's trial that the co-defendant was the killer while having that co-defendant testify at Drake's trial that Drake was the killer.  Judge Clark's special concurrence noted that a prosecutor's use of inconsistent theories to gain convictions against two co-defendants violates due process:  "The state cannot divide and conquer in this manner.  Such actions reduce criminal trials to mere gamesmanship and rob them of their supposed purpose of a search for truth."  *Id.* at 1479 (Clark, J., concurring).  These inconsistent presentations and arguments violate the fundamental fairness essential to the very

concept of justice. *Lisenba v. California*, 314 U.S. 219, 236 (1941); *see also Thompson v. Calderon*, 120 F.3d 1045, 1058 (9th Cir. 1997) (en banc), *rev'd on other grounds*, 523 U.S. 538 (1998) (based on "bedrock principles, it is well established that when no new significant evidence comes to light a prosecutor cannot, in order to convict two defendants at separate trials, offer inconsistent theories and facts regarding the same crime").

In addition, the Supreme Court has stressed that the Eighth Amendment commands a "heightened need for reliability" in capital sentencing. *Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985). A capital petitioner who fails to establish a due process violation may still prevail based on "more particular guarantees of sentencing reliability based on the Eighth Amendment." *Sawyer v. Smith*, 497 U.S. 227, 235 (1990). In *Jacobs v. Scott*, 513 U.S. 1067, 1068 (1995), two Justices dissented from the denial of certiorari and condemned prosecutorial inconsistency about the actual killer as "fundamentally unfair." *See also Bradshaw v. Stumpf*, 545 U.S. 175 (2005) (finding prosecutorial inconsistency "immaterial" to guilt phase, but remanding to the court of appeals to determine whether the prosecution's inconsistent theories about the actual killer rendered the death sentence unconstitutional); *Stumpf v. Houk*, 653 F.3d 426, 435, 439 (6th Cir. 2011), *vacated pending rehearing en banc* (Oct. 26, 2011) (death sentence was vacated on remand after the prosecutor presented arguments leaving the impression that the petitioner was the principal offender, despite the state having evidence that a co-defendant was the triggerman).

Because the wholly inconsistent theories presented by the prosecution violated the essential integrity of the process and rendered Speer's trial fundamentally unfair, Speer's due process rights were violated. Had the trial court been presented with this violation, there is a reasonable probability that it would have granted a motion to vacate Speer's judgment. Trial counsel's failure to file that motion prejudiced him, and violated his right to effective assistance of counsel.

1

2

**CLAIM 8**

**THE TRIAL COURT VIOLATED SPEER'S DUE PROCESS RIGHTS WHEN IT DENIED HIS MOTION TO SUPPRESS INCULPATORY JAIL RECORDINGS AFTER THE STATE HAD ALLOWED OTHER MITIGATING RECORDINGS TO BE DESTROYED**

3

4

5

6

7

8

9

10

11

12

The factual basis for this and other claims relating to the State's spoliation of potentially exculpatory evidence is provided in full in Claim 1. In sum, police subpoenaed a total of fifty-eight phone calls between Speer and his half-brother Brian Womble. They listened to thirty-six of those calls, and selected twenty-seven of them to present at trial. The other thirty-one were destroyed without being reviewed by trial counsel. Speer moved to suppress the twenty-seven calls selected and preserved by the State; but the trial court denied the motion. Speer's right to due process was violated by this spoliation of evidence that the State knew was likely to contain potentially exculpatory information.

13

14

15

16

17

18

19

Portions of this claim were raised in Speer's direct appeal, as Guilt Claim One. (DA dkt. 87 at 14-19.) The Arizona Supreme Court denied the claim on the merits. *State v. Speer*, 212 P.3d 787, 795 (Ariz. 2009). The claim, expanded, was raised as Claim One in Speer's state post-conviction petition and Petition for Review. (PCR 9/26/14 Pet. at 4-20; PFR at 7-12.) The state court found that this claim was precluded by Rule 32.2(a)(2) because it was raised on direct appeal and denied on the merits. (PCR ME 5/21/15 at 5.) The court also denied the claim on the merits. (*Id.* at 5-6.)

20

21

22

Speer incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

**A.    Legal Basis for the Claim**

23

24

25

26

27

28

The State has a duty to preserve exculpatory evidence. *California v. Trombetta*, 467 U.S. 479, 485 (1984). This duty exists even where no requests are made for the evidence. *United States v. Agurs*, 427 U.S. 97 (1976). When the State suppresses or fails to disclose material exculpatory evidence, the good or bad faith of the prosecution is irrelevant:  a due process violation occurs whenever such evidence is withheld. *Brady v.*

82

*Maryland*, 373 U.S. 83 (1963).  However, the Due Process Clause "requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant."  *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988).  The failure to preserve this "potentially useful evidence" does not violate due process unless a criminal defendant can show bad faith on the part of the police.  *Id.* at 58.  Bad faith turns less on the actor's intent than on the actor's knowledge that the evidence was constitutionally material.  *Id.* at 56 n.*.

Favorable, or "useful," evidence includes both exculpatory and impeachment material that is relevant either to guilt or punishment.  *See United States v. Bagley*, 473 U.S. 667, 674-76 (1985); *Giglio v. United States*, 405 U.S. 150, 154 (1972).  Evidence may be "favorable" for *Brady* purposes even if it seems inculpatory at first blush as long as the defendant can use it to make a point helpful to his defense.  *United States v. Howell*, 231 F.3d 615, 625 (9th Cir. 2000).  It does not mean evidence of innocence; rather all that is required is a showing of benefit to the defense.  *Gantt v. Roe*, 389 F.3d 908, 912 (9th Cir. 2004).  The exculpatory value of the evidence must be apparent before the evidence was destroyed.  *Trombetta*, 467 U.S. at 489.  And, the prosecutor is charged with knowledge of any *Brady* material of which the prosecutor's office or the investigating police agency is aware.  *See Youngblood v. West Virginia*, 547 U.S. 867, 869-70 (2006) (per curiam).

**B.    The Trial Court Erred in Denying Speer's Motion to Suppress the Selected Calls**

The prosecutor argued at the suppression hearing that she was not required to preserve every piece of evidence potentially relevant to the defendant.  (RT 7/28/06 at 55-56, 71.)  Yet, defense did not seek every recorded statement of the defendant.  They sought only those calls that had been specifically targeted and requested by the police in their investigation.  Never mentioning the twenty-two calls that were not listened to nor preserved by police, the prosecutor said the defense was on notice of what calls were not

83

1    preserved because they received Supplement 39 from the State which detailed the nine

2    calls the police listened to but did not preserve.  (*Id.* at 70.)  But Detective Olson admitted

3    at the hearing that Supplement 39 did not list, nor refer to, the twenty-two calls that were

4    not listened to or preserved.  (RT 5/19/06 at 76.)  Finally, the prosecutor said the State

5    was not obligated to keep calls police did not listen to.  Defense had the independent

6    obligation to collect them.  (RT 7/28/06 at 72.)

7            The State was making a failure-to-collect argument.  The duty to preserve material

8    evidence under *Trombetta* is limited to evidence that has actually been gathered.  467

9    U.S. at 488-90.  But though the police ordinarily have no duty to collect exculpatory

10   evidence, a bad faith failure to collect exculpatory evidence may constitute a due process

11   violation.  *See Miller v. Vasquez*, 868 F.2d 1116, 1119-21 (9th Cir. 1989) (due process

12   requires police to gather and collect evidence where police themselves by their conduct

13   indicate that the evidence could form a basis for exoneration).  Here, the police collected

14   fifty-eight calls specifically targeted as relevant to the planning of the crime, but failed to

15   listen to and preserve them all, though their stated intention was to review them all.

16   Additionally, Olson knew what mitigation evidence was and knew that he needed to

17   preserve it for the defense.

18           Nevertheless, the prosecutor continued to rely on this argument.  Later in the trial,

19   while discussing jury instructions, she maintained, "I'm not going to take Mr.

20   Blumberg's [defense co-counsel] word for it since he told you the other day with all

21   certainty that I had a duty to seek out exculpatory evidence for him, which the case law

22   says I don't."  (RT 1/17/07 at 10.)  The prosecutor, however, did in fact have a "duty to

23   learn of any favorable evidence known to the others acting on the government's behalf in

24   the case, including the police."  *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).  The phone

25   calls at issue were not unknown to the prosecutor.  The police specifically targeted those

26   calls, and had all fifty-eight calls in their possession.  The twenty-two destroyed calls

27   were in the State's control and were reasonably understood by them to be relevant.  Olson

28

intended to listen to those twenty-two calls.  Thus the State's argument was incorrect or disingenuous.

The trial judge denied the defense motion.  (PCR 9/26/17 Ex. 5.)  The court first found the defense had failed to show that any of the destroyed tapes were exculpatory.  As discussed below, Speer had only to show that the material was *potentially* exculpatory, which he did.  Moreover, in finding no bad faith by the police or the State, the court only focused on the nine calls police reviewed but did not preserve.  In fact, the court's order specifically mentioned only the thirty-six phone calls.  But there were not thirty-six phone calls.  There were fifty-eight phone calls.  The judge said the jury would hear that some tapes were destroyed and the defense would still be able to argue it was a selective presentation.  (*Id.* at 2.)

The twenty-seven tapes were admitted at trial against Speer.  On appeal, the Arizona Supreme Court, citing *Illinois v. Fisher*, 540 U.S. 544, 549 (2004) (per curiam), noted the distinction for constitutional purposes "between 'material exculpatory' evidence and 'potentially useful' evidence."  *Speer*, 212 P.3d at 795.  The Court found Speer had not established that the destroyed tapes contained material exculpatory evidence or that the police acted in bad faith.  *Id.*  In the subsequent, and last, reasoned opinion by the superior court on post-conviction review, the trial court agreed with the Arizona Supreme Court's agreement with its own ruling at trial.  (PCR ME 5/21/15 at 6.)  As it summarized, "Defendant did not establish that the destroyed tapes contained material exculpatory evidence, mitigated his participation in the murder plot, or showed that the police acted in bad faith."  (*Id.*)  The court also states that it would have ruled the same way had the unreviewed calls been included in its consideration.  (*Id.*)

## C.    This Claim Warrants Relief Under § 2254(d)

In their decisions, the state courts failed to considered the implications of *Kyles v. Whitley* or *Stickler v. Greene*, 527 U.S. 263 (1999).  Consequently, the decisions were contrary to or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court or were based on an unreasonable

1   determination of facts in light of the evidence presented in court.  *See, e.g.*, *Johnson v.*
2   *Williams*, 568 U.S. 289 (2013).

3         **1.**    **Unreasonable Application of and/or Contrary to Clearly**
                **Established Law**
4

5         **a.**    **The Destroyed Calls Were Exculpatory**

6         First, the state court found that Speer had not shown the destroyed tapes contained
7   material exculpatory evidence.  (PCR ME 5/21/15 at 6.)  However, under *Youngblood*, a
8   defendant does not have to show the destroyed evidence was material.  Rather, the
9   evidence need only be "potentially exculpatory."  *Youngblood*, 488 U.S. at 57-58.  In
10  fact, it is the difference between "material exculpatory evidence" and "potentially
11  exculpatory evidence" that distinguishes the *Brady* line of cases from the
12  *Trombetta/Youngblood* line of cases.  *Fisher*, 540 U.S. at 547-48.  It is the distinction
13  between "exculpatory evidence" and "potentially useful evidence" that caused the
14  *Youngblood* Court to require a defendant to show bad faith by police in order to prevail.
15  *Id.* at 548.

16        Speer did demonstrate that the twenty-two destroyed tapes were potentially
17  exculpatory.  Twenty-six of the twenty-seven preserved tapes, or 96% of the retained
18  calls, contained mitigation evidence.  In several calls, Speer encouraged Womble to just
19  talk to the victims and offer them money or a gun to not come to court.  (ROA 376, Supp.
20  42, 43, 44, 77.)  In one call, Speer told Womble that he "did those things" with Al
21  Heitzman so that Heitzman would pay for Womble's college and martial arts classes, and
22  so Delilah could get clothes.  Speer did those things to help his family, so they could "sit
23  proper."  (*Id.* at Supp. 77.)  In all but one of the twenty-seven preserved phone calls Speer
24  expressed his love for his family and friends.  (ROA 376.)

25        More importantly, the two calls recorded by Al Heitzman, neither of which the
26  State listened to in their initial review, both contained the love-of-family mitigation
27  advanced by Speer.  In the Heitzman-recorded call on April 19, 2002, Speer asked
28  Womble to come visit him, and the brothers tell each other they love the other.  (Trial Ex.

114.002 at 8, 9.)  In the May 5, 2002, Heitzman-recorded call, Speer and Womble try to convince Heitzman to bail Speer out.  Explaining to Heitzman why he would not fail to appear in court, Speer said, "The reason why is because I wanted to stay where my brother, Brian, was, that's why."  Then, "That's exactly why Al, because I didn't want to leave my family."  (Trial Ex. 160.002 at 2.)  These two calls, which must have been part of the unpreserved twenty-two calls, prove that the twenty-two unpreserved calls contained mitigation.  By showing that a statistically significant amount of mitigation existed on the preserved calls, it can be inferred that the destroyed calls also contained at least some mitigation.  Tellingly, the fact that the two Heitzman-recorded calls contained mitigation substantiates a reasonable probability that the destroyed calls were exculpatory.

Both *Trombetta* and *Youngblood* involved evidence which the police permanently lost or destroyed before its inculpatory or exculpatory value could be conclusively determined.  In both cases, the police had no reason to believe that the evidence would be exculpatory at the time it was destroyed.  But that is not the case here.  Unlike in *Trombetta*, the digital calls were not simply destroyed in the normal course of police business.  The caretaker for the recordings at the prison testified that, unless requested by a party, the tapes were normally recycled.  But here, that normal destruction process was interfered with—by the government.  When Detective Olson listened to thirty-six of the fifty-eight calls he requested, he discovered twenty-seven contained both mitigation as well as inculpatory information.  Hence, the "normal course" of destruction was interfered with such that it can no longer be said the remaining, twenty-two unreviewed calls were simply destroyed in the normal course.

In its decision denying post-conviction relief, the trial court speculated that the calls, "if disclosed, would have been more incriminating than having any tendency to exonerate Defendant or provide mitigation."  (PCR ME 5/21/15 at 5.)  However, the comment is not relevant to the analysis.  The question is not whether the destroyed calls would have been more incriminating than exculpatory, but whether the State destroyed

1   evidence in its possession that contained potentially exculpatory evidence, or whether

2   Speer can show more than a mere possibility that the destroyed evidence actually

3   contained exculpatory evidence that was destroyed in bad faith.  Speer has shown both

4   bad faith and a reasonable likelihood that exculpatory evidence was destroyed.

5         As a result, the trial court abused its discretion in dismissing this claim.  The claim

6   is not precluded.  The issue involves factual disputes that need to be resolved.  The claim

7   is colorable.  If true, there is a reasonable probability of a different outcome.

### b.      The State Acted in Bad Faith in Allowing Twenty-Two Phone Calls to Be Destroyed

9

10        In denying Speer's motion to suppress the twenty-seven preserved phone calls, the

11  court found the police had not lied or acted in bad faith.  (PCR 9/26/14 Ex. 5.)  That

12  finding is erroneous.  It later compounded that error, analyzing the claim against the

13  dictates of clearly established federal law, when it restated its earlier decision on post-

14  conviction review.  (PCR ME 5/21/15 at 5-6.)  Bad faith turns on "the police's

15  knowledge of the exculpatory value of the evidence at the time it was lost or destroyed."

16  *Youngblood*, 488 U.S. at 56, n*.  If the exculpatory value was apparent before the

17  evidence was destroyed, if it "might be expected to play a significant role in the suspect's

18  defense," and was of such a nature that the defendant would be unable to obtain

19  comparable evidence by other reasonably available means, then the destruction occurred

20  in bad faith." *Trombetta*, 467 U.S. at 488-89.

21        In *Fisher*, 540 U.S. 544, the court found no due process violation because the

22  defendant failed to establish bad faith.  In a possession of cocaine prosecution, although

23  police destroyed the evidence, police testing indicated that the chemical makeup of the

24  substance inculpated, not exculpated, Fisher and it was undisputed that police acted in

25  "good faith and in accord with their normal practice." *Id*. at 548 (internal quotation

26  marks omitted).

27        In contrast, here, the police did not act in accordance with their normal practices.

28  They targeted and seized fifty-eight telephone calls.  All fifty-eight were in their sole

possession.  Twenty-two calls were not reviewed prior to destruction even though Detective Olson intended they be listened to.  (RT 5/19/06 at 76-77.)  Because Detective Olson knew 75% of the calls he listened to contained mitigation evidence, he reasonably knew that at least 75% of the twenty-two calls he intended but failed to listen to also contained mitigation evidence.  Thus, the exculpatory value was apparent before the twenty-two calls were destroyed.  *Trombetta*, 467 U.S. at 489.  The mitigation from the twenty-seven preserved calls demonstrates that the mitigation from the twenty-two unpreserved calls could be expected to play a significant role in the defense.  *Id.* at 488-90.  They were also of such a nature that Speer was unable to obtain comparable evidence by other reasonably available means.  Therefore, the destruction of the twenty-two phone calls meets the *Trombetta* test for bad faith.

Under the circumstances here, where police knew that the majority of all calls were likely to include mitigation evidence, the police were legally obligated to preserve all the targeted calls.  The State's actions meet both the second and third circumstance described in *Kyles v. Whitley*—the State failed to accede to a defense request for disclosure of some specific kind of exculpatory evidence, and the State failed to volunteer exculpatory evidence never requested, or requested only in a general way, if the court believed the discovery request made was not specific enough.  Moreover, the very idea that the prosecutor claimed she had provided discovery by noticing the nine calls in Supplement 39 that the police listened to and discarded, while she knowingly let the clock tick down on the destruction date for the twenty-two unreviewed calls, is quintessential bad faith.

> [A]ctual awareness (or lack thereof) of exculpatory evidence in the government's hands. . . is not determinative of the prosecution's disclosure obligations.  Rather, the prosecution has a duty to learn of any exculpatory evidence known to others acting on the government's behalf.  Because the prosecution is in a unique position to obtain information known to other agents of the government, it may not be excused from disclosing what it does not know but could have learned.

1  *Carriger v. Stewart*, 132 F.3d 463, 479-80 (9th Cir. 1997) (en banc) (citations omitted).

2  "'[T]he individual prosecutor has a duty to learn of any favorable evidence known to the

3  others acting on the government's behalf in th[e] case, including the police.'"  *Strickler*,

4  527 U.S. at 281 (quoting *Kyles*, 514 U.S. at 437).

5  Therefore, Speer has demonstrated he was denied due process by the State's bad

6  faith destruction of the twenty-two potentially exculpatory calls.  The state court's

7  affirmance in the last reasoned opinion of its own prior denial of Speer's motion to

8  suppress was thus contrary to or involved an unreasonable application of clearly

9  established federal law as determined by the United States Supreme Court or was based

10  on an unreasonable determination of facts in light of the evidence presented in court.

11  Consequently, Speer has raised a colorable claim that his rights to due process and a fair

12  trial under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution

13  were violated.

14  ## 2.    Unreasonable Determination of Facts

15  The trial court denied Speer's motion to suppress the preserved calls. That finding

16  was upheld on direct appeal.  The Arizona Supreme Court found that Speer did not

17  establish that the destroyed tapes contained material exculpatory evidence or that the

18  police acted in bad faith.  *Speer*, 212 P.3d at 795.  Yet, neither the trial court nor the

19  Arizona Supreme Court was aware that the total number of calls at issue was fifty-eight,

20  not thirty-six.

21  In its minute entry denying the motion to suppress, the trial court said "Detectives

22  listened to 36 recorded phone calls . . . "  (PCR 9/26/14 Ex. 5 at 1.)  Thirty-six refers to

23  the twenty-seven preserved calls plus the nine calls Olson listened to but did not preserve.

24  This mistaken fact also made its way into the Arizona Supreme Court's decision on

25  Speer's appeal:

26  Nine recordings listed in the . . . search were not copied or tagged by the detectives and were thus destroyed when

27  MCSO reused the tapes.  Speer moved to suppress the twenty-seven preserved recordings.

28

1     *Speer*, 212 P.3d at 794.

2         Subsequently, on post-conviction review, the superior court was made aware that

3 there were an additional twenty-two recorded phone calls, relevant to the circumstances

4 of the crime, gathered by the police, and then destroyed without being reviewed—as the

5 detectives later testified they had intended to do.  The court summarily dismissed these

6 facts, stating only that it would have made a "similar determination" regarding the lack of

7 exculpatory value and failed showing of bad faith that it made the first time.  (PCR ME

8 5/21/15 at 6.)  In doing so, it failed to take into consideration the fact that the bad faith

9 analysis had to be affected by the showing of the additional calls.  With regard to the nine

10 calls the courts had thought were destroyed at the trial proceedings and on direct appeal,

11 the superior court had now been shown that the police had considered twenty-two

12 additional calls material; had targeted and subpoenaed them; and had had them destroyed

13 *without first reviewing them*.  The State kept from the defense twenty-two calls that it

14 could not even argue it knew to be lacking in potentially exculpatory evidence.  Thus, the

15 state court failed, in its last opinion, to apply the clearly established federal law regarding

16 the bad faith element of the claim to the relevant facts.

17         The claim is not precluded because it involves a mistake of fact essential to a

18 correct resolution of the claim.  Currently, the claim involves an unreasonable

19 determination of the facts.  Additionally, Speer raised colorable claims that the destroyed

20 calls were exculpatory and that the State acted in bad faith.  Thus, the trial court abused

21 its discretion in denying the claim on the merits.

22 **CLAIM 9**

23        **THE TRIAL COURT'S FAILURE TO GIVE THE JURY A WILLITS**
       **INSTRUCTION VIOLATED SPEER'S RIGHT TO DUE PROCESS**

24

25         Portions of this claim were raised in Speer's direct appeal, as Guilt Claim Two.

26 (DA dkt. 87 at 19-21.)  The Arizona Supreme Court denied the claim on the merits.  *State*

*v. Speer*, 212 P.3d 787, 795 (Ariz. 2009).  The claim, expanded, was raised as Claim Six

27 in Speer's state post-conviction petition and Petition for Review.  (PCR 9/26/14 Pet. at

28

31-36; PFR at 17-20.)  The state court found that this claim was precluded by Rules 32.6(d) and 32.2(a) because it was raised on direct appeal and denied on the merits. (PCR ME 5/21/15 at 9-10.)  The court also denied the claim on the merits.  (*Id.*)

## A.    Factual Basis

Speer incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition, particularly those in Claims 1, 2, 3, 4, 8, and others.

The State's theory of the case was that Speer conspired with his half-brother Brian Womble to kill the victims of a burglary for which Speer was charged.  Since Speer was in jail for that burglary at the time Adan Soto was killed, the State necessarily relied on recordings of phone calls between Speer and Womble to prove the conspiracy.  The defense argued that the plan was proposed by Womble, who eventually pressured Speer into acquiescing.  (*See, e.g.*, RT 1/16/07 at 10.)

Police investigators targeted a total of fifty-eight phone calls between Speer and Womble that they believed inculpated Speer in the killing.  The police failed to preserve thirty-one of these calls; they claimed nine included no relevant information, but failed entirely to listen to twenty-two.  The twenty-seven they selected to preserve provided all of the evidence at trial of Speer's guilt.

The calls also included, however, copious mitigation evidence, including Speer's attempts to reject Womble's plan and mitigating expressions of love of family—leading to a colorable conclusion that the destroyed tapes also included exculpatory and/or mitigating evidence.

Because the fifty-eight calls targeted by police covered the time period before the killing and all the brothers' communications, each of those calls had significance and was material to the murder charge.  But over half of them were destroyed before the defense could listen to them, and use them in presenting a defense.

## B.    The Trial Court's Error Denied Speer His Due Process

A *Willits* instruction is available to an Arizona defendant upon a showing that:  (1) the State failed to preserve material evidence that was accessible and might have tended

to exonerate the defendant; and (2) there was resulting prejudice.  *See State v. Willits*, 393

P.2d 274 (Ariz. 1964); *State v. Reffitt*, 702 P.2d 681, 690 (Ariz. 1985).  If there is no bad

faith, such an instruction can provide adequate due process.  *State v. Youngblood*, 844

P.2d 1152, 1156-57 (Ariz. 1993).

Trial counsel requested the following *Willits* instruction:

> If you find that the state has lost, destroyed, or failed to preserve evidence whose contents or quality are important to the issues in this case, then you should weigh the explanation, if any, given for the loss or unavailability of the evidence.  If you find that any such explanation is inadequate, then you may draw an inference unfavorable to the state, which in itself may create a reasonable doubt as to the defendant's guilt.

(ROA 549 at 5, quoting Standard Criminal 11, RAJI Criminal Standard, 2d. ed. (1989);

*see also* RT 1/16/07 at 4.)  The trial court asked if the opinions published since *Willits*

said that the evidence had to meet a materiality standard of showing the evidence had

exculpatory value that was apparent before it was destroyed.  (RT 1/16/07 at 6.)  In the

court's opinion, nothing had been presented to show the calls were exculpatory.  (*Id.* at

6.)  Trial counsel responded that, with a *Willits* instruction, the jurors were allowed to

weigh the State's explanation for the loss of the evidence to determine whether they

should draw an inference against the State for the loss of the evidence.  (*Id.* at 8.)

The court declined to give the instruction.  (*Id.* at 21.)  The court stated that trial

counsel was free to argue selective presentation to the jury.  "[D]efense counsel is free to

comment as he sees fit in closing and argue appropriately on the State's failure to

preserve all of the jail calls."  (*Id.* at 21; *see also* RT 5/19/06 at 83-84.)

The court was correct in noting that the *Willits* rule had been interpreted in various

cases since the initial decision.  The Arizona Supreme Court noted in *Youngblood*, 844

P.2d at 1157, that "our *Willits* jurisprudence has sometimes defied neat analysis."

Nevertheless, "the core of the doctrine as it relates to Arizona due process is that an

instruction is adequate where the state destroys, loses or fails to preserve evidence unless

the state acts in bad faith or the defendant suffers prejudice-in-fact."  *Id.*

93

In *Willits* itself, the instruction that was rejected by the trial court stated:

> If you find that the plaintiff, the State of Arizona, has destroyed, causd (sic) to be destroyed, or allowed to be destroyed any evidence whose contents or quality are in issue, you may infer that the true fact is against their interest.

393 P.2d at 276.  In reversing the conviction and approving the instruction, the Arizona Supreme Court observed:

> We think that the rule permitting an inference is not based only on the notion that the destruction is motivated by a desire to conceal the truth.  Evidence, of course, may be innocently destroyed without a fraudulent intent simply through carelessness or negligence or, as the case might have appeared to the jury here, an unwillingness to make the necessary effort to preserve it.  In any event, the State cannot be permitted the advantage of its own conduct in destroying evidence which might have substantiated the defendant's claim regarding the missing evidence.  But the damage to the defendant is equally great because the evidence was no longer available at the trial by which the facts with certainty could be determined.

*Id.* at 279.

Thus while the cases since *Willits* restated its rule in various ways, the rule itself had not been changed or modified—the materiality required remained that the contents of the evidence are in issue.  Here, contents of the phone calls were the key to the case, and formed the entire basis for Speer's conviction.

Neither does *Willits* require a defendant to show the evidence was exculpatory.  Such a requirement would be meaningless in reference to destroyed evidence.  "[T]he State cannot be permitted the advantage of its own conduct in destroying evidence which might have substantiated the defendant's claim regarding the missing evidence."  *Willits*, 393 P.2d at 279.  If a defendant cannot show the evidence was exculpatory and cannot get a *Willits* instruction, then the State is permitted the advantage of its own conduct in destroying evidence.

Nor does *Willits* require that the exculpatory value of the evidence be known before its destruction.  As the *Willits* court noted, the destruction might be simply through

carelessness or negligence or, an unwillingness to make the necessary effort to preserve

it.  The Court did not require any other knowledge by police of the value of the evidence.

Finally, the *Willits* Court explained:

> Had the instruction been given, the jury would have been in
> the position of weighing the explanation and, if they believed
> it was not adequate, an inference unfavorable to the
> prosecution could have been drawn.  This in itself could
> create a reasonable doubt as to the defendant's guilt.

393 P.2d at 279.

As trial counsel argued, the weight of the court in instructing the jury on how to

view the destruction under the law was required by due process.  From the beginning the

court had instructed the jury thusly:  "You must follow these jury instructions.  They are

the rules you should use to decide this case."  And:  "In their opening statements and

closing arguments, the lawyers have talked to you about the law and the evidence.  What

the lawyers said is not evidence but it may help you to understand the law and the

evidence."  (RT 1/17/07 at 17.)  Thus the court, on one hand, told defense counsel they

could "argue" a legal issue, while on the other hand telling the jury it could ignore

attorney arguments that were not supported by court instructions.  Its decision to deny a

*Willits* instruction left Speer with nothing and deprived him of due process.  *See*

*Youngblood*, 844 P.2d at 1156-57 ("where there is no bad faith conduct, the *Willits* rule

more than adequately complies with the fundamental fairness component of Arizona due

process.").

This error violated Speer's federal constitutional right to due process.  When a

state provides rules or procedures designed to protect a defendant's liberty interests, and

then deprives a person of the protection of those rules, the Due Process Clause of the

Fourteenth Amendment is violated.  *Hicks v. Oklahoma*, 447 U.S. 343, 344 (1980).

*Hicks* refers to a state-created "liberty interest," but in death penalty cases an even more

compelling interest is at stake:  the right not to be deprived of life without due process.

Separate from any consideration of state law, the Fourteenth Amendment due process

1   clause is also violated by errors that taint the fairness of the trial and present an

2   "unacceptable risk . . . of impermissible factors coming into play." *Estelle v. Williams,*

3   425 U.S. 501, 505 (1976).

4   **C.    The State Court's Denial of the Claim Was Unreasonable**

5           The opinion on post-conviction review by the superior court (PCR ME 5/21/15 at

6   9-10) is the last reasoned opinion for purposes of 28 U.S.C. § 2254(d) analysis.  *Ylst v.*

7   *Nunnemaker*, 501 U.S. 797, 804 (1991).  The basis of that court's denial of Speer's claim

8   was that "the Defendant has not established that these calls had a tendency to exonerate

9   him. . . . [T]here must be a real likelihood that the evidence would have had evidentiary

10  value."  (PCR ME 5/21/15 at 10.)  This conclusion is based on an unreasonable

11  determination of fact.

12          Speer had established, to the extent posited and required under *Willits* for a

13  curative instruction, that the "contents or quality [of the lost evidence] are in issue."

14  *Willits*, 393 P.2d at 276.  The contents of all the calls were the *only* issue in the

15  determination of Speer's guilt; and there is no question that the State had destroyed the

16  majority of the targeted, relevant calls.  It preserved twenty-seven of them for inculpatory

17  purposes while at the same time destroying other calls that potentially would have helped

18  Speer's defense.

19          The state court said, "[N]o one will ever know what was said on the tapes that

20  were not preserved."  (PCR ME 5/21/15 at 10.)  That is not accurate.  There were two

21  calls recorded by Al Heitzman; these calls were not among the twenty-seven the police

22  preserved.  Therefore, they must have been amongst the calls the police destroyed.  Both

23  of the Heitzman calls included mitigation such as love of family.  Thus, it is clear that the

24  State destroyed evidence that could have aided Speer's case.  Therefore, Speer showed

25  that he was prejudiced by the loss of the evidence, and by the trial court's refusal to give

26  the jury a *Willits* instruction.

27          The purpose of the *Willits* rule is so the State is not permitted the advantage of its

28  own conduct in destroying evidence which might have substantiated the defendant's

claim regarding the missing evidence.  *Willits*, 393 P.2d at 279.  By denying Speer a *Willits* instruction after the State destroyed calls before first reviewing them for evidentiary value, the State was permitted the evidentiary advantage of the preserved phone calls, yet also given the advantage of its own conduct in destroying the other calls.  This is the precise situation *Willits* was intended to remedy.

And while Speer was free to argue and the jury free to assign less weight to the tape evidence (PCR ME 5/21/15 at 10), without a *Willits* instruction, the jury did not receive proper guidance from the court as to how they should assess that information and decide how to view it in their deliberations.  Without the proper guidance, the freedom to assign less weight was meaningless.

**CLAIM 10**

**SPEER WAS DENIED HIS RIGHT OF CONFRONTATION UNDER THE SIXTH AND FOURTEENTH AMENDMENTS IN HIS CROSS-EXAMINATION OF DETECTIVE OLSON**

The factual basis for this claim is detailed in Claim 5, above.  To summarize: though Detective Dennis Olson was likely the key witness in the conviction of Speer, trial counsel were hamstrung by a restrictive court ruling in their cross-examination of him.  Detective Olson was the police officer who testified about how the phone calls introduced as the only evidence implicating Speer were targeted; how only some of the relevant calls were listened to; and how only some of those latter calls were copied for use as evidence in the case.  The rest were destroyed.  Detective Olson had a history of shoddy detective work that was most exemplified by his investigation in the case of Ray Krone, who spent ten years in prison, much of it on death row, for a murder he did not commit.  Though Olson was in part responsible for this miscarriage of justice, trial counsel for Speer were precluded by the court from questioning Olson directly about his work in the Krone case.

Speer was thus denied his right of confrontation under the Sixth, Eighth, and Fourteenth Amendments; his conviction and sentence are unconstitutional and must be overturned.

This claim was raised in Speer's state post-conviction petition and Petition for Review as Claim Eight.  (PCR 9/26/14 at 37-42; PFR at 22-23.)  The state court denied the claim as procedurally barred because it could have been, but was not, raised on appeal.  (PCR ME 5/21/15 at 11-12.)  The state court did not rule on the merits.  Speer shows below, and in Claim 26 (Ineffective Assistance of Appellate Counsel), that the procedural bar does not preclude federal review.  This Court, therefore, reviews this claim de novo.

Speer incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition, particularly in Claims 5 and 26.

**A.    Speer's Right to Confront the Key Witness Against Him Was Denied Him by the Court's Erroneous Ruling**

The Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him."  That right is incorporated into the Fourteenth Amendment and therefore available in state proceedings.  *Pointer v. Texas*, 380 U.S. 400, 400-01 (1965).  Confrontation includes the right to conduct reasonable cross-examination.  *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974).  The Confrontation Clause commands that the reliability of evidence be assessed in a particular manner:  by testing in the crucible of cross-examination.  *Crawford v. Washington*, 541 U.S. 36, 61 (2004).

In *Davis*, the Court observed that, subject to "the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation . . . , the cross-examiner has traditionally been allowed to impeach, *i.e.*, discredit, the witness."  *Id.* at 316.  The Court stressed that "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination."  *Id.* at 316-17 (citing *Greene v. McElroy*, 360 U.S. 474, 496 (1959)).  And, importantly, cross-examination for this purpose is especially important where the credibility of a key

1  government witness is the central factor to be weighed by the trier of fact.  *Davis*, 415

2  U.S. at 317.

3       In *Delaware v. Van Arsdall*, 475 U.S. 673 (1986), the Court reaffirmed *Davis*,

4  holding that "a criminal defendant states a violation of the Confrontation Clause by

5  showing that he was prohibited from engaging in otherwise appropriate cross-

6  examination designed to show a prototypical form of bias on the part of the witness, and

7  thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw

8  inferences relating to the reliability of the witness.'"  *Id.* at 680 (quoting *Davis*, 415 U.S.

9  at 318).  The *Van Arsdall* Court also observed that the focus of the Confrontation Clause

10  is on individual witnesses:

11           Accordingly, the focus of the prejudice inquiry in determining
             whether the confrontation right has been violated must be on
12           the particular witness, not on the outcome of the entire trial.
             It would be a contradiction in terms to conclude that a
13           defendant denied any opportunity to cross-examine the
             witnesses against him nonetheless had been afforded his right
14           to "[confrontation]" because use of that right would not have
             affected the jury's verdict.
15  *Id.*

16       By denying the defense the opportunity to inform the jury of Olson's many and

17  varied mistakes in the Krone case (*see* Claim 5), the court denied Speer the opportunity to

18  confront and cross-examine the key witness against him.  Ray Krone was an innocent

19  man wrongly convicted of the murder of Kim Ancona.  He spent a decade in prison,

20  much of it on death row before being exonerated by DNA evidence.  (PCR 9/26/14 Ex.

21  13.)  Detective Olson's mistakes in the case contributed to the wrongful conviction.  The

22  issue was not that Olson made mistakes in a prior uncontextualized investigations; it was

23  that his errors were piled on in one particular case with the result that an innocent man

24  was sent to death row.  Hence, the very facts the court precluded—the name of the case,

25  the facts of the case, and most importantly, the outcome of the case—were the most vital

26  aspects of Olson's investigation approach and history.  If the jury had been shown that

27  Olson had made serious investigational errors in the past that resulted in a false

28  conviction for capital murder, the jury would have had the true and parallel perspective

1   from which to view Olson's investigation in Speer's case.  The jury would have had

2   proper insight to analyze Olson's error in not ensuring that all of the jail phone calls

3   Olson targeted in his investigation were in fact reviewed, documented, and preserved for

4   the defense.

5        Consequently, the court's refusal to allow this full cross-examination of Detective

6   Olson deprived Speer of his right to confront and to cross-examine the witness with

7   powerful impeachment evidence, in violation of his Sixth and Fourteenth Amendment

8   rights.

9        This issue also would have reasonably provided relief on appeal.  As is argued in

10  Claim 26, appellate counsel was ineffective for failing to raise this claim on appeal.  This

11  claim reasonably provided a substantial means of reversal on appeal.  Thus the failure to

12  raise the issue was conduct below the objective professional norm, and as a result, Speer

13  was prejudiced.

## B. The State Court's Denial of this Claim Is Based on an Unreasonable Application of Clearly Established Federal Law

     The trial court, acting as the final state-court arbiter in its ruling on post-conviction review, found this claim precluded.  (PCR ME 5/21/15 at 11-12.)  The court also "disagree[d] [with Defendant] that a colorable claim has been presented."  (*Id.* at 11.)  It opined that, had the issue been raised on appeal, the Arizona Supreme Court would have upheld the trial court's (*i.e.*, the reviewing court's) decision, on the basis of *State v. Murray*, 906 P.2d 542 (Ariz. 1995).  (PCR ME 5/21/15 at 11.)

     *Murray*, however, as well as the superior court here, only analyzed the issue in terms of Evidence Rule 608.  *Murray*, 906 P.2d at 563-64.  (*See also* PCR ME 5/21/15 at 11-12.)  The court did not consider how Speer's inability to cross-examine Olson utilizing the civil suit deposition in the Krone case denied Speer's constitutional rights under the Confrontation Clause.  Thus the federal issue was not determined in the state court; this Court may then evaluate it de novo.  *See, e.g.*, *Johnson v. Williams*, 568 U.S.

289, 301-02 (2013) (presumption that federal claim was adjudicated on the merits when, as here, it can be shown to have been adjudicated on state rather than federal standards).

A defendant has the right under the Confrontation Clause to cross-examine a witness concerning his bias, motive, and prejudice, and on issues that directly bear on his credibility. *Davis*, 415 U.S. at 316-18 ("[A] cross-examiner should be given great latitude in his questions which seek to impeach an adverse witness being examined."). Speer was prejudiced by being denied his right to confrontation by the trial court's undue restriction on the cross-examination of Detective Olson. Had he been able to use Olson's deposition testimony in the Krone case, he would have attacked Olson's credibility, revealed his biases and motives, and shown the jury a pattern of incomplete and false investigation geared to convicting the easiest target, even when innocent. There is thus a reasonable probability of a different outcome.

**CLAIM 11**

> **THE TRIAL COURT ERRED IN FAILING TO GRANT SPEER'S MOTION FOR MISTRIAL FOR PROSECUTORIAL MISCONDUCT THAT SO INFECTED THE PROCEEDINGS AS TO RENDER SPEER'S TRIAL UNFAIR**

This claim was raised as Claim Three in Speer's direct appeal. (DA dkt. 87 at 21-23.) The Arizona Supreme Court denied the claims on the merits. *State v. Speer*, 212 P.3d 787, 795-96 (Ariz. 2009). To the extent any aspects of this claim were not exhausted, that failure is attributable to the ineffective assistance of Speer's appellate and post-conviction counsel. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985); *Martinez v. Ryan*, 566 U.S. 1, 9 (2012). Speer will demonstrate at an evidentiary hearing that appellate and post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced Speer.

Speer incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition, in particular in Claim 7 and 13.

Speer's conviction and sentence of death were imposed in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because the trial court failed to grant Speer's motions for a mistrial, and thus allowed the prosecutor to taint the trial beyond all constitutional notions of fairness. Because the trial court erred in allowing the trial to go forward as prosecuted by someone who infected the proceedings with unjust comments and actions, Speer's fair trial rights were violated.

The many and varied instances of prosecutorial misconduct are detailed in Claims 7 and 13. At various times during the proceedings trial counsel objected to blatant misconduct, and moved for a mistrial, explaining why the prosecutor's conduct infected the trial proceedings. Each time the court justified the prosecutor's behavior and denied the motions for mistrial.

To prevail on a claim of prosecutorial misconduct, a defendant must demonstrate that the prosecutor's misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). "Reversal on the basis of prosecutorial misconduct requires that the conduct be 'so pronounced and persistent that it permeates the entire atmosphere of the trial.'" *State v. Atwood*, 832 P.2d 593, 628 (1992) (quoting *United States v. Weinstein*, 762 F.2d 1522, 1542 (11th Cir.1985) (quoting *United States v. Blevins*, 555 F.2d 1236, 1240 (5th Cir.1977))). To determine whether prosecutorial misconduct permeates the entire atmosphere of the trial, the court necessarily has to recognize the cumulative effect of the misconduct.

The defense moved for a mistrial on at least three occasions that the prosecutor's misconduct crossed the line into infecting the trial with unfairness. The first occurred on December 11, 2006, when Gallagher openly and repeatedly mocked trial counsel before the jury in relation to his cross-examination of Detective Olson. (*See* RT 12/11/06 at 63-64, 81, 82, 89-92; *see also* Claim 13.) When trial counsel moved for a mistrial (RT 12/11/06 at 90), the prosecutor responded with further mockery, stating, "[trial counsel]

1    presented a bumbling cross-examination." (*Id.* at 91.)  "His line of questioning was

2    ridiculous." (*Id.* at 82.)  And finally, she boasted that, "if [trial counsel] didn't accuse me

3    of prosecutorial misconduct every day, I would think I was in the wrong trial." (*Id.* at

4    91.)  The trial court responded merely by stating, "Okay.  The record is made.  Motion

5    denied." (*Id.* at 93.)

6         Next, when examining Detective Olson on the issue of the police practices that led

7    to spoliation of key evidence, the prosecutor asked the witness, "to your knowledge does

8    Mr. Storrs [trial counsel] know that jail calls are destroyed after three months?"  (RT

9    1/10/07 at 94.)  And then again, "to your knowledge did Bob Storrs know in August of

10   2002 that the jails calls only get kept for six months?" (*Id.* at 96-97.)  Trial counsel

11   moved for a mistrial.  (*Id.* at 113.)  The basis of the motion was that:

12            the prosecutor brought up counsel's deficiencies and
             actually shifted the burden to the defense, because she was
13            pointing out to the jury that the defendant knew that these
             calls would be destroyed within six months and –

14            The court:  She didn't say the defendant.

15            [Trial counsel]:   Defense counsel, which is worse
             really because it doesn't matter what the defendant knows.
16            But the defense or defense has no burden whatsoever, has no
             burden to come forward with evidence and she's shifting the
17            burden to the defendant to adduce evidence before this
             tribunal [in violation of his rights to due process and a fair
18            trial].

19   (*Id.* at 113-14.)

20        When trial counsel concluded, after further argument, that "mistrial is the only real

21   remedy," the trial court stated merely, "I disagree," and denied the motion.  (*Id.* at 120.)

22   It did agree to instruct the jury that the burden of proving guilt beyond a reasonable doubt

23   never shifts.  (*Id.* at 120-21.)  But that remedy fell far short of curing the taint of the

24   prosecutor's questions.

25        Finally, during her guilt-phase closing argument, the prosecutor told the jury, "The

26   burden of proof *in the guilt phase* is all on the State.  It never shifts to the defendant."

27   (RT 1/17/07 at 111 (emphasis added).)  Trial counsel moved for a mistrial, explaining

28   that, "you can't intimate that this trial is going to go on, and then, you know, in the next

phase, perhaps the burden will be different.  But you can't talk about any other phase
other than the one that we're in, and so that denies my client a fair trial." (*Id.* at 112.)
The court denied the motion, alleging there was no harm, no prejudice.  (*Id.* at 112-13.)
Again, the trial court erred.

Multiple incidents of prosecutorial misconduct contribute to an overall assessment
of cumulative error.  Even if this court deems that none of these incidents by itself,
warrants reversal the cumulative effect of the incidents so infected the trial proceedings
as to deprive Speer of a fair trial.

**CLAIM 12**

**SPEER WAS DEPRIVED OF HIS RIGHT TO A FAIR AND IMPARTIAL
JURY BECAUSE VOIR DIRE FAVORED THOSE WHO LEANED
TOWARD AUTOMATIC DEATH PENALTY**

This claim was raised as Guilt Claim Four in Speer's direct appeal.  (DA dkt. 87 at
24-29.)  The Arizona Supreme Court denied the claim on the merits.  *State v. Speer*, 212
P.3d 787, 792-94 (Ariz. 2009).  To the extent any aspects of this claim were not
exhausted, that failure is attributable to the ineffective assistance of Speer's appellate and
post-conviction counsel.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Evitts
v. Lucey*, 469 U.S. 387, 396-97 (1985); *Martinez v. Ryan*, 566 U.S. 1, 9 (2012).  Speer
will demonstrate at an evidentiary hearing that appellate and post-conviction counsel fell
below the standards of minimally competent capital attorneys and that those failures
prejudiced Speer.

**A.     The Jury Was Not Impartial Because a Juror Was Seated Who
Substantially Leaned in Favor of Death, Rendering the Verdict and
Sentence Unfair**

Speer's conviction and sentence of death were obtained in violation of the Sixth,
Eighth, and Fourteenth Amendments to the United States Constitution because Juror 29,
who was predisposed to vote for death in all cases involving premeditated murder, was
seated and served on Speer's jury.

1

### 1.     Relevant Law

2        The Sixth Amendment "guarantees to the criminally accused a fair trial by a panel

3   of impartial, 'indifferent' jurors." *Tinsley v. Borg*, 895 F.2d 520, 523 (9th Cir. 1990);

4   *Parker v. Gladden*, 385 U.S. 363, 364 (1966); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).

5   The United States Supreme Court has defined "an impartial trier of fact" as "a jury

6   capable and willing to decide the case solely on the evidence before it." *McDonough*

7   *Power Equip. v. Greenwood*, 464 U.S. 548, 554 (1984).

8        The actual or implied bias or prejudice of even a single juror violates a defendant's

9   right to a fair trial. *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998).  Such a juror

10  does not have "the quality of indifference which, along with impartiality, is the hallmark

11  of an unbiased juror." *Id*. at 982.  Both juror bias and juror taint/misconduct threaten the

12  impartiality and indifference of the jury and are constitutionally intolerable.

13       The Supreme Court has directed that a juror should be dismissed for cause if his or

14  her views would prevent or substantially impair his or her ability to perform the duties of

15  a juror in accordance with the instructions and under the oath. *Adams v. Texas*, 448 U.S.

16  38, 45 (1980).  "[A]ctual bias is 'bias in fact' – the existence of a state of mind that leads

17  to an inference that the person will not act with entire impartiality." *United States v.*

18  *Gonzalez*, 214 F.3d 1109, 1112 (9th Cir. 2000) (internal quotation marks and citation

19  omitted).  "Although bias can be revealed by a juror's express admission of that

20  fact, . . . more frequently, jurors are reluctant to admit actual bias, and the reality of their

21  biased attitudes must be revealed by circumstantial evidence.'" *Id.* at 1111-12 (quoting

22  *United States v. Allsup*, 566 F.2d 68, 71 (9th Cir. 1977)).

23       Where actual bias is found, a new trial is required because the presence of a biased

24  juror cannot be harmless. *Gonzalez*, 214 F.3d at 1112.  Notably, a defendant is not

25  required to use a peremptory challenge to strike a juror who should have been removed

26  for cause in order to preserve the claim that the for-cause ruling impaired the defendant's

27  right to a fair trial. *United States v. Martinez-Salazar*, 528 U.S. 304, 314-15 (2000).

28

Empanelment of jurors who are biased in favor of the death penalty violates the right to an impartial jury and to a jury aware of its undivided responsibility to determine the appropriateness of a death sentence. *Caldwell v. Mississippi*, 472 U.S. 320, 329-33 (1985). Jurors' strong inclinations towards handing down a death sentence precludes a jury from giving a reasoned moral response to the mitigating evidence presented at trial and creates the risk that death was imposed despite evidence which might otherwise have been seen to call for a life sentence. *See Penry v. Lynaugh*, 492 U.S. 302 (1989); *Lockett v. Ohio*, 438 U.S. 586 (1978); *Witherspoon v. Illinois*, 391 U.S. 510 (1968).

## 2. Relevant Facts

Juror 29 stated that he believed the death penalty should be imposed in *all* cases where the State proves that a person killed another person with premeditation. (RT 11/13/2006 at 149.) According to Juror 29, "an eye for an eye" is an appropriate punishment. (*Id.* at 155.) In light of his admitted bias, the defense moved to dismiss Juror 29 for cause. (*Id.* at 165-66.)

Defense counsel explained that Juror 29's fixed impression that the "death penalty should be imposed in all cases when the State has proven beyond a reasonable doubt that the person killed another with premeditation" was in violation of the law. (*Id.*) The trial court rejected the defense's contention, finding that Juror 29's views "do not substantially impair the performance of his duties." (*Id.* at 166.) Juror 29 ultimately served on Speer's jury (as Juror 2) because Speer exhausted his peremptory strikes. (*See* RT 12/4/2006 at 73-76.)

## 3. The Trial Court's Decision to Not Strike a Biased Juror Was Contrary to the Due Process Clause of the United States Constitution

In addition to the right to a fair trial with a panel of impartial jurors as delineated in the case law discussed in Section B1 above, Arizona law also entitles a criminal defendant to a fair trial by a panel of impartial, indifferent jurors. *See*, *e.g.*, *State v. Velazquez*, 166 P.3d 91, 97 (Ariz. 2007) (juror who automatically votes for the death penalty without considering mitigation evidence is not impartial and must be excused).

Therefore, when the trial court refused to excuse Juror 29, who believed the death penalty was appropriate in all cases of premeditated murder, he arbitrarily violated Speer's state-created rights in violation of the federal constitution.  *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980).

### 4.    The Error Was Structural and the Judgment Must Be Reversed

Structural errors are "defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards."  *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991).  The presence of a biased juror is a structural error requiring reversal.  *Dyer*, 151 F.3d at 973, n.2.  The death judgment should be reversed.

## B.    The Trial Court Failed to Excuse for Cause Jurors Who Leaned Toward Automatic Imposition of the Death Penalty, Forcing Defense Counsel to Exercise Peremptory Challenges

Speer's conviction and sentence of death were obtained in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because the trial judge failed to follow the law as described above in Subsection B1 and denied motions to excuse for cause jurors biased toward automatic imposition of the death penalty.

Speer identified seven potential jurors (nos. 5, 19, 29, 55, 90, 400, and 242) who should have been dismissed for cause.  Speer exhausted his peremptory challenges removing six of these potential jurors.  Juror 29, who is discussed above, was empaneled.

### 1.    Juror 5

Juror 5 stated, when questioned, that the death penalty was the appropriate sanction in all cases involving first-degree premeditated murder.  (RT 11/13/2006 at 41, 42, 49, 51.)  In his questionnaire, his response to question number 46 read:  "If a person commits murder, premeditated, and intends to do it, plans to do it and does it, that person does not deserve to be on this planet."  (*Id*. at 42, 51.)  Defense counsel moved to strike Juror 5 for cause; but the court denied counsel's request, so counsel was compelled to exercise one of his peremptory strikes to remove Juror 5 from the panel.  (*Id.* at 49; RT 12/4/2006 at 70-76.)

### 2.    Juror 19

Similarly, defense counsel moved to strike Juror 19 from the panel based on his conviction that he would not consider a person's childhood or social history as possible mitigating circumstances.  (RT 11/13/2006 at 139.)  Juror 19 stated that the death penalty is appropriate "when proven without a doubt that that person intended to commit the death of another individual."  (*Id*. at 118.)  Juror 19 also stated, "If it's been proven that . . . that person intended to commit harm to another individual, yes, I believe [the death penalty] should be imposed, without a doubt, of course."  (*Id*. at 126.)  On the issue of mitigation, Juror 19 said that he was "not willing to consider" family background and upbringing.  (*Id*. at 128.)  Finally, the court questioned Juror 19, asking leading questions on the burden of proof and consideration of mitigation evidence.  (*Id*. at 133, 134, 135, 136.)  The court repeatedly prefaced these statements with, "I don't want to put words in your mouth."  (*Id*. at 134, 135.)  The court denied counsel's request to strike Juror 19 for cause; defendant had to exercise a peremptory strike to remove him from the panel.  (*Id*. at 141; RT 12/4/2006 at 70-76.)

### 3.    Juror 55

Juror 55 stated that a difficult childhood or substance abuse "would be mitigating circumstances if it was heat of the motion [*sic*] or passion," but not if the act was premeditated.  (RT 11/14/2006 at 15-16.)  Defense counsel moved to strike Juror 55 for cause, and argued that Juror 55 could not seriously consider mitigating factors.  (*Id*. at 29-30.)  The court denied counsel's request; defense counsel was forced to use a peremptory strike to remove Juror 55 from the panel.  (*Id*. at 36.)

### 4.    Juror 90

Counsel for Speer moved to strike Juror 90 after she stated on her questionnaire that, if a person does not testify, he or she is more likely guilty.  (RT 11/15/2006 at 27.)  With regard to mitigation evidence, Juror 90 stated that people who are afflicted by substance abuse are "making bad choices over time," and she could not "say for sure one way or other" whether she would consider drug addiction as a mitigating factor.  (*Id*. at

37.)  She also agreed with the statement that a "child's environment or upbringing may be important, but generally speaking, I don't think it's very important."  (*Id*. at 39.)  The court denied counsel's request to strike Juror 90 for cause; Speer used his peremptory strikes to remove her from the panel.  (*Id*. at 43-44; RT 12/4/2006 at 70-76.)

### 5. Juror 400

Juror 400 indicated that, in a case of premediated murder, there would be no mitigating factors that would change her mind and lead her to consider a sentence lower than death.  (RT 11/29/2006 at 148-49.)  The court denied counsel's motion to strike Juror 400 for cause; defense counsel was forced to use his peremptory strikes to remove her from the panel.  (*Id.* at 156, 157; RT 12/4/2006 at 70-76.)

### 6. Juror 242

Defense counsel moved to strike Juror 242 for cause because he stated that he had previously deliberated in another death penalty case.  (RT 11/20/2006 PM at 75-77.)  Juror 242 also indicated that people who plan, premeditate, or kill for pecuniary gain should receive capital punishment.  (*Id.*)  Again defense counsel's request was denied and defendant exercised a peremptory strike to remove Juror 242 from the panel.  (*Id.* at 77; RT 12/4/2006 at 70-76.)

## C. The Trial Court Excused for Cause Jurors Who Leaned Against the Death Penalty but Who Would Have Followed the Law

Speer argued that the trial court improperly excused for cause three potential jurors (nos. 136, 250, and 427) who could and should have been rehabilitated.

### 1. Relevant Law

The Sixth and Fourteenth Amendments require that a capital defendant be entitled to impartial jurors who will not be excluded because of their general objections to the death penalty.  *Gray v. Mississippi*, 481 U.S. 648, 657 (1987).  "[T]he exclusion of venire members must be limited to those who were irrevocably committed to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course

of the proceedings, and to those whose views would prevent them from making an impartial decision on the question of guilt." *Id*. (internal quotation marks omitted).

Jurors who oppose the death penalty can make the same discretionary judgment entrusted to them by the State and follow the law. A jury that lacks these individuals cannot "express the conscience of the community on the ultimate question of life or death." *Witherspoon*, 391 U.S. at 519. "A sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Id.* at 522.

### 2. Relevant Facts

#### a. Juror 136

The prosecution moved to strike Juror 136 after she expressed confusion about the standard of proof in a criminal case and stated that the prosecution must present an eyewitness. (RT 11/15/2006 at 140, 152.) However, Juror 136 stated that she would not have difficulty following the law and that she believed the death penalty was appropriate in certain circumstances, including for serial killers. (*Id*. at 139, 143.) Defense counsel explained the burden of proof and Juror 146 confirmed that she would be able to make a decision if she were firmly convinced that the State had met its burden in proving guilt. (*Id*. at 145-46.) Juror 146 stated that she would "have to be firmly convinced," but "would not need an eye witness." (*Id*. at 146.) Juror 146 initially expressed hesitation about sentencing another person to death, but later stated that she would listen to all the evidence before making a decision. (*Id*. at 148-49.) The trial court excluded Juror 146 for cause after finding that her statements "raised significant red flags." (*Id*. at 157.)

#### b. Juror 250

Juror 250 stated that she was not against the death penalty. (RT 11/20/2006 PM at 93.) She said that imposing the death penalty "would be very hard for me . . . it would have to be an extreme case." (*Id*. at 84.) However, Juror 250 also said that she could "find a person guilty of first-degree murder if the proof was there." (*Id*. at 85.) The trial

110

court demanded that Juror 250 provide a "yes" or "no" answer on whether she could vote for the death penalty without providing a hypothetical scenario.  Presented with no hypothetical and no opportunity to qualify her answer, Juror 250 said, "I guess I'd have to say I don't think I can vote for the death penalty."  (*Id*. at 96-97.)  The trial court granted the prosecution's motion to strike Juror 250 for cause.  (*Id*. at 102.)

### c.  Juror 427

Juror 427 stated that she would impose the death penalty only after very careful consideration.  (RT 11/30/2006 AM at 65.)  When asked if she could personally impose the death penalty, Juror 427 stated, "I could see [the death penalty] as an end, and I would impose it by the letter of the law."  (*Id*. at 69.)  Juror 427 explained that she would listen to all of the evidence and follow the law.  (*Id*. at 67.)  The prosecutor asked Juror 427 if she could vote for death.  She responded, "This is a hard question for me to answer because I don't know all of the facts yet."  The trial court granted the prosecution's motion to strike Juror 427 for cause based on her hesitation in imposing the death sentence.  (*Id*. at 80.)

**D.  The Trial Court's Exclusion of Anti-Death-Penalty-Leaning Jurors While Not Excusing for Cause Those Who Would Not Follow the Law Violated Speer's Rights Under the United States Constitution**

Speer argued that he was deprived an adequate opportunity to rehabilitate the jurors who stated that they did not favor the death penalty.  (RT 11/20/2006 PM at 98-101.)  The judge advised that it was not interested in impaneling a "stacked jury" in favor of death and dismissed the jurors for cause over defense objections.  (*Id.* at 101.)  Because the jurors could have been adequately rehabilitated and the judge did not afford Speer the opportunity to do so, the trial court erred by striking the three jurors for cause over Speer's objection, thus tainting the jury.

On the other hand, the court excluded Jurors 136, 250, and 427 after they expressed hesitation about imposing the death penalty.  However, each of these jurors stated that they were not opposed to the death penalty and would apply the law.  Meanwhile, pro-death penalty leaning Jurors 5, 19, 29, 55, 90, 400, and 242 revealed

their unwillingness to follow the law by refusing to consider mitigation evidence.  None of these jurors were removed for cause.

The Eighth Amendment mandates that the death penalty be imposed by a process that is reliable and free from arbitrariness.  *See Sawyer v. Smith*, 497 U.S. 227, 235 (1990); *Sochor v. Florida*, 504 U.S. 527, 532-36 (1992); *Gregg v. Georgia*, 428 U.S. 153, 204 (1976).  A Defendant's Eighth Amendment rights are violated when jurors opposed to the death penalty are removed for cause, while jurors who are pro-death penalty are not.  *Witherspoon*, 391 U.S. 510.  Removing all jurors who express objections to the death penalty "crosse[s] the line of neutrality" and "produce[s] a jury uncommonly willing to condemn a man to die."  *Id.* at 520-21.

This error was structural.  Structural errors are "defects in the constitution of the trial mechanism, which defy analysis by harmless-error standards.  *Fulminante*, 499 U.S. at 309.  The trial court's exclusion of three jurors who expressed general objections to the death penalty was a structural error requiring reversal.  *Dyer*, 151 F.3d at 973, n.2.

## E.   The State Court Did Not Adjudicate the Federal Question

The Arizona Supreme Court found no abuse of discretion in the trial court's findings.  With regard to the six death-leaning jurors who had to be stricken by defense peremptories, the court stated:  "'Even if a defendant is forced to use a peremptory challenge to remove a juror who should have been excused for cause, . . . an otherwise valid criminal conviction will not be reversed unless prejudice is shown.'  *Id.* (citing *State v. Hickman*, . . . 68 P.3d 418, 422-23 ([Ariz.] 2003))."  *Speer*, 212 P.3d at 793.  Thus, it cited a state law that itself cited a state law to support its finding that "[w]e thus need consider only the single juror who served on the trial jury, Juror 29."  *Id.*  Thus, the federal issue was examined on the basis only of state, not federal law; this Court may then evaluate it de novo.  *See, e.g.*, *Johnson v. Williams*, 568 U.S. 289, 301-02 (2013) (presumption that federal claim was adjudicated on the merits when, as here, it can be shown to have been adjudicated on state rather than federal standards).

The Arizona Supreme Court thus failed to analyze this claim with regard to prevailing the federal law that reinforces a defendant's rights to not have a pro-death stacked jury.  Consequently, this Court should find that the state court violated Speer's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.  Under United States Supreme Court precedent, violation of the rule established by *Witherspoon* and its progeny is reversible error not subject to harmless-error analysis.  *See Gray*, 481 U.S. at 659-67; *id.* at 667-68 (plurality opinion); *id.* at 669, 672 (Powell, J., concurring); *Davis v. Georgia,* 429 U.S. 122, 123 (1976) (holding that the improper exclusion of a prospective juror based on his or her views about the death penalty is reversible error); *see also Witherspoon,* 391 U.S. at 522-23 ("No defendant can constitutionally be put to death at the hands of a tribunal so selected.").  As such, Speer's sentence of death must be reversed.

**CLAIM 13**

**PROSECUTORIAL MISCONDUCT PERVADED ALL PHASES OF THE TRIAL**

**A.    Legal Basis of the Claim**

Speer's convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the prosecutor failed to disclose material exculpatory and impeachment evidence and knowingly presented false evidence to secure Speer's conviction.  *Brady v. Maryland*, 373 U.S. 83 (1963); *Napue v. Illinois*, 360 U.S. 264 (1959).  In addition, she engaged in pervasive misconduct to produce a wrongful conviction, rendering the trial unfair.  *Berger v. United States*, 295 U.S. 78, 88 (1935); *see also Donnelly DeChristoforo*, 416 U.S. 637, 644 (1974) (right to due process and a fair trial denied where the prosecutor's misconduct prejudiced a substantive right).  The prosecution's acts and omissions constitute misconduct in violation of Speer's right to due process and a fair trial, including but not limited to:  (1) the use of suggestive identification procedures; (2) the knowing presentation of false inculpatory evidence; (3) reliance on testimony from witnesses

whose testimony was obtained in exchange for an undisclosed benefit, whether explicit or implied; (4) reliance on testimony from witnesses whose testimony was obtained to avoid criminal charges or sentencing enhancements that were not disclosed to the defense; (5) failure to disclose the identity of exculpatory and impeachment witnesses; (6) destruction of exculpatory evidence; (7) making false representations to the trial court and/or to counsel; (8) vouching for prosecution witnesses in argument; (9) making statements designed to inflame the passions of the jury; and (10) making arguments not supported by the evidence and/or misleading the jury.

The total weight of the misconduct committed by the prosecution requires relief on both the guilt and penalty verdicts.  *See, e.g.*, *Taylor v. Kentucky*, 436 U.S. 478, 487 n.15 (1978);  *Killian v. Poole*, 282 F.3d 1204, 1211 (9th Cir. 2002) (quoting *United States v. De Cruz*, 82 F.3d 856, 868 (9th Cir. 1996) (even if no single error were prejudicial, where there are several substantial errors, "their cumulative effect may nevertheless be so prejudicial as to require reversal")); *United States v. Sanchez*, 176 F.3d 1214, 1219-20 (9th Cir. 1999) (cumulative misconduct required reversal where prosecutor elicited a law enforcement officer's opinion whether a defendant gave truthful answers during an interrogation, introduced inadmissible hearsay statements of a third person through cross-examination, vouched in closing argument for witnesses, denigrated defense as a sham); *Kelly v. Stone*, 514 F.2d 18, 19 (9th Cir. 1975) (cumulative impact of prosecutor's racially inflammatory statements and personal opinion of the evidence required reversal).

**B.    Before Trial, the State's Non-Compliance with a Discovery Request to Produce the Recorded Conversations of Speer and His Co-defendant Denied Speer His Right to a Fair Trial and Due Process**

The State's failure to comply with a timely discovery request pursuant to the Arizona Rules of Criminal Procedure, Rule 15.1, permitted thirty-one recorded phone calls to be destroyed without being preserved for Speer's use at trial.  Although the discovery request was made by Brian Womble, at the time, Speer and Womble were joined as co-defendants for trial, so that the production for Womble would have also

benefitted Speer.[12]  Rule 15.1 requires disclosure of all statements of any person who would be tried with the defendant.

Notwithstanding any defense discovery requests, the State was duty-bound to make the disclosures.  Fundamental due process requires the State to disclose to a defendant, prior to trial, both exculpatory and impeachment evidence that is in the State's possession, custody, or control.  In *Brady v. Maryland,* the Supreme Court held that the "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or punishment, irrespective of the good or bad faith of the prosecution."  373 U.S. at 87.  The State's obligation extends to both exculpatory and impeachment evidence.  *United States v. Bagley*, 473 U.S. 667, 676 (1985).  The disclosure requirement applies even if the exculpatory or impeachment evidence is known only to the police because "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."  *Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *see also Youngblood v. West Virginia*, 547 U.S. 867, 869-70 (2006).

A *Brady* violation occurs when:  (1) the evidence at issue was favorable to the accused, because it was either exculpatory or impeaching; (2) the evidence was within the possession or control of the government or its agents and was not disclosed; and (3) the evidence was material.  *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

Evidence may be "favorable" for *Brady* purposes even if it seems inculpatory at first blush as long as the defendant can use it to make a point helpful to his defense.  *United States v. Howell*, 231 F.3d 615, 625 (9th Cir. 2000).  It does not mean evidence of innocence; rather all that is required is a showing of benefit to the defense.  *Gantt v. Roe*, 389 F.3d 908, 912 (9th Cir. 2004).

---

[12] Speer incorporates herein by reference Claims 1, 2, 3, 4, 8, 9, and other claims. The factual basis is described most fully in Claim 1.

1      Evidence is "material" if "there is a reasonable probability that, had the evidence

2 been disclosed to the defense, the result of the proceeding would have been different.  A

3 'reasonable probability' is a probability sufficient to undermine confidence in the

4 outcome."  *Bagley*, 473 U.S. at 682.  Once established, a *Brady* violation requires

5 reversal.  *Id.* at 678.  By failing to comply with the defense's discovery request or,

6 because of its inherent duty, on its own to turn over the material recordings, the State

7 violated its constitutional obligations under *Brady* and its progeny.  Speer was thus

8 denied his right to a fair trial and due process.

9      This claim was raised in Speer's state post-conviction petition and Petition for

10 Review as Claim Four.  (PCR 9/26/14 at 25-30; PFR at 15-16.)  The state court denied

11 the claim as procedurally barred because it could have been, but was not, raised on

12 appeal; and alternatively on the merits.  (PCR ME 5/21/15 at 8.)

### 1.    The State Committed Misconduct by Denying Speer Material Evidence in Discovery

15      Rule 15.1 disclosure is mandatory under state law.  *State v. Hyde*, 921 P.2d 655,

16 669-70 (Ariz. 1996).  Rule 15.1(a) of the 2002-2003 rules in effect at the time Speer was

17 charged (PCR 9/26/14 Ex. 10) required that "the prosecutor *shall* make available to the

18 defendant. . . ." (emphasis added).  That language is mandatory, not precatory.  Rule

19 15.1(a)(2) mandated the disclosure of "[a]ll statements of the defendant and of any person

20 who will be tried with the defendant."  And "statement" was defined by Rule

21 15.4(a)(1)(ii) to include "mechanical, electronic or other recording of a person's oral

22 communications or a transcript thereof."  Importantly, 15.1(b) directed the prosecutor to

23 inform the defendant and make available to the defendant for examination and

24 reproduction any written or recorded material or information within the prosecutor's

25 possession or control regarding (1) "Whether there has been any electronic surveillance

26 of any conversations to which the accused was a party. . . ."  (*Id.*)

27      On July 24, 2002, Womble's first attorney filed a motion for discovery.  (Womble

28 ROA 24.)  Item #2 of the motion requested "[a]ll statements of the defendant and of any

1   person who will be tried with the defendant." As set forth above, that included all

2   recorded oral communications of the defendant. Moreover, item #7 of the motion very

3   pointedly requested "[a]ll material or information which tends to mitigate or negate the

4   defendant's guilt as to the offense charged, or which would tend to reduce defendant's

5   punishment therefore."

6       On June 4, 2004, the State filed an amended notice of disclosure and, *inter alia*,

7   denied knowing of any existing information that would tend to negate the defendant's

8   guilt or punishment. (ROA at 198 at 5.) At the hearing to suppress the twenty-seven

9   preserved phone calls, Brian Womble's attorney noted the first attorney's discovery

10  request to preserve all conversations. (RT 5/19/06 at 81.) Then he specifically argued

11  the discovery violation at the next hearing date. (RT 7/28/06 at 43, 67-69.)

12      The prosecutor responded that the discovery motion was not specific and under

13  Rule 15.1, "any statement" applied to statements to police, not to evidentiary recordings

14  of statements by defendants. (RT 7/28/06 at 70.) She found the idea that Rule 15 applied

15  to all recorded statements by a defendant "absurd." (*Id.* at 70.) The prosecutor told the

16  judge that the State was not obligated to keep calls Olson did not listen to. She stated that

17  the defense had the obligation to get them. It was not "stuff" in the State's control. (*Id.*

18  at 72.) As Speer sets forth in Claim 8, the prosecutor does have a duty to learn of any

19  favorable evidence known to others acting on the government's behalf in the case,

20  including the police.

21      With a corrected view of the prosecutor's obligations under Rule 15 in mind, the

22  prosecutor's argument is nonsensical. The rule did not limit "statements" to statements

23  made to police. It specifically anticipated electronic recordings, and plainly obliged the

24  prosecutor to preserve and provide that material to Speer, with or without a request.

25      The trial court's order denying the motion to suppress the tapes did not reference

26  the twenty-two calls targeted by police that they intended to review but did not listen to,

27  and did not preserve. (PCR 9/26/14 Ex. 5.) The order only refers to thirty-six calls, not

28  fifty-eight calls. The court observed that when the discovery request was made, police

117

had already decided which of the "36" calls it would preserve; thus the State did turn over all calls in its possession.  (*Id.*)  But that is not correct.

Consequently, the trial court's ruling on the matter is not correct.  The failure to preserve, or give notice of the impending destruction of the remaining twenty-two calls was the State's fault.  And the destruction without notice was squarely based on the State's failure to comply with its duty to provide discovery as required by Rule 15.1.

A *Brady* violation may arise if the prosecutor fails "to take the most rudimentary steps to obtain access to, to preserve, or to promptly disclose [exculpatory] evidence." *United States v. Sherlock*, 962 F.2d 1349, 1355 (9th Cir. 1992) (quoting *United States v. Alderdyce*, 787 F.2d 1365, 1370 (9th Cir. 1986)).  In *Sherlock*, the court found no bad faith because neither the government nor its agents had possession or control of the evidence (a rape kit) or its test results.  *Id.*  In contrast, here, the State, through it agents, plainly had possession and control of the fifty-eight telephone calls.  While the Court in *Illinois v. Fisher*, 540 U.S. 544, 548 (2004), observed that they had never held that the existence of a pending discovery request eliminates the necessity of showing bad faith on the part of police, nevertheless, in *Bagley*, 473 U.S. at 682, the Court found the prosecutor's failure to respond fully to a discovery request may impair the adversary process.  The *Bagley* Court observed that the reviewing court may consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case.  *Id.* at 683.

Here, the State's failure resulted in the loss of important mitigation evidence.  As all but one of the twenty-seven preserved calls contained mitigation evidence, as set forth in Claims 1, 8, and others, there is a reasonable probability that the twenty-two unpreserved calls also contained mitigation evidence.  The destruction of these calls denied Speer the opportunity to present critical mitigation evidence.  The destruction impaired the adversary process, and denied Speer the opportunity to use the information the calls would have provided in adopting trial strategy, preparing for trial, and conducting cross-examination sufficiently to undermine confidence in the outcome.

1  Thus, the failure of the State to comply with the discovery request prejudiced Speer,

2  denying him his right to a fair trial and due process under the Fifth, Sixth, Eighth, and

3  Fourteenth Amendments of the U.S. Constitution.

### 2. The State Court's Denial of the Claim Was Based on an Unreasonable Determination of Facts

Speer asserted in the state PCR petition, as above, that the State's non-compliance

with the defense's request to produce all recorded conversations of the defendants

deprived him of due process and a fair trial.  The trial court rejected Speer's claim,

quoting the Arizona Supreme Court from the co-defendant's case:

> However, in this case, the State produced all calls taped by the detectives and disclosed a list of the phone calls they reviewed but did not preserve, and thus complied with Rule 15.1(b)(2).

(PCR ME 5/21/15 at 8, quoting *State v. Womble*, 235 P.3d 244, 250-51 (Ariz. 2010).)

But, as Speer shows in Claims 1 and 8, the Arizona Supreme Court did not understand

there were a total of fifty-eight calls, not thirty-six calls—twenty-two of which were

never reviewed by police.  Thus, the State did not produce "all calls taped by the

detectives."  This disparity in the facts alone warrants remand for an evidentiary hearing

to resolve the disputed facts and make a record for review.

### C. During the Guilt Phase, the Prosecutor Made Inflammatory Statements and Engaged in Egregious Misconduct that So Infected the Pre-Trial and Guilt Phase Proceedings as to Render Speer's Trial Unfair

Though some of the factual basis of this claim was brought before the Arizona

Supreme Court on direct appeal as part of Guilt Claim Three (trial court failure to grant

mistrial as a result of prosecutorial misconduct) (DA dkt. 87 at 21-23), Speer did not

present this direct prosecutorial misconduct claim to the state court as a result of appellate

and post-conviction counsels' deficient performance.  The deficient performance of state

appellate and post-conviction counsel prejudiced Speer and provides cause to excuse any

procedural default.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Evitts v.

Lucey*, 469 U.S. 387, 396-97 (1985); *Martinez v. Ryan*, 566 U.S. 1, 9 (2012).  Therefore,

1    the Court may consider the merits of this claim.  Because the claim has not been

2    adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C.

3    § 2254(d) do not apply to this Court's review, and the Court may consider the claim de

4    novo.

5         Speer incorporates by specific reference all facts, allegations, and arguments made

6    elsewhere in this Petition.

7    **1.    Prosecutorial Misconduct So Infected the Guilt Phase with**
     **Unfairness as to Render the Resulting Conviction a Denial of Due**
8    **Process**

9         **a.    Legal Basis**

10        A prosecutor occupies a unique position in the bar, and is subject to uniquely

11   rigorous standards.  "[W]hile he may strike hard blows, he is not at liberty to strike foul

12   ones.  It is as much his duty to refrain from improper methods calculated to produce a

13   wrongful conviction as it is to use every legitimate means to bring about a just one."

14   *Berger*, 295 U.S. at 88.  "Prosecutors are subject to constraints and responsibilities that

15   don't apply to other lawyers . . . [t]he prosecutor's job isn't just to win, but to win fairly,

16   staying well within the rules."  *United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir.

17   1993) (internal citations omitted).

18        To succeed on a claim of prosecutorial misconduct, Speer must meet one of two

19   standards.  Speer must demonstrate either that the prosecutor's misconduct prejudiced a

20   substantive right, *see Donnelly*, 416 U.S. at 644 (internal citations omitted), or that the

21   prosecutor's misconduct rendered the trial fundamentally unfair, *see Berger*, 295 U.S. 78.

22   Speer will show that the prosecutor's conduct both prejudiced his substantive rights and

23   rendered the trial fundamentally unfair.  The prosecutor in Speer's case has a long and

24   egregious history of violating her ethical duties and flouting both the law and propriety to

25   obtain a conviction at all costs.  This misconducted pervaded Speer's trial, and rendered it

26   fundamentally unfair.

27

28

### b. Instances of Prosecutorial Misconduct During Guilt Phase of Trial

Prosecutorial misconduct may "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643. Prosecutorial misconduct is not evaluated from isolated instances alone; rather, the reviewing court must consider the cumulative effect of the harm. *Berger*, 295 U.S. at 89. In Speer's case, the State's misconduct was not confined to a single instance but was persistent. Speer was already facing an uphill battle as his trial counsel were unprepared for his defense. The inequity of the battle was exacerbated when Speer was pitted against a prosecutor with a history of ethical complaints and misconduct. Speer's right to a fair trial was eviscerated by Gallagher's repeated instances of misconduct.

Both federal and Arizona courts recognize that whether a prosecutor's misconduct is isolated or a consistent pattern is relevant to analysis of such a claim. *See Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987); *State v. Minnitt*, 55 P.3d 774, 782 (Ariz. 2002) ("Like the misdeeds in *Pool* [*v. Superior Court*, 677 P.2d 261, 271 (Ariz. 1984)], Peasley's misdeeds were not isolated events but became a consistent pattern of prosecutorial misconduct that began in 1993 and continued through retrial in 1997."); *State v. Jorgenson*, 10 P.3d 1177, 1180 (Ariz. 2000) ("This is perhaps the third or fourth time that the conduct of this same prosecutor has raised the same type of problem. It is unfortunate that he was permitted to try so serious a case and, without proper supervision, permitted to try it in such an improper manner.").

The experience level of the prosecutor is also relevant. *See Minnitt*, 55 P.3d at 782 (reversing a conviction for prosecutorial misconduct, which permeated the trials in question, and noting, "Peasley is not an inexperienced prosecutor, but rather a veteran homicide prosecutor"). In disciplinary cases involving prosecutorial misconduct, the experience of the prosecutor renders conduct more egregious. *In re Peasley*, 90 P.3d 764, 774 (Ariz. 2004) ("[W]hen a lawyer's substantial experience places that lawyer in a position that would be unavailable to a less experienced lawyer, and that lawyer's

experience also affords, or should afford, a greater appreciation of the advantages of eliciting false testimony, substantial experience may be considered a relevant aggravating factor."); *In re Zawada*, 92 P.3d 862, 869 (Ariz. 2004) (citation omitted) ("Peasley's extensive experience as a prosecutor helped him understand how a jury would react to unfavorable evidence.  Accordingly, he suborned perjured testimony to destroy the negative inference the jury would otherwise have drawn.").

Jeanette Gallagher, who prosecuted both Speer and his half-brother Brian Womble, has been recognized for a notable pattern of malfeasance.  In June 2016 The Fair Punishment Project, a joint project out of Harvard Law School, The Accountable Justice Collaborative, and The Bronx Defenders (Fair Punishment Project, "About Us," *available at* http://fairpunishment.org/about-us/), published a report entitled "America's Top Five Deadliest Prosecutors:  How Overzealous Personalities Drive the Death Penalty" (hereinafter "Top Five"), *available at* http://fairpunishment.org/wp-content/uploads/2016/06/FPP-Top5Report_FINAL.pdf.  The report analyzes the records of the five head prosecutors around the nation responsible for the highest numbers of death verdicts.  "Top Five" at 3.  In addition, the report highlights "five additional prosecutors who came very close to becoming members of this notorious group.  These runners-up have egregious records in their own states."  *Id.*  At number two in this group of runners-up is Jeanette Gallagher.  *Id.* at 24.

Of Gallagher, the report finds:

> Gallagher, the current head of Maricopa County's capital case unit, has obtained at least 9 death sentences, which appears to be more than any other active prosecutor in Arizona in the last decade.  She has secured death sentences against people with severe impairments, including a military veteran diagnosed with paranoid schizophrenia.  Gallagher also obtained a death sentence for a 19-year-old who had tried to commit suicide the day before he committed murder and who had attempted to seek treatment for his severe depression only to be turned away.  The Arizona Supreme Court rebuked Gallagher for prosecutorial misconduct in at least three death penalty cases, calling her behavior "improper," "very troubling," and "entirely unprofessional."

122

1    *Id.* (citations omitted).

2         The Arizona Supreme Court described Gallagher's conduct as "improper" in *State*

3    *v. Velazquez*, 166 P.3d 91 (Ariz. 2007).  In that case Velasquez alleged that Gallagher had

4    committed misconduct by claiming a mental health expert who was a professional

5    witness for Velazquez had fabricated his report.  *Id.* at 101.  In addition, Gallagher said

6    that the defense attorneys were complicit in fabricating medical evidence.  *Id.* at 102.

7    The court found both of these statements improper, but that, in the context of that case,

8    they did not warrant reversal.  *Id.* at 103.

9         Similarly, in *State v. Martinez*, 282 P.3d 409 (Ariz. 2012), Gallagher was accused

10   of misconduct on several points in the trial.  For example, "During voir dire in the guilt

11   phase, the court warned the prosecutor to watch her conduct because, she 'tend[ed] to

12   give a big sigh, audible sigh, and throw up [her] hands and roll [her] eyes' when the court

13   ruled against her."  *Id.* at 415.  The issue arose again when Martinez made a motion to

14   strike the death penalty based on Gallagher "constantly 'rolling her eyes;' 'quipping,'

15   'ad-libbing,' and her 'running commentary on various events as they occur during trial;'

16   as well as her 'propensity to display irritation, displeasure or skepticism over rulings by

17   the Court adverse to her.'  Defense counsel said a juror mentioned this conduct."  *Id.*  The

18   Arizona Supreme Court characterized her behavior as "very troubling" and

19   "inappropriate."  *Id.* at 415.  In addition, Gallagher compared the defendant's traumatic

20   past, being presented on mitigation, to the impact of the victim's death on his family.  *Id.*

21   at 415-16.  Finally, Gallagher told the jury about a burglary for which the defendant had

22   been acquitted.  *Id.* at 417.  For case-specific reasons, however, the court found no

23   reversible error.  *Id.* at 417-18.

24        The case in which the Arizona Supreme Court characterized Gallagher's behavior

25   as "entirely unprofessional" was this one—*State v. Speer*, 212 P.3d 787 (Ariz. 2009).

26   Appellate counsel brought a claim, not of prosecutorial misconduct, but of trial court

27   error for failure to declare a mistrial on the basis of that misconduct.  *Id.* at 795-96.  Thus

28

the court examined the factual basis of this claim, but not in this claim's legal context. (For discussion of the claim brought in the direct appeal, *see* below, Claim 11.)

The behavior to which the court was referring occurred outside the presence of the judge and jury but in the presence of Speer.  On January 18, 2007, Gallagher said that, "when this trial's over with, Pam [Nicholson—trial counsel] [is] going to need to be checked for gonorrhea, or tested for gonorrhea."  (RT 1/19/07 at 21.)  Gallagher was aware from disclosed medical records that Speer had had gonorrhea.  (*Id.*)  Trial counsel objected strongly, on the basis that Gallagher's snide implication that the relationship between attorney and client was sexual was deeply upsetting, and interfered with the attorney/client trust relationship.  (*Id.* at 22.)  He moved for Gallagher's removal from the case.  (*Id.* at 24.)  Gallagher defended herself to the court, claiming she had meant no offense by the statement; that she had merely been expressing genuine concern over communicable diseases.  (*Id.* at 24-26.)  The trial court asked Gallagher to apologize to Nicholson (*id.* at 31), but denied the defense's motion (*id.* at 38).

In addition to this shockingly unprofessional assault on opposing counsel and the defendant, Gallagher otherwise peppered Speer's trial throughout with incidents of prosecutorial misconduct, some more pronounced and egregious than others, but nonetheless prejudicial to Speer.

For example, during the re-direct examination of Detective Dennis Olson, Gallagher made "a mockery" of trial counsel's cross-examination.  (RT 12/11/06 at 90.) Trial counsel had asked the detective about a missing cushion at the crime scene.  (*Id.* at 63-64.)  Gallagher followed up by asking him if he had had a chance to talk to Brian Womble—the actual shooter in this case—about the cushion.  (*Id.* at 89.)  This question constituted misconduct as Womble had invoked his Fifth Amendment privilege, and thus had a constitutional right not to have his silence brought up at trial.  (*Id.* at 92.)  In addition, Gallagher asked whether the police had taken down a door and brought it to the lab for fingerprinting, mocking trial counsel's line of questions about fingerprinting procedures.  (*Id.* at 90.)  Trial counsel had also attempted to make a point about shoddy

investigation procedures in asking the detective about all the people close to the crime who had not been fingerprinted; Gallagher mocked this entirely appropriate line of questioning by asking Detective Olson, "Did it ever cross your mind to fingerprint little Kimberly and her brother little Marcos [the small children of the victim]?"  (*Id.* at 81.)

Trial counsel moved for a mistrial, on the basis of the prejudicial nature of Gallagher's mockery.  (RT 12/11/06 at 90.)  Gallagher responded with further mockery, stating, "[trial counsel] presented a bumbling cross-examination."  (*Id.* at 91.)  "His line of questioning was ridiculous."  (*Id.* at 82.)  And finally, she boasted that, "if [trial counsel] didn't accuse me of prosecutorial misconduct every day, I would think I was in the wrong trial."  (*Id.* at 91.)

In addition, when examining Detective Olson in front of the jury on the issue of the police practices that led to spoliation of key evidence, the prosecutor asked the witness, "to your knowledge does Mr. Storrs [trial counsel] know that jail calls are destroyed after three months?"  (RT 1/10/07 at 94.)  And then again, "to your knowledge did Bob Storrs know in August of 2002 that the jails calls only get kept for six months?"  (*Id.* at 96-97.)  Trial counsel moved for a mistrial, on the basis that the prosecutor had improperly shifted the burden of proof through the question.  (*Id.* at 113-15.)  The trial court denied the motion, but instructed the jury that the burden of proving guilt beyond a reasonable doubt never shifts.  (*Id.* at 120.)

In addition, during her guilt-phase closing argument, the prosecutor told the jury, "The burden of proof *in the guilt phase* is all on the State.  It never shifts to the defendant." (RT 1/17/07 at 111 (emphasis added).)  Trial counsel moved for a mistrial, explaining that, "you can't intimate that this trial is going to go on, and then, you know, in the next phase, perhaps the burden will be different.  But you can't talk about any other phase other than the one that we're in, and so that denies my client a fair trial."  (*Id.* at 112.)  The court denied the motion, alleging there was no harm, no prejudice.  (*Id.*)  The trial court was incorrect.

1    The prosecutor improperly vouched for the strength of the State's case by

2    intimating that there would indeed be additional phases, namely the aggravation phase,

3    since jurors would assuredly find Speer guilty of first degree murder.  *See United States*

4    *v. Rodriguez*, 43 F.3d 117, 124 (5th Cir. 1995) ("While a prosecutor 'may strike hard

5    blows,' he is not at liberty to strike foul ones.  It is as much his duty to refrain from

6    improper methods calculated to produce a wrongful conviction as it is to use every

7    legitimate means to bring about a just one."  *State v. Minnitt*, 55 P.3d 774, 783 (Ariz.

8    2002) (quoting *Berger*, 295 U.S. at 88).

9    Finally, Gallagher, who prosecuted both Speer and his half-brother Brian Womble,

10   committed misconduct by arguing directly contradictory theories of the crime at their

11   trials.  After convincing Speer's jurors that Speer was the master manipulator who

12   emotionally blackmailed and coerced his little brother—who was particularly vulnerable

13   to the machinations as he was depressed and suicidal—Gallagher then turned around at

14   Womble's trial and presented Womble as the master planner who wanted to kill, wanted

15   the pleasure of killing, and forced his "loser" brother to accede.  The factual details

16   supporting this sub-claim are detailed in Claim 7.  By presenting incompatible,

17   inconsistent theories regarding what the same evidence showed about ultimate

18   responsibility for the crime in separate trials, the prosecution violated its duty under

19   *Brady* "to prevent fraud upon the court, and to elicit the truth."  *Morris v. Ylst*, 447 F.3d

20   735, 744 (9th Cir. 2006) (quoting *Northern Mariana Islands v. Bowie*, 243 F.3d 1109,

21   1117 (9th Cir. 2001)).  This type of misconduct has been specifically condemned in other

22   capital cases as a violation of due process.  *See, e.g.*, *Drake v. Kemp*, 762 F.2d 1449,

23   1479 (11th Cir. 1985) ("The state cannot divide and conquer in this manner.  Such

24   actions reduce criminal trials to mere gamesmanship and rob them of their supposed

25   purpose of a search for truth."); *see also Thompson v. Calderon*, 120 F.3d 1045, 1058

26   (9th Cir. 1997) (en banc), *rev'd on other grounds*, 523 U.S. 538 (1998) (based on

27   "bedrock principles, it is well established that when no new significant evidence comes to

28

126

1   light a prosecutor cannot, in order to convict two defendants at separate trials, offer

2   inconsistent theories and facts regarding the same crime.").

3   **D.    During the Penalty Phase, Egregious and Varied Instances of Prosecutorial Misconduct Rendered the Trial Unfair and Resulted in a Death Sentence in Violation of Speer's Constitutional Rights**

5         As explained below, there were multiple instances of prosecutorial misconduct

6   which occurred during the penalty phase.  However, due to the ineffective assistance of

7   appellate and state post-conviction counsel, the only example of penalty phase

8   prosecutorial misconduct that was presented to the state courts was a claim challenging

9   Gallagher's use of the causal nexus test during closing argument.  (*See* Claim 18.)

10  Because the arguments raised herein are meritorious, the deficient performance of state

11  appellate and post-conviction counsel prejudiced Speer and provides cause to excuse any

12  procedural default.  *See Strickland*, 466 U.S. at 687; *Evitts*, 469 U.S. at 396-97; *Martinez*,

13  566 U.S. at 9.  Moreover, as the claim has not been adjudicated by the Arizona state

14  courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this

15  Court's review, and the Court may consider the claim de novo.

16        **1.    The Prosecutor Committed Misconduct by Using Speer's Mental Health History and Other Mitigation as Non-Statutory Aggravating Evidence**

18         Arizona's capital sentencing scheme explicitly precludes the introduction and

19  consideration of non-statutory aggravators.  Therefore, the State's sentencing evidence

20  must be relevant to the statutory aggravating circumstances alleged by the State at trial.

21  This funneling of aggravation and mitigation is essential to the survival of Arizona's

22  death penalty statute, as presentation of non-statutory aggravating circumstances creates

23  an unacceptable risk that the death penalty will be imposed in an arbitrary and capricious

24  manner.  *Furman v. Georgia*, 408 U.S. 238, 277 (1972); *Proffitt v. Florida*, 428 U.S. 242,

25  259 (1976); *Gregg v. Georgia*, 428 U.S. 153, 189 (1976).  This is so because

26  consideration of non-statutory aggravating circumstances destroys the guided discretion

27  required by *Furman* and its progeny that is protected by Arizona's death penalty scheme.

28  It is therefore improper for the prosecutor to argue factors that are not listed in the statute,

or to refer to a mitigator as an aggravator and thereby denigrate the mitigation. *Zant v. Stephens*, 462 U.S. 862, 885 (1983).   Yet, in this case, the prosecutor routinely mischaracterized Speer's mitigating evidence and prior criminal history as aggravating factors, in violation of Due Process and Eighth Amendment principles.

Arizona and Ninth Circuit case law make clear that a diagnosis of antisocial personality disorder "is a mitigating factor, even if it does not come up to the level of a factor specifically listed in the Arizona sentencing statute." *Smith v. Stewart*, 140 F.3d 1263, 1270 (9th Cir. 1998) (citing *State v. Thornton*, 929 P.2d 676, 685-86 (Ariz. 1996), *cert. denied*, 117 S. Ct. 1706 (1997), and *State v. Stokley*, 898 P.2d 454, 470-71 (Ariz. 1995)).   Here, Dr. Bayless diagnosed Speer with antisocial personality disorder,[13] and there were clear indications of antisocial conduct in Speer's history.   The vast majority of the many clinicians who examined Speer throughout his lifetime concluded that, while Speer acted in antisocial ways at certain times in his life, these behaviors were due to parental abuse and neglect, physical and sexual abuse, exposure to criminal behavior from infancy, substance abuse and addiction from childhood, lifelong depression, ADHD, complex trauma, and neurocognitive deficits.   (*See, e.g.*, Trial Exs. 197, 203, 212-217, 223, 231, 249-254.)   Regardless of how one viewed the "antisocial" aspects of Speer's history, he was entitled to have all of that evidence considered in mitigation, not aggravation.   *See Smith*, 140 F.3d at 1270 ("[T]here can be no doubt that the [sentencer] must consider that personality defect [as mitigation] when it is present in a case."); *State v. Walton*, 769 P.2d 1017, 1034 (Ariz. 1989) ("[T]he judge should consider any evidence of mental impairment to mitigate capital punishment.").   Yet the prosecutor consistently used "antisocial" as an unconstitutional and non-statutory aggravating circumstance to support her case for death.

---

[13] As Speer argues in Claim 19, this diagnosis is suspect based on Dr. Bayless's misapplication of the MMPI and possible misrepresentations about the work he did on Speer's case.

1    In penalty phase opening and closing argument, the prosecutor intimated that,

2    because Speer was antisocial, he would forever be a sociopathic monster who is

3    undeserving of mercy.  For example, the prosecutor listed the entirety of Speer's criminal

4    history (without objection from defense counsel) during her opening argument.  (RT

5    2/1/2007 at 82-83; 98-111.)  In addition to allowing the jury to consider as non-statutory

6    aggravating evidence events that clearly did not meet the prior felony aggravator, this

7    harangue improperly turned Bayless's mental health diagnosis into an aggravator.

8    According to the prosecutor, Speer's serious mental health issues were nothing more than

9    an example of "the lengths that this defendant will go to to avoid the ultimate

10   consequences of his actions."  (*Id.* at 72.)  She tried to convince the jury that Speer would

11   always be a danger to society; that, as a "sociopath," Speer "lacks empathy" and is

12   "callous, cynical, contemptuous of the feelings, rights, and sufferings of others. . . .  And

13   that's what the defendant has.  That is who he is."  (*Id.* at 118-19.)  Later, after discussing

14   Speer's attempts to get medical treatment while incarcerated, she argued:

15            He also got something that he didn't want, a diagnosis
         of antisocial personality disorder.

16            According to the DSM, deceit and manipulation are
         essential features of an antisocial personality disorder.  And

17       for almost five years, the defendant has been lying and
         manipulating towards the end of convincing the 12 of you

18       that he is not morally culpable for the death of Adan Soto,
         that he should not be blamed for the murder because he had a

19       lousy childhood, his grandfather died, the system failed him,
         he's mentally ill, his mother's a drug addict, and so on and so

20       on and so on.  As far as the defendant is concerned, everyone
         is to blame for Adan Soto's murder except him.

21            Now, the problem with all that, what the defendant
         wants you to believe, is that a lot of it simply isn't true.  That

22       which is true is exaggerated.  Much of it is nonsense.  And the
         rest of it is presented to make you feel responsible for the fact

23       that the defendant committed a murder under circumstances
         that make him eligible for the death penalty.

24

25   (RT 3/27/2007 AM at 5-6.)

26            The prosecutor continued with this thread—and threat—throughout the closing.

27   When describing Dr. Parrish's testimony about scale 4 of the MMPI, she stated,

28            [Dr. Parrish] didn't want to call it the psychopathic deviant
         scale.  She said, Well, that sounds prejudicial . . . Of course,

                                        129

> when you look at the DSM and you have the parts for it, it says it's also called psychopathology and sociopath. Those names don't sound nice. So the defendant doesn't want that. He doesn't want to have you see that he is someone who has absolutely no respect for the rights of others, malinger, con to get what he wants.

(*Id.* at 67.) The prosecutor went even further, arguing that no mitigation existed *at all* because "defendant's real issue" is that he is antisocial:

> [T]here's no indication that in the spring of 2002, he was using any drugs [and] there's no indication that he was using drugs during the time of the offense. . . . How did any of those things have anything to do with why he murdered Adan Soto? They don't. They do not reduce the degree of his moral culpability or blameworthiness. I suggest that they don't exist, and they're being used to try to explain what the defendant's real issue is, *which is he has antisocial personality disorder.*

(*Id.* at 66-67 (emphasis added).) The prosecutor ended her closing argument with this last salvo:

> Paul Speer cares about one person and one person only. He has an antisocial personality disorder. He is never going to change. There is nothing about this crime that calls out for mercy for the defendant.

(*Id.* at 72.)

These exhortations were not ambiguous or one-off remarks, nor can they be viewed in artificial isolation. *Donnelly*, 416 U.S. at 645. Rather, their impact was clear and unmistakable. Through the prosecutor's repeated and egregious misconduct, the jury was urged not only to disregard the evidence in mitigation, but to affirmatively consider it in aggravation and as direct support for a sentence of death rather than life, in violation of constitutional mandates. *Zant*, 462 U.S. at 885; *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982). These errors were particularly harmful in this case, where the prosecutor, trial court, and appellate court all applied an unconstitutional causal nexus test that contributed to the jury's misunderstanding of the value and effect of Speer's mitigation. (*See* Claims 18, 20, and 21, *infra*.)

130

Ultimately, Speer's due process rights were denied because the prosecutor's deceptive misstatements of the law raised a reasonable likelihood that the jury applied their sentencing duties "in a way that prevent[ed] the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990). The error violated the Eighth and Fourteenth Amendments' guarantees of due process and against cruel and unusual punishment, which require heightened reliability in the determination of guilt and death eligibility in capital cases. *See Beck v. Alabama*, 447 U.S. 625, 627-46 (1980); *see also Kyles*, 514 U.S. at 422; *Burger v. Kemp,* 483 U.S. 776, 785 (1987); *Gilmore v. Taylor*, 508 U.S. 333, 342 (1993); *White v. Illinois*, 502 U.S. 346, 363-64 (1992). Additionally, because Arizona law specifically limits aggravating evidence to those elements enumerated in the capital sentencing statute, the prosecutor's unchecked use of non-statutory aggravating factors also violated Speer's freedom against arbitrary deprivation of state-created rights. *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980).

**2.   The Prosecutor Engaged in Misconduct When She Solicited and Failed to Correct Testimony that She Knew to Be False in Violation of *Napue v. Illinois* and Speer's Rights Under the Fifth and Fourteenth Amendments**

Dr. Bayless was the State's sole mental health expert during the penalty phase of Speer's trial. He testified that he conducted a clinical interview and testing of Speer on August 14 and 15, 2006 at the Maricopa County Jail. (RT 3/20/2007 at 65, 69.) Dr. Bayless administered three tests: "the Shipley Institute of Living Scale, the Minnesota Multiphasic Personality Inventory-2, [and] the Williamson Sentence Completion Test." (*Id.* at 70; Trial Ex. 192 at 8.) Dr. Bayless stated that during his visit on the morning of August 14, 2006, he administered the clinical interview and the MMPI and spent "four hours maybe" with Speer. (*Id.* at 77.) On the afternoon of August 15, according to Dr. Bayless, he gave Speer the Shipley and the Williamson Sentence Completion Test and spent "probably an hour to an hour and a half [with him]." (*Id.* at 77.)

However, Dr. Bayless's claims about the amount of time he spent with Speer are contradicted by the Maricopa County jail visitation records from those dates. The

visitation log from August 14, 2006 indicates that "Bayless, Michael" visited with Speer from 10:28 a.m. to 10:58 a.m. (a total of thirty minutes).  Similarly, on August 15, 2006, "Bayless, Michael" visited with Speer from 1401 to 1431 (a total of thirty minutes).  In light of the record evidence from the jail, Dr. Bayless's testimony and findings are, at the very least, compromised.

The prosecutor stated on the record that she "look[ed] at the jail visitation records weekly."  (Womble RT 3/9/2007 at 50.)  Moreover, it was apparent that she reviewed the jail records and relied on their validity when questioning other witnesses during the trial.  (*See, e.g.*, Trial Ex. 104 and RT 1/10/2007 at 134-36 (Testimony of Det. Sanchez); RT 2/20/2007 at 189-90 (Testimony of Carla Lujan[14]).)  Thus, the prosecutor was in possession and aware of the jail visitation records and knew that Bayless could not have conducted the testing and interview he claimed to have conducted in only sixty total minutes.

A conviction obtained using knowingly perjured testimony violates due process.  *Mooney v. Holohan*, 294 U.S. 103, 112 (1935).  A defendant's due process rights are violated when the state solicits false evidence or allows false testimony to go uncorrected when it appears.  *Giglio*, 405 U.S. at 153; *Alcorta v. Texas*, 355 U.S. 28, 313-32 (1957).  This prohibition applies even when the testimony in question is relevant only to the witness's credibility.  *Napue*, 360 U.S. at 269.  In *Napue*, the Court recognized that "[t]he jury's estimate of truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend."  *Id.* at 269.  A conviction obtained through the use of perjured testimony is fundamentally unfair, and "must be set aside if there is any reasonable likelihood that the false testimony

---

[14] "Q:  Okay.  If the jail records indicate that you saw the defendant on July 28th, 2003, first at 12:12 in the afternoon and then again in the evening at 20:22 hours and then you didn't see him again until November 7th, 2003, would you have any reason to disagree with the records?"  (RT 2/20/2007 at 189.)

1  could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103

2  (1976); *Jackson v. Brown*, 513 F.3d 1057, 1076 (9th Cir. 2008).

3  If the times listed in the jail records are accurate—and the prosecutor relied upon

4  them as such for her own case-in-chief—then Dr. Bayless's testimony regarding the time

5  he spent with Speer was false.  More importantly, it is unlikely that Dr. Bayless actually

6  administered the tests in the way he described during his testimony.  As Dr. Bayless

7  stated during his deposition, the MMPI alone typically takes two to two and a half hours

8  to complete, and the Shipley is a timed 20-minute exam.  As there is no way that three

9  tests and a lengthy clinical interview could have been completed in one hour, Dr.

10  Bayless's test results and clinical findings are suspect.

11  Similarly, the prosecutor should have acted to correct (or prevent) Dr. Bayless's

12  misleading testimony about the Shipley, the Williamson, and the MMPI-2.  (*See* Claim

13  19.)  For example, Dr. Bayless gave incorrect testimony regarding the L, K, and F scales,

14  the Paranoia Scale, and the T-score distribution—all of which he relied upon to formulate

15  his diagnosis of antisocial personality disorder.  By failing to correct this false testimony,

16  the prosecutor violated her obligations under *Napue* and *Giglio*.

17  Dr. Bayless's credibility and diagnosis were crucial to the State's case.  (*See, e.g.*,

18  RT 3/20/2007 and 3/21/2007 (Bayless testimony); 3/27/2007 AM at 17-18, 23, 39, 42,

19  55, 62-63) (prosecutor's closing argument relying on Bayless's testimony).)  The jury had

20  to weigh the contradictory mental health testimony and determine which experts were

21  credible in order to decide whether to sentence Speer to life or death.  Because "there is

22  [a] reasonable likelihood that the false testimony could have affected the judgment of the

23  jury," Speer's sentence must be set aside.  *See Agurs*, 427 U.S. at 103; *Jackson*, 513 F.3d

24  at 1076.

25  **3.    The Prosecutor Committed Misconduct by Using Inflammatory**
   **Language, Misstating the Evidence, and Making Improper**
26  **Comments During Closing Argument**

27  The prosecutor's role is to "vindicate the public interest in punishing crime," and

28  "not to exact revenge on behalf of an individual victim."  *Drayden v. White*, 232 F.3d

133

1    704, 713 (9th Cir. 2000).  Furthermore, it is misconduct when the prosecutor manipulates

2    or misstates the evidence at trial.  *Darden*, 477 U.S. at 181-82.

3          During closing argument, the prosecutor repeatedly accused the defendant and his

4    attorneys of exaggerating or outright lying about mitigation evidence.  This behavior was

5    egregious, was done with the intention of inflaming the passions or prejudices of the

6    jurors, and prejudiced Speer's right to a fair sentencing proceeding.  For example, she

7    argued that Speer's entire mitigation history was a lie, and that Speer was trying to

8    manipulate the jury into making them feel sorry for him:

9                Now, the problem with [Speer's mitigation evidence], what
             the defendant wants you to believe, is that a lot of it simply
10           isn't true.  That which is true is exaggerated.  Much of it is
             nonsense.  *And the rest of it is presented to make you feel*
11           *responsible* for the fact that the defendant committed a
             murder under circumstances that make him eligible for the
12           death penalty.

                              [* * *]
13

14           Mr. Storrs asked in one of his slides how will Cedric [Speer's
             son] be impacted if the defendant were sentenced to death?
15           *That's called pile on the juror guilt.  Feel guilty if you impose*
             *the death penalty* because of what it will do to Cedric.

16
     (RT 3/27/2007 AM at 6, 9 (emphasis added).)
17
           Here, by twisting Speer's mitigation evidence and turning it into a metaphorical
18
     weapon that Speer allegedly used against the jury to "make [them] feel responsible" for
19
     what Speer did, the prosecutor violated her role to vindicate the public interest, pressured
20
     and misled the jury as to its role, and appealed to the vengeance of the jury.  By arguing
21
     that "a lot of [Speer's mitigating evidence] simply isn't true," she accused dozens of
22
     witnesses—including mental health experts, social workers, family members, and
23
     probation officers—of giving false statements about Speer's life circumstances, history of
24
     abuse, and mental and emotional problems.  A prosecutor may not denigrate the strategy
25
     of the defense as a scam on the jury.  *See Sechrest v. Ignacio*, 549 F.3d 789, 809 (9th Cir.
26
     2008).  In this case, Gallagher's inflammatory comments—made worse when coupled
27
     with her repeated use of antisocial personality disorder as a non-statutory aggravator—
28
                                          134

1    infringed on Speer's right to present a defense at trial and undermined his mitigation

2    presentation.  *See Darden*, 477 U.S. at 182; *Hovey v. Ayers*, 458 F.3d 892, 923 (9th Cir.

3    2006); *Towns v. Jackson*, 287 F. Supp. 2d 749, 760 (E.D. Mich. 2003) (even though

4    prosecutor's improper closing remarks were not extensive, they were prejudicial to the

5    defense because they "spoke directly to a critical issue at trial").  The lack of any

6    objections from trial counsel, or of any effort by the trial judge to "cure or minimize the

7    problem through admonishment or special instruction of the jury," also contributed to the

8    prejudicial effect.  *Mahorney v. Wallman*, 917 F.2d 469, 473 (10th Cir. 1990).  As a

9    result of this argument, Speer was denied a fair trial.

10        The prosecutor also misstated the evidence and the law on a number of occasions

11    during closing argument.  For example, *inter alia*, she accused Speer of not being

12    Cedric's father and of denying paternity, when in fact he had always claimed paternity

13    and always treated Cedric as his son.  (*Compare*, RT 3/26/2007 at 37-38 ("I'm fine being

14    a father to my son . . . . I'm glad of being a father to my son.") and RT 3/27/2007 AM at

15    8-9.)  Additionally, she argued that there was "a different worker assigned [to Speer's

16    case] every time.  So my God, Child Protective Services must be full of incompetent

17    people that don't know child abuse when they see it."  (RT 3/27/2007 AM at 23.)

18    Gallagher made this argument in an attempt to show that CPS did everything right, and

19    that Speer was just an incorrigible, brutal, and dangerous person from childhood.

20    However, Scharlene DeHorney and other social and CPS workers actually saw Speer and

21    his family on more than one occasion—DeHorney wrote at least five reports herself.

22    (*See* Trial Ex. 197.)  And CPS did document instances of child abuse, including, *inter*

23    *alia*, neglect, physical assault, and sexual assault.  (*See id.*)  As DeHorney will attest,

24    CPS was understaffed at the time, and so children were placed on a scale of 1 to 10 and

25    not removed from the home unless they were at the very high end of the scale.  (*See*

26    Section II, *supra* and Claim 14, *infra*.)

27        Furthermore, Gallagher repeatedly misstated the law throughout her closing

28    argument.  In addition to asserting that a nexus test applied to Speer's mitigation (*see*

135

Claims 18 and 21, fully incorporated here by reference), she incorrectly claimed that the jury should not give a life sentence in this case because "the crime" did not deserve it:

> Now, there is a mitigating factor, I think it's the second-to-last one. That is mercy. And I suggest to you that mercy for this crime isn't appropriate either. . . . There is nothing about this crime that calls out for mercy for the defendant.

(RT 3/27/2007 AM at 68, 72.) The prosecutor's argument misstated clearly established law regarding the penalty phase, where the question of mercy is directed toward the defendant, not the crime. "The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence." *United States v. Koon*, 34 F.3d 1416, 1443 (9th Cir. 1994) (quoting *United States v. Monaghan*, 741 F.2d 1434, 1441 (D.C. Cir. 1984)), *aff'd in part, rev'd in part on other grounds*, 518 U.S. 81 (1996).

The average juror has confidence in the prosecutor as a public servant, so improper suggestions "are apt to carry much weight against the accused when they should properly carry none." *Berger*, 295 U.S. at 88. Because the prosecutor's improper arguments and misstatement of the evidence were designed to inflame the jury, they created the very real risk that Speer would be sentenced to death in an arbitrary and capricious manner. *See id.* at 85 (finding reversible error where prosecutor made "improper insinuations and assertions calculated to mislead the jury"); *see also Furman*, 408 U.S. at 277 (Brennan, J., concurring). Trial counsel's failure to object or to request adequate remedies for both individual acts of misconduct and for their cumulative effect on Speer's trial also prejudiced Speer.

## E.    Conclusion

Multiple incidents of prosecutorial misconduct contribute to an overall assessment of cumulative error, both within the rubric of a prosecutorial misconduct claim and as general cumulative error in a trial. Thus, the reviewing court must consider the cumulative effect of the harm. *Berger*, 295 U.S. at 89. Even if this court deems that none of these incidents by itself warrants reversal, the cumulative effect of the incidents so

136

infected the trial proceedings as to deprive Speer of a fair trial.  This court should review

the claim de novo and grant habeas relief.

**CLAIM 14**

**SPEER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL
DURING THE PENALTY PHASE IN VIOLATION OF HIS SIXTH,
EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS**

Speer raised a claim of ineffective assistance of penalty-phase counsel in his state

post-conviction petition and petition for review as Claim XII.  (PCR 9/26/14 Pet. at 58-

64; PFR at 29-31.)  Speer presents the entirety of that claim here, as well as several

additional allegations of *Strickland* error during the penalty phase that were not raised by

state post-conviction counsel.  To the extent any aspects of this claim are not exhausted,

that failure is attributable to the ineffective assistance of Speer's post-conviction counsel.

*Martinez v. Ryan*, 132 S. Ct. 1309, 1315 (2012).  Speer will demonstrate at an evidentiary

hearing that state post-conviction counsel fell below the standards of minimally

competent capital attorneys by failing to raise all meritorious *Strickland* claims, and that

those failures prejudiced Speer.

As to the portions of this claim that were presented to the state courts, Speer will

show that the state court's denial constituted an unreasonable application of clearly-

established federal law, 28 U.S.C. § 2254(d)(1), and an unreasonable determination of the

facts, *id.* at § 2254(d)(2).

**A.    Legal Standards**

"There is no more important hearing in law or equity than the penalty phase of a

capital trial."  *Correll v. Ryan*, 539 F.3d 938, 946 (9th Cir. 2008) (quoting *Gerlaugh v.

Stewart*, 129 F.3d 1027, 1050 (9th Cir. 1997) (Reinhardt, J., concurring and dissenting)).

As such, a capital sentencer must be afforded the opportunity to assess "the character and

record of the individual offender."  *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982)

(internal quotation marks and citation omitted). As the Supreme Court has explained,

"[i]f the sentencer is to make an individualized assessment of the appropriateness of the

death penalty, evidence about the defendant's background and character is relevant

because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse."  *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (internal quotation marks and citation omitted), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002); *see also California v. Brown*, 479 U.S. 538 (1987) (O'Connor, J., concurring); *Eddings*, 455 U.S. at 112 (explaining that consideration of offender's life history is a "constitutionally indispensable part of the process of inflicting the penalty of death").  Consistent with this view, courts have held that during the penalty phase of a capital trial, defense counsel has a constitutional duty to provide the jury with mitigating evidence.  *Bean v. Calderon*, 163 F.3d 1073, 1079 (9th Cir. 1998); *Ainsworth v. Woodford*, 268 F.3d 868, 877 (9th Cir. 2001); *Douglas v. Woodford*, 316 F.3d 1079, 1090-91 (9th Cir. 2003).

In determining whether counsel's performance failed to meet Constitutional requirements, "[t]he benchmark . . . must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  Under *Strickland*, counsel is ineffective if:  (1) "representation fell below an objective standard of reasonableness"; and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 669.  In reviewing claims of ineffective assistance of counsel, this Court must consider counsel's overall performance throughout the case[15] in order to determine whether the identified acts or omissions overcome the presumption that counsel rendered reasonable professional assistance.  *See id.* at 695 ("in making this [prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the

---

[15] Because the allegations of deficiency must be considered cumulatively, Speer respectfully directs this Court to Claims 15 through 19, *infra*, which also assert *Strickland* error during the penalty phase of Speer's trial.

evidence before the judge or jury."); *Williams v. Taylor*, 529 U.S. 362, 397 (2000) (holding that when assessing prejudice, reviewing court must consider "the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the [post-conviction] proceeding"); *Alcala v. Woodford*, 334 F.3d 862 (9th Cir. 2003) (granting relief on basis of cumulative impact of multiple errors by counsel). Furthermore, to assess prejudice, the court considers the mitigating evidence that was presented along with the new mitigating evidence and reweighs all of it against the aggravating evidence to determine whether there is a "reasonable probability" that it would have produced a different verdict. *Sears v. Upton*, 561 U.S. 945, 955-56 (2010); *Williams*, 529 U.S. at 399. Stated another way, the prejudice inquiry must consider "whether there is a reasonable probability that, absent the errors, the sentence . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. As *Strickland* recognizes,

> a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Id.* at 695-96.

Speer asserts that the penalty phase verdict was closely balanced, with the State's case for death "only weakly supported by the record" in light of the substantial mitigating evidence presented at trial. Had trial counsel presented the totality of Speer's mitigating evidence, and properly rebutted the State's seriously flawed case in aggravation, there is a reasonable probability that at least one juror would have been moved to vote for a life sentence. *See Wiggins v. Smith*, 539 U.S. 510, 534-35, 537 (2003).

1

2

**B.    Trial Counsel Unreasonably Failed to Investigate and Present Available Mitigating Evidence**

This claim was raised by Speer in his state post-conviction petition and denied on

the merits.  (PCR 9/26/14 at 58-64; PCR ME 5/21/15 at 17-20.)

**1.    What the Jury Did Not Hear**

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable

decision that makes particular investigations unnecessary."  *Strickland*, at 691; *see also* 1

ABA Standards for Criminal Justice 10.7(A) (Revised Edition, 2003) ("The defense team

"has an obligation to conduct thorough and independent investigations relating to the

issues of both guilt and penalty.").  This includes a "thorough" mitigation investigation

and presentation of the defendant's background.  *Williams*, 529 U.S. at 396.  In this case,

there is no question that trial counsel put on mitigating evidence to support Speer's case

for life.  However, "[p]resentation of some mitigating evidence does not excuse the

failure to provide evidence of different mitigating circumstances."  *Laird v. Horn*, 159 F.

Supp. 2d 58, 116 (E.D. PA); *Stankewitz v. Woodford*, 365 F.3d 706, 715 (9th Cir. 2004);

*Williams*, 529 U.S. at 398 (counsel's duty is not discharged merely by presenting some

limited evidence).  Here, despite the amount of evidence presented, counsel committed a

number of crucial and unreasonable errors, including failure to present mitigating

evidence, which had a deeply prejudicial effect on the jury's sentencing calculus.

Of primary concern is trial counsel's failure to interview or present the testimony

of key lay witnesses who would have substantiated Speer's claims of physical and sexual

abuse, multigenerational addiction and mental illness, trauma, institutional failure, and

substance abuse.  These witnesses include, *inter alia*:  Speer's mother, Sabrina Womble

(referred to herein as "Mrs. Womble" for clarity); his father, Mike Speer; his aunts,

Debra Corral and Doris Donithan; his step-uncle, John Womble, Jr.; his former juvenile

probation officer, Scharlene DeHorney; as well as Speer's former neighbors, teachers,

acquaintances, and school officials.  (*See supra* Part I.)  The lack of a proper investigation

allowed the prosecutor to successfully argue that counsel had not proven Speer's

140

mitigation was sufficiently substantial to call for leniency.  Trial counsel knew long before the penalty phase began that the whole thrust of the State's case for death rested upon the assertion that Speer was a malingerer and manipulator who did not have the abusive and dysfunctional background he claimed to have and therefore could not be relied upon to tell the truth.  (*See, e.g.*, Trial Ex. 192; RT 3/27/07 AM at 4 (State's argument to the jury during penalty phase that Speer had made up much of his mitigating evidence and was not being truthful).)  Trial counsel also knew that the defense experts' diagnoses, as well as those of therapists who examined Speer as a child, relied in large part on Speer's self-reporting of his history, experiences, and symptoms.  Therefore, it was imperative that trial counsel find and present witnesses who could corroborate Speer's reporting.  These witnesses were readily available and willing to testify, but counsel unreasonably failed in their duty to investigate and present their testimony.

Perhaps the biggest error was trial counsel's failure to present the testimony of Speer's mother, Sabrina Womble.  The trial mitigation specialist, Dave Wilcox, claimed that they refused to put Sabrina on the stand because she was a heroin addict and therefore not credible.  (PCR 9/26/14 Ex. 16 at ¶ 8.)  However, the reality is that Wilcox and defense counsel failed in their duty to develop a productive relationship with this most crucial of witnesses.  (*See, e.g.*, *id.* Ex. 17 at ¶¶ 4, 6 ("I felt that I was harassed, demeaned, threatened and pressured into silence [by trial counsel]. . . .  I had no good relationship with Paul's defense team.")  Mrs. Womble told Speer's defense team that she had concerns about Randy Walker, Brian Womble's mitigation specialist, working on the case, because Walker had been Bill Womble's probation officer years ago, and Mrs. Womble felt like that conflict was problematic.  (*Id.* at ¶ 8.)  There was also an inherent conflict in Walker and Wilcox interviewing witnesses together, since it was known very early on that Speer and Brian Womble's defenses were adverse to each other.  Nevertheless, Walker and Wilcox continued to conduct tandem interviews of family members, and no one on the defense team tried to develop a healthy and productive

relationship with Mrs. Womble.  While that might have been a difficult task, it was also a necessary one.

Had trial counsel presented Mrs. Womble to the jury, she would have confirmed key details of Speer's life about which the prosecution (and, at times, the jury) were openly skeptical.  For example, among the non-statutory mitigators alleged by trial counsel were "history of family instability," "history of family tragedy," "genetic propensity toward mental illness," and "genetic propensity toward addiction."  (RT 3/26/07 at 74.)  Yet the prosecutor argued successfully that there was no evidence of a history of cultural trauma, family tragedy, or genetic predisposition to addiction and mental illness.  (RT 3/27/07 AM at 13.)  Mrs. Womble (along with other family members) would have provided powerful evidence to support these non-statutory mitigators.  (*See supra* Part I.A; PCR 9/26/14 Ex. 17.)  For example, Mrs. Womble (as well as Mike Speer) would have testified that Paul was in fact born addicted to heroin, and that he had to spend extra days in the hospital to recover from his difficult birth and be treated for opiate withdrawal.  (*See, e.g.*, PCR 9/26/14 Ex. 17 at ¶¶ 3, 4, and 12.)  Similarly, the information Mrs. Womble provided to post-conviction counsel about Speer's birth—namely, that his eye and head were injured due to use of forceps during delivery—was relevant information for Dr. Parrish and other experts who evaluated Speer for neurocognitive deficits and brain damage.  Mrs. Womble would have described how she became involved in drugs, how she was using heroin while she was pregnant with Speer, and how she allowed Speer to get involved with family members who were criminals.  She also would have testified that her brother, Steven Cates, used Speer in crimes such as burglary and theft when Speer was as young as ten.  Cates showed Speer how to climb through doggie doors of stranger's homes to allow Cates to gain access to the home.  Mrs. Womble allowed this criminal behavior because she would receive money for drugs from the robberies.  This information bolstered the expert's reports claiming Speer was brought into crime by adults in his life when he was just a youth, and rebutted the prosecutor's argument that Speer's claims about being used as a pawn by his

uncle were unsubstantiated.  Additionally, Mrs. Womble also would have confirmed that she introduced Speer and her other sons to heroin, and that her own crippling addiction was the reason she was "not a good mother."  (*Id.* at ¶ 15.)

Trial counsel admits they did not have a good relationship with Speer's mother and it caused her to not want to help trial counsel during trial.  (PCR 9/26/14 Ex. 1 at ¶ 9.)  Counsel also acknowledges that he should have tried to cultivate that relationship rather than discounting Mrs. Womble and other family members as witnesses.  (*Id.* at ¶¶ 9-11.)  However, even if Mrs. Womble ultimately refused to assist trial counsel (or if she did assist and the jury found her incredible), there were a number of other witnesses who could have substantiated many of the details that the defense experts relied upon in their own testimony.  Trial counsel does not recall contacting or interviewing Speer's extended relatives (including, but not limited to, Debra Corral and Doris Donithan) who could have provided crucial social history information.  (*See supra* Section II.)  Had he pursued these key family witnesses, he would have been able to present Speer's paternal aunt, Debra Speer Corral, who would have provided powerful testimony about Speer's infancy and childhood years.  Corral visited Speer in the hospital when he was born.  (*Id.* Ex. 18 at ¶ 7.)  She witnessed Speer in the pediatric intensive care unit, on a ventilator, twitching uncontrollably, shaking, sweating and "dry-crying" as he suffered the excruciating pain of heroin withdrawal.  (*Id.*)  Despite Speer's fragile medical state during infancy, Mrs. Womble never took Speer to any "well baby" visits because "[s]he was usually high on drugs."  (*Id.* at ¶ 8.)  Corral also provided first-hand evidence of Mrs. Womble's violent nature, as well as the violence that Speer was exposed to in George Cates's home.  (*Id.* at ¶¶ 4-5, 9-10.)

There were also non-family witnesses available who would have attested to the dysfunction in Speer's social history and family life.  Perhaps the most important non-family witnesses included the social workers and probation officers who began working with Paul Speer from the time he was in kindergarten.  One of these professionals— Scharlene DeHorney, a juvenile probation officer who worked with Speer's family for

years—would have rebutted the prosecution's argument that Paul Speer failed the system rather than the system failing Speer.  (*See, e.g.*, RT 3/27/07 AM at 23-24 (arguing that CPS would have removed Speer from the home if the conditions were as terrible as Speer makes them out to be).)  According to DeHorney, CPS was very understaffed at the time she worked on Speer's case.  Children were placed on a scale of 1 to 10, with 10 meaning children's lives were in danger due to physical abuse.  A child was not removed from the home unless CPS could substantiate that level of physical abuse; the child had to be on the high end of the scale to be a CPS priority.  DeHorney did a great deal of work on Speer's case and really liked him.  She recognized that he was a "challenge," as he was often an "angry person," but she understood where that anger came from and she never felt threatened by him personally.  DeHorney encouraged Speer's parents to be more involved in his treatment, but they always had a reason why they could not participate or attend counseling.  DeHorney recalls that Sabrina in particular lacked "the capacity to handle situations" and was often depressed.  In DeHorney's opinion, the lack of adequate CPS engagement and the failure of Speer's family to fully participate in the treatment meant that the totality of Speer's issues were not being properly addressed, even though Speer tried hard and usually completed the hours and tasks assigned to him.  However, without the necessary family support, Speer's struggles were bound to continue.

Similarly, employees from the Alhambra School District, where Speer was an elementary school student, would have testified to Speer's attempts to do well, his childhood adversities, and his experiences in the school setting.  (*See, e.g.*, PCR 9/26/14 Exs. 19 and 22.)  For example, Diane Hauer, school secretary at Cordova Elementary, would have testified that Speer was not from a healthy, happy home, and was thrown out of his house while he was in elementary school.  (*Id.* Ex. 19 at ¶¶ 3-4.)

Other lay witnesses were available, including Veronica Trujillo, Speer's girlfriend and the mother of his son Cedric.  (*Id.* Ex. 20 at ¶ 1.)  Trujillo would have testified that she saw Speer's mother order him to go get her drugs, and was with him when he did so.  (*Id.* at ¶ 4.)  She witnessed illicit drug and criminal activity in the Womble home,

including drug dealers coming to the house to make deliveries for Sabrina and Bill

Womble.  Veronica could also attest to the damaged and frightening relationship between

Speer and his uncle Steve Cates, and how Cates enlisted Speer in illegal activities in

order to get money for drugs.  (*Id.*)  She would have testified how she saw Sabrina

Womble react with violence and anger when Speer did not get her heroin or other

narcotics, and how Speer prostituted himself to men in order to get drug money for his

uncle, mother, and himself.  Lilly Trujillo Valdivia, Veronica Trujillo's mother, had

regular interactions with Speer and his family because Speer dated her daughter and they

lived in close proximity to the Speers.  (*Id.* Ex. 21 at ¶ 1.)  She observed Sabrina Womble

using heroin, the filthy and unsafe conditions in the Womble home, the neglect and abuse

Sabrina and Bill Womble visited on the children, and how Mrs. Womble ordered Speer to

go get her drugs.  (*Id.* at ¶¶ 5, 7, 9, 12.)  A thorough mitigation investigation would have

also detailed that Speer had little or no relationship with his father, Mike Speer.  Mike

Speer was not present for his son's birth because he was obtaining drugs for himself and

Sabrina.  The elder Speer saw Sabrina Womble use heroin while she was pregnant with

their son.  Mike Speer admits he did not have a good relationship with his son because

Sabrina Womble was a violent person.

Additionally, evidence was available that Speer and his family were exposed to

toxic levels of trichloroethylene (TCE) in their drinking water when Speer was a young

child.  Bill Womble noticed that his children, including Speer, began to behave more

"normally" and less agitated when he switched from tap water to bottled water in the

home.  It was well-publicized that TCE (and possibly another industrial solvent,

tetrochloroethylene (PCE) had contaminated the drinking and ground water in the

neighborhood where Speer lived.  A reasonable investigation would have uncovered

these facts, and reasonable counsel would have presented such facts to an expert so that

this exposure and its potential effects could be considered in their assessment of

Speer's mental health and neurocognitive abilities.  Sustained TCE exposure has known

negative neurological impacts, including memory deficits, psychotic behavior, impaired

1    cognitive function, and mood swings.  *See* U.S. Department of Health and Human

2    Services, Agency for Toxic Substances and Disease Registry, *Draft Toxicological Profile*

3    *for Trichloroethylene* (October 2014) at 12.

4    "A decision not to present mitigating evidence to the jury can be considered

5    tactical only if counsel is aware of that information and how it could fit into a penalty

6    phase defense." *Hamilton v. Ayers*, 583 F.3d 1100, 1122 (9th Cir. 2009).  Based on the

7    statements of the witnesses listed above, it appears that trial counsel failed to speak with

8    them (with the exception of Sabrina Womble) and therefore were unaware of the

9    mitigating evidence they had to offer; as a result, it cannot be said that they made a

10   reasonable, tactical decision not to investigate and present their testimony.  Conversely, if

11   they were aware of the mitigating evidence provided by these witnesses and chose not to

12   present it, such a decision was also unreasonable.  Without presenting percipient lay

13   witnesses to substantiate the extraordinary deprivation and trauma that Speer

14   experienced, the State was able to successfully (though wrongly) characterize Speer's

15   background as "not that bad," his mother as "trying to help," and Speer as a master

16   manipulator who would never have recovered from his traumatic childhood no matter

17   how many resources the State threw at him.  This failure clearly prejudiced the defense,

18   as only one juror needed to change his or her mind and vote for life.

19           **2.    The State Court Denial of this Claim Was an Unreasonable**
                     **Application of Clearly Established Law and Based on an**
20                   **Unreasonable Interpretation of the Facts**

21           The mitigating evidence set forth above, which the jury did not get to hear,

22   constitutes "classic mitigation evidence" which has some established weight through

23   numerous United States Supreme Court cases.  *Robinson v. Schriro*, 595 F.3d 1086, 1110

24   (9th Cir. 2010) (listing impoverished background, an unstable and abusive upbringing,

25   childhood sexual abuse, low intelligence, and personality disorder as examples of the

26   "classic mitigation evidence" that supports a life sentence); *see also Wallace v. Stewart*,

27   184 F.3d 1112, 1115 (9th Cir. 1999) (crucial mitigation evidence not considered by the

28   jury included a dysfunctional family background, drug history, and organic brain

1    damage).  There is no reasonable strategy that could account for defense counsel's failure

2    to present this corroborating evidence, especially when it all supports the main defense

3    strategy at sentencing.  *Id.*; *see also Hart v. Gomez*, 174 F.3d 1067, 1071 (9th Cir. 1999).

4         Thus, the state court unreasonably applied clearly established federal law when it

5    found that "trial counsel presented by way of mitigation the content of much of the

6    evidence Defendant now wants to add. . . .  It was not unreasonable for trial counsel to

7    rely heavily on mental health professionals, instead of Speer's family members, to

8    present their case for mitigation."  (PCR ME 5/21/15 at 19.)  In light of the state court

9    record, it was in fact patently unreasonable for trial counsel to rely solely on experts and

10   not enlist the many lay witnesses who were available to testify.  The prosecution attacked

11   the defense experts because their opinions relied heavily upon Speer's self-reporting of

12   adverse events.  (*See, e.g.*, RT 3/27/07 AM at 26-29 (discrediting Dr. Stewart's testimony

13   about psychosis and abuse because it relied so heavily on Speer's self-reporting.)  Trial

14   counsel was well aware that the prosecutor and the State's expert, Dr. Bayless, were

15   going to argue that Speer was an antisocial, lying manipulator, and that his statements

16   should not be trusted.  Therefore, it was essential for trial counsel to present evidence

17   from percipient witnesses who would substantiate Speer's claims.  With regard to a great

18   deal of crucial mitigating evidence (e.g., sexual abuse; opioid addiction at birth; genetic

19   predisposition to mental illness and addiction; and multigenerational and complex

20   trauma), this is exactly what these missing witnesses would have provided to the jury.

21   The state court was unreasonable in finding that this mitigation evidence was already

22   "illustrat[ed] generally" in the penalty phase.  (PCR ME 5/21/15 at 19.)  It was likewise

23   unreasonable for the state court to find that the presentation of this evidence would not

24   have made a difference in the sentencing outcome.

25        Indeed, when one reviews juror questions during the testimony of the defense

26   experts during penalty phase, it is clear that testimony from corroborating witnesses

27   would have made a difference in the sentence.  In question after question, the jurors

28   expressed their concern with the fact that the expert reports relied so heavily on Speer's

1    self-reporting, expressed concern about Speer's veracity, and wondered whether the

2    experts had evidence from other sources to substantiate Speer's claims.  (*See, e.g.*, ROA

3    632, 648, 657, 658, 659, 665, 688, 689, 694, 696, 697, 734, 736, and 737.)  Jurors also

4    expressed concern about the possible bias of the defense experts.  (*See, e.g.*, ROA 650,

5    667, 688 (querying the experts about compensation and the number of times the expert

6    "testified on behalf of people in a similar situation as Paul Speer?").)  It was unreasonable

7    for the state court to find that evidence that directly addressed the jurors' concerns about

8    the credibility of Speer and his expert witnesses was not reasonably likely to lead to a

9    different sentencing outcome.  *See Hart*, 174 F.3d at 1073 ("When defense counsel fails

10   to introduce this type of evidence—evidence that corroborates a key witness whom the

11   jury might otherwise not believe—confidence in the outcome is necessarily

12   undermined.").  The evidence in aggravation was not so overwhelming that this

13   additional mitigating evidence could never have tipped the scales toward life—especially

14   when coupled with trial counsel's failure to effectively impeach the State's star penalty

15   phase witness and expose the fallacy of his findings.  *Williams*, 529 U.S. at 397-98

16   (prejudice is assessed by reweighing the aggravating evidence against the totality of the

17   mitigating evidence adduced both at trial and in the habeas proceedings).

18         In addition to unreasonably applying federal law contrary to § 2254(d)(1), the state

19   court made several factual findings that are not substantiated by the state court record, in

20   violation of § 2254(d)(2).  First, the court determined that, because Sabrina Womble

21   "lacked credibility," trial counsel had a sound strategic reason for not calling her as a

22   witness during the penalty phase.  (PCR ME 5/21/15 at 19.)  In support of this finding,

23   the court states that Mrs. Womble's guilt phase testimony as a prosecution witness

24   "minimized her use of heroin, denying she was an addict her entire adult life, which is in

25   stark contrast to her [post-conviction] Declaration."  (*Id.* at 18.)  This is a

26   mischaracterization of Mrs. Womble's trial testimony.  When asked whether she took

27

28

1    heroin in addition to methadone, Mrs. Womble responded that she did not.[16]  (RT 1/4/07

2    at 93.)  However, she never denied being an addict—indeed, she admitted that she has

3    been on methadone for thirty years.  (*Id.*)  As far as her heroin use, "there may be 10

4    years [of using it], and then maybe another five years go by."  (*Id.*)  Thus, Mrs. Womble

5    did not unduly minimize her drug activity to the extent that she should or would be

6    deemed automatically incredible.

7        The state court engaged in further unreasonable fact finding when it made

8    credibility determinations without affording Speer an opportunity for evidentiary

9    development.  *See Hibbler v. Benedetti*, 693 F.3d 1140, 1148 (9th Cir. 2012).  For

10   example, the court determined that it was "difficult to believe" Mrs. Womble's trial

11   testimony and she would have lacked credibility with the jury; that trial counsel had a

12   "sound strategic reason" for not calling Mrs. Womble; and that because the proffered

13   mitigation witnesses "have a natural bias in favor of the Defendant," their testimony

14   "would not in the Court's view have led to a different outcome."[17]  (PCR ME 5/21/15 at

15   19.)  Each of these findings involved a credibility determination by the state court that

16   was not warranted by the state court record.  In the absence of an evidentiary hearing to

17   assess the witnesses' testimony, there is no way to determine whether and to what extent

18   they may have lacked credibility or had a "natural bias" in favor of Speer.  Moreover, not

19   all of the witnesses described above are family members; several are professionals or

20   para-professionals who observed and/or worked with Speer, and therefore are ostensibly

21   free from the alleged "bias" that the state court believed taints anyone related to Speer.

22

23

24       [16] This response makes sense in context, because methadone is designed to be a
     substitute for heroin.  *See* https://en.wikipedia.org/wiki/Methadone ("Methadone . . . is an
     opioid used to treat pain and as a maintenance therapy or to help with tapering in people
25   with opioid dependence.").

26       [17] Additionally, "would not have led to a different outcome" is not the proper
     standard for evaluating *Strickland* error.  Rather, the test is "whether there *is a reasonable*
27   *probability* that, absent the errors, the sentence . . . would have concluded that the balance
     of aggravating and mitigating circumstances did not warrant death."  *Strickland*, 466 U.S.
28   at 695 (emphasis added).

1    Additionally, trial counsel has definitively stated that he should have presented lay

2    witnesses in light of the State's case in aggravation against Speer.  The state court is not

3    permitted to attribute "strategic reason[s]" to trial counsel that contradicts available

4    evidence of counsel's actions.  *Wiggins*, 539 U.S. at 526-27.

5         The entirety of the state court's fact finding with regard to this claim is

6    unreasonable.  *See Earp v. Ornoski*, 431 F.3d 1158, 1169-70 and n.8 (9th Cir. 2005)

7    ("[I]n the absence of an evidentiary hearing to determine who was telling the truth, it

8    remains unclear why [a defense witness] would be inherently incredible."); *Blackledge v.*

9    *Allison*, 431 U.S. 63, 82 n.25 (1977) ("When the issue is one of credibility, resolution on

10   the basis of affidavits can rarely be conclusive.")  The only way for the state court to have

11   determined the actual "credibility" or "bias" of the proffered witnesses was to hold an

12   evidentiary hearing.  In the absence of a hearing, Speer has demonstrated that the state

13   court acted unreasonably, and this Court is free to review this claim de novo.

14   **C.   Trial Counsel Unreasonably Failed to Present Effective Expert
         Testimony on Speer's Difficult History as a Victim of Domestic and
15       Sexual Violence, Neurocognitive Deficits, and Complex Trauma**

16        This claim was not presented to the state court during post-conviction review.  To

17   the extent any aspects of this claim are not exhausted, that failure is attributable to the

18   ineffective assistance of Speer's post-conviction counsel.  *Martinez*, 132 S. Ct. at 1315.

19        Speer's tumultuous and at times torturous life history was not merely a timeline of

20   events that happened to him.  Rather, these events built upon each other resulting in

21   complex trauma that shaped every aspect of his life.  By failing to present an expert in

22   complex trauma who could properly contextualize Speer's complicated mental health

23   presentation, the jury lacked the proper understanding both of who Speer is and *why*

24   Speer is how he is.

25        As set forth in Part I.A, *supra*, Speer's life was beset by extraordinary levels of

26   dysfunction, anxiety, stress, neglect, loss, abuse, confusion, and pain.  Although penalty-

27   phase counsel presented many of the facts presented in Part I.A, their presentation of the

28   facts lacked the proper context—and without that context, the jury did not know the true

relevance of Speer's history.  Thus, for example, Speer did not simply have opioid-addicted and depressed parents; he was genetically predisposed to substance abuse and mental illness.  Speer did not just grow up in a bad home; he grew up in a home that created and encouraged his antisocial behaviors and prevented him from forming normal attachments.  He was not simply neglected; he was left under the care of a heroin-addicted mother who would sleep for days at a time, physically abused her family (and was the victim of physical abuse herself), gave her own children their first taste of heroin, and failed to provide even the basic necessities for her children, let alone love them.  All of this, and so many other factors, contributing to the complex trauma, depression, and dysfunction experienced by her son Paul Speer.  From the moment he was born, heroin-addicted and wailing in pain, Speer was reared in an environment where the most fundamental human needs—*i.e.*, the need for love and safety—were not met.  This repeated exposure to traumatic events over time, and typically at the hands of his caregivers and other loved ones, created a level of trauma and distrust in Speer that is not easily vanquished.  The jury needed to hear from an expert in complex trauma (including sexual abuse) who could synthesize Speer's extraordinary history in a meaningful and accurate way for the jury.

The trauma expert that trial counsel did present, Dr. Pablo Stewart, was not adequately prepared to testify—and the jury noticed.  (*See, e.g.*, ROA 691 ("Do you feel that you where [sic] prepared too [sic] testify in this case? Or did you need more time to know the facts about trial.")  He repeatedly misstated the evidence and failed to articulate how a complex trauma presentation differs from traditional PTSD.  He also failed to explain effectively to the jury that a person can malinger and still be profoundly mentally ill, especially those persons who have experienced complex trauma.  Had trial counsel performed effectively, they would have recognized the need to either better prepare Dr. Stewart, or to present a different expert entirely to proffer evidence of complex trauma to the jury.  Effective counsel would have presented an expert who would have explained the effects of Speer's genetic legacy for addiction and mental illness, exposure to drugs in

utero and environmental toxins as a young child, and lifetime of trauma and abuse on his brain chemistry, and thus, his behavior.

"Counsel should choose experts who are tailored to the needs of the case, rather than an 'all-purpose' expert who may have insufficient knowledge or expertise to testify persuasively."  American Bar Association Guidelines for the Appointment and Retention of Counsel in Death Penalty Cases, 2003 Edition, Commentary to Guideline 10.11, p. 1061.  The obligation to select an appropriate expert is part and parcel of the duty of capital defense counsel to discover "all reasonably available mitigating evidence." *Wiggins*, 539 U.S. at 524.  Here, trial counsel failed in that duty.  The fact that counsel put on some expert testimony is not sufficient where that expert testimony failed to adequately present a defendant's true mitigation picture.  *See, e.g.*, *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999) (remanding for an evidentiary hearing on an ineffective assistance claim for failure to present the testimony of an expert on brain injury in a case where four different experts were retained by the defense).  An expert in complex trauma, factoring in sexual abuse and neurocognitive deficits, would have established a connection between Speer's mental state, his family background, his neurological defects, and the offense; thus, the Arizona Supreme Court would have been precluded from assigning minimal weight to Speer's mitigation evidence.  *See State v. Hampton*, 140 P.3d 950 (Ariz. 2006).  Trial counsel's performance fell below the standard of reasonably competent counsel when they failed to investigate and secure the testimony of appropriate experts.  But for these failures, there is a reasonable probability that the jury would have returned a verdict less than death and there is a reasonable probability that the Arizona Supreme Court would have remanded for resentencing, especially once it invalidated one of the statutory aggravating factors.

1

## D.   Trial Counsel Unreasonably Failed to Investigate and Present Evidence of Co-Defendant Brian Womble's Mental Illness

2

3      This claim was not presented to the state court during post-conviction review.  To

4   the extent any aspects of this claim are not exhausted, that failure is attributable to the

5   ineffective assistance of Speer's post-conviction counsel.  *Martinez*, 132 S. Ct. at 1315.

6      Another mitigating factor that trial counsel alleged during the penalty phase was

7   that the co-defendant, Brian Womble, suffered from mental illness at the time of the

8   crime.  In support of this non-statutory mitigation, the defense referred the jury to the

9   guilt phase testimony of Joyce Nuth, the counselor at Terros who evaluated Brian hours

10  before the Soto murder.  (RT 1/10/07 at 138-42.)  Even though Brian stated that "he

11  wanted to kill himself and before he did he wanted to hurt other people" (*id.* at 167),

12  Terros counselors determined he was not likely to harm himself or others because he

13  retracted his statement of intention to do harm.  (RT 1/10/07 at 138-67.)  The counselors

14  requested that he sign a "no-suicide" form (Trial Ex. 172), and released him.  In rebuttal,

15  the prosecutor declared unequivocally that there was no evidence that Brian was mentally

16  ill at the time of the murder; rather he had "situational depression because he got dumped

17  by his girlfriend."  (RT 3/27/07 AM at 12.)  She argued that Chris Womble's testimony

18  supported this contention, because Chris saw Brian two days after the murder and

19  described Brian's demeanor as "fine."  (*Id.* at 13.)  Therefore, "[s]ince there was

20  absolutely no evidence that Brian Womble was mentally ill at the time he killed Adan

21  Soto, that circumstance cannot be mitigating, and you should not consider it further."

22  (*Id.*)  While it is unknown whether any member of the jury assigned any weight to this

23  mitigating circumstance, the Arizona Supreme Court found it was not established by a

24  preponderance of the evidence.  *See Speer*, 212 F.3d at 802-03 (describing "the

25  mitigating circumstances that we find proved by a preponderance of the evidence").

26      Contrary to the prosecutor's assertions, there was in fact abundant evidence

27  supporting the defense argument that Brian was mentally ill at the time of the murder.

28  Bill Womble and Debra Corral would have testified that Brian had suicidal ideations

from the time he was a very young child.  At age twelve, Brian actually did try to commit

suicide by overdosing on pills.  Bill Womble and Veronica Trujillo also would have been

able to describe Brian's worsening depression and "mental breakdown" well over a

month before the Soto murder.  Recorded phone calls between Brian and Paul Speer also

document Brian's downward mental spiral.  (*See, e.g.*, ROA 376, Supp. 77 at 1, 2, 6

("[M]y fucking mind is twisted . . . I'm about to go to the hospital"; "Cause I'm fucking

sick"; "My body hurts and I'm sick"; "I've got psychological problems.").)  In another

jail call recording, Al Heitzman tells Speer that "Brian is suffering from a severe case of

depression.  He has been for the past, uh, couple of months. . . .  He needs counseling."

(*Id.* Supp. 74 at 4.)  Finally, Sabrina Womble would have testified that Brian was

suicidal, delusional, and just "not himself" in the weeks before the crime.

Had trial counsel presented this readily available testimony and evidence, there is

a reasonable likelihood that the jury, and the Arizona Supreme Court, would have found

this mitigator proved by a preponderance of the evidence—and therefore would likely

"have concluded that the balance of aggravating and mitigating circumstances did not

warrant death." *Strickland*, 466 U.S. at 695.

## E.   Trial Counsel Unreasonably Failed to Object and/or Seek Necessary Remedies to Protect Speer from Repeated Instances of Prosecutorial Misconduct

Speer did not present this meritorious claim to the state court as a result of post-

conviction counsel's deficient performance.  The deficient performance of state appellate

and post-conviction counsel prejudiced Speer and provides cause to excuse any

procedural default.  *See Strickland*, 466 U.S. at 687; *Evitts v. Lucey*, 469 U.S. 387, 396-

97 (1985); *Martinez*, 132 S. Ct. at 1315.  Speer will demonstrate at an evidentiary hearing

that post-conviction counsel fell below the standards of a minimally competent capital

attorney when they failed to raise this meritorious claim.

The prosecutor in this case committed a number of egregious errors during Speer's

trial.  Trial counsel failed to object to various instances of prosecutorial misconduct,

including, but not limited to, those described in Claim 13.  Further, trial counsel failed to

request adequate remedies for the prosecutor's misconduct, including but not limited to motions to strike, requests for curative instructions, and motions for a mistrial.  Counsel's failures were particularly damaging during Speer's penalty phase, where the prosecutor encouraged the jury to consider impermissible non-statutory aggravating evidence and to apply a causal nexus test to Speer's mitigation, in violation of Eighth Amendment and due process principles.  *See Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978); *Penry*, 492 U.S. at 319, *overruled on other grounds by Atkins*, 536 U.S. 304; *see also Boyde v. California*, 494 U.S. 370, 377-78 (1990).

Because trial counsel left the prosecutor's misconduct unchecked, it failed to stop "[t]he evil lurking in such prosecutorial appeals"—namely, "that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence."  *United States v. Koon*, 34 F.3d 1416, 1443 (9th Cir. 1994) (quoting *United States v. Monaghan*, 741 F.2d 1434, 1441 (D.C. Cir. 1984)), *aff'd in part, rev'd in part on other grounds*, 518 U.S. 81 (1996); *see also United States v. Nobari*, 574 F.3d 1065, 1076 (9th Cir. 2009) (finding error when the prosecutor's arguments "appear designed to encourage the jury to view the government's case more favorably" by appealing to emotion).  Counsel's failure to object to this improper argument was deficient, and their failure to properly and continuously object to this constitutional violation undermines confidence in the outcome of Speer's trial.

## F.   Trial Counsel Failed to Raise the Proper Objections During Penalty Phase Deadlock

This claim was not presented to the state court during post-conviction review.  To the extent any aspects of this claim are not exhausted, that failure is attributable to the ineffective assistance of Speer's post-conviction counsel.  *Martinez*, 132 S. Ct. at 1315.

As detailed in Claim 23, during penalty phase the jury indicated on two occasions that it was unable to reach a unanimous verdict, and asked the trial court what the consequences would be if they were not able to come to a unanimous decision.  (RT 3/28/07 at 4; ROA 757 and 758 at 2.)  The trial court wanted to give the jurors a modified

version of an *Allen* charge, even though the jury had already been instructed with an *Allen* charge on four previous occasions.  (RT 3/28/07 at 6.)  Defense counsel originally objected to the fifth *Allen* charge, but ultimately agreed to the instruction that was given to the jury.  (RT 3/28/07 at 20-21; ROA 757.)  In addition to including language which improperly encouraged the jurors to enlist the court's assistance in reaching a verdict, the instruction failed to include an admonishment that the jury's primary duty was to follow their individual consciences and not take any cue from the judge himself.  As Speer argues in Claim 23, these actions by the trial court amounted to unconstitutional jury coercion.  *See Lowenfield v. Phelps*, 484 U.S. 231, 235 (1988); *Zant v. Stephens*, 462 U.S. 862, 879 (1983); *Weaver v. Thompson*, 197 F.3d 359, 365 (9th Cir. 1999).  Yet even though trial counsel recognized the very serious risk of prejudice that the court's instruction posed, they unreasonably agreed to allow it.  This failure was neither reasonable nor informed.  Trial counsel's objectively unreasonable decision to acquiesce to an impermissibly coercive jury instruction deprived Speer of his right to a fair sentencing proceeding, as there is a reasonable probability that, without the coercive instruction, at least one juror would have voted for a life verdict.  *See Strickland*, 466 U.S. at 694.

**CLAIM 15**

**COUNSEL WERE INEFFECTIVE BY STIPULATING TO AGGRAVATING FACTORS**

In the aggravation phase of the trial, defense counsel admitted three of the four charged aggravators.  In doing so, counsel rendered ineffective assistance under both the *Cronic* and *Strickland* standards.[18]

This claim was raised in Speer's state post-conviction petition and Petition for Review as Claim X.  (PCR 9/26/14 Pet. at 50-55; PFR at 25-28.)  The state court denied

---

[18] *United States v. Cronic*, 466 U.S. 648 (1984); *Strickland v. Washington*, 466 U.S. 668, 687 (1984)

156

this claim on the merits, finding that counsel employed a reasonable strategy and "no prejudice could attach by virtue of trial counsel's strategic decision to stipulate." (PCR ME 5/21/15 at 16.)

## A.    Facts in Support of the Claim

Pursuant to A.R.S. § 13-751(B), the State must prove the alleged aggravating factors beyond a reasonable doubt. In filing its notice of intent to seek the death penalty, the State noticed four aggravating factors under A.R.S. § 13-751(F)—Speer had a serious prior felony conviction (F2), he created a grave risk of danger to another during the commission of the offense (F3), he committed the murder in an especially cruel, heinous or depraved manner (F6), and he committed the offense while in the custody of a county jail (F7). (PCR 9/26/14 Ex. 15.)

At trial, defense counsel Bob Storrs, in his aggravation phase opening, admitted to the jury three of the four alleged aggravators, stating:

> We admit Paul Speer was convicted of the armed robbery. . . . We admit that Mr. Speer was still on release, under supervision by the Department of Corrections, on May 25th, 2002. It's a fact. . . . You've already found Paul guilty of first degree murder. The State's theory was witness elimination.
>
> Is it reasonable to expect or anticipate based on the verdicts you've already returned that you will find that aggravating circumstance?

(RT 1/29/07 at 39-40.)

The only aggravator defense counsel challenged was whether the co-defendant created a grave risk of harm to another during the commission of the offense. (*Id.* at 40.) Although the jury found this aggravator, it was later reversed on appeal by the Arizona Supreme Court. *State v. Speer*, 212 P.3d 787, 798 (Ariz. 2009). The jury found all four aggravators as alleged by the State. (RT 1/31/07 PM at 5-6.)

157

1

2

## B.   Trial Counsel Were Ineffective, and the State Court's Decision to the Contrary Was Unreasonable

Capital defense counsel are charged with the duty to contest aggravating factors alleged by the State against their client. *See, e.g.*, *Correll v. Ryan*, 539 F.3d 938, 947-48 (2008) (finding deficient performance when, among other things, counsel failed to challenge three of five alleged aggravating factors). It is true that, in some cases, "candidly acknowledging [a] client's shortcomings" might "buil[d] credibility with the jury and persuade[] it to focus on the relevant issues in the case." *Yarborough v. Gentry*, 540 U.S. 1, 9-10 (2003) (internal citations omitted). However, it is not reasonable to pursue this tactic in every case. Because the existence of even one aggravating factor exposes a defendant to the death penalty in Arizona, *see State v. Martinez*, 115 P.3d 618, 925 (Ariz. 2005), a decision to stipulate to the admission of an aggravator must be based on a foundation of investigation, research, and reasoned consideration.

In this case, while the (F)(2) (previous commission of a serious offense) and (F)(7) (commission of the offense while on release or probation) aggravators may have been readily proven by documentary evidence, the (F)(6) aggravator (heinous, cruel, or depraved) was supported only by evidence that the motive for the murder was witness elimination. While witness elimination is an element which goes to support the (F)(6) aggravator, and may alone be sufficient to justify a finding of heinousness or depravity it is not a "per se" aggravating factor. *State v. Johnson*, 133 P.3d 735, 750 (Ariz. 2006). Trial counsel was obligated to hold the State to its burden to prove aggravation beyond a reasonable doubt. *Cronic*, 466 U.S. at 656.

Counsel's theory of admitting three aggravators only to contest one to gain credibility with the jury was not an acceptable strategy, as the admission of any single aggravator exposed Speer to the death penalty. This was a serious error by counsel that was not only below the objective standard of reasonableness mandated for the prevailing professional norm, it resulted in a complete breakdown of the adversary process at this critical phase of the trial. Trial counsel agrees that he should have not stipulated to any

aggravating factors.  (PCR 9/26/14 Ex. 1.)  Similarly, the *Strickland* expert retained in state post-conviction found that trial counsel's stipulation to any aggravating factors fell below prevailing objective professional standards.  (PCR 9/26/14 Ex. 2 at ¶ 13.)

By failing to subject all of the aggravators to meaningful adversarial testing, and by admitting three of four aggravators which immediately subjected his client to the death penalty, defense counsel deprived his client of counsel at a critical stage of the proceeding such that the aggravation phase completely lost its character as a confrontation between adversaries.  Consequently, the Sixth Amendment guarantee of effective counsel was violated rendering the trial at this stage unfair.  Even if prejudice is not presumed, Speer can demonstrate prejudice because it is reasonably likely that at least one juror would have found that the aggravators were not proven beyond a reasonable doubt.

**CLAIM 16**

### DEFENSE COUNSEL WERE INEFFECTIVE BY ADMITTING IRRELEVANT PRIOR CONVICTIONS AT THE AGGRAVATION PHASE

This claim was presented in Speer's state post-conviction petition and Petition for Review as Claim XI (PCR 9/26/14 Pet. at 55-58; PFR at 27-29) and denied on the merits by the state court.  (PCR ME 5/21/15 at 16-17.)

## A.     Facts and Argument

At trial, the State relied upon Speer's prior robbery conviction in support of the "serious prior felony conviction" aggravator pursuant to A.R.S. § 13-751(F)(2).  (RT 1/29/07 at 110-12.)  This was the only conviction that the State alleged was an (F)(2) aggravator.  However, in his aggravation phase closing, trial counsel told the jury Speer had two other prior convictions for burglary and resisting arrest.  (*Id.* at 122-23.)  Trial counsel decided to mention these convictions to the jury because they were contained in documents going to the jury, and he "did not want them to hear about them or see them for the first time when they walked into the jury room."  (*Id.* at 122.)  After flagging these prior convictions for the jury during his aggravation argument, counsel cautioned the jury

that they were "not supposed to take them into account in making the determination . . . ." (*Id.* at 122-23.)  Trial counsel then concluded, "I'm not saying you shouldn't find that aggravator [F2 serious prior felony conviction], because you would, and you shall."  (*Id.* at 123.)  Trial counsel's decision to admit two irrelevant prior convictions during the aggravation phase amounted to deficient performance which prejudiced Speer.

There were several unreasonable decisions made by trial counsel which resulted in this ultimate and prejudicial error.  First, trial counsel failed to object to this irrelevant felony information going before the jury.  He did not ask the court to redact the information from the documents sent for jury review, nor did he ask that the priors be analyzed under any rule or statute to determine if they were more prejudicial than probative.  Instead, he simply asked the jury not to consider what had just been presented to them, and then confused the issue further by acknowledging that they "would, and . . . shall" find the prior serious felony aggravator.  (RT 1/29/07 at 122-23.)

There was no legally or strategically sustainable basis for counsel to have interjected his client's prior convictions into the trial or to not have them redacted from documents going to the jury.  Trial counsel acknowledges that he should have moved to have the prior convictions redacted, and if unsuccessful, he should have requested a limiting instruction. [19]  In no event should he have revealed them to the jury.  (PCR 9/26/14 Ex. 1 at 2.)  By failing to even attempt to redact the prior felony convictions or otherwise limit the prejudice caused by their admission, counsel rendered ineffective assistance because he failed to subject the state's case to meaningful adversarial testing, and as such, the prejudice is presumed.  *Cronic*, 466 U.S. at 59-60.  However, even if prejudice is not presumed, Speer can demonstrate prejudice because trial counsel's unreasonable decision allowed the jury to hear yet more evidence about criminal behavior

---

[19] A *Strickland* expert retained during state post-conviction also agrees that trial counsel's admission to irrelevant prior convictions and failure to request a limiting instruction was conduct below the prevailing professional objective norm.  (PCR 9/26/14 Ex. 2.)

at the most sensitive time of Speer's trial—as the jury is about to determine whether he should live or die. *Strickland*, 466 U.S. at 690-91.

## B. The State Court's Denial of this Claim Was Unreasonable

The superior court determined that trial counsel did not render deficient performance in admitting the prior convictions:

> The record supports the conclusion that counsel made a strategic decision to disclose the prior convictions during penalty phase to "draw the sting." There is nothing inappropriate about such a decision because the jury was going to hear evidence of certain prior convictions anyway since the State alleged as aggravating factors that Speer was previously convicted of a serious offense and was on release from prison at the time of the murder.

(PCR ME 5/21/15 at 16-17.) The superior court found no prejudice because, "[w]hether disclosed by trial counsel during the aggravation phase, or by the State in rebuttal [in] penalty phase, the jury would learn at some point of the prior convictions." (*Id.* at 17.) The superior court also found that since the offenses "were not serious," "any harm was minimal in connection with the determination of the aggravating factors." (*Id.*) These findings were contrary to clearly established law and an unreasonable determination of the facts of Speer's sentencing proceedings.

The erroneous admission of irrelevant and prejudicial evidence may constitute a federal due process violation. *Estelle v. Getty*, 502 U.S. 62, 68-70 (1991); *McKinney v. Rees*, 993 F.2d 1378, 1386 (9th Cir. 1993). Prejudice arises when such evidence violates "our community's sense of fair play that people are convicted because of what they have done, not who they are." *McKinney*, 993 F.3d at 1386. In this case, the admission of Speer's prior convictions was highly prejudicial in light of the State's case for death. The State argued over and over again that Speer was nothing more than an antisocial criminal who was never going to change. Thus, it was defense counsel's duty to fight the admission of any evidence that the State could even remotely rely upon to establish that factor.

Although the superior court found that the State could have gotten the prior convictions before the jury as rebuttal evidence during penalty phase, that is far from a

given.  Contrary to the superior court's finding, the "certain prior convictions" that the jury was going to hear about did not have to include the prior convictions for burglary and resisting arrest.  The Due Process Clause of the Fourteenth Amendment places limitations on rebuttal evidence; namely, the rebuttal must be relevant to the "thrust of the defendant's mitigation," and not unduly prejudicial.  *State v. Hampton*, 140 P.3d 950, 963 (Ariz. 2006); *Estelle*, 502 U.S. 68-70.  Based on these due process requirements, Speer's non-aggravator prior convictions would not have been admissible to rebut Speer's proffered mitigation.  Under Arizona Rule of Evidence 609(a), evidence of a prior criminal conviction is admissible to attack a witness's character for truthfulness.  Because Speer was not testifying, the fact of these prior convictions would not have been admitted in any event.  Thus, if defense counsel "feared" the revelation of these convictions by the State in its rebuttal, those fears were completely unfounded.  Therefore, the superior court's assertion that this was a reasonable "strategy" is not supported by fact or law.

Similarly, while a witnesses' other acts may be admitted for limited reasons under the Arizona Rules of Evidence, they may not be admitted to show he acted in conformity with a character trait.  Under the protective provisions of that rule, before the State could have admitted those convictions, the trial court would have first had to have found:  (1) Rule 404(b)'s requirement that the evidence be admitted for a proper purpose; (2) the relevancy requirement of Rule 402; (3) the trial court's assessment that the probative value of the similar acts evidence is substantially outweighed by its potential for unfair prejudice (*see* Rule 403); and (4) Rule 105's provision for an appropriate limiting instruction, if the party requests one.  *See State v. Terrazas*, 944 P.2d 1194, 1197 (Ariz. 1997).  These procedural hurdles were important protections for Speer that defense counsel had not even considered when he unreasonably admitted Speer's prior felony convictions.  The superior court was unreasonable in finding that "the jury would learn at some point of the prior convictions."

Finally, the superior court's determination that "any harm was minimal" because the offenses were not serious offenses is belied by the court's finding that the State could and would have presented the information in rebuttal to Speer's mitigation case.  It is unreasonable to call evidence that counters a defendant's case for life minimally important or non-prejudicial.  *Cf. Rompilla*, 545 U.S. at 389-90 (trial counsel's failure to discover evidence that counters the State's aggravation case was prejudicial); *see also State v. Martinez*, 508 P.2d 1165, 1166 (Ariz. 1973) ("The effect of information of a prior conviction is to create in the minds of the jury an impression that the defendant's character is bad.").

In this case, there is at least a reasonable probability that defense counsel's conduct caused jurors to improperly consider these irrelevant prior convictions in making their sentencing determination at this critical stage.  The state court's denial of the claim was unreasonable, and Speer should be granted habeas relief.

**CLAIM 17**

### DEFENSE COUNSEL WERE INEFFECTIVE IN PERMITTING DISSEMINATION OF TWO DOCTOR'S REPORTS THAT WERE USED BY THE STATE IN THE PENALTY PHASE

This claim was raised by Speer in his state post-conviction petition and PFR as Claim XIII.  The state court denied the claim on the merits.  (PCR ME 5/21/15 at 20-21.)

**A.   Factual Basis**

Prior to trial, the court ordered (and defense counsel authorized) testing for competency and intellectual disability[20] pursuant to A.R.S. §§ 13-703.02(B)[21] and A.R.S.

_____

[20] At the time, the term "mental retardation" was used.

[21] "If the state files a notice of intent to seek the death penalty, the court, unless the defendant objects, shall appoint a prescreening psychological expert in order to determine the defendant's intelligence quotient using current community, nationally and culturally accepted intelligence testing procedures.  The prescreening psychological expert shall submit a written report of the intelligence quotient determination to the court within ten days of the testing of the defendant.  If the defendant objects to the prescreening, the defendant waives the right to a pretrial determination of mental retardation status.  The waiver does not preclude the defendant from offering evidence of the defendant's mental retardation in the penalty phase."  A.R.S. § 13.703.02(B),

§ 13-703.03(A).[22]   The prescreen report, prepared by Dr. George DeLong, showed that Speer had an IQ below 75.  (RT 2/6/03 at 6.)  Based on this result, the court ordered further testing for intellectual disability, and trial counsel agreed.  (*Id.* at 18-19.)  Shortly thereafter, the court transferred the case for competency proceedings pursuant to Arizona Rule of Criminal Procedure 11 ("Rule 11").  Dr. Jack Potts, M.D., evaluated Speer for competency[23] on April 1, 2003.  (ROA 253 Ex. A.)  As Dr. Potts described in his report to the trial court, "When I saw the defendant, I informed him of the nature of our conversation.  I also told the defendant the information he provided could not be used against him in further proceedings, unless he entered a plea of Guilty Except Insane." (*Id.* at 1.)  During the evaluation, according to Dr. Potts, Speer "[made] a cognitive choice to not cooperate in the proceedings, and his malingering is to such an extent that it overshadows other diagnostic possibilities."  (*Id.* at 2.)  Although Dr. Potts believed that Speer was malingering, Dr. Potts also found that "[t]his does not mean [Speer] does not have cognitive or other deficits; but not to the extent he is attempting to portray."  (*Id.* at 3.)  Dr. Potts determined that Speer was competent to proceed with the trial.

After receiving Dr. Potts's report, Speer's attorneys filed a motion requesting that the competency evaluations cease, although they had no objection to continuing with an evaluation for intellectual disability.  (ROA 135.)  Based on the objection, the Rule 11 judge sealed Dr. Potts's report, vacated the Rule 11 order, and returned the case to the trial court.  (RT 5/6/03; ROA 140; ME ROA 141.)  Back in trial court, counsel reaffirmed that he had no objection to continuing with IQ testing, and Dr. John Toma, Ph.D, was appointed to evaluate Speer for intellectual disability.  (RT 5/8/03 at 3-4; ME ROA 152.)

---

[22] "If the state files a notice of intent to seek the death penalty, unless the defendant objects, the court shall appoint a psychologist or psychiatrist . . . to conduct a prescreening evaluation to determine if reasonable grounds exist to conduct another examination to determine the following:  (1.) the defendant's competency to stand trial. (2.) Whether the defendant was sane at the time the defendant allegedly committed the offense."  A.R.S. § 13-703.03(A),

[23] In the 9/26/2014 state PCR petition, state post-conviction counsel erroneously claimed that Dr. Potts was appointed to evaluate Speer solely for intellectual disability.

1    Dr. Toma found that Speer was inconsistent in the testing, was malingering cognitive

2    deficits, and did not meet the criteria for intellectual disability.  (ROA 253 Ex. B at 7.)

3        Subsequently, in May 2005, defense counsel moved for a competency evaluation

4    pursuant to Rule 11.  (ROA 252.)  Under the mandates of Rule 11 proceedings, the

5    defense must disclose reports of "mental health experts who have personally examined a

6    defendant or any evidence in the particular case, together with the results of mental

7    examinations and of scientific tests, experiments or comparisons, including all written

8    reports and statements, made by them in connection with the particular case."  Ariz. R.

9    Crim. Pro. 11.4(b).  Even though Dr. Potts's report was sealed, and Dr. Toma's

10   evaluation was done solely for the purposes of assessing Speer for intellectual disability,

11   the defense stipulated that both Dr. Potts's and Dr. Toma's reports would be disclosed to

12   the State.  (RT 1/12/06 at 6-7.)  Following a hearing in 2006, Speer was found competent

13   and returned to superior court.  (ME ROA 312.)

14       Later, during the penalty phase rebuttal, the State's expert, Dr. Brad Bayless,

15   relied upon both Dr. Potts's and Dr. Toma's reports to support his diagnosis of antisocial

16   personality disorder.  (RT 3/21/07 at 38.)  Dr. Bayless testified that the reports supported

17   his opinion that Speer would attempt to malinger mental illness when it was to his

18   advantage to do so.  (*Id.* at 39.)

19   **B.    Trial Counsel's Decision to Disclose Dr. Potts's and Dr. Toma's
            Reports During Competency Proceedings Prejudiced Speer, and the**

20   **     State Court Was Unreasonable in Finding No *Strickland* Error**

21       "Counsel . . . has a duty to bring to bear such skill and knowledge as will render

22   the trial a reliable adversarial testing process."  *Strickland v. Washington*, 466 U.S. 668,

23   685 (1984).  The Potts and Toma reports contained harmful information that counsel was

24   not obligated to disclose during the 2005 competency proceedings.  Trial counsel should

25   not have given these reports to his Rule 11 experts (Dr. Parrish and Dr. Stewart), nor

26   should they have stipulated to their disclosure to the State, as they contained incomplete

27   yet extremely harmful findings that Speer was malingering based in part on Speer's

28   statements about the case and his counsel.  Because the State is not permitted to use

statements about the case against the defendant when obtained through Rule 11 or otherwise compelled proceedings, trial counsel's error resulted in prejudice to Speer.

During Rule 11 proceedings, "the parties shall make available to the opposite party for examination and reproduction the names and addresses of mental health experts who have personally examined a defendant or any evidence in the particular case, together with the results of mental examinations of scientific tests, experiments or comparisons, including all written reports or statements made by them in connection with the particular case." Ariz. R. Crim. P. 11.4(b). However, any defendant who undergoes a court-ordered mental health examination has a Fifth Amendment privilege against self-incrimination, and any statement to the examiner about the facts of the case must be redacted. *See* A.R.S. § 13-4508(A), (C); Ariz. R. Crim. P. 11.4(a). The only time a complete and unredacted report must be disclosed to the prosecution in Rule 11 proceedings is when the defendant raises the guilty-except-insane (GEI) defense. *See* Ariz. R. Crim. P. 11.4(b). Moreover, the information in the reports may not be used in guilt/innocence proceedings, and "shall be treated as confidential by the court and counsel in all other respects." *See* Ariz. R. Crim. P. 11.7 and 11.8.

In this case, defense counsel withdrew from the 2003 Rule 11 proceedings because "doctors appointed to perform Rule 11 evaluations are not adequately compensated to perform thorough evaluations. Under the current circumstances, a thorough evaluation can only be done in conjunction with the mitigation investigation." (ROA 135.) Defense counsel sought and obtained an order sealing Dr. Potts's report. As Dr. Potts himself noted, the only way the findings in that report could be "used against [Speer] in further proceedings" was if he entered a plea of Guilty Except Insane. Because the report was sealed, trial counsel was under no obligation to turn it over without a court order. And contrary to the state court's PCR findings, it was not automatic that the Potts report would have been discoverable by the State. Dr. Potts based his competency finding in part on statements that Speer made about the case and his defense representation. (ROA

253 Ex. B at 3 (asking about current charges Speer was facing and information about his attorneys).)

Similarly, Dr. Toma's report should not have been disclosed because it was prepared as part of an inquiry into whether Speer had intellectual disability.  The rules governing disclosure in Rule 11 proceedings mandate that reports of "mental health experts" be shared between the parties.  Ariz. R. Crim. P. 11.4(b).  However, Dr. Toma's interview and testing (the WAIS-III) was not conducted for competency purposes, but rather to assess possible intellectual disability (called "mental retardation" in the statute) under § 13.703.02(B).  The distinction between intellectual disability and competency has long been incorporated into the Anglo-American legal system:  differing treatment of "idiots" and "lunatics" is seen at least as far back as the thirteenth century.  James W. Ellis & Ruth A. Luckasson, *Mentally Retarded Criminal Defendants*, 53 Geo. Wash. L. Rev. 414, 416 (1985).  Intellectual disability is not a mental illness.  *Id.* at 423.  While "[m]entally ill people encounter disturbances in their thought processes and emotions[,] mentally retarded people have limited abilities to learn." *Id.* at 424.  Another distinction is that mental retardation is largely immutable while mental illness is often episodic.  *Id.*; *see also State v. Trujillo*, 206 P.3d 125, 134 (N.M. 2009).

In Arizona, and across the nation, intellectual disability and mental illness are treated distinctly differently.  For example, intellectually disabled persons are categorically ineligible for execution.  *See Atkins v. Virginia*, 536 U.S. 304 (2002).  Conversely, a mentally ill person can be tried and executed.  If incompetent, they may be tried and executed if they are restored to competence.  Ariz. R. of Crim. P. 11.1 *et. seq.*  As a result, it was error for the prosecutor to introduce doctor's reports on the issue of intellectual disability, in order to rebut mitigation evidence of mental illness.

And, contrary to the prosecutor's claim that she was entitled to rebut with anything, good, bad, or indifferent (RT 2/28/07 PM at 10-11), penalty phase rebuttal is bound by relevance.  *State v. Pandeli*, 161 P.3d 557, 570-71 (Ariz. 2007) (Due Process Clause prohibits unbounded and limitless rebuttal evidence).  The rebuttal must be

1   relevant to the "'thrust of the defendant's mitigation'" and not unduly prejudicial.  *State*

2   *v. Hampton*, 140 P.3d 950, 963 (Ariz. 2006).  The use of competency reports may be fair

3   rebuttal to a defendant's mental health mitigation evidence.  *State v. Fitzgerald*, 303 P.3d

4   519, 528 (Ariz. 2013).  But here, Dr. Toma's report was produced as part of the

5   intellectual disability inquiry, not mental illness.  Additionally, information that is unduly

6   prejudicial rebuttal evidence must be excluded if it would make the proceeding

7   "fundamentally unfair."  *See State v. Smith*, 159 P.3d 531, 542 (Ariz. 2007).

8        Speer never claimed he was intellectually disabled in his mitigation.  As the issues

9   are distinct, the reports were not relevant to the mitigation raised by Speer; therefore, they

10   were not fair rebuttal.  Counsel should never have disclosed the Toma report to the State,

11   and should have objected to its use in penalty phase rebuttal.  By not only failing to

12   object to the use of the reports on rebuttal, but actually providing the reports to the

13   prosecutor, counsel's conduct was below the professional norm.  Counsel acknowledges

14   that he failed to object to the State's use of the two reports.  (PCR 9/26/14 Ex. 1 at 18.)

15   The *Strickland* expert states that reasonably competent counsel would have objected to

16   the use of reports generated for inquiry into intellectual disability to rebut Speer's mental

17   health mitigation as the two issues are distinct.  (PCR 9/26/14 Ex. 2 at ¶ 17.)

18        Speer was prejudiced.  The doctors' opinions that Speer was malingering had a

19   devastating effect to his mitigation.  It entitled the jury to discount Speer's long history of

20   mental issues, and believe he was merely lying.  There is a reasonable probability that

21   had the jury not heard this improper rebuttal, the outcome of the case would have been

22   different.  Thus, Speer has raised a colorable claim for relief on this issue.

23   **CLAIM 18**

24        **DEFENSE COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT
        TO THE STATE'S CAUSAL NEXUS ARGUMENT**

25

26   **A.     Facts in Support of the Claim**

27        During her penalty phase closing, the prosecutor challenged the mitigation

28   presented by the defense, with a particular emphasis on his mental health diagnoses,

history of suffering sexual and physical violence, and substance abuse.  The State

contended that Speer was trying to convince the jury he should not be blamed for the

murder because he had a "lousy childhood," and that, "[a]s far as the defendant is

concerned, everyone is to blame for Adan Soto's murder except him."  (RT 3/27/2007

AM at 6.)  The State also downplayed Speer's history of substance abuse, claiming

"there's no indication that in the spring of 2002, he was using drugs [and] there's no

indication that he was using drugs during the time of the offense."  (*Id.* at 66.)  The State

then summarized Speer's mitigation presentation in this way:

> How did any of those things have anything to do with why he
> murdered Adan Soto?  They don't.  They do not reduce the
> degree of his moral culpability or blameworthiness.  I suggest
> that they don't exist, and they're being used to try to explain
> what the defendant's real issue is, which is he has antisocial
> personality disorder. . . .  Paul Speer cares about one person
> and one person only.  He has antisocial personality disorder.
> He is never going to change.  There is nothing about this
> crime that calls out for mercy for the defendant.  He came
> from a dysfunctional family.  So what.  We all came from
> someplace.  And we all managed to be law-abiding citizens.

(RT 3/27/2007 AM at 66-67, 72 (emphasis added).)

       With this argument, the State went beyond a challenge to the existence of statutory

mitigation and encouraged the jury to discount Speer's appalling childhood, cognitive

impairment, and substance abuse, because (in her view) it had little if anything to do with

his capital crimes.  This is the essence of an improper causal nexus requirement.[24]  *See*

*Tennard v. Dretke*, 542 U.S. 274, 284 (2004) (mitigating evidence should be evaluated in

"the most expansive terms"); *Smith v. Texas*, 543 U.S. 37, 45 (2004); *Williams v. Ryan*,

623 F.3d 1258, 1270-71 (9th Cir. 2010) ("By holding that 'drug use cannot be a

mitigating circumstance of any kind' unless [the defendant] demonstrated 'some

---

[24] *See also* Claim 21 (causal nexus errors at trial) and Claim 13D (prosecutorial
misconduct during the penalty phase).

1    impairment at the time of the offense,' the Arizona Supreme Court imposed a 'nexus'

2    requirement.").

3          As argued in more detail in Claims 14 and 21, the State committed misconduct by

4    misrepresenting the law regarding mitigation.  The State's misconduct violated Speer's

5    rights against self-incrimination, to be free from cruel and unusual punishment, to a fair

6    trial, and to due process.  However, defense counsel failed to object to the State's clearly

7    improper argument.  This failure was deficient performance which prejudiced Speer.

8    *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

9          This claim was raised in Speer's state post-conviction petition as Claim XV.

10   (PCR 9/26/14 Pet. at 72-75.)  The state PCR court denied the claim on both procedural

11   and substantive grounds.  With regard to the procedural bar, the state court found that the

12   claim was "precluded from relief" pursuant to Rule 32.6(c) and 32.2(a) because

13   "Defendant concedes that this issue was raised on appeal, and the Arizona Supreme Court

14   denied it, finding 'no error, let alone fundamental error.'"  (PCR ME 5/21/15 at 23.)

15   However, this is a mischaracterization of the state court proceedings.

16         On appeal, Speer presented causal nexus challenges in Issue III(A) of his opening

17   brief.  (DA dkt. 87 at 34-46.)  One of the arguments raised in Issue III(A) addressed the

18   State's improper causal nexus argument during the penalty phase.  (*Id.* at 37-38.)

19   However, neither the opening brief nor the reply brief include any claim that trial counsel

20   was ineffective for failing to object to this improper argument.  Similarly, while the

21   Arizona Supreme Court addressed and denied Speer's contention that the State's closing

22   argument included a causal nexus test, the court reviewed the claim for fundamental error

23   only because "Speer did not object to this argument" at trial.  *Speer*, 212 P.3d at 799.

24   Therefore, the state PCR court was incorrect in finding that this present claim (which

25   raises a claim of *Strickland* error) was raised and rejected on appeal.[25]

26

27         [25] The mistaken ruling by the state PCR court may be due to this passage in
28   Speer's state PCR petition:

170

**B.**    **The State Court's Denial of this Claim Was Unreasonable Because the Record Clearly Showed that the State Made a Causal Nexus Argument Which Prejudiced Speer, and Trial Counsel Were Ineffective for Not Objecting to the Argument**

In denying this claim, the state PCR court unreasonably found that the State "properly argued its belief as to the weight to be afforded mitigation, absent proof of a nexus to the crime." (PCR ME 5/20/2015 at 24.)  The court additionally found that the claim was meritless because the trial court "advised the jurors to 'consider and give effect to all mitigating circumstances raised by the evidence,'; to determine credibility and weight and to consider 'factors that bear on credibility and weight'; and that 'each individual juror may give different value to any particular mitigating circumstance.'" (*Id.*)  Therefore, according to the state PCR court, because the State's argument contained nothing objectionable, trial counsel was not ineffective for failing to object.

The state PCR court's denial of this claim is predicated on the same faulty reasoning the Arizona Supreme Court applied in denying Speer's nexus claims on direct appeal.  (*See* Claim 21.)  As argued more fully therein (and incorporated by reference here), the Arizona state courts have routinely thwarted *Tennard* and its predecessors, *Lockett v. Ohio*, 438 U.S. 586 (1978) and *Eddings v. Oklahoma*, 455 U.S. 104 (1982), by applying a nexus analysis to mitigating evidence in capital cases.  *See McKinney v. Ryan*,

---

While the trial court did instruct the jury that "the fact the defendant has been convicted of first-degree murder is unrelated to whether mitigating circumstances exist," this instruction is far from properly instructing jurors that the existence and strength of mitigation must be considered independently.  There need be no nexus between the offenses and the mitigation in order for jurors to consider it.

If this instruction was a nexus instruction, it was certainly insufficient to properly advise the jury on how to utilize the connection between mitigation and murder to properly evaluate the case.

*The issue was raised on appeal.*  The Arizona Supreme Court held there was no error let alone fundamental error.  The court noted that absence of such a nexus can be considered in evaluating the strength of that evidence.

(PCR 9/26/14 Pet. at 73 (emphasis added).)  While this passage is confusing, based on the entirety of the state court record it is more likely that state PCR counsel was referring to the denial of the fundamental error claim regarding the State's closing argument, and not the present *Strickland* claim for failure to object to that argument.

1   813 F.3d 798 (9th Cir. 2015) (en banc).  Prosecutors may not deliberately misstate the

2   law, and "clearly established federal law provides that a prosecutor's improper comments

3   amount to a constitutional violation if they rendered the trial fundamentally unfair."

4   *Deck v. Jenkins*, 814 F.3d 954, 977 (9th Cir. 2014); *see also Sechrest v. Ignacio*, 549 F.3d

5   789, 807 (9th Cir. 2008).  Yet that is exactly what the prosecutor in this case did with

6   regard to the law on mitigating evidence.  (*See* Claim 21.)

7            Furthermore, as Speer argues in Claim 21, *infra*, the trial court's instructions were

8   not sufficient to protect Speer against the State's nexus argument.  As trial counsel noted

9   during his closing, no instruction told the jurors that there did not have to be a connection

10  between the murders and the mitigating evidence for the jury to consider and give effect

11  to the evidence.  (RT 3/27/2007 PM at 6-7.)  At best, the jurors heard confusing and

12  conflicting information from the attorneys and the trial court as to how they should

13  evaluate mitigation.

14           Reasonably competent capital counsel would have been aware that the causal

15  nexus test advanced by the State precludes the jury from giving effect to certain types of

16  mitigation and violates the Eighth and Fourteenth Amendments.  The Supreme Court

17  issued its opinion in *Tennard* on June 24, 2004—nearly two years before Speer's trial.

18  As the law was well established, reasonably competent defense counsel would have

19  objected to the State's legal fiction that causal nexus was required before the jury could

20  give effect to Speer's substance abuse, horrific childhood, and mental health diagnoses.

21  By failing to object to the State's improper nexus claims, or request the trial court to

22  properly instruct the jury, counsel's conduct fell below the objective standard of

23  reasonable professional norms.  Trial counsel admits he failed to object to the State's

24  "nexus" argument.  (PCR 9/26/14 Ex. 1 at ¶ 12.)  The *Strickland* expert retained by state

25  post-conviction counsel confirms that reasonably competent counsel would have objected

26  to this improper argument, and the failure to do so constitutes conduct below the

27  prevailing professional norm.  (*Id.* Ex. 2 at ¶ 20.)

28

Speer was prejudiced by this failure.  By not objecting to the improper comments or requesting a proper jury instruction on the jury's use of nexus, there is a reasonable probability the jury believed that if his mitigation was insufficient to call for leniency, ithere was no connection between Speer's mitigation and the murder.  But for these omissions, there is a reasonable probability the outcome would have been different sufficient to undermine confidence in the death verdict.  Consequently, Speer has raised a colorable claim on this issue entitling him to relief.

**CLAIM 19**

**SPEER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL DURING THE PENALTY PHASE OF HIS CAPITAL MURDER TRIAL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE COUNSEL FAILED TO IMPEACH THE STATE'S KEY WITNESS IN THE PENALTY PHASE WITH READILY AVAILABLE INFORMATION, FAILED TO UTILIZE A PSYCHOLOGICAL EXPERT'S ASSISTANCE IN THE CROSS-EXAMINATION OF THE STATE'S MENTAL HEALTH EXPERT, AND FAILED TO PRESENT A PSYCHOLOGIST TO REBUT THE STATE EXPERT'S MISLEADING PENALTY PHASE TESTIMONY**

**A.    Introduction**

An expert evaluates the testimony of the State's key penalty witness against Speer thusly:

> Essentially, a psychologist consulting to Mr. Speer's legal team would have been able to tell them that the results from the three tests Dr. Bayless administered, which formed the foundations for his diagnostic impressions and opinions, were useless.  He did not administer the Shipley according to the standardized requirements and the results cannot be interpreted.  He used an outdated scoring and interpretive program for the MMPI-2 and did not provide the raw scores to determine if he actually entered the data accurately or so that the scores could be interpreted with [the 2006] scales.  He also interpreted the scores that he had inaccurately which definitely would have misled the jury into believing something that was not true about Mr. Speer.  Finally, he did not report on the Williamson Sentence Completion Test in his report.  This would suggest, at a minimum, that his evaluation did not meet the standards of practice. . . . [M]any of his statements clearly suggested a bias with an inadequate foundation.

(PCR 9/26/14 Ex. 34 (Declaration of John Toma, Ph.D., at 9.)

1    At sentencing, trial counsel presented testimony from three mental health experts,

2  including Dr. Paul Miller, Ph.D., Dr. Pablo Stewart, Ph.D., and Dr. Susan Parrish, Ph.D.

3  Dr. Parrish is a psychologist with almost three decades worth of experience and a

4  specialty in the Halstead-Reitan test battery and Post-Traumatic Stress Disorder (PTSD).

5  (RT 2/27/07 at 111-13.)  Dr. Parrish met with Speer on five occasions and administered a

6  complete neuropsychological battery.  (*Id.* at 126-27.)  She also reviewed relevant

7  documents, including past psychological and psychiatric records from nine mental health

8  professionals, his school records, and a social history that described Speer's history as a

9  victim of trauma, substance abuse and addiction, parental abuse and neglect, and sexual

10  abuse.  (*Id.* at 130-31.)  Based on this information, Dr. Parrish opined "[t]here is very

11  strong evidence to indicate that [Speer] suffers from significant impairment in brain

12  functions."  (ROA 349 Ex. 2 at 7.)  She also believed that Speer fit the DSM criteria for

13  PTSD, though she did not definitively diagnose him with that disorder because she did

14  not personally conduct a clinical interview of Speer.  (*Id.* at 11-12)  Similarly, Dr. Paul

15  Miller and Dr. Pablo Stewart also believed that Speer suffered from significant emotional

16  and mental impairments.

17    In rebuttal, the prosecution called Dr. Michael Bayless.  Dr. Bayless testified that

18  he met with Speer on two occasions and conducted a clinical interview as well as the

19  Shipley Institute of Living Scale ("SILS"), the Williamson Sentence Completion Test,

20  and the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2").  (RT 3/20/07 at 70.)

21  Dr. Bayless testified at length about his testing, most prominently, the MMPI-2.  (*Id.* at

22  70-78, 87-108; RT 3/21/07 at 7-9, 47.)  Based on his test results and what he knew of

23  Speer's background, Dr. Bayless diagnosed Speer with having an Axis I disorder of

24  dysthymia, and an Axis II diagnosis of antisocial personality disorder.  (RT 3/21/07 at 9.)

25  Dr. Bayless dismissed the work of Dr. Parrish and Dr. Stewart because they "seemly [sic]

26  want to blame everyone in Mr. Spear's [sic] family for Mr. Spear's own behavior.

27  Instead of focusing on Mr. Spear's responsibility, they describe him as the victim."

28  (Trial Ex. 192 at 4.)  According to Dr. Bayless, "There is little if any evidence that Mr.

Speer suffers from brain damage that can be casually [sic] related to his behavior in the instant offense.  He does not have the symptom picture of PTSD or major depression with psychosis." (*Id.*)  Rather, "[h]is history indicates an individual that has learned to take rather than to earn what he wants, to be only concerned about his appetite of the moment, to lie, cheat, and steal, and to avoid responsibility at all cost [sic]. . . .  He is manipulative and has the ability to scheme without regard to the consequences of his schemes.  Evidence to this can be seen in his attempt to fake mental illness." (*Id.*)  In Dr. Bayless's opinion, "with antisocial personality disorder, most likely [Speer's] prognosis is relatively poor in the sense that it doesn't change over time."  (RT 3/21/07 at 44; *see also* Trial Ex. 192 at 9.)  Dr. Bayless also believed that Speer exhibited no deficiency in his understanding of right from wrong or in his ability to understand the consequences of his actions, and his ability to make choices was not impaired.  (RT 3/21/07 at 45-47.)

During the penalty phase, trial counsel consulted with defense expert Dr. Susan Parrish and asked her to review Dr. Bayless's report to assist with cross-examination.  (PCR 9/26/14 Exs. 1 and 33.)  Trial counsel wanted to give the jury the specific MMPI-2 questions.  (RT 3/21/07 at 87.)  The court declined to admit the score report, but ordered that counsel was permitted to inquire about the nature of the MMPI-2 questions, how the test was scored, and how the test was devised and administered.  (*Id.* at 91-92.)  During this discussion, trial counsel admitted that they had only "a little bit of education" on the MMPI-2, but they thought it was important for the jury to see how "innocuous" the test questions were.  (*Id.* at 92.)  The judge again declined to give the jurors a copy of the questions, reasoning that because jurors were not experts they would take the MMPI-2 questions out of context and would not be able to give the weight an expert would.  (*Id.* at 93.)  He reaffirmed that trial counsel could explore how the test was administered, its validity, and even the innocuousness of the questions.  (*Id.* at 93.)

On cross, trial counsel reviewed the SILS and the MMPI-2 with Dr. Bayless in very general terms.  (*Id.* at 151-55, 161-78.)  Counsel never challenged the tests' validity, or Dr. Bayless's methodology, testing protocols, or results.  Trial counsel also failed to

175

1    confront Dr. Bayless with evidence from the jail visitation records that contradicted his

2    in-court testimony about the length of time he spent with Speer.  Furthermore, counsel

3    failed to put on the testimony of an expert witness in rebuttal, even though crucial

4    rebuttal evidence and witnesses were readily available.

5         Trial counsel's failure to challenge Dr. Bayless's testimony amounted to deficient

6    performance that prejudiced Speer.  Dr. Bayless's testimony was absolutely crucial to the

7    State's case for death.  The prosecutor relied heavily on Dr. Bayless's testimony and his

8    diagnosis of antisocial personality disorder in her successful attempt to persuade the jury

9    that Speer was unworthy of a life sentence.  However, there was a wealth of information

10   available to trial counsel—some of it actually in trial counsel's files—which

11   demonstrated that Dr. Bayless's opinions were built on a foundation of misinformation,

12   outdated testing protocols, and biased assessments.  Had trial counsel adequately

13   prepared for Dr. Bayless's testimony, the jury would have known that Dr. Bayless's

14   testing results and opinions were simply not credible.  And without Dr. Bayless's

15   testimony, there is a reasonable likelihood that at least one juror would have voted to save

16   Speer's life.

17        This claim was raised in Speer's state post-conviction petition and PFR as Claim

18   XVI.  (PCR 9/26/14 Pet. at 75-90; PFR at 40-44.)  The state PCR court denied the claim

19   on the merits.  (PCR ME 5/21/15 at 24-26.)

20        To the extent that any portion of this claim is defaulted, such error is due to post-

21   conviction counsel's deficient performance.  This deficient performance prejudiced Speer

22   and provides cause to excuse any procedural default.  *See Strickland v. Washington*, 466

23   U.S. 668, 687 (1984); *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985); *Martinez v. Ryan*,

24   566 U.S. 1, 9 (2012).  Therefore, the Court may consider the merits of this claim.

25   **B.    Trial Counsel Unreasonably Failed to Present Readily Available
           Evidence that Would Have Exposed the Unreliability of Dr.
26         Bayless's Test Results and Opinions**

27        When the facts of a case necessitate the services of an expert to explain their

28   significance to the finder of fact, the Sixth Amendment requires counsel to obtain an

expert.  *Ake v. Oklahoma*, 470 U.S. 68 (1985).  In this case, trial counsel did consult with an expert, Dr. Susan Parrish, in an effort to better understand Dr. Bayless's findings and to prepare himself for cross.  However, trial counsel erred by not properly utilizing the information Dr. Parrish provided and by not putting on an expert in rebuttal who could explain for the jury how Dr. Bayless's opinions and test results were unreliable and misleading.

As set forth in Dr. Parrish's report and in the declaration of Speer's post-conviction psychological expert, Dr. John Toma, Dr. Bayless's test results and testimony were fraught with misstatements of fact, bias, and unsupported opinions.  Had trial counsel properly prepared, he could have exposed the following serious problems with Dr. Bayless's work.

### 1.    Shipley Institute of Living Scale (SILS)

According to Dr. Bayless, the SILS is "an IQ scan, basically," that "measures an individual's vocabulary ability and their abstract reasoning ability."  (RT 3/20/07 at 70.)  Dr. Bayless testified that he chose that test because he "wanted to make sure that there was nothing interfering with his ability to think rationally and logically" and to show that "his IQ basically was not an issue."  (*Id.*)  When asked whether "you actually get an IQ that's comparable to a Wechsler when you give [the SILS]," Dr. Bayless answered yes, as the SILS "is correlated to the WAIS."  (*Id.* at 71.)  According to the SILS results, Speer's "total IQ score was 82."  (*Id.*)  However, that score was "depressed" because Speer "didn't even try" on the Abstraction section, where he answered seven out of 20 questions.  (*Id.* at 71-72.)  Although Dr. Bayless accused Speer of not trying, he also acknowledged that Speer said "I'm not good at this" as he took the Abstraction portion of the test.  (*Id.* at 72; *see also* Trial Ex. 257.)  Nevertheless, according to Dr. Bayless, the SILS results were valid and in line with Speer's history; Dr. Bayless opined that Speer is "operating" in the "average to below average" range of intelligence, and that his SILS score was lower because Speer did not put his full effort into the testing.  (RT 3/20/07 at 72-73.)  On cross, Dr. Bayless stated that Speer's alleged "refus[al]" to take the test was

177

an example of his tendency to malinger.  (RT 3/21/2007 at 153.)  Similarly, Dr. Bayless's report (which was admitted as exhibit 192) stated that Speer's "true level of intelligence is in the average range," but had a poorer outcome on the SILS because Speer gave up. (Trial Ex. 192 at 8.)  Dr. Bayless went even further in his report then he did during his trial testimony by using the SILS evaluation as one means of assessing Speer's competency and behavioral functioning.  (*Id*.)

Had trial counsel adequately investigated and prepared, he would have been able to demonstrate that Dr. Bayless's testimony with regard to the SILS, and Speer's performance on the SILS, were seriously problematic.  For example, Dr. Parrish noted that Dr. Bayless's interpretation of the test results failed to abide by guidelines provided by the creator of the test.  (PCR 9/26/14 Ex. 33 at 1.)  Moreover, Dr. Bayless "interpreted Paul's low score on the Abstraction section as a lack of motivation," but without any support in the report or explanation as to why.  (*Id.*)

Dr. Toma pointed out even more problems with Dr. Bayless's interpretation of the SILS.  (*See* PCR 9/26/14 Ex. 34 at 3-4.)  First, Dr. Bayless's testimony to the jury misrepresented both what the SILS does and how it operates.  Dr. Bayless testified during his deposition that the SILS "was designed as a cognitive assessment of IQ and specific impairment" and "was utilized initially for the purpose of cognitive distortion."  (*Id.* at 4 (quoting Dr. Bayless's deposition).)  However, the SILS "has not been found to measure [brain impairment] consistently."  (*Id.* at 3.)  Moreover, Dr. Bayless's assertion at trial that the SILS gives an IQ result is "just factually incorrect," as the SILS gives only an estimate of intelligence.  (*Id.*)

As Dr. Toma explained, the version of the SILS taken by Speer was designed to give an estimate of intelligence based on a comparison of the SILS results to known results on the WAIS-R.  (*Id.* at 3 (the version of the SILS administered by Dr. Bayless "*has not been shown* to provide an estimate of IQ based upon . . . the WAIS-III") (emphasis in original).)  Yet in this case, Speer had taken the WAIS-III, not the WAIS-R. Even though there was an updated version of the SILS available in 2006 that was normed

against the version of the WAIS taken by Speer, Dr. Bayless failed to use that SILS in his

testing.  (*Id.*)  Additionally, Dr. Bayless failed to properly time the test, thereby violating

standard procedures.  (*Id.* at 4.)  In sum, according to Dr. Toma, the SILS results Dr.

Bayless obtained "were of no value":

> Essentially, Dr. Bayless did not appear to fully understand the underlying properties of the SILS, nor did he administer it according to standardized procedures.   The scores were useless and have no meaning.   In addition, he may have misled the jury into believing that Mr. Speer was not putting forth effort in this test, which is not necessarily an appropriate interpretation of the behavior Dr. Bayless described.

(*Id.* at 4, 5.)  As Dr. Toma opined, and as is demonstrated below, Dr. Bayless's tendency

to mislead the jury about Speer's pathologies and behavior "appears to be a consistent

bias presented by Dr. Bayless throughout his report and testimony."  (*Id.* at 5.)

## 2.    The Williamson Sentence Completion Test

Dr. Bayless testified that the Williamson Sentence Completion Test "is a

projective test" that he analogized to "inkblots and Rorschach cards."  (RT 3/20/07 at 74.)

He selected that test because he "wanted to see whether or not there was any type of

interfering thought process that possibly could be associated with psychosis" or would

suggest that Speer "was suffering from some type of mental disease that would interfere

with his ability to make appropriate judgments and decisions."  (*Id.*)  Dr. Bayless claimed

that if a person was psychotic or delusional, "one would see that as a major theme in this

type of testing."  (*Id.* at 75.)  In this case, according to Dr. Bayless, Speer's responses

were "very normal," with no evidence of psychosis, "thought problems," or "difficulty

with linear or coherent thought process."  (*Id.* at 74, 75.)  Speer's results were so normal

that Dr. Bayless "didn't even mention it in [his] report."  (RT 3/21/07 at 151.)

Dr. Parrish and Dr. Toma had serious criticisms of the Williamson that would

have provided valuable impeachment evidence on cross and/or defense rebuttal.  Both

expressed concern about the propriety of using the Williamson, as it is not a widely used

projective measure.  (*See* PCR 9/26/14 Ex. 33 at 1 and Ex. 34 at 5.)  Dr. Toma was

1   "unable to find any published research (or mention) of this test" and "could not find any

2   publication to explain the development, use of, or utility of this test."  (PCR 9/26/14 Ex.

3   34 at 5.)  Similarly, Dr. Parrish noted that the test was out of print and questioned why

4   Dr. Bayless did not use the Rotter Incomplete Sentences Blank, which is both widely

5   used and (unlike the Williamson) has "some associated objective scoring with it."  (PCR

6   9/26/14 Ex. 33 at 1.)  According to Dr. Parrish, "[t]he answers on the Williams [sic] don't

7   support the harsh view [Dr. Bayless] expresses.  It's as though Bayless is simply citing

8   the description of someone who is antisocial."  (*Id.* at 4.)

9   Yet again, Dr. Bayless was inaccurate in his stated understanding of the protocols

10  of the tests he administered.  In his deposition, when queried as to why he chose an

11  uncopyrighted and subjective test like the Williamson rather than a more standard

12  projective measure, Dr. Bayless said that he did not know of any projective tests with

13  copyrights or standardized scoring systems other than the Rorschach.  (PCR 9/26/14 Ex.

14  34 at 5 (citing Dr. Bayless's deposition).)  However, as Dr. Toma pointed out, there are

15  several tests—including ones mentioned by Dr. Bayless as tests he was familiar with—

16  which meet those standards.  (*Id.*)  Dr. Toma also criticized Dr. Bayless for leaving the

17  Williamson test results out of his report.  In Dr. Toma's view, that omission was another

18  example of Dr. Bayless's lack of objectivity:

19            Again, [Dr. Bayless] does not provide any information
          about the results of this test with Mr. Speer in his written
20        report.  He does not explain how he scored or interpreted the
          test, other than that the results contributed to his finding of
21        Antisocial Personality Disorder (see discussion [in Dr.
          Bayless's deposition] 01/22/07, pages 49 through 61).  None
22        of this was in his report.  The fact that Mr. Speer cooperated
          with the test was not reported either which suggests, again,
23        that Dr. Bayless was not objective.
              Essentially the reasoning, administration, scoring, and
24        interpretation of the test results from the Williamson Sentence
          Completion Test were not in Dr. Bayless's written report . . . .
25        In addition to questionable standards of practice, some of the
          information he provided about the test and projective tests in
26        general is factually inaccurate.

27

28  (*Id.* at 6.)

180

1    ###    3.    The MMPI-2

2          The most egregious, misleading, and damaging evidence came from Dr. Bayless's

3    administration of the MMPI-2.  Both Dr. Parrish and Dr. Toma were very critical of Dr.

4    Bayless's methodology and opinions, which they found to be misleading at best and

5    dishonest at worst.

6          According to Dr. Parrish, it was important for trial counsel to help the jury

7    understand that the MMPI's computer generated reports provide only general references

8    about people who have a specific profile pattern.  (PCR 9/26/14 Ex. 33 at 1.)  The MMPI-

9    2 manual makes it clear that one has to consider the individual's history and

10   circumstances when making determinations about what the profile actually means in the

11   real world.  (*Id.*)  In this case, Dr. Parrish believed that "[t]he [MMPI-2] interpretation

12   should be conservative because of the difference between [Speer's] background and

13   education level and that of the population to which he is being compared [i.e., those with

14   at least an 8th grade reading level and a completed education of high school or above]."

15   (*Id.*)  Because of the educational bias in the MMPI, Dr. Parrish thought the Personality

16   Assessment Inventory might have been a better test for Speer, as it required a lower

17   reading level.  (*Id.* at 1.)

18         As with the SILS and the Williamson, Dr. Parrish believed that Dr. Bayless's test

19   results were suspect and possibly biased.  For example, under the category of Personality

20   and Emotional Functioning (the key category from where Dr. Bayless drew his antisocial

21   diagnosis), "Bayless categorizes Paul's MMPI profile as being a code type of 4-6/6-4 (2)

22   and then proceeds to describe people who have this type."  (*Id.* at 4 (referencing Trial Ex.

23   192 at 8.)  Yet as Dr. Parrish pointed out, on Speer's actual MMPI-2 results (which are

24   generated by a computer program), "it notes that the Best Fit Prototype Profile is a 4-8/8-

25   4-6," a personality type that is "much less harsh" than the one used by Dr. Bayless in his

26   report.  (PCR 9/26/14 Ex. 33 at 4.)  Dr. Parrish directed trial counsel to page six of the

27   computer-generated MMPI-2 report, which provided descriptions of Speer's scores that

28   are much less "harsh" and prejudicial than the language Dr. Bayless used in his report.

(*Id.*)  Moreover, Dr. Bayless's "use of the words 'malignant' and 'seethe' are very strong and not in keeping with the MMPI report language."  (*Id.*)  The bottom line, according to Dr. Parrish, is that Dr. Bayless's description of Speer's functioning "does not match the description in the MMPI report."  (*Id.*)  Dr. Parrish advised trial counsel that while she believed "there is something to this," she was not familiar with the interpretative program and recommended that counsel ask Dr. Bayless about it.  (*Id.*)

As with the SILS and the Williamson, Dr. Parrish made specific suggestions to guide counsel's cross-examination.  She felt it was worth reading to the jury the essential feature of a Personality Disorder from the Diagnostic and Statistical Manual of Mental Disorders (DSM), and then have either she or Dr. Bayless read the brief descriptions of Personality Disorders listed under Axis II on page 4 of the MMPI-2 report, as well as the description of Schizophrenia from the DSM.  (*Id* at 2.)  While Dr. Parrish did not believe that Speer was schizophrenic, she thought the MMPI was picking up on Speer's distorted view of the world and his sense of alienation, and it was important for the jury to hear that there were other ways of interpreting Speer's behavior rather than just claiming he was antisocial.  (*Id.*)  Moreover, because the MMPI-2 results supported a finding that Speer has a personality disorder, Dr. Bayless was required—but failed—to consider a diagnosis of PTSD and explain why such a diagnosis is unfounded.  (*Id.* at 3.)  Rather than following that protocol, Dr. Bayless failed to calculate the appropriate scale in order to get a meaningful understanding of Speer's actual pathology.  (*Id.*)  Dr. Parrish specifically advised trial counsel to "ask Bayless why this scale was not calculated."  (*Id.*)  Relatedly, she recommended that trial counsel ask Dr. Bayless why he focused only on Speer's antisocial behavior, but failed to give credence to Speer's openness during the clinical interview and testing, his need to please adults, or the times he did well in placements as a juvenile.  (*Id.* at 2-3.)  This was particularly important because the MMPI-2 manual mandates that diagnosticians take into consideration the subject's family history, early environment, and "the social and economic context in which the behaviors occur."  (*Id.* at 3.)  In Dr. Parrish's view, taking into account Speer's past test results,

1   social and educational history, and traumatic family background, a diagnosis of

2   Borderline Personality Disorder (BPD) was more fitting than Antisocial Personality

3   Disorder.  (*Id.* at 4.)  Overall, Dr. Parrish felt that Dr. Bayless's failure to consider

4   Speer's neuropsychological test results, history of trauma, and likelihood of PTSD were

5   "fatal with regard to his conclusions."  (*Id.* at 5.)

6          Dr. Toma was even more critical of Dr. Bayless's administration of the MMPI.  Of

7   great concern was the fact that Dr. Bayless failed to disclose the raw test data, despite

8   such disclosure being a common and necessary practice to allow other experts to review

9   the validity and accuracy of the test results.  (PCR 9/26/14 Ex. 34 at 9.)  Yet even without

10  the raw test data, it was evident that from administration to scoring to interpretation, Dr.

11  Bayless's MMPI results were "outdated," "questionable," "misleading," and

12  "inaccurate."  (*Id.* at 6, 8, and 9.)  For example:

13  - Dr. Bayless used a scoring and interpretation software program that was

14  published in 1998, despite the fact that the same program had been updated in

15  2000 and again in 2006.  Thus, he used an outdated scoring and interpretative

16  program which rendered his results questionable.  (*Id.* at 6.)

17  - Dr. Bayless incorrectly stated that the "L scale" stands for "Lying," the "F

18  stands for faking" and the "K stands for defensiveness."  (*Id.* at 6-7; *see also*

19  RT 3/20/07 at 87.)  However, the L scale is actually called the "Lie" scale, all

20  of the F scales are "Infrequency" (not "faking") and the K is the "Correction"

21  scale.  (PCR 9/26/14 Ex. 34 at 6-7.)  By misinforming the jury as to the title of

22  the MMPI-2 validity scales, he may well have misled the jury into believing

23  something that was not true.  (*Id.* at 7.)

24  - Dr. Bayless also incorrectly defined some of the Clinical Scales of the MMPI-

25  2, particularly for the Paranoia Scale.  (*Id.* at 8; *see also* RT 3/20/07 at 91.)

26  The Paranoia scale does not measure a person's tendency "to get into revenge"

27  as Dr. Bayless described in his testimony.  Rather, according to the MMPI-2

28  manual, Speer's score of 94 actually indicates "Psychotic symptoms, including

183

disturbed thinking, delusions of persecution, ideas of reference." (PCR 9/26/14 Ex. 34 at 8.) In Dr. Toma's opinion, Dr. Bayless's testimony was "definitely misleading." (*Id.*)

- Dr. Bayless likewise "omitted some important details" in his description of Speer's results on the Schizophrenia scale. (*Id.*) Rather than tossing off the MMPI-2 findings on this scale as just more evidence of antisocial behavior, "Mr. Speer's score of 86 should have been interpreted with the following: 'Confused, disorganized thinking, hallucinations and/or delusions, impaired contact with reality; poor judgment; may reflect effects of some forms of substance abuse and/or medical conditions such as epilepsy, stroke, or closed-head injury.'" Dr. Bayless misled the jury yet again by failing to convey this information. (*Id.*)

- The program Dr. Bayless used was missing some Validity scales which would have assisted in determining whether Speer actually exaggerated symptoms of mental illness. (*Id.* at 7.)

- Dr. Bayless misinformed the jury with his explanation of the t-score Distribution. (*Id.* at 7; *see also* RT 3/20/07 at 94.)

- Dr. Bayless's descriptions of "exaggerated" symptoms are not supported by the test protocols or Speer's results. Based on Speer's medical history, he would have been considered a member of a "clinical" population and needed to be evaluated under the standards for that population. (PCR 9/24/16 Ex. 34 at 7-8.) Instead, Dr. Bayless improperly compared Speer's FB score (which measures validity) of 75 against a non-clinical population and declared that it indicated an exaggeration of symptoms. Yet according to the test manual, the FB score needs to be over 110 in clinical settings, and over 90 in nonclinical settings, before there can be any interpretation of this validity scale at all. At minimum, according to Dr. Toma, this score does not indicate "exaggeration" as Dr. Bayless repeatedly claimed. (*Id.* at 8.)

184

- Finally, Dr. Toma advised that a psychologist (such as himself or Dr. Parrish) could have instructed Speer's attorney to have the Harris Lingoes scale results evaluated by Dr. Bayless, before the jury, especially relating to those form the Pd (Psychopathic Deviate) Scale.  (*Id.* at 9.)  According to Dr. Toma, this was "especially important given that Dr. Bayless used this scale, in part, to diagnose Antisocial Personality Disorder."  (*Id.*)  Speer's scores indicate significant elevations for Family Discord (Pd1 – 84), Social Alienation (Pd4 – 87) and Self-Alienation (Pd5 – 72).  In Dr. Toma's view, "[n]ot only are these scales consistent with Speer's reported and documented history but they are unrelated to antisocial behaviors.  The scale for Authority Problems (Pd2 – 60), behaviors that Dr. Bayless emphasized in his testimony, was not significantly elevated and not a major contributor to the overall elevation of the Pd Scale which contributed so significantly to Dr. Bayless's diagnostic opinion.  This information should have been provided to the jury."  (*Id.*)

In sum, Dr. Toma found, the MMPI-2 results were simply not reliable, and as a result, *"definitely would have misled the jury into believing something that may not be true about Mr. Speer."*  (*Id.*) (emphasis added).

## C.     The State Court's Denial of this Claim Was Contrary to Clearly Established Federal Law

Dr. Parrish provided clear guidance and information for the defense to use in cross-examining Dr. Bayless, and the assessment provided by Dr. Toma was readily available had trial counsel done the necessary preparation and consultation to obtain that information.  Unfortunately, trial counsel failed to prepare and present an effective rebuttal to Dr. Bayless.  As a result, Dr. Bayless's inaccurate, powerful, and prejudicial testimony stood unchallenged before the jury.

When the investigation uncovers facts that require the services of an expert to explain their significance to the finder of fact, the Sixth Amendment requires counsel to obtain an expert.  *Ake*, 470 U.S. at 68.  Counsel's failure to utilize available psychiatric

information, especially where that information supports the theory of defense, falls below acceptable performance standards. *Turner v. Duncan*, 158 F. 23d 449, 456 (9th Cir. 1998). An attorney's decision not to consult with an expert may qualify as sound trial strategy only if counsel had a reasoned basis justifying the decision. "A purportedly strategic decision is not objectively reasonable 'when the attorney has failed to investigate his options and make a reasonable choice between them.'" *State v. Denz*, 306 P.3d 98, 102 (Ariz. Ct. App. 2013) (quoting *Parrish Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005)) (quoting *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991)). Here, there were serious and damaging misrepresentations—if not outright falsehoods—in Dr. Bayless's report and trial testimony.

There is no question that Dr. Bayless was a determining factor in both the jury's decision to sentence Speer to death as well as the Arizona Supreme Court's denial of relief on independent review. (*See, e.g.*, PCR ME 5/21/15 at 25 ("The jury evaluated all of the experts offered by both sides and afforded the weight to each expert that they believed to be appropriate. Clearly, they afforded greater weight to Dr. Bayless, which was their prerogative."); *Speer*, 212 F.3d at 802-03 (discussing the "sharply conflicting evidence on mental health issues," including Dr. Bayless's conclusion that Speer was malingering cognitive impairment and had antisocial personality disorder).) There is also no question that it was incumbent on defense counsel to challenge the findings of the State's primary witness in the sentencing phase. *See, e.g.*, *Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir. 1997) (en banc) (holding that impeachment evidence was material where it pertained to "the prosecution's star witness"). No reasonable strategy supports counsel's decision to not utilize or follow up on Dr. Parrish's findings in order to adequately prepare for cross-examination and rebuttal of this important State expert.

Just as important, Dr. Parrish's report questions the bases for Dr. Bayless's findings and repeatedly asks if Bayless was aware of other factors in Speer's case. As such, Dr. Parrish's report solicits further inquiries for information and the bases for Dr. Bayless's opinions. Yet, there was no effort by trial counsel to follow up with Dr. Parrish

186

to obtain more information from her, or to follow up with Dr. Bayless about Dr. Parrish's concerns.  The failure to utilize Dr. Parrish's information or investigate further in order to properly prepare for the cross-examination of Dr. Bayless was not strategic.  If the failure was the product of a strategic decision, that decision was not reasonable.  *Browning v. Baker*, No. 15-99002, 2017 U.S. App. LEXIS 18232, at *64-65 (9th Cir. Sept. 20, 2017).

Speer was prejudiced by this failure.  There were serious problems with Dr. Bayless's testing, methodology, and results.  Rather than properly prepare to confront this important testimony, counsel simply repeated the testing results and tried to get Dr. Bayless to agree that Speer was similar to the clients Dr. Bayless treated.  This cross was ineffectual, and as a result, this lone State's expert was able to convince the jury that Speer's case for life was not to be believed.  There is a reasonable probability that effective impeachment and rebuttal of Dr. Bayless's clearly problematic testimony would have convinced at least one juror to reject a death sentence.

It was therefore unreasonable for the state PCR court to reject this claim based on the reasoning that "[t]he Court does not second-guess the strategic decisions of trial counsel."  (PCR ME 5/21/15 at 24.)  "Counsel cannot justify a failure to investigate simply by invoking strategy. . . .  Under *Strickland*, counsel's investigation must determine strategy, not the other way around."  *Browning*, 2017 U.S. App. LEXIS 18232, at *65 (internal citations and quotations omitted).  Merely articulating the possibility of a reasonable strategy in response to a deficiency argument does not end the inquiry when that strategy does not explain the decision itself.  *See* Wayne R. Lafave, et al., *Criminal Procedure* § 11.10(c), at 797 (6th ed. 2016) ("Of course, a decision apparently based on a tactical judgment is not therefore rendered immune from an incompetency challenge.").  Rather, it is necessary to see if the purported strategy is actually based on a reasonable investigation and whether the decision is justified in light of the circumstances of the case and the theory of defense.  *Strickland*, 466 U.S. at 690-91 (strategic choices made after less than complete investigation are reasonable only to the extent that reasonable professional judgments justify the curtailment of counsel's investigation).  The

1   information provided by Dr. Parrish would have led reasonable counsel to further

2   investigation, preparation, and detailed cross-examination.  It was simply unreasonable

3   for trial counsel to fail to present the jury with evidence of Dr. Bayless's faulty testing

4   when it was both readily available and so strongly supported Speer's penalty-phase

5   presentation.  *See Wiggins v. Smith*, 539 U.S. 510, 524-34 (2003); *Rompilla v. Beard*, 545

6   U.S. 374, 383, 386 n.5 (2005).

7          It was also unreasonable for the state court to find that Speer "failed to show

8   prejudice under *Strickland*" because "the jury evaluated all of the experts offered by both

9   sides" and "afforded greater weight to Dr. Bayless."  (PCR ME 5/21/15 at 25.)  The

10  testimony of Dr. Bayless was crucial to the State's penalty phase case.  Based on his

11  error-riddled and misleading testimony, the jury "afforded greater weight" to him and

12  sentenced Speer to death.  The materiality of Dr. Bayless's testimony and the importance

13  of effective impeachment and rebuttal cannot be understated.  Moreover, the state court

14  failed to actually consider the impeachment evidence that the jury never heard, and

15  therefore its prejudice analysis is flawed.  Thus, it was patently unreasonable for the state

16  court to find that evidence of Dr. Bayless's blatant misstatements, use of improper

17  protocols, failure to abide by testing standards, and biased, selective analysis would have

18  had no impact on the jury.  *See Carriger*, 132 F.3d at 480.

19         Because the state court's denial of this claim was unreasonable under

20  § 2254(d)(1), this Court should exercise *de novo* review and determine that Speer is

21  entitled to relief.

22  **D.    The State Court's Denial of this Claim Was Based on an**
        **Unreasonable Determination of the Facts in Light of the Evidence**
23      **Presented**

24         Under § 2254(d)(2), a state court's decision is not entitled to deference if it "was

25  based on an unreasonable determination of the facts in light of the evidence presented in

26  the State court proceeding."  The Ninth Circuit has recognized that (d)(2) errors "come in

27  several flavors, each presenting its own peculiar set of considerations."  *Taylor v.*

28  *Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004).  One such variation occurs when the state

1   court's fact-finding process itself is defective.  *Id.* at 1001.  The process is defective when

2   the "state court makes evidentiary findings without holding a hearing and giving

3   petitioner an opportunity to present evidence. . . ."  *Id.*; *see also Nunes v. Mueller*, 350

4   F.3d 1045, 1056 (9th Cir. 2003) (state court factual determination is unreasonable where

5   court draws negative inferences against the petitioner and makes credibility

6   determinations without holding an evidentiary hearing); *Brumfield v. Cain*, 135 S. Ct.

7   2269, 2277 (2015).  The "ultimate issue" in this kind of (d)(2) analysis "is whether the

8   state court's fact-finding procedures were reasonable; this is a fact-bound and case-

    specific inquiry."  *Hibbler v. Benedetti*, 693 F.3d 1140, 1147 (9th Cir. 2012).

9            Here, the state court's fact-finding procedures were unreasonable in several ways.

10  First, the court completely ignored the declaration of Dr. Toma, which detailed specific

11  falsehoods and misstatements in Dr. Bayless's testing.  Indeed, Dr. Toma found that due

12  to these errors, "the results from the three tests Dr. Bayless administered, which formed

13  the foundations for his diagnostic impressions and opinions, were useless."  (PCR

14  9/26/14 Ex. 34 at 9.)  As the state court acknowledged, there were considerable

15  differences between the state and defense experts' opinions regarding Speer's mental

16  health and other mitigating evidence.  The jury "evaluated all of the experts offered by

17  both sides and afforded the weight to each expert that they believed to be appropriate."

18  (PCR ME 5/21/15 at 25.)  Thus, the information provided by Dr. Parrish and Dr. Toma—

19  which, at the very least, seriously impeached Dr. Bayless's credibility as an allegedly

20  skilled and unbiased expert—would have had a significant impact on the jury's

21  calculations.  The state court's failure to take these facts into account before denying

    Speer's claim was an unreasonable application of the facts.

22           Additionally, the state court unreasonably applied the facts when it claimed that

23  because there was "evidence that trial counsel used some of Dr. Parrish's suggestions

24  during his cross-examination of Dr. Bayless," this meant that counsel made a strategic

25  decision not to use the rest of the information.  Trial counsel averred that he did not have

26  a strategic reason for failing to pursue readily available and powerful impeachment and

27  rebuttal evidence against Dr. Bayless.  (PCR 9/26/14 Ex. 1.)  "[C]ourts may not indulge

28  'post hoc rationalization' for counsel's decisionmaking that contradicts available

                                              189

evidence of counsel's actions." *Harrington v. Richter*, 131 S. Ct. 770, 790 (2011) (citing *Wiggins*, 539 U.S. at 526-27).

Moreover, trial counsel did not question Dr. Bayless about the Shipley and his antisocial diagnosis "as Dr. Parrish advised." (PCR ME 5/21/15 at 25.) If he had, he would have (at the very least) followed up on Dr. Parrish's advice to impeach Dr. Bayless on his claim that the SILS provides an IQ score; question his choice to use a different code type on the MMPI than the one given by the computer-generated score report; and inquire about his failure to calculate scales that evaluate PTSD. (PCR 9/26/14 Ex. 33.) Each of these recommendations were designed to support Speer's theory of defense at the penalty phase—i.e., that he was a seriously damaged individual who suffered from complex trauma and mental illness, and that his was a life worth saving. No reasonable strategy can be attributed to counsel's choice to ignore these valuable recommendations.

The state court's failure to address the deficiency inherent in trial counsel's performance, the prejudice that resulted from failing to adequately cross and rebut Dr. Bayless, and the magnitude of available information that counsel failed to present amounted to an unreasonable application of *Strickland* and an unreasonable determination of the facts in light of the state court record. Speer is entitled to de novo review and relief on this claim.

**CLAIM 20**

> **SPEER WAS DENIED HIS RIGHT TO A FAIR SENTENCING AND DUE PROCESS OF LAW WHEN THE ARIZONA SUPREME COURT AFFIRMED HIS DEATH SENTENCE UNDER INDEPENDENT REVIEW**

In Arizona, the state supreme court independently reviews the aggravation and mitigation findings of the trial court for offenses occurring before August 1, 2002.[26] A.R.S. § 13-703.01(A). Such review ensures that the death penalty complies with the Eighth Amendment requirement that it not be imposed arbitrarily and is reserved for exceptional cases. In performing its independent review, the court reviews the record for

---

[26] In light of *Ring v. Arizona*, 536 U.S. 584 (2002), the Arizona legislature redrafted a bill addressing Arizona's constitutional defects; independent review is now no longer required. *See State v. Morris*, 160 P.3d 203, 219 (Ariz. 2007).

the presence or absence of mitigating factors and determines the weight to be accorded to each circumstance.  *See State v. Bolton*, 896 P.2d 830, 852 (Ariz. 1995) (presence or absence of factors); *State v. Ramirez*, 871 P.2d 237, 249 (Ariz. 1994) (weight given to factors).  Aggravating factors must be proved beyond a reasonable doubt.  In Arizona, both statutory and non-statutory mitigating circumstances may be proven by a preponderance of the evidence.  *See* A.R.S. § 13-751 (B)-(C) (2012).  The state supreme court is responsible for independently weighing all factors to determine whether proven mitigating circumstances, measured separately or cumulatively, are sufficient to outweigh aggravating circumstances established on the record.

   As set forth below, Speer argues that his rights under the Eighth and Fourteenth Amendments, to due process and an individualized sentencing determination, were violated when the Arizona Supreme Court employed a causal nexus test to avoid giving effect to his mitigating evidence.  Moreover, the Arizona Supreme Court's finding that Speer was not entitled to a life sentence was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  In addition, due to the ineffective assistance of trial counsel, the court was unaware of the extensive and compelling evidence which challenged the State's rebuttal evidence in penalty phase and supported Speer's mitigation case.  (*See* Claim 14.)

## A.    Procedural History

   Because the crime took place prior to August 1, 2002, the Arizona Supreme Court was required to conduct an independent review of Speer's death sentence, pursuant to A.R.S. § 13-755(A) (Supp. 2008).  *State v. Speer*, 212 P.3d 787, 801 (Ariz. 2009).  Unfortunately, appellate counsel failed to brief this important claim.[27]  *See id.*  The Arizona Supreme Court reprimanded appellate counsel for omitting an independent review argument from her briefs, which violated her ethical duties to her client:

> We have reminded capital defense counsel on two recent
> occasions of their professional obligation 'to take advantage
> of all appropriate opportunities to argue why death is not a

_____

   [27] (*See* Claim 26 (appellate counsel rendered ineffective assistance by failing to raise substantive claims on direct review).)

1
2
3
4

> suitable punishment' for their client, and not to 'simply rely on this Court's statutory duty to review the record.' *[State v.] Garza*, [], 163 P.3d 1006, 1021 & n. 16 (citing *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (2003); *[State v.] Morris*, [], 160 P.3d 203, 209 & n. 10 (same).

5
6
7

*Id.* Nevertheless, "[d]espite the failure of defense counsel to brief the issue," the Arizona Supreme Court conducted its own independent review, ultimately determining that Speer's death sentence was warranted. *Id.* at 803.

8
9
10
11
12
13
14
15
16
17

A challenge to the Arizona Supreme Court's independent review determination was not raised in Speer's state post-conviction petition. However, *McKinney v. Ryan*, 813 F.3d 798, 819-20 (9th Cir. 2015) (en banc), clarifies that independent review of the death sentence exhausts the causal nexus claim. Although independent review may not exhaust every sentencing error, *McKinney* holds that it does encompass *Eddings/Lockett* error. The Arizona Supreme Court is the last word on the permissibility of the death sentence. When that court itself commits the error, there is nowhere else for an Arizona petitioner to go for exhaustion purposes. Additionally, direct appeal counsel raised a challenge to the causal nexus test. (DA dkt. 87 at 34-39; *see* Claim 26.) Thus, this Court should find that this claim is exhausted.

18
19
20
21
22
23
24
25

However, should this Court determine that any portion of this claim is defaulted, Speer can meet the cause and prejudice standard for the default. Speer contends that post-conviction counsel's ineffectiveness in failing to raise this challenge raises a colorable claim of cause and prejudice that deserves evidentiary development. *See Martinez*, 132 S. Ct. at 1309, 1315. Speer will demonstrate at an evidentiary hearing that appellate and post-conviction counsel fell below the standards of a minimally competent capital attorney when they failed to raise this meritorious claim, and that this failure prejudiced him. (*See* Claim 27.)

26
27
28

1

**B.    The Arizona Supreme Court's Independent Review of the Sentencing Verdict Engaged in the Exact Causal Nexus Analysis Found to Be Unconstitutional in *Tennard* and *McKinney* and Therefore Was an Unreasonable Application of Clearly Established Federal Law**

2

3

4    Clearly established federal law has long held that a defendant is not required to

5    establish a nexus between mitigating evidence and the crime before such evidence can be

6    considered by the jury.  *Tennard v. Dretke*, 542 U.S. 274, 284-87 (2004); *see also*

7    *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982).  Indeed, the sentencer in a capital case

8    may not "refuse to consider, as a matter of law, any relevant mitigating evidence" offered

9    by the defendant.  *Eddings*, 455 U.S. at 114.  As long as the evidence "tends logically to

10   prove or disprove some fact or circumstances which a fact-finder could reasonably deem

11   to have mitigating value," the State (including the prosecution and the courts) cannot

12   deter a jury from considering it as evidence that warrants a sentence less than death.

13   *Tennard*, 542 U.S. at 282.  However, despite the clear mandates of *Tennard* and *Eddings*,

14   the Arizona state courts have consistently failed to abide by this Constitutional

15   requirement.  *See McKinney*, 813 F.3d at 802.  Instead, they have routinely applied a

16   causal nexus test for nonstatutory mitigation that fails to "giv[e] weight to mitigating

17   evidence, such as family background or mental condition, unless the background or

18   mental condition was causally connected to the crime."  *Id.*

19   In this case, the state courts violated the *Tennard/Eddings* rule in two different

20   ways.  First, as set forth in this claim, the Arizona Supreme Court applied the causal

21   nexus test as part of its independent review of the propriety of the death sentence and

22   determined that the mitigating evidence was "not sufficiently substantial to call for

23   leniency."  *Speer*, 212 P. 3d at 465.  Additionally, the causal nexus test also tainted

24   Speer's trial (*see infra* Claim 21) by way of insufficient jury instructions, prosecutorial

25   misconduct, the lack of special verdict forms for mitigating factors, and the trial court's

26   refusal to allow the jury to consider residual doubt at sentencing.  (DA dkt. 87 at 34-46.)

27   The Arizona Supreme Court, like any sentence, must be able to give effect to any

28   aspect of the defendant's record the defendant proffers as a basis for a life sentence.  *See*

*Lockett v. Ohio*, 438 U.S. 586, 604 (1978).  Yet "[b]efore *Tennard* was decided, Arizona courts recognized a nexus test . . . to preclude consideration of [mitigating] evidence . . . unless the [evidence] bore a causal connection to the crime of conviction." *Schad v. Ryan*, 606 F.3d 1022, 1045-46 (9th Cir. 2010) (citation omitted).[28]  Arizona law has long applied this causal-nexus requirement to a broad range of mitigating evidence, including childhood abuse, *see State v. Wallace*, 773 P.2d 983, 985-86 (Ariz. 1989), and drug abuse, *see State v. Sharp*, 973 P.2d 1171, 1182 (Ariz. 1999).  Under the Arizona Supreme Court's stunted view of mitigation, if the law were to allow sympathy to prevail, evidence of childhood abuse, mental illness, and drug abuse "would become meaningless because virtually every homicide defendant can point to" such factors as "a basis for leniency."  *State v. Hoskins*, 14 P.3d 997, 1022 (Ariz. 2000).  However, this approach is a clear violation of federal constitutional principles.  "Unlike at the guilt phase, where the primary focus is on evidence offering a causative explanation which might reduce formal culpability, mitigating evidence at the penalty phase also serves to increase jurors' sympathy for or comprehension of the lives, and crimes, of defendants who have themselves suffered terribly."  *Doe v. Ayers*, 782 F.3d 425, 462 (9th Cir. 2015) (citing *Sears*, 561 U.S. at 951).  In this case, the Arizona Supreme Court's independent review deliberately and unreasonably refused to consider whether the mitigation presented by Speer, including evidence that sought "to increase jurors' sympathy for or comprehension of" his life, was given its due effect by the jury.

The Arizona Supreme Court's findings with respect to Speer's mitigating evidence illustrate the court's misguided approach:

> [T]he record is not bereft of mitigating evidence.  Among other things, Speer suffered a difficult childhood and serious drug abuse.  But that history is not in itself sufficient to warrant leniency in this case.  Nor do Speer's mental health issues warrant leniency under the circumstances of this case.

---

[28] *Schad v. Ryan* articulated a "clear indication" test, which held that "[a]bsent a clear indication in the record that the state court applied the wrong standard, we cannot assume the courts violated *Eddings'* constitutional mandates." *Schad*, 671 F.3d at 724 (citing *Bell v. Cone*, 543 U.S. 447, 455 (2005)).  *McKinney* overruled *Schad's* clear indication test, finding that it was "an inappropriate and unnecessary gloss on the deference already required under § 2254(d)." *McKinney*, 813 F.3d at 818-19.

1

2

3

> This was not a crime of passion or an impetuous reaction to difficult circumstances.  For almost a month, Speer planned the murder of two innocent victims of a burglary that he had committed, with the goal of avoiding the consequences of his prior crime.

4

5

*Speer*, 212 P.3d at 803.  The Court supported this analysis with the following argument and citations:

6

7

8

9

10

11

> In *State v. Hampton*, we acknowledged the defendant's "horrendous childhood" but nonetheless affirmed a death sentence, noting that "difficult family background, in and of itself, is not a mitigating circumstance sufficient to mandate leniency in every capital case."  Similarly, *State v. Ellison* noted that even if the defendant's "childhood experiences left him less equipped to make good moral decisions . . . [he] was not actually incapable of telling right from wrong.  His childhood troubles deserve little value as a mitigator for the murder he committed at age thirty-three."

12

*Id.* at n.10 (internal citations omitted).

13

14

15

16

17

18

19

20

21

22

23

However, these and other cases relied upon by the Arizona Supreme Court to justify its decision in Speer's case have been found by the Ninth Circuit to violate *Eddings*, *Tennard*, and *Lockett*.  *See McKinney*, 813 F.3d at 819; *see also Greenway v. Ryan*, 866 f.3d 1094, 1097-98 (9th Cir. 2017).  For example, *State v. Anderson* ("*Anderson II*"), 111 P.3d 369, 392 (Ariz. 2005), supp. op. 116 P.3d 1219 (Ariz. 2005) and *State v. Pandeli*, 161 P.3d 557, 569 (Ariz. 2007) (cited in *Speer* at 212 P.3d at 799 and 801), were issued during the time period that the Arizona Supreme Court consistently and explicitly violated *Eddings*.  *See id.*; *see also Greene v. Ryan*, No. CV-03-00605-TUC-FRZ, 2016 U.S. Dist. LEXIS 149825 *2 and n.1 (Dist. AZ, October 27, 2016).  Similarly, the Court's citation to *Hampton* as justification for its mitigation analysis pin cites to this paragraph in *State v. Wallace*:

24

25

26

27

28

> A difficult family background, in and of itself, is not a mitigating circumstance.  If it were, nearly every defendant could point to some circumstance in his or her background that would call for mitigation.  *A difficult family background is a relevant mitigating circumstance if a defendant can show that something in that background had an effect or impact on his behavior that was beyond the defendant's control. . . .* [Appellant's] entire family background was before the court in the pre-sentence report.  Appellant, however, made no

195

claim that his family background had anything to do with the murders he committed.

773 P.2d 983, 986 (Ariz. 1989) (emphasis added).  By citing this passage, the Arizona Supreme Court "could not have been clearer that, *as a matter of law,* nonstatutory mitigation evidence not satisfying the causal nexus test was irrelevant."  *McKinney*, 813 F.3d at 814 (emphasis in original).  Such an approach is "in direct contravention of *Eddings* and *Lockett*."  *Id.*

Finally, the *Ellison* analysis quoted by the Arizona Supreme Court in this case relies upon the unconstitutional nexus test articulated in *Anderson II*.  *See State v. Ellison*, 140 P.3d 899 (Ariz. 2006) ("His childhood troubles deserve little value as a mitigator for the murders he committed at age thirty-three.  *Cf. Anderson II*, 111 P.3d at 399 (finding the defendant's evidence of sexual abuse, low IQ, frequent moves between schools, and follower-type personality 'do[es] not in any way explain his decision, decades later at age forty-eight, to kill three innocent people to steal a pickup.')").  *Ellison* also applied an unconstitutional nexus test to the defendant's evidence of drug addiction—the exact same nexus test that the Arizona Supreme Court permitted and applied in this case:

> The defense did not present evidence that Ellison was on drugs when he committed the burglary and murders.  [The mitigation presented by the defense] makes it more likely that Ellison did suffer some mental or emotional damage due to a combination of his upbringing, physical and sexual abuse, physical deformity, and drug and alcohol use.  Ellison, however, has not provided any specific evidence that his brain chemistry was actually altered by his past alcohol and drug abuse so as to cause or contribute to his participation in the murders.  This mitigator is not of such a quality or value as to warrant leniency.

*Id.*; *cf. Speer*, 212 P.3d at 803 ("[T]he record is not bereft of mitigating evidence.  Among other things, Speer suffered a difficult childhood and serious drug abuse.  But that history is not in itself sufficient to warrant leniency in this case.").

During sentencing, the evidence clearly established that Speer was born addicted to opiates; had endured a tortured childhood which included severe neglect, deprivation, and physical, sexual, and emotional abuse; struggled with multiple-substance abuse from

the time he was a young boy; and suffered from a life-long combination of mental health and cognitive issues, including severe depression, trauma, and neuropsychological deficits.  (*See, e.g.*, RT 1/12/2006 at 26-40, 76, 78; RT 1/27/2006 at 7, 10; RT 2/5/2007 at 8, 13, 52, 59, 76, 140; RT 2/6/2007 at 61, 64, 94, 105, 120, 124, 129, 137; RT 2/7/2007 AM at 5; *see also* Part IA, *supra*.)  Despite this wealth of evidence, the Arizona Supreme Court concluded on direct appeal that Speer failed to meet the statutory mitigating factor of incapacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law.  *Speer*, 212 F.2d at 803.  Then, as noted above, the Arizona Supreme Court failed to give *any* mitigating effect to this evidence, finding that Speer's "difficult childhood," "serious drug abuse," and "mental health issues" did not "warrant leniency under the circumstances of this case."  *Id.* at 801-03 and n.10 (citing to, *inter alia*, *Hampton* and *Ellison*).  By relying on these cases—which in turn rely upon cases that applied the causal nexus test—the Arizona Supreme Court acted contrary to, and unreasonably applied, clearly established federal law.  *See, e.g.*, *Styers v. Schriro*, 547 F.3d 1026, 1035 (9th Cir. 2008) (deconstructing the legal analysis to determine mitigating evidence was not actually considered); *Lambright v. Schriro*, 490 F.3d 1103, 1115 (9th Cir. 2007) (giving *de minimis* weight to relevant mitigation violates *Tennard*).

It is true that the Arizona Supreme Court stated that it "considered the entire record" and "conclude[d] that the mitigating evidence, in the aggregate, is not sufficiently substantial to call for leniency."  *Speer*, 212 F.3d at 803.  However, a state court cannot simply give lip service to mitigating evidence by saying it "considered" it.  *See, e.g.*, *Styers*, 547 F.3d at 1035 (9th Cir. 2008) (finding the Arizona Supreme Court had applied the causal nexus test despite avowing that it had "considered all of the proffered mitigation.").  There must be no barriers in place to prevent a sentencer from giving effect to the mitigation evidence.  *See Tennard*, 542 U.S. at 284-85.  Yet the Arizona Supreme Court erected those barriers itself when it relied upon state precedent which dictated that Arizona sentencers and courts could not show leniency to a defendant who did not show his mitigation was connected to the crime.  In this case, the Arizona Supreme Court specifically and unconstitutionally limited Speer's mitigation by employing causal

197

connection analysis in its opinion, in violation of Speer's right to have the fact-finder give effect to all relevant mitigating evidence.  *See Eddings*, 455 U.S. at 114.

**C.    The Arizona Supreme Court's Independent Review Resulted in a Decision that Was Based on an Unreasonable Interpretation of the Facts; Contrary to the State Court's Findings, Speer Established that His Mitigation Evidence Was More than Sufficient to Require a Life Sentence**

In Arizona, the state supreme court conducts independent review of "the facts that established the aggravating and mitigating factors in order to justify the sentence imposed."  *Wood v. Ryan*, 693 F.3d 1104, 1122 (citing *Correll v. Ryan*, 539 F.3d at 951).  When state appellate courts independently reweigh the mitigation and aggravation in order to determine whether a death sentence is appropriate, the court's reweighing must be done in a constitutional manner so as to avoid the arbitrary or freakish imposition of the death penalty.  *See Clemons v. Mississippi*, 494 U.S. 738, 748 (1990); *Furman v. Georgia*, 408 U.S. 238, 310 (1972).  "The primary concern in the Eighth Amendment context has been that the sentencing decision be based on the facts and circumstances of the defendant, his background, and his crime."  *Clemons*, 494 U.S. at 749-52.  The Supreme Court has "emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally." *Parker v. Dugger*, 498 U.S. 308, 321 (1990) (citing *Clemons*, 494 U.S. at 749).  This was the concept behind Arizona's independent review scheme—to meaningfully review the evidence presented and give extra scrutiny in capital cases.  In Speer's case, however, rather than serve as an additional safeguard, independent review thwarted relief.

At Speer's trial, the State alleged four aggravating circumstances:  Speer was previously convicted of a serious offense (A.R.S. § 13-751(F)(2)); Speer knowingly created a grave risk of death to another person (A.R.S. § 13-751(F)(3)); the murder was especially heinous or depraved (A.R.S. § 13-751(F)(6)); and Speer committed the offense while in custody (A.R.S. § 13-751(F)(7)).  (RT 3/26/2007 at 70.)  The State did not present evidence in the aggravation phase.  (RT 1/25/2007 at 21; RT 1/29/2007 at 35.) Defense counsel challenged the application of the grave risk of death aggravator (RT 1/25/2007 at 18; RT 1/29/2007 at 5, 38, 40), but conceded the remaining three

1    aggravators.  At the close of the aggravation phase of trial, the jury unanimously found

2    the presence of all aggravating factors.  (RT 1/31/2007 at 5.)  On appeal, the Arizona

3    Supreme Court determined that the grave risk of death aggravator was not applicable in

4    this case.  *Speer*, 212 P.3d at 801.  However, the court concluded that the other

5    aggravators were proven beyond a reasonable doubt.  *Id.* at 801-02.

6         Of the twenty-three mitigators Speer presented in support of his appeal for life, the

7    Arizona Supreme Court found the following proved by a preponderance of the evidence:

8    Speer "suffered a difficult childhood"; he experienced "at least some physical abuse

9    during childhood" and "presented evidence of sexual abuse by a female relative at age

10   five"; he "habitually abused both alcohol and drugs"; "he suffered from depression"; "he

11   had an IQ between 87 and 97"; and "the death penalty would have negative effects on his

12   family."  *Id.* at 802-03.  These findings alone were sufficiently substantial to call for

13   leniency, even with the three remaining aggravators.  *Roque*, 141 P.3d at 405 (when

14   conducting independent review, the Arizona Supreme Court is required to "consider the

15   quality and strength, not simply the number, of aggravating and mitigating factors.").

16   Mitigation evidence of the same kind, quality, and strength of Speer's[29] has been found

17   adequate to warrant a life sentence.  *See, e.g.*, *State v. Bocharski*, 189 P.3d 403, 422-26

18   (Ariz. 2008) (overturning death sentence on independent review where defendant

19   presented mitigation evidence "unique in its depth and breadth," including "a severely

20   dysfunctional family," sexual and physical abuse, neglect, poverty, substance abuse, and

21   trauma).  In this case, however, the Arizona Supreme Court unreasonably determined the

22   facts when it held that Speer's mitigation was "not sufficiently substantial to call for

23   leniency."  *Speer*, 212 F.3d at 803.  The court's characterization of Speer's childhood as a

24   "difficult home life" improperly minimizes the actual extent of the neglect, trauma,

25

26   _____

27   [29] As the mitigation presented at trial is already fully presented in the procedural
     history and Claim 14 *supra*, Speer will not repeat the evidence here, but instead
28   respectfully directs this Court to those sections of the instant Petition.

dysfunction, and abuse that he suffered.  *See Williams (Terry) v. Taylor*, 529 U.S. 362, 386 (2000) (opn. of Stevens, J.) (an unreasonable determination of the facts occurs when a state court's conclusion or characterization of evidence is unsupported by the record); *see also* Part IA.

The Arizona Supreme Court engaged in further unreasonable determination of the facts by not finding that Speer had established the remaining mitigators he presented at trial.  For example, Speer demonstrated that he satisfied the terms of the age statutory mitigator by a preponderance of the evidence.  The Arizona Supreme Court has found the age mitigator established in other cases where the defendants, like Speer, were twenty-four years or older at the time of the crimes.  *See, e.g.*, *State v. Correll*, 715 P.2d 721 (1986) (defendant was 24 years old); *State v. Poland*, 698 P.2d 207 (1985) (defendant was 36 years old; age mitigator established but not sufficient to warrant leniency). Additionally, chronological age is not always dispositive of one's maturity.  Other factors, such as intelligence, past experience, and mental abilities should also be considered.  *See State v. Bolton*, 896 P.2d 830, 854 (1995).  Speer presented substantial evidence that his history of significant trauma, substance abuse, mental impairments, low IQ, and highly dysfunctional home life combined to make him more immature than other adults of his age at the time of the crime.

Similarly, the Arizona Supreme Court did not give appropriate consideration to both the mental health and the trauma evidence presented by Speer.  The Arizona Supreme Court erred in this respect in two ways.  First, it unreasonably concluded that Speer did not prove "significant cognitive impairment."  *Speer*, 212 P.3d at 803.  This finding is belied by the record evidence, which shows that a combination of depression, PTSD, continued trauma, and moderate to severe cognitive impairment combine to result in significant cognitive deficits, and therefore significant mitigation.  *See* Part IA *supra*; *see also Wiggins v. Smith*, 539 U.S. 510, 512 (2003) (finding prejudice established where trial counsel failed to present evidence of a traumatic childhood to the jury); *Rompilla v. Beard*, 545 U.S. 374, 393 (2005) (noting significant mitigation not presented to the jury included evidence of parental substance abuse, a "poorly kept" and "filthy" home,

neglect, and impaired brain development).  Compounding this error, the state supreme court then said nothing about Speer's trauma or mental health evidence in relation to non-statutory mitigation.  Instead, the court opined, "Whatever the formal diagnosis of Speer's mental health, the record makes plain that he had a clear ability to think ahead and consider the wrongfulness of his actions."  *Speer*, 212 P.3d at 803.  This is not a sufficient analysis of proffered mitigation evidence.  Under *Lockett* and *Watson*, the inquiry should not end once a court has concluded that mental health evidence does not rise to the level of a statutory mitigator.  Instead, the court must examine further "to determine whether it in some other way suggested that [the defendant] . . . should be shown leniency."  *State v. McMurtrey*, 664 P.2d 637, 646 (Ariz. 1983) (remanding the case for resentencing because the trial court failed to consider how the defendant's mental state impacted the mitigation analysis).

By failing to grasp that Speer's mitigation is part and parcel of who he is, including at the time of the crime, the Arizona Supreme Court made an unreasonable determination of the facts.  This is particularly true where the defendant, as here, presents "classic mitigation evidence" which has some established weight through numerous United States Supreme Court cases.  *Robinson v. Schriro*, 595 F.3d 1086, 1110 (9th Cir. 2010) (listing impoverished background, an unstable and abusive upbringing, childhood sexual abuse, low intelligence, and personality disorder as examples of the "classic mitigation evidence" that supports a life sentence); *see also Wallace v. Stewart*, 184 F.3d 1112, 1115 (9th Cir. 1999) (crucial mitigation evidence not considered by the jury included a dysfunctional family background, drug history, and organic brain damage).

## D.    Speer Is Entitled to a Life Sentence

The Arizona Supreme Court's unreasonable determinations on independent review prejudiced Speer, because a proper accounting of the mitigation presented at trial was more than sufficient to call for leniency.  The Ninth Circuit has recognized that "prejudice is 'especially likely'" where the facts of the crime (in this case, witness elimination) "constituted the vast majority of the aggravation case."  *Earp v. Ornoski*, 431 F.3d at 1180 (quoting *Lambright v. Stewart*, 241 F.3d 1201, 1208 (9th Cir. 2001).  In light of the wealth of mitigation evidence presented at trial, it cannot be said that Speer is

undeserving of a life sentence. *See, e.g.*, *Earp*, 431 F.3d at 1164-65 (finding prejudice where eighteen-month old victim died from multiple blows or shaking, and had severe rectal and vaginal injuries consistent with sexual assault); *Stankewitz v. Woodford*, 365 F.3d 706 (9th Cir. 2004) (finding prejudice where defendant attacked a seventy-year-old man, shot at a police officer, attacked a California Youth Authority counselor, stabbed a fellow inmate, and attacked several officers at a police station); *Douglas v. Woodford*, 316 F.3d 1079, 1091 (9th Cir. 2003) (even in a "gruesome" case, the death penalty is not necessarily "unavoidable); *Ainsworth v. Woodford*, 268 F.3d 868 (9th Cir. 2001) (finding prejudice despite especially strong aggravating evidence; defendant shot the victim, held her captive for 24 hours, raped her, and dumped her body in the woods); *Correll v. Stewart*, 137 F.3d 1404 (9th Cir. 1998) (finding prejudice where petitioner and co-defendant bound and kidnapped four victims, taking them out to the desert after 45 minutes and killing two victims with gunshots and a third by strangulation; the fourth victim survived being shot in the head).

The Arizona Supreme Court's minimization of Speer's mitigation and its failure to find the mitigators established by a preponderance of the evidence was unreasonable. The state supreme court was not at liberty to treat Speer's mitigation as *de minimis*. *See Porter v. McCollum*, 130 S. Ct. 447, 455 (2009). Even if particular mitigating evidence does "not relate specifically to . . . [the defendant's] culpability for the crime he committed," the defendant is constitutionally entitled have such evidence considered because it might "serve 'as a basis for a sentence less than death.'" *Skipper v. South Carolina*, 476 U.S. at 4-5 (quoting *Lockett*, 438 U.S. at 604); *see also Penry v. Johnson (Penry II)*, 532 U.S. 782, 797 (2001). Because the state court utilized an unconstitutional nexus test and failed to adequately apply its independent review, its holding was in violation of Speer's due process and Eighth Amendment rights. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Accordingly, Speer is entitled to evidentiary development and habeas relief.

**CLAIM 21**

> **WHEN EVALUATING SENTENCING ERRORS AT TRIAL, THE ARIZONA SUPREME COURT APPLIED A CAUSAL NEXUS TEST WHICH WAS CONTRARY TO AND AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW AS SET FORTH IN EDDINGS AND TENNARD**

**A.    Introduction and Applicable Law**

As discussed in Claim 18, state courts in Arizona have routinely applied an unconstitutional nexus test, in violation of clearly established federal law.  Speer will not repeat the applicable federal law regarding causal nexus analysis again here, but instead respectfully directs this Court to the discussion of the law in Claim 18.

All of the following claims were raised by Speer on direct appeal.  (DA dkt. 87 at 34-46.)  As Speer illustrates below, because the nexus test used by the Arizona Supreme Court in its denial of the following claims is contrary to clearly established federal law, Speer has satisfied § 2254(d)(1), and this Court should review the following claims de novo.

**B.    The Prosecutor's Closing Argument Improperly Limited the Jury's Consideration of Mitigating Factors by Urging the Jury to Disregard Evidence Lacking a Causal Nexus to the Crime**

**1.    Procedural History**

This claim was raised in Speer's direct appeal.  (DA dkt. 87 at 34-39.)  The Arizona Supreme Court denied the claim on the merits.  *State v. Speer*, 212 P.3d 787, 799 (Ariz. 2009).  As this claim was not presented in Speer's state post-conviction petition, the Arizona Supreme Court's denial on direct appeal is the last reasoned opinion for purposes of 28 U.S.C. § 2254(d) analysis.  *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991).

**2.    What the Jury Heard**

During closing argument, the prosecutor challenged the mitigation presented by the defense, with a particular emphasis on his mental health diagnoses, history of sexual and physical violence, and substance abuse.  The prosecutor then made the following statements to the jury:

> [T]here's no indication that in the spring of 2002, he was using any drugs [and] there's no indication that he was using drugs during the time of the offense. . . . *How did any of those things have anything to do with why he murdered Adan Soto?*

203

> *They don't.*  They do not reduce the degree of his moral culpability or blameworthiness.  I suggest that they don't exist, and they're being used to try to explain what the defendant's real issue is, which is he has antisocial personality disorder. . . .  Paul Speer cares about one person and one person only.  He has antisocial personality disorder.  He is never going to change.  There is nothing about this crime that calls out for mercy for the defendant.  He came from a dysfunctional family.  So what.  We all came from someplace.  And we all managed to be law-abiding citizens.

(RT 3/27/2007 AM at 66-67, 72 (emphasis added).

### 3. The Prosecutor's Misstatement of the Law Violated Speer's Constitutional Rights and Had a Substantial and Injurious Effect on the Penalty Phase Verdict

With this argument, the prosecutor went beyond a challenge to the existence of statutory mitigation and encouraged the jury to discount Speer's appalling childhood, cognitive impairment, and substance abuse because (in her view) it had little if anything to do with his capital crimes.  This is the essence of an improper nexus argument.  *See Smith v. Texas*, 543 U.S. 37, 45 (2004); *Williams v. Ryan*, 623 F.3d 1258, 1270-71 (9th Cir. 2010) ("By holding that 'drug use cannot be a mitigating circumstance of any kind' unless [the defendant] demonstrated 'some impairment at the time of the offense,' the Arizona Supreme Court imposed a 'nexus' requirement.").  Although Dr. Parrish, Dr. Miller, and Dr. Stewart all presented information that explained how trauma, substance abuse, and cognitive and emotional impairment substantially impacted Speer's ability to conform his conduct and control his behavior, such evidence was undermined by the prosecution's unchecked argument[30] that a specific nexus to the crimes was required.  As a result, jurors likely improperly minimized Speer's mitigation.  *See, e.g., Sims v. Brown*, No. 03-99007, 2005 U.S. App. LEXIS 26806 at *112-13; *State v. Johnson*, 133 P.3d 735 (Ariz. 2006) (lack of causal nexus between proffered mitigating evidence and crime; experts acknowledged that defendant knew right from wrong, and therefore substantial

---

[30] As discussed in Claim 18, *supra*, trial counsel failed to object to the prosecution's improper nexus argument during closing, and thus rendered ineffective assistance of counsel.

evidence of personality disorder and a difficult childhood were only afforded minimal value by the jury).

On appeal, the Arizona Supreme Court evaluated this claim for fundamental error because defense counsel failed to object to the prosecutor's argument at trial.  *Speer*, 212 P.3d at 799.  The Court held that there was "no error, let alone fundamental error," because "although a jury may not be prevented from hearing mitigation evidence lacking a causal nexus to the crime, absence of such a nexus can be considered in evaluating the strength of that evidence."  *Id.* (citing *State v. Anderson* ("*Anderson II*"), 111 P.3d 369 (Ariz. 2005), and *State v. Pandeli*, 161 P.3d 557, 569 (Ariz. 2007)).  However, as argued above, this ruling was itself erroneous, as it was predicated on the unconstitutional nexus requirement, and is therefore not entitled to deference.  18 U.S.C. § 2254(d)(1).  Thus, this Court must apply de novo review and determine whether the prosecutor's misstatement of the law warrants relief.[31]

The prosecutor's blatant misstatement of the law denied Speer a fair trial in violation of the Eighth and Fourteenth Amendments.  The standards of review governing prosecutorial misconduct are settled.  "A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such 'unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  Speer's due process rights were denied because the prosecutor's deceptive misstatements of the law raised "a reasonable likelihood that the jury . . . applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."  *Boyde v. California*, 494 U.S. 370, 380 (1990).  Though "arguments of counsel generally carry less weight with a jury than do instructions from the court," the

---

[31] Speer maintains that this one instance of prosecutorial misconduct is sufficient, standing alone, to warrant relief.  However, clearly established federal law holds that instances of prosecutorial misconduct must be considered collectively, rather than item-by-item.  *See Kyles v. Whitley*, 514 U.S. 419, 436 (1995); *see also Hein v. Sullivan*, 601 F.3d 897, 914-15 (9th Cir. 2010) (holding that allegations of *Brady* and general prosecutorial misconduct must be considered in the aggregate).  Thus, this claim should also be considered along with the other claims of prosecutorial misconduct raised in Claim 13.

1    Supreme Court has acknowledged that prosecutorial misstatements of law may "have a

2    decisive effect on the jury." *Id.* at 384. "The arguments of counsel, like the instructions

3    of the court, must be judged in the context in which they are made." *Id.* at 385.

4        Viewed in the overall context of Speer's trial, the prosecutor's arguments during

5    Speer's penalty phase more likely than not misled the jury and were clearly intended to

6    persuade the jury that they could not consider Speer's horrific childhood, established

7    substance abuse, and mental health issues as relevant mitigating evidence. The

8    prosecutor was not merely arguing about the supposed "absence of such a nexus" in

9    relation to "the strength of that evidence." *Speer*, 212 P.3d at 799. Rather, the prosecutor

10   repeatedly argued both explicitly and implicitly that Speer's background was not legally

     cognizable mitigating evidence in any way.

11       Moreover, by arguing that Speer "came from a dysfunctional family. So what. We

12   all came from someplace. And we all managed to be law-abiding citizens" (RT

13   3/27/2007 AM at 71), the prosecutor violated clearly established federal law which

14   rejects the proposition that mitigating evidence can be restricted to facts about the

15   defendant that are "uniquely severe." *Tennard v. Dretke*, 542 U.S. 274, 287 (2004). It is

16   antithetical to Eighth Amendment jurisprudence for the prosecution (or a court) to

17   discount any aspect of a defendant's history just because it is not unique to him alone.

18   *See Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982).

19       Unfortunately, the trial court's nexus instruction was not sufficient to cure the

20   error. The trial court gave the standard instruction to the jury with regard to its

21   consideration of non-statutory mitigating evidence. (RT 3/26/2007 at 71.) The Arizona

22   Supreme Court found no error because the jury was specifically told that it could

23   "consider anything about the commission of the crime or Paul Speer's background or

24   character that would mitigate against imposing the death penalty." *Speer*, 212 P.3d at

25   799. However, this instruction was insufficient in light of the prosecutor's improper

26   argument—not to mention the numerous other ways that Arizona's death penalty scheme,

27   in practice and as applied here, forced Speer's jury to find a causal nexus existed before

28   affording Speer's non-statutory mitigation the consideration it deserved. *See McKinney

     v. Ryan*, 813 F.3d 798, 822 (9th Cir. 2015). Because this jury instruction failed to correct

     206

the nexus argument made by the prosecutor, the error "undermined the very core of [Speer's] plea for life." *Coleman v. Calderon*, 210 F.3d 1047, 1051 (9th Cir. 2000).

In sum, the prosecutor's closing argument repeatedly encouraged the jury to dismiss the mitigation evidence entirely, in violation of *Eddings* and *Tennard*; trial counsel failed to object to this prejudicial misstatement of the law; the trial court's subsequent instruction regarding "nexus" improperly minimized the weight of the mitigation evidence offered; and the trial court failed to give a curative instruction directed at the prosecutor's misstatements of the law. Consequently, there is at least "a reasonable likelihood that the jury [was prevented from the correct] consideration of constitutionally relevant evidence." *Boyde*, 494 U.S. at 380. Because Speer's troubled background was central to his mitigation defense, the prosecution's arguments "left the jury bereft of any countervailing evidence to weigh against the prosecution's evidence of aggravating circumstances." *Payton v. Woodford*, 299 F.3d 815, 829 (9th Cir. 2002) (en banc) ("*Payton I*"), *vac'd on other grounds*, 538 U.S. 975 (2003). It is of course unknowable whether the jury would have returned a life verdict in the absence of the prosecutor's misstatements of the law. However, where there is "grave doubt" as to the effect of constitutional errors, the petitioner is entitled to relief. *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). Here, because there is at least "grave doubt" about whether the constitutional error wrought by the prosecutor's improper nexus argument had a substantial or injurious effect or influence on the jury's verdict, this Court should find that Speer is entitled to relief from his death sentence.

### C.   A.R.S. § 13-751(G) Unconstitutionally Limits Mitigation by Requiring a Causal Nexus

This claim was raised on appeal (DA dkt. 87 at 39-41), and denied by the Arizona Supreme Court in a reasoned opinion. *Speer*, 212 F.3d at 798-99.

As Speer argued on appeal, and as the Ninth Circuit has recently held, Arizona trial and appellate courts have consistently failed to consider evidence of a difficult childhood, drug and alcohol abuse, post-traumatic stress disorder, and non-statutory mental health mitigation unless a causal connection is established. *See McKinney*, 813 F.3d at 815-16 (recounting seventeen cases which illustrate Arizona's application of the

nexus test).  As a result, as a practical matter, entire categories of mitigation are precluded, in violation of due process and Eighth Amendment principles.  *See Walton v. Arizona*, 497 U.S. 639, 649 (1990).  Although Arizona courts have routinely denied defendants their constitutionally mandated rights under *Eddings* and *Tennard*, federal courts have long held that the kind of social history and non-statutory mitigation presented in this case is crucial to a fair determination of a defendant's culpability.  *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 525 (2003); *Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir.1999) (holding that counsel was ineffective for failing to investigate defendant's mental impairments caused by childhood exposure to toxic chemicals); *Wallace v. Stewart*, 184 F.3d 1112, 1115 (9th Cir.1999) (concluding that counsel was ineffective where counsel failed to investigate dysfunctional family background, drug history, and evidence of organic brain damage); *Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir.1995) (holding that counsel's performance was deficient for failing to investigate readily available evidence of mental impairment); *Rompilla v. Beard*, 125 S. Ct. 2456, 2463 (2005); *see also Williams v. Taylor*, 529 U.S. 362, 396 (2000) (holding that counsel failed to "fulfill their obligation to conduct a thorough investigation of the defendant's background" for purposes of sentencing and thus failed to uncover voluminous evidence of a "nightmarish childhood" in juvenile court records).

The Arizona Supreme Court held that A.R.S. § 13-751(G) "does not require a causal nexus between mitigation and the murder," because the statute "allows the jury to consider 'as mitigating circumstances *any* factors proffered by the defendant or the state that are relevant in determining whether to impose a sentence less than death, including *any* aspect of the defendant's character, propensities or record and *any* of the circumstances of the offense.'"  *Speer*, 212 P.3d at 799 (emphasis in original).  However, as the Ninth Circuit's recent holding in *McKinney* makes clear, this language has not been sufficient to stop the repeated and unconstitutional application of the nexus test.  The Arizona Supreme Court's finding that the jury "was entirely free to consider all mitigating evidence" is not borne out by the record or by the state courts' actual application of the language in A.R.S. § 13-751(G).  The *Speer* court merely recited this language of the statute without actually upholding the tenets it espouses—a pattern and

practice of Arizona state courts which has violated the rights of capital defendants for years. *McKinney*, 813 F.3d at 815. Speer was denied his right to due process and a fair trial by this practice, and relief is warranted.

**D.    The Lack of Special Verdict Forms for Mitigation Findings Is Unconstitutional Because It Impedes the Full Consideration of Mitigation Evidence**

This claim was raised on direct appeal (DA dkt. 87 at 43-45), and denied in a reasoned opinion. *Speer*, 212 F.3d at 800.

Arizona's capital sentencing statute directs the Arizona Supreme Court to consider whether the jury abused its discretion when it imposed a sentence of death. *See* A.R.S. § 13-703.04. At trial, defense counsel requested that the trial court issue special verdict forms for jurors to indicate which, if any, of the twenty-three mitigating circumstances were proven by a preponderance of the evidence. (RT 3/14/2007 at 4-6; RT 3/26/2007 at 74; ROA 674.) Defense counsel argued that special verdict forms provided the only way for the Arizona Supreme Court to engage in meaningful appellate review: "There is no way the Arizona Supreme Court can determine whether the jury abused its discretion in finding aggravating circumstances and imposing death unless there is some guidance as to what mitigators were or were not found. Otherwise everything is guesswork." (RT 3/14/2007 at 5.) Just like the trial court's instructions included a verdict form for aggravating circumstances, there should be a corresponding verdict form documenting which mitigating circumstances the jurors identified. (*Id.* at 35.) The trial court denied Speer's request, and instead read a laundry list of twenty-three potential mitigating factors. (RT 3/26/2007 at 74.)

The Arizona Supreme Court denied this claim on appeal, stating "We have repeatedly rejected this argument." *Speer*, 212 F.3d at 800. However, in light of the other problems inherent in the jury's assessment of mitigation (including the nexus test), the trial court's refusal to grant Speer's request for a special verdict form denied Speer his right to due process and meaningful appellate review of his death sentence. *Profitt v. Florida*, 428 U.S. 242 (1976); *Jurek v. Texas*, 428 U.S. 262 (1976). The error violated

1    the Eighth and Fourteenth Amendments' guarantees of due process and against cruel and

2    unusual punishment, which require heightened reliability in the determination of guilt and

3    death eligibility in capital cases.  *See Beck v. Alabama*, 447 U.S. 625, 627-46 (1980); *see*

4    *also Kyles v. Whitley*, 514 U.S. 419, 422 (1995); *Burger v. Kemp,* 483 U.S. 776, 785

5    (1987); *Gilmore v. Taylor*, 508 U.S. 333, 342 (1993); *White v. Illinois*, 502 U.S. 346,

6    363-64 (1992).  It also violated Speer's freedom against arbitrary deprivation of state-

7    created rights.  *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980).

8    **E.    Speer Was Denied Due Process in the Penalty Phase when the Trial**
     **Court Improperly Restricted Mitigation and Refused to Instruct**
9    **the Jury on Residual Doubt**

10        This claim was raised on direct appeal (DA dkt. 87 at 45-46), and denied by the

11   Arizona Supreme Court in a reasoned opinion, holding that the trial court acted correctly

12   because a residual doubt instruction is not required under Arizona law.  *Speer*, 212 P.3d

13   at 800.  However, while a residual doubt instruction may not be required under Arizona

14   state law, the failure to issue the instruction was a violation of federal constitutional law.

15        "As a general proposition, a defendant is entitled to an instruction as to any

16   recognized defense for which there exists evidence sufficient for a reasonable jury to find

17   in his favor."  *Mathews v. United States*, 485 U.S. 58, 63 (1988).  Here, Speer pleaded not

18   guilty and presented evidence and argument that he was not guilty of first degree capital

19   murder.  His request for an instruction to allow the jury to consider residual doubt was

20   reasonable and necessary in light of the defense he presented at trial.  The trial court's

21   refusal to issue the instruction impeded Speer's right to have the jury consider "any

22   relevant mitigating evidence" offered by the defendant.  *Eddings*, 455 U.S. at 114.

23   Mitigation can be found anywhere in the record, before or during the penalty phase of

24   trial.  Coupled with the improper nexus argument presented to the jury, this was yet

25   another example of how Speer's right to present mitigation was infringed.  Thus, the trial

26   court erred in concluding that residual doubt could not be considered by the jury as a

27   mitigating factor.  *Eddings*, 455 U.S. at 114; *see also Anderson*, 111 P.3d at 390.

28

1    The court's ruling also violated Speer's due process right to present a defense.

2    *Bradley v. Duncan*, 315 F.3d 1091, 1099 (9th Cir. 2002) (the right to present a defense

3    "would be empty if it did not entail the further right to an instruction that allowed the jury

4    to consider the defense."); *see also Chambers v. Mississippi*, 410 U.S. 284, 301-02

5    (1973) (due process violated by court's exclusion of critical exculpatory evidence).

6    Finally, the error also violated the Eighth and Fourteenth Amendments' guarantees of due

7    process and against cruel and unusual punishment, which require heightened reliability in

8    the determination of guilt and death eligibility in capital cases.  *See Beck*, 447 U.S. at

9    627-46; *see also Kyles*, 514 U.S. at 422.

10   **CLAIM 22**

11   **SPEER'S RIGHTS TO A FAIR TRIAL AND DUE PROCESS UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS WERE DENIED DURING THE PENALTY PHASE WHEN A JUROR OBSERVED HIM IN HANDCUFFS**

12

13   This claim was raised in Speer's direct appeal.  (DA dkt. 87 at 47-48.)  The

14   Arizona Supreme Court denied the claim on the merits.  *State v. Speer*, 212 P.3d 787,

15   800-01 (Ariz. 2009).  As this claim was not presented in Speer's state post-conviction

16   petition, the Arizona Supreme Court's denial on direct appeal is the last reasoned opinion

17   for purposes of 28 U.S.C. § 2254(d) analysis.  *Ylst v. Nunnemaker*, 501 U.S. 797, 804

18   (1991).  As will be explained below, the state court's denial of this claim was an

19   unreasonable interpretation of the facts, as well as an unreasonable application of clearly

20   established federal law holding that a trial court abuses its discretion in allowing visible

21   restraints in the absence of compelling circumstances, such as security concerns.  *Deck v.*

22   *Missouri*, 544 U.S. 622, 633 (2005).

23   **A.    Legal Basis for the Claim**

24   A criminal defendant is entitled to be tried by an impartial jury.  *Turner v.*

25   *Louisiana*, 379 U.S. 466, 471-72 (1965).  "Among those basic fair trial rights that 'can

26   never be treated as harmless' is a defendant's 'right to an impartial adjudicator.'"  *Gomez*

27   *v. United States*, 490 U.S. 858, 876 (1989) (citing *Gray v. Mississippi*, 481 U.S. 648, 668

28

211

1   (1987)).  "Even if 'only one juror is unduly biased or prejudiced,' the defendant is denied

2   his constitutional right to an impartial jury."  *Mach v. Stewart*, 137 F.3d 630, 633 (9th

3   Cir. 1998) (quoting *United States v. Eubanks*, 591 F.2d 513, 517 (9th Cir. 1977)).

4   Undue bias or prejudice against the defendant can occur when a juror sees the

5   defendant in shackles or other forms of restraint during trial.  As the Supreme Court has

6   explained, "the sight of shackles and gags might have a significant effect on the jury's

7   feelings about the defendant."  *Illinois v. Allen*, 397 U.S. 337, 344 (1970).  In the absence

8   of a determination by the trial court that a specific and significant state interest justifies

9   their use, the Fifth and Fourteenth Amendments to the United States Constitution prohibit

10   the use of physical restraints visible to the jury during any phase of a capital case.  *Id.*;

11   *see also Deck*, 544 U.S. at 633.  Because shackling a defendant in front of the jury is

12   "inherently prejudicial," *Holbrook v. Flynn*, 475 U.S. 560, 568 (1986), clearly established

13   federal law requires the trial court to make an individualized determination as to whether

14   safety concerns merit restraints during trial.  *Deck*, 544 U.S. at 632.

15   When reviewing a shackling claim on direct appeal, an appellate court must apply

16   the standard set forth in *Deck*:  If a defendant is shackled without justification, he does

17   not need to demonstrate that he suffered actual prejudice to establish a due process

18   violation; rather, the State must prove beyond a reasonable doubt that the shackling error

19   did not contribute to the verdict.  *Deck*, 544 U.S. at 635 (citation omitted).  However, in a

20   § 2254(d) proceeding, relief is warranted only if the shackling "'had a substantial and

21   injurious effect or influence in determining the jury's verdict.'"  *Elmore v. Sinclair*, 799

22   F.3d 1238, 1247 (9th Cir. 2015) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623

23   (1993).)  "To determine whether the imposition of physical restraints constitutes

24   prejudicial error, we have considered the appearance and visibility of the restraining

25   device, the nature of the crime with which the defendant was charged and the strength of

26   the state's evidence against the defendant."  *Larson v. Palmateer*, 515 F.3d 1057, 1064

27   (9th Cir. 2008); *see also Duckett v. Godinez*, 67 F.3d 734, 747-49 (9th Cir.1995)

28   (visibility of restraints).  The nature of the defendant's crime is a primary concern in the

212

1   prejudice analysis, because, "if the defendant is charged with a violent crime, then the

2   risk of prejudice increases." *Larson*, 515 F.3d at 1064.  Courts pay special attention to

3   shackling that occurs in the penalty phase, because it potentially presents a harmful image

4   that a defendant is too dangerous to be unrestrained—and therefore, potentially, too

5   dangerous to be kept alive.  *Cox v. Ayers*, 613 F.3d 883, 892 (9th Cir. 2010); *see also*

6   *Rhoden v. Rowland (Rhoden II)*, 172 F.3d 633, 636 (9th Cir. 1999) (shackling

7   "essentially brands the defendant as having a violent nature in a case where his

8   propensity for violence is the crucial issue.").

9   **B.    Facts in Support of the Claim**

10          During the penalty phase of Speer's case, it was determined that Juror 7 had met

11   and talked at length with a deputy county attorney at a fish fry at the juror's church.  (RT

12   2/26/07 AM at 4-6.)  While the juror was being questioned about the incident (*id.* at 8-

13   13), Speer was brought into the courtroom wearing pink handcuffs.  (*Id.* at 13-14.)  When

14   the trial court realized that Speer was restrained, he asked the sheriff's deputy escorting

15   Speer to remove him from the courtroom.  (*Id.* at 13.)  Counsel for both the prosecution

16   and the defense recognized the serious error that had just occurred:

17              MR. STORRS [uttered immediately upon Speer being
                removed from the courtroom, still in handcuffs]:  Oh, my
18              God.

19              MS. GALLAGHER:  She just saw him come in in handcuffs.
                She's gone.  That's it.
20

21   *See id.*  Juror 7 was excused and the parties discussed the incident.  Upon further

22   questioning, Juror 7 admitted that she saw Speer being escorted into the courtroom in

23   handcuffs.  (*Id.* at 27.)

24          Defense counsel moved for a mistrial, arguing that state and federal law was very

25   clear that a juror seeing a defendant in handcuffs was extremely prejudicial to the

26   defense.  (*Id.* at 16-17.)  When the trial court opined that dismissing Juror 7 would cure

27   the error, defense counsel argued that such an approach was "detrimental to Mr. Speer's

28   well-being" because the defense believed Juror 7 would accept mitigation and grant a life

213

1   sentence.  (*Id.* at 17.)  Therefore, dismissing her from the jury would compound the harm

2   done to Speer, and in fact be "the opposite of a remedy."  (*Id.*)  The prosecutor agreed

3   that "the Arizona Supreme Court is real clear if a juror sees a defendant in any kind of

4   custody—anything that indicates he's in custody, that is prejudicial to the defendant."

5   (*Id.* at 20.)  However, the prosecutor argued that dismissing Juror 7 would cure the error.

6   (*Id.*)  When the trial court denied defense counsel's request for a mistrial and sought to

7   excuse Juror 7, defense counsel advised that he would seek a mistrial if she were

8   removed.  (*Id.* at 17-22, 29-33.)  Ultimately, defense counsel agreed to keep Juror 7 on

9   the jury after another motion for mistrial was denied.  (*Id.* at 32.)

10  **C.    The Trial Court Abused its Discretion by Not Ordering a Mistrial,**
**and the Arizona Supreme Court's Finding to the Contrary Was**
11  **Unreasonable Under § 2254(d)**

12          On appeal, Speer argued that the trial court's denial of his motion for mistrial was

13  an abuse of discretion because Speer was inherently prejudiced when Juror 7 saw him in

14  pink handcuffs during the penalty phase.  The Arizona Supreme Court found that the

15  superior court did not abuse its discretion in finding that Speer suffered no prejudice from

16  the incident.  *Speer*, 212 P.3d at 801.  The Arizona Supreme Court acknowledged that

17  "[r]eversal is required for a *Deck* violation unless the State can demonstrate harmless

18  error."  *Id.* at 462.  However, it dismissed *Deck* and instead relied upon state law holding

19  that "the inadvertent exposure of a handcuffed or shackled defendant to members of the

20  jury outside the courtroom is not inherently prejudicial, and a defendant is not entitled to

21  a new trial absent a showing of actual prejudice."  *Id.* (citing *State v. Apelt*, 861 P.2d 634,

22  646 (Ariz. 1985).)  The Arizona Supreme Court ultimately found that Speer was "not

23  restrained during trial," that his case was "more analogous to inadvertent exposure to a

24  restrained prisoner during transportation than to restraint during trial," and that the

25  protection of *Deck* did not apply.  *Id.* at 463.

26          The Arizona Supreme Court's reliance on *Apelt* was misplaced, because it is both

27  contrary to the requirements of *Deck* and its progeny as well as distinguishable from the

28  facts of Speer's case.  In *Apelt*, the defendant was exposed briefly in handcuffs to

214

members of the jury outside the courtroom and not during the penalty phase of the trial. 861 P.2d at 646.  Here, Speer was seen by Juror 7 in the courtroom and during the penalty phase of the trial when jurors were deciding whether the death sentence was unwarranted in light of mitigating evidence.  As both the prosecution and the defense recognized, the incident was highly prejudicial to Speer.  *See United States v. Halliburton*, 870 F.2d 557, 559 (9th Cir. 1989) (observation of a defendant in custody may create an impression that the defendant is dangerous or untrustworthy, which can unfairly prejudice his right to a fair trial).  Being shackled, in essence, branded Speer as "having a violent nature."  *Larson*, 515 F.3d at 1064.  The trial court erred in ignoring the prejudice that accrued to Speer by not granting the motion for mistrial.

This error was compounded on appeal when the Arizona Supreme Court both failed to acknowledge the prejudice and also failed to engage in the proper analysis when reviewing the claim.  Because Juror 7 saw Speer in handcuffs during the penalty phase and in the courtroom, the Arizona Supreme Court should have applied *Deck* and required the State to prove beyond a reasonable doubt that the shackling error did not contribute to the verdict.  The Arizona Supreme Court's application of the wrong standard was both contrary to the requirements of *Deck* and an unreasonable interpretation of the record facts.  *See* 18 U.S.C. § 2254(d)(1) and (d)(2).

The Arizona Supreme Court was also unreasonable when it ruled that Speer could not claim error on appeal because his defense declined the trial court's offer to seat an alternate juror.  Once the motion for mistrial was denied, during the most fraught and important stage of his capital trial, Speer was confronted with the untenable choice of removing the tainted juror against the detriment of losing a juror who was potentially favorable toward mitigation.  Speer did not create the error of the tainted juror, nor did he participate in the error by waiving her removal.  Nor did the trial court's questioning of Juror 7 cure the error.  As the Supreme Court has held, "whenever a courtroom arrangement is challenged as inherently prejudicial . . . the question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether

215

an unacceptable risk is presented of impermissible factors coming into play." *Holbrook*, 475 U.S. at 570 (quotation omitted). Here, the risk of Juror 7 having her views of Speer tainted were impermissibly high, because it presented an image that Speer was perhaps too dangerous to be worthy of mercy. *Cox*, 613 F.3d at 892. For these reasons, Speer's right to a fair and impartial jury was violated, and he is entitled to relief.

**CLAIM 23**

### THE TRIAL JUDGE IMPROPERLY COERCED THE JURY AFTER IT REPORTED BEING DEADLOCKED AT PENALTY

## A.    Introduction

During penalty-phase deliberations, the jury twice sent out notes to the judge indicating that they were unable to reach a unanimous verdict. In response, the trial judge—who had already given an *Allen*[32]-type instruction on four prior occasions—issued yet another supplemental instruction which asked the jurors whether there was anything the court or attorneys could do to aid them in coming to a verdict. However, this supplemental instruction failed to advise the jurors that they should not surrender their honest convictions as to the weight of the evidence solely because of the opinion of other jurors or for the purpose of reaching a verdict. As explained below, the trial court's actions resulted in a coerced jury verdict. As a result, Speer's convictions and sentence of death were obtained in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

## B.    Procedural History

This claim was not raised on direct appeal or in Speer's state post-conviction petition. Should this Court determine that any portion of this claim is defaulted, Speer can meet the cause and prejudice standard for the default. Direct appeal and state post-conviction counsel's ineffectiveness in failing to raise this challenge raises a colorable

---

[32] *Allen v. United States*, 164 U.S. 492 (1896) (permitting supplemental instructions designed to encourage a jury to come to a unanimous verdict).

claim of cause and prejudice that deserves evidentiary development.  *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012).  Speer will demonstrate at an evidentiary hearing that direct appeal and post-conviction counsel fell below the standards of a minimally competent attorney when they failed to raise this meritorious claim.  (*See* Claim 27.)

## C.    Legal Bases for the Claim

"Any criminal defendant, and especially any capital defendant, being tried by a jury is entitled to the uncoerced verdict of that body."  *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988).  This is especially true because the decision whether to vote for a death sentence is an individual and moral one.  *See generally Kansas v. Carr*, 136 S. Ct. 633, 642 (2016) ("And of course the ultimate question whether mitigating circumstances outweigh aggravating circumstances is mostly a question of mercy. . . .")  At any point during trial, but especially in a capital sentencing proceeding, trial courts must have paramount concern for protecting the sanctity of this deliberative process.  "Protecting the deliberative process requires not only a vigilant watch against external threats to juror secrecy, but also strict limitations on intrusions from those who participate in the trial process itself, including . . . the presiding judge."  *United States v. Thomas*, 116 F.3d 606, 620 (2d Cir. 1997).  Accordingly, a trial court must be vigilant to instruct the jury in a way that, given all the circumstances, does not coerce the jury into returning a death verdict.  *Lowenfield*, 484 U.S. at 238-39.

An *Allen* charge, "traditionally understood as an instruction to work towards unanimity," *Weaver v. Thompson*, 197 F.3d 359, 365 (9th Cir. 1999), "has long been sanctioned" by the Supreme Court.  *Lowenfield*, 484 U.S. at 237.  "Because it can have the effect of blasting verdicts out of juries," it is also known as the "dynamite charge." *Hooks v. Workman*, 606 F.3d 715, 719 n.1 (10th Cir. 2010) (internal citations and quotations omitted).  However, while *Allen* charges are permissible, they are also recognized as "standing at the brink of impermissible coercion."  *United States v. Evanston*, 651 F.3d 1080, 1085 (9th Cir. 2011) (citation omitted).  Therefore, supplemental instructions to a divided jury must avoid any appearance of undue pressure

or jury coercion.  *See Locks v. Sumner*, 703 F.2d 403, 406 (9th Cir. 1983) (explaining that whether the state trial court infringed due process turns on whether its inquiry would be likely to coerce jurors into relinquishing their views in favor of a unanimous decision). There is nothing talismanic about any single element either making an *Allen* charge valid or invalid; rather, the fundamental question is whether the jury was improperly coerced, thus infringing the defendant's due process rights.  *Weaver*, 197 F.3d at 365.

Improper coercion can be explicit in the form of the jury instruction itself, or implicit under the circumstances.  *Id.* at 365; *see also Jiminez v. Myers*, 40 F.3d 976, 980 (9th Cir. 1993) (court's comments and conduct following jury deadlock amounted to "de facto" *Allen* charge).  For example, numerous courts have held that, when a trial court asks jurors to re-examine their views, it is important to counterbalance that charge with a word of caution that no juror should yield a conscientious conviction in order to achieve unanimity.  *See, e.g.*, *Lowenfield*, 484 U.S. at 235 (allowing an *Allen* charge because the trial court advised the jurors to not surrender one's honest belief as to the weight and effect of the evidence solely because of other jurors' opinions or for the mere purpose of returning a verdict); *Hooks*, 606 F.3d at 751 (granting habeas relief on an improper *Allen* charge claim because, *inter alia*, the trial court "failed to remind the jurors not to abandon their honestly held beliefs") (internal quotations omitted); *Jiminez*, 40 F.3d at 981, n.5 ("A trial court's failure to give such a cautionary instruction weighs heavily in favor of the conclusion that the defendant's right to a fair trial and impartial jury has been violated").  Additional factors to consider are the form of the instruction, the period of deliberation following the *Allen* charge, the total time of jury deliberations, and the indicia of coerciveness or pressure upon the jury.  *See United States v. Foster*, 711 F.2d 871, 884 (9th Cir. 1983).  However, the ultimate test of whether a supplemental jury instruction is in error is "to consider all the circumstances to determine if the instruction was coercive."  *Jiminez*, 40 F.3d at 980; *see also Jenkins v. United States*, 380 U.S. 445, 446 (1965) (per curiam).

218

1    **D.    Facts Supporting the Claim**

2         During the trial court's instructions to the jury before penalty phase deliberations,

3    the judge read the following admonition:

4              Again, you are to decide the case without sympathy,
     bias, or prejudice.   You are to carefully and impartially

5    consider all of the evidence in the case and follow the law as
     stated in these instructions and attempt to reach a verdict

6    regardless of the consequences.  You took an oath promising
     to do so at the beginning of the case.

7              If you have any questions during deliberations, they
     should be submitted to the Court in writing by using a form

8    that will be provided to you by the bailiff.  Don't indicate on
     the question form the outcome of any vote that's been taken.

9    If you feel you've reached an impasse, simply let the court
     know without disclosing the numerical results of any vote.

10             Each juror has a duty to consult with one another to
     deliberate with a view to reaching an agreement, if it can be

11   done without violence to any individual judgment.  No juror
     should ever surrender his or her honest conviction as to the

12   weight or effect of the evidence solely because of the opinion
     of other jurors or for the purpose of reaching a verdict.

13             However, you may want to identify areas of agreement
     and disagreement and discuss the law and the evidence as

14   they relate to the areas of disagreement.  Then and only then,
     if you still disagree, you may wish to tell the attorneys and me

15   which issues, questions, law, or facts you would like us to
     assist you with.   If you decide to follow this suggestion,

16   please write down the issues, questions, law, or facts on
     which we can possibly help.

17

18   (RT 3/27/07 PM at 26-27.)  This instruction was in all material ways the same instruction

19   given to the jurors prior to both the guilt and aggravation phases of Speer's trial.  (RT

20   1/17/07 at 187-88; RT 1/24/07 at 52; RT 1/29/07 at 128-29.)  The last three paragraphs of

21   this instruction make up Arizona's "dynamite instruction," or *Allen* charge.  (*See* RT

22   3/28/07 at 4-5.)  Thus, by the time Speer's jury began their penalty phase deliberations,

23   they had received the dynamite instruction on four different occasions.[33]  (RT 3/28/07 at

24   6.)

25

26   _____

27        [33] Juror 15 had to be dismissed during guilt phase deliberations because he
     violated the admonition not to speak with outside persons about the case, and the jury

28   began their guilt phase deliberations anew with alternate Juror 5.  (RT 1/24/07 at 2-24;

219

1       Penalty phase deliberations began on the afternoon of March 28, 07.  At 2:55 p.m.,

2    after about two and a half hours of deliberations, the jury foreperson sent out a note

3    which stated, "We currently are unable to reach an unaminous [sic] verdict, what do we

4    do now?"  (RT 3/28/07 at 4; ROA 757.)  Twenty minutes later, the jury foreperson sent

5    out another note, which asked, "If we can't reach an unaminous [sic] verdict and check

6    that selection, what happens to the sentencing?"  (RT 3/28/07 at 4; ROA 758 at 2.)

7       The trial judge summoned the attorneys and informed them of the jury's queries.

8    (RT 3/28/07 at 4-5.)  With regard to the second question, the judge said, "I don't even

9    want to get involved with [it].  We told them before that they're not to concern

10   themselves with any sentence if it's less than death because that's my province, not

11   theirs."  (*Id.* at 5.)  However, with regard to the jury's position that they were unable to

12   reach a unanimous verdict, the judge stated that he was inclined to read them the

13   dynamite instruction again.  (*Id.* at 6.)

14      Defense counsel responded that the jurors should be brought into the courtroom

15   and questioned only as to "whether or not they think that further deliberations would be

16   worthwhile or productive."  (*Id.* at 5.)  The prosecution had no objection to that approach.

17   (*Id.*)  However, the court wanted to ask "what their area of disagreement is so that

18   perhaps they can give us a little further guidance?"  (*Id.* at 6.)  This phrase is a specific

19   element of Arizona's dynamite instruction.  (*See* RT 3/27/07 at 26-27.)  Defense counsel

20   objected, telling the judge, "It's not possible that you can artfully do that.  You're getting

21   too involved. . . .  ["Do you think further deliberations would be worthwhile or

22   productive?"] is the only question you can ask after a dynamite instruction, and you have

23   already given it to them."  (RT 3/28/07 at 6.)  The judge agreed that he had already given

24   the jury the dynamite instruction, but that he was "willing to do it again."  (*Id.*)  Defense

25   counsel again objected, saying, "No, your Honor's pushing them . . . .  I think you can

26

27   36-40.)  Therefore, the jury was given the dynamite instruction twice during the guilt
28   phase, once during the aggravation phase, and once during the penalty phase.

only damage it at this point by doing anything other than asking them.  If they say no, no further deliberations are going to be helpful, then you're done." (*Id.* at 6-9.) Nevertheless, the court insisted that giving at least a portion of the dynamite instruction was necessary, because only asking the jury "are further deliberations going to be helpful, I don't think that's going to advance the ball." (*Id.* at 9.)  The prosecution ultimately agreed with the court's position, while the defense continued to strenuously object for some time. (*See id.* at 9-17.)

Finally, the judge proposed the following modified dynamite instruction: "If you recall before you began your deliberations, I told you that you might want to identify for us any areas of agreement and disagreement and tell the attorneys and me whether there are issues, questions, law or facts you'd like us to assist you with." (*Id.* at 17-18.)  In response, defense counsel stated again that they did not want the court to say anything about "assisting" the jury.  They asked the judge to simply remind the jury of the prior instructions in very general terms, and then ask if they think further deliberations would be productive. (*Id.* at 19-20.)  The judge and the parties discussed for a few minutes whether the jury should be given the instruction in the courtroom or in writing, and the parties requested that the instruction be given in writing. (*Id.* at 18-19.)  The judge "scribbled" the instruction, and then read the following proposed instruction to the parties:  "I previously told you that if you couldn't agree on a verdict you might want to tell the attorneys and me which issues you would like us to assist you with.  Would you like me to do that or do you feel that further deliberations would not be productive." (*Id.* at 20-21.)  Despite defense counsel's previous objections to this very language, defense counsel acquiesced, and this instruction is what was ultimately given to the jury.[34] (ROA 757.)  The court provided no response to the jury's second question. (*See id.*)  The trial

---

[34] As argued *supra*, defense counsel was ineffective for permitting the jury to be given a version of the dynamite instruction a fifth time, and also for not requesting that the trial court instruct the jury not to abandon their honestly held beliefs.

judge noted the time of his response to the jury as 4:00 p.m.  (*Id.*)  Forty-five minutes later, the jury adjourned for the day.  (Minutes ROA 756.)

Deliberations resumed at 9:59 a.m. the next day.  (Minutes ROA 766.)  According to the judge, "the first thing" the jury did was ask the clerk to see exhibits from the penalty phase which were not entered into evidence.  (RT 3/29/07 at 3-4.)  This request was denied.  (*Id.*)  Shortly thereafter, the trial court received a second jury note, time-stamped at 10:00 a.m., which said, "We asked a 2nd question about the implications of sentencing if we have to select the 'unable to reach a unanimous verdict' selection.  Are we going to get an answer?"  (RT 3/29/07 at 4; *see also* ROA 758 at 1.)  The judge summoned counsel for the parties to the courtroom to "bring you up to speed on what I think has been happening."  (RT 3/29/07 at 3.)  The judge described the previous day's proceedings, claiming that they had "sent the jurors our answer to their question sometime around quarter of 3:00, 3:00.  And we didn't get any answer from them, and then they went home at quarter of 5."  (*Id.* at 3.)  However, this was partially incorrect—while the jury did adjourn at approximately 4:45 p.m. the previous day, they did not receive the answer from the court until 4:00 p.m.  (ROA 757.)  With regard to their question about the implications of sentencing, the parties decided that the jury would be told simply, "You are not to be concerned about the implications of sentencing if you cannot reach a unanimous verdict."  (RT 3/29/07 at 4.)  This answer was sent back to the jury in written form at approximately 10:30 a.m.  (ROA 758 at 1.)  There was a jury recess at 11:00 a.m., with deliberations resuming at 11:15 a.m.  (Minutes ROA 766.)  By 11:30 a.m., the jury came back with a death sentence and the matter was adjourned.  (*Id.* at 2.)

## E.      The Trial Judge's Responses to the Jurors' Announced Deadlock Were Coercive

Considering all the circumstances in this case, the trial court's supplemental instructions impermissibly coerced the jury into returning a death verdict.  *See Foster*, 711 F.2d at 884 (listing factors to consider when evaluating whether a supplemental

instruction was coercive).  The form of the March 28, 07 instruction ("I previously told you that if you couldn't agree on a verdict you might want to tell the attorneys and me which issues you would like us to assist you with.  Would you like me to do that or do you feel that further deliberations would not be productive?") was coercive for several reasons.  First, the instruction constituted the fifth time that Speer's jury was instructed with an *Allen*-type charge.  Giving such an instruction more than once is disfavored in the Ninth Circuit in order to avoid "the overwhelmingly coercive effect of the [trial] court's giving a second *Allen* charge after the jury has deadlocked a second time."  *United States v. Nickell*, 883 F.2d 824, 828 (9th Cir. 1989); *see also Kaluna v. Iranon*, 952 F. Supp. 1426, 1430-31 (D. Haw. 1996) (finding it was proper for the trial court to refuse to give a further *Allen* instruction after already giving it once in response to the jury's stated deadlock).

The March 28, 2007 instruction was also coercive because it did not respond directly to the jury's question.  The facts of *Lowenfield v. Phelps* are instructive on this point.  In *Lowenfield*, the jury was initially instructed that, if it could not reach a unanimous decision, the trial court would impose a life sentence.  484 U.S. at 234.  After the jury informed the court that it was having trouble reaching a unanimous decision, the court offered a supplemental instruction that again informed the jurors what would happen if they could not agree.  *Id.* at 234-35.  Thus, the *Lowenfield* jurors were given permissible information about the outcome of a hung jury.  Here, in contrast, the March 28, 07 supplemental instructions emphasized—for the fifth time—what the jury should do in order to reach a unanimous decision, but left a critical gap about what would happen if unanimity were impossible.  This left the jury with the impression that they needed to come to a verdict.  *See Weaver*, 197 F.3d at 366 ("It requires no imagination to comprehend that these events may have altered the minority jurors' views of the deliberations. . . .  In effect, the minority jurors were told that they had two choices:  give in to the majority position, or manage the same coup pulled off by Juror 8 in Twelve Angry Men.").  Additionally, because the court did not inform the jury that a hung jury

was a legally acceptable outcome, the supplemental instruction effectively told the jurors

that a unanimous verdict was required and was the only acceptable result.  *See Hooks*,

606 F.3d at 749 (including the fact that the jury was not informed of the consequences of

failing to agree on a sentence as "one of the contextual circumstances bearing on the

question of jury coercion" and finding instruction to resolve difference so that "case can

be completed" coercive); *cf. United States v. Alvarez-Ulloa*, 784 F.3d 558, 568-69 (9th

Cir. 2015) ("When the jury 'makes explicit its difficulties by, for example, asking a

question, the trial court should clear [the jury's difficulties] away with concrete

accuracy.'") (quoting *Bollenbach v. United States*, 326 U.S. 607, 612-13 (1946)); *Jones

v. United States*, 527 U.S. 373, 381-82 (1999) (acknowledging Eighth Amendment

requirement that jury be instructed of consequences of failure to agree on sentence if

failure to do so would affirmatively mislead jury regarding role in sentencing process);

*Arizona v. Johnson*, 351 F.3d 988, 994 (9th Cir. 2003).

Other indicia of coerciveness could be found in the trial court's repeated

statements in front of the jury about the length of the trial and the danger of not being

able to reach a verdict because of a lack of alternate jurors.  For example, after learning

that jurors had brought extrinsic evidence into the jury room (*see* Claim 25), the trial

court admonished them again about their duties, and then stated,

> You must at all times avoid even the appearance of improper conduct.  We are real close to finishing.  I know it seems like an eternity because we have had unforeseen things happen but we are close.  You have been a very patient jury.  You have been a very good jury.  I am proud that you have been in this court.  We have been in trial picking a jury since November 2nd; that's three and a half months ago. There is light at the end of the tunnel. . . .  If we exclude you, we are real close to not having enough jurors.  That's the problem.  We started with four alternates.  We are down to one and 12 jurors.

(RT 2/22/07 at 121-22.)  Similarly, the timing of the final instruction and the jury's

verdict in this case is crucial.  Here, the jury rendered a sentence of death less than an

hour after the trial court told the jurors not to concern themselves with the consequences

of deadlock.  (ROA 758 at 1; Minutes ROA 766.)  A verdict given a short amount of time

1   after an *Allen*-type instruction supports the inference that the instruction was coercive.

2   *See Weaver*, 197 F.3d at 366.

3   However, perhaps the most coercive aspect of the trial judge's supplemental

4   instruction arose from what was *not* stated—namely, an admonishment that the jury's

5   primary duty was to follow their individual consciences and to not take any cue from the

6   judge himself.  *See Jiminez*, 40 F.3d at 981, n.5; *see also Lowenfield*, 484 U.S. at 235

7   (allowing an *Allen*-like instruction because it was tempered with an admonition to not

8   surrender one's honest belief solely because of other jurors' opinions or for the mere

9   purpose of returning a verdict).  The instruction as a whole therefore "failed to inform the

10  jurors of the possibility that they could remain deadlocked rather than surrender their

11  conscientiously held beliefs."  *Smalls v. Batista*, 191 F.3d 272, 281 (2d Cir. 1999)

12  (upholding grant of habeas relief).

13  Improper coercion of the jury during a death penalty sentencing trial

14  fundamentally undermines the fairness and reliability of the verdict.  The combination of

15  the initial instructions, the jury's unanswered question, the trial court's expressed

16  concerns about the length and complexity of the trial, and the faulty supplemental

17  instruction told the jurors that they must agree on a verdict.  Considering all the

18  circumstances, Speer's death sentence was tainted by the trial court's coercive

19  instruction, and such an error had a substantial and injurious impact on the verdict.

20  *Brecht v. Abrahamson*, 507 U.S. 619 (1993).  Speer's Sixth, Eighth, and Fourteenth

21  Amendment rights were violated, and he is entitled to a new penalty phase hearing.

22  **F.  All Prior Counsel Were Ineffective for Failing to Challenge the Above Acts and Omissions by Trial Counsel and the State**

23  Speer's appellate and/or state habeas counsel were ineffective for failing to raise

24  these claims.  Although appellate counsel is not required to raise every colorable issue,

25  the refusal to raise a particular claim must be made after the exercise of professional

26  judgment.  *Jones v. Barnes*, 463 U.S. 745, 751 (1983).  To show prejudice from

27  ineffective assistance of appellate counsel, Speer must "show a reasonable probability

28

that, but for his counsel's unreasonable failure to file a merits brief, he would have prevailed on his appeal." *Smith v. Robbins*, 528 U.S. 259, 285 (2000). Here, had appellate and/or state habeas counsel raised these claims, there is at least a reasonable probability that they would have prevailed.

**CLAIM 24**

> **THE TRIAL COURT'S FAILURE TO INSTRUCT THE JURY THAT IT HAD TO FIND THAT THE AGGRAVATING CIRCUMSTANCE OUTWEIGHED MITIGATING CIRCUMSTANCES BEYOND A REASONABLE DOUBT VIOLATED SPEER'S SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS**

Speer raised a systemic sub-claim in his direct appeal to preserve it for federal review. The claim was that "Arizona's death penalty scheme unconstitutionally requires imposition of the death penalty whenever at least one aggravating circumstance and no mitigating circumstances exist, in violation of the Eighth and Fourteenth Amendments." (Claim IV(12), DA dkt. 87 at 52.) The Arizona Supreme Court denied the sub-claim as previously rejected. *State v. Speer*, 212 P.3d 787, 805 (Ariz. 2009).

**A.     Under Clearly Established Supreme Court Precedent at the Time of Speer's Appeal, He Was Entitled to Relief Based on the Instructional Error Regarding the Burden of Proof at the Penalty Phase**

The trial court instructed Speer's jurors that:

> You must . . . individually determine if the total of the mitigation is sufficiently substantial to call for leniency. "Sufficiently substantial to call for leniency" means that mitigation must be of such quality or value that it is adequate, in the opinion of an individual juror, to persuade that juror to vote for a sentence of life imprisonment.
>
> You shall impose a sentence of death if you have found one or more aggravating circumstances and then determine that there are no mitigating circumstances or no mitigating circumstances sufficiently substantial to call for leniency

(ROA 752 at 11-12.) This instruction neglected to inform the jury of something that the Constitution requires: the standard of proof by which they were to evaluate the relative weight of the mitigating and aggravating circumstances. Jurors were not told that they had find, *beyond a reasonable doubt*, that the mitigating circumstances were

insufficiently substantial to outweigh the aggravating circumstances.  This failure to provide the jury with the necessary, constitutionally-required standard of proof for imposing a death sentence violated Speer's Sixth, Eighth, and Fourteenth Amendment rights.

The Supreme Court has repeatedly held that "any fact (other than a prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt."  *Jones v. United States*, 526 U.S. 227, 243 n.6 (1999); *Apprendi v. New Jersey*, 530 U.S. 466, 476 (2000) (applying this principle to states through the Fourteenth Amendment).  The Court affirmed this principle in the context of a capital case in *Ring v. Arizona*, 536 U.S. 584, 602 (2002):

> If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt.

*See also id.* at 610 (Scalia, J., concurring) ("[T]he fundamental meaning of the jury-trial guarantee of the Sixth Amendment is that all facts essential to imposition of the level of punishment that the defendant receives—whether the statute calls them elements of the offense, sentencing factors, or Mary Jane—must be found by the jury beyond a reasonable doubt.").  The jury's finding that the mitigating circumstances do not outweigh the aggravating circumstances is an essential prerequisite to a death sentence in Arizona.  *See* Ariz. Rev. Stat. § 13-751(E); *Murdaugh v. Ryan*, 724 F.3d 1104, 1115 (9th Cir. 2013) ("In [*Ring*], the Supreme Court described several determinations that had to occur under Arizona law before a defendant became death-eligible, including the judge's determination that 'there are no mitigating circumstances sufficiently substantial to call for leniency.'").  Consequently, under *Ring* and its antecedents, that factual finding must be made not only by a jury—but under a beyond-a-reasonable-doubt standard as well.

This is so for two reasons.  First, *Murdaugh* holds that *Ring* clearly establishes that a jury in Arizona must determine *both* whether the requisite aggravating factors exist *and*

whether their weight against the mitigating factors in the case makes a death sentence appropriate. *Murdaugh*, 724 F.3d at 1115. Second, when something must be determined by a jury rather than a judge in a criminal case, it follows axiomatically that the determination must be made beyond a reasonable doubt. Under *In re Winship*, 397 U.S. 358 (1970), and its progeny, there is no standard by which elements, or their functional equivalent in the capital sentencing context, may be found other than beyond a reasonable doubt. Thus, as the Supreme Court has unambiguously held, "the jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt." *Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993). When a jury has rendered a decision without properly employing the reasonable-doubt standard, "there has been no jury verdict within the meaning of the Sixth Amendment." *Id.* at 280. *See also Ring*, 536 U.S. at 602 (describing the right to a jury as a right to "'a jury determination that [the defendant] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt'" (citation omitted); *Apprendi*, 530 U.S. at 477 ("[T]rial by jury has been understood to require that '*the truth of every accusation*, whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the *unanimous suffrage* of twelve of [the defendant's] equals and neighbours'" (quoting 4 W. Blackstone, Commentaries on the Laws of England 343 (1769) (second emphasis added)).

The accuracy of Speer's position on appeal was made explicit when the Supreme Court decided *Hurst v. Florida*, 136 S. Ct. 616, 621 (2016), in which the Court held that the failure to require a jury to determine the relative weight of aggravating and mitigating circumstances beyond a reasonable doubt violates the Sixth Amendment right to a jury trial as well as the Fourteenth Amendment's Due Process Clause. The Court reiterated the Sixth Amendment's basic requirement that "any fact that 'expose[s] the defendant to a greater punishment than that authorized by the jury's guilty verdict' is an 'element' that must be submitted to the jury." *Id.* (quoting *Apprendi*, 530 U.S. at 494). The Court also emphasized that under *Ring*, this principle applies with equal force to death penalty

statutes:  "The Sixth Amendment requires a jury, not a judge, to find *each* fact necessary to impose a sentence of death."  *Id.* at 619 (emphasis added).  The Court recognized that under *Alleyne v. United States*, 133 S. Ct. 2151, 2156 (2013), "each element of a crime [must] be proved to a jury beyond a reasonable doubt."  *Id.* at 621; *see also Apprendi*, 530 U.S. at 498 (Scalia, J., concurring) (stating that charges against the accused, and the corresponding maximum exposure he faces, must be determined "beyond a reasonable doubt by the unanimous vote of 12 of his fellow citizens").

In *Hurst*, the State of Florida argued that the weighing process fell outside the ambit of *Ring* and *Apprendi*, as the defendant was death-eligible after the jury found at least one aggravating circumstance.  *Hurst*, 136 S. Ct. at 622.  The Court rejected this contention, and *Hurst* therefore stated what prior Sixth Amendment precedent had already established:  It is not constitutionally sufficient that a jury find the existence of at least one aggravating circumstance beyond a reasonable doubt because a determination regarding the relative weight of aggravating and mitigating circumstances is also a factual finding necessary to a defendant's eligibility for a sentence of death.  *Id.*; *see also Rauf v. State*, 145 A.3d 430 (Del. 2016) (per curiam) (striking down Delaware's capital sentencing scheme on the basis of *Hurst* and determining that the Sixth Amendment requires a jury to find, beyond a reasonable doubt, each aggravating circumstance and that the aggravation outweighs mitigation); *Hurst v. State*, 202 So.3d 40, 57 (Fla. 2016) (finding that *Hurst* "mandates that all the findings necessary for the imposition of a death sentence are 'elements' that must be found by a jury").

*Hurst* built upon *Ring* and *Apprendi*, but did not create new law.  Rather, it reiterated, to a state that did not follow *Ring*'s plain lesson, what *Ring* had made clear: the jury's role in the capital penalty phase may not be regarded as fundamentally different from its role in an ordinary criminal trial.  *Every* finding necessary to impose a death sentence must be found by a jury, beyond a reasonable doubt.

Speer is therefore entitled to relief under either de novo review or § 2254(d)(1) because the state court's failure to recognize the violation of his Sixth and Fourteenth

Amendment rights was contrary to and an unreasonable application of *Ring* and *Apprendi*.

## B. If *Hurst v. Florida* Instead Announced a New Rule of Constitutional Law, It Is Retroactive to Cases on Collateral Review

In the alternative, if *Hurst* constitutes a new rule of constitutional law, it warrants retroactive application because it implicates the standard of proof by which the weighing finding must be made. 136 S. Ct. at 621-22. That is why the Delaware Supreme Court unanimously held that its decision in *Rauf*, invalidating the state's death penalty in light of *Hurst*, is fully retroactive. *See Powell v. State*, 153 A.3d 69 (Del. 2016) (holding the missing beyond-a-reasonable-doubt requirement to be retroactive because it is essential to accuracy and fundamental fairness). *Powell* reasoned that the retroactivity issue in the weighing step necessary to impose the death penalty "was decided by the United States Supreme Court more than forty years ago." *Id.* at 74. As the Delaware Court noted, the beyond-a-reasonable-doubt standard of proof that *Hurst* requires stems from *Winship*, 397 U.S. at 363, which the Supreme Court held in *Ivan V. v. City of New York*, 407 U.S. 203, 205 (1972) (per curiam), to be fully retroactive. *Powell*, 153 A.3d at 74-75. *See also id.* at 75-76 ("In *Hankerson v. North Carolina*," the United States "Supreme Court observed 'we have never deviated from the rule stated in *Ivan V.* that "[w]here the major purpose of new constitutional doctrine is to overcome an aspect of the criminal trial that substantially impairs its truth-finding function and so raises serious questions about the accuracy of guilty verdicts in past trials, the new rule [is] given complete retroactive effect"'" (quoting *Hankerson*, 432 U.S. 233, 243-44 (1977) (footnotes omitted, alternation in original).)

The Delaware *Powell* Court noted that "the burden of proof is one of those rules that has both procedural and substantive ramifications." *Powell*, 153 A.3d at 74. Indeed, *Hurst* is retroactive because it is a substantive rule. The Supreme Court explained that under *Teague v. Lane*, 489 U.S. 288 (1989), "courts must give retroactive effect to new

substantive rules of constitutional law." *Montgomery v. Louisiana*, 136 S. Ct. 718, 728 (2016).

*Hurst* is substantive because it implicates the standard of proof by which the weighing finding must be made. *See Hurst*, 136 S. Ct. at 621-22. "[T]he reasonable-doubt standard is indispensable," *Ivan V.*, 407 U.S. at 205, and "reflect[s] a profound judgment" about the justice system, *Apprendi*, 530 U.S. at 478 (alteration in original) (internal quotations omitted). Indeed, as rules about the standard of proof lessen the "risk that a defendant . . . faces a punishment that the law cannot impose upon him," they are substantive in nature. *Schriro v. Summerlin*, 542 U.S. 348, 351-52 (2004). As a result, the Supreme Court has deemed retroactive cases applying the beyond-a-reasonable-doubt standard. *See Hankerson*, 432 U.S. at 241- 42 (making retroactive the requirement that the prosecution prove beyond a reasonable doubt each element of a crime); *Ivan V.*, 407 U.S. at 204 (making retroactive the application of that standard of proof to juvenile adjudications). Because *Hurst* extends the beyond-a-reasonable-doubt standard to a capital jury's weighing of aggravating and mitigating circumstances, it too is substantive and retroactive.

Furthermore, *Hurst* is substantive because it prohibits the death penalty—a category of punishment—for those made eligible for the penalty other than by a jury finding beyond a reasonable doubt that mitigation does not outweigh aggravation—a class of defendants. *See Montgomery*, 136 S. Ct. at 728 (quoting *Penry v. Lynaugh*, 492 U.S. 302, 330 (1989)). It also imposes a new burden on the State whenever it seeks a death sentence and places that punishment outside the power of the State to impose unless that burden has been met. *See Summerlin*, 542 U.S. at 352 (describing "substantive" rules as those that put particular punishments beyond the power of the State to impose). Finally, *Hurst* narrowed the scope of Arizona's capital sentencing statute, which does not impose any standard of proof on a capital jury's weighing determination, by making it more difficult for juries to return death verdicts. *See id.* at 351 (describing

"substantive" rules as those that "narrow the scope of a criminal statute by interpreting its terms").

Because *Hurst* is substantive, and therefore retroactive, Speer is entitled to relief under the new rule the Supreme Court announced.  *See Montgomery*, 136 S. Ct. at 729 ("The Court now holds that when a new substantive rule of constitutional law controls the outcome of a case, the Constitution requires state collateral review courts to give retroactive effect to that rule."); *Summerlin*, 542 U.S. at 352 n.4 (explaining that substantive rules "are more accurately characterized as" not "subject to the bar" on retroactive application under *Teague*).

Even if it is deemed procedural and not substantive, *Hurst*'s beyond-a-reasonable-doubt holding constitutes a "watershed" procedural rule under *Teague,* as the Delaware Supreme Court unanimously held.  *Powell*, 153 A.3d at 74 (making retroactive its prior decision in *Rauf*, which invalidated Delaware's death penalty statute under *Hurst*, because it fell "squarely within the second exception set forth in *Teague* requiring retroactive application of 'new rules' of criminal procedure").  This is because *Hurst* "implicate[s] the fundamental fairness and accuracy" of sentencing, *Welch v. United States*, 136 S. Ct. 1257, 1264 (2016), by mandating the use of the beyond-a-reasonable-doubt standard, which "is a prime instrument for reducing the risk of convictions resting on factual error," *Ivan V.*, 407 U.S. at 203.  *Hurst*, if deemed procedural, constitutes a watershed rule of criminal procedure and is retroactive.

Therefore, if the Court finds that *Hurst* announced a new rule of constitutional law, it is retroactive and Speer is entitled to relief.

## C.   *Ring* and *Hurst* Errors Are Structural when They Deprive a Defendant of His Right to a Beyond-a-Reasonable-Doubt Jury Finding

The trial court's error in failing to instruct the jury that it had to find that the mitigating circumstances did not outweigh the aggravating circumstance of cruelty beyond a reasonable doubt was structural error and therefore per se prejudicial.  *See generally United States v. Gonzalez-Lopez*, 548 U.S. 140, 148-49 (2006) (explaining that

232

structural errors "defy analysis by harmless error standards because they affect[t] the framework within which the trial proceeds" (internal quotation marks omitted)).

In *Sullivan v. Louisiana*, the Supreme Court expressly held that an erroneous instruction on the reasonable-doubt standard is a structural error, because the lack of a proper reasonable-doubt instruction "vitiates *all* the jury's findings," and means that "there has been no jury verdict within the meaning of the Sixth Amendment" to which harmless-error review could apply. *Sullivan*, 508 U.S. at 280-81. The Supreme Court reasoned that harmless-error review cannot "hypothesize a guilty verdict that was never in fact rendered," but must look "to the basis on which 'the jury actually rested its verdict.'" *Id.* at 279 (quoting *Yates v. Evatt*, 500 U.S. 391, 404 (1991)). The lack of a proper reasonable-doubt instruction means that there has been "no jury verdict of guilty-beyond-a-reasonable doubt"; and "the entire premise of *Chapman* review is simply absent" because "the question whether the same verdict of guilty-beyond-a-reasonable doubt would have been rendered absent the constitutional error is utterly meaningless." *Id.* at 280. The inapplicability of harmless-error analysis was also clear, the Court held, because the right to a jury verdict of guilty beyond a reasonable doubt is a "'basic protectio[n]' whose precise effects are unmeasurable, but without which a criminal trial cannot reliably serve its function." *Id.* at 281 (quoting *Rose v. Clark*, 478 U.S. 570, 577 (1986)).

Under *Sullivan*'s reasoning, Arizona's failure to require a reasonable-doubt standard at the final step of the death sentencing process is a structural error. The defect in the capital sentencing process involves not the balance between judge and jury, which is subject to harmless error analysis, *see Murdaugh*, 724 F.3d at 1117, but rather the proper standard of proof. Like the defective verdict in *Sullivan*, the absence of any reasonable doubt instruction "vitiates *all* the jury's findings" at the penalty phase. There is thus no "jury verdict within the meaning of the Sixth Amendment" to which harmless-error analysis could apply. And, to the same extent discussed in *Sullivan*, the right to a jury verdict beyond a reasonable doubt at the penalty phase is a "basic protectio[n]" with immeasurable effects, not amenable to harmless error review. Indeed, even in cases where there was overwhelming evidence of aggravating factors, it is impossible to know

233

whether the jury would have found the required balance of aggravating and mitigating factors beyond a reasonable doubt had the jury been instructed on that standard.

The jury instructions violated Speer's Sixth and Fourteenth Amendment rights, and under any construction of the import of *Ring* and *Hurst*, he is entitled to relief in the form of a new penalty phase hearing.

**CLAIM 25**

**JURORS CONSIDERED INADMISSIBLE AND PREJUDICIAL EXTRINSIC EVIDENCE DURING THE PENALTY PHASE IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS**

Speer did not present this claim to the state court as a result of appellate and post-conviction counsels' deficient performance. The deficient performance of state appellate and post-conviction counsel prejudiced Speer and provides cause to excuse any procedural default. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985); *Martinez v. Ryan*, 566 U.S. 1, 9 (2012). Therefore, the Court may consider the merits of this claim. Because the claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the claim de novo.

**A.    Legal Bases for the Claim**

Under the Sixth Amendment, Speer had the right to "a fair trial by a panel of impartial, indifferent jurors," and to allow otherwise violates "even the minimal standards of due process." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (internal quotation marks omitted). A criminal defendant's right to a fair trial "necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965) (quoting *Irvin*, 366 U.S. at 722). The Constitution requires these protections "regardless of the heinousness of the crime charged, the apparent guilt of the

offender or the station in life which he occupies." *Irvin*, 366 U.S. at 722 (internal citation omitted). When a juror is improperly influenced by information outside the courtroom, the trial itself becomes "little more than a hollow formality." *Turner*, 379 U.S. at 473. Thus, jurors are not permitted to come in contact with prejudicial news or commentary during trial, and "courts must take steps by rule and regulation that will protect their processes from prejudicial outside interferences." *Sheppard v. Maxwell*, 384 U.S. 333, 362-63 (1966). It is a violation of a defendant's due process rights for jurors to flaunt those rules and regulations, and thus bring prejudicial extrajudicial information into deliberations. *See Marshall v. United States*, 360 U.S. 310, 312-13 (1959) (setting aside a federal conviction where jurors were exposed, through news accounts, to information not admitted at trial).

All these considerations acquire even greater force in a death penalty case. It is especially "vital in capital cases that the jury should pass upon the case free from external causes" because, when a defendant's life is in the balance, no "ground of suspicion that the administration of justice has been interfered with [can] be tolerated." *Mattox v. United States*, 146 U.S. 140, 149 (1892); *see also Schiro v. Farley*, 510 U.S. 222, 238 (1994) (stating the "fundamental principle" that "death is different" and noting that, for this reason, "heightened reliability is required at all stages of the capital trial") (internal quotation marks and citation omitted).

## B.  Juror Exposure to Extrinsic Evidence Creates a Presumption of Prejudice

Juror misconduct typically occurs when a member of the jury has introduced into its deliberations information that was not in evidence or in the instructions. *Marino v. Vasquez*, 812 F.2d 499, 504 (9th Cir. 1987). When faced with allegations of improper jury exposure to extrinsic information, courts apply a two-step analysis. First, "the court asks whether the contact was 'possibly prejudicial,' meaning it had a 'tendency' to be 'injurious to the defendant.'" *Godoy v. Spearman*, 861 F.3d 956, 959 (9th Cir. 2017) (quoting *Mattox*, 146 U.S. at 149). A juror's exposure to extrinsic evidence need only

"cross[] a low threshold to create the potential for prejudice." *Caliendo v. Warden of Cal. Men's Colony*, 365 F.3d 691, 697 (9th Cir. 2004). If the extrinsic information creates "any ground of suspicion that the administration of justice has been interfered with," *Mattox*, 146 U.S. at 149, then the exchange is "deemed presumptively prejudicial." *Remmer v. United States*, 347 U.S. 227, 229 (1954). At that point, the court proceeds to the second step, where "the burden rests heavily upon the [state] to establish the contact was, in fact, 'harmless.'" *Id.* The presumption is not rebutted unless *the State* shows "the absence of prejudice," *United States v. Olano*, 507 U.S. 725, 741 (1993), meaning "there is no reasonable possibility that the communication will influence the verdict." *Caliendo*, 365 F.3d at 697 (observing that this rule is clearly established). If the State cannot show harmlessness, the reviewing court must grant the defendant a new trial. *See Remmer v. United States*, 350 U.S. 377, 382 (1956) (*Remmer II*). Finally, if the prejudicial contact is unclear from the existing record, the reviewing court must order or hold a hearing to determine "the circumstances [of the contact], the impact thereof upon the juror, and whether or not it was prejudicial." *Remmer*, 347 U.S. at 229-30.

## C.   Facts in Support of the Claim

### 1.   At Least Two Jurors Committed Misconduct by Considering Extrinsic Evidence Concerning the Criminal Justice System and the Death Penalty

On the seventh of fourteen days of penalty phase testimony, the bailiff found a document in the jury room titled "True/False Test on Juries." (Trial Ex. 210.) On the front of the test were the following true/false questions:

      1.   Over 90 percent of all cases never come before a jury.

      2.   Juries never impose sentences after reaching verdicts.

      3.   Women may because [sic] excluded from jury duty solely because of their sex.

      4.   A lawyer can keep someone from serving on a jury based on a hunch or for no reason at all.

5.    It is constitutional for a lawyer to use peremptory challenges to keep members of certain races, as well as members of a particular gender, off of a jury.

6.    All federal juries require unanimous votes.

7.    Judges can be called for jury duty.

8.    The Constitution guarantees you the right to a jury trial only in criminal cases.

9.    States do not require unanimous verdicts in certain cases.

10.   In most cases, judges and juries disagree on the verdict.

(*Id.*)  A notation on the front of the test[35] explained that the quiz was reprinted from an article, "Courts at the Crossroads," that originally appeared in the ABA magazine *Update on Law-Related Education*.  (*Id.*)  On the back of the test was an "Answer Key," which gave the correct answer and (in most cases) a detailed explanation of the facts, laws, and/or principles which supported the answers.  (*Id.*)  Among other things, the answers informed the test-takers that:  "Most cases are plea bargained, settled, or tried before a judge"; murder defendants have a "constitutional right to be tried by a jury composed of a cross section of the community"; lawyers are "entitled to use peremptory challenges to exclude prospective jurors from serving" and that those challenges "do not require that a reason be given"; many states "require jurors to pass sentence on those they have convicted or crimes punishable by death"; and studies show that judges and juries "agree at least 80 percent of the time."  (*Id.*)

The parties requested that the court individually speak with each juror.  (RT 2/22/07 at 90.)  The jurors were brought in one at a time, and ultimately six jurors testified that they had knowledge of the document:

---

[35] The court and parties alternately referred to the document as a "test" or a "questionnaire."

- **Juror 4** testified that "I think one of the jurors brought it in today but I didn't see it. . . . I know there was talk about it but I didn't—I wasn't listening.  I know I heard something about juries."  (*Id.* at 95.)  Juror 4 denied reading the "questionnaire" or having any discussions about it, though she admitted that "it was being talked about but I didn't hear what was being said."  (*Id.*)  Juror 4 stated that she thought Jurors 12[36] and 13 were discussing the questionnaire.  (*Id.* at 96.)  Neither the prosecution nor the defense had any questions for Juror 4.  (*Id.* at 96-97.)

- **Juror 5** admitted seeing the questionnaire for the first time that morning.  (*Id.* at 99.)  He thought one of the jurors brought it in, but he was not sure which one.  (*Id.* at 98.)  Juror 5 read the ten questions, but not the answers.  (*Id.*)  He acknowledged that he had been advised not to research anything about the case or to bring extraneous materials into the jury room, but stated that the questionnaire did not affect his view of the case.  (*Id.* at 98-99.)  He read the questions and "tried to answer a couple of them that were there, and one of the other jurors" (Juror 13) told him the answers.  (*Id.* at 99-101.)  In his view, the questionnaire was "almost like reading a newspaper, kind of."  (*Id.* at 100.)

- **Juror 6** "saw [the questionnaire] but not like—I didn't actually read it.  I just saw somebody else reading it."  (*Id.* at 103.)  Juror 6 denied looking at the questions or discussing it with another juror.  (*Id.*)  He saw two people discussing it and it "looked like they were reading it together."  (*Id.*)  Neither the prosecution nor the defense had any questions for Juror 6.  (*Id.* at 103-04.)

- **Juror 8** "saw some paper but [did not] know about a questionnaire."  (*Id.* at 105.)  He "didn't bother to read it."  (*Id.*)  He did not hear any comments about what was on the questionnaire.  (*Id.* at 106.)

---

[36] Juror 12 denied knowing anything about the questionnaire.  (RT 2/22/07 at 109-10.)

- **Juror 11** did not personally view the questionnaire or hear other jurors talking about the questionnaire.  (*Id.* at 108.)  When asked, "Have you seen any other jurors . . . discussing something that appears to be on a sheet of paper, looking at it and talking about it?", Juror 11 stated yes.  (*Id.*)  However, neither the trial court, the prosecution, nor defense counsel asked Juror 11 which jurors she saw discussing the document.  (*Id.* at 108-09.)

- **Juror 12** denied seeing a piece of paper that looked like a questionnaire, and claimed to have "no clue" what the court was talking about.  (*Id.* at 110.)

- **Juror 13** brought the document into the jury room.  (*Id.* at 111.)  She got it from her father; her father, in turn, had been given it by his elderly neighbor who "is very interested in this" and whose "son is an attorney."  (*Id.* at 111, 114.)  Both her father and her neighbor knew she was serving on a capital case jury, and her neighbor stated that he "[couldn't] wait until it's over so she can tell me the details."[37]  (*Id.* at 115.)  Juror 13 read both the questions and the answers.  (*Id.* at 111.)  She only showed it to one juror, Juror 5, and they discussed the questions and the answers.  (*Id.* at 111-12.)  Although Juror 5 had denied reading the answers, Juror 13 stated that she and Juror 5 both "looked at the questions and looked at the answers."  (*Id.* at 112.)  She and Juror 5 "both agreed on the answers that we were all wrong on or we were both wrong on."  (*Id.* at 114.)  Juror 13 remembered being admonished not to research the case, look up newspaper articles, go on the internet, or do anything "that could in any way, shape or form taint [her] view on the evidence that was going to be presented."  (*Id.* at 112.)  However, she stated she was not aware that the test violated the admission against extraneous materials in the jury room "because that has nothing to do with this case."  (*Id.*)  In her view (as stated by the trial court), "as long as it's not related to

---

[37] It is unclear from the record whether Juror 13's father and his neighbor knew she was serving on Paul Speer's case specifically.

1    this case, it's neither here nor there." (*Id.* at 112-13.)  Juror 13 denied that the

2    questionnaire had any effect on her view of the case, the mitigation evidence, or

3    her ability to be fair and impartial.  (*Id.* at 113.)

4        After questioning the jurors, the trial court opined that "[w]e have two jurors

5    [Jurors 5 and 13] who have apparently reviewed and discussed the questionnaire," and

6    asked whether the State or defense had a problem with those jurors continuing on the

7    case. (*Id.* at 118.)  The prosecutor had no objection; however, defense counsel moved for

8    a mistrial.  (*Id.*)  Defense counsel argued that the extraneous information received by the

9    jury "has to do with the court system.  It has to do with plea bargaining.  It has to do with

10   death penalty cases and what states have jury sentencing, which states don't. There are

11   discussions about *Batson*, other legal issues. . . .  So defense would request that a mistrial

12   be declared." (*Id* at 118-19.)  Defense counsel also disagreed with the court's

13   characterization of only two jurors being exposed to the document.  (*Id.* at 119.)

14       The trial court appeared somewhat incredulous at defense counsel's stated

15   concerns:

16           Even though we have spoken to both juror number 5 and 13,
     and even though both of them said that it doesn't affect their
17           deliberations in any way, that it doesn't impact the way they
     view the evidence they have heard, doesn't affect their view
18           on mitigation, and it will not impede their ability to be open-
     minded, fair and impartial until they have heard all the
19           evidence, even though we have talked to them about it, you
     don't find this to be harmless?  You think it is so prejudicial
20           that it will—that it warrants a mistrial?

21
     (*Id.* at 119.) Defense counsel responded by arguing that *State v. Hall* supported his
22
     claim.  (*Id.*)
23
         At this point in the state court transcript (*id.* at 119, line 21), the remaining
24
     argument by counsel, the entry of the questionnaire into evidence as Court Exhibit
25
     No. 210, and the denial of the mistrial motion by the court is missing from the
26
     record.  (*Compare,* RT 2/22/07 at 119-22 and Trial ME 2/22/07.)  The transcript
27
     jumps from a discussion about the questionnaire to the jury re-entering the
28

courtroom and being admonished yet again on extraneous evidence.  However, we know that additional discussion and a ruling occurred based on the clerk's minute entry from this date (Trial ME 2/22/07).  The minute entry form notes that the jurors were questioned from 3:32 p.m. to 4:05 p.m.  At 4:05 p.m., the trial court requested the position of the parties; "State has no problem in continuing with the trial; Defense Counsel is requesting mis-trial."  At that point, the "[q]uestionnaire is marked as exhibit No. 210 and entered in evidence for appeal purposes only."  The "Defense Oral Motion for Mistrial" was denied, and at 4:17 p.m., the jurors were present and admonished.  It does not appear that either the prosecutor or defense counsel moved to excuse any of the jurors, and all those who had knowledge of the questionnaire remained on the jury.

Due process requires "a trial judge [to be] ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."  *Smith v. Phillips*, 455 U.S. 209, 217 (1982).  A defendant who raises a claim of juror bias or misconduct need not show that the entire jury was tainted, as the defendant is "entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors."  *Parker v. Gladden*, 385 U.S. 363, 366 (1966).  "[I]f even a single juror's impartiality is overcome by an improper extraneous influence, the accused has been deprived of the right to an impartial jury" and a new trial is required.  *Fullwood v. Lee*, 290 F.3d 663, 678 (4th Cir. 2002); *see also Davis v. Woodford*, 384 F.3d 628, 652 (9th Cir. 2004) (emphasizing that "even a single partial juror violates a defendant's constitutional right to fair trial") (quotation marks omitted).

Here, there is no question that a presumption of prejudice arose from the exposure of six jurors to extrinsic evidence that discussed, *inter alia*, the criminal justice system, the role of juries, jury selection, and death penalty sentencing.  Unfortunately, the record is incomplete with regard to the trial court's ultimate justification for denying defense counsel's motion for a new trial.  Additional discovery and a hearing are necessary to determine additional facts underlying this claim.

1      However, even this incomplete record demonstrates that the process followed by

2  the trial court failed to rebut the presumption of prejudice because it shifted the burden

3  for proving prejudice (or the lack thereof) to defense counsel rather than the prosecution.

4  (*See* RT 2/22/07 at 119.)  By asking defense counsel to explain why he thought the

5  extrinsic evidence seen by the jury was "so prejudicial" and not harmless, the judge put

6  the onus on defense counsel to prove prejudice.  In so doing, the trial court failed to hold

7  the State to its burden to "'determine the circumstances [of the contact], the impact

8  thereof upon the juror, and whether or not it was prejudicial.'"  *Godoy*, 861 F.3d at 964

9  (quoting *Remmer*, 347 U.S. at 230).

10      The trial court's admonition was not sufficient to overcome the substantial danger

11  of undue, and likely subliminal, prejudice that arose from the jurors' contemplation of

12  extrinsic evidence.  As Justice Jackson noted in his concurring opinion in *Krulewitch v.*

13  *United States*, 336 U.S. 440, 453 (1949), "The naive assumption that prejudicial effects

14  can be overcome by instructions to the jury. . . all practicing lawyers know to be

15  unmitigated fiction."  Because the extrinsic information dealt with matters directly related

16  to criminal jury service and death penalty sentencing, is impossible to offer evidence to

17  rebut it, to offer a curative instruction, to discuss its significance in argument to the jury,

18  or to take other tactical steps that might ameliorate its impact.  *Gibson v. Clanon*, 633

19  F.2d 851, 854 (9th Cir. 1980).  As a result, the jurors' improper consideration of this

20  evidence had a substantial and injurious influence in determining the jury's verdict that

21  requires relief under the Sixth Amendment.  *Brecht v. Abrahamson*, 507 U.S. 619 (1993);

22  *Jeffries v. Wood*, 114 F.3d 1484, 1492 (9th Cir. 1997).

23      Furthermore, the jurors' consideration of these factors clearly demonstrate that the

24  jury did not take their obligation to consider only evidence presented at trial seriously

25  enough.  These failures violate Speer's constitutional rights to a fair and impartial jury

26  and disturb the fundamental fairness of the sentencing proceeding.  *Caldwell v.*

27  *Mississippi*, 472 U.S. 320 (1985).

28

1

2

### 2. The Jury Contemplated Impermissible and Prejudicial Extrinsic Evidence by Considering the Consequences of Deadlock

3

During the penalty phase, after about two and a half hours of deliberation, the

4

jurors sent out a note which stated, "We currently are unable to reach an unaminous [sic]

5

verdict, what do we do now?" (RT 3/28/07 at 4; ROA 757.) Twenty minutes later, the

6

jury foreperson sent out another question, which asked, "If we can't reach an unaminous

7

[sic] verdict and check that selection, what happens to the sentencing?" (RT 3/28/07 at 4;

8

ROA 758 at 2.) The trial court declined to answer the jury's question about the possible

9

outcomes of a deadlock. (RT 3/28/07 at 20-21.) The jury continued to deliberate about

10

another hour and half before being dismissed for the day. (Trial ME 3/30/07.)

11

The next morning, less than an hour into resumed penalty phase deliberations, the

12

jury sent out a third question, which said, "We asked a 2nd question about the

13

implications of sentencing, if we have to select the unable to reach a unaminous [sic]

14

verdict selection—are we going to get an answer." (RT 3/29/07 at 4; ROA 758 at 1.)

15

The trial court and the parties discussed how to address the jury's question, and

16

ultimately the jury was told simply, "You are not to concern yourselves with the

17

implications of sentencing if you cannot reach a unanimous verdict." (RT 3/29/07 at 4-6;

18

ROA 758 at 1.)

19

The jury's notes made it apparent that the jurors discussed and considered the

20

consequences of not reaching a verdict. Because the consequences of deadlock are

21

extrinsic considerations, the jurors' consideration of those consequences was misconduct

22

violating Speer's Sixth Amendment jury trial rights. *See Turner*, 379 U.S. at 472-73 ("In

23

the constitutional sense, trial by jury in a criminal case necessarily implies at the very

24

least that the 'evidence developed' against a defendant shall come from the witness stand

25

in a public courtroom where there is full judicial protection of the defendant's right of

26

confrontation, of cross-examination, and of counsel."). Here, the jury's notes put the trial

27

court on notice of presumptively prejudicial consideration of extrinsic information, and

28

therefore potential juror misconduct. The trial court failed to abide by its "primary

obligation to fashion a responsible procedure for ascertaining whether misconduct actually occurred and if so, whether it was prejudicial." *Dyer v. Calderon*, 151 F.3d 970, 978 (9th Cir. 1998) (internal citations and quotations omitted).  Although defense counsel should have argued that the jury's consideration of the consequences of deadlock was misconduct (*see* Claim 23), the trial court had a sua sponte duty to make this inquiry, but unreasonably failed to do so.  This is especially true in light of the fact that Juror 15 had previously been removed from the jury for asking his niece, a deputy county attorney, about the consequences of deadlock because he and some other jurors were discussing that possibility during deliberations.  (RT 1/24/07 at 7, 11.)  "Where juror misconduct or bias is credibly alleged, the trial judge cannot wait for defense counsel to spoon feed him every bit of information which would make a case of juror bias; rather, the judge has an independent responsibility to satisfy himself that the allegation of bias is unfounded."  *Id.*

To the extent harmless error applies to this claim, because the penalty deliberations were closely balanced—as evidenced by the jury deadlock and requests for exhibits and testimony, the jury's misconduct in considering extrinsic evidence had a substantial and injurious impact on the verdict and the death judgment should be vacated on that ground.  *Brecht*, 507 U.S. 619.

Moreover, the error also violated the Eighth and Fourteenth Amendments by compromising the reliability of the death verdict.  In a capital case the Cruel and Unusual Punishment and Due Process Clauses of the federal constitution require heightened reliability in any determination that death is the appropriate sentence.  *See Beck v. Alabama*, 447 U.S. 625, 627-46 (1980).  That reliability was undermined by the jury's consideration of an entirely irrelevant factor in reaching its penalty determination.

## D. All Prior Counsel Were Ineffective for Failing to Challenge the Above Acts and Omissions by Trial Counsel and the State

Speer's appellate and/or state habeas counsel were ineffective for failing to raise these claims.  Although appellate counsel is not required to raise every colorable issue, the refusal to raise a particular claim must be made after the exercise of professional

judgment.  *Jones v. Barnes*, 463 U.S. 745, 751 (1983).  To show prejudice from ineffective assistance of appellate counsel, Speer must "show a reasonable probability that, but for his counsel's unreasonable failure to file a merits brief, he would have prevailed on his appeal."  *Smith v. Robbins*, 528 U.S. 259, 285 (2000).  Here, had appellate and/or state habeas counsel raised these claims, there is at least a reasonable probability that they would have prevailed.

**CLAIM 26**

**SPEER WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL ON DIRECT APPEAL IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION**

Portions of this claim—appellate counsel failed to raise a claim of ineffective assistance of counsel regarding the accomplice instruction and appellate counsel failed to pursue a confrontation clause claim—were raised on state post-conviction review within Claims Fourteen and Eight, respectively.  (PFR at 38; PCR 9/26/14 Pet. at 42.)  The state court denied these claims on the merits.  (PCR ME 5/21/15 at 26.).  Therefore, the claims raised in subsections C1 and C3, *infra*, have been exhausted in state court and are properly before this Court for federal review.

The claims raised in subsections C2 and C4 through C7 were not raised in Speer's state court proceedings.  Speer can demonstrate cause and prejudice for failing to raise these claims previously due to the ineffective assistance of Speer's post-conviction counsel, which constitutes cause for the default and resulted in prejudice to Speer.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985); *Martinez v. Ryan*, 566 U.S. 1, 9 (2012).  Speer will demonstrate at an evidentiary hearing that post-conviction counsel fell below the standards of a minimally competent capital post-conviction attorney when they failed to raise these meritorious claims.  (*See* Claim 27).  In addition, the state court's decision with regard to the portions of the claim previously raised is based on an unreasonable application of or is contrary to clearly established federal law, and/or is based on an unreasonable determination of fact.  Therefore, the Court may consider the merits of this claim de novo.

1   **A.     Legal Basis for the Claims**

2          The effective assistance of appellate counsel is guaranteed by the Due Process

3   Clause of the Fourteenth Amendment.  *Evitts*, 469 U.S. at 396 ("A first appeal as of

4   right . . . is not adjudicated in accord with due process of law if the appellant does not

5   have the effective assistance of an attorney."); *see also id.* at 395 ("Because the right to

6   counsel is so fundamental to a fair trial, the Constitution cannot tolerate trials in which

7   counsel, though present in name, is unable to assist the defendant to obtain a fair decision

8   on the merits.").  As such, "nominal representation" during an appeal "does not suffice to

9   render the proceedings constitutionally adequate."  *Id.* at 396.

10         Ineffective assistance of appellate counsel claims are governed by the standard of

11  review set forth in *Strickland*, 466 U.S. at 686-87.  *See Smith v. Robbins*, 528 U.S. 259,

12  285 (2000).  Accordingly, Speer must show that appellate counsel's representation "fell

13  below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, and that

14  "there is a reasonable probability that, but for counsel's unprofessional errors, the result

15  of the proceeding would have been different," *id.* at 694.

16         In addition, the ABA Guidelines are instructive in evaluating the reasonableness of

17  counsel's conduct.  *Rompilla v. Beard*, 545 U.S. 374, 387 (2005).  Regarding appellate

18  performance, the 1989 ABA Guidelines indicate that "[a]ppellate counsel should seek,

19  when perfecting the appeal, to present all arguably meritorious issues."  1989 ABA

20  Guidelines § 11.9.2(D) (emphasis added).  Moreover, "[a]ppellate counsel should be

21  familiar with all state and federal appellate and post-conviction options available to the

22  client, and should consider how any tactical decision might affect later options."  1989

23  ABA Guidelines § 11.9.2(A).  Therefore, when appellate counsel fails to raise

24  meritorious issues that could have resulted in a reversal of conviction or a sentence,

25  counsel has necessarily caused prejudice to the defendant.  *See, e.g.*, *Strickland*, 466 U.S.

26  at 694 (stating that prejudice occurs when, absent counsel's deficiencies, there is a

27  reasonable probability that the result of proceeding would have been different).

28

Individually and cumulatively, the deficiencies raised below constitute ineffective assistance of appellate counsel.  *See id.* at 690 (allegations of ineffectiveness must be examined in light of all the circumstances); *Rompilla*, 545 U.S. at 393 (evaluating prejudice based on the evidence "taken as a whole").  Appellate counsel's deficient performance was prejudicial.  Thus, Speer is entitled to relief.

## B.  Appellate Counsel Was Ineffective for Failing to Raise Meritorious Claims Under Federal Law

### 1.  Failure to Raise a Claim Challenging the Faulty Accomplice Instruction and Trial Counsel's Failure to Object and Correct the Erroneous Instruction

As detailed above in Claim 6, the trial court incorrectly instructed the jury that Speer could be convicted of capital murder if they found he was an accomplice in *any* of the various offenses with which he was charged, not just if he were an accomplice to murder.  The trial court violated Speer's rights to due process and a fair trial with this instruction.  In addition, trial counsel failed to object to this erroneous instruction and/or offer a correct instruction.  This performance fell below reasonable professional standards, and prejudiced Speer in that his conviction for murder and his death sentence could be based on the jury's finding that he was an accomplice to burglary or conspiracy.

Competent appellate counsel would have raised this meritorious claim.  Failure to do so constituted deficient performance, and there is a reasonable probability that had this issue been placed before the Arizona Supreme Court, the court would have determined that Speer was entitled to a new penalty phase hearing.  Consequently, he was prejudiced by counsel's failure to raise this claim on direct appeal.  *See Strickland*, 466 U.S. at 694.

### 2.  Failure to Raise a Claim that Trial Counsel Were Ineffective for Failing to Move to Vacate Speer's Conviction and Sentence on the Basis of Conflicting Theories of Prosecution

As discussed in Claim 7, the Arizona Rules of Criminal Procedure provide that trial counsel may move to vacate judgment no later than sixty days after the entry of judgment and sentence, if the conviction was obtained in violation of the constitution. Ariz. R. Crim. P. 24.2(a).  Within that sixty-day time period, the same prosecutor tried

247

Speer's alleged accomplice in the murder, his half-brother Brian Womble.  In Speer's trial, the prosecutor had gained a conviction by convincing the jury that Speer—who was in jail at the time of the killing—had been primarily responsible for the crime.  She argued that Speer was the older, dominant brother who manipulated his depressed and vulnerable younger brother into committing the crime.  In Womble's trial, however, she argued the opposite—that Womble was the prime mover, who wanted to kill for the thrill, and got his "loser" brother to accede to Womble's plan.

Though the prosecutor was known to trial counsel for her ruthlessness, however, he did not in any way track the closely-related trial.  Thus, his performance was deficient in that he did not move to vacate Speer's judgment on the basis of the prosecutor's misconduct in arguing contradictory theories of the crime.  Speer was prejudiced in that, had the motion to vacate been timely brought, it is reasonably likely to have resulted in a different outcome.

Likewise, appellate counsel performed deficiently in also failing to review the related trial and bring this claim against trial counsel.  There is a reasonable probability that, but for appellate counsel's unprofessional error, the Arizona Supreme Court would have determined that trial counsel's failure to bring a meritorious motion to vacate judgment rendered him ineffective, and the court would have granted relief.  Consequently, Speer was prejudiced by counsel's failure to raise this claim on direct appeal.  *See Strickland*, 466 U.S. at 694.

### 3.    Failure to Raise a Claim that the Trial Court Erred in Violating Speer's Rights Under the Confrontation Clause

As discussed in Claim 10, the trial court limited the cross-examination by which Speer's counsel could impeach the credibility of the detective whose testimony was key in Speer's conviction.  The detective had been shown in a separate case to be willing and able to conduct an investigation so shoddy and questionable that it resulted in a death sentence for an innocent man.  The trial court prevented Speer's counsel, however, from using the deposition from that case directly in confronting the detective with his shoddy

work in the Speer investigation.  Speer was thus denied his right of confrontation under the Sixth, Eighth, and Fourteenth Amendments.

This claim was raised in post-conviction (PCR 9/26/14 Pet. at 37-42; PFR at 22-23), but was rejected on review as procedurally barred because it could have been, but was not, raised on appeal.  (PCR ME 5/21/15 at 11-12.)  Thus, appellate counsel's failure to raise this meritorious claim was both deficient – as the constitutional violation was clear on the record – and prejudicial to Speer.

### 4.  Failure to Raise a Claim of Prosecutorial Misconduct

As discussed in Claim 13, Speer's trial in all its phases was rife with misconduct by the prosecutor—who has been found in a study out of Harvard Law School and other institutions to be the seventh deadliest prosecutor in America, securing often unjust death sentences.  The many instances of egregious misconduct, detailed in Claim 13, include, but are not limited to:  non-compliance with a discovery request to produce recordings of all conversations between Speer and his alleged conspirator during the relevant time period, though she used selected recordings to secure their convictions; other failures to produce material evidence; statements impugning the defense and the defendant, intended to harm the relationship between Speer and his counsel; improper vouching for witnesses; statements shifting the burden of proof; misstatements of the evidence and arguing facts not in evidence; and inducing false testimony.

All these instances of prosecutorial misconduct separately and cumulatively require relief on both the guilt and penalty verdicts.  All of these violations of Speer's right to a fair trial were also clear on the record.  Though appellate counsel mentioned some of the more shocking statements in the appeal, she did so in the context of other claims, such as that of trial court error for failure to grant a mistrial.  Though the basis of the motions for mistrial that the trial court denied was the prosecutor's misconduct, appellate counsel failed to take the obvious step and bring the prosecutorial misconduct claim directly.  For the most part, however, she missed entirely the majority of the

1   prosecutor's infractions—which failure was highly deficient and prejudicial to Speer.

2   Thus, Speer merits relief on his claims.

3   ### 5.   Failure to Present an Independent Review Argument

4   As discussed in Claim 20 Speer is entitled to relief because the Arizona Supreme

5   Court failed to conduct a constitutionally adequate independent review.  While

6   independent review on direct appeal is an important part of meaningful review of a death

7   sentence, it is limited in its scope.  Appellate courts must rely on the written record,

8   which diminishes their ability to make reliable factual determinations.  Thus, appellate

9   counsel has a professional obligation to guide appellate courts through the record,

10  vigorously advocate for their clients, and "take advantage of all appropriate opportunities

11  to argue why death is not a suitable punishment."  *State v. Garza*, 163 P.3d 1006, 1021

12  and n.16 (Ariz. 2007).

13  At the time of Speer's appeal, the Arizona Supreme Court, federal courts, and the

14  2003 ABA Guidelines all emphasized that capital appellate counsel should take

15  advantage of every opportunity to argue for life.  *See, e.g.*, *State v. Morris*, 160 P.3d 203,

16  219 n.10 (Ariz. 2007) (citation omitted) (the court's duty of independent review "should

17  not be understood to relieve death penalty counsel of the duty to raise all meritorious

18  arguments against a death sentence"); *see also Penson v. Ohio*, 488 U.S. 75, 82 (1988)

19  (rejecting argument that defendant suffered no prejudice from counsel's failure to submit

20  a merits brief on arguable claims because the appellate court examined the record

21  independently); *Anders v. California*, 386 U.S. 738, 745 (1967) (highlighting advantages

22  of advocacy over leaving the appellate court with "only the cold record which it must

23  review without the help of an advocate").  Additionally, the Supreme Court has

24  "emphasized repeatedly the crucial role of meaningful appellate review in ensuring that

25  the death penalty is not imposed arbitrarily or irrationally."  *Parker v. Dugger*, 498 U.S.

26  308, 321 (1991) (citing *Clemons v. Mississippi*, 494 U.S. 738, 749 (1990)).  When state

27  appellate courts independently reweigh the mitigation and aggravation in order to

28  determine whether a death sentence is appropriate, the court's reweighing must be done

in a constitutional manner so as to avoid the arbitrary or freakish imposition of the death penalty.  *See Clemons*, 494 U.S. at 749-52; *Furman v. Georgia*, 408 U.S. 238, 310 (1972).  In Speer's case, however, his independent review was unaided by effective advocacy of defense counsel on the aggravating and mitigating factors.  As *Evitts* makes clear, such a process does not comport with due process.  "Just as a transcript may by rule or custom be a prerequisite to appellate review, the services of a lawyer will for virtually every layman be necessary to present an appeal in a form suitable for consideration on the merits."  469 U.S. at 393.  While independent review may be sufficient in some cases, in a case where Speer was left with the mere presence of counsel and not the actual assistance of an appellate advocate, independent review cannot suffice.  Neither a criminal trial, nor an appeal, is "conducted in accord with due process of law unless the defendant has counsel to represent him."  *Id*. at 394.  "An unrepresented appellant—like an unrepresented defendant at trial—is unable to protect the vital interests at stake."  *Id*. at 395.  Failure to advocate and argue which mitigating factors were proven by a preponderance of the evidence left Speer with appellate counsel in name only, at least as to penalty phase.

Despite the clear mandate to present a case for independent review, appellate counsel failed in her duties.  This failure constituted deficient performance, and there is a reasonable probability that had this issue been placed before the Arizona Supreme Court, the court would have determined that Speer was entitled to a life sentence.  As a result, Speer is entitled to relief.

### 6.  Failure to Raise Claim of Juror Misconduct for Considering Extrinsic Evidence

As presented in Claim 25, Speer's penalty phase jury was exposed to extrinsic evidence due to juror misconduct.  At least two, and possibly more, jurors reviewed and discussed a questionnaire from the American Bar Association which had questions and detailed answers about the criminal justice system, including the role of juries, jury selection, and death penalty sentencing.  The jury's exposure to this clearly improper

extrinsic evidence created a presumption of prejudice to Speer, but the trial court flouted clearly established federal law by requiring defense counsel, rather than the State, to rebut the presumption of prejudice.  In doing so, the trial court failed to hold the State to its  burden to "'determine the circumstances [of the contact], the impact thereof upon the juror, and whether or not it was prejudicial.'"  *Godoy v. Spearman*, 861 F.3d 956, 964 (9th Cir. 2017) (en banc) (quoting *Remmer v. United States*, 347 U.S. 227, 229 (1954)). Although the jury was admonished not to consider the extrinsic evidence, the admonishment was not sufficient to overcome the substantial danger of undue, and likely subliminal, prejudice that arose from the jurors' exposure to the questionnaire.  *See Krulewitch v. United States*, 336 U.S. 440, 453 (1949) (Jackson, J., concurring).  As a result, the jurors' improper consideration of this evidence had a substantial and injurious influence in determining the jury's verdict that requires relief under the Sixth Amendment.  *Brecht v. Abrahamson*, 507 U.S. 619, 619 (1993); *Jeffries v. Wood*, 114 F.3d 1484, 1492 (9th Cir. 1997).

Appellate counsel's failure to raise this meritorious claim was both deficient—as the constitutional violation was clear on the record—and prejudicial to Speer.  Had this claim been presented on appeal, there is a reasonable probability that the Arizona Supreme Court would have determined that Speer was entitled to a new penalty phase.

### 7.    Failure to Raise a Claim of Jury Coercion

In Claim 23, Speer presented a meritorious argument that the trial court coerced the jury into giving Speer a death sentence due to repeated and improper *Allen*[38]-type instructions after the jury declared that they were unable to reach a unanimous verdict.  In addition to unduly interfering with the jury's deliberations and pressuring them to come to a unanimous verdict, the trial court failed to advise the jurors that they should not surrender their honest convictions about the weight of the evidence solely because of the

---

[38] *Allen v. United States*, 164 U.S. 492 (1896) (permitting supplemental instructions designed to encourage a jury to come to a unanimous verdict).

opinion of other jurors or for the purpose of reaching a verdict.  The trial court's actions were improper under clearly established federal law, and Speer's sentencing was highly prejudiced as a result.  *See Lowenfield v. Phelps*, 484 U.S. 231, 238-41 (1988); *Weaver v. Thompson*, 197 F.3d 359, 365 (9th Cir. 1999); *Smalls v. Batista*, 191 F.3d 272, 281 (2d Cir. 1999).

All of these errors were clear on the appellate record.  Competent appellate counsel would have raised this meritorious claim.  Failure to do so constituted deficient performance, and there is a reasonable probability that had this issue been placed before the Arizona Supreme Court, the court would have determined that Speer was entitled to a new penalty phase hearing.  Consequently, he was prejudiced by counsel's failure to raise this claim on direct appeal.  *See Strickland*, 466 U.S. at 694.

**CLAIM 27**

### SPEER'S POST-CONVICTION COUNSEL WERE CONSTITUTIONALLY INEFFECTIVE BY FAILING TO RAISE MERITORIOUS CLAIMS OF INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

By the nature of this claim, these proceedings are the first in which Speer could raise these issues.  Because no state court has decided the merits of this claim, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply and this Court's review should be de novo.

Speer incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

## A.    Speer's Post-Conviction Counsel Were Ineffective

Arizona's post-conviction process was inadequate and ineffective to protect Speer's constitutional right to counsel, and his post-conviction counsel performed deficiently, to Speer's prejudice.  As explained in *Martinez v. Ryan*, 566 U.S. 1 (2012), in Arizona, prisoners must raise the ineffectiveness of trial counsel in a petition for post-conviction relief, not on direct appeal.  *See, e.g.*, *State v. Apelt*, 861 P.2d 654, 659 (Ariz. 1993).  Speer's post-conviction proceedings were his only opportunity to pursue ineffective assistance claims—and, for that matter, any other claims that relied on more

than the cold trial record.  Thus, those post-conviction proceedings were a "first appeal as of right" on those claims, and he should have a constitutional right to the effective assistance of counsel in those proceedings.  *See Evitts v. Lucey*, 469 U.S. 387, 396 (1985) ("A first appeal as of right therefore is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney.").

Speer's post-conviction counsel were ineffective.  The problems faced by Speer's lead post-conviction counsel during the time he represented Speer— problems that stemmed from his own shockingly unethical patterns of behavior—are a matter of public record.  Carr was appointed to represent Speer on post-conviction on May 10, 2011.  (DA dkt. 104.)  After requesting many extensions of time to file a petition for post-conviction relief, and after filing a couple of initial attempts at that petition, Carr finally filed an operative document on September 26, 2014 (PCR 9/26/14 Pet.)—though the court did allow him to revise one of the claims one further time on April 8, 2015.  (PCR ME 5/21/15 at 1.)  Subsequently, he filed the Petition for Review ("PFR") to the Arizona Supreme Court on August 7, 2015.

During the time Carr was representing Speer, Carr was under intense scrutiny.  Media sources began reporting on investigations into his practices by at least 2012.  *See* Paul Rubin, *Death-Penalty Lawyers are Making a Killing off Maricopa Taxpayers*, Phoenix New Times, July 19, 2012, http://www. phoenixnewtimes.com/news/death-penalty-lawyers-are-making-a-killing-off-maricopa-taxpayers-6454923.  The Arizona State Bar opened an investigation into Carr in 2012, and another in 2015.  The result was that, in 2016, Carr was suspended from the practice of law for four years, beginning on January 1, 2017.  The state bar cited to the following conclusions:

> Mr. Carr contracted . . . to represent indigent criminal defendants.  He was first chair on two separate death penalty cases and advisory counsel on a third case.  His billings for those services, open to the public, were replete with statements of client confidences.  Carr billed for services specifically excluded by his contract including scanning documents, and non-substantive motions.  He also billed for work not performed.  As first chair, Carr failed to oversee the work of the mitigation expert to assure the work for the mitigation phase of trial was performed.  That failure led, in

254

part, to the court granting petitions for postconviction relief and resentencing his clients. Additionally, Carr was summarily suspended from the practice of law for failing to submit proof of his mandatory continuing legal education. He *received actual notice of his suspension but continued to practice law*.

Mr. Carr's misconduct was knowing and there was actual harm to his clients, the profession, the legal system, and the public. Aggravating factors were: selfish or dishonest motive, pattern of misconduct, multiple offenses, vulnerability of the victims, and substantial experience in the practice of law.

State Bar of Arizona, 12-2482 Disposition Summary, State Bar File Nos.: 12-2482 and 15-0328 (emphasis added). In fact, Carr filed the Reply to Speer's PFR during the period he was suspended from the practice of law.

At the time of his appointment to the Speer case, Carr was ordered to bring on associate counsel. (DA dkt. 104.) In June of 2011, Brent E. Graham agreed to assist as associate counsel in an informal, unpaid capacity, to answer Carr's questions as needed. (Mot. to Withdraw, PCR 8/8/12 [Sup. Ct. dkt. 733].) In November of that year, however, the court appointed Graham formally, and ordered him to take a more active role – over Graham's objections. (*Id.*) Graham moved to withdraw in August 2012. (*Id.*) The motion was denied. Thus, though Carr had associated counsel, that counsel's role was limited, ambiguous, and performed under some level of discomfort and duress.

In general, on information and belief, post-conviction counsel were not qualified, failed to maintain a functional relationship within the team and with Speer, failed to reasonably investigate all aspects of Speer's case (including but not limited to his trial and appeal), failed to investigate and present crucial legal and factual issues, failed to pursue a reasonable post-conviction litigation strategy, failed to obtain, maintain, or attempt to reconstruct the record, failed to obtain other relevant records, failed to obtain, prepare, and present the testimony of experts, unreasonably waived or dropped crucial issues without adequate information to make those choices, and failed to follow all of the applicable standards governing the reasonable performance of post-conviction counsel.

255

Thus, post-conviction counsel failed to raise a number of meritorious claims, including but not limited to the following ineffective assistance of counsel claims:

- failure to move to vacate the judgment on the basis that the State had presented inconsistent theories of the case at the related trials of Speer and Brian Womble (Claim 7);

- failure to present evidence of mental illness;

- failure to present evidence of mitigating childhood exposure to toxins;

- failure to present an expert on the effects of childhood sexual abuse (Claim 14);

- and failure to present impeachment evidence that the State's expert had not performed testing on Speer in the manner he described in his testimony (Claim 19).

All of these claims and sub-claims are substantial; post-conviction counsel's failure to raise them on state habeas prejudiced Speer.

**B.    The Ineffective Assistance of Post-Conviction Counsel Is Cause to Overcome the Procedural Default of the Claims Raised in this Petition; this Court May Thus Consider the Merits of Any Defaulted Claims**

In Arizona, where "the initial-review collateral proceeding is the first designated proceeding for a prisoner to raise a claim of ineffective assistance at trial, the collateral proceeding is in many ways the equivalent of a prisoner's direct appeal as to the ineffective-assistance claim." *Martinez*, 566 U.S. at 11. "[I]f the attorney appointed by the State to pursue the direct appeal is ineffective, the prisoner has been denied fair process and the opportunity to comply with the State's procedures and obtain an adjudication on the merits of his claims." *Id.* Likewise, "[w]ithout the help of an adequate attorney, a prisoner will have similar difficulties vindicating a substantial ineffective-assistance-of-trial-counsel claim." *Id.* Ineffective assistance claims "often require investigative work and an understanding of trial strategy. When the issue cannot be raised on direct review, moreover, a prisoner asserting an ineffective-assistance-of-

1  trial-counsel claim" during post-conviction proceedings cannot "rely on a court opinion

2  or the prior work of an attorney addressing that claim." *Id.* at 11-12.  Thus, "[t]o present

3  a claim of ineffective assistance at trial in accordance with the State's procedures . . . a

4  prisoner likely needs an effective attorney." *Id*. at 12.

5       This Court may consider the merits of any of Speer's claims that would otherwise

6  be procedurally defaulted, because he can demonstrate cause and prejudice.  *See*

7  *generally Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *see also Smith v. Murray*,

8  477 U.S. 527, 533 (1986).  The United States Supreme Court has established the

9  equitable rule that the "[i]nadequate assistance of counsel at initial-review collateral

10  proceedings may establish cause for a prisoner's procedural default of a claim of

11  ineffective assistance at trial." *Martinez*, 566 U.S. at 9.

12       Speer can demonstrate cause under *Martinez* because the underlying claims (*i.e.*,

13  the defaulted claims) are substantial and post-conviction counsel's performance was

14  inadequate. *See id*. at 16.  To show his claims are "substantial," Speer only needs to

15  demonstrate they have "some merit." *Id*. at 14.  In *Martinez*, the Court specifically cited

16  the standard for issuance of a Certificate of Appealability ("COA").  *Id*. at 14 (citing

17  *Miller-El v. Cockrell*, 537 U.S. 322 (2003)).  By citing *Miller-El*'s discussion of COA

18  standards, the Court indicated that the COA standard applies when determining if an

19  underlying claim is "substantial."

20       Under the COA standard, "[t]he petitioner must demonstrate that reasonable jurists

21  would find the district court's assessment of the constitutional claims debatable or

22  wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  "In requiring a question of some

23  substance, or a substantial showing of the denial of [a] federal right, obviously a

24  petitioner need not show that he should prevail on the merits." *Barefoot v. Estelle*, 463

25  U.S. 880, 893 n.4 (1983) (internal quotation marks omitted).  *Slack*'s holding "would

26  mean very little if appellate review were denied because the prisoner could not convince

27  a judge, or, for that matter, three judges, that he or she would prevail." *Miller-El*, 537

28  U.S. at 337.  The COA standard is intended to screen out only the clearly frivolous claims

1   and, therefore, any doubt whether Speer has advanced a nonfrivolous claim should be

2   resolved in his favor.  *See Lambright v. Stewart*, 220 F.3d 1022, 1025 (9th Cir. 2000).

3   Further, "[a]lthough not dispositive," a death sentence "is a proper consideration" in

4   deciding whether to issue a COA.  *Id.* (internal quotation marks omitted).

5         After all, conducting a full merits review on the undeveloped record would

6   frustrate the intention of *Martinez* to avoid the circumstance of a prisoner never receiving

7   a proper hearing on a claim involving a "bedrock principle," *Martinez*, 566 U.S. at 12—

8   the right to effective trial counsel.  The Ninth Circuit Court of Appeals' jurisprudence on

9   *Martinez* supports these principles.

10        Two en banc panels of the Ninth Circuit have addressed *Martinez*.  In *Detrich v.*

11  *Ryan*, a four-judge plurality explained that, where a prisoner demonstrates that his post-

12  conviction counsel performed deficiently and failed to raise a "substantial" claim of

13  ineffective assistance of trial counsel, he satisfies *Martinez*'s cause-and-prejudice

14  standard.  740 F.3d 1237, 1245 (9th Cir. 2013) (en banc).  A petitioner shows cause by

15  showing post-conviction counsel were deficient, and shows prejudice by showing the

16  ineffective-assistance-of-trial-counsel claim is substantial.  *Id.* at 1245-46.

17        Judge Fletcher explained that, for the "narrow purpose" of showing cause under

18  *Martinez*, a "prisoner need not show actual prejudice resulting from his [post-conviction]

19  counsel's deficient performance, over and above his required showing that the trial-

20  counsel [ineffectiveness] claim be 'substantial[.]'"  *Id.* at 1246.  The plurality reasoned

21  that, if a petitioner "were required to show that the defaulted trial-counsel

22  [ineffectiveness] claims fully satisfied *Strickland* . . . this would render superfluous the

23  first *Martinez* requirement of showing that the underlying *Strickland* claims were

24  'substantial[.]'"  *Detrich*, 740 F.3d at 1246.

25        In *Dickens v. Ryan*, 740 F.3d 1302 (9th Cir. 2014) (en banc), an eight judge

26  majority largely paralleled the plurality's analysis in *Detrich*.  In *Dickens*, the Court

27  instructed that the petitioner could show cause for default if he could show the first two

28  *Martinez* elements:  "(1) the [defaulted] claim is substantial and," (2) "his PCR counsel

258

1   was ineffective under *Strickland*." *Id.* at 1320.  Thus, because Speer's post-conviction

2   counsel were inadequate and substantial claims went unreviewed in state court, he can

3   show cause to overcome any procedural default.

4           The prejudice element of the cause-and-prejudice test remains settled.  Generally,

5   once the petitioner has shown cause, the Court should consider whether there is prejudice

6   based on the underlying constitutional claim.  *See, e.g.*, *Walker v. Martin*, 562 U.S. 307,

7   315 (2011) (describing cause and prejudice as "cause for the delay in asserting his claims

8   and actual prejudice resulting from the State's alleged violation of his constitutional

9   rights"); *Smith*, 477 U.S. at 533 ("actual prejudice resulting from the alleged

10  constitutional violation" (quoting *Wainwright v. Sykes*, 433 U.S. 72, 84 (1997))).

11          Thus, this Court should determine whether there is a reasonable probability that

12  errors alleged undermined confidence in the outcome of the proceedings against Speer.

13  In undertaking this analysis, the Court should bear in mind that *Martinez* provided an

14  equitable avenue for federal courts to review the merits of non-frivolous constitutional

15  violations, and that evidentiary development is necessary to establishing cause and

16  prejudice.  *See, e.g.*, *Woods v. Sinclair*, 764 F.3d 1109, 1138 n.16 (9th Cir. 2014)

17  (rejecting argument that "*Pinholster* and § 2254(e)(2) categorically bar [habeas

18  petitioners] from obtaining such a hearing or from presenting extra-record evidence to

19  establish cause and prejudice for the procedural default").

20          In sum, Speer's post-conviction counsel were ineffective.  This failure deprived

21  him of his constitutional rights to due process and the effective assistance of counsel, and

22  also provides cause and prejudice to overcome the default of any claims raised herein.

23  He is entitled to evidentiary development and relief.

24  **CLAIM 28**

25          **SPEER'S CONVICTION AND SENTENCE MUST BE VACATED DUE TO
        THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS IN THIS**

26      **CASE**

27          Portions of this claim—the cumulative effect of the ineffective assistance of

28  counsel claims raised on state post-conviction review—were raised on post-conviction

1    review in Claim Seventeen.  (PCR 9/26/14 Pet. at 90-91; PFR at 41-44.)  The state court

2    denied this claim on the basis that "Arizona does not recognize the cumulative error

3    rule."  (PCR ME 5/21/15 at 26.)  Thus, the federal question not decided; this Court may

4    then evaluate it de novo.

5         Here, Speer also asserts that *all* the claims are to be evaluated for cumulative

6    prejudicial effect, not only ineffective assistance of counsel claims, and particularly not

7    only those IAC claims raised by state post-conviction counsel.  Thus, the claim as it is

8    constituted herein has not been presented in Speer's state court proceedings.  Speer can

9    demonstrate cause and prejudice for failing to raise these claims previously due to the

10   ineffective assistance of Speer's state counsel, which constitutes cause for the default and

11   resulted in prejudice to Speer.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984);

12   *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985); *Martinez v. Ryan*, 566 U.S. 1, 9 (2012).

13   Speer will demonstrate at an evidentiary hearing that post-conviction counsel fell below

14   the standards of a minimally competent capital post-conviction attorney when they failed

15   to raise these meritorious claims.  *See* Claim 27.  Therefore, the Court may consider the

16   merits of this claim.  Because the claim has not been adjudicated by the Arizona state

17   courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this

18   Court's review, and the Court may consider the claim de novo.

19        Speer incorporates by specific reference all facts, allegations, and arguments made

20   elsewhere in this Petition.

21        *Chambers v. Mississippi*, 410 U.S. 284 (1973), clearly established that "the

22   combined effect of multiple trial court errors violates due process where it renders the

23   resulting criminal trial fundamentally unfair."  *Parle v. Runnels*, 505 F.3d 922, 927 (9th

24   Cir. 2007).  The combination of errors in this case deprived Speer of his fundamental

25   constitutional rights, including his right to a fair trial, trial by jury, due process, effective

26   assistance of counsel, presentation of a defense, a reliable determination of guilt and

27   penalty, and fundamental fairness.  *Taylor v. Kentucky*, 436 U.S. 478, 487 n.15 (1978).

28   As a result of the cumulative effect of the errors in the guilt and penalty phases of the trial

against Speer, his convictions and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  When evaluating cumulative error, while only guilt-phase errors are relevant to Speer's convictions, "all errors are relevant to the sentence."  *Darks v. Mullin*, 327 F.3d 1001, 1018 (10th Cir. 2003).  As stated above, Speer incorporates by specific reference all facts, allegations, and arguments made elsewhere in this document. In addition, he re-raises all objections, arguments, and claims of error made at trial and during direct appeal and post-conviction proceedings, and incorporates by reference herein those prior objections, arguments, and claims of error.

Even in cases where no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the Ninth Circuit Court of Appeals recognizes that the cumulative effect of multiple errors may still prejudice a defendant.  *See Parle*, 505 F.3d at 934 (finding habeas relief warranted when combined effect of multiple trial errors resulted in injurious effect on jury's verdict); *Alcala v. Woodford*, 334 F.3d 862, 894-95 (9th Cir. 2003) (affirming grant of habeas relief where multiple errors by court and counsel deprived defendant of a fundamentally fair trial); *Killian v. Poole*, 282 F.3d 1204, 1211 (9th Cir. 2002) (stating that the cumulative effect of errors may be so prejudicial as to require reversal); *Mak* v. *Blodgett*, 970 F.2d 614, 622 (9th Cir. 1992) (finding that counsel's deficiencies taken in combination with two other errors constituted a denial of petitioner's due process rights).

As the preceding claims illustrate, multiple grievous errors were committed during Speer's trial and sentencing proceedings.  Even if the above errors are deemed harmless when viewed individually, their cumulative effect substantially prejudiced Speer, and when viewed cumulatively in the totality of the circumstances, Speer did not receive a fair trial or sentencing.  "[T]he cumulative effect of two of more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error."  *Darks*, 327 F.3d at 1018 (quotation and internal citations omitted).

The aggregate harm of the constitutional violations described herein warrants the granting of this Petition without any determination of whether these violations substantially affected or influenced the jury's verdict.  *Brecht v. Abrahamson*, 507 U.S. 619, 638 n.9 (1993).  Furthermore, these constitutional violations so infected the integrity of the proceedings that the errors cannot be deemed harmless.  In any event, these violations of Speer's rights had a substantial and injurious effect or influence on the penalty judgment, rendering it fundamentally unfair.  Considering all the errors above, this Court must conclude that Speer was denied a fair trial.

**CLAIM 29**

**SYSTEMIC CLAIMS**

Speer incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

**A.     Arizona's Death Penalty Scheme Does Not Sufficiently Channel the Jury's Sentencing Discretion**

This sub-claim was raised in Speer's direct appeal as Claim IV(10).  (DA dkt. 87 at 51-52.)  The Arizona Supreme Court denied the sub-claims as previously rejected. *State v. Speer*, 212 P.3d 787, 805 (Ariz. 2009).  To the extent any aspects of this sub-claim were not exhausted, that failure is attributable to the ineffective assistance of Speer's appellate and post-conviction counsel.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985); *Martinez v. Ryan*, 566 U.S. 1, 9 (2012).  Speer will demonstrate at an evidentiary hearing that appellate and post-conviction counsel fell below the standards of minimally competent capital attorneys and that those failures prejudiced Speer.

Arizona's death penalty scheme does not sufficiently channel the sentencing jury's discretion.  Aggravating circumstances should narrow the class of persons eligible for the death penalty and reasonably justify the imposition of a harsher penalty.  Arizona Revised Statutes section 13-703.01 is unconstitutional because it provides no objective standards to guide the jury in weighing the aggravating and mitigating circumstances.

1    The broad scope of Arizona's aggravating factors encompasses nearly anyone involved in

2    a murder, in violation of the Eighth and Fourteenth Amendments.[39]

3            In *Furman v. Georgia*, the Supreme Court declared that a death-sentencing

4    procedure is unconstitutional when it provides "no meaningful basis for distinguishing

5    the few cases in which [death] is imposed from the many cases in which it is not."  408

6    U.S. 238, 313 (1972) (White, J., concurring); *see also, e.g.*, *Maynard v. Cartwright*, 486

7    U.S. 356, 362 (1988); *Godfrey v. Georgia*, 446 U.S. 420, 427-28 (1980).  "*Furman*

8    mandates that where discretion is afforded a sentencing body on a matter so grave as the

9    determination of whether a human life should be taken or spared, that discretion must be

10   suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious

11   action."  *Gregg v. Georgia*, 428 U.S. 153, 189 1976).

12           The narrowing process must, moreover, be established by statute.  *See id.* at 207

13   (stating that the selection of the persons eligible to be prosecuted and ultimately

14   sentenced to death "[must] always [be] circumscribed by . . . legislative guidelines").

15   "Part of a State's responsibility in this regard is to define the crimes for which death may

16   be the sentence in a way that obviates 'standardless [sentencing] discretion.'"  *Godfrey*,

17   446 U.S. at 428 (alteration in original) (quoting *Gregg*, 428 U.S. at 196).  Ultimately,

18   "[t]o pass constitutional muster, a capital sentencing scheme must 'genuinely narrow the

19   class of persons eligible for the death penalty and must reasonably justify the imposition

20   of a more severe sentence on the defendant compared to others found guilty of murder.'"

21   *Lowenfield v. Phelps*, 484 U.S. 231 (1988) (quoting *Zant*, 462 U.S. at 877.)

22

23

24           [39] A petition for a writ of certiorari has been filed in the United States Supreme
25   Court, presenting the following questions:  (1) "Whether Arizona's capital sentencing
     scheme, which includes so many aggravating circumstances that virtually every
26   defendant convicted of first-degree murder is eligible for death, violates the Eighth
     Amendment" and (2) "Whether the death penalty in and of itself violates the Eighth
27   Amendment, in light of contemporary standards of decency."  Petition for Writ of
     Certiorari, Abel Daniel Hidalgo v. State of Arizona, 2017 WL 3531089 (U.S. Aug. 14,
28   2017) (No. 17-251).  Speer incorporates the arguments brought therein by reference.

The narrowing principle is so fundamental to the constitutional administration of the death penalty that even Justice Scalia—otherwise a vocal critic of the Court's Eighth Amendment jurisprudence—"adhere[d] to the precedent establish[ing] . . . that when a State adopts capital punishment for a given crime but does not make it mandatory," the State must "establish in advance, and convey to the sentencer, a governing standard." *Walton v. Arizona*, 497 U.S. 639, 671 (1990) (Scalia, J., concurring in part and concurring in the judgment).  In other words, the legislature must offer "clear and objective" standards, *Godfrey*, 446 U.S. at 428, that provide a "meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not."  *Furman*, 408 U.S. at 313 (White, J., concurring).

Arizona's death penalty statute violates these mandates of the Supreme Court. Under Arizona law, a broad range of conduct constitutes first-degree murder, including intentional killings, premeditated killings, killings committed in the course of a number of other crimes, and the killings of law-enforcement officers in the line of duty.  *See* Ariz. Rev. Stat. § 13-1105(A).  This initial "pool" of individuals eligible for the death penalty is so broadly defined that it encompasses the vast majority of murders actually committed.  This is seen both by a reading of the statute, which fails to meaningfully distinguish first-degree murder and second-degree murder, and through a review of the actual cases which demonstrates that almost all murders in Arizona could in fact be categorized as first-degree murder.

The narrowing function, then, is ostensibly performed by the aggravating factors; a jury must find at least one to make a first-degree-murder defendant death-eligible. However, the aggravating factors sweep so expansively that they do not meaningfully separate out a group of offenders whose crimes are so egregious they should be eligible for the death penalty.  *See id.* § 13-703(F); *compare, e.g., State v. Wallace*, 728 P.2d 232, 238 (Ariz. 1986) (stating that a murder with no apparent motive is death-eligible), *and State v. Chaney*, 686 P.2d 1265, 1282 (Ariz. 1984) (finding that the defendant used insufficient force and is therefore death-eligible), *with State v. Smith*, 687 P.2d 1265,

1266-67 (Ariz. 1984) (discussing crime committed with specific motive of eliminating a witness), *and State v. Summerlin*, 675 P.2d 686, 696 (Ariz. 1983) (finding that the defendant used excessive force and so was death-eligible).  Under Arizona law, the sentencer must impose a death sentence whenever it "finds one or more of the aggravating circumstances . . . and then determines that there are no mitigating circumstances sufficiently substantial to call for leniency."  Ariz. Rev. Stat. § 13-703(E) (current version at Ariz. Rev. Stat. § 13-751(E) (2012)).

Because both Arizona's definition of first-degree murder and its aggravating factors sweep so broadly, the Arizona statute fails to perform the constitutionally required function of channeling the sentencer's discretion toward imposing a death sentence for only the most egregious of murders.  *See Lowenfield*, 484 U.S. at 244.  Because Speer was sentenced to death under Arizona's overbroad capital-sentencing scheme, his sentence is constitutionally infirm, and he is entitled to relief.

**B.    The Death Penalty Is Irrational and Arbitrarily Imposed; It Serves No Purpose that Is Not Adequately Addressed by Life in Prison**

This sub-claim was raised in Speer's direct appeal as Claim IV(5).  (DA dkt. 87 at 50.)  The Arizona Supreme Court denied the sub-claim as previously rejected.  *Speer*, 212 P.3d at 804.  To the extent any aspects of this sub-claim were not exhausted, that failure is attributable to the ineffective assistance of Speer's appellate and post-conviction counsel, as described above in sub-claim A.

The death penalty is irrational and arbitrarily imposed; it serves no purpose that is not adequately addressed by life in prison, in violation of Speer's right to due process under the Eighth and Fourteenth Amendments to the United States Constitution.

In 1972, the Supreme Court struck down all existing death-penalty statutes because the court concluded that the death penalty was being imposed in an arbitrary and irrational manner.  *Furman*, 408 U.S. 238.  The death penalty continues to be imposed in an arbitrary and irrational fashion by Arizona courts.

1    The arbitrary application of the death penalty in Speer's case amounts to cruel and

2  unusual punishment in violation of the Eighth Amendment and violates his right to due

3  process under the Fourteenth Amendment.  *See Glossip v. Gross*, 135 S. Ct. 2726, 2755-

4  56 (2015) (Breyer, J., dissenting) ("Today's administration of the death penalty involves

5  three fundamental constitutional defects:  (1) serious unreliability, (2) arbitrariness in

6  application, and (3) unconscionably long delays that undermine the death penalty's

7  penological purpose."); *Callins v. Collins*, 510 U.S. 1141, 1144 (1994) (Blackmun, J.,

8  dissenting); *Jeffers v. Lewis*, 38 F.3d 411, 425 (9th Cir. 1994) (Noonan, J., dissenting)

9  ("[T]he administration of the death penalty in Arizona is so arbitrary as to constitute cruel

10  and unusual punishment in violation of the Eighth Amendment . . . ").  Speer's death

11  sentence was imposed arbitrarily when compared with other cases involving either a

12  sentence of death or a sentence of life imprisonment.  There is still no rational,

13  constitutionally permissible basis for distinguishing Speer's case, or the few cases in

14  which the death penalty has been imposed in Arizona and in the United States, from the

15  many cases in which it has not been imposed.  This fact highlights the irrational and

16  arbitrary imposition of the death penalty in Arizona.  Because Speer's sentence violates

17  his Eighth and Fourteenth Amendment rights, he is entitled to relief.

18  **C.    The Fact-Finder in Capital Cases Must Be Able to Consider All
        Relevant Mitigating Evidence**

19

20    This sub-claim was raised in Speer's direct appeal as Claim IV(1).  (DA dkt. 87 at

21  48-49.)  The Arizona Supreme Court denied the sub-claim as previously rejected.  *Speer*,

22  212 P.3d at 804.  To the extent any aspects of this sub-claim were not exhausted, that

23  failure is attributable to the ineffective assistance of Speer's appellate and post-conviction

24  counsel, as described above in sub-claim A.

25    In *Lockett*, the Supreme Court held that "in all but the rarest kind of capital case,"

26  the sentencer must "not be precluded from considering, as a mitigating factor, any aspect

27  of a defendant's character or record and any of the circumstances of the

28  offense . . . [offered] as a basis for a sentence less than death."  *Lockett v. Ohio*, 438 U.S.

586, 604 (1978).  "[I]t is not enough simply to allow the defendant to present mitigating evidence to the sentencer.  The sentencer must also be able to consider and give effect to that evidence in imposing [the] sentence."  *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989); *see also Boyde v. California*, 494 U.S. 370, 377-78 (1990); *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982).  Upon meeting the low threshold for relevance, "the 'Eighth Amendment requires that the jury be able to consider and give effect to' a capital defendant's mitigating evidence."  *Tennard v. Dretke*, 542 U.S. 274, 285 (2004) (quoting *Boyde*, 494 U.S. at 377-78).  Imposing a standard that limits the mitigating evidence considered by the jury violates the Eighth Amendment's requirement that the sentencer be allowed to consider any aspect of the defendant's character or record that counsels in favor of a sentence other than death.  *See Smith v. Texas*, 543 U.S. 37, 38 (2004); *Tennard*, 542 U.S. at 285; *Lockett*, 438 U.S. at 604.

Thus, it is clear that the fact-finder in capital cases must be able to consider all relevant mitigating evidence in deciding whether to give the death penalty.  *See Woodson v. North Carolina*, 428 U.S. 280 (1976).  The trial court's failure to allow the jury to consider and give effect to all mitigating evidence in this case by limiting its consideration to that proven by a preponderance of the evidence is unconstitutional under the Eighth and Fourteenth Amendments.

**D.    The "Especially Heinous, Cruel or Depraved" Aggravating Factor Is Unconstitutionally Vague and Overbroad**

This sub-claim was raised in Speer's direct appeal as Claim IV(2).  (DA dkt. 87 at 49.)  The Arizona Supreme Court denied the sub-claim as previously rejected.  *Speer*, 212 P.3d at 804.  To the extent any aspects of this sub-claim were not exhausted, that failure is attributable to the ineffective assistance of Speer's appellate and post-conviction counsel, as described above in sub-claim A.

Under Arizona law, a person convicted of first-degree murder is eligible for the death penalty if she "committed the offense in an especially heinous, cruel or depraved manner."  Ariz. Rev. Stat. § 13-703(F)(6) (renumbered to § 13-751(F)(6)).  Speer's Sixth,

Eighth, and Fourteenth Amendment rights were violated by his prosecution for the especially cruel aggravating circumstance because it is vague when applied by juries and fails to narrow the class of those eligible for the death penalty. *See Tuilaepa v. California*, 512 U.S. 967, 972 (1994) ("As we have explained, the aggravating circumstance must meet two requirements. First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder. Second, the aggravating circumstance may not be unconstitutionally vague." (internal citations omitted)).

### 1. The Cruelty Aggravator Is Vague Because It Fails to Channel Jurors' Sentencing Discretion

The aggravating circumstance that a murder be especially cruel is unconstitutionally vague when applied by jurors because it does not sufficiently narrow the jurors' discretion. The death penalty cannot be imposed in an arbitrary and capricious manner. *See Furman*, 408 U.S. 238. Therefore, the Supreme Court has clearly established that a state must define death-penalty eligible crimes in a way that "obviates 'standardless [sentencing] discretion.'" *Godfrey*, 446 U.S. at 428; *see also Zant v. Stephens*, 462 U.S. 862, 874, 877 (1983). The "State must establish rational criteria that narrow the decisionmaker's judgment as to whether the circumstances of a particular defendant's case meet the threshold." *McCleskey v. Kemp*, 481 U.S. 279, 305 (1987). Vague sentencing standards are therefore unconstitutional because they fail to adequately "channel the sentencing decision patterns of juries with the result that a pattern of arbitrary and capricious sentencing like that found unconstitutional in *Furman* could occur." *Gregg*, 428 U.S. at 195 n.46.

The jury-sentencing process employed in Arizona following *Ring v. Arizona*, 536 U.S. 584 (2002), rendered Ariz. Rev. Stat. § 13-703(F)(6) unconstitutionally vague. *See generally Maynard*, 486 U.S. at 361-62 (discussing appropriate constitutional framework for vagueness challenges to aggravating circumstances). The Supreme Court had previously held that the aggravating circumstance as written was unconstitutionally vague

but that Arizona courts had given it sufficient substance by providing, through case law, a narrowing construction. *Walton*, 497 U.S. at 652-55, *overruled on other grounds by Ring*, 536 U.S. at 589.  This decision, however, depended on judges conducting the sentencing.  *Id.* at 653 (distinguishing prior cases that struck down similar aggravators under jury sentencing schemes because the "logic of those cases has no place in the context of sentencing by a trial judge").  The *Walton* Court presumed that Arizona trial judges could and were applying the narrowed definition.  *Id.*  Such a presumption does not hold for juries.  *Walton* therefore is not the appropriate framework for Speer's challenge to § 13-703(F)(6) as enforced by juries; instead *Maynard* and *Godfrey* control.

In those cases, the United States Supreme Court found unconstitutionally vague aggravating circumstances applied by juries.  As there, in Arizona a juror could reasonably believe that every intentional murder is especially cruel.  *See Maynard*, 486 U.S. at 364; *Godfrey*, 446 U.S. at 428-29.  Jurors instructed in accordance with *Walton* are left with only general terms, which are insufficient to guide their discretion.  The narrowed definition of cruelty approved of in *Walton* read:  "[A] crime is committed in an especially cruel manner when the perpetrator inflicts mental anguish or physical abuse before the victim's death, and that mental anguish includes a victim's uncertainty as to his ultimate fate."  497 U.S. at 654 (internal quotation marks omitted).  This definition fails to inform a juror what type, duration, or degree of physical pain qualifies as abuse and thus differentiates a crime deserving of the death penalty from every first-degree murder.  A juror could reasonably believe that any murder, except one in which the victim dies instantaneously and therefore painlessly, would include physical pain and therefore qualify as especially cruel.  Jurors do not have the knowledge that judges do of case law that explains when a murder is especially cruel, knowledge that saved the aggravating circumstance from being unconstitutionally vague in *Walton*.  And juries, unlike judges, do not have the benefit of experience with multiple cases so that they can discern if the case before them is above the norm of first-degree murder cases.  *See State v. Carlson*, 48 P.3d 1180, 1192 (Ariz. 2002) ("As we have repeatedly held, the death

penalty should not be imposed in every capital murder case but, rather, it should be reserved for cases in which either the manner of the commission of the offense or the background of the defendant places the crime 'above the norm of first-degree murders.'" (citation omitted)); *cf. Gregg*, 428 U.S. at 192 ("Since the members of a jury will have had little, if any, previous experience in sentencing, they are unlikely to be skilled in dealing with the information they are given." (citations omitted)). The instruction approved of for imposition by judges in *Walton* is therefore vague when applied by juries.

The Arizona Supreme Court rejected Speer's claim as having been previously decided. *Speer*, 212 P.3d at 804. The conclusion that the cruelty aggravator is not unconstitutionally vague was an unreasonable application of clearly established federal law. The shift to jury sentencing alters the landscape and makes *Walton* no longer the controlling case on the issue. The cruelty aggravating circumstance is vague under *Maynard* and *Godfrey*. Speer's rights under the Sixth, Eighth, and Fourteenth Amendments were violated, and he is entitled to relief in the form of new aggravation-phase and penalty-phase proceedings.

### 2. The Cruelty Aggravator Is Overbroad Because It Does Not Narrow the Class of Death-Eligible Offenders

In addition to being vague, the cruelty aggravating circumstance does not genuinely narrow the class of death-eligible offenders. *See, e.g.*, *Lowenfield*, 484 U.S. at 244 (quoting *Zant*, 462 U.S. at 877). Aggravating circumstances cannot be so broad that a jury "is incapable of imposing capital punishment other than by arbitrariness or caprice," *Gregg*, 428 U.S. at 201 n.51, and "the circumstance may not apply to every defendant convicted of a murder," *Tuilaepa*, 512 U.S. at 972; *see also Arave v. Creech*, 507 U.S. 463, 474 (1993). Arizona's judicial interpretations of the cruelty aggravating circumstance have resulted in the aggravating circumstance being found under conflicting circumstances. *Compare Summerlin*, 675 P.2d at 696 (finding cruelty because defendant used excessive force); *with Chaney*, 686 P.2d at 1282 (finding cruelty because defendant

270

used insufficient force, causing victim to suffer).  A jury could find the aggravating

circumstance in almost any first-degree murder.  The cruelty aggravating circumstance

therefore does not ensure that "the imposition of a more severe sentence on the defendant

compared to others found guilty of murder" is justified.  *Lowenfield*, 484 U.S. at 244

(quoting *Zant*, 462 U.S. at 877).

　　　　The Arizona Supreme Court summarily dismissed this claim as previously

decided.  *Speer*, 212 P.3d at 804.  This was an unreasonable application of clearly

established federal law because the cruelty aggravating circumstance applies to almost

every first-degree murder and therefore does not genuinely narrow those eligible for the

death penalty.  The result is the potential for the arbitrary imposition of the death penalty.

Speer's sentence based on this aggravating circumstance violated his Sixth, Eighth, and

Fourteenth Amendment rights.  He is therefore entitled to new aggravation-phase and

penalty-phase proceedings.

**E.**　**The Court's Instruction that the Jury "Must Not Be Influenced by Mere Sympathy" Limited the Mitigation the Jury Could Consider**

　　　　This sub-claim was raised in Speer's direct appeal as Claim IV(3).  (DA dkt. 87 at

49.)  The Arizona Supreme Court denied the sub-claim as previously rejected.  *Speer*,

212 P.3d at 804.  To the extent any aspects of this sub-claim were not exhausted, that

failure is attributable to the ineffective assistance of Speer's appellate and post-conviction

counsel, as described above in sub-claim A.

　　　　The Eighth and Fourteenth Amendments of the United States Constitution require

that in capital cases the sentencer "not be precluded from considering, as a mitigating

factor, any aspect of a defendant's character or record and any of the circumstances of the

offense that the defendant proffers as a basis for a sentence less than death."  *Lockett,* 438

U.S. at 604.  "[I]t is not enough simply to allow the defendant to present mitigating

evidence to the sentencer.  The sentencer must also be able to consider and give effect to

that evidence in imposing [the] sentence."  *Penry*, 492 U.S. at 319; *see also Boyde*, 494

U.S. at 377-78; *Eddings*, 455 U.S. at 110.

In *California* v. *Brown*, 479 U.S. 538, 542-43 (1987), the United States Supreme Court determined that an instruction directing the jury not to be swayed by "mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" was not unconstitutional.  *Brown* did not hold that a state court can prevent a jury from considering feelings of mercy or sympathy.  *See id.*  The *Brown* Court simply approved of jury instructions that "prohibit[] juries from basing their sentencing decisions on factors not presented at the trial, and irrelevant to the issues at the trial."  *Id.* at 543.

The Court's decisions since *Brown* have emphasized that juries must be permitted to consider all relevant mitigating evidence.  In *Tennard*, 542 U.S. at 284-85, the United States Supreme Court addressed and reaffirmed the relevancy standard with regard to mitigating evidence, emphasizing that the general rule of relevance applies and that mitigating evidence is relevant where it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  *See also* Fed. R. Evid. 401.  "[A] State cannot bar 'the consideration of. . . evidence if the sentencer could reasonably find that it warrants a sentence less than death.'"  *Tennard,* 542 U.S. at 285 (quoting *McKoy* v. *North Carolina,* 494 U.S. 433, 441 (1990)).  Upon meeting the low threshold for relevance, the "'Eighth Amendment requires that the jury be able to consider and give effect to' a capital defendant's mitigating evidence."  *Id.* (quoting *Boyde*, 494 U.S. at 377-78).

The court here instructed the jury that "Evidence is irrelevant and should not be considered by you individually if it is mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling."  (ROA 752 at 9.)  These instructions limited the mitigation the jury could consider in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.  The jury instructions in this case fulfilled the fears expressed by Justice O'Connor in her concurring opinion in *Brown,* that the absence of emotion in jury verdicts may mislead jurors "into believing that mitigating evidence about a defendant's background or character must also be ignored."  *Brown,* 479 U.S. at 545-46 (O'Connor, J., concurring).  Further, the jury instructions limited the jury's effective

consideration of the mitigating evidence presented by Speer and deprived Speer of a "constitutionally indispensable part of the process of inflicting the penalty of death." *See Woodson*, 428 U.S. at 304. Thus, his sentence must be reversed.

**F.      The Death Penalty Is Cruel and Unusual Under Any Circumstances and Violates the Eighth and Fourteenth Amendments**

This sub-claim was raised in Speer's direct appeal as Claim IV(4). (DA dkt. 87 at 50.) The Arizona Supreme Court denied the sub-claim as previously rejected. *Speer*, 212 P.3d at 804. To the extent any aspects of this sub-claim were not exhausted, that failure is attributable to the ineffective assistance of Speer's appellate and post-conviction counsel, as described above in sub-claim A.

The Eighth Amendment precludes the imposition of punishments that are "cruel and unusual," as assessed according to the "evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 100, 101 (1958). The past forty years have demonstrated that capital punishment is cruel and unusual and serves no penological purpose. Accordingly, it does not comport with the dictates of the Eighth Amendment.

The death penalty is cruel for two distinct reasons: it is both unreliable and arbitrarily imposed. First, in spite of the need for heightened reliability in a proceeding when a sentence of death is at stake, *see Woodson*, 428 U.S. at 305 (joint opinion of Stewart, Powell, and Stevens, JJ.), capital punishment is unreliable because of the significant risk that an innocent person will be sentenced to death or even executed. Between 1989 and 2012, there were 115 exonerations from capital convictions; there were six more based on actual innocence in 2014 alone. *Glossip*, 135 S. Ct. at 2757 (Breyer, J., dissenting). Research suggests that 4.1% of the people on death row are actually innocent. *See id.* at 2758 (citing Samuel R. Gross et al., *Rate of False Conviction of Criminal Defendants Who Are Sentenced to Death*, 111 Proc. of the Nat'l Acad. of Sci. 7230 (2014)). Moreover, there is compelling evidence that innocent individuals have in fact been executed. *See, e.g.*, David Grann, *Trial by Fire: Did Texas*

1  *Execute an Innocent Man?*, The New Yorker, Sept. 7, 2009, at 42, *available at*

2  http://www.newyorker.com/magazine/2009/09/07/trial-by-fire (describing the conviction

3  and execution of Cameron Todd Willingham for the house fire that killed his children,

4  despite the invalidity of the scientific analysis deeming the fire intentional).

5        In addition to being unreliable, the death penalty is wholly arbitrary.  The

6  imposition of the death penalty should turn on the crime and the offender's culpability;

7  capital punishment in this country is to be reserved for "those offenders who commit 'a

8  narrow category of the most serious crimes' and whose extreme culpability makes them

9  'the most deserving of execution.'"  *Roper v. Simmons*, 543 U.S. 551, 568 (2005)

10  (quotation omitted).  But research demonstrates that a number of irrelevant factors,

11  including the race and gender of the victim or defendant and the geographic location of

12  the crime, have an impermissible bearing on the probability of a death sentence.  *See,*

13  *e.g.*, Steven F. Shatz & Terry Dalton, *Challenging the Death Penalty with Statistics:*

14  *Furman, McCleskey, and a Single County Case Study*, 34 Cardozo L. Rev. 1227, 1244-56

15  (2013) (citing studies finding gender, racial, and geographic disparities in the imposition

16  of death sentences).  That the death penalty is both unreliable and turns on

17  constitutionally irrelevant factors renders it cruel.  *Cf. Furman*, 408 U.S. at 309-10

18  (Stewart, J., concurring) (deeming "cruel and unusual" the "wanton[] and freakish[]"

19  imposition of death sentences).

20        The death penalty has also become unusual.  Both the number of death sentences

21  and the number of executions nationally have plummeted over the last fifteen years.  *See*

22  *Glossip*, 135 S. Ct. at 2775 (Breyer, J., dissenting).  Fewer and fewer states use the death

23  penalty—thirty have abolished capital punishment or have not conducted an execution in

24  over eight years—and the use of the death penalty is now concentrated in a handful of

25  counties.  *See Executions by State and Year*, The Death Penalty Information Center,

26  http://www.deathpenaltyinfo.org/node/5741; *States With and Without the Death Penalty*,

27  The Death Penalty Information Center, http://www.deathpenaltyinfo.org/ states-and-

28  without-death-penalty; Richard C. Dieter, *The 2% Death Penalty*, 1 (2013) ("Over half of

274

the executions carried out since 1976 come from cases originating in 2% of U.S. counties.").  Perhaps most striking is the "consistency of the direction of change."  *Atkins v. Virginia*, 536 U.S. 304, 315 (2002).  Seven states have abolished the death penalty in the last decade alone, making capital punishment singularly unusual.  *See States With and Without the Death Penalty*, *supra*.

Finally, capital punishment serves no permissible penological purpose.  In 1976, the Supreme Court emphasized that the death penalty was "said to serve two principal social purposes:  retribution and deterrence of capital crimes by prospective offenders." *Gregg*, 428 U.S. at 183 (joint opinion of Stewart, Powell, and Stevens, JJ.).  However, the Court recognized that a "sanction imposed cannot be . . . totally without penological justification."  *Id.*; *see also Enmund v. Florida*, 458 U.S. 782, 798 (1982) ("Unless the death penalty when applied . . . measurably contributes to one or both of these goals [retribution and deterrence], it 'is nothing more than the purposeless and needless imposition of pain and suffering,' and hence an unconstitutional punishment" (quoting *Coker v. Georgia*, 433 U.S. 584, 592 (1977) (plurality opinion))).  Over time, empirical evidence and philosophical critiques have emerged that have eroded these two justifications for the death penalty, leaving the death penalty with no discernible purpose at all.  *See, e.g.*, John J. Donohue & Justin Wolfers, *Uses and Abuses of Empirical Evidence in the Death Penalty Debate*, 58 Stan. L. Rev. 791, 794, 843 (2005); Carol S. Steiker, *No, Capital Punishment Is Not Morally Required: Deterrence, Deontology, and the Death Penalty*, 58 Stan. L. Rev. 751 (2005).

Because the death penalty is cruel and unusual, and because it serves neither the goal of retribution nor that of deterrence, capital punishment is unconstitutional. Accordingly, Speer's sentence is constitutionally infirm under the Eighth and Fourteenth Amendments, and he is entitled to relief.

## G.   The Prosecutor's Unfettered Discretion to Seek the Death Penalty Violates the Constitution

This sub-claim was raised in Speer's direct appeal as Claim IV(6).  (DA dkt. 87 at 50.)  The Arizona Supreme Court denied the sub-claim as previously rejected.  *Speer*, 212 P.3d at 804.  To the extent any aspects of this sub-claim were not exhausted, that failure is attributable to the ineffective assistance of Speer's appellate and post-conviction counsel, as described above in sub-claim A.

In Arizona, each prosecutor has the sole authority and complete discretion to determine whether to seek the death penalty as a sentencing option, following his unreviewable determination that one or more aggravating circumstances exist.  This discretion is limited only by the whims of each individual prosecutor as to which cases are appropriate for the death penalty.  *See State v. Harding*, 670 P.2d 383, 397 (Ariz. 1983).  Arizona's scheme thus allows arbitrary and capricious charging decisions and creates a substantial risk of variation between similar cases.  Such "arbitrary and wanton" discretion in seeking a death sentence, *Woodson*, 428 U.S. at 303, leads to the "wanton[] and freakish[]" imposition of the death sentence.  *Furman*, 408 U.S. at 310 (Stewart, J., concurring).  *But see Gregg*, 428 U.S. at 199.  The fact that Arizona prosecutors have unbridled discretion to seek the death penalty violates the Eighth and Fourteenth Amendments.  Speer's death sentence must therefore be vacated.

## H.   The Death Penalty Discriminates Against Poor, Young, and Male Defendants

This sub-claim was raised in Speer's direct appeal as Claim IV(7).  (DA dkt. 87 at 50.)  The Arizona Supreme Court denied the sub-claim as previously rejected.  *Speer*, 212 P.3d at 804.  To the extent any aspects of this sub-claim were not exhausted, that failure is attributable to the ineffective assistance of Speer's appellate and post-conviction counsel, as described above in sub-claim A.

Arizona's death penalty is applied so as to discriminate against poor, young, and male defendants in violation of the Eighth and Fourteenth Amendments to the Constitution.  Speer was sentenced pursuant to a statutory scheme that is discriminatorily

276

applied.  The Fourteenth Amendment guarantees that no State shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1. The Equal Protection Clause protects criminal defendants from being sentenced based on purposeful discrimination.  *McCleskey*, 481 U.S. at 292.  Still, Arizona's death row is predominantly populated by indigent males.  Although women commit nearly twelve percent of all murders and non-negligent manslaughters, only two of the 119 persons on Arizona's death row are women.  *See Crime in the United States 2013*, *Table 42: Arrests by Sex*, *2013*, FBI, https://ucr.fbi.gov/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/tables/table-33/table_33_ten_year_arrest_ trends_by_sex_2013.xls; *Death Row Demographics*, Ariz. Dep't of Corr., http://corrections.az.gov/node/431.  Indeed, research suggests that "women homicide defendants receive more favorable treatment at each stage of the criminal process," even in capital cases.  Steven F. Shatz & Terry Dalton, *Challenging the Death Penalty with Statistics:*  Furman*,* McCleskey*, and a Single County Case Study*, 34 Cardozo L. Rev. 1227, 1251-53 (2013) (citing studies finding gender disparities in the imposition of death sentences).

If a defendant similarly situated to Speer happened to have been a woman, there would likely have been no sentence of death imposed.  Nothing regarding the nature of the crime, or the aggravating or mitigating circumstances, can explain this disproportionate pattern other than systemic discrimination on the basis of race, class, and sex.  The discriminatory application of the death penalty in Arizona violates Speer's constitutional rights as guaranteed by the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution.

This error, individually and cumulatively, violated Speer's constitutional rights and prejudiced him.  It affected all phases of the trial against him.  He is entitled to evidentiary development and relief.

## I.   The Absence of Proportionality Review Violates Defendants' Constitutional Rights

This sub-claim was raised in Speer's direct appeal as Claim IV(8).  (DA dkt. 87 at 51.)  The Arizona Supreme Court denied the sub-claim as previously rejected.  *Speer*, 212 P.3d at 804-05.  To the extent any aspects of this sub-claim were not exhausted, that failure is attributable to the ineffective assistance of Speer's appellate and post-conviction counsel, as described above in sub-claim A.

Proportionality review serves to identify which cases are above the "norm" of first-degree murder, thus narrowing the class of defendants who are eligible for the death penalty.  The absence of proportionality review of death sentences by Arizona courts denies capital defendants due process of law and equal protection and amounts to cruel and unusual punishment in violation of the Fifth, Eighth, and Fourteenth Amendments.

The Arizona Supreme Court failed to conduct a comparative proportionality review of Speer's death sentence, rendering the sentence unconstitutional.  When the Supreme Court sanctioned the modern death penalty scheme, it did so based on the belief that state supreme courts would conduct careful and effective proportionality reviews in individual cases to guard against the arbitrary and capricious infliction of the death penalty.  *See Gregg*, 428 U.S. at 203-06 (joint opinion of Stewart, Powell, and Stevens, JJ.) (highlighting proportionality review on appeal as an important protection against caprice in sentencing); *Proffitt v. Florida*, 428 U.S. 242, 258 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.) (same); *see also Glossip*, 135 S. Ct. at 2763 (Breyer, J., dissenting) (recognizing the importance of comparative proportionality review to avoid arbitrary imposition of the death penalty).  *But see Pulley v. Harris*, 465 U.S. 37, 50-51 (1984).  The Arizona Supreme Court, however, has abandoned this procedural safeguard.  *See State v. Salazar*, 844 P.2d 566, 583-84 (Ariz. 1992).  The discontinuation of proportionality review allows for the death penalty to be applied arbitrarily in Arizona and violates the Fifth, Eighth, and Fourteenth Amendments.  Speer's sentence, affirmed

without a comparative proportionality review, is constitutionally unsound, and Speer is entitled to relief.

### J.   Arizona's Capital Sentencing Scheme Is Unconstitutional Because It Does Not Require that the State Prove that the Death Penalty Is Appropriate

This sub-claim was raised in Speer's direct appeal as Claim IV(9).  (DA dkt. 87 at 51.)  The Arizona Supreme Court denied the sub-claim as previously rejected.  *Speer*, 212 P.3d at 805.  To the extent any aspects of this sub-claim were not exhausted, that failure is attributable to the ineffective assistance of Speer's appellate and post-conviction counsel, as described above in sub-claim A.

Arizona's capital sentencing scheme is unconstitutional because it does not require the State to prove the death penalty is appropriate or require the jury to find beyond a reasonable doubt that the aggravating circumstances outweigh the accumulated mitigating circumstances.  Instead, Arizona's death penalty statute requires defendants to prove their lives should be spared, in violation of the Fifth, Eighth, and Fourteenth Amendments.

In light of the qualitative difference between a sentence of death and a sentence to a term of imprisonment, the Eighth Amendment demands a higher degree of "reliability in the determination that death is the appropriate punishment in a specific case." *Woodson*, 428 U.S. at 305.  To achieve that heightened reliability, states must embrace procedural measures that protect a defendant from the arbitrary and capricious imposition of the death penalty.  *See California v. Ramos*, 463 U.S. 992, 998-99 (1983).  The reasonable-doubt standard "is indispensable to command the respect and confidence of the community in applications of the criminal law."  *In re Winship*, 397 U.S. 358, 364 (1970).  "It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned."  *Id.*  In addition, to avoid the arbitrary and inconsistent imposition of death on a "jury-by-jury" basis, a specified burden of proof is required to ensure that juries faced with similar

1  evidence will return similar verdicts.  *See Eddings*, 455 U.S. at 112 ("[C]apital

2  punishment [must] be imposed fairly, and with reasonable consistency, or not at all.").

3  Before the jury may impose a death sentence, Arizona's capital sentencing scheme

4  requires the jury to find the State has proven the aggravating circumstances beyond a

5  reasonable doubt and also that the aggravating circumstances outweigh the mitigating

6  circumstances, in the sense that the jury must conclude that the mitigating circumstances

7  are not "sufficiently substantial to call for leniency."  Ariz. Rev. Stat. § 13-703(E); *see*

8  *also Ring*, 536 U.S. 584.  Arizona's capital sentencing scheme does not impose any

9  particular burden of persuasion on either party at the sentencing hearing.  Therefore, the

10  current sentencing scheme does not require the prosecution to prove beyond a reasonable

11  doubt that aggravating circumstances outweigh mitigating circumstances or that the

12  mitigating circumstances are insufficient to warrant a life sentence.  *See State v.*

13  *Gulbrandson*, 906 P.2d 579, 605 (Ariz. 1995).

14  Arizona's capital sentencing scheme is unconstitutional because it does not require

15  the State to prove that the death penalty is appropriate.  In essence, the State's rebuttal to

16  mitigation evidence amounts to additional aggravation evidence.  The purpose of the

17  rebuttal is to persuade the jury that there is sufficient aggravation in a case to overwhelm

18  the mitigation and to necessitate a capital punishment; however, there is no burden of

19  proof placed on this evidence and no instruction to the jury about how to weigh and

20  compare the evidence as a whole.  Without a burden, the State is able to achieve two bites

21  at the apple, but one without the same high standard.  Under the law, therefore, it is only

22  logical and equitable that the same high burden of proof that applies to the State's

23  aggravating circumstances, should also apply to the State's rebuttal to mitigation.

24  In *Kansas v. Marsh*, 548 U.S. 163 (2006), the Supreme Court indirectly

25  questioned the constitutionality of Arizona's death penalty statute when it upheld the

26  Kansas statute that permitted a death sentence when the aggravating circumstances and

27  mitigating circumstances were found to be equal.  In that decision, the Court noted that

28  Arizona's statutes are comparable to those of Kansas, except that Arizona, "once the

280

State has met its burden, tasks the defendant with the burden of proving sufficient mitigating circumstance to overcome the aggravating circumstances and that a sentence less than death is therefore warranted." *Id.* at 173.  The Court further explained that:

> In contrast, the Kansas statute requires the State to bear the burden of proving to the jury, beyond a reasonable doubt, that aggravators are not outweighed by mitigators and that a sentence of death is therefore appropriate; it places no additional evidentiary burden on the capital defendant.  This distinction operates in favor of Kansas capital defendants.

*Id.*  It is because of this difference that the Court upheld Kansas's statute as constitutional.  *Id.*  Without such safeguards, Arizona's capital sentencing scheme is unconstitutional and violated Speer's rights under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.  As a result, Speer is entitled to relief.

## K.     Arizona's Death Penalty Scheme Unconstitutionally Requires Imposition of the Death Penalty Whenever at Least One Aggravating Circumstance and No Mitigating Circumstances Exist

This sub-claim was raised in Speer's direct appeal as Claim IV(12).  (DA dkt. 87 at 52.)  The Arizona Supreme Court denied the sub-claim as previously rejected.  *Speer*, 212 P.3d at 805.  To the extent any aspects of this sub-claim were not exhausted, that failure is attributable to the ineffective assistance of Speer's appellate and post-conviction counsel, as described above in sub-claim A.

Arizona's death penalty scheme unconstitutionally requires imposition of the death penalty whenever at least one aggravating circumstance and no mitigating circumstances exist, in violation of the Eighth and Fourteenth Amendments.  Arizona's death penalty law cannot constitutionally presume that death is the appropriate default sentence.

Because death is the ultimate penalty, unlike any other, the sentencer must provide an "individualized determination on the basis of the character of the individual and the circumstances of the crime."  *Zant*, 462 U.S. at 879; *see also Woodson*, 428 U.S. at 303 (plurality opinion) (acknowledging that death is a punishment different from all other sanctions).  Under Arizona law, the trier of fact is required to impose a death sentence

1    whenever it "finds one or more of the aggravating circumstances . . . and then determines

2    that there are no mitigating circumstances sufficiently substantial to call for leniency."

3    Ariz. Rev. Stat. § 13-703(E) (current version at § 13-751(E)).  Arizona's statute

4    effectively places a "'thumb [on] death's side of the scale,' thus 'creat[ing] the risk [of]

5    treat[ing] the defendant as more deserving of the death penalty.'"  *Sochor v. Florida*, 504

6    U.S. 527, 532 (1992) (citations omitted; alterations in original).  In Arizona, a death

7    sentence is the default sentence once at least one aggravating circumstance has been

8    proven.

9            What is more, mitigating evidence is not considered because of the use of a

10   screening mechanism designed to prevent the sentencer from considering such evidence.

11   *See, e.g.*, *State v. Ramirez*, 871 P.2d 237, 252-53 (Ariz. 1994) (requiring the defendant to

12   prove mitigating evidence by a preponderance of the evidence before the sentencer must

13   "accept" the evidence as mitigating).  Speer's jury was instructed that "[t]he defendant

14   bears the burden of proving the existence of any mitigating circumstance by a

15   preponderance of the evidence," and "[y]ou *shall* impose a sentence of death if you have

16   found one or more aggravating circumstances and then determine that there are no

17   mitigating circumstances or no mitigating circumstances sufficiently substantial to call

18   for leniency."  (ROA 752 at 11-12 (emphasis added).)  As a result, a sentencer is not free

19   to consider any circumstance for a sentence less than death if it was not proven by the

20   defendant by a preponderance of the evidence.

21           The use of such a screening mechanism, coupled with the statute where the default

22   sentence is death, deprives the sentencer of discretion to impose a sentence other than

23   death, in violation of the Eighth and Fourteenth Amendments.  *See Woodson*, 428 U.S. at

24   302-03.  Speer's sentence is therefore constitutionally infirm, and he is entitled to relief.

25

26

27

28

**L.   Arizona's Capital Sentencing Scheme Violates the Constitution Because It Does Not Set Forth Objective Standards to Guide the Sentencer in Weighing the Aggravating Circumstances Against the Mitigating Circumstances**

Speer did not present this claim to the state court as a result of appellate and post-conviction counsels' deficient performance.  The deficient performance of state appellate and post-conviction counsel prejudiced Speer and provides cause to excuse any procedural default.  *See Strickland*, 466 U.S. at 687; *Evitts*, 469 U.S. at 396-97; *Martinez*, 566 U.S. at 9.  Therefore, the Court may consider the merits of this claim.  Because the claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the claim de novo.

Under the Eighth and Fourteenth Amendments, a capital defendant has a right to an individualized sentencing determination.  *See Zant*, 462 U.S. at 879.  There was no individualized sentencing in Speer's case because the sentencing jury had no guidance in determining whether the mitigating evidence presented was sufficiently substantial to call for leniency.  In the absence of such guidance, the risk that Speer's death sentence was the result of unfettered discretion is intolerably high and Speer's sentence is constitutionally infirm.  *See Furman*, 408 U.S. at 239-40.  These errors, individually and cumulatively, violated Speer's constitutional rights and prejudiced him.

**M.   Speer Will Be Denied a Fair Clemency Process in Violation of the Eighth and Fourteenth Amendments**

Speer has not yet presented this claim to the Arizona courts because his opportunity to seek executive clemency has not yet become ripe.  Speer presents this claim now in order to avoid difficulties with raising this claim in future federal habeas proceedings.  *See Stewart v. Martinez-Villareal*, 523 U.S. 637, 643-46 (1998).  Under Arizona law, Speer has a right to seek executive clemency before execution.  *See Ariz. Const. art. V, § 5; Ariz. Rev. Stat. § 31-401 et seq.*  This should be part of the constitutional scheme that ensures the reliability of criminal convictions and the propriety of sentences.  *See Herrera v. Collins*, 506 U.S. 390, 415 (1993).  Accordingly, Speer has

283

a due process liberty interest in the impartiality of the system by which clemency may be afforded to him.  *See generally Mathews v. Eldridge*, 424 U.S. 319 (1976).

Speer's clemency proceedings will not be impartial.  On information and belief, Speer asserts that both the selection process for members of Arizona's Board of Executive Clemency ("the Board") and the conflicting roles of the State will work to deprive him of a fair clemency proceeding.  Without judicial review of the bias inherent in Arizona's clemency process, Speer will never have an opportunity to vindicate his right to a fair and impartial clemency process.

The Board consists of five members appointed by the Governor with input from the Director of the Department of Corrections, the Director of Public Safety, and three other individuals of his choosing.  *See* Ariz. Rev. Stat. § 31-401(A).  The Governor may remove members of the Board for cause.  *See id*. § 31-401(E).  On information and belief, Speer asserts that the Attorney General's Office, the office that advocated for his death in state appellate and post-conviction proceedings and is currently advocating for his death before this Court, is responsible for training the members of the Board regarding their duties.  On information and belief, Speer asserts that he will neither have notice of the time and place of the hearing, the evidence the Governor will use when he decides whether to grant or deny clemency, or an opportunity to present evidence to him in favor of granting clemency.  For all these reasons, Arizona's clemency procedures do not comport with the procedural due process protections guaranteed to him by the Fourteenth Amendment.  Speer is entitled to habeas corpus relief.

**N.  It Would Violate Speer's Right to Be Free from Cruel and Unusual Punishment for the State of Arizona to Execute Him After He Has Spent Over Ten Years on Its Death Row**

Speer did not present this claim to the state courts as a result of appellate and post-conviction counsel's deficient performance.  The deficient performance of state appellate counsel and post-conviction counsel prejudiced Speer and provides cause to excuse any procedural default.  *See Martinez v. Ryan*, 132 S. Ct. 1309, 1315 (2012); *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986); *Strickland v. Washington*, 466 U.S. 668, 687-88

1  (1984).  Alternatively, there was an absence of available state corrective process or

2  circumstances exist that rendered the process ineffective, thereby excusing the failure to

3  exhaust.  *See* 28 U.S.C. § 2254(b)(1)(B).  Therefore, the Court will be able to consider

4  the merits of this claim.  Moreover, because the claim has not been adjudicated by the

5  Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not

6  apply to this Court's review, and the Court may consider the claim de novo.  Speer will

7  demonstrate at an evidentiary hearing that appellate and post-conviction counsel fell

8  below the standards of minimally competent capital attorneys and that those failures

9  prejudiced him.

10      "By protecting even those convicted of heinous crimes, the Eighth Amendment

11  reaffirms the duty of the government to respect the dignity of all persons."  *Roper*, 543

12  U.S. at 560.  It therefore forbids punishments that are excessive.  *See id.*  Speer entered

13  death row in 2007.  Executing Speer after he has served more than ten years under a

14  death sentence would violate Speer's Eighth and Fourteenth Amendment rights.

15      First, if Speer is executed, he will be punished "both by death and also by more

16  than a generation spent in death row's twilight."  *Foster v. Florida*, 537 U.S. 990, 993

17  (2002) (Breyer, J., dissenting from denial of certiorari).  Speer's time on death row itself

18  has been a severe punishment, making the additional punishment of execution excessive.

19  *See Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) (discussing

20  years in solitary confinement as an "added punishment"); *Hutto v. Finney*, 437 U.S. 678,

21  685 (1978) ("Confinement in a prison or in an isolation cell is a form of punishment

22  subject to scrutiny under Eighth Amendment standards."); *Williams v. Sec'y Pa. Dep't of*

23  *Corr.,* No. 14-1469, No. 15-1390, 2017 WL 526483, at *8-9, *11-13 (3d Cir. Feb. 9,

24  2017) (discussing the harsh conditions of death row, its deprivations compared to those of

25  general population, and studies of the severe psychological consequences of solitary

26  confinement).  The United States Supreme Court in 1890 recognized time spent in

27  solitary confinement awaiting execution as "an additional punishment of the most

28  important and painful character," *In re Medley*, 134 U.S. 160, 171 (1890), and "research

285

1   still confirms what [the] Court suggested over a century ago:  Years on end of near-total

2   isolation exact a terrible price."  *Davis*, 135 S. Ct. at 2210 (Kennedy, J., concurring).

3   Accordingly, the American Bar Association and the United Nations Special Rapporteur

4   on Torture have recommended limitations on the use of solitary confinement.  *See*

5   *Glossip*, 135 S. Ct. at 2765 (Breyer, J., dissenting).  Indeed, foreign courts have found

6   that extended delay in the imposition of a death sentence "renders ultimate execution

7   inhuman, degrading, or unusually cruel."  *Knight v. Florida*, 528 U.S. 990, 995 (1999)

8   (Breyer, J., dissenting from denial of certiorari); *see also Foster*, 537 U.S. at 992-93

9   (Breyer, J., dissenting).

10         The severity of the physical conditions of death row is not the only punishment

11   Speer has faced, for "[t]he dehumanizing effect of solitary confinement is aggravated by

12   uncertainty as to whether a death sentence will in fact be carried out."  *Glossip*, 135 S. Ct.

13   at 2765 (Breyer, J., dissenting).  The United States Supreme Court has recognized the toll

14   that waiting for execution can take on a prisoner, writing over a century ago—of a delay

15   of just four weeks—that "when a prisoner sentenced by a court to death is confined in the

16   penitentiary awaiting the execution of the sentence, one of the most horrible feelings to

17   which he can be subjected during that time is the uncertainty during the whole of it."  *In*

18   *re Medley*, 134 U.S. at 172; *see also Valle v. Florida*, 564 U.S. 1067, 1067 (2011)

19   (Breyer, J., dissenting from denial of stay); *Knight*, 528 U.S. at 994-95 (Breyer, J.,

20   dissenting); *Furman*, 408 U.S. at 288-89 (Brennan, J., concurring).  Speer has been

21   severely punished through his imprisonment, and exacting the additional punishment of

22   an execution would be excessive.

23         Executing Speer after his lengthy imprisonment also would be unconstitutional

24   because no penological justification would support the punishment.  The Supreme Court

25   has recognized deterrence and retribution as the justifications for the death penalty.  *See*

26   *Enmund*, 458 U.S. at 798; *Gregg*, 428 U.S. at 183 (joint opinion of Stewart, Powell, and

27   Stevens, JJ.).  But when these aims can no longer be advanced, an execution "is nothing

28   more than the purposeless and needless imposition of pain and suffering and hence an

unconstitutional punishment." *Atkins*, 536 U.S. at 319 (internal quotation marks and citation omitted); *see also Furman*, 408 U.S. at 279-80 (Brennan, J., concurring). Executing Speer would provide little, if any, deterrent effect that is not achieved by a lifetime of imprisonment. *See, e.g.*, *Valle*, 564 U.S. at 1068 (Breyer, J., dissenting from denial of stay) ("It is difficult to imagine how an execution following so long a period of incarceration could add significantly to that punishment's deterrent value."); *Coleman v. Balkcom*, 451 U.S. 949, 952 (1981) (Stevens, J., concurring in denial of certiorari) ("[T]he deterrent value of incarceration during that period of uncertainty [confined under a death sentence] may well be comparable to the consequences of the ultimate step itself."); *Lackey v. Texas*, 514 U.S. 1045, 1046 (1995) (Stevens, J., memorandum respecting denial of certiorari). Studies on the question of the death penalty's deterrent value are contradictory and inconclusive, and therefore insufficient to justify Speer's execution. *See Glossip*, 135 S. Ct. at 2767-68 (Breyer, J., dissenting) (comparing sources); *Baze v. Rees*, 553 U.S. 35, 79 (2008) (Stevens, J., concurring); *Ring*, 536 U.S. at 614-15 (Breyer, J., concurring). Nor would retribution be a sufficient justification for Speer's execution. *See Glossip*, 135 S. Ct. at 2769 (Breyer, J., dissenting); *Coleman*, 451 U.S. at 960 (Rehnquist, J., dissenting from denial of certiorari) ("There can be little doubt that delay in the enforcement of capital punishment frustrates the purpose of retribution."). Because neither penological justification for the death penalty has much, if any, force after an excessive period of confinement under a death sentence, such an execution would be gratuitous.

Execution under the circumstances of Speer's case would be cruel and unusual in violation of the Eighth and Fourteenth Amendments. He is therefore entitled to relief.

## O. Execution by Lethal Injection Is Cruel and Unusual Punishment in Violation of the Eighth and Fourteenth Amendments

This sub-claim was raised in Speer's direct appeal as Claim IV(11). (DA dkt. 87 at 52.) The Arizona Supreme Court denied the sub-claim as previously rejected. *Speer*, 212 P.3d at 805. This sub-claim was also raised as Claim Eighteen in Speer's state post-

conviction petition and Petition for Review.  (PCR 9/26/14 Pet. at 91-98; PFR at 44-46.)

The state court denied the claim as premature, and also denied it on the merits.  (PCR ME

5/21/15 at 26-27.)  To the extent any aspects of this sub-claim were not exhausted, that

failure is attributable to the ineffective assistance of Speer's appellate and post-conviction

counsel, as described above in sub-claim A.

### 1.      Arizona Has a Troublesome History of Carrying Out Lethal-Injection Executions

Speer was sentenced to death by lethal injection.  Arizona Revised Statutes § 13-

757(A) provides that "[t]he penalty of death shall be inflicted by an intravenous injection

of a substance or substances in a lethal quantity sufficient to cause death, under the

supervision of the state department of corrections."  There is no additional statutory

guidance provided to the Arizona Department of Corrections ("ADC") in carrying out the

execution.  Instead, the Director of ADC is given unfettered discretion in selecting

substances to be used in carrying out executions.  *See* ADC, Dep't Order 710 at 1,

https://corrections.az.gov/sites/default/files/policies/700/0710_062917.pdf (outlining

execution procedures but noting that "deviation" or "adjustment" is permitted as

determined by the Director of the Arizona Department of Corrections).  The procedures

implemented and the drugs used during the last five years demonstrate that Arizona's

lethal-injection process is cruel and unusual.

Since the time that Speer was sentenced to death, Arizona has carried out fifteen

executions—all via lethal injection using various combinations of drugs.  *See* ADC,

Executions Prior to 1992 & Execution Methods, https://corrections.az.gov/public-

resources/death-row/executions-prior-1992-execution-methods.  Based on ADC's actions

in these recent executions, there are three reasons that ADC cannot constitutionally carry

out executions via lethal injection.  First, ADC has not complied with the law in

obtaining the substances to be used in executions.  A state cannot violate the law while

carrying out the law.  Second, ADC has been unable to follow its written protocol time

and time again.  Therefore, there is no guarantee that lethal injection will occur as set

forth in the written protocol.  Third, ADC has selected drugs that result in human experimentation.  These factors both individually and combined make Arizona's use of lethal injection inherently cruel and unusual and therefore a violation of the Eighth Amendment.

## 2. Illegal Importation

Arizona killed Jeff Landrigan on October 26, 2010, using the drug sodium thiopental obtained from, at that time, an unknown foreign source.  *See Landrigan v. Brewer*, No. CV-10-02246-PHX-ROS, 2010 WL 4269559, at *4 (D. Ariz. Oct. 25, 2010) *stay of execution aff'd*, 625 F.3d 1144 (9th Cir. 2010) and *stay vacated*, 562 U.S. 996 (2010) ("During argument, counsel for the State declined to reveal where ADOC obtained the sodium thiopental for Plaintiff's execution but acknowledged that it was not obtained from or manufactured by Hospira, Inc., which Plaintiff alleges is the only manufacturer of sodium thiopental approved by the Food and Drug Administration.").  Several months later, on May 4, 2011, eighteen hours before its scheduled execution of Donald Beaty, Arizona announced that it intended to use a different drug because "the Department of Justice informed ADC that its supply of sodium thiopental was imported without compliance with the Controlled Substance Act."  *See West v. Brewer*, Findings of Fact and Conclusion of Law and Order, No. CV-11-1409-PHX-NVW, 2011 WL 6724628, at *10 (D. Ariz. Dec. 21, 2011).  As was later shown, the drug sodium thiopental used in Landrigan's execution (and the one carried out after his) was imported in violation of federal law.  *See, e.g.*, *Cook v. FDA*, 733 F.3d 1, 11-12 (D.C. Cir. 2013).

Again, recently, ADC imported sodium thiopental that has been detained by the Food and Drug Administration.  *See Wood v. Ryan*, No. 2:14-cv-01447-NVW, Def's. Notice in Resp. to Ct. Order, at 1-2 (D. Ariz. filed Nov. 3, 2015).  Given ADC's past and current actions, it is cruel and unusual to permit the government to carry out the law by violating the law.

3. **Protocol Violations**

In December 2011, the district court held a trial, issued an opinion, and found that "[f]ive prisoners were executed by lethal injection between October 2010 and July 2011. At the direction of those responsible for administering these executions, *ADC failed to follow certain components of its execution protocol*." *West*, 2011 WL 6724628, at *7 (emphasis added).  In January 2012, ADC amended its protocol and removed many of the provisions it was found to have violated—including minimum qualifications for and training of the IV team members.

In February 2012, with execution dates pending, two prisoners, Robert Moorman and Robert Towery, challenged the change to the protocol.  On appeal, the court noted, "[e]ven after the appeal was filed and hours before the argument, Arizona yet again changed course as to its plans for the executions." *Towery v. Brewer*, 672 F.3d 650, 652 (9th Cir. 2012).  ADC changed the drug formula because it discovered at the last minute that one of the drugs had expired.  *Id.*  The court remarked:  "How such a discovery escaped the State for the past six weeks is beyond us, and gives us pause as to the regularity and reliability of Arizona's protocols." *Id.* at 653.  During that case, the court upheld the denial of a preliminary injunction but *only* based on the protocol "as amended by the State during oral argument" and it further noted that "the State's frequent changes to its protocol during litigation are not sustainable." *Id.*

After the Ninth Circuit allowed the executions to go forward, known problems occurred during the execution of Robert Towery.  Those concerns were raised by another prisoner facing execution, Samuel Lopez.  *See Villegas Lopez v. Brewer*, 680 F.3d 1068, 1073 (9th Cir. 2012) ("Towery's recent execution is the primary basis of Lopez's claim.").  Those problems included concerns with setting the IV lines.  *See id.*  "Although [the court] uph[e]ld the district court's decision, [it] caution[ed], yet again, that Arizona's ad hoc approach risks going beyond *Baze's* safe harbor." *Id.* at 1075.  The court expressed grave concern with the State's method of changing its protocol hours before an

1    execution, in which the State essentially asked the court to "trust that it will exercise its

2    discretion in a constitutionally permissible manner." *Id.* at 1070.

3        Indeed, in response to the lawsuit brought related to Samuel Lopez's execution,

4    several Ninth Circuit judges noted:  "In case after case, [the court has] been forced to rely

5    on the ad hoc representations of the state's counsel in conducting one of the gravest

6    responsibilities that [it is] asked to perform: approving the state's plan to take a human

7    life." *Villegas Lopez*, 680 F.3d at 1095 (Reinhardt, J., dissenting from denial of rehearing

8    en banc).  As explained, "[t]he trouble that plagued Towery's execution highlights the

9    practical problems this obsessive secrecy creates for any meaningful litigation in the

10   constricted time periods permitted by Arizona's moving target approach to execution

11   procedures." *Villegas Lopez*, 680 F.3d at 1083 (Berzon, J., concurring in part and

12   dissenting in part).

13       Arizona has made it impractical to determine the constitutionality of its protocol

14   and procedures by keeping the information secret and releasing it only after a court orders

15   it to do so.  *See Schad v. Brewer*, Order, No. CV-13-2001- PHX-ROS, 2013 WL

16   5551668, at *10 (D. Ariz. Oct. 7, 2013) (requiring disclosure of information to plaintiff

17   regarding lethal-injection drugs); *Wood v. Ryan*, 759 F.3d 1076, 1088 (9th Cir. 2014),

18   *stay of execution vacated*, 135 S. Ct. 21 (2014) (Ninth Circuit requiring ADC to disclose

19   "(a) the name and provenance of the drugs to be used in the execution and (b) the

20   qualifications of the medical personnel, subject to the restriction that the information

21   provided will not give the means by which the specific individuals can be identified").

22   Moreover, ADC has evaded appropriate review before an execution by maintaining a

23   catch-all provision that allows ADC's Director to deviate from the protocol at any time in

24   any manner.  *See* ADC, Dep't Order 710, at 1.  In fact, the most recent execution

25   demonstrates this exact point, and provides further support why Arizona's attempts at

26   carrying out lethal injection constitute cruel and unusual punishment.

27

28

### 4.       Human Experimentation

Arizona's most recent execution occurred on July 23, 2014.  Arizona executed Joseph Wood using experimental drugs; it took nearly two hours for Wood to die.  *See Glossip*, 135 S. Ct. at 2783 (Sotomayor, J., dissenting) ("Despite being administered 750 milligrams of midazolam, Wood had continued breathing and moving for nearly two hours . . . .").  The concoction to be used—50 milligrams of hydromorphone and 50 milligrams of midazolam—had never been used by Arizona and the combination (albeit in different amounts) had been used *with problems* in January 2014 in Ohio.  *See* Lawrence Hummer, *I Witnessed Ohio's Execution of Dennis McGuire. What I Saw Was Inhumane*, The Guardian, (Jan. 22, 2014), https://www.theguardian.com/commentisfree/2014/jan/22/ohio-mcguire-execution-untested-lethal-injection-inhumane.  Arizona had no scientific or medical basis for its formula.

Wood's execution began at 1:52 p.m.  Wood lay on the gurney gasping for breath for over an hour.  Around 3:00 p.m., one of his attorneys contacted the district court and filed an emergency motion; the court held a hearing while the execution was occurring.  *See Wood v. Ryan*, No. 2:14-cv- 01447-NVW, Mot. for Emergency Stay of Execution, ECF No. 26 (D. Ariz. July 23, 2014); *Wood*, No. 2:14-cv-01447-NVW, Minute Entry, ECF No. 33 (D. Ariz. July 23, 2014); *Wood*, No. 2:14-cv-01447-NVW, Order, ECF No. 34 (D. Ariz. July 24, 2014).

During the emergency hearing, at 3:25 p.m., the attorney for the State represented that Wood was given a "second dose of drugs."  *Wood*, No. 2:14- cv-01447-NVW, Tr. July 23, 2014, at 7:22.  Wood was still alive, but died during the hearing at 3:49 p.m.  The State later revealed that Wood was given fifteen doses of the drugs—and it had already administered *twelve* doses at the time the State's attorney told the court that two doses had been given.  *See* Michael Kiefer, *Arizona inmate injected 15 times, records show*, The Arizona Republic, (Aug. 21, 2014),

1    http://www.azcentral.com/story/news/local/Arizona/2014/08/01/arizona-botched-

2    execution-report-injections/13492511.[40]

3          The use of fifteen doses of the drug formula was *not* in the written protocol, but

4    the Director claimed that there was nothing wrong with the execution.  In fact, in an ADC

5    press release, the Department indicated that the administration of 750 milligrams of drugs

6    was "permitted" under the protocol.  *See* ADC Press Release, Independent Review

7    Process for Wood Execution Underway, (Aug. 1, 2014),

8    https://corrections.az.gov/article/independent-review-process-wood-execution- underway.

9    Wood's execution resulted in human experimentation and failed to comply not only with

10   ADC's written protocol but also with the Eighth Amendment.

11        **5.      Lethal Injection as Carried Out by Arizona Is Cruel and Unusual**

12          As demonstrated above, the State of Arizona cannot carry out lethal injection in a

13   manner that comports with the Constitution.  As Circuit Judge Kozinski noted regarding

14   lethal injection, "Whatever the hopes and reasons for the switch to drugs [from prior

15   methods], they proved to be misguided.  Subverting medicines meant to heal the human

16   body to the opposite purpose was an enterprise doomed to failure."  *Wood*, 759 F.3d at

17   1102 (Kozinski, J., dissenting).  "The [lethal-injection] enterprise is flawed.  Using drugs

18   meant for individuals with medical needs to carry out executions is a misguided effort to

19   mask the brutality of executions by making them look serene and peaceful—like

20   something any one of us might experience in our final moments." *Id.* at 1102-03.  But, as

21   Judge Kozinski explained, executions are brutal, and "[i]f we as a society want to carry

22   out executions, we should be willing to face the fact that the state is committing a

23   horrendous brutality on our behalf." *Id.* at 1103.

24          In 2017, in Arizona, we have reached the point that lethal injection cannot be

25   carried out in a manner consistent with principles of dignity, that does not impose a

26

27          [40] Documentation of Wood's execution is available here:
28   http://archive.azcentral.com/ic/pdf/wood-execution-documentation.pdf.

lingering death, and that avoids pain and suffering.  For these reasons, lethal injection is unconstitutional, and Speer's sentence of death should be vacated.

# IX.  VERIFICATION

I, Celeste Bacchi, declare as follows:

I am an attorney licensed to practice law in the State of California, and I am admitted to practice before the federal district court.  I am an attorney with the Office of the Federal Public Defender for the Central District of California, and I am one of the attorneys of record for Paul Bradley Speer in the above-captioned proceeding.

Speer is confined and restrained of his liberty at the Central Unit in Florence, Arizona, by Charles L. Ryan, Director, Arizona Department of Corrections, and Kevin Curran, Warden, of the Arizona State Prison Complex – Florence.

Co-counsel and I have prepared the foregoing Petition.  I have read the Petition and declare that the facts alleged are true to the best of my knowledge based upon my reading of what I know to be true copies of documents in this action.

The Office of the Federal Public Defender, Central District of California, is authorized by Paul Bradley Speer to file this Petition for Writ of Habeas Corpus on his behalf.  I make this verification because Speer is incarcerated in a state and county different than that of my law office, and because the truth and accuracy of the facts contained herein are within my knowledge as much or more than that of Speer.

I declare under penalty of perjury under the laws of the United States of America and the State of Arizona and California that the foregoing is true and correct.  Executed on the 6th day of October, 2017.


/s/  Celeste Bacchi
Counsel for Petitioner
Paul Bradley Speer

## X.  PRAYER FOR RELIEF

WHEREFORE, Paul Bradley Speer respectfully prays this Court to:

1.      Order that Speer be granted leave to conduct discovery pursuant to Rule 6 of the Rules Governing § 2254 Cases and permit Speer to utilize the processes of discovery set forth in Federal Rules of Civil Procedure 26-37, to the extent necessary to fully develop and identify the facts supporting his petition, and any defenses thereto raised by Respondents' Answer;

2.      Order that upon completion of discovery, Speer be granted leave to amend his petition to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery; and that Speer be granted to leave to expand the record pursuant to Rule 7 of the Rules Governing § 2254 Cases to include additional materials related to the petition;

3.      Grant an evidentiary hearing pursuant to Rule 8 of the Rules Governing § 2254 Cases at which proof may be offered concerning the allegations of this petition;

4.      Issue a writ of habeas corpus to have Speer brought before it to the end that he may be discharged from his unconstitutional confinement and restraint;

5.      In the alternative to the relief requested in Paragraph 4, if this Court should deny the relief as requested in Paragraph 4, issue a writ of habeas corpus to have Speer brought before it to the end that he may be relieved of his unconstitutional sentence;

6.      Grant such other relief as may be appropriate and dispose of the matter as law and justice require.

Respectfully submitted this 6th day of October, 2017.

Hilary Potashner
Federal Public Defender
Central District of California

Celeste Bacchi
Marta VanLandingham
Deputy Federal Public Defenders

*/s/  Celeste Bacchi*
Counsel for Petitioner
Paul Bradley Speer

1

**CERTIFICATE OF SERVICE**

2       I hereby certify that on October 6, 2017, I electronically filed the foregoing

3 Petition for Writ of Habeas Corpus with the Clerk's Office by using the CM/ECF system.

4 I certify that all participants in the case are registered CM/ECF users and that service will

5 be accomplished by the CM/ECF system.

6

7 */s/  Damon Berry*
Legal Secretary
8 Capital Habeas Unit

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28