**Speer v. Ryan, CV-16-04193-PHX-GMS**
**Motion for Evidentiary Development**
**INDEX OF EXHIBITS**

Ex. 1        Declaration of Robert L. Storrs, dated July 26, 2018

Ex. 2        Declaration of Pamela Nicholson, dated July 30, 2018

Ex. 3        Declaration of David Wilcox, dated July 30, 2018

Ex. 4        *East Valley Tribune* article titled "Justice System Can't Cope with
             Backlog of Death Penalty Cases," dated March 4, 2003

Ex. 5        RT Excerpts from *State of Arizona v. Brian Womble*, Maricopa
             County Superior Court Case No. CR2002-010926(B)

Ex. 6        Fair Punishment Project, *America's Top Five Deadliest Prosecutors
             How Overzealous Personalities Drive the Death Penalty*, June 2016

Ex. 7        Transcripts of the Pretrial Defense Interviews with Dr. Brad Michael
             Bayless, dated January 22, 2007, January 23, 2007, and January 24,
             2007

Ex. 8        Visitation Record from Maricopa County Jail for Dr. Brad Michael
             Bayless

Ex. 9        Declaration of Debra Corral, dated May 6, 2018

Ex. 10       Declaration of John Womble Jr., dated May 6, 2018

Ex. 11       Declaration of Michael Speer, dated May 6, 2018

Ex. 12       Declaration of William Womble, dated June 30, 2018

Ex. 13       Declaration of Doris Donithan, dated June 27, 2018

Ex. 14       Declaration of Pamela Sue Riley, dated July 23, 2018

Ex. 15       Declaration of Scharlene DeHorney, dated July 30, 2018

Ex. 16       Declaration of Dr. Matthew Mendel, Ph.D., dated July 6, 2018

Ex. 17       Declaration of Lee Brinkmoeller, dated July 28, 2018

| Ex. 18 | *Phoenix New Times* article titled "Death-Penalty Lawyers Are Making a Killing Off Maricopa Taxpayers," dated July 19, 2012 |
| Ex. 19 | State Bar of Arizona, 12-2482 Disposition Summary, State Bar File Nos. 12-2482 and 15-0328 |
| Ex. 20 | Parrish email dated January 5, 2007 |
| Ex. 21 | Nicholson email and attachments dated January 24, 2007 |
| Ex. 22 | Nicholson email dated January 18, 2007 |
| Ex. 23 | Parrish email and attachment dated January 18, 2007 |
| Ex. 24 | Parrish email and attachment dated January 21, 2007 |
| Ex. 25 | Parrish email and attachments dated January 21, 2007 |
| Ex. 26 | Parrish email dated January 21, 2007 |
| Ex. 27 | Storrs email dated March 3, 2007 |
| Ex. 28 | Storrs email dated March 6, 2007 |
| Ex. 29 | Parrish email dated March 7, 2007 |
| Ex. 30 | Parrish email dated March 17, 2007 |
| Ex. 31 | Nicholson email dated March 30, 2007 |
| Ex. 32 | Declaration of Sabrina Womble from *State of Arizona v. Brian Womble*, Petition for Post-Conviction Relief, Case No. CR2002-010926(B) |
| Ex. 33 | Adult Comprehensive Assessment of Sabrina Womble, dated November 12, 1999 |
| Ex. 34 | Court Record - Aggravated Assault by Sabrina Womble, dated April 19, 1981 |
| Ex. 35 | *Phoenix New Times* article titled "The Pain of Maryvale," dated October 24, 1996 |

Ex. 36       ATSDR Report on Toxicity of Trichloroethylene, dated November 11, 2007

Ex. 37       U.S. Department of Health and Human Services, *Draft Toxicological Report for Trichloroethylene*, dated October 2014

Ex. 38       Article by Artiola, J.F. and Ramirez, M.D., *Chlorinated Solvent Contaminants in Arizona Aquifers*, Sci Transfer Issue 001, August 2006

Ex. 39       Active Management Area Water Supply - Effluent and Contamination Sites, dated July 26, 2017

Ex. 40       Letter from Durand to capital defense attorneys, dated November 23, 2002

Ex. 41       Request for Jail Visitation Logs for Paul Speer by Lee Brinkmoeller and Response from Maricopa County Sheriff's Office, dated April 2012

Ex. 42       Letter from Gallagher to Bayless, dated May 9, 2005

Ex. 43       Sabrina Womble Death Certificate (redacted)

Ex. 44       MMPI-2 Report on Paul Speer prepared by Dr. Brad Michael Bayless dated August 14, 2006

Ex. 45       Notes and evaluation forms on Speer prepared by Dr. Brad Michael Bayless, dated August 14, 2006

Ex. 46       Shipley Institute of Living Scale, administered to Paul Speer by Dr. Brad Michael Bayless, dated August 15, 2006

Ex. 47       Williamson Sentence Completion Test, administered to Paul Speer by Dr. Brad Michael Bayless, dated August 15, 2006

Ex. 48       Extended MMPI-2 Score Report for Paul Speer, assessed by Dr. Brad Michael Bayless on August 14, 2006

Ex. 49       Report of Dr. Susan Parrish on the Clinical Assessment and Neuropsychological Testing Results for Paul Speer, dated February 21, 2005

Ex. 49     Report of Dr. Susan Parrish on the Clinical Assessment and
           Neuropsychological Testing Results for Paul Speer, dated February
           21, 2005 (defense trial exhibit 225)

Ex. 50     Letter to Robert Storrs from Dr. Susan Parrish, dated March 16, 2005
           (defense trial exhibit 224)

Ex. 51     Report of Dr. Pablo Stewart Regarding His Psychiatric Evaluation of
           Paul Speer, dated March 17, 2005 (defense trial exhibit 223)

Ex. 52     Terros Contract with Brian Womble, dated May 24, 2002 (defense
           trial exhibit 172)

Ex. 53     Report of Dr. Paul Miller, dated March 25, 2005 (prosecution trial
           exhibit 204)

Ex. 54     "True/False Quiz on Juries" (court trial exhibit 210)

Ex. 55     Lee Brinkmoeller mitigation transcript summary for PCR attorneys to
           support prosecutorial misconduct claim, dated March 1, 2013

# Exhibit 1

# DECLARATION OF ROBERT L. STORRS

I, Robert L. Storrs, declare as follows:

1.      I am an attorney, licensed to practice law in the State of Arizona since 1968.

2.      I was lead counsel for Paul Bradley Speer.  I was appointed to represent him in August, 2002.

3.      Over the four years I represented Mr. Speer, I also handled seven other capital cases, although I did not represent all of those capital clients simultaneously.  I was handling too many capital cases during my representation of Mr. Speer.  If I had a more reasonable case load, I would have conducted substantially more investigation.  As it was, I did not conduct an investigation adequate to the case.

4.      Bruce Blumberg and Pam Nicholson were assigned to assist me in representing Mr. Speer.  Ms. Nicholson was not an experienced capital attorney; she was added to the case at the last minute to give her some experience so that she could qualify to handle death penalty cases.

5.      Kerri Logan was appointed as the mitigation specialist after Mary Durand withdrew.  After Kerri's death, Dave Wilcox was appointed as the mitigation specialist.  Dave Wilcox was a former probation officer.  I did not then, and do not now, believe he was qualified to serve as a capital mitigation specialist at the time he worked on Paul's case.  However, the system was so overloaded at that time, there weren't enough qualified mitigation specialists to assist on capital cases.

6.      At the time, most murder cases were death-eligible; the DA's office was treating every murder as a death case until negotiated otherwise.  Because there was a lack of defense

1

attorneys and mitigation specialists to handle this heavy workload, inexperienced people were recruited to serve – such as Pam Nicholson and Dave Wilcox. Experienced attorneys like myself were routinely appointed to too many cases to handle effectively.

7.      I did not obtain or review all of the phone calls recorded by the jail and targeted by police as relevant to this case.  There were calls I should have obtained and calls I should have listened to, but did not.  I did not realize there were additional calls until shortly before trial, though I should have investigated this issue earlier and requested and reviewed the calls. I was aware that, if no request was made for their preservation, jail calls were routinely destroyed after six months.  I have no explanation for this, except I relied on the State's duty to disclose material information.

8.      I did not file a discovery motion or join in co-defendant Brian Womble's motion for discovery to obtain all the fifty-eight calls relevant to this case.  I am aware they may have included exculpatory and/or mitigating information.

9.      I stipulated to three out of four aggravating factors during my opening to the aggravation phase of the trial.  With regard to the cruel, heinous, and depraved aggravator, I believed that the aggravator was definitively established because the case involved witness elimination.  However, I did not conduct sufficient legal research on this aggravator at the time to make this determination.

10.      During my closing in the aggravation phase of Paul's trial, I told the jury about two prior convictions on Paul's record that were mentioned in documents going to the jury. Neither of those convictions supported the application of the serious prior felony conviction aggravator pursuant to A.R.S. § 13-751(F)(2).  However, I should have filed a motion to try to

2

get prior irrelevant convictions excluded from trial, or at the very least ask the court to redact the irrelevant felony information from going before the jury, as they were more prejudicial than probative. I also should have requested a limiting instruction to the jury for the irrelevant prior convictions, but I did not. I had no strategic reason for not doing so.

11.     I did not contact or interview any of Mr. Speer's teachers, school personnel, or Child Protective Services workers. I should have contacted and interviewed as many of these people as possible for mitigation information. I also failed to obtain all CPS records; I should have done so, and provided them to defense experts. I had no strategic reason for not doing so.

12.     I did not have a good relationship with Sabrina Womble, Mr. Speer's mother. But I should have had her testify anyway at the penalty phase of trial. Putting her on the stand would have shown the jury that Mr. Speer was raised by someone who was anything but an adequate mother.

13.     I did not contact or interview Mr. Speer's extended family in order to investigate a generational social history. I should have done so. Had I investigated, I would have found evidence of generations of drug use that I could have provided to the experts. Dr. Miller briefly interviewed Margaret Womble, Bill Womble's mother, but our team did not interview Paul's biological grandparents or extended family in order to get a deeper understanding of the generations of trauma that existed in Paul's family history.

14.     During the trial the prosecutor vouched for the truthfulness of her own witnesses' testimony and expressed disbelief in the testimony of defense witnesses. Defense

3

objections were rare; I should have objected every time she engaged in this behavior until she stopped. I had no strategic reason for not doing so.

15.    I did not object to the prosecutor's "nexus" argument during or after her closing. I also did not object when the prosecutor argued that ASPD is not mitigating. It was a mistake, as Arizona caselaw specifically says that ASPD can be a mitigating factor, but I had no reason for not objecting.

16.    I did not follow the trial of Brian Womble. I should have done so, or at least obtained the transcripts. Had I done so I would have realized that ADA Gallagher, the prosecutor in both Mr. Speer's and Mr. Womble's trials, was arguing conflicting theories. In Mr. Speer's trial, she had portrayed him to the jury as the dominant figure, the mastermind, of the murder. In Mr. Womble's trial, she argued Mr. Womble had been the prime mover. Had I been aware of this misconduct, I would have filed a motion to vacate judgment under Ariz. R. Crim. P. 24.2. I have no good reason for failing to follow the paired trial.

17.    I consulted with Dr. Parrish, an independent expert, to assist me in preparation for my cross-examination of Dr. Bayless regarding his testing of Speer. At my request Dr. Parrish prepared a ten-page report with illustrations to assist me in my cross-examination of Dr. Bayless. I have no independent recollection of this report or of asking her to prepare it, nor do I recall any reason why I did not use the information provided during cross-examination of Dr. Bayless. I myself had no particular or specialized training or knowledge in psychological testing to aid in the cross-examination of Dr. Bayless. I was also not aware of jail visitation records which showed that Dr. Bayless visited Paul for only 30 minutes each on

4

two separate occasions.  Had I been aware of that information, I would have used it on cross-examination to impeach Dr. Bayless.

18.    Pablo Stewart was the defense psychiatrist.  He came highly recommended, but I had not used him before.  He was not sufficiently familiar with the facts of the case at the time of his testimony at trial.  I think he thought he was smart enough that he could get by without really knowing the case, but he was proven wrong on the stand by ADA Gallagher.  It was my responsibility, though, to make sure he knew the facts of the case thoroughly, and I did not do so.

19.    I was aware of the evidence of Mr. Speer's sexual victimization in childhood.  I should have, but did not, retain a child sexual abuse expert who specialized in the effects of sexual abuse on young males.

20.    I provided two prior declarations in this case to state post-conviction counsel. The first, dated October 24th, 2013, was submitted with the PCR petition filed on October 25, 2013.  The second, dated September 25, 2014, was submitted with the amended PCR petition dated September 26, 2014.  This instant declaration is intended to supplement, not replace, those prior declarations.  Had I been asked the specific questions addressed in this declaration by state post-conviction counsel, I would have then attested to this information.

21.    I declare under penalty of perjury under the laws of the State of Arizona and the United States of America that the foregoing is true and correct and that this declaration was executed this 26th day of July , 2018, in Phoenix, Arizona.

ROBERT L. STORRS, ESQ.

5

# Exhibit 2

# DECLARATION OF PAMELA NICHOLSON

I, PAMELA NICHOLSON, declare:

1.     I am an attorney in private practice in Phoenix, Arizona.  I have been an attorney since May, 1985.  My primary practice is criminal defense.  In 1994, I took a break from the practice of law while I obtained a Master's degree with an emphasis in mental health, law, and policy from the Harvard Kennedy School.

2.     I was a member of the legal team who represented Paul Speer at his capital trial in 2006 and 2007.  The other attorneys on the team were Robert Storrs and Bruce Blumberg.  I was brought on to Paul's case as a "third chair" attorney.  As I recall, I joined the team a few months prior to the start of trial.

3.     I had worked on a couple of homicide cases prior to Paul's case.  I worked on one capital case from 1991 through 1993. This was before the capital guidelines that mandated a first chair, a second chair, a mitigation specialist and an investigator.  In that early case, I did virtually all of the investigation and had to do an interlocutory appeal to the Arizona Court of Appeals just to get a second chair appointed.

4.     I joined Paul's team in part to get experience doing capital defense.  Paul's trial took place during the "capital crisis" in Maricopa County, when there were not enough qualified defense attorneys available to represent the high number of capitally charged defendants.  Because I did not have the experience mandated by the ABA guidelines adopted by Arizona, I applied for and was granted a waiver to serve as a second chair by the Arizona Supreme Court.

