# Exhibit 7

1

1      IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2          IN AND FOR THE COUNTY OF MARICOPA

3

4   STATE OF ARIZONA,          )
                               )
5              Plaintiff,      )
                               )
6          vs.                 )     CR2002-010926
                               )
7   PAUL BRADLEY SPEER,        )
                               )
8              Defendant.      )
                               )

9

10

11                         Phoenix, Arizona
                           January 22, 2007

12

13

14                  TRANSCRIPT OF PROCEEDINGS

15              Taped Interview of DR. BAYLESS

16

17

18
    Transcript Prepared For:
19
    ROBERT L. STORRS, Esq.
20

21

22                         COPPERSTATE REPORTING SERVICE
                                  Court Reporters
23                       12601 North 59th Place, Suite 100
                            Scottsdale, Arizona 85254
24
                         Transcribed by:   Leona McNutt
25

COPPERSTATE REPORTING SERVICE

1          MS. NICHOLSON:   Today is Monday, January twenty-second,
2   two-thousand-and-six. We are seated in the conference room of
3   Bayless & Associates for an interview in the matter of State
4   vs. Paul Speer.  Present for today's interview, for the State,
5   is Jeanette Gallagher.   Present for the defense are Bob Storrs,
6   Bruce Blumberg and myself, Pam Nicholson.  And our witness
7   today is Dr. Bayless.
8   BY MS. NICHOLSON:
9          Q.   Dr. Bayless, first of all -- I just realized, I
10  should have asked before we went on, I don't have a resume to
11  work from.
12         A.   (Inaudible) a CV?
13         Q.   Or, a CV, yeah.
14         A.   I've given --
15         Q.   I'm sure -- I should have asked before we went on
16  tape.
17         A.   We'll get you one.
18         Q.   Okay.  All right, so we'll (inaudible) a little
19  later.  Um, let's talk about this case in particular, we'll do
20  the rest, the CV stuff at the end.  When were you first
21  contacted about this case?
22         A.   Oh, wow, that goes way back.  Probably in --
23  somewhere around May 2005, I believe it was.
24         Q.   And, who contacted you?
25         A.   Jeanette Gallagher.

3

```
 1        Q.    And was that in writing or by telephone?
 2        A.    Uh, frankly, I don't remember but possibly both.
 3        Q.    Um, do you recall what it was that you were
 4   initially requested to do in connection with that case?  Was it
 5   put in writing or it just something that was a verbal request?
 6        A.    Well, it was agreeing to evaluate Paul Speer and
 7   Brian Womble.  Apparently the defense had alleged mental health
 8   reasons for their behavior, reference to the murder.  And
 9   that's all I knew at the time.
10        Q.    Okay.  When you say you were asked to evaluate,
11   what does it mean when you're asked to evaluate?  What is an
12   evaluation?
13        A.    Psychological evaluation.
14        Q.    No, I understand that.  What does it mean to you,
15   as a professional?  What do you do to conduct a psychological
16   evaluation?
17        A.    Clinical interview, psycho-diagnostic testing,
18   review of collateral information, review of witness statements,
19   review of police reports, review of medical records, review of
20   all collateral data that possibly we can get our hands on.  And
21   make a determination as to what their mental status is.
22        Q.    Do you want to check the volume on that?
23              (Replays a portion of her tape to listen to the
24   quality of the recording, some discussion about state of
25   quality with Bruce  Blumberg before turning off recorder and
```

4

1   resuming the interview). Okay, the volume's working.  Now, you
2   said your -- you want to check the mental status.  Can you
3   explain to me more specifically what you mean by checking
4   mental status?
5          A.    Whether or not they suffer from any type of mental
6   illness or defect that would provide as to whether or not it's
7   a chronic illness or an acute problem or whatever.  Uh, and
8   whether or not that would provide any kind of substantiation as
9   to their behavior.
10         A.    Substantiation as to behavior of -- I'm not
11  familiar with that term.  What do you mean, substantiation as
12  to behavior?
13         Q.    As to what they're charged with.  Substantiation
14  to the -- why they did what they did.
15         A.    You mean justification?
16         Q.    You can use that term, that's fine with me.
17         A.    I'm just trying to understand your term.
18         Q.    Well, I don't know about justification --
19         Q.    Well, did you mean substantiating that there was a
20  mental disease or defect?
21         A.    Right.
22         Q.    Is that what you were talking about?
23         A.    Exactly.
24         Q.    I -- I thought you were talking about
25  substantiating the criminal behavior and I didn't know what

5

1  that meant.

2          A. OK.

3          Q. OK. Um, now you begin your report -- I have the

4  report in front of me, dated October 5, 2006.  I presume you

5  have the same report?

6          A.   Uh-huh.

7          Q.   I also see you have a file in front of you.  Can

8  you tell me what's contained in your file and has, and to your

9  knowledge, has that entire file been provided to the defense?

10         A.   Yes.

11         Q.   Okay.  Just -- would you mind just telling me just

12 the various items that are in there?

13         A.   Well, my report, the letter from Jeanette

14 Gallagher --

15         Q.   Could we please have a copy of that?

16         A.   That's it.

17         Q.   Okay, I see some items at the bottom there.

18         A.   That's nothing.

19         Q.   That's what, a timesheet or something?

20         A.   A fax code sheet.  It's a contact sheet that we

21 don't use for this(inaudible).

22         Q.   Oh, okay.

23         A.   All this is in the file and it's a fax cover

24 sheet.  This is a, uh, -- okay?

25         Q.   Yes.  I can go ahead and get copies made of those

COPPERSTATE REPORTING SERVICE

6

```
1   then?
2        A.    Sure.
3        Q.    Okay.
4        A.    An MPI, you have all that.
5        Q.    Right.  The report.
6        A.    Where he signed indicating his admission, sentence
7   completion MMI, you have that.
8        Q.    Okay.
9        A.    This is -- I don't know why we even stuck this in
10  here, this is nothing but a -- I'm sure you have this, this is
11  nothing but a continuance deal
12       Q.    Okay.
13       A.    A Minute Entry.  It's Minute Entry, yeah,
14  whatever.
15       Q.    Where -- where do you keep your billing sheets or
16  your timesheets for a case like this?  Oh, that was in the file
17  too?  Oh, it's a flat fee.
18       A.    Yeah.
19       Q.    Okay.  Now, your flat fee of $15,000 does that
20  contemplate a certain number of hours or --
21       A.    It's a flat fee.
22       Q.    Now, when you worked with Jeanette in the past,
23  did you charge her a $15,000 flat fee in connection with each
24  case that you work on with her?
25       A.    No.
```

```
 1          Q.    How many cases have you worked on with Jeanette?
 2          A.    Four?  Five?  Four?  I don't remember.  Let me
 3    think --
 4          MS. GALLAGHER:   What number have you worked on with Bob?
 5          DR. BAYLESS:   Yeah, has it been four?  Let me see --
 6          MS GALLAGHER:   Ramirez isn't mine. That you had with
 7    Bob.
 8    BY MS. NICHOLSON:
 9          Q.    But you know, it would be helpful, I guess what
10    I'm interested in find out is the number of times in the past
11    several years that you're been a consultant for the State.  And
12    so if you could just run through a list of the cases -- several
13    cases with Jeanette --
14          MR. BLUMBERG:   On capital cases.
15    BY MS. NICHOLSON:
16          Q.    On capital cases, yes.  Might your bookkeeper have
17    a record of bills submitted to the State?
18          A.    No, no, we don't keep records like that.
19          Q.    You don't send bills to the Maricopa County
20    Attorneys Office?
21          A.    Yeah, we send bills to the Maricopa County
22    Attorneys Office but we don't keep records like she would be
23    able to go through -- we spend to a lot of -- lot of -- this is
24    a big agency, we send bills to a lot of different people.  It
25    would take her forever to go through and sift through all that.
```

8

1    Let me think -- in -- over the last how long?

2          Q.    Um, last three years.  This case has actually been

3    going on, what, since 2002?

4          A.    Yeah.

5          Q.    That's -- longer than that.

6          A.    Two, um, three  --

7    BY MR. BLUMBERG:

8          Q.    Can you name them, Brad?

9          A.    Well, there was -- I can't think of what his first

10   name was.  Tonitihu Aguilar, then there was Ramirez, that's two

11   -- Peter Ross, three,

12         MS. NICHOLSON:    And Ramirez --

13         A.    Four, five, with Brian Womble and Paul Speer,

14   that's five.  There's some cases pending that I haven't done

15   yet -- I have -- they're sitting on the back burner. Five.

16   What am I missing?

17         MR. STORRS:  Andrano (phonetic).

18         DR. BAYLESS:  Oh, yeah, that's right.  Andrano.

19   BY MR. BLUMBERG:

20         Q.    Pandelli (phonetic).

21         A.    Who?

22         Q.    Didn't you do Pandelli?

23         A.    That's six.

24         Q.    And Valesquez.

25         A.    We did -- I said Valezquez.

9

```
 1          Q.     No, you said Aguillar.
 2          A.     Okay.  Valesquez -- they got a better memory than
 3   I do, so --
 4          Q.     Seven cases.
 5          A.     Its only seven cases, yeah.
 6          Q.     Not including Speers and Womble -- Speer and
 7   Womble.
 8   BY MS. NICHOLSON:
 9          Q.     Well, if they have a better memory, just sort of
10   -- just from the courthouse, do you have a memory that you
11   could sort of refresh from your own records so that you could
12   go back and see?
13          A.     Probably not.
14          Q.     It's not possible to do that.
15          A.     Not right now.
16          Q.     Is it possible you could do it this week?
17          A.     If I have time.
18          Q.     Okay.  Do you have staff that could do something
19   like that?
20          A.     No.
21          Q.     There's nobody that could --
22          A.     No, because I keep those -- those records would be
23   something I'd have to -- they wouldn't know whether or not --
24   what case it was.  We don't keep records like that, so I would
25   have to go back and look.
```

COPPERSTATE REPORTING SERVICE

1      Q.    Okay.

2      A.    But this -- that's pretty close though.

3      Q.    Well, I'm just looking at this invoice, this

4 invoice says Maricopa County Attorneys office, client name,

5 Speer and Womble.  It seemed to me that you would have invoices

6 -- wouldn't all the cases have invoices like this?

7      A.    No.

8      Q.    They wouldn't say Maricopa County Attorneys

9 office, client, Speer and Womble?

10     A.    No, that's a new program that we just got.

11     Q.    I see.  Okay, and the old program didn't

12 identify --

13     A.    They'll identify who it is but finding it by name

14 -- you have to find it by invoice number, it's not by name.

15 And they're all scanned, so it's difficult.

16     Q.    Okay.  So just going back over, Tony Aguilar,

17 there's a (inaudible) Ramirez -- I missed the third name.

18     A.    Peter Ross.

19     Q.    R-o-s-s?

20     A.    Yeah.

21     Q.    Womble, Mr. Speer, Durano, Pandelli, Valesquez --

22     A.    Adriano.

23     Q.    Adriano.

24     A.    That's --

25     Q.    Oh, not Durano, Adriano.

11

```
 1          A.    Right.  Is Adriano somebody's last name?
 2          MR. BLUMBERG:  Yeah, it was Juan Martinez's case.  Yeah,
 3   these aren't all my cases.
 4   MS. NICHOLSON:
 5          Q.    And these are over what period of time, sir?
 6          A.    Last five years.
 7          Q.    And you said there were several pending?
 8          A.    Um, we've got -- capital cases now?
 9          Q.    Yes, that's all I'm interested in.
10          A.    Okay.  Well, I've got Leroy Cropper, which is not
11   -- it's been put on the back burner because of his -- I don't
12   know what's going on with that yet, at this point in time.  I
13   haven't see him yet either, so I don't know.  There's other
14   cases that I have that are murder cases that are not from the
15   county attorney's office, also.
16          Q.    Well, what I'm interested in is the cases on which
17   you have been retained as an expert by the county attorney's
18   office in a capital case.
19          A. Not the defense?
20          Q. I'm interested in finding out the capital cases in
21   which the county attorney's office has retained you.
22          A.    Okay.
23          Q.    That's it?
24          A.    Yep. That I'm aware of.
25          MS. GALLAGHER:  And Fitzgerald.
```

```
 1          DR. BAYLESS:  Oh, Fitzgerald, yeah.
 2          MS GALLAGHER:  That's mine.
 3          Mr. STORRS:  Is that the samurai sword?
 4          MS. GALLAGHER:  That's the samurai sword.
 5     BY MS. NICHOLSON:
 6          Q.   That's pending but you haven't already testified
 7     in that.
 8          A.   No, it's pending.
 9          MR. STORRS:  What's that one called?
10          MS. NICHOLSON:  Fitzgerald.
11     BY MR. STORRS:
12          Q.   If I can ask a question.  Is the $15,000 for both
13     individuals?
14          A.   Right.
15          Q.   And doEs that include any trial testimony?
16          A.   Yes.
17          Q.   So evaluations and trial testimony in both.
18          A.   Yeah.
19          Q.   It's a flat fee.
20          A.   Yes.
21          Q.   You intend to bill us.
22          A.   Yes.
23          Q.   At that rate?
24          A.   For what?  For this?
25          Q.   Yes.
```

13

```
 1          A.    $350 an hour.
 2          MR. BLUMBERG: I hope we have it Mr. Storrs.  The check's
 3  in the mail.
 4          MR. BLUMBERG: It always is with you, Bob.  (Laughter)
 5  BY MS. NICHOLSON:
 6          Q.    Um, Dr. Bayless, I'm looking at the letter in
 7  which -- the first letter that Ms. Gallagher wrote to you and
 8  she indicates that she's attaching mitigation material and that
 9  additional material may be forthcoming.
10          And I -- it indicates that there's a list attached
11  of materials.  So, this list that's attached to the letter
12  dated May 9, 2005, is that all the materials that you received
13  from Ms. Gallagher?
14          A.    Probably not, no.  Probably there's more
15  information than that.
16          Q.    So in May 2005, you got those materials.
17          A.    Uh-huh.
18          Q.    You received additional materials, when?
19          A.    Um, I'd have to go -- I'd have to go look.  I
20  really don't remember when.  During this timeframe, I mean
21  during the timeframe of the evaluation and stuff, I think we've
22  gotten more materials than that.  A couple, two or three things
23  from your side, as a matter of fact, I think from you guys.
24          Q.    What I'm wondering is, as far as transmittal
25  letters, are there any other transmittal letters that would
```

1  indicate --

2      A.    No.

3      Q.    Okay.  All right, now the fax to the Maricopa

4  County Sheriff's Office, dated April 6th, indicates that on May

5  10th you were going to make a visit to Mr. Speer.

6      A.    Yeah.

7      Q.    Now, did you make any additional -- first of all,

8  did you make that visit?

9      A.    Um --

10     Q.    On April 10th?

11     A.    Yes.

12     Q.    And do you keep a timesheet on that so that you

13 know when you entered the jail, when you came out --

14     A.    I think that was the day Mr. Speer would not talk

15 to me, as I remember.  And because of the flat fee, there was

16 no need to keep a timesheet.

17     Q.    Okay.  All right, all I'm trying to do is figure

18 out how much time you were in the jail; so, there is no way to

19 know.

20     A.    Well, you could probably check the jail.

21     Q.    And I understand that you also went back in August

22 of 2006.

23     A.    That's correct.

24     Q.    And it appears that there were two dates in August

25 2006, both the 14th and the 15th.

15

```
1          A.    Correct.

2          Q.    Now, were those misprints or did you actually go

3    back on two days?

4          A.    Two days.

5          Q.    Okay.  All right, I'm interested in hearing about

6    the amount of time that you spent on each of those two days,

7    when you went in, how long you stayed, whether you were there

8    over dinner or -- or whatever.

9          A.    Well, on August 14th -- you know what?  That's not

10   -- that's not correct.  The first thing, we saw Paul on

11   5/23/06, initially.  We apparently -- you have May 10th there.

12         Q.    Well, I'm looking at the fax.

13         A.    Yeah, it was a fax that we sent -- but I don't

14   think we got to see him that day.  I think we saw him on the

15   23rd of May.

16         Q.    And why is it you think that?

17         A.    I don't know, I'm not really sure exactly what

18   happened there. I don't know if he refused to see me or went

19   back to see him or what.  I'm not sure exactly what happened

20   there.

21         Q.    Well, where are you getting the May 23rd date?

22         A.    Because he signed the sheet which I have everybody

23   do the first day when I see them, in terms of agreeing to the

24   examination.  This was on May 23rd.

25         Q.    All right.  Now, I do note that on your clinical
```

1  interview sheet, at the bottom of the first page, you do
2  indicate that the personal interview took place was on --
3         A.    -- Yeah, and he refused to see me.  Yeah, okay.
4         Q.    Okay, so now I'm really confused because we've
5  got, actually got --
6         A.    That should be five -- that should be five-ten,
7  I'm sorry.  That's a misprint on my part. That's what it looks
8  like.
9         Q.    Okay, I just want to get this straight.
10        A.    Uh-huh.
11        Q.    I'm trying to figure out the times that you went
12 in, tried to see Mr. Speer and whether or not he was prepared
13 to work with you on those particular days.  It looks like, even
14 before, when -- you were retained in May but at the same time,
15 by a --
16        A.    -- That should have been 5/10.
17        Q.    It should have been 5/10?
18        A.    Yeah, I -- that was my mistake there.  I'm sure --
19        Q.    Well, it's interesting because your fax sheet not
20 only is dated four -- let me show it to you, put it in front of
21 you.
22        A.    Okay.
23        Q.    But it also says you were on a visit on Monday,
24 April 10th, it's very explicit.
25        A.    Could have been 4/10 then, I don't know.  I don't

17

```
 1   -- to be honest with you, I really don't remember, you know.
 2   That's a long time ago.  Maybe it was 4/10 that we went to see
 3   him and he refused to see me.  Okay.
 4        Q.    And when he -- well, what is the -- go back and
 5   get these dates straight before we figure everything else out.
 6        A.    Uh-huh.
 7        Q.    You have a consent that you obtained on May 23rd.
 8        A.    Right.  We went to see him on May 23rd, correct.
 9        Q.    And did you do an evaluation that day?
10        A.    Uh, apparently not.  I don't think he -- he,
11   again, I think there was a problem, as I can't remember exactly
12   what happened that day because I have no notes concerning that
13   day whatsoever.  I'm not sure if he refused to see me again and
14   we called Bob, or what happened that day.  I can't remember.
15        MS. GALLAGHER:  That's the one we have tape recorded.
16   But Bob, you have the transcript of the tape.
17        MR. STORRS:  Uh-huh.
18        MS. GALLAGHER:  Yes?
19        MR. STORRS:  I think so, yeah.
20        MS GALLAGHER:  Yeah, 'cause we had a hearing on it.
21        MR. STORRS:  Right.
22        DR. BAYLESS:  So, I can't remember exactly, there was a
23   lot of confusion about him seeing me and not seeing me, what
24   have you.
25   BY MS. NICHOLSON:
```

```
 1          Q.    Right.  But there were no notes in connection with
 2   that.
 3          A.    No, we had a tape -- we tape recorded it.
 4          Q.    And the notes that you made in connection with the
 5   April 10th visit, is it strictly the --
 6          A.    -- Yeah, refused to talk to examiner, that's all.
 7          Q.    Okay.  But -- so you didn't even obtain a consent
 8   until a-month-and-a-half later, after the initial refusal.
 9          A.    He wouldn't see me.  I couldn't get an interview
10   from him.
11          Q.    He wouldn't let you in at all?
12          A.    Correct.
13          Q.    I see.  Well, let me ask you then, in your report,
14   you indicate that he refused to talk and take your test because
15   his attorneys had warned him.  Now, if he wouldn't see you, how
16   did you know that information?
17          A.    That had to be off the 23rd -- where -- where are
18   you reading this?
19          Q.    I'm reading your report.  Under "Observations,"
20   the very first paragraph.
21          A.    That had to be on the 23rd, May 23rd, when he
22   refused to talk to this examiner.  'Cause I did talk to him at
23   that point in time, there was a tape recording of that.
24          Q.    On April 10th, you tried to see him and he
25   wouldn't even come out to the visiting area to see you, is that
```

19

1   correct?

2         A.    That's my memory, yes.

3         Q.    And then on the 23rd, you went in and got a

4   consent, you had a conversation with him during which he

5   related to you that he was fearful and was -- was concerned

6   about proceeding.

7         A.    Right.

8         Q.    And then you ultimately went back in August?

9         A.    That's correct.

10        Q.    Is that correct?

11        A.    I think so.

12        Q.    Now, what is your practice, with regard to

13  preparing for conducting one of these evaluations?  Did you

14  just grab a handful of testing instruments you're going to use

15  and go in?  Do you sit down and go through the stack of

16  collateral data that you talked about?  I mean, how do you

17  prepare to go in for the initial interview and, and evaluation?

18        A.    Normally we usually read and review as much

19  collateral information I have on an individual before I go see

20  them.  Sometimes I'll have everything but --

21        Q.    Uh-huh.

22        A.    -- but -- and things come later in cases, as you

23  well know.  And based on what I've read and what's going on in

24  the particular case, then we make a determination.

25              You say, just grab a bunch of tests, no, I don't

1   just grab a bunch of tests, I typically, in a case like this,
2   we certainly want certain types of testing that -- that we take
3   with us.
4               And I'm not sure if I'm understanding your
5   question in terms of preparation for, you know -- that's it.
6       Q.    I, I'm just wondering because we all have
7   different types of interviews, all of us, as professionals,
8   that we want to conduct.
9       A.    Uh-huh.
10      Q.    I didn't know, for you, what it was that you did
11  in order to --
12      A.    -- It's kind of hard to -- it's kind of hard to
13  prepare yourself for an interview that you don't know what the
14  person's going to say. So, it depends on, you know, I may
15  review the materials that I have in front of me that -- that --
16  before I see them, so I have some idea about who they are, what
17  their background is, what their history is and so forth and so
18  on.
19              And then I go talk to them. And I do an interview
20  with them. I mean, that may -- that interview may last two
21  hours, it may last ten hours. I don't know, it depends. It
22  may last over two days. I mean, it depends. Or, three days.
23  I mean, it depends on the person and it depends on what's going
24  on.
25      Q.    All right. And so in this case, if I understand

21

1    it, you went through the entire stack of material because on
2    page - I believe it's page 6, 7 and 8, you list 57 various
3    items of collateral data or documents that you reviewed.
4              A.    Yes.
5              Q.    Are you telling us you reviewed all of those
6    before you went in to see Paul?
7              A.    Probably not.  I reviewed most of it but some of
8    the stuff, I think, came in after the fact, so I didn't have
9    all of it.  But a fairly large portion of this, of which, I
10   don't know, I can't remember exactly what I had and what I
11   didn't have at the time, but I know some of the stuff came in
12   after the fact but -- after I saw him -- but most of it, I had
13   most of it previous to seeing him.
14             Q.    All right.  In any event, your report indicates
15   that you actually reviewed each and every one of these 57
16   items.
17             A.    Before I wrote my report, yes.
18             Q.    Okay.  And some of them you may not have seen
19   prior to the interview.
20             A.    Exactly.
21             Q.    And we don't know which ones those were.
22             A.    You know, no.  I would say the majority of stuff I
23   had before because the majority of the stuff was old, like some
24   DOC stuff and a lot of juvenile records and that kind of stuff
25   was all there.  But I can't say that all of it -- everything

22

1  was -- I got everything at one time because that's not true.  I
2  didn't get everything at one time.

3          So, whether or not I had it, there was probably
4  some information I had after the fact.  Especially the stuff, I
5  think from -- I had a - (inaudible)Is there a Dr. Stewart? I
6  don't remember if I had their stuff before or after but -- I
7  don't remember.

8      Q.   All right.  The bottom line is, you reviewed a
9  portion of it beforehand and a portion of it after your
10 interview.

11     A.   Probably a larger portion beforehand and the
12 smaller portion after.

13     Q.   Okay, right.

14 BY MR. BLUMBERG:

15     Q.   How about the juvenile stuff?  Did you interview
16 -- did you review that before you interviewed him? Kobansky
17 and, and uh --

18     A.   -- No.  To be honest, I don't remember, okay?  I
19 don't remember if I did or didn't.  I can't say.  I thought we
20 had all the juvenile stuff beforehand, we may not have had it
21 all.  I think there was some stuff that came in later.

22     Q.   Dr. Martig?  (phonetic)

23     A.   Yeah, Martig and Kabanski, there was -- we had --

24 BY MS. NICHOLSON:

25     Q.   (Inaudible), Rice, Delong, Fox --

23

```
1          A.    Yeah, there was a bunch of stuff in there.
2          Q.    But in any event, by the time you wrote your
3    report in October, six-, seven-weeks after your -- your visit -
4    -
5          A.    Uh-huh.
6          Q.    -- with Paul, you had ultimately gone through this
7    material.
8          A.    Exactly, uh-huh.
9          Q.    Okay.  All right, let's go back.  I -- I wanted to
10   look at that first paragraph that you wrote because I'm really
11   interested when you say, "The purpose of the evaluation is to
12   examine Mr. Speer's intellect, personality, emotional stability
13   and potential danger to the community."  Now, are these the
14   specific items that Ms. Gallagher asked you to --
15         A.    -- No --
16         Q.    -- evaluate, or you just decided that's what you
17   were going to do?
18         A.    Well, that's basically, you know, what we're
19   looking at, his intellect in terms of, you know, whether or not
20   there is any cognitive problems in terms of understanding
21   what's going on.
22               And in doing a -- a murder case, it's one of the
23   things you want to look at and see whether or not there is any
24   kind of cognitive intervention or cognitive deficits that a
25   person may have that may interfere with their ability to
```

PCBG-01-07-05-0023

24

1  understand, you know, the difference between right and wrong.
2  If they're retarded, for example, so you --
3        Q.    -- Yes, of course.
4        A.    All right.  Personality, obviously, in terms of
5  character traits, you want to look at that.  Emotional
6  stability, whether or not there's any significant mood
7  disturbance.  That -- that's what I'm talking about here.  That
8  would, again, cause any kind of distortion in perceptions or
9  whatever.
10             And potential dangerousness, potential
11 dangerousness is a characterlogical trait, you know, whether or
12 not if they have a history of dangerousness.  I think that's
13 basically what -- what I was looking at.
14        Q.    Why did you decide that that was something you
15 should look into?
16        A.    It's a murder case, why not?
17        Q.    Okay, well, so it was just why not?
18        A.    Well, it's a murder case, like I said.  I mean,
19 what -- what -- what else are you going to be looking at?
20             (Phone ringing)
21        Q.    Do you have to take that call?
22        A.    No.
23        Q.    Well, I was just interested in what you were
24 looking at and what Ms. Gallagher had asked you to look at and
25 I guess that covers that.  Now, I'm interested in the

25

```
1  instruments that you chose.  You chose to administer three
2  specific tests and to conduct a clinical interview--
3              (End of Tape 1, Side 1.)
4        (Interview continues on Tape 1, Side 2:)
5  BY MS. NICHOLSON:
6        -- This is the continuation of my interview of Dr.
7  Bayless in the matter of State vs. Paul Speer.  This is side
8  number 2.
9        Q.    Dr. Bayless, I was just asking you about the test
10 instruments that you selected in this particular case.
11       A.    Uh-huh.
12       Q.    Can you tell me whether the tests -- the
13 instruments that you chose were based on what you knew about
14 what the other doctors had already -- the tests the other
15 doctors had already administered or did you just choose these
16 because they were the ones that you felt you wanted to
17 administer?
18       A.    Well, I think that -- that the tests were chosen
19 based on what they -- what -- the MMPI probably would be the
20 only test that I would say that, regardless of what happened, I
21 would have attempted to administer.
22            The Shipley is a very -- is an IQ scan.  I knew
23 from his history that he had had an IQ in -- that range
24 anywhere between, would be the low to mid 90s, an average
25 range, intellectual functioning from early on development, to -
```

1  - and consequently I knew that there was no evidence in -- in
2  the record that he was retarded.  No one ever, ever said that.
3            So, utilizing the -- the IQ, the Shipley was
4  really to say, okay, where is he at at this point in time.  He
5  did not perform on the abstract section of the test, kind of
6  gave up on that, and he still scored an 82 on the test, which
7  is substantiates are really kind of -- not substantiates but
8  really kind of correlates to what he had already previously
9  had, what his testing was.
10           So, there wasn't really a significant difference
11 between where he was previously.  So there -- so what I was
12 looking at there, is terms of longitudinal IQ maintenance,
13 okay?
14           So, he's had, going back to his juvenile history
15 time, he had had full Wexler's done and what have you, there
16 was no need for me to do that.  And his IQ was still ranging in
17 the below average to average range of intellectual functioning.
18 So, in -- no matter who was doing the testing.  And I believe
19 that's also true across the board.  So, that's basically -- so
20 that told me that he is not suffering -- he understands the
21 difference between right and wrong, he understands -- he is
22 fully aware of what's going on around him in terms of cognitive
23 functioning.
24      Q.    You got all that from the Shipley.
25      A.    No, I got that from the records and the Shipley.

1  I'm correlating everything together.

2          Q.    Okay.   Right now I'm trying to focus on the tests,

3  so let's just talk about the tests for a few minutes, okay?

4          A.    I did, that's what I was talking about.

5          Q.    All right.   I'm trying to find out why you

6  selected the tests that you selected.   You --

7          A.    -- I just told you.

8          Q.    You told me that you chose this Shipley as an IQ

9  scan. You told me that the MMPI is one you would have done

10 anyway.   You haven't mentioned anything about the Williamson

11 Sentence Completion Test.

12         A.    I thought we were talking about the Shipley.   Now

13 we're talking about the Williamson.   The Williamson, I chose

14 that particular test because it's a free-floating or -- I

15 shouldn't say free-floating -- it's a free-association test,

16 basically, you give a sentence probe and the individual answers

17 whatever, the first thing that comes to his mind.

18             It -- the sentence completion test is basically a

19 what we call a projective test, okay, and there's several

20 projective issues, the madigar (phonetic) perception test, you

21 use the sentence completion test, the Rorsach, whatever.

22             I chose to use this because it would -- it kind of

23 gave me an indication of where -- what his thinking was and

24 where his -- what his responses were to various sentence probes

25 but more specifically whether or not there is any indication of

1  any type of psychotic or deranged or perceptual distortion type
2  of thinking.

3        Q.    So, you selected these three instruments to use to
4  evaluate Mr. Speer, so we've got that established.

5        A.    Uh-huh.

6        Q.    Did you choose these three instruments simply
7  because they are the instruments that you typically use in an
8  evaluation of this nature or did you use them in order to
9  measure things that perhaps the other doctors haven't measured
10 yet?  Had you -- in other words, had you seen what the other
11 doctors had done and were just trying to get a fuller picture?

12       A.    No, it wasn't in correlation to what the other
13 doctors had done.  I already knew what the other doctors had
14 done and I wanted to get my own picture as to what was going
15 on.  It wasn't based on what Susan Parrish had done or anybody
16 else had done, no.  But, I knew what they had done.

17       Q.    Okay.  Now, with respect to these three particular
18 tests, is this the standard battery that you use when you go
19 into a jail?

20       A.    Not a standard battery.  I may use other tests.  I
21 use a PAI, I use a number of different tests, depending upon
22 what's going on with the individual.

23       Q.    And why was it in this particular case, depending
24 on Paul Speer, why was it that you chose the Shipley with Paul
25 Speer?  Because you said there were a number of different tests

1   you could have chosen.

2       Q.   Well, the Shipley is -- I could have done a Wexler

3   on Paul too, okay?  But a Wexler is an IQ test, same thing as

4   the Shipley, but he's already had Wexler's before, number one.

5   So, you -- and number two, I had a range, all I needed was a

6   scan, I didn't need a full-blown IQ test on him because I

7   already knew what was going on from previous testing.

8            I wanted to see whether or not there was any

9   cognitive disturbance, did he have any -- what his abstract

10  reasoning was and whether or not -- and also his vocabulary,

11  which is pretty -- stays pretty constant over time in terms of

12  performance.  His stayed pretty constant also.

13           So, of all the different tests that we have in IQ,

14  vocabulary remains constant, more constant than any other

15  tests.  And that's a big, large part of the Shipley.  But I

16  already had other IQs -- I mean, he's been tested many times.

17  It wasn't like this is the first time he's been tested.  If it

18  had been the first time he had been tested and never been

19  tested before, I would have used a Wexler.

20      Q.   Okay.  So, I guess the short answer would be,

21  other -- other doctors had administered the Wexler, you decided

22  to administer the Shipley because it was a shorter instrument.

23      A.   Yeah, because Susan Parrish uses the Wexler in her

24  neuropsychological evaluation, he had been given a Wexler

25  during this juvenile years, so -- and we had -- we had a number

1  of IQ scores over a history.  And so the Shipley was a very

2  simplistic IQ scan, that would give me the data that I was

3  looking for.

4      Q.   Can  you tell me a little bit about the -- the, I

5  guess it was a Dr. Shipley who developed this test, can you

6  tell me what -- how the Shipley test was designed and what Dr.

7  Shipley set out to do in that test?

8      A.   Well, what he set out to do in the test -- I don't

9  know.

10     Q.   Do you know what test is designed to --

11     A.   It's an IQ scan. I know exactly the -- that's what

12  its designed to do, it's designed to give you a -- an IQ scan

13  on an individual, based on their abstract reasoning and their

14  vocabulary skills.  And correlated -- it's correlated to the

15  Wexler.

16     Q.   Now, -- and is that what you're telling me that

17  Dr. Shipley -- that's the purpose of the instrument that Dr.

18  Shipley designed?

19     A.   Yeah, basically the purpose of the instrument was

20  to set up a IQ or intellectual assessment, a brief intellectual

21  assessment procedure that was correlated to the Wexler scales,

22  that can be done fairly quickly and give an idea -- it's a --

23  it's a scan, it's nothing more than a scan, that's all.

