# Exhibit 17

1

**DECLARATION OF LEE BRINKMOELLER**

2

3        I, LEE BRINKMOELLER, declare:

4   I was the mitigation specialist on the team handling Paul Speer's petition for post-

5   conviction review ("PCR") in the Arizona state court system.  I was asked to come on

6   the case in 2011 by Paul's lead counsel Nathaniel J. Carr III.

7   This case was my first as a capital PCR as a mitigation specialist.

8   I believe that Paul's PCR might have been Mr. Carr's first PCR as well.  Brent Graham

9   was initially appointed as advisory counsel, but then the court ordered him to officially

10  be made co-counsel .

11  I drafted a list of times I thought that the defense should have objected to prosecutorial

12  misconduct during trial and I gave it to the attorneys. I also was aware of the

13  contradictory theories of the prosecution between Paul's and Brian's trials, and I

14  believe I discussed that situation with Mr. Carr.  I don't recall whether Mr. Carr or Mr.

15  Graham considered that issue as a PCR claim.

16  Mr. Carr was going through his legal and ethical troubles with the state bar association

17  when we were working on this case.

18  Dave Wilcox was the mitigation specialist appointed by the court at Mr. Speer's capital

19  trial.  I know Mr. Wilcox from our time working together in probation.  Mr. Wilcox

20  was pretty cooperative with me.  One thing that he felt strongly about was that he

21  should not interview Sabrina Womble, Mr. Speer's mother, because "she is a heroin

22  addict."  Mr. Wilcox told me that was why the trial team didn't talk to her much or try

23  to put her on the stand.  Mr. Wilcox felt that Sabrina still wouldn't be a useful or

24  helpful witness.  However, I disagreed with that approach; I would have wanted her to

25  testify at the penalty phase to show the jury how screwed up she is and to corroborate

26  Paul's statements to the experts. The prosecutor continuously presented Paul as being a

27  dishonest sociopath who manipulated the defense experts. The defense experts and

28

1

mitigation specialist did not obtain independent interviews with Paul's family that would corroborate Paul's statements. I thought that was a big mistake by the trial team. Paul Speer's aunt, Debra Corral, was accused by his mother of sexually abusing Paul when he was about four years old. Ms. Corral's position was that Sabrina Womble made it all up. Interestingly, the detective who did the child sex abuse investigation is married to my friend's ex-husband. That detective thought that Paul's claim of sex abuse was a valid claim.

I knew of Dr. Bayless thirty years ago, when I was a probation officer. Dr. Bayless was very much a partisan of the prosecution who put a lot of people on death row. Dr. Bayless had a reputation for doing sloppy work, but he would give the prosecution what it wanted. Dr. Bayless thought everyone was a psychopath.

Dr. Bayless charged a flat fee for his work on both Paul Speer's and Brian Womble's cases.

The PCR team tried to get the notes and raw data from Dr. Bayless, because Paul insisted that Dr. Bayless didn't do the testing he said he did. My recollection is that Dr. Bayless told Mr. Carr that the notes and raw data were lost in a flood or a fire. I never talked to Dr. Bayless with regard to the Speer case.

Mr. Carr and Mr. Graham were aware of the discrepancy between the testing Dr. Bayless testified he administered, and the short amount of time the jail records showed him to have been with Mr. Speer. I do not believe they did enough with that issue.

I tried to speak with Dr. Stewart and get his files, but Dr. Stewart kept blowing me off and didn't want to help at all. I think that Dr. Stewart did a sub-par job. I discussed subpoenaing Dr. Stewart with Mr. Carr and Mr. Graham so the PCR team could talk to him and get his files, but nothing happened on that front.

I do not recall there ever being a discussion with Mr. Carr or Mr. Graham about the jury deadlock during penalty phase. We should have been aware of that.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

2

1    Executed on 7/28/18 _____, at Mesa, Arizona.

2

3                                 _____

4                                 LEE BRINKMOELLER

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                              3

Exhibit 18



Chris Gash

# Death-Penalty Lawyers Are Making a Killing Off Maricopa Taxpayers

**PAUL RUBIN** | JULY 19, 2012 | 4:00AM

In early December 2010, Phoenix criminal-defense attorney Nathaniel Carr III submitted an invoice for payment to Maricopa County in the death-penalty case of Israel Naranjo.

The invoice included a notation for November 17, 2010:

"Florence interviews Willie and Adolph. We got trouble."

Carr was referring to interviews with Naranjo's two incarcerated half-brothers at the state prison in the central Arizona town. He billed the county for eight hours of work that day, which may have included travel time.

As Naranjo's lead lawyer, Carr was paid $125 an hour by Maricopa County. He is one of a group of private attorneys who hold contracts with the county to represent indigent clients in murder cases that the Public Defender agencies can't handle for one reason or another.

The eight hours on November 17 equated to $1,000 for Carr. Add to that invoices for work he said he had done in the days preceding to prepare for the prison interviews. (Carr also billed the county three hours that day in two other cases.)

"Going to see Israel's brothers on the 17th, trying to prep as much as possible," Carr wrote in his November 14 entry for 2.5 hours ($312.50).

In a November 16 invoice, Carr charged another four hours ($500) for more "preparation," and mentioned his client's imprisoned half-brother Adolph Perales.

"Adolph, he is the guy for us," Carr typed into his bill, which read (like dozens of his invoices) more like a personal journal entry than a formal request for payment from a government agency.

"Carries a lot of baggage, but is HUGE for us in mitigation."

**See also: Grim Reapers: Arizona Inmates On Death Row (slideshow)**

Naranjo was facing death row in the March 2007 stabbing death in Phoenix of his pregnant 38-year-old girlfriend, Delia Rivera. Evidence of his guilt included the victim's three children as eyewitnesses and a confession. Carr and his defense team had to try to persuade jurors to spare their client's life after they inevitably convicted him of murder.

Perhaps Naranjo's imprisoned half-siblings might provide compelling evidence about his particularly difficult childhood.

Carr's next billing entry was for the November 17 "we got trouble" interviews at the prison with Perales and Willie Torres, the other half-brother.

Carr sent over his November 2010 billings, as usual, to James Logan, director of Maricopa County's Office of Public Defender Services. Among many other duties, Logan is responsible for approving payments to the private criminal-defense attorneys under contract with the county.

Carr signed his name to his request for payment just above a sentence that said in part, "I do solemnly swear that the accompanying statement is a just statement of account against Maricopa County; that the work and labor specified herein have been performed."

In other words, Carr was avowing that he had done all of the work he claimed.

Without comment, Logan approved the month's billings in *Naranjo*, $11,985 for 102 hours of work, just as he had literally hundreds of times in Carr's murder cases since becoming his agency's director in 2007.

But Nate Carr was lying about going to Florence for those November 17, 2010 interviews.

He wasn't at the state prison that day, and he never spoke with Israel Naranjo's half-brothers.

Carr's co-counsel in *Naranjo* was Taylor Fox, a Phoenix attorney paid $95 an hour by the county as "second chair" in the case.

Fox also submitted an invoice to Jim Logan for November 17, 2010, saying he, too, had interviewed the half-brothers that day in Florence. For his efforts that day, Fox charged 6.8 hours (compared with Carr's eight-hour bill).

Fox was asked why both he and Carr had gone to Florence, after *New Times* obtained their separate billing records through a public-records request. The question seemed to stop the attorney short.

"Both of us didn't interview those guys," Fox said, after glancing at Carr's November 17 invoice, which he said he previously hadn't seen. "This is totally false, a bald-faced lie. I *was* down there. I spoke with those guys. Nate didn't. This is some serious lying here."

Nate Carr did not respond to repeated e-mails, phone calls, and a hand-delivered letter seeking comment.

But a representative for the Arizona Department of Corrections told *New Times* that Carr didn't visit with the half-brothers on November 17, 2010 – or ever. The spokesman, Bill Lamoreaux, did confirm that Taylor Fox met with Adolph Perales on that date, though he said he couldn't find a visitation record that day with the other half-brother, Willie Torres.

Fox said he took notes during his interviews with Perales and Torres, and then drafted a memo about his findings dated December 2, 2010, which he sent to Carr and Johnson.

Torres confirmed to *New Times* that he did meet with "a white lawyer" for his brother.

Fox is white.

Carr is African-American.

---

Nate Carr remains the king of Maricopa County's contract criminal-defense attorneys when it comes to collecting money, even though he hasn't been assigned a new capital case since 2009.

As of June 21, according to a county spreadsheet, Carr had been paid $2.4 million since the start of 2006 for representing accused murderers.

