Exhibit 48

# Extended Score Report

# MMPI-2™

**Minnesota Multiphasic Personality Inventory-2™**

ID Number 200

PAUL SPEER

Male

Age 27

Date Assessed 8/14/2006

Copyright © 1989, 1994, 2000, 2003 REGENTS OF THE UNIVERSITY OF MINNESOTA. All rights reserved.
Portions reproduced from the MMPI-2 test booklet. Copyright © 1942, 1943, (renewed 1970), 1989 REGENTS OF THE
UNIVERSITY OF MINNESOTA. Portions excerpted from the MMPI-2 Manual for Administration, Scoring, and Interpretation,
Revised Edition, copyright © 2001 REGENTS OF THE UNIVERSITY OF MINNESOTA. All rights reserved.
Distributed exclusively by NCS Pearson, Inc.

"Minnesota Multiphasic Personality Inventory-2" and "MMPI-2" are trademarks of the University of Minnesota.

[ 4.3 / 5.08 / 1.0 ]



MMPI-2™
ID 200

**Extended Score Report**
**Page 2**



## MMPI-2 VALIDITY AND CLINICAL SCALES PROFILE

|  | VRIN | TRIN | F | F(B) | F(P) | L | K | S | Hs | D | Hy | Pd | Mf | Pa | Pt | Sc | Ma | Si |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Raw Score: | 5 | 7 | 10 | 8 | 0 | 5 | 14 | 15 | 16 | 38 | 33 | 38 | 33 | 22 | 29 | 33 | 24 | 27 |
| K Correction: |  |  |  |  |  |  |  |  | 7 |  |  | 6 |  |  | 14 | 14 | 3 |  |
| T Score: | 50 | 64F | 67 | 75 | 41 | 56 | 47 | 38 | 75 | 89 | 79 | 102 | 64 | 94 | 85 | 86 | 69 | 53 |
| Response %: | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |

Cannot Say (Raw):   0
F-K (Raw):   -4
Welsh Code:  4**6*287"31'9+5-0/ F+-L/K:

Percent True:   47
Percent False:   53
Profile Elevation:   84.9

Note: The highest and lowest T scores possible on each scale are indicated by a "--".



## MMPI-2 RESTRUCTURED CLINICAL SCALES PROFILE

|  | RCd dem | RC1 som | RC2 lpe | RC3 cyn | RC4 asb | RC6 per | RC7 dne | RC8 abx | RC9 hpm |
|---|---|---|---|---|---|---|---|---|---|
| Raw Score: | 19 | 7 | 10 | 11 | 18 | 8 | 10 | 6 | 16 |
| T Score: | 79 | 63 | 72 | 64 | 86 | 79 | 60 | 66 | 56 |
| Response %: | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |

Note: The highest and lowest Uniform T scores possible on each scale are indicated by a "--".

LEGEND

| | | |
|---|---|---|
| **dem** = Demoralization | **cyn** = Cynicism | **dne** = Dysfunctional Negative Emotions |
| **som** = Somatic Complaints | **asb** = Antisocial Behavior | **abx** = Aberrant Experiences |
| **lpe** = Low Positive Emotions | **per** = Ideas of Persecution | **hpm** = Hypomanic Activation |

For information on the RC scales, see Tellegen, A., Ben-Porath, Y.S., McNulty, J.L., Arbisi, P.A., Graham, J.R., & Kaemmer, B. 2003. The MMPI-2 Restructured Clinical (RC) Scales: Development, Validation, and Interpretation. Minneapolis: University of Minnesota Press.

MMPI-2™
ID 200

Extended Score Report
Page 4



MMPI-2 CONTENT SCALES PROFILE

| | ANX | FRS | OBS | DEP | HEA | BIZ | ANG | CYN | ASP | TPA | LSE | SOD | FAM | WRK | TRT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Raw Score: | 18 | 9 | 8 | 21 | 16 | 9 | 5 | 14 | 14 | 8 | 13 | 1 | 19 | 20 | 11 |
| T Score: | 80 | 67 | 59 | 80 | 74 | 74 | 48 | 56 | 65 | 48 | 72 | 35 | 88 | 74 | 66 |
| Response %: | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |

Ncte: The highest and lowest Uniform T scores possible on each scale are indicated by a "--".



## MMPI-2 SUPPLEMENTARY SCALES PROFILE

| | A | R | Es | Do | Re | Mt | PK | MDS | Ho | O-H | MAC-R | AAS | APS | GM | GF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Raw Score: | 29 | 17 | 24 | 10 | 14 | 32 | 26 | 12 | 28 | 18 | 27 | 7 | 28 | 24 | 27 |
| T Score: | 77 | 54 | 30 | 30 | 34 | 82 | 80 | 92 | 62 | 69 | 64 | 70 | 63 | 30 | 48 |
| Response %: | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |

Note: The highest and lowest T scores possible on each scale are indicated by a "--".



## MMPI-2 PSY-5 SCALES PROFILE

|  | AGGR | PSYC | DISC | NEGE | INTR |
|---|---|---|---|---|---|
| Raw Score: | 6 | 11 | 18 | 19 | 16 |
| T Score: | 43 | 75 | 60 | 68 | 61 |
| Response %: | 100 | 100 | 100 | 100 | 100 |

Note: The highest and lowest Uniform T scores possible on each scale are indicated by a "--".

## CLINICAL SUBSCALES

### HARRIS-LINGOES SUBSCALES
(to be used as an aid in interpreting the parent scale)

|  | Raw Score | T Score | Resp % |
|---|---|---|---|
| **Depression Subscales** | | | |
| Subjective Depression (D1) | 20 | 85 | 100 |
| Psychomotor Retardation (D2) | 9 | 70 | 100 |
| Physical Malfunctioning (D3) | 5 | 67 | 100 |
| Mental Dullness (D4) | 10 | 86 | 100 |
| Brooding (D5) | 9 | 91 | 100 |
| **Hysteria Subscales** | | | |
| Denial of Social Anxiety (Hy1) | 5 | 56 | 100 |
| Need for Affection (Hy2) | 4 | 40 | 100 |
| Lassitude-Malaise (Hy3) | 12 | 93 | 100 |
| Somatic Complaints (Hy4) | 5 | 62 | 100 |
| Inhibition of Aggression (Hy5) | 6 | 71 | 100 |
| **Psychopathic Deviate Subscales** | | | |
| Familial Discord (Pd1) | 7 | 84 | 100 |
| Authority Problems (Pd2) | 5 | 60 | 100 |
| Social Imperturbability (Pd3) | 4 | 51 | 100 |
| Social Alienation (Pd4) | 11 | 87 | 100 |
| Self-Alienation (Pd5) | 10 | 82 | 100 |
| **Paranoia Subscales** | | | |
| Persecutory Ideas (Pa1) | 11 | 106 | 100 |
| Poignancy (Pa2) | 6 | 75 | 100 |
| Naivete (Pa3) | 3 | 41 | 100 |
| **Schizophrenia Subscales** | | | |
| Social Alienation (Sc1) | 11 | 84 | 100 |
| Emotional Alienation (Sc2) | 4 | 78 | 100 |
| Lack of Ego Mastery, Cognitive (Sc3) | 8 | 90 | 100 |
| Lack of Ego Mastery, Conative (Sc4) | 9 | 87 | 100 |
| Lack of Ego Mastery, Defective Inhibition (Sc5) | 4 | 68 | 100 |
| Bizarre Sensory Experiences (Sc6) | 5 | 65 | 100 |

|  | Raw Score | T Score | Resp % |
|---|---|---|---|
| **Hypomania Subscales** | | | |
| Amorality (Ma1) | 3 | 58 | 100 |
| Psychomotor Acceleration (Ma2) | 8 | 63 | 100 |
| Imperturbability (Ma3) | 3 | 47 | 100 |
| Ego Inflation (Ma4) | 4 | 56 | 100 |

## SOCIAL INTROVERSION SUBSCALES

|  | Raw Score | T Score | Resp % |
|---|---|---|---|
| Shyness/Self-Consciousness (Si1) | 0 | 36 | 100 |
| Social Avoidance (Si2) | 1 | 41 | 100 |
| Alienation--Self and Others (Si3) | 11 | 68 | 100 |

Uniform T scores are used for Hs, D, Hy, Pd, Pa, Pt, Sc, Ma, and the content scales; all other MMPI-2 scales use linear T scores.

## CONTENT COMPONENT SCALES

|  | Raw Score | T Score | Resp % |
|---|---|---|---|
| **Fears Subscales** | | | |
| Generalized Fearfulness (FRS1) | 3 | 71 | 100 |
| Multiple Fears (FRS2) | 6 | 63 | 100 |
| **Depression Subscales** | | | |
| Lack of Drive (DEP1) | 8 | 84 | 100 |
| Dysphoria (DEP2) | 6 | 90 | 100 |
| Self-Depreciation (DEP3) | 5 | 76 | 100 |
| Suicidal Ideation (DEP4) | 1 | 62 | 100 |
| **Health Concerns Subscales** | | | |
| Gastrointestinal Symptoms (HEA1) | 3 | 83 | 100 |
| Neurological Symptoms (HEA2) | 2 | 54 | 100 |
| General Health Concerns (HEA3) | 5 | 81 | 100 |
| **Bizarre Mentation Subscales** | | | |
| Psychotic Symptomatology (BIZ1) | 2 | 64 | 100 |
| Schizotypal Characteristics (BIZ2) | 5 | 73 | 100 |
| **Anger Subscales** | | | |
| Explosive Behavior (ANG1) | 2 | 52 | 100 |
| Irritability (ANG2) | 3 | 51 | 100 |
| **Cynicism Subscales** | | | |
| Misanthropic Beliefs (CYN1) | 10 | 60 | 100 |
| Interpersonal Suspiciousness (CYN2) | 4 | 53 | 100 |
| **Antisocial Practices Subscales** | | | |
| Antisocial Attitudes (ASP1) | 9 | 57 | 100 |
| Antisocial Behavior (ASP2) | 5 | 74 | 100 |
| **Type A Subscales** | | | |
| Impatience (TPA1) | 2 | 45 | 100 |
| Competitive Drive (TPA2) | 4 | 55 | 100 |
| **Low Self-Esteem Subscales** | | | |
| Self-Doubt (LSE1) | 6 | 70 | 100 |
| Submissiveness (LSE2) | 4 | 69 | 100 |

Case 2:16-cv-04193-GMS   Document 23-10   Filed 08/02/18   Page 11 of 150

| | Raw Score | T Score | Resp % |
|---|---|---|---|
| **Social Discomfort Subscales** | | | |
| Introversion (SOD1) | 1 | 39 | 100 |
| Shyness (SOD2) | 0 | 36 | 100 |
| **Family Problems Subscales** | | | |
| Family Discord (FAM1) | 8 | 75 | 100 |
| Familial Alienation (FAM2) | 5 | 84 | 100 |
| **Negative Treatment Indicators Subscales** | | | |
| Low Motivation (TRT1) | 5 | 71 | 100 |
| Inability to Disclose (TRT2) | 2 | 52 | 100 |

## OMITTED ITEMS

Those items for which there is no response or for which both true and false responses have been entered are considered "omitted." The potential for lowering the elevation of individual scales or the overall profile and rendering the administration invalid increases with the number of omitted items. Defensiveness, confusion, carelessness, and indecision are among the common reasons for omitting items. Examination of the content of the items that were omitted by the respondent may reveal specific problem areas or suggest reasons for their not responding appropriately to all items. Following are the items that were omitted:

None omitted.

## CRITICAL ITEMS

The MMPI-2 contains a number of items whose content may indicate the presence of psychological problems when endorsed in the deviant direction. These "critical items," developed for use in clinical settings, may provide an additional source of hypotheses about the respondent. However, caution should be used in interpreting critical items since responses to single items are very unreliable and should not be treated as scores on full-length scales -- for example, an individual could easily mismark or misunderstand a single item and not intend the answer given. The content of the items and the possibility of misinterpretation make it important to keep the test results strictly confidential. Special caution should be exercised when interpreting these items in nonclinical settings.

**Acute Anxiety State (Koss-Butcher Critical Items)**
   3.  I wake up fresh and rested most mornings. (False)
   5.  I am easily awakened by noise. (True)
  15.  I work under a great deal of tension. (True)
  28.  I am bothered by an upset stomach several times a week. (True)
  39.  My sleep is fitful and disturbed. (True)
  59.  I am troubled by discomfort in the pit of my stomach every few days or oftener. (True)
 140.  Most nights I go to sleep without thoughts or ideas bothering me. (False)
 218.  I have periods of such great restlessness that I cannot sit long in a chair. (True)
 223.  I believe I am no more nervous than most others. (False)
 301.  I feel anxiety about something or someone almost all the time. (True)
 444.  I am a high-strung person. (True)
 469.  I sometimes feel that I am about to go to pieces. (True)

**Depressed Suicidal Ideation (Koss-Butcher Critical Items)**
   9.  My daily life is full of things that keep me interested. (False)
  38.  I have had periods of days, weeks, or months when I couldn't take care of things because I couldn't "get going." (True)
  65.  Most of the time I feel blue. (True)
  75.  I usually feel that life is worthwhile. (False)

95. I am happy most of the time. (False)
130. I certainly feel useless at times. (True)
146. I cry easily. (True)
215. I brood a great deal. (True)
233. I have difficulty in starting to do things. (True)
273. Life is a strain for me much of the time. (True)
388. I very seldom have spells of the blues. (False)
411. At times I think I am no good at all. (True)
485. I often feel that I'm not as good as other people. (True)
518. I have made lots of bad mistakes in my life. (True)

## Threatened Assault (Koss-Butcher Critical Items)
213. I get mad easily and then get over it soon. (True)

## Situational Stress Due to Alcoholism (Koss-Butcher Critical Items)
125. I believe that my home life is as pleasant as that of most people I know. (False)
264. I have used alcohol excessively. (True)
487. I have enjoyed using marijuana. (True)
489. I have a drug or alcohol problem. (True)
502. I have some habits that are really harmful. (True)
511. Once a week or more I get high or drunk. (True)
518. I have made lots of bad mistakes in my life. (True)

## Mental Confusion (Koss-Butcher Critical Items)
31. I find it hard to keep my mind on a task or job. (True)
32. I have had very peculiar and strange experiences. (True)
72. My soul sometimes leaves my body. (True)
180. There is something wrong with my mind. (True)
299. I cannot keep my mind on one thing. (True)
311. I often feel as if things are not real. (True)
325. I have more trouble concentrating than others seem to have. (True)

## Persecutory Ideas (Koss-Butcher Critical Items)
17. I am sure I get a raw deal from life. (True)
42. If people had not had it in for me, I would have been much more successful. (True)
99. Someone has it in for me. (True)
124. I often wonder what hidden reason another person may have for doing something nice for me. (True)
138. I believe I am being plotted against. (True)
145. I feel that I have often been punished without cause. (True)
241. It is safer to trust nobody. (True)
251. I have often felt that strangers were looking at me critically. (True)
259. I am sure I am being talked about. (True)
314. I have no enemies who really wish to harm me. (False)

333.  People say insulting and vulgar things about me. (True)

## Antisocial Attitude (Lachar-Wrobel Critical Items)
27.  When people do me a wrong, I feel I should pay them back if I can, just for the principle of the thing. (True)
35.  Sometimes when I was young I stole things. (True)
84.  I was suspended from school one or more times for bad behavior. (True)
105.  In school I was sometimes sent to the principal for bad behavior. (True)
227.  I don't blame people for trying to grab everything they can get in this world. (True)
254.  Most people make friends because friends are likely to be useful to them. (True)
266.  I have never been in trouble with the law. (False)

## Family Conflict (Lachar-Wrobel Critical Items)
21.  At times I have very much wanted to leave home. (True)
83.  I have very few quarrels with members of my family. (False)
125.  I believe that my home life is as pleasant as that of most people I know. (False)
288.  My parents and family find more fault with me than they should. (True)

## Somatic Symptoms (Lachar-Wrobel Critical Items)
28.  I am bothered by an upset stomach several times a week. (True)
33.  I seldom worry about my health. (False)
47.  I am almost never bothered by pains over my heart or in my chest. (False)
53.  Parts of my body often have feelings like burning, tingling, crawling, or like "going to sleep." (True)
59.  I am troubled by discomfort in the pit of my stomach every few days or oftener. (True)
111.  I have a great deal of stomach trouble. (True)
142.  I have never had a fit or convulsion. (False)
176.  I have very few headaches. (False)
224.  I have few or no pains. (False)
229.  I have had blank spells in which my activities were interrupted and I did not know what was going on around me. (True)

## Sexual Concern and Deviation (Lachar-Wrobel Critical Items)
12.  My sex life is satisfactory. (False)
121.  I have never indulged in any unusual sex practices. (False)

## Anxiety and Tension (Lachar-Wrobel Critical Items)
15.  I work under a great deal of tension. (True)
17.  I am sure I get a raw deal from life. (True)
218.  I have periods of such great restlessness that I cannot sit long in a chair. (True)
223.  I believe I am no more nervous than most others. (False)
261.  I have very few fears compared to my friends. (False)
299.  I cannot keep my mind on one thing. (True)
301.  I feel anxiety about something or someone almost all the time. (True)

320. I have been afraid of things or people that I knew could not hurt me. (True)
405. I am usually calm and not easily upset. (False)

### Sleep Disturbance (Lachar-Wrobel Critical Items)
  5. I am easily awakened by noise. (True)
 30. I have nightmares every few nights. (True)
 39. My sleep is fitful and disturbed. (True)
140. Most nights I go to sleep without thoughts or ideas bothering me. (False)
328. Sometimes some unimportant thought will run through my mind and bother me for days. (True)
471. I have often been frightened in the middle of the night. (True)

### Deviant Thinking and Experience (Lachar-Wrobel Critical Items)
 32. I have had very peculiar and strange experiences. (True)
122. At times my thoughts have raced ahead faster than I could speak them. (True)
427. I have never seen a vision. (False)

### Depression and Worry (Lachar-Wrobel Critical Items)
  3. I wake up fresh and rested most mornings. (False)
 65. Most of the time I feel blue. (True)
 73. I am certainly lacking in self-confidence. (True)
 75. I usually feel that life is worthwhile. (False)
130. I certainly feel useless at times. (True)
165. My memory seems to be all right. (False)
180. There is something wrong with my mind. (True)
273. Life is a strain for me much of the time. (True)
339. I have sometimes felt that difficulties were piling up so high that I could not overcome them. (True)
411. At times I think I am no good at all. (True)
415. I worry quite a bit over possible misfortunes. (True)

### Deviant Beliefs (Lachar-Wrobel Critical Items)
 42. If people had not had it in for me, I would have been much more  successful. (True)
 99. Someone has it in for me. (True)
106. My speech is the same as always (not faster or slower, no slurring or hoarseness). (False)
138. I believe I am being plotted against. (True)
259. I am sure I am being talked about. (True)
314. I have no enemies who really wish to harm me. (False)
333. People say insulting and vulgar things about me. (True)

### Substance Abuse (Lachar-Wrobel Critical Items)
264. I have used alcohol excessively. (True)
429. Except by doctor's orders I never take drugs or sleeping pills. (False)

**Problematic Anger (Lachar-Wrobel Critical Items)**
213.  I get mad easily and then get over it soon. (True)

MMPI-2™
ID 200

## ITEM RESPONSES

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1: 2 | 2: 1 | 3: 2 | 4: 1 | 5: 1 | 6: 1 | 7: 2 | 8: 1 | 9: 2 | 10: 1 |
| 11: 2 | 12: 2 | 13: 1 | 14: 2 | 15: 1 | 16: 2 | 17: 1 | 18: 2 | 19: 2 | 20: 1 |
| 21: 1 | 22: 1 | 23: 1 | 24: 2 | 25: 1 | 26: 1 | 27: 1 | 28: 1 | 29: 2 | 30: 1 |
| 31: 1 | 32: 1 | 33: 2 | 34: 1 | 35: 1 | 36: 2 | 37: 2 | 38: 1 | 39: 1 | 40: 2 |
| 41: 1 | 42: 1 | 43: 2 | 44: 2 | 45: 2 | 46: 2 | 47: 2 | 48: 2 | 49: 1 | 50: 2 |
| 51: 1 | 52: 1 | 53: 1 | 54: 2 | 55: 1 | 56: 1 | 57: 1 | 58: 1 | 59: 1 | 60: 2 |
| 61: 2 | 62: 2 | 63: 2 | 64: 1 | 65: 1 | 66: 2 | 67: 1 | 68: 2 | 69: 1 | 70: 1 |
| 71: 2 | 72: 1 | 73: 1 | 74: 2 | 75: 2 | 76: 2 | 77: 1 | 78: 1 | 79: 2 | 80: 1 |
| 81: 1 | 82: 1 | 83: 2 | 84: 1 | 85: 2 | 86: 1 | 87: 1 | 88: 1 | 89: 1 | 90: 1 |
| 91: 1 | 92: 2 | 93: 1 | 94: 2 | 95: 2 | 96: 2 | 97: 2 | 98: 2 | 99: 1 | 100: 2 |
| 101: 2 | 102: 1 | 103: 2 | 104: 2 | 105: 1 | 106: 2 | 107: 1 | 108: 1 | 109: 1 | 110: 1 |
| 111: 1 | 112: 1 | 113: 1 | 114: 2 | 115: 2 | 116: 2 | 117: 2 | 118: 2 | 119: 1 | 120: 1 |
| 121: 2 | 122: 1 | 123: 2 | 124: 1 | 125: 2 | 126: 1 | 127: 1 | 128: 1 | 129: 1 | 130: 1 |
| 131: 2 | 132: 1 | 133: 2 | 134: 2 | 135: 1 | 136: 1 | 137: 2 | 138: 1 | 139: 1 | 140: 2 |
| 141: 2 | 142: 2 | 143: 2 | 144: 2 | 145: 1 | 146: 1 | 147: 2 | 148: 2 | 149: 2 | 150: 2 |
| 151: 2 | 152: 1 | 153: 2 | 154: 1 | 155: 2 | 156: 2 | 157: 2 | 158: 2 | 159: 1 | 160: 2 |
| 161: 2 | 162: 2 | 163: 1 | 164: 1 | 165: 2 | 166: 2 | 167: 2 | 168: 2 | 169: 2 | 170: 1 |
| 171: 2 | 172: 2 | 173: 2 | 174: 1 | 175: 2 | 176: 2 | 177: 1 | 178: 2 | 179: 1 | 180: 1 |
| 181: 2 | 182: 2 | 183: 1 | 184: 2 | 185: 2 | 186: 1 | 187: 2 | 188: 1 | 189: 1 | 190: 1 |
| 191: 2 | 192: 1 | 193: 2 | 194: 2 | 195: 1 | 196: 1 | 197: 1 | 198: 2 | 199: 1 | 200: 2 |
| 201: 2 | 202: 1 | 203: 1 | 204: 1 | 205: 1 | 206: 2 | 207: 2 | 208: 1 | 209: 1 | 210: 1 |
| 211: 2 | 212: 2 | 213: 1 | 214: 1 | 215: 1 | 216: 2 | 217: 2 | 218: 1 | 219: 1 | 220: 2 |
| 221: 2 | 222: 1 | 223: 2 | 224: 2 | 225: 2 | 226: 1 | 227: 1 | 228: 2 | 229: 1 | 230: 1 |
| 231: 2 | 232: 2 | 233: 1 | 234: 2 | 235: 2 | 236: 2 | 237: 2 | 238: 2 | 239: 2 | 240: 2 |
| 241: 1 | 242: 1 | 243: 2 | 244: 1 | 245: 2 | 246: 2 | 247: 2 | 248: 2 | 249: 2 | 250: 2 |
| 251: 1 | 252: 2 | 253: 1 | 254: 1 | 255: 1 | 256: 2 | 257: 2 | 258: 2 | 259: 1 | 260: 1 |
| 261: 2 | 262: 1 | 263: 2 | 264: 1 | 265: 2 | 266: 2 | 267: 1 | 268: 2 | 269: 1 | 270: 2 |
| 271: 1 | 272: 1 | 273: 1 | 274: 2 | 275: 2 | 276: 1 | 277: 1 | 278: 1 | 279: 1 | 280: 1 |
| 281: 2 | 282: 2 | 283: 2 | 284: 1 | 285: 1 | 286: 1 | 287: 2 | 288: 1 | 289: 2 | 290: 2 |
| 291: 2 | 292: 1 | 293: 2 | 294: 2 | 295: 1 | 296: 2 | 297: 1 | 298: 2 | 299: 1 | 300: 2 |
| 301: 1 | 302: 1 | 303: 2 | 304: 1 | 305: 1 | 306: 2 | 307: 2 | 308: 2 | 309: 2 | 310: 2 |
| 311: 2 | 312: 2 | 313: 2 | 314: 2 | 315: 1 | 316: 2 | 317: 2 | 318: 2 | 319: 2 | 320: 1 |
| 321: 1 | 322: 2 | 323: 2 | 324: 2 | 325: 1 | 326: 1 | 327: 2 | 328: 1 | 329: 2 | 330: 1 |
| 331: 2 | 332: 2 | 333: 1 | 334: 2 | 335: 1 | 336: 2 | 337: 2 | 338: 1 | 339: 1 | 340: 2 |
| 341: 1 | 342: 1 | 343: 1 | 344: 2 | 345: 1 | 346: 2 | 347: 2 | 348: 2 | 349: 2 | 350: 2 |
| 351: 1 | 352: 1 | 353: 1 | 354: 1 | 355: 1 | 356: 2 | 357: 2 | 358: 2 | 359: 1 | 360: 1 |
| 361: 2 | 362: 2 | 363: 1 | 364: 1 | 365: 1 | 366: 2 | 367: 2 | 368: 2 | 369: 1 | 370: 1 |
| 371: 2 | 372: 2 | 373: 1 | 374: 2 | 375: 2 | 376: 1 | 377: 1 | 378: 1 | 379: 1 | 380: 2 |
| 381: 2 | 382: 1 | 383: 2 | 384: 2 | 385: 2 | 386: 1 | 387: 2 | 388: 2 | 389: 2 | 390: 1 |
| 391: 1 | 392: 2 | 393: 2 | 394: 1 | 395: 1 | 396: 1 | 397: 2 | 398: 1 | 399: 1 | 400: 2 |
| 401: 2 | 402: 2 | 403: 1 | 404: 1 | 405: 2 | 406: 2 | 407: 2 | 408: 2 | 409: 2 | 410: 2 |
| 411: 1 | 412: 1 | 413: 1 | 414: 1 | 415: 1 | 416: 1 | 417: 2 | 418: 1 | 419: 1 | 420: 1 |

Case 2:16-cv-04193-GMS   Document 23-10   Filed 08/02/18   Page 18 of 150

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 421: 1 | 422: 1 | 423: 1 | 424: 2 | 425: 2 | 426: 2 | 427: 2 | 428: 1 | 429: 2 | 430: 2 |
| 431: 1 | 432: 2 | 433: 2 | 434: 2 | 435: 1 | 436: 2 | 437: 2 | 438: 1 | 439: 2 | 440: 1 |
| 441: 2 | 442: 1 | 443: 1 | 444: 1 | 445: 1 | 446: 2 | 447: 2 | 448: 2 | 449: 1 | 450: 2 |
| 451: 2 | 452: 1 | 453: 2 | 454: 2 | 455: 2 | 456: 1 | 457: 2 | 458: 2 | 459: 1 | 460: 2 |
| 461: 2 | 462: 1 | 463: 2 | 464: 2 | 465: 2 | 466: 2 | 467: 2 | 468: 2 | 469: 1 | 470: 2 |
| 471: 1 | 472: 1 | 473: 1 | 474: 1 | 475: 1 | 476: 2 | 477: 2 | 478: 2 | 479: 2 | 480: 2 |
| 481: 1 | 482: 2 | 483: 2 | 484: 2 | 485: 1 | 486: 1 | 487: 1 | 488: 1 | 489: 1 | 490: 1 |
| 491: 2 | 492: 1 | 493: 1 | 494: 2 | 495: 2 | 496: 2 | 497: 2 | 498: 2 | 499: 2 | 500: 1 |
| 501: 1 | 502: 1 | 503: 1 | 504: 2 | 505: 1 | 506: 2 | 507: 2 | 508: 2 | 509: 1 | 510: 2 |
| 511: 1 | 512: 1 | 513: 2 | 514: 2 | 515: 2 | 516: 1 | 517: 1 | 518: 1 | 519: 2 | 520: 2 |
| 521: 2 | 522: 2 | 523: 2 | 524: 2 | 525: 2 | 526: 2 | 527: 2 | 528: 2 | 529: 1 | 530: 2 |
| 531: 2 | 532: 2 | 533: 1 | 534: 2 | 535: 2 | 536: 2 | 537: 1 | 538: 1 | 539: 2 | 540: 2 |
| 541: 2 | 542: 1 | 543: 1 | 544: 2 | 545: 2 | 546: 1 | 547: 2 | 548: 1 | 549: 2 | 550: 1 |
| 551: 1 | 552: 2 | 553: 2 | 554: 1 | 555: 2 | 556: 2 | 557: 2 | 558: 2 | 559: 2 | 560: 2 |
| 561: 1 | 562: 2 | 563: 1 | 564: 1 | 565: 2 | 566: 1 | 567: 2 | | | |

**End of Report**

Exhibit 49

# Susan Downs Parrish, Ph.D.
## Psychologist

P.O. Box 50580
Mesa, Arizona 85208-0029
Telephone: (480) 415-1998
Fax: (480) 357-7531

February 21, 2005

Robert Storrs
Attorney at Law
45 West Jefferson
Luhrs Tower, Suite 803
Phoenix, Arizona 85003-2317

Re: Paul Bradley Speer

Name: Paul Bradley Speer
DOB:  11/13/78
Age:   26
DOE:  12/6/04; 12/7/04; 12/23/04; 1/3/05; 1/11/05

Dear Mr. Storrs:

As requested, I evaluated Paul Bradley Speer. The evaluation took place at Madison Street Jail on December 6, 7, and 23 of 2004 and January 3 and 11 of 2005. He was cooperative, and the results were judged to be a valid representation of his current functioning. The testing was spread out over five sessions to accommodate Mr. Speer's short attention span. At the time of the present evaluation, Artane and Risperdal were being prescribed. Throughout the test, Mr. Speer inquired as to whether he was doing well. On some occasions, he offered to repeat a test if his performance was judged to be inadequate. No test was repeated. He recognized that he did not do well on the Arithmetic subtests of the Wide Range Achievement Test- 3, and stated that he was not interested in math when he was in school because he did not think that math was a necessary skill in life. He sometimes reminded me that he did not have a complete education. At no time did I think that he was invested in performing poorly. The results were as follows.

**Methods of Evaluation**
Review of Records
Halstead-Reitan Neuropsychological Test Battery for Adults (HRB)
Wechsler Adult Intelligence Scale (WAIS)
Wide Range Achievement Test-3

Speer, Paul Bradley Rpt.                                                           2
Susan Downs Parrish, Ph.D.
February 21, 2005

**Review of Records**
The following records were reviewed:

Indictment
Phoenix Police Reports
Transcripts of Telephone Conversations
Correctional Health Records
Alhambra School Records
Child Protective Services Records
Juvenile Records
Psychological/Psychiatric Evaluations by:
      Roger M. Martig, Ph.D.
      Stan Cabanski, Ph.D.
      Stanley Zucker, Ph.D.
      Barry N. Fine, M.D.
      George DeLong, Ph.D.
      Jack Potts, M.D.
      John Toma, Ph.D.
      James S. Thal, Ph.D.
      Leslie Hoyt-Croft, Ph.D.
Arizona Department of Juvenile Corrections
Parents Divorce Records

The purpose of this evaluation was the assessment of Mr. Speer's neuropsychological functioning. The above records were reviewed and aspects relevant to the purpose of this evaluation were selected for inclusion in this report.

According to the Indictment CR 2002-010926, Mr. Speer is charged with first-degree murder, attempted first-degree murder, conspiracy to commit first-degree murder, burglary in the first degree, misconduct involving weapons, two counts of tampering with a witness, aggravated assault, a class 5 felony, and aggravated assault, a class 6 felony.

Barry N. Fine, M.D., conducted a neuropsychiatric evaluation of Mr. Speer on October 13, 1993, when Mr. Speer was almost 15 years old. Dr. Fine included statements that nicely summarized Mr. Speer's early school experience. The following is a quote from his report.

> Paul had been referred because of delayed progress in academic areas (and) disruptive behavior in the classroom. He had difficulty concentrating, was easily distracted, was overactive and restless, would give up easily, lose his attention when teachers (were) explaining something, does not comply with directions, can be aggressive towards staff and students, (and) forgets his homework and materials. Early medical and developmental history (were) within normal limits (and) developmental milestones (were) within the average

Speer, Paul Bradley Rpt.                                                                    3
Susan Downs Parrish, Ph.D.
February 21, 2005

range.  Paul made fair progress in kindergarten, however, he was "deemed
hyperactive and was on Ritalin at the time."  In first grade he had about average
grades, but was recommended for retention.  By second grade, he had difficulty
with concentration although the Iowa Test of Basic Skills results were above
average in all areas except math.  He was retained in fourth grade and he
actually did worse the second time around.  When observed in the classroom he
was not working, had difficulty attending to tasks, (and) required several
redirections by the teacher.  Paul has lived with his grandparents or his aunt off
and on in the past.  In school his behavior is still out of control, oppositional,
assaultive with peers verbally and physically.  He is disruptive in the classroom.

Dr. Fine diagnosed Mr. Speer with Conduct Disorder, Undifferentiated Type,
Psychoactive Substance Abuse NOS (including alcohol, marijuana, Crystal and perhaps
some LSD), and Attention Deficit Hyperactivity Disorder, now in the residual state.  He
noted that Paul was not displaying "much in the way of Attention Deficit Hyperactivity
Disorder (ADHD) symptoms."  Dr. Fine reviewed records, talked to staff who interacted
with Mr. Speer, and probably interviewed Mr. Speer.  The report made no mention of test
results other than the results from previous evaluations.

Leslie Hoyt-Croft, Ph.D., evaluated Mr. Speer and wrote a report dated May 21, 2004.
Her evaluation consisted of an interview carried out over multiple sessions and review of
records.  She noted that Mr. Speer was born addicted to heroin and grew up in an
"extremely dysfunctional and unstable family."  His mother and stepfather are both
heroin addicts and also use methadone, crack cocaine, marijuana, and prescription drugs.
Mr. Speer has a history of drug use, which includes alcohol, inhalants, marijuana,
amphetamine, crystal methamphetamine, cocaine, prescription drugs, methadone, and
heroin.  At the age of five or six, Paul was molested by his paternal aunt, who forced him
to perform cunnilingus.

According to Child Protective Services records, in 1992, Mr. Speer's mother reported that
he assaulted her and that he was trying to sell Valium.  The note stated that Mr. Speer's
mother was pregnant and appeared to be "high."  Apparently, she had been threatening
Mr. Speer with a baseball bat and she appeared to have "lost her mind."  It was concluded
that she was possibly suffering from hallucinations as a result of taking Valium.

According to his Juvenile Records, Mr. Speer was placed in a self-contained special-
education program in February of 1991, when he was about 12.  At age 13, he was
hospitalized for an overdose of crystal methamphetamine.  The hospital staff was
concerned that he might have seriously damaged his heart.  No follow-up record was
available.

Mr. Speer has taken the Wechsler IQ test a number of times.  In 1990, Roger M. Martig,
Ph.D., administered the Culture Fair test of general ability and the Performance section of
the Wechsler Intelligence Scale for Children-Revised (WISC-R).  Mr. Speer earned an IQ

Speer, Paul Bradley Rpt.                                                                 4
Susan Downs Parrish, Ph.D.
February 21, 2005

score of 75 on the Culture Fair test and an IQ score of 90 on the WISC-R. His arithmetic skills were at an ending fourth grade level and his reading skills were at a middle fifth-grade level.  He was diagnosed with depression, a conduct disorder, symptoms of hyperactivity, and narcissistic personality characteristics.