5.     My primary role on the team was to work with Paul and help keep him focused and under control.  By "under control," I don't mean that Paul was threatening or violent.  However, he did exhibit extreme anxiety, dissociation, and other behaviors related to his mental health that were evident during the course of the trial.  Paul was extremely fidgety during trial and he had such trouble paying attention to what was going in the courtroom that the second chair, Bruce Blumberg, began to bring Paul martial arts magazines, and the like, for Paul to look at.  There were several times

1

during trial that we (the defense team) were afraid he was decompensating.  I believe that Paul's traumatic background made it difficult for him to trust people, and sometimes that even included members of his defense team.  My goal was to help Paul maintain a productive relationship with his attorneys.

6.     Most of the mitigation for the case had already been developed by the time I joined the team.  The main thing left to do was interview Dr. Brad Bayless, the prosecution's expert witness.  I was familiar with Dr. Bayless's work.  In the late 1980's, I used him once on a case.  During one of our early conversations about my client, Dr. Bayless asked me, "What do you want me to say?"  I was shocked by this statement, as I didn't "want" him to say anything; rather, I needed him to do a thorough and honest evaluation of my client.  But that was Dr. Bayless's reputation—especially later in his career, it was widely believed that he would work the facts to get a diagnosis of antisocial personality disorder (ASPD) for the prosecution.  So when I learned Dr. Bayless was the prosecution expert on Paul Speer's case, I knew what to expect.

7.     As part of my work on Paul's case, I reviewed a number of transcripts of Dr. Bayless's testimony in other cases, and I prepared and conducted his pretrial defense interviews.  Along with Dr. Susan Parrish, one of our defense experts, I was actively involved in deconstructing Dr. Bayless's testing methodology and results.  As I recall, the defense team was concerned that there were a number of problems with Dr. Bayless's work, particularly with his MMPI-2 results.  However, because none of us were trained in the MMPI-2, or had any specialized training in understanding or diagnosing ASPD, we knew we needed to work with Dr. Parrish to help us prepare to rebut Dr. Bayless's findings on cross.

8.     The team asked Dr. Parrish to review Dr. Bayless's report and test results.  There were a number of emails exchanged between me, Bob Storrs, and Dr. Parrish about how to rebut Dr. Bayless's findings.  I recall that Dr. Parrish prepared a five or six page report for the team which outlined the problems with Dr. Bayless's work and gave guidance for what to ask on cross.

2

9.     Bob Storrs conducted Dr. Bayless's cross-examination.  I recall feeling very disappointed in the way Dr. Bayless's cross-examination went.  I was concerned that Bob did not utilize Dr. Parrish's advice sufficiently so that the jury could understand that Dr. Bayless's test results, especially the results of the MMPI-2, were seriously flawed.

10.     I was not asked to review Paul's jail visitation records as part of my work on Paul's case.  If I had been aware that the jail records indicated that Dr. Bayless was actually at the jail for a shorter time than he stated during his pretrial interview or his trial testimony, I would have advised Bob to impeach Dr. Bayless with that information.

11.     I do not recall participating in any conversations with Bob or Bruce about presenting Paul's teachers, probation officers, social workers, or prior treating psychologists as witnesses during penalty phase.

12.     In general, I felt like Bob Storrs and Bruce Blumberg were reluctant to challenge Dr. Bayless or Jeannette Gallagher, the prosecutor, too strongly.  It was my impression that Bruce, in particular, had a thing about Dr. Bayless and didn't want to be too hard on him because he admired the fact that Dr. Bayless's son was a star basketball player headed for the NBA.  I tried to make my opinions heard, but in general I felt like I wasn't heard since I was the third chair attorney and had no ultimate control over the direction of the litigation.  However, when Bruce said that he wanted to do the closing argument at the penalty phase, I begged Bob to do the closing rather than Bruce.  I felt that Bruce's guilt phase closing was disjointed and cavalier and that the jury noticed.  Also, there were many occasions when Bruce would not appear in court, which led to more of a workload on Bob's shoulders.

13.     Paul's mental state was always a concern.  As the trial progressed, he grew more and more anxious and irrational.  That behavior worsened after the prosecutor, Jeannette Gallagher, stated in open court that the reason I was absent from court on a particular day was because I needed to be treated for gonorrhea since I was always

hanging all over Paul.  The judge was not in the courtroom when Jeannette made that comment, but Paul heard it.  Aside from the fact that the comment was extremely insulting to me and entirely unprofessional, it also had what I believe was the intended effect of upsetting and destabilizing Paul.  When I got back to the office that evening, Paul called.  He was very distressed by her comments.  I assured Paul that I would handle it.  The issue was addressed at our next court appearance.  Paul believed and trusted that the judge would remove Jeannette from the case (as we asked him to do) or otherwise reprimand her for her behavior.  But when the judge gave her a pass and refused to discipline Jeannette because "people say things during the heat of trial," Paul felt that judge was biased against him and his defense team.  After that, Paul believed that if the judge wasn't going to impose some kind of consequence on the prosecutor for making that kind of comment, there was no way he could "catch a break" from the judge.

14.     During one two-hour evening visit with Paul, I observed that he was paranoid and exhibiting delusional thinking.  He was hostile and expressed distrust of the defense team.  The next morning, Paul was behaving irrationally.  He came into the courtroom wearing a white T-shirt with his stun-belt showing, asking "what difference did it make" since he could not get a fair trial.  He wanted to allocute and ask for the death penalty. We promptly sought an emergency psychiatric evaluation.  Despite the finding by the psychiatrist that Paul was unstable, the judge put more weight on the psychology tech who made a drive-by evaluation and concluded that Paul was stable because he was oriented to time and place.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 30, 2018 at Phoenix, Arizona.

PAMELA NICHOLSON

4

Exhibit 3

# DECLARATION OF DAVID WILCOX

I, DAVID WILCOX, declare:

1.      I was the mitigation specialist assigned to Paul Bradley Speer's case during his murder trial after a previously assigned mitigation specialist became seriously ill and later passed away.  There was no investigator assigned to this case that I can recall.  I was assigned to the Speer case in October of 2004, about two years after I retired as a probation officer.  I was already working four other cases at that time.

2.      Maricopa County had approximately 150 death penalty cases when these cases were active, so five probation officers were appointed to work these cases after we retired from the probation office.  Randy Walker, who was appointed to Brian Womble's case, may have received his appointment even before he retired from the probation office.

3.      Death penalty mitigation training was minimal for the new mitigation specialists at the time.  Some of us started working capital cases before we received any training.  I was working on Paul Speer's case before I was totally trained to do that work.  The defense attorneys and mitigation specialists at that time had an overwhelming number of cases.

4.      I worked together with Randy Walker, whom I had known well from the probation office.  He and I conducted joint interviews of some key witnesses in Paul Speer's and Brian Womble's cases, including Bill Womble, Chris Womble, the boys' step-grandmother, and Al Heitzman.  I believe we conducted these interviews together after Paul's and Brian's cases were severed.  There was no discussion of conflict; none of the lawyers said anything about it, and we took our own notes and reported information to our individual first chairs.  I had several cases with co-defendants at that time, including cases where Randy Walker was the other assigned mitigation specialist.  However, Paul Speer's case was the only case where I worked with the co-defendant's mitigation specialist to interview witnesses.

1

5.      I took direction from Bob Storrs regarding whom I interviewed and what information I sought on Paul's case.  I did not interview any of Paul Speer's teachers, Child Protective Services workers, probation employees, Department of Corrections employees, or past mental health evaluators/counselors, although I did have access to some juvenile records.  I believed interviewing such people could have helped the case, since I thought the jury would be more moved by hearing from common people than from experts about Paul's horrible family and upbringing; but I deferred to Mr. Storrs, because he had the experience.  But if I were on the jury, I would want to hear from people who knew firsthand how bad this young man was treated by his family.

6.      I wish that the legal team had gone further into Paul's school and Child Protective Services experiences.  I was happy that Dr. Paul Miller was retained as an expert, because I thought that it was important for the jury to hear about Paul Speer's terrible early childhood experiences.  I thought it was significant that once Paul was in a relatively stable environment, like the Cordova School, he tended to do well there.

7.      Randy Walker and I interviewed Al Heitzman together.  It was obvious that he had groomed Paul and his brother Brian for sexual favors.

8.      Paul's mother, Sabrina, was sick a lot prior to trial.  Her long term heroin abuse and other drug abuse made it difficult to attempt to interview her.  She did not show up for an interview Bob Storrs and I had tried to set up.  In my opinion, her active heroin abuse made her unsuitable as a mitigation witness.

9.      I interviewed the state expert, Dr. Bayless, who hadn't made a good impression on me, even when I had worked with him in the probation office.

10.      I met with Lee Brinkmoeller before the state PCR petition was filed.  The PCR team was going to meet with me again to sign a declaration, but then they did not.  I would have worked with them on a declaration.

//

//

//

2

1     I declare under penalty of perjury under the laws of the United States of America

2 that the foregoing is true and correct.

3     Executed on _____July 30, 2018_____, at Phoenix, Arizona.

4

5                             _____

6                             DAVID K. WILCOX

Exhibit 4

http://www.eastvalleytribune.com/news/justice-system-can-t-cope-with-backlog-of-death-penalty/article_f802227f-1d46-5c54-b5c5-b2762cb8e000.html

# Justice system can't cope with backlog of death penalty cases

Jennifer Ryan    Mar 4, 2003

A landmark case that put juries instead of judges in charge of sentencing death penalty cases has left the criminal justice system ill-prepared to cope with a backlog of capital cases, legal authorities say.

As Maricopa County Superior Court sets trial dates for the more than 70 cases on hold since the U.S. Supreme Court's decision in the Timothy Ring case, many lawyers, especially criminal defense lawyers, said they are far from ready to put on their cases.

"I don't want to try a case until I know I'm competent to do that," said Daniel Patterson, a public defender assigned to four capital cases involving East Valley defendants. "I am not competent, and I have been telling judges that."

Prosecutors and defense lawyers alike said they will make mistakes, and some already have. Crunched by limited resources, training and time, lawyers said missteps will result in more appeals, more heartache for victims who have to go through another trial and more costs to an underfunded system in which nearly half of capital cases started over on appeal at least once, according to recent research by Arizona State University.

"I don't think people appreciate how dramatically that (Ring) case changed the landscape," said Mark Kennedy, administrator of Maricopa County's Office of Contract Counsel, which handles the overflow of criminal cases. "We were at least limping along, and then, all of a sudden, kaboom! We're talking about a double whammy unlike any I've ever seen before."

MITIGATION MESS

It's been nearly two years since Michael Sehwani was indicted on murder charges in the death of James Panzarella of Scottsdale. But last month, Tonya McMath, one of Sehwani's defense lawyers, told Superior Court Judge Mark Aceto that she couldn't begin trial because she was not assigned a qualified mitigation specialist, a key member of her defense team.

Aceto agreed to give her more time.

"Given the seriousness of the case, and given the complexity of things that are apparently happening . . . I'm inclined to (postpone) this (trial)," Aceto said.

The Sehwani case is one of many death penalty cases that are testing the capabilities of lawyers and the county's resources in a judicial system created by Ring.

Lawyers used to have several months between conviction and sentencing to probe a defendant's life for mitigating evidence to argue against the death penalty. Now sentencing must begin immediately after conviction, forcing lawyers to prepare for the verdict and sentencing before all first-degree murder trials.

The requirement is leaving lawyers short on time, and the county short on mitigation specialists. To offset the shortage, which was delaying cases, Superior Court Judge Ron Reinstein helped develop an arrangement to use former probation officers.

"They know the sentencing process backwards and forwards," he said.

But mitigation specialist Mary Durand said the arrangement puts inexperienced, unqualified people in a job that can influence whether a defendant is sentenced to death or given life in prison.

"It is an arduous, difficult, rapport-building, trust-building task to have people tell you the secrets of their lives," she said. If the job is not done right, cases will be overturned, she said.

In a review of Arizona capital cases from 1975 to 1989, ASU researchers found that one in five cases were reversed, remanded or modified because of mitigation issues. From 1990 to 2002, the most common reason was ineffective assistance of counsel.

CASE CRUNCH

When Richard Glassel opened fire during a homeowners association meeting in April 2000 in Peoria, killing two people, he had more than 30 witnesses and little chance of avoiding the conviction he received in December 2002, lawyers said.

But today, prosecutors are worried that the case, which resulted in a death sentence, will come back on appeal because of an inadequate defense, said Paul Ahler, chief deputy for the Maricopa County Attorney's Office.

Glassel's public defender, Dennis Jones, tried to get more time, saying he was unprepared to represent Glassel. But the trial moved forward, with little mitigating evidence presented at sentencing.

As the first case to be completed after the Ring decision, Glassel's case shows what can happen when lawyers have little training and resources and a high volume of cases, defense attorneys said. Since most defendants facing the death penalty cannot afford a private lawyer, the burden falls on county public defenders. They invest an estimated 800 to 1,000 hours for the trial phase of each capital case, according to county records. Some states have established standards limiting the number of capital cases that lawyers can take each year and restricting them from taking other criminal cases. Legal authorities said three capital cases each year is an acceptable caseload, although Washington limits qualified lawyers to one capital case annually.

Arizona has no such limitations. Leaders in the county attorney's and public defender's offices said they want to keep the volume down to three capital cases per lawyer, especially as the transition is made to jury sentencing. But ultimately, it's up to the lawyer to say enough is enough, they said.

Jones' caseload includes three death penalty cases, and he may get two more. Patterson, the public defender with East Valley capital cases, said he has pared down his workload from eight capital cases before Ring to four, but he may get a fifth one. Robert Storrs, a criminal defense lawyer who works on contract with the county, said the six capital cases he has are too many, but he'll keep them as along as judges are understanding.

"They sort of backed up on me," Storrs said. "What I really need is time to do these cases."

FUNDS LACKING

Officials from two of the county's public defender's offices said they have hit capacity on capital cases and have turned new cases away. Since the Ring decision, more capital cases are going to the county's Office of Contract Counsel, where Kennedy scrambles to contract with qualified lawyers to take capital cases.

Justice system can't cope with backlog of death penalty cases | News | eastvalleytribune.com

Officials from all three offices said they are training more lawyers for death penalty cases. But each new capital case, which costs as much as $250,000 through the trial phase, will require more money for personnel, expert witnesses and other resources. Public defenders requested more than $8 million a year from the county. Budget officials have recommended $1.2 million, with a $2 million contingency fund for capital cases that may be resentenced because they were on appeal before the Ring decision.

"If we have enough money . . . we have a better chance of (cases) not coming back (on appeal)," said Jim Haas, director of the Maricopa County Office of the Public Defender. "If they come back, the costs are almost incalculable at that point."

Exhibit 5

 1    when he saw that the defendant had no weapon.