24     Q.   That's all it is.

25     A.   Sure.

```
 1          Q.    It's not used for any other purpose?
 2          A.    Oh, I, you know, I'd have to go back and look at
 3  the research.  I mean, this test has been around for quite some
 4  time.  I can go back and look if you want me to but I don't
 5  know.
 6          Q.    No, I'm -- when was the last time that you looked
 7  at the research?
 8          A.    Oh, come on.
 9          Q.    Oh, come on?  I mean, Doctor, when was the last
10  time you looked at the research?
11          A.    The research of what?  On the Shipley?
12          Q.    Yes.  You just said you could go back and look at
13  the research; when was the last time you looked at this Shipley
14  research?
15          A.    Probably the last time I looked at the manual.  I
16  mean, I don't read that every time I pick up that manual.
17          Q.    Okay.  When would the last time have been, Dr.
18  Bayless?
19          A.    I don't know.  Don't know.
20          Q.    Within the last year?
21          A.    I don't know.
22          Q.    Within the last five years?
23          A.    I don't know.
24          Q.    Has the instrument been modified at all?
25          A.    Yes.
```

PCBG-01-07-05-0031

32

```
1          Q.    You concluded that because Paul performed
2    reasonably well -- don't let me misstate you -- it's my
3    understanding that you concluded that Paul performed reasonably
4    well on the verbal portion.
5          A.    Uh-huh.
6          Q.    And then essentially gave up on the abstract
7    portion.
8          A.    Yes.
9          Q.    Now, this instrument basically has two portions of
10   the test, verbal and abstract; are they always given in the
11   same order?
12         A.    Yes, as far as I know.
13         Q.    Okay, is there a reason for that?
14         A.    Order of the test.  I mean --
15         Q.    Okay, so it's important to administer the test the
16   way Dr. Shipley designed the test?
17         A.    I think so.
18         Q.    Okay.  And now when Paul was unable to complete
19   the abstract portion of the test or gave up and said, "I'm no
20   good at this," did you consider that there might be a multitude
21   of reasons for Paul giving up midway through the abstract
22   portion of the test?
23         A.    He didn't give up, he didn't do -- didn't give up
24   midway through, he gave up after seven questions.  Seven
25   probes.
```

PCBG-01-07-05-0032

```
 1          Q.    Okay.  So, seven out of 20.
 2          A.    Right.
 3          Q.    So he gave up --
 4          MR. BLUMBERG:  Call it a third.
 5          Q.    -- a third of the way through.
 6          A.    Yes.
 7          Q.    All right.  And when he gave up, as I understand
 8   it from what you wrote in your report, by giving up he was
 9   basically -- as test difficulty increased, his motivation
10   decreased.  That's what you decided.
11          A.    Yes.
12          Q.    Okay.  Did he tell you that -- that it was -- his
13   motivation was decreasing or did he tell you it was just
14   getting too hard?
15          A.    No, he said, "I'm not good at this," and he gave
16   up quick.  He just wouldn't even try.  So, his motivation to
17   push through that was not there.
18          Q.    But, he had filled out -- if I'm not mistaken, it
19   looks like he filled out every single answer on the first page,
20   on the verbal portion.
21          A.    That's correct.
22          Q.    And it was on the second page when he got part way
23   through and it started to get more difficult, he finally said,
24   "I give up, I'm not good at this."
25          A.    Well, it's interesting when you say that because
```

PCBG-01-07-05-0033

1  if you look at the number eight question, it really isn't more
2  difficult.  You know --
3          Q.    -- For whom?  For you?
4          A.    For anyone.
5
6  MR. STORRS:  For me -- I can't -- I don't know the answer to
7  that.
8          A. Oh, get out of here.
9
10 MR. BLUMBERG:  It's like the caveman goes to see this therapist
11 -
12 MS. GALLAGHER: Bruce.
13 MR. BLUMBERG: I'll shut up.
14 (Inaudible chatter)
15 BY MS. NICHOLSON:
16         Q.    All right, what I'm trying to understand here is
17 why it is that you interpreted it as him simply losing
18 motivation as opposed to feeling that he could simply no longer
19 perform the test?
20         A.    Mainly because, if you look back at his history,
21 look at the abstract reasoning part of the Wexler, which he's
22 able to get through very well, which are not any more difficult
23 -- or less -- they're not -- this is not more difficult than
24 that, for sure.
25         Q.    Okay.  And there's literature that correlates the

1   two?

2          A.     Look at the -- look at the questions.  Yeah,

3   there's literature that correlates to -- yes, there is.

4          Q.     I'm asking you as an expert, is there

5   literature --

6          A.     Yes.  Yes, there is.

7          Q.     -- that correlates the two abstract tests.

8          A.     Yes, there is.

9          Q.     Okay.

10         A.     Yes, there is.  And matter of fact, the Shipley is

11  correlated to the Wexler, as a matter of fact.

12         Q.     Okay.

13         A.     Okay?  But he was able to get through those things

14  and Wexler's far more strenuous than -- than this ever dared to

15  be.  He just didn't want to do it.

16         Q.     Now, let me ask you, at what point of the day --

17  which day was it?  You did this on the 15th; what else did you

18  do on the 15th with Paul?  What other test did you administer?

19         A.     I think I gave him the --  the sentence completion

20  test.

21         Q.     Which one was first?

22         A.     The Shipley.

23         Q.     The Shipley was first, sentence completion test

24  next --

25         A.     Un-huh.

36

```
 1          Q.    Anything else that day?
 2          A.    I don't believe so, no.  'Cause I gave the -- the
 3   MMPI on the 14th.
 4          Q.    And when did you conduct the interview?
 5          A.    The 14th.
 6          Q.    So, the only two things that were done then were
 7   the sentence completion and the Shipley.
 8          A.    Uh-huh.
 9          Q.    The Shipley was first.  How long did it take for
10   Paul to work through the Shipley?
11          A.    Not long, because -- 20 minutes?
12          Q.    Is that a question or is that an answer.
13          A.    It's an answer.
14          Q.    And is that in your notes?
15          A.    No, but I know how long it takes to do the test.
16   I mean, it -- usually you've got ten minutes on either side,
17   you know, in terms of time limits and so, you know, if he did
18   ten minutes, 15 minutes, you know, before we, you know, because
19   I tried to encourage him to continue on and he gave up.  So,
20   I'm saying ten, 15, 20 minutes.
21          Q.    Okay.  Were you timing it that day?
22          A.    No.
23          Q.    Is it a timed test?
24          A.    Only time in terms of limits, okay.  If it takes
25   too long to take it, then you know that, obviously.
```

PCBG-01-07-05-0036

```
1          Q.    What's too long?
2          A.    Over ten minutes.
3          Q.    So, it is a timed test.
4          A.    Over ten minutes to do either side.  Ten minutes
5    each side.
6          Q.    So, it is a timed test.
7          A.    Yeah, but you don't tell people that it's timed.
8    I mean, if it takes them more than ten minutes to do it, then
9    you would note that and indicate that that -- that there is,
10   you know, there may be some difficulty there.  But --
11         Q.    How much time had elapsed before Paul actually
12   gave up during this ten-minute session?
13         A.    Very quickly.  I mean, he gave up very quickly --
14   I don't know, probably within two minutes.
15         Q.    Probably or is there a notation somewhere --
16         A.    There's no notation.
17         Q.    So, you don't know how long it was before Paul
18   gave up.
19         A.    Yeah, but he -- he answered six questions, he did
20   these very rapidly and then he got to the number eight and he
21   quit.
22         Q.    How many of these tests, Doctor, have you
23   administered over the course of the last year?
24         A.    The Shipley?
25         Q.    Yeah.  Five?
```

39

```
 1        A.    I don't know.
 2        Q.    Ten?
 3        A.    I don't know.
 4        Q.    Doctor, you do this for a living?
 5        A.    Yes.  Do you practice law for a living?
 6        A.    I certainly do.
 7        Q.    Okay, how many interviews have you done over the
 8   last year?
 9        A.    I can definitely give you a ballpark, and I'd like
10   to know your --
11        A.    Well, a ballpark, yeah.  You know, you asked me
12   specifically how many did I give.  I don't know.  But -- I
13   don't know, but ten, 15, I don't know.
14        Q.    And are these used exclusively with respect to
15   forensic interviews in jail visits?
16        A.    Not necessarily.
17        Q.    But going back to the, knowing exactly what
18   happened here, we don't know what time it started -- correct?
19        A.    Correct.
20        Q.    We don't know what time it ended, correct?
21        A.    Correct.
22        Q.    We don't know how long Paul spent on the verbal
23   portion, correct?
24        A.    Under ten minutes.
25        Q.    And we don't know how long Paul spent on the
```

COPPERSTATE REPORTING SERVICE

39

1  abstract portion.

2       A.    It's not required that you write down exact time
3  you spent on it.  Only if it goes over ten minutes.

4       Q.    I understand that, Doctor.  My question was, we
5  don't know how long Paul did spend on this abstract portion, do
6  we.

7       A.    What's the purpose of that?

8       Q.    Doctor, we do not know how long Paul spent on the
9  abstract portion of the test.

10      A.    What's the purpose of that?  There's no reason for
11 us to know that.

12      Q.    Yes or no, Doctor.

13      A.    I told you, he done it very rapidly, so it had to
14 be more than -- no more than two minutes he spent on this.

15      Q.    Doctor, we do not know how long Paul spent on the
16 abstract portion of the test.  There is no record of that, is
17 there.

18      A.    Other than my mind, in terms of what took place.

19      Q.    And you have a specific recollection of how much
20 time passed.

21      A.    I have a specific recollection of him giving up on
22 this particular test, yes.  And I know what happened and I know
23 how they administer these tests.  If you're questioning that,
24 then fine.

25      Q.    Doctor, all I'm asking is how long it took.

PCBG-01-07-05-0039

1         A.    And I'm trying to give you an answer and you're

2   not really accepting my answer.  I've told you, no more than

3   two minutes on that abstract section.  I've told you that how

4   many times?

5         Q.    It's -- there's no notation of that anywhere.

6         A.    I told you there was no notation of that anywhere.

7         Q.    Okay.

8         A.    So what?

9         Q.    Now, as I understand it, in fact the Shipley --

10  the Shipley instrument is actually designed more to measure

11  impairment than it is to measure cognitive ability.  That was

12  the purpose of Dr. Shipley's instrument, wasn't it.

13        A.    In the conceptual process, yes.

14        Q.    Yes, okay.  So as opposed to the standard Wexler,

15  which measures cognitive ability.

16        A.    No, it measures impairment also.

17        Q.    The Wexler is designed to provide a much larger

18  picture, correct?

19        A.    A much broader picture, exactly.

20        Q.    That's right.  And the Shipley was designed to

21  focus on a much narrower portion of the picture, correct?

22        A.    Yeah, absolutely.

23        Q.    And that portion of the picture that Dr. Shipley

24  was focusing on was impairment, correct?

25        A.    In terms of cognitive impairment, yes.

1        Q.    And Dr. Shipley recognized that a person may have
2    different abilities verbally as opposed to abstract reasoning,
3    correct?
4        A.    Much like that in the Wexler in terms of verbal
5    and performance IQs, yes.
6        Q.    I'm -- I'm speaking about Dr. Shipley.
7        A.    Yes.
8        Q.    I'm going to try to keep the focus here on -- on
9    Dr. Shipley right now.
10       A.    Okay.
11       Q.    Okay?
12       A.    Yes.
13       Q.    Dr. Shipley's theory was that you can compare an
14   individual's verbal performance to their abstract performance
15   and determine impairment because -- because abstract
16   performance is more likely to be reflective of impairment than
17   verbal performance.  Correct?
18       A.    Yes.
19       Q.    And so indeed, performance on this test is
20   reflective of cognitive impairment.
21       A.    No.  Not -- Speer's specific test or that test?
22       Q.    I'm speaking about --
23       A.    Are you speaking generally or are you speaking --
24       Q.    I'm speaking about Dr. Shipley's instrument.
25       A.    I'm talking -- well, now you're -- you're --

PCBG-01-07-05-0041

42

1  you're twisting it here.  Are you talking about Speer's
2  performance or and you talking about Dr. Shipley's test
3  overall, generally?
4       Q.   I am talking about Dr. Shipley's test.
5       A.   Okay.
6       Q.   I'm asking if performance on the test -- Dr.
7  Shipley designed the test for purposes of assessing impairment.
8       A.   It was -- it was designed -- if you really want to
9  look at it specifically, it was designed as a cognitive
10 assessment of IQ and specific impairment.  If there was an
11 impairment, then other testing should be done.
12          It was used -- utilized initially for the purpose
13 of cognitive distortion.  If a person -- what he's looking at
14 is the measurement between abstract IQ or abstract
15 reasonability and vocabulary.  And -- which is the same thing
16 as is done in all IQ testing.
17          If you have a performance IQ that is lower than
18 verbal IQ, then we -- we look at and see whether or not there
19 is any type of reasoning behind that.
20          Now, many times you'll find that such abstract
21 reasonings, areas such as block design, the matrix, digit span,
22 picture arrangement, is many times lower than vocabulary and we
23 find those individuals who have difficulty in that area,
24 picture completion also, would have problems in terms of
25 learning disabilities.  Possibly.  Possibly.

43

1          What he did was a scan, saying, hey, if we look at
2   it overall in terms of look at vocabulary, look at abstract
3   reasoning -- is there an indication of cognitive impairment in
4   terms of -- when he says cognitive impairment, he's talking
5   about learning disabilities there.  In the old days we called
6   it minimum cerebral dysfunction.

7          Q.    Okay.  Let's do the short version.  Dr. Shipley
8   designed a test that measures impairment based upon --

9          A.    Well, it measures more than impairment.  It
10  measures if there is an IQ that is extrapolated from these
11  particular scores.  And it's correlated to the Wexler.

12         Q.    Dr. Shipley believed that impairment affects
13  vocabulary and abstract ability differently, did he not?

14         A.    Yes, I believe so.  Not just Shipley, that's
15  pretty normal, general stuff.

16         Q.    So, when one performs well on the verbal portion
17  and struggles on the abstract portion, that is something that
18  Dr. Shipley designed the test to identify, isn't it.

19         A.    No, because he could perform well on the abstract
20  and perform poorly on the verbal.

21         Q.    Absolutely.

22         A.    Okay, so yeah.  No, that's not necessarily --

23         Q.    The purpose that Dr. Shipley undertook -- or, the
24  purpose of his instrument, is to determine abstract performance
25  versus verbal performance.

PCBG-01-07-05-0043

44

1     A.    Or vice-versa, yes.

2     Q.    Okay.   And in this particular case, Paul

3  performed reasonably well on verbal.

4     A.    Not really.   He only scored 26.   If you look at

5  the -- if you look at his scores there, you look at the actual

6  -- he missed 14 out of 40 points that he could possibly get.

7  So, I mean, that's, you know --

8     Q.    He answered all your questions, Doctor?

9     A.    Did he answer all the questions?

10    Q.    Yes.

11    A.    Did he go through each one of these, yes he did.

12    Q.    He went through every one of the verbal questions.

13    A.    Right.

14    Q.    And, when it comes to the abstract questions --

15    A.    He quit.

16    Q.    They get progressively more difficult, correct?

17    A.    Well, not necessarily.   They -- if you look at --

18  look at number -- if you look at number eight, oh-ho, wrap

19  tarp, mood -- and the answer's doom -- they split the words,

20  reversed the words, much like he did in number seven, so it

21  really isn't any more difficult.

22         If you look at number 11, you got mist and is, you

23  see where it says, ross, as, pine, in tone and it should be on.

24  (all phonetic)   I mean, this is pretty -- there's some easy

25  ones in there, that are not difficult.

45

```
1              As you get further down, like 17 -- 17, 18, 19, I
2    think are probably the -- the more difficult ones.
3              Q.    Thank you, Doctor.  But when you start with number
4    one, which is counting from one through six --
5              A.    Uh-huh.
6              Q.    And then you end with the difficult ones --
7              A.    Uh-huh.
8              Q.    And then 15 through 20, would you agree that it
9    starts with the easy questions and moves towards the more
10   difficult abstract reasoning questions?
11             A.    Yes.
12             Q.    And so Paul got a third of the way through and it
13   became -- he reached a point where he felt that he was not good
14   at this.
15             A.    Paul quit.  I mean, he said, "I'm not good at
16   this," and he just gave up.  He would not push through it.  He
17   didn't even try.
18             Q.    Okay.  Let's move on.  I'd -- I'd like to hear
19   about the Williamson Sentence Completion Test.
20             A.    Uh-huh.
21             Q.    Where is your assessment?
22             A.    What do you mean, where is my assessment?
23             Q.    It's not mentioned in your report.
24             A.    Mainly because there was not a whole lot there.
25   There was nothing there for me to mention, there was not
```

PCBG-01-07-05-0045

46

```
 1   already he brought up in the MMPI, if I remember.  Let's see
 2   what I said here.  There really wasn't anything there that --
 3   it was pretty normal stuff.
 4            If you go through it, and if you want to go
 5   through it, I'd be more than happy to go through it.
 6        Q.   Well, actually, what I'm interested in, Doctor, is
 7   why your report doesn't say that not only did you administer
 8   it, which it does indicate --
 9        A.   Uh-huh.
10        Q.   But it doesn't say that Paul completed the test
11   and it was pretty normal stuff.  It doesn't say that anywhere
12   in your report.  In fact, it doesn't mention the test.  Again,
13   it doesn't.
14        A.   There was nothing there.
15        Q.   And what does it mean, that there was nothing
16   there, Doctor?
17        A.   There was nothing bad or there was nothing good, I
18   mean, there was nothing -- it was pretty normal stuff.  I mean,
19   it says here -- there was really nothing I got out -- got from
20   this particular test, other than normal responses.  I mean, it
21   was nothing that -- there was no (inaudible), no -- nothing
22   bad.  Nothing good.  Nothing.  Nothing.
23        Q.   I was curious, as I went through each of the tests
24   that you administered, that the Shipley indicates that it's
25   been copyrighted and there's information at the bottom and it
```

1  gives the date that it was designed.  Likewise, with the MMPI-
2  2.  I'm looking at these and there's nothing on the Williamson
3  Sentence Completion test.  Is this a copyrighted test?
4        A.    The Sentence Completion Test, like a TAT and like
5  many sentence probes or many sentence probes tests, we've been
6  giving this test for ages.  I don't believe there is a
7  copyright because it is not a -- it's not an objective test,
8  it's a projective test.
9             I mean, it's just -- it's more for to see where --
10  how the thinking is of an individual, more so than anything
11  else.  It utilizes the psychologist's ability to assess.  It's
12  another way of assessing -- it's like doing an interview, more
13  so than anything else.  We could use -- like a TAT, we could
14  use a magazine to do a TAT with.
15        Q.    Let -- let me stop you there.  My question,
16  Doctor, was --
17        A.    No, it's not copyright, no.
18        Q.    Okay.  And are you telling me that none of the
19  projected tests are copyrighted?
20        A.    Other than the Rorsach, that's the only one I know
21  of.
22        Q.    That's the only one.  So that are a multitude of
23  -- of projective tests out there and virtually none of them,
24  except for the Rorsach are copyrighted?
25        A.    Well, you're talking about sentence -- sentence

49

1   completion test, I -- I've never seen a sentence completion

2   test that had a copyright on it.  Maybe there is, I don't know.

3        Q.    Now, in fact, the Williamson Sentence Completion

4   Test is out of print, isn't it?

5        A.    I don't know.

6        Q.    You don't know?

7        A.    Not really.  'Cause you can use the sentence

8   completion test, it's not -- you say it's out of print?  There

9   are story completion, sentence completions that you can get,

10  there's (inaudible) completions, incomplete sentence tests, I

11  mean, there's a ton of them out there that are around, have

12  been around forever.

13       Q.    I understand that, Doctor.  My question is about

14  the Williamson Sentence Completion Test.  That test is out of

15  print, isn't it.

16       A.    I don't know.

17       Q.    Well, we don't have any of the information that

18  allows us to go back to whoever published it, do we.

19       A.    No.  I've been using this test forever, I mean,

20  it's just a good sentence completion test, it's a sentence

21  probe.  It's not -- it's not an objective test.  I don't know,

22  you can use any probe that you wanted to.

23            I mean, there are psychologists that make up their

24  own probes.  They make -- and have them complete the sentence

25  for.  So, it's not like a --

PCBG-01-07-05-0048

49

1        Q.    -- Now, there are actually other tests, other
2   sentence completion tests that are more widely used and
3   considered to be more reliable, correct?
4        A.    There's no reliability or -- or validity with
5   sentence completion tests.  Where'd you see that?
6        Q.    What about the Rodder (phonetic) incomplete --
7        A.    There's no reliability with that test.
8        Q.    That's -- oh, there isn't?
9        A.    No.  There's no reliability statistics with that
10  test.
11       Q.    So, there's no reliability on any sentence
12  completion test?
13       A.    Not that I'm aware of.
14       Q.    So why are you doing it if there's no reliability.
15       A. Because it's not geared for the reliability. It's
16  geared for the - that's the artistry of doing psychology. Its -
17  you're using - you're looking at -
18
19       MR. STORRS: Wait. Wait. Stop.
20       MS. NICHOLSON: Okay.
21            (End of Tape 1, Side 2.)
22            (Interview continues on Tape 2, Side 1:)
23       MR. BLUMBERG:  (inaudible) available today.
24       MR. STORRS: How long are you available today?
25  DR. BAYLESS:  It's 11 o'clock.  I got another patient I got to

50

1   see.

2          MS. NICHOLSON:  That's 20 minutes.

3          DR. BAYLESS:  Yeah, well, then we got to reschedule.

4          MR. BLUMBERG:  You don't need to go anywhere right now.

5          DR. BAYLESS:  I don't need to go --

6          MS. NICHOLSON:  No, no.

7          MR. BLUMBERG:  Except going to the bathroom.

8          MS. NICHOLSON:  Okay, well, let's -- All right. We are

9   back on tape after some discussion of scheduling and so forth.

10  We just have another 15 minutes here but we're going to try to

11  get as much done as we can.

12              I -- I want to talk about these projected tests.

13  Now, the test that you selected, Williamson, has basically no

14  objective scoring at all, is that correct?

15         A.    That's correct.

16         Q.    But there are other tests, including the Rodder,

17  for example, that does have some objective scoring scales,

18  correct?

19         A.    No, not that I'm aware of.

20         Q.    It doesn't --

21         A.    No.

22         Q.    You're not aware of it?

23         A.    No.  Rodder's is the same thing, it's an

24  incomplete sentence test.  There's no objective scoring with

25  that.

51

```
 1         Q.    Have you ever used it?  Rodder?
 2         A.    Yes.
 3         Q.    Often?
 4         A.    Not that often but I have used it before and there
 5    is no objective scoring with the Rodders.  It's not an
 6    objective test.
 7         Q.    All right.  So, if somebody indicated that there
 8    were objective measures associated with Rodder, they would be
 9    incorrect?
10         A.    I've never -- if there's a new Rodders out, that
11    I'm not aware of, then that's possible.  I don't know.  But,
12    don't know.
13         Q.    Well, if --
14         A.    I've got a Rodders here at the office, I've never
15    seen objective scoring with that.  How could you objectively --
16    I've never seen objective scoring with that.
17         Q.    Actually, that's my next question.  When it comes
18    to subjective scoring --
19         A.    There's no scoring.
20         Q.    There is no scoring.
21         A.    No.  You're looking at stream of thought, you're
22    looking at themes, you're looking at whether or not there's any
23    type of obsessions or any kind of preoccupation with particular
24    areas, that type of thing, that's what you're looking for.
25    You're not looking for any type of particular scoring.
```

PCBG-01-07-05-0051

52

```
1        Q.    Okay.  Why don't we look at Paul's answers since
2    you didn't discuss anywhere in your report.  I'd like for you
3    to interpret Paul's answers now so that we understand why it
4    was you thought there was nothing there.  Can we just start and
5    go through them, one through -- what is it?  Thirty-nine.
6    Please?
7        A.    Sure.
8        Q.    Now what --
9        A.    First of all --
10       Q.    Oh, pardon me.
11       A.    Go ahead.
12       Q.    First of all, this was -- this test was
13   administered after the Shipley, correct?
14       A.    Yes.
15       Q.    And do you know if -- if these two tests were
16   administered in the morning or the afternoon?
17       A.    I don't remember what time I got there.
18       Q.    Because I'm wondering if it was after breakfast,
19   after lunch, after meds, after what?  Do you know -- you don't
20   know when.
21       A.    I don't know.
22       Q.    Okay.  All right, so go ahead, let's -- let's talk
23   about the questions and the answers.
24       A.    There's not questions, they're sentence probes.
25       Q.    All right.
```

```
 1          A.    And so this, in terms of not being confused.  The
 2   probe is, "Most families -- " his response was, "Should work
 3   together more."
 4          Q.    How did you interpret that?
 5          A.    I didn't interpret that.  You don't interpret it
 6   by one sentence, first of all.
 7          Q.    Okay.  All right, let's go to the next one.
 8          A.    "The people I like best -- "  " -- are people that
 9   care about everyone."  That's his response.  "I wish I could
10   forget the time I -- "  " -- heard about my grandfather dying."
11   "When I'm older, I want to be --"  "-- well-established."  "I'm
12   always glad if -- "  " -- I don't have to listen to fighting,
13   yelling and screaming at my house."
14          MR. BLUMBERG:  I'm sorry.  Stop.  Are you going to have
15   him read every one that's already --
16          MS. NICHOLSON:  No, what I'd like -- I would like for
17   you to tell me, as you go through, like perhaps five at a time,
18   what --
19          MR. BLUMBERG:  What did they mean to you.
20          MS. NICHOLSON:  What -- how you're interpreting these
21   things.
22          DR.BAYLESS:  Well, I -- you have to read all of them to
23   interpret anything.  I mean, basically, like I --
24          MR. BLUMBERG:  Okay, but they're on this paper.
25          DR. BAYLESS:  What I'm saying here, that we look -- if
```

1   you look at the --the answers to those questions -- I mean

2   answers to the sentence probes, he talks about being with his

3   son.  He talks about his grandfather dying.  He talked about

4   being well-established.  He doesn't like listening to fighting,

5   yelling and screaming like at his house.  There really isn't

6   any -- I mean, there was no pattern here.

7           We would like to have -- "If we had a new baby --"

8   "-- we'd have our hands full."  Okay.

9   BY MR. BLUMBERG:

10      Q.    Does it demonstrate normal hopes and dreams of an

11  individual or --

12      A.    Yeah, there's -- well, there's no -- I don't know

13  about hopes and dreams, I think it's unrealistic in terms of:

14  When I'm older, I want to be well-established.  You know,

15  there's nothing he's done to do that.

16      Q.    Uh-huh.

17      A.    But I, you know, I mean, there's some pretty pat

18  answers here.  "I feel that a real friendship --"  " --I'd

19  always be there for you."

20      Q.    But these are spur of the moment -- he wasn't

21  given an opportunity to think about the answers.

22      A.    No, no, I give him the probe and he answers and I

23  wrote them down.

24      Q.    Okay.

25  BY MS. NICHOLSON:

55

```
1          Q.    And this was tape recorded?
2          A.    No.  I don't know if it was or not.
3          Q.    Oh, there was a discussion of tape recording
4    earlier.
5          A.    It could have been taped -- no, the testing was
6    not tape recorded.
7          Q.    It is not.
8          A.    Yeah.
9          Q.    Okay.  All right, you ultimately concluded -- and
10   we'll get back to this later -- that, that Mr. Speer has anti-
11   social personality disorder.  And based on some of the
12   criteria, I'm wondering if you see any of the criteria of anti-
13   social personality disorder in this -- this free association
14   sentence completion test.  Any evidence at all that you can
15   point to that suggests that Mr. Speer suffers from an anti-
16   social personality disorder?
17         A.    That's a very complex question, first of all, in
18   terms of saying, is there anything here that says he has anti-
19   social personality disorder.  That's kind of difficult to say.
20   One of the things I could say is that, where he talks about, in
21   number 36, he talks about putting drugs first in his life,
22   which would be kind of a correlate there.
23         Q.    Well, actually, that would also be consistent
24   with, probably substance abuse, which is one of your diagnoses.
25         A.    Exactly.
```

PCBG-01-07-05-0055

1        Q.    Okay, so --

2        A.    Are you going to interpret this or am I going to

3   interpret this?

4        Q.    No, I'm just -- that was an observation.

5        A.    Okay.  When he gets mad and people disrespect him,

6   I thought that was kind of interesting, but that may not mean

7   anything.  I mean, just --

8        Q.    What -- what number are you referring to, Doctor?

9        A.    Number 25.  Being free on the streets --

10       Q.    These -- these are indicators of anti-social --

11       A.    I didn't say they were indicators.  You're the one

12  said that.  I said these are things that are quite interesting

13  in terms of leading in a direction of --

14  BY MR. BLUMBERG:

15       Q.    She asked you if there's anything on the test --

16       A.    There is nothing -- this test does not measure

17  that, so it's not -- it's kind of hard to say that.  I mean,

18  you can't take it out of context like that.

19       Q.    All right. Contrarily, is there anything in the

20  test that leads you to believe that a person might not be

21  suffering from anti-social personality, who gave those answers.

22       A.    No.  I mean -- no.

23  BY MS. NICHOLSON:

24       Q.    Now, as far as the features that you look for in

25  anti-social personality disorder, actually, many of the answers

57

1  here fly directly in the face of a diagnosis of anti-social

2  personality disorder, if you go through the various diagnostic

3  criteria.

4          A.    Really?

5          Q.    You -- you don't think so.

6          A.    No.

7          Q.    Absolutely none?

8          A.    Well, give me an example, we'll talk about it.

9          Q.    Well, I'm asking you.  You're -- you're the

10 doctor, I'm asking you, isn't it true that some of them --

11         A.    No, I don't think so.  Because, if you also look

12 at what -- one of the criteria for anti-social personality

13 disorder, one of the things that you -- that you're forgetting

14 here, if you look at it really closely, is that they tend to be

15 charming, disarming, and they tend to do very well verbally, on

16 verbal questions like this.

17             He may say anything in this particular arena that

18 -- that may be contrary to what one would think would be an

19 anti-social personality disorder.

20             But, if you look at anti-social personality

21 disorder and you look at the criteria for it, you know, you

22 have to look at the fact of him being diagnosed with a conduct

23 disorder prior to age 15.  You got to look at his behavior

24 throughout his history, you got to look at everything.  You

25 can't take a sentence completion test that is easily

PCBG-01-07-05-0057

58

1  manipulated, easily says things that he thinks you want to
2  hear, that is necessarily indicative of -- or not indicative of
3  anti-social personality disorder.
4        Q.    Well, you know, you just raised a very good point.
5  Because, I -- it makes me wonder why in the world you would
6  even use this test --
7        A.    I told you that before.
8        Q.    -- if you think that the person is less than
9  likely to be candid and if they are going to manipulate you, if
10  the test had --
11       A.    Because there was -- this is an issue of whether
12 or not Mr. Speer -- and what I'm looking at there is whether or
13 not there's any psychosis.  This has nothing to do with anti-
14 social personality disorder, it has to do with stream of
15 thought.
16              Was there any type of disorganization of thought
17 process going on.  And -- and are perceptual distortions going
18 on.  That's what I was looking for with the sentence -- and
19 there's nothing there.
20       Q.    So, the test can't be -- it has no purpose or
21 cannot be used just typically to gauge what a person is
22 actually saying, what their values are, when they talk about: I
23 wish my mother -- and social values.
24       MR. BLUMBERG:  Love of family and --
25 BY MS. NICHOLSON:

59

1          Q.    Yes.   None of that is relevant to your assessment.

2          A.    Well, it is relevant to the assessment if you look

3    at love of family and then you look at what happened in his

4    family, it's kind of interesting, isn't it?  So, he's telling

5    me something that he wants me to hear.   Where -- where do you

6    see love of family?

7          MR. BLUMBERG:   It's just a general principle throughout.

8    I wish my family was together.

9          MS. NICHOLSON:   If I could have three magic wishes, I

10   would wish for my family to be united.

11         MR. STORRS:   Out of drug addiction and dysfunction going

12   away.

13         MR. BLUMBERG:   My mother and I are not always as close

14   as we should be.   It's a theme, Dr. Bayless.

15         A.    Yeah.   But if you look at -- at the reality of

16   this family, you know, then this is something, you know,

17   anybody would wish for, I guess,  you know.

18   BY MS. NICHOLSON:

19         Q.    Well, let me ask you about the reality of his

20   family.   What do you know, Doctor, about the reality of Paul's

21   family?

22         A.    From the records that I reviewed?

23         Q.    I'm just asking, what do you know?

24         A.    You've got to ask me a specific question, I'll

25   tell you.

PCBG-01-07-05-0059

60

1        Q.      What do you know about Paul's family?

2        A.      I know a lot about Paul's family. Give me a
3    question.

4        Q.      Doctor, the question is, why don't you tell me
5    what you know about Paul's --

6        A.      (Inaudible) right off the top of my head. I mean,
7    I don't know what all the different things you want me to say.
8    Give me a specific question about his family and I'll tell you
9    the answer.