That amounts to about $370,000 per year, a sum that compares favorably to the $123,000 that County Attorney Bill Montgomery earns yearly, the $100,000 that deputy county attorney Eric Basta (chief prosecutor in *Naranjo*) makes, and the $145,000 that Judge Roland Steinle (who presided at Naranjo's trial) is paid.

Jim Logan of the Office of Public Defender Services makes $164,000 a year.

President Barack Obama is paid $400,000 annually, but he has perks that Carr doesn't.

Close behind Carr is Phoenix attorney Roderick Carter, paid $2.2 million over the same 5 1/2-year stretch, much of it for work as second chair in the extended trial last year of Mark "Baseline Killer" Goudeau.

Carter collected $494,000 from Maricopa County in 2011.

Randy Craig sits third on the money list, at $1.8 million.

As with Carter, much of that sum was from his representation of Goudeau, who now sits on death row.

The $1,800 that Maricopa County paid Carr for his duplicitous "prison interview" invoices is a fraction of the $453,000 he collected in *Naranjo* over a four-year period that ended with the killer's May 2011 death sentence.

(Taylor Fox made $138,000 in *Naranjo* as co-counsel, and Stephen Johnson – another key player in this story – billed $98,000 as the defense team's "mitigation specialist," a position that doesn't require a law license.)

On top of Carr's falsified invoices, an examination of invoices submitted by both him and Johnson in *Naranjo* and other cases over the past half-decade show that both men padded billings as they collected thousands of dollars from Maricopa County every month.

The *Naranjo* billings reveal that the pair billed for dozens of "team meetings" with Taylor Fox – 58 in Johnson's case and 38 in Carr's – that Fox never submitted invoices for and says he never attended.

"If I attended a team meeting, I would have wanted to get paid for it," Fox said. "If I wasn't there, I wasn't there, and I wouldn't say I was. I don't over-bill or under-bill."

It gets worse.

A review of more than 64 invoices submitted separately for payment by Fox and Carr for work they allegedly did complete together (these so-called "team meetings," court hearings and one-on-one discussions) reveals this:

On average, Nate Carr billed almost three times more hours than co-counsel Fox for identical services supposedly rendered.

Here's a comparison of some billings that the pair submitted separately in early 2011 during jury selection in the Naranjo trial:

• February 21: Carr lists a 6 1/2-hour "team meeting," and Fox bills that same day for a two-hour "team meeting."

• February 23: Carr bills 12 hours and Fox bills 7.2 hours.

• March 2: Carr bills 9.5 hours for "preparing" an expert witness for testimony. Fox charges 3.5 hours for preparing the same witness.

• March 16: Carr bills for a 14-hour day. Fox bills 3.3 hours.

Such was the norm throughout the Naranjo case, month after month, year after year.

Carr and Fox had other murder clients at the same time and were billing in those cases as well. So was mitigation specialist Steve Johnson, who was reinstated as an attorney in late 2007 – several months after his appointment in *Naranjo* – after a suspension that lasted four years.

Carr and Johnson appear to have added hours to their invoices whenever they wanted. Perhaps they were emboldened knowing that Jim Logan, the county's gatekeeper of the contract private attorneys, approved whatever amounts they asked for (with one exception regarding Carr).

"My job is to look at every invoice that comes into this office, and I do that," Logan told *New Times*.

"But I don't think it's fair to expect me to know every last thing, true or not, that may be occurring with every lawyer. No one, including Taylor Fox, alerted me to anything negative about Mr. Carr or Mr. Johnson."

Fox confirmed that he didn't speak to Logan about the two men, despite problems he said he had with their work ethic in *Naranjo*, or what he suggested was the *lack* of a work ethic. He said he hasn't spoken with either Carr or Johnson about the case since Israel Naranjo was sentenced to death May 12, 2011.

"I don't know what I would say to him that would be productive," Fox said.

Logan is correct that it would have taken major sleuthing by him to have unearthed Carr's falsified 2010 prison interviews billings.

But this question lingers:

How was it that the reputedly hyper-vigilant Logan and his in-house auditor didn't ever suspect wrongdoing over Nate Carr's multitude of steep invoices?

Logan did catch an improper billing by Carr once, in February 2009, when he declined to pay Carr for 14 hours of "work" after the attorney charged the county $1,750 for "scanning documents" in another murder case.

"Scanning is clerical work not to be paid," Logan scribbled on a Carr invoice.

Logan told *New Times* that he never noticed other charges for "scanning" on Carr's billings before then and didn't look at the invoices retroactively after that.

He should have.

Carr's paperwork shows he billed Maricopa County more than $5,000 for "scanning" in the Naranjo case alone, and almost $20,000 overall in more than 50 invoices over a three-year period before Logan happened to notice.

"Scanning day," he wrote on a June 2008 bill for 3.5 hours, or $437. "Putting it on flash drive takes quite a bit of time."

Carr claimed on July 4 that year to have spent three hours at the printer: "Love scanning on holidays – the best!"

Later in 2008, Carr expressed frustration on his invoice after an apparent 2.5-hour attempt to scan in yet more documents: "Tried to scan into flash drive – Houston, we have a problem!"

Bills submitted to public agencies are public record, but Carr oddly chose a stream-of-consciousness approach in many invoices, even when referring to his own death-penalty-eligible clients.

"He just snuck up and blasted her in the head," he wrote of his client Larry Gary, now serving a life sentence for murdering his Phoenix girlfriend in November 2007. "I don't think she ever saw it coming. So he blows his girlfriend of five years' head off. Not good."

In a February 2009 invoice for four hours, Carr wrote: "Heavy work. We are getting down to the nitty-gritty. I think we are good, but it's dirty Basta and not-so-smart Steinle."

This would be *Naranjo* prosecutor Eric Basta and Judge Roland Steinle.

The following month, Carr said this about Dr. Brad Bayless, a prosecution expert witness in *Naranjo*: "Lots of impeachment material – he's the state's whore."

He charged the county three hours, or $375, to come up with that observation.

After interviewing a pair of Phoenix homicide cops in August 2010, Carr wrote, "Those two make me dislike cops even more. They are so full of garbage. I will destroy them on the stand."

Finally, this one from June 2009, an invoice for what Carr claimed was three hours of video-watching: "Looking at new video of our client from the past. He looks like a killer, not a retard."

The latter reference is to the fact that Naranjo is mentally handicapped.

Jim Logan said he never advised Carr to tone down his commentary on official county paperwork.

"It was very weird, but I never said a word to him about it," Logan said. "Why should I have?"

---

Maricopa County's lucrative criminal-defense niche began to explode in 2005, within months after Andrew Thomas became county attorney.

Death-penalty filings increased exponentially during Thomas' controversial reign, which ended when he resigned in 2010 to unsuccessfully run for Arizona attorney general.

By 2008, Maricopa County had become the nation's unofficial capital-punishment capital, with about 150 death-penalty cases pending — up by two-thirds from three years earlier. It didn't help that the landmark U.S. Supreme Court ruling in *Ring v. Arizona* mandated retrials for several convicted murderers (now they would be sentenced by juries, not judges).

Death-penalty cases are among the most expensive, time-consuming, and rigorous in the justice system. One reason is that most murder defendants are unable to afford lawyers, and the courts must appoint counsel to represent them — at great cost to taxpayers.

In Maricopa County, defense attorneys appointed to murder cases usually come from one of three Public Defender agencies. The country also contracts with private lawyers to take on cases with several defendants, who may be pointing fingers at each other and legally cannot have attorneys from the same agency representing them.

Jim Keppel, the county's presiding criminal judge during the height of the courthouse crisis regarding death-penalty cases, says there just weren't enough judges, prosecutors, and qualified defense attorneys to handle the load during the unprecedented blitz of capital filings under Thomas, who since has been disbarred. (Pending death-eligible cases have shrunk from the peak of about 150 to about 65 since Thomas' departure.)

Maricopa County tried at the time to lure more private attorneys into the death-penalty-defense fold by increasing the hourly rate for first-chair lawyers to $125 an hour and second-chair attorneys to $95 an hour. Mitigation specialists – who are similar to private investigators, but whose sole task it is to find reasons for jurors to possibly spare guilty clients – got bumped up to $55 an hour.

Twice-suspended attorney Stephen Johnson, still months away from getting his law license back, made his reentry in early 2007 as a death-penalty mitigation specialist.

---

Since then, Johnson has become the Zelig of Maricopa County's criminal-justice system.