On May 16, 1990, when Mr. Speer was in the fourth grade and 11 years old, he was evaluated by Stan Cabanski, Ph.D.  He was found to have a Verbal IQ of 95, a Performance IQ of 90, and a Full-Scale IQ of 91. He was described as being significantly below average in visual-motor integration and significantly above average in visual motor coordination. His math skills were at an upper fourth-grade level and his reading skills were at a middle fifth-grade level. He was diagnosed as Emotionally Handicapped Severe with Attention Deficit Hyperactivity Disorder. It was noted that he had not been in special education in the past.

Dr. Cabanski evaluated Mr. Speer on two other occasions, on July 31, 1991, when Mr. Speer was 12 years old, and on September 22, 1992, when Paul was nearly 14 years old. When Mr. Speer was 12, Dr. Cabanski diagnosed him with Atypical Impulse Control Disorder with a history of ADHD.   When Paul was 13 years and 10 months, Dr. Cabanski, Ph.D., diagnosed him with Undifferentiated Conduct Disorder, Mixed Substance Abuse, and a history of Attention Deficit Hyperactivity Disorder. His math skills were at a beginning six-grade level, his reading skills were at middle seventh-grade level.

When Mr. Speer was 14 years old, he was evaluated by Stanley H. Zucker, Ph.D. He was found to have a Verbal IQ of 92, a Performance IQ of 95, and a Full Scale IQ of 92.  His lowest Verbal subtest score was on Arithmetic, for which he received a score of five (fifth percentile rank) and his lowest Performance subtest score was on Coding, for which he received a score of 8 (25th percentile rank).  These are the two WISC-R subtest scores that are most sensitive to brain functions. His reading skills were at a late seventh grade level and his arithmetic skills were at a fourth-grade level.

On January 20, 2003, George DeLong, Ph.D., conducted a prescreen evaluation in regard to competency.   Dr. DeLong recommended a complete Rule 11 evaluation.   He administered parts of the Wechsler IQ test and found scores in the mentally retarded range.

Jack Potts, M.D., conducted a Full Rule 11 evaluation on April 21, 2003.  He concluded that Mr. Speer was malingering and was competent to proceed through the adjudication process.

On August 20, 2003, John Toma, Ph.D., administered the Wechsler Adult Intelligence Scale-III (WAIS-III).  Mr. Speer was found to have a Verbal IQ of 85, a Performance IQ of 72, and a Full Scale IQ of 77.  The individual subtest scores were not included in his report. He concluded that Mr. Speer was malingering.

Speer, Paul Bradley Rpt.                                                                          5
Susan Downs Parrish, Ph.D.
February 21, 2005

James S. Thal, Ph.D. evaluated Mr. Speer on October 29, 2003. Mr. Speer was 24 years old at the time of this valuation. Using the same test that was administered by Dr. Toma, Mr. Speer earned a Verbal IQ of 80, a Performance IQ of 77, and a Full Scale IQ of 77. Once again, Mr. Speer's lowest Verbal subtest score was a 5 on Arithmetic and his lowest Performance subtest score was 3 on Digit Symbol. He concluded that Mr. Speer was not mentally retarded.

## Test Results

### Validity of Current Test Results

The Halstead-Reitan Neuropsychological Test Battery does not include a separate test to identify malingering or dissimulation because there are significant problems in the validation of all currently available dissimulation tests (Nies and Sweet, 1994), and because with a total of 42 different variables comprising the GNDS, malingering or dissimulation is often obvious from the actual pattern across the multiple scores. It is practically impossible to fake impairment at the same level across 42 different scores.

Heaton, Smith, Lehman, and Vogt (1978) studied the differences between the particular patterns across the HRB demonstrated by genuinely head-injured patients versus malingerers, and found that head-injured patients performed more poorly than malingerers on the Category Test, Trails B (errors), and the Memory and Localization components of the Tactual Performance Test. The malingerers, on the other hand, performed more poorly than brain-injured patients on the Speech Sounds Perception Test, Tapping, Finger Agnosia, Suppressions, Grip Strength, and the WAIS Digit Span subtest. Using Reitan and Wolfson's (1993) GNDS scores for quantitative analysis, Mr. Speer's scores on the tests identified by discriminant analysis in the Heaton et al. (1978) study are as follows:

Speer, Paul Bradley Rpt.                                                                6
Susan Downs Parrish, Ph.D.
February 21, 2005

Tests on which malingerers scored worse:                          NDS

| Speech Sounds | 3 |
|---|---|
| Tapping, Dominant | 2 |
| Tapping, Non-Dominant | 1 |
| Finger Agnosia | 2 |
| Suppression Tactile | 3 |
| Suppression Auditory | 3 |
| Suppression Visual | 1 |
| Grip Strength | 3 |
| **Total:** | **18** |
| **Average** | **2.25** |

Tests on which Genuine Head-Injured Scored Worse:

| The Category Test | 3 |
|---|---|
| Trails B | 3 |
| TPT Memory | 2 |
| Localization | 2 |
| **Total:** | **10** |
| **Average** | **2.50** |

Quantitative analysis of Mr. Speer's performances across the 42 indices of the Halstead-Reitan Neuropsychological Test Battery demonstrates a greater similarity to the performance of the Heaton et al. (1978) group of genuine head-injured subjects than to the performance of their malingering subjects, suggesting a valid profile.

**The Halstead-Reitan Neuropsychological Test Battery for Adults (HRB)**
The Halstead-Reitan Neuropsychological Test Battery for Adults (HRB) has been validated more than thirty-nine times in the literature. It meets the Daubert Standard. Its credibility is well established.

Two summary scores provide an overview of Mr. Speer's performance on the HRB: the General Neuropsychological Deficit Scale (GNDS) score, which is based on 42 variables and the Halstead Impairment Index, which is based on 7 variables. The GNDS reflects the total number of Neuropsychological Deficit Scale (NDS) points accumulated by the subject. It is the single most sensitive score in the HRB.

Mr. Speer's GNDS score of 67 is on the borderline between the Moderately and Severely Impaired range, and his Impairment Index score of 0.9 is in the Severely Impaired range.

Speer, Paul Bradley Rpt.                                                                    7
Susan Downs Parrish, Ph.D.
February 21, 2005

(The Moderately Impaired range is the beginning of the brain-damaged range.) It is worth
noting that the tests that contribute to the Impairment Index are objectively scored; there
is no clinical judgment involved. There is very strong evidence to indicate that he suffers
from significant impairment in brain functions.

The GNDS and the HII are two of five measures in the HRB that are considered
especially sensitive to brain functions. The other three tests are: the Category Test, the
Localization component of the Tactual Performance Test, and Trails B. Before
considering these tests, a review of his scores on the Wechsler Adult Intelligence Scale
(WAIS) will be helpful.

In relation to the HRB, the latest version of the Wechsler Intelligence Scale, the WAIS-
III, is not used. This is because it has not been validated with respect to the HRB. Since
the WAIS is outdated with regard to IQ, it is no longer a valid instrument in the
assessment of intelligence[1]; however, it does have empirically validated implications with
respect to brain functions. For this reason, it is invaluable in regard to interpreting the
HRB results.

Mr. Speer's Verbal and Performance IQ scores differ by 1 point, which is an insignificant
difference. His Verbal, Performance, and Full Scale IQ scores were in the middle of the
Low Average range. All of his IQ scores were in the bottom 20% when compared to the
standardization group for the WAIS. Review of the Verbal subtests revealed that his best
scores were on measures of word knowledge (average range), and his poorest score was
on general information, which is not surprising considering that he has a fifth grade
education.

Inspection of the Performance subtests indicated that his strongest ability, which was
about average, had to do with spatial relations. His poorest score was on Digit Symbol, a
coding task. His score was one and two-thirds standard deviations below the mean. Digit
Symbol is the WAIS subtest most sensitive to brain functions. His score on Digit Symbol
is consistent with his scores on the GNDS and the Impairment Index.

We have considered two of the five measures considered most sensitive to brain
functions, i.e., the GNDS and the Impairment Index. We now turn to the other three
measures, beginning with the Category Test. The following is offered as an explanation
of the Category Test.

> "We have tested many individuals who appear superficially to have all of
> the elements for successful performance in everyday life (i.e., education,
> high IQ, earlier records of outstanding achievements, etc.), but, in fact, are
> unable to meet the requirements of everyday living. Often these demands

---

[1] Research has shown that the WAIS overestimates IQ by as much as 10 points which should be kept in
mind when considering the IQ scores in the present evaluation.

Speer, Paul Bradley Rpt.                                                                    8
Susan Downs Parrish, Ph.D.
February 21, 2005

> of functioning effectively and efficiently in everyday life are quite subtle,
> and require insight into the essential nature of a situation and the
> integration of the relevant (as compared to the inconsequential) elements.
> This subtle type of impairment, which is critically important in influencing
> everyday behavior, is (1) often demonstrated by persons with cerebral
> impairment, (2) most clearly apparent and misunderstood among persons
> with adequate (or even superior) IQ values, (3) Routinely missed entirely
> by neuropsychologists who neglect to give the Category Test, and (4) not
> necessarily revealed by other neuropsychological tests." (*The Halstead-
> Reitan Neuropsychological Test Battery* by Ralph M. Reitan and Deborah
> Wolfson, 1993, p. 91)

Mr. Speer made 108 errors on the Category Test, which falls in the Severely Impaired
range. This score is the score expected of someone who is mentally retarded. Although
his IQ scores are below average, his score on the Category Test is below that expected of
someone with low average intelligence. This score is consistent with his scores on the
GNDS, the Impairment Index, and the Digit Symbol subtest.

Localization is a memory component of the Tactual Performance Test (TPT). The TPT is
a complex motor task that reflects one's ability to engage in higher-level problem
solving. It took Mr. Speer 24.1 minutes to complete three trials of the TPT, which falls in
the Moderately Impaired range approaching the Severely Impaired range. Individuals
with normal brains are expected to complete all three trials in 12 or less minutes. It took
Mr. Speer 12.7 minutes to complete trial 1, which is very slow. His time score improved
significantly on trial 2, but it was still slow. It took him 7.4 minutes to complete trial 2.
His performance on the TPT is consistent with his Category Test score. The reader is
reminded that neither the Category Test nor the TPT rely on language or academic
knowledge. Both tests do involve the use of memory and the ability to think on one's
feet. The Category Test reflects one's ability to benefit from experience, because it
involves feedback with each response. People who score poorly on the Category Test
tend to make the same mistake over and over again. It is not that they cannot learn; it is
that they do not recognize what may seem obvious to others.

Mr. Speer's TPT Localization score of 3 was in the Severely Impaired range. In practical
terms, his score on Localization means that his memory for the concrete detail involved
in an experience is poor. Since abstract thought requires a reasonable grasp of the
concrete elements of experience, his ability to reason is affected by this memory deficit.
The memory components of the TPT and the Category Test are embedded within the
tasks, and they are good reflections of the kind of memory we rely on for daily living.

The TPT is undoubtedly a complex task in terms of its demands. The subject must rely on
tactile form discrimination, kinesthesis, coordination of movement of the upper
extremities, manual dexterity, and an understanding of the relationship between the
spatial configuration of the shapes and their location on the board. Ward Halstead, the

Speer, Paul Bradley Rpt.                                                    9
Susan Downs Parrish, Ph.D.
February 21, 2005

first person to establish a neuropsychology lab in the United States, observed that many
people with biologically compromised cerebral functions were deficient in the ability to
perform relatively simple tasks, especially if required to execute the task in an unusual
way or under unusual circumstances. Dr. Halstead postulated that performing a task
under unusual conditions would be much more difficult for the brain-damaged person
than for the normal person.

Dr. Halstead also believed that subjects with brain lesions would not be able to reproduce
as much of the content of the test as would persons with normal brain functions. In other
words, he postulated that the brain-damaged subject would learn far less from the
experience of performing the TPT than the control subject even though the brain-
damaged subject spends more time working on the task and is exposed to the stimulus
materials for longer, about twice as long. Halstead's postulate has been confirmed by
research. The Localization component has been shown to be more sensitive in
differentiating between subjects with and without cerebral damage than the Memory
component. Mere reproduction of stimulus material appears to make more limited
demands on the brain than does integration of the material within a more complex
framework. Mr. Speer's score on Memory is 6, which is consistent with an honest effort.

Trails B is a measure of the ability to keep two ideas in mind at the same time. It is a
measure of flexibility of thought. His score of 286 seconds falls in the Severely Impaired
range. This score is very poor. It is consistent with the other four measures discussed thus
far.

The pattern among these five measures indicates significant chronic impairment that falls
in the Moderately to Severely Impaired range. Further exploration of the entire pattern of
results reveals more information about his functioning.

The table below is one way to express Mr. Speer's neuropsychological functioning. It
provides the mean scores of a Control group and a Head Injured group as a context for
understanding Mr. Speer's scores. This table represents four levels of inference, or four
ways to measure an individual's functioning. The four levels of inference are "time-
honored methods in clinical neuropsychology," and they are as follows:

1. Level of Performance includes measures in which normative data is used to
   make interindividual comparisons. Examples of such measures include an IQ
   test or an academic achievement test;

2. Pathognomonic Signs contains measures that identify performances that are
   defective almost exclusively in persons with cerebral damage. An example of
   such a sign of impairment is the misalignment of the arms of a Greek cross.
   As with Level of Performance, this is an interindividual comparison method;

Speer, Paul Bradley Rpt.                                                                    10
Susan Downs Parrish, Ph.D.
February 21, 2005

3. Patterns includes analyses aimed at discovering discrepancies between certain
   abilities, e.g., a discrepancy between the Full Scale IQ score and the
   Impairment Index. This method is an intra individual comparison, but must
   take into consideration environmental and biological influences;

4. Right/Left Differences refers to measures that allow for the comparison of the
   functioning of the two sides of Mr. Speer's body. This final level of inference
   allows Mr. Speer to be his own control; it reflects the hard wiring of his brain.

| | *Level of Performance* | *Signs* | *Patterns* | *Rt/Lt Differences* | *Total GNDS* |
|---|---|---|---|---|---|
| *Control* *N=41* | 11.95 | .54 | 1.34 | 3.37 | 17.20 |
| *Mr. Speer* | 42.00 | 5.00 | 0.00 | 20.00 | 67.00 |
| *Head Injured* *N=45* | 29.22 | 7.31 | 2.20 | 9.60 | 48.47 |

The table reveals that Mr. Speer's scores are, in many respects poorer than the mean
scores for the Head Injured group. It is worth considering each category. Level of
Performance is the level of inference least sensitive to brain functions; it is not surprising
that he falls short when compared to other adults. He has a fifth grade education and had
an abusive environment as a child. Thus, he did not have the basics in regard to his
development. With regard to Pathognomonic Signs, he was in the impaired range but his
score did not exceed the head injured mean. This supports the conclusion that he was
making an honest effort. His score on Patterns is 0 because there was consistency
between his Verbal and Performance IQ scores, and between his Full Scale IQ and his
Impairment Index. This consistency supports the conclusion that he applied himself
honestly, and it is consistent with chronic, static impairment.

His score of 20 on Right/Left Differences indicates that a significant number of the
comparisons of the functioning of the two sides of his body are outside of normal limits.
His score reflects the hard wiring of his brain and makes a very strong case for
impairment in brain functions being the source of his errors and low scores. There are
two summary scores that allow a comparison of the functioning of the two sides of the
brain, the Left Neuropsychological Deficit Scale (LNDS) score and the Right
Neuropsychological Deficit Scale (RNDS) score.

The LNDS and the RNDS each represent the accumulation of deficit points indicating
impairment of one side or the other of the brain. His LNDS was 15 and his RNDS was
11. This means his impairment is diffusely distributed to both cerebral hemispheres, but
the impairment is slightly greater in the left cerebral hemisphere.

Speer, Paul Bradley Rpt.                                                                              11
Susan Downs Parrish, Ph.D.
February 21, 2005

According to the Wide Range Achievement Test, he is at a post high school level in reading, a high school level in spelling and a third grade level in math. The standard scores for Reading, Spelling, and Arithmetic, 103, 97, and 62, respectively, can be compared to his Full Scale IQ score of 84. These scores reveal that his reading and spelling skills are somewhat above expectation and his arithmetic skills are well below expectation.

The Seashore Rhythm Test and the Speech-sounds Perception Test (SSPT) are measures of severity. They require the processing of auditory material. The Rhythm Test involves distinguishing different rhythmical patterns, and SSPT involves listening to nonsense words composed of a consonant double-vowel consonant blend, and then identifying the blend from an array of four choices. His score on Rhythm was in the Moderately Impaired range and his score on SSPT was in the Severely Impaired range.

As to the question of the etiology of impairment, Mr. Speer reports a history of head trauma, he has a long history of substance abuse, and his biological mother has a long history of drug abuse. On one occasion, she was described as being pregnant and "high." Mr. Speer is described as being addicted to heroin when he was born. There is no medical documentation of this as far as I know, and his mother will not agree to be interviewed. The pattern of results is one of chronic, static impairment. His IQ scores do appear to be significantly lower than when he was tested as a child, but even when he was tested as a child, his IQ scores were a little below the mean. He consistently had difficulty in the area of arithmetic, and his Wechsler Arithmetic and Coding/Digit Symbol have been among his lower scores. As mentioned, these are the Wechsler subtests most sensitive to brain functions. It is likely that he entered the world with some degree of impairment and then sustained more damage to his brain along the way.

### Conclusion and Recommendations

Mr. Speer has moderate to severe impairment in brain functions. The DSM-IV offers Cognitive Disorder NOS and Dementia NOS as alternatives for diagnosing someone with impairment in brain functions. Neither diagnosis fits Mr. Speer. Cognitive Disorder NOS refers to a condition that is too mild, and Dementia NOS refers to a condition that is too severe. The exact etiology cannot be determined, but there is evidence of events in Mr. Speer's life likely to cause impairment in brain functions.

I did not conduct a formal interview Mr. Speer, so I did not consider diagnosing him with a disorder unrelated to his neuropsychological functioning. Considering the documentation of abuse, it is surprising that no one has diagnosed him with Posttraumatic Stress Disorder. The following description from the DSM-IV-TR, page 465, under Posttraumatic Stress Disorder (PTSD), Associated Features and Disorders seems fitting.

> The following associated constellation of symptoms may occur and are more commonly seen in association with an interpersonal stressor (e.g., childhood sexual

Speer, Paul Bradley Rpt.                                                    12
Susan Downs Parrish, Ph.D.
February 21, 2005

or physical abuse, domestic battering): impaired affect modulation; self-destructive
and impulsive behavior; dissociative symptoms; somatic complaints; feelings of
ineffectiveness, shame, despair, or hopelessness; feeling permanently damaged; a
loss of previously sustained believes; hostility; social withdrawal; feeling constantly
threatened; impaired relationships with others; or a change in the individual's
previous personality characteristics.

If there are any questions with regard to this report, please call me. I hope that this
information is helpful in this case.

Sincerely,

Susan Downs Parrish, Ph.D.

Exhibit 50

# Susan Downs Parrish, Ph.D.
## Psychologist

P.O. Box 50580
Mesa, Arizona 85208-0029
Telephone: (480) 415-1998
Fax: (480) 357-7531

March 16, 2005

Robert Storrs
Attorney at Law
45 West Jefferson
Luhrs Tower, Suite 803
Phoenix, Arizona 85003-2317

Re:  Dissimulation Index for Paul Bradley Speer

Name:  Paul Bradley Speer
DOB:  11/13/78
Age:   26
DOE:  03/08/05; 03/09/05; 03/14/05

Dear Mr. Storrs:

As you know, I wanted to re-test Paul Bradley Speer so that I could calculate a Dissimulation Index as presented by Ralph M. Reitan and Deborah Wolfson in their book Detection of Malingering and Invalid Test Scores (1997).[1]  The results of the calculations appear in the attached forms.  Paul earned a Dissimulation Index of 26 which supports a conclusion of valid test results.  His score was well below the cut off of 31/32.  Reitan and Wolfson found that head-injured individuals involved in litigation had a mean Dissimulation Index of 42.05, while head-injured individuals not involved in litigation had a mean Dissimulation Index of 23.50.  As you can see, his score was similar to the mean score for the subjects not involved in litigation.

I will copy the raw data from the second testing and send the results to you by early next week.  If you have any questions about this letter, please call me.

Sincerely,

Susan Downs Parrish, Ph.D.

---

[1]Reitan, R. M. and Wolfson, D. (1997) Detection of Malingering and Invalid Test Scores.  Tucson, Arizona: Neuropsychology Press.

Exhibit No.: X X 1

Case No.: CR02 - 01092261

For Identification: Defense

MAR 0 1 2007

In Evidence: Defense
3/01/07

## Clerk of Superior Court

By: _____ E. Canas _____
(Deputy Clerk)

1001012920

CR-07-01 0 3-AP

Exhibit 51

*PABLO STEWART, M.D.*
Psychiatric Consultant
824 Ashbury Street
San Francisco, California 94117
415 753-0321
Fax 753 5479
E Mail pab4emi@aol.com

March 17, 2005

Robert L. Storrs
45 West Jefferson
Luhrs Tower, Suite 803
Phoenix, Arizona 85003-2317

Re: Paul Bradley Speer

Dear Mr. Storrs:

At your request, I conducted a psychiatric evaluation of Paul Bradley Speer to determine the presence, severity, and effect of mental illness on his behavior and functioning.

**Materials Reviewed**

In order to answer the referral question, I interviewed Mr. Speer at the Maricopa County Jail and conducted an extensive review of medical, psychiatric, juvenile, correctional, educational, and social history records. I also reviewed forensic, police, and lab reports related to the criminal charges against Mr. Speer. I reviewed numerous mental health evaluations of Mr. Speer, including those by Susan D. Parrish, Ph.D. (February 21, 2005); Lesley Hoyt Croft, Ph.D. (May 25, 2004); James S. Thal, Ph.D. (October 29, 2003); John J. Toma, Ph.D. (August 20, 2003); Jack L. Potts, M.D. (April 21, 2003); Stanley H. Zucker, Ph.D. (January 30, 1993); George M. DeLong, Ph.D. (January 20, 2003); Barry N. Fine, M.D. (October 13, 1993); Stan Cabanski, Ph.D. (September 22, 1992); Stan Cabanski, Ph.D. (July 31, 1991); Robin Storm, M.A., N.C.S.P. (October 22, 1990); Stan Cabanski, Ph.D. (May 16, 1990); and Roger M. Martig, Ph.D. (May 3, 1990).

**Clinical Interview**

I interviewed Mr. Speer at the Maricopa County Jail on January 10, 2005, for half a day. At the time of the interview, he was treated with a regimen of antipsychotic and anticholinergic medications for his psychiatric symptoms and was receiving Risperdal 3 mg QHS and Artane 2.5 mg BID.

Mr. Speer appeared very anxious with very poor eye contact. Although he was cooperative and sincere, he had great difficulty staying on topic. As an example, when he was describing the severe physical and sexual abuse he survived as a child, he suddenly switched topics and asked, "Does the government study people with special powers?" He demonstrated severe psychomotor agitation, pacing, fidgeting, jerking, and continuously moving about during the interview.

Mr. Speer reported that he completed the sixth grade but was unable to complete the seventh or eighth grade and received his eighth grade diploma when he was at the Adobe Mountain Juvenile Prison. He stated he "grew up in juvenile institutions." He grew up with his mother, step father and grandmother in Phoenix. His biologic father left the family when Mr. Speer was a baby, and Mr. Speer "never grew up around him." When asked about his family, he quickly changed the subject to some topic that was unrelated to what we were talking about.

Mr. Speer claimed that his mother has supernatural powers and is a very powerful woman. When she is mad, according to him, she can "cause things to happen. When speed freaks are making noise next door, she can cause all of their appliances to go off." He believes his mother and grandmother (maternal) are witches and that "bad stuff happens to people when they make them mad." His mother and grandmother "used to tinker with witch craft" when he was a kid. He stated, "I could see ghosts when I was a child." The last time he saw a ghost was at age 15. He explained that once he started trying to do something good, something bad would happen and that people who get close to him have bad things happen to them.

Mr. Speer believes that one of his brothers, as well as Mr. Speer himself, also has special powers. He reported, "My brother has the power to become invisible. It only happens at night. If he's surrounded, he can disappear so the cops don't get him." Mr. Speer stated that he can put a talisman in a room and become invisible too. He also believes he can put spells on people and make them like him.

Mr. Speer briefly described a childhood of physical abuse, which he attributed to his mother and step father's use of drugs. In response to my questioning, he reluctantly stated that his parents beat him up, hit him really hard, busted his ribs, and hit him with a belt with his shirt off. He reported that he was beaten often by both his mother and step father. His grandmother hit him with a switch. He softly stated that "after a while you don't want to be hit any more, so you'd hit back."

Chronic sexual abuse accompanied the physical abuse and abandonment Mr. Speer experienced during his childhood and developmental years. Although he stated his mother and step father did not force sex on him, he remembered that on two occasions his mother came into his bed, called him by his father's name, and tried to have sex with him. His aunt and uncle molested him as a child for months at a time. His aunt made him "lick her vagina; she put sugar on it." His uncle sold him as a prostitute as a young teen of 13, 14, and 15. His uncle gave Mr.

Παγε –2–

Speer drugs and money "to have sex with people. . .men." Mr. Speer stated, "I've blocked out time frames in my mind."

Mr. Speer described numerous behaviors that are characteristic of persons who have survived chronic abuse. He tries "not to go to sleep so [he] won't have to dream" about the abuse. He has nightmares of "being murdered" and "tied up." He experiences panic attacks when his heart pounds, he hyperventilates, and he breaks out in a cold sweat. He used a wide array of drugs, alcohol and organic solvents, but especially sleeping pills, in an effort to quell overwhelming emotions. The drugs "didn't take it away but only made you numb to where you could deal with it." He learned as an adolescent and teenager that "some medication can numb you." He does not dream when he takes Valium, Xanax, or methadone. When Mr. Speer does not dream, he reported, "I don't wake up sweating."

Mr. Speer has "overwhelming feelings of people wanting to hurt" him that cause him extreme discomfort and that he wants to stop. His dreams are "worse right now because people are actually trying to get" him. He stated, "I can't trust people because everyone wants to take me down." Although he admitted that he has "delusions of people wanting to hurt me," he very much believes in the power of "spiritual curses" that bring him harm. These spiritual curses are so strong that "pills only work for a little while and the 'Force' will overpower them." The "Force" overpowers street drugs as well as medications prescribed by jail psychiatric staff. He is exhausted by being in the "mode of always having to protect" himself.

Mr. Speer described his use of illicit drugs in relation to his severe symptoms of Attention Deficit Hyperactivity Disorder (ADHD) when he answered questions about methamphetamine (speed). He reported, "When I first did speed (methamphetamine) I felt mellow. If you overdose on speed, it will cause you to get over amped. I took Ritalin as a kid; it did the same thing as street speed." It is well established in the literature that methamphetamine is frequently used to self medicate otherwise intolerable symptoms of ADHD. As Mr. Speer explained, "I would do speed as a kid when I wanted to mellow out."

## Psychiatric History

Paul Speer is a 26-year-old (DOB 11.13.78), single, Caucasian male with a longstanding history of severe psychiatric and cognitive disabilities. Mr. Speer was first referred to Arizona's Department of Child Protective Services in 1982 at the age of four years old due to reports of physical and sexual abuse at the hands of his caretakers. Multiple psychological, psychiatric, and psychoeducational evaluations conducted by juvenile mental health officials during Mr. Speer's childhood and adolescence document his history of significant mental impairments that affected his behavior and functioning throughout the course of his life.

Although the etiology of Mr. Speer's impairments may be difficult to determine with certainty, several circumstances offer reasonable explanations for them. Mr. Speer was the first child born to his mother, who was addicted to heroin during her pregnancy with him. She also

regularly drank alcohol during her pregnancy, exposing the developing fetus to toxins known to cause permanent brain damage. During his early years of life, his mother left him in the care of her parents, his father abandoned him, and his relatives sexually abused him. Mr. Speer's mother and her third husband singled Mr. Speer out for punishment and routinely physically assaulted him. They beat him with their hands, belts, and other objects. His mother attempted to beat him with a baseball bat and stab him with a knife. Child protective service records show that Mr. Speer had blackened eyes, scratched skin, bruises, and welts on his face, stomach, back, arms, and legs from assaults by his parents. In addition to causing a pervasive pattern of psychiatric symptoms, physical abuse can and does result in brain damage that seriously derails a child's developmental track.

There is also a likely genetic component to Mr. Speer's multiple disabilities. Mr. Speer's mother was severely depressed, psychotic at times, and addicted to an array of drugs. His grandfather and one uncle committed suicide. Mr. Speer informed psychiatric staff at the jail following his arrest that, "mental illness runs in my family." Child protective workers and probation officers reported witnessing first hand his mother's episodes of psychosis and intoxication. In 1988, when Mr. Speer was 10 years old, a juvenile probation officer attempted to interview her and reported that she was unable to "complete a thought while conversing with the juvenile probation officer." On another occasion in 1992, his mother was "threatening Paul with a baseball bat" and appeared "to have lost her mind." The probation officer went on to report that Mr. Speer's mother "has dreams and then believes they are real life," "abuses Valium and is possibly hallucinating." His mother and his step father erratically participated in a methadone program for their heroin addiction. Both of them failed to participate in family counseling specifically requested by Mr. Speer's juvenile case workers. Caseworkers recognized that Mr. Speer's emotional instability was complicated by his "multi-dysfunctional and multi-problematic background."

Mr. Speer's cognitive and behavioral impairments began to be documented by the time he enrolled in elementary school and are expertly summarized in the Alhambra School District school psychologist's evaluation of October 22, 1990. Although Mr. Speer made good progress academically in kindergarten, he was found to be hyperactive and placed on Ritalin at age four. His first grade teacher recommended that he be retained but he was placed in second grade when he transferred schools. His mother refused to follow the prescribed regimen of Ritalin in kindergarten, and later on lithium. The school psychologist noted difficulties with his concentration. Standardized testing revealed above average skills in all areas except math, which is a frequently seen in children who have been exposed prenatally to alcohol. He was retained in the fourth grade. He demonstrated a "high degree of psycho-motor agitation," "tired quickly," "did not understand directions," and had "difficulty attending to task." He was placed in special education classes. The very thorough neuropsychological assessment by Susan Downs Parrish, Ph.D. (February 21, 2005) concludes that Mr. Speer has "significant, chronic impairment that falls in the Moderately to Severely Impaired range" of brain functioning.

The 1990 school psychologist concluded that Mr. Speer was severely emotionally disturbed. He reported that Mr. Speer's behavior changed and he began having nightmares after his mother had placed him with a series of relatives, who sexually abused him before he enrolled in school. An aunt forced the boy to perform oral sex. Mr. Speer confided in the psychologist that he felt he was "not really one of the family." Mr. Speer thought that his behavior depended on his mood and even realized that when he was upset or depressed, he was more likely to act out. His "inability to tolerate frustration and persevere severely hampered his ability to perform." Teachers reported that Mr. Speer showed high levels of inappropriate behavior and was socially withdrawn, unpopular, inattentive, nervous, overactive, and obsessive compulsive.

Even as Mr. Speer's psychiatric symptoms increased, his family "failed to follow through on any type of therapeutic intervention" recommended and arranged by juvenile case workers. He was removed from the home and placed in a series of residential treatment programs beginning in 1991 at the age of 13. He was placed on Tofranil, an antidepressant, and his behavior improved. Unfortunately, once he improved, he was returned home in 1992. One uncle dressed the boy in costumes, prostituted him to men, and gave Mr. Speer drugs and money. His parents encouraged him to commit criminal offenses such as burglary in order for them to use the proceeds to buy drugs. In June, 1992, he was admitted to the hospital due to an overdose of methamphetamine. Mr. Speer ingested methadone, PCP, LSD, marijuana, methadone, and Valium; inhaled glue and gasoline; and injected heroin throughout his adolescence. His mother and uncle gave him drugs to gain compliance from him, and he learned to use drugs to treat severe psychiatric symptoms such as depression, fear, and anxiety.

Psychological evaluations from 1990, 1991, 1992, and 1993 chronicle Mr. Speer's impairments. Every mental health professional agreed that he was severely emotionally handicapped and diagnosed him with significant mental illness, including attention deficit hyperactivity disorder, atypical impulse control, and substance abuse. They described a constellation of symptoms that prevented Mr. Speer from functioning normally in the community: hyperactivity, impulsivity, distractibility, low self esteem, depression, suicidality, and inappropriate behavior. He was placed in residential treatment programs where reports of improvement were mixed with reports of poor adjustment. Although he was anxious to please adults and gain their approval, he was frequently involved in disturbances and relatively minor encounters with law enforcement. Many of the disturbances were caused by assaultive behavior by other youth or his family when he visited them.

Mr. Speer continued to ingest nearly fatal amounts of illicit drugs secondary to the trauma he experienced. He continued to be exposed to trauma in his home during his periodic visits, and he was hyper vigilant to any threat of harm in the residential programs where he was placed such as Adobe Mountain. He was physically injured by other inmates and sexually exploited by staff. He received medical treatment for a range of injuries from fights with other boys, including a bite in his groin area and a broken hand. He prematurely removed a caste on his broken hand because he felt he needed to be able to protect himself. He attempted suicide by hanging himself with sheets and cutting his wrists. An older counselor at one of the programs

befriended Mr. Speer and began a sexually exploitive relationship with him.

Since Mr. Speer's arrest, he has been under the care of the Maricopa jail's psychiatric staff. Maricopa County Correctional Health Services records describe symptoms of significant mental disease. At times, he demonstrated psychotic symptoms (auditory hallucinations). Staff also observed he was paranoid, dysphoric, constricted, and depressed. He has been diagnosed with bipolar affective disorder, not otherwise specified, and treated with antidepressants and a mood stabilizer. He has also been treated with numerous psychotropic medications including Risperdal, Seroquel, lithium, Wellbutrin, Zoloft, Effexor, Artane, Elavil, Lexapro, and Navane.

### Conclusions

It is my professional opinion, which I hold to a reasonable degree of medical certainty, that Paul Speer suffers from multiple psychiatric disorders. He suffers from Posttraumatic Stress Disorder (PTSD), chronic, severe, Attention Deficit Hyperactivity Disorder (ADHD), and Polysubstance Abuse Dependence. He also displays symptoms of specific neurologic deficits that implicate his frontal lobe and executive brain functions, most likely as a result of fetal exposure to alcohol and other neurotoxins, physical trauma at the hands of his caretakers, and chronic substance abuse during critical developmental years. Each and all of these mental disease/defects were present and acute at the time of the offense for which Mr. Speer is charged, substantially impairing his ability to conform his conduct to the requirements of the law.

### Posttraumatic Stress Disorder, chronic, severe.

Mr. Speer was chronically exposed to physical, sexual, and psychological abuse that threatened him with annihilation and serious injury. He responded with intense fear and helplessness, as well as agitated behavior, as is frequently seen in children. As a child he demonstrated repetitive play in which aspects of the trauma were expressed. He persistently re-experiences the trauma through distressing recollections, flashbacks, and nightmares of the events. He persistently avoids stimuli associated with the trauma by avoiding thoughts, feelings, and conversations associated with the trauma, being unable to recall important aspects of the trauma, and by feeling detached or estranged from others. He has persistent symptoms of increased arousal as indicated by his difficulty sleeping and concentrating and his omnipresent hypervigilance. He has demonstrated these symptoms since childhood and adolescence. Mr. Speer experiences these symptoms intensely, and they have caused significant distress and impairment in every aspect of his life.