 2              Now that you've heard all of the evidence in

 3    the trial, you know that the defendant does not believe

 4    that the rules apply to him.  He had no problem shooting

 5    Adan Soto, a man who was not only unarmed but asleep.

 6    Shooting the sleeping Enriqueta Soto also didn't bother

 7    the defendant.

 8              On June 10th, the defendant told his

 9    brother:  It felt good.

10              Why did the defendant shoot two innocent

11    people?  He did it because he decided that Paul Speer

12    shouldn't have to go to prison for burglarizing the Sotos'

13    apartment.  He decided that the victims of the burglary

14    should die so they could not testify about their

15    victimization at trial.  He decided that his

16    half-brother's freedom was more important than the lives

17    of the people that Paul Speer had stolen from.

18              Adan Soto is dead and Enriqueta Soto is

19    totally disabled because the defendant didn't think the

20    rules about being punished for stealing should apply to

21    his half-brother.

22              Judge Klein has just instructed you on the

23    law, and he told you that based on the evidence presented,

24    you are to determine what the facts are.  That's your job.

25    Then once you determine what actually happened, then you

1          MS. GALLAGHER:  How excited Paul Speer was
2    when the defendant made his decision to help him out.
3          Now, Paul Speer called right back, using a
4    blow number, and told the defendant to just go over and
5    talk to the guy.
6          And the defendant said, quote:  I was going
7    to give you the other fucking plan B.
8          Now, Paul Speer acknowledged knowing what
9    plan B was.  And then Speer admitted that he didn't have
10   the police report, you know, though he said he did, so he
11   didn't have the Sotos' address.  And he told the defendant
12   to have Al Heitzman go get the police report.  And towards
13   the end of that April 30th phone call, the following
14   exchange occurred.
15          (The tape is played in open court.)
16          MS. GALLAGHER:  Plan B was the defendant's
17   idea, and it was the defendant who decided to go ahead
18   with that plan rather than just talk to the Sotos, as
19   Paul Speer had suggested.  Paul Speer said -- when Brian
20   said, "I'm going to go ahead and do that other plan,"
21   Paul Speer didn't have a problem with that either.  But it
22   wasn't his idea.
23          Now, Detective George Sanchez from the
24   Sheriff's Department told you that on the evening of
25   May 2nd, 2002, the defendant did go visit Paul Speer in

1   will be imposed.

2          It is the same as in the penalty -- or in

3   the guilt phase if all 12 of you agree the defendant was

4   guilty beyond a reasonable doubt of murder in the first

5   degree, and that's what you need to do now.

6          And the bottom line is that there is only

7   one person responsible for the fact that the defendant now

8   sits at the defense table facing the death penalty, and

9   that person is the defendant himself.  He made the choices

10  and decisions that put him where he is today.

11         He decided that his half-brother's freedom

12  was more important than Adan Soto's life.  He has proven

13  that he will kill to get what he wants.  For that, he

14  deserves leniency?  I don't think so.

15         Now, Judge Klein told you that you may

16  consider anything about the defendant's character in

17  deciding if mitigation has been established, so what do

18  you know about the defendant's character?

19         Well, you know that, like his brother, Paul

20  Speer, he has no apparent problem using people to benefit

21  himself.  He allowed Al Heitzman to support him, to take

22  him on a trip to California, but yet when Al Heitzman

23  wasn't around, what was he doing?  He was badmouthing him

24  on the phone, he and Paul Speer.

25         You know that the defendant doesn't have a

1  problem lying if it suits his purpose.  He lied to Al

2  Heitzman why about he wanted the guns out of the safety

3  deposit box.

4        You remember in one conversation the

5  defendant told Paul Speer that Delilah, his younger

6  sister, had told Al not to get the guns out of the safety

7  deposit box for him, and so Brian lied to him and said,

8  well, I'm going to sell them to get counseling.

9        Well, you know from Joyce Nuth, the

10  counselor at Terros, that he was on Access, Access paid

11  for it, but that's what he tells Al Heitzman 'cause lying

12  doesn't seem to bother him either.

13        Now, what else do you know about the

14  defendant's character?  You know that he wanted to see

15  what .45-caliber bullets do to a person's skull.  You know

16  that he believes he knows how to hit someone in the head

17  and kill them.

18        Does any of those things that you know about

19  Brian Womble's character reduce his moral culpability or

20  blame for Mr. Soto's murder?  No.  But now the defendant

21  says to you this morning he's sorry this family was hurt.

22  He said, I wish these things never happened.  I wish they

23  were never put through this.

24        Did you notice he never called Mr. and Mrs.

25  Soto by their name?  Did you notice he never took

1  responsibility for destroying them?

2            He never said I'm sorry I shot Adan Soto in

3  the back, I'm sorry I shot Enriqueta Soto and that she was

4  so severely injured she had to learn how to walk and talk

5  again, I'm sorry that I killed Mr. Soto so that Kimberly

6  and Marco and Miguel don't have a father and don't have a

7  mother that can take them to school because of her

8  disabilities.  He didn't say those things.

9            What he said is, I wish these things never

10  happened.  He's not taking responsibility for his actions.

11  He's trying to convince you that somehow he's remorseful.

12            Judge Klein told you that you may consider

13  the circumstances of the crime to see if there is anything

14  mitigating about how this crime was committed.

15            Mr. Alcantar said is this the worst of the

16  worst?  Is this the kind of crime that a person who

17  commits it should be sentenced to death for?  And I

18  suggest to you that it's exactly the kind of crime someone

19  should be sentenced to death for.

20            Every person should be safe in their own

21  home.  What's the expression, a man's home is his castle?

22  And Adan Soto is dead because Paul Speer burglarized his

23  home, and all Mr. Soto was going to do was go testify that

24  that was his property that was stolen, because when you

25  follow the rules, that's what you do.

1          You've been victimized, you go to court, you
2   testify about it, but, no, in this case the defendant
3   broke into Mr. Soto's home in the middle of the night
4   while Mr. and Mrs. Soto were asleep with no chance to
5   defend themselves, armed with a .45-caliber handgun with a
6   silencer on it, and he didn't fire just one time, he fired
7   hitting both of his targets, all the while that baby
8   Marcos was right there in the bed with his parents.

9          He did it to eliminate a witness.  He
10  endangered someone else.  He was on probation when this
11  happened.  Is this the worst of the worst?  Absolutely.

12         Defense counsel suggested that Paul Speer
13  somehow made the defendant shoot the Sotos, that he
14  hounded him to help him, that somehow this is all Paul
15  Speer's fault.  Well, Paul Speer is equally to blame for
16  what happened, but he didn't unduly influence Brian
17  Womble.

18         How much influence did Paul Speer have over
19  his brother?  The jail tapes that you've listened to
20  suggest that he didn't have much, if any, influence over
21  him.  The defendant was perfectly capable of saying no to
22  his brother, and he did so on more than one occasion.

23         Remember the call when Speer asked the
24  defendant to sell his guns to put up the bail fee.
25              (Audiotape was played.)

1              MS. GALLAGHER:  Brian Womble had no problem
2  saying no to his brother when he wanted him to sell his
3  guns to put up the bond fee.  He wouldn't sell his guns,
4  but he had no problem shooting two people to get Paul
5  Speer out of jail.  What does that tell you about the
6  defendant?

7              Then there are the times that Speer pestered
8  the defendant to put money on his books at the jail so
9  that Speer could buy food from the commissary, and on
10  April 30th in the 15:56 call, Paul Speer says, hey, Brian,
11  can you do me a favor?  Hey, can you hook me up with 20
12  bucks, bro?

13              Defendant:  I'm fucking -- I need to buy a
14  fucking clip and shit.  Now, this is after they've already
15  decided -- Brian Womble's already decided to commit this
16  murder and he needs a clip for his .45.

17              Speer says, nah, give me 20 for a while, I
18  mean, at least 20, dog.

19              Defendant:  Can't.

20              Speer:  You gonna give me 20?

21              Brian:  Maybe in a week when I get paid.

22              Speer:  Oh, in a week when you get paid?
23  All right.

24              Now, at the time of that call, the defendant
25  had at least a hundred dollars in his bank account.  In

1  the May 5th call that Al Heitzman recorded that you have

2  the transcript of, the defendant told Al he had about a

3  hundred dollars in the bank.

4         Now, that was on May 5th.  That was less

5  than a week after the May 30th call where he told Speer

6  maybe I'll give you 20 bucks when he got paid, so he had

7  the money, but he wasn't giving it to his brother.

8         The defendant got paid on May 13th, as he

9  said in the call that he had with Speer that day, and even

10  though he got paid, did he run right down to the jail and

11  put money on his brother's books?  Nope.  Instead, the

12  following conversation occurred.

13         Speer said, you got any cash right now, bro?

14         Defendant:  I just got a check, that's it.

15  I just got my check.

16         Speer:  Oh, you got your check?

17         Defendant:  Yeah.

18         Speer:  Do you think you could hook me up

19  with a little bit of money, like, 20 bucks or something so

20  I can fucking eat and shit?

21         Defendant:  Maybe.  I don't know.

22         Speer:  You -- huh?

23         Defendant:  I don't know, maybe.  And then

24  the defendant changed the subject.

25         The defendant wasn't about to give his

1   brother any of his money.  Regardless of how hungry Paul

2   Speer was, regardless of how much Paul Speer bugged him to

3   give him money, he wasn't doing it.

4           And look at the things that the defendant

5   knew about his brother.  The defendant knew that Paul

6   Speer was a liar and a con man.  Look at the way Paul

7   Speer treated Al Heitzman.

8           In the May 18th jail call where Speer, the

9   defendant, and Heitzman were all on the call together,

10  Paul Speer is begging Al Heitzman to post his bail so he

11  can get out of jail.  He's crying.

12          Speer denied -- Al Heitzman accused him,

13  you're trying to manipulate me, and Speer denied it, and

14  Speer said, I told you, Al, that I would be a friend for

15  you until you fucking died.  We made that deal together in

16  your living room one day.  This is his friend for life,

17  bail me out.

18          Then on April 29th at 16:51, Speer called

19  and spoke to the defendant, and after ascertaining that Al

20  Heitzman wasn't home and wasn't tape recording this

21  particular conversation, Speer says regarding Al Heitzman,

22  he's a fucking weirdo, dude.  How do you know he isn't

23  trying to poison you, dude, or trying to fuck you or

24  something?  This is his friend for life.

25          And then further in the conversation Speer

1  says -- once again calls Mr. Heitzman a fucking weirdo.

2  He said, that's why I fucking -- that's why I have -- I

3  have problems with that guy.  The fucking dude took care

4  of me the whole time I was in prison.  He did all that

5  shit, dude, hey, and then fucking -- and then when I got

6  out, dude, he started acting like a freaking weirdo,

7  crying like a baby and shit.

8           On the May 5th phone call, the one at 11:00,

9  Speer says, I hate that fucking fag, dude.  When I get out

10 of here, I'm going to bust his fucking head open.

11          And what does Brian Womble -- the person

12 that Al Heitzman is supporting, paying for kung fu, doing

13 those things for him, what does the defendant say?  He

14 says, hey, I know, I'm gonna fuck him up.

15          So he and the brother were alike in this

16 regard; used people, but he knew that's what Paul Speer

17 was like, but it doesn't stop either one of them from, on

18 May 5th in a series of three phone calls, begging Al to

19 put up the bond money.  Al says, well, what am I going to

20 get out of this?  And Paul Speer says, well, you can watch

21 me graduate from GED school.

22          During those calls Al Heitzman says, I'm not

23 going to do anything for you, Paul, because you stole from

24 me four times, and Paul swears up and down, all the while

25 his brother is listening on the phone that he didn't steal

1   anything, he didn't do that, but then in the May 7th phone
2   call that Al recorded and you have the transcript of it,
3   Paul Speer calls and apologizes to Al Heitzman for
4   stealing from him and then says, will you put up my bail
5   money, which he never does.
6           The defendant also knew that his brother,
7   Paul Speer, was a loser.  In the last call on May 5th, Al
8   Heitzman said to the defendant, he said, you, talking to
9   Brian Womble, you seem to be gifted with common sense.
10  Paul doesn't have any.
11          Defendant:  Some people, it takes a fucking
12  while.  They go back to jail a few times and they finally
13  figure it out.
14          Al Heitzman:  Well, I don't believe Paul has
15  learned.  I mean, you -- you keep telling him and telling
16  him and telling him, you keep doing this and you're gonna
17  go back to jail.  He had warnings from everybody, but he
18  continued to do it.  He obviously hadn't learned.
19          The defendant knew all of this about his
20  brother.  He knew he was a heroin addict who didn't take
21  responsibility for his addiction, but, rather, blamed
22  Chris Womble, the other brother, for getting him involved
23  in heroin again when he got out of prison.
24          The defendant knew that Paul Speer was a
25  repeat offender who couldn't stay out of trouble.  Despite

1   all of that, the tapes illustrate that he was perfectly

2   capable of telling Paul Speer no, but you're supposed to

3   believe that Paul Speer managed to exercise undue

4   influence over the defendant and hound him into doing

5   something he didn't want to do.

6           Well, remember whose idea it was to murder

7   the Sotos.  It was the defendant's idea.  Paul Speer

8   didn't even ask Brian Womble to help him.

9           The defendant volunteered his help in that

10  April 29th call at 17:26 when Paul Speer said, if I get

11  out of here, check this out, bro, I got the -- I got the

12  fucking police report -- which was a lie, he didn't get it

13  until later -- but he says, I got the fucking names of any

14  witnesses.  All I gotta do is go to those people, talk to

15  them, have them not go to court and I -- we can take it to

16  trial and get off because if no witness shows up, there's

17  no case.  I talked to my lawyer about that, that's why I

18  want to fucking get out, dude.

19          Defendant:  Do you want me to go fucking

20  talk to them?

21          Brian Womble volunteered his help.

22          Speer says, can you do it?  They speak

23  nothing but Spanish.

24          Defendant:  Ah, fuck, I don't know anybody

25  that can fucking translate.

1     Speer:  Hey, Brian.

2     Defendant:  How would you talk to them?

3     Speer:  I'd fucking -- I'd bring somebody

4 with me.

5     Remember, the defendant thought about it

6 overnight, his offer to help, and the next day he told

7 Speer to send him the addresses, and that's when Speer

8 calls back using a blow number and the following

9 conversation occurs.

10     (Audiotape was played.)

11     MS. GALLAGHER:  That's Brian Womble who

12 suggests Plan B, which you all know is to murder the

13 Sotos.

14     Then, despite the defendant telling Paul

15 that he was going to get his guns out of the safety

16 deposit box, which was the very first thing he said in

17 that is, hey, I'm going to tell Al to get that shit,

18 despite the defendant saying he was -- should he go with

19 Plan B, which is killing the Sotos, does Paul Speer say,

20 oh, yeah, yeah, yeah, go do that?  Does he jump on that

21 idea?  No.