10        Q.      All right. What do you know about Paul's mother,
11    Doctor Bayless?

12        A.      What do I know about Paul's mother. That she's
13    unemployed, that she -- they describe her as being lazy, they
14    describe her as being a -- a heroin addict. She's described as
15    being on methadone maintenance for 30 years -- or 20 years or
16    for a long, long period of time.

17                That she shot Paul up when he was -- according to
18    Paul, I have no verification on this -- that she -- the first
19    time he used heroin, that he did it with his mother. I mean,
20    what do you want me to tell you?

21        Q.      Well --

22        A.      She tends to (inaudible), she tends to want him to
23    go out and steal and do things that are anti-social or
24    (inaudible), so that they can get money to buy her heroin or
25    get her a fix, that's the only thing she concerns herself with.

COPPERSTATE REPORTING SERVICE

61

```
 1  That's the image that I have gotten from Paul and from the
 2  records.
 3       Q.   All right.  Now, in your summary on page 9 of your
 4  report, you say that based on -- on history, diagnostic tests
 5  and interviews with significant others --
 6       A.   Right.
 7       Q.   Can you tell me who it was that you interviewed?
 8       A.   Not interviews -- meaning that those interviews
 9  that I've read.
10       Q.   Oh, oh, so did you read any interviews of Paul's
11  mother?
12       A.   Uh, -- I'd have to go back and look at that.  Um,
13  I believe there were some transcripts of Paul's mother -- not
14  transcripts but I think there was some stuff that she had
15  indicated in some court hearings or whatever, yeah.
16       MR. BLUMBERG:  Did you read any of the police reports of
17  interviews of Paul's half-brother Chris Womble?  His statements
18  about his mother, for example.
19       DR. BAYLESS:  Yeah, I've read those.
20  BY MR. NICHOLSON:
21       Q.   What did you learn from those?
22       A.   I'm not really sure what you mean from those?
23       Q.   I'm just wondering what additional information you
24  gleaned from what Chris Womble had to say about his mother.  I
25  mean, certainly, you didn't interview Chris Womble.
```

PCBG-01-07-05-0061

62

```
 1          A.    No, I did not interview him.
 2          Q.    The third brother.
 3          A.    Right.
 4          Q.    But that's - reported other than Paul.
 5          A.    Uh-huh.
 6          Q.    Would have made statements about Sabrina Womble --
 7          A.    Uh-huh.
 8          Q.    Certainly I would think would be important to you.
 9          A.    Yeah, and I think that his response -- and I need
10    to go back and look at that again, it's been a long time since
11    I've read it but I -- as I remember -- I hope I'm not getting
12    this confused with Brian and Paul, in terms of their -- their
13    concept about their mother.  But, as I remember, that Chris
14    also talked about her being lazy, sleeping all the time, not
15    involved.  Gave me the picture of a classic heroin addict.
16          Q.    Would it be significant to you if he -- I mean,
17    you keep referring to how -- well, this is just Paul's report,
18    this is just what Paul told me -- when you -- is it important
19    for you to obtain information from other people to find out
20    whether or not Paul's telling you absolutely what was going on
21    in his life at that time?
22          MR. BLUMBERG:  Or whether it's substantiated.
23    BY MS. NICHOLSON:
24          Q.    Yes, whether it's corroborated.
25          A.    Sure, any information I can get is important.
```

63

```
 1          MR. STORRS:   What -- do you think that CPS reports,
 2   juvenile probation officer reports, psychological evaluations
 3   or psycho-educational evaluations are reliable sources for you
 4   in making these kinds of determinations?
 5          A.    Well, you know, reliable sources, I think they are
 6   collateral sources that you review and -- and you consider,
 7   certainly.  I would not just be throwing any of that away.  I
 8   mean, all that's important.
 9   BY MS. NICHOLSON:
10          Q.    I need to understand what you're saying here.  Bob
11   asked you about reliable and  you used the term "collateral."
12   Does collateral mean that it's not necessarily reliable?
13          A.    No, no, it doesn't mean that at all.  It means
14   that there are collateral sources of information that came from
15   different time periods in this person's life.
16              Reliable, meaning that it was a perception of the
17   person who saw him or whoever wrote the report at the time.
18   Reliable -- I mean, I don't, you know.  How do you -- how do
19   you define reliable, you know.
20          Q.    Well, that's -- that's actually my next question.
21   How do you define reliable, Doctor?
22          A.    I don't.
23          Q.    How do you determine whether or not what Paul was
24   telling you is or is not reliable?
25          A.    By looking at all the other sources, collateral
```

COPPERSTATE REPORTING SERVICE

PCBG-01-07-05-0063

64

1   information, and see whether or not there is substantiation,

2   you know, and if there is substantiation, we may -- you know,

3   there are some things he says and certain things he doesn't

4   say.  I mean, we all -- you have to take a look at the total

5   picture.  You can't take one piece there and try to piecemeal

6   it.

7        Q.    So in this case, you did try to look at the total

8   picture.

9        A.    Yes, I did.

10       Q.    And the Williamson Sentence Completion Test

11  assisted you in looking at the total picture.

12       A.    It gave me -- there was real, like I said to you

13  before, it really wasn't anything there with the sentence

14  completion test that -- there was no evidence of any psychosis,

15  there was no evidence of any type of obsessive thought process,

16  there was no evidence of him being preoccupied with anything,

17  little green men flying through the air and coming to get him

18  or anything.

19            There was -- and his thinking was logical,

20  coherent, linear.  You know, there was nothing really that told

21  me that he had any kind of problems in that arena that I needed

22  to go further in that area.

23       Q.    So, just so that we can wrap this up because I

24  know time is running right now.  You used the Williamson

25  Sentence Completion Test only to determine whether or not his

65

1   thought process was intact, is that correct?  And is that --
2   did I understand you correctly?
3         A.     Well, you know, if there was something else that
4   was there, if he had came out -- if there had been other things
5   that he had said that gave me other rise to other things, I
6   would have considered it.
7              But, in this particular case, there was nothing
8   that I gleaned from the sentence completion test.  And -- and I
9   have to admit, I was remiss.  I should have put a paragraph in
10  my report, indicating that.  Period.  And I did not do that and
11  I -- and I'm remiss about that and I apologize for that.
12             At the same time, I think that there was really
13  nothing in the sentence completion that helped me or -- or
14  deterred me from -- one way or the other, from my thought
15  process concerning Mr. Speer.
16        Q.     All right.  Just a couple of questions and then
17  we'll wrap up here.  If Mr. Speer had given you answers that
18  were clearly indicative of anti-social personality disorder
19  criteria -- for example, I look forward to -- if instead of
20  "being with my son," he had answered, "I look forward to
21  getting out of here and hitting the first bank so I can get
22  another hit of heroin."  Would you have considered that
23  relevant to your diagnosis?
24        A.     I would have considered that -- I would have
25  explored that, probed that statement further, at that time,

66

1  number one.  Number two, I have yet to have any inmate ever

2  tell me something like that, in a jail situation that they're

3  in.  And number three, I would have been -- I'd have been

4  shocked for him to say something like that to me, okay?

5           In 30 years of doing interviews with inmates, I

6  have never had an inmate tell me that, "When I leave here, I'm

7  going to go out and do -- " then I would have started

8  questioning his -- his reasonability, I would have thought that

9  maybe there would have to be something else behind that, that

10 maybe, you know, he's pulling my leg and trying to yank my

11 chain.  I -- there would have been a whole lot of questions in

12 my mind (inaudible).

13 BY MR. BLUMBERG:

14      Q.   Can you finish this sentence -- because you don't

15 expect inmates to be so -- what would you?

16      A.   (Inaudible)

17      Q.   (Inaudible) in 30 years.

18      A.   So -- so condemning.  I mean, I don't expect

19 inmates to be that self-condemning unless they have some mental

20 illness going on with them.  And you'll see that with some

21 mental -- you know, when I get out of here I'm going to go

22 explore why they put these probes in my brain -- I've had those

23 kinds of things happen.

24           That tells you about the obsession and the

25 preoccupations and psychosis.  But, I -- for an anti-social

67

1   statement, no, I've never see that.

2        Q.   Okay.

3   BY MS. NICHOLSON:

4        Q.   So, basically, for example, when Paul said to you

5   the worse thing that ever happened to me was -- and he

6   answered, "Being sexually abused."

7        A.   Yeah.   What about it?

8        Q.   Did you just discount that that didn't have

9   anything to do with anything other than whether or not his

10  mental processes were intact?

11       A.   The only time that I'm aware that he had been

12  quote, unquote, sexually abused was the -- I think it was his

13  aunt, supposedly.   There was another time when he complains

14  that he was being pimped, I guess, by this guy, but he admits

15  to me that he -- he did that because he wanted drugs.

16       Q.   Yeah, and at what age, Doctor, was that?

17       A.   I don't remember what age.   It was like 13, 14,

18  something like that.   Where he was into using heroin, and he

19  did some sexual things to get heroin, that's according to him.

20       Q.   Uh-huh.

21       A.   Okay?   He was well into being, you know,

22  (inaudible).   The -- but other than that --

23            MR. BLUMBERG:   Let's continue this.

24            MS. NICHOLSON:   Okay.

25            MR. STORRS:   You were going to say he was well into

```
 1   being -- you didn't complete that thought.  Would you complete
 2   that sentence?
 3        A.    He was well into heroin addiction at that time. He
 4   was utilizing -- using fairly regular at that time.  According
 5   to him.
 6        A.    Uh-huh.
 7        MR. BLUMBERG:  Enough's enough for right now.
 8        MS. NICHOLSON:  Okay.  All right, tomorrow morning at
 9   nine o'clock?
10                        (End of interview)
11                           -oo0oo-
12
13   STATE OF ARIZONA     )
                          )  ss.
14   COUNTY OF MARICOPA   )
15
16
17
18          I hereby certify that the foregoing pages,
19   numbered 1 through 67 inclusive, is a correct transcript from
20   the record of proceedings in the above-entitled matter.
21
22
23
24
25                        Leona McNutt, Transcriber
```

69



1             January 27, 2007

2        reviewed/corrected 1/31/07 by JMH, MCAO

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

COPPERSTATE REPORTING SERVICE

1

1          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2              IN AND FOR THE COUNTY OF MARICOPA

3                    _____

4    STATE OF ARIZONA,              )
                                    )
5                 Plaintiff,        )
                                    )
6          vs.                      )    CR2002-010926
                                    )
7    PAUL BRADLEY SPEER,            )
                                    )
8                 Defendant.        )
     _____)
9              .

10                       Phoenix, Arizona
11                       January 23, 2007

12

13

14              TRANSCRIPT OF PROCEEDINGS

15           Taped Interview of DR. BAYLESS

16

17

18
     Transcript Prepared For:
19
     ROBERT STORRS, Esq.
20

21

22                       COPPERSTATE REPORTING SERVICE
                              Court Reporters
23                    12601 North 59th Place, Suite 100
                         Scottsdale, Arizona 85254
24
                         Transcribed by:   Leona McNutt
25


                  COPPERSTATE REPORTING SERVICE

1          MS. NICHOLSON:  All right, today is Wednesday -- no,

2    it's Tuesday.  Tuesday, January 23, 2007.  We are seated in the

3    conference room of Bayless & Associates for interviews in the

4    matter of State vs. Paul Speer.

5               Present for the interview this morning are Deputy

6    County Attorney Jeanette Gallagher and myself, Pam Nicholson.

7    Our witness this morning is Dr. Bayless.

8               This is a continuation of an interview that

9    started yesterday morning.  We anticipate the additional

10   presence of other co-counsel for the defense but they have not

11   yet arrived.

12   BY MS. NICHOLSON:

13        Q.    Okay, before we went on record, Dr. Bayless, you

14   were kind enough to provide me with the invoices that I

15   requested in connection with all of the capital cases you've

16   handled in Maricopa County for the Maricopa County Attorneys

17   Offices -- or, office, in the last five years.  Are there any

18   other cases?

19        A.    No, not that I'm aware of.

20        Q.    Okay.

21        MS. GALLAGHER:  Well, there's Ramirez.

22        MS. NICHOLSON:  Yeah, well that -- that was my next

23   point.  Evidently there's a case that Bob had in which you were

24   both involved, I take it.

25        MS. GALLAGHER:  No, I wasn't.

COPPERSTATE REPORTING SERVICE

```
 1          MS. NICHOLSON:  Oh, okay.
 2          MS. GALLAGHER:  That's why I don't know anything about
 3   it.
 4          MS. NICHOLSON:  Anyway, there's the Ramirez case that
 5   Bob has and we don't know the name of the county attorney.
 6          DR. PAYLESS:  Yeah, I can't -- I don't know it.
 7   BY MS. NICHOLSON:
 8          Q.   Okay.  So, evidently, as I understand it, the way
 9   you did the search was to go back and run the search on the
10   names of the county attorney and that's how you found it?
11          A.   Right, right.
12          Q.   Not the county attorney's office per se.
13          A.   No.
14          Q.   Okay.  As soon as we get the name of that county
15   attorney, we're good.
16          A.   If I have it.
17          Q.   Okay, fair enough.  All right, now I noticed that
18   the invoice that you provided us for Mr. Speer was basically a
19   joint agreement, a joint flat-fee agreement that covered both
20   Mr. Speer and Mr. Womble.  I notice that all of these other
21   invoices are done on an hourly basis.
22          A.   Uh-huh.
23          Q.   Is there a reason you converted to the flat fee in
24   this particular case?
25          MS. GALLAGHER:  No, this one -- oh, you mean --
```

COPPERSTATE REPORTING SERVICE

PCBG-01-07-06-0003

4

```
 1  BY MS. NICHOLSON:
 2        Q.    In the Speer case.
 3        A.    No, it was Ms. Gallagher called me and asked me
 4  would I agree to participate in examining these two defendants
 5  and I said, "Sure, you know.  I love to work."  And she said,
 6  "Well, we have $15,000 available to you for both cases."  And I
 7  said, "Okay, fine, I'll do it for a flat fee."
 8        Q.    All right.  Now, --
 9        A.    That's basically -- that kind of sums it up.
10        Q.    Well, it looks like -- just in my quick review of
11  these -- and I'm just going to flip through them quickly -- on
12  Aguilar you billed 16,000, on Andriano 8,000 -- 8900.  On
13  Valesquez, 16,000.  Pandelli, 9500 and Ross, 9200, give or
14  take.
15              Now, why is it that in the Womble-Speer case
16  you're essentially discounting your fee, because it looked like
17  just in a standard single-defendant case --
18        A.    Uh-huh.
19        Q.    -- you get up in that area.
20        A.    Correct.
21        MS. GALLAGHER:  Mr. Blumberg has now joined us.
22        MS. NICHOLSON:  Yes.
23        MS. GALLAGHER:  And we're happy to have him.
24        DR. BAYLESS:  I have other invoices where I have done
25  cases for Bob Storrs, which I discounted for the Public
```

COPPERSTATE REPORTING SERVICE

5

1   Defender's office also.

2   BY MS. NICHOLSON:

3          Q.    No, I understand that but all of these are for the

4   Maricopa County Attorney's office.

5          A.    Right.

6          Q.    All of these come to at least roughly $10,000,

7   some of them go up to $16,000 and yet you've got two defendants

8   in this case.

9          A.    Uh-huh.

10         Q.    And what I'm wondering is, why is the fee

11  structure on this case different and why is it basically two

12  for the price of one in this case.

13         A.    Oh, I don't know about two for the price of one,

14  but I think, you know, it was a situation where they had a

15  limited amount of funds, I'm assuming, and which the public

16  defender's office typically does that to me all the time also.

17                I can show you other invoices from other people --

18  I'd have to go back and look at all of the invoices in the

19  various cases that I've done for both sides, and I've -- when

20  there are situations that have come up, I have discounted my

21  fees for both sides.  I mean, that's happened.  They got a deal

22  this time.

23         Q.    Smoking deal!

24         A.    Yeah.  It won't happen again.  (Laughter)  But you

25  know, it's not -- there was an agreement that was made and I

COPPERSTATE REPORTING SERVICE

6

1  stick to my agreement.

2       Q.    All right.  Did you anticipate that there would be
3  a considerable amount of overlap, outside of the police reports
4  themselves?

5       A.    I didn't consider anything.  I didn't know
6  anything at that particular point in time we made the
7  agreement.

8       Q.    Okay.

9       A.    You know, just that she said, "I got 15,000, can
10 you do both for 15,000?"  And I said, "More than likely."  And
11 I said, "Okay, we'll make a flat-fee agreement, you know, and
12 we'll do it."  It's as simple as that.

13            And I didn't have any work or paperwork or
14 anything in front of me when I made -- when I made that
15 decision.  In hindsight, I probably shouldn't have made that, I
16 could have probably done better economically if I hadn't.

17       Q.    Now, you said that you've had also done capital
18 work for the public defender's office as well?

19       A.    Yes.

20       Q.    Can you just give me -- do you know off the top of
21 your head, cases that you've done for them?

22       A.    Not off the top of my head, I've done, I do so
23 many cases I really don't know.

24       Q.    Capital cases --

25       A.    I can go look at the billing statements and look

1    and see who it was but --

2         Q.    I'm just interested in capital.

3         A.    Well, I don't bill more for capital cases than

4    other cases.

5         Q.    I understand that but it seems to me that a

6    capital case might stand out in your mind.

7         A.    No.

8         Q.    My capital cases stick out in my mind.

9         A.    Good.

10        Q.    They're -- they're no different from your point of

11   view?

12        A.    A case is a case.

13        Q.    Okay.  Now -- oh, first of all, thank you for

14   providing the invoices.

15        A.    Uh-huh.

16        Q.    And in connection with the request I made for the

17   invoices, I also asked for the reports that were written in

18   connection with those invoices.

19        A.    I know.

20        Q.    Can we get those?

21        A.    No.

22        Q.    And why is that?

23        A.    Because, you got a records release from those

24   people?

25        Q.    Well, this is -- the records release from the

COPPERSTATE REPORTING SERVICE

8

1   defendant?

2        A.    Uh-huh.

3        Q.    You weren't their -- you weren't their clinician

4   in those cases, you were brought in as part of the State's

5   effort to execute them.

6        A.    I still don't give other people -- you're not

7   involved in their cases, why -- I don't distribute -- no, I

8   wouldn't give it to you.

9        Q.    All right.  You understand they're part of the

10  public record.

11       A.    Then go find them.

12       Q.    Okay.  All right, I'll get a court order then.

13  Or, Jeanette, would you be willing to produce them?

14       MS. GALLAGHER:  Um, no.   Bob has two of them.

15  Actually, if you did Ramirez, he has three of them already.

16  BY MS. NICHOLSON:

17       Q.    Okay.  You're asserting -- your refusal is based

18  on privilege, is that it?

19       A.    My refusal is based on the fact that you're not

20  involved in those particular cases.  I'm not really sure and I

21  need to look at my ethical guidelines on that, I'm not really

22  sure about that but at this point in time, no, I would not

23  provide anyone copies of anybody's report unless they were in a

24  case like -- whether it's a capital case of not -- if the

25  attorneys in that particular case are -- the judge, in that

COPPERSTATE REPORTING SERVICE

9

1   case, I would obviously provide my report to him but after the

2   fact, I don't -- I have never had an attorney come back to me

3   after the fact and ask for a copy of that report that they were

4   not involved in the case in the first place.  This is the first

5   time it's ever happened.  I'm not really sure if I am ethically

6   bound to give it to you or not.

7          Q.     Well,  you understand, you were employed by the

8   State, that's part --

9          A.     I doesn't matter.

10         Q.     Well, it's part of the --

11         A.     Who employed me, it doesn't matter who employed

12  me.  I -- I -- again, I just do not release -- I'm not

13  comfortable giving those reports without me really checking to

14  see whether or not it's okay for me to do so, number one.

15  Number two, if the court orders that I give them up, then we'll

16  give them up.

17         Q.     And have you consulted with Ms. Gallagher as to

18  whether or not --

19         MS. GALLAGHER:   I told her I wouldn't give them up too.

20         MS. NICHOLSON:   Okay.  All right, well, the judge will

21  help you, I think, in that regard.

22         MS. GALLAGHER:   That's fine.

23  BY MS. NICHOLSON:

24         Q.     Now, okay, I had an opportunity to go over the --

25  your resume, that you were kind enough to provide and I have

1   just a few questions.

2          MR BLUMBERG:  Do you have two copies there?

3          MS. NICHOLSON:  No, but I'll be happy to let you look.

4          MR BLUMBERG:  Well, no, you go -- you're using them

5   first.

6          MS. NICHOLSON:  Why don't you come over and sit over

7   there, then  you can look.

8          MR BLUMBERG:  I'm comfortable, that's all right.  I

9   can't look over your shoulder.  Go ahead.

10         MS. NICHOLSON:  Oh, okay.

11         MR BLUMBERG:  I'll get it after you do.

12  BY MS. NICHOLSON:

13         Q.   All right.  Just a few questions sort of in

14  overview.  It indicates that your practice involves both

15  clinical and forensic psychology and your clinical practice is

16  -- involves adult, adolescent and child psychology.

17         A.   Uh-huh.

18         Q.   Just so that I understand what the nature is of

19  your clinical practice -- not -- not the entire agency's

20  practice, but your clinical practice right now.  Can you just

21  describe for me proportionately how much of your practice is

22  clinical and how much of your practice is forensic at this

23  time?

24         A.   At this time?  Probably 85-percent forensic,

25  probably 15-percent clinical.

```
1        Q.    And among the 15 percent clinical -- and would
2   that be this year or the last couple of years or what?
3        A.    I don't know. When you say right at this
4   particular point in time, I'm guestimating at that.
5        Q.    Okay.
6        A.    I mean, I don't know.
7        Q.    Among the clinical case load that you carry, can
8   you estimate just the number of patient files that would be
9   involved in that clinical case load?
10             And all I'm asking is would that involve one file,
11  five patients, ten patients, whatever that you see once or once
12  every week or whatever, but all I'm wondering is the number of
13  -- of patients that are involved.
14             And what I'm getting at here isn't specifically
15  the number of patients but I'm trying to figure out whether you
16  deal with patients and families or patients individually?
17       A.    Both.
18       Q.    Do you do family therapy or individual therapy or
19  both?
20       A.    It depends on the situation.  I have a young
21  patient right now who is a 15-year-old girl, who is involved in
22  taking prescription medication and got busted by her parents,
23  and so there are some parental and intra -- inter and intra-
24  family issues that sort of deal with both the family and the
25  client, obviously.  I do a lot of consulting with my group that
```

1   works for me --
2          Q.    Uh-huh.
3          A.    In the children's clinic and where there is a
4   number of cases that I consult on in terms of setting treatment
5   plans and those kind of things, so there's a lot of family
6   activity going on.
7              And, we have a thing here called CFT, which is
8   Child and Family Teams, that we provide a number of services
9   for families and children in developing various kinds of
10  treatment plans, community action kind of situation.  So,
11  there's a lot of overlap area.
12         Q.    Now --
13         MR. BLUMBERG:  You were going to get a number, though.
14  You started there and you never got -- do you have an
15  approximate number of clinically, how many people or families
16  you're treating at one time?
17         DR. BAYLESS:  It varies.  I mean, --
18         MR. BLUMBERG:  I'm, sure it does.
19         DR. BAYLESS:  -- I don't know.
20  BY MR. BLUMBERG:
21         Q.    But, is it 40 or 400 or -- you know what I mean?
22         A.    It's no 40 or 400, are you kidding me?  (Laughter)
23  You know I don't have that much time, Bruce.  You know,
24  probably five to ten, you know, clinical patients at any one
25  time that are -- that are specifically my patients.

1          Then we have overlap to the clinic in which I
2   consult and do clinical stuff with the families and stuff if
3   they come here for services when there's a need for my
4   oversight, so --
5          Q.    And you do juveniles through adults in the -- in
6   the -- 15 or so --
7          A.    Yeah, we do children --
8          Q.    -- patients.
9          A.    The children, zero to 18 years in the clinic,
10  yeah.
11         Q.    And adults you treat.
12         A.    And adults, yes.
13         Q.    So at any time, you might have some juveniles,
14  some teenagers and some adults.
15         A.    Personally, probably more juveniles and adults
16  that are my, quote/unquote personal patients?
17         Q.    Uh-huh.
18         A.    The younger ones, under 12, are usually in the
19  clinic that I'm consulting on and working with the psychiatrist
20  -- we have four psychiatrists that work for me.
21         Q.    So, mostly teens and adults.
22         A.    Mostly teens and adults in terms of personal
23  (inaudible), yeah.  But, they're all my clients.  I mean, we
24  have six hundred and seventy some people here, families that we
25  treat.

COPPERSTATE REPORTING SERVICE

14

```
 1          Q.    All right.  So, that gives us an idea.
 2          A.    Yeah.
 3          Q.    So there're approximately 15 at any given time
 4    that are you own exclusive patients.
 5          A.    Maybe.
 6          Q.    But in a group you've got --
 7          A.    Yeah, that may vary.  I mean --
 8          Q.    That may vary, I understand.  Could it be 25?
 9          A.    No, it's never 25.  No, never.
10          Q.    Okay.
11          A.    Are you kidding me?  No.  I don't have time for
12    that.  No, probably the max would be 15.
13          Q.    Okay.
14          A.    Ten to 15, max, that would be personal clients of
15    mine.  The rest are in the clinic, things that I -- cases that
16    I will consult on and work with the other people here.
17    BY MS. NICHOLSON:
18          Q.    What I'm interested in finding out is, at various
19    times over the course of his childhood you've read in all of
20    this information about Paul Speer, there were numerous
21    referrals for assistance, to various -- to CPS and various
22    other agencies.
23          A.    Uh-huh.
24          Q.    Tell me, based upon what you've seen about Paul's
25    records and history, is he and his family, the kind of family
```

COPPERSTATE REPORTING SERVICE

1  you might have taken on in connection with providing

2  therapeutic intervention?

3       A.    Possibly.  I mean, I, you know, his and his type

4  of family, I'm not really sure what that means.  If you're

5  talking about families that have parents who have drug

6  addiction, we've had that.  Kids who have drug addiction, we've

7  had that.  Kids from juvenile referrals, we've had that.  So, I

8  guess so, yes.

9       Q.    So if at some point Paul had been referred here

10  for treatment, for therapeutic intervention and the

11  recommendations had previously been -- or your recommendations

12  included family intervention --

13       A.    Uh-huh.

14       Q.    -- can you tell me what kind of intervention you

15  would have felt was appropriate, given the very sad history of

16  all the troubles that Paul went through?

17       A.    Well, I don't know about sad history, but --

18       MR. BLUMBERG:  Well, wait.  When you say that, what do

19  you mean, you don't know about sad history?  I just --

20       DR. BAYLESS:  She asked me --

21  BY MR. BLUMBERG:

22       Q.    I don't mean to --

23       A.    She asked me a hypothetical question, basically,

24  of what I would do if -- if the client was referred here.

25       Q.    Right.

16

1      A.    I don't know about -- she described a sad history.
2 I didn't say it was a sad history.
3      Q.    Right, okay.  What I'm --
4      A.    I don't know about a sad history.
5      Q.    Okay, and I caught on that, Brad.  That's exactly
6 why I'm asking.  So, when we get done with the therapeutic --
7 let's go back and say, do you -- would you describe this as a
8 happy history -- or, you don't go into happy and sad.
9      A.    No, I wouldn't go into happy or sad, I wouldn't
10 describe it one way --
11     Q.    As a clinician.
12     A.    As a clinician, it was -- it would be a case that
13 came before the clinic, and she asked me what we would do?
14     Q.    I guess if you've been a clinician for 30 years,
15 you could get beyond happy and sad, as terms that you --
16     A.    Yeah.  I mean, that's not, you know, we -- we see
17 issues or problems or difficulty that we need to address.  I
18 mean, I'm not --
19     Q.    Okay.  So, therapeutically then.
20 BY MS. NICHOLSON:
21     Q.    Yeah, the question is, what kind of therapeutic
22 interventions would you have recommended or undertaken with an
23 individual with this sort of history?
24     A.    I guess -- and I'm not being flippant with you at
25 all, it depends on -- it depends on what timeframe in which he

17

```
 1  was referred here, was he 3, 4, 5, 12, 14?  It depends on what
 2  was going on in the world when we got the referral.  But let's
 3  assume that he came here when he was eight years old.
 4       Q.    Right.  Well, how about when he went to see Dr.
 5  Martek the first time?  He saw Dr. Martek.
 6       Q.    How old was he then?
 7       A.    That was 1990.
 8  BY MR. BLUMBERG:
 9       Q.    He was 11.
10       A.    So he would have been what?  Eleven years old?
11       Q.    Yes.
12       A.    Okay.
13       Q.    Well, you said 10.
14       A.    Okay, whatever.
15       Q.    No, he said eight though.
16       MS. GALLAGHER:  No, he didn't say eight, he said 11.
17  Bruce, let the man answer the damn question.
18       (Laughter)
19       A.    Probably the first thing we would have done -- the
20  first thing, which is the normal procedure here, would be to do
21  an intake with the family and the child.
22            Okay, intake involves a complete history,
23  background, and one of our intake workers would have taken all
24  the data, demographic end, and then after the demographic, then
25  a therapist would do the second part of the intake in which
```

1   we'd look at what problems, therapeutic problems, possibly
2   there are.
3           There would have been a -- one, we would have
4   developed a team around the family.  We would have a case
5   manager, a family support partner, a therapist and a
6   psychiatrist involved in the particular case.
7           Whether or not there would have been a need for
8   medication or not, we don't know.
9   BY MS. NICHOLSON:
10      Q.   But you would have explored that.
11      A.   We would explore it, sure.
12          MR. BLUMBERG:  That's why the psychiatrist on board?
13          DR. BAYLESS:  Well, we have -- yes.
14          MR. BLUMBERG:  Okay, I should clear something up.  Pam
15  invited me to ask questions, if I like.  I may not be invited
16  by Jeanette.
17          MS. GALLAGHER:  But you seem to be interrupting his
18  thought.  If you could write down your question.  Let him --
19  and then --
20          DR. BAYLESS:  Well anyway, yeah, there's a psychiatrist
21  involved in the CFT approach.  Where we have children here who
22  are -- they've completed the behavioral intervention stuff but
23  who are still in need of medication.
24          For example, the ADHD kid.  They'll go on and
25  they're doing well in school, we've got them stabilized, the

1  family's working with them, we got them -- behaviorally they're
2  doing okay but they still need to have medication.  They come
3  once a month for medication.
4          Of course problems during the medication, we may
5  reinstitute some behavioral therapy or whatever that we need to
6  happen, based on their report of how the kid was doing.
7          But, generally speaking, what it will be -- like I
8  said, there will be a family support partner, a case manager
9  and a therapist, one each.  And this will probably, given the
10 history, this will be called an intensive case.  We have non-
11 intensive cases and intensive cases.
12         Given the fact that he had juvenile referral,
13 given the fact that there's been -- we know, based on the
14 history that we have, a drug-infested home environment, we can
15 have some CPS referral.
16         Probably this would have came from CPS, and then
17 we would involve -- like I said, a case manager, family support
18 partner and a therapist in this particular case.
19         What we try to do, what we call a wrap-around
20 process in which we would -- the case manager is the individual
21 who would really -- who designs a lot of the -- what needs to
22 meet and facilitate the CFT team.
23         The team -- in other words, we sit down with the
24 parents and see what their needs are, based on their perception
25 of needs, and how they see their child and their family

PCBG-01-07-06-0019

20

```
 1  functioning.  Based on their input, then we design things to
 2  help them obtain the goals that they set for themselves,
 3  basically.
 4              We then look at the -- that's the first  section.
 5  We also involve community supports.  Go ahead.
 6  BY MS. NICHOLSON:
 7       Q.   I just wanted to ask a question.  You said based
 8  on what the parents report; do you assume the parents are going
 9  to be reliable reporters?
10       A.   No.
11       Q.   Okay.
12       A.   No.  Are you kidding me?  No.  (Laughter)
13       Q.   But in an abuse situation, I just wondered how you
14  got to the bottom of that.  Do you --
15       A.   Well, I never said anything about abuse.  I don't
16  know about abuse at this point.
17       MR. BLUMBERG:  I had the same question though, I mean --
18       DR. BAYLESS:  I don't know about abuse.
19  BY MR. BLUMBERG:
20       Q.   You said based on parents' goals but you recognize
21  sometimes that that parents are covering up.
22       A.   We're -- these are -- these are clinically trained
23  people.  Yeah, we'd know -- we have as much information we can
24  get from the family at this point.
25              Now, understand, this is not a forensic case, so
```

PCBG-01-07-06-0020

1   we don't have a litany of material to look at.  A lot of stuff
2   we're getting -- unless there's a CPS referral, is from CPS or
3   the person making a direct referral or the school is making a
4   referral.  So, we don't have a whole lot of data.
5          A lot of that comes out later, as we -- 'cause we
6   get really invested in the family because there's somebody at
7   their home -- we not only do in-patient, I mean, out-patient
8   therapy in the office but we go to the homes.
9   BY MS. NICHOLSON:
10         Q.    Home visit.
11         A.    We do home visits, we do home visits every day.
12  We're on it, okay?  That's why my clinic has no kids right now
13  in the hospital, we have no kids in RTC.  We have had the
14  lowest encounter of any problem kind of situations in which we
15  turn to hospitalizations and we have no suicides.  We're on it.
16         And a kid like this, we would have been on him
17  very heavily.  This kid didn't get this kind of treatment and
18  -- which is kind of -- and we would change a lot of different
19  things.
20         Not saying we were going to be successful but
21  we're at the home every day.  There's a family support partner
22  who works directly with the parents.  They're there every day
23  on the case level.
24         Q.    So, let me ask you, in this particular case, once
25  you establish the parents' substance abuse history -- which,

COPPERSTATE REPORTING SERVICE

22

1  they were -- at times --

2       A.    Well, first of all, when we do a home visit, you
3  -- you see the house -- the house tells you whole lot of things
4  that's going on, okay?  I mean, and so if the house is in total
5  disarray -- let's assume --

6       Q.    Well, you read, this house was indeed in total
7  disarray.

8       A.    And we see that oftentimes, you know, there --
9  I've had people come back here to the office and tell me they
10 have to go home and take a shower, that's how bad homes are,
11 okay?  Where there's dog feces in their -- in -- in the living
12 room.  Where kids are playing in dog feces.  I mean, it's --
13 it's crazy, you know.