In part, his ubiquitous presence is testament to how desperate county officials were during the Andrew Thomas era to lure practically anyone to work on the rash of capital cases that emerged.

Johnson has collected more than $1 million from Maricopa County since 2007 as either a co-counsel and mitigation specialist in a series of murder cases. That's about $200,000 a year, not bad for a fellow so down on his luck a decade ago that he moved back in with his parents.

A bear of a man, Johnson is known around the courthouse as gregarious and likable. But he long has taken on (and authorities have allowed him to take on) more clients and cases than he can handle. As a result, he inevitably has gotten in trouble with the State Bar of Arizona.

The Arizona Supreme Court suspended Johnson for the second time in May 2004, more than a year after he admitted lying to the state Court of Appeals about why he hadn't submitted legal paperwork on time for an incarcerated client.

More than a dozen people had filed complaints against Johnson before the suspension, claiming he ignored their cases after collecting fees.

"It is apparent that Mr. Johnson's only concern is to receive whatever amount of money he receives with as little or no work as possible," the parents of one of Johnson's incarcerated clients wrote in 2002.

"Mr. Johnson believes he is above and beyond the law."

Johnson's 2004 suspension was for six months and one day – the extra day signifying the formal proceedings he would have to undergo to be reinstated.

He didn't win reinstatement until November 2007. But, meanwhile, he found good-paying jobs ($55 an hour) as a mitigation specialist for Nate Carr in *Naranjo* and for Randall Craig in the sprawling Mark "Baseline Killer" Goudeau case.

To be appointed in a capital case, rules of the Arizona Supreme Court say, a defense attorney must "be a member in good standing of the State Bar of Arizona for at least five years preceding the appointment" and "have practiced in the area of state criminal litigation for three years preceding the appointment."

Steve Johnson was able to bypass these rules because, without comment, the Supreme Court in January 2008 granted his petition and allowed his appointment as a second-chair attorney in trial and appellate proceedings. (Last September, the court granted another Johnson petition, this one to allow him to be lead counsel in death-penalty cases.)

"It's up to the first chairs who they want as co-counsel or as mitigation specialists," said Jim Logan of the county's Office of Public Defender Services. "I did mention Mr. Johnson's recent history to Mr. Carr and to others at one point or another, and they seemed okay with it."

Among his new cases after his reinstatement as a lawyer, Johnson became co-counsel to Randy Craig in the capital case of Donald Delahanty, accused of killing Phoenix police officer David Uribe during a routine traffic stop on West Cactus Road in May 2005.

Many criminal defendants are prone to whining about their attorneys when things go poorly.

But the several recent clients who have protested to judges and to the State Bar about Johnson sound eerily similar to those of a decade or so ago, when he lost his livelihood for years.

A year ago, the Bar issued a formal reprimand against Johnson after a convicted inmate complained, with good reason, that the attorney − his court-appointed appellate advocate − had not responded to his repeated phone calls and a letter. The reprimand was a hard slap on the wrist, one step short of yet another suspension.

Another complainant was Mexican national Fidel Godinez-Garcia, one of eight men charged in May 2008 in the Phoenix murder of a suspected high-level human-smuggling boss. Court records show that Jim Logan appointed Johnson in late 2008 to replace Nate Carr as lead attorney in the non-capital case.

Godinez-Garcia wrote to the Bar in early July 2010 that his trial supposedly was on the horizon, yet he hadn't spoken with Johnson for months.

This, by the way, should have surprised no one, given the workload that court officials had allowed Johnson to assume. Legitimate mitigation work in *Naranjo* and *Goudeau* alone would have been more than enough for most people.

But Johnson also was lead lawyer in one first-degree non-capital murder case and co-counsel in at least three others.

Godinez-Garcia, who doesn't speak English, claimed that Johnson (who doesn't speak Spanish) had showed up for a rare jailhouse visit without an interpreter.

"That just goes to show that he is not taking me serious," Godinez-Garcia said. "My case is very important to me and my family, and I need a lawyer that will take me serious." (Another inmate translated into English what Godinez-Garcia said for the handwritten missive.)

But Johnson remained on the defendant's case until early this year, when another private attorney on the county's contract list replaced him.

Daniel Garcia-Saenz is another murder defendant who expressed serious dissatisfaction with Steve Johnson in writing. He also is a Mexican national and remains accused with three other defendants in the 2008 drug-related home-invasion murder of a West Phoenix man. Actually, the accused man wanted *both* lead attorney Carr and co-counsel Johnson off his case.

In late 2009, Garcia-Saenz informed trial judge Michael Kemp that his attorneys weren't paying any attention to his case.

"There is no way I could ever trust such dishonest and incompetent attorneys," the defendant wrote. "They have repeatedly told me they would visit and would bring information to me to review and then broke those promises. This is the same type of dishonesty they have demonstrated for a year and continue to do so in my case."

Judges usually pay little heed to such grievances, not wanting indigent clients to engage in lawyer-hopping as trial dates near.

But Kemp, a former county and federal prosecutor, was concerned enough to hold a hearing in December 2009 on the issue. According to a court transcript, the judge asked Nate Carr how many interviews he had conducted in the case during the year and a half he had been on it.

None, Carr replied, suggesting he simply followed the lead of other attorneys in the multi-defendant case.

Carr actually agreed with Garcia-Saenz about the lack of mutual trust between the attorneys and their client.

Kemp allowed Carr and co-counsel Johnson to withdraw, without sanction. More than three years later, Garcia-Saenz still is awaiting resolution of his case.

Jim Logan approved all of Carr and Johnson's bills in the case, almost $100,000 for Carr and $40,000 for Johnson.

Looking over the pair's invoices in *Garcia-Saenz*, it appears that both men were hard at work as the case edged forward. But court files show that they filed just four minimal legal motions between them during their year and a half on board and, as Carr admitted, had completed no interviews.

In May 2009, Nate Carr claimed to have worked 28 of 31 days (including each Sunday in that span) on *Garcia-Saenz*, including six meetings with co-counsel Johnson.

"Discussion with team about this god-awful mess," Carr wrote on an invoice that month in which he asked for and got $7,300 from the county.

In September 2009, Carr billed the county $8,250 after supposedly working every day that month — including Labor Day — on the Garcia-Saenz case.

He charged two hours on September 29 for what he called "media review," noting on the invoice, "Found some new old articles, kinda an oxymoron." That would be $150 for reading brief news stories about the home-invasion killing.

Carr also billed 61 hours in the Naranjo case ($7,625), saying he had worked on it for all but four days that month. He also was paid for another alleged 159 hours of work on behalf of other murder clients, for another $14,000.

On Friday, September 17, he billed 10 hours for work on various cases, including Daniel Garcia-Saenz's ("Research-witness questions") and Israel Naranjo's ("Had to listen to confession — not good.")

What makes that date noteworthy is that the Glendale Mountain Ridge High School football team traveled to Chandler late that afternoon for a game against powerful Hamilton.

From 2006 through the end of last season, Carr served as offensive coordinator for Ridge, a time-consuming passion of his from the late summer into December. People at the county courthouse who know the onetime University of Arizona football walk-on tell *New Times* that coaching seems Carr's true passion.

To put in 10 hours of work that September 17 would have been a tall order for Nate Carr, who often was unavailable to clients and co-counsel on most weekday afternoons during football season – and always on game days.

"He was really into his coaching," says Taylor Fox, Carr's co-counsel in the Naranjo case. "I don't think he missed too many practices, and he never was around on Fridays if he could help it."

Pat Gitre, a Phoenix attorney who worked on *Garcia-Saenz* on behalf of the Mexican consulate (because of the defendant's nationality), said this when asked about the work of Carr and Johnson in that case:

"Death-penalty work is a lifestyle choice and has to be a passion. If you hop on the money train, don't give a rat's ass about the consequences, and you can get away with it, that's on you. Your client may end up dying, but what the hell."

---

Jim Logan tried cases as a public defender for years, earning the respect of judges and opposing prosecutors along the way.

These days, as the director of the Office of Public Defender Services, he is a bureaucrat in a rigorous job, part of which is to try to save the county money while overseeing the appointment of supposedly qualified attorneys to represent death-eligible clients.

Logan said at the onset of last week's sometimes-contentious interview with *New Times* that he suspected a "hit piece" against him was in the works.

"I am very aware that some guys have billed for a lot of money," Logan said shortly after the interview began, "but I have not seen what I would call overly excessive invoices under the circumstances."

He continued, "The buck does stop with me, and I take that responsibility very seriously. When I see discrepancies or I suspect that someone has been overcharging or not billing accurately, I act on it. I have docked people on the contract, more than once. I have stopped assigning people to cases, including Nate Carr – and that was four years ago – just because I thought it was the right thing to do at the time."