### Major Depression

Mr. Speer's PTSD was the foundational mental disease of the multiple disorders he suffered --and continues to suffer -- from. He also suffered from severe depression all his life. A combination of mental disorders, called co-morbid disorders, is common, particularly between

PTSD, an anxiety disorder, and depression, a mood disorder. Mr. Speer's mother, grandfather, and uncle suffered from depression. Most experts attribute an increased risk for depression when family history is positive to a genetic predisposition; yet shared family environment may also contribute to the increased risk. His severe depression, coupled with PTSD, most likely accounts for his auditory hallucinations and delusions about his mother's supernatural powers, omnipotent forces that punish him, and his and his brother's special powers to become invisible.

## Polysubstance Abuse Dependence

Mr. Speer attempted to quell the distressing psychiatric symptoms he faced daily by using illicit drugs. He used drugs to self medicate an alarming array of symptoms that overwhelmed him, including depression, hyperactivity, hypervigilance, anxiety, paranoia, fear, and sleeplessness. Illicit drugs gave him some relief from chronic and pervasive symptoms of post traumatic stress disorder and kept memories of the abuse at bay. The severity and consistency of Mr. Speer's substance abuse speaks to self-medication of his severe anxiety and depressive symptomatology throughout his life, rather than a simplistic perspective of him as a primary addict. He attempted to use drugs as a mediator for the extreme anxiety, affective dysregulation, depression, and impaired executive function that were part of his genetic and environmental heritage.

## Neurologic Deficits

Dr. Parrish's concludes that Mr. Speer has moderate to severe brain damage. This brain damage impairs Mr. Speer's ability to weigh and deliberate, conceptualize, sequence events, and adapt to changing environmental cues. The neuropsychological examination by Dr. Parrish shows significant impairments in all of these neurologically-derived skills. These cognitive skills, those very ones that were lacking at the time of the offense for which Mr. Speer is accused, are not transient. The interaction between Mr. Speer's PTSD, his depression, and his cognitive dysfunction is synergistic, with the final, tragic result impeding his ability, at the time of the offense, to conform his ability to the law and appreciate the criminality of his conduct.

## Diagnoses

Axis I.  A.   POST TRAUMATIC STRESS DISORDER, CHRONIC, SEVERE, WITH DISSOCIATIVE SYMPTOMS
         B.   MAJOR DEPRESSIVE DISORDER, CHRONIC, SEVERE
         C.   POLYSUBSTANCE ABUSE DEPENDENCE
         D.   ATTENTION DEFICIT HYPERACTIVE DISORDER

Axis II.  NO PERSONALITY DISORDER

Axis III.  MODERATE TO SEVERE IMPAIRMENT IN BRAIN FUNCTION

Axis IV.     LEGAL PROBLEMS, EXTREME ENVIRONMENTAL TRAUMA

Axis V.      40

**Summary**

Mr. Speer has a documented history of extraordinary trauma and neglect, starting before he was born. He meets the criteria for Post Traumatic Stress Disorder, Major Depressive Disorder, Polysubstance Abuse/Dependence, and Attention Deficit Hyperactivity Disorder. He also has significant neurologic impairments. The multiple disorders and cognitive defects are synergistic in nature, and at the time of the offense, coalesced to compromise Mr. Speer's ability to conform his behavior to the law and to appreciate the criminality of his behavior.

Thank you for allowing me to examine Mr. Speer.

Sincerely,

Pablo Stewart, M.D.

# Exhibit 52



Date: 5-24-02

I, Brian Womble agree to call the 24 hour Crisis Phone Line at 222-9444 if I am experiencing suicidal feelings. I am making a commitment to life and am willing to look at other alternatives and options available to me that are not destructive to me or anyone else.

Client Signature Brian Womble

Parent(s) Signature _____

Witness Jaque Nuth, MC

2830 West Glendale Avenue • Suite 26 • Phoenix, Arizona 85051 • (602) 995-1486 • FAX (602) 995-8503

Case No.: _CRO2 - 010926 A_

For Identification: Defense

_JAN 1 0 2007_

In Evidence: Defense

JAN 1 0 2007

## Clerk of Superior Court

By: _____E. Canas_____
(Deputy Clerk)



CR-07-0103-AP

Exhibit 53

Note: This report and the information gathered to produce it is protected by the Sixth Amendment to the United States Constitution and the attorney-client and work product privileges. The report was completed under the direction and instruction of counsel and is based on the author's professional analysis and review of evidence. It is not to be disclosed or disseminated without the consent of counsel for Mr. Paul Speer.


DT:    March 22, 2005


TO:    Mr. Robert Storrs
       Attorney at Law

FR:    Paul A. Miller, Ph.D.
       Licensed Psychologist
       State of Arizona, # 144

RE:    A developmental analysis of risk factors and their effects on Mr. Speer's growth
       and development from infancy into adolescence

This report draws upon the following documentation:

- Social and family history
- Psychological evaluations in childhood & adolescence
- Mitigation specialist's information
- School records
- CPS records
- Interviews with Mr. Speer on 3/16/2005 and 3/17/2005 (3.5 hours)
- Juvenile corrections reports
- Neuropsychological evaluation
- Psychiatric evaluation


Research literature bases reviewed include child development, substance abuse, sexual abuse, physical abuse, parenting, criminal justice, juvenile delinquency, conduct disorder, antisocial behavior, learning disability/ADHD, prenatal drug exposure, and parental substance abuse. The risk factors are presented in an approximate developmental sequence, with the understanding that they interact cumulatively and transactionally over time.

# Family Risk Factors

## Maternal History

Mr. Speer's mother, Sabrina, was married three times. She reportedly stabbed her first husband with a knife. In the interview with Mr. Speer, he indicated that her father was a motorcycle mechanic who was connected with the major biker gangs (e.g., Hells Angels). The mitigation specialist indicated that her own mother left the family when she was young, leading her to assume her mother's role in the family as an adolescent.

## Maternal substance abuse

Paul's mother has been a polysubstance abuser (heroin, methadone, crack cocaine, marijuana and prescription drugs) throughout his life. She maintained her drug habit while she was pregnant with him, and it is reported that he was born addicted to heroin. During his childhood, she was on a methadone maintenance program, "shot heroin", and took high doses of Valium and other prescription drugs. Her habit so occupied her daily life and behavior that she neglected Paul's needs as a child, and she was verbally, physically, and emotionally abusive to him. As will be described in this report, children of substance abusing parents have poorer emotional functioning and a more negative view of the world (Schenberg, 1999), and parental drug use is consistently related to the initiation of drug use and abuse by their own children (Hawkins, Lishner, Catalano & Howard, 1985).

## Maternal depression

The court records indicate that Paul's mother had problems with depression, which itself is associated with the long-term risk for risk for depression and adjustment problems in children and adolescents (Whitbeck and colleagues, 1992). In the interview, Paul indicated, "If she felt good she would praise me, if in a bad mood, there would be name calling and anger." On days when she would wake up depressed and not on drugs, the yelling would be louder and worse because she "would have more energy". She would say things like, 'you son of a bitch, you are just like your father". You "mother fucker get the dishes done. At these times, he said, "I would be in panic." "what did I do." He hated the loud yelling, the loudness and the screaming. He became fearful because the loudness meant that that was potential that he could be hit. There was more safety when it was quiet.

The emotional unpredictability of his mother is a common feature of families with a depressed parent. The unpredictability produces anxiety in the child because he cannot always predict when he will be safe or when he will be yelled at or hit. The inability to predict negative experiences is one of the dynamics associated with learned helplessness, and such helplessness is one of the three "triads" associated with depression in childhood (see section on child depression below). In discussing these interactions, he indicated that he had more messed up memories than good ones. Moreover, these effects are magnified in families with opiate addicted parents. Children of opiate addicted parents who also

were depressed showed higher rates of conduct disorder and social and intellectual impairment when compared to children of nondepressed opiate addicted parents (Nunes and colleagues, 1998). Similarly, children from 3-7 years of age who were diagnosed with both ADHD and oppositional defiant disorder were more likely to have mothers who exhibited mood disorders and drug dependence than the mothers of non-ADHD children (Chronis and colleagues, 2003).

## Paternal History

Mr. Speer's natural father left the family when Paul was two years old. The mother reported that the father would promise to take him on a visit but then would never show up, leaving the young child waiting for him to arrive. After he stopped making child support payments, Paul's stepfather and mother stopped contact with him.

## Stepfather history

The stepfather worked 12-hour days with a golf club manufacturer. In the interview, Paul remembers his father either always working or on drugs, but not really being available as a parent. The record indicates that his stepfather used multiple substances before and after work and was physically and emotionally abusive toward Paul. The effects on children of parental drug use described in the section regarding Paul's mother will not be repeated, but apply equally, here. In a specific study of fathers, Fals-Stewart and colleagues (2004) found that children with drug-abusing fathers were more likely to have both internalizing symptoms (e.g., depression, anxiety) and externalizing symptoms (e.g., aggression, acting out) than children with either alcoholic or non-substance abusing fathers. In the interview, Paul said that his dad would discipline him when his mother would ride his father so much that he would tire of it or when Paul did something "bad" like get kicked out of school. His father would hit him by punching him in the side, ribs, and back, or use a belt. He remembers the bruises on his body being "huge" as a child. He was not hit in the face until after was he 10 years old. He remembers that his father would start by lashing him with a belt and then 'break loose with his fist". He would just collapse after being hit, saying, "Oh, please, don't hit me no more". His father had huge hands from the work he did, which made the beatings hurt even more. Such beatings made him hate his father, even though another part of him loved and respected his dad for being the provider of the family and always working. He worked double shifts at times and "never slacked". Most of the time Paul remembers his father being on drugs or working so much that there was no time to do things with him. Family activities were 'few and far between". He and his siblings were "left to ourselves" (see section below on parental neglect).

## Grandfather

Paul's relationship with his grandfather was especially important to him. He recounted how his grandfather would come to him when his mother would "flip out and beat me up". He would hear about it and come get Paul. He still remembers being told that it was not right and being encouraged to not accept that (the beatings). His grandfather "would help when the whole thing would get to me". Paul remembered an incident in first grade when he was bitten by a dog. The bite was serious enough to draw blood. When he came home, his mother told him he was being a 'big ass sissy' and ignored it. His grandfather

came over and took him to the hospital for stitches. His grandfather appeared to serve as a parent substitute, and provided emotional comfort and a source of safety and support.

Hi grandfather died, however, when he was around 12 years old. He described how he felt numb and empty inside. He often wondered about the things that he could have done better to make his grandfather happier. While the research on childhood bereavement focuses mainly on parental death, the loss of this relationship left him in an equivalent position. That is, he lost the 'safety valve" and mitigating influence that a positive relationship with an adult can serve when other parent-child relationships are debilitating.

In a review of 14 bereavement studies from 1965 through 1996, Lutzke, Ayers, Sandler and Barr (1997) report a consistent pattern of relations between parental death and child and adolescent mental health problems. Children or adolescents who lost a parent typically rated themselves or were rated by their parents and/or teachers as having significantly poorer academic performance, lower educational aspirations and expectations for success, higher overall moodiness/withdrawal, higher levels of delinquency, and higher levels of depression, conduct disorder and/or anxiety. Furthermore, the studies reviewed indicated that individual and family variables such as lower child self esteem, parental distress, a poor quality or negative parent-child relationship, decreased cohesiveness, control and organization within the family, increased family conflict and fewer positive family events increased the likelihood of children developing adjustment problems, such as depression and conduct disorder. Many of these variables, as the court records attest, were present in Paul's family situation.

### *Interparental Conflict*

The probation office reports indicate that there was ongoing interparental conflict in the family. His brother Chris reported that his parents would become involved in physical fights in front of the kids. Paul indicated that his mother would yell and scream, and lash out on a weekly basis but his father would not hit her back. He said that his mother grew up knowing how to fight. In longitudinal studies of the transmission of family violence across generations, Simons and Johnston (1998) describe how marital violence often is associated with violence toward the children in the family by the parents. That is, intrafamilial violence and aggression appears to be a part of a general antisocial orientation with the family. Furthermore, children experiencing marital conflict are more at risk for developing oppositional behavior, depression and/or conduct disorder when it is associated with problems in parenting, such as acceptance, inconsistent discipline and hostile control (Fals-Stewart et al., 2004; Gonzales, Pitts, Hill, & Roosa, 2000; Mann & MacKenzie, 1996).).

## Risk factors in infancy and early childhood

The record indicates that Paul was born addicted to heroin. DeCristofaro and LaGamma (1995) indicate that opoids affect the vulnerability and plasticity of the immature brain, and increase the risk for significant social, emotional, and environmental instability in

exposed children. There are multiple studies showing that that infants exposed to heroin and/or methadone in utero are typically lower in birth weight, abnormal or disorganized in sleep patterns, have disturbed reflex patterns, smaller head circumference, visual and auditory orientation and motor immaturity, less consolabile, less able to regulate state, more irritable, less cuddly and less responsive to visual stimulation, and have a higher incidence of suspect or abnormal electro-encephalograms (Chasnoff, Burns, Scholl, 1984; Dinges, Davis, & Glass, 1980; Finnegan, Reeser, Connaughton, 1977; Kaltenbach, K., 1994; van-Baar et al., 1989). These effects are worsened if the mother is abusing multiple substances (Fusco-Raimondo, 2004; Keyser-Marcus, 2004), and they may not be fully expressed until later in infancy and childhood (Wagner, Katikaneni, Cox, & Ryan, 1998).

Recent models (see Moe & Slinning, 2002) of the effects of prenatal drug exposure and its long-term effects have moved away from a 'main effects' model. In this model, a particular drug exerts a particular effect that then can be traced over the developmental course of a child's life. Rather, current theory describes the effects of early drug exposure in terms of a transactional developmental model. In this model, the long-term effects of drug exposure on an infants' development involves the interaction of cumulative multiple risk and/or protective factors over time. That is, once an infant's neurological and physiological status is comprised by the effects of drugs in utero, the impact of those effects on cognitive and social functioning longer term are affected by the quality of environmental factors, such as quality of parenting.

Thus, while some drug-exposed infants appear to 'catch up' on developmental indexes in the first years of life (Chasnoff, Burns, Burns, Schnoll, 1986; Moe & Slinning, 2001), it appears that their ability to do so depends upon the degree of original disability and family environment factors. Drug-exposed infants, however, already start at a disadvantage. Infants' drug-induced difficulties in regulating physiological states and responding to caregiving attempts puts them at-risk for poor parenting in the postnatal period and thereafter (Eiden, Lewis, Croff & Young, 2002). That is, they are more challenging to parent because it is harder for them to regulate their internal states in response to parental actions (e.g., soothing, feeding), and they may be less socially responsive to parental caregiving.

Mothers who then remain on drugs further undermine the ability of the young infant to make up for these early deficits (Locke, Newcomb, 2004). Although these children require higher quality care and responsiveness, mothers who continue abusing substances are even less likely to be able to provide quality parenting required. Mothers who continued substance abuse have more difficulty with day-to-day functioning, and in providing a stable, consistent routine for their children (Howard, Beckwith, & Rodning, 1990). There are multiple reports in the record that Mr. Speer's mother was unable to provide a structured environment for him, likely beginning in early infancy. Among mothers who continue their heroin use, poor attitudes about parenting are associated with lower competency scores during mother-child interaction, which suggests that these mothers have difficulty parenting adequately (Schuler, Nair, & Black, 2002).

Thus, rather than improving or reducing developmental delays over time, drug-exposed infants with poor quality parenting continue to show delays, and these delays undermine the acquisition of age-appropriate skills in early childhood. Johnson and Rosen (1982) reported delays in motor development in drug-exposed infants at 6 months in age,

especially among male infants. Bunikowski and colleagues (1998) tracked drug-exposed infants over the first year of life. After one year, infants continued to show a higher incidence of neurological abnormalities and lower intellectual performance than did nonexposed infants.

As infants become more mobile behaviorally and acquire language skills, they become increasingly difficulty to control in both domains. By the toddler period, delays and difficulties in social interaction appear. Beckwith and colleagues (1994) report that 2-year old children of polysubstance abusing mothers exhibited more immature play strategies, less sustained attention, more deviant behaviors, and fewer positive social interactions with their caregivers. That is, the poorer social cognitive skills of drug-exposed toddlers emerge as longer-term outcomes of prenatal drug exposure. When individual drug-exposed children are tracked across early childhood, their impairments appear to be stable. Drug-exposed children of mothers who used combinations of cocaine, heroin, and methadone during pregnancy showed delays in cognitive functioning and language at 3 ½, 4, 4 ½ and 5 ½ years of age (van Baar, & de-Graaf, 1994). The mitigation specialist reported that Paul's grandmother would not take him places as early as two years of age because he used foul language and she could not control his behavior. Clearly, children at this age do not learn such language on their own, nor are they uncontrollable on their own. Problems with parenting, in fact, predict children who exhibit early aggressive and acting out behaviors (Simons, Conger & Lorenz, 1994).

Laucht, Esser, Schmidt (2001) point out that the presence of psychosocial risk factors (e.g., parental low education, parent psychiatric disorder, marital discord, etc…) and the lack of maternal responsivity in these early years resulted in hyper kinetic and internalizing problems in low birth weight children from 2-6 years of age. Ornoy, Lukashow, Bar-Hamburger and Harel (1996) found 2-to-5 year-old children born of heroin dependent mothers and fathers had a higher rate of hyperactivity, inattention and behavior problems than children living in environmental deprivation or healthy children living in more advantaged conditions. Notably, children born to heroin-dependent mothers adopted out of the family at a very young age performed at levels similar to the nonexposed children. Ornoy and his colleagues (2001) found the same results in a later study. Five to twelve year-old children born to parents with heroin dependency, and who were raised at home, exhibited higher levels of impairment in verbal and performance skills, reading, and arithmetic than either children of low/average socioeconomic status or children born of heroin dependent parents but adopted out of the home. Moreover, ADHD diagnoses were twice as high among children born of heroin-addicted parents raised in the home than those adopted out of the home.

The core disability that characterizes ADHD is the inability to inhibit impulses (Barkley, 1997). This is manifested in the well-recognized problem ADHD children have in regulating their attention and behavioral impulses. School-aged boys (7-12 years old) exposed to opiates in utero have more difficulty regulating physiological responses underlying attention on a task than either nonexposed children of mothers using illicit drugs or normal children, and the two drug-associated groups of children made fewer correct responses than children raised in drug-free environments (Hickey, Suess, Newlin, Spurgeon, & Porges, 1995). Thus, some drug-exposed children appear to have an underlying physiological handicap that shows up in an area critical to success in school

environments. The neuropsychologist's report competed in February 2005 indicated that Paul suffered from moderate to severe brain impairment diffusely distributed over both hemispheres, and it was likely "he entered the world with some degree of impairment and then sustained more damage to his brain along the way."

From a transactional perspective, then, what we have seen thus far is the following: prenatal drug exposure affects infants' ability to regulate their state, leading to them to be more difficult to parent. Mothers who continue abusing drugs postnatally are less able to parent adequately, and their poorer parenting is associated with a worsening of children's social, cognitive and language behaviors, which makes them increasingly difficult to manage and parent as they enter the toddler and preschool years.

Furthermore, and to foreshadow this report, early difficulties in self-regulating behavior, due to the interaction of drug effects and poor parenting, now become a risk factor for later learning problems in school, which, in turn, becomes a risk factor for later deviant peer associations and behavioral adjustment problems. Poor quality parenting itself predicts early oppositional/ defiant behavior, which also leads to affiliation with deviant peers, and these affiliations predict criminal justice system involvement (Simons et. al., 1994).

Problems in parenting emerge early in the cumulative record of risk factors that led to Paul's emotional and behavioral adjustment problems in later childhood and adolescence, so they are reviewed next.

# Parenting Practices

CPS records, psychological evaluations, and juvenile corrections records consistently indicated that problems in parenting skills was a major element in Paul's behavior, and that his behavior could not be expected to change without some change in the behavior of the parents. These reports variously implicated either or both parents, indicating that they:

- favored Paul's siblings
- rejected and scapegoated Paul
- were inconsistent, lax, or ineffectual in their disciplinary practices
- were verbally and physically abuse in their disciplinary practices
- were neglectful and rejecting
- failed to adequately supervise and monitor him
- were in conflict amongst themselves
- chronically abused various controlled substances
- engaged Paul in substance use/abuse

## The parenting environment

In the interview Paul described at length was it was like as a child growing up in his family. He did not care about his room because there was 'nothing in it". He may have wanted it fixed up, but it was not going to happen. He said he 'hated it…hate you people"

(referring to his parents). In the court records, the house was described as filthy, and his brother Chris confirmed this.

Paul said he watched TV shows he liked as young child. In the evenings, he would watch shows that his parents liked. However, he did not like to watch TV or play with toys much. He would play with stuff but not stay with it (consistent with a short attention span). He preferred instead to go walk around, ride his bike, and be out of the house in the neighborhood. He remembers being very little when he was going around the neighborhood. People would walk by and ask him if he was lost. One time he got lost when he was about 7 years old. He took a wrong turn out of a Burger King in his neighborhood. Someone called the police, and they took him home. His parents did not have any reaction to what happened to him: it was like, 'oh, you're back'. Essentially, they did not miss his absence.

While out walking around, he would try to catch cats and other animals to play with. He would bring them home and keep them in his room because "he wanted a little friend to be with, and talk to". He would hide them in his closet until his mom found out, and she had him get rid of them. She would say, "Get that goddamn cat out of here" and slap him.

At times, his mother would not wake up from a drug-induced state. He remembers being very angry and afraid because she would not wake up, or come out of her room. He remarked poignantly that, "all I really wanted at this age was to be with mom" rather than be locked out of her room. He would leave the house angry, walk around, and find stuff to do. He remembered this situation as early as 8 years of age.

Paul also expressed anger at the fact that his mother "tried to make me do everything." This included many household chores, such as washing dishes, cleaning the bathrooms and so on. She would give him a list and then go sleep in her room on drugs. At first, he would do the chores, but then he got angry and would not do them. His mother would get mad and yell at him, saying "You fucker, get this shit done right now". She would "yell, yell, yell" and if mad enough, she would come hit him. Sometimes he felt like if she just hit him it would at least stop the yelling.

He would also take care of his little baby brother, such as changing diapers and making and giving him a bottle. At times he could not calm the baby. He would yell at his mom through her door for help. She would take the baby and leave him out. He indicated that he did the same thing for his sister. He was 10 years old when she was born.

He remembers 'celebrating' his ninth birthday in jail. He experienced the situation as one in which his mother did not want him around and lied to the police that he had hit his younger brother. He was in detention for two days. He indicated that his mother would always be threatening to put him 'in jail', and did so many times when he was in early adolescence. It "frustrated me so bad" because he never told on his parents when police or CPS workers asked him about his bruises. He felt that he stuck up for them and was loyal to them because he never said anything about the bruises. Yet, he remembers being very angry and feeling confused when his mom would then lie to the police about his

behavior in order to 'get me out of the house". After a time, he stopped feeling any loyalty toward his parents because of their lack of support and his sense of betrayal.

He said that things were good when his mother was high on heroin or methadone. He liked being around her and felt love from her at these times. She would ask "me what I wanted" and make him cakes. However, when she was on pills (e.g., Valium) they would knock her out, and during these times, she would talk angry with him, and be very mean to him. He hated the loneliness of being isolated and 'being by myself" when she was doing pills. He would even have preferred that she fought with him, than not interact with him. However, she would scream at him, "get out of here you mother fucker, I'm trying to sleep" and be a "total bitch" to him. According to him, his mother's vacillating emotional responses to him were a part of everyday life. He said that "all I could do was hope to know what mood she was in" and then I knew what drug she was on." He learned early on about which drugs would produce which effects. He knew for example, that Saturday was 'methadone day", and would hope that then he would have day when they would be nice to him.

He recounted, however, than he had more messed up memories in all of this than good ones. He described how it "became a hopeless situation at home" because he "just could not develop a relationship with my mother". He would ask himself, "Is she going to be a bitch forever?" He said, "I couldn't' get a lock on it" and it was very confusing to him both as a younger child and in middle childhood. Around 10 years of age and older, he remembers trying to work things out, trying to make the relationship work and then his mom would get mad, get "fucked up" on drugs, and then would lash out at him. It would be "bam", just more confusing again. He talks about how he would be trying to do better, but she would go back and forth on it when high on different drugs. When older he felt that sometimes he was blamed for everything, "I was the piece of shit". His parents, especially his mother, never took responsibility for any of it (their unwillingness to participate in therapy is documented in court records). For a time the probation officers and counselors believed his parents, but after a time some of them understood that his parents were part of the problem. It was 'really frustrating" to him that she wouldn't acknowledge her role in any of the problems in the family. After these events, he essentially felt that whatever he did, "nothing worked". This sense of hopelessness is a core feature of childhood depression, which is described in a later section of this report.

### Sibling interactions, favoritism, and parental scapegoating

The court records indicate that professionals working with the family observed that there was differential treatment in the family. Paul was blamed for the problems in the family, and was treated as a scapegoat.

In the interview, Paul described his relationships with his siblings in positive terms. He related how his brother Brian would hug and kiss him and love him after his parents hit him. He considers Brian a brother and a friend. His described his other brother, Chris as more self centered and less empathic to him and his troubles.

He said that his parents said that they loved him. but they treated him differently and this was confusing to him. He described how he was blamed for things that his siblings would do. If they broke something in the house, he was the one blamed for it. He would be told that he was the oldest, and that he was responsible if he didn't prevent his siblings from doing things they weren't supposed to do, or their behavior could be excused because he was 'being mean' to them.. If they were having a fight, he would be punished more severely. He said; "They didn't get hit like I did." They would receive a spanking or stand in the corner. His brothers were told that he was "bad" and a bad influence. His brother, Chris confirmed Paul's perception of the situation. He indicated that Paul got the worst of the discipline because he was the oldest, was not Bill Womble's own son, and because he had the biggest mouth and acted out the most.

Paul also described the favoritism in terms of household chores. He was still the one that had "to do all those damn chores", even though his brothers were old enough to help in some way. "I was stuck doing dishes and stuff, while they watched TV." Other times the siblings would get stuff, he would not receive any, and this happened a lot. Paul said that even his grandmother and grandfather told him that he was treated differently.

## *When disciplinary practices are inconsistent, lax, and ineffective*

The records indicate that Paul's behavior problems "emerged" when he was five years old, as reported by the mother. Dr. Mertig's psychological evaluation of Paul when he was 11 ½ years old pointed out that his hyperactivity and impulsivity likely started in infancy and toddlerhood, in response to a lack of contact with important caretakers and feelings of depression. As noted previously, the mitigation specialist reported that his grandmother would not take him places when he was two years old because he was uncontrollable and because of his foul language. At age 9, the grandmother requested CPS involvement because of the lack of discipline in the home.

The research cited above is consistent with the notion that drug-abusing mothers have more difficulty providing structure and routine care for their children. In the interview, Paul stated, "Mom totally did not take care of nothing". His brother Chris said essentially the same thing in a separate interview with the mitigation specialist. In his psychological evaluation of Paul, Dr. Martig indicated that Paul's mother was unable to soothe him. empathize with him, and provide structure for him so that he could gain control of himself.

Lack of structure is associated with inconsistent discipline. There are reports in the record that his mother was inconsistent in her parenting practices. Inconsistent discipline practices increase problem behavior in children because they learn that if they keep on doing what they do, or if they escalate their negative behavior, the parent will give up their attempts to control them. When discipline is ineffectual and inconsistent as his mother's practices were described, children have no boundaries against which to structure their behavior. Consequently, their behavior becomes unstructured and impulses are expressed unchecked. Impulsivity is reinforced when it is not controlled by parental standards and consequences. Thus, if a child already were at-risk for self-regulation problems, a lack of structure would only make it more difficult for a child like Paul to

self-regulate his behavior. In families with or without a drug dependent parent, inconsistent discipline is associated with rule-breaking behavior, oppositional, and aggressive behavior starting as early as 6 years of age (Stinger, Dominic, Kaman, Bur stein, 2004), conduct disorder (Duke, Roosa, & Jackson, 1997), and disruptive parenting is associated with delinquent behavior in 8-9 year-olds (Patterson, 1999) and young adolescents (Keller, Catalano, Haggerty & Fleming, 2002).

## *When there is physical abuse, and coercive, harsh discipline*

Punitive, harsh discipline has long-term negative effects on children, and has been identified as one of the early and critical factors in the developmental pathway to early conduct disorder and antisocial behavior in adolescence (Hood, 2001).

Various CPS reports, starting at 10, document physically abusive parenting toward Paul. These reports made reference to such things as, "belt mark on stomach, bruises across body, handprint of father still on face, fearful of dad, sent to Wayland Center due to abuse; hit with stick when went home to visit, mom throws him out of house with birth certificate at age 13 and told not to return, mother with baseball bat threatening Paul and appears hallucinating, throws cans and yells at him".

In the interview, Paul described a home environment marked by physically abusive control tactics. He said that his mom was "strong, and mean" when he was little. He would get 'lashings" with a belt, and be slapped aside his head. He said the hits were "hard" because "she was way bigger than me". He would run away to avoid being hurt. He would crawl under the table, and she would come after him with a broom and poke him with it. He would be sad, cry and scream back at her. His younger brother Chris said that their mother would make their father discipline the kids when he came home. Paul said that their mother would threaten to put him in jail and to have his father "beat your ass" when he got home, which his father would do. According to Chris, their father would discipline the kids by hitting the kids with fists or with open hands and sometimes would kick them. Paul said his father did not hit him in the face until he was an adolescent. At times, Chris said the discipline was violent. After being hit, Paul said he would sometimes cry himself to sleep. The abuse would slow down a little bit when he cried, and he would be left alone. He felt angry about the abuse, saying to himself, "why are they doing this to me, why making me cry, why sad?"

Coercive disciplinary practices are commonly used to gain compliance in families with conduct disordered, antisocial children. When discipline is punitive and harsh, a child's negative behavior may be suppressed for a short time, but it is not changed. Unfortunately, physical abuse and harsh punishment has seriously negative effects on children's growth and development as it increases the risk for antisocial, aggressive, and violent behavior long term (Haapasalo & Pokla, 1999). First, it models from significant others that the way to express your frustration with others is to attack them physically. Notably, the CPS records indicate that Paul was physically aggressive toward his family members.

Moreover, in families with children of conduct disorder, an impressive body of literature has captured the developmental dynamics that shape a child's acquisition of aggressive

behaviors (Patterson, Debaryshe, & Ramsey, 1989). In these families, a coercive cycle of control and counter control attempts are used to gain compliance. Essentially, family members use coercive tactics (e.g., screaming, yelling, hitting, bullying) in their attempts to influence each other's behavior, and to avoid being controlled by others. As these tactics succeed in gaining compliance, they are reinforced and thus are more likely to be used again in future conflicts. However, because each member of the family uses them, the control attempts become increasingly aggressive in order to gain control or resist control attempts by other family members. Consequently, children and parents become caught in an ever-increasing escalation of aggressive and hostile verbal and physical interactions. In essence, the members of such families routinely use coercive tactics (e.g., screaming, yelling, hitting, bullying) in their attempts to influence each other's behavior, and to avoid being controlled by them. The effects of such practices swiftly emerge in children's behavior. Coercive parent discipline at age 4 1/2 predict conduct problems for both boys and girls as early as 6 years of age (Kilgor, Snyder and Lentz (2000). Among first-grade children, punitive parent-child interactions increase children's disruptive behavior problems (e.g., oppositional, aggressive, and hyperactive behavior), and physically aggressive parenting is linked with children's aggression (Stormshak, Bierman, McMahon & Lengua, 2000). Consequently, at even an early age children can show increasingly aggressive and acting out behavior in their interactions with others because that is the way the experienced control from their caregivers and learned to use it to negotiate their needs in the parent-child relationship. They take this model of relating to others to other relationships and social contexts, such as school. Paul already is at risk for learning problems because of his drug-exposure, and now aggressive schemas for relating to others becomes part of the mix.

In a long-term study of the development of delinquency and antisocial behavior in males from eight to 32 years of age, the most important predictors included poor parenting behavior and antisocial child behavior (Farrington, 1995). Thus, once children start being aggressive and oppositional, these behaviors themselves become risk factors for other negative outcomes later in life. In addition, early antisocial behavior is a predictor of later drug abuse (Hawkins, Lishner, Catalano & Howard, 1985), which will appear later in his developmental profile.

### When there is lack of parental monitoring and supervision

The court records indicate that there was a lack of parental monitoring and supervision. In the interview for this report, Paul said that he and his siblings were often on their own. He recounted how he would end up walking the streets when his mother locked herself in her room when doing drugs. He would be out riding his bike because he could go places. The mitigation specialist's interview with his brother Chris revealed a similar account. Chris indicated that he and his siblings ran wild all day and fended for themselves because their father worked long hours every day and their mother was in bed ignoring them. They had nothing to do or anything to play with so they would go to friend's houses to play with their things.

Children and adolescents who are less effectively supervised and monitored in their activities consistently have been shown to be at risk for delinquent and antisocial activities. (Ary et al, 1999; Barerra, Ary, & Li, 2001; Jang, S.J., & Smith, C.A., 1997;

Fletcher, Steinberg, & Williams-Wheeler, 2004; Steinberg, 1986; Wenar & Kerig, 2000). Moreover, parents who fail to adequately monitor their adolescent activities, increases their susceptibility to antisocial peer pressure, and this susceptibility increases the incidence of delinquent behavior Fridrich & Flannery (1995).

### When there is parental rejection and neglect

The psychologist (Dr. Cabanski) reported that the family was very disapproving of Paul and that he experienced strong rejection from his parents. Parental rejection and neglect are yet another component of life experience of children at risk for conduct disorder.

As noted, Paul described how his mother would lock herself in (and him out) of her room when she was using drugs for long periods. She would curse and scream at him if he attempted to seek her attention or needed something. He remembers these times as early as 7-8 years of age. He felt lonely and anxious, and he would become angry for being left alone.

When he talked about his school experiences, Paul described how he would have to ask the teacher for basic school supplies because his parents told him that there was not enough money for such things. Yet, he knew the money was being used for drugs. He also was embarrassed among his peers in school because he did not have decent clothes to wear. He remembers stealing clothing off clotheslines because his parents would not buy school clothes for him. The mitigation specialist reported that he and his siblings were told by their parents that they were "on their own" after 12 years of age to find themselves clothing.

The effects of parental rejection can emerge in early in childhood, and they are expressed psychologically and behaviorally. When there is sibling conflict and rejecting parenting in the family, children as young as five years of age become more aggressive (Garcia and colleagues, 2000). In children 6 to 11 years of age, parental rejection leads to oppositional behavior in boys (Mann & MacKenzie, 1996). Parents currently using drugs report more rejection and neglect of their children than nonabusing parents, and rated their 7–12 year old children lower in self-esteem and more negative in their world view (Schenberg, 1999). In this same study, children feeling more rejected displayed higher aggression/hostility, negative self-esteem and sense of self-adequacy, a negative worldview, and emotional unresponsiveness. Parental rejection shows similar effects on the emotional and behavioral adjustment of adolescents. A major factor in the etiology of deviance (i.e., delinquency, drug abuse) among 13-17 year old adolescents was their experience of rejection in their relationship with their parents (Simons, Robertson & Downs, 1989; Teichman & Kefir, 2000). In fact, parental neglect alone, even without parental substance abuse, increases the risk for substance abuse disorders in children (Dunn and colleagues, 2002).