22     He then suggests that the defendant should

23 get Al Heitzman to give him some money so that the

24 defendant can take the money over to the Sotos and bribe

25 them not to show up for the trial.  Paul Speer says, give

1   those people some money, and the defendant's response to
2   that is, I don't know, fuck, I don't even know that
3   they'll do that.
4           So Paul Speer is still trying to suggest
5   something other than cold-blooded murder, but then at the
6   end of that particular April 30th call at 15:56, the
7   following conversation occurs.
8           (Audiotape was played.)
9           MS. GALLAGHER:  Actually that's the next
10  one, but what he said at the very end of that call is the
11  defendant says, should I talk to those people or do my
12  other plan?  Speer says, well, bro, fucking -- and the
13  defendant says, 'cause I'm going to do the other plan.
14  Paul Speer says, okay, yeah, okay, go ahead.  The
15  defendant says, all right.
16          The defendant unilaterally made the decision
17  to kill Adan and Enriqueta Soto.  He came up with the plan
18  and he decided that's what he was going to do.
19          You have every call that Speer made, from
20  the one on April 29th when the defendant first offered to
21  go talk to the Sotos, to the one on April 30th where the
22  defendant decided to kill them.
23          So that you know, listen to all of them.
24  You know that Paul Speer didn't suggest killing anyone.
25  The defendant came up with that idea all on his own.

1          So how is that mitigating?  How does that

2    reduce the defendant's degree of moral culpability or

3    blamelessness -- or blameworthiness for the murder of Adan

4    Soto?  It doesn't.

5          Then there's the fact that Paul Speer kept

6    suggesting ways that the defendant could commit the

7    murder, but the defendant repeatedly shot down those ideas

8    saying, I've got to think of something, I've got to think

9    of something.  He didn't ask Paul Speer how should I

10   commit the murders.  He had his own plans, and one of them

11   was going over to the Sotos to check it out.

12         The defendant did that all on his own.  Paul

13   Speer never suggested that, and Speer was actually quite

14   surprised in the May 17th call when the defendant told him

15   that not only had he gotten Speer's letter with the

16   address but he'd already gone over to, quote, just peep it

17   out.

18         Another idea that the defendant came up with

19   all on his own was getting a silencer for the .45.  He

20   says on the May 13th call, there's something I need real

21   bad, dude.  Well, actually I don't really need it, but it

22   will help me out a lot, one of those -- those fucking

23   things that makes it real quiet, and then he got one.

24         And he told Speer about on it on May 19th.

25   Quote, it's a very quiet weapon, put them to sleep right

1   in the soul, no noise, no nothing, and they're shaking on

2   the floor, they're dead.

3            And in that call Speer suggested that the

4   defendant knock on the Sotos' door and pretend he was one

5   of the boys in blue there to take pictures of the stolen

6   property.

7            How does the defendant respond to his older

8   brother's suggestion on how to do this?  He says, your way

9   is fucking smooth, but I don't really like it, and a

10  little while later he says, well, I've got to think of

11  something.  Fuck it, I've got a couple of different ideas.

12           The defendant clearly wasn't interested in

13  any of the ideas Paul Speer had.  Now, after all, Paul

14  Speer was not a very successful criminal.  He'd already

15  spent four years in prison for armed robbery and he'd

16  gotten caught within an hour of breaking into the Sotos'

17  apartment on March 14th, so why would the defendant listen

18  to him?  He didn't.  Brian Womble came up with his own

19  plan for eliminating the Sotos as witnesses.

20           The defendant only does things that don't

21  cost him anything.  He wouldn't sell his guns to pay the

22  bail bond fee so Paul Speer could get out of jail .  He

23  wouldn't put any money on Paul Speer's books so he could

24  eat while he was in jail, but he would and he did kill

25  because that didn't cost him anything.

1          The defendant didn't murder Adan Soto
2   because his brother hounded him or pressured him into
3   doing it, he did it because he wanted to.  Shooting the
4   Sotos was his idea, and he did it because he thought
5   shooting the Sotos would be fun.  That's what he told Paul
6   Speer on May 13th.
7          (Audiotape was played.)
8          MS. GALLAGHER:  It will be fucking fun.  How
9   did the defendant act after the murder?  On May 26th when
10  Paul Speer asked him if he fixed both parts on the car,
11  meaning did he murder both Adan and Enriqueta, the
12  defendant said, yep, perfect.
13         And what did he tell Speer he had been doing
14  every night?  Quote, I fucking drive the car every night
15  now, dude, and party with my friends.  That was in the
16  10:00 call on May 26th.
17         Adan Soto was dead and Enriqueta Soto was in
18  the intensive care unit, and what was the defendant doing?
19  He was out partying with his friends.
20         When the defendant visited Chris Womble in
21  jail the following day, on May 27th, was he upset, was he
22  depressed, was he sorry this happened to these people?
23  No.  According to Chris Womble, he was fine.  I asked
24  Chris when he testified, and that's what he said, he was
25  just fine.

Exhibit 6

# FAIR PUNISHMENT PROJECT



# AMERICA'S TOP FIVE DEADLIEST PROSECUTORS:
## *How Overzealous Personalities Drive The Death Penalty*

JUNE 2016

Last year, a journalist asked Dale Cox, then the District Attorney of Caddo Parish, Louisiana, about the wisdom of the death penalty in light of the recent exoneration of Glenn Ford, a man who spent thirty years on death row for a crime that he did not commit.[1] Cox told the reporter: "I think we need to kill more people."[2] "Revenge," he said, "brings to us a visceral satisfaction."[3] Between 2010 and 2015, Cox alone secured one-third of Louisiana's death sentences.[4]

Cox's disproportionate use of the death penalty illustrates a point that Justice Stephen Breyer recently made. "It is now unusual to find capital punishment in the United States,"[5] Breyer wrote, because "capital prosecutions are being pursued in only a few isolated counties."[6] There are more than 3,100 counties,[7] 2,400 head prosecutors,[8] and thousands of line prosecutors in America—yet only a tiny handful of prosecutors are responsible for a vastly disproportionate number of death sentences. The question that this disparity prompts is: **Why?**

[1]     Alexaneria Burris, *Glenn Ford, Exonerated Death Row Inmate, Dies*, USA Today, Jun. 29, 2015, http://www.usatoday.com/story/news/nation-2015-06/29/glenn-ford-exonerated-death-row-inmate-dies/29489433/.

[2]     Vickie Welborn, *ADA On Death Penalty: 'We Need To Kill More People'*, Shreveport Times, Mar. 27, 2015, http://www.shreveporttimes.com/story/news/local/2015/03/27/glenn-ford-dale-cox-charles-scott-caddo-parish-death-penalty-execution-marty-stroud/70529188/.

[3]     Leon Nevfakh, *Bloodthirsty Prosecutor Who Said "We Need To Kill More People" Will Not Run For Reelection*, Slate (Jul. 14, 2015), http://www.slate.com/blogs/the_slatest/2015/07/14/dale_cox_louisiana_prosecutor_with_horrendous_death_penalty_views_will_not.html.

[4]     *1 County, 2 Prosecutors Responsible for 3/4 of Recent Louisiana Death Sentences, Amid Charges of Prosecutorial Misconduct*, Death Penalty Info. Ctr. (2015), http://www.deathpenaltyinfo.org/node/6097.

[5]     Glossip v. Gross, 135 S.Ct. 2726, 2774 (2015).

[6]     *Id.* See also Robert J. Smith, *America's Deadliest Prosecutors*, Slate (May 14, 2015), http://www.slate.com/articles/news_and_politics/jurisprudence/2015/05/america_s_deadliest_prosecutors_death_penalty_sentences_in_louisiana_florida.html; Richard C. Dieter, The 2% Death Penalty: How A Minority Of Counties Produce Most Death Cases At Enormous Costs To All, Death Penalty Info. Ctr. (2013), *available at* http://www.deathpenaltyinfo.org/documents/TwoPercentReport.pdf.

[7]     *How Many Counties Are There In The United States?*, U.S. Geological Surv., https://www2.usgs.gov/faq/categories/9799/2971 (explaining that there are 3,141 counties and county equivalents in the 50 States and the District of Columbia.").

[8]     Kyle Swenson, *Florida's Elected State Attorneys: Overwhelmingly White And Male*, Broward-Palm Beach New Times, Jul. 9, 2015, http://www.browardpalmbeach.com/news/floridas-elected-state-attorneys-overwhelmingly-white-and-male-7101778.

This report analyzes the records of five of America's deadliest head prosecutors. Three of them personally obtained over 35 death sentences each: Joe Freeman Britt in North Carolina, Bob Macy in Oklahoma, and Donnie Myers in South Carolina. These men shared an obsession with winning death sentences at almost any cost.[9] For example, Joe Freeman Britt, who committed misconduct in more than 36% of his death penalty prosecutions,[10] said: "Within the breast of each of us burns a flame that constantly whispers in our ear 'preserve life, preserve life, preserve life at any cost.' It is the prosecutor's job to extinguish that flame."[11] The remaining two prosecutors, Lynne Abraham (Philadelphia County, Pennsylvania) and Johnny Holmes (Harris County, Texas), did not personally prosecute as many death penalty cases as the three men above, but nonetheless oversaw the imposition of death sentences against a staggering 108[12] and 201 people,[13] respectively, during their terms.

Of these five prosecutors, only one—Donnie Myers—remains in office, and he plans to retire at the end of the year.[14] One of the most remarkable findings from our research is the fact that once these prosecutors and their protégés left their positions, death sentences dramatically declined in these jurisdictions--a pattern that has only become clear in the years since their departures.

We also highlight five additional prosecutors who came very close to becoming members of this notorious group. These runners-up have egregious records in their own states, and like the prosecutors above, the striking drop in new death sentences that has occurred in their respective jurisdictions since their departures illustrates their outsized impact on the death penalty.

Unfortunately, the problem of personality-driven capital sentencing has continued beyond the tenure of these prosecutors. Over the past fifteen years, prosecutors have pursued far fewer capital cases and juries have returned far fewer death sentences than in years past. Indeed, in 2015, juries returned just 49 death sentences, the fewest in recent history. This number represents an 84.4% drop from

---

9     See, e.g., John A. Horowitz, *Prosecutorial Discretion And The Death Penalty: Creating A Committee To Decide Whether To See The Death Penalty*, 65 Fordham L. Rev. 2571 (1997), available at http://ir.lawnet.fordham.edu/cgi/viewcontent.cgi?article=3377&context=flr (examining prosecutorial discretion in the context of the death penalty).

10    See AMERICA'S DEADLIEST PROSECUTORS SPREADSHEET: DONNIE MYERS, JOE FREEMAN BRITT, AND BOB MACY, http://fairpunishment.org/wp-content/uploads/2016/06/Americas-Deadliest-Prosecutors-Donnie-Myers-Joe-Freeman-Britt-and-Bob-Macy.xlsx.

11    Barry Saunders, *An End To Joe Freeman Britt's Brand Of Justice*, News & Observer, Apr. 11, 2016, http://www.newsobserver.com/news/local/news-columns-blogs/barry-saunders/article71222712.html.

12    Robert Brett Dunham, Assistant Federal Defender, Federal Public Defender Office for the Middle District of Pennsylvania, *Philadelphia Death Row: 1990-2014* (Feb. 23, 2015).

13    See AMERICA'S DEADLIEST PROSECUTORS SPREADSHEET, *supra* note 10.

14    Andy Shain & Tim Flach, *Veteran Lexington Prosecutor Myers Retiring*, The State, Mar. 15, 2016, http://www.thestate.com/news/local/article66304792.html.

the 1996 high of 315 death verdicts.[15] However, in the increasingly small number of the counties that still actively sentence people to death, a handful of prosecutors dominate death-sentencing statistics.

In the final section of this report, we offer a snapshot of three active prosecutors who, if they continue on their current trajectories, may soon join the ranks of the deadliest prosecutors in America. Taken together, the profiles featured in this report demonstrate that the death penalty has been, and continues to be, a personality-driven system with very few safeguards against misconduct and frequent abuse of power, a fact that seriously undermines its legitimacy.

15   Death Sentences By Year: 1976-2014, Death Penalty Info. Ctr., http://www.deathpenaltyinfo.org/death-sentences-year-1977-2009 (last visited May 26, 2016).

# THE WORST
# OF THE WORST

"Within the breast of each of us burns a flame that constantly whispers in our ear 'preserve life, preserve life, preserve life at any cost,'" Joe Freeman Britt once said. "It is the prosecutor's job to extinguish that flame."[16]



| #1 | | |
|---|---|---|
| NAME | JOE FREEMAN BRITT | |
| COUNTY | ROBESON COUNTY, NC | |
| # OF DEATH SENTENCES | 38 | |
| YEARS IN OFFICE | 1974-1988 (14 YEARS) | |
| MISCONDUCT ALLEGED | 81.6% (31/38) | |
| MISCONDUCT FOUND | 36.8% (14/38) | |
| EXONERATIONS | 2 | |

Joe Freeman Britt was the head prosecutor for Robeson County, North Carolina, from 1974 to 1988.[17] He personally obtained 38 death sentences,[18] more than any other prosecutor in the state's history,[19] and his status as "the deadliest prosecutor in America" is recorded in the Guinness Book of World Records.[20]

16    See Saunders, *supra* note 11.

17    Matt Schudel, *Joe Freeman Britt, Prosecutor Who Sent Dozens To Death Row, Dies At 80*, Wash. Post, Apr. 15, 2016. https://www.washingtonpost.com/national/joe-freeman-britt-prosecutor-who-sent-dozens-to-death-row-dies-at-80/2016/04/15/b246f27e-025b-11e6-b823-707c79ce3504_story.html.

18    See *America's Deadliest Prosecutors* Section III, *supra* note 10. This number is lower than reported in some sources because of the methodology used in this report. We chose not to include concurrent death sentences, due to their duplicative and essentially symbolic nature.

19    See Schudel, *supra* note 17. Schudel explains that "after just one year on the job, Mr. Britt had won more death-row convictions than any other prosecutor in the country." Despite the fact that these sentences were later overturned because of North Carolina's unconstitutional pre-*Gregg* legislative response to *Furman v. Georgia*, Britt's record still exceeded any other prosecutor at the time.

20    Richard A. Oppel Jr., *As Two Men Go Free, a Dogged Ex-Prosecutor Digs In*, N.Y. Times. Sept. 7, 2014, http://www.nytimes.com/2014/09/08/us/as-2-go-free-joe-freeman-britt-a-dogged-ex-prosecutor-digs-in.html?_r=0.