14            Where people who are on -- who are super poor or
15 whatever, that now have 17 cats and 16 dogs in their house.
16 How they feed them is beyond me.  They feed the dogs rather
17 than feed the kids.  It's amazing.

18            But, given the fact that we see the disarray, we
19 give -- we see what's going on, and we get a history from the
20 parents and find out about -- if we found about their drug
21 addiction or whatever, then that changes the complexion of
22 things also.

23            But now, we would make the referral for them to a
24 substance abuse program.  We don't do adults through the
25 children's clinic.  So, we would then tie into -- this would be

1  coming through AHCCCS and stuff.  We would then tie into the

2  adult system and get to the case managers at (inaudible), with

3  the adult population sample, get them registered to get adult

4  services, get them into treatment also, okay?

5          And then we would have a correlation or

6  communication with the case manger and people who have done

7  adult work, along with us, and they would also be involved in

8  what we call a CFT team.  They would automatically be pulled

9  in.

10          The family support partner, the -- would make sure

11  that not only the parents would go be at each and every meeting

12  they're supposed to be at, they would go, make sure they made

13  their meeting, they would call and confirm their meeting, they

14  would be there and pick them up if necessary.  And we have

15  transportation services.

16          As a matter of fact, I saw a cab picking up a few

17  minutes ago.  We pay for cab services, we make sure the people

18  get to -- there's no excuses.

19  BY MR. BLUMBERG:

20      Q.    So the excuses fall by the wayside then.

21      A.    Oh, yeah.  "I can't make it.  I'm too busy, I got

22  this -- "  Well, you know, Okay, "You can make it and we'll be

23  there to get you."  Okay, and that's the family support

24  partner.

25          Now, we also bring in community support.  We bring

1  in the -- if there's a minister, if the kid -- let's assume the
2  kid needs to be in the Boys and Girls Club because he has poor
3  socialization.
4          He may get, you know, he may have a talent.  We
5  look for strengths.  And this is a strength-based model.  We
6  look for various strengths.  If they have art strength, if they
7  have music strength, if they play sports, if they have talent
8  in dancing, if they have an interest in electronics, whatever.
9  We find stuff in the community to get them involved with so
10 they have something that they do that they enjoy doing and
11 also, that brings positive feedback, feeling that they're okay.
12         We get the minister, we get the PO, we get --
13 they're often involved in the CFT team.  We bring them in also.
14 So we surround the family with community support and the case
15 manager is the one that facilitates all of this in making sure
16 that each and every person is playing their role, okay?
17         The therapist -- if there is a disturbance, mood
18 disturbance, anxiety-related disturbance, whatever, just a
19 disturbance, whatever it may be, the therapist may -- will be
20 brought in and they will then provide individual therapy -- or
21 group therapy, with the family and the individual, okay?
22         If there's a need for medication, then we have an
23 oversight team that oversees all of it, and it's reviewed and
24 looked at as from a step-wise procedure, as to whatever -- and
25 we do brainstorming on each and every case -- as to what else

25

```
 1   can we do to make the intervention.
 2                And, it may be that we need, what we call, an
 3   outside resource, where we would do a -- a (inaudible) case
 4   agreement.
 5                Let's assume we find out the kid has an auditory
 6   problem, so we use speech pathologists, audiologist, because he
 7   has speech difficulty, secondary to a hearing problem.  So
 8   we'll go out and hire a speech pathologist, audiologist and
 9   bring them in to the CFT team and they will be sent and the
10   family support partner will make sure they get there and get to
11   their treatment and --
12                MR. BLUMBERG: May I ask who gets to pay for all this?
13   You know, there's a lot of people who don't have --
14        A.    You do.
15        Q.    -- insurance and the --
16        A.    You do.
17        Q.    Taxpayers.
18        A.    And this is through, usually kids coming through
19   AHCCCS.
20        Q.    So, some families just don't realize that it's
21   available for them, is that --
22        A.    A lot of people don't know AHCCCS is available to
23   them and they don't realize the extensiveness of -- and I think
24   that we have -- and I'm not saying this because it's my clinic
25   and I own it, but I really strongly believe that we have the
```

```
 1  strongest treatment process.

 2          We don't only do this with kids, we also do it

 3  with families.  We have also contracts with Arizona Long Term -

 4  ALTCS (Arizona Long Term Care System).  Arizona long-term care

 5  patients.  We do ADD kids, we do adults with (inaudible), Mercy

 6  Care --

 7          MR. BLUMBERG (CONT.) Do you get referrals from the court

 8  system?

 9          A.    Uh, no, because you guys don't want to pay.

10          Q.    What do you mean "you guys"?

11          A.    You're a court person, you know.

12          Q.    No, but can't they go to the same -

13          A.    If they're coming through the AHCCS channel then

14  they qualify for AHCCCS, then they would get the services if

15  they're juveniles or, or adults, yes.  But generally, direct

16  referrals from the court, generally not, right now.

17          Q.    And I don't mean that, I mean, you know, defense

18  attorneys, for example.

19          A.    No.

20          Q.    Like the public defender's office, they'll go to

21  -- what's it called?  Teen Challenge.  You know or something

22  like that.  But you don't get them?

23          A.    No, we don't do that.

24          Q.    Bayless Enterprises.

25          A.    Well, maybe not.  I would have to, you know, I
```

1  would have to go back and look.  Maybe we may have a few of

2  those but I don't think so.  I don't remember seeing any.

3       Q.    How long has it been operating?

4       A.    My company?

5       Q.    Yeah, that's -- what we've just described.

6       A.    What we're doing now?  The last seven to ten years

7  it's been going on.  Seven years, probably.

8       MS. NICHOLSON:  Well, if you've had a chance to read all

9  the mental health professionals that Paul encountered over the

10 course of his --

11            (End of Tape 1, Side 1.)

12            (Interview continues on Tape 1, Side 2:)

13       MS. NICHOLSON:  -- this is side number two of the

14 interview of Dr. Brad Bayless in the matter of State vs. Speer.

15       MS. BLUMBERG:  Side 2, day 2.

16       MS. GALLAGHER:  R2D2?  (Laughter)

17 BY MS. NICHOLSON:

18       Q.    Thank you, Bruce.  We had just begun to ask you

19 about the different mental health professionals to whom Paul

20 was referred.  And they -- all of them had a variety of

21 diagnoses and --

22       A.    Right.

23       Q.    -- treatment plans and so forth and some of the

24 treatment plans, including -- involving the parents.

25       A.    Uh-huh.

28

```
 1        Q.    And I'm sure you noted that in virtually every
 2   single instance without exception, the parents refused to be
 3   involved, at all.
 4        A.    It happens.
 5        Q.    Would you, in the treatment (inaudible) that you
 6   offer here, have taken action to overcome that resistance?
 7        A.    Yes.
 8        Q.    Does that make a difference?
 9        A.    Sometimes it does and sometimes it doesn't.
10        Q.    Okay.
11        A.    It depends on the parents and whether or not they
12   -- I mean, you can't force people to do things.  And they don't
13   want to be involved, and they can't be involved or are refusing
14   to be involved, then it's very difficult to make progress in a
15   home environment that -- in which all the participants refuse
16   to participate.
17              That includes the child.  We get kids who are
18   (inaudible)not only Parents.  I mean we get kids that don't
19   want to be here.  I mean, they don't want to talk to anybody,
20   they don't want -- they don't think they need any services, and
21   it may become very difficult, sure.
22        Q.    Uh-huh.
23        A.    They become difficult cases.
24        Q.    Well, let me ask you, you had a chance -- you were
25   talking about your collateral data yesterday and you referred
```

PCBG-01-07-06-0028

```
 1   to all these different evaluations.
 2                 I just wanted to run through each of them that you
 3   -- you've reviewed yourself and ask then whether you even
 4   agreed or disagreed with the evaluations, based upon the
 5   information that was contained in those reports.  And, I wanted
 6   to start with Dr. Martig, who you referred to, who did a 1990
 7   evaluation.
 8         A.    (Inaudible)
 9         Q.    The report talks about that on page 3.
10         A.    What do you want me to day about it?
11         Q.    I just wondered if based on your review of the
12   report that Dr. Martig wrote and the recommendations that he
13   made, if you agree with his diagnosis as well as with his
14   treatment plan.
15         A.    I never saw a treatment plan.
16         Q.    I believe there was a treatment plan.  Maybe --
17   maybe I'm overstating it.  I had understood that -- that
18   recommendations constitute the treatment plan.
19         A.    Okay. Not necessarily.
20         Q.    Is that a mischaracterization?
21         A.    Yes, a mischaracterization.
22         Q.    Okay.
23         A.    A treatment plan is, once the person's there, you
24   design a plan of treatment based on what you find, what your
25   findings are.  But, I don't remember seeing a treatment plan
```

1   with him, he may have had some recommendations to the court.

2        Q.    Okay. I'm looking at this and he has summary and

3   recommendations --

4        A.    Yeah, okay.

5        Q.    But just to speed this up --

6        A.    He -- I don't know where the other part of it is

7   but basically he -- he recommended individual and family

8   therapy, counseling, coupled with training on behalf of the

9   mother, and basically that's all he said.

10        Q.    He also -- he gave his opinions with regard to his

11   diagnosing Paul. And in fact, that's reflected in your report

12   -- average intelligence, dysthymic disorder, conduct disorder,

13   hyperactivity and narcissistic personality characteristics.

14        A.    Uh-huh.

15        Q.    First of all, do you agree with that assessment?

16        A.    I cannot disagree with the assessment, I mean, I

17   wasn't there at the time. And to -- you know, I know Roger

18   pretty well, he does a decent job.  I mean, I don't -- you

19   know, do I agree or disagree?  I mean, I'm -- that what he --

20   that was his opinion at the time.

21        Q.    All right.  And you agree with the recommendations

22   for treatment plan?

23        A.    You know, given that he's doing an examination, I

24   believe he did this for the juvenile court system, that's

25   usually where Roger typically is working, the juvenile court

31

```
 1   center.
 2              He's making recommendations based on what he
 3   knows, what the availability of services are at the juvenile
 4   court level.
 5              The comprehensive evaluation -- the comprehensive
 6   services that we offer here today more than likely were not
 7   available in -- in 1990 when he did this report.
 8        Q.    You know, I appreciate that.  At this point,
 9   recognizing that treatment models and treatment availability
10   have changed over the years --
11        Q.    Uh-huh.
12        A.    -- all I'm asking is, if you agree or disagree
13   with the diagnosis as well as the treatment recommendations.
14        Q.    I don't -- I can't comment one way or the other.
15   I didn't see Paul at that particular point in time.  I mean, it
16   -- it looks okay to me.  I mean, I don't have anything negative
17   to say about it, one way or the other.  I mean, or positive.  I
18   mean, I just -- it is what it is.
19        Q.    All right.  And did you base any of your
20   evaluation of Paul on any of the material or, I should say, of
21   the material that is contained in the report?
22        A.    Well, I think what we see here is, we've got a --
23   on AHCCCS-1 we got a dysthymic disorder, some depressive
24   activity, chronic depressive activity has been going on -- I
25   think -- this is an 11-year-old child.
```

PCBG-01-07-06-0031

1            I -- when he says dysthymic disorder, you're

2  talking about chronic depression is the definition of dysthymia

3  -- I don't know about that.  But, he also has some conduct

4  problems and where, you know, he, a group type, I mean that

5  typically happens within a group setting.

6            He had hyperactivity symptoms.  You know, there's

7  no recommendation for -- at least on this paper I'm looking at

8  right here, I don't know if it was or not but there's no

9  recommendation for referral to a psychiatrist for possible

10 medication for hyperactivity.

11      Q.   Okay.  All I was trying to get at was, based upon

12 the information contained in his report, do you agree with his

13 observations regarding appropriate diagnosis -- or, regarding

14 diagnosis as well as treatment recommendations.  And it sounds

15 like, "Yes."

16      A.   Well, you know, it's hard for me not to say yes.

17 I mean, again, I wasn't there at the time he did this

18 examination and, you know, like I said, Roger typically does a

19 very thorough, a pretty thorough job and I don't have any

20 negative things to say about what he -- what he did.  There his

21 opinion was, as a professional, that he suffers from these

22 particular problems.

23      Q.   All right.  One last question about Dr. Martig.

24 Did you then rely upon that as part of the collateral data --

25      A.   Sure.

33

```
 1          Q.    -- that you described to us yesterday?
 2          A.    Yes.
 3          Q.    So this -- this factored into your analysis of the
 4   problem.
 5          A.    Sure, absolutely.
 6          Q.    Okay.  All right, let's go on to Dr. Kabanski
 7   (phonetic), who evaluated Paul in '90, '91 and '92.
 8          A.    Uh-huh.
 9          Q.    You make reference to that, Dr. Kabanski's
10   evaluations in your report.  Did you agree or disagree with his
11   assessments of Paul as well as his recommendations for
12   appropriate treatment or intervention?
13          A.    I don't know about agreeing or disagreeing with
14   him.  I think that, as I remember -- he -- he kind of graduated
15   with Kabanski, I think he went from a kind of an emotional
16   handicapped kind of diagnosis, attention deficit hyperactivity
17   disorder diagnosis, to undifferentiated conduct disorder at the
18   end.
19               And, that can happen.  I mean, those things can --
20   as a kid is growing -- how old was -- let me see how old he was
21   at this time.  He was 11-years-old at the time.  I considered
22   it, I looked at it, it certainly played a role in my overall
23   assessment.
24          Q.    And are you saying you neither disagreed or agreed
25   with what was written or you simply accepted it?
```

1      A.    Well, you know, you're asking me do I disagree or
2  agree.  I  wasn't there at the examination.  Here's a
3  professional who's writing a report on an individual.
4          I know Stan Kabanski, I've know him for 30 years,
5  okay?  I've know Roger for 30 years.  They do decent reports
6  and they've done before, for the juvenile court center,
7  forever.  Everybody knows that.  I looked at, you know, what he
8  did and, you know, and what his opinion was and I considered
9  that opinion, that's all.
10      Q.    So you neither agreed or disagreed, it just formed
11  a basis for --
12      A.    It didn't form any basis or anything else, it just
13  simply was data that I had in front of me, that I used.  And,
14  that's part of his history.
15      Q.    All right.  Let's go on to Dr. Zucker, in '93.
16      A.    He's 14 years old now and the (inaudible) said
17  that he was -- (inaudible) is pretty constant.  He did more of
18  a -- this is more of a psyhco-social -- psycho-educational
19  evaluation, more so than it was a clinical evaluation, okay?
20          What he's looking at here is a -- an academic
21  referral.  I'm assuming he's doing this for. I think he's doing
22  this as a school psychologist in terms of whether or not --
23  this looks like more like an IPE kind of an evaluation, you
24  know.  I assume it's part of an IPE.
25          An IPE is an Independent Psychological Evaluation

1    for school systems.  And, it's for educational placement.  And
2    I -- and I'm assuming -- I don't remember this, but I thought
3    this was at Adobe Mountain School, as I remember.  I don't see
4    it here anywhere but -- it was for his placement at Adobe
5    Mountain, I believe it was.
6         Q.   All right.  All right, let me ask you again, do
7    you agree or disagree --
8         A.   Oh, yeah, here it is.  Here it is.  It is at Adobe
9    Mountain.  I'm sorry.
10        Q.   Okay.  And do you agree or disagree or have any
11   reason to dispute his conclusions and recommendations?
12        A.   I have no reason to dispute.
13        Q.   Okay.  Moving along -- Dr. Fine also evaluated
14   Paul in 1993 --
15        A.   Uh-huh.
16        Q.   And once again, the question's the same.  Do you
17   agree or disagree with the information contained in the report?
18   Do you have any reason to dispute the doctor's findings and is
19   this information you relied on as collateral data in forming
20   your opinions?
21        A.   Again, my answer's the same.  I have no reason to
22   disagree with his assessment.  His assessment's actually fairly
23   consistent with everybody else's assessment.  I mean, there's
24   not a whole lot of difference in the -- in the opinions
25   afforded here.

36

```
1         Q.    You see no reason to dispute the findings and
2    conclusions?
3         A.    No.
4         Q.    And this is something you relied on as part of the
5    collateral data.
6         A.    Yeah.
7         Q.    Okay.  Let's move on to Dr. Rice.
8         A.    Dr. -- who?  Oh, Robert?
9         Q.    Robert Rice.
10   (under breath mutterings by Bayless and Nicholson regarding
11   locating the Rice report.)
12        A.    Your papers are tearing up here.
13        Q.    Well, that's bound to happen.
14        A.    This is not a -- first of all, this is not a --
15   Rice did not do an assessment.  He's a therapist for -- at
16   Adobe Mountain School.
17        Q.    Right.  But, this is information that was part of
18   your collateral data --
19        A.    Yeah, I read it.  Yeah.
20        Q.    Okay.
21        A.    And I -- I noted it but I mean, this is not --
22   he's not -- first of all, he's not a doctor.
23        Q.    Oh, forgive me.  I -- I called him Dr. Rice.
24        A.    Uh-huh.
25        Q.    He's not a doctor.
```

PCBG-01-07-06-0036

```
 1          A.    He's not a doctor, no.

 2          Q.    Okay.

 3          A.    And, you know, "Substance -- he's in need of

 4   substance abuse counseling and mild to moderate depression."

 5          Q.    Do you have any reason to agree or disagree with

 6   what's contained in that report?

 7          A.    Nothing, no.  There's not very much to it, I mean,

 8   I don't -- it's a substance -- it's a psychological assessment

 9   review.

10          Q.    Well, this was information that you relied on in

11   -- with respect to the collective -- or, collateral data that

12   you described yesterday.

13          A.    Yeah, yeah, uh-huh.

14          Q.    Okay.  All right, then let's move along.  There

15   were the various assessments that were done in connection with

16   the Rule 11, prescreen and screening.

17          A.    Right.

18          Q.    And there was Dr. Delong, Dr. Potts, Dr. Toman,

19   Dr. Fall.  (All phonetic)

20          A.    Uh-huh.

21          Q.    Did you take a look at those reports?

22          A.    Yes.

23          Q.    Do you have any reason to agree or disagree with

24   anything that's contained within them?

25          A.    No.
```

38

```
 1          Q.    Any issues with the methodology that was used?
 2          A.    No.
 3          Q.    You didn't dispute any of the findings contained
 4    in any of the reports?
 5          A.    No.
 6          Q.    Okay.  And this again was information that you
 7    relied on as collateral data in forming your opinion.
 8          A.    Correct.
 9          Q.    Okay.  Now, let's move on to the heart of the
10    information.  You speak at length in your report about Dr.
11    Hoyt-Croft, Dr. Parrish and Dr. Stewart.
12          A.    Right.
13          Q.    Okay.  So, what I'm -- I'll get that out of your
14    way unless you want to keep --
15          A.    No.
16          Q.    Okay.  Now, with respect to Dr. Hoyt-Croft, you
17    had an opportunity to review her evaluation?
18          A.    Yes.
19          Q.    Were -- was there anything in that evaluation that
20    you either agreed with or disagreed with, with respect to facts
21    contained in that evaluation or simply the manner in which the
22    evaluation was conducted?
23          A.    I don't know how she conducted her evaluation or
24    what she did in terms of that but I -- the only issue I have
25    was that she said in her report that she concluded that his
```

1   drug use effectively arrested his brain development at the age
2   of 12 or 13.
3              She stated, "Paul failed to mature, just as he
4   brain failed to mature." And I -- as I said in my report, I'm
5   uncertain as to how Dr. Croft came up with that conclusion.
6        Q.   Okay.
7        A.   I've never heard of that before.
8        Q.   Did you go back and re-read the report?  I mean,
9   have you studied that report?
10       A.   Since when?  Since I did, they brought this
11  report?
12       Q.   Uh-huh, yeah.
13       A.   No.
14       Q.   Now, Dr. Hoyt-Croft is a psychologist --
15       A.   Okay.
16       Q.   So, do you have any reason to dispute that she is
17  skilled in any way in addressing issues of arrested brain
18  development?
19       A.   I just never heard of that before.
20       Q.   Okay.
21       A.   I don't know how she came to a conclusion that his
22  brain stopped developing at age 12.  I've never heard of that.
23       Q.   Did you make any effort to consult with any
24  colleagues or do any research on the issue or the potential
25  affect of drug use on brain development in pre-adolescence and

1  adolescence?

2       A.   I've done some in the past.  I've just never heard

3  that a brain would -- it effectively would arrest brain

4  development at age 12.  I mean, I never heard of that before.

5  I mean, that's -- that's something that's -- I'm not sure how

6  she measured that, even.  I mean, how would you measure that?

7       Q.   Well, I'm asking you.

8       A.   I don't know.  I've never -- that's the problem I

9  have with that.  I mean, that's -- I don't know how that could

10 be -- how -- given what she did and how she evaluated him -- do

11 you have a copy of her report?  I don't have it with me.  And

12 if you look at what she did - (under breath mutterins by

13 Bayless as he flips through report).

14            Yeah, that's what I thought.  I can't remember her

15 doing any diagnostic testing, in pre- and post-testing, to

16 determine whether or not his brain has arrested at age 12.  And

17 based on his premorbid level of functioning.

18            I don't know where she got that from, other than

19 the research that she had done, stating that the effects of

20 heroin and cocaine and so forth and so on, that -- we don't

21 know how much he was doing, we don't know exactly -- I mean, I

22 -- this is very hypothetical.

23       Q.   Well, let me ask you, do you dispute the research

24 upon which she based her opinion?

25       A.   I don't dispute the research at all, I just

41

1  dispute that how she knows that this happened to him.  How does
2  she come up with that conclusion, that this -- that his brain
3  was arrested based on issues of drugs?  I don't know how she
4  came up with that.

5          But a conclusion based on a hypothetical, based on
6  looking at some research that says this possibly can occur?
7  How do you know it occurred with this patient?

8          Q.   Well, I think, earlier when you were talking about
9  what -- what one of your therapeutic teams would do, it
10 involves taking a history and using that history as a starting
11 point.  Do you think that she took a history from Paul?

12         A.   Well, it's not a part of -- this is not about
13 history, she's talking about brain development, okay?  You're
14 talking about your -- the function of the brain and she's
15 saying that it -- effectively, it had arrested.  It has nothing
16 to do with history.  This is physiology.

17         And, you're talking about the utilization of some
18 type of toxic intervention, i.e. drugs, okay, that have
19 arrested this boy's development, his brain.

20         I'm saying, you'd have to have a measure before
21 and a measure after, in order to make that determination.
22 There was no measurement here.  You cannot -- you can't
23 hypothetically say that.

24         Q.   So --

25         A.   That's all.  Other than that, I have no problem

42

1   with the report.

2           Q.    Do you dispute her qualifications?

3           A.    No, I'm not disputing her qualifications, I didn't

4   say anything about her qualifications or anything else.  I was

5   saying, I don't understand how she came up with that

6   conclusion, that's all.  I not disputing anything else.

7           Q.    Let me ask you, do you dispute her -- her

8   methodology or are you simply saying you don't know how she got

9   to her ultimate conclusion?

10          A.    I have no clue how she got to her ultimate

11  conclusion.  And -- and based on what she said in this report,

12  she couldn't -- it's impossible for her to -- for her to make

13  that statement.  I mean, it doesn't make any sense to me.

14              I mean, I, you know, maybe she can explain it

15  further herself but there is no evidence to suggest that this

16  occurred, that his brain has arrested at age 12.  I -- there's

17  no data to support that.

18          Q.    But, as I understand it, you do acknowledge that

19  there is literature -- I should say, research, that documents

20  that that very thing is a known phenomena in developing brain

21   -- pardon me, in pre-adolescence and adolescence.

22          MR. BLUMBERG: Drug use.

23          MS. NICHOLSON: Yes, I'm -- yes, thank you.

24          A. That they change brain chemistry?

25          MR. BLUMBERG: And can also arrest the brain development.

44

1  such as tetrahydrocannabinols, which is marijuana, central
2  nervous system depressants, such as heroin or opiates, other
3  med -- other drugs such as inhalants affect brain development.
4         To say that it doesn't have an effect on brain
5  development would be a miscue; it does.  It can affect brain
6  development.  Sniffing glue is not a healthy thing to do, so is
7  drinking Drano.  So --
8  BY MS. NICHOLSON:
9         Q.    Is the effect different on portions of the body,
10 though.  Drano affects the throat whereas sniffing --
11        A.    Drano affects the brain too.
12        Q.    Really.
13        A.    Drano affects the brain, too. Any kind of -- any
14 toxic substance like that will go right in your blood stream,
15 goes directly to the brain, (inaudible) first.
16        Q.    (Inaudible)
17        MR. BLUMBERG:  Did he answer my question?
18        MS. NICHOLSON:  He did, yeah.
19        A.    Well yeah, they die. Like I say, what I'm saying,
20 you know, you -- anything you ingest, whether it is -- whether
21 it's GI, the lungs, your stomach or whatever, it goes directly
22 to the blood stream before it will have any effect on you
23 whatsoever.
24        If it gets in the blood system, it goes directly
25 to the brain.  So, say that -- that drugs and alcohol or any

PCBG-01-07-06-0043

drug, say, if you drink heavy, also get Korsakoff's disease. I mean, you can arrest brain development from drinking.

I mean, so, everybody uses drugs, I mean, you can say brain development is affected by toxic chemicals in the air outside too. How much -- when you talk about a specific individual, however, how much -- you know, and different strokes for different folks. I mean, different people metabolize drugs differently.

To say that this individual who took "X" amount of drugs or a multiple number of drugs, that their brain was arrested at a particular stage, is very, very highly unusual, given the sense that -- one, we don't have any -- we have no way of measuring that. That's -- that's my criticism. I don't know if I -- if that arrested his development or not.

BY MR. BLUMBERG:

Q. How about his maturation, that development, not --
A. Maturation is the same thing. I mean, you know --
Q. But don't you counsel your own patients, that if you're using drugs, you're not listening, you're not prepared to deal with therapy. In other words, Brad, --
A. Is that maturation or is that in terms of attentiveness?
Q. Don't people use drugs in order to escape?
A. Not necessarily. Some people use drugs to get high.

```
 1          Q.    But isn't part of that getting high escaping?
 2          A.    Well, we -- there's all kinds of -- yes and no.  I
 3    mean, I don't know what you mean by "escape."  Escaping
 4    reality?
 5          Q.    Correct.
 6          A.    Escaping the world in which we live in?
 7          Q.    Right.  Even if they're doing it for fun and
 8    they're doing it to get away.  If they're doing it on a regular
 9    basis, they're not maturing as some 13-year-old should --
10          A.    Well, no, that's hypothetical.  That's like saying
11    anybody -- a kid gets drunk when he's 14 years old, as probably
12    you did, or, you know, as most people did, you know, in high
13    school, you know.  I mean, saying that they're now not going to
14    mature to, you know, to be adequate adults -- I mean, if that
15    was the case, we'd all have brain arrest, you know.
16          Q.    No, but marijuana, meth, heroin, are more serious
17    on a daily basis than getting drunk once a month.
18          A.    Let me tell you, there is -- there is research
19    that talks about individuals who use opiate derivative drugs,
20    which heroin is, okay, and in various other countries, that
21    live to be a ripe old age, live long -- heroin's a very
22    nontoxic kind of drug, as a matter of fact, contrary to most
23    people's belief.
24          Q.    I understand.
25          A.    Okay, and you can live a long time, using heroin,
```

47

1  as well as methadone, which is synthetic heroin.  You know, as

2  we know it in this case, we got a person who in 30 years.  You

3  don't see, you know -- and after a while, there will be some

4  breakdown in terms of physiological body functioning and what

5  have you, but there is, you know, heroin is a fairly innocuous

6  drug except that it's very physiologically addictive.

7       Q.    Right.  And you can't go learning and go to school

8  and take part in social --

9       A.    That's not true.  That's not true at all.  That's

10  not true.  There are people that use heroin who have Ph.D.s

11  are you kidding me?  Doctors who use morphine.  Come on.

12       Q.    They've already reached that process of

13  maturation.

14       A. They were using it beforehand.

15       Q. From 13 to 20?

16       A. I don't know.

17       MS. GALLAGHER: Pam, let Pam finish. She's got to change

18  her tape. Let's stop here.

19                  (End of Tape 1, Side 2.)

20                  (Interview continues on Tape 2, Side 1:)

21  BY MS. NICHOLSON:

22              This is the continuation of the interview of Dr.

23  Bayless in the matter of State vs. Speer.  This is side number

24  3 of the interview on January 23rd, day two. And Doctor, you

25  were kind enough to engage with us in a discussion of the

48

1   effects of various substances --
2           A.     Uh-huh.
3           Q.     -- on the developing brain.  And I guess --
4           A.     Well, again, you said on a "developing" brain.  In
5   a developing brain you're looking at zero to five or zero to
6   six years.  That's the developing brain.  We're talking about a
7   kid who was 11, 12, 13 years old, is not what you considered
8   quote, unquote, developing, I mean, brain -- the brain's
9   already developed at that point.
10          Q.     Really?  I wouldn't -- all right, now this is
11  getting to be very -- a lay person's knowledge.
12          A.     Uh-huh.
13          Q.     What about the front-page article on Time Magazine
14  two years ago, where they talked about the adolescent brain?
15          A.     There -- there's such thing as an adolescent
16  brain.  You said brain development.  There is an adolescent
17  brain in that there is neuro-structure -- you're talking about
18  -- the brain itself is developed.
19                 We're talking neuro-pathways now.  Neuro-pathways
20  in terms of how people think, and judgment, those kinds of
21  things, mature and grow with experience as we move along, okay?
22                 And, we gain knowledge and judgment and decision
23  making and choices, based on our experiences within our
24  environment, during that adolescent phase.  And that adolescent
25  brain is less adequate in terms of making judgments and

COPPERSTATE REPORTING SERVICE

PCBG-01-07-06-0047

1  decisions.

2           They were talking about whether or not an

3  adolescent brain is the same as an adult brain in terms of

4  judgmental decisions.  They tend to be more impulsive, they

5  tend to have other -- but the brain itself, the neuro-

6  structures are there and just experiential learning has not

7  occurred as yet because of time.

8           Q.    Okay.  So there will be -- if I understand you

9  correctly -- and please, I want to make sure I understand this

10 -- you are telling me that as of the age of 10 or 12, there is

11 no longer an issue of the brain developing -- the brain

12 structures developing and the potential impact of substances on

13 the development of brain structure.  Is that what you just told

14 me?

15          A.    No, that's not what I told you.  What I told you

16 was that the brain, at that timeframe, in terms of size, for

17 example -- if you notice, your head is not going to get bigger

18 -- okay?

19          A.    Can we just stop?  I'm not interested in size.

20 What I'm interested in is Paul.  And what I'm interested in is

21 the impact of the use of those drugs, on Paul, at that age.

22 And I guess the best way for me to answer is, are you --

23          MR. BLUMBERG:  If you prefer to answer -- well, we're

24 going to wait --  (Laughter)

25          MS. NICHOLSON:  Stop, Bruce.

50

```
1          MS. GALLAGHER:  Let me ask her question.
2          MR. BLUMBERG:  Oh, shut up.
3  BY MS. NICHOLSON:
4          Q.    I guess the best way is to ask you, do you -- do
5  you believe that it -- that drugs of any sort, all the variety
6  of drugs you've discussed, would not have had an impact on his
7  brain at that age, because his brain was not developing?  Is
8  that what you're saying?
9          A.    No, no, not --
10         MR. BLUMBERG:  No, because his brain had developed.
11         A.    No, I'm saying that -- what I'm saying, that -- if
12  you're looking at a -- when  you say that the brain has
13  arrested in development, okay, then there is no further
14  neurostructures that are going to be gorged out, so to speak,
15  that neurons are not firing, were not -- were not developing
16  new pathways that were not, you know, --
17         And I'm saying, my criticism with Dr. Croft, is
18  that there -- that drugs, alcohol, toxic chemicals in the
19  environment, all -- dust storms, I mean, I mean, you name it --
20  nuclear waste fallout, drinking water, whatever, has an affect
21  on that overall.  No question about that.  I'm not denying that
22  -- that if you use toxic chemicals, inhale toxic chemicals or
23  ingest toxic chemicals on any level whatsoever, that it may
24  have an affect on your brain, 'cause that's one of the first
25  places everything goes.  No question about it.
```

PCBG-01-07-06-0049

1          To say that it arrests at 12 years old, there is

2   no evidence to that whatsoever.  And to say that -- that he

3   could not -- and it does not mean that the brain -- if -- if

4   the drug affects, let's assume, the parietal lobe of the brain

5   or occipital lobe of the brain or the frontal lobes of the

6   brain or whatever, and there is a -- a blockage, an arrestment

7   and --

8          The brain has a unique way of -- of channel -- of

9   rechanneling and developing new pathways for it to compensate

10  for that.  To say that it arrests, the brain will not do that

11  any more.