At first, Logan hinted at a possible "he said/he said" personality conflict between the defense attorneys in the Naranjo case. But he quickly changed his mind after learning from *New Times* about Nate Carr's false avowals in the November 2010 "prison interviews" billings, for which the attorney collected almost $2,000.

"That would be serious business, fraudulent," Logan said tersely.

At that point, Maricopa County spokeswoman Cari Gerchick spoke up for the first time late in the interview.

"If we determined that these allegations merit a criminal investigation, we will refer this to the County Attorney's Office," Gerchick said.

For now, Nate Carr and Steve Johnson continue to do fine, money-wise.

Maricopa County paid Carr $125,000 for the first half of this year. Still, this puts him on track for his *least* lucrative year since 2005, about $250,000 if the second half is about the same as the first.

Steve Johnson collected $133,000 for the first six months of this year.

Last week, when *New Times* contacted Taylor Fox with follow-up questions, he expressed concern about the rumors he had been hearing about his role in this story.

He said friends in the criminal-defense community have told him that Nate Carr has been trying to sell the "he said/he said" riff that Jim Logan retreated from during his interview.

The circumspect Fox concluded by saying:

"I have thought hard about this, and I'll just say it. If you would ask me if I felt that Nate and Steve's lack of real work on the Naranjo case could have affected the outcome of our client going to death row, my answer would be yes, it could have. There is something fundamentally wrong that happened here – on many levels."

RELATED TOPICS:    NEWS    LONGFORM

©2018 Phoenix New Times, LLC. All rights reserved.

Exhibit 19

## 12-2482 Disposition Summary

Respondent: Nathaniel J. Carr, III

Bar No. 018753

State Bar File Nos.: 12-2482 and 15-0328

Court File No.: PDJ 2016-9041

By the presiding disciplinary judge's judgment and order dated December 8, 2016, Nathaniel J. Carr, III, Phoenix, Arizona, was suspended from the practice of law for four years, effective January 1, 2017. Mr. Carr will be subject to any additional terms imposed if reinstated. He was assessed $1,532.28 in costs and expenses for the disciplinary proceeding.

Mr. Carr contracted with the Office of Public Defense Services (OPDS) to represent indigent criminal defendants. He was first chair on two separate death penalty cases and advisory counsel on a third case. His billings for those services, open to the public, were replete with statements of client confidences. Carr billed for services specifically excluded by his contract including scanning documents, and non-substantive motions. He also billed for work not performed. As first chair, Carr failed to oversee the work of the mitigation expert to assure the work for the mitigation phase of trial was performed. That failure led, in part, to the court granting petitions for post-conviction relief and resentencing his clients. Additionally, Carr was summarily suspended from the practice of law for failing to submit proof of his mandatory continuing legal education. He received actual notice of his suspension but continued to practice law.

Mr. Carr's misconduct was knowing and there was actual harm to his clients, the profession, the legal system, and the public. Aggravating factors were: selfish or dishonest motive, pattern of misconduct, multiple offenses, vulnerability of the victims, and substantial experience in the practice of law. Mitigating factors were: absence of a prior disciplinary record, personal or emotional problems, and delay in disciplinary proceedings.

Mr. Carr violated Rule 42, Ariz. R. Sup. Ct., ERs 1.1 (competence), 1.5 (fees), 1.6 (confidentiality of information), 5.5 (unauthorized practice of law), and 8.4(c) (conduct involving dishonesty, deceit, fraud or misrepresentation).

Exhibit 20

| | |
|---|---|
| **From:** | Susan Parrish |
| **To:** | "Robert Storrs" |
| **Subject:** | Paul |
| **Date:** | Friday, January 5, 2007 7:35:17 PM |

I am going through the MMPI manual in accordance with my obsessive-compulsive nature. I am going to write down questions for Dr. Bayless. For example, the reading level considered adequate for taking the MMPI is 8th grade. I am wondering how Paul's reading level was assessed? For each scale, there are sometimes more than one reason for and elevated or low score. It would be interesting to hear Dr. Bayless's thoughts in regard to each scale. For example, a mildly elevated L scale may reflect someone's desire to put his best foot forward. Certainly, this would run counter to the notion that the person was exaggerating his symptoms.

This is the only way I know to systematically demonstrate Dr. Bayless's flawed methodology. I will keep you posted.
Susan

Exhibit 21

**From:**      Pam Nicholson
**To:**        "rlstorrspc@netzero.net"
**Subject:**   Juror misconduct, Bayless, and gonorrhea
**Date:**      Wednesday, January 24, 2007 6:38:00 AM
**Attachments:** St v Rogue (2006).wpd
                 Arizona Practice.wpd
                 image001.gif

Bob,

I have both a sentencing in front of O'Toole and a complex case conference in front of Mahoney at 8:30, so it's a safe bet I won't be there at 9:15.

I've attached some stuff on juror misconduct just in case you want to be able to cite some authority.

I didn't get a quickie motion done on the Parrish-Bayless issue. I still think we should re-urge our motion. When Judge Klein ruled against us, he didn't know that Jeannette had Bayless sitting next to her while she cross-examined Susan in front of Comm. Hintze.

Finally, on the gonorrhea misconduct issue, I now realize what she was doing – boy, am I slow! No way was this innocuous. She knew that Paul was highly volatile because Bruce alerted the court during closing argument that there was a possibility that Paul would lose it. In fact, the judge took the extra step of warning Paul that there would be no mistrial if there was any outburst. Her gonorrhea statement was a deliberate, carefully timed provocation. She didn't say it to you privately. She waited until she was in the courtroom so that Paul would hear her. She said it just minutes before the jurors were going to their last look at Paul before deliberations. Her goal was to get him so upset that he would lose it. In one sentence, she attacked both him and me, one of the few people in the world that he has a relationship of trust with – and she knew that I wasn't going to be there to calm him down went the jury went out. The statement was an attack on each of us individually and, even worse, it made our relationship look filthy. Even though there was no outburst, Bruce said he was highly agitated by what she said. She was doing everything she could to provoke an outburst because the judge already said that an outburst would not trigger a mistrial. She didn't get the outburst, but she managed to get Paul so upset that the jury could not help but see how agitated he was. We really need to put this on the record.

Pam

State v. Roque  141 P.3d 368, *395 (Ariz.,2006)

7. Refusal to Replace Juror who had been Approached by the Media

[45] ¶ 102 Roque claims that the trial judge abused his discretion in not replacing a juror with an alternate after a movie producer handed the juror a business card. We review for abuse of discretion, see Glassel, 211 Ariz. at 47, ¶ 46, 116 P.3d at 1207, deferring to the trial judge's superior opportunity to assess the juror's demeanor and credibility, see Wainwright, 469 U.S. at 428-29, 105 S.Ct. 844; accord Glassel, 211 Ariz. at 48, ¶ 50, 116 P.3d at 1208.

[46] ¶ 103 "In a criminal case, any private communication, contact or tampering[,] directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial." State v. Miller, 178 Ariz. 555, 558-59, 875 P.2d 788, 791-92 (1994) (quoting Remmer v. United States, 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954)). But the "presumption is rebuttable, and the burden rests with the government to show that the third party communication did not taint the verdict." Id. at 559, 875 P.2d at 792.

¶ 104 In this case, while the movie producer's contact with the juror was presumptively prejudicial, the judge properly heard testimony from the producer and the juror to determine whether the juror could still render a fair and impartial decision. The hearing revealed that, when the producer handed the business card to the juror, the juror simply put it in his pocket. He said nothing to the producer and was unsure of the producer's profession. The juror stated unequivocally that the producer's contact would not affect his ability to fairly and impartially decide the case. The judge concluded that the State had met its burden of overcoming the presumption of prejudice. On this record, we cannot conclude that the judge abused his discretion in allowing the juror to remain on the panel.