## Sexual Abuse as a Child

The record mentions that his biological father's sister who was in her late teens/early twenties sexually abused Paul at 5 years of age. In the interview, he said that he had a sense that it was more than once but no clear memory of whether it was or not. He said that the experience "confused me". He wondered, "Why are we doing this", but did it

because she was an older adult who was telling him to do it. He did not think of it as being weird. He always thought of the aunt as a good person. She would take care of him when his mother was out doing stuff. After the incident, and before he told his mom about it, his visits there were not as frequent. He said that he thought about it all the time, and had dreams about it. He said that he did not want to tell anyone, but then told his mom after seeing a TV show in which children were encouraged to tell their parents about such events. After he told his mother, she called the police and there was a major falling out in the family. He was not allowed to go to see her again, and visits to his grandmother's house were restricted. It ended up isolating him from members of his father's family. He felt that maybe it was his fault because it caused so much trouble. It created more confusing feelings for him. He would argue with his mother about letting him visit his grandmother. He would tell his mom that he did not want to be at home but at his grandmothers because there was food and stuff there. He would cry, and be so sad and angry that he would break his toys. His mom would get mad at him and hit him. He felt he 'should have said nothing because all it did was start trouble". Things were "ten times worse" because of his disclosure, and he feels that way to this day. Thus, Paul experienced the double victimization of children who have been sexually abused. That is, he experienced the negative emotional effects of the abuse itself, and then the negative and exacerbating emotional effects of what happened to the family and feelings of guilt for it after he disclosed the abuse (Gold, 1997).

The negative impact of this situation appeared to continue into middle childhood. One of the symptoms of sexual victimization is that children engage in premature sexual activity. A CPS report on 2-7-1986 describes allegations of him exposing himself to students. There is another allegation by his mother of exposing himself to family members (which he denied in the interview as nothing more that kids goofing around). Another CPS report describes sexual activity with a male cousin at age 10 (which he indicated in the interview was initiated by the other child). Finally, Paul reported being sexually active with a girl at age 12 (Dr. Cabanski's psychological evaluation on 7-31-91). In Dr. Croft's report and in interviews with Paul, he described how an older male relative sexually victimized him when he was 12-13 years old. This uncle "pimped him out" for money and drugs to support his own and Paul's methamphetamine habit (see section on delinquency socialization). He did not like this activity because it made him feel dirty, but did it under emotional pressure and the promise of drugs.

While sexual abuse among males occurs less frequently than among females, the effects are no less debilitating and they are worsened among individuals with histories of abuse by both female and male perpetrators (Romano & De Lucak, 2001). There appear to be both short- and long-term negative effects resulting from sexual abuse. In a review of multiple studies, Kendall-Tacket et al. (1993) found that sexually abused children, when compared to nonabused children, exhibited negative psychological effects (e.g., lower self esteem) greater levels of both internalizing (e.g., fears/anxiety, depression, regression, withdrawal) and externalizing (e.g., temper tantrums, delinquency, aggression) symptoms, and sexually inappropriate behavior. In Romano and De Luca's (2001) review of the sexual abuse literature, the research indicates that many of these effects continue into adulthood, including low self esteem, depression, guilt, anxiety, offending behavior, and psychiatric disorders (e.g., substance abuse, mood and anxiety disorders. When compared to a nonabused control group, males with sexual abuse

histories had higher rates of externalizing disorders including drug abuse and dependence (Finkelhor, 1990). Moreover, sexually victimized males also report internalizing problems, with depression being one of the more frequent long-term disorders, along with increased risk for suicide (Bagley et al, 1994; Watkins & Bentovim, 1992). In a longitudinal birth cohort study, 18 year-old adolescents reporting child sexual abuse had higher rates of "major depression, anxiety disorder, conduct disorder, substance abuse, and suicidal behaviors than those not reporting such abuse.

Moreover, these disorders are often associated with one another. For example, comorbidity is common between ADHD and conduct disorder, substance abuse and conduct disorder, and depression and substance abuse (Wenar & Kerig, 2000). By feeding into and compounding each other, they seriously compromise a child's chances for successful adjustment. In the various court records and psychological evaluations at different time periods, nearly every one of the above problems was described in Paul's childhood and adolescence.

## The etiology and effects of early childhood depression

It is important to note that Paul was evaluated as depressed and suicidal in various psychological evaluations starting as early as 11-12 years of age. It is not surprising given that he experienced multiple risk factors for depression in early and middle childhood.

Depression in children and adults is associated with the triad of, "helplessness, worthlessness, and hopelessness" (Wenar & Kerig, 2000). Helplessness occurs when a child is exposed continually to negative psychological and emotional outcomes and experiences, such as verbal, physical, sexual abuse, over which he has no control and cannot prevent from happening to him. In the interview, Paul described how he could never "get a lock" on establishing a relationship with his mother, and how he was always trying to predict what mood his mother was in so he could avoid being yelled at or hit. Inconsistency treatment by a parent is an uncontrollable factor in a child's life, and it associated with later depression (Dumka, Roosa & Jackson, 1997; Gonzales et al, 2000).

Worthlessness occurs, simply stated, when a child is told and begins to believe that he is to blame for the negative experiences that happen to him, including those perpetrated upon him by others (e.g., physical, emotional, sexual abuse). Dr. Cabanski's report (7-31 -91) described how his parents blamed him for his adjustment problems, as well as for all the problems in the family. Dr. Mertig's prior evaluation at age 11 suggested that it was likely that such blame began at an early age. As described earlier, he clearly described how his parents blamed him for family problems and treated him differently from his siblings.

From a developmental perspective, children through the middle childhood years are cognitively vulnerable to believing that they are at faulty for negative outcomes in which they are involved. Children's thinking at this age still confuses causal relations between what happens to them and their role in causing what happens to them, especially when there are strong negative feelings involved. In Paul's case, he would have had difficulty separating the bad emotional and psychological feelings of negative experiences perpetrated by his parents and other adults (e.g., physical, emotional, sexual abuse) from his role in creating these negative experiences. Simply stated, a child feels he must be bad

because these negative experiences are happening to him (Lisak, 1994). Such feelings
lead to diminished self-esteem and self-worth, especially when the messages of self-
blame are being communicated to him emotionally significant others.

His sexual abuse and exploitation experiences were yet another source of self-blame.
Self-blame is one of the more common self-attributions that adult males, sexually abused
as children, make when explaining why their experiences occurred (Lisak, 1994). Paul
describes having memories of his abuse, and feeling even worse after disclosing it. His
disclosure resulted in family conflict and restrictions from going to his grandmother's
house, and he felt that his disclosure caused the trouble. He also described how he was
sexually 'used' by his uncle to obtain drugs and money

Hopelessness emerges once the individual begins to believe that these negative
experiences and feelings associated with them will never change and that he has no
ability to change them. In the interview with Paul, he related poignantly in his own words
his sense of hopelessness regarding learning in school, in establishing a relationship with
is mother. One proposed pathway to depression, in fact, leads from physical abuse to
perceptions of rejection, which, in turn, leads to negative self-esteem, and subsequently to
depression (Ito, 1995). Given the sum of these experiences, it is not surprising that he
would have been experiencing depressive symptoms starting in infancy and continuing
throughout his childhood, as Dr. Mertig suggested in Paul's psychological evaluation at
11 years of age.

# Drug Use and Abuse

Multiple factors predict drug use and abuse in childhood and adolescence, including early
antisocial behavior, poor academic performance, lack of commitment to education, and
association with drug using peers (Hawkins, et al., 1985). The record shows that all of
these risk factors were present in Paul's childhood and/or adolescence.

Mr. Speer's first introduction substance abuse started at the age of 12 when his mother
"shot him up". Dr. Croft's report reviews the negative effects of drug use and abuse so
they will not be covered in this report. As noted earlier, he learned as a young child about
the different effects of the drugs his mother used. He knew that heroin and methadone
made his mother 'happy', and the prescription pills made her mean. His constant
exposure to drugs taught him things well beyond that of other children his age, and he
was not afraid of the drugs. After watching his parents' positive emotional reactions to
opiates and marijuana, he decided that he also wanted to feel happy. The good feelings
and positive mood that he experienced with heroin resulted in his wanting more of the
drug. The drug would have relieved feelings of sadness, anger, and depression that he
was experiencing due to his problems at home and school, and thus would have become a
powerful reinforcer for its continued use, i.e., an addiction for him. Furthermore, and as
noted next in this report, an addicted uncle facilitated his progression to chronic
substance abuse at about this same age.

# Socialization into delinquency and drug abuse

Mr. Speer's parents were long-term polysubstance abusers who were abusive to him
psychologically and emotionally. From a very young age, Paul became very familiar with

the different effects of the various drugs his mother and father used. He knew that his mother would be happy if she were on heroin or methadone, but abusive when on other pills and drugs. He saw his stepfather smoking marijuana, laughing and having a good time. Such activity sparked his interest because he wanted to experience those feelings. Children living in families with drug abusing parents are more likely to initiate and abuse drugs (Hawkins et al., 1985). When he was twelve, he pressured his mother to give him a dose of heroin. He remembers feeling euphoric, "so happy", and he gave his mother a hug. His mother would occasionally share her methadone with him or shoot him up. She would tell him, "I know you are going to be a drug addict", and she educated him on how to 'use' heroin without overdosing. Her father was a drug addict, and so it was "in the family". In terms of his reaction to the drug, he said it was like "this makes me feel very good" and it was easy for him to fall into using it.

With his uncle (on his mother's side), he describes how he was socialized into burglary and a substance abusing lifestyle. Because he was small at this age, he could crawl into houses through dog doors and burglarize them. The items were 'turned' for cash or for drugs. He received considerable praise and approval. He uncle would say things like, "right on, you're bad, you're slick, you're smooth". It made him feel very good and happy to feel this way in his relationship with his uncle. His burglaries became sources of pride to him because of the praise his uncle gave him for accomplishing them. This uncle also would cheer him up when he felt sad due to problems he was having with his parents. He would clown around and make Paul laugh and they would sometimes do things together like play Frisbee in the park. Paul learned to turn to this uncle for support, and this may have been the best support that was available to him. Thus, this uncle appeared to provide Paul with the kinds of positive emotional experiences in an adult-child relationship that children need to develop a positive self-esteem and sense of worth. Unfortunately, he was being praised and supported for engaging in delinquent activities.

This uncle, however, did not appear to be motivated by concerns for Paul's self esteem and development. Paul described how his uncle would emotionally pressure him, at 12-13 years of age, to engage in sexual activities with older men to obtain drugs. He would find people and have Paul dress up and engage in fondling and other sexual activity. He remembers it as being very weird, and feeling dirty and confused. He would also be shot up with crystal, which "makes you horny", and do things that you would not normally do. He said that it made him uncomfortable, but he would do it only if his uncle stayed with him. Although he was never forced, his uncle would emotional pressure him. He would not threaten Paul, but talked about how much money they would make, or the drugs they would get, and act very disappointed if Paul refused. He would reject Paul by not talking to him, and not letting him into his room. These actions mirrored Paul's relationship with his mother, and likely raised the same kinds of anxieties about rejection and losing contact with an emotionally significant other.

Furthermore, was highly critical if Paul didn't conform to his uncle's expectations. If Paul made a mistake in a burglary, the uncle would yell at him, and make him feel stupid and dumb. He would get very mad and withhold his attention. Given Paul's need for attention as documented in the court records, this rejection would have been painful emotionally and serve as a powerful mechanism for manipulating him. That is, given his need for approval originating in his experiences of emotional rejection from his mother,

his need to gain and maintain his uncle's approval would have made him highly
susceptible, as a young adolescent, to being manipulated into doing things that he likely
would not have done otherwise. Moreover, these experiences set Paul up for further
problems with authorities, and likely contributed to his problems in school and eventual
placement in juvenile corrections.

# Problems in school

The research literature consistently shows that children with ADHD have a greatly
increased risk for the development of conduct disorder, which, in turn, is oftentimes
associated with substance abuse (Wenar & Kerig, 2000). We now turn to that part of the
risk cycle, learning problems in school.

## *Learning problems, school failure, and hopelessness*

The psychological evaluation when Paul was 11 ½ years old put him in the average range
of intelligence, and about at grade level in his subjects with the exception of math. Other
evaluations also put him roughly in the average range of intelligence. However, he met
the criteria for learning disability, and he had special difficulty with math. In these reports
and throughout the case records, concerns are expressed repeatedly about his impulsivity
and hyperactivity.

Paul described school as something he did not like. He did not feel stupid, but he did
have a problem with learning. School became very hard for him starting in the third and
fourth grade. Expectations for learning increase in these grades, making it harder for
children with learning disabilities and ADHD symptoms to keep up. He would watch
other kids in class just "get it" and he would still be asking questions. He felt "bad"
because he was not like other, "smarter" kids. He mentioned that he would ask himself,
"Why can't I remember the steps to long division." He tired of it after awhile, stopped
asking questions in class, and would pretend that he was doing schoolwork. This suggests
that learning was more problematic for him than what his grades indicated when he was
11 years old.

In addition, his siblings were better in school that he was. He remembers not wanting to
do his homework because "he didn't understand it." He describes how he would ask his
mother for help, but she would tell him, "you're just being stupid, you can do it, you're
just being ignorant". Such nonsupportive messages increase children's shame (Harter,
2003), and only serve to increase a child's doubts about his/her ability. As the material
became harder, he would keep trying and trying. However, after his attempts were "not
working and not working", he just said 'fuck this, why keep trying if it don't work". He
poignantly described that he felt "hopeless" after continually trying but not succeeding in
learning at school.

Children with learning disabilities have been found to express more helplessness, lower
academic expectations, lower self-esteem, and poorer psychological adjustment than non-
LD children across 4th, 7th and 9th grades (Valas, 2001). It is not surprising, then, that
after a time he describes how he just gave up, saying, "I'm not going to do this shit'. He

stopped telling his parents about his problems and that stopped them from yelling at him. The emotional reactions he reports are common among children with learning problems in school, and they become risk factors for later adjustment problems. Poor academic performance and social and emotional problems stemming from a learning disability increase the risk for delinquency (Marmo, 1997) and drug abuse (Hawkins et al., 1985) in these youth.

### Problem behavior as a compensatory strategy for school failure

Paul described how his parents would say that they did not have the money for clothes yet he knew the priority was on drugs. He felt embarrassed, and would wonder why his mom just could not get even basic school supplies for him. He said, "She wouldn't do nothing, she used the money for drugs." This knowledge made things all the worse. He knew they were able to buy these things for him, and became angry wondering why things were not "normal". He indicated that he would steal clothes in order to have something to wear to school.

He remembers some peer rejection in the early grades, of being made fun of by students, in part also because of his appearance. He did not want to appear stupid to his peers, so he acted out and tried to be funny. This strategy was adaptive given his circumstances, even if it led to problems with teachers. If the teacher disciplined him, that worked well because then he was put in a corner or away from the academic activity of the class and he could avoid being embarrassed or looking stupid for not knowing something. He wouldn't have to do the work anymore, and could "fuck it". His being funny and the 'bad boy' paid off as well with his peers. It helped as he said, "to hide the pain that he didn't have things to fit in with his peers. Moreover, his being funny helped him be liked and accepted. He also had other people who were like him, i.e., who had learning problems, who would "roll" (hang out) with him—they would gravitate toward each other.

### School failure leading to alternative services

However, his acting out "came back to him" as he said because it led to fights and problems in school. His behavior is consistent with teachers' reports that children with learning disabilities demonstrate more behavior problems than higher achieving students (Haager & Vaughn, 1995). He also said he would go to school mad and depressed, and get into it with other students. He wasn't a gang banger looking for fights, and he described his fights as "not dog down dirty" but typical for the age, "throwing rocks and stuff". As the court records indicate, however, these altercations led to multiple psychological evaluations, various special education and alternative school services, and group home and juvenile corrections placements.

## Psychological Evaluations

Data reported here are taken from the psychological evaluations beginning when he was 11 and 12 years old to the present. At age 11 ½ years of age he was reported to be depressed, and that it likely started in infancy due to his lack of contact with his caretakers. His IQ was in the low average range, and he was achieving at or near grade

level. He was diagnosed with ADHD and as a seriously emotionally handicapped youth with serious problems with aggressive behavior. Hyperactivity and impulsivity due to ADHD could not be differentiated from impulsivity due to the serious emotional disturbance. He was seen as a child who needed a great deal of attention, who was immature, disregarded social standards and values, and who acted without deliberation. He continually became involved in highly conflicted interpersonal interactions with peers and teachers in school. He needed a highly structured environment, and his parents needed parent effectiveness training and counseling (in which they never participated). Approximately one year later, the psychologist expressed concern over his developing sexual behavior, symptoms of conduct disorder, mixed substance abuse, and ADHD history. His acting out behavior was interpreted as a defense against underlying depressive feelings. As before, "highly disruptive and erratic behavior" characterized his profile, and he needed a highly structured environment with clear contingencies for his behavior. Four months later, at 14 years old, a fourth evaluation at Adobe Mountain reported that his behavior was under control in the highly structured classroom, and he had not exhibited behavioral or emotional problems. He matched the criteria for LD in mathematics. At approximately age 15, he was given a neuropsychiatric evaluation. Staff at Adobe did not see ADHD symptoms at this time, but he was considered to have a serious conduct disorder and drug abuse problem. Approximately six months later he was evaluated as depressed with a need for counseling for severe substance abuse and underlying anger towards his parents—a theme mentioned in his first evaluation at age 11 years old, and prior to that in his interview for this report. When 11 years old, he reported that drug addiction was accepted and a lifestyle in his home, and that his parents had a larger problem than he did. He stated he "was in need of REAL drug treatment for his addiction not just a group home." He was referred for counseling services thereafter.

In December 2002, a psychologist found that he was performing well below his IQ level as assessed in previous evaluations, and questioned whether it was due to a neurocognitive dysfunction due to substance abuse. However, a psychiatric evaluation in April 2003 judged his behavior as malingering because his behavior in all other contexts was competent. In August of that year, he was assessed for mental retardation, which was ruled out in favor of malingering, and this was confirmed by a second evaluation several months later. A neurological exam at age 24 indicated brain impairment in the moderately to severely impaired range, diffusely distributed across both cerebral hemispheres. Finally, the psychiatric evaluation completed 3-17-2005, indicated that he met the criteria for posttraumatic stress disorder, polysubstance abuse/dependence, and attention deficit hyperactivity disorder.

The upshot of these evaluations is that there is a progressive stacking of symptoms and disorders as he moves into adolescence. The impulsivity and inattention characteristic of ADHD, learning problems, early emotional disturbance and disruptive behavior are followed with depression, sexual acting out, drug use leading to polysubstance abuse, and posttraumatic stress disorder. Just as learning problems make it difficult to learn in school, psychological problems make it difficult for a child to benefit from various interventions. However, there is evidence that, in spite of this treatment at home, he showed a certain amount of resilience, and hope as most children do, in dealing with his problems.

# Adaptive characteristics and strengths

A number of relative strengths appeared during the course of reading through the available information. To begin with, a Probation Officer (Alexander) indicated that Paul seemed "intelligent and capable of learning new behaviors if the environment is highly structured".

He stayed with an aunt, the Sue Riley family, when he was about 7 years old, or about the second or third grade. The mitigation specialist indicated that Mrs. Riley reported that he was out of control initially but that she was able to control his behavior relatively quickly and that he responded to firm control. Moreover, she reported that he would wait eagerly for her to return from work to explain all the things that went on during his school day. Her comments are significant for two reasons. First, even when he was described already as an aggressive and acting out child, he responded positively to a structured and firm parenting environment, and he appeared eager to do so. This suggests strongly that an important component of his "hyperactivity" was due to insufficient and inadequate parenting practices, as described in the court records and suggested by Dr. Mertig's psychological evaluation. That is, his behavior was unstructured, unorganized and impulsive because it reflected the type of environment in which he was living.

This dynamic was confirmed in the interview with Paul. He indicated that the disruptive effects he experienced with his family were not present in the Riley home (i.e., drug abuse, psychological and emotional abuse, neglect, lack of monitoring and structure). He recounted how there was always something to do, and by that he meant that the day was structure with school, homework and religious and family activities. He said that it was a very positive experience. The mitigation specialist indicated that Paul considered this the first 'normal' kind of family life that he had. He did better in school because he did not want to do something "dumb that would reflect on is cousins." Unfortunately, this ended after a short time when his mother took him home, presumably because he needed to be living at home in order for her to get money. He described how his mom was 'real nice to me" for awhile, but then the old routine started up, and he became sad again. He felt sad about leaving the Riley family and sad when they left for Texas. It should be noted that this is yet a second loss of a positive family influence that could have had a beneficial impact on his development. He himself felt that he could have done a lot better in High School if he had been able to stay with the Riley family.

In addition, the court records indicate that he showed a clear improvement in behavior, and fewer emotional problems in response to the structured classroom of Adobe Mountain School. As before, he responded to a structured, controlled environment. He also described a summer school experience at a place he called the "West Valley Learning Center". He stayed at the house of a teacher for the Center for this time. He had his own room and a stereo, which he really liked. He felt that he did better than ever educationally, and worked harder. He did so because of the interest and support of the teacher, which is consistent with reports of his need for attention and approval. However, this arrangement didn't' last long. He said that mother came to get him he said because she needed him to be living at home for her to get a check for something.

These incidents suggest that even in early adolescence he responded to therapeutic intervention if it was highly structured. Problems living with his family, however,

appeared to undermine his progress, and he was becoming under the increasing influence of deviant peers and relatives. These experiences furthered his drug abuse problems and delinquency.

# Intervention history

The court record documents multiple strategies involving counseling, alternative educational services, group home placement, and detention in juvenile corrections starting in early adolescence. They will not be repeated here, as extensive documentation exists in the court records.

The family reported that Paul's behavior problems became too difficult to handle for the family, i.e., his mother, around five years of age. However, the mitigation specialist reported that his grandmother would not take him places because of his swearing and uncontrollable behavior as early as two years of age. Thus, it appears that problems in parenting had been ongoing from infancy.

It is reported also that his mother would send him off to relatives because she could not handle him. CPS became involved in the middle school years because of evidence of child abuse. In the interview, Paul indicated that his parents physically abused him, but that he did not disclose this to the authorities out of loyalty to his family. Nevertheless, the abuse incidents resulted in the family being ordered by the court to go to counseling. Paul's parents were uncooperative and never participated. Their lack of participation was considered a major detriment in Paul's overall adjustment. In the interview, he indicated that their lack of involvement was a source of frustration and anger for him.

By age 11, he was placed in a partial care program. He requested placement in a residential facility because "his home life was so miserable". Yet, he was returned to the home with a "poor" prognosis for success. He was soon arrested and sent to Adobe Mountain. Upon release, he returned to his home, but returned again to Adobe, then to a group home, and back to his own home again.

In the interview, Paul described his experiences at Adobe as foundational to his development of delinquent and antisocial behavior. It was a highly threatening and unpredictably aggressive environment. He never knew if he was going to get through the day without being hit by someone, or someone taking his food from him. He was a young and small adolescent who was among much older and physically bigger teens. He did not like being there, and felt that he did not want to be a part of what was going on. However, he was white, small, and did not belong to a gang. He felt he had to join one to gain protection. He learned things about stealing cars and other delinquent and criminal activities from the older adolescents. Due to Paul's juvenile correction and group home placements with other juvenile offenders, they became his peer group and social support network. This of course only exacerbated his adjustment problems and engagement in antisocial activities.

## Deviant peer influence

One of the strongest and most consistent findings in the pathway from childhood to adolescent antisocial behavior concerns the deleterious effects of deviant peer

associations. Patterson et al.'s (1989) coercion theory model of the development of delinquency and antisocial behavior in adolescence begins with problems in parenting, which leads to association with deviant peers, and subsequently to delinquency. This model has been supported in empirical research (Voss, 2001). In a longitudinal study of children from birth to 15 years of age, Fergusson and Horwood (1999) found that children most at risk for forming deviant peer associations showed an early onset of behavior problems, problems in mother-child interaction, childhood sexual abuse, parental illicit drug use, early smoking, and early anxiety/withdrawal. Notably, virtually all of these risk factors were present in Paul's formative years in early and middle childhood.

Association with deviant peers, in turn, puts children and adolescents at risk for multiple problem behaviors, including antisocial activities, alcohol abuse, violent crime, cannabis abuse and/or nicotine dependence (Hoge, Andrews & Leschied, 1996; Fergusson, Nicola, & Horwood, 2002; Hawkins, Lishner, Catalano & Howard, 1985; Hoge, Werner & Silberreisen, 2003; Woodward, 1999). Friendship among antisocial/delinquent adolescents increases one's status and increases aggression. Deviant peer pressure and socialization increases similarity among friends, and values become more the same as the friendship increases (Deptula & Roberts, 2004). Individuals experience greater pressure to comply when information comes from older (in age) sources (Dillard, Henwood, Giles, Coupland & Coupland, 1998). Children who have older deviant sibling are more likely to engage in antisocial behavior (Ardelt & Day, 2002). In his case the source of influence began with an older deviant uncle and continued under the pressure of living among older deviant peers in juvenile corrections. Moreover, when this pressure comes from deviant peers; it is more likely associated with engaging in antisocial behavior (Eamon & Mulder, 2005).

## *Summary*

Paul's recent multiple diagnoses of PTSD, Polysubstance Use/Abuse, and ADHD by Dr. Stewart were no accident. His progression to these diagnoses and serious antisocial behavior was multidetermined by a transactional and reciprocal interplay between personal, family, school, neighborhood/community and peer risk factors starting as early as infancy and throughout his childhood and adolescence. Sadly, this was not a pre-ordained outcome but became increasingly likely as these risk factors kept piling up in his life over time.

He was born addicted to heroin, which likely affected his self-regulatory capacity and responsiveness to parenting. This could have righted itself, as shown in long-term studies of infants adopted out of substance abusing homes. In his case, however, he remained under the care of a substance-abusing mother. In such families, infants like Paul tend not to show the same kinds of improvements over time, but their problems grow as they do, emerging as difficulties in social interaction with peers and in regulating behavior. Under a mantle of chronic emotional neglect, lax and ineffectual parenting, and verbal, physical and emotional abuse starting so early in life, Paul adopted behaviors that mirrored his parent-child relationship, and carried them forward into all his interactions with others.

Thus, it is no wonder then that his grandmother felt unable to take him out even when he was a toddler because he was uncontrollable and used foul language. The impulses naturally present in the toddler years become acting out behaviors in the preschool period. Parental discipline becomes increasingly punitive in an attempt to control him. A coercive cycle of parent and child control and counter control tactics is created, maintained, and increasingly escalate into hostile and aggressive interactions in the ensuing years. Inconsistent discipline reinforces noncompliance as parents fail to initiate or enforce rules and consequences and children begin to believe that they do not have to listen to authorities. His mother reports that he became uncontrollable around five years of age. At this same age, he is sexually molested by a young aunt too whom he felt close and enjoyed being around. When he discloses the abuse some time later, he feels he is to blame for the falling out among the family. He is restricted from going to his grandmother's house, where he received attention he did not get at home. His mother and father are continuing to use drugs, and he finds himself angry and walking the streets looking for something to do. He is on his own a lot, to fend for himself because his mother is on drugs, locked in her room, and his father either is working all day or on otherwise on drugs. Family activities are 'few and far between".

When school starts, Paul's difficulties in regulating his behavior, aggressive model of interpersonal relationships, impulsive tendencies, and incipient learning problems have set him up for failure. By the third grade, he talked about how it became 'really hard'. Yet, in a brief stay with an aunt, the Sue Riley family, he responds rather quickly to a structured environment and firm control, and he does better in school. He is taken back home after a short time because his mother needs him home to receive child support money, which likely supports her drug habit.

Physical abuse continues and is sometimes violent, and it increasingly reinforces feelings of anger and alienation in response to it. He experiences rejection and his self-esteem is undermined because of his learning problems. He is told by his mother that he is acting stupid when he asks for help with his schoolwork because his learning disability makes it harder for him to 'get it'. After repeated attempts to master the material over several years, he finally succumbs to feelings of hopelessness and stops seeking help. He copes by becoming the 'funny' kid, which hides the emotional pain, gains peer approval, and masks feelings of inferiority because of his appearance and learning problems. He gets into trouble for his behavior, but he escapes the embarrassment of looking stupid in front of his peers. This starts the cycle of school-based learning and behavioral problems. He associates with other children who have learning problems, and they reinforce each other's sense of alienation from the other students. He steals clothes from neighborhood clotheslines because money is going for his parents' drug use rather than his school supplies and clothes.

He observes that his parents are in positive moods when doing certain drugs, and experiences positive interactions with his mother only at these times. Emotional pain, neglect and rejection occur unpredictably as his mother becomes mean with pills, and he always is trying to figure out what she is on so he can avoid being hit or verbally abused. It is not surprising then that drugs like heroin will take on a special appeal to him when

his mother shoots him up with heroin at 12 years of age. The euphoria he experiences with heroin relieves feelings of sadness, depression and anger, and becomes a powerful incentive for continued and chronic drug abuse. His mother abets the process by telling him that he is going to be an addict like herself and her father and providing additional experiences with heroin and methadone.

While still struggling in school, and having various behavioral and academic difficulties, he is taken under the wing of an addicted uncle. The uncle provides emotional support, approval, and a self-esteem enhancing relationship---as long as Paul is helping him burglarize houses and allows himself to be used sexually by other men. By agreeing, he avoids his uncles' disapproval and rejection, and receives drugs for his developing addiction.

Human service professionals have been intervening, but he finally is placed in a juvenile corrections institution. There he acquires the lifestyle and attitudes of antisocial, deviant peers in order to 'survive' living in that environment. These deviant peers now become his social support network, and delinquent antisocial activities become an established part of his lifestyle.

References

Ardelt, M., & Day, L., (2002). Parents, siblings, and peers: Close social relationships and adolescent deviance. *Journal of Early Adolescence, 22,* 310-349.

Ary, D. V., Duncan, T. E., Duncan, S. C., & Hops, H. (1999). Adolescent Problem Behavior: The Influence of Parents and Peers. *Behavior and research Therapy, 37,* 217-230.

Bagley, C., Wood, M., & Young, L., (1994). Victim to abuser: Mental health and behavioral sequels of child sexual abuse in a community survey of young adult males. Child Abuse & neglect, 18, 683-697.

Barkley, R.A., (1997). Behavioral inhibition, sustained attention, and executive function. *Psychological Bulletin, 121,* 65-94.

Barrera, M. J., Biglan, A., Ary, D., & Li, F. (2001). Replication of a problem behavior model with American Indian, Hispanic, and Caucasian youth. *Journal-of-Early-Adolescence., 21*(2), 133-157.

Beckwith, L., Rodning, C., Norris, D., Phillipsen, L., & et-al. (1994). Spontaneous play in two-year-olds born to substance-abusing mothers. *Infant Mental Health Journal, 15*(2), 189-201.

Cahill, L. T., Kaminer, R. K., & Johnson, P. G. (1999). Developmental, cognitive, and behavioral sequelae of child abuse. *Child and Adolescent Psychiatric Clinics of North America, 8*(4), 827-843.

Chasnoff, I. J., Burns, K. A., Burns, W. J., & Schnoll, S. H. (1986). Prenatal drug exposure: Effects on neonatal and infant growth and development. *Neurobehavioral Toxicology and Teratology, 8*(4), 357-362.

Chasnoff, I. J., Burns, W. J., & Schnoll, S. H. (1984). Perinatal addiction: The effects of maternal narcotic and nonnarcotic substance abuse on the fetus and neonate. *National Institute on Drug Abuse: Research Monograph Series, Mono 49*(220-226).

Deptula, D. P., & Cohen, R., (2004). Aggressive, rejected, and delinquent children and adolescents: A comparison of their friendships. *Aggression and Violent Behavior, 9,* 75-104.

Dilliard, J.P., Henwood, K., Giles, H., Coupland, N., & Coupland, J., (1990). Compliance gaining young and old: Beliefs about influence in different age groups. *Communication Reports,* Vol. 3 92), 84-91

Dinges, D. F., Davis, M. M., & Glass, P. (1980). Fetal exposure to narcotics: Neonatal sleep as a measure of nervous system disturbance. *Science, 209*(4456), 619-621.

Dumka, L., Roosa, M.W., & Jackson, K.M. (1997). Risk, Conflict, Mothers' Parenting, and Children's Adjustment in Low-Income Mexican Immigrants, and Mexican American Families. *Journal of Marriage and the Family, 59*, 309-323.

Dunn, M. G., Tarter, R. E., Mezzich, A. C., Vanyukov, M., Kirisci, L., & Kirillova, G. (2002). Origins and consequences of child neglect in substance abuse families. *Clinical Psychology Review, 22*(7), 1063-1090.

Eamon, M. K., & Mulder, C., (2005). Predicting antisocial behavior among Latino young adolescents: An ecological systems analysis. *American Journal of Orthopsychiatry*, Vol. 75 (1), 117-127.

Eiden, R. D., Lewis, A., Croff, S., & Young, E. (2002). Maternal cocaine use and infant behavior. *Infancy, 3*(1), 77-96.

Fals-Stewart, W., Kelley, M. L., Fincham, F. D., Golden, J., & Logsdon, T. (2004). Emotional and Behavioral Problems of Children Living With Drug-Abusing Fathers: Comparisons With Children Living With Alcohol-Abusing and Non-Substance-Abusing Fathers. *Journal of Family Psychology, 18*(2), 319-330.

Farrington, D. P. (1995a). The Twelfth Jack Tizard Memorial Lecture: The development of offending and antisocial behavior from childhood: Key findings from the Cambridge study in delinquent development. *Journal of Child Psychology and Psychiatry, 36*, 929-964.

Fergusson, D. M., & Horwood, L.J. (1999). Prospective childhood predictors of deviant peer affiliations in adolescence. *Journal of Child Psychology and Psychiatry and Allied Disciplines, 40*, 581-592.

Fergusson, D. M., Swain Campbell, N. R., & Horwood, L. J. (2002). Deviant peer affiliations, crime and substance use: A fixed effects regression analysis. *Journal-of-Abnormal-Child-Psychology, 30*(4), 419-430.

Finkelhor, D. (1990). Early and long-term effects of child sexual abuse: An update. *Professional Psychology: Research and Practice, 21*(5), 325-330.

Finnegan, L. P., Reeser, D. S., & Connaughton, J. F. (1977). The effects of maternal drug dependence on neonatal mortality. *Drug and Alcohol Dependence, 2*(2), 131-140.

Fletcher, A. C., Steinberg, L., & Williams Wheeler, M. (2004). Parental influences on adolescent problem behavior: Revisiting Stattin & Kerr. *Child Development, 75*, 781-796.

Fridrich, A. H., & Fannery, D. J. (1995). The Effects of Ethnicity and Acculturation on Early Adolescent Delinquency. *Journal of Child and Family Studies, 4*, 69-87.

Fusco-Raimondo, A. (2004). Drug-exposed neonates: Signs and symptoms of withdrawal. *Dissertation Abstracts International: Section B: The Sciences and Engineering. 65*(1-B), 458.

Gold, Y. (1997). Breaking the silence again: A retrospective study investigating the long-term effects of childhood disclosures upon symptoms and coping in adult survivors of sexual abuse. *Dissertation Abstracts International: Section B: The Sciences and Engineering, 58*(6-B), 3315.

Gonzales, N. A., Pitts, S., Hill, N. E., & Roosa, M.W. (2000). A Mediational Model of the Impact of Interparental Conflict on Child Adjustment in a Multiethnic, Low-Income Sample. *Journal of Family Psychology, 14*(3), 365-379.

Haager, D., & Vaughn, S. (1995). Parent, teacher, peer, and self-reports of the social competence of students with learning disabilities. *Journal of Learning Disabilities, 28*(4), 205-215, 231.

Haapasalo, J., & Polela, E. (1999). Child rearing and child abuse antecedents of criminality. *Aggression and Violent behavior, 4*, 107-127.

Harter, K. S. M. (2003). The socialization of shame in children with learning disabilities: Parenting behaviors that influence children's shame. *Dissertation-Abstracts-International:-Section-B:-The-Sciences-and-Engineering., 63*(8-B), 3916.

Hawkins, J. D., Lishner, D.M., Catalano, R.F., & Howard, M. O. (1985). Childhood predictors of adolescent substance abuse: Toward an empirically grounded theory. *Journal of Children in Contemporary Society, 18*, 11-48.