At one point, one out of every 25 death row inmates nationwide had been prosecuted by Joe Freeman Britt.[21] With the District Attorney's office under Britt's control, a person in Robeson County was almost 100 times more likely to be sentenced to death than a randomly selected person in the United States.[22] What's even more striking is that in the 27 years before Britt's arrival, no one in Robeson County had been sentenced to death,[23] and with Britt out of office, Robeson County has imposed only two death sentences in the past decade.[24] Therefore, the remarkable increase in death sentences during Britt's tenure is likely due to Britt's overzealous prosecution, and not a reflection of abnormally high support for the death penalty by local residents.

Courts found that Britt committed misconduct in 14 of his death penalty trials,[25] and at the height of Britt's self-styled "blitz" on murderers, the North Carolina Supreme Court frequently condemned his tactics.[26] For example, defendant John Wesley Oliver received a new sentencing hearing because Britt failed to give to the defense an eyewitness's statement that cast doubt on the state's contention that Oliver was the shooter.[27]

In prosecuting Henry McCollum and Leon Brown, two intellectually disabled brothers, Britt failed to notify the defense about a cigarette butt found at the crime scene, which DNA testing would later link to a different man.[28] Britt complained that "[w]hen we tried those cases, every time they would bring in shrinks to talk about how retarded they were. It went on and on and on, blah-blah-blah."[29] In addition, Brown was only 15 years old when he was charged.[30] McCollum, who was 19 years old, sustained hours of "intense questioning," without speaking to an

21    See Cynthia F. Adcock, *The Twenty-Fifth Anniversary of Post-Furman Executions in N.C.: A History of One S. St.'s Evolving Standards of Decency*, 1 Elon L. Rev. 113, 119 n.27 (2009), *available at* http://www.elon.edu/docs/e-web/law/law_review/issues/adcock.pdf (citing Dee Reid, *'Killer' DA: In First 28 Months On Job, He Won 23 Death Verdicts*, Nat'l L. J., Sept. 17, 1984, at col. 3).

22    *Compare Population Overview: 1970-1995*, N.C. Off. of St. Budget and Mgmt., https://ncosbm.s3.amazonaws.com/s3fs-public/demog/pop7095.html (last visited May 9, 2016) (displaying population statistics for Robeson, NC), *with* I Historical National Population Estimates: July 1, 1990 to July 1, 1999, U.S. Census Bureau, https://www.census.gov/population/estimates/nation/popclockest.txt (last visited May 9, 2016) (displaying population statistics for U.S.).

23    See Schudel, *supra* note 17.

24    Smith, *supra* note 6.

25    *See* AMERICA'S DEADLIEST PROSECUTORS SPREADSHEET, *supra* note 10.

26    Hunter James, *'Deadliest Prosecutor' Has Achieved 41 Death Sentences*, Gainesville Sun, March 16, 1986, at 1B, *available at* https://news.google.com/newspapers?nid=dBzKUGQurMsC&dat=19860316&printsec=frontpage&hl=en.

27    Robert P. Mosteller, *Exculpatory Evidence, Ethics, and the Road to the Disbarment of Mike Nifong: The Critical Importance of Full Open-File Discovery*, 15 Geo. Mason L. Rev. 257, 261 n.11 (2008), *available at* http://scholarship.law.duke.edu/cgi/viewcontent.cgi?article=2486&context=faculty_scholarship.

28    Joseph Neff, *DNA Evidence Could Free 2 Men In 1983 Case*, Charlotte Observer, Sept. 2, 2014, http://www.charlotteobserver.com/news/local/crime/article9159632.html.

29    Victor Li, *Retired Prosecutor Who Convicted Two Men Just Exonerated After 30 Years Behind Bars Is Unrepentant*, ABA J., Sept. 8, 2014, http://www.abajournal.com/mobile/article/ex_prosecutor_convicted_two_men_of_rape_and_murder_exonerated_after_30_years.

30    *State v. McCollum*, 433 S.E.2d 144, 160 (1993); *see also* Op-Ed., *How to Reduce Coerced Confessions And Wrongful Convictions*, L.A. Times, Oct. 14, 2014, http://www.latimes.com/opinion/editorials/la-ed-recordings-police-interrogations-20141015-story.html.

attorney or parent, and signed a confession only upon "a promise [he] could go home."[31] Britt relied on McCollum's coerced statement to prosecute and seek death for the brothers, despite the mitigating fact that McCollum was "mentally retarded and easily influenced by others."[32] After DNA testing exonerated the men, Britt simply doubled down, insisting the two were "absolutely" guilty.[33] Both men spent 30 years in prison for a crime they didn't commit, including time on death row. On June 4, 2014, North Carolina Governor Pat McCrory formally pardoned Brown and McCollum.[34]



Henry McCollum and Leon Brown
Photo by Corey Lowenstein, The News & Observer

When the current Robeson County District Attorney called Britt "a bully" and chastised him for his unethical behavior in the McCollum case, Britt shot back, calling the new D.A. a "pussy" who had been "hanging around too much with the wine and cheese crowd."[35] Even in his retirement, Britt displayed the same attributes that the North Carolina Supreme Court had rebuked him for two decades earlier. "Ministers of the law ought not to permit zeal in its enforcement to cause them to transgress its precepts," the court wrote.[36] "They should remember that where the law ends, tyranny begins."[37] This "flagrant disregard"[38] for well-established rules earned Britt notoriety as "a living symbol of the gross, almost medieval nature of the justice system in small Southern counties."[39] As one journalist quipped, "Good Lord in Heaven, man. He did know he was dealing with people's lives and not auditioning for 'Matlock,' right?"[40]

Prosecutorial misconduct was found in more than one-third of Britt's death penalty cases.[41]

31    Op-Ed., *supra* note 30.

32    *McCollum*, 433 S.E.2d at 161-62.

33    See Schudel, *supra* note 17.

34    Craig Jarvis, *Gov. McCrory Pardons Half-Brothers Imprisoned for Decades*, Charlotte Observer, June 4, 2015. http://www.charlotteobserver.com/news/politics-government/article23092284.html.

35    Oppel, *supra* note 20.

36    State v. Thompson, 290 N.C. 431, 448 (1976).

37    *Id.*

38    *Id.* at 449.

39    Hamilton Nolan, *Prosecutor Who Sent Innocent Man To Death Row Proud He's No 'Pussy'*, Gawker (Sept. 8, 2014), http://gawker.com/prosecutor-who-sent-innocent-man-to-death-row-proud-hes-1631877118.

40    See Saunders, *supra* note 11.

41    See AMERICA'S DEADLIEST PROSECUTORS SPREADSHEET, *supra* note 10.

"There is no better example of how a weak state judicial system was overpowered by a powerful and malicious district attorney than that of Cowboy Bob Macy and the Oklahoma Court of Criminal Appeals."

PROFESSOR RYAN PATRICK ALFORD.[42]



| **#2** | | |
|---|---|---|
| NAME | ROBERT H. MACY | |
| AKA | "COWBOY" BOB MACY | |
| COUNTY | OKLAHOMA COUNTY, OK | |
| # OF DEATH SENTENCES | 54 | |
| YEARS IN OFFICE | 1980-2001 (21 YEARS) | |
| MISCONDUCT ALLEGED | 94.4% (51/54) | |
| MISCONDUCT FOUND | 33.3% (18/54) | |
| EXONERATIONS | 3 | |

"Cowboy" Bob Macy sent more people to death row than any other individual district attorney in the United States. He was personally responsible for 54 death sentences,[43] more than the current death row populations of Colorado, Indiana, New Mexico, Utah, Virginia, Washington, and Wyoming combined.[44] Under Macy, Oklahoma County had more death sentences than it had seen in the previous 40 years.[45] The number dropped precipitously after he retired: Oklahoma County has only had three death sentences in the past six years.[46]

---

42   Ryan Patrick Alford, *Catalyzing More Adequate Fed. Habeas Rev. Of Summation Misconduct: Persuasion Theory And The Sixth Am. Right To An Unbiased Jury*, 59 Okla. L. R. 479, 491 (2006), *available at* http://adams.law.ou.edu/olr/articles/vol59/301Alford4articleblu.pdf.

43   *See* Nolan Clay & Bryan Dean, *Former Oklahoma County District Attorney Bob Macy Dies*, Oklahoman, Nov. 19, 2011, http://newsok.com/article/3624881.

44   Deborah Fins, NAACP Legal Def. and Educ. Fund, Inc., Death Row U.S.A. 36-37 (2016) [hereinafter Death Row U.S.A.], *available at* http://www.deathpenaltyinfo.org/documents/DRUSAWinter2016.pdf.

45   Amnesty International, Old Habits Die Hard: The Death Penalty In Oklahoma 54 n.101 (2001), *available at* https://www.amnesty.org/en/documents/AMR51/055/2001/en/ (noting that only "twelve of the 82 men (14.6 per cent) executed in Oklahoma between 1915 and 1966 were prosecuted in Oklahoma County," while "fifteen of the 40 prisoners (37.5) put to death since 1990 were prosecuted there").

46   Brain Hardzinski, *Why Oklahoma County Backed Off Pursuing The Death Penalty*, KGOU, Aug. 18, 2015, http://kgou.org/post/why-oklahoma-county-backed-pursuing-death-penalty#stream/0.

Like Joe Freeman Britt, Macy had a combative personality that drew attention and controversy. Bob Macy kept an old stack of baseball cards on his desk.[47] The front of the cards showed images of Macy riding a horse, while the back sides conveyed "accomplishments," such as being the "nation's leading death penalty prosecutor" and sending over 40 people to death row.[48] He hung a movie poster from the film "Tombstone" in his office that read: "Justice is Coming."[49] In one capital murder trial, Macy physically pushed a defense attorney in front of the jury.[50] Another time, Macy "was dragged from the courtroom after reaching for his gun when a jury acquitted six defendants."[51]

Macy once told a jury that sentencing the defendant to death was a "patriotic duty" similar to military service.[52] He boasted about his prosecution of 16-year-old Sean Sellers, who was executed before the U.S. Supreme Court barred death sentences for juveniles.[53] Macy mocked the notions of mental illness and trauma when they were presented as mitigating evidence. In one case, he told the jury that defendant Earl Alexander Frederick, Jr. must have "dreamed up" the claim that he "had been sexually molested as a child by his mother."[54]

Prosecutorial misconduct was found in approximately one-third of Macy's death penalty cases.[55] In fact, Macy's "extreme prosecutorial misconduct,"[56] which included findings of inappropriate behavior in 18 of his death penalty cases,[57] contributed to the conviction and condemnation of innocent people. Courts reversed nearly half of his death sentences, and three of the people Macy helped to convict were later exonerated and freed from death row.[58]



Curtis McCarty, exonerated after prosecutorial misconduct was exposed.
Photo by Teri Robinson

---

47    Sara Rimer, *A Proud And Unwavering Believer In The Death Penalty*, N.Y. Times, Feb. 10, 2001, http://www.nytimes.com/2001/02/10/us/public-lives-a-proud-and-unwavering-believer-in-the-death-penalty.html.

48    *Id.*

49    Clay & Dean, *supra* note 43.

50    Howell v. State, 882 P.2d 1086, 1094 (Okla.Crim.App. 1994).

51    Mark Fuhrman, Death and Justice: An Expose Of Oklahoma's Death Row Machine 25 (2003); *see also* Nolan Clay, *Macy Dragged From Court After Jury Frees 6 Suspects*, Oklahoman, Apr. 18, 1990. http://newsok.com/article/2314197.

52    Moore v. Reynolds, 153 F.3d 1086, 1113 (10th Cir. 1998)

53    Rimer, *supra* note 47.

54    Frederick v. State, 37 P.3d 919, 948 (Okla.Crim.App. 2001).

55    *See* AMERICA'S DEADLIEST PROSECUTORS SPREADSHEET, *supra* note 10.

56    *See* Alford, *supra* note 42, at 494.

57    *See* AMERICA'S DEADLIEST PROSECUTORS SPREADSHEET, *supra* note 10.

58    Bowen v. Maynard, 799 F.2d 593 (10th Cir. 1986) (exculpating Bowen); Jay F. Marks & Ken Raymond, *Ex-Death Row Inmate A Free Man, Judge Calls Case Tainted By Misconduct*, Oklahoman, May 12, 2007, http://newsok.com/article/3052699 (explaining Curtis McCarty's innocence); Graham Lee Brewer, *Oklahoma Executes Man For Two Rapes, Murders*, Oklahoman, Dec. 11, 2013, http://newsok.com/article/3913351 (explaining Robert Lee Miller, Jr.'s exoneration).

In his first capital case, in which twelve witnesses confirmed the defendant's alibi that he was "300 miles away at a rodeo," Macy hid a much more credible suspect's identity from the defense.[59] A federal appellate court reversed the death sentence, holding that "Bowen's alibi would have been viewed in a different light" if the jury heard about the other suspect.[60] But Macy did not learn his lesson from the Bowen case.

Joyce Gilchrist, a disgraced scientist once known as the "darling of Macy's lethal forensics squad," helped Macy win cases by "misidentifying evidence" and "giving improper courtroom testimony."[61] Bob Macy wrongfully prosecuted Robert Lee Miller, Jr. after Gilchrist characterized hair follicle evidence as conclusive of guilt during trial;[62] many years later, DNA evidence exonerated Mr. Miller.[63] When Macy prosecuted Loyd Lafevers, Gilchrist lied in her trial testimony, denying that she had performed any blood tests because the results would have hurt the prosecution.[64] Macy then relied on Gilchrist's lies to mislead the jury, suggesting that the blood belonged to Lafevers and the victim, even though both he and Gilchrist knew that it belonged to someone else.[65]

Indeed, Macy retired early due to revelations about misconduct shortly after his use of fabricated evidence was publicly exposed.[66]

59    Ben Fenwick, *Bob Macy: A Look Back*, Oklahoma Gazette, Jan. 12, 2011, http://okgazette.com/2011/01/12/bob-macy-a-look-back/.

60    *See Bowen*, 799 F.2d at 612-13.

61    Randall Coyne, *Dead Wrong In Oklahoma*, 42 Tulsa L. R. 209, 236 (2006).

62    *Id.*

63    *Id.*

64    Lafevers v. Gibson, 238 F.3d 1263, 1266 (10th Cir. 2001).

65    *Id.*

66    Megan K. Stack, *Prosecutor's Days in Saddle Ending in Controversy*, L.A. Times, May 17, 2001, http://articles.latimes.com/2001/may/17/news/mn-64599; Jeffrey Todd Pierce, convicted of rape despite faulty testimony from Gilchrist and "extreme prosecutorial misconduct" by Macy, was exonerated in 2001 due to DNA evidence. *See* Elisabeth Salemme, *Faces of the Innocence Project: Jeffrey Pierce*, Time (2007), http://content.time.com/time/specials/2007/article/0,28804,1627368_1627366_1627379,00.html (last visited May 9, 2016).