12  BY MS. NICHOLSON:

13      Q.   All right, let me ask --

14      A.   That's -- to me, is -- is unreasonable.

15      Q    All right.  So, you're saying that chemicals,

16  external chemicals, from whatever source are not going to cause

17  the kind of arrested development that's described by Dr. Hoyt-

18  Croft.

19      A.   Exactly.

20      Q.   All right, thank you.  All right, now --

21      A.   Now, it took a long time to get there, you know?

22  (Laughter)

23      Q.   All right.  I have heard the term "arrested

24  development" used.  Can a person's development -- emotional

25  development arrest as opposed to -- you're -- you're talking

PCBG-01-07-06-0050

52

1  about --
2             No, I'm just trying to understand, Doctor, please
3  -- I'm sorry that I made you roll your eyes.  But, I just want
4  to make sure I understand.  Are there different kinds of
5  development that can arrest -- now, you're saying, globally,
6  all kinds of development --
7        MR. BLUMBERG:  That was my question.
8        A.    Globally, all kind of development -- emotional
9  development, we're talking about physiological development, you
10 know, it all can be affected by utilization of drugs, alcohol,
11 any other toxic chemicals, possibly even milk from the mother.
12            I mean -- I mean, it can be affected by that.  To
13 say that it's totally arrested, we're talking about a -- a
14 person who -- what we refer to often as a -- a developmentally
15 disabled or delayed individual.
16       Q.    Yes.
17       A.    Okay.  And that can occur from a number of
18 different diseases and what have you.  In this particular case,
19 I have not seen any professional say that he is suffering from
20 delayed or arrested development -- cognitively, mentally,
21 emotionally, based on -- on some other external source.
22       Q.    Okay.
23       A.    If you can find that, I'd be more than happy to
24 address it.
25       Q.    Well, my question was, that as an expert, do you

1  have any reason to believe that anywhere in the literature,

2  that there is anything that disputes this or supports this; and

3  it sound like you're attitude -- or, your feeling is, your

4  opinion is, no, there's nothing that supports this.

5      A.    There's nothing that supports this, there's

6  nothing to dispute it.  I mean, I -- to dispute it means that

7  there -- and I'm disputing that -- that he has arrested

8  development because there's -- there's no measurement.

9          To use a hypothetical term, hypothetical research

10  and say, you know, well because of this research, you know, his

11  brain is arrested.  That's not -- you can't do that.

12      Q.    Okay.  All right, now let me move on.  Before I

13  get into talking specifically about Dr. Parrish and Dr.

14  Stewart, I'd just like to ask you a little bit, just about any

15  of the research or consultation you might have done with other

16  colleagues or trips to the library, the internet or whatever,

17  based on your regular reading, which I'm sure you have volumes

18  of journals that come in --

19      A.    Uh-huh.

20      Q.    Can you tell me, are there -- whether prior to

21  writing your report, prior to preparing for today's interview

22  or in preparation for the trial, from which you'll be

23  testifying in the next few weeks.  Do you have any intent or

24  have already done any research or consultation on the effect of

25  a variety of subjects?  And, one is the effect of prenatal

54

```
 1   exposure to heroin or methadone.
 2         A.    I'm pretty familiar with that research.
 3         Q.    Okay.  Can you tell me what your familiarity is?
 4   Just summarize it for me?
 5         A.    Um, if a child - your talking about in a prenatal
 6   state?
 7         Q.    Prenatal exposure.
 8         A.    Okay.  A prenatal exposure to heroin because the
 9   parent is taking it, obviously, the mother is taking it, the
10   child can be born addicted to heroin or addicted to methadone,
11   and it can cause other kinds of significant physiological
12   problems.
13               Possibly, in terms of central nervous system and
14   problems -- dulling of senses, sometimes -- sometimes other
15   kind of physiological problems.  It depends on when the use of
16   heroin was ingested at the time of the development of the child
17   also, depends on what tri-semester we talking about.
18         Q.    Okay.  All right, putting aside all of those
19   variables, because we probably don't know in connection with
20   this, what are the possible impacts on a child?  It sounds like
21   it can be neurological --
22         A.    Possibly.
23         Q.    It sounds like they can be cognitive.
24         A.    That is neurological.
25         Q.    Well, yeah, but there -- I'm thinking about more
```

PCBG-01-07-06-0053

```
 1   in terms of neurological -- I'm thinking more in terms of
 2   movement and that sort of thing.
 3          A.    That is neurological.  Cognitive and neurological
 4   mean the same thing.
 5          Q.    Oh, I thought of cognitive more as brain function.
 6          A.    Movement is brain function.
 7          Q.    I'm sorry.  When --
 8          A.    Okay, that's fine.
 9          Q.    Fine.  In any event, so there is a potential of a
10   neurological impact -- can it be short term or long term?
11          A.    Again, it depends on -- on what the effect is and
12   whether or not the brain can compensate for that.  And we learn
13   certain things, sometimes it's permanent.
14          Q.    All right.  And the permanent damage can manifest
15   itself in what sort of conditions?  ADHD, is that one of them?
16          A.    Uh, I don't know about that.  There is some
17   literature that says that, I've read some that --
18          Q.    There is literature that says that.
19          A.    Yeah, there's literature that says that but
20   what --
21          Q.    Have you reviewed the literature?
22          A.    Hold on a second, before you jump all over that
23   and think that you got something and --
24          Q.    No, I'm trying to understand and we're running out
25   of time, so --
```

56

```
1        A.      Okay.  Well, it's not necessarily -- all -- all
2    research is -- first of all, peer reviewed.  But very few is
3    not.  But this hypothetical, that it can cause or possibly
4    there is some research that says that there is some possible
5    correlation between the two, that's more in line with
6    methamphetamine, from what I've read, more so than heroin, in
7    terms of ingesting methamphetamine during -- in vitro.
8                We don't know that and there is some research that
9    says that that possibly could be true.  And some trials that
10   they've run, but we don't know that for a fact.
11       Q.      All right, let's move on.  I'm interested in any
12   research or consultation you've done either before writing your
13   report or before today or before trial that you intend to do on
14   the effect of sexual abuse on pre-adolescent or adolescent
15   development, emotional development.
16       A.      Again, I'm pretty familiar with that.  I do
17   psycho-sexual evaluation in adolescents and in adults.
18       Q.      Can childhood sexual abuse impact a child's
19   development?
20       A.      You say "development" that's a very broad
21   statement.  Can it impact a person's perception of reality?
22   Can it impact a person's perception of self?
23       Q.      Well, let me ask you, what impact does it have?
24       A.      Well, like I said, I mean, I don't know about
25   development.  I mean development means a lot of different
```

PCBG-01-07-06-0055

57

1   things to me.

2         Q.    What impact --

3         A.    Perceptions -- perceptions itself, self-esteem, it

4   can create obsessive-compulsive kind of thought process when it

5   comes to sex, possibly.  From many different directions to

6   abstention or -- or no sex, to high promiscuity.

7              When a child is eroticized, it can be -- there may

8   not be any effect whatsoever.  There are many people who are

9   eroticized, or molested, during their early development and

10  they go on and live very normal, healthy lives and manage to

11  categorize and compartmentalize it and go on with their life

12  and not have any real big deal about it.  There are other

13  people who do have a big deal about it.

14        Q.    Okay.  All right, I need to move on because we're

15  running short of time, so I -- I apologize.

16        A.    That's okay.

17        Q.    So, it can have an effect.

18        A.    Maybe.

19        Q.    Okay.  It might not.

20        A.    It might not.

21        Q.    All right.  Let's talk about serious physical

22  abuse.

23        A.    Serious physical abuse?

24        Q.    Right.  What does the literature --

25        A.    On the development of what?

59

```
 1          Q.      Just on the development of the child.

 2          A.      Uh, the personality of a kid?

 3          Q.      (Inaudible)

 4          A.      In effect, the usual physical abuse -- severe

 5    physical abuse can affect the personality.  There's other kinds

 6    -- there's physical -- there is direct physical abuse and then

 7    there is indirect -- what I call indirect physical abuse, which

 8    is neglect.

 9                  Okay, it can have an affect on the personality,

10    perceptions of reality, perceptions of warmth.  We -- where --

11    we are animals that love to be loved.  When we feel as though

12    we're not loved or cared about, we have difficulty developing

13    that caring and -- and processing for ourselves.  So, learning

14    to love one's self is a very important aspect of -- of overall

15    growth and maturation.

16                  In order to love somebody else, you got to love

17    yourself.  How we learn that is through our interaction with

18    our environment.  If our environment says you're not worthy of

19    love, then we tend to not love ourselves and we set ourselves

20    up for problems further on down the road.

21          Q.      Right.  That raises two questions.  One is

22    infantile deprivation.  It takes me back to the monkey cases

23    and the (inaudible) mothers and all of that.

24          Q.      Uh-huh, uh-huh.

25          A.      Has that been borne out in human research,
```

PCBG-01-07-06-0057

1  infantile deprivation of maternal (inaudible)?

2       Q.    Uh, you're -- you know, -- boy, that goes --

3  that's General Psych 101.  The -- where the Rhesus monkeys were

4  taken away from their parent and -- and (inaudible), and those

5  who did not get that, showed more aggressiveness and what have

6  you.

7            There are some -- philosophical viewpoints in

8  psychology that says that if we, through neglect, that, the

9  (inaudible) monkeys we associate with what you're talking

10 about, um -- um -- that, yeah, that can in effect, occur.

11      Q.    And there's human research that confirms that?

12      A.    I don't know about human research that confirms

13 that, I can't pull human research off the top of my head, I'm

14 saying that philosophically, I think we tend to agree that --

15 that if a person goes to neglect, does not learn to coddle

16 themselves and comfort themselves and love themselves, that

17 they may act out in the environment and show aggressive

18 tendencies.

19      Q.    And going back to the physical abuse, you

20 indicated that overt physical abuse, beating a child, can have

21 an impact.  I'm wondering specifically if it can result in a

22 modeling of behavior and wherein the child, in turn, acts out

23 with physical --

24      A.    Well, yeah.  Again, I think that depends on the

25 individual too, there's -- and what you define as physical

PCBG-01-07-06-0058

1 abuse. Now, some people define physical abuse as, you know,
2 simply spanking a child, which I have no problem with something
3 like giving a child a spanking.
4     Q.    Excuse me.  Can we just focus on what we know
5 that's in the file, in this case, which is the belt, the
6 bruises on the face, the kinds of information contained in the
7 CPS reports.  Let's just focus on that.  The information that
8 was in your collateral data.
9     A.    I'm -- I'm trying to remember -- how many
10 incidences were there of -- that they were documented, physical
11 abuse in the record.
12    Q.    There were several CPS reports, CPS went in and
13 investigated the family.  The family denied that the child was
14 ever hit.
15    A.    And he denied it too.
16    MR. BLUMBERG:  Also, police were called several times.
17    MS. NICHOLSON:  Police were called.
18 BY MR. BLUMBERG:
19    Q.    Without results, CPS.
20    A.    Yeah, I know, but there was never any removal from
21 the home, there was never any documented evidence of any
22 physical abuse that occurred.
23         And as a matter of fact, the victim in the case,
24 i.e. Paul, said that it didn't occur.  The only time we know
25 that, in retrospect, he's come back and said that it did occur.

1  But he lied to CPS and to the police about that.  Now, we
2  don't --
3         BLUMBERG:  But it wasn't recent that that occurred?  In
4  other words, the child, Paul Speer, came back and admitted it
5  long ago, not when this case arose.
6         A.    What I'm saying is, we don't know that to be fact
7  at this point in time.  We've got conflicting evidence.
8         Q.    How about assuming the fact?  How about if you
9  assume the fact?
10        A.    What about it?
11        Q.    If you assume that it's true, does it have a --
12  can it have a -- an effect on the growth or development of the
13  child?
14  BY MS. NICHOLSON:
15        Q.    Or behavioral development in particular, the
16  modeling effect that I asked about.
17        A.    In terms of how to handle conflict?  Maybe.
18        Q.    Does the child who has been beaten, tend to react
19  to conflict by physical --
20        A.    By -- by physical aggression.
21        Q.    -- aggression.  Isn't that what most all the
22  literature says?
23        A.    No, that's not what all the literature says.  Some
24  literature says that the person may in fact withdraw from
25  physical aggressiveness and become very meek.  They can go the

PCBG-01-07-06-0060

62

```
 1   other direction, also than more or less become aggressive.
 2              So, there's a -- there's a continuum of what the
 3   response may be.  Oftentimes we see aggressive kids, we think
 4   that that had been modeled at home.  Not necessarily.  That can
 5   be from a lot of different sources.  It can be because the
 6   parents are too permissive.  You'll find permissive parents
 7   also create aggressive children.
 8        Q.    You know, it's funny because my next question was
 9   appropriate discipline in the home.
10        A.    Yeah.
11        Q.    Okay, why don't you tell me about that.  Is there
12   research --
13        A.    Oh, yeah, there's a bunch of research on that.
14        Q.    All right, tell me -- why don't you summarize it
15   briefly, please.  Based on the information that you have on
16   this case, can you tell me whether or not you have an opinion
17   or -- or have researched the issue of --
18        A.    Dysfunctionality within this home?
19        Q.    Not only dysfunctionality but the lack of any
20   parental controls on the children and the (inaudible) impact
21   that that may have had on Paul.
22        A.    It --it -- I'm guestimating, 'cause I wasn't
23   there.  I'm guestimating, based on the records and stuff, it
24   looks like to me that we have a home environment which was
25   based on neglect and permissiveness.  They didn't care.  They
```

COPPERSTATE REPORTING SERVICE

```
 1   let them run rampant.  There were more raising themselves than
 2   there was any kind of parental controls.
 3              And more so of that, than I -- I found of abuse or
 4   abusive kind of conduct.  I think that the -- the allowing the
 5   child to run amuck and not showing that you care enough to put
 6   parental controls on them, gives a message to the child that
 7   they can do whatever they want to do and that they're in
 8   control of their own destiny and that they can do whatever.
 9              And, that boils over into society, which does have
10   rules and has punishment secondary to those particular
11   behaviors.  And those kids get in trouble as a result of that.
12              But, you'll find that -- I think this is more a
13   permissiveness process than it was of an abuse process, in
14   terms of their home environment.
15        Q.    That's -- that's your opinion, based on what
16   you've read.
17        A.    Well, yeah, it's based on her -- that her
18   described by all the people as being lazy, not involved,
19   sleeping all day long, the mother.  The father working -- he
20   was a workaholic who came in and really was -- was a stepfather
21   to Paul, as a matter of fact, and really was somewhat not
22   involved and in not really controlling.
23              That also takes into consideration that there was
24   a -- a tremendous amount of juvenile referral, that there were
25   involved in various, nefarious activities of -- from early
```

PCBG-01-07-06-0062

64

1   development on and there was --

2              And every time the parents are asked about

3   different things, they gave -- they gave this glowing rendition

4   of that, "There's no problem."  That, "We don't have any drug

5   problem."  That, "We don't have any problem in the home."  And

6   that, "Paul's a good kid and Brian's a wonderful child."

7              And, you know, then they moved to Paul being the

8   culprit and -- and manipulating Brian and Brian's a model child

9   and yada, da, da, da.  All of which was -- and also, Paul lying

10  to people about his parents' use of drugs and everything.

11             Everybody was lying here.  So, I, you know, my

12  whole thing is that there was more permissiveness in -- and

13  denying reinforcement of negative behavior and not really

14  taking into consideration the impact on other people and how

15  they affected people because they really didn't care, only

16  about their own needs at the moment, which was really modeled

17  more so than anything else.

18        Q.   A couple of thoughts -- number one, is it at all

19  unusual in your experience for a child who has been seriously

20  physically abused in the home, to deny that it's his parents

21  that did it to him?

22        A.   Is it unusual?

23        Q.   Is it unusual.

24        A.   No.  Not necessarily the fact either, but that's

25  not unusual.  That happens.

PCBG-01-07-06-0063

1          Q.      And that, your last point brings me to the absence
2    of values or moral training at home (inaudible), training a
3    child to behave in appropriate ways in the world at large.  For
4    example, to commit burglaries by being trained to crawl through
5    doggie doors.

6          A.      Well, moral, ethical values, you know. There's two
7    ways -- many ways, I should say, not just two ways, but
8    typically we could say home environment, outside environment,
9    that we have rules and regulations that we have to follow and
10   that we develop morals and ethics and values based on our
11   interactions with each.  We make choices in our life.

12               Early on, in early development, I think that our
13   choices are typically more confined to how our home environment
14   teaches us.  But as we grow and as we develop, going to school
15   and so forth and so on, there are rules and regulations that
16   are set forth that we recognize that we make choices as to
17   whether or not we're going to follow the rules.

18               As we get older, those choices become more of our
19   own than they are of our parents.  Just like, you know, my
20   grandfather was a Baptist minister and I never heard him use
21   profanity.  I certainly do, and have, okay?

22               I (inaudible) state that his training was very
23   influential with me and yet at the same time, there are things
24   that I do not adopt that he does do, okay?  And so I make a
25   choice about my religious convictions.

PCBG-01-07-06-0064

1              I make a choice about my interactions with the
2    environment, I make a choice about my adherence to the various
3    laws and rules and regulations within our society in which we
4    live and those choices are mine.
5         Q.   Forgive me, because we're running short on time --
6         A.   Yeah.
7         Q.   I wonder if we could focus on Paul.
8         A.   I'm talking about Paul.
9         Q.   And the moral training that he got.
10        A.   I'm saying he -- that his moral training leaves a
11   lot to be desired.  I'm not saying it wasn't dysfunctional, it
12   was very dysfunctional, okay?  But, he makes choices too.  You
13   cannot say that he did not have a role in this.  He plays a
14   role in his own development as well as his parents play a role.
15        Q.   Okay, was he playing a role at the age of five
16   when it was reported that his aunt sexually abused him?  Did he
17   play a role and have a choice there?
18        A.   Well, we're not talking about sexual abuse.  You
19   said moral and ethical training and whether or not he was
20   sexually abused at age five has little if anything to do with
21   him burglarizing a house at age 15.
22        Q.   Okay.  I am concerned because we're still running
23   short of time.  Very quickly, before I get into -- we still
24   haven't gotten into Dr. Stewart and Dr. Parrish, which is the
25   core, as well as your -- your central opinion.

1        BLUMBERG:  What about Paul Miller?

2        NICHOLSON:  Oh, gosh, I don't even -- Paul Miller isn't

3   even commented on -- in here.

4        A.    Oh.

5        Q.    It's not even referred to in your report.

6        A.    Paul Miller?

7        MS. GALLAGHER:  Dr. Miller didn't diagnose, he gave all

8   the -- all the risk factors.  I think I -- I'm sure I gave you

9   his report.

10       DR. BAYLESS:  Oh, okay.  But that wasn't an evaluation.

11  BY MS. NICHOLSON:

12       Q.    Right.  But very quickly, stepping back to your

13  CV, I see that there are a number of your publications that you

14  had listed that had to do with being an expert witness:

15  mitigation, family dynamics and so forth.  And I've highlighted

16  them and I wondered if it would be possible to get copies of

17  that literature.

18       A.    I have no clue where that stuff is at. We had a

19  flood here, when we first moved here, and the whole bottom

20  floor was flooded. You remember that, Bruce.

21       MR. BLUMBERG:  I did not. I didn't know you moved here,

22  I thought you were in the house.

23       A.    (Laughter)  Well, you know, when we first moved

24  here and we had the ramp built out front and we didn't have the

25  retaining walls up.  Okay, we had that big rain and the first

COPPERSTATE REPORTING SERVICE

68

```
 1   floor flooded and all my research -- those research papers and
 2   stuff, they're gone.  I have no clue where they are.
 3   BY MS. NICHOLSON:
 4        Q.    Do you have -- well, will you be referring to them
 5   during the course of your testimony?
 6        A.    Probably not. For what?
 7        Q.    Well, if you would be, I -- the problem is --
 8        A.    I don't even know what I wrote.  Let me see what I
 9   wrote.
10   BY MR. BLUMBERG:
11        Q.    Brad --
12        A.    Huh?
13        Q.    The defense would like copies or access to
14   anything to which you might refer during your testimony.
15        A.    I don't have -- I'm not going to refer to any of
16   that stuff.
17        Q.    Okay.  If you did, would you bring it along?
18        A.    Sure.
19        Q.    Okay.  Or give it to us earlier?  Drop it by my
20   house.
21        A.    Uh --  I can't imagine why I would even refer to
22   any of this stuff.
23   BY MS. NICHOLSON:
24        Q.    All right.  Well, I just need to know, if you're
25   not going to refer to it, you're not -- you won't be making
```

PCBG-01-07-06-0067

```
 1   references to the presentations you've done to the State Bar
 2   and the Criminal Defense Bar and so forth.
 3         A.    No.
 4         Q.    Because if we don't know what was in it, we aren't
 5   in a position to cross-examine.  So that will not be part of
 6   your testimony at all?
 7         A.    No.
 8         Q.    Okay.
 9         A.    I mean, I don't know -- what do you mean?  What do
10   you mean?
11         GALLAGHER: Have I ever asked you about it in the past?
12         DR. BAYLESS:  No.
13   BY MS. NICHOLSON:
14         Q.    Okay, I just need to know.  Okay, we're done with
15   that then.
16         A.    Okay.
17         Q.    All right.  Continuing education --
18         A.    What about it?
19         Q.    What are the continuing education requirements for
20   a psychologist?
21         A.    Sixty hours every two years.
22         Q.    And do you keep records of that?
23         A.    Of course you keep records of that.
24         Q.    Well, I'm just wondering if you've done any
25   continuing education involving any of the issues involved in
```

COPPERSTATE REPORTING SERVICE

```
 1  this case, including forensic testimony, comprehensive
 2  evaluations that have been done in this case, the diagnoses
 3  that are involved in this case.
 4          MR. BLUMBERG:  Death penalty work, maybe?
 5          DR. BAYLESS:  No.  This year?
 6  BY MS. NICHOLSON:
 7          Q.    In five years, in the last five years.
 8          A.    Right.
 9          Q.    Would it be possible to simply get a list of the
10  continuing education that you have done?
11          A.    We're only required to keep them two years, I --
12          MR. BLUMBERG:  He said he hasn't done any studies in
13  death penalty work, mitigation or any of the areas applicable
14  to this case or --
15          GALLAGHER:  She didn't say studies.  She asked has he
16  attended any continuing education.
17          NICHOLSON:  Would it be fair to say you've done none?
18  Can we just leave it at that?
19          A.    Yes.
20          Q.    You've done no continuing education on -- on
21  expert testimony, forensic examination, child abuse, capital
22  sentencing, brain development -- adolescent brain development,
23  PTSD, major depression with psychotic features, ADHD, substance
24  abuse, um --
25          A.    Are you -- are you kidding me?  You're not kidding
```

1  me, are you.

2          Q.    No, I'm not kidding you.

3          A.    (Laughter)  I have no -- you know there is -- I'm

4  -- part and parcel every workshop you go to, is going to have

5  some of the stuff in.  I mean, you say -- I mean why else would

6  we go?  I mean, there's -- obviously there's going to be -- I'm

7  interested in forensic psychology, I mean, there's going to be

8  stuff that's going to be -- probably every seminar, everything

9  I've ever gone to, there's going to be something about

10  something like that. I mean you know I'm not going there to

11  learn something about, you know, Susie Winemaker  --

12          BLUMBERG: Okay, Brad so you haven't gone --

13                  (End of Tape 2, Side 1.)

14          (Interview continues on Tape 2, Side 2:)

15      MS. NICHOLSON: This is a continuation of our interview

16  with Dr. Bayless on January 22, -- 23rd, 2007.  This is a

17  continuation of our interview of Dr. Bayless on January 23,

18  2007.  This is side number four of the interview and we are

19  continuing with the live questioning.  Bruce, you were going to

20  follow.

21  BY MR. BLUMBERG:

22          Q.    Okay.  Brad, so none of the seminars were about

23  capital sentencing and testimony with respect to that.

24          A.    No.

25          Q.    Did you attend any regarding forensic subjects?

COPPERSTATE REPORTING SERVICE

72

```
 1        A.    Of course, I did.

 2        Q.    Okay.  And so --

 3        A.    I was thinking the educational, I mean, I continue

 4   to do home study stuff also.

 5        Q.    Okay.

 6        A.    I've done a lot of that.

 7        Q.    So, you have recently studied in areas of ADHD,

 8   depression, poly-substance abuse and their effect on humans.

 9   And --

10        A.    Well, yeah, but not necessarily from -- from that.

11   I'm also writing a program right now on DUI and substance abuse

12   stuff with DUI, because we're a licensed DUI agency and we're

13   putting together a -- an educational program right now for DUI

14   clients.

15             And part and parcel, that is the utilization of

16   drugs and stuff, so I'm going -- I've done a lot of research on

17   that recently.

18        Q.    How about mitigation in sentencing?  Forget

19   capital.

20        A.    I've done it so many years, Bruce, I mean, you

21   know, I haven't really done anything recently.

22        Q.    And you might say to yourself, listen, I could

23   give this seminar just as well.  But that doesn't mean you

24   don't attend just for the credits.

25        A.    Right.  But I haven't done anything on mitigation
```

```
1   other than we had some stuff, like Jack used to -- Jack Potts
2   used to have those seminars for the forensic people at the
3   courthouse and we've done -- and there was some stuff there for
4   mitigation, we had the paperwork.  There was no paperwork on
5   where you would actually go in there and get an hour of credit.
6        Q.   So, Ms. Nicholson wants to know if there's a record
7   of what you attended on those subjects.
8        A.   No.
9        Q.   No.
10       MS. NICHOLSON:  You don't have the --
11  BY MR. BLUMBERG:
12       Q.   You don't have the literature preserved?
13       A.   No.  I said I had -- we had a flood, I told you.
14       Q.   Oh, okay, okay.  But no, we thought that pertained
15  to your old literature from your research.
16       A.   No, I'm talking about the --
17       Q.   Not talking about seminars.
18       A.   -- all my continuing education stuff, other than
19  what I've done this year, which has nothing to do with this,
20  whatsoever --
21       Q.   Okay.
22       A.   -- has been destroyed and I had a report that was
23  destroyed.
24  BY MS. NICHOLSON:
25       Q.   So, the flood was a year ago.
```

COPPERSTATE REPORTING SERVICE

74

1      A.    Yeah.  It was a year ago.  That's what I'm saying,

2  I've been trying to tell you guys, I don't have it.  (Laughter)

3      Q.    All right, I know we're going to run really -- we

4  probably got a half an hour left.  Do you have time, Doctor?

5      A.    I got an eleven o'clock appointment.

6      Q.    And then we're going to have to schedule because I

7  still, as I said, I need to go through --

8      MR. BLUMBERG:  You got to go through --

9      MS. NICHOLSON:  Dr. Parrish, Dr. Stewart --

10     MR. BLUMBERG:  Oh, yeah, Parrish and Stewart.

11     MS. NICHOLSON:  Dr. Miller and Dr. Bayless' specific

12  finding and opinions.  So, we still have -- we need to

13  schedule, more time, so --

14     A.    You love being with me, don't you?

15     Q.    It's fun. I love it.  I love it.  Okay, all right,

16  well we're going off tape.  We'll find a time to come back.

17         (End of interview)

18  STATE OF ARIZONA      )

19                 )  ss.
      COUNTY OF MARICOPA  )

20

21

22

23

24

25

COPPERSTATE REPORTING SERVICE

1       STATE VS. PAUL SPEER
2       CR 2002-09026 (A)
3       INTERVIEW OF DR. BRAD BAYLESS
4
5   PRESENT:
6
7   JG:   Jeannette Gallagher
8   DB:   Dr. Brad Bayless
9   PN:   Pam Nicholson
10  BB:   Bruce Blumberg
11  BS:   Bob Storrs

12
13  PN:      Today is Wednesday, January 24, 2007. We are seated in the offices of
14  Bayless and Associates for interviews in the matter of State vs. Paul Speer.
15  Present for today's interview are Deputy County Attorney Jeannette Gallagher,
16  Bruce Blumberg and myself. And we're here for a continuation, this is day three
17  of our interviews of um Dr. Brad Bayless. Thank you for joining us once again,
18  uh, I should say --
19
20  DB:    -- Alright --
21
22  PN:      -- for allowing us to join you once again Dr. Bayless. I'm when we
23  wrapped up yesterday um I told you that the...areas that I wanted to um conclude
24  with...we're talking about um your...your professional opinions as well as your
25  assessment of Dr. Parrish and Dr. Stewart's opinions. And so I'm wondering if
26  perhaps we could um....start with your opinions your overall opinions and the
27  bases for those opinions and then I'd like to move on and um...I'd like for you to
28  explain to me um how they contrast with what the other two doctors have
29  concluded. So um...overall um...I have carefully looked at your report. And
30  um...let me begin by asking just is your report...does your report contain
31  your...the entirety of your opinion in this case? Or do you have additional
32  opinions about Paul Speer that are not set forth in this report?
33
34  DB:      Uh I don't know unless...I would assume that it...it certainly covers what I
35  think about Paul Speers. But I don't know about additional opinions concerning
36  him. That depends on what questions I'm asked in court I guess.
37
38  PN:    Well...
39
40  DB:      Whether or not I have an opinion about something. But I can't say what
41  that is unless I'm asked a question, I have no clue.
42
43  PN:      Right well let me ask it this way. Um...you...you undertook a
44  psychological evaluation?

1

1
2  DB:  Right.
3
4  PN:  And with respect to the evaluation that you undertook and...and let me go
5  back to...let's...hello Bob.
6
7  DB:  Hi Bob.
8
9  JG:  Mr. Storrs is now joining us.
10
11  BS:  And it's my pleasure.
12
13  JG:  It's 3:20.
14
15  BS:  Is it?
16
17  BB:  Well you know what Mr. Blumberg was late, too.
18
19  JG:  Well we didn't get started until late.
20
21  PN:  Okay you know what; we don't need to have the attorneys (inaudible) on
22  the tape (laughing). Let's go back when you...when you um undertook this
23  evaluation you indicated previously that um you essentially defined the
24  perimeters of the evaluation. Is that correct?
25
26  DB:  Pretty much yes.
27
28  PN:  Okay. Um...and so with respect to the parameters that you chose you feel
29  that this was a sufficient assessment for you to render an opinion on Mr. Speer I
30  take it?
31
32  DB:  Yes.
33
34  PN:  Okay um...and so I presume that you would have done additional testing
35  um had you felt that additional testing was necessary in order for you to render
36  an opinion is that correct?
37
38  DB:  If I found something that was necessary for me to do additional testing....
39
40  PN:  Yeah if you felt it was appropriate. So the testing that you did you thought
41  was sufficient to render the opinions that you've rendered here.
42
43  DB:  Exactly.
44

2

PN:     And so the opinions that are set forth in this...this report then um...are basically the opinions that you've formed about this...about Paul Speer. Is that accurate or no?

DB:    Yeah...well again you're asking me whether or not...I think the original question was whether or not I had any other opinions about Paul Speer that are not in the body of my report. And I'm saying that I don't think I do but if somebody should ask me a question that I can answer based on my review that I possibly may have overlooked then...whatever...I don't know. But uh...that I didn't write about that I feel confident to answer....I...I certainly will answer it in court.

PN:    Okay.

DB:    If no one asks any other questions than I certainly won't answer it. But I'm not volunteering anything that is not in my report; I'll put it that way.

PN:    Okay alright but you might volunteer things that are not in....or you might um....might add additional things that are not in your report if you were...if you felt so inclined to embellish?

DB:    Well...if I'm asked to embellish and to...to extraculate on a matter I'm certainly...typically I'm...sometimes my brain works well enough to do that.

BS:    Right now do you have opinions that aren't in your report?

DB:    That I...right this minute...not unless you ask me specific questions. I mean I...I...I don't know...I have no clue what...what areas I would go into now.

PN:    But you are the expert here so we're relying on your opinion.

DB:    I understand that but uh in order for me to give you that opinion I have to be asked a specific question that tells...that gives me a hint to what you're speaking too. My reports stands by itself. I'm not trying to be...be evasive here Bobby, okay? I'm really saying that my opinion is that Mr. Speers suffers from a dysthymic disorder. I think it's been going on, probably substance dependence and antisocial personality disorder. Um I...that's my opinion at this point and time.

BB:    Can...can I throw in a question? How does dysthymic disorder differ from major depressive disorder?

DB:    Significantly. A dysthymic disorder is more of an endogenous or what we call a...a depressive kind of overlay that happens that...that there and is chronic usually has to be around for two years durations. Um major depressive disorder is more severe. And uh usually typically more...more acute to have a major depressive disorder similar to like an episode of major depressive disorder. Um...um but recurrent um...there is a much more

1    intensiveness...intensive...intensification of the depressive symptoms with a
2    major depressive disorder to the point possibly of hospitalization and psychosis
3    to a stuporous non vegetative...vegetative type state.
4
5    BB:    Can one who suffers from dysthymic disorder at times in their life suffer
6    from major depressive disorder?
7
8    DB:    Yes you can.
9
10    BB:    And do they people with dysthymic disorder are they more likely to suffer
11    from major disorder than somebody who doesn't suffer from dysthymic disorder?
12
13    DB:    Not necessary...well somebody who doesn't suffer from...?
14
15    BB:    Correct.
16
17    DB:    Well yeah if you...if you tend to be depressive but obviously...
18
19    BB:    Chronically?
20
21    DB:    Chronically depressed than you know...well chronically depressed mean
22    that your depressions last in over a two year period. Um...that you have a higher
23    percentage chance of if something happens in your life or whatever to have a
24    major depressive episode than someone who has...who does not have chronic
25    depression yes.
26
27    BB:    And...and I didn't read about this Brad so it's not...
28
29    DB:    I understand what you're saying.
30
31    BB:    Right okay.
32
33    DB:    I'm just pointing (inaudible).
34
35    BB:    But the thing is like for a major depressive disorder do you have to undergo
36    some sort of event...traumatic event or can you just be overcome to have the
37    symptoms of a major depressive disorder and not be dysthymically depressed
38    person?
39
40    DB:    Yes that can happen.
41
42    BB:    Does it have to be triggered by a...an event?
43
44    DB:    Um...usually by an event or a series of events. That can be a
45    combination or accumulation of things that...that person now looks at life through
46    a very negative review point. And they...and they just spiral downward.