8 Ariz. Prac., Trial Handbook For Ariz. Lawyers § 37:4 (2006-2007 ed.)

Arizona Practice Series TM
Current Through the 2006-2007 Update

Trial Handbook For Arizona Lawyers


Bennett Evan Cooper[FNa0]

Kevin M. Judiscak[FNa1]

Leslie Kyman Cooper[FNa2]


Chapter 37. Jury Conduct and Verdict

§ 37:4. Improper conduct by jurors


Juror misconduct is grounds for granting a new trial.[FN1] The criminal rules define juror misconduct as including (1) receiving evidence not properly admitted during trial; (2) deciding the verdict by lot; (3) a juror's perjuring himself or herself or failing to respond fully to a question posed during voir dire; (4) receiving a bribe or pledging his or her vote in any other way; and (5) conversing before the verdict with any interested party about the case.[FN2] In determining whether juror misconduct occurred, one may not inquire into the "subjective motives or mental processes which led a juror to assent to or dissent from a verdict."[FN3] **The proper procedure upon learning of possible juror misconduct is for the judge to "stop the deliberations, question the juror, and make a determination whether deliberations could then proceed."[FN4] Juror misconduct warrants a new trial only if the defense shows actual prejudice or if prejudice may be fairly presumed from the facts.[FN5]**

If a jury considers extraneous information, the court must order a new trial if there is a reasonable possibility the jury was prejudiced by the information.[FN6] This is true in both civil and criminal matters.[FN7] This standard applies because it is impossible for a party to show prejudice; as noted below, Ariz. R. Evid. 606(b) prohibits the introduction of evidence as to the effect of extraneous information upon the juror's decision.[FN8] Extrinsic information is defined as "information obtained from or provided by an outside source, whether admissible but not admitted at trial or inadmissible for some legal reason."[FN9] In Dunn v. Maras,[FN10] there was a reasonable possibility jurors were influenced by one juror's statement that a defendant had settled for over $2 million. In fact, the court's granting of a motion in limine excluding such evidence recognized the possibility of such prejudice.

Whether extrinsic information influenced the jury is a decision within the sound discretion of the trial court.[FN11] The trial court did not abuse its discretion in denying a criminal defendant's motion for a new trial where a newspaper containing a report of defendant's attempt to plead

guilty was found in the possession of one juror, but where the judge discerned from directly questioning the juror that the juror had not read the article.[FN12]

In State v. Miller,[FN13] the Supreme Court held that the trial court abused its discretion in denying defendant's request for an evidentiary hearing following the discovery of alleged juror misconduct. There, an alternate juror left a note on the car of a remaining juror after the close of evidence, which stated that the defendant was guilty. The jury returned a guilty verdict. After learning of the note, the trial court rejected the defense's request for an evidentiary hearing and denied the motion for a new trial. In its reversal of the trial court's decision, the Supreme Court focused on the fact that the communication related to the ultimate issue in the case—the defendant's guilt or innocence—and thus the trial court should have allowed the evidentiary hearing and inquired into the alternate juror's conduct.[FN14]

While jurors may not consider extrinsic information, they may rely upon their own life experience and accumulated knowledge.[FN15] In State v. Dickens,[FN16] jurors could rely on a mechanic's statement about a truck's overheating and information about a local interstate and rest area; such information came from their own life experience.

[FNa0] Steptoe & Johnson LLP.

[FNa1] Engelman Berger, PC.

[FNa2] Steptoe & Johnson LLP.

[FN1] Ariz. R. Civ. P. 59(a)(2); Ariz. R. Crim. P. 24.1(c)(3).

[FN2] Ariz. R. Crim. P. 24.1(c)(3).

[FN3] Ariz. R. Crim. P. 24.1(d).

[FN4] State v. Rojas, 177 Ariz. 454, 868 P.2d 1037 (Ct. App. 1993).

[FN5] State v. Davolt, 207 Ariz. 191, 208, ¶58, 84 P.3d 456, 473 (2004).

[FN6] Dunn v. Maras, 182 Ariz. 412, 897 P.2d 714 (Ct. App. 1995).

[FN7] Dunn v. Maras, 182 Ariz. 412, 897 P.2d 714 (Ct. App. 1995).

[FN8] Dunn v. Maras, 182 Ariz. 412, 897 P.2d 714 (Ct. App. 1995).

[FN9] State v. Dickens, 187 Ariz. 1, 926 P.2d 468 (1996).

[FN10] Dunn v. Maras, 182 Ariz. 412, 897 P.2d 714 (Ct. App. 1995).

[FN11] State v. Schackart, 175 Ariz. 494, 858 P.2d 639 (1993).

[FN12] State v. Schackart, 175 Ariz. 494, 858 P.2d 639 (1993).

[FN13] State v. Miller, 178 Ariz. 555, 875 P.2d 788 (1994).

[FN14] State v. Miller, 178 Ariz. 555, 875 P.2d 788 (1994).

[FN15] State v. Dickens, 187 Ariz. 1, 926 P.2d 468 (1996).

[FN16] State v. Dickens, 187 Ariz. 1, 926 P.2d 468 (1996).

© 2006 Thomson/West

8 AZPRAC § 37:4

END OF DOCUMENT

8 AZPRAC § 37:4

Exhibit 22

**From:**      Pam Nicholson
**To:**        "Robert L. Storrs"
**Subject:**   RE: Dr. Bayless
**Date:**      Thursday, January 18, 2007 4:04:00 PM

Bob,

Questions from Susan are going to be helpful, but we won't know what we're really asking Bayless so we won't know how to follow up in any meaningful way.  I understand that we have other issues to deal with, but this one is relatively straightforward and is probably as important as anything else we have to do. We're a bunch of morons and we need help asking the right questions.  Bayless is there to help make sure our client dies.  There is no rule anywhere that says we can't have help asking questions.  I can't imagine that the judge would have a problem with it if it comes to that.

**Call me right now!  I have Paul on the phone right now and he told me that Jeannette said I wasn't in court today because I was being treated for gonorrhea because I'm always all over Paul.  What the hell!!!   I want to know what happened right now.**

Pam

---

**From:** Robert L. Storrs [mailto:rlstorrspc@netzero.net]
**Sent:** Thursday, January 18, 2007 4:45 PM
**To:** Pam Nicholson
**Cc:** Bruce Blumberg
**Subject:** Re: Dr. Bayless

Pam
I think we have alot more serious issues to spend our time on.  Susan will give us questions.  I have funds for an expidated transcript and the jury is still out.  I will have to reschedule Pablo so we are not forced to start Monday or Tuesday. the judge said he would give us a couple of days after any verdict before we have to start aggravation.
bob----- Original Message -----

> **From:** Pam Nicholson
> **To:** 'Robert L. Storrs'
> **Sent:** Thursday, January 18, 2007 2:00 PM
> **Subject:** RE: Dr. Bayless
>
> Bullshit!   They have no right to preclude anyone from being present.

---

> **From:** Robert L. Storrs [mailto:rlstorrspc@netzero.net]
> **Sent:** Thursday, January 18, 2007 12:24 PM
> **To:** Susan's Mail
> **Cc:** Bruce Blumberg; pam nicholson
> **Subject:** Re: Dr. Bayless
>
> they refuse to allow you to attend
>
> > ----- Original Message -----
> > **From:** Susan's Mail
> > **To:** Robert L. Storrs
> > **Sent:** Wednesday, January 17, 2007 5:54 PM
> > **Subject:** RE: Dr. Bayless
> >
> > Bob,

That would work for me.
Susan

-----Original Message-----
**From:** Robert L. Storrs [mailto:rlstorrspc@netzero.net]
**Sent:** Wednesday, January 17, 2007 5:39 PM
**To:** pam nicholson; Susan Parrish
**Subject:** Fw: Dr. Bayless

----- Original Message -----
**From:** Gallagher Jeannette
**To:** Robert L. Storrs ; Bruce Blumberg
**Sent:** Wednesday, January 17, 2007 5:32 PM
**Subject:** Dr. Bayless

He is NOT available this Friday but he is available on Mon. 1/22 at 9:00
am. Will that work for you? I the jury convicts & it is before Monday,
we could just ask the judge to start the next phase at 1:30 on Monday.
Please let me know 1st thing tomorrow. Thanks.

Jeannette

Exhibit 23

| | |
|---|---|
| **From:** | Susan Parrish |
| **To:** | "Robert Storrs" |
| **Cc:** | Pamela Nicholson |
| **Subject:** | Paul |
| **Date:** | Tuesday, March 13, 2007 8:23:09 PM |
| **Attachments:** | Redirect.doc |

Here are the questions I suggest in redirect.