Hickey, J. E., Suess, P. E., Newlin, D. B., Spurgeon, L., & Porges, S. W. (1995). Vagal tone regulation during sustained attention in boys exposed to opiates in utero. *Addictive Behaviors, 20*(1), 43-59.

Hoge, R. D., Andrews, D. A., & Leschied, A. W., An investigation of risk and protective factors ina sample of youthful offenders. *Journal of Child Psychology and Psychiatry and Allied Disciplines, 37*, 419-424.

Hood, C. L. (2001). Antisocial behavior in youth. Influences and recommendations. *Dissertation Abstracts International, Section A. Humanities and the Social Sciences, 61*(11-A), 4549.

Howard, J., Beckwith, L., & Rodning, C. (1990). Adaptive behavior in recovering female phencyclidine/polysubstance abusers. *National Institute on Drug Abuse: Research Monograph Series, Research Mono 101*, 86-95.

Ito, E. S. (1995). The mediating effects of perceived parental rejection on the long-term correlates of child physical abuse: A path analysis model. *Dissertation-Abstracts-International:-Section-B:-The-Sciences-and-Engineering., 56*(3-B), 1701.

Jang, S. J., & Smith, C.A. (1997). A test of reciprocal causal relationships among parental supervision, affective ties, and delinquency. *Journal of Research in Crime and Delinquency, 34*, 307-336.

Johnson, H. L., & Rosen, T. S. (1982). Prenatal methadone exposure: effects on behavior in early infancy. *Pediatric Pharmacology, 2*(2), 113-120.

Kaltenbach, K. A. (1994). Effects of in-utero opiate exposure: New paradigms for old questions. *Drug and Alcohol Dependence, 36*(2), 83-87.

Keller, T. E., Catalano, R.F., Haggerty, K.P., & Fleming, C.B. (2002). Parent figure transitions and delinquency and drug use among early adolescent children of substance abusers. *American Journal of Drug and Alcohol Abuse, 28*(3), 399-427.

Kendall-Tackett, K.A., Williams, L.M., & Finkelhor, D. (1993). Impact of sexual abuse on children: A review and synthesis of recent empirical studies. *Psychological Bulletin, 113*, 164-180.

Keyser-Marcus, L. A. (2004). Birth characteristics of methadone-exposed infants with and without comorbid alcohol exposure. *Dissertation Abstracts International: Section B: The Sciences and Engineering. 65*(2-B), 1051.

Kilgore, K., Snyder, J., & Lentz, C. (2000). The contribution of parental discipline, parental monitoring, and school risk to early-onset conduct problems in African American boys and girls. *Developmental Psychology, 36*(6), 835-845.

Laucht, M., Esser,G., Schmidt, M.H., (2001). Differential development of infants at high risk for psychopathology: The moderating role of early maternal responsivity. *Developmental Medicine and Child Neurology, 43*, 292-300.

Lisak, D. (1994). The psychological impact of sexual abuse: Content analysis of interviews with male survivors. *Journal of Traumatic Stress, 7*, 525-548.

Locke, T. F., & Newcomb, M. (2004). Child Maltreatment, Parent Alcohol- and Drug-Related Problems, Polydrug Problems, and Parenting Practices: A Test of Gender Differences and Four Theoretical Perspectives. *Journal of Family Psychology, 18*(1), 120-134.

Lutzke, J.R., Ayers, T.S., Sandler, I.N., & Barr,A. (1997). Risks and Interventions for the Parentally Bereaved Child. In S. Wolchik & I. N. Sandler (Eds.), Handbook of Children's Coping: Linking Theory and Intervention. New York: Plenum.

Mann, B. J., & MacKenzie, E. P. (1996). Pathways among marital functioning, parental behaviors, and child behavior problems in school-age boys. *Journal of Clinical Child Psychology, 25*(2), 183-191.

Marmo, R. C. (1997). Exploring the effects of parenting practices on behaviors that predispose learning disabled youth to delinquent behavior. *Dissertation-Abstracts-International-Section-A:-Humanities-and-Social-Sciences, 58*(1-A), 0292.

Moe, V., & Slinning, K. (2001). Children prenatally exposed to substances: Gender-related differences in outcome from infancy to 3 years of age. *Infant Mental Health Journal, 22*(3), 334-350.

Moe, V., & Slinning, K. (2002). Prenatal drug exposure and the conceptualization of long-term effects. *Scandinavian Journal of Psychology, 43*(1), 41-47.

Nunes, E. V., Weissman, M. M., Goldstein, R. B., McAvay, G., Seracini, A. M., Verdeli, H., & Wickramaratne, P.J. (1998). Psychopathology in children of parents with opiate dependence and/or major depression. *Journal of the American Academy of child and Adolescent Psychiatry, 37*(11), 1142-1151.

Ornoy, A., Michailevskaya, V., Lukashov, I., Bar-Hamburger, R., & Harel, S. (1996). The Developmental Outcome of Children Born to Heroin-Dependent Mothers, Raised at Home or Adopted. *Child Abuse & Neglect, 20*(5), 385-396.

Ornoy, A., Segal, J., Bar-Hamburger, R., & Greenbaum, C. (2001). Developmental outcome of school-age children born to mothers with heroin dependency: importance of environmental factors. *Developmental Medicine and Child Neurology, 43*(10), 668-675.

Patterson, G. R. (1999). A Proposal Relating a Theory of Delinquency to Social Rates of Juvenile Crime: Putting Humpty Dumpty Together Again. *Oregon Social Learning*, 11-35.

Patterson, G. R., Debaryshe, B.D., & Ramsey, E. (1989). A developmental perspective on antisocial behavior. *American Psychologist, 44*, 329-335.

Romano, E., De Luca, R.V., (2001). Male sexual abuse: a review of effects, abuse characteristics, and links with later psychological functioning. *Aggression and Violent Behavior, 6*, 55-78.

Schenberg, T. B. (1999). Children of substance abusers: The relationship of perceived parental rejection to child emotional functioning. *Dissertation-Abstracts-International:-Section-B:-The-Sciences-and-Engineering., 59*(9-B), 5110.

Schuler, M. E., Nair, P., & Black, M. M. (2002). Ongoing maternal drug use, parenting attitudes, and a home intervention: Effects on mother-child interaction at 18 months. *Journal of Developmental and Behavioral Pediatrics, 23*(2), 87-94.

Simons, R. L., & Johnston, C. (1998). An Examination of Competing Explanations for the Intergenerational Transmission of Domestic Violence. 553-570. *Internet Handbook of Multigenerational Legacies of Trauma,* NY: Plenum Press.

Simons, R. L., Robertson, J. F., & Downs, W. R., (1989). The nature of the association between parental rejection and delinquent behavior. *Journal of Youth and Adolescence, 18,* 297-310.

Simons, R. L., Wu, C., Conger, R. D., & Lorenz, F. O. (1994). Two Routes to Delinquency: Differences Between Early and Late Starters in the Impact of Parenting and Deviant Peers. *Criminology, 32*(2), 247-275.

Stanger, C., Dumenci, L., Kamon, J., & Burstein, M. (2004). Parenting and Children's Externalizing Problems in Substance-Abusing Families. *Journal of Clinical Child and Adolescent Psychology, 33*(3), 590-600.

Steinberg, L. (1986). Latchkey Children and Susceptibility to Peer Pressure: An Ecological Analysis. *Developmental Psychology, 22*(4), 433-439.

Stormshak, E. A., Bierman, K. L., McMahon, R. J., & Lengua, L. J. (2000). Parenting Practices and Child Disruptive Behavior Problems in Early Elementary School. *Journal of Clinical Child Psychology, 29*(1), 17-29.

Teichman, M., & Kefir, E. (2000). The effects of perceived parental behaviors, attitudes, and substance-use on adolescent attitudes toward and intent to use psychoactive substances. *Journal of Drug Education, 30*(2), 193-204.

Valas, H. (2001). Learned Helplessness and Psychological Adjustment II: Effects of learning disabilities and low achievement. *Scandinavian-Journal-of-Educational-Research, 45*(2), 101-114.

van-Baar, A., & de-Graaff, B. M. (1994). Cognitive development at preschool-age of infants of drug-dependent mothers. *Developmental Medicine and Child Neurology, 36*(12), 1063-1075.

van-Baar, A. L., Fleury, P., Soepatmi, S., Ultee, C. A., & Wesselman, P. J. (1989). Neonatal behavior after drug dependent pregnancy. *Archives of Disease in Childhood, 64*(2), 235-240.

Voss, K. (2001). Understanding adolescent antisocial behavior from attachment theory and coercion theory perspectives. *Dissertation-Abstracts-International:-Section-B:-The-Sciences-and-Engineering., 61*(12-B), 6725.

32

Wagner, C. L., Katikaneni, L. D., Cox, T. H., & Ryan, R. M. (1998). The impact of prenatal drug exposure on the neonate. *Obstetrics and Gynecology Clinics of North America. 25*(1), 169-194.

Watkins, W. G., & Bentovim, A. (1992). The sexual abuse of male children and adolescents: A review of current research. *Journal of Child Psychology and Psychiatry and Allied Disciplines. 33*(1), 197-248.

Wenar, C., & Kerig, P. K. (2000). Developmental Psychopathology: From Infancy through Adolescence.

Werner, N., E., Silbereisen, R. K., (2003). Family relationship quality and contact with deviant peers as predictors of adolescent problem behaviors: The moderating role of gender. *Journal of Adolescent Research, 18,* 454-480.

Whitbeck, L. B., Hoyt, D. R., Simons, R. L., & Conger, R. D. (1992). Intergenerational continuity of parental rejection and depressed affect. *Journal of Personality and Social Psychology, 63,* 1036-1045.

Woodward, L. J., & Fergusson, D.M. (1999). Childhood peer relationship problems and psychosocial adjustment in late adolescence. *Journal of Abnormal Child Psychology, 27,* 87-104.

Exhibit 54

*For Appeal..*

## True/False Test on Juries

| | | |
|---|---|---|
| 1. Over 90 percent of all cases never come before a jury. | T | F |
| 2. Juries never impose sentences after reaching verdicts. | T | F |
| 3. Women may because excluded from jury duty solely because of their sex. | T | F |
| 4. A lawyer can keep someone from serving on a jury based on a hunch or for no reason at all. | T | F |

5. It is constitutional for a lawyer to use peremptory challenges to keep members of certain races, as well as members of a particular gender, off of a jury.     T     F

| | | |
|---|---|---|
| 6. All federal juries require unanimous votes. | T | F |
| 7. Judges can be called for jury duty. | T | F |
| 8. The Constitution guarantees you the right to a jury trial only in criminal cases. | T | F |
| 9. States do not require unanimous verdicts in certain cases. | T | F |
| 10. In most cases, judges and juries disagree on the verdict. | T | F |

*This presentation (an outreach strategy based on a true-false quiz) is reprinted from an article by Julie Van Camp, "Courts at the Crossroads," that originally appeared in the ABA magazine* Update on Law-Related Education.

### True/False Test on Juries
### Answer Key

1. True—Most cases are plea bargained, settled, or tried before a judge.

2. False—A number of states require jurors to pass sentence on those they have convicted of crimes punishable by death.

3. False—In *Duren v. Missouri*, a 1979 case, the U.S. Supreme Court held that a Missouri law allowing women automatic exemption from jury service, if women so requested, had deprived a murder defendant of his constitutional right to be tried by a jury composed of a cross section of the community.

4. True—Assuming that the lawyer in a case is entitled to use peremptory challenges to exclude prospective jurors from serving. These challenges do not require that a reason be given.

5. False—Beginning with *Batson v. Kentucky* in 1986, the Supreme Court has held, in a series of cases, that race- and gender-based peremptory challenges violate the Equal Protection Clause of the 14th Amendment. Such challenges cannot be used to exclude members of certain races or persons of a particular gender from service on a jury. Though lawyers generally do not have to give a reason for their peremptory challenges, if the opposing side objects to challenges as race- or gender-based, the side making the challenge must demonstrate a race- or gender-neutral basis for the challenges

6. True

7. True—In some states, especially those using one-day/one-trial juries.

8. False—The Seventh Amendment provides for jury trials in civil cases.

9. True—Many states allow less than unanimous verdicts in certain civil cases, and some allow such verdicts in certain criminal cases.

10. False—Studies have shown they agree at least 80 percent of the time.

Exhibit 55

Paul Speer Court Transcript Review; Mitigation Phase only.  Focus on Janette Gallagher

Provided by Lee Brinkmoeller; 4/1/13

Need afternoon transcripts of 2/26, 2/28, and 3/27/07 (different court reporter).  Also, there are some missing pages in the transcripts.