"The only reason he gets up in the morning is to try death penalty cases."

U.S. ATTORNEY BILL NETTLES

# #3



| | |
|---|---|
| NAME | DONALD V. MYERS |
| AKA | DONNIE "DR. DEATH" MYERS |
| COUNTY | 11TH JUDICIAL DISTRICT, SC (SALUDA, EDGEFIELD, MCCORMICK, LEXINGTON) |
| # OF DEATH SENTENCES | 39 |
| YEARS IN OFFICE | 1977-CURRENT (38 YEARS) |
| MISCONDUCT ALLEGED | 61.5% (24/39) |
| MISCONDUCT FOUND | 46.2% (18/39) |

Solicitor Donnie "Dr. Death" Myers[67] personally secured 39 death sentences,[68] more than any other prosecutor in South Carolina history.[69] Known as a "fire-and-brimstone" prosecutor who is "passionate" about the death penalty, Myers "keeps on his desk a small paperweight model of South Carolina's electric chair[.]"[70] Bill Nettles, currently a United States Attorney for the District of South Carolina, said of Myers, "The only reason he gets up in the morning is to try death penalty cases. Virtually the only time you see him in the courtroom is when he's trying to kill people." Myers himself explained, "This is about all I've got. If I had to go home and be by myself, I would shoot my damn self."[71]

67    Eric Frazier, *Lawyer Relishes Death Row Record*, Charlotte Observer, Sept. 12, 2000, http://fairpunishment.org/wp-content/uploads/2016/06/Charlotte-Observer_Nettles-quote.pdf.

68    *See* AMERICA'S DEADLIEST PROSECUTORS SPREADSHEET, *supra* note 10.

69    John Monk, *Avenging Angel? A Look At 5 of Donnie Myers' More Memorable Death Penalty Cases*, The State, Mar. 19, 2015, http://www.thestate.com/news/local/article67122927.html. Myers prosecuted Raymond Patterson in three different capital trials after multiple reversals of Patterson's death sentences. After Patterson's third death sentence for the same crime was reversed, Patterson received a life sentence. John H. Blume & Lindsey S. Vann, *Forty Years of Death: The Past, Present, and Future of the Death Penalty in S.C. (or Still Arbitrary After All These Years)*, 11 Duke J. Const. L. & Pub. Pol'y n.198 (forthcoming Summer 2016).

70    O'Shea, *supra* note 67.

71    Margaret N. O'Shea, *Life's Work Faces Threat In Ethics Case*, Augusta Chron., Apr. 1, 2001, http://old.chronicle.augusta.com/stories/2001/04/01/met_310270.shtml.

Myers used his charging discretion to seek the death penalty for some of the most vulnerable people he prosecuted. For example, he pursued death for Kevin Mercer, despite evidence of "cognitive deficiencies, including neurological dysfunction and learning disabilities," post-traumatic stress disorder (PTSD), and a "damaging disability in terms of making judgments and inferences."[72] He put William Kelly[73] and Ted Powers[74] on death row, even though both were under 18 at the time of their crimes. Powers was only 16 years old.[75]

Courts have found that Myers committed misconduct in 18 capital cases, which is approximately 46% of his cases.[76] Six of his death sentences were overturned due to his explicit misconduct.[77] Myers wiretapped confidential communications between defendants and their lawyers,[78] and once allowed his team to have ex parte communications with a potential juror to determine that he was not a "criminal."[79] He was often accused of excluding jurors based on race,[80] and used misleading arguments to scare and anger juries. He was known to work himself to tears at trial.[81]

In one case, Myers used a doll to demonstrate how an infant died and wheeled a crib draped in a black shroud in front of the jury to stage a fake funeral.[82] Myers cried several times during his closing argument and told the jury that not returning a death sentence would be like declaring "open season on babies in Lexington County."[83] He also told the jury it "will kick the baby some more," unless it returned a death sentence.[84] Myers later admitted that his own son's death, resulting from complications from mucopolysaccharidoses (a genetic condition that causes cell damage), motivated him to get revenge.[85]

---

72    State v. Mercer, 672 S.E.2d 556, 561 (S.C. 2009).

73    State v. Kelly, 343 S.C. 350 (2001).

74    State v. Powers, 331 S.C. 37 (1998).

75    Rick Brundrett, *Life-Or-Death Ruling Looms For Teen Killers*, The State, Jan. 2, 2005, http://www.freerepublic.com/focus/f-news/1312511/posts.

76    *See* AMERICA'S DEADLIEST PROSECUTORS SPREADSHEET, *supra* note 10.

77    *Id.*

78    State v. Quattlebaum, 338 S.C. 441, 447 (2000).

79    In re Myers, 355 S.C. 1, 12 (2003).

80    *See, e.g.*, Patterson v. South Carolina, 110 S.Ct. 709 (1990); State v. Southerland, 316 S.C. 377 (1994); State v. Powers, 331 S.C. 37 (1998).

81    State v. Northcutt, 372 S.C. 207, 229 (2007).

82    *Id.* at 223.

83    *Id.*

84    Bryce Mursch, *Sup. Ct. Overturns Death Sentence For Baby Killer*, WIS-TV (Feb. 20, 2007), http://www.wistv.com/Global/story.asp?s=6113797.

85    Beam, *supra* note 71.

In another death penalty case, Myers referred to the African-American defendant, Johnny Bennett, as "King Kong," a "monster," a "caveman," and a "beast of burden," and elicited testimony referencing "black Indians."[86] U.S. District Judge Richard Gergel held that this characterization "played upon a racist stereotype of the bestial black savage that seems calculated to animate and excite the all-white Lexington County jury."[87] Myers' tactic worked—one juror later testified that he sentenced Bennett to death because he was "just a dumb nigger."[88] In yet another case, the U.S. Supreme Court found that Myers engaged in racial discrimination during jury selection. At the retrial, Myers *again* engaged in improper jury selection, and again the U.S. Supreme Court reversed the conviction.[89]

86    Bennett v. Stirling, CV 2:13-3191-RMG, 2016 WL 1070812, at *2 (D.S.C. Mar. 16, 2016).

87    Id. at *9.

88    Id. at *12.

89    See Patterson v. South Carolina, 493 U.S. 1013 (1990); Patterson v. South Carolina, 500 U.S. 950 (1991).





| NAME | LYNNE ABRAHAM |
| --- | --- |
| COUNTY | PHILADELPHIA COUNTY, PA |
| # OF DEATH SENTENCES | 108 |
| YEARS IN OFFICE | 1991-2010 (19 YEARS) |
| EXONERATIONS | 2 |

Under the leadership of Lynne Abraham, who has been dubbed the "Queen of Death"[90] and "The Deadliest D.A.,"[91] the Philadelphia County District Attorney's office obtained 108 death sentences.[92] Abraham exhibited the same personality quirks that Britt, Macy, and Myers shared. She described herself as "passionate" about the death penalty.[93] "I truly believe it is manifestly correct," she said.[94] After overseeing her first execution, she described the killing as "a nonevent for me" and emphasized, "I don't feel anything."[95] Since Abraham's departure from the office in 2010, her successor, Seth Williams, has overseen the imposition of just three death sentences in the last six years.

Abraham was equally unfazed by death row exonerations, going so far as to interpret a Philadelphia man's release from death row as proof that "the system worked."[96] Indeed, before leaving office, Lynne Abraham was asked whether she ever secured a death sentence against a person who did not deserve to die. She answered, "No, I have not seen that."[97] However, at least two Philadelphia death row prisoners who had their convictions overturned were retried during Abraham's tenure and acquitted.[98]

Abraham drew criticism for her apparent insensitivity to the complexities of race

90    Jenn Carbin, *A Matter of Life and Death*, Phila. City Paper, Nov. 1-8, 2001, http://mycitypaper.com/articles/110101/cs.cover1.shtml.

91    Tina Rosenberg, *The Deadliest D. A.*, N.Y. Times, Jul. 16, 1995, http://www.nytimes.com/1995/07/16/magazine/the-deadliest-da.html?pagewanted=all.

92    Robert Brett Dunham, Assistant Federal Defender, Federal Public Defender Office for the Middle District of Pennsylvania, *Philadelphia Death Row: 1990-2014* (Feb. 23, 2015), http://fairpunishment.org/wp-content/uploads/2016/06/PHILApost-1990.pdf.

93    Rosenberg, *supra* note 91.

94    *Id.*

95    *Id.*

96    *Id.*

97    *Id.*

98    *See* Jacqueline Soteropoulos, *South Phila. Man Cleared in Slaying*, Philly.com (Nov. 19, 2005), http://articles.philly.com/2005-11-19/news/25430837_1_dna-testing-new-trial-death-row; Dave Racher, *Pa. High Court Overturns Man's Death Sentence*, Philly.com (Feb. 19, 2000), http://articles.philly.com/2000-02-19/news/25573535_1_death-sentence-murder-conviction-and-death-drug-convictions.

in the justice system.[99]  A reporter once noted that 85% of the inmates in the city's prison were Black, and asked Abraham whether she believed 85% of the city's crime was committed by African-Americans.[100] "Yes, I do. I really do," Abraham responded.[101]

Unlike Britt, Macy, and Myers, Lynne Abraham did not try many death cases herself. She entrusted that role to her assistant district attorneys, particularly Roger King. King tried more capital cases than any other prosecutor in Pennsylvania history.[102] He ultimately put at least 20 people on death row and personally claimed a number of sentences in the "high 30s" by 1995.[103] A wall of Roger King's Philadelphia office was papered with pictures of people he prosecuted who had been sentenced to death.[104] Each person's face was circled in the picture with a line through it, and the word "death" was written on each image.[105]

King was known to engage in specious trial tactics. Once, in urging the jury to return a death sentence against a 16 year-old, King told jurors that mitigating evidence about the defendant and his background was a mere "relic" of the "great society [that has] failed" and should thus be ignored.[106] In another case, King asked jurors to vote for a death sentence in order to send a message to a judge who had previously sentenced the defendant in a prior matter.[107] The Pennsylvania Supreme Court held that it was "extremely prejudicial for a prosecutor to exhort a jury" in this fashion.[108] And across his death penalty trials, King was two times more likely to strike potential Black jurors compared to other potential jurors who were not Black.[109]

99      Dianna Marder, *Street Enters Race Fray With D.A.*, Philly.com (Oct. 3, 1996), http://articles.philly.com/1996-10-03/news/25664094_1_criminal-justice-system-blacks-abraham.

100     *Id.*

101     *Id.* This is despite the fact that studies of self-reported crime for serious adolescent offenders in Philadelphia demonstrated that Black and white youth commit crimes at similar rates. *See* Alex R. Piquero and Robert W. Brame, *Assessing The Race—Crime and Ethnicity—Crime Relationship In A Sample Of Serious Adolescent Delinquents*, 54 Crime Delinq. 390 (2008), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2782848/.

102     Dwight Ott, *Retired, But Memories Stay. For 35 Years, Roger King Relentlessly Prosecuted Murder Cases*, Philly.com (June 7, 2008), http://articles.philly.com/2008-06-07/news/25249127_1_prosecutor-murder-charge-murder-cases.

103     *See* Joseph R. Daughen, *He's Simply The Best*, Philly.com (Mar. 6, 1995), http://articles.philly.com/1995-03-06/news/25701152_1_death-sentences-death-row-robbery-murder.

104     Carbin, *supra* note 90.

105     *Id.*

106     Com. v. Hughes, 865 A.2d 761, 804 (Pa. 2004)

107     Com. v. Crawley, 526 A.2d 334, 344 (Pa. 1987).

108     *Id.*

109     Com v. Reid, 99 A.3d 470 (2014).



**# 5**

NAME **JOHNNY HOLMES**

COUNTY **HARRIS COUNTY, TX**

# OF DEATH SENTENCES **201**

YEARS IN OFFICE **1979-2000 (21 YEARS)**

EXONERATIONS **1**

"If you murder someone here, the state of Texas is going to kill you,"[110] then-Harris County District Attorney Johnny Holmes said. He meant what he said. Under Holmes's leadership, the Harris County District Attorney's office sent 201 people to death row, and Harris County subsequently became known as the "buckle" of the "death belt" and the "Death Penalty Capital of the World."[111] Indeed, Holmes' office "secured an average 12 capital sentences a year in the decade before his retirement in 2000."[112] Since 2008, by contrast, Harris County juries sent an average of one person to death row each year.[113]

Like Lynne Abraham, Johnny Holmes did not prosecute many death cases himself. Instead, he relied primarily on two of his deputy district attorneys: Lyn McClellan, who estimates he sent approximately 30 people to death row,"[114] and Kelly Siegler, nicknamed the "Giant Killer" for putting 19 people on death row.[115]

Over Lyn McClellan's 27-year tenure at the Harris County DA's office, he obtained a remarkable number of capital sentences.[116] From the time McClellan was in law school, he bought into Holmes' death-oriented version of justice. He decided to become a prosecutor because he wanted to see Max Soffar executed for the murder he was convinced that Soffar had committed.[117] McClellan finally had his chance

---

110    Audrey Duff, *The Deadly DA*, Tex. Monthly, Feb. 1, 1994, *available at* https://business.highbeam.com/410545/article-1G1-14790976/deadly-da.

111    Simone Seiver, *Why Three Counties That Loved the Death Penalty Have Almost Stopped Pursuing It*, The Marshall Project (Aug. 11, 2015), https://www.themarshallproject.org/2015/08/11/why-three-counties-that-loved-the-death-penalty-have-almost-stopped-pursuing-it#.xNroshNVN.

112    *Id.*

113    *Id.*

114    Tommy Witherspoon, *McLennan County Prosecutor Likely Holds Active Death Row Record*, Waco Trib., May 24, 2014, http://www.wacotrib.com/news/courts_and_trials/mclennan-county-prosecutor-likely-holds-active-death-row-record/article_548a4b86-4742-5f0a-aa35-bce4a41ad89a.html.

115    Biography for Kelly Siegler, "Cold Justice", TNTdrama.com, http://mobile19.tntdrama.com/series/cold-justice/ (last visited May 31, 2016).