BB:    Do they overlap at all major depressive disorder and dysthymic?

DB:    Well they both are both depression sure they overlap.

BB:    In the severity of symptoms I guess I should say?

DB:    Yeah I think...probably the most distinction between the two would be severity of symptoms and the intensification of symptoms I guess. And um...

BB:    Okay thank you.

BS:    And how long has Mr. Speer in your opinion suffered from this?

DB:    Well I think that he's been you know been depressed uh...for quite some time. I think that there has been a low level of depression because he's engaged in a lot of self defeating kind of behaviors for quite some time. Um...uh and...and I would imagine that you know when you look back at his history and everything that there's been a kind of depressive overlay uh in his life for quite some time. And you also find that often times with heroin addicts also. And that they have that kind of depressive kind of format.

BS:    Would you say that...uh...there were symptoms that appeared as early as 1990 in some of the evaluations that were done by Stan Kabanski and Dr. Martig in juvenile court?

DB:    Yeah I think he had some substance abuse issues back...back in that time frame. And that yeah there were some depressive...issues going on during that time.

BB:    And you should note that Ms. Nicholson asked him all about Stan Kabanski, Martig  and...as well...

BS:    And I'm going to shut up and...and let you go ahead. I just sometime I have this...

BB:    Overwhelming urge to butt in.

BS:    Compulsive....compulsive...

DB:    Impulse control...

BS:    Control disorder.

DB:    Disorder that's what I'm seeing.

BB:    (Inaudible) Mrs. Gallagher (inaudible).

5

DB:     As long as you don't go klepto so you don't have to be stealing things Bob... (Laughing).

BS:    This chair...the wheels in this chair don't work.

BB:    Right I noticed....

JG:    That's why Bruce didn't sit there.

BB:    (Inaudible talking same time).

DB:     It really doesn't...it depends on the weight in the chair. Mine is fine see (laughs).

PN:    Okay folks let's continue with this interview how about that. Um...now...you...you concluded uh...or you diagnosed Paul with dysthymic disorder and um...and I think um...your...very well aware that Dr. Stewart concluded that he suffers from uh major depressive disorder. Now um...in terms of uh the questions that Bruce was just asking you about um...some major depressive episodes being triggered by circumstances. Um...uh as I understood it you said this that yes....

DB:    It could...

PN:     Episodes can be triggered um... but isn't there a difference between a...a episode...a major episode of short duration as opposed to a longer term chronic episode of major depression?

DB:    A short duration of major depression? Like a single episode situation?

PN:    Yes.

DB:     Where they...they respond very rapidly to uh...uh psycho therapeutic intervention?

PN:    As opposed to chronic?

DB:    Uh....well there's no chronic episode of...I mean we call it reocurrent...recurrent...not reocurrent but recurrent. Um...I you know...I'm not sure if I understand your question. Is there....is there a difference between the symptom picture...what do you mean? I'm not sure if I understand you?

PN:    Well and thank you for....um...pointing out that that was not a very good question. Um....I...what I was trying to focus on was the idea that uh...some...depressive episodes are triggered by circumstances or situation. The term situational depression comes up frequently.

DB:     Well that's different than...than major depression. Situational depression is a depressive disorder NOS-type thing. Um...where a person may have lost their job or they uh lost their girlfriend or boyfriend or they you know they wreck their car.  Their brand new car. When I got my bicycle tire went flat when I was 13 years old and...and you know it was totally miserable because I couldn't afford to get another tire for my bicycle. Um...you know I mean there could be a number of different....Uh situational depression typically is just that...situational and as soon as the situation resolves itself...it's kind like an adjustment kind of situation where...adjustment disorder where as the stimulus that cause the depressive affect is removed the...the...the depression resolves itself very rapidly. Not necessarily with any kind of drugs or intervention or anything else. It's simply um...and some people refer to situational depression also as like with death and dying. But that's a little different...it's call bereavement and bereavement is stems from depressive disorder because as people go through their mourning phase or whatever and they transition out of it naturally and normally without residual problems typically. Now if do we give them to depressive disorder cause there is other things that happen (inaudible).

PN:     Right. I guess um...I...I just simply wanted to um make sure that I understood um...what...what you were describing as um dysthymic disorder. Because Bruce was asking you about certain things that could trigger episodes. And then you also described um...how um...major depression is the kind of thing where you become um...did you say catatonic or...

DB:     Well I never used the term catatonic...

PN:     No I don't mean....

DB:     I said stuporous,  you know...

PN:     Thank you...

DB:     A person may become stupor -- or vegetative, typically.

PN:     Vegetative?

DB:     Vegetative um...uh...we start seeing such things as...as being unable to function in both social and occupational environments. You start seeing things such as uh lack of body hygiene. Uh you see things such as um...um...unable to care for one's self. Not...not combing hair, not brushing teeth you know taking care of body hygiene. Withdrawal....isolation um....um...vegetative kind of activity. Um where there's a...a withdrawal...an inability to connect outside to their external environment. And...and their in a depressive uh...very...lack of energy...significant fatigue all those factors come... we're talking a very intense kind of situation. That's what major depressive looks like.

PN:      Okay, um what I'd be interested in um having you explain to me is...um...which criteria of...of um...a (inaudible) you felt were more appropriate for Paul? And what's your criteria in um...major depressive disorder you felt ruled Paul...or you felt you had...you could....it's too late in the day...uh....there's a criteria for major depressive disorder. There's a criteria for a typical...or I'm sorry um... dysthymic disorder?

DB:      There really relatively...There...if you look at the DSM, if you read it closely, the criteria is really for depressive disorder is relatively the same. I mean you get the DSM -- you got a copy of that?

PN:      Sure do.

DB:      Okay. I'll show you what I'm talking about. Um...

PN:      That's exactly what I'm getting at. I'm wondering why you concluded that Paul was um...

DB:      Because Paul was functional.

PN:      So someone with a major depressive disorder does not function?

DB:      Not well. If you look at...we're looking at essential features for dysthymic disorder is a chronic depressed mood that occurs for most of the day. More days than not or at least two years. With dysthymic disorder described here as their mood as sad or down in the dumps. Okay so here we're talking about intensification. If you look at major depression...major depression disorder....what...you got this labeled pretty good don't you?

BS:      Don't read any of my notes.

PN:      Yeah those are Bob's labels so...

BB:      Mine are printed.

DB:      He can't write anyway so... (Laughs) yours are printed in the back of the book right? Get out of here...

JG:      Did you Cliffs Notes in high school, Bruce?

BB:      No.

JG:      Okay.

DB:      He probably did (laughs).  If you look at major depression...here, "an essential a feature of major depressive disorder  is a clinical course that is

characterized by one or more, " -- also there can be some actually chemical changes in the brain from major depression, uh -- "one or more major depressive episodes with out a history of manic, mixed or hypomanic episodes." There again you're talking about bipolar kind of stuff, okay? Uh, "episodes of substance induced mood disorder," which could be happening here, okay?

PN:    Right now...uh...uh let me stop you there. When you say it could be happening here, you're saying you have to distinguish major depressive from substance abuse?

DB:    Major depressive disorder is...reads...it says here, "The clinical course that is characterized by one or more major depressive episodes, page 349," okay? "Without a history of manic, mixed or hypermanic episodes, criteria A & C. Episodes of substance induced mood disorder" --.

BB:    -- But that wouldn't be major depression.

DB:    Exactly. "Due to direct physiological effects of a drug of abuse, a medication or toxin exposure or of mood disorder due to a general medical condition do not count toward a diagnosis of major depressive disorder. In addition, the episodes must not be better accounted for by schizoaffective disorder and are not superimposed on Schizophrenia, Schizophrenifom Disorder, Delusional Disorder or," yah da,da, da, da. So now --

BB:    -- You know the transcriber is going to have a very tough time --

DB:    -- Well --

BB:    -- But I understand what you're doing.

BS:    Can you spell yah da,da, da, da?

PN:    Well...

DB:    I mean if you read through this you know you began to see that there is a distinguish 349 should be uh...a distinct difference between major depressive episode...and here it is here: "The essential feature of major depressive episode is a period of at least two weeks during which there is either depressed mood or a loss of interest pleasure in nearly all activities. In children adolescent the mood maybe irritable rather than sad. But an individual must experience at least four additional symptoms drawn from a list that includes changes in appetite, weight, sleep, and psycho motor activity, decreased energy, feelings of worthlessness or guilt, difficulty thinking, concentrating or making decisions, or recurrent thoughts of death or suicidal ideations. Plans or attempts to count to a major depressive episodes the symptoms must be either a...must be either new...newly present or must have been clearly worsened compared to the person's pre episode status.

1
2   PN:   Okay.
3
4   DB:   So I mean...
5
6   PN:   I've got...
7
8   DB:   You understand where I'm going with this? I mean there is no evidence
9        that any of those things were happening with Paul and there is no evidence of
10       major depressive episode with Paul during the time which I've read about him or
11       that I saw him in...in the jail. I do not believe he suffers from major depression. I
12       don't believe he can substantiate he suffers from major depression. And I won't
13       offer it as a diagnosis.
14
15  PN:  You won't offer?
16
17  DB:   That's exactly what I said.
18
19  PN:   Alright. Um...now...
20
21  DB:   And I suggest that you don't either (inaudible).
22
23  PN:   No...
24
25  BB:   We put that in the margin.
26
27  DB:   You put it in the margin? Okay good.
28
29  PN:   Um now the major depressive episode is an episode that it can last for a
30       limited period of time where as the um, dysthymic disorder is of a longer duration.
31
32  DB:   Well no, dysthymic disorder has to...in order for you to meet the criteria
33       for dysthymia it's got to have a two year duration.
34
35  PN:   Correct.
36
37  DB:   But major depressive episode can last for two years.
38
39  PN:   It can.
40
41  DB:   But it would be recurrent at that point. It would not be a single episode.
42
43  PN:   Um...
44
45  DB:   It can keep going.
46

10

PN:    Right.

DB:    Okay.

PN:    Alright um now...you seem to um...to actually ridicule um Dr. Stewart's um conclusion that Paul does indeed suffer from a major depression...depressive disorder with um...

DB:    Well....

PN:    psychotic features you...uh but you keep referring to it as major depression with psychosis. I believe the actual...

DB:    Well major depressive episode with psychosis or major depressive episode with psychotic features uh if you look at the DSN it's with psychosis....if you want to say with psychotic features...I'm not sure what he means by that. If he means that he has psychotic type symptom pitch symptom...symptomlogy that is going along with the depression, is that what he's saying? Um...I'm not sure what....where he's going with that.

BB:    (Inaudible talking).

DB:    Well that's what she's asking about. I mean I don't know what that...means.

PN:    No well I'm just trying to understand um you evidentially dispute that um vehemently because it...I note that...easily a half dozen times you...you were adamant that there is no evidence of psychosis whatsoever. Now um...

DB:    Well...there....Mr. Speers has been seen by several different people. Not...not...all of whom have been well seasoned. Uh...uh people...professionals, not just me. In all the people that have seen him...all of them except for Dr. Stewart, Toma, Potts, DeLong, myself, Kabanski, go back to his juvenile history years, Martig, all the people who have seen him. Even your people (Inaudible) no one except him talked about psychosis or psychotic features. I haven't seen any psychotic features. Um...it's amazing to me that, well not amazing to me but it is...it is unrealistic to that only he had the insight to see this number one. Number two it didn't show up on any testing. It never showed up at any form whatsoever and Stewart did not use any...any psychological testing. He just came up with this. I don't know where he came with it from,  but there was no evidence of that whatsoever during my interview. During anybody else's interview the (inaudible) interview. No one said he was suffering from psychosis.

PN:    I...I....let me...you said it didn't show up on any of your testing anywhere?

DB:    There's no psychosis, no.

PN:     Well I'm wondering are there...well a whole variety of scales virtually none of which um...do I understand. But are you telling me that on the MMPI,  that you...but let me finish. But on the MMPI that...that there was no evidence on any of the MMPI scales of um...any sort of um....disordered thinking or psychosis?

DB:     That's correct.

PN:     No where?

DB:     What do you mean no where? There's...there is no diagnosis that one would make from the scores that he made of psychotic thinking.

PN:     I...well I was asking if there was any evidence that would suggest?

DB:     Well...let's go back and look. I don't know. But I don't think so.

PN:     In particular I was curious about page three of your report.

DB:     Of my report?

PN:     Well it was the report that was generated from the MMPI.

DB:     Okay.

PN:     And under clinical presentation two thirds of the...way down this page it talks about  cognitions?

DB:     Where...page?

PN:     Page three....

DB:     Oh cognitions, okay.

PN:     Now um...that paragraph about difficulty concentrating....

DB:     Uh-um.

PN:     Exhibiting poor judgment...

DB:     Uh-um.

PN:     Unpredictable, impulsive...

DB:     Uh-um.

PCBG-01-07-07-0012

PN:   Things (inaudible) about things he knows but have kept to himself. (Inaudible) that things are not real.

DN:   Uh-um.

PN:   Worried that there is something wrong with his mind.

DN:   Uh-um.

PN:   Hyper vigilant.

BB:   Low esteem.

PN:   Suspicious of motives of others.

DB:   Uh-um.

PN:   And these symptoms may reflect a psychotic process.

DB:   Uh-um. It may but there isn't.

PN:   There isn't?

DB:   No.

PN:   Okay so but...

DB:   Do you know why?

PN:   As I understand it this is a...your test results were generated this diagnosis right?

DB:   No...no....

PN:   Generated this report?

DB:   This is one test okay number one. Number two off of the MMPI, if you look at the...you didn't look at the "F" score did you?

PN:   Well maybe you can tell me what I should look at.

DB:   Yeah you should look at the "F" score because the "F" score is elevated which says...which is symptom exaggeration on "F" and "FB" we have an elevated score.

PN:   Can you tell me which page we're looking at because I'm...I ..

DB:     Page five.

PN:     Page five.

DB:     Okay and page seven.

PN:     Okay now...

JG:     Oh...

PN:     Page five the "F" score under the validity scales?

DB.     Right.

PN:     And....

DB:     Number 67 this is elevated.

PN:     Okay.

DB:     Okay and...let me look...take a look at "FB" on page seven.

PN:     Uh-um.

DB:     Okay. And you got a "FB" at 75 there also okay.

PN:     And what does that mean?

DB:     That's elevated. 65 is critical and that means he's got an elevated "F"
score front and back which means he....there is symptom exaggeration here.
Which is consistent with what George...uh I believe it was George DeLong
or....was it George DeLong or...George DeLong...it was George DeLong, Potts
and Toma who saw him and that were uh talked about his...his symptom
exaggeration and malingering index. And so what we have here and...even if you
take a look at his...scores of 4, 8 and his clinical scales of 4, 8 which 4 is
psychopathic deviancy and 8 is schizophrenia but 8 does not necessarily mean
schizophrenia. It means he has bizarre thinking processes (inaudible). Uh those
are...that's probably one of the most pathological profile that one can obtain. As a
matter of fact and I can get some of those texts to show you what I'm talking
about if you like.

PN:     Um if you could just provide me with the citation to (inaudible) that would
helpful.

DB:     No problem.

14

JG:   I'm going to pause mine.

BS:   Please.

(Pause the tape).

PN:   Okay you were kind enough to go and grab some texts. If you could tell us what the names of the texts are and the uh....

DB:   Sure.

PN:   Authors and the edition that would be helpful.

DB:   Okay MMPI2 assessing personalities and Psycho pathology...John Graham who is one of the original authors of the MMPI and let me see what I can find here.

PN:   And what...year is that or what edition?

DB:   3rd edition.

PN:   Thank you. And...and what you're looking for right now is...?

DB:    Four eight code type.

PN:   I'm sorry?

DB:   The 4-8 code type.

PN:   Oh I'm sorry thank you.

DB   …..here it is (inaudible).

BB   Oh where'd you buy that book?  I have that book, I think.

DB   Oh.

BB   I u, I had it before.

DB   Did you read it?  Want me to read it to you?

PN   Now if you could just um, just tell me, no I'd prefer that you not read it, if you could just tell me to sort of in brief summary what the point is that you're…..

15

DB  Well the point I'm trying to make is that uh, that four eight code types, okay? Are individuals who are fairly or very erratic, unpredictable. Uh, have marked problems with impulse control, uh, they don't, they do not profit from their mistakes, they tend to be angry irritable, resentful, act out in asocial or anti-social ways.

PN  Uh, excuse me, just and I apologize from interrupting but a lot of that is in, is generated in your, in the program that generated this report, it's pretty consistent, I, what I'm trying…..

DB  …..yeah…..

PN  …..I, what I'm trying to…..

DB  …..well consistent across, across the board at a four eight uh and you got a high f of symptom exaggeration it makes him more pathological and uh, it says that this person is being, ya know, not psychotic, they are um, um, anti social. In which case it would've said. And then you got Roger Green's book which is…..

PN  ….Roger Green?

DB  Roger Green.

PN  Mmm hhh.

DB  Um, MMPI two and MPI. Interpretive manual, you've got the clinical handbook by and long clinical interpretation. by, by Dolstrom, Welsh and Dolstrom, um, put out by Minnesota.

JG  Wait, hold it.

BB  You don't have to stop yours.

JG  Okay.

PN  The continuation of my interview of Doctor Brad Bayless, uh, this is side number two. Um, uh, Doctor Bayless, you were just talking about the, the three different volumes, now are any of those the, the secret volume, that the…..

DB  …..secret volume…..

PN  …..that the general public cannot have access to, that only the.

DB  I don't ….

| | | |
|---|---|---|
| 1 | PN | …..the members…… |
| 2 | | |
| 3 | DB | ……I don't know, you know that you can actually get your hands on, I |
| 4 | | don't know if you can get them in a library anywhere.  Um, you might be |
| 5 | | able to get them, I'm sure that your, your experts will have copies but um, I |
| 6 | | don't know. |
| 7 | | |
| 8 | BB | Some of them they can't share with us either. |
| 9 | | |
| 10 | DB | Huh? |
| 11 | | |
| 12 | BB | I'm not sure they're supposed to share the MM -- one or more of those |
| 13 | | books. |
| 14 | | |
| 15 | PN | That, that's actually what I was getting at, are you, are those, are any of |
| 16 | | those the book that is actually the book that is used for purposes of…… |
| 17 | | |
| 18 | BB | ….interpretation? |
| 19 | | |
| 20 | PN | Interpretation. |
| 21 | | |
| 22 | DB | They all three are. |
| 23 | | |
| 24 | PN | So are any of those books, books available to the general public? |
| 25 | | |
| 26 | DB | I don't think so, I don't know. |
| 27 | | |
| 28 | JG | But Bob you said you had one. |
| 29 | | |
| 30 | BS | I think I had one, it may have, somebody may have, some psychologist, I |
| 31 | | think may have bought it for me though. |
| 32 | | |
| 33 | DB | Yeah, I think I heard that before, too. |
| 34 | | |
| 35 | BS | You do have one, right, Jeannette? |
| 36 | | |
| 37 | JG | …..oh….. |
| 38 | | |
| 39 | BB | Who did that? |
| 40 | | |
| 41 | BS | I can't answer that. |
| 42 | | |
| 43 | BB | We may not recall. |
| 44 | | |
| 45 | PN | Um, in any event Doctor Bayless um….. |
| 46 | | |

PCBG-01-07-07-0017

BB      ....that's bad.

BS      He's not authorized to recall that information (inaudible) I think the (inaudible) secret books (inaudible).

PN      Now one of the things that I, I was a bit confused by, is um, you were just talking about a four eight for purposes of the transcript, I'm going to explain then, it's four dash eight the numbers.

DB      Mmm hhh.

PN      The numbers, uh, the four eight code type and that's what's generated in the report that's generated.

DB      Mmm hhh.

PN      Now in the report that you dictated you talk about a different code type. You talk about a four six code type and that's what's referred to in your report.

DB      Four six and four six two yeah, but see here, four eight, four six there, kay (inaudible).

PN      Right, let me show you here, what I'm, maybe I'm confused and not understanding.

DB      Mmm hhh.

PN      On page eight of your dictated report.

DB      Because, hold on a second, I'll tell you why I did that.  His profile's a four six, see that?  Six four, four six two, the best fit, fit profile which is what this generates, okay is a four eight, four eight six, but his actual client profile's a four six is what I, which I used as his profile, which is his profile.

PN      Alright so, we're, now we're looking at page two of the computer.....

DB      .....right.

PN      Of the computer generated report.

DB      Right.

PN      Alright.

DB    And what, what it does it takes a look at all the different variables and discriminate functions and (inaudible) index numbers and it comes up and says okay, overall look in overall, his overall scores and everything, this is computer generated, his best profile, the best fit for the prototype for this individual is more of a four eight than it is a four six, even thought it has concombinant six on the end. Do you see that? But in order, what his profile is, as I stated in my report, wherever that is, I stated he has a four six profile, did I not say that, that was his profile, that's what.....

PN    .....in your dictated report you call it a four six.

DB    .....four six, right. Okay.....

PN    .....in.....

DB    ..... but if you look at four six, a four eight, an interpretation of each, it's not any different actually. One is more suspicious than the other but you have a four eight concombinant six, look at the scores clinical scale scores on four eight and six. If you look at the highest scores. okay so that you can understand this, here's four.....

PN    .....right, just for purposes of my transcript we're looking at page two.....

DB    ..... page two.....

PN    .....of the computer generated report.

DB    Alright, page, I mean four is a hundred and two. Look at that, okay?

PN    Alright so, what we're doing is we're at the middle of the page where we have client's profile (inaudible) profile, prototype profile.....

DB    .....uh, you're, you're.....

PN    .....and then we're down here.....

DB    .....your analness is driving me crazy.

PN    No, it's, I'm sorry when I go back to read this doctor, I'm not going to know what you've been telling me.

DB    Alright, you've got a four, hundred and two, t score.....

PN    .....mmm hhh.....

DB  .....highest score, alright, boom four.  Okay, what's the next highest score on that profile?  Ninety four.....

PN  .....mmm hhh.....

DB  .....six.

PN  So that's scale number six?

DB  It's scale six.

PN  It's a ninety four.

DB  Ninety four, so you got a four six, two point code profile.  Okay, what is the next concombinant highest score?  Two, eighty-nine.

PN  Alright.

DB  Okay, got it?  Now, what else do you have there that is also above sixty five, almost everything is elevated except for MF and SI which is social (inaudible) that means he is more extroverted not introverted, okay?

PN  Alright.

DB  So, if you look at everything on there, everything is elevated, why is everything so elevated above a scale score, critical score sixty five?  That's because you have a high F and high F B so everything's pushed up.  Okay?  Because he's endorsed a lot of different symptoms, but his endorsement is also going along with three, these three scales, now if you look at the, the computer says his best fit, fit profile, best fit for his profile is these scores over here.  Okay?  It's a four which is eighty six, right?  An eight which is eighty seven, see that?  And I concombinant six which came in at an eighty.  They say from a statistical stand point this is his best fit profile, okay?

PN  You know what, I need for you to explain to me, the difference between these two columns and why you're saying the computer says this is the best fit but you're saying......

DB  .....it's a prototype, it's a statistical prototype, they do it based on discriminate function, um, this is the statistical analysis process I don't know, I don't know how else to explain it to you.

PN  Alright, so basically are you telling me that the prototype is well......

DB     ....the prototype is not his profile, the prototype is what the computer says
       most likely he will react, how he will be so to speak.  Okay?  Given all the
       scores con, together, take in consideration, the validity scores and
       everything else, what the computer says, you know, prototype-wise, he
       most likely is going to be like this more so than like this. Even thought
       they're both very, very close together.

PN     So the computer is saying he's more likely to be.....

DB     .....a four eight.

PN     A four eight?

DB     MMM hhh.

PN     You.....

DB     .....his actual scores......

PN     ......alright, his actual scores are.....

DB     .....his actual scores.....

PN     .....four six.

DB     Are four six.  And if you look in the extended thing which I score also, here
       is his actual scores and you look at it and here is a four and the six, you
       see the two highest scores there?

PN     N, I understand that.

DB     Okay.

PN     Uh, what I'm trying to understand is um, the prototype versus the actual
       scores.

DB     The prototype is a statistical analysis saying that most likely this person's
       going to behave like, more like a four eight than he is a four six.  But if you
       look at a little close, it's a four eight six.  You see what I'm saying?  Four
       eight four eight six, four eight, eight four six, I think it has on there, right?
       Okay, so he's gonna be, those are the three, three areas that, that we see
       elevated and, and so there really isn't a whole lot of difference between
       the two so you're not gonna see a major problem with that but many times
       you'll see things like the  person may have a one, one, one, one three two
       profile, so they'll say one, one and then a two is down here and a three but
       they really because of where their scores lie at and because other

1   concombinant scores on there they more likely will show more depression
2   than what is indicated on the profile so the prototype may say he will most
3   likely be a two one three or two one five or two one six than he is that.
4
5 PN You know I gotta, I gotta be honest I'm not following that at all so what I'm
6   gonna…..
7
8 BS …..are you talking about points on a graph? 'Cause earlier you were
9   pointing to a graph and you guys didn't describe it.
10
11 DB I'm trying to explain this to you, in a, you know without you taking MMPI
12   course it's kinda hard for me to tell you how this, the MMPI has ten clinical
13   scales and three validity three validity scales, actually, okay? Along with
14   that it has a number of other supplemental scales and each one of each
15   scales. If you look at all, and also with the validity scales you can have
16   the trend (inaudible) and F B. Okay, which is their backside of F. Okay?
17   (Inaudible, sounds like: "ventren") are your consistency indicators. If you
18   look at the overall, general, in the old days we used to look at, just at the
19   clinical profile. The ten (inaudible) scales and three validity scales and
20   that was it. We didn't look at anything else. Now we've become
21   sophisticated because we've got computers and we've got a new scoring
22   techniques and what have you. With the new scoring techniques, they,
23   they're looking at all the different, if you look at the different functions here
24   in terms of the discriminant function. They're adding in colins, index and
25   deviations squared and they, and they look and they say okay, four six, six
26   four what's the score, then they gotta probably (inaudible) what's the
27   probability, it's a point six nine probability of a hit on that. Code type, four
28   six, six four three point nine nine nine. So you look at all these different
29   statistical correlations, the computer does this. I don't do this and then it
30   would take me too long to do this. And they said you know, overall his
31   best fit is a four eight six out of all of this calculations. That's what they're
32   saying. His clients profile is a four six with concombinant two. That's what
33   his scores are but they're saying this is a better, best fit. Now when they
34   do a best fit, they will score the best fit.
35
36 PN Okay, I need to understand one thing.
37
38 DB I can score the other one if you'd like. I mean it's no problem.
39
40 PN I'm just trying to understand what's here, okay?
41
42   (Inaudible – people talking)
43
44 PN But if I understand it there is, there is raw data where Paul actual filled out,
45   a, a test form, right?
46

22

| 1 | DB | Mmm hhh. |
| 2 | | |
| 3 | PN | Um, filled in the little boxes or whatever. |
| 4 | | |
| 5 | DB | Right. |
| 6 | | |
| 7 | PN | And then that gets run through computer and then the computer generates |
| 8 | | this report. |
| 9 | | |
| 10 | DB | Right. |
| 11 | | |
| 12 | PN | And then this report looks at all the answers that were given and it tells |
| 13 | | you whether or not, number one he answered all the questions. |
| 14 | | |
| 15 | DB | MMM hhh. |
| 16 | | |
| 17 | PN | Did he? |
| 18 | | |
| 19 | BB | Yeah, sure it's on the back. |
| 20 | | |
| 21 | PN | How long does it take to fill out this.  How long does it take to take this |
| 22 | | test? |
| 23 | | |
| 24 | DB | Uh, it depends on how well you read two hours two and half hours. |
| 25 | | |
| 26 | PN | Okay, um did he take any breaks? |
| 27 | | |
| 28 | DB | He could've.  There's no additional time limit on it? |
| 29 | | |
| 30 | PN | I'm just wondering did you supervise him? |
| 31 | | |
| 32 | DB | Yeah, I sit there with him but I don't remember if he took any breaks or |
| 33 | | not. |
| 34 | | |
| 35 | PN | Okay, in any event he completed it. |
| 36 | | |
| 37 | DB | Mmm hhh. |
| 38 | | |
| 39 | PN | Okay so that data goes into the computer and the computer generates this |
| 40 | | report and the computer says that there's this profile that's specific to him |
| 41 | | but they think that, but the computer program that you use and are there |
| 42 | | different programs by the way? |
| 43 | | |
| 44 | DB | No, the same programs, everybody uses the same programs. |
| 45 | | |
| 46 | PN | There's only one program available? |

23

DB      Well I don't know about one program, there's all, there's different
        programs but you're gonna come up with the same, the scoring system
        has to be the same.

PN      Okay, so every program is going to pick up the (inaudible).

DB      There's a (inaudible) yeah, this comes on, my program comes from
        Minnesota uh, is licensed by Minnesota, um, there's one, there's a
        Minnesota report I believe there's one other one, there's three, three or
        four of them but if, no matter how you plug it in you're gonna come up with
        the same numbers.

PN      Okay, it'll be the same......

DB      ......I can score this by hand, I come up with the same numbers.

PN      Okay, I'm just wanna make sure I understand that, now.....

DB      .....just take me a hell of a lot longer to get there.

PN      Alright, alright, bottom line is the computer says that the best fit is the four
        eight?

DB      Mmm hhh.

PN      But the raw data generates a four six score.

DB      Right.

PN      Am I getting it right?

DB      Yeah, yeah.

PN      Okay, um, now I know you've explained this once already but I, I
        apologize, I'm not fully understanding why the computer says that it's best
        fit is more accurate than the, the score. The raw score.

DB      It didn't say it was more accurate.

PN      Why does it say best fit?

DB      Best fit meaning that given all the discriminant functions, given all the
        statistical analysis and everything that that, the computer sees this as, if
        you look at overall everything that he most likely will react from a clinical
        standpoint react more like a four eight than he's gonna react at a four six.

PN    Okay.

DB    That's all.

PN    Alright, so um, so you…..

DB    That's based on all the different scores.  All the supplemental scales and everything else.

PN    Alright.  If the computer said that, that he is most likely to react like this.

DB    Mmm hhh.

PN    Um, you nevertheless seized on the four six as opposed to the four eight.  Now, I'm, please just help me to understand this.

DB    I said…..

PN    …..please don't, I…..

DB    …..I'm not, I'm not laughing because if I had ju, if I had a put four eight in there you'd just say just the opposite why did I jump on the four eight and…..

PN    …..no, I'm trying to understand…..

DB    …..I'm saying the four six is, is the actual, if I had scored this myself by hand.

PN    Mmm hhh.

DB    I'd a came up with a four six profile, okay?  I would've came up with these numbers here, I would not have had these numbers 'cause I, there'd been no way I could've generate those without a, a, a major statistical course that I'd need to take and, and work and get all these numbers and everything, there's no way I could do that.

PN    But the prototype is something, is a feature of the program that actually let's you know…..

DB    …..mmm hhh.

PN    The kinds of…..

DB    …..mmm hhh.

25

PN      .....of uh, the just sort of the larger picture of the person that you're gonna be dealing with or the larger picture of that person who just generated those scores, right?

DB      Right.

PN      So.....

DB      .....this give me more data to look at.

PN      Okay, okay.

DB      Okay?

PN      Alright.

DB      I mean that's basically what it is.  I mean it gives you more data to look at, they give you a print out, we can print, it automatically prints the best fit prototype.  We can have the computer print out the four six prototype, that's not a problem.

PN      Okay.

DB      Okay, either way it doesn't make any difference but those two prototypes are not that different.  I mean ....

PN      .....okay.

DB      If you look at and let me, let me get, since we're on this and since it's what you want to understand, actually, going with a four eight probably is a little four six code type, classic four six, six four code types are angry, resentful, argumentative individuals who are difficult to interact with personally or socially because of these characteristics.  They are usually are able, usually are able to control the act now to their hostility but do exhibit vio, violent outbursts on occasion.  They will externalize blame for their anger, they offered, often express rather vague, emotional, physical complaints and they resort, report feelings depressed and anxious.  They are suspicious of motives of other people and are likely to paranoid features should be examined closely and it goes on and on and on about how they can become very, very bad people.

PN      O, okay, alright, um, what, I am not familiar now with this program, I'm not even familiar with the scoring and so that's the reasons why I'm asking.

DB      Okay, I understand, I understand.

PN    There are two sets of scores, I'm trying to understand the difference.....

DB    .....mmm hhh.....

PN    .....between the two sets of scores......

DB    .....I hope I'm helping you out here.....

PN    .....yeah and you are.

DB    Okay.

PN    I'm wondering, you, you keep saying that they're different but they're not all that different.

DB    Mmm hhh.