Redirect of Parrish

**Malingering:**

1. Article attached to my report of February 21, 2005, titled <u>Prospects for Faking Believable Deficits on Neuropsychological Testing</u> by Heaton, Smith Jr., Lehman, and Vogt (1978)

   - It is a good but complex article,
   - Compared two groups:
     - 13 head injured—considered to have put forth adequate effort; not in civil or criminal litigation.
     - 20 malingerers—paid to pretend to have brain impairment. Of the 20, three had normal results (they didn't malinger) and one was so obvious that the technician who did not know that she was testing malingerers told the subject that he was obviously not trying and she threatened to call his attorney. He shaped up and earned above average scores. Of the 16 left, 7 were identified by the technicians as not giving their best effort. The technicians did not know anything about the study. They were reacting normally. Thus, only 9 of the 16 malingers escaped detection by the technicians who administered the tests. **(Since I gave the HRB, I had the same advantage as the technicians in this study.)**
   - The study noted that the MMPI is "often" used to help determine the emotional status of subjects with neuropsychological impairment. The authors pointed out that although the MMPI has validity scales, it is not known whether subjects have the same attitude when taking neuropsych tests as they do when taking the MMPI. It turned out that the discriminant function cutoff that they developed correctly classified all subjects in both groups (truly impaired and malingers). The MMPI F scale missed one in each group. **(It is interesting to note that Paul's F scale score of 67 was similar to the mean F scale score of 64.1 for head-injured. The mean F scale score for Malingerers was 79.9**
   - The main point of the study is this: "Because the head-injury and malingering subjects did show different patterns of performance on testing, it seemed possible that these differences might permit classification of subjects with a greater degree of accuracy than that achieved by judges (neuropsychologists used in the study)." P. 898 This hypothesis was supported by accuracy of the discriminant function.
   - Jeannette made a big deal about a couple of sentences on p. 900 about neuropsychological tests being inherently vulnerable to faking. It might be worthwhile to read the whole paragraph or paraphrase it and read the sentence beginning in the middle of the paragraph that begins with "In cases in which this judgment….

2

- Jeannette made a big deal about the fact that I left out the Digit Span and the Tactual Performance Test Total Time scores even though these measures were shown to discriminate between head-injured and malingerers. NDS scores were not available when this study was done. Without the use of NDS scores, it would be like totaling figures from different number systems, e.g., yards and meters. Digit span does not have an NDS associated with it therefore I could not include it. In addition, Digit Span is unreliable because it is too easily affected by anxiety. This is Reitan's view after reviewing the Digit Span scores of thousands of subjects. I didn't use the TPT Total Time score because the Heaton et. al study used a measure based on time per block. There is no NDS score associated with this measure. Had I used the NDS score associated with the TPT Total Time score, it would not be precisely the same.
- Although, applying what was learned in the Heaton et al study is worthwhile re malingering, the superior measure is the Dissimulation Index based on the two administrations of the HRB. Few would disagree with the statement that this is the best measure of malingering because it allows an intra-individual comparison. It would be worth explaining how this is done—maybe depending on how much more we want to bore the jury.

2. Jeannette quoted David Wechsler from a 1958 publication about the Block Design being the best non-verbal measure of intelligence. I stated that I did not agree. The Block Design is associated with the functioning of the parietal lobe, but Digit Symbol has been shown by research to be the WAIS subtest most sensitive to brain functions. In 1958, we didn't know what we know today.

3. Jeannette quoted Butcher re the Pd scale being the best measure of antisocial behavior or psychopathy. In my opinion, Hare has more authority re psychopathy than Butcher and Hare states that the Pd scale is inadequate in regard to identifying psychopaths. **(I think it would be worthwhile to paraphrase questions from the Pd scale. It is easy to see why Paul would score high if he were honest. There are questions re truancy, breaking the law, lying, etc.**

4. More about the Pd scale. In the manual by Butcher et. al 1989, Pd is described on p. 28. "This measure was developed on individuals who were referred to a psychiatric service for clarification of why they had continuing difficulties with the law even though they suffered no cultural deprivation and despite their possessing normal intelligence and a relative freedom from serious neurotic or psychotic disorders. Some items comprising scale 4 concern the willingness of these persons to acknowledge these kinds of trouble; other items reflect their lack of concern about most social and moral standards of conduct." **(I think Pam has a copy of Graham's book on the MMPI. You might want to look at his description of scale 4. He discusses it in terms of rebelliousness. He is not describing psychopathy. In my experience, people with PTSD have elevated scores on the F scale and scale 4. I will look for something on line in this regard, but I can't promise anything. I need to review other things.)**

Exhibit 24

| | |
|---|---|
| **From:** | Pam Nicholson |
| **To:** | "pnicholson@cox.net" |
| **Subject:** | FW: Paul |
| **Date:** | Sunday, January 21, 2007 4:20:00 PM |
| **Attachments:** | Bayless" methodology.doc |

**From:** rlstorrspc@netzero.net [mailto:rlstorrspc@netzero.net]
**Sent:** Saturday, January 20, 2007 8:05 PM
**To:** pam@pnlaw.net; bblumberg@blumbergandassoc.com
**Cc:** rlstorrspc@netzero.net
**Subject:** Fw: Paul

Bob,
Here is what I have done re Bayless' report. I have spent most of the day on this and I am really DONE. I have not read it over. I hope it makes sense to you. Let me know.
Susan

Bayless' Methodology

Eval consists of: review of records, clinical interview, Shipley Institute of Living Scale, and MMPI-2.

**Shipley Institute of Living Scale**
Designed to provide a measure of impairment by comparing the Ss performance on the Vocabulary section to his performance on the Abstraction section. Shipley believed that impairment affected vocabulary knowledge and abstraction ability differently. Bayless made no mention of this. He interpreted Paul's low score on the Abstraction section as a lack of motivation. On what basis?

**Williams Sentence Completion Test**
As far as I can discover, this test is out of print. Why not use the Rotter Incomplete Sentences Blank? It is also a projective measure and it is widely used. It has some associated objective scoring with it. Dr. Bayless offers no interpretation of it in his report.

**MMPI-2**
The manual indicates that an 8th grade reading level is required. I did not see any measure of reading level. How does he know Paul can read at the level required? It was re-standardized in 1989.

> The population is biased in favor of people who are more highly educated than Paul. These figures come from the Manual. Only 5.4% (61) of the male subjects had "Part high school" in regard to education level. 21.3% (242) were high school graduates, 23.9% (272) had some college, 27.2% (310) were college graduates, and 22.2% (253) had some postgraduate training.

Paul was being compared to males who were more highly educated than he. The Personality Assessment Inventory has been standardized on a population that closely matches the population of this country. It would have been a better test to use with Paul. It also requires a lower reading level—4th grade.

The bottom line is that the results of the MMPI have to be interpreted with Paul in mind. The interpretation should be conservative because of the difference between his background and education level and that of the population to which he is being compared. When reading the narrative produced by the computer generated report of the MMPI results, one has to keep in mind that the statements are general references to what we think is true about people who have a specific profile pattern. It is easy to forget that the evaluator has to interpret the general statements in the context of the individual's history. Although blind interpretations are possible with the HRB, the MMPI manual makes it clear that one has to consider the individual's history and circumstance.

Having said all this, the MMPI does reflect some of Paul's problems. Anyone who has read the records and spent some time with Paul would come up with the same description. In other words, I don't think it adds much to the picture. In my experience,

this is generally the case with the MMPI. In this case, it does support the thought that Paul was applying genuine effort because of the validity scales.

The MMPI raises hypotheses about the subject's functioning that should be explored. To the extent that the profile is valid, it represents the subject's view of the world and the effect his experience in life had on him. A review of page 3 and 4 of the MMPI-@ Adult Interpretive System report that accompanies Bayless' report reveals Paul's state at the time he took the test.

It might be worthwhile having Bayless or me read the Clinical Presentation that begins on page 3 and continues on page 4. Then you might want to repeat the highlights of this narrative like "According to the MMPI-2 profile, Paul is experiencing a moderate to severe level of emotional distress characterized by….."

On page 4 Treatment is mentioned. The prognosis is described as poor because of the characterologic (this means Personality Disorder) nature of Paul's problems.  Here it is important to note that abuse and poor parenting are risk factors for developing a Personality Disorder. The records document that Paul has these risk factors so it is not a surprise that he has a Personality Disorder.

In the DSM-IV p. 686, under Diagnostic Features, the third line that begins with "The essential feature of a Personality Disorder…."  Is worth reading to the jury. Then I would go back to p. 685 and have Bayless or me read the brief descriptions of Personality Disorders listed under Axis II on p. 4 of the MMPI-2 report, i.e., Paranoid Personality Disorder, etc.

While considering Diagnosis (diagnostic possibilities offered by the MMPI report), I would next consider the diagnostic possibilities offered under Axis I. (Personality Disorders are listed under Axis II.) I would cover it generally by looking at what the DSM-IV has to say about Schizophrenia on page 299; the first full sentence begins with "The characteristic symptoms of Schizophrenia…." I would read the following sentence as well. I would sum up by saying that someone who has schizophrenia has a distorted view of the world, tends to be isolated rather than closely involved with people.