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|---|---|---|---|---|
| 2/1/07 | 3 | 21-3 | n | She (Gallagher) suggests there were changes she wanted to new proposed preliminary penalty instructions, but judge's ruling was 'fine.' |
| | 4 | 14-5<br><br>19-20 | n | She starts to say she has a problem with something when Storrs has the judge's attention. She tells Blumberg they'll need something for their opening. |
| | 5 | 17-20 | n | She tells Storrs that Pam is getting something for him then questions his correction. |
| | 5-6 | 25, 2 | n | She says she is ready but defense is "apparently not." |
| | 6 | 5 | n | She answers for Storrs. |
| | 7 | 17 | y | She interrupts the judge. |
| | 8 | 3-5 | y | She sympathizes with judge's mistake and Storrs gives her credit for pointing it out though he stated mistake first. |
| | 9 | 9-10 | n | She suggests alternative to judge's plan and they go with it. |
| | 10 | 25 | n | She says off the record and it's off. |
| | 16, 17 | 22<br>1-2 | y | She corrects judge and Storrs echoes.<br>When judge thanks her she says "sorry." |
| | 45 | 13-16 | y | She and judge repeat each other then she says "that's what he meant to say" – about judge or Storrs is unclear, but judge says "okay." |
| | 45 | 19 | n | She says the judge forgot about something. |
| | 71 | 23 | y | Her opening statements |
| | 73 | 15-9 | y | She says Storrs' definition of moral culpability is his opinion and that the judge wouldn't say the same. |
| | 74-5 | 17-1 | y | She says Storrs basically blamed Sabrina Womble for the murder in his opening statements and also backtracked on the allegation, but his doctors will support it. |
| | 79-80 | 22-1 | y | She says Storrs wants it both ways regarding Aunt Debbie's positive or negative influence being taken away from Paul. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|------|------|-------|------------------------|------------------|
| | 82 | 6 | y | She says Storrs omitted Paul's assaults on mother and great-grandmother. |
| | 84 | 7-10 | y | She says Storrs implied inaccurate info about time with parents. |
| | 92 | 1-8 | y | She implies that Storrs' suggestion of Sabrina's bad parenting wasn't cause of Paul's behavior but jealousy was. |
| 2/1/7 | 93 | 8-17 | y | She gives an example of Storrs saying something is a fact when it is an impression. |
| | 94 | 6-10 | y | She infers and announces the judge's intentions in giving a jury break. |
| | 120 | 7-11 | n | She says she finished on time to make the judge happy and he thanks her for her restraint. |
| | 122 | 6 | n | She parrots Storrs. |
| 2/5/7 | | | | Direct exam of Chris Womble by Storrs |
| | 4 | 20 | n | She interrupts Storrs. |
| | 10 | 8-9 | y | She objects unless witness can establish knowledge. |
| | 24 | 7-11 | y | She objects and picks apart Storrs' questions for details and he says "Oh." Judge agrees and instructs Storrs. |
| | 29 | 5-9 | y | She objects, Storrs tries to continue and judge stops him to rule and Storrs says he was going to rephrase. |
| | 38 | 11-16 | y | Judge sustains when she says there was no question, even though there was. |
| | 39 | 11-16 | y | She objects about assuming facts in evidence, judge says again to rephrase. (He doesn't officially rule, so does that mean it can't be overturned if appealed?) |
| | 40-1 | 21-2 | y | She objects to Storrs' question formation. Judge doesn't officially rule but says to add foundation. |
| | 41 | 8-14 | y | She objects to relevance and is overruled. |
| | 43-4 | 23-4 | y | She objects to witness imagining what happened when he wasn't there and judge sustains. |
| | 44-5 | 22-6 | y | She objects to witness being non-responsive to question Storrs asked. Judge sustains and says to re-ask. |
| | 45 | 7-22 | y | She objects to compound questions of four. Judge says break it down without ruling officially. |
| | 45-6 | 23-2 | y | She objects to irrelevant questions and judge overrules. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|------|------|-------|------------------------|------------------|
|  | 46 | 3-8 | y | She objects to witness being non-responsive to question Storrs asked. Judge sustains and says to be more specific. |
|  | 46 | 9-12 | y | She objects to witness answering question Storrs didn't ask. Judge doesn't rule but says to re-ask and tells witness to listen to question and only answer it. |
| 2/5/7 | 54 | 11-16 | y | She objects about Storrs assuming facts in evidence about same issue as earlier, judge sustains and says again to rephrase. |
|  | 61 | 7-14 | y | She objects after witness says he imagines and judge sustains. She asks that it be stricken. Judge doesn't respond to that but instructs witness about answering without speculation and says to rephrase question. |
|  | 61 | 15-25 | y | She objects about Storrs not laying foundation and hearsay and judge sustains but allows subject. |
|  | 64 | 9-18 | y | She objects about Storrs misstating evidence and judge doesn't rule but says to rephrase. |
|  | 69-70 | 9-1 | n | She asks/implies to judge about juror possibly trying to be released from duty and says juror's documentation is alibi. |
|  |  |  |  | Cross exam of Chris Womble by Gallagher |
|  | 83 | 20-25 | y | During cross-exam, she corrects witness' dates and locations and he agrees that he is confused. |
|  | 84-5 | 18-24 | y | She questions witness about whether Storrs showed him material and/or how much Storrs prompted witness when talking about witness' memories in earlier interviews. Witness has to recant and say he wasn't shown any physical material. |
|  | 86 | 5-16 | y | She asks if witness was nervous when he testified incorrectly and if he's still nervous – yes to both. |
|  | 88 | 9-11 | y | She interrupts witness' answer. |
|  | 91 | 10-16 | y | She paraphrases witness' answer to state/question that Paul "wanted to be the center of the universe" at home because he thought he deserved the attention. |
|  | 94 | 1-4, 16-18 | y | She asks about abusive event using descriptive, violent language. |
|  | 94 | 5-14 | y | She paraphrases witness' answers with |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|------|------|-------|------------------------|------------------|
| | | | | statements/questions. |
| | 95 | 13-15 | y | Her statement/question assumes/rephrases witness' words. |
| | 95 | 24 | y | Her question rephrases witness' answer. |
| | 96 | 4-5 | y | Statement as question. |
| | 96 | 24-25 | y | She rephrases witness' words. |
| | 97 | 7 | y | Statement as question. |
| | 97 | 14-15 | | Statement as question that interprets/rephrases witness' words. |
| 2/5/7 | 98 | 4, 6-7, 17-18, 20, 22 | y | Statements as questions. |
| | 98-99 | 24 -1 | y | Statement as question. |
| | 99 | 3, 21-22 | y | Statements as questions. |
| | 99 | 10-11 | y | She rephrases witness' words for effect. |
| | 100 | 5-9 | y | She interprets witness' words possibly incorrectly. |
| | 100 | 15-16 | y | Statement as question. |
| | 100 | 19-20 | y | She rephrases witness' words for effect. |
| | 99-100 | 10-19 | y | Witness doesn't give enough details about the incident and Paul to support questions. Foundation? Speculation? |
| | 101 | 1-2 | y | Statement as question. |
| | 102 | 3, 10-12, 15-16, 18-19, 22 | y | Statements as questions. |
| | 103 | 9, 11,17, 19-21 | y | Statements as questions. |
| | 103 | 13-14 | y | Statement as question that "assumes" how the witness acted. |
| | 104 | 3-10 | y | Statements as questions. |
| | 105 | 1-7 | y | Statements as questions and says she was "just asking." |
| | 105 | 15-17, 23 | y | Statements as questions. |
| | 106 | 1-2 | y | Statement as question. |
| | 106-7 | 23-3 | y | Statements as questions. |
| | 107 | 8-25 | y | Statements as questions and she finds inconsistencies from earlier interview with Storrs |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|------|------|-------|------------------------|------------------|
| | | | | and offers to show transcript. |
| | 108 | 1-2 | y | She gives Storrs the page number when he asks. |
| | 108 | 5-18 | y | She tells/suggests to witness to read out loud then states/ questions about inconsistencies from earlier interview. |
| | 108 | 19-21 | y | Statement as question. |
| | 109 | 14 | y | Statement as question. |
| | 110 | 22 | y | Statement as question. |
| | 111 | 3-4, 10-12, 19-20, 22-23, 25 | y | Statements as questions. |
| 2/5/7 | 111 | 14-16 | y | She directs him back to transcript and reads his words from it. |
| | 111 | 19-25 | y | She turns statements into questions about witness' testimony of mother's drug use. |
| | 112 | 2-3, 5, 12-13, 15-17, 21-22 | y | Statements as questions. |
| | 113 | 5-6, 8-9, 15-17, 23 | y | Statements as questions. |
| | 113 | 5-7 | y | Asked and answered? |
| | 114 | 4-9 | y | She gives Storrs pg # when he asks. |
| | 114 | 10 | y | She directs witness to pg. |
| | 114 | 20-21 | y | Statement as question. |
| | 114-115 | 24-4 | y | Witness tries to explain inconsistency and she interrupts with statement as question about uncle. |
| | 115 | 4, 11, 16, 23-25 | y | More statements into questions. She says he "obviously" doesn't know directly about his mom's abandonment as a child. He wasn't born yet; she says "exactly." |
| | 116 | 4-17, 22 | y | More statements into questions. Interrupts witness. |
| | 117 | 1-16 | y | She finds other inconsistency from transcript about uncle's drug use and directs to transcript and reads from it. |
| | 117 | 24 | y | She states as a question that witness misunderstood a simple question. |
| | 118 | 2-9, 12-14 | y | More statements into questions. She asks what he's saying "today." |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|---|---|---|---|---|
| | 120 | 3, 14-19 | y | Statements as questions. |
| | 121 | 3-6 | y | Statements as questions. |
| | 122 | 2-5, 9-13, 23 | y | Statements as questions. |
| | 123 | 7, 17 | y | Statements as questions. |
| | 123 | 21-3 | y | She offers to show witness police report to refresh memory. |
| | 124 | 1 | y | Interrupts witness. |
| | 124 | 7 | y | Directs witness to turn to a date. He says, "Okay. There," and she asks if he found it. |
| | 124 | 18-25 | y | Storrs and judge ask for bate stamp #. She doesn't know then says it's by date, not bate stamp. |
| 2/5/7 | 125 | 8 | n | When witness had to lean forward to read, he was farther from mike. |
| | 125 | 17-20 | y | After recess, she says they were talking about an incident on a date different than she mentioned before recess. |
| | 126 | 7-17 | y | After Storrs' foundation objection is sustained, she rephrases to "experience of being the defendant's brother for 23 years" and judge overrules subsequent foundation objection. |
| | 127 | 1 | y | Statement as question. |
| | 127 | 8-20 | y | She tells witness to look at police report so he can give his former address and questions his responses several times. |
| | 128 | 8-11 | y | Witness says "my brothers," she interrupts to confirm them by name, but he only has 2 brothers. |
| | 128 | 14-19 | y | Statements as questions. |
| | 128-29 | 25-19 | y | Statements as questions. |
| | 129 | 23 | y | She starts to say witness' brother "shot" "Mr. Whitmore" then changes it to "hit" with mace. |
| | 130 | 1, 8, 15 | y | Statements as questions. |
| | 130-31 | 12-4 | y | She states as questions info witness already gave and is redundant then she says "okay.' |
| | 131 | 5-12 | y | She asks about differences in "story" he told police at time of 2nd shooting and what he's saying on stand. |
| | 131 | 15-20 | y | He denies her recounting and she directs him to police report. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|------|------|-------|-----------------------|------------------|
| | 132 | 1 | y | She interrupts his explanation. |
| | 132-33 | 15 1-6 | y | More statements into questions. She asks about what witness already denied then says "No?" |
| | 133 | 10 | y | She asks about Paul attacking their mother and Storrs objects to question form. Overruled. |
| | 134-35 | 1-20 1-6 | y | She asks detailed questions about Paul's attacks on their mother. |
| | 135 | 11,14, 16-24 | y | Statements as questions about Paul's violence and witness' drug use. |
| | 136 | 16 | y | She questions his answer by repeating it. |
| | 136-37 | 24-3, 9 | y | Statements as questions about jail tents, birthday. |
| | 137 | 11-18 20-22 | y | She asks about witness remembering a letter from brother and Storrs objects on foundation. She says "I just asked"… judge doesn't officially rule and says witness could answer. She isn't specific about which brother. |
| 2/5/7 | 138 | 1 | y | She approaches witness to show letter from Paul and ask about it. |
| | 139 | 4-9 12-23 | y | She responds "okay" to witness answering about relationship with Paul then interrupts him with statements as questions about Paul's feelings about witness stealing from Al. She restates for direct answer. |
| | 139-40 | 25-2 | y | Statements as questions about brother's prison release. |
| | 140 | 10 | y | She questions his statement of being falsely arrested. |
| | 141 | 3 | y | Statement as question about Al's sexual expectations of Paul. |
| | 142 | 1-7 | y | Statements as questions about witness' knowledge of Paul and sexuality. |
| | 142 | 16 | y | She responds "uh-huh. Well, we'll just have to ask Al that" when witness answers a question about Al. |
| | 142 | 20-24 | y | Statements as questions about witness' arrest warrants. |
| | 143 | 3, 5, 11 | y | Statements as questions about witness' employment. |
| | 143 | 1, 9 | y | She repeats answers as questions. |
| | 143 | 33 | y | She responds "all right" to witness' explanation about ability to work. |
| | 144 | 1 | y | Statement as question about heroin. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|------|------|-------|------------------------|------------------|
|  | 144 | 12-14 | y | She interrupts witness' answer about drug use with "huh?" then "exactly" after he finishes. Statement as question. |
|  | 146 | 1-4 | y | He answers question about police conversation, she repeats "right?" so he answers again. |
|  | 146 | 8-24 | y | Statements as questions about witness' and Paul's burglary. When Storrs objects to form of argumentative question, judge overrules. |
|  | 147 | 19 | y | Statement as question about burglary. |
|  | 148 | 10-13 | y | Statement as question about burglary. When witness doesn't answer, she answers for him as a question: "yes?" |
|  | 149 | 7 | y | Statement as question about witness' dealer after he'd already given the info. |
|  | 149 | 13 | y | She mistakenly makes witness' jail term sound longer than it was. |
| 2/5/7 | 149 | 21 | y | She says "that's right." Then repeats witness' answer. |
|  | 149-50 | 24-1 | y | Her question changes witness' previous answer and he agrees with it. She asks if he wants to look at the documentation. |
|  | 150 | 9-11 | y | She interrupts witness to address judge. |
|  | 150 | 20-5 | y | Statements as questions about jail visitation. |
|  | 151 | 5-9 | y | Statements as questions about witness' jail conversation. |
|  | 151 | 10-13 | y | She answers "yep" when witness needs assistance finding info in document. |
|  | 151 | 22 | y | Statement as question. |
|  | 155 | 10 | y | Statement as question. |
|  | 156 | 6 | y | Statement as question that witness already answered. |
|  | 156 | 14-18 | y | She repeats answer as question so witness confirms. |
|  | 156 | 25 | y | Statement as question. |
|  | 157 | 18-23 | y | Rephrases questions. |
|  | 159 | 3 |  | Statement as question. |
|  |  |  |  | Redirect of Chris Womble by Storrs |
|  | 161 | 18-22 | y | She objects to leading before Storrs finishes question. |
|  | 162 | 18-20 | y | She objects to leading. Judge doesn't rule but Storrs rephrases. |
|  | 164 | 4-11 | y | She objects to leading but there was a ? at end of |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|------|------|-------|------------------------|------------------|
| | | | | the question. She says it was still leading and Storrs rephrases even though judge doesn't rule. |
| | 166-67 | 22-1 | y | She objects to exceeding the scope of cross; judge sustains. |
| | 168 | 3-7 | y | She objects to leading after witness answers and judge says to rephrase. |
| | 169 | 16-25 | y | She objects on foundation and exceeding scope. Judge overrules on scope and says to rephrase and establish foundation. |
| | 170 | 1-5 | y | She objects on asked and answered and court agrees. |
| | 171 | 21-25 | y | She objects to exceeding the scope of cross; judge sustains. |
| | 172 | 20-23 | y | She objects to leading after witness answers and judge sustains. |
| | 173 | 4-16 | y | She objects to exceeding the scope of cross; judge agrees and says it was covered on direct. Storrs explains his reasoning and judge says they'll finish the next day. |
| 2/5/7 | 174 | 9, | n | She tries to limit what Storrs can use for redirect. |
| | 175 | 1-5 | n | Storrs tells judge she tried to minimize points he made in direct. Did he address them all at the time? |
| 2/6/7 | | | | Redirect of Chris Womble by Storrs |
| | 16 | 1-4 | y | She objects to exceeding scope of cross; judge sustains. |
| | 17 | 8-11 | y | She objects to exceeding scope of cross and relevance; judge agrees. |
| | 18 | 4-7 | y | She objects to exceeding scope of cross; judge sustains. |
| | 19 | 2 | y | Judge directs her to get jury's questions. Why her? |
| | 21 | 18-24 | y | Leading? Statements as questions. |
| | 22 | 9 | y | Statement as question. |
| | 22 | 11 | y | She repeats witness' words as a question. |
| | 22 | 9, 16 | y | She repeats question line 9 and witness answers "imagine so, yes." Storrs doesn't object. Speculation? |
| | 22 | 18-21 | y | Statements as questions. |
| | 22 | 23 | y | She makes a statement without asking a question; witness responds. Storrs doesn't object. |
| | 23 | 4-8 | y | Statements as questions. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|------|------|-------|------------------------|------------------|
|  | 23-24 | 19-6 | y | Statements as questions. |
|  | 24 | 8-12 | y | She doesn't establish enough foundation for her question but Storrs doesn't object to that or for speculation. |
|  | 24 | 13-17 | y | She doesn't ask a question but witness responds. Storrs doesn't object. |
|  | 24 | 18-25 | y | Statements as questions. |
|  |  |  |  | Blumberg's direct exam of Paul Miller |
|  | 43 | 1-3 | y | She objects to Blumberg's statement and asks if it's a question; judge sustains. |
|  | 43 | 4-5 | y | She objects for leading. Blumberg continues before judge says anything. |
|  | 44 | 1-7 | y | She corrects Blumberg away from incorrect exhibit. |
|  | 45 | 4-8 | y | She says the exhibit includes irrelevant material and Blumberg says just the report is fine. |
|  | 49-50 | 12-8 | N, Bench | She objects and approaches to discuss Blumberg showing material that hasn't been admitted to evidence. Judge agrees and Blumberg admits it. |
| 2/6/7 | 50-51 | 20-7 | y | She interrupts witness to ask for slower and louder speaking. Judge was going to say the same. Blumberg says he doesn't need to read exhibit to give info |
|  | 88 | 19-21 | y | She objects when witness wants to talk about subject that Blumberg hasn't asked about. Judge sustains. |
|  | 91 | 5-9 | y | She objects to question form as speculative. Judge says to rephrase. |
|  | 92-93 | 22-3 | y | She objects to Blumberg's question telling the witness how to answer. Judge sustains and says to rephrase. |
|  | 104 | 21-25 | y | She objects when witness wants to answer off-topic. Judge agrees and she says it's fine if Blumberg wants to ask it. |
|  | 105 | 11-18 | y | She objects to how witness is reading/commenting on interview. Judge disagrees, Blumberg supports her, judge says "just read then" but doesn't officially sustain. |
|  | 109 | 21-23 | y | She has a problem when the slide set the defense gave her doesn't match what's shown in court. |
|  | 111 | 5-10 | n | Blumberg tells judge he wants to admit material created in court but she doesn't. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|------|------|-------|------------------------|------------------|
| | 113 | 1-10 | n | She mentions the lengthiness of the proposed exhibit and that its content keeps changing; she doesn't have the updated version even though the defense said what they gave her was most recent. |
| | 113-14 | 14-10 | n | She asks which version the judge is allowing, Blumberg responds that the judge said, but judge doesn't know and will trust both defense teams to work out which parts were testified to. Blumberg delegates task to Storrs. Blumberg says they gave her a marked copy and she repeats her problem of multiple copies. |
| | 114-15 | 11-4 | n | She wants to assume prior ruling doesn't stand and wants to admit all demonstrative. Judge denies with sentencing Rules of Evidence. She asks about creating her own charts. Judge can see argument. She wonders if that's why it's let in and Blumberg disagrees that theirs is used by expert but hers is for foundation and opinion. Judge will consider it. |
| | 115-16 | 23-9 | N, Bench | She says expert's exhibit doesn't match what he just gave her. Blumberg possibly changes direction direct exam and judge sustains. |
| 2/6/7 | 116-17 | 17-2 | y | More discussion of everyone having identical material. |
| | 117-18 | 23-7 | y | She says she still doesn't have matching exhibit. Neither does Blumberg. |
| | 135 | 11-18 | y | She objects to witness' non-responsive answer. Judge sustains. |
| | 136 | 18-23 | y | She objects to narrative past original question. Judge sustains and Blumberg unsuccessfully argues against ruling. |
| | 144 | 5-17 | N, Bench | She objects to witness wanting to go to a subject not asked about. Judge has them approach and they discuss the witness. |
| | 145 | 23-25 | n | She wants to confirm when witness will be finished and if they're considering her in that estimation. |
| | 147 | 6-14 | n | She addresses Storrs by first name after they've all called her Ms. Gallagher, then she says if Storrs does the direct then it will be shorter/take less time. He consults her on length of time. |
| | 148 | 1-3 | n | She says it'll be "all day" when Blumberg will have a witness. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|---|---|---|---|---|
| | 148 | 5-14 | n | She doesn't want to "pretend" the trial will finish on time or for the trial to take "all these days off." |
| | 148 | 16-22 | n | She says a specific witness in one afternoon is "more than enough" and Storrs agrees. |
| 2/7/7 am | 4 | 13-21 | y | She objects when witness wants to talk about subject that Blumberg hasn't asked about. Judge agrees and tells Blumberg to ask the question. |
| Bad co urt re porter | 8 | 21-3 | y | She objects to witness covering material from the previous day. Judge sustains. |
| | 32 | 16-21 | y | She objects to narrative when Blumberg had a question. Judge sustains and Blumberg tells the witness to continue. |
| | 33 | 11-16 | y | She objects to leading after witness answers Blumberg's question; judge sustains. She objects that there wasn't a question, even though the judge had just sustained. Judge doesn't rule but Blumberg continues. |
| | 38 | 8-15 | y | She objects to compound question and witness already answered the first part; judge sustains. |
| | 39 | 6-10 | y | She objects to repetitive answer; judge sustains. |
| | 48 | 14-24 | y | She objects to form of question; judge says to rephrase. Blumberg says witness understands it; judge didn't. |
| 2/7/7 am | 51-55 | 25-17 | n | Blumberg complains about Gallagher laughing and being too loud at bench conferences that jury can hear and Paul feels bad about. Blumberg says her objections are scornful and ridicule defense counsel and judge didn't do anything about it a while ago when it was brought to his attention. Judge doesn't think complaint is valid or he would have addressed it like he did when G made inappropriate remarks to Nicholson. G doesn't remember the bench incident. Judge will watch for signs and deal with it if he notices any. |
| | 57 | 4-12 | y | She objects to non-responsive answer. Blumberg explains what he meant; judge overrules. |
| 2/7/7 pm | 9-12 | 20-21 | n, be nch | Gallagher objects and Leos says witness is guessing outside of his expertise. Judge says speculation and Blumberg should lay foundation. G comments again on witness' lack of knowledge. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|---|---|---|---|---|
| | 16-17 | 8-2 | n, be nch | She objects for relevance; judge sustains. Blumberg asks about better approach. Bench. G explains objection but judge allows. |
| | | | | Cross exam of Miller by Gallagher |
| | 18 | 9-14 | y | She tells witness to put his top down so she can see him. |
| | 18 | 18-24 | y | Witness can't answer her question and Blumberg wants to renew objection of form but judge says to lay foundation but doesn't officially rule. She interrupts judge. |
| | 20 | 3-12 | y | She questions what records the witness read and confuses him by differentiating mitigation notebook and other records. |
| | 21 | 2-23 | N, Bench | She tells judge she doesn't know why exhibits she needs aren't out. Blumberg questions adult record relevance, judge overrules and she said she objected to its relevance before but judge allowed it. |
| | 22 | 1-4 | y | She says she'll ask him a question that tells him the answer. |
| | 22-23 | 20-7 | | She directs him to records he hasn't seen. Statements as questions. |
| | 23 | 8-12, 19-25 | y | Statements as questions. |
| | 24 | 3-16 | y | Statements as questions. Blumberg objects to her misstating testimony; judge overrules. |
| 2/7/7 pm | 24 | 19-22 | y | Statements as questions. |
| | 25 | 20-3 | y | Statement as question of witness' lack of research. |
| | 26 | 5 | y | Statement as question. |
| | 26 | 8-20 | y | She directs witness to book to find info for his answer. |
| | 27 | 6-7 | y | She asks witness if he remembers what he testified to. |
| | 28 | 5 | y | She tells him it's okay if he can't remember or find the info. |
| | 28 | 18 | y | Statement as question. |
| | 28 | 25 | y | She directs him to page. |
| | 29 | 20-25 | y | She made a mistake earlier in questioning and confused witness. Blumberg didn't notice. |
| | 30 | 4-21 | N, bench | Blumberg at bench questions her info but she knows details that he forgot. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|------|------|-------|------------------------|------------------|
| | 30 | 23 | y | She changes line of questioning to what she'd mistaken p.29. |
| | 31 | 3-15 | y | She asks details like dates that witness has to look up when she gives the pg #. Statements as questions. |
| | 32 | 2 | y | She directs him to page. |
| | 32 | 10, 15, 17 | y | Statements as questions. |
| | 32 | 21-25 | y | She asks date that witness has to look up. Statement as question. |
| | 33 | 1-8 | y | He's giving incorrect details from wrong pg, so she redirects him. He has to look up records to answer. |
| | 33-34 | 13-3 | Y | He doesn't know incidents by much detail and timeline, and she repeatedly asks for dates, numbers, court actions he has to look up. He calls her on it and says it wasn't expected of him. |
| | 34 | 10-22 | y | She questions the report he used and has to direct him to the pg #. Both lawyers say different pg #s. |
| | 35 | 2, 16 9 | y | Statements as questions. She tells him pg# of info. |
| | 35-36 | 22-2 | y | She asks him for details that aren't on the pg he's on, then after he answers about not knowing, she gives him a new pg to look at. |
| | 36 | 21 | y | She tells him he's answering something she didn't ask him. |
| | 37 | 4-15 | y | Statement as question. He can't find answer she's asked about several times. Judge tells her to show him and she tells witness location of info. |
| 2/7/7 pm | 37-38 | 23-1 | y | Statement as question correcting his previous testimony. |
| | 38 | 8 | y | Statement as question about his misinterpretation on direct. |
| | 38 | 15 | y | Her question prompts judge to ask about a pg # for info for witness. She finds it. |
| | 39 | 20-23 | y | Statements as questions. She interrupts witness to keep on topic. |
| | 40 | 3-18 | y | She questions for details and gives him report pg # but not the exact one with the info until he asks for it. |
| | 41-42 | 5-3 | y | Her questions and witness' answers seem assumptive. Lack of foundation? Statements as questions. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|------|------|-------|------------------------|------------------|
| | 42 | 4-9 | y | Her question prompts judge to ask about a pg # for info for witness. She gives it with approximate location. |
| | 42 | 11-15 | y | Statements as questions. Leading? |
| | 43 | 2-7 | y | Witness defends lack of date knowledge and she explains that wasn't what she just asked him. |
| | 43 | 22-25 | y | She tells him he can't nod, he answers verbally, then she explains why he can't nod. |
| | 44 | | | Transcript skipped pg 44 |
| | 44 | 8-9 | y | She directs witness to pg when he can't find it. |
| | 44 | 17-25 | y | He doesn't have exact info, she says he can look at info for answer then changes to different statement as a question. Blumberg approaches bench. |
| | 45 | 3-8 | N, bench | She'll clarify misinformation Blumberg heard. |
| | 46 | 24 | y | Statements as questions. Leading? |
| | 47 | 4-10 | y | Her question prompts judge to ask about a pg # for info for witness. She thinks he shouldn't need it. Judge mentions 3 books witness is referring to. |
| | 47 | 11 | y | She starts an insulting question and witness defends lack of date knowledge. |
| | 47 | 23 | y | She says dates are important. |
| | 47-48 | 25, 8 | y | She directs him to pgs. |
| | 48-49 | 23-3 | y | Leading? Statement as question. Is witness reading to find answers? |
| | 49 | 17-19 | y | Statement as question. Leading or assumptive about "benefited?" |
| 2/7/7 pm | 50-51<br><br>52 | 14-15<br>6-24<br><br>14-17 | n | She wants something on record so she isn't blamed. She doesn't want Blumberg and Storrs to switch back and forth with witness – only one transfer to Storrs. Judge agrees. Storrs likes her point that redirecter has to hear cross. Judge hadn't caught that with his idea. She defends Blumberg not being available then says they're delayed enough. |
| | 54 | 6-10 | y | She gives pg #s when witness mentions them. |
| | 54 | 12-19 | y | Leading? |
| | 55-56 | 7-4 | y | She questions witness about info from 2005 interview and not in 670 pg mitigation book. She implies connection of death penalty being the difference. Foundation of record limits in |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|------|------|-------|------------------------|------------------|
| | | | | general? |
| | 56-57 | 6-2 | y | She points out witness' wrong info and gives pg of correct detail. |
| | 58 | 3 | y | She redirects him to same pg # then a different one. |
| | 58 | 19-25 | y | She asks question that witness already talked about more than once that corrects her wrong inference. |
| | 59-62 | 1-14 | y | She questions witness' employment on case and preparedness, including the confusion of material she had. She asks about the bill he sent her for their interview and amount. |
| | 62-64 | 18- | y | She asks about job definition of mitigation specialist and source of materials witness used. Scope? Relevance-for jury's knowledge |
| | 64-65 | 21-9 | y | She asks for material witness has that wasn't given to her. |
| | 68 | 2 | y | Leading? Statement as question. Earlier questioning doesn't lay exact foundation. |
| | 69 | 7 | y | She states as question to witness if her own interview was "good." |
| | 69 | 19-21 | y | She wants witness to change "uh-huh" to "yes." |
| | 69 | 22-23 | y | Leading? |
| | 70-71 | 5-9 | y | Scope? Relevance? She includes questions about herself. |
| | 71-72 | 20-16-20 | y | Scope? Relevance? Memories of past case people. Witness repeats answer and she comments on it and "just wanted to know." |
| | 72-73 | 25-3 | y | He answers question non-responsively but she doesn't point it out. |
| 2/7/7 pm | 73-74 | 18-4 | y | She comments on witness not liking dates and she can't read his writing. |
| | 75 | 17-18 | y | Leading? Statement as question. |
| 2/8/7 | 4 | 12-13 | n | She wants to start without relevant atty, Blumberg, though this issue was settled previously. Judge said her comments before prevented it. She says high point. |
| | 7 | 6-7 | y | She says she opened the book for him to the relevant pg. |
| | 8 | 7 | y | She interrupts witness to tell him to read aloud slower. |
| | 8 | 11-13 | y | He echoes her but doesn't answer the question and she doesn't point it out. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|---|---|---|---|---|
|  | 8-9 | 22-11 | y | Blumberg objects to speculation and improper lay opinion, judge allows it without official ruling. |
|  | 9 | 20 | y | She directs witness to pg |
|  | 10 | 2 | y | Statement as question on his "interpretation." |
|  | 10 | 5-12 | y | She questions about Paul's age so witness has to do the math. |
|  | 10 | 13 | y | She directs him to a different pg to read from. Storrs gives him something and asks if he has the material. |
|  | 11 | 9-10 | y | She interrupts witness to explain something the witness knows. |
|  | 12 | 18-23 | y | She directs to another pg to read from and to his slides that don't match. She references new packet-may be hint back to ongoing slide confusion. |
|  | 13 | 18 | y | She calls witness Doc. |
|  | 14 | 8 | y | She tells witness another pg to read from. |
|  | 14 | 8-11 | y | He answers question non-responsively but she doesn't point it out. |
|  | 15 | 9-11 | y | She directs him to a different pg. |
|  | 15 | 13-22 | y | Statement as question. Blumberg can't tell difference and would object. She objects and approaches. |
|  | 16 | all | n | She wants Blumberg to formally object but he "just blurted things out." Blumberg says she didn't ask a question and judge says they both tend to make statements that sound like questions. He'll tell her to rephrase. |
|  | 17 | 8-15 | y | She interrupts witness to stop his non-responsive answer by suggesting he doesn't know the answer. |
|  | 18 | 21-22 | y | Statement as question. |
| 2/8/7 | 18-19 | 24-2 | y | She directs him to a different pg to read from in a way that confuses witness. |
|  | 20 | 17-20 | y | Statement as question. |
|  | 21 | 16-17 | y | She directs him to a different pg. to read from. |
|  | 22 | 10- | y | Leading? |
|  | 22 | 24-25 | y | Statement as question. |
|  | 23 | 4-5 | y | She directs him to a different pg. to read from. |
|  | 23 | 16-19 | y | She asks witness question with incorrect info that witness clarifies. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|------|------|-------|------------------------|------------------|
| | 23 | 21 | y | She directs him to a different pg. to read from. |
| | 24 | 3-4 | y | Statement as question. |
| | 24 | 6-7 | y | She gives him another pg. to read from. |
| | 24 | 22-23 | y | She gives him another pg. to read from. |
| | | | | Transcript skips a pg (25) |
| | 25 | 7-8 | y | She directs him to a different pg. to read from. |
| | 25 | 11-20 | y | She corrects witness and guides him to their purpose of looking at Paul's history and no one else's. |
| | 25-26 | 21-3 | y | She can't find matching slide again and repeats as a question witness' assertion that he can; witness changes "can" to "should." Storrs helps. |
| | 27 | 4-8 | y | She directs him to a different pg. to read from and questions whether his slide is the right one. |
| | 27 | 19, 25 | y | Leading? Statements as questions. |
| | 28 | 14-16 | y | Statement as question. |
| | 28 | 18-20 | y | Leading? |
| | 28 | 24-25 | y | She directs him to a different pg. to read from. |
| | 29 | 19 | y | She directs him to a different pg. to read from. |
| | 30 | 12-15 | y | Statement as question about witness' mistake/typo. |
| | 30 | 20-21 | y | She directs him to a different pg. to read from. |
| | 31 | 7, 9, 14 | y | Statements as questions. |
| | 31 | 17-23 | y | She says his answer is non-responsive and re-asks/states. |
| | 32 | 10-11 | y | She interrupts, although she "hates to," and says the witness doesn't understand what she asked him. |
| | 32 | 13-14 | y | Statement as question. |
| | 33 | 19-22 | y | Statement as question. |
| | 34 | 5-8 | y | Statement as question. Witness' answer corrects her question. |
| | 34 | 9, 11 | y | Statements as questions. |
| 2/8/7 | 35 | 7, 18 | y | Statement as question. |
| | 36 | 7-12 | Y | She directs him to a pg. on a different exhibit to read from. |
| | 37 | 7-8 | y | She directs him to a different pg. to read from. |
| | 37 | 9-17 | y | Statements as questions. |
| | 37 | 18-20 | y | She asks if he doubts interview transcript when he doesn't remember interview details but goes by exhibit/transcript. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|---|---|---|---|---|
| | 38 | 5-6 | y | Statement as question. |
| | 38 | 12-13 | y | She says she lost info the witness testified yesterday. |
| | 38 | 17-23 | y | She says his response doesn't answer her question and re-asks/states. |
| | 39 | 7-9, 19-21 | y | Statements as questions. |
| | 40 | 7 | y | She directs him to a different pg. to read from. |
| | 41 | 6-7 | y | She directs him to a different pg. and he has to ask what section to read from. |
| | 41 | 14 | y | She interrupts to say "slow" regarding his too-fast reading. |
| | 41-42 | 19-1 | y | Her questions seem condescending. |
| | 42 | 3 | y | She tells him he can now continue reading. |
| | 43 | 10 | y | Statement as question that reinterprets witness' previous answer. |
| | 43 | 14-20 | y | She switches to another source and he asks for a pg #. She hasn't given it to him yet |
| | 44 | 21-22 | y | Statement as question. |
| | 44-45 | 23-4 | y | She has to help him find where to read from. |
| | 45 | 9 | y | Statement as question. |
| | 45 | 23-25 | y | She directs him to a different pg. to read from. Statement as question. |
| | 46 | 11-20 | y | She emphasizes details about Paul and another child where Paul appears unsympathetic. |
| | 46 | 23-24 | y | She directs him to a different pg. to read from, this time giving a more detailed location. |
| | 47 | 6-7 | y | Statement as question. |
| | 47 | 9-10 | y | Leading? Suggestion about witness character/opinion? |
| | 48 | 7-8, 20 | y | Statements as questions. |
| | 49 | 12-14, 17, 19 | y | Statements as questions. |
| | 50 | 4, 17-19, 21, 25 | y | Statements as questions. |
| 2/8/7 | 51 | 3 | y | Statement as question that she assumes answer to. |
| | 51 | 6-7 | y | She directs him to a different pg. to read from, with a detailed location. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|------|------|-------|------------------------|------------------|
| | 52 | 11-12, 15-16 | y | Statements as questions. |
| | 52-53 | 24-5 | y | She directs him to a different pg, giving a more detailed location when witness asks. |
| | 53 | 20, 22, 25 | Y | Statements as questions. |
| | 54 | 8-9 | y | She directs him to a different location and uses ambiguous pronoun; Blumberg objects for clarity. |
| | 54 | 23 | y | She directs him to a different location to find answer. |
| | 55 | 3-5 | y | Statement as question. |
| | 55 | 7 | y | She directs him to a location. |
| | 55 | 16-23 | y | When witness responds with a question about her assumption, she rephrases. |
| | 56 | 25 | y | Statement as question. |
| | 57 | 24 | y | Statement as question. |
| | 58 | 1, 4-7 | y | Statements as questions. |
| | 58 | 15-19 | y | She belatedly realizes that witness' answer doesn't answer her question and re-asks/states. |
| | 59 | 5-8 | y | She mimics his phrase and gives him a pg #. |
| | 59 | 15-19 | y | She says his response doesn't answer her question and re-asks. |
| | 60 | 9-11 | y | Statement as question. Condescending? |
| | 60 | 17 | y | She interrupts witness. |
| | 61 | 13-23 | y | She waits until witness finishes long answer before saying she'd asked a different question and it's okay if he doesn't know the answer. When witness wants to explain more she says no and it's for redirect by Blumberg. Then she repeats the question. |
| | 62 | 1, 24 | y | Statements as questions. |
| | 62 | 7-8, 12-13, 17 | y | She directs him to a pg from his own report, then when she finishes the question, she says it's on a different pg. |
| | 63 | 8, 18-19, 24 | y | Statements as questions. |
| | 63 | 17 | y | After witness finishes speaking, she says there's no question for him (?) |
| 2/8/7 | 63 | 21-22 | y | She states/asks that she didn't write his power point. |
| | 64 | 9 | y | She interrupts his answer. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|---|---|---|---|---|
| | 64 | 3-7, 9-12, 15, 18-19, 21-23, 25 | y | Statements as questions. |
| | 65 | 2-3, 5-6, 8-10, 12-13, 15, 21, 24-5 | y | Statements as questions. |
| | 66 | 2-3, 10-11, 20-21, 24 | y | Statements as questions. |
| | 66-67 | 22-2 | y | Her statements as questions cast doubt on witness' and source's memories. |
| | 67 | 4-5, 13-14, 18, 20 | y | Statements as questions. |
| | 67 | 16 | y | Speculative? Inaccurate by use of "all?" Statement as question. |
| | 67-68 | 25-1 | y | She admits using her question to suggest something. Statement as question. |
| | 68 | 3 | y | Statement as question. Speculative? Leading? |
| | 68 | 14-21 | y | She tried to suggest a source for his answer he couldn't remember. |
| | 69 | 8 | y | She states as question what he already answered. |
| | 69 | 15-16 | y | She disagrees with his term and says "But whatever." |
| | 71 | 1-3, 11-12, 16-17 | y | Statements as questions. |
| | 72 | 3-6 | y | Statement as question. |
| | 72-73 | 7- | y,n bench | She changed a report and wants witness to read/confirm parts. The exhibit will be added later because she hasn't done it yet. Blumberg okays it. |
| | 74 | 1 | y | She possibly misspoke interview date. |
| | 73-74 | 23-14 | y | She admits exhibit after witness goes over it with her highlights. |
| | 75 | 1-2, 19-21 | y | Statements as questions. |
| 2/8/7 | 75 | 5 | y | She directs him to a pg. |
| | 75 | 23 | y | Statement as question. Correct interpretation of |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|---|---|---|---|---|
| | | | | report? |
| | 75-76 | 25-2 | y | Statement as question. |
| | 76 | 4-7 | y | Statement as question. Witness corrects her misinterpretation of report. |
| | 76 | 8-23 | y | She rephrases his answer to match her question. |
| | 76-77 | 25-4 | y | She again refers to the slide confusion that is still a problem. |
| | 77 | 5-14 | y | She points out more obvious mistakes from witness' presentation. |
| | 77 | 15-17 | y | Statement as question. |
| | 78 | 6-15 | y | She points out more mistakes from witness' presentation. |
| | 78 | 23-24 | y | Statement as question. |
| | 79 | 1-5 | y | She rephrases his answer to match her question. |
| | 79 | 6-7, 11 | y | Speculative? Leading? |
| | 79 | 21-22 | y | Statement as question. |
| | 80 | 11-12 | y | Statement as question. |
| | 80 | 20-22 | y | She interrupts witness and tells him he can finish on redirect. |
| | 80 | 23 | y | She changes detail from what witness had answered and is not corrected throughout questioning. |
| | 81 | 6-8 | y | She rephrases his answer as a statement/question so he confirms. |
| | 81 | 22-23 | y | She interrupts witness when he starts to answer astray. |
| | 82 | 11-20 | y | Her question references Paul's conviction. Judge overrules relevance objection and she continues questioning. |
| | 83 | 5-11 | y | Witness speculates in answer but no one mentions it. |
| | 83 | 12-15 | y | Repeat objection similar to pg 82. |
| | 83 84 | 20-21, 23-1 | y | Statements as questions. |
| | 84 | 2-4 | y | Witness starts to predict her question and she interrupts with actual question. |
| | 84 | 7-17 | Y | His response doesn't directly answer her question. |
| | 84 | 21-25 | y | Repeat objection similar to pgs 82 and 83. |
| | 86 | 18-19 | N, b | She comments that Miller will take the longest. |
| 2/20/7 | 4-10 | NA for | n | She wants alternate jurors re-asked questions |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|---|---|---|---|---|