116    McClellan claimed to have secured around 30 death sentences. *See supra* note 114 and accompanying text.

117    *See* Brian Rogers, *Longtime Prosecutor McClellan Praised For His Service*, Houston Chron., Nov. 27, 2008, http://www.chron.com/news/

to prosecute Soffar after Soffar's original murder conviction was overturned in 2004.[118] McClellan did not care that the original conviction was reversed because it was based on a "thin case consisting only of an uncorroborated confession,"[119] that a serial killer named Paul Reid was likely the true culprit,[120] or that Soffar suffered from intellectual disability and brain damage.[121] He charged forward despite the weakness of his case and sought the death penalty anew.[122] Just as the Fifth Circuit was poised to review the case again, Soffar died of cancer while in prison.[123] Soffar insisted on his innocence until his death.

While Lyn McClellan mostly managed to stay out of the limelight while racking up death sentences, his colleague Kelly Siegler became famous for her big personality and notorious willingness to break the rules. Last year, a state court judge reversed a murder conviction after finding that Kelly Siegler committed 36 instances of misconduct, including "failure to disclose or timely disclose favorable evidence."[124] According to the court, "[h]ad that evidence been disclosed or disclosed timely, the results of the trial would have been different."[125] In another murder case, Siegler failed to reveal to defense lawyers the fact "that crime scene investigators found fingerprints that were not [the defendant's] on the victim's car door and front fender."[126] In a third murder trial, Siegler "had the bloodstained bed from the [defendant's] bedroom brought into the courtroom," then dramatically "straddled her colleague, raised one of the actual knives that the defendant was alleged to have used to kill her husband, and reenacted the stabbings."[127] In a fourth case, one involving a juvenile defendant, Siegler told the jury to sentence the teenager to death because "he ain't a boy and he ain't a child...he's been a grown man for a lot longer than some of you were."[128] In a fifth case, Siegler excluded a Black juror while

---

houston-texas/article/Longtime-prosecutor-McClellan-praised-for-his-1776508.php.

118   *See id.*

119   Soffar v. Dretke, 368 F.3d 441, 479 (5th Cir. 2004).

120   *See id;* Maurice Chammah, *80 Murder Confession Prompts Call to Require Police to Record Interrogations,* N.Y. Times, Dec. 27, 2012. http://www.nytimes.com/2012/12/28/us/murder-confession-prompts-calls-in-texas-for-recording-interrogations.html.

121   *State of Texas v. Max Soffar,* ACLU (Feb. 23, 2015), https://www.aclu.org/cases/state-texas-v-max-soffar.

122   *See* Rogers, *Longtime Prosecutor, supra* note 117.

123   *See* Allan Turner, *Twice-Convicted Houston Killer Max Soffar, Suffering Cancer, Dies in Prison,* Houston Chron., Apr. 25, 2016. http://www.chron.com/news/houston-texas/houston/article/Twice-convicted-Houston-killer-Max-Soffar-7307734.php.

124   Brian Rogers, *Judge Cites Prosecutorial Misconduct In Temple Case,* Houston Chron., Jul. 8, 2015. http://www.expressnews.com/news/local/article/Judge-cites-prosecutorial-misconduct-in-Temple-6374157.php.

125   *Ex parte* Temple, No. 1008763-A, (178th Crim. D. Ct. of Harris Cnty., Tex., July 6, 2015), https://assets.documentcloud.org/documents/2159592/judge-cites-prosecutorial-misconduct-in-temple.pdf.

126   Jonathan Turley, *Cold Injustice? TNT Star Kelly Siegler Accused Of A Pattern Of Prosecutorial Misconduct,* JonathanTurley.org (Jul. 22, 2015), https://jonathanturley.org/2015/07/22/cold-injustice-tnt-star-kelly-siegler-accused-of-a-pattern-of-prosecutorial-misconduct/.

127   Skip Hollandsworth, *Trial by Monthly,* Feb. 2010, http://www.texasmonthly.com/articles/1930/.

128   Elizabeth F. Emens, *Aggravating Youth: Roper v. Simmons and Age Discrimination,* 2005 Sup. Ct. Rev. 51, 84 (2005), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1128362 (citing closing argument trans. at 29, Loper v. State, No. 72636 (Tex. Crim. App. 2002) (quoting the prosecutor, Kelly Siegler, of Harris County)).

claiming that members of the juror's church are "screwballs" and "nuts," even though the prospective juror belonged to the nondenominational Christian church with the largest congregation in the United States.[129] And these examples only reflect a small sample of Siegler's behavior during death penalty prosecutions. It appears that Holmes never disciplined Siegler for misconduct.

Together, Britt, Macy, and Myers personally obtained 131 death sentences,[130] a number greater than the total death row populations of fifteen states combined.[131] When death sentences obtained under the leadership of Lynne Abraham and Johnny Holmes are included, that total comes to 440.[132] If you compare that total to the current number of prisoners on death row in the entire country, which was determined to be 2,943 as of January 1, 2016,[133] it is clear that these five prosecutors have had an outsized impact on the death penalty. Their total number of death verdicts is equal to roughly 15% of the current death row population nationwide, or approximately one out of every seven individuals on death row.[134] Over the past fifteen years, even as death sentences have declined nationally, a small group of individuals continue to drive up the total number of death sentences nationwide, which has contributed to a misperception that the death penalty is a common practice, when in reality, most of America's prosecutors have abandoned it.

129    See Lisa Falkenberg, *DA Hopeful Should Lead By Example*, Houston Chron., Jan. 29, 2008, http://www.chron.com/news/falkenberg/article/DA-hopeful-should-lead-by-example-1627042.php.

130    See America's Deadliest Prosecutors Spreadsheet, *supra* note 10.

131    These states are New Hampshire; Wyoming; New Mexico; Montana; South Dakota; Colorado; Virginia; Washington; Utah; Idaho; Kansas; Nebraska; Indiana; Delaware; and Missouri. *See* Death Row Inmates by State, Death Penalty Info. Ctr., http://www.deathpenaltyinfo.org/death-row-inmates-state-and-size-death-row-year?scid=9&did=188#state (last updated Jan. 1, 2016).

132    See America's Deadliest Prosecutors Spreadsheet, *supra* note 10.

133    Death Row U.S.A., *supra* note 44, at 1.

134    See America's Deadliest Prosecutors Spreadsheet, *supra* note 10.

# THE RUNNERS-UP

Our efforts to identify the top five deadliest prosecutors in America turned up
a small handful of prosecutors who failed to meet the threshold for the worst of
the worst, but who broke records in their own states or counties, and racked up
notoriously long records of misconduct. We have dubbed them "The Runners-Up" for
their overzealous and sometimes infamous pursuit of the death penalty.

## #6  ABE LAESER, MIAMI-DADE COUNTY, FLORIDA

Abe Laeser, who retired in 2009 as a prosecutor in Miami-Dade County, Florida,
narrowly missed the top five list. Laeser obtained at least 30 death sentences, more
than any other Florida prosecutor.[135] He illegally withheld evidence from defense
lawyers in two capital trials;[136] put a man on death row who suffered from paranoid
delusions and organic brain damage;[137] and secured a death sentence for a mentally
disabled, non-triggerman who suffered from "child abuse, incest and neglect."[138]
He also once seriously considered prosecuting a five-year-old child for murder.[139]
In a widely reported incident, he unzipped his fly in front of a defense attorney and
female jury consultant.[140] Abe Laeser, like Britt, Macy and Myers, embodied the win-
at-all-costs, personality-driven death penalty.

---

135    See Susannah A. Nesmith, *Longtime Prosecutor Abe Laeser Retires From Miami-Dade State Attorney's Office*, Miami Herald, Apr. 30, 2009, http://www.susannahnesmith.com/clips/Laeser.pdf.

136    See *Smith v. State*, 7 So.3d 473, 504 (Fl. 2009); *Rodriguez v. State*, 39 So. 3d 275, 287 (Fl. 2010).

137    See *Connor v. State*, 979 So.2d 852, 865 (Fl. 2007).

138    See Madeline Diaz, *Attorney Asks Jury To Spare Caraballo*, Sun Sentinel, Apr. 17, 2007, http://articles.sun-sentinel.com/2007-04-17/news/0704160281_1_victor-caraballo-death-penalty-ana-maria-angel; David Ovalle, *Death Sentence For Defendant In Ana Maria Angel Murder Is Overturned*, Sun Sentinel Jun, 27, 2010, http://articles.sun-sentinel.com/2010-06-24/news/fl-angel-death-sentence-tossed-20100624_1_penalty-phase-death-penalty-death-sentence.

139    *State Undecided On Whether To Whether To Charge 5-Year-Old*, Lakeland Ledger, Mar. 15, 1986, 8B.

140    Luisa Yanez, *Trial's Prosecutor Demoted Assistant State Attorney For Gesture*, Sun Sentinel, Apr. 27, 1990, http://articles.sun-sentinel.com/1990-04-27/news/9001050125_1_trial-consultant-laeser-defense-team.

# #7   KENNETH PEASLEY, PIMA COUNTY, ARIZONA

Kenneth Peasley, dubbed a "death-penalty machine"[141] and "the most feared prosecutor in Arizona's Pima County,"[142] was personally responsible for at least 10 death sentences.[143] He often "bragged about having sent more men to death row in Arizona than any other prosecutor."[144] He prosecuted multiple men for murder who were later exonerated.[145] Until his death, Peasley was the only American prosecutor to be "disbarred for intentionally presenting false evidence in death-penalty cases."[146] He also sent at least one child to death row,[147] and secured a death sentence against an individual who was so mentally ill that he could not have been declared competent to be executed without being aggressively treated—a job that Arizona doctors refused to take on.[148]

# #8   NELS MOSS, CITY OF ST. LOUIS AND CHARLES COUNTY, MISSOURI
# #9   AND DEAN WALDEMER, ST. LOUIS COUNTY, MISSOURI

Missouri has only had four new death sentences since 2010.[149] Yet Missouri is responsible for over 25% of the nation's executions in the last two years.[150] Both of those facts owe, in part, to the retirement of two prosecutors.

---

141   Michael Kiefer, *Prosecutorial Misconduct Alleged In Half Of Capital Cases*, Ariz. Repub., Oct. 28, 2013, http://www.azcentral.com/news/arizona/articles/20131027milke-krone-prosecutors-conduct-day1.html.

142   Jeffrey Toobin, *Killer Instinct*, New Yorker (2005), http://www.newyorker.com/magazine/2005/01/17/killer-instincts.

143   *Id.* (explaining that "Peasley...is personally responsible for a tenth of the prisoners on Arizona's death row"). In 2007, there were 112 death row inmates in Arizona, three years after Peasley was disbarred. It is highly likely Peasley sent at least ten people to death row, if not more. *See* Ryn Gargulinski, *Waiting Hardest Part For Inmates, Families Of Victims*, Tucson Citizen, May 19, 2007, http://tucsoncitizen.com/morgue/2007/05/19/52098-waiting-hardest-part-for-inmates-families-of-victims/.

144   A. J. Flick, *Ken Peasley, Disbarred Prosecutor, Dead At 64*, Tucson Sentinel (Sep. 8, 2011), http://www.tucsonsentinel.com/local/report/090811_peasley_obit/ken-peasley-disbarred-prosecutor-dead-64/.

145   *See, e.g.,* Toobin, *supra* note 142 (discussing convictions and exonerations of Chris McCrimmon and Andre Minnit); Maurice Possley, *Victims Of The Prosecution*, Salon (Apr. 27, 2012), http://www.salon.com/2012/04/27/victims_of_the_prosecution/ (explaining exoneration of Khalil Rushdan).

146   *See* Toobin, *supra* note 142.

147   Martin Soto-Fong was seventeen years old at the time of the murders for which he was prosecuted. Fong v. Ryan, CV 04-68-TUC-DCB, 2011 WL 3439237, at *1 (D. Ariz. Aug. 5, 2011).

148   *See* Giovanna Dell'Orto, *Should Convicted Killer Be Made Fit To Die?*, Tuscon Citizen, May 10, 2001, http://tucsoncitizen.com/morgue2/2001/05/10/110732-should-convicted-killer-be-made-fit-to-die/. No doctor in Arizona would prepare Claude Marutana for execution, so prison officials outsourced a psychiatrist from Georgia. *See* Alfred M. Freedman, MD, *Commentary: The Doctor's Dilemma: A Conflict of Loyalties*, Psychiatric Times, Jan. 1, 2001, http://www.psychiatrictimes.com/articles/commentary-doctors-dilemma-conflict-loyalties.

149   Death Sentences in the United States From 1977 By State And By Year, Death Penalty Info. Ctr, http://www.deathpenaltyinfo.org/death-sentences-united-states-1977-2008 (last visited Jun. 2, 2016).

150   *See* Death Row U.S.A., *supra* note 44, at 8 (calculated using table of all U.S. executions, where a total of 63 people were executed in 2014 and 2015 combined, and 16 of those were in Missouri).

Nels Moss was a prosecutor for the City of St. Louis from 1968 to 1999 and for St. Charles County from 1999 to 2001. According to news sources, Moss "put about 10 people on death row."[151] He deliberately failed to disclose exculpatory evidence in a death penalty case where the federal judge described his behavior as "abusive and boorish."[152] He also committed misconduct in at least 25 additional cases, eight of which resulted in reversed convictions or mistrials.[153] A researcher who examined allegations of prosecutorial misconduct in over 11,000 state and local cases nationally called the number of misconduct findings against Moss "extremely uncommon" and labeled him "almost in a class by himself."[154]

Dean Waldemer served as St. Louis County Chief Trial Attorney from 1991 until 2011.[155] Between 2005 and 2010, Waldemer secured at least 10 death sentences, a fact that he proudly proclaimed in his 2011 application to be a circuit judge.[156] He is also the reputed architect of the "Postman Gambit," which enables prosecutors to hide racially biased jury selection practices by intentionally excluding postal workers from juries.[157] On its face, this may seem like a race-neutral reason, except for the fact that a majority of post office employees in St. Louis County are Black.[158] In the trial of Herbert Smulls, sentenced to death by an all-white jury and executed in 2014, Waldemer struck a Black prospective juror saying that he treats postal workers "with great suspicion," because they are "very disgruntled, unhappy people with the system and make every effort to strike back."[159]

# #10  DALE COX, CADDO PARISH, LOUISIANA

Dale Cox famously said, "I think we need to kill more people" when asked about the exoneration of Glenn Ford, who was sentenced to death for a crime he didn't commit.[160] Cox successfully secured death sentences against people with

151   John Sonderegger, *Talk of Charievtown*, St. Charles County Post, January 11, 1999. http://fairpunishment.org/wp-content/uploads/2016/06/11-Jan-1999-Page-163-St.-Louis-Post-Dispatch-at-Newspapers.pdf

152   Bianca Jagger, *The Time Has Come To Say No To Death*, Huffington Post (Apr. 28, 2010), http://www.huffingtonpost.com/bianca-jagger/the-time-has-come-to-say_b_478388.html.