PN    Um, I'm wondering, number one, is it possible to get the information, that from the sheets or the pages, the specific pages that describe these, these particular um, profiles, number one out of there, just so that we're all on the same page, rather than reading it into the transcript because the, reading it to the tape recorder but the reality is, it's not all gonna come out right when it gets typed up anyway.

DB    Oh, are you sure?

PN    So I was just wondering if we can copies of your pages, please?

DB    Well.....

PN    ......(inaudible).....

DB    ......my baby......

PN    .....(inaudible).....

DB    .....he already said, I couldn't, he couldn't get copies of my pages.

PN    No, please, please?  Just those two profiles and here, here's another question that I have that I need to understand, um, I understand that these are not um, that the profiles are a starting point, um, in that you then take the pro, you then take these numbers and you evaluate them in the context of the person, the background cri....

DB   …..right, no decision should be made solely based on the, on the result of any examination or test.

PN   Okay, so can you tell me how, just how you arrived at the big picture in this particular case because you, you have this test.

DB   Mmm hhh.

PN   And now this, even this test has to be in, informed by the individual's background, does it not?

DB   It has to be in, what, I'm sorry, I don't understand.

PN   That, you….

DB   …..why do I think it matched up to the individuals background, (inaudible) you looked at that data as part of my, the total diagnostic picture, is that what you're asking?

PN   Well I'm wondering, if, if, when you, you used this as a, as a diagnostic tool.

DB   Right.

PN   And, in connection with using as, as a diagnostic, it's part of what has to factor into your diagnosis is the individual's history.

DB   What?

BS   Wow.

DB   You're gonna knock the table over, Bob, Jesus Christ.

BS   Well my knees are bad.

DB   This table'd flip. You see it move? Hey, this table is going to fall over here.

BB   It is, I think you need a new one.

BS   Yes?

BB   Yeah.  Pull it, Bob.

BS   Get your chair off, Jesus Christ.

GG   Your chair is pushing the table, it's stuck.

BB    You can't get your chair under the table by the way.

BS    Oh, you saved my life.

GG    You're gonna kill him first with the table.

BB    Well you gotta, I swear to God, I can't take you anywhere.

BS    You can't put your arms of your chair under the table.

BB    I think the table's about ready to fall.

PN    Uh, yes (inaudible).

BS    No, I that, I measured that I think (inaudible) in about five seconds when
      we went over the scale (inaudible).

DB    Alright, come on.

PN    Alright, let's go back. Um, I'm just trying to understand.  Basically you
      concluded that you were going to use the four six scale.

DB    That's, that is the client's profile, okay?

PN    Okay, or that profile and that profile, you chose, you preferred over, you
      prefer to use over.....

DB    .....(inaudible) that is his profile, the, the best fit is a statistical prototype,
      it's his prototype.  It's not, that is not his profile, it's, it would not be kosher
      for me, kosher, right for me to put in a four eight profile when he is in fact a
      four six.  That is his prototype, that is what he scored.

PN    Okay, alright, I need to go take a class in MMPI, that's all there is to it.

BB    Okay. We're talking about our doctor's reports.

PN    I was going to do that, Bruce. Um....

BB    .....don't you use air conditioning in the building or is it because the recent
      upsurge in temperature, that?

BS    I like to make you sweat and I like to make you (inaudible).

BB    I'll know next time to do it on my terms 'cause the Luhrs tower really looks
      after us.

BS      Yeah and I, and I enjoy making you uncomfortable.

BB      Okay.

PN      Alright, um.

BS      It should kick on in a minute.

PN      Let's talk about Doctor Par -- or actually I wanna talk about Doctor
        Stewart first, um......

DB      ......okay.

PN      You, you in, when we were talking about um, the psychotic features that
        Doctor Stewart observed, um, you, you said that he had not done any
        psycho metric testing.

DB      Not that I'm aware of.

PN      Um.....

DB      .....I never saw any.

PN      Now, is psychometric testing necessary to make a clinical observation of
        um, evidence of psychosis?

DB      No, it's not necessary to make a clinical observation of, of psychosis but
        typically if you have psychosis, then it's going to show up on psycho
        metric testing and also other people, other examiners are going to see it,
        not just you, uh, this doesn't come one day and goes away the next.

PN      Um, so you're saying that any time an individual is, is exhibiting signs of
        psychosis it's going to be over a long period of time.

DB      Well unless you know something different about psychosis than I do, and
        there could be, there's been called brief reactive psychosis which we um.
        which is uh, a very temporary psychotic state which is a kind of rage
        reaction kind of stuff we're not gonna use anymore but, um, if you're
        talking about psychotic features then it is very unusual, I would say I have
        never seen it, I've never seen any literature anywhere, where it happens
        on one day and one day only or two days and two days only, I've just
        never seen that.  Um, he's been examined by multiple doctors and Doctor
        Stewart is the only one that saw the psychosis?  No one else mentioned
        psychosis whatsoever and he, and I certainly saw no psychosis and he
        even opined that the reason why he didn't talk to me because he was

GG    That's a yes?

DB    Yes it is?

PN    Do you also disagree with his diagnosis of PTSD?

DB    Uh, yes I do, and vehemently, even more vehemently than the, than the
      psychosis part, um, he didn't even say anything about PTSD until after Dr.
      Parrish had mentioned, said I don't know why, I don't why he came up
      with PTSD and all the sudden Stewart came up with it. I thought that was
      pretty convenient um, no one else has even talked about PTSD, again
      PTSD is a very um, uh, severe anxiety disorder that I cannot imagine with
      the quality of examiners that have seen this individual that no one, no one
      including myself saw any hint of PTSD with this boy.

PN    Let me go back and you talk about the quality of examiners. I understand
      some very fine doctors had seen him, um, but the doctors that did the
      evaluations in connection with the Rule eleven, were not doing a full blown
      uh psych evaluation, were they?

DB    They, they were doing an examination of a patient and if there was
      evidence of PTSD they certainly would've seen it number one, number
      two, Stewart did the same thing. I mean, if, did he do a thorough
      evaluation, he didn't do any testing or anything and um, Doctor Toma did
      and so did Doctor Delong and.....

PN    .....you know what, I'm not following, who did you say.....

DB    .....the only person I know that didn't do any testing was Jack Potts.

PN    That did not do testing?

DB    Did not do testing.

PN    Alright.

DB    Toma did testing and I believe Doctor Delong did testing, they're both
      psychologists so I know they did some kind of testing, with with him. Um,
      and their perception, I mean they, they spent time with this guy and there
      was never any evidence not even back from juvenile time that anybody
      saw any evidence or diagnosed PTSD. There has never been, not one
      other doctor has said that. Except for Doctor Parrish and then after Doctor
      Parrish came up with after Stewart had saw him, Stewart came up with it.

PN    So.....

DB    .....and if my chronological order is wrong there, tell me.

PN    I'm just wondering are you, you suggesting that Doctor Stewart um. simply jumped on Doctor Parrish's bandwagon and that Doctor Parrish invented it?

DB    You said it, I didn't.

BB    No, actually you did say that.

DB    Well, then I will, then I will own up to it Bruce, yes indeed I am saying that.

PN    Alright, um, let's talk about the ADHD.  Um, Doctor Stewart made a diagnosis of the ADHD.

DB    That's not the first time.

PN    Do you disagree with that?

DB    No, not necessarily.  Because first of all the, there was some evidence of that early on in his uh, early developmental history I believe that um. it was either Kabanski and or Martig that talked about possibly and also at the school I think that uh, possibly him having some uh Attention Deficit Hyper Activity Disorder, or Attention Deficit Disorder type of um, symptom pictures, symptom, symptomology going on with him so I don't disagree with that, that's very possible.

PN:   Is ADHD something that would have showed up on your um, MMPI data?

DB:   No, in terms of symptom picture uh, the diagnosis may be HD.

PN:   I just wondered if the

DB:   Yeah.

PN:   scales would have reflected signs of ADHD.

DB:   Um, you should see some, I should also make you aware that, that we do find in research there's a high correlation between ADHD and anti-social personality disorder in terms of development.  Take a look at that in research, there's a lot of research on that.  Um

PN:   Now correlation um, or you think correlation or

DB:   No, there's some, there is some

PN:    Observation.

DB:    I said correlation

PN:    Correlation.  OK.

DB:    between the diagnosis of ADHD and anti-social personality disorder that people who have ADHD have a higher incidence of being diagnosed with anti-social personality disorder later on in life than those kids who are not diagnosed with ADHD.

PN:    But that doesn't mean that ADHD is predictive of

DB:    I didn't say that.  I never said predictive.  I said there's a correlation.

PN:    I understand.  That's not what you said.  I was simply trying to clarify that I didn't misunderstand

DB:    OK.

PN:    what you said, alright?

DB:    OK.  There are some, there's anxiety was eighty-one on a content scales if you look at the content scales on page nine of the MMPI.

PN:    And that is relevant to what?  ADHD?

DB:    There, there, no, not really.  It's anxiety.  ADHD is an anxiety related disorder.

BB:    Can I ask a couple questions.

DB:    Uh hum.

BB:    Brad, you said earlier uh, I think it was in day two, maybe at the end of day one

DB:    Uh hum.

BB:    that um, Paul Speer that his background, psychological background uh, was not as comprehensive as you would have liked for example if your clinic had gone to work on Paul Speer when he was eleven years old then and forth.

DB     That the treatment that he received was not as comprehensive your saying?

34

BB:     Treatment, examination

DB:     Oh, by examination uh, in terms of comprehensiveness and to say that, how we provide treatment today uh, and which is a fairly new approach to it, a fresh approach to uh, uh, therapeutic intervention for a younger people in terms of a rap around approach.  Um, as opposed to the old clinical method uh, we use a medical model from a defective standpoint that a person's defective and then we need to fix 'em.

BB:     OK.

DB:     We're coming from a different viewpoint and different way of providing services today than what was going on then.

BB:     Didn't you also say that Martig and uh, um, Kobanski, you know, they see a lot of people.   They have limited time, limited resources 'cause they're appointed by the court and they're in the juvenile setting and that his, the examinations perhaps were not as thorough as you would have liked them to be.

DB:     No.  I don't think I said that.

BB:     OK.

DB:     No.

PN:     Is that true?

DB:     I don't know about that.  No.  I

PN:     There's no truth to that.

DB:     I didn't say there was any truth to that.  I don't know.  But I didn't say that, no.  I mean

BB:     OK.

DB:     I can't say that, Bruce, because if I'm wrong

BB:     If I am wrong  if I say

JG:     Hold it, Bruce.........

PN:     It's a continuation of the interview of Dr. Brad Bayless.   This is side number three

BB:   I'm just going to drop it and let Pam continue.

PN:   We will, I had asked you about um, indicators on your MMPI scales of ADHD and well, you were speaking with Bruce, you were pointing out um, an anxiety scale?

DB:   Well, I'm saying that, that typically what you'll find with ADHD is that you're gonna have some hits on, on anxiety but that doesn't mean that a person has ADHD and I don't want to be misleading here, but he does have various hits on anxiety um, the supplemental scale you get a seventy-seven on anxiety there um, you've got a hit on anxiety here um, you've got

PN:   Here, you'll have to help me with the here because when I go back

DB:   Up here is content scales.

PN:   OK. Thank you.

DB:   Content scale, page nine. Um, but that's not, first of all I think that I'm being unfair here because ADHD is a attention deficit hyper activity. The hyper activity is, is, is more manic than it is anxiety. There's anxiety underneath it because of their, their inability to function, act within their environment so they very anxious and they get, they get impulse, they have poor impulse control and those kinds of things. Um, but it's really not -- the hyperactivity that we see is not necessarily a mood disturbance of anxiety. OK? In other words, emotion disturbance. It's more of a manic disturbance and this is why we use stimulants to control it. Does that make sense to you?

PN:   I understand that part of it.

DB:   Yeah. Yeah.

PN:   What I'm wondering about is what's gonna show up on your scales that's either gonna assist you in ruling out or ruling in ADHD as a diagnosis.

DB:   The MMPI would not rule in or rule out ADHD, OK?

PN:   OK.

DB:   And um, actually ADHD if you're gonna do ADHD we would want to use it if was measured for that. We use other tests such as a TOBA. Uh

PN:   T-O-B-A?

DB:   Yeah. Uh um, and um, it's a test for, for inattentiveness and um, we also do the BASt, which would be teacher ratings, parent rating scales, individual

rating scales. Plus we would want to get feedback from other professionals as to how they're acting in the classroom and this type of stuff.

PN:    Why didn't you do those tests?  If, if there was some question about um, ADHD, why didn't you do some of those tests?

DB:    These are murder cases and not for a IPE for a, a individual IEP educational assessment.  Uh, it's a murder case.  Uh, number one, number two, whether you have ADHD or not, you know, he's, Paul is uh, twenty-seven years old.  Um, he would be what we call adult ADHD.  You know he was able to get through the MMPI.  He was able to do things there was no evidence that he was majorly inattentive uh, when I saw him um, to the point that it would play a role in this particular case.

PN:    Alright.  So, um, are you telling me that you simply chose not to test for that because you just didn't think it was relevant to this case?

DB:    I love the way you turn things around.  No.  I'm saying that I don't know anybody

PN:    You know what?  One thing here.  That's really not fair.  I'm not trying to turn things around.  I'm just trying to make sure I understand what you're telling me.

DB:    Well, I'm trying to make sure I understand what you're doing and that is that what you're doing is not really what I'm saying.  You're saying what I said was that ADHD is not, ADHD as a child if you had ADHD as a child is one thing.  ADHD in this particular case, whether he had ADHD or not is not really it's like saying he had a common cold or something.  I mean it's not, I fail to see the relevance of saying I didn't test for that because I didn't see it as being relevant.

PN:    OK.  I understand.  That's fair enough.  Let me go back then.  I didn't ask the same question about PTSD.  Were there any um, any indicators on the scales

DB:    Yep.

PN:    uh, the MMPI that would have either assisted you in ruling in or ruling out PTSD?

DB:    Well, first of all, in order to have to PTSD and if you look at PTSD when a person has to be um, gone through some kind of trauma.

PN:    Uh hum.

DB:    OK.  And the trauma would have to be, and we would assume –

JG:    -- Where'd you get cookies?

DB:    Those are my secretaries cookies, man.  What are you doing?

BB:    He borrowed 'em.

BS     She said we could.

PN     Alright.

DB:    You asked me about the PTSD.  Is there any limit on the, on the MMPI that talks about PTSD and the answer to that question is yes.  There is scales on MMPI that talk about the, talk about, well they don't talk about it, but their score um, as soon as I find it, I'll show it to you.  Um, PTSD

JG:    Did you just, oh I think you took Pam's glasses.

DB:    No.  It's mine. OK.

PN:    Let's talk about what page we're at so we'll all be on

BB:    Page nine.

PN:    Of your computer generated report.... Oh, I see.   Post traumatic stress disorder.

DB:    Yeah.  OK.

PN:    So what does that tell us?

DB:    Well, it says here it reports (inaudible) levels of stress that can be the result of PTSD, some other form of psychopathology of the over reporting of psychopathology.  Hmm.  PK is usually elevated in the same range as PS and so now we look at.............................

PN:    Well

JG:    Where is it?

DB:    Where's what?

JG:    PS.

PN:    PS.

DB:    I'm looking for PS right now.

PN:    Alright. Um, the fact that PK score, is that a high score or a low score or what on PK, that AD on post traumatic stress?

DB:    Well, what it's saying there is that there's a significant level of disturb that becomes the resolve of PTSD or some other form of psychopathology.

PN:    I understand. Is that a high score or a low score?

DB:    AD is significant, but this is supplemental scale of scores so

PN:    So we can't rely on supplemental scales scores? It's not a

DB:    Well, you don't take 'em individually

PN:    OK.

DB:    You gotta look at everything else. OK?  You know I'm trying to see where the PS, the PS is usually the same score

BB:    (inaudible).

DB:    Oh. Now you've gotten cold see. OK. Go ahead and ask me.

PN:    Well, um I guess overall, short of going through and, and spending all the time just looking for this

DB:    Uh hum.

PN:    Um, my question started out being and I guess still is are there scales on the MMPI that allow you to either rule in or rule out the diagnosis of MMPI?

BB:    You mean of PTSD.

NP:    Yes. I meant PTSD.

DB:    No. You can not rule it in or rule it out. The scales that measure if it's there then you have to correlate that with some other with other symptom pictures and we do not have that, that I know of.

NP:    You did not see the symptom pictures. Is that what you're saying?

DB:    Yeah. I mean you had to look at other things too.

NP:    OK.

DB:   And then there's, what I'm looking for and why I'm not finding it, I don't know

NP:   Well

DB:   Here it is. Um....

NP:   Well, I'll tell you what. Um, what I'm, what I'm actually trying to look at here and get the big picture of is there a number of access one disorders um, that have been diagnosed by various professionals.

DB:   Yeah.

NP:   You diagnosed access one disorders that were different from the ones that both Dr. Parrish and Dr. Stewart diagnosed?

DB:   No.

NP:   No?

DB   No. No. Not really. Uh, I diagnosed depression on access one.

NP:   Oh, I'm sorry. I saw this dysthymia  and I thought you

DB:   That is the (inaudible).

NP   I know. But I thought you disagreed with the major depression.

DB:   Major depression I disagree with.

NP   OK.

DB:   I didn't see major depression but the depression is there.

NP:   Depression is there. OK. Um, but you disagree with 'em as far as the access one diagnosis one of PTSD.

DB:   Yes.

NP:   You found no clinical evidence of t.

DB:   No

NP:   And no psychometric uh. data that would support it

DB.   Exactly.

NP:   OK. And with respect to ADHD you saw no clinical evidence of it?

DB:   ADHD you know, there's, afraid we weren't looking for ADHD.  I keep trying to

NP:   OK.

DB:   ADHD, I mean that's, I mean really if he got diagnosed with ADHD that has no bearing on this whole case at all.

NP:   OK. We already went over that.  I'm sorry to go back to that.  Alright. Let's talk about uh, cognitive impairment, brain damage uh, that, brain function uh, data that Dr. Parish developed.

DB:   OK.

NP:   Um, you seem to disagree with that as well.  You don't seem to think that there's any evidence at all of uh, any

DB:   I didn't say there was any, no evidence at all of any brain damage.  I just said that there was nothing, I think that what my concern was that there was evidence of brain malfunction that played a role in this whole situation.

NP:   OK. Can you elaborate on that a little bit 'cause I do see at the bottom of page four of your dictated report you say there is little if any evidence that Mr. Speer suffers from brain damage that can be casually related to his behavior in the instant offense.  First of all

DB:   That's what I'm saying.

NP:   is it causally or casually?

DB:   Did I misspell that?

NP:   So it should be causally related to the behavior.

DB:   I'm sorry.

NP:   OK. Can you tell me what that means?

DB:   You're on page four?

NP:   Yes.  At the bottom of page four.

1    DB:   Well, what that means is that Dr. Toma, who is a neuropsychologist, I
2    think he said he's malingering, didn't he?  Um
3
4    JG:   Yes.
5
6    DB:   and um, let's talk about the, what, what I know of the crime.  OK?  The
7    crime we have before us is of that of Paul Speers engaging in, in talking his
8    brother into committing a murder um, uh, via and we have transcripts of him
9    doing that
10
11   BB:   You can characterize it as that.
12
13   DB:   Well, this is what he's charged with.  Am I right?
14
15   BB:   Yes.
16
17   DB:   OK.  And this is what the jury is deliberating.  Am I right?
18
19   BB:   Yes.  Starts with being an accomplice to first degree
20
21   DB:   Accomplice to first degree murder.
22
23   JG:   Bruce, that's legally, technically not correct, causing or being an
24   accomplice
25
26   BB:   Oh.  OK.
27
28   DB:   Causing or being an accomplice to first degree murder, OK?
29
30   BB:   Right.
31
32   DB:   Now, if he had, let's assume he had, and if you look at Dr. Parish's report,
33   you have a copy of her report instead of me digging through everything 'cause I
34   certainly would like to show you what I'm talking about.  I believe that Dr. Parish,
35   number seven, OK.  This is her competency, she thought he wasn't competent
36   either by the way but I thought that was interesting, um, that's all competency
37   stuff there... where's her report?  Do we have a report?  Did she write a report?
38
39   JG:   Yeah.  She wrote
40
41   DB:   Where's her report?  You don't have her report.
42
43   PN:   You don't have the report in this notebook?
44
45   BB:   You're asking Bruce?
46

42

| | | |
|---|---|---|
| 1 | NP: | Well, this is the |
| 2 | | |
| 3 | BS: | For the record. |
| 4 | | |
| 5 | PN: | This is Theresa's notebook? |
| 6 | | |
| 7 | BB: | Bruce, I'm not Theresa's keeper. |
| 8 | | |
| 9 | NP: | Yeah. You're not Theresa's keeper. |
| 10 | | |
| 11 | BB: | Keeper. |
| 12 | | |
| 13 | DB: | There's no, I don't see her report.  See where it starts here and this is, this |
| 14 | | is her uh, this is not in tact. |
| 15 | | |
| 16 | BB: | Just, you know what, we're off the record.  Brad? |
| 17 | | |
| 18 | DB: | Uh huh. |
| 19 | | |
| 20 | BS: | Tell us what it is instead of getting a report as you said I'll show ya |
| 21 | | (inaudible) do you remember? |
| 22 | | |
| 23 | DB: | I'm looking for, well, first of all, what it came, what it came down to |
| 24 | | |
| 25 | BB: | Talk to us about it for a minute. |
| 26 | | |
| 27 | DB: | I thought it was kind of interesting. |
| 28 | | |
| 29 | NP: | Well then why don't we just go back on? |
| 30 | | |
| 31 | BB: | We'll just wait until he tells us and then we'll see whether or not he really |
| 32 | | needs the report.  Let's let him free associate. |
| 33 | | |
| 34 | DB: | It's well, I don't like doing that. |
| 35 | | |
| 36 | BB: | OK. |
| 37 | | |
| 38 | DB: | Free association gets you in trouble with you guys. |
| 39 | | |
| 40 | NP: | Why don't we just check |
| 41 | | |
| 42 | BB: | Do you have a copy of the report? |
| 43 | | |
| 44 | BS: | Jeannette's usually pretty courteous and will give you a copy of the report. |
| 45 | | |

43

1   DB:    Oh, I'm sure.  Oh, I have copies.  I got notebooks I have to go hunt for it,
2          that's what I didn't want to do.  But I might have it.
3
4   BB:    Do you want to just (inaudible)
5
6   JG:    No.
7
8   PN:    No.  We're just gonna have to go through, plow through to to the end
9          tonight.
10
11  DB:    Better hurry up.  I got things to do.  I got people to see.  I got places to go
12         and I got children to feed.
13
14  NP:    No.  You're children are gonna get pretty fed pretty well by the time we're
15         done with this.
16
17  BB:    Is this the only case you have?
18
19  DB     No.  This is not the only case I have.  I wish it was the only case I had.
20         Oh, here's her competency report.  Here it is.
21
22  NP:    OK.
23
24  JG     Alright.  Going back on tape.
25
26  BB:    Yeah.  I'm trying to find the spot now.
27
28  JG:    Oh.
29
30  NP:    I gotta get one of those.
31
32  BS:    Are you on?
33
34  JG:    No.
35
36  BB:    Just hold on.
37
38  NP:    Does it go right, do you click it right into your computer?
39
40  JG:    Yeah.  There's a docking station.  You stick it in there and then
41
42  NP:    And does it actually generate it's own transcript?
43
44  JG:    No.  Just verbal.  It's just audio.
45
46  BB:    Audio, yeah.

44

JG:     Yeah..

BB:     But then you get the right foot pedal for it and you can have it transcribed in the same manner.  And they like it a lot better.  They go oh, it's much clearer.

JG:     They?

BB:     They being the transcribe people.

NP      The transcribers.

BS:     You know those little transcribing people.

JG:     My secretary does my transcribing.   I don't have one of those little transcribing people. You can't find your report?

DB:     No. I don't have the report with here.

BB:     OK. Here, here, here's

JG:     OK.

DB:     With the experience of not having the report in front of me 'cause I don't want to misquote, misquote Dr. Parish.   But it was my understanding after reading her report was that what she said is that he had a learning she came up with more of a learning disability diagnosis. If I remember

BB:     More than what you say?

DB:     More than ADHD.  She didn't, I don't think she diagnosed ADHD.

BB:     I see.

DB:     OK.  I don't remember her diagnosing ADHD.  She may have but I don't remember that.  I remember her saying he had some mild diffused functioning.  It was either in the frontal lobe area or parietal area I believe.  I think it was frontal lobe area.  I can't remember exactly how she, but what we normally refer to as a learning disability or what we call (inaudible) minimum (inaudible) dysfunction which is a learning disability.   That is not significant brain, brain neurological malfunction nor would it have any effect on this whole process.

BB:     Do you recall her diagnosing him with significant brain impairment?

PN:     Let me just jump in here.

45

BB:    Please.

PN:    You're, in your dictated report on page four, you actually write Dr. Parish evaluated Mr. Speer and moving along and concluded that Mr. Speer has moderate to severe impairment in brain function.

DB:    Uh hum.

PN:    And then jumping to

DB:    Where, where are you?

BB:    OK.

PN:    And we're jumping down to the bottom of the page next to the very last paragraph, there's little if any evidence that Mr. Speer suffers from brain damage that can be causally, it should be causally related to his behavior in the instant offense.  What I'm trying to understand is number one, do you dispute that he, that her test data was number one reliable and number two that it did in fact show severe to moderate to severe impairment in, in brain function number one and number two um, I'm just wondering if indeed that's the case why you conclude um, that it's not causally related.  So let's go up number one.  Do you dispute the findings?

BB:    The findings.

DB:    Yeah, apparently so.

PN:    Apparently so?

DB:    Apparently so.

BB:    On what basis?

DB:    (Laughs).

PN:    Tell us about that.  OK.  Let's

DB:    Uh, and again I needed I didn't have a report in front of me and I need to recall that but um, as I remember yeah, it was a frontal lobe executive (mumbles)....  As I remember there was very, it was moderate to severe uh, brain dis -- but there was no evidence of any trauma or evidence of any severe trauma to his brain whatsoever other than possibly some, his use of drugs maybe I don't know.  Um, I know that Dr. Toma had done neuro, neuropsychological stuff with him and, and felt that he was malingering that there was no indication of any neurological pathology going on with him.

PN:   Can I stop you right there?

DB:   Yeah.

PN:   Do you know um, whether Dr. Toma did the same battery or a different battery, an abbreviated battery um

DB:   Well, it doesn't matter if you're doing, there's only certain batteries that you're gonna be able to do this. There's the Lurie (inaudible, sounds like Breaka) and then there's the Halsted Reitan and um, the subtest within the Halsted Reitan I mean in terms of all neuro-psychologists use those particular uh. subtest. I don't think that um, matter of fact I know that uh, Susan Parish did not use all of the Halsted Reitan in her, her uh, she didn't do the total battery herself. So but I kind of felt like it was kind of interesting that I could not find where his brain damage, alleged brain damage, played a role in his overall adjustment in the instant offense.   There was nothing that, that indicated that he was not thinking or acting without intent.  If you have organic brain damage, you have neurological impairment and you commit an act that is impulsive because you have brain damage somebody makes a noise and you snap at that noise very quickly because an organic process calls you to act impulsive (snaps his fingers) like that, then that's one thing.  To plot, scam, scheme and to do what he did in the instant offense which he's charged with, how the organic or neurological impairment that she's talking about which is that of more or less of a learning disability, plays a role in his anti-social orientation toward getting someone killed. allegedly speaking, until he's convicted um, I fail to see the correlation.  That's my, my, I think that's what I said. the (inaudible) I don't see where there's a relatedness between him having a minimum cerebral dysfunction. a learning disability, moderate brain dysfunction, no one else is seeing it besides her uh, that interpreted it that way uh, has anything to do with him um, um, coercing his brother into killing someone (inaudible).  And because he did burglaries I don't get it and I don't see how that where the relationship is between the two.

BB:   OK.

PN:   Alright.  Have um, so bottom line is you're characterizing her findings with respective brain function as

DB:   What it requires for him to do the crime.  How did that interfere with his ability to understand, comprehend, deal effectively with what he was doing.

BB:   And we understand that.  But the first question was did you disagree with her findings?

DB:   Well, I don't know about disagreeing with her findings.  I just said that I don't know of anybody else who did neurological looking him neurologically and his Wexler scores certainly don't come, don't suggest that that's accurate.

BB:   But you said you don't disagree with her findings, you just don't find a correlation between that and the crime alleged.

DB:   And I don't necessarily agree with her findings either.

BB:   OK.

DB:   I mean I and the reason why is because the IQ scores that, that he obtained do not substantiate moderate to severe neurological dysfunction in the frontal lobes.  He couldn't do some of the subtests that he did well on.  That, that's counter indicative of that kind of a brain processing.  I don't understand it.

PN:   So are you suggesting that her testing is unreliable or that the scores are inflated or that the interpretation has no basis.

DB:   I don't you know, I just don't, I don't know what her problem is, OK?  But um, I don't agree with it.

BB:   So is it fair to say you didn't look that deeply into it to be able to answer the last question.  Seriously.

DB:   No.  I could, no I looked that deeply into it.  But I just

BB:   But can you answer

DB:   I don't want to answer that question.

BB:   Is it wrong?

DB:   No.  It's very condescending and I don't want to be negative.  I'm trying to be nice.

BB:   Well, was it the test results that she obtained?  Yes or No?

DB:   I just think that, that for her to say that this person has neurological impairment to that is related to this particular offense is, is, is absurd.  I mean it just does not, it's not there.  Uh, that is not true.

BB:   The impairment's not there number one.

DB:   I don't know if the impairment, I don't see where the impairment could be there because if it was there, it's not interfering with his intellectual ability to make

48

choices and decisions.  Uh, he has an IQ that's an average range. He had uh...his scores on his IQ scores if you look at the scores, and you have the scores I can show you the scores.

BB     Okay is there something wrong with her testing?

DB     I don't know what she did.  Is there something wrong with her testing?  I'm not a neuro-psychologists..

BB     Okay.

DB     So I'm hesitating to say what's wrong.  I don't know what on her testing.  I just disagree that  that could possible have any correlation between the instance offense and why we're here.

BB     Okay your told us that.

DB     And and neurological impairment.

BB     Okay what about the second part at the bottom, you know.

PN     Well that was the correlation

BB     Oh I see.

PN     That there's little of any evidence that he suffers from brain damage that can be causally related to this to his behavior --

BB     -- I see --

PN     -- in this instance offense.  Now what I want to make sure I understand one additional point here.  You're saying that there's any evidence that's he suffered some brain damage that was causally related to this offense.  Um is there – there – there two possible implications to that.  One is that is some kinds of brain damage that could be causally related, but he just doesn't have it? Or are you saying that there are no kinds of brain damage based on -- on any of this that could be causally related?

DB     If there was brain damage that caused severe paranoia possibly uh...which would we did not see uh...where an individual now became severely paranoid and then requested uh...through his paranoia the ideation that the uh...these things to be done then one could say that then you would see again the paranoia which would be very ramped and pervasive to all of this thinking and processing.  Which we did not see.

| | | |
|---|---|---|
| 1<br>2<br>3 | BB | Oh didn't he reflect that paranoia when you went to visit him and he didn't want to talk to you because he thought you would -- |
| 4<br>5<br>6<br>7<br>8<br>9 | DB | -- No, he didn't want to me because you told him that I find everybody to be a psychopath and then Bob told him to be careful and because he heard me help her cross examine Susan Parrish in the courtroom that's exactly what he told me and that's exactly the reason he didn't want to talk to me. |
| 10<br>11 | PN | Oh you know what – |
| 12<br>13 | DB | -- It had nothing to do with that -- |
| 14<br>15<br>16 | PN | -- that brings up a point.  Um… you did sit in the courtroom and um, assist with the cross examination of Dr. Parrish right? |
| 17<br>18 | DB | In the courtroom, yes. |
| 19<br>20 | PN | Yeah cause I wasn't on board at that point. |
| 21<br>22 | JG | During  Rule 11. |
| 23<br>24 | PN | During Rule 11 right. |
| 25<br>26 | DB | Doing Rule 11. |
| 27<br>28<br>29 | PN | Uhm..and was were there any notes that were made during the course of that…hearing? |
| 30<br>31 | DB | No.  Not that I know of.  If I did I threw them away I don't know. |
| 32<br>33 | PN | So basically you were just sort of uh…. |
| 34<br>35 | DB | I'm just sitting there. |
| 36<br>37 | PN | Guiding? |
| 38<br>39<br>40 | DB | Yep, if the court asked her a certain question make sure she asked certain questions (inaudible). |
| 41<br>42 | JG | Cause I've never done a full Rule 11. |
| 43<br>44<br>45<br>46 | PN | So um…was it your idea or was it…were you aware that we had asked her assistance from Dr. Parrish in trying to understand what you were going to be telling us during the course of this interview?  And um….did – did were you aware of that? |

PCBG-01-07-07-0049

```
 1
 2   DB   No. Does she want to come here? (laughing)
 3
 4   PN   Would you have had a problem with that?
 5
 6   DB   No, put her in the hot seat over there.
 7
 8   PN   Okay.
 9
10   DB   Would I have a problem with that? Only if, if Ms. Gallagher had a problem
11        with it? No, then I'd have a major problem with it.
12
13   BB   Oh.
14
15   PN   Well then I guess you had a major problem with it?
16
17   DB   Well because she had a problem with it.
18
19   BB   But it wouldn't have bothered you?
20
21   DB   I don't get rattled about too many things. I try not to anyways, you know
22        it's not good for my blood pressure and I try to keep my cholesterol down
23        and those kind of things.
24
25   PN   Okay well uhm speaking of health conditions uhm with respect to the
26        medical history that you took from Mr. Speer you indicated that he
27        claimed that he had been knocked unconscious and had been in car
28        accidents. And then you said that his history is negative for any residual
29        or cognitive physical problems. Number one uhm...do you have any
30        reason to believe that his claim to have having been knocked unconscious
31        was accurate or inaccurate?
32
33   DB   I can't say it was accurate or inaccurate that's only what he claimed. I
34        have found no history in the medical records that said he was hospitalized
35        or received any treatment from any doctor for any kind of neurological
36        assault.
37
38   PN   Okay. Um so....
39
40   DB   I mean there's only his – his – his rendition. I have no way to confirm or
41        disconfirm it.
42
43   PN   Okay so...
44
45   BB   Did you want to talk about Dr. (inaudible)?
46
```

51

| | | |
|---|---|---|
| 1<br>2<br>3 | PN | Yeah (inaudible)  Um, but you do indicate that um his history is negative for residual cognitive or physical problems. |
| 4<br>5 | DB | Right. |
| 6<br>7 | PN | And I assume what your saying is that in the uhm...in the collateral data |
| 8<br>9 | DB | Yes. |
| 10<br>11<br>12 | PN | That you reviewed that you saw no evidence of cognitive or physical problems that you would correlate to a head injury? |
| 13<br>14<br>15<br>16<br>17<br>18<br>19 | DB | Right and he's been tested many times in juvenile uh...juvenile procedures and everything.  He was in Adobe Mountain, he was in he's been in institutions there's never been any professional testing him, observing him, treating him or giving him treatment that anyone has said that he has symptoms as a symptom picture of a neurologically impaired individual. |
| 20<br>21<br>22<br>23 | PN | Alright um...now you have been provided with um the material that Dr. Paul Miller has developed in preparation for his testimony.  Dr. Paul Miller is the developmental psychologist from -- |
| 24<br>25 | JG | -- He doesn't have the latest stuff I just got it. |
| 26<br>27 | DB | I don't have the latest stuff. |
| 28<br>29 | JG | His notes and those articles. And frankly I can't read the notes. |
| 30<br>31 | BB | Okay but he has his report. |
| 32<br>33 | JG | He has his report. |
| 34<br>35 | BS | And I have a PowerPoint that I haven't gotten to you that I just got. |
| 36<br>37 | BB | No, she won't get that till... |
| 38<br>39 | BS | She's get that until -- |
| 40<br>41 | BB | -- Five minutes before -- |
| 42<br>43 | BS | -- No, no she's get that until at least after the first -- |
| 44<br>45 | BB | -- after the PowerPoint -- |
| 46 | BS | -- after any verdict here. |

52

JG    (Indistinguishable talking over each other) Will you let Pam finish?