I don't think Paul is Schizophrenic. The MMPI is picking up on his distorted view of the world and his sense of alienation.

**Bayless' Conclusions**
On page 4 of his report, Bayless launches into his conclusions with the paragraph beginning with "Although Mr. Speer…." He acknowledges that Paul comes from "a very dysfunctional home environment," but he focuses on his antisocial behavior. What is interesting is that he never addresses the child-like openness in the answers that Paul gave to the questions in the Williams Sentence Completion test.  Nor does he acknowledge that in the past Paul was described as a child who "wanted to please" adults. Also, Paul did respond well to some of the placements he was in when he was a child. On one occasion he wrote a letter to a judge asking to stay in the placement. I think there is

evidence to support the idea that Paul did not enter the world as a bad person. He was plunked down in a toxic environment.

Paul has been tested multiple times. My testing clearly shows significant impairment in brain functions. Although Bayless doesn't acknowledge, his testing suggests impairment. He is in a very stressful situation. He fears for his life. To think that his test results would not vary, depending on the evaluator and the situation, is unrealistic. Toma, Thal and my test results are consistent if you take into consideration that the WAIS IQ scores have been found to vary in a positive direction by as much as 10 points, and the range associated with the WAIS-III as presented by Thal. The IQ scores my testing obtained and the estimated IQ Bayless obtained are very close.

In the last paragraph on p. 4 and carrying over to p. 5, Bayless criticizes Stewart and me for "blaming everyone in Mr. Spear's (sic) family for Mr. Spear's own behavior." What Bayless calls blaming I would call considering the context. Again, it is good methodology to take into consideration the subject's history, including family history and early environment, when drawing conclusions making a diagnosis. The MMPI manual makes this point, as does the DSM-IV. Specifically on page 688 of the DSM-IV, fifth line from the bottom, it is mentioned that a diagnosis of PTSD should be considered when personality changes occur following exposure to extreme stress. What about Paul's life does not qualify as "extreme stress?" In addition, on page 704 of the DSM-IV, it is noted that antisocial behavior may be "a protective survival strategy." Thus someone making a diagnosis must "consider the social and economic context in which the behaviors occur."

To give the jury a sense of the kind of questions on the MMPI that relate to an Antisocial attitude, have Bayless read the critical items on page 13 under Antisocial attitude.

The fact that Paul seems to have a Personality Disorder requires that the diagnostician consider a dx (diagnosis) of PTSD. I am not the only one to raise the issue of PTSD. Dr. Parker stated that he probably has PTSD and his competency at any given time may be questionable, if my memory serves me. Also, Paul scored high on the PK scale. (See page 9 of the MMPI report.)

It mentions that PK is usually elevated in the same range as PS (Posttraumatic Stress Disorder scale). Ask Bayless why this scale was not calculated. In my MMPI book by John Graham, Assessing *Personality and Psychopathology* {1993}, the PS scale was described as needing more research. According to Graham, a high score on PK reflects symptoms and behaviors typically associated with PTSD, but the scale was designed to identify combat vets with PTSD. Someone with high PK score is 1. Reporting intense emotional distress; 2. Reporting symptoms of anxiety and sleep disturbance; 3. Feeling guilty and depressed; 4. Maybe having unwanted and disturbing thoughts; 5. Fears loss of emotional and cognitive control; 6. Feels misunderstood and mistreated. (P. 164 )

Apparently Paul told Bayless that he has never experienced hallucinations. This is consistent with what he told me. When he would tell me things that were unusual occurrences similar to those mentioned to Bayless on p. 5 par. 4, he told me not to

mention it because people would say he was hallucinating.  He is not trying to present as psychotic, he has distorted perceptions and a dysfunctional family who have some unusual beliefs. He has difficulty sorting out fact from fiction.

On page 6 of his report, Bayless notes a "history negative for any residual cognitive or physical problems" associated with being knocked unconscious or in a car accident. There is no record of anyone administering any tests sensitive to brain functions other than me. The time Paul overdosed and the medical staff feared damage to his heart is a significant event in regard to his brain functions.

On to page 8 of Bayless' report I won't repeat myself re his interpretation of the Shipley. The last statements in the paragraph on Intellectual Functioning reflect the difficulty identified by the Category Test. Bayless sees these as reflecting an Antisocial Personality Disorder.

Under Personality and Emotional Functioning: Bayless categorizes Paul's MMPI profile as being a code type of 4-6/6-4 (2) and then proceeds to describe people who have this code type. His description does not match the description in the MMPI report. I checked and the MMPI report lists Paul's code type as 4-8/84-(6) and the accompanying description is much less harsh. On page 2 of the MMPI report, it notes that the Best Fit Prototype Profile is 4-8/8-4-6. I think there is something to this, but I am not familiar with this interpretative program. It would be worth asking Bayless about it. In any case, the MMPI report presents a much less harsh interpretation of the profile and I think it is more in keeping with what we know about Paul. If Bayless says this was his judgment call, I would ask him his basis. The answers on the Williams don't support the harsh view he expresses. It's as though Bayless is simply citing the description of someone who is Antisocial.

He really gets going on page 9. I would ask him for a reference for his interpretation. His use of the words "malignant" and "seethe" are very strong and not in keeping with the MMPI report language. On page 6 of the MMPI report, descriptions of the interpretations of Paul's scores on scale 4, 6, and 8 are presented. None of the descriptions use language as harsh and prejudicial as Bayless uses.   Paragraphs 2 and 3 seem to be lifted from the MMPI report p. 3.  On the one hand, Bayless seems to rely on the MMPI interpretative language, but only after he has lambasted Paul in his first paragraph. Again, I want to know his basis for this conclusion.

Diagnosis:
A diagnosis of Dysthymic Disorder is acceptable to me and so is Poly-Substance Dependence. I think a dx of PTSD is warranted. I will let Pablo present that. PTSD is an Anxiety Disorder and the MMPI reveals lots of anxiety. To the extent that the factors of Paul's early environment can be documented, the trauma is fact. I also think a dx of Borderline Personality Disorder (BPD) is more fitting than Antisocial Personality Disorder. See page 706 of the DSM-IV for a description of the essential features of BPD.

**In Summary:**

I have problems with Bayless's methodology. I would not have used the MMPI, but the results turned out to be in line with what we know about Paul. The results did support my belief that Paul applied genuine effort for Bayless. Also, the possibility of PTSD was raised by his score on the PK scale.

Bayless used the Shipley then ignored the implication that the results reflected impairment in brain functions.

I don't think the use of the Williams can be justified, but Paul's answers revealed a child-like openness that goes along with someone who has been abused as a child. His answers were not consistent with Antisocial Personality Disorder.

Bayless' did not take into consideration that Paul has serious impairment in brain functions and suffers from Posttraumatic Stress Disorder. These failures are fatal with regard to his conclusions.

Exhibit 25

| | |
|---|---|
| **From:** | Pam Nicholson |
| **To:** | "pnicholson@cox.net" |
| **Subject:** | FW: Paul |
| **Date:** | Sunday, January 21, 2007 4:56:00 PM |
| **Attachments:** | Questions re report.doc |
| | Question re MMPI.doc |

**From:** Robert L. Storrs [mailto:rlstorrspc@netzero.net]
**Sent:** Friday, January 19, 2007 4:47 PM
**To:** pam nicholson; Bruce Blumberg
**Subject:** Fw: Paul


----- Original Message -----
**From:** Susan Parrish
**To:** Robert Storrs
**Sent:** Friday, January 19, 2007 3:41 PM
**Subject:** Paul

I am working on what I will say when asked to critique Dr. Bayless' report/methodology.
Susan

January 6, 2007.