|  |  | entire doc |  | about following the law and told 4 aggravating factors from preliminary instructions. Storrs thinks it's gratuitous and her previous case where there was a problem involved a different issue. She also doesn't want to specify a juror yet. |
|  | 11 |  | n | She corrects judge about juror. |
|  | 15 |  | n | She transfers former juror's book to someone. |
|  |  |  |  | Redirect of Miller by Blumberg |
|  | 21 |  | y | She objects to exceeding scope of cross; judge overrules. |
|  | 22-23 |  | y | She objects to exceeding scope of cross; judge sustains. |
|  | 24 |  | y | She objects; judge sustains. No grounds given. |
|  | 24-26 |  | Y, n bench | She objects to Blumberg misstating cross. Discuss at bench to determine what she said and how to proceed. |
|  | 28-29 |  | y | She objects to lack of foundation; judge sustains. |
|  | 29 |  | y | She objects to irrelevance; judge sustains. |
|  | 31 |  | y | She objects to exceeding scope of cross; judge overrules. |
|  | 34 |  | y | She objects to asked and answered; judge sustains. |
|  | 34 |  | y | She objects to exceeding scope of cross; judge sustains. |
|  | 34-36 |  | N, bench | Judge doesn't remember cross details, so G and Blumberg discuss what she asked about. She denies implications of defending Sabrina to the judge. Blumberg says that she "tried to have it both ways" and she denies going into those issues. Judge says he can't support his direct without being in cross. G and B disagree with her cross content. "ludicrous" judge allows Blumberg. |
|  | 37 | NA | y | She objects to lack of time frame twice; judge first says to lay foundation without officially ruling, second gives Blumberg specific guidance. |
|  | 40 |  | y | She objects to Blumberg misstating cross and that what she said isn't the evidence anyway. (?) judge sustains and says to rephrase. |
|  | 44 |  | y | She objects to calling for speculation about why Paul "did anything." Judge says witness can answer but no official rule. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|---|---|---|---|---|
| | 46 | | y | She objects; judge sustains. Blumberg asks the legal objection and judge provides it-B was asking something witness didn't recall. |
| 2/20/7 | 48 | | y | She objects to asked and answered; judge sustains. |
| | 48 | | y | She objects to leading before Blumberg finishes question; judge overrules. |
| | 49 | | y | She objects to question exceeding scope of cross and being accumulative. |
| | 49-50 | | N, bench | They discuss with judge the limits of her cross and that slide used during cross contained material outside of cross and can't be redirected. She says the witness may clarify topic and judge agrees. Blumberg continues that line of questioning. |
| | 52-53 | | y | She objects that Blumberg said she asked a question that she didn't. Judge says approach. |
| | 53 | | N, bench | She repeats her specific wording and explains it to Blumberg since Paul never killed anyone and she doesn't want to be misquoted. Blumberg doesn't understand problem. Judge says he's ruling on misstating testimony and Blumberg can ask the way judge phrased it. No official ruling. |
| | 54 | | y | She objects to irrelevant question regarding witness' impression of Gallagher's intimation. Judge overrules. |
| | 56 | | y | She objects to narrative. Judge says he was about to say something. No official ruling. |
| | | | | Jury questions |
| | 59 | | n | Judge gave her jury's questions before defense. |
| | 59-60 | | n | She doesn't think witness can answer one question that was allowed. She says the questions aren't in order anymore. Blumberg says it's ok but judge spent hours organizing them. |
| | 60 | | n | She recommends asking witness if he can answer another question. Others disagree. Blumberg says they overall agree with her assessment (but what is it?) |
| | 63 | | n | She and Blumberg don't want a question asked, but judge says it's ok and Blumberg says Storrs is correct and question is ok. |
| | | | | Jury questions – further exam by Blumberg |
| | 87 | | n | She comments on Blumberg's slow progress |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|------|------|-------|------------------------|------------------|
|  |  |  |  | when discussion is on trying to finish with witness on time. |
|  | 88 | NA | n | She brings up settling jury instructions: she's finished and submitted hers and hasn't gotten defense's or response. |
| 2/20/7 | 88 |  | n | She answers Blumberg's question on procedure. |
|  |  |  |  | Jury questions – further exam by Gallagher, mainly to find inconsistencies in his report and testimony. |
|  | 100 |  | y | She asks confusing question regarding Mike Speer's interview. |
|  | 100 |  | y | Statement as question. Defines depression as regulatory issue. |
|  | 100 |  | y | Statement as question. |
|  | 101 |  | y | Statements as questions. |
|  | 101 |  | y | Inaccurate question. |
|  | 102-103 |  | y | Statements as questions. Questions about material that witness did not put in report – beyond witness expertise, scope? |
|  | 104 |  | y | Blumberg objects; irrelevant and outside scope of juror questions. Maybe responsive to judge questions. Both overruled. |
|  | 105 |  | y | She rephrases witness' testimony and he corrects her. |
|  | 106 |  | y | Statements as questions. |
|  | 107 |  | y | Her diction is confusing to Blumberg. |
|  | 108 |  | y | Statement as question. |
|  | 108-09 |  | y | Her questions illustrate witness' weakness with dates. |
|  | 109 |  | y | Her question confuses witness. |
|  | 109-10 |  | y | Blumberg objects; outside scope of juror questions. Overruled. Her line of questioning involves subject they said would not be used. Different application of subject matter? |
|  | 110 |  | y | Statements as questions. |
|  | 111 |  | y | Blumberg objects; outside scope of juror questions. |
|  | 111-12 |  | N, bench | Judge explains earlier ruling. She explains her line of questioning and Blumberg has to agree. |
|  | 113-14 |  | y | Her question confuses witness and seems deliberately obtuse. Her clarification is not a question. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|------|------|-------|------------------------|------------------|
| | 115 | | y | Statements as questions. |
| | 116 | | y | She tells witness he changed subject; off-topic. |
| | 116 | | y | She asks question witness just gave answer to. |
| | 116 | | y | Statement as question. |
| | 117 | | y | Statements as questions. Witness questions her direction and she denies/lies about drawing a conclusion and tells him not to "worry about it." |
| 2/20/7 | 118 | | y | Statement as question. |
| | 119 | | y | She points out mistake witness made. |
| | 120 | | y | Statements as questions- she reinterprets witness' answer. |
| | 121-22 | | y | She says witness' answer doesn't answer her question. |
| | 123-24 | | y | Statements as questions. |
| | 124 | NA | y | Her question implies relation between two events that isn't explained. Lack of foundation? |
| | 125 | | y | She states as a question that the report has a mistake and witness says his memory might be mistaken. |
| | 125-26 | | y | Statements as questions and statements without questions that witness responds to. |
| | 126-27 | | y | She re-asks/rephrases questions when witness' answers don't answer her questions. |
| | 127 | | y | She rephrases witness' earlier testimony in her question. |
| | 128 | | y | When he clarifies earlier testimony, she says she thought she understood him the first time, and does he want to retract? |
| | 128-29 | | y | She waits to mention when his response doesn't seem to answer her question. |
| | 129 | | y | Statements as questions and statements without questions that witness responds to. |
| | 130 | | y | She asks if witness has the book to answer the question and there is confusion over which book/source. She directs him to a pg to read aloud and he requests more location. |
| | 131 | | y | Statement as question. |
| | 132 | | y | Statement as question. |
| | | | | Jury questions – further exam by Blumberg |
| | 133 | | y | She objects to Blumberg changing the question she asked; judge overrules. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|---|---|---|---|---|
| | 133 | | y | She objects to question exceeding scope. Judge calls to bench. |
| | 133-36 | | N, bench | Judge explains why he let her go through witness' report point-by-point. Blumberg is challenging her indirect response and she explains her strategy. She tells judge he gave Blumberg "enough" "latitude" and Blumberg says it's reversed. (She addresses them in second person and Blumberg continually uses titles.) Judge agrees with her but will allow Blumberg some leeway. |
| 2/20/7 | 137 | | y | She objects to not understanding form of question. Judge says rephrase but doesn't rule officially. |
| | 137-38 | | y | She objects to exceeding her questions; judge overrules. |
| | 141 | | y | She objects; judge sustains. No reason for objection given. |
| | 141-42 | | y | She objects to question exceeding scope; judge sustains. Blumberg to argues and gets some latitude. |
| | | | | Direct exam of Carla Lujan by Storrs |
| | 160 | | y | When asked, G objects to admitting exhibit that doesn't have known relevance. She comments about Storrs' mistake and using exhibit when no one's there. |
| | 161 | | y | G objects to irrelevance; judge overrules. |
| | | | | Cross exam of Carla Lujan by Gallagher |
| | 162 | | y | Statements as questions. |
| | 163 | NA | y | G notes witness is a lawyer and admonishes her about courtroom procedure. |
| | 163-65 | | y | Statements as questions. |
| | 165 | | y | Leading? |
| | 166-67 | | y | Statements as questions. |
| | 167 | | Y | G questions witness' answer and witness repeats it then qualifies it. |
| | 168 | | Y | G asks incomplete question that assumes info. Leading? |
| | 169 | | y | Statements as questions. Statement to witness phrased as demand, not question. |
| | 171- | | y | Statements as questions. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|------|------|-------|------------------------|------------------|
| | 72 | | | |
| | 172 | | y | G interrupts witness when her question is not being answered then says it was a yes-or-no question. |
| | 173 | | y | G re-asks/restates her question that witness already answered. |
| | 173-174 | | y | G re-asks her question that witness already answered and witness comments on it. |
| | 174 | | y | Statements as questions. |
| 2/20/7 | 176 | | y | Statements as questions. |
| | 177 | | y | Statement as question. |
| | 178 | | y | Statements as questions. |
| | 179 | | y | G corrects her mistake during question. |
| | 179-80 | | y | Statements as questions. |
| | 182 | | y | Statements as questions. |
| | 183 | | y | G starts to rephrase her question when witness' first answer is non-responsive. |
| | 183 | | y | Statement as question. |
| | 185 | | y | Statement as question and statement without question about witness' testimony contradicting itself. |
| | 187 | | y | Statements as questions. |
| | 187-88 | | y | G re-asks her question that witness had answered off-subject. |
| | 188 | | y | Statement as question. |
| | 189 | | y | Statement as question. |
| | 190 | | y | Statements as questions. |
| | 191 | | y | Statement as question. |
| | 192 | | y | G makes statements without questions as well as questions phrased as statements. |
| | 193 | | y | Statement as question. Leading? |
| | 194 | | y | Witness' answer is non-responsive but it isn't mentioned. |
| | 194-95 | | y | Statements as questions. |
| | | | | Redirect exam of Carla Lujan by Storrs |
| | 199 | NA | y | G objects to exceeding scope of cross; judge sustains. |
| | 201 | | n | G makes derisive/joking comment about Herman(?) |
| 2/22/7 | | | | Direct exam of William Womble by Storrs |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|---|---|---|---|---|
| | 5 | 24-25 | y | She objects to relevance; judge overrules. |
| | 7 | 2-3 | y | She objects to relevance; judge overrules. |
| | 8 | 9-13 | y | She objects to witness giving answer not related to question; judge sustains. |
| | 8-9 | 23-2 | y | She objects; judge sustains. No reason given. Probably non- responsive answer. |
| | 9 | 21-24 | y | Judge sustains then she objects. No reason given. Probably non- responsive answer. |
| | 10 | 2-8 | y | She objects to lack of foundation. Judge requests more foundation but doesn't officially rule. |
| | 39 | 18-22 | y | She objects to question misinterpreting report. Judge says to rephrase but doesn't officially rule. |
| 2/22/7 | 42 | 6-14 | y | She objects to inappropriately reminding witness who wasn't present for occasion. Judge sustains. |
| | 42-43 | 21-4 | y | She objects to question assuming witness had a realization. Judge says testimony supports it and allows questioning but doesn't rule officially. |
| | 43 | 21-24 | y | She objects to leading; judge sustains and says to rephrase. |
| | 47 | 8-14 | n | She corrects judge. |
| | 49 | 23-24 | y | She supplies exhibit # when Storrs doesn't remember. |
| | 50 | 1-5 | y | She objects to lack of question before Storrs finishes speaking. Judge tells Storrs to continue without ruling officially. |
| | 50 | 12-17 | y | She objects; judge sustains. No reason given. Probably non- responsive answer. |
| | 51-52 | 24-2 | y | She interjects to give the approximate dates and judge agrees jury can accept as fact. |
| | 53 | 7-13 | y | She objects that witness answered question and already refreshed memory. Judge sustains. |
| | 54 | 11-17 | y | She objects that witness is thinking of his answer when Storrs interrupts witness. Judge sustains. |
| | 55 | 9-13 | y | She objects to repeat question, asked and answered. Judge overrules and allows once more. |
| | 56 | 15-17 | y | She objects to leading; judge says to rephrase but doesn't officially rule. |
| | 57 | 9-14 | y | She objects to get clarity; Storrs answers. |
| | 58 | 13-15 | y | She objects to approach. |
| | 58-59 | 18-2 | N, bench | She says Storrs is "spoon-feeding' the witness' testimony and gives him advice to "do it properly." He agrees. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|------|------|-------|------------------------|------------------|
| | 59 | 7-11 | y | She objects to Storrs misinterpreting report; judge says to rephrase but doesn't officially rule. |
| | 59-60 | 23-3 | y | She objects to Storrs asking about someone witness said he didn't remember. Leading? Judge sustains. |
| | 61 | 14-19 | y | She objects to lack of question from Storrs; he asks and judge doesn't rule. |
| | 62 | 14-21 | y | Storrs' question is phrased as a statement and she objects to lack of question. Judge sustains. They didn't hear it as a question? |
| | 66 | 11-16 | y | She objects to leading question with term "domestic violence." Judge says rephrase but doesn't officially rule. |
| 2/22/7 | 69 | 1-4 | y | She objects for foundation and judge directs Storrs but doesn't officially rule. |
| | 71 | 1-5 | y | She objects to leading question; judge overrules. |
| | 71 | 12-16 | y | She objects to leading question; judge wants it rephrased but doesn't officially rule. |
| | 74 | 5-11 | y | She objects to compound question; judge says it was a statement and directs Storrs to ask. No official rule. |
| | 74 | 13-19 | y | She objects that witness didn't say he needed refreshed memory. Judge doesn't rule but says to continue to speed up. |
| | 77 | 19-22 | y | She objects to relevance; judge sustains. |
| | 77-78 | 24-2 | y | She objects to relevance; judge changes his mind and tells Storrs to continue. No official rule. |
| | 79 | 8-10 | y | She objects for time frame foundation and judge doesn't officially rule when Storrs clarifies. |
| | 79 | 16-20 | y | She objects to question making assumption. Judge says rephrase but doesn't officially rule. |
| | 80 | 5-8 | y | She objects to question already answered; judge sustains. |
| | 81 | 1-5 | y | She asks for time frame with officially objecting; Storrs gives it. |
| | 81 | 13-15 | y | She objects to leading question; judge sustains. |
| | 83-84 | 24-4 | y | She objects to question rephrased from witness' answer; judge sustains. |
| | 84 | 15-19 | y | She objects to assuming facts in evidence; judge sustains. |
| | 88 | 4-7 | y | She objects to leading question; judge sustains. |
| | 89- | 25- | y | She objects to leading question; judge sustains. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|------|------|-------|------------------------|------------------|
| | 90 | 4 | | |
| | 90 | 12-18 | n | Storrs says he wants to lead a little. She says no and that he has to get used to direct exam and it's not as easy as defense attorneys think. |
| | 95 | 22-25 | N, 1 | She reminds judge about jury contamination. |
| | 98 | 5-6 | N, 1 | She tells juror not to talk about issue. |
| | 105 | 1 | N, 1 | She tells a juror they know the jurors by #. |
| | 119 | 10-12 | n | She doesn't have a problem continuing trial when 2 jurors have seen and discussed extraneous material; Storrs explains the violations and reasons for moving for mistrial. |
| | 120 | 22-24 | n | She interrupts mistrial argument to discuss court schedule and jurors. |
| | 121 | 18 | y | She interjects with jury instruction while judge is giving them. |
| 2/22/7 | 124-25 | 13-8 | N, bench | She doesn't want any part of newspaper allowed in jury room. Further disagreement with Storrs. |
| | 128-29 | 18-19 | n | She disagrees that jury should be asked if recent court/death penalty news has affected their opinions. Storrs admits he should have brought it up sooner. |
| | 131 | 23-25 | n | She interrupts judge with false correction. |
| 2/26/7 | 12 | 14-23 | n | She explains to Storrs about juror/atty issue. |
| | 13-14 | 25-2 | n | She mentions problem with juror seeing Paul in handcuffs. |
| | 20 | 2-16 | n | While arguing against mistrial and for striking juror, she mentions previous juror issue and juror's last name, which was discussed as not wanted on record. |
| | 21 | 1-9 | n | Judge thinks she was agreeing with Blumberg that juror should be excused, but B says they didn't ask for that yet. |
| | 26 | 4-24 | n | She wants juror that defense had approved of removed for potential taint then parrots judge about getting more info. |
| | 30-32 | 22-7 | n | She argues about unwaivable issue recurring if death penalty is chosen and jury taint. At one point when Storrs interrupts, she tells him to stop and asks to finish. |
| | 34 | 5-14 | n | She argues for defendant's right not to be seen in handcuffs, says it's a fallacy and changes subject to court schedule. |
| | 37 | 8-21 | N, 1 | She observed incomplete juror answer and |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|------|------|-------|------------------------|------------------|
| | | | | prompted to finish, which judge agreed with and had skipped over. |
| | 38-39 | 20-23 | N, 1 | She questions juror about handcuff issue and uses examples of wrong behavior. Storrs doesn't question juror. |
| | 45-46 | 20-19 | n | Blumberg asks question about juror risk and she says juror has to be stricken since B just refused to waive. She argues human nature and it's better to just eliminate problem possibility. |
| | | | | Direct exam of William Womble by Storrs cont. |
| | 51 | 4-8 | y | She objects for foundation and judge sustains. |
| | 51 | 11-15 | y | She objects to unhelpful foundation and judge sustains. |
| | 52 | 10-12 | Y | She objects; judge sustains. No reason given. |
| | 52 | 13-19 | y | She objects for relevance before Storrs finishes question and judge directs Storrs to do question and answer. She mentions relevance objection and judge says he sustained it. He didn't use official terms. |
| 2/26/7 | 52-53 | 21-2 | y | She objects for relevance; judge sustains. |
| | 60 | 18-23 | y | She stipulates documented info. Storrs accepts. Jury to accept as fact. |
| | 61 | 4-8 | y | She objects; judge sustains. No reason given. |
| | 61-62 | 24-5 | y | She objects that question assumes facts not in evidence; judge sustains and says to rephrase. |
| | 63 | 1-3 | y | She objects to leading when Storrs says "for example;" judge sustains. |
| | 63 | 19-22 | y | She objects to leading; judge sustains. |
| | 66-67 | 22-4 | y | She objects to repeat questioning and testimony; judge agrees and sustains. |
| | 68 | 15-21 | y | She objects to Storrs misstating history; judge says to lay more foundation. No official ruling. |
| | 71 | 14-18 | y | She interrupts witness to object that there is no question; judge sustains. |
| | 73 | 4-8 | y | She objects that witness' answer wasn't about question; judge sustains. |
| | 76-77 | 18-2 | y | She objects for specific info; Storrs gives it and judge sustains. |
| | 77 | 8-12 | y | She objects for relevance; judge overrules. |
| | 77-78 | 20-13 | y | She stipulates info. Storrs is confused about details and she is correct; he concedes and |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|------|------|-------|------------------------|------------------|
| | | | | accepts stipulation. |
| | 78 | 20-24 | y | She interrupts witness to object that there is no question; judge sustains and tells Storrs to ask question. |
| | 80 | 6-13 | y | She wants to approach so she "can help Mr. Storrs" but Storrs tells info and she agrees "yep.' |
| | 80 | 16-20 | y | She directs judge's attention to juror then makes a joke. |
| | 81 | 11-16 | y | She objects to rambling and non-responsive testimony; judge sustains. |
| | 81 | 24-25 | y | When Storrs makes a statement to witness she says they stipulated it. |
| | 82 | 5-18 | y | She objects to Storrs not giving enough info before suggesting witness use documentation to help memory; judge confuses subject matter and asks about the question. No official ruling. |
| | 82-83 | 22-15 | y | She interjects with correct info and argues with Storrs about it and location of info. She asks to approach. |
| 2/26/7 | 84 | 9-18 | y | Before she stipulates, she demands date from Storrs and interrupts him to tell him to read it, then stipulates. |
| | 85 | 2-9 | y | She objects to lack of foundation and judge sustains. Storrs starts to argue and judge says he'll allow if asked differently. |
| | 85-86 | 20-1 | y | She objects to question form. Judge agrees and says re-ask. No official rule. |
| | 86 | 17-21 | y | She objects; judge sustains. No reason given. Leading? |
| | 87 | 16-22 | y | She interrupts witness to object that there is no question; judge says he's explaining and tells witness to continue. |
| | 89 | 5-9 | y | She objects to question asked and answered. Judge sustains. |
| | 89 | 12-16 | y | She objects to witness' comment and wants it stricken. Judge sustains twice. |
| | 89-90 | 18-12 | N, bench | They discuss stricken comment and she needs witness instructed about not giving his opinion. Storrs is fine with that. Judge will allow area but not commenting on evidence. She wants recess for others to talk. |
| | 92 | 20-25 | n | She specifies limits to witness' opinion testimony and interrupts judge. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|------|------|-------|------------------------|------------------|
|  | 93 | 17-20, 11-15 | n | She interrupts judge to make joke involving juror. |
| 2/27/7 |  |  |  | Cross exam of William Womble by Gallagher |
|  | 12 | 3-4, 6-9 | y | Statements as questions. Leading? |
|  | 12 | 14-17 | y | Leading? |
|  | 12-13 | 23-2 | y | Statement as question. Storrs objects to question form; judge sustains. |
|  | 13 | 3-10 | y | Statements as questions. |
|  | 13-14 | 25-8, 14, 20 | y | Statements as questions. |
|  | 15 | 19 | y | Statement as question. |
|  | 16 | 3-4, 10-11 | Y | Statements as questions. |
|  | 16 | 6-8 | Y | Statements as questions; assumes facts. |
|  | 17 | 7-8 | y | Statement as question. |
|  | 18 | 11-12 | y | Statement instead of question that witness responds to. |
|  | 18 | 16-19 | y | Statement as question. |
|  | 19 | 9-10, 16, 23-24 | y | Statements as questions. |
| 2/27/7 | 20 | 23-24 | y | Statement as question. |
|  | 21 | 1-3 | y | Statement as question. |
|  | 22 | 1 | y | She directs him to exhibit and pg. |
|  | 22 | 6-7 | y | She says wrong date but it isn't mentioned. |
|  | 22 | 9-11 | y | Statement as question. |
|  | 23 | 11-12 | y | She directs him to different pg at his presumed request. |
|  | 23 | 14 | y | Statement as question. |
|  | 23-24 | 23-1 | y | Statement as question. Leading? |
|  | 24 | 9-12 | y | Statement as question. Leading? |
|  | 24 | 14-19 | y | Possible incorrect restatement of testimony? |
|  | 25 | 9-15, 23 | y | Statements as questions. Witness has hard time remembering specific details. |
|  | 25-26 | 25-4, 12-14 | y | Leading? Phrasing? |
|  | 26 | 16-17, 24-25 | y | Statements as questions. |
|  | 27 | 7-8 | y | She directs him to different pg. |
|  | 27 | 10-15 | y | Confusing phrasing. |
|  | 27- | 23- | y | Statements as questions. Rephrases witness' |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|---|---|---|---|---|
| | 28 | 4 | | answer in question. |
| | 28 | 6, 19-20 | y | Statements as questions. |
| | 29 | 1 | y | She directs him to different pg. |
| | 29 | 17-19 | y | Leading? Lack of foundation? |
| | 31 32 | 2-3, 14-2 | y | Statements as questions. |
| | 32 | 4-8 | y | She says his response doesn't directly answer her question. She re-asks. |
| | 32 | 9-12 | y | His response doesn't directly answer her question but she rephrases it in her next statement/question to confirm the answer she was seeking. |
| | 32 | 21, 23 | y | Statements as questions. |
| | 33 | 2-4 | y | Statement as question. Rephrases witness' answer in question and he corrects her in answer. |
| | 33 | 9-10 | y | Statement as question. |
| | 33 | 12-16 | y | She says his response doesn't directly answer her question. She re-asks. |
| | 34 | 9-13, 18-23 | y | She confirms testimony by stating as a question so witness will repeat. |
| | 35 | 3-6, 9-10 | y | Statements as questions. |
| 2/27/7 | 35 | 14-25 | y | Statements instead of questions that witness responds to. |
| | 36 | 5-8 | y | Statement as question. Rephrases witness' answer in question. |
| | 36 | 10-16 | y | Statements as questions. |
| | 36-37 | 25-4, 9, 11, 18-19 | y | Statements as questions. |
| | 37-38 | 21-1 | y | Reinterprets witness' answer in question. Assumes facts not in evidence. |
| | 39 | 10-14 | y | Her question assumes facts, and he corrects her in answer. |
| | 40 | 4-6, 11-12, 14-16 | y | Statements as questions. |
| | 41 | 6-7, 9-12 | y | Statements as questions. |
| | 42-43 | 21-17 | N, bench | Discussion over her asking witness subject that could incriminate him if answered. Judge allows cautiously. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|---|---|---|---|---|
|  | 43 | 22-25 | y | She directs him to different exhibit and pg. |
|  | 44-45 | 22-2 | y | Storrs objects. Assumes facts not in evidence. Judge overrules. |
|  | 45 | 7-15 | y | Storrs objects to misstating evidence. She corrects- no ruling. |
|  | 45 | 16-17 | y | Statement as question. |
|  | 46 | 1-3 | y | Statement as question that makes assumption. |
|  | 46 | 15-17 | y | Statement as question. Rephrases witness' answer in question. |
|  | 46 | 19-20 | y | Leading, reinterpreting witness' testimony. |
|  | 46 | 25 | y | Statement as question. |
|  | 47 | 2 | y | Statement as question. |
|  | 47 | 12 | y | Statement as question that witness wouldn't know answer to. She interrupts him and moves on. |
|  | 47 | 21-22 | y | Statement as question. |
|  | 48 | 5-10 | y | Statements as questions. Confusing line of reasoning. |
|  | 48-49 | 22-2 | y | Statement as question. |
|  | 49 | 21-24 | y | Statements as questions. Leading? |
|  | 50 | 1 | y | Statement as question. Leading? |
|  | 50 |  |  | Redirect of William Womble by Storrs |
|  | 53 | 1-5 | y | She objects to leading; judge sustains and says to rephrase. |
| 2/27/7 | 54 | 8-13 | y | She objects to exceeding scope of cross; judge overrules. |
|  | 55 | 10-18 | y | She objects to leading; judge says to make it a question. No official ruling. |
|  | 55 | 19-24 | y | She objects to question asked and answered; judge overrules. |
|  | 57 | 15-20 | y | She objects to assuming facts not in evidence; judge sustains. |
|  | 58 | 2-8 | y | She objects to misstating evidence; judge says approach. |
|  | 58 | 11-21 | N, bench | She explains objection at judge's behest and judge says to ask differently. |
|  | 59 | 11-17 | y | She interrupts witness and objects to witness' speculating. Judge addresses witness but doesn't officially rule. |
|  | 59 | 21-25 | y | She objects to exceeding scope of cross; judge sustains. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|------|------|-------|-------------------------|------------------|
| | 61-62 | 21-4 | y | She objects to exceeding scope of cross; judge says to rephrase. |
| | 63 | 10-14 | y | She interrupts and objects that question was already answered; judge sustains. |
| | 64 | 8-12 | y | She objects to exceeding scope of cross; judge sustains. |
| | 64 | 18-21 | y | She objects to leading once; judge sustains twice. |
| | 65 | 2-5 | y | She objects to assuming facts not in evidence; judge sustains. |
| | 65 | 13-18 | y | She objects to exceeding scope of cross; judge sustains. |
| | 72 | 2-6 | y | She objects to exceeding scope of cross; judge sustains. |
| | 72 | 11-25 | N, bench | She interrupts Storrs with "shush." Joke? He continues his reasoning; she explains her objection, "beating a dead horse." |
| | 74-75 | 23-2 | y | She objects to exceeding scope of cross; judge let's Storrs continue but doesn't officially rule. |
| | 76 | 18-25 | y | She objects to record admission-no foundation and irrelevant; judge will wait to decide. |
| | 78 | 16-20 | y | She objects to correct Storrs' info. Judge thanks her. |
| | 80 | 1-5 | y | She objects to exceeding scope of cross; judge sustains. |
| | 81 | 1-8 | N, bench | She doesn't want juror question asked. |
| | 81-82 | 20-8 | n, bench | She tries to clarify juror question and disagrees with Storrs over meaning. |
| 2/27/7 | 82 | 17-25 | n, bench | Juror question subject she objected to. Joke about her objections? |
| | | | | Further exam of William Womble by Storrs |
| | 93 | 9-17 | y | She objects that witness answered question but rephrases testimony. Judge allows witness to continue. No official rule. |
| | 93-94 | 24-2 | y | She says leading without formal objection. Judge sustains and says to rephrase. |
| | 95 | 5-10 | y | She objects to question asked and answered; judge allows one more chance to answer. No official rule. |
| | 94 | 17-22 | y | She starts to interrupt but judge sustains then says asked and answered. She didn't have a chance before he interrupted. |
| | 95 | 3-9 | y | She objects once with how witness already |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|---|---|---|---|---|
|  |  |  |  | answered; judge sustains twice. |
|  | 95 | 10-15 | y | She objects to leading; judge sustains. |
|  | 96 | 14-17 | y | She objects; judge sustains. No reason given. Leading? |
|  | 96-97 | 21-8 | y | She objects that witness didn't finish answering question; judge sustains and doesn't want narrative. |
|  | 99 | 2-6 | y | She objects to leading; judge sustains and says to rephrase. |
|  |  |  |  | Further exam of William Womble by Gallagher |
|  | 101 | 15 | y | Statement as question. |
|  | 102 | 8, 17-18, 20-21 | y | Statements as questions. |
|  | 103 | 2 | y | Statement as question. |
|  | 103 | 4-5 | y | Statement as question. Leading? |
|  | 103 | 9-10 | y | Statement as question. |
|  | 103 | 21 | y | Question asked and answered. |
|  | 103 | 25 | y | Statement as question. |
|  | 104 | 1-2 | y | She rephrases testimony in follow-up question. Leading? |
|  | 104 | 4-5 | y | Her question makes an assumption/judgment. |
|  | 104 | 16-17, 23 | y | Statements as questions. |
|  | 105 | 3-4 | y | Statement as question. |
|  | 105 | 8-11 | y | Storrs objects for foundation. Judge overrules. |
|  | 105 | 15-16 | y | Statement as question with assumption. |
|  | 106 | 2-3, 5-6 | y | Statements as questions. |
| 2/27/7 | 106 | 17 | y | Statement as question. Leading? |
|  | 106 | 20-23 | y | Self-corrects more than once on mistaken date. |
|  | 107 | 5 | y | Statement as question. Leading? |
|  | 107 | 7-8 | y | Statement as question. |
|  |  |  |  | Further exam of William Womble by Storrs |
|  | 107 | 17-19 | y | She objects to leading before Storrs finishes speaking. Judge asks for question. No official ruling. |
|  | 107-108 | 23-2 | y | She objects to exceeding scope of question; judge sustains. |
|  | 108 | 9-18 | y | She objects to witness giving answer not related to question; judge sustains. |
|  | 111 |  |  | Direct exam of Susan Parrish by Storrs |
|  | 115 | 7-21 | y | G gives technical suggestions. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|------|------|-------|------------------------|------------------|
| | 134-135 | 21-8 | N, bench | G wants material marked to show where witness is reading from. |
| | 151 | 18-22 | y | Storrs offers exhibit to be added but G made it and made copies for jurors. |
| | 153 | 18-23 | y | G helps witness find her copy of material. |
| | 159-160 | 17-13 | n | Storrs has a problem with G's statements to jury. She interrupts judge to protest defense talking to her during testimony. |
| 2/28/7 | | | | Direct exam of Pablo Stewart by Storrs |
| | 20 | 6-9 | y | She objects to leading; judge says to rephrase. No official rule. |
| | 23 | 14-18 | N, bench | She wants Storrs to ask witness to clarify source/s he refers to. |
| | 33-34 | 12-5 | Y, n, bench | She doesn't want witness to comment on Paul's behavior during course of trial. Storrs will rephrase question for witness. |
| | 43 | 6-8 | y | She objects to question asked and answered then says to continue. Judge doesn't speak. |
| | 50 | 21-24 | y | She objects to leading; judge sustains. |
| | 53 | 1-8 | y | She objects for relevance; judge overrules. |
| | 54 | 14-25 | N, bench | She says Storrs opened door to line of questioning; she wasn't planning to go in that direction, but now she is. Storrs tries to argue against it, but judge says it was already in evidence. |
| | 56 | | | Cross exam of Pablo Stewart by Gallagher |
| | 57 | 9-12 | y | Statement as question includes personal thought/sarcasm (?). |
| | 58 | 6-7, 23-25 | y | Statements as questions. |
| 2/28/7 | 59 | 23-25 | y | Statement as question that rephrases witness' testimony. |
| | 60 | 3-5 | y | Statement as question. |
| | 61 | 14 | y | She misstates witness. |
| | 61 | 19-21 | y | Statement as question. |
| | 62 | 9-12 | y | She asks confusingly-phrased question. |
| | 62 | 16-18 | y | Statement as question that misstates witness' testimony and witness denies saying it. |
| | 64 | 12-17 | y | She directs witness to exhibit pg and assists in finding location. |
| | 65 | 12-13 | y | She directs witness to different pg. |
| | 66- | 2- | y | After directing witness to read from exhibit, she |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|------|------|-------|------------------------|------------------|
| | 68 | 23 | | periodically corrects or asks about words. |
| | 69 | 4 | y | She directs witness to different pg. |
| | 69 | 11-12 | y | Statement as question. |
| | 69-70 | 14-6 | y | She again has witness read from exhibit. |
| | 70 | 10 | y | She directs witness to different pg. |
| | 70 | 20 | y | She directs witness to different pg. |
| | 70-71 | 23-14 | y | After directing witness to read from exhibit, she periodically assists to correct or explain words of her own volition or when asked by witness. |
| | 71-72 | 21-13 | y | She directs witness to continue reading aloud, correcting mistakes when applicable. |
| | 73 | 8-24 | y | She directs witness to continue reading aloud, interrupting to comment. |
| | 74 | 7-8 | y | Statement as question. |
| | 74 | 10-19 | y | Statements as questions. She re-asks question when his response doesn't directly answer it. (His answer might be expanded on but is limited by question phrasing.) |
| | 75 | 8-12 | y | She directs witness to pg in his report when he hints. |
| | 76 | 2-3, 5-7 | y | Statements as questions. |
| | 76 | 14-16 | y | She asks question with incorrect pronoun use addressing witness. No one mentions. |
| | 77 | 1 | y | She directs witness to pg in different exhibit/book. |
| | 77 | 7 | y | She mentions different pg to witness. |
| | 77 | 24-25 | y | Statement as question with assumption of witness conclusion. |
| | 78 | 2-3 | Y | Statement as question. |
| | 79 | 23-24 | y | Statement as question. |
| | 80 | 1-2 | y | Statement as question that rephrases witness' testimony. |
| 2/28/7 | 81 | 23-25 | y | She responds to witness' correction of her pronunciation with "whatever." |
| | 82 | 22-25 | y | Statements as questions. |
| | 83 | 2, 6-7 | y | Statements as questions with assumptions or misstatements of witness' words. |
| | 83 | 10 | y | Statement as question. |
| | 83 | 12-14 | y | Witness seems to answer non- responsively but it isn't mentioned. |
| | 83 | 15-16 | y | She directs witness to location on pg. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|---|---|---|---|---|
| | 84 | 7-8 | y | She states that he made an assumption. More foundation needed? |
| | 84 | 18-19 | y | Statement as question. |
| | 85 | 15-18 | y | Leading? |
| | 86 | 5-6 | y | Statement as question. |
| | 86 | 11 | y | She directs witness to different pg. |
| | 86 | 20-23 | y | She directs witness to pg in another exhibit. |
| | 87 | 6-7, 16-17, 23 | y | Statements as questions. |
| | 88 | 5 | y | Statement as question. |
| | 88 | 10-11 | y | She makes disparaging remark when reading from his report. |
| | 88 | 12-24 | y | She reads one short section of witness' report yet says one detail in it is "prevalent" in the report without providing more examples. |
| | 90 | 13 | y | Non-specific statement as question. |
| | 91 | 7-8, 19-20 | y | Statements as questions. |
| | 92 | 7-10 | y | Her question phrased as a statement contradicts/misstates witness' testimony and witness contests it. |
| | 93 | 5, 23 | y | Statements as questions. |
| | 94 | 1 | y | She gives witness another pg # and he reads aloud from it. |
| | 94 | 9 | y | She interrupts witness' response/reading to point out omission. |
| | 94 | 18-19 | y | Statement as question that witness answers non-responsively. |
| | 95 | 2-4 | y | Statement as question. |
| | 95-96 | 15-2 | y | Statements as questions that witness answers non-responsively. She asks/states that he was "assuming" which he agrees with. Leading? |
| | 96 | 11-13 | y | Statement as question. |
| | 96 | 16-21 | y | Statement as question. Storrs objects to misstating evidence. Judge sustains. She interrupts judge to continue questioning. |
| 3/1/7 | 4-5 | 20-15 | n | G objects to part of witness' report, Storrs refutes, and judge gives G broad scope in cross. |
| | 8-10 17 | 20-16 | n | She casts doubt on defense's juror objection, especially why they waited to mention problem and defense impropriety to different juror. Judge will admonish jury and observe them. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|------|------|-------|------------------------|------------------|
| | | | | Direct exam of Susan Parrish by Storrs cont |
| | 40 | 8-17 | N, bench | G says Blumberg "jabbering" to Paul during testimony is distracting her. |
| | 42-43 | 15-3 | y | G starts to mistakenly voir dire the witness based on wrong exhibit. Storrs corrects her. |
| | | | | Voir dire of Parrish by Gallagher |
| | 44 | 20-25 | y | When G voir dires she directs witness to pg in "big book." |
| | 45 | 10-14 | y | G asks question that witness doesn't directly answer but responds to G's suggestion. |
| | 45 | 16-19 | y | G objects when witness has info G hasn't seen. |
| | 45-46 | 23-24 | N, bench | G says it's "convenient" that witness and defense have "come up with" new information after telling G differently and don't have new info to give G. G says "shush" to Storrs when he mentions getting court order. |
| | 47 | 5-8 | N, bench | G corrects judge regarding court schedule. |
| | 47 | 13-18 | N, bench | G corrects Storrs' misinformation. |
| | 47-48 | 20-5 | N, bench | G explains why she didn't realize she was missing info sooner. Storrs says she was given list of data. |
| | 48 | 9-18 | N, bench | G wants to see if witness can get info so trial time isn't wasted. |
| | 50 | | | Direct exam of Susan Parrish by Storrs cont. |
| | 60-61 | 23-5 | y | G objects to misreading by witness and corrects her. |
| | 63 | 12-14 | y | G interrupts witness to rephrase answer for her. |
| | | | | Voir dire of Parrish by Gallagher |
| | 64 | 12-13 | y | Statement as question. |
| | | | | Direct exam of Susan Parrish by Storrs cont. |
| | 73 | 3-11 | N, bench | G doesn't want Blumberg accusing her of misconduct or to be taken advantage of, but she didn't make a book yet for defense to use and wanted to let Storrs know. |
| | 73-74 | 12-10 | N, bench | G doesn't want inappropriate comparisons in testimony. Storrs is asking about interpretation, and judge says G'll have more for cross. G wants marked copy. |
| 3/1/7 | 76 | 16-22 | y | G objects to witness' response that doesn't answer question. Storrs and witness make correction and judge doesn't speak/rule. |
| | 78 | 13-17 | y | G objects to leading; judge overrules-Storrs was |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|---|---|---|---|---|
| | | | | correcting witness. |
| | 80 | 20-21 | y | G interrupts judge's instructions to her and he tells her to let him finish. |
| | 81 | | | Cross exam of Susan Parrish by Gallagher |
| | 81 | 10-11 | y | Statement as question; G self-corrects mistaken title. |
| | 81 | 20-25 | y | G directs witness to pg to read to jury. |
| | 82-83 | 25-7 | y | G makes mistaken interpretation of material in her question phrased as a statement and witness corrects. |
| | 83 | 17-19, 24 | y | Statements as questions. |
| | 84 | 23-24 | y | Incomplete statement as question. |
| | 85 | 1-4 | y | G interrupts witness to clarify what G'd asked. |
| | 85 | 11-12 | y | Statement as question. |
| | 85-86 | 14-4 | y | G directs witness to pg in exhibit but is incorrect. Witness and Storrs help. The disruption confuses witness. |
| | 86 | 17-18, 20 | y | Statements as questions. |
| | 87 | 13-14 | y | Statement as question. |
| | 87 | 19-20 | y | Statement as question that witness was "arguing" with G. Leading or misstatement? |
| | 87 | 22-25 | y | G directs witness to different pg in exhibit to read from. |
| | 88 | 12-13 | y | G helps witness locate info. |
| | 88 | 18-19 | y | Statement as question. |
| | 89 | 15, 19 | y | Statements as questions. |
| | 90 | 11, 18-20 | y | Statements as questions. |
| | 91 | 18 | y | Statement as question that rephrases witness' answer. |
| | 91-92 | 25-1 | y | G repeats question that witness did not directly answer. |
| | 92 | 5-8 | y | Leading? |
| | 92 | 19-20, 22-23 | y | Statements as questions. |
| | 93 | 9 | y | Statement as question. Leading? |
| 3/1/7 | 93 | 11, 13, 15-16 | y | Statements as questions. |
| | 93 | 18-20 | y | G directs witness to pg to read to jury. |
| | 94 | 5-6 | y | Statement as question. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|---|---|---|---|---|
| | 94 | 8-19 | y | Statement as question that G misstates evidence witness read. Witness corrects G and is interrupted with another misinterpretation/assumption. |
| | 94 | 20 | y | Statement as question. |
| | 94 | 22-23 | y | Statement as question with assumption. |
| | 95 | 12 | y | Statement as question with interpretation of witness' testimony. |
| | 95 | 21-24 | y | G asks question with possibly incorrect interpretation of witness' report or testimony that witness refutes. |
| | 96 | 3-11 | y | G interrupts witness' non-responsive answer and re-asks. |
| | 96-97 | 25-1 | y | Statement as question. |
| | 97 | 5, 11, 23 | y | Statements as questions. |
| | 97-98 | 25-1 | y | Statement as question. |
| | 98 | 4, 18-19, 22-23 | y | Statements as questions. |
| | 98-99 | 25-1 | y | Statement as question. |
| | 99 | 3, 8-9,12 | y | Statements as questions. |
| | 99-100 | 25-1 | y | G comments on witness sitting in "hall all afternoon" when scheduled to testify. |
| | 100 | 4, 9, 15, 17 | y | Statements as questions. |
| | 107-108 | 19-24 | n | G wants motion record corrected after previous testimony. |