153   Radiey Balko, *U.S. Counties Killing The Most People Are Good At Getting Death Penalty, Not So Good At Justice*, Huffington Post (Nov. 19, 2013), http://www.huffingtonpost.com/2013/11/19/death-penalty_n_4275323.html.

154   Jessamyn Blau, *Ex-Prosecutor In City Erred In 25 Cases, Study Says*, St. Louis Post-Dispatch, Jun. 26, 2003, at A7.

155   Application for Twenty-First Circuit Judge by Dean P. Waldemer, Chief Trial Attorney, St. Louis Cnty., Mo., to Mo. Jud. Comm'n. (Sept. 2011), *available at* https://www.courts.mo.gov/file/21st%20circuit%20Hartenbach%20vacancy%20-%20Waldemer%20application.pdf.

156   *See id.*

157   *See* William Powell, *How We Kill: The State Of The Death Penalty*, St. Louis Mag., Apr. 25, 2014, https://www.stlmag.com/How-We-Kill/.

158   *See id.*

159   Smulls v. Roper, 535 F.3d 853, 868-69 (2008).

160   *See* Welborn, *supra* note 2.

intellectual disabilities and severe impairments. He sought death for two 18-year-olds, Lamondre Tucker and Laderrick Campbell, both of whom had low intellectual functioning.[161] An expert concluded that Tucker "thinks like a child" despite his chronological age.[162] Campbell, who has an IQ of 67, appeared to be "delusional"[163] when he represented himself during trial.[164] Cox also obtained a death sentence against Rodricus Crawford, a father convicted of killing his infant son.[165] Cox aggressively pursued the prosecution and death sentence despite the medical examiner's uncertainty that the death was even a homicide.[166] Cox upset a group of religious leaders when he cited scripture to the jury and suggested that Jesus would demand death for Crawford.[167] Cox retired in 2015.[168] Between 2011 and 2015, Cox alone secured one-third of Louisiana's death sentences.[169]

161    Maurice Chammah, *Could These Cases, Including One From Louisiana, End America's Death Penalty*, Times-Picayune, Jan. 13, 2016, http://www.nola.com/crime/index.ssf/2016/01/could_these_cases_including_sn.html (discussing Tucker); Charles Ogletree, *The Death Penalty's Last Stand*, Slate (Jan. 6, 2016), http://www.slate.com/articles/news_and_politics/jurisprudence/2016/01/data_and_charts_show_few_states_impose_the_death_penalty.html (discussing Campbell).

162    State v. Tucker, No.2013-KA-1631, at *26 (La. 2015), *available at* http://www.scotusblog.com/wp-content/uploads/2016/05/15-946-opinion-below.pdf.

163    *See* Ogletree, *supra* note 161.

164    State v. Campbell, 2006-KA-0286, at *17 n.7 (La. 2008), *available at* http://www.lasc.org/opinions/2008/06KA0286.opn.pdf.

165    *See* Shaun King, *Rodricus Crawford Is On Death Row. Read This And 0% Of You Will Think He Should Be*, Daily Kos (Jul. 13, 2015), http://www.dailykos.com/story/2015/7/13/1401800/-Rodricus-Crawford-is-on-death-row-Read-this-and-0-of-you-will-think-he-should-be.

166    *See id.*

167    *See* Jarvis DeBerry, *Clergy Object To Prosecutor's Pro-Death Penalty Jesus*, Times-Picayune, Oct. 23, 2015, http://www.nola.com/politics/index.ssf/2015/10/caddo_da_death_penalty.html.

168    *Acting Caddo DA Dale Cox Leaves Race Following National Criticism*, KTBS (Jul. 14, 2015), http://www.ktbs.com/story/29549496/acting-caddo-da-dale-cox-leaves-race-following-national-criticism.

169    *See* Campbell Robertson, *The Prosecutor Who Says La. Should 'Kill More People'*, N.Y. Times, Jul. 7, 2015, http://www.nytimes.com/2015/07/08/us/louisiana-prosecutor-becomes-blunt-spokesman-for-death-penalty.html?_r=1.

# THREE
# TO WATCH

## Could These Three Be America's Next Generation of Deadly Prosecutors?

There are three current prosecutors who could become part of America's next generation of deadly prosecutors if they continue to pursue death sentences at their current rate throughout the rest of their careers.

## #1   BERNIE DE LA RIONDA, DUVAL COUNTY, FLORIDA



Since 2010, death sentence rates in Florida have plummeted, yet Bernie de la Rionda of Duval County, Florida, has "put more people on death row than just about any other prosecutor in Florida."[170] It has been reported that he obtained death sentences in 22 cases.[171] Frustrated by delays in executions, de la Rionda stated that we should "bring firing squads back, as bullets are pretty cheap, and they're very quick."[172] The Florida Supreme Court has reversed de la Rionda in two cases after deeming death a disproportionately severe punishment for those particular defendants.[173] De la Rionda has the dubious distinction of obtaining death sentences against a number of defendants with significant impairments, including: a drug-addicted man who was severely abused and neglected as a child and suffers from significant neurological impairments;[174] a man with a 76 IQ and "mild to moderate impairment of his frontal lobe function";[175] and a severely depressed man with suicidal ideations whom the judge found to be "under the influence of extreme mental or emotional duress."[176]

---

170    Larry Hannan, *Fla.'s Death Penalty Proce. Declared Unconst. By U.S. Sup. Ct.*, Fla. Times-Union, Jan. 12, 2016, http://jacksonville.com/news/crime/2016-01-12/story/floridas-death-penalty-procedures-declared-unconstitutional-us-supreme.

171    2010 Director's Community Leadership Awards, Bernie de la Rionda, FBI (2010), https://www.fbi.gov/about-us/partnerships_and_outreach/community_outreach/dcla/2010/jacksonville.

172    Andrew Pantazi, *Prosecutor, Activist Argue Over Death Penalty At Tiger Bay Club Forum*, Fla. Times-Union, Sept. 18, 2015, http://jacksonville.com/news/crime/2015-09-18/story/prosecutor-activist-argue-over-death-penalty-tiger-bay-club-forum.

173    See Yacob v. State, 136 So. 3d 539, 550 (Fla. 2014) (determining that the aggravating factor, a robbery, was only incidental to the murder and thus not sufficient to justify the death penalty); Scott v. State, 66 So. 3d 923, 936-37 (2011) (finding that battery concurrent with the murder did not warrant the imposition of the death penalty).

174    See Asay v. Sec'y, Fla. Dep't of Corr., 3:05-CV-147-J-32PDB, 2014 WL 1463990, at *23-22 (M.D. Fla. Apr. 14, 2014).

175    McMillian v. State, 94 So. 3d 572, 578 (Fla. 2012).

176    Bright v. State, 90 So.3d 249, 257 (Fla. 2012).

# #2   JEANNETTE GALLAGHER, MARICOPA COUNTY, ARIZONA



The same linkage between the aberrant personalities of yesterday and today exists in Arizona. If anyone overtakes Kenneth Peasley's death sentence record, it is likely to be Jeanette Gallagher. Gallagher, the current head of Maricopa County's capital case unit, has obtained at least 9 death sentences, which appears to be more than any other active prosecutor in Arizona in the last decade.[177] She has secured death sentences against people with severe impairments, including a military veteran diagnosed with paranoid schizophrenia.[178] Gallagher also obtained a death sentence for a 19-year-old who had tried to commit suicide the day before he committed murder and who had attempted to seek treatment for his severe depression only to be turned away.[179] The Arizona Supreme Court rebuked Gallagher for prosecutorial misconduct in at least three death penalty cases, calling her behavior "improper,"[180] "very troubling,"[181] and "entirely unprofessional."[182]

# #3   PAUL EBERT, PRINCE WILLIAM COUNTY, VIRGINIA



Virginia, like Missouri, is no longer an active death sentencing state.[183] However, Virginia has had more executions in modern history than every state except Texas and Oklahoma.[184] The recently re-elected the District Attorney of Prince William County,[185] Paul Ebert, has personally obtained at least 14 death sentences, more than any prosecutor in Virginia.[186] As of 2012, nine of those men had been executed.[187] Ebert has admitted that his office withholds evidence of innocence as an office policy, in order to prevent defense attorneys from using it to benefit their clients.[188] This policy has likely contributed to the sentencing, and possibly the

177    See America's Deadliest Prosecutors Spreadsheet, supra note 10.

178    State v. Fitzgerald, 303 P.3d 519, 527 (Ariz. 2013).

179    State v. Womble, 235 P.3d 244, 257 (Ariz. 2010).

180    State v. Velazquez, 166 P.3d 91, 102 (Ariz. 2007).

181    State v. Martinez, 282 P.3d 409, 416 (Ariz. 2012).

182    State v. Speer, 212 P.3d 787, 796 (Ariz. 2009).

183    The Death Penalty in 2015: Year End Report, Death Penalty Info. Ctr. 4 (2015), available at http://deathpenaltyinfo.org/documents/2015YrEnd.pdf.

184    Number of Executions by State and Region Since 1976, Death Penalty Info. Ctr., http://www.deathpenaltyinfo.org/number-executions-state-and-region-1976 (last visited June 2, 2016).

185    See Fenit Nirappil, Prince William Board Chairman and Longtime Cnty. Prosecutor Reelected, Wash. Post, Nov. 4, 2015, https://www.washingtonpost.com/local/virginia-politics/veteran-prosecutor-ebert-neck-and-neck-with-challenger-in-pr william/2015/11/03/06f7870e-7e5c-11e5-b575-d8dcfedb4ea1_story.html.

186    See Josh White, Man Who Killed Prince William Couple in 2001 is Executed, Wash. Post, Nov. 18, 2009, http://www.washingtonpost.com/wp-dyn/content/article/2009/11/17/AR2009111702515.html; Ebert Gives it Another Go in Race for Commonwealth's Attorney, Culpepper Times, [DATE], http://www.northernvatimes.com/culpeper/article/ebert-gives-it-another-go-in-race-for-commonwealths-attorney.

187    See Dieter, supra note 6, app. at 27.

188    See Wolfe v. Clarke, 819 F. Supp.2d 538, 566 n.24 (E.D. Va. 2011) (quoting Ebert's explanation at the defendant's habeas evidentiary hearing: "when you have information that is given to certain counsel and certain defendants, they are able to fabricate a defense around what has been provided"); see also Dahlia Lithwick, Why is Justin Wolfe Still In Prison?, Slate (Nov. 13, 2014), http://www.slate.com/

execution, of multiple innocent people. The parents of a murder victim insisted that the man Ebert prosecuted, Larry Elliott, was innocent, and claimed that Ebert lied at trial about evidence that they provided to him which pointed to another suspect.[189] Elliott was executed in 2009, despite lingering doubts about his innocence and allegations that Ebert hid exculpatory evidence.[190] Before the courts overturned the conviction of another defendant, Justin Wolfe, Ebert hid evidence that detectives threatened the admitted triggerman with the death penalty unless he testified against Wolfe.[191] A judge described the behavior of Ebert and his team as "abhorrent to the judicial process."[192]

## CONCLUSION

There have always been a tiny handful of prosecutors who pursue death sentences with fervor, and without regard for fairness and accuracy. America's five deadliest prosecutors—Joe Freeman Britt, Bob Macy, Donnie Myers, Lynne Abraham and Johnny Holmes—epitomize this over-aggressive and reckless style of prosecution. But this personality-driven feature of the death penalty is visible in other states too, including among prosecutors who continue to seek the death penalty today. These prosecutors are evidence that the application of the death penalty is—and always has been—less about the circumstances of the offense or the characteristics of the person who committed the crime, and more a function of the personality and predilections of the local prosecutors entrusted with the power to seek the ultimate punishment. Their overzealous pursuit of the death penalty does not accurately reflect America's growing skepticism of the death penalty, nor is it representative of local constituencies that are more attached to the death penalty. It better reflects the lack of meaningful controls on prosecutorial discretion and a lack of consequences for their illegal or unethical behavior. In fact, death sentencing trends in these counties before and after these individuals served as prosecutors demonstrate that these individuals drove these counties to become extreme outliers in their use of the death penalty, and that these counties saw dramatic reductions in capital verdicts as soon as these individual actors were out of the picture. This overzealous, personality-driven, win-at-all-costs pursuit of capital

articles/news-and-politics/jurisprudence/2014/11/justin_wolfe_case_his_murder_conviction_was_vacated_three_years_ago_so_why. html.

189  See *Clemency Petition on behalf of Larry Bill Elliott*, pt. 2, apps. 4-5 (2009), *available at* https://library.albavard.........
ap-op214-Elliott-bill-appendices1-50.pdf.

190  See Josh White, *Man Who Killed Prince William Couple in 2001 Is Executed*, Wash. Post, Nov. 18, 2009, http://www.washingtonpost.com/wp-dyn/content/article/2009/11/17/AR2009111702515.html.

191  See *Wolfe*, 819 F. Supp.2d at 549-51, 556; Liptak, *supra* note 188.

192  *Wolfe*, 819 F. Supp.2d at 566 n.24.

punishment seriously undermines the legitimacy of the death penalty today.

## RESEARCH PROCESS

Our research process consisted of consulting the legal database Westlaw for court opinions, legal briefs, and motions; newspaper archives; and federal and local public defender offices, which allowed us to come up with an initial list of district attorneys who had secured a large number of death sentences in the modern death penalty era. We cross-checked this information with a list of all defendants sentenced to death in the relevant jurisdictions. Where we found incomplete information or discrepancies, we consulted with a second, and sometimes a third, source to verify the information. All of the numbers and figures are accurate to the best of our knowledge, and the resources relied upon are available via the citations in the report, and in the database we created for this purpose, which is on file with the Fair Punishment Project and available upon request.

## ACKNOWLEDGEMENTS

We would like to thank the NC Office of the Capital Defender; NC Indigent Defense Services; the Oklahoma County Public Defender; Clark County, Indiana, Prosecutor Jeremy Mull and ex-Clark County Prosecutor Steve Stewart; Justice 360; and Rory Fleming, Stacey Kennard, Liz Eisenberg, Dawn Milam, and Amy Weber for their research assistance.

## ABOUT THE FAIR PUNISHMENT PROJECT

The Fair Punishment Project uses legal research and educational initiatives to ensure that the U.S. justice system is fair and accountable. As a joint initiative of Harvard Law School's Charles Hamilton Houston Institute for Race & Justice and its Criminal Justice Institute, we work to highlight the gross injustices resulting from prosecutorial misconduct, ineffective defense lawyers, and racial bias, and to illuminate the laws that result in excessive punishment. For more information visit: www.fairpunishment.org.