PN    Have you had an opportunity to review the materials provided by Ms. Gallagher uh by Dr. Miller?

DB    Vaguely.

PN    Okay. Are you prepared to talk about it today or do you --

DB    -- No, I'd like to see --

PN    -- want to talk about that another day?

DB    I would prefer to see all the material before I talk about anything. I don't know what I'm saying at this point and time.

BB    You got his thorough report.

DB    I don't remember his thorough report.

BB    It's (inaudible) pages long for God sakes!

DB    Yeah...

BB    For Christ sake as you said (inaudible).

DB    Oh you mean the all the research guy? The research guy?

JG    That guy.

DB    That guy?

BB    Do you think that – that uhm  Paul Speer had an optimal childhood, childhood?

DB    No, I don't think I did either.

PN    Oh.

PN    It must have been rough?

DB    It was. My father was a – was a – was a numbers runner and my mother was a domestic worker. So what? And I lived in the projects.

PN    Want to hear my sob story?

| | | |
|---|---|---|
| 2 | JG | No, let's... |
| 4 | DB | Mine is not a sob story, mine is a rich story. |
| 6 | PN | Okay... |
| 8 | DB | And I've very proud of it as a matter of fact. |
| 10 | PN | Alright. |
| 12 | JG | Look at Dr. Miller's report. |
| 14 | PN | Okay I just sent it (inaudible). |
| 16 | BB | I was talking about his son. |
| 18 | PN | No you were talking about (inaudible). Go ahead. |
| 20 | BB | Okay let's go off. We have to go off. (tape stopped momentarily) Okay so we're talking about Paul Miller. Do you have any problem with Paul Miller's uh...background or his capabilities? |
| 24 | DB | I don't...I don't know Paul Miller. I mean I've seen his resume. Other than that -- |
| 27 | BB | -- Would you agree that for his position that he's kept up with the research (inaudible). |
| 30 | DB | Yeah I'm sure he has. Yes, sure. |
| 32 | BB | Do you disagree with any of the findings that Paul Miller made with respect to Paul Speer's childhood? |
| 35 | JG | He didn't make any findings. |
| 37 | BB | Even though he found he – he uhm... |
| 39 | JG | He made no diagnosis. |
| 41 | BB | No, that's not a finding. That's a medical or a psychological finding. I'm talking about the evidence that he used. In other words he used the CPS records, he used reporting um in order to...and he did make certain findings. He does make certain conclusions drawn from the evidence. |
| 46 | DB | Well he made some conclusions that were wrong. |

54

PN    Okay what is...tell us about those wrong conclusions?

BB    Well tell us about --

DB    -- Well number one he said here you know this is a long report, but you would have to go through this paragraph by paragraph which is gonna take a couple of hours, but she she he says about his mother she maintain her drug habit while she was pregnant with him and he's reported that he was born addicted to heroin.  Well I don't know....that I don't know how true that is first of all.  And he doesn't know how true that is either.  From what I understood was that she's been on methadone maintenance for 30 years which means she was on methadone and not heroin at the time.

BB    Don't you find that to be really um kind of ironic to be on methadone maintenance for 30 years?

DB    No.

BB    Okay she admitted on the stand that she was a heroin addict, but let's leave that aside.  Maybe she --

JG    -- She's admitted being in methadone maintenance for 30 years.   She didn't say --

BB    -- She admitted to be on and off heroin addict for 30 years.

JG    She didn't say addict Bruce she was fighting Pam every step of the way.

BB    Okay.

JG    She was not cooperative.

BB    Brad, Brad, maybe he was born that way or not.  Let's talk about his living situation as a baby.  Did you...

DB    Okay.

BB    He found evidence or he believed that uh the child was neglected, physically neglected by his mother.  Did you see that as one of the facts?

DB    I thought he was saying that she was more, he was more psychologically neglected, not physically neglected.  In other words,

BB    Well. . .

DB   There was; there was food.  There was – there was a roof over their head.  Uh...and so forth and so on.  Basic – basic necessities were there, but there was a neglect psychologically from the mother in terms of attentiveness.

BB   Well attentiveness, but you and I both know that the holding and touching and bonding of a baby with it's mother is one of the most important foundations for your life.

DB   Well that's again he –

BB   -- Assumes.

DB   He assumes that, I don't know if that's true or not.

BB   Okay but he assumes it, but my question was did you recognize that Paul Miller assumed that is true as one of the facts?

DB   Yeah and I'm trying to figure out where he got that from because. . .

BB   Alright.

DB   I. . .

BB   Your not a, your not an investigator.

DB   But no, but I'm asking. . .

BB   To you if it's true?  Would that have a very serious deleterious or negative effect on somebody like Paul Speer grown?

DB   Possibly.

BB   Okay then having the prominence that it did of heroin in the household as a youngster do you think the fact that – that might make the mother and the father a little bit less attentive to a child's needs?

DB   I – I think even my report it says there's no question he came from a dysfunctional family.  I – I never denied that.

BB   And I think Dr. Miller is saying that some of these factors um tend to uh exponentially uh create an atmosphere that's becomes worse and worse as a result of the factors of ignoring the child.  Uh using drugs you and then as the drug user you have to sleep more often.  You lock the door the child feels abandoned then did you find that as a child he had to take to the streets at an early age?

BB    Go ahead Brad.

DB    In order in the interest of and Jeannette you should listen to this.

JG    Alright.

DB    In the interest of – of – of cutting to the chase, to know exactly what your doing.

BB    Very well.

DB    Alright good thing let's cut to the chase.   Number one when does Paul Speer take responsibility for his behavior?

BB    Well that's one of the basic fundamental arguments.

DB    Let me finish…Let me finish, let me finish.

PN, BB, JG (all talking over one another inaudibly)

DB    Let me finish.  In each and every life that we live we all have issues in our lives that may have an effect good or bad, right or wrong on each one of us.   And how anxiety affects me or how something in my environment affects me may not affect you in the same identical way, okay? We all have lives and we all have crosses to bear that we all carry; burdens that we have we got from dysfunctional fathers, mother, aunts, uncles; been beat up in the neighborhood, traumatized by this kid, having drug infested neighborhoods, being involved in gangs so forth and so on.  We can go on and on and on.   And if –if the litany of all that disposes of our own requirements of responsibility then no one would be responsible for anything that they do.  Now my question is when does Paul Speer, of an average intelligence who understands the difference between right and wrong, who understand the morals and ethical guidelines of our society -- whether he adopts them or not is another story -- when does he have to take responsibility and when do you stop blaming the parents because they were heroin addicts, the brother because he was doing x, y and z, because the uncle did this and the aunt did this. And they did this, that and the other. When do we stop blaming that to the point of where now he takes responsibility for his behavior of calling his brother, planning a murder and engaging in the type of activity?  When do we stop blaming that his choices of doing burglaries, robberies and whatever else he was doing out there in the environment, when do we stop blaming other people externalizing and giving him a rationalization for his social inappropriate behavior?   That's what he's doing here by making a mitigation

|   | investigation process of finding each and every little nuance piece of thing to say this kid is not responsible.  Bullshit! |
|---|---|
| BS | (Inaudible) |
| BB | Don't argue. |
| BS | No. |
| BB | Don't.... |
| BS | I'm gonna finish this question.  Tell me what you think the term moral culpability means? |
| DB | Moral culpability means that your ability to be morally responsible for your behavior. |
| BS | Do you distinguish criminal responsibility and moral culpability in your mind.  Do you see a difference between those two terms? Or are they the same to you? |
| BB | No, let him finish. |
| DB | Do I see moral culpability and criminal responsibility as the same thing? (sigh) Wow their intertwined a great deal.  Uh...on – on – on – on a very basic level I think on a substantive level that they're may be a difference between criminal responsibility and moral culpability.  Yet at the same time how do you – how do you separate out morals and ethical value systems from criminal responsibility.  It's very difficult.  I think that you adopt morals and ethics based on your choices in life.  And whether or not you, as my father possibility may have, may be a Baptist minister and a very religious and moral individual who produces this household I may not adopt that.  And -- |
| BB | -- He's responding her now let me ask him a question.  No, but what he's asking: now you're the judge – |
| DB | -- Um huh. |
| BB | You're not a Baptist minister you're wearing the robes.  Do  you divide criminal responsibility from moral responsibility or moral culpability for the alleged perpetrator?  Or the perpetrator now he's been convicted? |
| DB | I think that when a person has a -- engages in a behavior that -- that we in society may see a immorally apprehensible, uh...it is not our – our – our I think it is not our duty or our -- |

BB    (inaudible)

DB    How we should -- I don't think we should be judgmental about the moral issues, about whether or not I believe, that's like me, do I believe in God? Can -- how dare you to judge me whether or not I believe in 'cause I don't believe in your Christian God or I believe in Allah or I believe in Buddha or I believe in some other God, you know? How dare you to say that I'm wrong because I don't believe in your God. That's the kind of the moral kind of thing that we get involved with because they're a kind of religious under tracking to it. In that with all morals I mean that's what you have. We have rules and regulations about criminal behavior. And if you do not perform or do some things that are against those rules and regulations and you are aware that you do those -- that your breaking those rules -- whether morally you have been tainted or not you still are responsible.

BB    Okay, now --

DB    - And I hope I'm being --

BB    -- No, your very clear.

BS    It's very clear, now the only other thing I'd like you to take two minutes or whatever and go through there his report and tell me the factual things that you disagree with. In other words, he goes through there and says I have this information you just told us one. The mother was addicted.

DB    Well I don't.....

BB    He didn't say he disagrees he says he's not sure.

DB    I don't, I don't --

BS    -- Wait. I want him to go through and tell me the areas where he disagrees. When he disagrees he doesn't think that data supports it --

BB    -- Oh, okay.

BS    I just want him --

BB    - Okay --

UM    -- I want to know the things that he says he thinks Paul Miller made a judgment about that isn't substantiated.

DB    Well, again --

BS   (Inaudible, talking over DB).

DB   Again I don't know if he was, if – if – if born addicted to anything --

BS   -- Okay --

DB   Because we have no medical records to substantiate that.

BS   Go on to the next one.

DB   The maternal depression. And he's talking about her calling him a little mother fucker and a son of a bitch in the talking to Paul I guess on the day she was depressed and not on drugs.  And I'm trying to figure out when those days are when she's not on drugs.

BS   Well, and you --

DB   -- Given the fact that she was on drugs consistently for 30, over 30 years.

BS   Well your saying that the data that you've reviewed the mitigation packet that was given to you does not contain any data that shows from collateral sources that Sabrina Womble had a history and a problem with depression. Is that what your saying?

DB   No.

BS   Okay what do you say is...well how do you disagree with his characterization.

DB   Well I see it says here on days when she would wake up depressed and not on drugs.  And I'm going is what do you mean; you mean she's going through withdrawal?  I'm not really sure.  Is she irritable because she's going through withdrawal?  Is that what he's saying here?  I don't know.

BS   Okay can you envision that as a possibility?

DB   If – if she was going through withdrawal then – then she may became very aggressive and said things like that to the kid possibly I don't know.  But I don't know where he got that from because it's not in any of the records.  And I mean...

BS   Okay your saying it's not in any of the records that you've reviewed?  Is that what your saying?

DB   Right right uh...

BS    And the record's, so this is clear, no misunderstanding, you got the entire mitigation packet that's been numbered one through what does it go to? 786.

JG    He's gotten the whole thing.

BS    Okay.

DB    Well I just don't know where it says in the mitigation packet where she says things like, 'You son of a bitch;' that, "You're just like your father. You mother fucker you get the dishes done." I don't --

JG    Those are quotes that come from Paul.

BS    Okay go on, go to the next one.

DB    Yeah okay, uh, I don't disagree with this, uh, but you know -- and I -- it says here that, uh, children from three to seven years of age with a diagnosis with both ADHD and oppositional defiant disorder were more likely to have mothers who exhibited mood disorders and drug dependence than mother's of non-ADHD children.  Well that's, that's, I would agree that's probably true research-wise.  But that's not necessarily true --

BS    -- Individually?

DB    Realistically.  Because -- and I'm not sure what he's saying there either -- I mean --

BS    -- Okay --

DB    -- you know, are you saying that -- that -- that was Paul's diagnosis of ADHD and oppositional defiant disorder when he was between the age of 3 and 7?  Because I didn't read anywhere where he was diagnosed during that time frame.

BS    Okay. Next: would you disagree with the research?  In other words, if you --

DB    -- The research, the research is right on target and -- and -- he quotes the _____ I've read his research before.

UM    You read it and it's right?

DB    Well no, I didn't say it was right, I said that -- that is not...

BB   No, you said it was right on.

DB   What I'm saying you guys are not putting words in my mouth.

BB   Oh okay.

DB   What I'm saying here is that the research on those on those children between three age and seven who have these particular criteria do in fact -- that's true.  But I, one, Paul was never diagnosed at age three or seven or four, five, six with ADHD and oppositional defiant disorder.  Where was that?

BS   Okay, we -- go on.

DB   Okay so there's a problem with that so –

BS   -- Okay.

DB   Your making a quote. You see what I'm saying.

BS   Just go to the next one.

DB   Okay. Um, I don't know about Paul's father leaving the house, I'm assuming he did, when he was two-years-old.

BS   You don't have any information in the – in the juvenile presentence reports?

DB   Well there was there this was what they say, but I mean again I don't have any other information about Paul's father or his biological father I'm taking about.

BS   But do you have any reason to disbelieve, categorically, the information contained in – in the doctor's reports from juvenile court, the probation officers reports, uh and juvenile court?

DB   No, I have no reason to doubt them that's the information I've read, I mean I'm saying that I just don't know that much, there was not a lot about Paul's biological father in this in all the records.

BS   But you knew he was out of the home?

DB   He was out of the home from early on, that's all I really only know.

BS   Right. And you heard this the information in there about him, you know, arranging to see his son and --

DB     Well that's what the mother said I don't know how true that is?

BS     Oh, okay. So you don't believe her?

DB     I didn't say I didn't believe her. I said I don't know how – I'm just taking it as data. I don't know.

UM     Okay. Go on to the next one.

DB     Okay step-father say he, step-father worked 12 hours a day with a golf club. I think he was a roofer.

JG     That was later.

DB     Oh okay.

BB     He's had more than on profession.

DB     Oh, okay.

JG     He even owned a furniture store at one time according to the records.

DB     Yeah.

JG     He failed after three months.

PN     Did you know that Bob?

BS     Not specifically.  I don't specifically remember.

DB     Again – again he's saying here in a specific study of father (sounds like something Stewart 2005) that children with drug abusing fathers were more likely to have both internalizing symptoms: depression, anxiety and external symptoms; aggression and acting out, than children with either alcoholic or non-substance abusing fathers.

BB     Do you think that studies wrong?

DB     No. I think that's probably pretty accurate, but that doesn't...I don't know how much it correlates to Paul.

BS     Okay you have two questions here Dr?  The first question is do you agree or disagree with the accuracy of the research that he sites?

DB     No. I have no problem with the research.

BS    Then – then where you disagree is the factual basis that he makes the connection between the research and Paul Speer.  Is that what your saying?

DB    Yes.

BS    Okay so then what we need to focus on the factual part.  I'd like you to go through and tell me the other factual things that you have either questioned, don't think the data is in the record, whatever.  Okay?

DB    Well here is a classic example I'm talking about.  I guess it's the reason why I -- well this is interesting: In an interview, in the interview Paul said his dad would discipline him when his mother would ride his father so much that he would (sounds like "target") or when Paul did something bad like get kicked out of school.  So now, did the beating cause him to get kicked out of school or did he get kicked out of school which caused the beatings?

BB    What's the difference?

DB    The difference --

BB    -- All we're talking about is that he was, his father wasn't loving him and he's father did beat him after being ridden so hard by his mother.  Not we all the doctor's talked about.  Is that -- and if he just takes that basis can he make a finding like he has made?  Are you saying the beatings did not occur at all?

DB    I don't know.

BB    Okay.

DB    Because I and the reason why I don't know is because there was never any other evidence other than Paul saying this that it occurred.

BS    Okay and there's nothing in the other records about Paul ever being beaten. And CPS records --

DB    -- There was, there in the CPS records there was one bruise on his, on his side I believe it was or something like that, but here it says he had bruises, he had (inaudible) side, ribs, back, or using the belt. The bruises on his body being huge as a child.  And it was not and he – he was not hit in the face until after he was 10 years old.  There's no evidence in the school records  or anything that says that he came to school with these big huge bruises.

64

BS    Go to the next one.

DB    Oh God. Grandfather.  (Pause) Okay grandfather. Okay the grandfather dies, right?

BB    Right.

JG BS BB (Inaudible whispered conversations)

DB    Now he's going to say the child has bereavement. What he's saying here is that children who have lost a parent, he's talking about Paul, he loses his grandfather, typically rated themselves, or were rated by their parents and their teachers as having significantly lower, poor academic performance, lower educational aspirations and expectations for success, higher overall incidence of withdrawal with higher levels of delinquency and higher levels of depression, (inaudible) disorder or anxiety. First of all this research is talking about loss of parent not necessarily grandparent. And it depends on the relationship between, I guess, between the child and the parent.  Second of all you can not blame that because a parent dies that uh that this this is gonna happen.  Kids parents die all the time and they don't go and have all these problems that they're talking about. That --

BB    -- Okay.

DB    And I'm not sure that Paul's grandfather dying caused him to have these problems.

BB    Okay. Next thing.

BS    Okay, but you agree with the research?

JG    As to parents?

BS    As to parents right.

DB    Well the research is 1965, 1996, '97. It says this thing happens.  I mean that we see a high -- that kids who -- this is all kids who's parents died (inaudible)  their kids have a higher incidence of this occurring. that's all.

BS    Well I mean you agree with that –

DB    (Inaudible).

BS    You don't necessarily agree with the research?

DB   No, I don't agree or disagree with it. I mean it's just like it really it's not very germane to anything, I mean --

BS   Okay.

DB   Inter-parental conflict. Oh Jesus. Do we have to go through every one of these?

BS   Yeah. Come on.

JG   Did you seen any evidence of domestic violence in the record other than anything Paul Speer said?

DB   You know first of all you know this is bull.

BB   He doesn't have to go through each one. Why doesn't he just say he doesn't agree with any of the findings because they're not supported. Is that true?

DB   Why don't I just say that -- that I'm not sure why -- how much money did you guys spend for this.

JG   You can't ask that.

DB   Oh okay I'm just saying that -- that this is nice generalization and nice nice uh...research on uh child behavior and problem behavior and and difficulty that kids have coming from abuse and uh, uh, drug abuse homes and so forth and so on; harsh discipline of course, or discipline, whatever. And the research is and the literature is full of this data. Um, I don't disagree that the data's out there, I don't disagree with what the data says but I'm not so sure if any of this data has anything to do with what Paul Speer did in the instant offense.

BS   Okay. In the phone calls over that four week period of time when these phone calls took place. You don't know how that relates to it? Is that what your telling us?

BB   12 week period.

BS   Whatever.

DB   Or in other things that he's done in his life. I mean I'm not so sure that -- that we can say research says that kids coming from these backgrounds tend to do this. They say kids come from my background tend to not do

what I do also.  I mean I'm a fairly large anomaly I guess okay because I was certainly chosen not to succeed.

BS    Well okay you – you basically though agree with the research?

DB    I'm saying the research is on is a generalization...

BS    I under....right.

DB    And is not necessarily germane to an individual.  To take the research and boil it down to what individuals say this is germane to this individuals life is incorrect and wrong.  It's gives you trends and theories about how to think about society and what we're doing and what's going on in this world that's what this research is doing.  It is not germane to one individual.

BS    Well it do you would you agree that those things that Dr. Miller talks about the research uh...are risk factors that may result in a development of deviant personality and antisocial behavior?

DB    May. It may not.

BS    Okay, but those are recognized risk factors based on the research increased the probability that a person that is raised under those conditions has a higher risk of engaging in anti-social or socially unacceptable behavior.

DB    Higher risk?

BS    A higher risk?

DB    I would say that there is certainly a dysfunctionality that went on in that home environment is a breeding ground for that kind of activity certainly. And I said that in my report.

BB    Well they were lucky enough to get 3 children like that.

DB    And?

BS    Three out of four is not bad, huh?

DB    (Inaudible, talked over) all four.

JG    Yeah, only two are killers.

DB    Well and you didn't get --and you didn't get all four, but at the same time --

BB    -- You don't know what Sabrina does?

BS    You don't know what Sabrina does?

DB    And you don't know what -- but I'm not gonna make her a killer when we don't know whether she is or not, okay?

BB BS DB (All inaudibly talking over each other)

DB    Okay, then okay

BB    Would you --

DB    -- Well that's the same kind of generalization that your using --

JG    -- Oh stop! You're arguing with the man and I need a cigarette.

DB BB BS    (Inaudible, talked over)

JG    If you have questions ask them.

BB    Go ahead.

PN    I didn't do it on purpose. Well we'll just let that go for now. I do want to follow up on a couple of other things. Dr. tell me this whole incident of personality disorder? Um from your point of view can you just tell me what the ideology is of a personality disorder? Is it a bad seed or is it something that happens over time?

DB    There's no such thing as a bad seed. Though you know sometimes I wonder about that in terms of that I've seen some of the kids here in my children's clinic that are, that seemingly have, you know, have this -- there is a core – there -- we do know the anti-social processing -- a personality -- a personality characteristics I should say, uh, we do know that – that there is some family dynamics with it. And if you look in the DSM it will say so, okay? But we do not know of any chromosomal or a genetic predisposition for that, number one. Number two it does not mean that somebody who has a anti-social personality disorder in their background or in their history is gonna be anti-social personality disorder themselves. The personality dynamics or personality disorder is a – a character, a characterological, or character, or a disorder of character that we have. And character is a basic fabric of the – the – the – the central stem of who we are. As one may the personality type of an individual is the fabric in which they are blended into. And there's some people who are cotton fibered or some people who are wooled fibered or some people who are rayon and they're -- but they when I say it like that I mean their different

personalities.   And the personality characteristics of those individuals are fairly uh, uh, resistant to change over time and -- once they had been set. Now where does that come from? It's the nature-nurture debate.  Some people think there's underlying genetic predisposition and that that plays a role. And some people think that there is an environmental influence that plays a role in it, uh, that develops this personality disorder or personality characteristics. Where does it come from?  I don't know.  Uh, you can find researchers on both side of the camp on that.  Um --

PN   -- Which side are you on?

DB   I – I – I just quote the data. I'm not taking any sides on that because I don't know.

BB   Are either of those the fault of the child?

DB   There's a point in time in life whether regardless of your personality that you have to take responsibility for your life.  The choices that you make are no longer externalized or external to you, but they are in fact internal and they are your thought process.  If you if that was the case that any or everybody could blame any and everything they did on somebody else when will start taking responsibility for our own behavior?  You know you can not continue to blame your parents because you are asked.  Okay simple as that.  Now if you are 3 years old we can blame your parents for poor parenting.  If your 5 years old we can blame your parents for not not total training and your pissing in your pants.  At 7 years old I can say you know what he needs some better pro social behavior and we need to get him involved in various types of activity 'cause he doesn't relate well to others.  And that maybe has something to do with him being abused as early as a child.  At 13, we could probably say some other things about their sexuality and whatever.  But right around 16, 17 years old things are set and you have to take responsibility for your behavior.  We all have different histories, different ways in which we are brought up; whether parents were permissive or were coercive over  the disciplinary or were horribly harsh. Whether or not they were loving, whether or not they were cold and removed or distant.   And you know there are jokes about different cultures who have different relationships with their family members and what have you.  Germans are cold.  Jewish people are over protective.  Black people have this kind -- I mean we have all kinds of jokes about this shit.  But when do we take responsibility for our own behavior?  When do we personally have to stand up and say it's my decision?

PN   Can we go back to –

DB   -- That's personality --

PN     -- Personality disorder.

DB     That is personality disorder.

PN     Okay, is there a point at which, uh, you believe personality is, is gelled or has become solidified in a person?

DB     (Sigh)  You're not 'gonna, you know there's a lot of research on it.  There's a lot of influences that -- you're not gonna see a whole lot of change after uh, six-, seven-years-of-age, okay? In terms of the, the seeds that didn't -- like the whole system has been set.  Other people say that, you know, there is changes in personality that occur up through all through your life and that it's a continuance, uh, fluid kind of change that occurs.

PN     What do you believe?

DB     I tend to be more in the fluid side.  I think that personality tends to, to evolve.  And I think that we all are evolving. I think we all tend to grow and evolve as we move along.  Right or wrong I think we evolve.

PN     So given that point of view can you explain to me why you believe that Paul's personality is not likely to change much over time?

DB     Because he's an anti-social personality disorder and is not gonna change too much over time because he has not given himself to that.  Research says that, that his char -- he's pretty much is not gonna change too much over time. He will be anti-social, you know?

PN     I --

DB     -- When he gets to 50, 60-years-old he may mellow a little bit, you know?

PN     So his personality will not continue to evolve?

DB     When I say evolve I'm talking about that he can  -- if you start off going in one -- yeah, he'll evolve he's become more anti-social at this point.   So he'll become more anti-social so he's gonna continue going in that direction.

PN     That's what we would read in the DSM?

DB     Um, yeah. Read it.

PN     Um, and do you stay current on research (sound of tape recorder manipulation) Probably have to listen 5 minutes.

70

DB    You guys are running out of time here cause I'm getting tired and you guys are way over your 2 hours.

PN    Continuation of my interview with Dr. Bayless. This is side number five. I promise it will be just a few more minutes. I was asking you about whether or not you stay current on the research of treatment of personality disorders?

DB    Treatment of personality disorders?  First of all I don't treat personality disorders, number one,  other than probably borderline (inaudible) and probably be DDT (Dynamic Deconstructive Therapy) with that. And, but anti-social personality disorders?  I don't know of any treatment that really works effectively. Do you?

PN    I'm just asking you if you stay current on the research?

DB    I – I believe I do, but if you know of some research that I should read about, I'd be more than happy to read it.

PN    Well I'm certain that if there was anything that was relevant you would have read about it.

PN    One last thing I was browsing through the American Psychological Association website and I see that, um --

DB    --I didn't pay my dues.

BB    What?

DB    I haven't paid my dues yet.

PN    I see that you have a code of ethics.

DB    Yeah.

PN    And I just wondered how you interpret --

DB    I just mailed it out. (Inaudible).

PN    I just wondered how you interpret your ethical or your professional duties with respect to your role in assisting the state in seeking the death penalty?

JG    Oh you don't have to answer that. Get a court order if you want that one answered.

1

2    PN    I think it most definitely (spoken over, inaudible)

3

4    BB    But she has to plan.

5

6    JG    Yeah, but I'm telling him don't answer that question.  I wasn't rude enough
7          to ask your expert their personal opinion on the death penalty.  This is an
8          attack on Dr. Bayless implying that he is somehow assisting the state in
9          killing someone. So I'm telling him don't answer it.  I don't know what the
10         answer is  I don't care what the answer is.

11

12   BB    Okay.

13

14   PN    Dr. Bayless?

15

16   DB    Yes?

17

18   PN    Do you have any view about your professional responsibility with respect
19         to?

20

21   DB    I was told not to answer that question.  You guys are fighting right now
22         and I don't want to be in the middle of your fights or anything.  As so you
23         know, and I can be a nice little kid and just sit back on the corner and
24         check things out.  So when you guys finish fighting this out I'll be more
25         than happy to answer that question.

26

27   PN    Alright.

28

29   BB    Is that it?

30

31   PN    That's it? No answer?

32

33   DB    No answer.

34

35   PN    Okay. Now we're previously talked about getting the additional reports and
36         you said we would need a court order to get the additional reports.

37

38   DB    You got one?

39

40   PN    So no, I didn't get one today, but I will bring you one. In addition to which
41         we talked about the pages that involve this, those profiles,  the --

42

43   DB    -- Now if you can't buy the book now what makes you think your gonna get
44         those pages huh?

45

46   PN    Please.

72

| | | |
|---|---|---|
| 1 | | |
| 2 | DB | No. |
| 3 | | |
| 4 | PN | Is that a real no? |
| 5 | | |
| 6 | DB | That's a very firm no. |
| 7 | | |
| 8 | PN | How are we in the world are we supposed to understand this stuff when |
| 9 | | it's just being – |
| 10 | | |
| 11 | DB | -- That is not my problem.  That is your problem.  You got experts go talk |
| 12 | | to them. |
| 13 | | |
| 14 | PN | Well we tried to bring them with us today and we weren't allowed to. |
| 15 | | |
| 16 | DB | Well, you know, listen to my tape and I'm sure they'll be happy to help you |
| 17 | | out.  And Dr. Parrish is a very renowned expert in this and he should do |
| 18 | | real well  with that. |
| 19 | | |
| 20 | JG | I thought you said you had the book? |
| 21 | | |
| 22 | DB | Yeah. |
| 23 | | |
| 24 | BB | He didn't say that.  Bob didn't say that. |
| 25 | | |
| 26 | JG | He did. |
| 27 | | |
| 28 | DB | He did say it. |
| 29 | | |
| 30 | BB | Okay, let's say we got to go. |
| 31 | | |
| 32 | PN | Alright, thank you. |
| 33 | | |
| 34 | BS | Well wait a minute one more question.  When do you -- |
| 35 | | |
| 36 | DB | I ain't going nowhere. |
| 37 | | |
| 38 | BS | When do you think -- Paul Speer -- his track was set? |
| 39 | | |
| 40 | JG | If you have an opinion? |
| 41 | | |
| 42 | BS | Do you think it was set at  nine or 10 or 11 when he saw Kabanski and -- |
| 43 | | |
| 44 | BB | -- Or 16 and 17 or 28 or 29? |
| 45 | | |

73

fl

DB   I don't think a track was set I think that he was moving in a direction very early on. Uh…he was doing burglaries and and stealing things from very early on.  Uh…was involved in well he went to Adobe uh….was I think uh…influenced by a lot of different factors in his life.  Uhm… and his thought process uh…I think became very anti at a high anti-social orientation at a very early age.

BS   (spoken over, inaudible)

DB   I didn't say nine you said nine.  I said at a very early age he was diagnosed with conduct disorder.  I think he was what 14, 15?

BS   Ten.

DB   No it was 14.

JG   Eleven.  It was Kabanski in 1990.  Am I the only one who read this?

BB   No, '91.

DB   Ninety-one, okay.

JG   No, the first one was --

DB   -- Nineteen-ninety-one it was Kabanski, the conduct disorder. But it was confirmed, it was confirmed, I think, two years later when he was 13. Again Kabanski saw him in '93 I think it was.  And Martig and everybody else came around and was talking about conduct disorder.  So we start seeing conduct disorder, which is a precursor to anti-social pro – orientation, uh, quite early on in this boy's teenage life.

(inaudible)

JG   It's now twenty minutes to six. (recorded stopped).

reviewed 2/15 jmh mcao

74