1. Was the original MMPI copyrighted in about 1942?
2. Was it re standardized in about 1989?
3. Are you aware of the breakdown among males in regard to years of education completed by subjects in the re standardization sample?  According to the Manual for Administration and Scoring prepared by the MMPI Re-standardization Committee appointed by The University of Minnesota Press only 5.4% (61) of the male subjects had "Part high school" in regard to education level.  21.3% (242) were high school graduates, 23.9% (272) had some college, 27.2% (310) were college graduates, and 22.2% (253) had some postgraduate training.  In light of these figures, do you think that this test was appropriate to use with someone who has at best, an eighth-grade education?  Did you consider giving the Personality Assessment Inventory?
4. What reading proficiency level does the manual suggests in order to take the MMPI-2?  (Eighth-grade)
5. How did you assess Paul's reading level?
6. Did Paul leave any items blank on the MMPI?  How did you interpret the fact that he answered every one of the 567 questions?
7. On the L scale, Paul had a T score of 56.  Is that an acceptable score?  How did you interpret the score?
8. Paul's  T score of 67 on the F scale, falls in what range?  How do you interpret the score?  The manual states:  "Some test subjects may earn a somewhat higher score on the F scale because they are describing unusual feelings or reactions to special circumstance they are facing (e.g., marital distress, bereavement, or job loss) or because of significant psychopathology.  Such individuals are not likely to produce an unusable test record.  As indicated in Table 12, scores on F above a T score of 70 but below 90 may reflect emotional problems of a significant degree but not necessarily a test record that is uninterruptible."
9. Paul's K scale T score of 47 was in the modal or average range.  Would you agree?  What does the case scale measure?  (Defensiveness) (A score between 41 and 55 represents a balance between self-protectiveness and self-disclosure.)
10. Paul score on the Back F scale was 75.  What is the significance of the score?  Does this have particular significance for the Supplementary and Content scales?
11. How would you interpret Paul's VRIN and TRIN scores?  (The manual says that a VRIN raw score of 13 or greater and a TRIN score of 5 or less, or of 13 or greater would indicate significant inconsistency.)
12. What does the S scale stand for?

Questions re Dr. Bayless' report dated October 5, 2006

1. "Marginal" response and "little effort" "quickly gave up as task difficulty increased." No omitted items on 567 items on MMPI—doesn't that support a conclusion of reasonable effort? Also, the validity scales on the MMPI indicated a valid profile. Doesn't that also support honest effort? Did Paul answer all the questions on the first section of the Williams Complete Sentences measure? Why do you think he answered all these questions, but gave up on the second section?

2. What company sells the Williams Complete Sentences measure? As far as I can determine, it is out of print. How do you justify using a test that is out of print? Why not use the Rotter Incomplete Sentences Blank?

3. Explain the theory behind the Williams. Is it similar to Julian Rotter's social learning theory? Go through each question on the Williams and find out how he interprets it. Look for discrepancies between what Paul says and what Bayless has concluded in his report.

4. On page 2, paragraph 3 contains "claims" of molestation. Does Bayless question this event? Does he know who beside Paul said this happened? In the next paragraph, Bayless refers to "a very dysfunctional home environment." Ask him to elaborate on the dysfunction and "lack of guidance, support, and ethical values." Paul reported "a lot of internal anxiety, which was manifested in nail biting behavior, stuttering, night terrors, excessive fears, and hyperactivity." Night terrors—is this Bayless' term or Paul's? The reactions Paul reports—are they reasonable in light of his environment.

5. Last paragraph on p. 2.  Have you evaluated many boys/men who have spent time in Adobe Mountain Detention Center? Do you know of any reports of abuse of boys by other boys while at the Center?

6. Page 3, paragraph 1. What kind of learning disability did Paul have? When you say that Paul scored in the average range on "all previous intelligence testing," what test results are you referring to? (See if he is including the test results on the chart of test results I created. Focus on the Full Scale IQ scores. Point out that Dr. Thal reports confidence levels re IQ scores that are about 10 points. No IQ test score is expected to be exact. Dr. Thal makes this point by including a range that is included in the WAIS-III manual. This line of questioning may be better pursued when Bayless is on the stand.)

7. What is your opinion of the Cattell Culture Fair Test?

8. P. 3, paragraph 3. Did Paul report that he wanted to be a nurse? Do male inmates often report that they want to be a nurse, in your experience?

9. P. 3, p. 4. Is it unusual for someone with impairment in brain functions to have average or above IQ scores? How about IQ and scores on the Category Test? (In my report, I think, I have a blurb about having average or above IQ scores and a poor Category Test score. The Category Test is far more sensitive to brain impairment.)

10. P. 3, p.4. Did Cabanski retest Paul or just repeat the IQ score from his 1991? If someone is learning disabled, but has average intelligence what does this mean in practical terms?

11. P.3, p.5.

Toward the end, I would ask Bayless if he considers himself a scientist?

Exhibit 26

**From:**      Pam Nicholson
**To:**        "pnicholson@cox.net"
**Subject:**   FW: Very interesting
**Date:**      Sunday, January 21, 2007 7:07:00 PM

**From:** Robert L. Storrs [mailto:rlstorrspc@netzero.net]
**Sent:** Friday, January 19, 2007 3:52 PM
**To:** pam nicholson; Bruce Blumberg
**Subject:** Fw: Very interesting

----- Original Message -----
**From:** Susan Parrish
**To:** Robert Storrs
**Sent:** Friday, January 19, 2007 3:06 PM
**Subject:** Very interesting

I just did a search on the Shipley Institute of Living Scale. It is published by the Western psychological services. A Concept Quotient (CQ) can be calculated that is considered a measure of the deterioration in someone's cognitive abilities. A CQ is based on the idea that impairment affects vocabulary ability and abstract thinking ability differently. This is why the Vocabulary subtest of the Wechsler IQ tests (WAIS) is not sensitive to impairment. It is one of the tests that holds up when someone becomes impaired. Brad did not report figuring a CQ. I think he just used the measure that estimates the WAIS or WAIS-R IQ. It is not surprising that the score he came up with is so close to the score I obtained.

His interpretation of Paul not applying himself to the Abstraction section is not in keeping with the description of this test.
Susan

Exhibit 27

| | |
|---|---|
| **From:** | Susan Parrish |
| **To:** | Pamela Nicholson |
| **Cc:** | "Robert Storrs" |
| **Subject:** | Paul |
| **Date:** | Saturday, March 3, 2007 1:41:48 PM |

I think we should go for broke. Bayless' methodology is flawed and it won't be hard to point that out. At first, the power of what the two of you were suggesting took my breath away, but we have the substance to do this right and we should to it.

Exhibit 28

**From:**        Robert L. Storrs
**To:**          "Susan Parrish"
**Cc:**          Pamela Nicholson
**Subject:**    Re: Paul
**Date:**        Tuesday, March 6, 2007 7:51:15 AM

I'll call you about 11
----- Original Message -----
From: "Susan Parrish" <parrish6@earthlink.net>
To: "Bob Storrs" <rlstorrspc@netzero.net>
Sent: Tuesday, March 06, 2007 7:51 AM
Subject: Paul


> Bob,
> Let's talk. You can include Pam, but we don't have time to do this in
> stages. We have to address the issues around the DSM-IV re APD vs
> psychopathy and the adequacy of the MMPI in relation to identifying APD or
> psychopathy. I think we need to use the VRAT diagram on Paul's antisocial
> behaviors. If we don't address this head on it hampers your capacity to
> challenge Bayless.
>
> I am going out to feed my horses now. It takes me about 40 minutes. Let me
> know when you have time to talk. The sooner the better.
> Susan
>
>

Exhibit 29

| | |
|---|---|
| **From:** | Robert L. Storrs |
| **To:** | Pamela Nicholson |
| **Subject:** | Fw: Paul |
| **Date:** | Tuesday, March 6, 2007 11:27:44 AM |

----- Original Message -----
**From:** Susan's Mail
**To:** Robert L. Storrs
**Sent:** Monday, March 05, 2007 4:36 PM
**Subject:** RE: Paul

The VRATS are the diagrams that you used in your opening. The same ones we are going to finish my direct with. Everything is in those diagrams. Tonight, I will go over the diagrams with the guy who helped me develop them. I will then email you as to questions you can ask.
You don't have to worry. I can't stop thinking about this case.
Susan

    -----Original Message-----
    **From:** Robert L. Storrs [mailto:rlstorrspc@netzero.net]
    **Sent:** Monday, March 05, 2007 3:54 PM
    **To:** Susan Parrish
    **Cc:** pam nicholson
    **Subject:** Re: Paul

    just tell me the questions to ask.  What are the VRAT diagrams.  Keep those brainstorms coming!
    bob

        ----- Original Message -----
        **From:** Susan Parrish
        **To:** Robert Storrs
        **Sent:** Monday, March 05, 2007 3:42 PM
        **Subject:** Paul

        Bob,
        I just came to me that we can use the VRAT diagrams to show how a diagnosis of APD excludes most of Paul's history and how PTSD and impairment in brain functions reflects his history. It could put the whole defense presentation in perspective. I will give it some more thought and get back to you. We have already done the work. It would just involve pointing it out to the jury.
        Susan