| 3/5/7 | 7 | 3-5, 11-12 | n | She corrects Storrs' decision. |
| | 8 | 14-16 | n | She corrects/updates Storrs' statement. |
| | 9 | 2-24 | n | She requests and will get complete report from defense that they had objected to her having before. |
| 3/8/7 | | | | Direct exam of Susan Parrish by Storrs cont. |
| | 7 | 3-5 | y | G interrupts witness to complain to judge about hearing witness. |
| | 20-21 | 25-1 | y | G interrupts witness to ask for pg #. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|------|------|-------|------------------------|------------------|
| | 25 | 15-19 | N, bench | G wants Storrs' new exhibit put in correct order before jury saw it so as not to be misleading. |
| | 25 | 24-25 | y | When witness confirms exhibit is in correct order, G says she has no objection "now," though she hadn't formally objected before. |
| | 28-29 | 22-11 | y | G objects twice to non-responsive testimony. Judge sustains twice. |
| | 29 | 12-15 | y | G objects to leading. Judge overrules and says to continue. |
| | 30 | 14-16 | y | G interrupts witness to criticize Storrs' line of questioning and that there wasn't a question. Judge says to re-ask. No official objection. |
| | 38 | 12-15 | y | G says witness can look at her notes as long as G can at same time. |
| | | | | Cross exam of Susan Parrish by Gallagher cont. |
| | 49 | 12, 14, 16-17 | y | Statements as questions. |
| | 49-50 | 24-6 | y | G directs witness to pg in big book. |
| | 50 | 19-22 | y | Statements as questions. Leading? |
| | 51 | 2, 4-6, 10-11, 17-18 | y | Statements as questions. |
| | 52-53 | 19-1 | y | After witness responds to question wrongly, G re-asks. |
| | 53 | 17 | y | Question suggests reinterpretation of witness' words/thoughts. |
| | 54 | 7-8 | y | Leading? |
| | 55 | 6, 10-11 | y | Statements as questions. |
| | 56 | 15-16 | y | Personal comment in question? |
| | 57 | 12-13, 20-21 | y | Statements as questions. |
| | | | | Missing pg 58 |
| | 58 | 5 | y | G directs witness to pg. Some confusion for witness over location |
| | 59 | 18 | y | G directs witness to two more pgs. |
| | 60 | 9-10, 23-25 | y | Statements as questions. |
| | 61 | 16-18, 20-21 | y | Statements as questions. Leading? |
| | 62 | 20, 25 | y | Statements as questions. |
| | 75 | 7-16 | y | G re-asks question and mentions it when witness |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|---|---|---|---|---|
| | | | | doesn't at first answer directly. |
| 3/8/7 | 77 | 7-8 | y | Statement as question. |
| | 78 | 9, 21-22 | y | Statements as questions. |
| | 78-79 | 24-4 | y | G's statement/question makes false assumption/ interpretation about witness that witness clarifies. |
| | 79 | 21 | y | Statement as question. |
| | 80 | 1-4 | y | Statement as question that doesn't agree with witness' previous statement. |
| | 80 | 17-19 | y | Incorrect info in statement as question. |
| | 80-81 | 25-3 | y | Incorrect statement as question that witness confirms then G corrects with real info. |
| | 81 | 11-12, 17,23-24 | y | Statements as questions. |
| | 82 | 13-15 | y | G's question prompts witness to suggest looking at material and G gives exhibit and pg. |
| | 82 | 17-18 | y | Statement as question. |
| | 83 | 17 | y | Statement as question. |
| | 83-84 | 22-1 | y | G interrupts witness to rephrase witness' words incorrectly in a statement/question. |
| | 84 | 9-11, 13-14 | y | Statements as questions. |
| | 84 | 17-19 | y | G asks witness to identify info from manual. |
| | 86 | 4, 6-7, 9-11 | y | Statements as questions. |
| | 86 | 14-18 | y | G directs witness to pg to read aloud from. |
| | 87 | 15-20 | y | G directs witness to another pg to read aloud from. |
| | 87 | 24 | y | Statement as question. |
| | 88 | 18-19,21 | y | Statements as questions. |
| | 89 | 5, 18-20, 24 | y | Statements as questions. |
| | 90 | 3-4 | y | Statement as question. |
| | 90 | 13-17 | y | Statement as question that may incorrectly interpret witness' intentions. |
| | 90 | 18-19, 21-24 | y | Statements as questions. |
| | 90-91 | 25-7 | y | Witness requests pg for info and G assists. |
| | 91 | 15 | y | Statement as question. |
| | 92 | 4-5, 9- | y | Statements as questions. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|---|---|---|---|---|
| | | 10, 17-18 | | |
| 3/8/7 | 92 | 21-25 | y | G directs witness to another exhibit and pg. |
| | 93 | 2-5, 9 | y | Statements as questions. |
| | 93 | 16 | y | G directs witness to another pg. |
| | 93 | 19-22, 24 | y | Statements as questions. |
| | 94 | 1, 5-6, 17-18, 24-25 | y | Statements as questions. |
| | 95 | 2 | Y | Statement as question. |
| | 95 | 14 | y | G directs witness to another pg. |
| | 96 | 7-8, 10, 12-13 | y | Statements as questions. |
| | 96 | 15-18 | y | Storrs objects to question form. Judge says rephrase. No official rule. |
| | 96-97 | 22-3 | y | G suggests setting aside exhibit and sitting, but witness will stand and keep book. (Helpful, or psychological advantage?) |
| | 97 | 4-15 | y | G refers to pgs from witness' report, then after witness questions her about which report, G continues but says it's different pgs. |
| | 97 | 13-15 | y | Statements as questions. |
| | 97 | 20-23 | y | G directs witness to new exhibit. |
| | 97-98 | 25, 2-3 | y | G states/asks questions witness has just answered. |
| | 98 | 17 | y | G directs witness to pg. |
| | 99 | 1, 8-9 | y | Statements as questions. |
| | 99 | 17-18 | y | Leading? |
| | 99-100 | 23-1 | y | Statement as question. |
| | 100 | 14-16, 21-22 | y | Statements as questions. |
| | 101 | 5 | y | G directs witness to another pg. |
| | 101 | 2-10 | y | G re-asks question and notes it when witness at first responds indirectly. |
| | 101 | 14 | y | Witness requests assistance locating pg. |
| | 101 | 20-21 | Y | Statement as question. |
| | 102 | 10-11 | Y | Witness gets another pg #. |
| | 102 | 8-25 | y | G says witness' response didn't answer her question and re-asks twice. Witness says G takes things out of context. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|---|---|---|---|---|
| | 104 | 9 | y | Witness gets another pg #. |
| | 104 | 14-15 | y | G moves one of witness' exhibits to see her- "driving [G] crazy." |
| | 104 | 15-16, 21-22 | y | Statements as questions. |
| 3/8/7 | 105 | 4, 8, 13 | y | Statements as questions. |
| | 106 | 2-3, 9-11 | Y | Statements as questions. |
| | 106 | 19 | y | G directs witness to another pg. |
| | 106 | 20-25 | Y | G interrupts when witness isn't answering correctly and re-asks. |
| | 107 | 7 | Y | G directs witness to another pg. |
| | 107 | 19-20 | Y | Statement as question. |
| | 109 | 4 | Y | Statement as question. |
| | 109 | 6-8 | Y | G directs witness to two pgs, the first incorrect, in a different exhibit. |
| | 110 | 13-25 | Y | After witness responds to G's question, G says that witness is answering a question G didn't ask. Witness continues and doesn't answer question directly. G doesn't mention it and says there's no question to answer. |
| | 111 | 2 | Y | Witness gets another pg #. |
| | 112 | 8, 10-12 | y | Statements as questions. |
| | 112 | 16-24 | y | Witness doesn't answer questions correctly. G points that out and repeats questions as statements. |
| | 113 | 3, 5-6, 20 | y | Statements as questions. |
| | 113 | 5 | y | G mentions another pg #. |
| | 114 | 8 | y | Statements as questions. |
| | 114 | 13-18 | y | G asks/states question and notes it when witness at first responds indirectly; G resays question. G points out witness' testimony error. |
| | 114-115 | 24-4 | y | Witness answers question correctly but G re-asks and includes answer in question/statement. Asked and answered? |
| | 115 | 6 | y | Statement as question. |
| | 115 | 25 | y | G directs witness to another exhibit/pg. |
| | 119 | 24-25 | y | Statement as question. |
| | 120 | 2, 4 | y | Statements as questions. |
| | 120 | 17 | y | Statement as question. Leading? |
| | 120 | 22-23 | y | Statement as question. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|------|------|-------|------------------------|------------------|
| | 121 | 8-10, 14 | y | Statements as questions. |
| | 122 | 1-2, 6-7, 9-10, 12, 14-18 | y | Statements as questions. |
| | 122-123 | 23-2 | y | G directs witness to big book exhibit and pg with location and asks her to read to jury. |
| 3/8/7 | 123 | 8 | y | G interrupts her to prompt to read. |
| | 123 | 16-18, 22-23 | y | Statements as questions. |
| | 124 | 2-8 | y | G notes when witness at first responds indirectly after question, then re-asks/states question. |
| | 124 | 10, 12-13, 20-21, 23 | y | Statements as questions. |
| | 125 | 10 | y | Statement as question. |
| | 125 | 12-17 | y | Witness rephrases G's question in her answer to be more accurate. |
| | 126 | 5-7, 15-16 | y | Statements as questions. |
| | 126 | 18-23 | y | Witness rephrases G's question in her answer to be more accurate and G confirms with original phrasing. |
| | 127 | 2-4 | y | Statement as question. |
| | 127 | 9-10 | y | G directs witness to another pg. |
| | 127 | 18-24 | y | G uses incorrect phrasing/assumption twice and witness corrects assumption in answer both times. |
| | 128 | 3-4 | y | Statement as question. G directs witness to another pg. |
| | 128 | 6-7 | y | G possibly uses incorrect date in question and witness confirms. No one mentions if mistake. |
| | 128 | 9 | y | G directs witness to another pg. |
| | 128 | 18 | y | G directs witness to another pg. |
| | 128-129 | 24-5 | y | Statement as question. |
| | 129 | 7-8, 10-14, 19-20 | y | Statements as questions. |
| | 130 | 1 | y | G directs witness to another pg. |
| | 130 | 3-5, 7-8 | y | Statements as questions. |
| | 130 | 18 | y | G directs witness to another pg. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|---|---|---|---|---|
| | 131 | 2-3, 7, 9, 14, 22 | y | Statements as questions. |
| | 131 | 18-20 | y | G has her to fill in chart and read aloud. |
| | 132 | 5 | Y | Statement as question. |
| | 132 | 21 | y | G directs witness to another pg. |
| | 133 | 9-10, 12-14 | y | Statements as questions. |
| | 134 | 8-14 | y | Storrs objects to speculation. Judge allows within reason. |
| 3/8/7 | 135 | 2-3 | y | G directs witness to another pg when witness needs it. |
| | 135 | 4-5 | Y | G more accurately directs witness to another pg to read aloud. |
| | 136 | 8 | y | G directs witness to another pg to read aloud. |
| | 136 | 19-20 | y | Statement as question. |
| | 137 | 10,23-24 | y | Statements as questions. |
| | 138 | 1-2, 7, 16-17, 24-25 | y | Statements as questions. |
| | 139 | 1-4 | y | Witness can't see at distance to answer question; G repeats question/statement. |
| | 139 | 16 | y | G interrupts witness when she starts to elaborate. |
| | 140 | 2-4 | y | Statement as question. |
| | 140 | 10-13 | y | Witness' answer is non-responsive but G said it was her question. |
| | 141 | 6 | y | G interrupts witness when she starts to elaborate. |
| | 141 | 8 | y | Storrs requests exhibit #s but G says she doesn't have the #s on them. |
| | 141 | 12-13 | y | G interrupts witness with statement/question. |
| | 143 | 19-24 | N, bench | G asks/reminds judge about court and witness schedule. |
| 3/19/7 | | | | Cross exam of Susan Parrish by Gallagher cont. |
| | 7 | 19,23-24 | y | Statements as questions. |
| | 8 | 1-11 | y | After witness correctly answers, G incorrectly says she was asking/talking about something else. No one mentions mistake, unless there was a previous change in topic. |
| | 8-9 | 24-7 | y | Witness gives non-responsive answer and G rephrases question. Leading? |
| | 10 | 15-20 | y | G misunderstands witness' answer as non- |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|------|------|-------|------------------------|------------------|
| | | | | responsive but G had asked a question with incorrect assumption. |
| | 11 | 17-20 | y | Statement as question. Leading? |
| | 12 | 18-19 | y | Statement as question. |
| | 13 | 1, 7, 17 | y | Statements as questions. |
| | 14 | 6, 9-10, 21-22,25 | y | Statements as questions. |
| | 15 | 6, 8, 10-11 | Y | Statements as questions. |
| 3/19/7 | 16 | 6-7, 13, 19-20 | y | Statements as questions. |
| | 17 | 20 | y | Statement as question. |
| | 18 | 2, 8, 14, 22 | y | Statements as questions. |
| | 18-19 | 25-1 | y | Statement as question. |
| | 20 | 21-23 | y | Statement as question. |
| | 21 | 5-6 | y | Statement as question. |
| | 22 | 25 | y | Statement as question. |
| | 23 | 5-6, 20, 22,24-25 | y | Statements as questions. |
| | 24 | 3, 7 | y | Statements as questions. |
| | 24 | 8-12 | y | Statement as question. Previously answered. |
| | 24-25 | 21-10 | y | G interrupts with re-asked question when witness misunderstands question and starts to answer incorrectly. |
| | 25 | 11, 21-22, 24 | y | Statements as questions. |
| | 26 | 10-13 | y | Statement as question. |
| | 26-27 | 25-2 | y | Statement as question. |
| | 27 | 4-9 | y | Statement as question with incorrect detail that witness verifies when G remembers correct term. |
| | 28 | 3-4, 10 | y | Statements as questions. Asked and answered twice. |
| | 28 | 19 | y | Statement as question. |
| | 29 | 10, 14 | y | Statements as questions. |
| | 30 | 2-3, 7-8, 18-19,21 | y | Statements as questions. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|---|---|---|---|---|
|  | 31 | 5, 7, 9, 18-21 | y | Statements as questions. |
|  | 33 | 18-19, 24-25 | y | Statements as questions. |
|  | 34 | 18 | y | Statement as question. |
|  | 36 | 2 | y | Statement as question. |
|  | 37 | 2-4, 12 | y | Statements as questions. |
|  | 38 | 23-24 | y | Statement as question. |
|  | 39 | 4-5 | y | Statement as question. |
|  | 40 | 3 | y | Statement as question. |
|  | 41 | 3-4, 22-23 | y | Statements as questions. |
| 3/19/7 | 42 | 10 | y | Statement as question. |
|  | 43 | 3-6, 13-15,20-21 | y | Statements as questions. |
|  | 44 | 9-14 | y | Statement as question that witness misunderstands until G rephrases. |
|  | 45 | 5-6, 17 | y | Statements as questions previously asked and answered. |
|  | 45 | 19 | y | Statement as question previously asked and answered. |
|  | 45 | 21-22 | y | Statement as question. |
|  | 46 | 2-3, 5, 13, 15-16,22-23 | y | Statements as questions. |
|  | 47 | 13, 16 | y | Statements as questions. |
|  | 47-48 | 20 2-3 | y | G twice directs witness to same pg in different exhibit, the second time when witness asks. |
|  | 48 | 15-17, 19-21 | y | Statements as questions. |
|  | 49 | 2 | Y | Statement as question. |
|  | 49 | 6-8, 20-21 | Y | Statements as questions where G misinterprets what witness is trying to explain. |
|  | 50 | 9-11 | Y | Statement as question where G is trying to understand or correct what witness is saying. |
|  | 51 | 20, 22-23 | y | Statements as questions. |
|  | 52 | 5-6, 8-9, 11-12, 14-15, | y | Statements as questions. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|---|---|---|---|---|
| | | 17-18 | | |
| | 52 | 24 | y | G directs witness to another pg. |
| | 53 | 19-20,25 | y | Statements as questions. |
| | 54 | 2 | y | Statements as questions. |
| | 54 | 4-11 | y | Storrs objects for relevance of G's statement/question; judge overrules and requests question form. |
| | 54 | 19-21 | y | G's statement/question rephrases/reinterprets witness' words. |
| | 55 | 3-6,8-10, 18-19 | y | G directs witness to two pgs at once and witness asks for help locating relevant area. |
| | 55 | 7, 15-16, 21-23 | y | Statements as questions. |
| 3/19/7 | 56 | 12-14 | y | G's statement/question makes assumption of witness' thoughts/ideas. |
| | 56 | 21-5 | y | G directs witness to another pg. |
| | 57 | 12-13 | y | Statement as question. |
| | 62-64 | 25-18 | n | G says Storrs introduced semi-banned info in direct that she used in cross (54) and will use again. Storrs says she made an assumption and could have approached cross differently, and there should be a mistrial. |
| | 66 | 13,21,23 | y | Statements as questions. |
| | 67 | 3, 5-6, 12, 14-16, 25 | y | Statements as questions. |
| | 68 | 5-7, 20-21 | y | Statements as questions. |
| | 69 | 1, 24 | y | Statements as questions. |
| | 69 | 13-17 | y | Witness' answer is non-responsive to G's question but no one mentions it. |
| | 70 | 7-13 | y | G asks why witness didn't provide info during past interview then refuses when witness offers to explain why she had "difficulty answering [her] questions" at interview. |
| | 70 | 13-16 | y | G directs witness to pg in another exhibit and has to get it for her. |
| | 71 | 13-15,23 | y | Statements as questions. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|------|------|-------|------------------------|------------------|
| | 71 | 20-21 | y | Witness asks before G tells her she's done with an exhibit (?) |
| | 71 | 25 | y | G gives witness another pg #. |
| | 72 | 4-6 | y | G rephrases/re-asks question after witness corrects her and doesn't answer question. |
| | 73 | 17 | y | G's question possibly assumes info not in evidence or mentioned in direct. |
| | 73 | 23 | y | Statement as question. |
| | 74 | 3 | y | Statement as question. |
| | 74 | 12-14 | y | Witness rephrases G's question correctly. |
| | 75 | 4-5 | y | Statement as question. |
| | 75 | 7-9 | Y | Witness explains how G's question is unclear. |
| | 75-76 | 14-4 | y | G says witness' response wasn't answering her question and rephrases it. |
| | 76 | 16-22 | y | G directs witness to pg in another exhibit and helps her find it. |
| 3/19/7 | 77 | 7-8, 21-22 | y | Statements as questions. |
| | 78 | 2-9 | y | G directs witness to pg in another exhibit and helps her find it. |
| | 78 | 11 | y | Statement as question. |
| | 78 | 13-17 | y | When witness misunderstands question, G tells her she didn't ask that and rephrases. |
| | 78-79 | 24-3 | y | G gives witness another pg # and witness mistakes it. |
| | 79 | 11-14 | y | G's question prompts witness to ask where in the book they are. |
| | 79 | 22 | y | Statement as question. |
| | 79 | 25 | y | G tells witness another pg. |
| | 80 | 5-7 | y | Witness doesn't know where G's question/statement refers to so G says the pg. |
| | 80 | 18-21 | y | G directs witness to another pg and asks her to read aloud. |
| | 81 | 8-10 | y | Confusingly-phrased statement as question. |
| | 82 | 2-9 | y | G interrupts with question correction when witness begins to answer question incorrectly. |
| | 82 | 11-13, 15-16, 18 | y | Statements as questions. |
| | 83 | 2-3 | y | Statement as question. |
| | 83 | 5-11 | y | G gives incorrect pg # after witness' lack of response following question then correct pg. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|------|------|-------|------------------------|------------------|
| | 84 | 6-13 | n | G says judge interrupted the end of her questioning and almost said something. |
| | 91 | 19 | y | Statement as question. |
| | 92 | 3-8 | y | G gives wrong info in question and confuses witness. |
| | 92 | 10-12 | y | Phrasing of question makes incorrect assumption of witness ("aware") and possibly Paul ("can figure out"). |
| | 92 | 13-14 | y | Statement as question. |
| | 92 | 16-18 | y | G doesn't give pg to look at records. (They might tell whether Paul did the math himself or if someone could have told him before call.) |
| | 93 | 4-6 | y | G gives witness another exhibit and pg #. |
| | | | | Redirect exam of Parrish by Storrs |
| | 105 | 13-21 | y | G objects to exceeding scope of cross; judge allows. No official rule. |
| | 113 | 1-4 | y | G objects to leading; judge sustains. |
| | 113 | 10-12 | y | G objects but doesn't give reason; judge says "question form" but doesn't officially rule. |
| 3/19/7 | 113 | 13-16 | y | G says "compound" but doesn't object' judge overrules. |
| | 113-114 | 17-12 | y | G objects to answer exceeding scope of question and cross; judge agrees and says to rephrase. No official rule. No clear question had been asked. |
| | 115 | 1-10 | y | G objects to exceeding scope of cross; judge sustains and Storrs contests at bench. |
| | 116 | 6-17 | N, bench | G offers alternate line of questioning to Storrs and judge recommends it. |
| | 117 | 1-7 | y | G objects to asked and answered response; judge overrules. |
| | 117 | 11-17 | y | G objects to witness not answering question; judge agrees. No official rule. |
| | 117 | 19-24 | y | G objects that they discussed subject at bench; judge agrees and says to rephrase. No official rule. |
| | 124-125 | 15-6 | y | G objects to witness not answering question; judge sustains. |
| | 126 | 9 | y | G interjects with help. |
| | | | | Jury questions |
| | 146 | 16-23 | y | G objects to non-responsive answer to question. Judge agrees with no official ruling. |
| | | | | More exam of Parrish by Gallagher |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|------|------|-------|------------------------|------------------|
| | 153 | 1-6, 14-17 | y | G repeats/confirms answers back to witness. Asked and answered? |
| | 153 | 18-24 | y | G stops witness' answer then repeats/confirms question as a statement that witness has agreed with. |
| | 154 | 20-21 | y | G interrupts witness to have her check a book for answer. |
| | 155 | 1-5 | y | G has problem finding location of info. Storrs helps. |
| | 155 | 12-13 | y | Statement as question. |
| | 155-156 | 24-2 | y | G interrupts witness' answer to repeat part of it then ask for more, which the witness had been trying to do. |
| | 156 | 13 | y | G suggests witness is guessing. |
| | 156 | 13-14 | y | Statement as question. |
| | 156 | 16-18 | y | G rephrases question after witness' answer doesn't address it directly. |
| | 157 | 2-3 | y | Statement as question. |
| | 157 | 6-11 | y | Storrs objects to her comment. Judge sustains. G withdraws it and it's stricken. |
| 3/19/7 | 157 | 13-14, 22, 24 | y | Statements as questions. |
| | 158 | 1 | y | Statement as question. |
| | 158 | 3-4 | y | G rephrases witness' words in a statement/question that refers to personal opinion of witness. |
| | 158 | 16-18 | y | G's question/statement makes incorrect assumption/interpretation of witness' previous answer and witness corrects her. |
| | 158 | 24-25 | y | G's diction in her question/statement is unclear/too inclusive to witness. |
| | 159 | 1, 7-8 | y | Statements as questions. |
| | 159 | 11-12 | y | G interrupts witness' answer with question/statement. |
| | 159 | 16-18 | y | G repeats/rephrases question/statement that witness hadn't fully answered. |
| | 159 | 21 | y | Statement as question. |
| 3/20/7 | 5 | 11-16 | n | She says defense hasn't made a full argument to support their request/motion. |
| | 13 | 1-2 | n | She comments on Storrs opening a line of questioning for her to use. |
| | 13 | 5-12 | n | At Storrs' concern, Judge recommends/suggests |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|---|---|---|---|---|
| | | | | following her example of stopping witnesses from straying from question. |
| | 15 | 2-3 | n | When she questions if Storrs' motion in limine is finished, he asks if there's more. |
| | 15 | 9 | N | Interrupts Storrs |
| | | | | Direct exam of Michael Bayless by Gallagher |
| | 19 | 6-7 | y | She asks if witness' microphone is on. It is, but no testimony is repeated if people couldn't hear him. |
| | 22 | 19-22 | y | Statement as question. |
| | 23 | 6-7 | y | Statement as question. |
| | 24 | 22-23 | y | Statement as question. |
| | 29 | 19-20 | y | She interrupts witness to compliment herself. |
| | 31 | 5-8 | y | She self-corrects her terminology for clarity. |
| | 32 | 17 | Y | Gallagher-Bayless interview: Speer refused to talk with him. |
| | 32 | 18-23 | y | Witness doesn't seem to answer her question directly but no one mentions it. |
| | 33 | 18 | y | Statement as question. |
| | 34 | 21-22 | y | Assumes facts in evidence? Relevance? Leading? |
| | 35 | 4-10 | y | She rephrases the witness' answer with her own interpretation/assumption of facts. |
| 3/20/7 | 35 | 20 | y | Statement as question. |
| | 35-36 | 22-3 | y | Storrs objects to exhibit for relevancy. |
| | 36-37 | | Y | Gallagher to play a tape of Speer and Bayless' recording after judge previously ordered no taping.  Gallagher interrupts Storrs |
| | 37-38 | 4-8 | N, bench | Previously, the State had not wanted interviews taped and Storrs did, but judge ruled no tapes. Now she wants to admit one that was done at Paul's request after tape ruling. Storrs also says not relevant because witness can testify to info on tape so it doesn't need to be played. She says relevant because defense's repeated concern of Paul's mental health. Storrs says they didn't say he was psychotic but she says Pam (Nicholson) did. |
| | 39 | 1-2 | y | Judge overrules. |
| | 39 | 21-23 | N, bench | Her sequence of events might not be directly related, cause and effect. |
| | 39- | 24- | N, bench | She mentions Storrs wanting Paul to see Bayless, |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|---|---|---|---|---|
| | 40 | 8 | | not allowing defense team to go with Bayless and previous motion to preclude. She says Paul's refusal wasn't on advice of counsel but that Blumberg "bad-mouthing" Bayless in front of Paul has "consequences." Judge says objection is noted and will allow tape. Storrs hadn't officially objected. |
| | 41 | 8 | Bench | Gallagher (Storrs' objections). |
| | 40-42 | 13-23 | N, bench | She is "tired of his interrupting" about the tape that Storrs's had for more than a year. Storrs objects to prejudicial and attorney/client material and it's not relevant anymore. Judge says tape should have been discussed before, but Storrs didn't know the tape would be played. She says it was marked and wonders what he thought she would do with it. |
| | 42 | 12 | N, Bench | Gallagher "so much for being brain damaged." Sarcasm about Speers and Parrish. |
| | 43 | 14-16 | N, bench | She advises judge of witness and court schedule. |
| | 48 | 15 | Chambers | Gallagher ("G.") answers question for Nicholson/Judge: jumps in; says "zero" chance of Speer being evaluated at jail sooner; implying her witness will go on without interruption. |
| | 50 | 2-15 | N, ju dge cha | When Storrs interrupts her, she addresses the judge passive-aggressively about it. |
| 3/20/7 | 50 | 2++ | Chambers | G. talks with Jill Kennedy (MCSO Mental Health) about mental health eval. after judge allows her to talk (over phone) and say Speer was Ok prior to Bayless testifying to his antisocial…" |
| | 54-55 | 19-19 | n | Storrs says marking exhibit isn't sufficient notice from her. If he was supposed to check exhibits more often, he didn't do it. |
| | 59 | | | Missing pg 59 of transcript |
| | 58-63 | 18-2 | n | She addresses concerns about Paul's voluntariness and Constitutional rights. She says inappropriate behavior wasn't used and needs time to research and formulate more argument for possible voluntariness hearing because defense brought it up at the last minute "as usual." Concern about witness and court schedule. Judge will stop tape and continue with testimony to keep trial going and discuss issue |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|---|---|---|---|---|
| | | | | later. |
| | 63 | 14+ | N | G., after learning what the judge was going to do with regard to the tape/Bayless issue, said, "That isn't going to happen, because he (Bayless) needs to be here if we are having a voluntariness issue.  So…"  she argues with judge |
| | 65-66 | 18-3 | y | She confuses her witness with her questions, including a statement/question. |
| | 66 | 7-11 | y | When Storrs has a concern about admitting her exhibit, she objects to speaking then approaches. |
| | 66 | 16-25 | N, bench | Before Storrs finishes speaking, she interrupts with "that's a lie" and clarifies the exhibit. She accuses Storrs of suggesting that she wants to hide things from the jury. |
| | 67 | 5 | y | Judge admits exhibit over Storrs' informal objection. No official rule. |
| | 68 | 13-17 | y | Storrs objects for relevancy; judge overrules. |
| | 70 | 11-14 | y | When witness begins to answer with too much detail, she interrupts says he doesn't have to explain. |
| | 70-71 | 19-1 | y | Witness is confused by her questions/phrasing and doesn't respond correctly. |
| | 71 | 7-8 | y | Leading? |
| | 71 | 10 | y | Statement as question. |
| | 72 | 22 | y | Statement as question. |
| | 73 | 3-15 | y | She interrupts with next question after witness starts to elaborate. |
| 3/20/7 | 74 | 15 | Y | Interrupts Bayless who is testifying. |
| | 75 | 15 | y | Statement as question that was already asked and answered. |
| | 76 | 6-14 | y | She lets witness elaborate then confirms actual answer. |
| | 78 | 16 | Y | G. tells judge "now is a good time" for lunch. OK by the judge. |
| | 81-83 | 15-12 | n | She says for tape issue, Paul revoked privilege and talked about what he heard attorney saying to someone else. She says privilege was also gone when Storrs gave her a different report without being ordered to. She'd been saying to jury from beginning that Paul refused to see State psych. |
| | 84 | 10-11 | N | G. connects Malingering with antisocial personality disorder. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|------|------|-------|------------------------|------------------|
| | 87-88 | 24-5 | y | She confirms info that was already asked and answered. |
| | 95 | 8-12 | y | When witness mentions "we" regarding Paul's test, it isn't mentioned again. |
| | 95 | 13-14 | y | Statement as question. |
| | 95 | 17 | Y | G. interrupts witness. |
| | 99 | 4 | y | Statement as question. |
| | 100-101 | 24-1 | y | She interrupts witness' elaboration to ask new question. |
| | 101 | 8 | y | Statement as question. |
| | 104 | 13 | y | Statement as question. |
| | 104 | 20-21 | y | When witness offers to read definition out of a book, she says she wants him to just tell her. |
| | 106 | 4-5 | y | Leading or reading? |
| | 107 | 1 | Y | G. interrupts witness. Then sets up witness to say "concomitant"…then tells witness 2 is depression scale…leading witness…no objections from defense. |
| | 110 | 2-3 | y | Statement as question. |
| | 110 | 21-25 | y | She gives witness two exhibits and a pg number and asks him to read. |
| | 111 | 11-13 | y | She interrupts witness when he's suggesting what acronyms mean. |
| | 112 | 13 | Y | G interrupts witness. |
| | 112 | 20-21 | y | She directs witness to pg to find answer. |
| | 113 | 14-17 | y | Statement as question. |
| | 114 | 9 | y | She directs witness to pg to find answer. |
| | 114 | 12 | Y | G. tells witness the answer and lets him repeat it. No objection. |
| 3/20/7 | 115 | 2-18 | y | She directs witness to pg to find answer number and asks him to read. She apologizes after she interrupts to correct his reading. |
| | 116 | 4 | y | Statement as question. |
| | 116 | 10-15 | Y | She directs witness to exhibit and pg. |
| | 116 | 15-20 | y | Statement as question. |
| | 117 | 1 | y | She directs witness to different pg. |
| | 117 | 7 | y | Statement as question. |
| | 117-118 | 23-3 | N, bench | Judge says she and jury can hear Paul and she asked defense to keep him from talking during her direct exam or she might call him to the stand. |
| | 122 | 1-12 | N, bench | She makes statement about Paul that |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|------|------|-------|------------------------|------------------|
| | | | | interprets/assumes/ rephrases what he said to judge. |
| | 123 | 1 | N | G. says that defendant is listening and assisting counsel (for the record). Judge interrupted Blumberg so that G. could put something on the record. Judge seems dismissive to defense and supportive of G. |
| | 124 | 15-18 | y | Storrs objects to form of question. Judge says rephrase. No official rule. |
| | 124 | 19-25 | y | She directs witness to exhibit and pg. |
| | 125 | 8-13 | y | She directs witness to different pg when he has trouble locating info for his answer. |
| | 125 | 18-19 | y | She directs witness to different pgs. |
| | 126 | 4-6 | y | She interrupts witness reading from report to direct him to different part to read. |
| | 127 | 17-18 | y | She directs witness back to previous exhibit and gives pg #. |
| | 128 | 1-6 | y | Storrs objects to leading. She'll rephrase it. No official ruling. |
| | 128 | 11-13 | y | Leading? |
| | 128 | 15 | y | Statement as question. |
| | 130-131 | 13-3 | y | Witness' answer possibly misspeaks word prejudicial to Paul, and then seems to use general term while still talking about specific type, but no one mentions. |
| | 132 | 3 | y | Statement as question. |
| | 132 | 8-15 | y | She directs witness to another exhibit and gives pg # with directions to help find it. |
| | 132 | 19-21 | y | She asks witness to read then interrupts to direct him to different part to read. |
| 3/20/7 | 133 | 12-17 | y | She directs witness to different exhibit and gives pg # with directions to help find it when he's confused. |
| | 134 | 2-8 | y | She asks witness to read then interrupts to correct. Leading? |
| | 134 | 17 | y | She directs witness to different pg. |
| | 134 | 23-24 | y | Leading? |
| | 135 | 16-19 | y | Storrs objects to foundation and speculation. Judge asks her to rephrase. No official ruling. |
| | 135-136 | 20-9 | y | Storrs objects to foundation and speculation and outside the scope of witness. Judge says answer if he can. Storrs wants to voir dire. Judge allows |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|---|---|---|---|---|
| | | | | it to lay foundation. |
| | 136 | | | Voir dire exam of Bayless by Storrs |
| | 136 | 13-22 | y | She objects to his first question that incorrectly rephrases hers. Judge had same misunderstanding and tells her to rephrase and lay foundation. |
| | 136-137 | 23- | y | She explains her question and Storrs says he would still object to relevance, foundation and speculation. Judge starts to ask her about her question when she asks to approach. |
| | 137-138 | 9-10 | N, bench | She comments on/maligns the defense's questioning practices and defends her question with its generalization. Storrs thinks it's suspect after her line of questioning. Judge allows. |
| | 139 | 9-10 | N, Bench | G. sarcastic with judge. |
| | 139-140 | 24-1 | y | Statement as question that leaves out important detail of witness' previous answer. |
| | 140 | 5 | y | She directs witness to different pg to find his answer. |
| | 140 | 14-16 | y | Leading? |
| | 140 | 18 | y | She directs witness to different pg. |
| | 140 | 22-25 | y | Statement as question. |
| | 142 | 5-6 | y | Statement as question. |
| | 142 | 13-14 | y | Her statement/question assumes interpretation of cause and effect that is not definitively written. Assumes facts not in evidence? |
| | 142 | 21-22 | y | She directs witness to different pg. |
| | 143 | 14-15 | y | Statement as question. |
| | 144 | 8 | y | She directs witness to different pg. |
| | 144 | 16 | y | She refers witness to different pg. |
| | 145-146 | 17-7 | y | She directs witness to different exhibit and gives pg # to read, helping him find it when he's confused. |
| 3/20/7 | 146 | 10-12 | y | She interrupts with a statement/question when witness makes a mistake reading. Leading? |
| | 147 | 9-11 | y | She supplies word to witness' reading. |
| | 147-148 | 21-12 | y | Storrs objects to asked and answered question. Judge allows since people didn't hear it. No official objection. |
| | 148-149 | 16-1 | y | Leading? |
| | 149 | 14-15 | y | She repeats part of witness' answer as a |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|---|---|---|---|---|
| | | | | question/statement that could suggest/assume something the witness didn't say. |
| | 150 | 4-17 | y | She directs witness to different pg # to read, helping him find it when he's confused between exhibits. She removes the conflicting exhibit. |
| | 151 | 11-22 | y | She directs witness to different pg # to read. He has problems reading it so she helps. |
| | 152 | 14-19 | y | She gives witness a different exhibit and pg # to read from. |
| | 153 | 20-21 | y | Statement as question. |
| | 156 | 14-21 | y | She interrupts witness' response to re-ask question to get applicable answer. |
| | 159-160 | 21-3 | y | Storrs objects; judge sustains. No reason given. |
| | 161 | 5-6 | y | Leading. |
| | 161 | 15 | y | Statement as question. |
| | 161-162 | 24-2 | y | Storrs says foundation; judge overrules. |
| | 162 | 6-18 | y | Storrs objects for foundation and speculation; judge allows. No official ruling. |
| | 162 | 23-24 | Y | Statement as question. |
| | 165 | 9-17 | y | Storrs objects for foundation; judge sustains. |
| | 167 | 2-3 | y | She directs witness to different book and tells him pg # to read. |
| | 167 | 7-8, 10-11 | y | Statements as questions. |
| | 168 | 15-16, 19 | y | Statements as questions. |
| | 169 | 5-6 | n | She interrupts judge. |
| | 169 | 21 | Y | G. ending testimony for the day. |
| | 170 | 5-11 | n | She interrupts judge. She says she won't provide additional assistance with something that the defense wanted-it's their responsibility. |
| | 171 | 1-17 | n | She interrupts the judge when discussing being interrupted during exam and the effect on the schedule of witnesses. |
| | 172 | 7 | N | G. tells judge she will not cut back her time to direct exam her witness (Bayless) |
| 3/21/7 | 8 | 19 | y | Statement as question. |
| | 9 | 20 | y | Statement as question. |
| | 10 | 9-13 | y | She repeats the witness' answer as a statement/question. Asked and answered? |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|---|---|---|---|---|
| | 11 | 21-22 | y | Statement as question. Leading? |
| | 11 | 24-25 | y | Statement as question. |
| | 15 | 5-7 | y | Her question makes assumption of cause and effect or facts not in evidence? |
| | 16 | 4 | y | She gives witness new exhibit and gives him a pg #. |
| | 16 | 13-14, 16 | y | Statements as questions. |
| | 18 | 10 | y | Statement as question. |
| | 19 | 2-4 | y | Statement as question. |
| | 26 | 20-24 | y | She interrupts the witness when he starts to stray incorrectly and reminds him of facts. |
| | 28 | 4-7 | y | The witness answers incorrectly and she responds with a correction. |
| | 29 | 24 | y | Statement as question. |
| | 30 | 25 | y | Statement as question. |
| | 31 | 7-8, 15-17 | y | Statements as questions. |
| | 32 | 1-3 | y | Statement as question. |
| | 33 | 8 | Y | G., questioning Bayless about Speer's delinquent peer associations, turns the question to imply Speer is the negative peer to his brothers: "or his brothers associating with him".  No objection be defense. |
| | 33-34 | 21-23 | N, bench | When Storrs doesn't want specific redundant info in new exhibit, she says there's no prejudice and they were previously admitted. Judge overrules objection, even though there was no formal request. |
| | 35 | 22-25 | y | She gives witness new exhibit. |
| | 36 | 18 | y | She gives witness pg #s to look at in another resource. |
| | 38 | 14 | y | Statement as question. |
| | 40 | 17-22 | y | Storrs objects for relevancy; judge sustains. |
| | 40-41 | 24-5 | y | Storrs objects to asked and answered, she denies and judge allows. No official ruling. |
| 3/21/7 | 41-42 | 13-7 | y | Storrs moves to strike the witness' non-responsive answer. She corrects his diction but agrees. Judge says to re-ask. |
| | 42-43 | 23-2 | y | Storrs objects for relevancy and free will; judge overrules. |
| | 43 | 10-14 | y | Storrs objects for relevancy; judge overrules. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|------|------|-------|------------------------|------------------|
|  |  |  |  | Storrs requests approach. |
|  | 43-44 | 17-6 | N, bench | Her argument for the objected-to question includes a non-relevant factor. Storrs says it's aggravation. Judge allows. |
|  | 44 | 18-25 | y | Storrs objects for relevancy; judge sustains. She requests approach. |
|  | 45 | 3-17 | N, bench | She sarcastic with judge/aggressive and argues idea that wasn't part of the defense. Judge disagrees with her diction and tells her to rephrase, giving her a suggestion. |
|  | 47-48 | 22-1 | y | Storrs says foundation; judge overrules. No formal objection. |
|  | 50 | 7 | y | Statement as question. Leading? |
|  | 51 | 3-6 | n | She comments on her time management. |
|  |  |  |  | Cross exam of Bayless by Storrs |
|  | 56 | 16-21 | y | She says irrelevant; judge overrules. No formal objection. |
|  | 57 | 1-5 | y | She objects without giving a reason. They approach. |
|  | 57 | 12-25 | N, bench | She offers to bring possible evidence for witness. Judge won't allow question. No official ruling. |
|  | 59 | 17-21 | y | She objects to irrelevance; judge agrees. |
|  | 66-67 | 16-5 | y | She objects to misstating and requests the transcript be used. Judge says to rephrase unclear question, she wants to approach, then Storrs says he will change question. Judge agrees and no approach. |
|  | 70 | 4-8, 10-13 | y | She objects to asked and answered twice; judge sustains both times. |
|  | 71 | 5-7 | y | She objects to compound question. |
|  | 73 | 1-11 | y | She objects to speculation; judge allows. No official ruling. |
|  | 73-74 | 13-1 | y | She interrupts Storrs to request to voir dire witness; judge agrees. After doing so, she renews objection. Storrs denies issue and judge allows him to continue. |
|  | 74 | 5-9 | y | She objects to asked and answered; judge overrules. |
| 3/21/7 | 75-76 | 22- | y | She objects that witness isn't familiar with material to be shown. Judge wants to save time by Storrs telling, not showing. No official ruling. |
|  | 79 | 5-7 | y | She objects to asked and answered; judge sustains. |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|---|---|---|---|---|
| | 81 | 9-16 | y | She objects, and when Storrs starts to continue, she gives the reason that the witness can't answer his own question. Storrs refutes and judge says to rephrase for record. |
| | 87-88 | 14-1 | n | She objects to intended part of exhibit because of its cautionary statement and integrity/copyright. |
| | 88 | 17-21 | n | She interrupts Storrs to express disbelief at his statement. |
| | 130 | | Y | She objects repeatedly, keeping Storrs on track. |
| | 140 | 1 | N | She says, "Bob, the judge is talking to you." As if to say, "pay attention" to the judge, implying he wasn't listening or paying attention. |
| | 196 | 24 | Y | Gallagher, in response to Storrs' question to Bayless about if Parrish is a competent Neuropsychologist, objects, saying "assumes facts not in evidence. That's for the jury to decide." Implies that the jury will decide if Parrish is competent.  No objection from Storrs. Then, Gallagher objects to Bayless answering about Parrish |
| | 197 | 22 | N | She asks judge to do something about Blumberg??? |
| | 202 | 2 | N | She is sarcastic about judge. |
| 3/23/07 | 43+ | | N | She argues about allocution and whether Speer can ask the jury to feel sorry for him; can't deny crime or blame his brother, etc. or she will object and threatens to put Speer on the stand to testify. |
| | 57 | 22 | N | She says, "this is all garbage." |
| 3/26/07 | 5 | 13+ | N | She argues that since Speer had sex in Adobe Mtn. then this negates his PTSD as a result of sexual abuse. |
| | 16 | 1 | N | She recommends judge not change the jury instructions that he just decided he would change. Judge explains to her and she says "okay."  Who's running this courtroom? |
| | 138 | 19 & 22 | N | She tells judge what is appropriate regarding jury questions after Storrs' closing. |
| | 139 | 1 | N | She then reverses her decision and says 'that's a good question' after hearing that the question is not about Storrs' closing. |
| | 139 | 6 | N | She then tells judge: "What is it? Now tell us." as a command to the judge. |
| 3/27/07 | 55 | 13 | Y | She, while going over Dr. Parrish's results of a |

| Date | Page | Lines | Jury Present yes or no | Prosecutor Issue |
|---|---|---|---|---|
| | | | | vocabulary test, lists some of the sample words. One of the words is "remorse".  Remorse is in the middle of a group of vocabulary words. Immediately after saying the word 'remorse', She says "I find that hard to believe".  She is commenting on whether he has remorse or not during closing argument.  This issue was never brought up but she comments on it during closing. |
| 3/28/07 | | | | NOTE: INDEX IS INCORRECT. |
| | | | | |
| | | | | |
| | | | | |
| | | | | |