**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Paul Bradley Speer, | No. CV-16-04193-PHX-GMS |
| Petitioner, | **ORDER** |
| v. | DEATH PENALTY CASE |
| Ryan Thornell, et al., | |
| Respondents.[1] | |

Petitioner Paul Bradley Speer is an Arizona death row inmate seeking federal habeas corpus relief. Before the Court are his habeas petition and his notice of request for evidentiary development. (Docs. 13, 23.) Respondents filed an answer to the petition and a response in opposition to the request for evidentiary development. (Docs. 16, 24.) The petition and the request for evidentiary development are denied for the reasons set forth below.

I.     **BACKGROUND**

In 2007 a Maricopa County jury convicted Speer of first-degree murder and other offenses and he was sentenced to death. The Arizona Supreme Court, in its opinion affirming the convictions and sentences, described the facts surrounding the crimes. *State v. Speer*, 221 Ariz. 449, 452–54, 212 P.3d 787, 790–92 (2009). These facts are "presumed correct." *Atwood v. Ryan*, 870 F.3d 1033, 1039 (9th Cir. 2017) (citing 28 U.S.C. §

---

[1] Under Federal Rule of Civil Procedure 25(d), Ryan Thornell, the Director of the Arizona Department of Corrections, Rehabilitation & Reentry, is substituted for the former Director, David Shinn.

1    2254(e)(1)).

2         On March 14, 2002, Speer and his half-brother Chris Womble burglarized a Phoenix

3    apartment. The apartment's residents, Adan and Enriqueta Soto and their three children,

4    were not at home but a neighbor saw two men trying to open an apartment window and

5    called the police. Other witnesses directed police to the apartment of Sabrina and Bill

6    Womble, Speer's mother and stepfather, where Speer and Chris were found and arrested.

7    Officers searched the apartment and found items belonging to the Sotos.

8         Speer was held at the Madison Street Jail. He made telephone calls to family and

9    friends, including his half-brother Brian Womble and an older man named Al Heitzman,

10   with whom Brian lived. The calls were recorded pursuant to the policy of the Maricopa

11   County Sheriff's Office ("MCSO").

12        Speer spoke repeatedly with Heitzman and Brian Womble about posting Speer's

13   bond. Speer stressed that he needed to be released so that he could talk with the victims

14   and convince them not to testify.

15        The necessary funds were not forthcoming, however, and Speer and Brian

16   eventually moved on to "Plan B." Speer told Brian to "make sure you take care of

17   everybody in that house . . . there's only like two." In subsequent calls Speer reiterated that

18   Brian could do the job alone as there were only "two people in there," that "everything in

19   there has to go," and that Brian should "make sure you talk to both people."

20        On May 17, Brian proposed that he break into the apartment and wait for the Sotos

21   to come home. Speer suggested instead that Brian pose as a police officer who needed to

22   take photos for the upcoming trial. Brian said that he had staked out the apartment complex.

23   Speer said, "Handle business fool, alright?"

24        On May 19, Speer called Brian again. This time they discussed a "surprise birthday

25   party." Speer said it would be a waste of a party if Brian did not get both people. Brian told

26   Speer that he now had a silencer for his gun.

27        On May 24, Speer spoke to Brian, urging him to carry out their plan that night. He

28   asked Brian: "Is it pretty sure you're going to . . . you'll be able to get it running tonight?"

- 2 -

Speer also told him to make sure to throw away the evidence. Speer again asked: "I don't have nothing to worry about, about you getting the car together, right?"

On May 25, 2002, at 3:00 a.m., the Sotos returned home from a party. At approximately 5:00 a.m., Enriqueta Soto called 911. When EMTs arrived, they found her on the living room couch. She had been shot but she survived her wounds. An EMT found Adan lying in bed with his arm around an infant. Adan was dead from a gunshot wound but the infant was unharmed.

When police arrived, they found the screen for the front window to the apartment removed. Brian Womble's palm prints were identified on the screen.

On the day after the murder, Speer called Brian and asked him if he got "the car running" and fixed "both parts." Brian said, "Yep, perfect." Speer then told Brian that he needed to "get rid of those [engine parts]."

On June 10, Speer called Brian, who told him one of the Sotos was still alive. Speer said he was not worried. On June 19, Speer sent a letter to Brian reminding him to get rid of the "engine parts" and his shoes. When police later searched Brian's bedroom, they found the letter and a book about silencers.

A grand jury indicted Speer on six felonies, including first-degree murder, in connection with the events of May 25. The State filed a notice of intent to seek the death penalty, alleging four aggravating factors: that Speer was previously convicted of a serious offense (armed robbery), A.R.S. § 13–751(F)(2); that he knowingly created a grave risk of death to the Soto's infant, A.R.S. § 13–751(F)(3); that the murder was committed in a heinous or depraved manner (witness elimination), A.R.S. § 13–751(F)(6); and that Speer committed the murder while in custody, A.R.S. § 13–751(F)(7).

In January 2007, the jury returned guilty verdicts on the six counts related to the May 25 shooting, as well as two counts related to the March 14 burglary. The jury then found that all four aggravating factors had been proved beyond a reasonable doubt and determined that Speer should be sentenced to death for Adan Soto's murder.

The Arizona Supreme Court affirmed. *Speer*, 221 Ariz. 449, 212 P.3d 787. After unsuccessfully pursuing post-conviction relief ("PCR") in state court,[2] Speer sought habeas relief in this Court, filing his petition on October 6, 2017. (Doc. 13.) He filed a notice of a request for evidentiary development on August 2, 2018. (Doc. 23.)

Speer was represented at trial and sentencing by Roberts Storrs, Bruce Blumberg, and Pamela Nicholson. The prosecutor was Jeanette Gallagher. Maricopa County Superior Court Judge Andrew Klein presided over Speer's trial and subsequent PCR proceedings.

## II.    APPLICABLE LAW

### A.    Exhaustion & Procedural Default

A writ of habeas corpus cannot be granted unless the petitioner has exhausted all available state court remedies. 28 U.S.C. § 2254(b)(1); *see also Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Rose v. Lundy*, 455 U.S. 509 (1982). To exhaust state remedies, the petitioner must "fairly present" his claims to the state's highest court in a procedurally appropriate manner. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).

A claim is "fairly presented" if the petitioner has described the operative facts and the federal legal theory on which his claim is based. *Anderson v. Harless*, 459 U.S. 4, 6 (1982). A petitioner must clearly alert the state court that he is alleging a specific federal constitutional violation. *See Casey v. Moore*, 386 F.3d 896, 913 (9th Cir. 2004); *see also Peterson v. Lampert*, 319 F.3d 1153, 1158 (9th Cir. 2003) (en banc).

In Arizona there are two avenues for petitioners to exhaust federal constitutional claims: direct appeal and post-conviction proceedings. Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings. It provides that a petitioner is precluded from relief on any claim that could have been raised on appeal or in a prior PCR petition. Ariz. R. Crim. P. 32.2(a)(3). The preclusive effect of Rule 32.2(a) may be avoided only if a claim falls within certain exceptions and the petitioner can justify why the claim was

---

[2] The PCR court denied Speer's petition and the Arizona Supreme Court denied his petition for review without comment. When the state's highest court denies a claim summarily, the federal court looks through to the last reasoned decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

1
2

omitted from a prior petition or not presented in a timely manner. *See* Ariz. R. Crim. P. 32.1(b)–(h), 32.2(b), 32.4(a).

3
4
5
6
7
8
9
10
11

A habeas petitioner's claims may be precluded from federal review in two ways. First, a claim may be procedurally defaulted in federal court if it was actually raised in state court but found by that court to be defaulted on state procedural grounds. *Coleman*, 501 U.S. at 729–30. Second, a claim may be procedurally defaulted if the petitioner failed to present it in state court and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Id.* at 735 n. 1. If no remedies are currently available pursuant to Rule 32, the claim is "technically" exhausted but procedurally defaulted. *Coleman*, 501 U.S. at 732, 735 n. 1; *see also Gray v. Netherland*, 518 U.S. 152, 161–62 (1996).

12

## B.    AEDPA & *Martinez*

13
14
15
16
17
18
19

Federal habeas claims are analyzed under the framework of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").[3] Pursuant to AEDPA, a petitioner is not entitled to habeas relief on any claim adjudicated on the merits in state court unless the state court's ruling (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. 28 U.S.C. § 2254(d).

20
21
22
23
24

A state court decision is "contrary to" clearly established federal law under § 2254(d)(1) if the decision applies a rule that contradicts the governing law set forth in Supreme Court precedent, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result.

25
26
27
28

---

[3] Speer's challenge to the constitutionality of AEDPA (Doc. 13 at 54) is meritless. *See Crater v. Galaza*, 491 F.3d 1119, 1125–26 (9th Cir. 2007) (holding that AEDPA violates neither the Suspension Clause nor the separation of powers doctrine).

*Williams (Terry) v. Taylor*, 529 U.S. 362, 405–06 (2000); *see, e.g.*, *Hooper v. Shinn*, 985 F.3d 594, 614 (9th Cir. 2021). Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407; *see, e.g.*, *Murray (Robert) v. Schriro*, 745 F.3d 984, 997 (9th Cir. 2014).

The Supreme Court has emphasized that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* For a state court's decision to be an unreasonable application of clearly-established federal law, "the ruling must be 'objectively unreasonable, not merely wrong; even clear error will not suffice.'" *Virginia v. LeBlanc*, 137 S. Ct. 1726, 1728 (2017) (quoting *Woods v. Donald*, 575 U.S. 312, 316 (2015) (per curiam)); *see Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020); *Bolin v. Davis*, 13 F.4th 797, 805 (9th Cir. 2021). The burden is on the petitioner to show "there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). This standard is meant to be "difficult to meet." *Kayer*, 141 S. Ct. at 523 (quoting *Richter*, 562 U.S. at 102).

Under § 2254(d)(2), habeas relief is available if the state court decision was based upon an unreasonable determination of the facts. *See Miller-El v. Dretke* (*Miller-El II*), 545 U.S. 231, 240 (2005). "[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell* (*Miller-El I*), 537 U.S. 322, 340 (2003). A state court's factual determination is presumed correct and a petitioner bears the burden of overcoming that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see Miller-El I*, 537 U.S. at 340. A "factual determination is not unreasonable merely because [a] federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301

Case 2:16-cv-04193-GMS   Document 35   Filed 03/14/23   Page 7 of 151

(2010); *see Brumfield v. Cain*, 576 U.S. 305, 314 (2015) (explaining that § 2254(d)(2) requires federal courts to "accord the state trial court substantial deference"); *Walden v. Shinn*, 990 F.3d 1183, 1196 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 791 (2022); *Ayala v. Chappell*, 829 F.3d 1081, 1094 (9th Cir. 2016) ("A state court's factual findings are unreasonable if 'reasonable minds reviewing the record' could not agree with them.") (quoting *Brumfield*, 576 U.S. at 314).

"[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (holding that "the record under review is limited to the record in existence at that same time, i.e. the record before the state court"); *see Murray (Robert)*, 745 F.3d at 998 ("Along with the significant deference AEDPA requires us to afford state courts' decisions, AEDPA also restricts the scope of the evidence that we can rely on in the normal course of discharging our responsibilities under § 2254(d)(1)."). The Ninth Circuit has observed that "*Pinholster* and the statutory text make clear that this evidentiary limitation is applicable to § 2254(d)(2) claims as well." *Gulbrandson v. Ryan*, 738 F.3d 976, 993 n.6 (2013) (citing § 2254(d)(2) and *Pinholster*, 563 U.S. at 185 n.7). Therefore, as the court explained in *Gulbrandson*:

> for claims that were adjudicated on the merits in state court, petitioners can rely only on the record before the state court in order to satisfy the requirements of § 2254(d). This effectively precludes federal evidentiary hearings for such claims because the evidence adduced during habeas proceedings in federal court could not be considered in evaluating whether the claim meets the requirements of § 2254(d).

*Id.* at 993–94.

For claims not adjudicated on the merits in state court, "federal habeas review . . . is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. *Coleman* specifically held that ineffective assistance of counsel in PCR proceedings cannot establish cause for a claim's procedural default. *Id.*

- 7 -

In *Martinez v. Ryan*, 566 U.S. 1 (2012), however, the Supreme Court created a "narrow exception" to that rule. The Court explained that:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Id.* at 17; *see also Shinn v. Ramirez*, 142 S. Ct. 1718, 1733 (2022).

Accordingly, under *Martinez* an Arizona habeas petitioner may establish cause and prejudice for the procedural default of a claim of ineffective assistance of trial counsel by demonstrating that (1) PCR counsel was ineffective and (2) the underlying ineffective assistance claim has some merit. *Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir. 2012) (citing *Martinez*, 566 U.S. at 14); *Atwood*, 870 F.3d at 1059–60.

To establish "cause" under *Martinez*, a petitioner must demonstrate that PCR counsel was ineffective according to the standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984). *Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014), *overruled on other grounds by McKinney v. Ryan*, 813 F.3d 798, 819 (9th Cir. 2015). *Strickland* requires a demonstration "that both (a) post-conviction counsel's performance was deficient, and (b) there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different." *Clabourne*, 745 F.3d at 377 (citation omitted).

To establish "prejudice" under the second prong of *Martinez*'s "cause and prejudice" analysis, a petitioner must demonstrate that his underlying ineffective assistance of trial counsel claim is "substantial." *Id.* In *Martinez* the Supreme Court defined a "substantial" claim as a claim that "has some merit." 566 U.S. at 14. The Court stated that the standard for finding a claim "substantial" is analogous to the standard for issuing a certificate of appealability. *Id.* at 14; *see Detrich v. Ryan*, 740 F.3d 1237, 1245 (9th Cir. 2013) (en banc). Under that standard, a claim is "substantial" if "reasonable jurists could debate whether the issue should have been resolved in a different manner or that the claim was adequate to deserve encouragement." *Id.* (citing *Miller-El I*, 537 U.S. at 336).

A finding of "prejudice" for purposes of the "cause and prejudice" analysis, "does not diminish the requirement . . . that petitioner satisfy the 'prejudice' prong under *Strickland* in establishing ineffective assistance by post-conviction counsel." *Clabourne*, 745 F.3d at 377.

The Ninth Circuit has offered guidance in assessing whether "cause" exists under *Martinez*. In *Atwood*, for example, the court explained:

> In evaluating whether the failure to raise a substantial claim of ineffective assistance of trial counsel in state court resulted from ineffective assistance of state habeas counsel under *Strickland*, we must evaluate the strength of the prisoner's underlying ineffective assistance of trial counsel claim. If the ineffective assistance of trial counsel claim lacks merit, then the state habeas counsel would not have been deficient for failing to raise it. Further, any deficient performance by state habeas counsel would not have been prejudicial, because there would not be a reasonable probability that the result of the post-conviction proceedings would have been different if the meritless claim had been raised.

870 F.3d at 1059–60; *see Hooper v. Shinn*, 985 F.3d 594, 627 (9th Cir. 2021); *Murray (Roger) v. Schriro*, 882 F.3d 778, 816 (9th Cir. 2018); *Runningeagle v. Ryan*, 825 F.3d 970, 982 (9th Cir. 2016) ("[T]o find a reasonable probability that PCR counsel prejudiced a petitioner by failing to raise a trial-level IAC claim, we must also find a reasonable probability that the trial-level IAC claim would have succeeded had it been raised.").

The *Martinez* exception to procedural default applies only to claims of ineffective assistance of trial counsel. It has not been expanded to other types of claims. *Martinez (Ernesto) v. Ryan*, 926 F.3d 1215, 1225 (9th Cir. 2019) ("[I]neffective assistance of PCR counsel can constitute cause only to overcome procedurally defaulted claims of ineffective assistance of trial counsel."); *Pizzuto v. Ramirez*, 783 F.3d 1171, 1177 (9th Cir. 2015) (explaining that the Ninth Circuit has "not allowed petitioners to substantially expand the scope of *Martinez* beyond the circumstances present in *Martinez*"); *Hunton v. Sinclair*, 732 F.3d 1124, 1126–27 (9th Cir. 2013) (noting that only the Supreme Court can expand the application of *Martinez* to other areas); *see Davila v. Davis*, 137 S. Ct. 2058, 2062–63,

2065–66 (2017) (holding that the *Martinez* exception does not apply to claims of ineffective assistance of appellate counsel).

Finally, as discussed in more detail below, with respect to claims that were not adjudicated on the merits, "a federal court may not hold an evidentiary hearing—or otherwise consider new evidence," unless the "stringent requirements" of 28 USC § 2254(e)(2) are met. *Ramirez*, 142 S. Ct. at 1739.

## C.   Ineffective Assistance of Counsel

Claims of ineffective assistance of counsel are governed by the principles set out in *Strickland*. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. *Id.* at 687–88. Unless both showings are made, "it cannot be said that a conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

The inquiry under *Strickland* is highly deferential. *Id.* at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* The "standard is necessarily a general one," *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009), because "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant," *Strickland*, 466 U.S. at 688–89.

Deficient performance, *Strickland*'s first prong, is established by "showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. To make this showing, a petitioner

must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (quotation omitted).

"The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690). "The defendant bears the heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy." *Murtishaw v. Woodford*, 255 F.3d 926, 939 (9th Cir. 2001) (citing *Strickland*, 466 U.S. at 689). "[T]he relevant inquiry . . . is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable." *Murray (Robert)*, 745 F.3d at 1011 (quoting *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998)).

With respect to *Strickland*'s second prong, a petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693); *see Hooper*, 985 F.3d at 628. The petitioner "bears the highly demanding and heavy burden [of] establishing actual prejudice." *Allen v. Woodford*, 395 F.3d 979, 1000 (9th Cir. 2005) (quoting *Williams (Terry)*, 529 U.S. at 394).

Under AEDPA claims of ineffective assistance of counsel are subject to two layers of deference. "Surmounting *Strickland*'s high bar is never an easy task," *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010), and "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult," *Richter*, 562 U.S. at 105; *see Burt v. Titlow*, 571 U.S. 12, 15 (2013) (explaining that under AEDPA, the reviewing court "gives both the state court and the defense attorney the benefit of the doubt"). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied

*Strickland*'s deferential standard." *Richter*, 562 U.S. at 105. Therefore, the "only question that matters" under § 2254(d) is whether the state court's decision was "so obviously wrong as to be 'beyond any possibility for fairminded disagreement.'" *Kayer*, 141 S. Ct. at 526 (quoting *Richter*, 562 U.S. at 102, 103).

## III.   ANALYSIS

Speer's petition contains 29 claims, some of which are unexhausted and many of which contain several subclaims. (Doc. 13.) He seeks evidentiary development with respect to 17 of those claims, including all of his ineffective assistance of counsel claims. (Doc. 23.) The Court will first consider the procedural status of the claims and, where necessary, their merits. The Court will then turn to Speer's requests for evidentiary development.

### A.   Claims Related to Jailhouse Phone Calls

Speer raises several claims relating to his jailhouse phone calls, including challenges to the trial court's rulings and the State's handling of the evidence (Claims 8, 9, and 13) and allegations of ineffective assistance of counsel (Claims 1–4). These claims are meritless.

<u>Additional background</u>

As noted above, the Madison Street Jail kept recordings of phone calls made by inmates. *Speer*, 221 Ariz. at 456, 212 P.3d at 794. After being stored for six months, the tapes were reused and the old data recorded over. *Id.* A database was kept with information about the calls, from which specific recordings could be located. *Id.* Law enforcement or an inmate could request that a cassette be "tagged," in which case the recording was not taped over. *Id.*

In June 2002, following a tip from a jailhouse informant, police subpoenaed recordings of phone calls made by Speer to the home of Al Heitzman, with whom Brian Womble was staying. *Id.* Speer made many of the calls using a different inmate's booking number, blowing into the phone to defeat the voice-recognition system. (*See* RT 5/19/06

at 42.)[4] He also made numerous three-party calls, in violation of jail regulations. (*See* RT 12/12/06 at 166–67.)

The State identified a total of 58 calls dating from the relevant period.[5] (*See* ME 5/20/15 at 4 n.1; PCR Pet. 10/25/14, Ex. 3.) Detectives listened to 36 of these recordings, preserving 27 as containing relevant information about the murder. Those tapes were played at trial. The remaining tapes were either reviewed but not preserved (9 tapes) or neither reviewed nor preserved (22 tapes).

On July 23, 2002, Brian Womble's attorney filed a discovery motion, requesting "[a]ll statements of the defendant and anyone who will be tried with defendant."[6] *Speer*, 221 Ariz. at 456, 212 P.3d at 794. In response, the State produced the 27 recordings. *Id.* "When the request was made, Speer's attorney knew that MCSO policy was to reuse cassettes after six months." *Id.* The remaining 31 tapes were destroyed pursuant to MCSO policy.

On April 29, 2005, Speer moved to suppress the 27 calls, arguing that the State acted in bad faith by preserving only calls unfavorable to Speer. (EIR 248.)[7] The trial court held an evidentiary hearing on the matter. (RT 5/19/06 at 71; RT 7/28/06 at 50.) The case agent, Detective Dennis Olson, testified that he preserved every phone call that contained any discussion about the homicide.[8] (*Id.*; *see* RT 7/28/06 at 50.) He acknowledged that he was legally required to preserve calls containing any information about the murder whether "it helps the defense or helps the prosecution." (*Id.* at 70.) He testified that the supplement

---

[4] "RT refers to the reporter's transcripts from Speer's state court proceedings. "ME" refers to the trial court's Minute Entries.

[5] The rulings of the trial court and the Arizona Supreme Court took into account a total of only 36 tapes. The additional 22 tapes were identified during the PCR proceedings.

[6] Speer and Brian Womble were both charged with the murder. Their trials were later severed. (*See* ME 3/28/06.) Speer did not join Womble's motion.

[7] "EIR" refers to the document number in the Electronic Index of Record in Maricopa County Case # CR2002-01096.

[8] Olson and two other detectives, including Detective Steve Ulrich, who served as the case agent until he retired and was replaced by Olson, listened to recordings over the period of a day and a half.

provided to the defense listed the calls he reviewed, including the nine calls he listened to but did not preserve. (*Id.* at 76.) Finally, Det. Olson testified that there were a number of calls the detectives neither listened to nor preserved, and that not every call was listed in the supplement. (*Id.* at 76–77.)

The court denied the suppression motion, finding that Speer did not show the detectives acted in bad faith by failing to preserve the tapes or that the tapes contained exculpatory or relevant information. (ME 7/28/06 at 2.) The ruling referred to the 9 tapes that were listened to but not preserved; it did not address the additional 22 calls that were destroyed without being reviewed. Speer subsequently moved for a *Willits* instruction, which the trial court also denied.[9] (ME 1/16/07.)

**Claims 1, 2, 3, and 8:**

In Claim 8, Speer alleges that his due process rights were violated by the trial court's failure to suppress the 27 recorded jail phone calls that the State used at trial. (Doc. 13 at 96.) In Claim 1, he alleges that counsel performed ineffectively in litigating their motion to suppress the calls. (*Id.* at 56.) In Claim 2, he alleges that counsel performed ineffectively by allowing the 31 recorded phone calls to be destroyed. (*Id.* at 64.) In Claim 3, he alleges that counsel performed ineffectively in litigating the Rule 15 discovery issue.[10] (*Id.* at 69.)

<u>Claim 8</u>

Speer raised Claim 8 on direct appeal. (Opening Br. at 14.)[11] The Arizona Supreme Court denied the claim, agreeing with the trial court that "Speer did not establish that the destroyed tapes contained material exculpatory evidence or that the police acted in bad faith." *Speer*, 221 Ariz. at 457, 212 P.3d at 795. The court noted that "because the nine calls at issue occurred after the first preserved call, and incriminating calls continued up to

---

[9] *State v. Willits*, 96 Ariz. 184, 186, 393 P.2d 274, 276 (1964), provides that if the State loses or destroys material evidence, the jury may infer that the evidence was exculpatory.

[10] Arizona Rule of Criminal Procedure 15.1 governs the State's disclosure obligations. As relevant here, Rule 15.1(b)(2) requires the State to disclose "any statement of the defendant" that is "within the State's possession or control."

[11] *See* Doc. 16, Ex. A.

and after the murder, there is no logical inference that these nine had a tendency to exonerate." *Id.* Although the court acknowledged that the detectives "did not listen to every call," meaning the court was aware that more than 36 calls had been tagged, its ruling, like the trial court's, discussed only the calls to which the detectives actually listened. *See id.* at 456–57, 212 P.3d at 794–95.

Speer raised this claim again during his PCR proceedings, this time referencing the 22 tapes that were never reviewed. (PCR Pet. at 5–19.) The court found the claim precluded under Rules 32.6(c) and 32.2(a)(2) because it had been raised and denied on direct appeal. (ME 5/20/15 at 5.) The court alternatively found that the claim was meritless even taking into account the additional 22 recordings that were destroyed without being reviewed. (*Id.* at 2–3.) The court found that Speer could not "establish, beyond mere speculation and conjecture, that the destroyed jail recordings contained material exculpatory evidence, or even evidence that would be in some way beneficial . . . as mitigation." (*Id.* at 4.) Instead, the court concluded:

> [G]iven Defendant's efforts to conceal his identity as the one making calls, concealing the recipient by placing a call and then asking the recipient to add others to the calls, the timing of the calls in relation to Defendant's incarceration, anticipated court appearances on pending charges, the proposed "discussions" with the victims, the murders, and the post-murder conversations and activities, the Court believes those calls, if disclosed, would have been more incriminating than having any tendency to exonerate Defendant or provide mitigation.

(*Id.* at 5.) The court also found no bad faith in the State's failure to preserve the tapes and therefore no due process violation. (*Id.*)

The parties both treat the PCR court's alternative merits ruling as the relevant state court decision. Speer argues that the decision was contrary to or an unreasonable application of clearly established federal law and based on an unreasonable determination of the facts. (Doc. 13 at 100–105.) This argument fails.

In *California v. Trombetta*, the Supreme Court reiterated that "[a] defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence

that is either material to the guilt of the defendant or relevant to the punishment to be imposed." 467 U.S. 479, 485 (1984) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). The Court explained that the government's constitutional duty to preserve evidence is "limited to evidence that might be expected to play a significant role in the suspect's defense." *Id. at* 488. To meet this standard of materiality, the evidence "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489.

If the evidence is not material and exculpatory, however, but instead only "potentially useful," a different legal standard applies. *Arizona v. Youngblood,* 488 U.S. 51, 57 (1988). While under *Brady* due process is violated by the failure to disclose material exculpatory evidence, regardless of the State's good or bad faith, *id.*, the failure to preserve evidence that is only "potentially useful" does not violate due process "unless a criminal defendant can show bad faith on the part of the police." *Id.* at 58; *see Illinois v. Fisher*, 540 U.S. 544, 547–48 (2004).

Bad faith can be demonstrated where there is evidence in the record of "official animus towards [a defendant] or of a conscious effort to suppress exculpatory evidence." *Trombetta*, 467 U.S. at 488. The presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed. *Youngblood*, 488 U.S. at 56 n.*; *see Sanders v. Cullen*, 873 F.3d 778, 811 (9th Cir. 2017); *United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993). Bad faith arises only in "that class of cases where the interests of justice most clearly require it, *i.e.*, those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." *Youngblood*, 488 U.S. at 58. The burden of showing bad faith rests with the defendant. *Id.*

To support his argument that the tapes were potentially exculpatory and therefore destroyed in bad faith, Speer contends that 96% (26 out of 27) of the admitted tapes contained mitigating evidence. (Doc. 13 at 100.) He next asserts that 75% of the total

number of calls Det. Olson listened to contained mitigating evidence and therefore Olson "reasonably knew that at least 75% of the 22 calls he intended but failed to listen to contained mitigating evidence."[12] (*Id.* at 103.) This data, according to Speer, proves that the destroyed tapes had exculpatory value, which the detectives were aware of, and therefore the destruction of the tapes was carried out in bad faith. (*Id.*) Speer also argues that among the 22 calls the detectives did not listen to are two calls recorded by Heitzman. According to Speer, these calls also contain mitigating information, supporting his argument that the remaining unreviewed calls are also likely to contain exculpatory material. Finally, Speer alleges that in allowing the destruction of the 22 unreviewed tapes, "the police did not act in accordance with their normal practices," apparently referring to the fact that the police, having "tagged" the calls, failed to preserve them past the standard six-month period. (*Id.* at 102.)

The PCR court specifically rejected these arguments. It found that "[m]erely suggesting a statistical probability that there might have been mitigation on the destroyed calls based on sampling the 27 calls the police preserved is speculative and not sufficient to establish material exculpatory evidence or mitigation evidence." (ME 5/20/15 at 7.) This was a reasonable determination.

Speer's argument relies both on the characterization of certain evidence in the reviewed tapes as being so mitigating that the police would be in bad faith for failing to review further tapes on the possibility that they might contain additional mitigating evidence of the same quality, and second, on the presumption that the contents of the 22 calls that were destroyed without being reviewed would mirror similar content as the 36 calls that were reviewed.

This, however, is far from sufficiently established. According to Speer, the mitigating evidence in the preserved calls includes Speer "encourag[ing] Womble to just talk to the victims and offer them money or a gun to not come to court"; the fact that "Speer

---

[12] The math behind the 75% figure is not readily apparent (26 out of 36 tapes is 72%).

committed property crimes to help his family—such as to pay for Womble's college courses and [his half-sister] Delilah's clothes[13]; and Speer expressing love for his family members. (Doc. 13 at 62.)  To the extent this is what Speer is counting as "mitigating evidence," it is unclear how its existence is so mitigating that Det. Olson can be accused of bad faith for failing to review further videotapes on the possibility that they might contain similar content.  The fact that Speer advocated witness tampering, albeit short of the murder plot that soon became "Plan B," and admitted to other crimes is not mitigating evidence, at least not to the degree that Det. Olson acted in bad faith by failing to flag it as such. Assuming the unreviewed tapes included similar information, the destroyed evidence did not have an exculpatory value with which the detectives can be charged.

Second, Speer's speculative assertion that a certain percentage of the unreviewed tapes would have contained mitigating evidence does not take into account that some or all of those same tapes may have contained inculpatory evidence to the same extent that the reviewed tapes actually did.  Thus, from both the standpoint of the police's bad faith, and of any prejudice to Speer which it is his burden to show, it is unclear how any such speculation could result in any sort of assurance that such tapes would have been more or less inculpatory to Speer in terms of affecting his final verdict, let alone establishing any bad faith by Det. Olson.

Speer has not met his burden of showing the police acted in bad faith. *Youngblood*, 488 U.S. at 58; *see United States v. Olivares*, 843 F.3d 752, 758–59 (8th Cir. 2016) (finding that defendant failed to show bad faith in government's failure to record and preserve all

---

[13] This refers to a conversation with Brian Womble in which Speer complained, referring to Al Heitzman:

All that shit I worked for, dude. . . . All that motherfucking shit I did with that fag, bro, that I fucking did, dude, was so that you can fucking show that my family could sit proper, dude. . . . So that. . . . when I was in jail, fucking D could get clothes, you got fucking kung fu paid, I got fucking all the money, TV, all that shit in jail last time. And now this fag's acting like fucking. . . . Hey dude, he's a scary fucking bitch, dude.

(*See* EIR 327, tape dated 4/29/02 at 11.)

jail phone calls with co-defendants while relying on incriminating calls at trial). The destruction of the tapes was not a product of bad faith. *See United States v. Guerrero-Hidrogo*, 710 F.App'x. 774, 775 (9th Cir. 2018) (explaining that "the government's routine overwrite of the [surveillance video] every sixty days was not a product of 'official animus' or of a 'conscious effort to suppress exculpatory evidence'") (quoting *Trombetta*, 467 U.S. at 488).

Accordingly, Claim 8 is denied.

Claims 1, 2, and 3

Speer alleges that counsel performed ineffectively in litigating their motion to suppress the calls (Claim 1) and by allowing the 31 recorded phone calls to be destroyed (Claim 2). (Doc. 13 at 56, 64.) He also alleges that counsel performed ineffectively in pursuing discovery of the recorded calls (Claim 3). (*Id.* at 69.) He raised these claims in his PCR petition and the court denied them. (PCR Pet. 10/25/14 at 20–25; ME 5/20/15 at 6–8.)

In Claim 1, Speer argues that counsel should have cited *Kyles v. Whitney*, 514 U.S. 419, 437 (1995), which held that a prosecutor has a "duty to learn of any favorable evidence known to others acting on the government's behalf . . . , including the police." (Doc. 13 at 61.) The PCR court disagreed, explaining "the holding in *Kyles* does not support Defendant's argument. *Kyles* imposes on prosecutors a duty to disclose known, favorable evidence rising to a material level of importance. Here, unlike *Kyles*, the Defendant cannot show the exculpatory nature and materiality of the evidence that was destroyed." (ME 5/20/15 at 6–7.) The court continued:

> Merely suggesting a statistical probability that there might have been mitigation on the destroyed calls based on sampling the 27 calls the police preserved is speculative and not sufficient to establish material exculpatory evidence or mitigation evidence.
>
> The jury listened to 27 tapes during which Defendant reminded others that the calls were being recorded, that he needed bail posted, that his co-defendant Womble should talk to the two burglary victims, that Womble should get his gun and steal a diamond ring from a b** in Scottsdale, that he

- 19 -

loved his brother, and that he loved his family. Given the content of the calls preserved, the tenor of the calls during which Defendant pressured Womble to secure his release or "it's on you," the timing of the calls introduced compared to those that were destroyed, and the fact that Defendant attempted to conceal the calls and admonished parties to the calls "don't say nothing crazy on this phone," suggests that he, too, believed the calls to be potentially incriminating. The Court finds that trial counsel had no way to demonstrate either the "material and exculpatory" nature of the alleged conversations or the bad faith of the police.

Trial counsel filed an unsuccessful motion to suppress the 27 calls and raised the related *Willits* issue again in a Renewed Motion for Mistrial. However, as trial counsel accurately recognized, any claim as to the content of the phone calls is purely speculative. . . .

Defendant claims that trial counsel should have briefed, argued and advanced the argument that the State had a clear obligation to preserve exculpatory evidence in its possession. However, because there is no evidence that the lost calls were either exculpatory or exonerating, the State had no obligation to preserve them. Therefore, trial counsel's performance was not deficient as counsel pursued the claim and preserved the issue for appeal.

(*Id.* at 7) (citations and footnote omitted).

In Claim 2, Speer alleges that counsel had notice of the calls and "were ineffective in failing to seek out, review, and preserve the recordings of the 31 destroyed phone calls." (Doc. 13 at 64.) The PCR court rejected this claim:

Given the content and context of the calls that were preserved, trial counsel's actions were not unreasonable. Trial counsel would be justified in concluding that the additional tapes, which were eventually destroyed, would also have contained Defendant's self-serving professions of love and actions taken for family members, made amidst attempts to secure his own ends (bail to secure his release from jail, the victim's non-attendance at court to secure dismissal of the criminal action, and ultimately the murder), and would not be helpful, either in the case-in-chief or as mitigation.

(ME 5/20/15 at 8.)

In Claim 3, Speer alleges that trial counsel performed ineffectively in seeking discovery of the recorded phone calls. (Doc. 13 at 69.) He cites counsel's failure to join Womble's discovery motion, failure to refute the prosecutor's arguments that she had

fulfilled her discovery obligations, and failure to establish that there were 58 total calls and that some of the unpreserved calls "almost certainly contained mitigation evidence." (Doc. 13 at 69–70.)

The PCR court denied the claim, finding it "not a cognizable PCR claim under Rule 32." (ME 5/20/15 at 8.) The court also noted that the Arizona Supreme Court, in co-defendant Womble's case, "found that because the State produced all calls taped by the detectives and disclosed a list of the phone calls they reviewed but did not preserve, they complied with Rule 15.1(b)(2)." (*Id.*) (citing *State v. Womble*, 225 Ariz. 91, 97, 235 P.3d 244, 250 n.5 (2010)). The court concluded that because the discovery claim was meritless, counsel did not perform deficiently by failing to raise it and Speer was not prejudiced. (*Id.* at 9.)

The PCR court's decisions were neither contrary to nor unreasonable applications of clearly established federal law, nor were they based on unreasonable factual determinations.

With respect to Claim 1, counsel did not perform ineffectively by failing to argue that the prosecutor violated her obligations under *Kyles*. As the PCR court explained, the prosecutor's duty under *Kyles* is to learn of "favorable evidence." 514 U.S. at 437 (citing *Brady*, 373 U.S. at 87, and *United States v. Bagley*, 473 U.S. 667, 675 (1985)). "Favorable evidence" is evidence that "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435. As already discussed, the destroyed tapes constituted potentially useful evidence under *Youngblood* and *Trombetta*, but not favorable or material evidence under *Brady* and *Kyles*. *See Fisher*, 540 U.S. at 548.

There is a second reason counsel did not perform ineffectively by failing to cite *Kyles* in their motion to suppress. Counsel did argue, citing *State v. Tucker*, 157 Ariz. 433, 438, 759 P.2d 579, 584 (1988), that "due process requires that the State 'disclose exculpatory evidence that is material on the issue of guilt or punishment.'" (EIR 195 at 6.)

*Tucker*, in turn, cites *Brady*. 157 Ariz. at 438, 759 P.2d at 584. Having cited cases that rely on *Brady*, counsel did not perform ineffectively in failing to cite *Kyles* as well.

With respect to Claim 2, as the PCR court noted, based on the content of the 27 calls that were preserved, counsel did not perform ineffectively in failing to preserve the 31 recordings that were destroyed. In particular, Speer cannot meet his burden of showing he was prejudiced by counsel's failure to preserve the tapes.

Finally, with respect to Claim 3, the PCR court correctly noted that in Womble's case, based on the same facts, the Arizona Supreme Court found there was no Rule 15 violation. Because there was no discovery violation, counsel cannot be faulted for failing to litigate the issue. *See Gonzalez v. Knowles*, 515 F.3d 1006, 1016 (9th Cir. 2008) ("[C]ounsel cannot be deemed ineffective for failing to raise [a] meritless claim."); *Jones v. Ryan*, 691 F.3d 1093, 1101 (9th Cir. 2012) ("It should be obvious that the failure of an attorney to raise a meritless claim is not prejudicial."); *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) (explaining that "the failure to take a futile action can never be deficient performance"); *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994) ("Counsel's failure to make a futile motion does not constitute ineffective assistance of counsel."); *Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir. 1985) ("Failure to raise a meritless argument does not constitute ineffective assistance.").

Accordingly, with respect to Claims 1, 2, and 3, "there is [a] reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105. The claims fail to satisfy the doubly deferential standard that governs ineffective assistance of counsel claims under AEDPA. *See Richter*, 562 U.S. at 105; *Titlow*, 571 U.S. at 15. They are therefore denied.

**Claims 4 and 9:**

In Claim 9, Speer alleges that his due process rights were violated when the trial court failed to give a *Willits* instruction. (Doc. 13 at 91.) In Claim 4, he alleges that trial counsel were ineffective for failing to support their request for a *Willits* instruction with "adequate legal authority." (*Id.* at 57.)

1      Counsel twice requested a *Willits* instruction: in their proposed jury instructions,

2  which included the standard instruction for lost or destroyed evidence with a citation to

3  *Willits*, and later in a motion and supporting memorandum. (EIR 499, 535.)

4      <u>Claim 9</u>

5      On direct appeal, Speer argued that the failure to provide a *Willits* instruction

6  violated his due process rights under the Arizona constitution and "the Fifth and Fourteenth

7  Amendments to the United States Constitution." (Opening Br. at 19.) Respondents contend

8  that this "drive-by" citation to federal authority is not sufficient to fairly present a federal

9  claim. (Doc. 16 at 44–45.)

10     To fairly present a claim, a petitioner "must make the federal basis of the claim

11  explicit either by specifying particular provisions of the federal Constitution or statutes, or

12  by citing to federal case law." *Insyxiengmay v. Morgan*, 403 F.3d 657, 668 (9th Cir. 2005).

13  Here, Speer satisfied that requirement by "relat[ing] his claim to the Due Process Clause

14  of the U.S. Constitution" and "cit[ing] the Fourteenth Amendment." *Castillo v. McFadden*,

15  399 F.3d 993, 999 (9th Cir. 2005).

16     The Arizona Supreme Court denied the claim, holding that the trial court's refusal

17  to provide the instruction was not an abuse of discretion because "Speer did not

18  demonstrate that the erased tapes might have exonerated him or even mitigated his

19  participation in the murder plot." *Speer*, 221 Ariz. at 457, 212 P.3d at 795. Instead, as

20  already noted, the court concluded that there was "no logical inference that these nine

21  [calls] had a tendency to exonerate." *Id.*

22     Speer also raised the claim during his PCR proceedings, alleging that the failure to

23  provide a *Willits* instruction denied him "a fair trial" and was "not only a state due process

24  violation, but also a federal due process violation under the Sixth and Fourteenth

25  Amendments to the U.S. Constitution." (PCR Pet. 10/25/14 at 31, 34.) The court found the

26  claim precluded under Rules 32.6(c) and 32.2(a) because it had been raised and denied on

27  direct appeal. (ME 5/20/15 at 10.) The court alternatively found the claim meritless because

28  Speer had not established that the destroyed calls had a "tendency to exonerate him." (*Id.*)

The court also determined that Speer was not harmed because trial counsel were allowed to argue to the jury that the State had failed to preserve relevant evidence. (*Id.*)

"To be entitled to a *Willits* instruction, a defendant must prove that (1) the state failed to preserve material and reasonably accessible evidence that could have had a tendency to exonerate the accused, and (2) there was resulting prejudice." *State v. Smith*, 158 Ariz. 222, 227, 762 P.2d 509, 514 (1988). To show that evidence had a tendency to exonerate, "the defendant must do more than simply speculate about how the evidence might have been helpful." *State v. Glissendorf*, 235 Ariz. 147, 150, 329 P.3d 1049, 1052 (2014); *see State v. Murray*, 184 Ariz. 9, 33, 906 P.2d 542, 566 (1995) ("A *Willits* instruction is not given merely because a more exhaustive investigation could have been made"). Rather, "there must be a real likelihood that the evidence would have had evidentiary value." *Id.* However, the tendency to exonerate requirement "does not mean the evidence must have had the potential to completely absolve the defendant." *Id.* "[A] defendant is entitled to an instruction if he can demonstrate that the lost evidence would have been material and potentially useful to a defense theory supported by the evidence." *Id.* (internal quotations and citations omitted).

Habeas review of a claim based on a failure to give a jury instruction is limited to a determination of whether that failure so infected the entire proceedings that the defendant was deprived of his right to a fair trial. *See Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988). Because the omission of an instruction is less likely to be prejudicial than a misstatement of the law, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "especially heavy" burden. *Henderson v. Kibbe,* 431 U.S. 145, 155 (1977); *see Simmons v. Arizona*, No. CV-12-00435-TUC-JGZ, 2015 WL 1405431, at *8 (D. Ariz. Mar. 26, 2015).

Speer has not met that burden. The failure to provide a *Willits* instruction did not violate his right to a fair trial. *See United States v. Dee*, 319 F.App'x 578, 582 (9th Cir. 2009) (finding no error in court's failure to give adverse inference instruction where there was no evidence of bad faith or prejudice and "counsel was allowed to argue that the jury

should draw an adverse inference from the fact that some evidence was not collected or was not preserved, which he did during his closing argument") (citing *United States v. Artero*, 121 F.3d 1256, 1259 (9th Cir. 1997)). As the PCR court noted, counsel were permitted to raise the issue of the destroyed phone calls in their closing argument. Counsel stated "we don't know what was on those calls," argued they "should have been provided an opportunity to see . . . what might have been revealed," suggested the calls could have contained exculpatory information, and questioned the detectives' motives for allowing the tapes to be destroyed. (RT 1/17/07 at 143–45.)

The state court decisions denying this claim were neither contrary to nor an unreasonable application of clearly-established federal law, nor were they based on an unreasonable determination of the facts.

Claim 4

Speer alleges that counsel performed ineffectively by failing to support their motion for a *Willits* instruction with "proper case law." (Doc. 13 at 58.) The PCR court denied the claim, finding that counsel did not perform deficiently under *Strickland*. The court explained:

> Trial counsel requested a *Willits* instruction, supported by a separately-filed Defense Memo in Support of Motion for *Willits* Instruction . . . , which this Court denied. Trial counsel raised the issue again in Defendant's Renewed Motion for Mistrial. . . . This Court's ruling denying a *Willits* instruction was upheld by the Supreme Court.

(ME 5/20/15 at 10.) This decision was neither contrary to nor an unreasonable application of clearly established federal law.

Speer faults counsel for not citing *Willis* itself and, contending that the trial court applied the wrong standard in denying the instruction, for failing to cite other cases holding that "a defendant need not prove that the evidence has absolute, exculpatory value, evident before its destruction." (Doc. 13 at 59.) For example, according to Speer, counsel should have cited *State v. Hunter*, which held that to be entitled to a *Willits* instruction "[a]n accused need not prove that evidence destroyed by the state would have conclusively

established a defense. An accused need only show that if the evidence had not been destroyed, it might have tended to exonerate him." 136 Ariz. 45, 51, 664 P.2d 195, 201 (1983) (additional quotation omitted).

This criticism is unpersuasive. First, counsel cannot be faulted for failing to cite *Willits* when they explicitly asked, twice, for a *Willits* instruction. (EIR 499, 535.) Next, counsel did cite the correct standard when they argued, citing *State v. Reffitt*, 145 Ariz. 452, 461, 702 P.2d 681, 690 (1985), that a defendant is entitled to a *Willits* instruction where "the State failed to preserve material evidence that was accessible and might have tended to exonerate him." (EIR 535 at 1.) Counsel also cited *Hunter*, one of the cases Speer faults them for not citing. (*Id.* at 2.)

Speer also criticizes counsel for not citing *State v. Lopez*, 163 Ariz. 108, 113, 786 P.2d 969, 964 (1990), which used the phrase "potentially helpful" to describe evidence subject to a *Willits* instruction. (Doc. 13 at 59–60.) The Arizona Supreme Court has explained, however, that it has "used the phrase 'potentially helpful' interchangeably with 'tendency to exonerate.'" *Glissendorf*, 235 Ariz. at 150, 329 P.3d at 1052 (citing *Lopez*, 163 Ariz. at 113, 786 P.2d at 964).

Finally, as the PCR court noted, the Arizona Supreme Court found that Speer was not entitled to a *Willits* instruction. Counsel cannot be faulted for attempting to secure relief to which Speer was not entitled. Under these circumstances, even if trial counsel had not sought a *Willits* instruction, their performance would not have been constitutionally ineffective. *See Garduno v. Lewis*, 365 F.App'x 820, 822 (9th Cir. 2010) ("Because the underlying arguments [concerning the jury instruction] lack merit, counsel was not ineffective for failing to raise them.") (citing *Boag*, 769 F.2d at 1344).

Claim 4 does not satisfy the doubly deferential standard that governs ineffective assistance of counsel claims under AEDPA. *See Richter*, 562 U.S. at 105; *Titlow*, 571 U.S. at 15.

**Claim 13 (in part):**

Speer alleges that the prosecutor committed misconduct and violated *Brady* by

failing to disclose all 58 of the recorded phone calls, including the 22 recordings that were destroyed without being reviewed. (*Id.* at 113.) In his PCR petition Speer alleged the prosecutor violated Rule 15.1 and *Brady* by failing to disclose all the tapes. (PCR Pet. at 25–30.) The PCR court denied the claim as waived and precluded under Rule 32.2(a)(3) because it could have been raised on appeal. (ME 5/20/15 at 8.) Because this is an independent and adequate state procedural bar, *Stewart v. Smith*, 536 U.S. 856, 860 (2002) (per curiam), the claim is procedurally defaulted. The PCR court's alternative merits ruling does not nullify the default. *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989).

Speer argues that its default is excused by the ineffective assistance of appellate and PCR counsel.  (*See* Doc. 13 at 119.) He is incorrect.

First, ineffective assistance of appellate counsel may be used as cause to excuse a procedural default only where the particular ineffective assistance allegation was first exhausted in state court as an independent constitutional claim. *See Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Murray v. Carrier*, 477 U.S. 478, 489–90 (1986). Speer did not raise such a claim of ineffective assistance of appellate counsel. Second, under *Martinez* the ineffective assistance of PCR counsel can excuse the default only of claims of ineffective assistance of trial counsel. *See Hunton*, 732 F.3d at 1126–27 (finding *Martinez* does not excuse default of *Brady* claim); *see also Martinez (Ernesto)*, 926 F.3d at 1225; *Pizzuto*, 783 F.3d at 1177. Accordingly, this aspect of Claim 13 remains defaulted and barred from federal review.

Conclusion

Speer has not met his burden of showing the police acted in bad faith in allowing the destruction of the tapes or that the State violated *Brady* by failing to disclose the tapes. He has not met his burden under *Strickland* of showing that counsel performed ineffectively in litigating the issues surrounding the recordings, including the request for a *Willits* instruction. Finally, he has failed to meet his burden under AEDPA of showing "there was no reasonable basis for the state court to deny relief" on these claims, which are therefore denied. *See Richter*, 562 U.S. at 98.

**B.      Ineffective Assistance of Counsel: Guilt Phase Issues**

Speer raises several additional claims alleging that counsel performed ineffectively during the guilt phase of trial. He also alleges that appellate counsel performed ineffectively by failing to raise two of these issues. The Court will consider the underlying claims along with the related ineffective assistance claims. The claims are all meritless.

**Claims 5, 10, and 26 (in part):**

In Claim 5, Speer alleges trial counsel performed ineffectively in cross-examining Det. Olson. (Doc. 13 at 61.) Specifically, he contends that counsel should have used Olson's answers in a deposition in a civil suit arising out of a wrongful conviction in a prior murder case. (*Id.* at 62.) In Claim 10, Speer alleges that his confrontation rights were violated by the limitations imposed by the trial court on counsel's cross-examination of Olson. (*Id.* at 97.) In Claim 26, he alleges that appellate counsel performed ineffectively by failing to raise the confrontation claim. (*Id.* at 248.)

Additional background

On September 14, 2006, Speer's counsel moved for production of Det. Olson's internal affairs records. (EIR 310.) The request was based on Olson's involvement in the Kim Ancona murder case, for which Ray Krone was erroneously convicted and sentenced to death. (*Id.*) The motion cited what counsel characterized as Olson's erroneous claim, made during a television appearance, that detectives had found sheets with Ancona's blood in the trunk of Krone's car. (*Id.*) After his exoneration, Krone filed a civil suit. (*Id.*)

The trial court found no disciplinary actions in Det. Olson's records. (RT 12/13/06, a.m., at 11.) The prosecutor asked the court to preclude any questioning about the Krone case. (*Id.*) The defense wanted to cross-examine Olson about mistakes he had made in the case and his failure to conduct a complete investigation. (*Id.*) The court deferred its ruling. (*Id.* at 13.)

On January 8, 2007, Speer filed a motion to permit cross-examination of Det. Olson about his involvement in the Krone case. (EIR 501.) Counsel sought to impeach Olson with answers he gave in a deposition in the civil suit. (*Id.*) Counsel argued that while Olson

denied making errors in the Krone case, his deposition answers acknowledged flaws in the investigation. (*Id.* at 2–3.) Counsel cited Rule 608 of the Arizona Rules of Evidence, which permits inquiry into specific instances of conduct for purposes of attacking a witness's character for truthfulness or untruthfulness. (*Id.* at 3.) They also argued that they were entitled to cross-examine Det. Olson about the Krone case to prove bias, prejudice, and motive—namely, Olson's desire to vindicate his reputation after the Krone case by securing a conviction against Speer. (*Id.* at 2–4.) Finally, they argued that such evidence was admissible under Rule 404(b) to show motive and that Det. Olson had "knowledge of how an investigation should and should not be conducted." (*Id.* at 5.)

> The court, trying to "strike a balance," ruled as follows:

> Detective Olson may be questioned about comments he made about investigation techniques in general. . . . [I]f you want to ask him about comments he's previously made without identifying cases, you can. He can also be questioned about any acknowledgment he may have made that detectives, like all of us, are human and have made mistakes before, even mistakes in previous investigations. But the Krone case can't be mentioned. Facts specific to that case can't be mentioned. The outcome of that case can't be discussed. TV segments can't be introduced, and transcripts from previous testimony don't come in either.

(RT 1/9/07 at 17.)

The court found that mistakes Det. Olson made in the Krone case would not be probative for truthfulness in the Speer case and therefore Rule 608 did not apply. (*Id.* at 18.) The court found that Rule 404(B) did not apply because the other acts Speer sought to prove would show Olson's character and that he was acting in conformity therewith. (*Id.*)

Instead, the court explained, defense counsel would be permitted to examine Olson in general as to mistakes he may have made in other cases. (*Id.* at 19.) While counsel would not be allowed to use the transcript of Det. Olson's civil deposition, they could ask if he had admitted making mistakes in a prior deposition. They would "be stuck with his answer," however. (*Id.*)

Speer contends that counsel performed ineffectively because they "asked no questions whatsoever about the many mistakes they knew existed in the Krone case, which

they could have done without naming the case itself." (Doc. 13 at 63.) He argues that "[e]ven within the limitations of the court's demands, the deposition provided powerful fodder to show that Olson was simply not a thorough, detail-oriented detective"—"a line of cross-examination [that] fit precisely with Speer's theory that Olson committed investigational errors in failing to properly preserve the phone call evidence." (*Id.* at 65.) Speer argues that, given the central role Det. Olson played in investigating the Soto murder, he was prejudiced by the omission of evidence of the detective's "shoddy investigative practices" in the Krone case. (*Id.* at 66.)

Speer raised this claim during the PCR proceedings. (PCR Pet. at 42–50.) The court analyzed the claim under "the strictures of *Strickland*," finding that counsel's performance was neither deficient nor prejudicial. (ME 5/20/15 at 12.) The court first stated that it would not "second-guess the strategic decisions of trial counsel." (*Id.* at 13.) The court then found that "[t]he record supports the conclusion that counsel made a strategic decision not to cross-examine Detective Olson about his investigative techniques." (*Id.*) The court continued:

> In support of this conclusion, the Court observes that trial counsel investigated the *Krone* matter and Detective Olson's role. Counsel filed and argued a motion to have the specific investigation mentioned, although counsel did not prevail and was properly limited to a generic cross-examination as to his methods in connection with "other" cases. Once the parameters have been identified, the extent of cross-examination is within the tactical decisions afforded trial counsel.

(*Id.*) The court then determined that Speer "suffered no prejudice" because counsel were "permitted to argue . . . the shoddy investigation and the detective's one-sided determination as to which tapes to preserve." (*Id.*) The court explained:

> To that end, trial counsel focused on the things Detective Olson failed to do, such as failing to obtain fingerprint samples from people who were in the victims' home; failing to take shoe sole impressions from people he believed were at the crime scene in order to compare them to footprints found at the scene; failing to collect gunshot residue from anyone inside the victims' home; failing to search for human hair samples at the murder scene; and Detective Olson was forced to admit to every recorded jail call he failed to

listen to, which reinforced the argument that he was not a thorough investigator.

(*Id.*) Finally, the court determined that the strength of the evidence against Speer precluded a finding that he was prejudiced by counsel's cross-examination of Det. Olson:

> [I]t is improbable that the jury would have evaluated the existing tapes differently had they been informed of the detective's role in the *Krone* case. Had there been evidence of a shoddy investigation and/or untruthfulness by the detective connected with a separate case, it is the Court's view that the jury still would have focused most of its attention on the validity of the evidence, the tapes themselves. The jail tapes essentially "spoke for themselves."
>
> . . .
>
> Given the contents of the tapes coupled with corroborating testimony of witnesses, Defendant's motivation and the theft/burglary police report found in Defendant's cell that identified the victims, and co-defendant Womble's palm print on the window screen to the victims' apartment, there is no reasonable probability that the jury would have had a reasonable doubt respecting Defendant's guilt.

(*Id.* at 13–14.)

<u>Analysis</u>

This decision was neither contrary to nor an unreasonable application of clearly established federal law. First, Speer had not rebutted the "strong presumption" that counsel limited his cross-examination of Det. Olson "for tactical reasons rather than through sheer neglect." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003); *Cheney v. Washington*, 614 F.3d 987, 996 (9th Cir. 2010); *see Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002) ("Decisions about 'whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature' and generally will not support an ineffective assistance claim.") (additional quotation omitted). It was not unreasonable for counsel to focus on the alleged deficiencies in Det. Olson's investigation in Speer's case rather than pursuing a "generic" cross-examination about his investigation in other cases.

As the PCR court noted, counsel cross-examined Olson about his failure to take fingerprint samples and shoeprint impressions; failure to collect gunshot residue; and

failure to search for hair samples. (RT 12/11/06 at 44–80.) Counsel also emphasized Det. Olson's failure to listen to and preserve numerous jail calls. (RT 1/10/07 at 28–113.) All this, as the PCR court found, "reinforced the argument that he was not a thorough investigator." (ME 5/20/15 at 13.) Having made that argument, counsel did not perform deficiently, or to Speer's prejudice, by failing to pose questions about prior investigations. *See Floyd v. Filson*, 949 F.3d 1128, 1143–44 (9th Cir.), *cert. denied sub nom. Floyd v. Gittere*, 141 S. Ct. 660 (2020) ("In prior cases in which we and other circuits have recognized constitutionally deficient cross-examination, there were glaring failures to ask even basic questions, not—as here—a strategic choice between one means of undermining the witness and another.").

Finally, the PCR court reasonably determined that the strength of the evidence against Speer foreclosed a finding of prejudice. The jury heard Speer's phone calls to Brian Womble that laid out the plot to kill the Sotos. Cross-examining Det. Olson about shortcomings in prior investigations would not have countered this key evidence of Speer's guilt. Moreover, the gravamen of counsel's examination was that Olson's investigation was faulty precisely with respect to Speer's jailhouse calls.

Claim 5 is denied. It fails to satisfy the doubly deferential standard that governs ineffective assistance claims under AEDPA. *See Richter*, 562 U.S. at 105; *Titlow*, 571 U.S. at 15.

Speer raised Claim 10 in his PCR petition, alleging a violation of his confrontation rights based on the trial court's limitations on the cross-examination of Det. Olson. (PCR Pet. at 37–41.) The court found the claim waived and precluded because it could have been raised on direct appeal. (ME 5/20/15 at 11.)

Speer argues that the claim's default is excused by the ineffective assistance of appellate counsel. (Doc. 13 at 98, 100.) Ineffective assistance of appellate counsel may be used as cause to excuse a procedural default where the particular ineffective assistance allegation was first exhausted in state court as an independent constitutional claim. *See Carpenter*, 529 U.S. at 453; *Carrier*, 477 U.S. at 489–90.

In his PCR petition Speer alleged that appellate counsel performed ineffectively by failing to raise a claim challenging the trial court's ruling on Det. Olson's cross-examination. (PCR Pet. at 41.) Speer did not, however, properly exhaust the claim by including it in his Petition for Review. (*See* Doc 16-1, Ex. D.) *Boerckel*, 526 U.S. at 848 (explaining that to exhaust state remedies, the petitioner must "fairly present" his claims to the state's highest court in a procedurally appropriate manner); *Swoopes v. Sublett*, 196 F.3d 1008 (9th Cir. 1999) (per curiam) (holding that capital prisoners must seek review in Arizona Supreme Court to exhaust claims). Therefore, he did not fairly present the claim to the Arizona Supreme Court. Speer may not exhaust the claim now because he does not have an available state court remedy. Because the claim of ineffective assistance of appellate counsel was not exhausted, the default of Claim 10 is not excused and the claim will be denied as barred from federal review.

In Claim 26 of his habeas petition Speer alleges ineffective assistance of appellate counsel. (Doc. 13 at 248.) As just stated, he raised this allegation in his PCR petition, where it was denied as meritless (ME 5/20/15 at 11–12), but did not include the claim in his petition for review. Its default is not excused, *see Davila*, 137 S. Ct. at 2065, so the claim is barred from federal review.

Claims 10 and 26 are also meritless. In Claim 10 Speer alleges that his right to confront Det. Olson was violated by the trial court's ruling that counsel could not question him directly about the Krone case. (Doc. 13 at 97.)

"[T]he Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to . . . expose [testimonial] infirmities through cross-examination." *Delaware v. Fensterer*, 474 U.S. 15, 22 (1985) (per curiam). "To state a violation of the Confrontation Clause, a defendant must show 'that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness.'" *Sully v Ayers*, 725 F.3d 1057, 1074 (9th Cir. 2013) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986)). The Supreme Court "has never held

1  that the Confrontation Clause entitles a criminal defendant to introduce *extrinsic evidence*

2  for impeachment purposes." *Nevada v. Jackson*, 569 U.S. 505, 512 (2013).

3      The trial court's ruling prevented Speer's counsel only from using the transcript

4  from Krone's civil lawsuit and from specifically referring to the Krone case. The court's

5  prohibition on the use of this extrinsic evidence did not violate Speer's confrontation rights.

6  *Id.*; *see, e.g.*, *Murray v. Schriro*, No. CV-99-1812-PHX-DGC, 2008 WL 1701404, at *20–

7  21 (D. Ariz. April 10, 2008) (finding petitioner not entitled to relief on confrontation claim

8  where trial court prohibited impeachment of detective using transcript from previous trial),

9  *aff'd*, 745 F.3d 984 (9th Cir. 2014); *see Bright v. Shimoda*, 819 F.2d 227, 229 (9th Cir.

10  1987) (federal habeas court will rarely find a constitutional violation if the defendant was

11  allowed to cross examine a witness at length and was restricted solely on a collateral

12  matter). For these reasons Claim 10 is meritless.

13      Finally, Claim 26, alleging ineffective assistance of appellate counsel, is meritless.

14  The PCR court denied the claim, explaining that the Arizona Supreme Court would have

15  rejected the claim pursuant to *State v. Murray*, 184 Ariz. 9, 906 P.2d 542 (1995). (ME

16  5/20/15 at 11.) As the PCR court noted, in *Murray* the Arizona Supreme Court set

17  "parameters for impeachment of witnesses using evidence of specific instances of

18  conduct." (*Id.*, n.3.) Under those parameters, which precluded the use of extrinsic evidence,

19  exclusion of the Krone transcript was not an abuse of discretion. *See Murray*, 184 Ariz. at

20  30–31, 906 P.2d at 563–64. Appellate counsel did not perform ineffectively by failing to

21  raise this meritless confrontation claim. *See Jones v. Smith*, 231 F.3d 1227, 1239 n.8 (9th

22  Cir. 2000) (finding no prejudice when appellate counsel fails to raise an issue on direct

23  appeal that is not grounds for reversal); *Miller v. Kenney*, 882 F.2d 1428, 1434 (9th Cir.

24  1989) (explaining that appellate counsel remains above an objective standard of

25  competence and does not cause prejudice when he declines to raise a weak issue on appeal).

26      **Claims 6, 26 (in part):**

27      Speer alleges that defense counsel performed ineffectively by failing to object to the

28  court's accomplice instruction and failing to offer a correct instruction. (Doc. 13 at 68.) He

argues that the instruction provided by the court, by referring to "an" offense rather than "the" offense, allowed the jury to convict him if it found he was an accomplice in any of the charged offenses, not just the murder. (*Id.*) He also alleges that appellate counsel performed ineffectively by failing to raise a claim challenging the instruction. (*Id.* at 247.) Speer raised these claims during his PCR proceedings and the court found them meritless.

The trial court provided the following "accomplice" instruction:

> A person is criminally accountable for the conduct of another if: One, acting with the culpable mental state sufficient for the commission of the offense, such person causes another person to engage in such conduct; or, two, the person is an accomplice of the other person in the commission of *an* offense.

> "Accomplice" means a person who, with the intent to promote or facilitate the commission of an offense, does any of the following:

> 1. Solicits or commands another person to commit *an* offense; or

> 2. Aids, counsels, agrees to aid, or attempts to aid another person in planning or committing *an* offense; or

> 3. Provides means or opportunity to another person to commit *an* offense.

> A defendant is criminally accountable for the conduct of another if the defendant is an accomplice of such other person in the commission of the offense. This criminal liability extends only to offenses that the defendant intended to aid, solicit, facilitate, or command.

(RT 1/17/07 at 23 (emphasis added); *see also* EIR 534 at 18.)

In denying Speer's claim that counsel performed ineffectively in failing to challenge the instruction, the PCR court relied on *State v. Rojo-Valenzuela*, 235 Ariz. 617, 334 P.3d 1276 (Ct. App. 2014), *aff'd,* 237 Ariz. 448, 352 P.3d 917 (2015). There the court of appeals rejected the defendant's argument that the attempted murder jury instruction provided by the trial court was impermissibly vague and would allow him to be convicted of attempted first-degree murder if the jury found that he had attempted to commit any crime. *Id.* at 622, 334 P.3d at 1281. The appellate court held that "no reasonable juror would have interpreted

1   the court's instruction on attempted first-degree murder as permitting a guilty verdict based

2   on a finding that he had been attempting to commit another crime, given the content of the

3   instruction and its juxtaposition with an instruction on the substantive crime of first-degree

4   murder." *Id.* at 623, 334 P.3d at 1282.

5     The PCR court, citing *Rojo-Valenzuela*, explained that jury instructions must be

6   considered "as a whole." (ME 5/20/15 at 22.) The court noted it had instructed the jury that

7   in order to find Speer guilty of the charged offenses, it needed to find Womble guilty of

8   the same specific charges. (*Id.*) The court then noted that the accomplice instruction

9   immediately preceded the first-degree murder instruction, explaining that "the placement

10  indicates First Degree Murder as the basis of accomplice liability." (*Id.*) Finally, the court

11  noted that the last paragraph of the instruction did refer to "the" offense and stated that

12  Speer could be found guilty only of crimes he "intended to aid, solicit, facilitate, or

13  command." (*Id.*) The court concluded that the "language focuses the jury's attention on the

14  particular offense under consideration"; that jurors are "presumed to follow the court's

15  instructions"; and that "in this case, it is mere speculation that they did not." (*Id.*)

16  Accordingly, the court explained, "there [was] not a reasonable likelihood that the jury

17  would have concluded that this instruction, read in the context of the other instructions,

18  would have authorized a First Degree Murder conviction if Defendant were only an

19  accomplice to burglary or conspiracy." (*Id.* at 23.)

20    Based on this analysis, the court ruled that Speer's counsel did not perform

21  ineffectively by failing to object to the instruction as given or by failing to propose that the

22  court use "*the* offense" instead of "*an* offense" in the accomplice instruction. (*Id.*) The

23  court explained that neither trial nor appellate counsel was ineffective for failing to

24  preserve or raise such "meritless issues." (*Id.*)

25    The PCR court's ruling does not entitle Speer to habeas relief. First, Speer cites no

26  authority holding that the instruction as given was incorrect. Contrary to Speer's argument

27  (Doc. 13 at 60), the final paragraph of the accomplice instruction explained that the

28  principal and the accomplice must have the same intent for the commission of the specific

crime. Neither trial nor appellate counsel performed deficiently by failing to object to a correct instruction. *See Rupe*, 93 F.3d at 1445; *James*, 24 F.3d at 27.

Moreover, reading the instructions as a whole, including the final paragraph of the accomplice instruction and the first-degree murder instruction which immediately followed, demonstrates there was no "'reasonable likelihood' that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." *Waddington v. Sarausad*, 555 U.S. 179, 190–91 (2009) (quoting *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)); *see Rojo–Valenzuela*, 235 Ariz. at 623, 334 P.3d at 1282 (citing "the content of the instruction and its juxtaposition with an instruction on the substantive crime of first-degree murder").

Claims 6 and 26 (in part) do not satisfy the doubly deferential standard governing ineffective assistance claims under AEDPA. *See Richter*, 562 U.S. at 105; *Titlow*, 571 U.S. at 15.

**Claim 7:**

Speer alleges that trial counsel performed ineffectively by failing to move to vacate his conviction and sentence after the same prosecutor presented a conflicting theory of the crime at Womble's trial. (Doc. 13 at 74.) Speer did not raise this claim in state court. He argues that the default of the claim is excused by the ineffective assistance of appellate and PCR counsel. In Arizona, claims of ineffective assistance of trial counsel cannot be brought on direct appeal, *see Runningeagle*, 825 F.3d at 980–82, so appellate counsel did not perform ineffectively by failing to raise this claim. Because the claim is without merit, PCR counsel did not perform ineffectively by failing to raise it.

Speer contends that the prosecutor committed misconduct by arguing opposing theories of the crime in the Speer and Womble trials. According to Speer, after convincing the jury in his trial that he was the "mastermind who manipulated his vulnerable younger brother into committing the crime," the prosecutor took the opposite position in Brian Womble's trial, arguing that it was Brian's idea to murder the Sotos and that Speer had no influence over his brother's behavior. (Doc. 13 at 75–78.) Speer alleges that counsel should

have been aware of the prosecutor's conduct in the Brian Womble case and cited it as grounds to vacate his conviction under Rule 24.2(a) of the Arizona Rules of Criminal Procedure.[14] Under Rule 24.2(a), a court "must vacate a judgment if it finds that . . . (2) newly discovered material facts exist satisfying the standards in Rule 32.1(e); or (3) the conviction was obtained in violation of the United States or Arizona constitutions."[15] (*Id.* at 78–80.) Speer contends that there was a reasonable probability that such a motion would have been granted. (*Id.* at 80–81.) That argument is not persuasive.

Trial counsel did not perform ineffectively because it was not impermissible for the prosecutor to argue different theories with respect to the co-defendants. The cases Speer cites do not support his claim. In *Bradshaw v. Stumpf*, 545 U.S. 175 (2005), for example, the Supreme Court reversed the Sixth Circuit's grant of habeas relief and held that a defendant's guilty plea was not rendered unknowing, involuntary, or unintelligent simply because the prosecutor first asserted that the defendant shot and killed the victim, but in the trial of his co-defendant argued that the co-defendant was the shooter. Justices Thomas and Scalia in their concurring opinion noted that "[the Supreme] Court has never hinted, much less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories." *Id.* at 190 (Thomas, J., concurring). "Since then, the Supreme Court has not [sic] still suggested, let alone held, that due process concerns prohibit prosecutors from taking alternative or inconsistent positions." *White v. White*, No. CV 5:02-492-KKC, 2021 WL 4236929, at *65–66 (E.D. Ky. Sept. 16, 2021) (citing *Littlejohn v. Trammell*, 704 F. 3d 817, 852-53 (10th Cir. 2013)); *cf. Dias v. Gipson*, No. C 12-05146 BLF (PR), 2014 WL 5035578, at *20 (N.D. Cal. Oct. 1, 2014) ("Although the Ninth Circuit has made no ruling on the issue of whether prosecuting defendants based on

---

[14] A motion to vacate must be filed no later than 60 days after the entry of judgment and sentence. Ariz. R. Crim. Proc. 24.2(b). Speer's judgment was entered on May 11, 2007. Counsel therefore had until July 10, 2007, to file a motion to vacate. The prosecutor gave her closing argument in Brian Womble's case on May 3, 2007.

[15] Rule 32.1(e) provides grounds for relief where "newly discovered material facts probably exist, and those facts probably would have changed the judgment or sentence."

inconsistent theories violates due process, sister circuits have ruled that there is no clearly established federal law on this issue. . . .").

In *Bradshaw* the Supreme Court held that inconsistent positions taken by the prosecution did not provide grounds to challenge the defendant's conviction, but "express[ed] no opinion on whether the prosecutor's actions amounted to a due process violation, or whether any such violation would have been prejudicial" with respect to the defendant's sentence and remanded the case to the Sixth Circuit. 545 U.S. at 187–88.

On remand the court concluded that the prosecution's contention that the defendant was the "triggerman" had an effect upon the death sentence imposed on him, and that "[t]o allow a prosecutor to advance irreconcilable theories without adequate explanation undermines confidence in the fairness and reliability of the trial and the punishment imposed and thus infringes upon the petitioner's right to due process." The panel granted habeas relief. *Stumpf v. Houk*, 653 F. 3d 426, 436 (6th Cir. 2011). The Sixth Circuit granted rehearing *en banc* and vacated the panel decision. *Stumpf v. Robinson*, 722 F. 3d 739 (6th Cir. 2013). The court held that "[a]ll that the prosecution did was to argue for two different inferences from the same, unquestionably complete, evidentiary record. It left the factfinder in [co-defendant] Wesley's trial and the factfinders in Stumpf's post-sentencing proceedings to find the facts. This, without more, does not offend the Due Process Clause." *Id.* at 749.

Speer also cites *Thompson v. Calderon*, 120 F.3d 1045 (9th Cir. 1997) (en banc*), vacated on other grounds*, 523 U.S. 538 (1998). Thompson and his codefendant, Leitch, were tried separately for the rape and murder of the victim. 120 F.3d at 1055–56. The Ninth Circuit found Thompson's due process rights had been violated based on the prosecutor's use of "fundamentally inconsistent theories" at the two trials. *Id.* at 1056. During Thompson's trial, the prosecutor presented the testimony of two inmate informants who provided the only direct evidence that Thompson had killed the victim, that the victim had been raped, and that it was Thompson who had raped her. *Id.* These witnesses were not called by the state at Leitch's trial, which followed Thompson's. Instead, the prosecutor

called defense witnesses whose testimony he had objected to at Thompson's trial and "relied heavily on their testimony to establish Leitch's motive for the murder." *Id.* As the Ninth Circuit explained, the prosecutor "asserted as the truth before Thompson's jury the story he subsequently labeled absurd and incredible in Leitch's trial." *Id.* at 1057. "By doing so, the prosecutor brought his conduct squarely within an area forbidden by the Supreme Court—the knowing [ ] present[ation of] false testimony.'"[16] *Shaw v. Terhune*, 353 F.3d 697, 703–05 (9th Cir. 2003), *opinion amended and superseded on denial of reh'g*, 380 F.3d 473 (9th Cir. 2004) (quoting *Thompson*, 120 F.3d at 1058).

Speer does not allege that the prosecutor knowingly presented false evidence or offered factually inconsistent evidence at the two trials. He accuses the prosecutor of "manipulating evidence" but his allegation of misconduct is based solely on the prosecutor's closing arguments in the two trials. (*See* Doc. 13 at 76–78.) The case differs from *Thompson*, where the prosecutor relied on contradictory evidence, some of which was necessarily false, in the two trials. *See Shaw*, 353 F.3d at 703. In Speer's case the evidence supported either theory about which co-defendant was more responsible for the attack on the Sotos. In the second trial, the prosecutor acknowledged that "Paul Speer is equally to blame for what happened," but argued that "he didn't unduly influence Brian Womble." (RT 5/3/07.)[17] She cited incidents in which Brian declined to carry out requests made by Speer and argued, based on the ambiguous content of the phone conversations, that Womble, not Speer, had come up with "Plan B." (*Id.* at 48, 61–64, 67–72.)

This scenario more closely tracks *Shaw* than *Thompson*. In the former case, the evidence suggested that one of two defendants, Shaw or Watts, assaulted the victim. *Shaw*, 353 F.3d at 703. In the first trial, the prosecutor argued that the evidence showed Shaw committed the assault. *Id.* In the second trial, a different prosecutor argued, based on the

---

[16] A prosecutor's knowing use of false testimony to get a conviction violates due process. *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

[17] *State v. Womble*, Maricopa County Superior Court Case No. CR2002-010926(B). (*See* Doc. 23-1, Ex. 5.)

"same evidence," that Watts committed the assault. *Id.* The court found no "constitutional violation." *Id.* at 704. The court explained that while a prosecutor is prohibited from "knowingly presenting false evidence," she is "not preclude[d] . . . from suggesting inconsistent interpretations of ambiguous evidence." *Id.*

Accordingly, counsel did not perform ineffectively by failing to file a motion to vacate Speer's conviction under Rule 24.2(a) based on the prosecutor's comments at Womble's trial. There was not a reasonable probability that the motion would have been granted.

First, as just discussed, there was no constitutional violation. Ariz. R. Crim. Proc. 24.2(a)(3). Next, even if the prosecutor's argument at Womble's trial constituted "newly discovered material facts," those facts would not probably have changed Speer's judgment or sentence. Ariz. R. Crim. Proc. 24.2(a)(2); 32.1(e). The cases Speer cites (Doc. 13 at 79–80) are inapposite, as they involved the discovery of new facts that directly challenged the evidence at trial. *See, e.g.*, *State v. Orantez*, 183 Ariz. 218, 221–23, 902 P.2d 824, 827–29 (1995) (finding defendant entitled to new trial where evidence showed key witness lied about her drug use and likely had drugs in her system at the time of the crime). In Speer's case, by contrast, there were no new facts affecting the key evidence against him—the contents of the jail phone calls.

Because the underlying claim of ineffective assistance of trial counsel is meritless, there was not a reasonable probability of a different outcome in the PCR proceedings if PCR counsel had raised the claim. Because PCR counsel did not perform ineffectively, Speer cannot establish cause for the claim's default. *See Atwood*, 870 F.3d at 1059–60; *Clabourne*. 745 F.3d at 377. Claim 7 is therefore denied as procedurally defaulted and barred from federal review.

## C.    Trial Error: Guilt Phase

Speer raises claims alleging prosecutorial misconduct (Claims 11 and 13) and challenging the court's voir dire with respect to the death penalty (Claim 12). The claims are meritless.

1    **Claim 11:**

2        Speer alleges that his rights under the Fifth, Sixth, Eighth, and Fourteenth

3    Amendments were violated when the trial court denied his motions for a mistrial based on

4    prosecutorial misconduct. (Doc. 13 at 101–02.) This claim includes three instances of

5    alleged misconduct. In the first, Speer states that the prosecutor "openly and repeatedly

6    mocked trial counsel before the jury." (*Id.* at 102.) In the second, Speer alleges that the

7    prosecutor, in questioning Det. Olson, "shifted the burden to the defense" by asking

8    whether defense counsel was aware of the jail's phone call retention policy. (*Id.* at 103.)

9    Finally, Speer contends that a mistrial was required when the prosecutor, during her guilt-

10   stage closing argument, referred to the burden of proof in the "guilt phase" of trial. (*Id.*)

11       Speer raised these allegations on direct appeal.[18] (Opening Br. at 21–23.) The

12   Arizona Supreme Court held that the trial court did not err in denying the motions for a

13   mistrial. *Speer*, 221 Ariz. at 458, 212 P.3d at 796. This decision was neither contrary to nor

14   an unreasonable application of clearly established federal law.

15       Speer's first allegation of misconduct is based on the prosecutor's redirect

16   examination of Det. Olson, in which she engaged in a *reductio ad absurdum* of defense

17   counsel's cross-examination of Olson and the challenges counsel raised to the

18   thoroughness of the crime-scene investigation—asking, for instance, whether Olson

19   fingerprinted the Soto's young children. (*See* RT 12/11/06 at 81–82, 89–92.) Defense

20   counsel moved for a mistrial, arguing that the prosecutor "creates a mockery of this case."

21   (*Id.* at 90.) The prosecutor responded that counsel had "presented a bumbling cross-

22   examination where he repeatedly asked the same question 16 times," that his line of

23   questioning was "ridiculous," and that the "State was certainly entitled to counter" the

24   _____

25       [18] Respondents concede that Speer exhausted the second and third of these
     allegations on direct appeal. (Doc. 16 at 49–51.) They argue the first allegation was not
26   exhausted. (*Id.* at 49.) Regardless of its procedural posture, the Court will consider the
     claim on its merits. *See* 28 U.S.C. § 2254(b)(2) (allowing denial of unexhausted claims on
27   the merits); *see also Lambrix v. Singletary*, 520 U.S. 518, 524–25 (1997) (explaining that
     the court may bypass the procedural default issue in the interest of judicial economy when
28   the merits are clear but the procedural default issues are not).

"aspersions" cast by counsel's cross-examination. (*Id.* at 91–92.) The trial court denied the motion for a mistrial. (*Id.* at 93.) On direct appeal, Speer "summarily allege[d]" this claim. *Speer*, 221 Ariz. at 458, 212 P.3d at 796, n.6. The Arizona Supreme Court denied the claim, finding there was no misconduct. *Id.*

The next incident of alleged misconduct occurred when the prosecutor asked Det. Olson whether "to your knowledge does Mr. Storrs [defense counsel] know that jail calls are destroyed after six months?" and "to your knowledge did Bob Storrs know in August of 2002 that the jails calls only get kept for six months?" (RT 1/10/07 at 94, 96–97.) Trial counsel moved for a mistrial, arguing that the prosecutor's questions "actually shifted the burden to the defense, because she was pointing out to the jury that the defendant knew that these calls would be destroyed within six months." (*Id.* at 113.) The court pointed out that the prosecutor "didn't say the defendant." (*Id.*) Counsel responded that "the defense or defense [sic] has no burden whatsoever, has no burden to come forward with evidence and she's shifting the burden to the defendant to adduce evidence" in violation of "his due process right and his right to a fair trial." (*Id.* at 113–14.)

Defense counsel contended that "mistrial is the only real remedy." (*Id.* at 120.) The trial court disagreed and denied the motion. (*Id.*) The court agreed, however, to instruct the jury that the burden of proving guilt beyond a reasonable doubt never shifts away from the State. (*Id.* at 120–21.)

The Arizona Supreme Court held that the trial judge did not err in denying a mistrial. *Speer*, 221 Ariz. at 458, 212 P.3d at 796. The court explained that:

> The prosecutor never suggested that the defense had the burden of proving Speer's innocence. Rather, the questioning appeared designed to rebut any contention of bad faith on the part of the police, by suggesting that both the State and the defense had a chance to preserve the nine calls but failed to do so. In any event, any conceivable prejudice was cured by the instruction.

*Id.*

The final incident occurred during the guilt-phase closing argument, when the prosecutor stated that "the defendant does not have—does not have to present any evidence at all. The burden of proof during the guilt phase is all on the State. It never shifts to the

1    defendant." (RT 1/17/07 at 111.) Defense counsel objected. (*Id.*) He argued that "you can't

2    intimate that this trial is going to go on, and . . . in the next phase, perhaps the burden will

3    be different. But you can't talk about any other phase other than the one that we're in, and

4    so that denies my client a fair trial." (*Id.* at 112.) The court denied counsel's motion for a

5    mistrial, noting that the prosecutor's statement was "technically correct" and finding no

6    prejudice because "we have spent countless time both in the voir dire and then in the

7    preliminary discussion we've had with each juror about the three phases. They have known

8    about it and been told about it. This is nothing new." (*Id.* at 112–13.) The Arizona Supreme

9    Court agreed that no prejudice resulted from the prosecutor's comment because "defense

10   counsel, the prosecutor, and the court itself had previously made plain to the jury that the

11   trial could involve three phases." *Speer*, 221 Ariz. at 458, 212 P.3d at 796.

12       <u>Analysis</u>

13       The appropriate standard of federal habeas review of a claim of prosecutorial

14   misconduct is "the narrow one of due process, and not the broad exercise of supervisory

15   power." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v.*

16   *DeChristoforo*, 416 U.S. 637, 642 (1974)). A petitioner is not entitled to relief in the

17   absence of a due process violation even if the prosecutor's comments were "undesirable or

18   even universally condemned." *Id.* Therefore, to succeed on a claim of prosecutorial

19   misconduct, a petitioner must prove not only that the prosecutor's remarks and other

20   conduct were improper but that they "so infected the trial with unfairness as to make the

21   resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643; *see Parker v.*

22   *Matthews*, 567 U.S. 37, 45 (2012); *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995)

23   (explaining that relief is limited to cases in which the petitioner can establish that

24   prosecutorial misconduct resulted in actual prejudice); *see also Smith v. Phillips*, 455 U.S.

25   209, 219 (1982) ("[T]he touchstone of due process analysis in cases of alleged

26   prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.").

27       In determining if a defendant's due process rights were violated, the court "must

28   consider the probable effect [of] the prosecutor's [remarks] . . . on the jury's ability to judge

the evidence fairly." *United States v. Young*, 470 U.S. 1, 12 (1985). To make such an assessment, the prosecutor's remarks must be put into context. *See Boyde v. California*, 494 U.S. 370, 385 (1990); *United States v. Robinson*, 485 U.S. 25, 33–34 (1988); *Williams v. Borg*, 139 F.3d 737, 745 (9th Cir. 1998). In *Darden*, for example, the Court assessed the fairness of the trial by considering whether the prosecutor's comments manipulated or misstated the evidence, whether the trial court gave a curative instruction, whether the comment was invited by the defense, whether defense counsel had an opportunity to rebut it, and "[t]he weight of the evidence against petitioner." 477 U.S. at 181–82; *see Trillo v. Biter*, 769 F.3d 995, 1001 (9th Cir. 2014).

In the event a petitioner can establish a due process violation, to be found eligible for relief he must also demonstrate that the violation resulted in a "substantial and injurious" effect on the verdict under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). *Fry v. Pliler*, 551 U.S. 112, 121–22 (2007); *see Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012).

Courts have substantial latitude when considering prosecutorial misconduct claims because "constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise." *Donnelly*, 416 U.S. at 645; *Matthews*, 567 U.S. at 48 (explaining that the "*Darden* standard is a very general one, leaving courts 'more leeway. . . in reaching outcomes in case-by-case determinations'") (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

The Arizona Supreme Court's denial of relief on these claims does not satisfy § 2254(d)(1). None of the incidents cited by Speer approaches the level of a due process violation. The prosecutor did not manipulate or misstate the evidence, the trial court gave a curative instruction where necessary and instructed the jury that what the lawyers say was not evidence (*see, e.g.*, RT 12/5/06 at 14), the prosecutor's questions to Det. Olson on redirect were invited by defense counsel's cross-examination, and the evidence against Speer was strong. *See Darden*, 477 U.S. at 181–82; *see also Williams*, 139 F.3d at 745 (finding that prosecutor's remarks maligning defense counsel did not infect the trial with

- 45 -

unfairness to such a degree that petitioner's due process rights were violated); *Johnson*, 63 F.3d at 930 (rejecting misconduct claim based on an alleged misstatement of the prosecutor's burden of proof where the statement was appropriate in context and where the trial court correctly instructed the jury on the state's burden). For the same reasons, Speer has failed to show that the prosecutor's comments had a substantial and injurious effect on the verdict. *See Brecht*, 507 U.S. at 637.

The Arizona Supreme Court's denial of this claim was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *See Richter*, 562 U.S. at 103. Claim 11 is denied.

**Claim 12:**

Speer alleges that he was deprived of his right to a fair and impartial jury because "voir dire favored those who leaned toward automatic death penalty." (Doc. 13 at 104.) Speer used his peremptory challenges to dismiss six jurors with a pro-death-penalty bias, but a seventh, Juror 29, served on the jury. Speer argues that his due process rights were violated by the trial court's failure to strike Juror 29 for cause. *Id.* He also alleges that his rights were violated when the trial court improperly struck for cause "jurors who leaned against the death penalty but who would have followed the law." (Doc. 13 at 109.) The Arizona Supreme Court denied these claims on direct appeal. *Speer*, 221 Ariz. at 454–56, 212 P.3d at 792–94.

1.    Failure to excuse pro-death-penalty juror

Defense counsel moved to strike Juror 29 for cause "on the basis that he did indicate that the death penalty should be imposed in all cases when the State has proven beyond a reasonable doubt that the person killed another with premeditation." (RT 11/13/06 at 165.) This was a reference to an answer on the juror questionnaire, which asked the potential juror to select the position that best matched their view on the death penalty. (*See id.* at 166.) The trial court denied the motion, finding that Juror 29's "views do not substantially impair the performance of his duties." (*Id.*) The court explained that the juror

"acknowledged changing his views on the death penalty from when he was younger, where he originally believed an eye for an eye, meaning you take a life you forfeit a life," whereas he now believed in "weigh[ing] all factors before determining the [sic] death is the punishment." (*Id.* at 167.) The court continued, noting that Juror 29 "not only backed off, he then urged that his views were that extenuating circumstances could mitigate against the death penalty," circumstances including the defendant's "mental health history," "difficult upbringing or substance abuse." (*Id.*) The court concluded that the juror was "open-minded, and he is willing to listen to all the facts before deciding whether to impose death." (*Id.*) The court's observations accurately described Juror 29's voir dire answers. (*See id.* at 148–57.)

The Arizona Supreme Court found that the trial court did not abuse its discretion by refusing to strike Juror 29 for cause. The court first cited *Morgan v. Illinois*, 504 U.S. 719, 729 (1992), for the proposition that a juror who will automatically vote for the death penalty without considering mitigating circumstances does not meet the threshold requirement of impartiality. *Speer*, 221 Ariz. at 455, 212 P.3d at 793. The court then explained that Juror 29 was the only pro-death-penalty-leaning juror identified by Speer who remained on the jury after the defense used its peremptory strikes,[19] so it was only his presence on the jury that the court needed to consider.[20] *Id.* Finally, the court examined the juror's answers to questions about the death penalty:

> Juror 29 selected the following statement in the jury questionnaire as most closely representing his views: "I feel the death penalty should be imposed in all cases as long as the State proves beyond a reasonable doubt that a person killed another human being with premeditation." He underlined "beyond a reasonable doubt." In the same questionnaire, the juror wrote that "when I was younger, I felt an eye for an eye," but now "I want to know why before I decide." During voir dire, he agreed that he "might not . . . vote to impose death" if a person "had a pretty tough upbringing" or "mental health problems," stating, "I need to hear everything before I decide." Given Juror

---

[19] The defense struck Jurors 5, 19, 55, 90, 242, and 400. (*See* Doc. 13 at 107–09.)

[20] Here the court cited *State v. Cruz*, 218 Ariz. 149, 158, 181 P.3d 196, 205 (2008). *Cruz*, in turn, relied on the United States Supreme Court's holding in *United States v. Martinez-Salazar*, 528 U.S. 304, 313 (2000).

29's statements, the trial court's refusal to strike him for cause was not an abuse of discretion.

*Speer*, 221 Ariz. at 455, 212 P.3d at 793. This ruling was neither contrary to nor an unreasonable application of clearly established federal law.

In *Witherspoon v. Illinois*, 391 U.S. 510 (1968), the Supreme Court "set forth the rule for juror disqualification in capital cases." *White v. Wheeler*, 577 U.S. 73, 77 (2015). Capital defendants are entitled to a jury not "uncommonly willing to condemn a man to die." *Witherspoon*, 391 U.S. at 521. The Supreme Court "with equal clarity has acknowledged the State's 'strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes.'" *Wheeler*, 577 U.S. at 77 (quoting *Uttecht v. Brown*, 551 U.S. 1, 9 (2007)). A juror may be excused for cause only if he or she is "substantially impaired in his or her ability to impose the death penalty under the state-law framework." *Uttecht*, 551 U.S. at 9 (citing *Wainwright v. Witt*, 469 U.S. 412, 424 (1985)). A juror may be excused for cause "where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Witt*, 469 U.S. at 425–26.

"A defendant has a constitutional due process right to remove for cause a juror who will automatically vote for the death penalty." *United States v. Mitchell*, 502 F.3d 931, 954 (9th Cir. 2007) (citing *Morgan*, 504 U.S. 719). However, the failure to strike a biased juror does not violate a defendant's rights to an impartial jury and due process when the juror did not sit on the jury, even if the defendant had to use a peremptory challenge to strike him. *Id.* "So long as the jury that sits is impartial, . . . the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." *United States v. Martinez-Salazar*, 528 U.S. 304, 313 (2000) (quoting *Ross v. Oklahoma*, 487 U.S. 81, 88 (1988)).

The Arizona Supreme Court reasonably applied *Martinez-Salazar* and *Witherspoon/Witt* in rejecting Speer's challenge to the trial court's refusal to remove Juror 29 for cause.

A state court's determination that a juror's views would substantially impair the discharge of his duties is a factual finding entitled to a presumption of correctness on federal habeas review. *Witt*, 469 U.S. at 426 ("[D]eference must be paid to the trial judge who sees and hears the juror."); *see Uttecht*, 551 U.S. at 9 ("Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critica487 U.S. importance in assessing the attitude and qualifications of potential jurors."). A trial court's "finding may be upheld even in the absence of clear statements from the juror that he or she is impaired. . . ." *Uttecht*, 551 U.S. at 7. Finally, AEDPA requires an additional, "independent, high standard" of deference. *Id*. at 10; *see Wheeler*, 577 U.S. at 78.

In *Uttecht* the Court clarified that "[t]he need to defer to the trial court's ability to perceive jurors' demeanor does not foreclose the possibility that a reviewing court may reverse the trial court's decision where the record discloses no basis for a finding of substantial impairment." 551 U.S. at 20. However, where there has been "lengthy questioning of a prospective juror and the trial court has supervised a diligent and thoughtful *voir dire*, the trial court has broad discretion." *Id.*; *see Wheeler*, 577 U.S. at 79.

In Speer's case there was a lengthy and diligent voir dire process, which included the prescreening of panels of potential jurors followed by the completion of a detailed questionnaire. (*See, e.g.*, RT 11/6/06 at 8, 13, 33.) The attorneys and the court then examined each of the remaining potential jurors, including Juror 29, individually, a process that consumed several days. (*See* RT 11/9/06–11/20/06.) The questioning of Juror 29 alone occupied more than 20 transcript pages. (RT 11/13/06 at 142–165.) Finally, the remaining 40 members of the final venire panel were questioned by the court and the parties, after which a jury of 16, consisting of 12 jurors and 4 alternates, was selected. (*See* RT 12/4/06 at 3, 56, 76.)

Nothing in this record undermines the presumption of correctness attaching to the trial court's determination that Juror 29 was not substantially impaired in his ability to carry out his duties impartially. His answers revealed that he would not vote for death without

considering the mitigating evidence. (RT 11/13/06 at 150–55.) To the extent any ambiguity remained in Juror 29's attitude about the death penalty after his questioning by the parties, the trial court was "entitled to resolve it in favor of the State." *Uttecht*, 551 U.S. at 7 (quoting *Witt*, 469 U.S. at 434).

Applying the additional level of deference required by AEDPA, the Arizona Supreme Court's decision to affirm the trial court's refusal to excuse Juror 29 for cause was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103; *see Wheeler*, 577 U.S. at 78–79.

2.      Excusal of anti-death-penalty jurors

Speer alleges that his rights were violated when the trial court "excused for cause jurors who leaned against the death penalty but who would have followed the law." (Doc. 13 at 109.) The Arizona Supreme Court, citing *Witherspoon* and *Witt*, denied the claim on direct appeal. *Speer*, 221 Ariz. at 455–56, 212 P.3d at 793–94. This decision was neither contrary to nor an unreasonable application of clearly established federal law.

A prospective juror in a capital case may be excluded for anti-death-penalty views only if he indicates he is "irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings." *Witherspoon,* 391 U.S. at 522 n.21. The exclusion of jurors for cause "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction" violates the federal constitution. *Id.* Again, a juror cannot be dismissed for cause unless his views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams v. Texas,* 448 U.S. 38, 45 (1980). "The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court." *Id.*  "[A] juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for cause." *Morgan*, 504 U.S. at 728.

Speer argues that the court wrongly excused Jurors 136, 250, and 427 for their "hesitation about imposing the death penalty." (Doc. 13 at 111.) He argues that each juror indicated he or she could follow the law, and that they could have been "rehabilitated" with additional questioning. (*Id.*) This argument is unpersuasive.

The trial court undertook an extensive voir dire with respect to these potential jurors, with the parties and the judge questioning the individual jurors.

Juror 136 stated that she was not sure she would "have the ability" to sentence someone to death. (RT 11/15/06 at 6.) She then admitted that she would hold the State to a higher burden of proof than beyond a reasonable doubt. (*Id.*) She explained that she had difficulty with "the sentencing part" and did not know if she "would be able to say, let's take his life." (*Id.* at 13.) She elaborated that "can I say that he is guilty and his life should be taken? No, I can't do that." (*Id.*)

The court granted the prosecutor's motion to strike Juror 136 for cause. (*Id.* at 20–21.) The court noted that the juror "began by saying she doesn't know if she could impose the death penalty given her conscience." (*Id.* at 21.) She also stated she would require the State to prove guilt beyond a "shadow of a doubt," even though she knew that was a higher standard than the law required. (*Id.* at 21–22.) Finally, the judge explained, Juror 136 again stated "she doesn't know if she could vote to take another person's life" and indicated "this isn't a case where she feels that she could impose the death penalty." (*Id.* at 22.)

The Arizona Supreme Court found that the trial court did not abuse its discretion by striking the juror:

> On voir dire, Juror 136 said "I'm not quite sure . . . if I will be able to do a death sentence." The juror then said that "it's not that I'm against it, it's just that I don't know if I would be able to put someone else's life in my hands beyond a reasonable doubt." On examination by defense counsel, the juror reiterated that "my problem . . . is . . . beyond a shadow of a doubt. Okay. Can you prove to me beyond a shadow of a doubt enough for me to accept that this crime happened?" The juror then stated, "I could listen to the evidence, but can I say that he is guilty and his life should be taken? No, I can't do that." Given these statements, the trial court did not abuse its discretion in granting the State's motion to strike.

*Speer*, 221 Ariz. at 455, 212 P.3d at 793. This was a reasonable application of clearly established federal law.

"A juror's voir dire responses that are ambiguous or reveal considerable confusion may demonstrate substantial impairment." *United States v. Fell*, 531 F.3d 197, 215 (2d Cir. 2008) ("[A juror's] assurances that he would consider imposing the death penalty and would follow the law do not overcome the reasonable inference from his other statements that in fact he would be substantially impaired in this case. . . .") (quoting *Uttrecht*, 551 U.S. at 18); *see United States v. Allen*, 605 F.3d 461, 466 (7th Cir. 2010) ("Because appellate judges are absent from voir dire, when a prospective juror fails to express herself 'carefully or even consistently . . . it is [the trial] judge who is best situated to determine competency to serve impartially.'") (quoting *Patton v. Yount*, 467 U.S. 1025, 1039 (1984)). Juror 136's statements were not always consistent, or even, at times, coherent, but she was consistent in indicating that her views would make it difficult or impossible to vote for a death sentence in this case. The trial court "properly considered all of [the juror's] responses in the context in which they were given and did not err in concluding that [her] views would significantly interfere with [her] duties as juror." *Fell*, 531 F.3d at 215.

Juror 250 stated that it would be "very hard" for her to vote for the death penalty and that it would have to be an "extreme case." (RT 11/20/06 at 84.) When questioned by counsel she repeated that "possibly" she would be unable to vote for the death penalty. (*Id.* at 91, 92, 94.) She stated again that she would prefer not to make the decision and would be uncomfortable doing so, and that the death penalty was appropriate only in the case of a serial killer. (*Id.* at 88–89, 90.) When asked by the judge for a definitive answer as to whether she could "follow the instructions of law as given and impose the death penalty and not vote automatically against it," the juror responded "I guess I'd have to say I don't think I can vote for the death penalty." (*Id.* at 97.) Based on that answer the court found the juror's ability to perform her duties was substantially impaired and granted the State's motion to strike her. (*Id.* at 101–02.) The Arizona Supreme Court affirmed, *Speer*, 221 Ariz. at 456, 212 P.3d at 794. This was a reasonable application of *Morgan*, 504 U.S. at

728, which held that jurors who would in no case vote for the death penalty must be removed for cause.

Finally, Juror 427 stated that although she was not opposed to the death penalty in "horrible cases," she was "not positive [she] can make a decision that could lead to the death sentence of a person." (RT 11/30/06 at 66.) She did not know if she was "capable of it." (*Id.*) In responding to questions from defense counsel, the juror agreed she could be fair and impartial in hearing and weighing the evidence and could follow the judge's instructions. (*Id.* at 67.) Subsequently, however, in responding to questions from the prosecutor, the juror admitted that her "ability to be fair and impartial" would be "substantially impaired by . . . not knowing whether you could actually vote for the death penalty or not." (*Id.* at 72.) Finally, when pressed by the judge for a definitive yes or no answer, the juror acknowledged that her "performance as a juror" would be "impaired" by the death penalty being an issue in the case. (*Id.* at  74.) The court granted the State's motion to strike the juror. (*Id.* at 80.)

The Arizona Supreme Court found that the trial court did not abuse its discretion, explaining:

> Juror 427 initially indicated that, although uncomfortable with the death penalty, she would follow the judge's instructions. However, the juror later stated, "I don't know that I'm capable of it." On further questioning by the State, the juror responded affirmatively to the question of whether "your ability to be fair and impartial is substantially impaired by your not knowing whether you could actually vote for the death penalty." The court later asked the same question, and the juror responded, "From where I sit right now, I believe it could be an impairment. I believe the fact that I don't wish to be responsible for that may sway me." Given these statements, the court did not abuse its discretion in striking the juror.

*Speer*, 221 Ariz. at 456, 212 P.3d at 794.

This was a reasonable application of *Witt*. Although at one point she indicated she could follow the court's instructions, ultimately Juror 427 admitted that her ability to serve as a fair and impartial juror was impaired. *See Uttrecht*, 551 U.S. at 18; *Morales v. Mitchell*, 507 F.3d 916, 941 (6th Cir. 2007) ("[I]solated statements indicating an ability to impose

the death penalty do not suffice to preclude the prosecution from striking for cause a juror whose responses, taken together, indicate a lack of such ability or a failure to comprehend the responsibilities of a juror.").

Applying the additional level of deference required by AEDPA, the Arizona Supreme Court's decision to affirm the trial court's excusal of Jurors 136, 250, and 427 for cause was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103; *see Wheeler*, 577 U.S. at 78–79. Claim 12 is denied.

**Claim 13:**

Speer alleges that "prosecutorial misconduct pervaded all phases" of his trial. (Doc. 13 at 113.) In the first of three subclaims, Speer alleged misconduct based on the State's non-compliance with a discovery request concerning the recorded phone calls. As set forth above, the Court denied the claim as procedurally defaulted and barred from federal review. Speer acknowledges that he likewise failed to raise in state court the remaining allegations of guilt- and penalty-phase misconduct. (Doc. 13 at 119, 127.) He argues that the default of the claims is excused by the ineffective assistance of appellate and PCR counsel. (*Id.*)

Again, ineffective assistance of appellate counsel may be used as cause to excuse a procedural default only where the particular ineffective assistance allegation was first exhausted in state court as an independent constitutional claim. *See Carpenter*, 529 U.S. at 453; *Carrier*, 477 U.S. at 489–90. Speer did not raise such a claim of ineffective assistance of appellate counsel. Under *Martinez* the ineffective assistance of PCR counsel can excuse the default only of claims of ineffective assistance of trial counsel. *See Martinez (Ernesto)*, 926 F.3d at 1225; *Pizzuto*, 783 F.3d at 1177. Accordingly, the remaining allegations in Claim 13 are also defaulted and barred from federal review.

**D.     Ineffective Assistance of Counsel: Sentencing**

Speer alleges that counsel performed ineffectively in their presentation of mitigating evidence, by failing to challenge prosecutor's misconduct, and by failing to challenge the instructions provided by the court when the jury deadlocked (Claim 14). He also alleges

that counsel performed ineffectively by stipulating to aggravating factors, by admitting prior convictions, and by allowing two expert reports to be disseminated to the State (Claims 15, 16, and 17). Finally, he alleges that counsel performed ineffectively by failing to effectively impeach the State's mental health expert (Claim 19).

**Claim 14:**

Claim 14 consists of one exhausted and four unexhausted subclaims. In the exhausted subclaim, Speer alleges that counsel performed ineffectively during the penalty phase of his trial by failing to investigate and present readily available mitigating evidence, specifically the testimony of lay witnesses who would have corroborated Speer's claims that he was physically and sexually abused, that his family had a history of addiction and mental illness, that he experienced substance abuse, and that he did not receive the institutional help he needed. (Doc. 13 at 140.) The PCR court denied this claim on the merits. (ME 5/20/15 at 17–20.)

Speer also alleges that counsel performed ineffectively by failing to present "effective" expert testimony about Speer's abusive background, trauma, and "neurocognitive deficits"; to present evidence of co-defendant Brian Womble's mental illness; to respond to prosecutorial misconduct; and to raise appropriate objections when the jury "deadlocked" during the penalty phase (Doc. 13 at 150–56.) He did not raise these claims in state court. He argues their default is excused under *Martinez* by the ineffective assistance of PCR counsel. (*Id.*)

1.      Exhausted claim: failure to present additional lay mitigating evidence

Speer argues that counsel performed ineffectively by failing to offer additional mitigating evidence from lay witnesses. (Doc. 13 at 140–150.)

Additional background

The penalty phase of Speer's trial was held over 14 days in February and March of 2007. Counsel presented mitigating testimony from three mental health experts: Dr. Paul Miller, Dr. Susan Parrish, and Dr. Pablo Stewart. Counsel also called three family

members, Speer's half-brother Chris; his stepfather, William Womble; and his cousin Carla Lujan.

### a.   Expert witnesses

#### i.   Dr. Miller

Dr. Paul Miller, a psychology professor with expertise in child development, was retained by the defense to "write a developmental report that took a look at all of the risk factors that [Speer] experienced, starting before birth" to age 13 or 14. (RT 2/6/07 at 27, 35, 37.) Dr. Miller met with Speer twice and reviewed records provided by counsel and mitigation specialist Dave Wilcox. (*Id.* at 35.) The documents included mental health records, school records, probation officer and Child Protective Services ("CPS") reports, and police reports. (*Id.* at 36–37.) Dr. Miller's 25-page report was admitted as a trial exhibit. (*See* Doc. 23-10, Ex. 53.)

Dr. Miller testified that a risk factor is a "factor that impedes or otherwise interferes with the normal growth and development of a child." (RT 2/6/07 at 46.) He explained that such factors, "pile[d] on top of one another," as they were in Speer's case, have a multiplying effect, so that "the worse it gets, the worse it gets." (*Id.* at 40, 46.)

Dr. Miller testified about these risk factors using a Power Point presentation which also documented the research supporting the factors. (*Id.* at 45.) The factors included substance abuse in the home and natal exposure to heroin and methadone (RT 2/6/07 at 47–55, 72–82); maternal depression and unpredictable behavior (*id.* at 55–63); abandonment by Speer's biological father (*id.* at 63–65); parental history of substance abuse (*id.* at 63–65; RT 2/7/07 at 30–34); abusive treatment by his stepfather Bill Womble, including beatings with fists and belts (RT 2/6/07 at 65–67); the death of Speer's grandfather (*id.* at 67–68); inter-parental conflict, including physical violence, causing insecurity, fear, depression, and disruptive behavior (*id.* at 70–71); negative parental practices, including neglect, favoritism, harsh and inconsistent discipline, and scapegoating, which led to low self-esteem and an increased risk for aggressive, oppositional, and anti-social behavior (*id. at* 89–134); sexual abuse (*id.* at 135–42; RT

2/7/07, a.m., at 4–9); childhood depression (RT 2/7/07 at 10–17); and Speer's own substance abuse (*id.* at 33–38).

Dr. Miller explained that natal exposure to methadone and heroin can be responsible for attention deficit hyperactivity disorder (ADHD) and difficulties in impulse control and self-regulation. (RT 2/6/07 at 75.) The caregiving environment in Speer's childhood home was also compromised by the parents' drug use. Speer needed more care and attention due to his in utero exposure to drugs but the continuing drug use by his parents prevented that from happening. A child in Speer's position cannot make up the developmental delays he experienced. (*Id.* at 75–76.) Children born to heroin-dependent parents also suffer from lower IQs, motor skills, visual skills, and reading and arithmetic skills. (*Id.* at 86.)

With respect to sexual abuse, Dr. Miller testified that Speer reported being sexually molested by a paternal aunt at age five or six. (RT 2/6/07 at 135–36.) Speer also reported that when he was 12 or 13 a maternal uncle "involve[ed] him in sexual activities with other men in order to obtain money for drug use." (*Id.* at 13.) He would find "older men" and have Speer "dress up and engage in fondling and other sexual activity." (RT 2/7/07 at 6.) He used emotional manipulation to persuade Speer to engage in these activities.

Dr. Miller testified that sexually abused children are at risk for drug use, depression, anxiety, conduct disorder, and low self-esteem. (RT 2/6/07 at 139; RT 2/7/07 at 9.) The same uncle who "pimped him out" also used Speer to commit burglaries. Because of his small size, Speer was able to enter homes by crawling through dog doors. (RT 2/7/07, a.m., at 5.)

In detailing the parental neglect and rejection Speer experienced, Dr. Miller noted that Speer's mother sent him to stay with his grandmother every weekend. (RT 2/6/07 at 127.) She wanted the court to remove Speer from her custody. (*Id.* at 128.) When Speer was 13 she threw him out of the house, gave him his birth certificate, threatened him with a baseball bat, and told him not to return. (*Id.* at 129–30.) She was abusing heroin and hallucinating at the time. (*Id.* at 130.) Dr. Miller also noted reports that the house was a

mess and that Speer and Chris had to steal clothes and shoes because his parents would not buy them new ones. (*Id.* at 131.)

Dr. Miller explained that among older adolescents, parental rejection may lead to "association with deviant peers," which in turn can lead to substance abuse. (*Id.* at 133–34.)

In describing Speer's childhood depression, Dr. Miller noted that Speer reported suicidal thoughts as early as age 11 and had been diagnosed with depression at ages 10 and 11 by Drs. Martig and Cabanski.[21] (RT 2/7/07, a.m., at 10.) Dr. Martig opined that Speer's depressive features began in early childhood. (*Id.* at 12.) In 1990 a school psychologist reported that Speer, who was living with his grandparents, was sad, fearful, and angry, and felt rejected, unloved, and not a part of the family. (*Id.* at 12–13.) The psychologist diagnosed Speer with clinical levels of depression and anxiety. (*Id.* at 13.) Dr. Miller testified that Speer's acting out and "disruptive conduct disorder behavior is his way of blocking out or defending against the feelings that are associated with depression, the shame, the guilt, the anger." (*Id.* at 14.) There was a link between Speer's depressive features and his behavioral problems in school. (*Id.* at 16.)

Dr. Miller also testified that Speer's aggressive and violent behavior was learned through watching the relationship between his parents and their use of threats and force against the children. (*Id.* at 21.) Speer "learn[ed] to fight back." (*Id.*) He engaged in aggressive behaviors and had problems "regulating his emotions starting very early in age and continuing throughout because he's dealing with all these really large messages of rejection and displacements from the family and these criticisms that he gets." (*Id.* at 23.) The message he got from his family was "the more you get upset, the more aggressive you are." (*Id.* at 24.)

_____

[21] Dr. Roger Martig and Dr. Stan Cabanski. Dr. Martig diagnosed Speer with depression, a conduct disorder, symptoms of hyperactivity, and narcissistic personality traits. (*See* Doc. 23-10, Ex. 49 at 3–4.) Dr. Cabanski diagnosed Speer as emotionally handicapped with ADHD and recommended probationary supervision and special education. (*Id.* at 4.)

Dr. Miller described the characteristics of a conduct disorder diagnosis and explained that "intervention programs [can be] effective in reducing conduct disorder behavior." (*Id.* at 28.) Dr. Miller noted that Speer's behavior changed for the better while undergoing intensive residential placement. (*Id.* at 29.)

Dr. Miller then recounted Speer's substance abuse history, testifying that Speer reported his mother "shooting him up" at age 12; he overdosed on crystal methamphetamine at that same age. (*Id.* at 31, 35.) He was constantly exposed to the drug use of his parents and other adults. (*Id.* at 30–36.) At age 16 he asked for "real drug treatment." (*Id.* at 35.)

The next risk factors Dr. Miller testified about were "academic, social, and behavioral problems." (*Id.* at 39.) Dr. Miller discussed Speer's ADHD and its effect on his academic performance and behavior. (*Id.* at 39–44.) He noted that Speer was treated with Ritalin but never received the necessary support from his parents to succeed academically. (*Id.* at 42–44.) Failing in school, Speer felt "hopeless, helpless, and worthless." (*Id.* at 48.) To become accepted he became a "class clown," getting into trouble with teachers but "gain[ing] recognition . . . in a negative way." (*Id.* at 49.) Eventually, however, he antagonized peers with his aggressive behavior. (*Id.* at 59.) At this point he became susceptible to "deviant peer associations" and these associations "progress[ed] toward delinquent behavior." (*Id.* at 60–61.) Ultimately Speer was placed in the juvenile prison system, where he joined a gang for protection against older and larger inmates. (*Id.* at 64.)

Finally, Dr. Miller testified about Speer's successes or "pro-social choices." (*Id.* at 68.) At age eight he lived with his cousin Carla Lujan. In that "well-organized" household, Speer was "great" and "wonderful," participating in family Bible studies, acting politely, and not getting into trouble. (*Id.* at 68–69.) Carla also noted that Speer took care of his siblings when they needed something to eat or drink. (*Id.* at 69.)

Dr. Miller testified that Carla's mother, Sue, regularly attended therapy sessions with Speer, unlike his mother and stepfather, who attended few sessions and did not participate effectively. (*Id.* at 69–70.) Speer appeared to be "very bright" and "capable of

1  learning new behaviors." (*Id.*) The probation officer who was working with Speer's family

2  described Speer's attitude as positive. (*Id.* at 70.) Another probation officer reported that

3  at age 11 Speer was "starting to show improvement in school daily checks." (*Id.*) The

4  assistant principal noted that Speer "was not seen as violent, but his behavior reflect[ed]

5  attention seeking," which was "very consistent with a child who doesn't feel he's loved,

6  feels he's rejected, . . . wants some approval from some adult." (*Id.*)

7      Speer responded positively to Juvenile Intensive Probation, even without the

8  participation of his parents (*Id.* at 71–72.) His attitude was good, he took probation

9  seriously and enjoyed visits from the probation officer, and he submitted clean urinalyses.

10 (*Id.* at 71–73.) His attendance was good and "he[] made good strides in changing his

11 behavior, progressing toward self-control and self-esteem." (*Id.* at 73.)

12      In 1991, at age 12, Speer was placed in a residential facility, Wayland. (RT 2/7/07,

13 p.m., at 6.) At one point he wrote a letter asking to remain in the program. (*Id.*) At Wayland

14 he showed "positive changes in his behavior in terms of controlling his impulses, and

15 reduced oppositional behaviors and aggressive behaviors." (*Id.* at 7.)

16      Dr. Miller testified that Speer was released from the Wayland program prematurely.

17 (*Id.* at 7–8.) He did "generally well" when he returned home but his conduct quickly

18 regressed. (*Id.* at 8.) He began to engage in disruptive behavior, property damage, and

19 substance abuse. (*Id.*) Dr. Miller explained that a much longer period of time in the program

20 was required to change the behavior of Speer's parents and the "dynamics or the common

21 disorder" in the family. (*Id.* at 8–9.)

22      Speer was next placed in the Adobe Mountain juvenile facility where he again made

23 "deviant peer associations" and became "more ingrained into delinquent behaviors,"

24 learning "what to do in terms of being delinquent, in terms of theft and car stealing, and

25 stuff like that." (*Id.* at 9.) Dr. Miller explained that "we see from there on out a pattern of

26 continued delinquent behaviors, alternative placements through corrections, and  . . . just

27 the progression into more and more delinquent behaviors." (*Id.*)

28

1    Dr. Miller testified that a structured, comprehensive residential program like

2  Wayland can be "effective in reducing recidivism or reducing the aggressive behavior

3  conduct disorder." (*Id.* at 14–15.) He concluded that he was not surprised that Speer

4  continued his delinquent behavior as an adult, given the risk factors Speer was exposed to

5  and the failure to provide him with an adequate treatment program. (*Id.* at 16–17.)

6                           ii.    Dr. Parrish

7    Dr. Susan Parrish, a neuropsychologist, evaluated Speer's neurocognitive

8  functioning and testified on his behalf. (RT 2/27/07.) Dr. Parrish administered the

9  Halstead-Reitan Neuropsychological Test Battery, an instrument on which she is a leading

10 expert, the Wechsler Adult Intelligence Scale, and the Wide Range Achievement Test-3.

11 (*See* 3/1/07 at 21–22.) She also reviewed previous evaluations of Speer, dating back to

12 when he was 11 years old, and other records, including the indictment, police reports,

13 correctional health records, school records, and CPS records. (RT 2/27/01 at 129–31.)

14   Dr. Parrish testified at length about Speer's performance on the Halstead-Reitan

15 test. (*Id.* at 126–55.) She concluded that Speer's score placed him "at the very upper end

16 of the range for moderate impairment," one point away from severe impairment. (*Id.* at

17 155.) She opined that the cause of Speer's impairment was his drug use or his in utero

18 exposure to drugs. (RT 3/1/07 at 51–52.)

19   Dr. Parrish testified that Speer's IQ had been tested on eight prior occasions, with

20 full-scale scores ranging from 77 to 92. (RT 3/8/07 at 12–16.) Dr. Parrish measured Speer's

21 IQ as 84. (RT 3/1/07 at 30.)

22   Because experts who had evaluated Speer earlier in the case—Drs. Jack Potts and

23 John Toma—had opined that he malingered during tests for competency and IQ, Dr.

24 Parrish re-tested Speer to include a malingering index and found that the test results were

25 valid. (RT 3/19/07 at 37–38.)

26   Dr. Parrish testified that while she did not perform a clinical interview of Speer, and

27 therefore could not diagnose him, based on her review of the data she "thought a diagnosis

28

of posttraumatic stress disorder should be explored." (RT 3/1/07 at 52.) She noted Speer's history of family dysfunction, physical abuse, and sexual abuse. (*Id.* at 53.)

Dr. Parrish testified that Speer's neurological impairment "affects all areas of performance" and behavior. (*Id.* at 54.) His impulsivity, difficulty following rules, and difficulty maintaining attention were consistent with a diagnosis of neurological impairment. (*Id.*) Dr. Parrish noted that Speer had been diagnosed with conduct disorder, meaning that his misconduct was a choice, but she felt that his behavior and acting out were the product of neurological impairment and depression. (*Id.* at 55–56.) She agreed with a school psychologist, Robin Storm, who had opined that Speer suffered from severe emotional impairment rather than a conduct disorder. (*Id.* at 56–60.)

Dr. Parrish testified that Speer's history of legal problems and aggressive, oppositional behaviors were better accounted for by a diagnosis of PTSD as opposed to antisocial personality disorder. (RT 3/8/07 at 23.) Dr. Parrish outlined the facts supporting each of the criteria for a diagnosis of PTSD, including traumatic events Speer experienced, among which were being attacked by his mother, who wanted to beat the demons out of him, witnessing his half-brother Chris get shot, being sexually abused by his aunt, being sent away from home on several occasions, and being physically abused by his stepfather. (*Id.* at 27–31.)

In support of a diagnosis of PTSD, Dr. Parrish further testified that Speer experienced "intrusive distressing recollection[s]" of these events as well as "intense psychological distress," including depression. (*Id.* at 33.) She testified that Speer engaged in acting out behavior, including sexual acting out as a child; that he made "efforts to avoid thoughts, feelings or conversations associated with the trauma"; that he experienced "increased arousal," including difficulty falling or staying asleep; that his symptoms lasted more than a month; and that the "disturbance caused clinically significant distress or impairment in social, occupational, or other important areas of functioning." (*Id.* at 33–35.) Dr. Parrish opined that Speer suffered from chronic rather than acute PTSD. (*Id.* at 43.)

1    Dr. Parrish acknowledged that Speer engaged in antisocial behavior but again

2    documented a number of factors that contributed to that behavior, including conflicts

3    within the home, neuropsychological problems, impairment in brain function, and

4    depression. (*Id.* at 36–41.) She also noted that "substance abuse is commonly found among

5    people who have ADHD." (*Id.* at 41–42.)

6    Finally, Dr. Parrish testified that antisocial personality disorder was not the

7    appropriate diagnosis for Speer. (*Id.* at 45.) In her opinion, the "combination of impairment

8    of brain functions and PTSD account for the symptoms far better than personality

9    disorder." (*Id.*) She also noted that, unlike individuals diagnosed with antisocial personality

10   disorder or psychopathy, Speer was capable of expressing concern for others and

11   experiencing fear and anxiety. (*Id.* at 47–49.)

12   Dr. Parrish's report was admitted at trial. (*See* Doc. 23-10, Ex. 49.)

13                    iii.    Dr. Stewart

14   Dr. Pablo Stewart, a psychiatrist, testified for Speer in mitigation. He diagnosed

15   Speer with PTSD, ADHD, major depressive disorder, and Polysubstance Abuse

16   Dependence, as well as moderate to severe impairment in brain function. (RT 2/28/07 at

17   10.) According to Dr. Stewart, Speer's "constellation of disorders all contributed to his

18   neurocognitive impairment." (*Id.* at 14.) Dr. Stewart opined that Speer's "brain is damaged

19   to the extent that he has an impaired ability to weigh, deliberate, conceptualize sequence

20   of events and adapt to changing environmental cues." (*Id.*)

21   Dr. Stewart also cited as significant circumstances in Speer's background the fact

22   that he was "drug-exposed as a fetus," which contributed to his brain dysfunction, and "the

23   depravity of [sic] which he grew up, the lack of nurturing, this absence of availability of

24   any parent, parental figure." (*Id.* at 15.)

25   According to Dr. Stewart, these conditions "act synergistically," like a "perfect

26   storm," "where you have the posttraumatic stress and the depression and the attention

27   deficit hyperactivity disorder, . . . coupled with the fact that he was exposed to significant

28   neurotoxins as a fetus, the fact that he had this very depraved upbringing . . . all contributed

to his brain damage." (*Id.* at 16.) Dr. Stewart explained that Speer's brain is damaged in the way that it "processes information and . . . uses that information to have him make decisions and determine his behavior." (*Id.*)

Dr. Stewart next testified about the criteria for a diagnosis of PTSD and the facts about Speer's life that satisfied those criteria. As described above when discussing Dr. Parrish's testimony on the same subject, Speer experienced several traumatic events that meet the first criteria, including witnessing his step-brother get shot, being beaten by his parents, and being sexually abused. (*Id.* at 19–26.)

The next criteria, reexperiencing the trauma, was satisfied because Speer reported seeing things, having bad dreams, being depressed, and experiencing "intrusive thoughts of sexual abuse." (*Id.* at 26–27.) Speer also acted out sexually as a child at school, made sexual remarks, and grabbed other children while in juvenile detention. (*Id.* at 30–31.) He also acted out violently, hitting other children with various objects, poking another boy with a knife, and hitting his great-grandmother in the face. (*Id.* at 32–33.)

Dr. Stewart testified that the next PTSD criterion, avoidance, was satisfied by Speer's efforts to change the subject when speaking with Dr. Stewart and Speer's "disassociative episodes . . . where he would still be there physically in the room with me, but psychologically, he would be gone." (*Id.* at 35–36.) Another method of avoidance was Speer's substance abuse, beginning at age five with marijuana and alcohol use. (*Id.* at 36.) Dr. Stewart noted that Speer overdosed on methadone at age 13 and used crack cocaine and methadone as a young adolescent. (*Id.* at 37.)

A finding of Hyperarousal, the next criterion, was supported by DOC records showing Speer had been prescribed an antidepressant to control "intrusive memories, hyperarousability, decreased sleep, and dysphoria." (*Id.* at 38.) The disturbance lasted more than a month, satisfying another criteria for a PTSD diagnosis. (*Id.* at 39–40.) Dr. Stewart then explained that Speer's symptoms interfered with his ability to function, causing significant impairment in several areas of his life, thus satisfying the final PTSD criterion. (*Id.* at 41.)

Dr. Stewart next testified that he considered whether Speer "suffered from any personality disorders" and determined that he did not. (*Id.* at 45–46.) While acknowledging that Speer had been diagnosed with conduct disorder as a child, Dr. Stewart opined that Speer's behavior was the "understandable" product of "his family and the drug abuse and the lack of parental involvement" and "the abuse that went on." (*Id.* at 48.)

Dr. Stewart testified that the circumstances of Speer's involvement in the Soto murder reflected his impaired brain function. (*Id.* at 50.) These circumstances included the "funny little code" Speer used to communicate over the phone, his difficulty "weighing consequences," and his inability to "respond to the changing environment." (*Id.*) All of these factors were "absolutely consistent with someone who has severe brain damage." (*Id.* at 51.)

Finally, Dr. Stewart testified that Speer's PTSD, depression, substance abuse, and ADHD are all treatable conditions. (*Id.* at 51.)

Dr. Stewart's report was also admitted at trial. (*See* Doc. 23-10, Ex. 51.)

b.      *Lay witnesses*

Counsel called three lay witnesses in mitigation, relatives who detailed the neglect, violence, and dysfunction of Speer's childhood.

i.      Chris Womble

The first witness was Speer's half-brother Chris Womble. When shown a photograph of his mother, Sabrina Womble, he identified the track marks on her arm caused by shooting heroin. (RT 2/5/07 at 8.) He testified that he, his mother, his father, and Speer all used heroin from November 2001 to March 2002 when Chris and Speer were arrested for the Soto burglary. (*Id.* at 9.) He and Speer used heroin every day, his parents four or five times a week. (*Id.*) His parents were also enrolled in a methadone program; they had received methadone daily for 25 or 30 years. (*Id.* at 10.)

Chris testified that he and Speer were feeling the symptoms of withdrawal on the morning of the burglary, which they carried out in order to steal property that could be sold for money to buy drugs. (*Id.* at 17–18.)

Sabrina's routine was to get up and go to the methadone clinic, then come back and sleep for most of the day, "not really make no meals or nothing." (*Id.* at 24.) Chris testified that the houses his family lived in were always filthy. (*Id.* at 25–26.)

Sabrina did not care what her children were doing the majority of the time. (*Id.* at 34.) When she did get upset, she would "slug us with her fist, maybe hit us with a broom." (*Id.* at 34.) The children were not involved in extracurricular activities. (*Id.* at 35–36.)

Chris testified about Speer's behavior from 6 to 11 years old. He recalled that Speer "would be in all hours of the night, carrying guns maybe, stolen bikes, stuff like that." (*Id.* at 36–37.) In response Sabrina would hit Speer "with her fist, with a belt, maybe wait until he was asleep and call the police on him to have him removed from the home, or just take him to a relative and dump him off there." (*Id.* at 37.) Chris recalled an incident when Sabrina was "slugging Paul in the face, talking about that she wanted the demons to leave [him]. And Paul was just sitting there growling and spitting at her." (*Id.* at 39.)

Chris testified that he and his sister witnessed a man raping Sabrina. (*Id.* at 41–42.) Sabrina then had an "emotional breakdown where she flipped out in the home." (*Id.* at 42.) She physically punished the children, striking Speer with a fist, belt, or broom. (*Id.* at 46.) She punished Speer more severely than his brothers, hitting him longer, harder, and more frequently. (*Id.*) Bill Womble, Brian's father and Speer's stepfather, would also discipline Speer more severely, striking him with a fist or belt. (*Id.* at 48.) He punished Speer for "not being his kid, and he didn't want to have to deal with Paul." (*Id.* at 48–49.)

Chris testified that he and his siblings were dressed poorly for school, wearing stained shirts and shoes and jeans with holes. (*Id.* at 50.) Chris and Speer would steal clothes off clotheslines or from stores. (*Id.* at 51.) Sabrina knew they were stealing but she did not want to spend money on new clothes; she needed the money to buy "[h]eroin, valium, things like that." (*Id.* at 52.)

Chris described a pattern of improved behavior when Speer returned home from placement in juvenile facilities, but "[w]ithin a couple weeks" his conduct would deteriorate and "he'd be staying out late, absconding from probation, maybe running

1   around with [his maternal uncle] Steve [Case] late hours of the night, . . . having drugs with

2   him, maybe having stolen bikes and things like that." (*Id.* at 57.) Chris saw Steve, who was

3   around 30 at the time, and Speer, then 13, injecting speed. (*Id.* at 59.) Speer and Steve

4   brought stolen goods into the home, including VCRs, bikes, and guns. (*Id.* at 61.)

5         Chris testified that his father never took him hunting, fishing, or to sporting events.

6   (*Id.* at 62–63.) Their mother never read them a bedtime story. (*Id.* at 72.)

7         Chris testified that their parents fought verbally and, a couple times a month,

8   physically. His mother would "slug" his father with a fist or strike him with other objects,

9   like a high-heeled shoe. (*Id.* at 72–73.) They argued about money and drugs. (*Id.* at 73.)

10        Chris testified that there was "talk in the family" about his maternal grandmother

11   being a witch with special powers. (*Id.* at 74.) Sabrina herself was clairvoyant and knew

12   about events before they happened. (*Id.* at 74–75.)

13        Chris described an incident when their mother gave Speer his birth certificate and

14   threw him out of the house. (*Id.* at 75–76.) Speer was 11 or 12 at the time. (*Id.* at 76.)

15        Finally, Chris testified that he loved Speer and it would "tear him up" for Speer to

16   be sentenced to death. (*Id.* at 78.)

17          ii.     Bill Womble

18        Speer's stepfather, Bill Womble, testified that he married Sabrina in 1981, when he

19   was 30, she was 24, and Speer was two or three. (RT 2/22/07 at 10, 13.)

20        Womble had been addicted to heroin and other narcotics since he was 18. (*Id.* at

21   12.) Womble was aware that at the time of their marriage Sabrina had been using drugs,

22   including heroin, dilaudid, and valium, "for some years." (*Id.*) Womble and Sabrina both

23   injected heroin. (*Id.* at 12–13.) Sabrina slept a lot from all the valium she took. (*Id.* at 15.)

24   Speer once came home from school to find her asleep and tried, unsuccessfully, to wake

25   her by flooding the apartment. (*Id.*)

26        Speer liked to spend time with his paternal grandfather, George, who was also an

27   intravenous heroin and dilaudid user. (*Id.* at 17.) Steve Case, Speer's uncle, also lived with

28   George. (*Id.* at 18.) He too was a dilaudid user. (*Id.* at 18.)

1   Speer's biological father, Mike Speer, did not want to spend time with him. (*Id.* at

2   18–19.) When Speer did spend time with his father's family he was neglected. (*Id.* at 19.)

3   Speer wanted to see his father but when visits were arranged Mike Speer would cancel at

4   the last minute, leaving Speer disappointed. (*Id.* at 20–21.)

5   Sabrina had a temper and would push, hit, and throw things at Womble. (*Id.* at 22–

6   23.) They argued in front of the children. (*Id.* at 23.)

7   Sabrina told Womble she had a family history of witchcraft. She performed chants

8   and once angrily accused Womble and Speer of trying to cast a spell on her. (*Id.* at 24.)

9   Sabrina's mood fluctuated depending on whether she had access to valium; she

10   would become "extremely angry" when she ran out. (*Id.* at 25.) Womble believed she also

11   suffered from depression. (*Id.* at 26.)

12   Womble testified that Speer was hyperactive. In one incident, Speer was six or seven

13   and had been misbehaving all day, including "using the F word." (*Id.* at 30.) When Womble

14   arrived home from work, Sabrina insisted he discipline Speer. (*Id.*) Womble swatted him

15   on the butt with his belt. (*Id.*) The same thing happened the next day and Womble "just

16   flipped out and started swatting him on the butt" and asking Speer "why do you keep doing

17   it over and over?" (*Id.* at 31.) He ended up leaving marks on Speer's back. (*Id.*) He

18   acknowledged that he might have hit Speer with his fist. (*Id.* at 32.) According to Womble,

19   Speer was "very smart" and "knew how to get people mad," which was a "daily

20   occurrence." (*Id.*) The household was "chaotic." (*Id.*)

21   Womble testified that in 1985 Speer disclosed that he had been sexually molested

22   by his aunt, who forced him to perform oral sex on her. (*Id.* 33–34.)

23   Womble testified that when Chris was old enough to accompany him and Speer on

24   outings, Speer began to misbehave because he wanted Womble's complete attention. (*Id.*

25   at 34–35.) He was "constantly breaking things, just always trying to get attention." (*Id.* at

26   36.) He would use obscenities at four or five years old. (*Id.*)

27   Womble testified that he remembered an incident from 1986 when Speer, at age

28   seven, exposed himself in school. (*Id.* at 37–38.) Speer's grandmother told one of his

teachers that Speer was "emotionally disturbed." (*Id.* at 38.) She told Womble the same thing, and that Speer needed to be disciplined, but Womble and Sabrina never followed through. (*Id.* at 39–40.) Sabrina ignored reports stating the family needed counseling or that Speer needed to be evaluated. (*Id.* at 43.) Womble never involved Chris and Speer in sports, outdoor activities, or the Scouts. (*Id.* at 44.)

Womble testified that there were CPS contacts in 1988 and that police officers came to his house "on numerous occasions, talking to [Womble] or Sabrina about Paul." (*Id.* at 48.) Womble agreed that Speer was "out of control and incorrigible" in July 1988. (*Id.* at 50.)

Womble testified about court-ordered counseling sessions that he and Sabrina attended. Womble would try to hide Sabrina's drug use from counsellors and try to make the family look better than it was. (*Id.* at 54.) He did not want to contradict Sabrina or otherwise upset her, or "get between her and the counselor." (*Id.* at 53–54.)

In late 1988 CPS removed Speer from the home. (*Id.* at 55–57.) He had red welts on his neck and stomach, which Womble acknowledged he was responsible for. (*Id.* at 57.)

Sabrina was the dominant partner in the marriage, and because she spent much of her time sleeping due to the effects of valium or heroin, the children were unsupervised and roamed the streets at night. (*Id.* at 60–62.)

Womble acknowledged other incidents of domestic violence, where Speer was either the victim or the perpetrator. He recalled that Speer "was taken several times to juvenile." (*Id.* at 65–66.)

Because Sabrina wanted Speer out of the house, he spent many weekends with one of his grandparents. (*Id.* at 66.) When he returned, his behavior was worse because of all the attention he had received. (*Id.* at 66–67.)

Speer was close to his grandfather George, who died when Speer was 12 or 13. (*Id.* at 67.) After George's death, Speer grew closer to his uncle Steve Case, Sabrina's brother. (*Id.*) Case was around 40 at the time and a drug user; Speer was 12. (*Id.* at 28.) They committed burglaries together. They broke into the house of Womble's neighbor—"Steve

put Paul through a window and had him take some guns or silver coins that he knew was in the house." (*Id.* at 68.) Case also "got Paul to steal a .357 magnum from [Womble's] own brother." (*Id.* at 68–69.)

Around this time Speer, age 12, was hospitalized after overdosing on methamphetamine he had injected. (*Id.* at 70–71.)

From 1989 to 1992, Speer "went to juvenile court several times." (*Id.* at 71.) Womble recalled that one of the probation officers or psychologists who saw Speer explained that Speer needed "structure and control." (*Id.*) Sabrina opposed recommendations that Speer be placed in special education. (*Id.* at 75.)

Speer was prescribed the maximum does of Ritalin but it made him "high as a kite," so Sabrina discontinued the drug without consulting a physician. (*Id.* at 76 .) Steve Case took the leftover Ritalin. (*Id.* at 77.)

Womble testified about the incident in which Chris caught a man attacking Sabrina in her bedroom. (*Id.* at 82.) After the assault Sabrina was "really out of it" for a couple weeks to a month, "like she was possessed by a demon." (*Id.* at 86.) She attacked Womble and Speer with a baseball bat. (*Id.* at 83.) She chased Speer, then 14, around with the bat until "she ran him off" and he went to his grandmother's house. (*Id.* at 84.) In another incident Sabrina was taken to jail after attacking Womble with a fork. (*Id.* at 84–85.) Womble moved the children out of the home. (*Id.* at 85.) Sabrina was voluntarily committed for three days. (*Id.*)

Womble testified that doctors had used a forceps to deliver Speer, which left a mark that was still visible when he was three. (RT 2/26/07, a.m., at 50.)

Womble testified that between ages 13 and 18 Speer was committed to the Adobe Mountain juvenile facility four or five times. (*Id.* at 64–65.) When he returned home, the conditions in the household had not improved with respect to Sabrina's "emotional state" and her drug use and inability to discipline Speer. (*Id.* at 65–66.)

At one point when Speer was 18 he returned home to live with Womble and Sabrina. (*Id.* at 68.) They all used drugs together, including sharing needles. (*Id.*)

Speer was arrested and went to prison in 1998 for three or four years. (*Id.* at 69–70.) Womble visited him once; Sabrina did not visit him at all. (*Id.* at 70.) After being released from prison, Speer stayed with Al Heitzman for a month before moving back home with Womble, Sabrina, Delilah, Chris, and Brian. (*Id.* at 71–72.) They were all using heroin, Sabrina was still taking valium, and Chris was also using crack and "getting into burglarizing cars." (*Id.* at 72–73.) Brian eventually moved out and went to stay with Heitzman. (*Id.* at 74.)

Womble testified that Chris had been shot twice, the first time in the leg, the second time, a drive-by shooting, in the face. (*Id.* at 77.)

Womble acknowledged that his children were "raised in an environment where violence was a way of dealing with problems and disputes." (*Id.* at 86.)

Womble testified that Speer receiving the death penalty would affect him negatively because he still loved Speer. He pointed out that Sabrina was "just about suicidal about this." (RT 2/26/07, p.m., at 8.) She could not face what was going on and "doesn't want to live through it." (*Id.* at 9.) Speer's half-sister Delilah also loved Speer and was "just not facing what is going on." (*Id.*) Counsel then showed a video depicting Speer's son, Cedric, in the apartment they all shared in 2000.

### iii.   Carla Lujan

Carla Lujan, Speer's cousin on his father's side, testified that Speer stayed with her family in 1988 when he was nine and she was eleven. (RT 2/20/07 at 146.) Lujan, now a lawyer, explained that her mom, Sue, was fond of Speer and offered to take him in when Sabrina said she was going to give Speer away. (*Id.* at 147.) Speer lived with them for a couple months. (*Id.*) Lujan testified that Speer's house was "always trashed out, a big mess." (*Id.*) Speer wore "raggedy" clothes before he came to live with Lujan's family. (*Id.* at 148.)

Speer was "pretty hyperactive" but he was "very good" and participated in Bible studies with family. (*Id.* at 147–48.) He and Lujan played together in a treehouse in the backyard, went swimming, and played video games. (*Id.* at 148–49.) Speer told Lujan that

1  his mom hated him and didn't want him and said so in front of him. (*Id.* at 149.) She "put

2  him down" and yelled at him "constantly." (*Id.* at 150.)

3          Sue took Speer to counseling sessions. (*Id.* at 151.)

4          Lujan testified that Speer, in contrast to his behavior at his own home, was "very,

5  very good in our home." (*Id.* at 152.) He had "very good manners . . . for such a young

6  age." (*Id.*)

7          Lujan testified that Sabrina came late one night to take Speer home. (*Id.* at 153.) She

8  needed Speer to live at home or she would lose out on support money. (*Id.*) Lujan was

9  upset because Speer "was like a brother to her." (*Id.*)

10         Lujan testified that Speer was "very active" when living at home and Sabrina

11 "constantly yelled at him and told him to knock it off." (*Id.* at 153–54.) While living at

12 Lujan's house, Speer was "very calm." (*Id.* at 154.)

13         Lujan also testified about Speer's half-sister, Delilah. She told Lujan that she had

14 dropped out of school and become a prostitute at age 13. (*Id.* at 157.) She was a drug user

15 and had gotten a sexually transmitted disease. (*Id.*)

16         Finally, Lujan testified that she loved Speer and that he was important to her and

17 other members of her family and they cared what sentence he received. (*Id.* at 161.)

18         In rebuttal, the State called one witness, Dr. Michael Bayless. As discussed in detail

19 below, Dr. Bayless diagnosed Speer with antisocial personality disorder and dysthymia,

20 with little to no cognitive impairment.

21         In his lengthy closing argument, defense counsel traced Speer's development and

22 the hardships and risk factors he encountered, emphasizing the dysfunctional home in

23 which Speer grew up; the fact that his mother used heroin and methadone while she was

24 pregnant with Speer and that both parents were addicts; the physical and sexual abuse Speer

25 experienced; his own extensive drug use; and his depression, ADHD, and learning and

26 emotional disabilities, for which he never received adequate treatment. (*See, e.g.*, RT

27 3/26/07 at 81–140.) Without those circumstances, counsel argued, the murder would not

28 have occurred.

1

       c.     *PCR evidence*

2       Speer attached several declarations to his PCR petition. Mitigation specialist David

3    Wilcox attested that he did not prepare a chronology of Speer's life. (PCR Pet., Ex. 16, ¶

4    4.) He did not interview Speer's teachers, CPS workers, probation employees, DOC

5    employees, or mental health evaluators/counselors. (*Id.*, ¶ 7.) He did not interview Sabrina

6    Womble because he "felt her heroin abuse did not make her a suitable witness for the

7    defense." (*Id.*, ¶ 7.) He interviewed Bill Womble twice and spoke to Speer's biological

8    father, Mike Speer, on the phone. Mr. Speer "was not receptive to being interviewed or

9    cooperating with the defense team." (*Id.*, ¶ 9.) Wilcox had a "very poor relationship" with

10   Speer and had difficulty "establish[ing] good communication and trust." (*Id.*, ¶ 10.)

11       Sabrina Womble attested that she "used significant amounts of heroin throughout

12   [her] pregnancy with Paul" and he "was born heroin addicted." (PCR Pet., Ex. 17, ¶ 3.)

13   She introduced her sons to heroin so they would not have to "run across the freeway" to

14   buy methamphetamine. (*Id.*, ¶ 7.) Sabrina stated that Speer's biological father "was not

15   involved in his life or in this case." (*Id.*, ¶ 13.) She admitted she was "not a good mother."

16   (*Id.*, ¶ 15.) She also stated that she was "not allowed to testify in Paul's mitigation hearing"

17   and did not have a "good relationship" with the defense team. (*Id.*, ¶¶ 2, 6.)

18       Debra Corral, Speer's paternal aunt, attested that she observed fresh track marks on

19   Sabrina's arms and saw her shooting heroin when she was pregnant with Speer. (PCR Pet.,

20   Ex. 18, ¶ 6.) According to Debra, all of Sabrina's children were born addicted to heroin

21   and methadone. (*Id.*, ¶ 7.) The day Speer was born, Debra saw his "arms and legs jerking

22   and he was 'dry crying.'" (*Id.*) He spent four or five days in the hospital. (*Id.*) Debra denied

23   sexually abusing Speer, stating that Sabrina used the allegation to try to extort money from

24   her parents. (*Id.*, ¶ 15.) She was never alone with Speer and he never stayed with her

25   overnight. (*Id.*) Speer's legal team never spoke with her. (*Id.*, ¶ 19.)

26       Diane Hauer was a secretary at Speer's elementary school. She knew that his parents

27   kicked Speer out of the house and that he also ran away from home. (PCR Pet., Ex. 19, ¶

28   3.) Diane visited Speer's home and found it so filthy she "dared not sit down." (*Id.*, ¶ 4.)

She knew from his school records that Speer "was a slow student but did not reach the level of mental retardation." (*Id.*, ¶ 5.) Diane was not contacted by Speer's defense team. (*Id.*, ¶ 6.)

Veronica Trujillo, the mother of Speer's child, attested that Speer "would steal so that his parents would have money for drugs. His parents sent [him] to get the drugs or money or else they kicked him out of the house." (PCR Pet., Ex. 20, ¶ 4.) Veronica's mother, Lilly, attested that Speer did not have a relationship with his biological father. (PCR Pet., Ex. 21, ¶ 4.) She noticed that Speer's mother slept all day and was up all night; the parents had a "weird lifestyle" and used drugs. (*Id.*, ¶ 7.) They would have their son arrested but he would always return to the family home. (*Id.*, ¶ 8.) Speer's mother "put restraining orders on [him] and threw him out of the family home. [She] then told police [he] was abusive." (*Id.*, ¶ 10.) Lilly suspected that the parents sent Speer out at night to get drugs for them. (*Id.*, ¶ 9.)

Robin Storm attested that she completed a psychological evaluation of Paul Speer for the school district. (PCR Pet., Ex. 22, ¶ 1.) She was not contacted by the defense team. (*Id.*, ¶ 2.) She measured Speer's IQ as ranging from 76 to 88. (*Id.*, ¶ 3.) She diagnosed him at age 11 as "seriously emotionally disturbed." (*Id.*, ¶ 4.) She opined that Speer was "handicapped, emotional disability [sic] based on his depression" and should have been placed in a special education classroom. (*Id.*, ¶ 7.)

Analysis

In alleging ineffective assistance of counsel at sentencing, Speer contends that "[o]f primary concern is trial counsel's failure to interview or present the testimony of key lay witnesses who would have substantiated Speer's claims of physical and sexual abuse, multigenerational addiction and mental illness, trauma, institutional failure, and substance abuse." (Doc. 13 at 140.) These witnesses include family members, a former juvenile probation officer, and former neighbors, teachers, acquaintances, and school officials. (*Id.*) According to Speer, "[p]erhaps the biggest error was trial counsel's failure to present the testimony of Speer's mother." (*Id.* at 141.)

In these habeas proceedings Speer attempts to support this claim with a new set of declarations, executed in 2018. Attached to his notice of request for evidentiary development are declarations from his aunt Debra Corral; his step-uncle John Womble; his biological father, Michael Speer; his stepfather, William Womble; his great aunt Doris Donithan; his step-aunt Sue Riley; and his juvenile probation officer, Scharlene DeHorney.[22] (*See* Doc. 23, Ex's 9–15.)

Because this aspect of Claim 14 was decided on the merits by the state PCR court, the Court's review under AEDPA is "limited to the record that was before the state court. . . ." *Pinholster*, 563 U.S. at 181; *see Ayala v. Chappell*, 829 F.3d 1081, 1102 (9th Cir. 2016) (refusing to consider evidence that specific individuals were willing to testify on petitioner's behalf when the individuals weren't named in the claim as it was presented to the state supreme court); *Murray (Robert)*, 745 F.3d at 998. Therefore, the Court cannot consider these new declarations in its analysis of this claim.

The PCR court, in denying the claim on the merits, first noted that defense counsel had cited 23 mitigating circumstances at sentencing and that the Arizona Supreme Court, in its independent review, found that the following circumstances had been proved by a preponderance of the evidence:

> Defendant suffered a difficult childhood; he suffered physical and sexual abuse during childhood; he habitually abused drugs and alcohol beginning in his early teens and eventually became a heroin addict; he presented evidence

---

[22] Also attached are documents, including a 1996 newspaper article and scientific papers, purporting to support the allegation that as a child Speer may have been exposed to a toxin, trichloroethylene (TCE), which had contaminated the drinking water in parts of Phoenix. (Doc 23, Ex's 35–40.) Speer alleges that trial counsel performed ineffectively in failing to investigate Speer's potential exposure to TCE. (Doc. 13 at 15–16, 145–46.) This is a new claim, raised for the first time in Speer's habeas petition. Contrary to Speer's argument (Doc. 13 at 256), the claim's default is not excused by the performance of PCR counsel because the claim itself is speculative and conclusory. *See Atwood*, 870 F.3d at 1060; *Runningeagle*, 825 F.3d at 982; *see also Jones v. Gomez*, 66 F.3d 199, 205 (9th Cir. 1995) (conclusory allegations of ineffective assistance of counsel do not warrant habeas relief). In addition, the Court is not permitted to consider the new evidence, *Ramirez*, 142 S. Ct. 1718, leaving the claim wholly without support.

of mental health issues and a low IQ; and he proved that the death penalty would have negative effects on his family.

(ME 5/20/15 at 17–18.)

The PCR court then outlined the evidence Speer argued counsel should have presented:

> Now, Defendant seeks to provide additional information about his background, from family members (mother, estranged father, paternal aunt to testify about his heroin withdrawal as a newborn); teachers (fourth grade teacher, school secretary to testify Defendant was "not from a healthy happy home," school psychologist to testify that Defendant's IQ was measured at 11 as between 76 and 88, and that he was seriously emotionally disturbed); and others (girlfriend and mother of his son, as well as his girlfriend's mother, to testify to Defendant's mother's involvement in his drug use, including using Defendant and money earned from Defendant prostituting himself to procure drugs for herself).

(*Id.* at 18.)

In addition to this information, the PCR court considered Speer's "'love of family' based on statements made in the 22 available tapes." (*Id.*) The court gave the evidence "little weight" as mitigation, however, because "Defendant was simultaneously plotting the murder of the victims to a previous crime and pressuring his half-brother to provide assistance." (*Id.*) The court also noted that "the jury was presented with evidence of Speer's love of his family as Sabrina Womble, Defendant's mother, testified during the guilt phase that Defendant repeatedly talked to her about how much he loved her." (*Id.*)

The court then noted that "trial counsel spent almost three weeks presenting a great deal of evidence of Defendant's difficult childhood and dysfunctional home life and information about his mental health." (*Id.*) Counsel presented this mitigating evidence "through then-available family members as well as relying heavily on the defense mental health experts." (*Id.*)

The court next considered Speer's argument that counsel should have presented Sabrina Womble as a mitigation witness. Sabrina "contend[ed] that she could have provided relevant evidence of her heroin use during pregnancy, how she introduced her

son to heroin, how she was a drug addict, how Defendant's natural father was not involved in his life, and how she was not a good mother." (*Id.*) The court rejected this as a grounds for ineffective assistance, explaining:

> The problem is that Sabrina Womble was called by the State as a witness in the guilt phase of the trial. During testimony, she minimized her use of heroin, denying she was an addict her entire adult life, which is in stark contrast to her Declaration attached as Exhibit 17 to the Petition.
>
> There was a sound strategic reason for trial counsel not to call Sabrina Womble in the penalty phase: she lacked credibility. Among other things, she testified that she denied knowing her husband was on probation, which is difficult to believe; she said she was asleep at the time of the March 14 burglary and denied seeing the Defendant and co-Defendant in her apartment with stolen items; she stated she was too high to remember anything; she was impeached at trial with her prior inconsistent statements; and Defendant was convicted of witness tampering as a result of inducing her to testify falsely. Not only would Sabrina have lacked credibility with the jury, the mitigation specialist declared that Sabrina's heroin abuse did not make her a suitable witness for the defense. . . .

(*Id.* at 18–19.)

The court determined that, even without the additional witnesses Speer argued should have been called, "the jury heard ample evidence of mitigation":

> As the Supreme Court determined, trial counsel presented by way of mitigation the content of much of the evidence Defendant now wants to add, not necessarily by way of specific example, but illustrating generally that Defendant had a troubled childhood and dysfunctional home life. This included: Sabrina Womble's drug use and her abuse and neglect of Defendant; Defendant's early exposure to drugs and history of substance abuse; he witnessed his mother being raped; he was physically abused by his step-father; he was abandoned by his own father; he was sexually abused by a family member; he offered testimony from mental health professionals about how he suffered from PTSD, was depressed, and had a low IQ; how he was forced to prostitute himself at age 12 for money to be used to buy drugs; and how he had moderate to severe cognitive impairment.

(*Id.* at 19.) The court found that "[i]t was not unreasonable for trial counsel to rely heavily on mental health professionals, instead of Speer's family members" because "[t]he additional family members . . . would merely have offered cumulative evidence. Since they

have a natural bias in favor of Defendant, the weight of their purported testimony would not in the Court's view have led to a different outcome." (*Id.*)

The court concluded, therefore, that "trial counsel's performance was reasonable under the circumstances, was not deficient, and Defendant was not prejudiced. In the Court's view, there is not a reasonable probability that, absent the errors Defendant alleges, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." (*Id.*)

Finally, the court found that "given the evidence that Defendant conspired with his brother to eliminate witnesses to a previous crime, which is a particularly egregious act, the Court does not believe that additional evidence of Defendant's background and childhood would have resulted in leniency" and therefore "Defendant was not prejudiced by any deficiency in the mitigation investigation." (*Id.* at 19–20.)

Speer argues that this decision was an unreasonable application of clearly established federal law and based on an unreasonable interpretation of the facts. (Doc. 13 at 146–50.) These arguments fail, as set forth next.

     *a.*     *Application of clearly established federal law*

Speer contends that the PCR court unreasonably applied clearly established federal law by finding it was reasonable for defense counsel "to rely heavily on mental health professionals, instead of Speer's family members." (Doc. 13 at 147.) Speer asserts that "[i]n light of the state court record, it was in fact patently unreasonable for trial counsel to rely solely on experts and not enlist the many lay witnesses who were available to testify." (*Id.*) This argument is not persuasive. First, of course, counsel did not rely "solely" on expert witnesses; in fact, they presented as many lay witnesses as experts.

Nevertheless Speer contends that the missing "percipient witnesses" would have provided supporting evidence regarding "sexual abuse; opioid addiction at birth; genetic predisposition to mental illness and addiction; and multigenerational and complex trauma." (*Id.*) According to Speer, such testimony was necessary to corroborate his self-reporting regarding these issues and to counter the prosecution's attempt to portray him as a

"malingerer and manipulator" "who could not be relied upon to tell the truth." (*Id.* at 141.) This argument does not withstand scrutiny.

Speer's expert witnesses, particularly Dr. Miller, addressed each of the issues Speer contends should have been corroborated by additional testimony from lay witnesses. With respect to Speer's opioid addiction at birth, Dr. Miller testified that in a police report Speer's biological father stated that Sabrina Womble used heroin during her pregnancy. (RT 2/6/07 at 48.) He further testified that information about Sabrina Womble's natal drug use had been provided by "various sources" and confirmed again by Speer's biological father immediately prior to Dr. Miller's testimony. (RT 2/6/07 at 72.) Lay testimony was not needed to provide additional support for this factor. The Arizona Supreme Court found that Speer had proved "his mother used heroin during pregnancy." *Speer*, 221 Ariz. at 464, 212 P.3d at 802.

In addition, Sabrina Womble, as the PCR court found, would not have been a credible witness, given her inconsistent reports about the extent of her drug use. Speer's aunt Debra Corral, according to her PCR declaration, could have testified about her observation of Speer's condition as a newborn, but she also denied Speer's allegation of sexual abuse, reducing her value as a mitigation witness. (*See* PCR Pet., Ex. 18.) Finally, of course, Speer could not corroborate his mother's drug use during pregnancy, so his credibility on that question was not at issue.

With respect to the sexual abuse Speer allegedly experienced, he offers no witnesses who could have corroborated his self-reporting of the incidents; and, again, the Arizona Supreme Court found that sexual abuse was a mitigating factor. *Speer*, 221 Ariz. at 464, 212 P.3d at 802.

Speer does not specify what the missing lay witnesses would have testified about to corroborate his "genetic predisposition to mental illness and addiction [] and multigenerational and complex trauma." (Doc. 13 at 147.) As described above, the lay witnesses who did testify offered substantial evidence of multi-generational drug use, violence, criminality, and dysfunction, and this evidence was the grounds for much of Dr.

Miller's expert testimony about risk factors. In addition, Dr. Parrish testified about Robin Storm's evaluation of Speer. *See McGill v. Shinn*, 16 F.4th 666, 694–96, 698 (9th Cir. 2021) (rejecting ineffective assistance claim where "the defense team uncovered a 'not insignificant' amount of mitigation evidence that spanned decades of McGill's life and presented a comprehensive picture to the jury").

Speer next argues that the PCR court unreasonably determined that the omitted evidence would have been cumulative to the evidence that was presented. (Doc. 13 at 147.) The PCR court supported its determination that "the jury heard ample evidence of mitigation" (ME 5/20/15 at 19) by noting that the Arizona Supreme, in its independent review, found that a number of mitigating circumstances had been proved. *See Speer*, 221 Ariz. at 464–65, 212 P.3d at 802–03. The omitted testimony—from Sabrina Womble, Debra Corral, Diane Hauer, Veronica and Lilly Trujillo, and Robin Storm—would have been cumulative to the evidence offered through Speer's family members and the experts, evidence which the Arizona Supreme Court found sufficient to prove, as mitigating circumstances, Sabrina Womble's heroin use during pregnancy, the family's drug use, Speer's depression and low IQ, his chaotic and dysfunctional childhood, his placements outside the home and extensive experience with the juvenile justice system, his early drug use, and the physical and sexual abuse he suffered.

The PCR court did not unreasonably apply *Strickland* when it determined that the omission of cumulative evidence did not support a finding that counsel performed ineffectively. The omitted evidence "barely . . . alter[s] the sentencing profile presented" to the jury. *Strickland*, 466 U.S. at 700; *see Leavitt v. Arave*, 646 F.3d 605, 615 (9th Cir. 2011) (explaining that "cumulative evidence is given less weight because it is not as likely to have affected the outcome of the sentencing").

"[T]o establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005). The Ninth Circuit has consistently declined to find prejudice where the omitted mitigating evidence

was cumulative to the evidence presented. *See Benson v. Chappell*, 958 F.3d 801, 833 (9th Cir. 2020) (finding no prejudice where new evidence of torture and sexual abuse was "cumulative" to evidence of petitioner's "horrendous childhood"); *Schurz v. Ryan*, 730 F.3d 812, 815 (9th Cir. 2013) (rejecting claim that counsel performed ineffectively by failing to present mitigating evidence of petitioner's "drug abuse and dysfunctional family life" where counsel "extensively covered these topics in his sentencing memorandum, complete with an attached psychological evaluation"); *Cunningham v. Wong*, 704 F.3d 1143, 1161 (9th Cir. 2013) (explaining that the "primary mitigation value" of testimony that petitioner was loved by his family "was adequately presented at the penalty phase" so additional evidence was cumulative); *Rhoades v. Henry*, 638 F.3d 1027, 1051 (9th Cir. 2011) (finding no prejudice despite the fact that new evidence "exceed[ed] what was uncovered and presented by trial counsel" in part because "much of the newly adduced evidence is cumulative"); *Babbitt*, 151 F.3d at 1176 (finding no prejudice where evidence omitted at sentencing was "largely cumulative of the evidence actually presented"); *Woratzeck v. Stewart*, 97 F.3d 329, 336–37 (9th Cir. 1996) (finding no prejudice from counsel's failure to investigate or call additional witnesses at sentencing because all the information the witnesses would have presented was contained in the presentence report).

The omitted mitigating evidence from Speer's mother and aunt and other lay witnesses was not different in strength and subject matter from the evidence counsel did present. Speer was not prejudiced under *Strickland* by the omission of this cumulative evidence.

The cases cited by Speer do not support his claim. In *Stankewitz v. Woodford*, 365 F.3d 706 (9th Cir. 2004), for example, counsel presented "minimal" mitigating evidence, "consisting of testimony from six witnesses (only four of whom were actually in court) and covering only approximately 50 pages in the transcript." *Id.* at 716. Counsel failed to retain an investigator, failed to interview Stankewitz's "teachers, foster parents, psychiatrists, psychologists or anyone else who may have examined or spent significant time with him during his childhood and youth," and failed to procure a psychological examination or

obtain any records related to Stankewitz's background. *Id.* at 719–20. Counsel was also unaware of Stankewitz's history of drug and alcohol abuse. *Id.*

These failures resulted in the wholesale omission of classic mitigating evidence. This evidence showed that Stankewitz was born into a poverty-stricken household where there was not enough food to feed the 10 children. *Id.* at 717. The house was dirty, filled with vermin, and lacked running water and electricity. *Id.* By age five, Stankewitz had started sniffing paint. *Id.* He was physically and mentally abused by both parents. *Id.* His mother drank excessively while pregnant with Stankewitz and was abused by Stankewitz's father, who struck her repeatedly in the abdomen. *Id.* Stankewitz's mother beat him so badly that she was jailed and he was placed in the care of the state where he was "shuffled from one state institution to another." *Id.* at 718. During these placements "he was massively and unnecessarily drugged, tied to beds, beaten, sexually molested, neglected, deliberately tortured, and otherwise abused by staff." *Id.*

Also omitted at sentencing was evidence that Stankewitz was brain-damaged, borderline retarded, and suffered from significant brain dysfunction which caused problems with impulse control and judgment. *Id.* He experienced "intense mood shifts, profound depressions with suicidal tendencies, psychotic thinking, an inability to relate to reality in a rational manner, and paranoid delusional thinking." *Id.* He also had a "very severe" substance abuse problem dating back to as early as age 10. *Id.*

The mitigating evidence that was omitted due to counsel's deficient performance in *Stankewitz* is precisely the evidence that Speer's counsel did present at sentencing. As just recounted, the jury heard, over the course of almost three weeks of testimony, detailed evidence about Speer's dysfunctional childhood, which included natal exposure to heroin and methadone, early drug use encouraged by his mother, emotional neglect and abuse, physical abuse, and sexual abuse. Counsel presented extensive testimony from experts who had reviewed the relevant records, examined Speer, and determined that he suffered from PTSD, ADHD, and brain impairment. These same experts explained that Speer performed

well in institutional settings but was consistently discharged prematurely back to his dysfunctional family home.

Similarly, in *Hamilton v. Ayers*, 583 F.3d 1100, 1119 (9th Cir. 2009), the entire penalty phase took less than a day and was contained in 39 transcript pages. Counsel waived an opening statement and presented one witness—Hamilton's mother—whose testimony was contained in five pages. *Id.* at 1119–20. As a result of counsel's lack of preparation and "scant questioning," this testimony "left the false impression that Hamilton's childhood, while unhappy, was not unusual." *Id.* at 1120. As in *Stankewitz*, counsel's incompetent representation resulted in the omission of significant mitigating evidence about Hamilton's family background and his mental health history. Hamilton's alcoholic father physically abused him, physically and sexually abused his mother in front of Hamilton, and sexually abused Hamilton's sister with his mother's knowledge, consent, and participation. *Id.* at 1124–25. When the sexual abuse was disclosed the parents were taken into custody. *Id.* at 1125. Hamilton "spent the next few years moving from one foster home to another." *Id.* Hamilton also "suffered from serious mental health problems throughout most of his life," including "schizophrenic paranoid disturbances" and depression. *Id.* at 1126–27. He attempted suicide on multiple occasions. *Id.* at 1127.

Again, the contrast with the performance of Speer's counsel is telling. The mitigation evidence presented at Speer's sentencing by both lay and expert witnesses covered his family background and mental health history in extensive detail.

In *Robinson v. Schriro*, 595 F.3d 1086 (9th Cir. 2010), counsel's performance bears no relationship to the efforts Speer's counsel made on his behalf. Robinson's counsel "engaged in virtually no investigation" and did not call any witnesses or present any evidence at the sentencing hearing. *Id.* at 1109. Counsel did not investigate Robinson's family history, speak with any member of his family, "request school, medical, or employment records, or seek a mental health evaluation." *Id.* at 1109–1110. Again, counsel's failure to carry out an "effective penalty-phase investigation" resulted in the omission of "classic mitigation evidence" such as Robinson's impoverished background,

unstable and abusive upbringing, childhood sexual abuse, low intelligence, personality disorder, non-violent nature; and potential for rehabilitation. *Id.* at 1110. "Instead, counsel's limited investigation yielded almost nothing of use." *Id.* at 1111. In Speer's case, counsel's investigation yielded a comprehensive account of the mitigating aspects of his background and mental health.

In *Wallace v. Stewart*, 184 F.3d 1112 (9th Cir. 1999), the defendant pleaded guilty to three murders so the only issue was his sentence. Counsel at his initial sentencing spent just 36 minutes conferring with the expert retained for sentencing and 1.4 hours talking with other potential mitigation witnesses. *Id.* at 1115–16. Counsel failed to discover and provide the expert with test results and information about Wallace's background. This deficient performance left the sentencing judge with an incomplete and inaccurate picture of Wallace's history and mental health. Among the information omitted was the fact that Wallace came from a "dysfunctional family background[]," an environment "marred by an almost unimaginable level of chaos, neglect, bizarre and insane behavior, and by extreme violence between the parents." *Id.* at 1116. Wallace's mother was psychotic; his father beat her; both were alcoholics. *Id.* Wallace sniffed glue and gasoline daily between the ages of ten and twelve. *Id.* He experienced a "clinically significant series of head traumas" and suffered from major depressive disorder and possibly organic brain disorder. *Id.* At the time of the murders, his ability to conform his conduct to the requirements of the law was "significantly impaired." *Id.*

In contrast to this incompetent performance of Wallace's attorney, Speer's counsel were aware of his background and provided their experts with the information necessary for them to render their diagnoses. They presented this classic mitigating evidence at sentencing.

In each of the cases cited by Speer counsel performed ineffectively by failing to investigate and present the kind of mitigating evidence Speer's counsel did in fact investigate and present. The cases support a finding that the PCR court's denial of this claim was a reasonable application of *Strickland*.

b.    *Factual determinations*

Speer contends that the PCR court made unreasonable factual determinations by questioning the credibility of the proposed family member witnesses, principally Sabrina Womble, without an evidentiary hearing. (Doc. 13 at 148–50.) He argues that the PCR court mischaracterized Sabrina's trial testimony and its divergence from the information she provided in her PCR declaration. (*Id.*)

The State called Sabrina to testify in the guilt phase of trial about the circumstances surrounding the arrest of Speer and Chris Womble at her apartment on March 14, 2002. (RT 1/4/07 at 80–97.) She testified that she had taken valium, Tylenol 3, and methadone that night but denied taking heroin that day or the day before. (*Id.* at 92–93, 94.) She testified that she had been on methadone for 30 years. (*Id.* at 93.) She also denied taking heroin in addition to methadone, but then acknowledged that she had also taken heroin: "There may be 10 years, and then maybe another five years would go by. So yes, I have taken it. Not on a regular basis." (*Id.*) She also admitted that in the past she had taken heroin "on top of the methadone." (*Id.* at 94.)

On cross-examination, defense counsel asked Sabrina whether she had "been using heroin for quite some time." (*Id.* at 99.) She replied: "When I was under 18, there was a couple years I used it. But since I became an adult, if I did it, it would—it would be, maybe I'd go—you know—10 years—first 10 years we were together, no, I didn't do it." (*Id.*) Under counsel's continued questioning Sabrina agreed that she had used heroin "more than a few times—more than a few periods of time[.] In other words, there was two weeks at one point and two weeks at another point, and sometimes it was years apart. . . ." (*Id.*) She could not answer whether there were "numerous periods of time during which [she was] taking heroin . . . on top of [her] methadone." (*Id.* at 100.) She denied being a heroin addict her "entire adult life," denied introducing Speer and Chris to the drug, and denied sending Speer and Chris out to "steal shit in order to get dope, heroin" for her. (*Id.* at 100–02.)

In challenging the PCR court's assessment of her credibility, Speer asserts that Sabrina "never denied being an addict" or "unduly minimize[d] her drug activity." (Doc.

13 at 149.) She did, however, deny using heroin "on a regular basis" or being addicted her

"entire adult life." In her trial testimony she denied introducing Speer and Chris to the drug

but in her later declaration she admitted doing so.

"Credibility determinations," such as those the state PCR court made regarding

Sabrina Womble, "are factual determinations. As such, they 'are presumed to be correct

absent clear and convincing evidence to the contrary, and a decision adjudicated on the

merits and based on a factual determination will not be overturned on factual grounds

unless objectively unreasonable in light of the evidence presented in the state court

proceeding.'" *Wilson v. Ozmint*, 352 F.3d 847, 858 (4th Cir. 2003), *opinion amended on

denial of reh'g, 357 F.3d 461* (4th Cir. 2004) (quoting *Miller-El*, 537 U.S. at 340).

Speer's critique falls far short of a clear and convincing rebuttal of the PCR court's

assessment of Sabrina Womble's credibility. *See Rice v. Collins*, 546 U.S. 333, 341–42

(2006) (explaining that reasonable minds might disagree about a factual finding "does not

suffice to supersede the trial court's credibility determination" on habeas review); *see also

Atwood*, 870 F.3d at 1050 (explaining that a court may not "second-guess a state's fact-

finding process" unless it finds that "the state court was not merely wrong but actually

unreasonable") (citing *Hibbler v. Benedetti*, 693 F.3d 1140, 1148 (9th Cir. 2012)

(additional quotations omitted)).

    *c.   Conclusion*

There was not a reasonable probability of a different sentence if counsel had

presented additional lay testimony about Speer's troubled background. Speer has not

demonstrated that the discrepancy between what was presented in mitigation and what

could have been presented was of sufficient magnitude to establish prejudice. *See

Stankewitz*, 365 F.3d at 716. The omitted mitigating evidence is largely inconclusive or

cumulative, and does not change the "sentencing profile" offered to the jury. *Strickland*,

466 U.S. at 700; *see Babbitt*, 151 F.3d at 1175 (finding no prejudice where counsel failed

to present cumulative mitigating evidence); *Van Hook*, 558 U.S. at 12 (finding no prejudice

where new evidence added "nothing of value"). The cumulative nature of the evidence

offered about Speer's background diminishes the likelihood of prejudice. *See Leavitt*, 646 F.3d at 615; *Rhoades*, 638 F.3d at 1051.

As the Ninth Circuit has observed, "There will always be more documents that could be reviewed, more family members that could be interviewed and more psychiatric examinations that could be performed." *Leavitt*, 646 F.3d at 612. In Speer's case, the record demonstrates that even if counsel had conducted a more in-depth investigation, significant and credible new mitigation evidence was not available.

The PCR court's denial of this claim was neither contrary to nor an unreasonable application of *Strickland*, nor was it based on an unreasonable determination of the facts. Speer's claim that counsel performed ineffectively during the penalty phase of his trial by failing to investigate and present readily available mitigating evidence from lay witnesses is denied as meritless under the doubly deferential standard of *Strickland* and AEDPA. *See Richter*, 562 U.S. at 105.

2. Unexhausted claims

Speer also alleges that counsel performed ineffectively by failing to "present effective expert testimony on Speer's difficult history as a victim of domestic and sexual violence, neurocognitive deficits, and complex trauma"; to present evidence of co-defendant Brian Womble's mental illness; to "protect Speer from repeated instances of prosecutorial misconduct"; and to raise appropriate objections during penalty-phase jury "deadlock." (Doc. 13 at 150–56.) Speer acknowledges that he did not raise these claims in state court. He contends that their default is excused under *Martinez* by the ineffective assistance of PCR counsel.

a. *Trauma expert*

Speer argues that Dr. Stewart "was not adequately prepared to testify," "misstated the evidence and failed to articulate how a complex trauma presentation differs from traditional PTSD." (Doc. 13 at 151.) Instead, according to Speer, "[t]he jury needed to hear from an expert in complex trauma (including sexual abuse) who could synthesize Speer's extraordinary history in a meaningful and accurate way." (*Id.*) Speer contends that if

counsel had performed effectively they would have done a better job of preparing Dr. Stewart or offered a different expert, one who would have "established a connection between Speer's mental state, his family background, his neurological defects, and the offense." (*Id.* at 152.) Such testimony, according to Speer, would have prevented the Arizona Supreme Court from assigning minimal weight to his mitigating evidence. (*Id.*)

Speer does not contest Dr. Stewart's expertise, nor does he specify what counsel could have done to better prepare Dr. Stewart for his testimony. As discussed above, Dr. Stewart testified at length about the causes and effects of Speer's trauma, his mental state, abusive background, and neurological defects, and their relationship to the offense. In essence, then, Speer's criticism is that Dr. Stewart was not a more effective witness, but "[t]he Constitution does not entitle a criminal defendant to the effective assistance of an expert witness." *Wilson v. Greene*, 155 F.3d 396, 401 (4th Cir. 1998); *see Harris v. Vasquez*, 949 F.2d 1497, 1518 (9th Cir. 1991); *Silagy v. Peters*, 905 F.2d 986, 1013 (7th Cir. 1990); *McGill v. Ryan*, No. CV-12-01149-PHX-JJT, 2019 WL 160732, at *12 (D. Ariz. Jan. 10, 2019), *aff'd sub nom. McGill v. Shinn*, 16 F.4th 666. Therefore, "while there may be a duty to seek out psychiatric evaluation of a client where appropriate, there is no duty to ensure the trustworthiness of the expert's conclusions." *Babbitt*, 151 F.3d at 1174; *cf. Hendricks v. Calderon*, 70 F.3d 1032, 1038 (9th Cir. 1995) ("To . . . impose a duty on attorneys to acquire sufficient background material on which an expert can base reliable psychiatric conclusions, independent of any request for information from an expert, would defeat the whole aim of having experts participate in the investigation.").

The allegation that trial counsel performed ineffectively with respect to Dr. Stewart's selection and performance as an expert witness is meritless. PCR counsel, in turn, did not perform ineffectively by failing to raise this claim. *See Atwood*, 870 F.3d at 1060 ("If the ineffective assistance of trial counsel claim lacks merit, then the state habeas counsel would not have been deficient for failing to raise it."); *Runningeagle*, 825 F.3d at 982 (explaining that to find prejudice based on PCR counsel's failure to raise a trial-level ineffective assistance of counsel claim, the court "must also find a reasonable probability

that the trial-level IAC claim would have succeeded had it been raised"). There is not a reasonable probability that the results of the PCR proceedings would have been different if counsel had raised this claim. Speer therefore cannot show "cause" under *Martinez* for the claim's default. This allegation remains procedurally defaulted and barred from federal review.

### b.    *Brian Womble's mental illness*

During the penalty phase of Speer's trial, counsel argued that Brian Womble's mental illness constituted a mitigating circumstance. Speer alleges that counsel performed ineffectively by failing to support the circumstance with testimony from Womble's family that Brian suffered from lifelong depression.[23] (Doc. 13 at 153–54.)

During the guilt phase of trial, a counselor at Terros, a provider of mental health services, testified that she evaluated Brian Womble on May 24, 2002, the day before the murder, at 4:00 p.m. (RT 1/10/07 at 142.) Although he did not appear depressed, he told her "I want to kill myself and before I do I'm going to kill some other people too." (*Id.* at 143.) She and another therapist met with Brian for an hour and a half; before he left he retracted his suicide threat and signed a "no harm" contract. (*Id.*)

Speer notes that during his phone calls with his step-brother, Brian talked about being "sick" and having "psychological problems." (*See* Doc. 13 at 154.) In another call, Al Heitzman describes Brian as suffering "severe depression" and needing counseling. (*Id.*) The jurors heard these recordings, however, so they were aware Brian's mental health was an issue. Lay testimony from family members about Brian being suicidal and "not himself" in the weeks leading up to the crime would have been cumulative to this evidence and the testimony of the Terros counselor.

In addition, as Respondents suggest, it is not apparent that evidence that Brian Womble suffered from mental illness would mitigate Speer's involvement in the murder. Mental illness could have been viewed as making Brian an even easier target for Speer to

---

[23] On independent review of Speer's death sentence, the Arizona Supreme Court did not discuss Brian Womble's mental illness as one of the mitigating circumstances proved by a preponderance of the evidence. *See Speer*, 221 Ariz. at 464–65, 212 P.3d at 802–03.

1    manipulate into carrying out the shooting in accord with the State's theory of the crime.

2         The allegation that trial counsel performed ineffectively with respect to Brian

3    Womble's alleged mental illness is without merit. PCR counsel therefore did not perform

4    ineffectively by failing to raise this claim. *See Atwood*, 870 F.3d at 1060; *Runningeagle*,

5    825 F.3d at 982. There is not a reasonable probability that the results of the PCR

6    proceedings would have been different if the claim had been raised. Speer therefore cannot

7    show "cause" under *Martinez* for the claim's default. This allegation remains procedurally

8    defaulted and barred from federal review.

9              *c.    Prosecutorial misconduct*

10        Speer alleges that counsel performed ineffectively during the penalty phase by

11   failing to object and seek appropriate remedies for prosecutorial misconduct. (Doc. 13 at

12   154–55.) He argues that the prosecutor committed misconduct by using Speer's "mental

13   health history"—namely, the antisocial personality diagnosis arrived at by Dr . Bayless—

14   as "non-statutory aggravating evidence." (Doc. 13 at 127.) He argues the prosecutor

15   solicited and failed to correct false testimony from Dr. Bayless about the amount of time

16   he spent with Speer during his examinations. (*Id.* at 131–33.) Finally, he contends that the

17   prosecutor committed misconduct during her closing argument by using inflammatory

18   language, misstating the evidence, and making improper comments. (*Id.* at 133.)

19        Defense counsel did not perform ineffectively. Counsel's strategy with respect to

20   objections is entitled to deference under *Strickland*. 466 U.S. at 689; *see Cunningham*, 704

21   F.3d at 1160 (explaining that "withholding objections . . . is acceptable defense strategy").

22   "[A] few missed objections alone, unless on a crucial point, do not rebut the strong

23   presumption that counsel's actions (or failures to act) were pursuant to his litigation

24   strategy and within the wide range of reasonable performance." *United States v. Mejia–*

25   *Mesa*, 153 F.3d 925, 931 (9th Cir. 1998); *see United States v. Necoechea*, 986 F.2d 1273,

26   1281 (9th Cir. 1993). Counsel may reasonably decide to "refrain from objecting during

27   closing argument to all but the most egregious misstatements by opposing counsel on the

28

theory that the jury may construe their objections to be a sign of desperation or hyper-technicality." *United States v. Molina*, 934 F.2d 1440, 1448 (9th Cir. 1991).

### i.      Comments on Speer's mental health

Speer contends that the prosecutor committed misconduct during her penalty-phase arguments by emphasizing the negative implications of his diagnosis of antisocial personality disorder—that Speer was deceitful, manipulative, uncaring, and dangerous. (Doc. 13 at 128–30.) The comments did not constitute prosecutorial misconduct, so counsel did not perform ineffectively by failing to object. *See, e.g.*, *Dubria v. Smith*, 224 F.3d 995, 1003–04 (9th Cir. 2000); *Boggs v. Shinn*, No. CV-14-02165-PHX-GMS, 2020 WL 1494491, at \*51 (D. Ariz. Mar. 27, 2020). As Respondents note, A.R.S. § 13–752(G) provides that the State "may present any evidence that demonstrates that the defendant should not be shown leniency including any evidence regarding the defendant's character, propensities, criminal record or other acts." The prosecutor was therefore entitled to argue that Speer's diagnosis of antisocial personality disorder rebutted the defense arguments that he should be shown leniency. *See State v. Carlson*, 237 Ariz. 381, 396–97, 351 P.3d 1079, 1094–95 (2015) (explaining that while it is improper to argue a nonstatutory aggravating factor, "[t]he prosecutor may, however, argue any circumstances that rebut the mitigation evidence proffered by the defense.")

The prosecutor's arguments about the elements of an antisocial personality were also reasonable inferences from that diagnosis as testified to by Dr. Bayless. *See United States v. Tucker*, 641 F.3d 1110, 1120 (9th Cir. 2011) ("Prosecutors can argue reasonable inferences based on the record, and have considerable leeway to strike hard blows based on the evidence and all reasonable inferences from the evidence.") (additional quotations omitted); *United States v. Blueford*, 312 F.3d 962, 968 (9th Cir. 2002) ("It is certainly within the bounds of fair advocacy for a prosecutor, like any lawyer, to ask the jury to draw inferences from the evidence that the prosecutor believes in good faith might be true."). Dr. Bayless testified, for example, that the prognosis for those with antisocial personality disorder is poor and that the condition cannot be treated with medication. (RT 3/21/07 at

44–45.) He also testified that Speer was capable of conforming his conduct to the requirements of law despite have an antisocial personality disorder. (*Id.* at 45.)

### ii.    Dr. Bayless's testimony

Speer asserts that the prosecutor violated *Napue v. Illinois*, 360 U.S. 264 (1959), by soliciting and failing to correct false testimony from Dr. Bayless about the amount of time he spent examining Speer and about the results of his examinations. (Doc. 13 at 131.) Speer alleges that defense counsel performed ineffectively by failing to object to this testimony.

The state may not knowingly use false testimony to obtain a conviction. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). A *Napue* violation consists of three components: (1) the testimony was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material. *See Hayes v. Ayers*, 632 F.3d 500, 520 (9th Cir. 2011). An error is material where "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976).

Dr. Bayless testified that he examined Speer over two consecutive days. (RT 3/20/07 at 77.) According to Bayless, he spent "maybe" four hours with Speer on August 14, 2006, performing a clinical interview and administering the MMPI-2.[24] (*Id.*) He "guesstimate[ed]" that on the 15th he "spent probably an hour to an hour and a half" with Speer. (*Id.*) On that day he administered two tests, the Shipley Institute of Living Scale and the Williamson Sentence Completion Test. (*Id.* at 76–77.)

Speer contends that jail visitor logs indicate that Bayless visited Speer for only 30 minutes on each of those days. (Doc. 13 at 131–33; *see* Doc. 23-3, Ex. 8.) He asserts that the prosecutor was aware of the jail logs and therefore knew Bayless's testimony was false. (*Id.*) Speer alleges that his counsel performed ineffectively in failing to challenge this aspect of Dr. Bayless's testimony. (*Id.* at 154–55.)

The apparent inconsistency between the jail records and Dr. Bayless's testimony is not sufficient to support a *Napue* violation because the jail records do not appear to

---

[24] Minnesota Multiphasic Personality Inventory.

accurately document the length of visits. In the records provided by Speer, the duration of every visit in the jail logs is listed as precisely 30 or 40 minutes. (*See* Doc. 23-9, Ex. 41.) For example, on 1/10/05, Dr. Stewart, one of Speer's experts, is documented as visiting Speer from 1329 to 1409. (*Id.*) In his report, however, Dr. Stewart stated that he "interviewed Mr. Speer at the Maricopa County Jail on January 10, 2005, for *half a day*." (Doc. 23-10, Ex. 51 at 1) (emphasis added). Another defense expert, Dr. Parrish, testified that she administered the Halstead-Reitan Battery, a five-hour test, over five different sessions with Speer, breaking up the test sessions due to Speer's difficulty concentrating and sometimes being interrupted when the interview room became unavailable. (RT 2/27/07 at 120, 126–27; *see* Doc. 23-10, Ex. 51.) The jail records, however, list five visits each lasting exactly 40 minutes.[25] (*See* Doc. 23-9, Ex. 41.)

This information suggests that while the jail records document Speer's visitors, they do not accurately depict the length of each visit, and therefore Dr. Bayless did not testify falsely when he estimated that he spent about four hours with Speer administering the MMPI-2—any more than Dr. Stewart inaccurately reported spending half a day with Speer when the jail record listed only a 40 minute visit.

While Speer notes that the prosecutor referred to the jail records when questioning other witnesses, she used the records to establish the fact of the visits, not their duration. Given the information just discussed, it is not reasonable to say that the prosecutor knew Dr. Bayless's testimony was untrue.

Finally, Speer engages in pure speculation when he asserts that the prosecutor knew of, and should have corrected, Dr. Bayless's "misleading" testimony about the results of the tests he administered.[26] (Doc. 13 at 133.)

There was no *Napue* violation. Speer's counsel therefore did not perform ineffectively in failing to object. *See Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005)

---

[25] The visits occurred on 12/6/04, 12/7/04, 12/23/04, 1/3/05, and 1/11/05.

[26] Speer asserts that Dr. Bayless "gave incorrect scores" with respect to various scales on the MMPI. (Doc. 13 at 133.)

1   ("[T]rial counsel cannot have been ineffective for failing to raise a meritless objection.");

2   *Rupe*, 93 F.3d at 1445.

3        iii. Prosecutor's closing argument

4     Speer alleges that counsel performed ineffectively in response to the prosecutor's

5   misconduct during her closing argument. (Doc. 13 at 154–55; *see id.* at 133–36.)

6       (a) *Denigrating the mitigating evidence and the defense strategy*

7     Speer first contends that the prosecutor committed misconduct by attacking the

8   mitigating evidence as untrue and manipulative and accusing the defense of appealing to

9   "juror guilt." (Doc. 13 at 134.) Speer alleges that counsel performed ineffectively by failing

10  to object to this purported misconduct. (*Id.* at 154–55.)

11    The prosecutor argued that Speer's mitigation evidence was untrue, "exaggerated,"

12  or "nonsense." (RT 3/27/07, a.m., at 6.) "[T]he rest of it," she continued, "is presented to

13  make you feel responsible for the fact the defendant committed a murder under

14  circumstances that make him eligible for the death penalty." (*Id.*) In another passage cited

15  by Speer, the prosecutor addressed the defense argument that executing Speer would affect

16  his son. (Doc. 13 at 134.) She characterized that argument as "pile on the juror guilt. Feel

17  guilty if you impose the death penalty because of what it will do to Cedric." (RT 3/27/07,

18  a.m., at 9.)

19    The Ninth Circuit has found that a prosecutor commits misconduct when he

20  denigrates the defense as a sham. *United States v. Sanchez*, 176 F.3d 1214, 1225 (9th Cir.

21  1999) ("The prosecutor committed misconduct in vouching for his witnesses, denigrating

22  the defense as a sham, and arguing that it was the jury's duty to find the defendants

23  guilty."). Here, the prosecutor did not denigrate defense counsel; rather, she criticized

24  counsel's tactics in choosing to present certain mitigating evidence. *See United States v.*

25  *Bernard*, 299 F.3d 467, 487–88 (5th Cir. 2002) (rejecting a challenge to a prosecutor's

26  closing argument that accused the defense of trying "to get someone on this jury to . . . take

27  a red herring"); *see also United States v. Vazquez–Botet*, 532 F.3d 37, 56–59 (1st Cir.

28  2008) (finding no misconduct where prosecutor characterized defense counsel as

"desperate lawyers" seeking to "cloud the issues"); *United States v. Sayetsitty*, 107 F.3d 1405, 1409 (9th Cir. 1997) ("Criticism of defense theories and tactics is a proper subject of closing argument.").

Some courts have found that a prosecutor's "guilt trip" comments approached or crossed the line of improper argument but determined that any error was harmless, in part because the comments were invited by the defense. *See Harmon v. Sharp*, 936 F.3d 1044, 1080 (10th Cir. 2019) (finding that defense counsel's improper argument that defendant's daughter deserved mercy because she loved her father weighed against a finding that defendant was harmed by prosecutor's remarks, including his argument that defendant used his family members as "human shields" at sentencing); *Cuesta-Rodriguez v. Carpenter*, 916 F.3d 885, 908 (10th Cir. 2019) (finding the defense invited the comments by "attempt[ing] to elicit sympathy for Cuesta-Rodriguez's family—his son in particular—based on the pain they would feel if he received the death penalty"); *see also People v. Krebs*, 8 Cal. 5th 265, 342, 452 P.3d 609, 668 (2019) (finding no misconduct where prosecutor argued that the defense was "trying to deflect . . . responsibility" and "lay some kind of a guilt trip on you for what their client truly deserves").

Here, defense counsel argued that the effect of Speer's execution on Cedric was a mitigating circumstance (RT 3/26/07 at 129), inviting the prosecutor's challenge to the circumstance. In addition, counsel was given an opportunity in his rebuttal closing argument to address the prosecutor's comments about Cedric. (RT 3/27/07, p.m., at 7–8.) Any prejudice related to the purported misconduct was therefore limited. *See Hein v. Sullivan*, 601 F.3d 897, 912–13 (9th Cir. 2010) (citing *Darden*, 477 U.S. at 182).

In any event, the issue is not whether the prosecutor's comments constituted misconduct but whether trial counsel performed at a constitutionally ineffective level by failing to object. They did not. As the Ninth Circuit has explained, "absent egregious misstatements, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct." *Necoechea*, 986 F.2d at 1281 (noting that "many lawyers refrain from objecting during opening statement and

closing argument"); *see Dubria*, 224 F.3d at 1003–04 (finding that failure to object to closing argument in which prosecutor referred to defendant as "the biggest liar you've ever encountered" and defendant's story as a "piece of garbage" did not constitute deficient performance); *Cunningham*, 704 F.3d at 1159 (finding that failure to object to the prosecutor's comments, "possibly to avoid highlighting them, was a reasonable strategic decision"). Speer's counsel could reasonably have determined that objecting to the prosecutor's comments would have highlighted them unnecessarily.

> *(b)   Misstating facts*

Speer asserts that the prosecutor committed misconduct when she falsely suggested that Speer was not Cedric's father and accused him of denying paternity. (Doc. 13 at 135.) In fact, the record showed that Speer did question paternity. In one of the letters he wrote to Al Heitzman, which was read into the record the day before the State's closing argument, Speer wrote: "Honestly, Al, I don't even know if Cedric is really my son because Veronica was cheating on me the whole time we were together, so at this point in time, a DNA test is mandatory." (RT 3/26/07 at 48.) Defense counsel did not perform ineffectively by failing to object to the prosecutor's statement because it was supported by the record and not improper.

Speer also contends that the prosecutor misled the jury by stating that Speer had a different CPS caseworker "every time" when in fact several caseworkers saw Speer and his family on more than one occasion. (Doc. 13 at 135) (citing RT 3/27/07, a.m., at 23).

There was no misconduct for defense counsel to object to. The prosecutor was responding to the defense argument that Speer should have been removed from his dysfunctional home. The prosecutor was entitled to draw the inference, based on the fact that several CPS workers investigated Speer's family but did not seek his removal, that the abuse and neglect were less severe than Speer alleged. *See Tucker*, 641 F.3d at 1120 (explaining that "[p]rosecutors can argue reasonable inferences based on the record").

> *(c)   Misstating the law*

Speer asserts that the prosecutor misstated the law by arguing that evidence had to

be causally connected to the murder in order to be mitigating. (Doc. 13 at 135–36.) He also argues that the prosecutor misstated the law by arguing that "mercy for this crime isn't appropriate" and "[t]here is nothing about this crime that calls out for mercy for the defendant." (*Id.* at 136) (quoting RT 3/27/07, a.m., at 68, 72). According to Speer, these comments misstated the law because "the question of mercy is directed toward the defendant, not the crime." (*Id.*) There was no misconduct.

Speer proposed mercy as a mitigating circumstance. The prosecutor was entitled to respond to that argument. *See State v. Anderson*, 210 Ariz. 327, 350, 111 P.3d 369, 392 (2005) ("Once the jury has heard all of the defendant's mitigation evidence, there is no constitutional prohibition against the State arguing that the evidence is not particularly relevant or that it is entitled to little weight."). It was not improper to argue that the nature of the crime and Speer's role in it—selfishly manipulating his younger brother into shooting a sleeping couple in an attempt to eliminate them as witnesses to a prior crime—did not support a call for mercy. Speer's counsel did not perform ineffectively by failing to object.

The allegation that trial counsel performed ineffectively in responding to the purported misconduct is without merit. PCR counsel therefore did not perform ineffectively. *See Atwood*, 870 F.3d at 1060; *Runningeagle*, 825 F.3d at 982. There is not a reasonable probability that the results of the PCR proceedings would have been different if counsel had raised this claim. Speer therefore cannot show "cause" under *Martinez* for the claim's default. This allegation remains procedurally defaulted and barred from federal review.

### d.    *Jury deadlock instruction*

Finally, Speer alleges that counsel performed ineffectively by failing to raise "proper objections" when the jury deadlocked during the penalty phase and the trial court provided an impermissibly coercive jury instruction. (Doc. 13 at 155.) The record does not support this claim.

Prior to deliberations in the penalty phase of Speer's trial, the court provided the following jury instruction[27]:

> . . . If you feel you've reached an impasse, simply let the court know without disclosing the numerical results of any vote.
>
> Each juror has a duty to consult with one another to deliberate with a view to reaching an agreement, if it can be done without violence to any individual judgment. No juror should ever surrender his or her honest conviction as to the weight or effect of the evidence solely because of the opinion of other jurors or for the purpose of reaching a verdict.
>
> However, you may want to identify areas of agreement and disagreement and discuss the law and the evidence as they relate to the areas of disagreement. Then and only then, if you still disagree, you may wish to tell the attorneys and me which issues, questions, law, or facts you would like us to assist you with. If you decide to follow this suggestion, please write down the issues, questions, law, or facts on which we can possibly help.

(RT 3/27/07, p.m., at 26–27.) The court had provided similar instructions, which it referred to as a "dynamite" instruction (RT 3/28/07 at 4), prior to the guilt and aggravation phases of Speer's trial. (RT 1/17/07 at 187–88; RT 1/24/07 at 52; RT 1/29/07 at 128–29.)

After two and a half hours of penalty-phase deliberations, the jury foreperson sent the court a note stating "We currently are unable to reach an unaminous [sic] verdict, what do we do now?" (RT 3/28/07 at 4; EIR 734.) Twenty minutes later, the jury foreperson sent another note, which asked "If we can't reach an unaminous [sic] verdict . . . what happens to the sentencing?" (RT 3/28/07 at 4; EIR 735.)

The judge and the parties discussed the jury's questions. (RT 3/28/07 at 4–5.) With regard to the second question, the judge stated, "I don't even want to get involved with [it].

---

[27] The instruction was based in part on Rule 22.4 of the Arizona Rules of Criminal Procedure, which provided:

If the jury advises the court that it has reached an impasse in its deliberations, the court may, in the presence of counsel, inquire of the jurors to determine whether and how court and counsel can assist them in their deliberative process. After receiving the jurors' response, if any, the judge may direct that further proceedings occur as appropriate.

We told them before that they're not to concern themselves with any sentence if it's less than death because that's my province, not theirs." (*Id.* at 5.) The court ultimately provided no answer to the question, telling the jury it was not relevant. (*Id.* at 21.)

With respect to the first question, the judge explained that he was inclined to provide the dynamite instruction again. (*Id.* at 5–6.) The court wanted to ask the jurors "what their area of disagreement is so that perhaps they can give us a little further guidance" (*Id.* at 6.) Defense counsel objected, arguing "It's not possible you can artfully do that. You're getting too involved." (*Id.*) Counsel objected that the judge was "pushing them [the jurors]" and that they should be questioned only as to "whether or not they think that further deliberations would be worthwhile or productive." (*Id.* at 5.) As the judge continued to consider providing the dynamite instruction again, defense counsel repeatedly objected, noting that the jury had already heard the instruction at least three times and insisting that the only permissible question was whether additional deliberations would be productive. (*See id.* at 9, 11, 13, 18.)

The court suggested the following language: "If you recall before you began your deliberations, I told you that you might want to identify for us any areas of agreement and disagreement and tell the attorneys and me whether there are issues, questions, law or facts you'd like us to assist you with." (*Id.* at 17–18.) Defense counsel again objected to the inclusion of language about "assisting" the jury. (*Id.* at 18–20.) The judge finally proposed the following script: "I previously told you that if you couldn't agree on a verdict you might want to tell the attorneys and me which issues you would like us to assist you with. Would you like me to do that or do you feel that further deliberations would not be productive?" (*Id.* at 20–21.) This time, counsel stated "Okay with us" and the instruction was provided to the jury in writing. (*Id.* at 21; *see* EIR 734.)

The jury then deliberated for 45 minutes more before adjourning for the day. (EIR 740.) It began deliberations the next morning around 10:00 and returned with its death verdict at 11:30. (EIR 743.)

Speer alleges that counsel performed ineffectively when they "acquiesced" to the final version of the court's instruction. (Doc. 13 at 156.) This argument is not persuasive. *See State v. Kuhs*, 223 Ariz. 376, 384–86, 224 P.3d 192, 200–02 (2010) (discussing factors to consider in assessing coerciveness of impasse instruction). First, as just noted, counsel did object, repeatedly, to any instruction offering to assist the jury. Next, the instruction given was likely not coercive under Arizona law, so further objection would have been futile. *See James*, 24 F.3d at 27. The court did not know the numerical split of the jury, and the jurors had been deliberating for only two and a half hours, after a five month trial, when they sent the note. These factors support a finding that the instruction was not coercive. *Kuhs*, 223 Ariz. at 384–86, 224 P.3d at 200–02 .

This claim of ineffective assistance of counsel is meritless. PCR counsel did not perform ineffectively by failing to raise it, so the claim remains defaulted and barred from review.

### 3. Conclusion

Speer's trial counsel did not perform at a constitutionally ineffective level in the penalty phase of trial. The PCR court's denial of the exhausted portion of this claim was reasonable under the doubly deferential standard of *Strickland* and AEDPA. *See Richter*, 562 U.S. at 105. With respect to the unexhausted allegations, Speer has not established cause and prejudice to excuse their default under *Martinez* so they remain barred from federal review. Claim 14 is therefore denied.

**Claims 15 and 16:**

In Claim 15, Speer alleges that counsel performed ineffectively by stipulating to aggravating factors. (Doc. 13 at 156.) In Claim 16, he alleges that counsel performed ineffectively by "admitting irrelevant prior convictions" (*Id.* at 161.) Speer raised these claims during the PCR proceedings. The PCR court's denial of the claims was neither contrary to nor an unreasonable application of clearly established federal law.

1      Claim 15

2          The State noticed four aggravating factors. Speer's counsel stipulated to three of

3  them: previous commission of a serious offense under A.R.S. § 13–703(F)(2); committing

4  the offense in an especially heinous, cruel, or depraved manner, (F)(6); and committing the

5  offense while on release or probation. (F)(7)(a).[28] As the PCR court noted, the (F)(2) and

6  (7) factors "were easily proven with documentary evidence from Superior Court files"

7  while (F)(6) "had been proven in connection with the guilt phase evidence as witness

8  elimination was the motive for the premeditated murder." (ME 5/20/15 at 14.) The fourth

9  aggravating factor, to which counsel did not stipulate, was creating a grave risk of death to

10  another person in the commission of the offense under (F)(3).

11          Speer contends that by stipulating to the aggravating factors, counsel's performance

12  violated both *Strickland* and *United States v. Cronic*, 466 U.S. 648 (1984). (Doc. 13 at

13  156–59.) This argument is unpersuasive.

14          The Arizona Supreme Court independently reviewed the aggravating factors and

15  found that the three to which counsel stipulated were proved beyond a reasonable doubt.

16  *Speer*, 221 Ariz. at 463–64, 212 P.3d at 801–02. The court found that the (F)(3) factor was

17  not proved. *Id.* at 460, 463, 212 P.3d at 798, 801.

18          In rejecting this ineffective assistance claim, the PCR court found neither deficient

19  performance nor prejudice. The court first noted that Speer acknowledged that in conceding

20  the aggravating factors trial counsel made a strategic decision, which PCR counsel labeled

21  "confession and avoidance." (ME 5/20/15 at 15.) The court rejected Speer's argument that

22  such a strategy is never "appropriate in the penalty phase of a capital trial." (*Id.*) Citing

23  *Strickland*, the court explained that it would "not second-guess the strategic decisions of

24  trial counsel" and that:

25          The record here supports the conclusion that counsel made a strategic
           decision to stipulate to three of the four aggravating factors; the fourth,
26

27  ─────────────────────
28  [28] The Court refers to Arizona's statutes in effect at the time of Speer's sentencing.
   Arizona's capital sentencing statutes have since been renumbered. *See* A.R.S. §§ 13-751–
   59.

1
2

(F)(3), he challenged, preserving the issue for appeal, and the Supreme Court found in Defendant's favor. The Supreme Court's decision supports trial counsel's strategic decision to challenge only one of the aggravating factors.

3
4
5
6
7
8
9
10

In further support of this conclusion, the Court notes the strength of the aggravating factors and the relative ease with which each could be proved. The Court is aware that in a death penalty case such as this, trial counsel is initially called upon to argue his client's lack of guilt, and then must accept a finding of guilt. Trial counsel is then called upon to seek leniency from the same jury who has just rejected counsel's presentation. Counsel may strategically determine that credibility may be built at the aggravation phase by conceding matters that are a matter of record or that have already been proved.

Such a concession, in the form of a stipulation, is within a tactical decision reasonably made by trial counsel. . . .

11
12

(*Id.*) The court then addressed Speer's argument that trial counsel's performance satisfied the standard set out in *Cronic*:

13
14
15
16
17

*Cronic* is violated when counsel is either totally absent or is prevented from assisting the accused. In the instant case, trial counsel was neither absent nor prevented from assisting his client; rather, by entering into a stipulation counsel made a tactical decision with which Defendant disagrees. Since there was overwhelming proof of these three aggravating factors, challenging them would have been "a useless charade."

18
19

(*Id.* at 16) (quoting *Cronic*, 466 U.S. at 657, n. 19). Finally, the Court determined that Speer was not prejudiced by trial counsel's stipulation to the aggravators:

20
21
22
23
24

In the Court's view, the outcome would have been the same had trial counsel required the State to prove the three aggravating factors that instead were stipulated to. Defendant's prior conviction for a serious offense and his parole status were easily proved by court documents and Defendant's Arizona Department of Corrections history. In order for the jury to convict Defendant of premeditated murder, they had to conclude that his motivation was to kill witnesses. On that front, the evidence in the guilt phase was overwhelming through Defendant's own telephone conversations.

25
26
27

Challenging these aggravating factors would not have led to a different result and, thus, no prejudice can attach by virtue of trial counsel's strategic decision to stipulate to the (F)(2), (6), and (7) aggravating factors.

28

(*Id.*)

The PCR court's ruling was neither contrary to nor an unreasonable application of *Strickland* and *Cronic*. In *Florida v. Nixon*, the Supreme Court described *Cronic* as a

> narrow exception to *Strickland*'s holding that a defendant who asserts ineffective assistance of counsel must demonstrate not only that his attorney's performance was deficient, but also that the deficiency prejudiced the defense. *Cronic* instructed that a presumption of prejudice would be in order in "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified."

543 U.S. 175, 190 (2004) (quoting *Cronic*, 466 U.S. at 658).

*Cronic* held that the application of presumptive prejudice is appropriate when "there [is] a breakdown in the adversarial process," such that "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." 466 U.S. at 659, 662. The Court made clear, however, that the *Cronic* exception is very narrow. "When we spoke in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, we indicated that the attorney's failure must be complete." *Bell v. Cone*, 535 U.S. 685, 696–97 (2002); *see United States v. Thomas*, 417 F.3d 1053, 1057 (9th Cir. 2005) (explaining that in *Cone* "the Court emphasized that *Cronic*'s exception for failing to test the prosecution's case applies when the attorney's failure to oppose the prosecution goes to the proceeding as a whole—not when the failure occurs only at specific points in the trial").

*Cronic* is not applicable here. Counsel's stipulation to the easily-proved aggravating factors did not constitute a complete failure to test the State's case. *See Allerdice v. Ryan*, 395 F.App'x 449, 451 (9th Cir. 2010) (finding that stipulation to certain facts did not meet *Cronic* standard where counsel "offered evidence, cross-examined witnesses, elicited favorable testimony, and presented a coherent if ultimately unsuccessful defense in closing argument"); *Pratt v. Conway*, 151 F.App'x 582, 583 (9th Cir. 2005) ("[T]he decision to stipulate to facts did not completely fail to subject the prosecution's case to meaningful adversarial testing."). Speer's counsel opposed the State's case at every stage of trial, including by successfully contesting one of the aggravating factors. Therefore *Strickland*, not *Cronic*, provides the proper framework for analyzing this claim.

As the PCR court found, under *Strickland* Speer cannot show he was prejudiced by counsel's stipulation to the three aggravating circumstances. There was not a reasonable probability that the sentencing outcome would have been different if counsel had challenged the aggravators, two of which, (F)(2) and (F)(7), were conclusively proved by documentary evidence. The third factor, that the murder was especially heinous or depraved, is satisfied where the purpose of the murder is witness elimination. *See Speer*, 221 Ariz. at 464, 212 P.3d at 802; *State v. Johnson*, 212 Ariz. 425, 439, 133 P.3d 735, 749 (2006). The evidence from Speer's jail phone calls was overwhelming that the murder was committed to eliminate the Sotos as witnesses.

Speer contends counsel failed to subject the aggravating factors to "meaningful adversarial testing" (Doc. 13 at 159), but does not suggest what such testing would entail let alone demonstrate that this unidentified challenge to the aggravators would have resulted in a reasonable probability of a different sentence.[29] A "cursory and vague" claim of ineffective assistance is insufficient to establish a *Strickland* violation. *See Greenway v. Schriro*, 653 F.3d 790, 804 (9th Cir. 2011); *James*, 24 F.3d. at 26. Speer fails therefore to meet his burden under *Strickland*.

Claim 15 does not satisfy the doubly deferential standard governing ineffective assistance claims under AEDPA. *See Richter*, 562 U.S. at 105; *Titlow*, 571 U.S. at 15.

Claim 16

Speer alleges that counsel performed ineffectively by allowing evidence of two prior convictions to be admitted in addition to the robbery conviction that was used to satisfy the (F)(2) aggravating factor. (Doc. 13 at 159.)

---

[29] In support of Claims 15 and 16, Speer cites the opinion of Michael Reeves, a "*Strickland* expert" retained during the PCR proceedings. (Doc. 13 at 159, 160 n.19.) In his declaration, dated October 24, 2013, Reeves summarily attests that trial counsel's performance in "admitting the aggravating factors" and "not filing a motion to preclude irrelevant prior convictions" fell "below prevailing professional norms." (PCR Pet., Ex. 2 at ¶¶ 13, 14.) The Court considers but accords little weight to these conclusory opinions.

In his closing argument during the aggravation phase, defense counsel told the jury that his client "was not a saint" and had two other prior convictions, for third-degree burglary and resisting arrest. (RT 1/29/07 at 122–23.) Counsel raised the convictions because they were referenced in documents that were going to be provided to the jury and he "did not want them to hear about them or see them for the first time when they walked into the jury room." (*Id.* at 122.) Counsel cautioned the jurors, however, that they were "not supposed to take them into account in making the determination" about the aggravating factors. (*Id.* at 122–23.)

The PCR court denied Speer's claim that counsel performed ineffectively by admitting the additional convictions. The court repeated that in capital cases "trial counsel is tasked with rebuilding credibility with the jury in order to seek leniency from the same jury who has just rejected counsel's guilt phase presentation." (ME 5/20/15 at 16.) This may be accomplished "by conceding damaging matters that are a matter of record and that are likely to be proved by the State during the sentencing phase." (*Id.*) The court explained that it would not second-guess counsel's strategic choice to "draw the sting":

> There is nothing inappropriate about such a decision because the jury was going to hear evidence of certain prior convictions anyway since the State alleged as aggravating factors that Speer was previously convicted of a serious offense and was on release from prison at the time of the murder.
>
> Trial counsel discussed the prior felony convictions with the jury because, otherwise, the jury would hear it for the first time from the State. Such concerns were totally justified and well within the prevailing professional standards of reasonableness for counsel in a death penalty case to make.

(*Id.* at 16–17.) The court then found that Speer was not prejudiced by counsel's performance:

> Whether disclosed by trial counsel during the aggravation phase, or by the State in rebuttal to the issue of whether Defendant was deserving of leniency at the penalty phase, the jury would learn at some point of the prior convictions. Additionally, even if the convictions had been kept from the jury, as trial counsel noted, the offenses were not serious offenses (convictions for burglary and resisting arrest), such that any harm was minimal in connection with the determination of the aggravating factors.

(*Id.* at 17.)

This decision was neither contrary to nor an unreasonable application of *Strickland* or *Cronic*. First, courts have recognized the strategic reasonableness of "drawing the sting" from unfavorable information by revealing it before the prosecution does. *See Smith v. Spisak*, 558 U.S. 139, 161 (2010) (Stevens J., concurring in part and concurring in the judgment) (stating that it "is generally a reasonable" trial strategy "to draw the sting out of the prosecution's argument and gain credibility with the jury by conceding the weaknesses of [counsel's] own case"); *see Pearson v. Wyoming Att'y Gen.*, 856 F.App'x 758, 763 (10th Cir. 2021), *cert. denied sub nom. Pearson v. Hill*, 142 S. Ct. 454; *Cave v. Sec'y for Dep't of Corr.*, 638 F.3d 739 (11th Cir. 2011).

As discussed above, counsel did not completely fail to challenge the State's case, so *Cronic* does not apply and Speer must prove prejudice from counsel's handling of the evidence of the additional convictions. The PCR court reasonably found that he failed to do so. (ME 5/20/15 at 16.) Notwithstanding any action defense counsel may have taken, the State would have introduced the convictions in rebuttal to any argument that Speer deserved leniency. Additionally, given the aggravating factors that had been established, there was no reasonable probability that the presence or absence of evidence of lesser crimes would have affected Speer's sentence.

Claim 16 fails to satisfy the doubly deferential standard that governs ineffective assistance claims under AEDPA. *See Richter*, 562 U.S. at 105; *Titlow*, 571 U.S. at 15.

**Claim 17:**

Speer alleges that trial counsel performed ineffectively in "permitting dissemination of two doctor's reports that were used by the state in the penalty phase." (Doc. 13 at 163.) At issue are pretrial reports of two experts who evaluated Speer and concluded that he had malingered during their examinations. The PCR court denied this claim on the merits. (ME 5/20/15 at 20–21.)

At the time of Speer's case, unless a defendant objected, Arizona law required a capital defendant to be evaluated for intellectual disability, competency, and sanity at the

time of the offense. *See* A.R.S. § 13–703.02(B); –703.03(A). The trial court appointed Dr. Potts to evaluate Speer's competency and Dr. Toma to evaluate Speer for intellectual disability. (EIR 86; EIR 200, Ex. A.) Dr. Potts, in his report dated April 21, 2003, found that Speer was "malingering." (*Id.* at 2.) According to Dr. Potts, Speer "is attempting to not only feign a mental illness, but also cognitive defects. He is making a cognitive choice to not cooperate in the proceedings, and his malingering is to such an extent that it overshadows other diagnostic possibilities." (*Id.* at 2.) Dr. Potts concluded that Speer "is clearly competent and can effectively assist his attorney in his defense, if he chooses." Speer's counsel successfully moved to have Dr. Potts's report sealed. (ME 5/6/03.)

As described in his report dated August 23, 2003, Dr. Toma administered the Wechsler Adult Intelligence Scale–III, which resulted in a full-scale IQ score of 77. (EIR 200, Ex. B at 6.) This placed Speer in the borderline range of intellectual functioning, with an IQ score of 70 or below being one of the criteria for a diagnosis of intellectual disability. (*Id.*) However, like Dr. Potts, Dr. Toma found that Speer "attempted to malinger cognitive deficits." (*Id.*) His score of 77 was therefore a "gross underestimate of his true abilities," which were "more likely in the average range of intellectual functioning." (*Id.* at 6, 7.)

In March 2005, counsel forwarded Dr. Toma's report and test data to Dr. Parrish, at her request. Counsel then moved for a competency evaluation pursuant to Rule 11 of the Arizona Rules of Criminal Procedure. (EIR 199.)

Under Rule 11 proceedings, the defense must disclose reports of "mental health experts who have personally examined a defendant or any evidence in the particular case, together with the results of mental examinations and of scientific tests, experiments or comparisons, including all written reports and statements, made by them in connection with the particular case." Ariz. R. Crim. Pro. 11.4(b). Prior to the hearing, the defense stipulated to a number of exhibits, including the reports of Dr. Potts and Dr. Toma. (RT 1/12/06 at 6–7.) Following the hearing, in January 2006, Speer was found competent. (ME 2/10/06; EIR 264.)

As discussed above, at the penalty phase of trial, Speer presented mitigating evidence from three experts, including Dr. Parrish, who testified that Speer suffered from cognitive impairments. (*See* RT 2/27/07 at 119–51; RT 3/1/07 at 52–96; RT 3/8/07 at 23–49.) In rebuttal, the State's expert, Dr. Bayless, testified that he found support in the reports of Drs. Potts and Toma for his diagnosis of antisocial personality disorder and for his opinion that Speer would attempt to malinger mental illness when doing so would be to his advantage. (RT 3/21/07 at 37–39.)

During the PCR proceedings, Speer alleged that counsel were ineffective in permitting dissemination of the reports. (PCR Pet. at 64.) The court disagreed, first noting that "[b]oth experts were appointed by the Court, not retained by trial counsel, which means that the reports they generated were available to both sides." (ME 5/20/15 at 20.) The court then explained that the defense expert Dr. Parrish, who testified at the competency hearing and at sentencing, used the raw data from Dr. Toma's testing and therefore "trial counsel were obligated to disclose Dr. Toma's report and raw data to the State; otherwise, the State would have had additional grounds to challenge the defense expert's conclusions/diagnosis as being based on incomplete information," which "would have undermined the validity of her opinion." (*Id.*) The court held that Dr. Potts's report was "likewise relevant and discoverable" because Speer's competency was at issue. (*Id.*) Since the reports were available to both sides, "there can be no deficient performance by trial counsel in disseminating the reports of both Dr. Toma and Dr. Potts to the prosecutor." (*Id.*)

Even if counsel had "attempted to withhold the reports" of Drs. Potts and Toma, the court would have ordered disclosure to the State because "the records were relevant to the mental health mitigation Defendant offered at the penalty phase of his trial." (*Id.*) The court continued:

> Defendant called three mental health experts who opined that he had PTSD, a major depressive disorder, had substance abuse issues, had cognitive impairment, learning disabilities, behavioral disorders, and emotional problems. The purpose for presenting this mitigation evidence was to convince the jury to give him leniency. Therefore, it was appropriate for the State, through its expert, Dr. Bayless, to offer Dr. Toma's and Dr. Potts'

opinions in rebuttal to present their opinions that Defendant was malingering. Accordingly, their testimony was not unfairly prejudicial.

Whether to disclose or whether to await a court order is a tactical decision reserved to trial counsel and, under these circumstances where an order would have issued anyway, the tactical decision to disclose was reasonable. Trial counsel's actions do not demonstrate deficient performance. . . .

(*Id.* at 20–21.)

Finally, the court found that no prejudice arose from "the introduction of relevant and admissible mitigation evidence in rebuttal to the thrust of Defendant's mitigation. . . ." (*Id.* at 21.) Accordingly, "the sentencing decision would have been no different had trial counsel not provided Dr. Toma's and Dr. Potts' reports to the prosecution or objected to their admission in the penalty phase." (*Id.*)

Speer raises several arguments challenging the PCR court's ruling that the State was entitled to the reports. First he argues that Dr. Potts's report and his opinion about Speer's competence were based in "part on statements that Speer made about the case and his defense representation," which it was impermissible for the prosecution to use.[30] (Doc. 13 at 165–66.) Speer does not cite, and the Court cannot locate, any testimony based on the information about the case that Speer shared with Dr. Potts. As reported by Dr. Potts, the only statements Speer made about the charges he was facing were nonsensical responses about stealing or eating pizza in someone's house. (EIR 86; EIR 200, Ex. A at 3.) Speer also argues, without any supporting authority, that the fact Dr. Potts's report was sealed

---

[30]     Rule 11.4(a)(2) provides:

An expert's report completed under Rule 11.3 must be made available to the examined defendant and the State, except that any statement by the defendant about the charged offense or any other charged or uncharged offense (or any summary of such a statement) may be made available only to the defendant. Upon receipt, court staff will copy and provide the expert's report to the court and defense counsel. Defense counsel is responsible for editing a copy of the report for the State. . . .

Ariz. R. Crim. P. 11.4

1   affected whether it was discoverable by the state and that "trial counsel was under no

2   obligation to turn it over without a court order." (*Id.* at 166.) The PCR judge, however,

3   who was also the trial judge, stated it would have ordered disclosure if the defense did not

4   turn over the report.

5       With respect to Dr. Toma's report, Speer argues that it fell outside Rule 11

6   disclosure provisions because Toma was evaluating Speer for intellectual disability rather

7   than competency and therefore was not acting as a "mental health expert." (Doc. 13 at 167–

8   68.) Again, however, the PCR court determined that the information was relevant as

9   rebuttal to Speer's mental health mitigating evidence, without reference to the provisions

10  of Rule 11. The court found that the reports were relevant to the "thrust" of Speer's

11  mitigation, which consisted of the various mental health diagnoses offered by Speer's

12  experts. (ME 5/20/15 at 21.)

13      Dr. Parrish also testified that she disagreed with the opinions of Drs. Potts and Toma

14  that Speer was malingering. (RT 3/1/07 at 32–33.) The reports of Potts and Toma therefore

15  constituted proper rebuttal. The evidence from the Potts and Toma reports was "closely

16  tailored" to Speer's "allegations of mental impairment" because it rebutted the testimony

17  of Speer's expert and supported one of the criteria for Dr. Bayless's diagnosis of antisocial

18  personality disorder. *See State v. Fitzgerald*, 232 Ariz. 208, 217, 303 P.3d 519, 528 (2013)

19  (holding that trial court did not abuse its discretion in admitting rebuttal evidence from

20  competency proceedings, including statements made to Correctional Health Services

21  which suggested he was malingering).

22      Finally, as the PCR court noted, Dr. Parrish requested Dr. Toma's report and raw

23  data and reviewed that information in reaching her own diagnoses. (ME 5/20/15 at 20; Doc.

24  23-10, Ex. 49.) As Dr. Parrish testified on Speer's behalf at sentencing, the State was

25  entitled to disclosure of Dr. Toma's report. *See* Ariz. R. Evid. 705; Ariz. R. Crim. Proc.

26  15(c), (e).

27      Because the reports were properly available to the prosecution, trial counsel did not

28  perform ineffectively in failing to prevent their disclosure. The failure of an attorney to

1   raise a meritless claim or take a futile action fails both *Strickland* prongs. *Gonzalez*, 515

2   F.3d at 1016; *Jones*, 691 F.3d at 1101; *Rupe*, 93 F.3d at 1445.

3       The PCR court's denial of this claim was a reasonable application of *Strickland*.

4   Under the doubly deferential standard of *Strickland* and AEDPA, Claim 17 fails.

5   **Claim 19:**

6       Speer alleges that trial counsel performed ineffectively in cross-examining and

7   impeaching Dr. Bayless. (Doc. 13 at 173.) Specifically, he claims that counsel "failed to

8   utilize a psychological expert's assistance in the cross-examination" of Dr. Bayless and

9   "failed to present a psychologist to rebut" Dr. Bayless's "misleading" testimony. (*Id.*)

10  Speer argues that the report of his expert Dr. Parrish contained information that counsel

11  should have used to challenge Dr. Bayless's findings on the tests he administered. Speer

12  also cites the opinions of Dr. Toma, who was retained again during the PCR proceedings

13  and was also critical of Dr. Bayless's testing methods, results, and diagnoses.

14      Speer raised this claim during the PCR proceedings. The court found Speer could

15  not make a "colorable claim" that trial counsel performed ineffectively by failing to use

16  the information provided by Dr. Parrish to impeach Dr. Bayless. (ME 5/20/15 at 24.) The

17  court explained that "[w]hether to call witnesses, what questions to ask, and how to cross-

18  examine opposing experts are strategic decisions, made after reasonable investigation,"

19  which the court "does not second-guess." (*Id.*)

20      The record indicates that counsel made a strategic decision concerning how
21      he would cross-examine Dr. Bayless regarding his evaluation. The decision
        was reasonable, as counsel investigated Dr. Bayless's opinion, asking his
22      own expert to identify and address any perceived shortcomings. Trial counsel
        called expert witnesses on behalf of Defendant, and cross-examined Dr.
23      Bayless extensively. The extent of cross-examination is within the
        permissible tactical decisions left to trial counsel and is afforded the
24      presumption that the action is sound trial strategy. Such a decision is
25      "virtually unchallengeable" under *Strickland*, 466 U.S. at 690.

26      Moreover, there is evidence that trial counsel used some of Dr. Parrish's
27      suggestions during his cross-examination of Dr. Bayless, which suggests he
        made a strategic decision as to which of her suggestions to accept and which
28      to reject. For example, trial counsel questioned Dr. Bayless about

Defendant's performance on the Shipley scale as Dr. Parrish advised and also followed Dr. Parrish's advice regarding the use of the DSM-IV to challenge Dr. Bayless' diagnosis of antisocial personality disorder. Further, trial counsel questioned Dr. Bayless about his alleged failure to take into consideration that the Defendant suffered from PTSD, which was a diagnosis Dr. Parrish made in her Report.

The fact that trial counsel did not adopt all of Dr. Parrish's suggestions is not proof of deficient performance.. . . .

(*Id.* at 24–25)

The court then found that Speer had failed to demonstrate prejudice from counsel's cross-examination of Dr. Bayless:

Defendant has also failed to establish a reasonable likelihood of a different outcome had counsel cross-examined Dr. Bayless on these particular topics. Therefore, Defendant has failed to show prejudice under *Strickland*. The jury evaluated all of the experts offered by both sides and afforded the weight to each expert that they believed to be appropriate. Clearly, they afforded greater weight to Dr. Bayless, which was their prerogative.

(*Id.* at 24.)

The court addressed the affidavit of trial counsel Storrs, which it found "to not be persuasive in its consideration of whether certain 'ineffective assistance' claims are colorable":

First, trial counsel consistently says what he should have done without ever explaining why he acted as he did. Second, the Declaration makes no allowances for tactical or strategic decisions, which this Court finds odd considering that Mr. Storrs is an extremely experienced and well-regarded criminal defense lawyer, having been licensed since 1968, having been a criminal law specialist since 1980, and having probably tried as many capital cases as any lawyer currently practicing in Phoenix. Third, trial counsel's Declaration admits no deficient performance but, even if it did, this Court would not view such an admission as outcome determinative.

(*Id.*) (citations omitted).

The court then turned to the 2014 declaration of Speer's "*Strickland* expert," attorney Michael Reeves, who stated that counsel performed ineffectively in his cross-examination of Dr. Bayless. (PCR Pet., Ex.2, ¶ 18.) The PCR court considered Reeves's opinion but did not accord it "significant weight" because "the standard for assessing IAC

is objective, not subjective, and cannot be evaluated by the opinions of other attorneys second-guessing counsel's assistance after a death sentence." (*Id.* at 26.) The court also noted that it was just as qualified as Reeves "to determine the prevailing professional norms at the time of Defendant's trial, or to decide whether counsel's acts or omissions were objectively reasonable under those norms." (*Id.*)

The court concluded that Speer "cannot demonstrate prejudice, a reasonable probability that the sentencer would have reached a decision for leniency, based on the cross-examination of Dr. Bayless on the points raised by Dr. Parrish and the other evidence presented during the mitigation phase." (*Id.*)

Speer argues that this ruling was contrary to clearly established federal law and based on an unreasonable determination of the facts. (Doc. 13 at 185, 188.) These arguments fail.

"[T]actical decisions at trial, such as refraining from cross-examining a particular witness or from asking a particular line of questions, are given great deference and must similarly meet only objectively reasonable standards." *Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000); *see Brown v. Uttecht*, 530 F.3d 1031, 1036 (9th Cir. 2008); *see also Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002) ("Decisions about 'whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature' and generally will not support an ineffective assistance claim.") (quoting *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987)); *Phoenix v. Matesanz*, 233 F.3d 77, 83 (1st Cir. 2000) (explaining that choices concerning cross-examination are "prototypical examples of unchallengeable strategy"). Furthermore, a petitioner alleging ineffective assistance of counsel due to counsel's failure to impeach a witness must demonstrate that, if the witness had been impeached in the manner suggested, there was a reasonable probability that the verdict would have been different. *United States. v. Holmes*, 229 F.3d 782, 789–90 (9th Cir. 2000).

The PCR court reasonably found that counsel's cross-examination of Dr. Bayless was neither deficient nor prejudicial. First, as described above, counsel presented extensive

mental health mitigation evidence through the testimony of Dr. Parrish and the other experts.

Next, Storrs did consult with Dr. Parrish in preparation for his examination of Dr. Bayless. (PCR Pet., Ex. 1, ¶ 13.) He also interviewed Dr. Bayless. (*See* RT 3/21/07 at 55.) At counsel's request Dr. Parrish prepared a report to assist him in his cross-examination of Bayless. (PCR Pet., Ex.1, ¶ 14; *see id.*, Ex. 33.) Counsel stated he had no independent recollection of the report and no strategic reason for not using the information it contained in his cross-examination of Dr. Bayless. (*Id.*, ¶¶ 15–16.) As the PCR court noted, however, counsel's cross-examination of Bayless indicated that he took into account some of Dr. Parrish's suggested lines of attack, including challenging Bayless's diagnosis of antisocial personality disorder and his failure to consider whether Speer suffered from PTSD. (*See* RT 3/21/07 at 178–88.)

Although his focus was not on the issues highlighted by Dr. Parrish, counsel thoroughly cross-examined Dr. Bayless. His emphasis was on the childhood risk factors identified in Dr. Miller's report and testimony and the research behind those factors. (*Id.* at 55–150.) This line of questioning reminded the jury of those factors and exposed Dr. Bayless's lack of familiarity with the relevant research supporting the factors.

The fact that counsel interviewed Dr. Bayless, consulted with Dr. Parrish, and used some of her input in his cross-examination, supports the PCR court's determination that counsel's approach to questioning Bayless was tactical and the product of a reasonable investigation and therefore, under *Strickland*, "virtually unchallengeable," 466 U.S. at 690. (ME 5/20/15 at 24.)

Speer argues that under clearly established federal law, counsel were required to consult with an expert and failure to do so rendered their strategy with respect to cross-examining Dr. Bayless unreasonable. (Doc. 13 at 185–87.) In support of this argument Speer cites *Ake v. Oklahoma*, 470 U.S. 68 (1985), for the proposition that counsel must obtain expert assistance when the facts revealed by an investigation so require. He also cites *Turner v. Duncan*, 158 F.3d 449, 456 (9th Cir. 1998), for the proposition that failure

1    to use available psychiatric information that supports the defense constitutes ineffective

2    assistance, and *Browning v. Baker*, 875 F.3d 444, 473 (9th Cir. 2017), which held that

3    "investigation must determine strategy, not the other way around." (*Id.*) These cases do not

4    support the argument that defense counsel performed ineffectively.

5         Counsel retained three experts who testified on Speer's behalf at sentencing.

6    Counsel directed one of those experts, Dr. Parrish, to prepare a report addressing Dr.

7    Bayless's findings. To suggest that counsel failed to investigate Speer's mental health or

8    retain expert assistance before making any strategic decisions is therefore contrary to the

9    record. Moreover, the choice of what type of expert to use is one of trial strategy and

10   deserves "a heavy measure of deference." *Turner v. Calderon*, 281 F.3d 851, 876 (9th Cir.

11   2002) (quoting *Strickland*, 466 U.S. at 691) (finding trial counsel not ineffective for using

12   a general psychological expert rather than one specialized in the effects of PCP); *Harris v.*

13   *Vasquez*, 949 F.2d 1497, 1525 (9th Cir. 1990) ("It is certainly within the 'wide range of

14   professionally competent assistance' for an attorney to rely on properly selected experts.").

15   Counsel is not constitutionally ineffective because, with the benefit of hindsight, other

16   strategies or experts may have been a better choice. *Id.*

17        Ultimately, as the United States Supreme Court has explained, "it is difficult to

18   establish ineffective assistance when counsel's overall performance indicates active and

19   capable advocacy." *Richter*, 562 U.S. at 111 (finding counsel did not perform ineffectively

20   in failing to present expert witness to rebut state's evidence). Speer's counsel provided

21   "active and capable advocacy" throughout Speer's trial, including at the penalty phase; *see*

22   *Babbitt*, 151 F.3d at 1176 ("[C]ounsel did far more than a cursory investigation.").

23        Speer next contends that the PCR court's ruling was based on an unreasonable

24   determination of the facts. (Doc. 13 at 188.) Specifically, Speer argues that the court's

25   "factfinding procedures were unreasonable" because the court failed to discuss Dr. Toma's

26   report and because it found that counsel followed some of Dr. Parrish's suggestions when

27   cross-examining Dr. Bayless. (*Id.* at 189–90.) In support of the latter argument, Speer cites

28

counsel Storr's statement that he had no strategic reason not to use Dr. Parrish's information to impeach Dr. Bayless or to cross-examine him thoroughly.

The PCR court correctly found that Storr's declaration was not "outcome determinative." (ME 5/20/15 at 24.) The fact that counsel "falls of his sword" in retrospect is "not dispositive" of a claim of ineffective assistance. *Carter v. Davis*, 946 F.3d 489, 524 (9th Cir. 2019). Instead, "a court 'must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Id.* (quoting *Strickland*, 466 U.S. at 690); *see McAfee v. Thurmer*, 589 F.3d 353, 356 (7th Cir. 2009) (explaining that an attorney's "reflection after the fact is irrelevant to the question of ineffective assistance of counsel").

Counsel's mea culpa, therefore, does not relieve the Court of its role in assessing the reasonableness of counsel's cross-examination of Dr. Bayless and applying the presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Carter*, 946 F.3d at 524 (quoting *Strickland*, 466 U.S. at 690).

The fact that the PCR court did not discuss Dr. Toma's 2013 declaration does not render the factfinding process unreasonable. "[S]tate courts are not required to address every jot and tittle of proof suggested to them, nor need they 'make detailed findings addressing all the evidence before [them].'" *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004) (quoting *Miller–El I*, 537 U.S. at 347), *overruled on other grounds by Murray (Robert) v. Schriro*, 745 F.3d 984, 999–1000 (9th Cir. 2014). "To fatally undermine the state fact-finding process, and render the resulting finding unreasonable, the overlooked or ignored evidence must be highly probative and central to petitioner's claim." *Id.*

Dr. Toma's 2013 declaration is not highly probative and central to this ineffective assistance claim. The claim alleges that trial counsel ignored Dr. Parrish's report when cross-examining Dr. Bayless in 2007. Like Dr. Parrish, Dr. Toma offered a critique of Dr. Bayless's choice of tests and testing methodology. (PCR Pet., Ex's 33, 34.) To focus on

Dr. Parrish's report, which was the basis of the ineffective assistance allegation, did not fatally undermine or make unreasonable the PCR court's analysis of the claim.

Speer challenges specific findings of the PCR court, including the court's determination that counsel did adopt in his cross-examination some of Dr. Parrish's critiques of Dr. Bayless despite counsel's avowal otherwise. (Doc. 13 at 189.) The PCR court did not, however, engage in a post hoc rationalization, as Speer alleges. (*Id.* at 189–90.) The court simply recounted the lines of questions counsel posed to Dr. Bayless. Reasonable minds reviewing this record could agree with PCR court's factual findings. *Brumfield*, 576 U.S. at 314.

Finally, Speer has not shown there was a reasonable probability the jury would have voted for a life sentence if counsel had impeached Dr. Bayless in the manner Speer advocates. The jury determined that death was the appropriate sentence notwithstanding the extensive mitigating evidence counsel presented about Speer's mental health and the childhood risk factors he faced. Counsel's cross-examination of Bayless was likewise extensive even in the absence of specific attacks on the testing Bayless performed. Speer has failed to show that if trial counsel had relied more thoroughly on Dr. Parrish's opinions in cross-examining Dr. Bayless, the "likelihood of a different result" was "substantial, not just conceivable." *Richter*, 562 U.S. at 112.

Conclusion

The PCR court's denial of the claim that counsel's cross-examination of Dr. Bayless was constitutionally ineffective was neither contrary to nor an unreasonable application of *Strickland*, nor was it based on an unreasonable determination of the facts. Claim 19 therefore does not satisfy the doubly deferential standard governing ineffective assistance claims under AEDPA. *See Richter*, 562 U.S. at 105; *Titlow*, 571 U.S. at 15.

**E.** *Eddings* **Error**

Speer raises several claims based on the allegation that his sentence was the product of an unconstitutional "causal nexus" test. These claims are without merit.

**Claims 18, 20, and 21:**

In Claim 20, Speer alleges that in reviewing his death sentence the Arizona Supreme Court applied an unconstitutional causal nexus test to his mitigating evidence under *McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015), and *Tennard v. Dretke*, 542 U.S. 274 (2004), and therefore "failed to adequately apply its independent review." (Doc. 13 at 190–202.)

In Claim 21, Speer alleges that the Arizona Supreme Court applied an impermissible causal nexus test "when evaluating sentencing errors at trial" in violation of *Eddings v. Oklahoma*, 455 U.S. 104 (1982), and *Tennard*. (Doc. 13 at 203.) He argues that the "causal nexus test also tainted Speer's trial . . . by way of insufficient jury instructions, prosecutorial misconduct, the lack of special verdict forms for mitigating factors, and the trial court's refusal to allow the jury to consider residual doubt at sentencing." (*Id.* at 193, 203–11.)

In Claim 18, Speer alleges that counsel performed ineffectively in failing to object to the prosecutor's causal nexus argument. (*Id.* at 168.)

<u>Clearly-established federal law</u>

The sentencer in a capital case may "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Eddings*, 455 U.S. at 110 (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion)). Accordingly, a state cannot adopt a "causal nexus" rule—that is, a rule precluding a sentencer from considering mitigating evidence unless a causal connection is established between the evidence and the murder. *Tennard*, 542 U.S. at 287.

Courts have emphasized, however, that the sentencer may consider "causal nexus . . . as a factor in determining the weight or significance of mitigating evidence." *Lopez v. Ryan*, 630 F.3d 1198, 1204 (9th Cir. 2011), *overruled on other grounds by McKinney*, 813 F.3d at 819; *see McGill*, 16 F.4th at 683 ("But *Eddings* does not hold that evidence of a causal nexus is irrelevant to the trier of fact."); *Sansing v. Ryan*, 997 F.3d 1018, 1052 (9th

Cir. 2021) (finding no *Eddings* error where sentencing court afforded "minimal weight" to mitigating circumstance not causally linked to the crime). As the Arizona Supreme Court explained in *Speer*, "although a jury may not be prevented from hearing mitigation evidence lacking a causal nexus to the crime, absence of such a nexus can be considered in evaluating the strength of that evidence." 221 Ariz. at 461, 212 P.3d at 799 (citing *Anderson*, 210 Ariz. at 350, 111 P.3d at 392). In sum, "[t]he sentencer, and the [court of appeals] on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration." *Eddings*, 455 U.S. at 114–15.

In *McKinney* the Ninth Circuit held that the Arizona Supreme Court, for a period of more than 15 years, from *State v. Wallace*, 160 Ariz. 424, 773 P.2d 983 (1989), to *Anderson*, violated *Eddings* in its capital sentencing analysis by requiring a defendant to show a causal nexus between his proffered mitigating evidence and the crime. *McKinney*, 813 F.3d at 802. In 2005, with its decision in *Anderson*, "the Arizona Supreme Court finally abandoned its unconstitutional causal nexus test for nonstatutory mitigation." *McKinney*, 813 F.3d at 817.

<u>Claim 20</u>

1.    Causal nexus

Speer first argues that his due process rights were violated when the Arizona Supreme Court applied an unconstitutional causal nexus test to its independent review of his death sentence.

Speer did not raise this claim during the PCR proceedings. (Doc. 13 at 192.) He argues, however, that the claim was exhausted by the Arizona Supreme Court's independent review of his death sentence. (*Id.*) This is incorrect. The Ninth Circuit has held that the Arizona Supreme Court's independent review does not exhaust a claim "that the Arizona Supreme Court failed independently to review and reweigh mitigation and aggravation evidence." *Moormann v. Schriro*, 426 F.3d 1044, 1058 (9th Cir. 2005).

Speer contends that the claim's default is excused under *Martinez* by the ineffective

1   assistance of PCR counsel. (Doc. 13 at 192.) This also is incorrect. Under *Martinez* the

2   ineffective assistance of PCR counsel can excuse the default only of claims of ineffective

3   assistance of trial counsel. *See Martinez (Ernesto)*, 926 F.3d at 1225; *Pizzuto*, 783 F.3d at

4   1177. Accordingly, Claim 20 remains defaulted and barred from federal review. The claim

5   is also meritless.

6          The Arizona Supreme Court considered Speer's appeal in 2009, well outside the

7   time period with which the Ninth Circuit in *McKinney* was concerned. Speer argues

8   nonetheless that the court applied a causal nexus test by citing cases that were decided

9   during the period identified in *McKinney*. (Doc. 13 at 194–96.) This is simply incorrect.

10         The cases discussed by Speer and cited by the Arizona Supreme Court in his case,

11  are *Anderson*; *State v. Pandeli*, 215 Ariz. 514, 526, 161 P.3d 557, 569 (2007); *State v.*

12  *Ellison*, 213 Ariz. 116, 144, 140 P.3d 899, 927 (2006); and *State v. Hampton*, 213 Ariz.

13  167, 185, 140 P.3d 950, 968 (2006). In *Anderson* the Arizona Supreme Court

14  acknowledged that "a jury cannot be prevented from giving effect to mitigating evidence

15  solely because the evidence has no causal 'nexus' to a defendant's crimes." 210 Ariz. at

16  349, 111 P.3d at 391 (citing *Tennard*, 542 U.S. at 283–87). Subsequently, in *State v.*

17  *Newell*, the Arizona Supreme Court held that, "We do not require that a nexus between the

18  mitigating factors and the crime be established before we consider the mitigation evidence.

19  But the failure to establish such a causal connection may be considered in assessing the

20  quality and strength of the mitigation evidence." 212 Ariz. 389, 405, 132 P.3d 833, 849

21  (2006) (citing *Tennard*, 542 U.S. at 287, and *Anderson*, 210 Ariz. at 350, 111 P.3d at 392).

22         Like Speer's own appeal, *Pandeli*, *Ellison*, and *Hampton* were decided after

23  *Anderson* and *Newell*, when, as the Ninth Circuit recognized in *McKinney*, the Arizona

24  Supreme Court had "abandoned" the causal nexus test. *McKinney*, 813 F.3d at 817.

25  However, even if Speer's appeal had been decided during the period identified in

26  *McKinney*, he would not be entitled to relief on his causal-nexus claim.

27         In *Greenway v. Ryan*, the Ninth Circuit explained: "We said in McKinney that the

28  Arizona courts had 'consistently' applied the causal-nexus test. We did not say, however,

- 120 -

that Arizona had always applied it." 866 F.3d 1094, 1095 (9th Cir. 2017) (citing *McKinney*, 813 F.3d at 803). Determining whether a causal-nexus violation occurred requires an examination of the specific state court ruling. *Id.* as 1096; *see Apelt v. Ryan*, 878 F.3d 800, 839–40 (9th Cir. 2017).

Contrary to Speer's argument, nothing in the Arizona Supreme Court's opinion suggests that the court applied a causal nexus test. In carrying out its independent review, the court "thoroughly reviewed the record." *Speer*, 221 Ariz. at 464, 212 P.3d at 802. The court found that a number of mitigating circumstances had been established. For example, Speer experienced a "difficult childhood" in a "dysfunctional home" with pervasive drug abuse, including drug abuse by Speer's mother while she was pregnant with him. *Id.* He was referred to juvenile court 26 times and incarcerated 12 times from ages 14 to 18. *Id.* Speer was physically abused by his parents and sexually abused at age five by a female relative. *Id.* During his early school years his mother refused recommended evaluations for suspected learning disabilities. *Id.* Speer abused alcohol and drugs. He began using drugs in his early adolescence and overdosed on methamphetamines at 13. *Id.* He was sent to drug treatment as a juvenile. He became addicted to heroin and apparently committed the March 14 burglary to get money to buy heroin. *Id.*

The court found, in the light of conflicting expert evidence, that Speer suffered from depression and had an IQ between 87 and 97. *Id.* at 465, 212 P.3d at 803. The court rejected Speer's diagnosis of cognitive impairment, noting that "the record makes plain that he had a clear ability to think ahead and understand the wrongfulness of his actions" as shown by his planning of the murder from jail, use of code in communicating with Brian Womble, ability to evade MCSO phone restrictions, and directives that Brian dispose of incriminating evidence. *Id.*

Finally, the court found that Speer had proved that his execution would have negative effects on his family. *Id.*

The court then summarized its findings with respect to Speer's mitigating evidence as balanced against the aggravating factors:

[T]he record is not bereft of mitigating evidence. Among other things, Speer suffered a difficult childhood and serious drug abuse. But that history is not in itself sufficient to warrant leniency in this case.

Nor do Speer's mental health issues warrant leniency under the circumstances of this case. This was not a crime of passion or an impetuous reaction to difficult circumstances. For almost a month, Speer planned the murder of two innocent victims of a burglary that he had committed, with the goal of avoiding the consequences of his prior crime. The three aggravating circumstances—prior serious conviction, witness elimination, and committing the offense while on parole or in custody—are cumulatively entitled to substantial weight. And, the factor of witness elimination is in itself especially weighty, as it involves a direct affront to the functioning of the justice system.

Having considered the entire record, we conclude that the mitigating evidence, in the aggregate, is not sufficiently substantial to call for leniency.

*Id.* (footnote and citation omitted).

Far from precluding Speer's evidence or failing to give it "*any* mitigating effect," as Speer argues (Doc. 13 at 197), the Arizona Supreme Court found that a number of mitigating circumstances were proved. The court then evaluated those circumstances in connection with the facts of the crimes. *Speer*, 221 Ariz. at 465, 212 P.3d at 803. Having done so, the court's decision to assign limited weight to Speer's dysfunctional childhood, drug abuse, and mental health problems, was "a choice not foreclosed by *Eddings*." *Sansing*, 997 F.3d at 1042.

In arguing that the Arizona Supreme Court applied a causal nexus test in his case, Speer notes that the court cited *Hampton* for the proposition that a "difficult family background, in and of itself, is not a mitigating circumstance sufficient to mandate leniency in every capital case." *Speer*, 221 Ariz. at 465, 212 P.3d at 803 n.10 (quoting *Hampton*, 213 Ariz. at 185, 140 P.3d at 968). The court also cited *Ellison*, which held that a defendant's "childhood troubles deserve little value as a mitigator for the murder he committed at age thirty-three." *Id.* (quoting *Ellison*, 213 Ariz. at 144, 140 P.3d at 927). In both *Hampton* and *Ellison*, however, the court specifically explained that "[a] defendant is not required to show a nexus between the crime and the mitigation evidence before such

evidence can be considered." *Ellison*, 213 Ariz. at 144, 140 P.3d at 927; *see Hampton*, 213 Ariz. at 185, 140 P.3d at 968 ("[W]hile we 'do not require that a nexus between the mitigating factors and the crime be established before we consider the mitigation evidence . . . the failure to establish such a causal connection may be considered in assessing the quality and strength of the mitigation evidence.'") (quoting *Newell*, 212 Ariz. at 405, 132 P.3d at 849).

In none of these cases did the court violate *Eddings* by refusing to consider mitigating evidence offered by the defendant. Rather, the courts permissibly applied "causal nexus . . . as a factor in determining the weight or significance of mitigating evidence." *Lopez*, 630 F.3d at 1204; *see McGill*, 16 F.4th at 683. Citation to cases that explicitly disavowed the causal-nexus test is not evidence that the *Speer* court applied such a test itself.

*Hampton*, in the passage cited by the court in *Speer*, cites *Wallace*, 160 Ariz. at 427, 773 P.2d at 986, where the court applied an inappropriate causal-nexus test. According to Speer, this error was transmitted to the *Speer* court's decision 20 years later. This argument is unpersuasive. As already recounted, the Arizona Supreme Court abandoned the causal-nexus test in 2005. There is no basis to believe that the court in *Speer* rejected that precedent, especially when it reiterated the correct standard while citing *Tennard*, the case that prompted the court to abandon the nexus test. *Speer*, 221 Ariz. at 461, 212 P.3d at 799; *cf. McKinney*, 813 F.3d at 803, 826 (noting Arizona Supreme Court's "strong view of stare decisis").

2. Reasonableness of factual determinations

Speer also argues in Claim 20 that the Arizona Supreme Court unreasonably interpreted the facts when it found that his mitigating evidence was not sufficiently substantial to require a life sentence. (Doc. 13 at 198.) He contends that the court minimized evidence of his difficult homelife, unreasonably failed to find that other circumstances, such as his age, were mitigating, and did not give appropriate consideration to his mental health and trauma evidence. (*Id.* at 199–200.)

Speer cites *Parker v. Dugger*, 498 U.S. 308, 321 (1991), and *Clemons v. Mississippi*, 494 U.S. 738, 74 (1990), as cases emphasizing the importance of meaningful appellate review in capital cases. (Doc. 13 at 198.) In support of his argument that the Arizona Supreme Court's decision in his case was factually unreasonable, Speer relies on other decisions where the court has found the mitigating evidence sufficient to require leniency at sentencing. (*Id.* at 199–201.) In essence, Speer asks the Court to grant habeas relief based on a proportionality review of Arizona death sentences.

Proportionality review of death sentences is not constitutionally required. *See McCleskey v. Kemp*, 481 U.S. 279, 306 (1987) (citing *Pulley v. Harris*, 465 U.S. 37, 43 (1984)); *Allen*, 395 F.3d at 1018. Moreover, while "meaningful appellate review" is necessary to ensure that the death penalty is not imposed in an arbitrary or irrational fashion, *Pulley*, 465 U.S. at 54 (Stevens, J., concurring); *Parker*, 498 U.S. at 321, the Supreme Court has never held that "independent" or "de novo" review of death sentences is constitutionally mandated. *See also Walton v. Arizona*, 497 U.S. 639, 655–56 (1990) *overruled on other grounds by Ring v. Arizona,* 536 U.S. 584 (2002). The Constitution requires only that an appellate court "consider whether the evidence is such that the sentencer could have arrived at the death sentence that was imposed," not whether the appellate court itself would have imposed a death sentence. *Clemons*, 494 U.S. at 749.

The Arizona Supreme Court did not violate clearly-established federal law by finding that mitigating circumstances in Speer's case did not outweigh the aggravating factors. In *Poyson v. Ryan*, 879 F.3d 875, 893–94 (9th Cir. 2018), the petitioner alleged that his rights under *Eddings* and *Parker* were violated when the trial court and Arizona Supreme Court erroneously found that he had not proved substance abuse as a mitigating circumstance. The petitioner argued that he was entitled to habeas relief because his sentence was based on an unreasonable determination of the facts under § 2254(d)(2). *Id.* at 893.

The Ninth Circuit explained that this argument "misunderstands the law." *Id.* Even if the state courts made a factual error, a habeas petitioner is entitled to relief only if he can

demonstrate that his constitutional rights were violated. *Id.* (citing *Wilson v. Corcoran*, 562 U.S. 1, 5–6 (2010) (per curiam)); *see* 28 U.S.C. § 2254(a) (providing that habeas relief may be granted "only on the ground" that the petitioner's custody violated the law).

Like the petitioner in *Poyson*, Speer cannot show a constitutional violation under *Eddings* or *Parker*. The Arizona Supreme Court did not apply a causal-nexus test to Speer's mitigating evidence, so there was no violation of *Eddings*.

At issue in *Parker* was a decision of the Florida Supreme Court which had affirmed the petitioner's death sentence after striking two aggravating factors. 498 U.S. at 321. The state supreme court based its decision on an erroneous determination that the trial court had found no mitigation. *Id.* at 318. In fact, the record established that the trial court had found mitigating circumstances. *Id.* at 318–20. Having erroneously reviewed the trial court's decision, the state supreme court "did not come to its own independent factual conclusion, and it did not rely on what the trial judge actually found; it relied on 'findings' of the trial judge that bear no necessary relation to this case." *Id.* at 322. By striking two aggravating factors and then affirming the death sentence without considering the mitigating circumstances, the Florida Supreme Court "deprived Parker of the individualized treatment to which he is entitled under the Constitution." *Id.*

The Arizona Supreme Court committed no such error in Speer's case. In carrying out its independent review, the court thoroughly assessed all of the aggravating factors and mitigating circumstances. *Parker* does not support the argument that the Arizona Supreme Court's independent review of Speer's sentence was constitutionally infirm.

Claim 20 is therefore denied.

Claim 21

Speer alleges that the Arizona Supreme Court unreasonably applied *Eddings* and *Tennard* in denying several claims raised on direct appeal. (Doc. 13 at 203.) The allegation is meritless.

1.      Prosecutor's closing argument

Speer first alleges that the prosecutor included an improper causal-nexus argument

in her closing argument after the penalty phase of trial. (Doc. 13 at 203–04.) Speer cites, in severely truncated form, the following passage culled from the prosecutor's closing argument:

> [T]here's no indication that in the spring of 2002, he was using any drugs. And if he did get his hands on some, he certainly wasn't using it on a daily basis.
>
> And how many phone calls did we hear where he plots the murder? 22? So there's no indication that he was using drugs during the time of the offense, he was on Zoloft for the alleged posttraumatic stress disorder, if he had it, and he's not brain damaged, then how was his ability to conform his conduct to the requirements of law impaired? How was he unable to control his behavior? How did any of those things have anything to do with why he murdered Adan Soto?
>
> They don't. They do not reduce the degree of his moral culpability or blameworthiness. I suggest that they don't exist, and they're being used to try to explain what the defendant's real issue is, which is he has antisocial personality disorder.

(RT 3/27/2007, a.m., 66–67.) Speer also quotes this passage:

> . . . Paul Speer cares about one person and one person only. He has antisocial personality disorder. He is never going to change. There is nothing about this crime that calls out for mercy for the defendant. He came from a dysfunctional family. So what. We all came from someplace. And we all managed to be law-abiding citizens.

(*Id.* at 72.)

On direct appeal, the Arizona Supreme Court rejected Speer's claim that the prosecutor's closing argument "improperly limited the jury's consideration of mitigating factors by urging that evidence lacking a causal nexus to the crime should not be given weight." *Speer*, 221 Ariz. at 461, 212 P.3d at 799. The court found no error, citing *Anderson* and reiterating that "although a jury may not be prevented from hearing mitigation evidence lacking a causal nexus to the crime, absence of such a nexus can be considered in evaluating the strength of that evidence." *Id.* (citing *Anderson*, 210 Ariz. at 350, 111 P.3d at 392).

This ruling was not an unreasonable application of *Eddings* and *Tennard*. The prosecutor's argument was a permissible comment on the weight of the proffered

mitigating evidence. "Once the jury has heard all of the defendant's mitigation evidence, there is no constitutional prohibition against the State arguing that the evidence is not particularly relevant or that it is entitled to little weight. The prosecutor's various comments and questions here simply went to the weight of Anderson's mitigation evidence and were not improper." *Anderson*, 210 Ariz. at 350, 111 P.3d at 392; *see McGill*, 16 F.4th at 683 (citing *Anderson*, 210 Ariz. 327, 111 P.3d 369); *McKinney*, 813 F.3d at 818 (same); *cf. Eddings*, 455 U.S. at 114–15 ("The sentencer . . . may determine the weight to be given relevant mitigating evidence."); *McKinney*, 813 F.3d at 834 n.22 ("A sentencer is free to assign whatever weight, including *no* weight, that mitigating evidence deserves under the facts of the case. . . .") (emphasis in original); *Lopez*, 630 F.3d at 1204.

In Speer's case, the prosecutor attempted to discount the mitigating value of Speer's mental health and substance abuse evidence by questioning whether it had been proved and discounting its relationship to the murder. Again, this was permissible. *See, e.g.*, *Underwood v. Royal*, 894 F.3d 1154, 1171–72 (10th Cir. 2018) (finding state court reasonably applied clearly established federal law in denying petitioner's *Eddings* claim where the prosecutor "attacked the quality and strength" of petitioner's mitigating evidence); *United States v. Johnson*, 495 F.3d 951, 978 (8th Cir. 2007) ("[A]s long as the jurors are not told to ignore or disregard mitigators, a prosecutor may argue, based on the circumstances of the case, that they are entitled to little or no weight.") The prosecutor did not tell the jurors they could not consider Speer's mitigating evidence.

Even if the prosecutor's comments were impermissible, however, any error was cured by the trial court's instructions on mitigating evidence. The court explained that "[t]he attorneys' remarks, statements, and arguments are not evidence. . . ." (RT 3/26/07 at 72.) The court then instructed the jury as follows:

> Mitigating circumstances may be offered by the defendant or the State or be apparent from the evidence presented at any phase of these proceedings. You must consider and give effect to all mitigating circumstances that have been raised by any aspect of the evidence. You must disregard any jury instruction that conflicts with this principle.
>
> . . .

1

2      During this trial each of you individually are required to consider mitigating

3      circumstances, that is, circumstances that do not justify or excuse the offense
       but which, in fairness and mercy, may be considered as extenuating or

4      reducing the defendant's moral culpability and blameworthiness and which
       suggest that life imprisonment is the appropriate punishment.

5

6      You are called upon to make a unique individual assessment about the
       sentence Paul Speer should receive. The law contemplates that each

7      individual juror may give different value to any particular mitigating
       circumstance. For example, one juror may find one factor substantial to call

8      for life imprisonment while another juror may give the same factor no value.
       Any one juror who is persuaded that a mitigating factor exists must consider

9      it in his or her sentencing decision.

10

11     The determination of what circumstances are mitigating is for each of you to
       resolve individually, based on all the evidence presented to you.

12

13     Mitigating circumstances may be any factors presented by the defendant or
       the State that are relevant in determining whether to impose life

14     imprisonment, including any aspect of the defendant's character,
       propensities, that is, tendencies or inclinations, or record, and any of the

15     circumstances of the offense, and any other factor you find relevant to your
       individual consideration.

16

17     (*Id.* at 71, 73–74.) The court next listed the 23 mitigating circumstances proposed by

18     defense counsel. (*Id.* at 74–75.)

19          Finally, in his closing argument, Speer's counsel explained to the jury that there

20     "does not have to be a connection" between a mitigating circumstance, such as Speer's

21     alleged molestation by his aunt, and the crime. (RT 3/27/07 at 6.) He also noted that the

22     jury instructions did not require such a connection. (*Id.*)

23          The court's instructions imposed no causal nexus on Speer's mitigating evidence

24     and defined mitigation in the broadest possible terms, as "any other factor you find relevant

25     to your individual consideration." (RT 3/26/07 at 74.)

26          In addition, the arguments of counsel do not have the same force as instructions

27     from the court, *see Boyde*, 494 U.S. at 384, and jurors are presumed to follow such

28     instructions, *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

Based on these considerations, the jury would have understood that it was able to consider all of Speer's mitigating evidence.

The Arizona Supreme Court's denial of this claim was not an unreasonable application of clearly-established federal law.

2.      § 13–751(G)

Speer next argues that A.R.S. § 13–751(G) unconstitutionally limits mitigation by requiring a causal nexus between the evidence and the murder. (Doc. 13 at 207.) The Arizona Supreme Court denied this claim on direct appeal, finding that the statute did not require such a connection. *Speer*, 221 Ariz. at 461, 212 P.3d at 799.

The court first noted that the text of the statute itself places no such limits on the consideration of mitigating evidence, but instead "allows the jury to consider 'as mitigating circumstances *any* factors proffered by the defendant or the state that are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and *any* of the circumstances of the offense.'" *Id.* (quoting § 13–751(G)) (emphasis added by supreme court). The court then noted that the trial judge "specifically instructed the jury that, in addition to specific mitigating factors claimed by Speer, it could 'consider anything else about the commission of the crime or Paul Speer's background or character that would mitigate against imposing the death penalty.' Thus, the jury was entirely free to consider all mitigating evidence, whether or not it had a causal nexus to the murder." *Id.*

Speer's only response to the statutory language is to repeat his incorrect argument that *McKinney* applies to the Arizona Supreme Court's analysis of mitigating evidence in his case. (Doc. 13 at 207–09.) It does not because, as has been earlier discussed, the decision in *Speer* fell outside the *McKinney* time frame and nothing in the decision suggests that the court applied a causal-nexus test.

The Arizona Supreme Court's denial of this claim was not an unreasonable application of clearly-established federal law.

3.     Special verdict form

Speer argues that his right to due process and meaningful appellate review were denied because the trial court failed to provide a special verdict form for Speer's mitigating evidence. (Doc. 13 at 209.) The Arizona Supreme Court summarily denied the claim on direct appeal. *Speer*, 221 Ariz. at 462, 212 P.3d at 800.

The Constitution does not require a capital sentencer to document its analysis of mitigating circumstances, as long as the sentencer considers all of the evidence. *See Jeffries v. Blodgett*, 5 F.3d 1180, 1197 (9th Cir. 1993) ("[D]ue process does not require that the sentencer exhaustively document its analysis of each mitigating factor as long as a reviewing federal court can discern from the record that the state court did indeed consider all mitigating evidence offered by the defendant") (citing *Parker*, 498 U.S. at 314–19); *see also Jeffers v. Lewis*, 38 F.3d 411, 418 (9th Cir. 1994) (explaining that a defendant is not "entitled to a specific listing and discussion of each piece of mitigating evidence under federal constitutional law").

The Arizona Supreme Court's denial of this claim was not an unreasonable application of clearly-established federal law.

4.     Residual doubt

Speer argues that his due process rights were violated by the trial court's refusal to issue a penalty-phase instruction on residual doubt as a mitigating circumstance. (Doc. 13 at 210.) On appeal, the Arizona Supreme Court held that the trial court "acted correctly" because there is no constitutional or statutory right to present residual doubt evidence during the penalty phase and because a residual doubt instruction is not required by Arizona law. *Speer*, 221 Ariz. at 462, 212 P.3d at 800 (citations omitted). This decision is not an unreasonable application of clearly-established federal law.

"[T]he United States Supreme Court has expressly rejected the assertion that a capital defendant has a federal constitutional right to produce evidence of residual doubt at sentencing." *Atwood v. Schriro*, 489 F. Supp. 2d 982, 1021 (D. Ariz. 2007) (citing *Oregon v. Guzek*, 546 U.S. 517, 523–25 (2006)); *see Abdul-Kabir v. Quarterman*, 550 U.S. 233,

250–51 (2007) ("[W]e have never held that capital defendants have an Eighth Amendment right to present 'residual doubt' evidence at sentencing."); *Franklin v. Lynaugh*, 487 U.S. 164, 174 (1988) (suggesting there is no constitutional right to present evidence of "residual doubt" because "[s]uch lingering doubts are not over any aspect of petitioner's character, record, or a circumstance of the offense") (quotation omitted); *see also Holland v. Anderson*, 583 F.3d 267, 283 (5th Cir. 2009) (explaining that the Supreme Court "has not recognized a constitutional right to argue 'residual doubt' at sentencing," so the state court's decision precluding such evidence was neither contrary to nor an unreasonable application of clearly established federal law).

Claim 18

Speer alleges that counsel performed ineffectively by failing to object to the prosecutor's closing argument. As previously noted, the Arizona Supreme Court rejected Speer's causal-nexus arguments, including the claim the prosecutor's argument was erroneous. *Speer*, 221 Ariz. at 461, 212 P.3d at 799.

Speer raised this claim of ineffective assistance in his PCR petition. The court found the claim precluded and meritless. (PCR Pet. at 72.) With respect to the latter determination, the PCR court explained:

> The State properly argued its belief as to the weight to be afforded mitigation, absent proof of a *nexus* to the crime. In the instructions to the jury, this Court advised the jurors to "consider and give effect to all mitigating circumstances raised by the evidence"; to determine credibility and weight and to consider "factors that bear on credibility and weight;" and that "each individual juror may give different value to any particular mitigating circumstance."

(PCR Ruling, ME 5/20/15 at 24.) This claim is meritless and is denied on that basis.

As explained above, the prosecutor's remarks were permissible under *Anderson* and *Eddings*. Because Speer's prosecutorial misconduct claim has no merit, counsel cannot be ineffective for failing to object. *See e.g.*, *Juan H.*, 408 F.3d at 1273; *Rupe*, 93 F.3d at 1444–45; *see also Fulks v. United States*, 875 F. Supp. 2d 535, 581 (D.S.C. 2010) (finding "counsel was not ineffective for failing to object to the prosecutor's argument" where the "argument did not imply a strict causal nexus was required, and to the extent the prosecutor

might have suggested this indirectly, the court's omnibus jury charge clearly explained to the jury the proper role of mitigating factors in this case. Hence, there was no error by the court or counsel"); *Allen v. United States*, No. 4:07CV00027 ERW, 2011 WL 1770929, at *40 (E.D. Mo. May 10, 2011) ("Counsel performed reasonably in not objecting to these statements because none of them rose to the level of instructing the jury that they were required to ignore Allen's mitigating evidence.").

### F.    Juror Issues

**Claim 22:**

Speer alleges that his rights to a fair trial and due process were violated when a juror observed him in handcuffs. (Doc. 13 at 211.) He contends that the Arizona Supreme Court's denial of this claim was "an unreasonable interpretation of the facts" and "an unreasonable application of clearly established federal law holding that a trial court abuses its discretion in allowing visible restraints in the absence of compelling circumstances." (*Id.*)

During the penalty phase of trial, Juror 7 reported attending a social event where she sat next to a deputy county attorney. (RT 2/26/07 at 1–11.) The court and counsel questioned the juror about the incident the next morning. (*Id.*) While she was being questioned, a deputy brought Speer into the courtroom. Speer was wearing pink handcuffs. (*Id.* at 13–14.) The court immediately told the deputy to remove Speer and bring him back in a few minutes and excused the juror. (*Id.*)

Speer's attorney moved for a mistrial. (*Id.* at 15.) The court denied the motion but offered to dismiss Juror 7 and seat the last remaining alternate. (*Id.* at 15–22.) Speer's counsel rejected the offer because he believed that Juror 7 would favor voting for a life sentence. (*Id.* at 17.)

Juror 7 was then brought back into the courtroom. (*Id.* at 27.) She acknowledged seeing Speer's handcuffs (*id.*) but stated that did not affect her ability to be fair and impartial about the evidence in the penalty phase (*id.* at 35). She already knew from the

1  trial evidence that Speer was in jail and believed that it was standard procedure for inmates

2  to be in handcuffs. (*Id.*)

3       Speer conferred with counsel. (*Id.* at 42.) The court then engaged in a colloquy with

4  Speer and found that, on counsel's advice, he made a knowing and voluntary waiver of the

5  court's offer to excuse Juror 7. (*Id.* at 43–45.) The court admonished the juror not to discuss

6  the issue with the other jurors.

7       In denying this claim on direct appeal, the Arizona Supreme Court first cited *Deck*

8  *v. Missouri*, 544 U.S. 622, 633 (2005). *Speer*, 221 Ariz. at 462, 212 P.3d at 800. *Deck* held

9  that "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible

10  to the jury absent a trial court determination, in the exercise of its discretion, that they are

11  justified by a state interest specific to a particular trial." 544 U.S. at 629. Accordingly,

12  "where a court, without adequate justification, orders the defendant to wear shackles that

13  will be seen by the jury, the defendant need not demonstrate actual prejudice to make out

14  a due process violation." *Id.* at 635.

15       The court determined, however, that Speer's case was "more analogous to

16  inadvertent exposure to a restrained prisoner during transportation than to restraint during

17  trial." *Speer*, 221 Ariz. at 463, 212 P.3d at 801. In such cases, the defendant must show

18  actual prejudice. *Id.* at 463–64, 212 P.3d at 800–01. The court explained:

19       In this case, a single juror saw Speer brought into the courtroom in restraints
        during a preliminary proceeding. . . . Because Speer was not restrained during
20       trial, the considerations that led the Supreme Court to find inherent prejudice
        in *Deck* are not present. *See* 544 U.S. at 630–32, 125 S. Ct. 2007 (noting that
21       shackling during trial undermines presumption of innocence, interferes with
        right to assistance of counsel, and diminishes dignity of process); *id.* at 633,
22       125 S. Ct. 2007 (noting that shackling during trial suggests that defendant is
23       danger to the community).

24       Given Juror 7's statements, the superior court did not abuse its discretion in
25       finding that Speer suffered no prejudice from the incident. Moreover,
        because only one juror saw Speer in restraints, the trial court's offer to seat
26       an alternate would have obviated any prejudice. Having rejected that offer,
27       Speer cannot now claim error.

28  *Id.* at 463, 212 P.3d at 801.

This decision was not an unreasonable application of clearly established federal law. As the Arizona Supreme Court recognized, *Deck* is distinguishable. There, the defendant was handcuffed and shackled with leg irons and a belly chain throughout the penalty phase of his capital trial. 544 U.S. at 625. The Court held that visibly shackling a defendant inside the courtroom is inherently prejudicial and must be justified by an essential state interest. *Id.* at 627.

Speer was not shackled or handcuffed during any courtroom proceedings. A single juror inadvertently caught a glimpse of him in handcuffs as he was being led into the courtroom. The Supreme Court has not considered whether such a scenario is inherently prejudicial. The Ninth Circuit, however, has "held that visible shackling outside the courtroom—at least when the viewing is brief and accidental—is not inherently prejudicial; instead, a due process violation occurs only if the criminal defendant demonstrates actual prejudice." *Wharton v. Chappell*, 765 F.3d 953, 964–65 (9th Cir. 2014). Courts in other cases have likewise found that the glimpse by a juror or jurors of a shackled defendant as he is brought into the courtroom is not inherently or presumptively prejudicial. *See, e.g.*, *Williams v. Woodford*, 384 F.3d 567, 593 (9th Cir. 2004); *Ghent v. Woodford*, 279 F.3d 1121, 1133 (9th Cir. 2002); *United States v. Olano*, 62 F.3d 1180, 1190 (9th Cir. 1995). As the court in *Wharton* explained, one reason to distinguish between "shackling in open court and shackling during transportation" is the fact the jurors are aware that defendants may be in custody and that it is a regular practice to handcuff inmates while they are being transported. 765 F.3d at 965 (citing, *e.g.*, *United States v. Halliburton*, 870 F.2d 557, 561 (9th Cir. 1989)).

In *Wharton*, some jurors saw the petitioner being escorted through the public hallways of the courthouse in a "chain gang" of other inmates. *Id.* at 958, 965. He was not shackled while in the courtroom. *Id.* at 965–67. In this scenario, the petitioner was required to "demonstrate actual prejudice." *Id.* at 966. The court of appeals held that the petitioner did not make that showing. *Id.* at 966–67. The court noted the strong evidence of the

petitioner's guilt. The court also explained that "jurors likely understood that the transportation shackling was a regular part of his custody." *Id.*

These factors support a finding that Speer was not prejudiced by the fact that a single juror saw him in handcuffs as he was being brought into the courtroom. The evidence against Speer was strong, and the juror believed Speer was in custody and that it was standard procedure for inmates to be handcuffed. Finally, the fact that Speer was unhandcuffed while inside the courtroom "suggested that [he] was *not* a dangerous person." *Id.* Under these circumstances, Speer has not shown that he was prejudiced by Juror 7's glimpse of him in handcuffs.

The Arizona Supreme Court's denial of this claim was neither contrary to nor an unreasonable application of clearly established federal law nor was it based on an unreasonable determination of the facts. Claim 22 is denied.

**Claim 25:**

Speer alleges that jurors considered inadmissible and prejudicial extrinsic evidence during the penalty phase of his trial in violation of the Sixth, Eighth, and Fourteenth Amendments. (Doc. 13 at 234.) He did not raise this claim in state court but contends, incorrectly, that its default is excused by the ineffective assistance of appellate and PCR counsel. (*Id.*.) Again, ineffective assistance of appellate counsel may be used as cause to excuse a procedural default only where the particular ineffective assistance allegation was first exhausted in state court as an independent constitutional claim. *See Carpenter*, 529 U.S. at 453; *Carrier*, 477 U.S. at 489–90. Speer did not raise such a claim of ineffective assistance of appellate counsel. Under *Martinez* the ineffective assistance of PCR counsel can excuse the default only of claims of ineffective assistance of trial counsel. *See Martinez (Ernesto)*, 926 F.3d at 1225; *Pizzuto*, 783 F.3d at 1177.

Claim 25 remains procedurally defaulted and is barred from federal review.

**G.     Challenges to Jury Instructions**

**Claim 23:**

Speer alleges that the trial court "improperly coerced the jury" when it reported

being deadlocked during penalty-phase deliberations. (Doc. 13 at 216.) Speer acknowledges that he did not raise this claim in state court. (*Id.*) He contends that its default is excused by the ineffective assistance of appellate and PCR counsel. (*Id.* at 225–26.) Again, this is incorrect. First, as noted previously, ineffective assistance of appellate counsel may be used as cause to excuse a procedural default only where the particular ineffective assistance allegation was first exhausted in state court as an independent constitutional claim. *See Carpenter*, 529 U.S. at 453; *Carrier*, 477 U.S. at 489–90. Speer did not raise such a claim of ineffective assistance of appellate counsel. Second, under *Martinez* the ineffective assistance of PCR counsel can excuse the default only of claims of ineffective assistance of trial counsel. *See Martinez (Ernesto)*, 926 F.3d at 1225; *Pizzuto*, 783 F.3d at 1177. Claim 23 remains procedurally defaulted and is barred from federal review.

**Claim 24:**

Speer argues that his rights under the Sixth, Eighth, and Fourteenth Amendments were violated by the trial court's failure to instruct the jury that to find that death was the appropriate sentence it had to determine beyond a reasonable doubt that the aggravating factors outweighed the mitigating circumstances. (Doc. 13 at 226.) The Arizona Supreme Court summarily denied this claim on direct review. *Speer*, 221 Ariz. at 467, 212 P.3d at 805. The court's decision does not entitle Speer to habeas relief.

Speer argues that in *Hurst v. Florida*, 577 U.S. 92 (2016), the Supreme Court held capital jurors must make their weighing determination—aggravating versus mitigating factors—beyond a reasonable doubt. (Doc. 13 at 228–29.) This argument fails.

First, *Hurst* was not clearly-established federal law at the time the Arizona Supreme Court reviewed Speer's death sentence. *See Underwood v. Royal*, 894 F.3d 1154, 1186 (10th Cir. 2018) ("*Hurst* post-dates the [Oklahoma Court of Criminal Appeal's] decision and thus cannot serve as clearly established federal law for purposes of our review under AEDPA.") (citing *Greene v. Fisher*, 565 U.S. 34, 38 (2011)).

In *Hurst* the Court held that Florida's capital sentencing scheme violated *Ring v. Arizona*, 536 U.S. 584 (2002). *Ring* invalidated Arizona's capital sentencing statute under which a judge made the factual findings necessary to expose a defendant to a death sentence. Under the Florida scheme, a jury rendered an advisory verdict while the judge made the ultimate factual determinations necessary to sentence a defendant to death. *Hurst*, 577 U.S. at 98. The Court held that this procedure was invalid because it "does not require the jury to make the critical findings necessary to impose the death penalty." *Id.* In Hurst the Supreme Court simply applied *Ring* to Florida's capital sentencing statutes.

Contrary to Speer's argument, *Hurst* does not hold that a jury is required to find beyond a reasonable doubt that the aggravating factors outweigh the mitigating circumstances. *Hurst* held only that Florida's scheme, in which the jury rendered an advisory sentence but the judge made the findings regarding aggravating and mitigating factors, violated the Sixth Amendment. *Id.* at 97.

*Hurst* did not address the process of weighing aggravating and mitigating circumstances and "made no holding regarding [the] determination . . . that the mitigators do not outweigh the aggravators." *United States v. Tsarnaev*, 968 F.3d 24, 88–89 (1st Cir. 2020), *reversed on other grounds,* 142 S. Ct. 1024 (2022). The Supreme Court has held that the sentencer may be given "unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty." *Zant v. Stephens*, 462 U.S. 862, 875 (1983); *see Tuilaepa v. California*, 512 U.S. 967, 979–80 (1994). In *Zant* the Court explained that "specific standards for balancing aggravating against mitigating circumstances are not constitutionally required." *Id.* at 875 n.13; *see Franklin*, 487 U.S. at 179 ("[W]e have never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required.").

In *McKinney v. Arizona*, 140 S. Ct. 702, 707 (2020), the Court reiterated that "a jury must find the aggravating circumstance that makes the defendant death eligible." The Court explained, however, that "in a capital sentencing proceeding just as in an ordinary

sentencing proceeding, a jury (as opposed to a judge) is not constitutionally required to weigh the aggravating and mitigating circumstances or to make the ultimate sentencing decision within the relevant sentencing range." Thus, "*Ring* and *Hurst* did not require jury weighing of aggravating and mitigating circumstances." *Id.* at 708. If jury weighing is not required, there cannot be a standard for that weighing.

Finally, as the Court announced in *McKinney*, *Hurst* does "not apply retroactively on collateral review." *Id.*

The Arizona Supreme Court's denial of this claim was neither contrary to nor an unreasonable application of clearly established federal law. Claim 24 is denied.

### H.     Ineffective Assistance of Appellate and PCR Counsel

**Claim 26:**

Speer alleges that he was denied his right to effective assistance of appellate counsel. (Doc. 13 at 245.) The claim consists of seven subclaims.[31] Speer contends that he exhausted two of the subclaims, (1) and (3), by raising them in his PCR petition, where they were denied on the merits. (*Id.*; *see* ME 5/20/15 at 12 and 23.) Respondents argue that Speer failed to exhaust those subclaims because he did not include them in his petition for review. (Doc. 16 at 100; *see* PR at 22–23, 34–38.) Respondents are correct. Speer's failure to include the claims in his petition for review renders them unexhausted. *See Boerckel*, 526 U.S. at 848*; Swoopes*, 196 F.3d 1008 (holding that capital prisoners must seek review in Arizona Supreme Court to exhaust claims). In addition, as discussed above, the subclaims are meritless.

---

[31]     Speer alleges that appellate counsel was ineffective based on his failure to raise claims (1) challenging the accomplice instruction and trial counsel's failure to object to and correct the instruction; (2) that trial counsel were ineffective for failing to move to vacate Speer's conviction and sentence on the basis of conflicting theories of prosecution; (3) that the trial court violated Speer's confrontation rights; (4) alleging prosecutorial misconduct; (5) presenting an independent review argument; and alleging (6) juror misconduct and (7) jury coercion.

The parties agree that the five remaining subclaims are unexhausted because Speer did not raise them in state court. (Doc. 13 at 245; Doc. 16 at 100.) Speer contends that their default is excused under *Martinez* by the ineffective assistance of PCR counsel. As has already been noted, however, *Martinez* applies only to claims of ineffective assistance of trial counsel, not to claims of ineffective assistance of appellate counsel. *Davila*, 137 S. Ct. at 2062–63, 2065–66.

The allegations in Claim 26 are all procedurally defaulted and barred from federal review. Claim 26 is denied.

**Claim 27:**

Speer alleges that his PCR counsel were constitutionally ineffective. (Doc. 13 at 253.) The ineffective assistance of PCR counsel is not cognizable as an independent constitutional claim. *See* 28 U.S.C. § 2254(i) ("[T]he ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief."); *Coleman*, 501 U.S. at 752 (explaining that because there is no constitutional right to an attorney in PCR proceedings, "a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings"); *Mendoza v. Sec'y, Fla. Dep't of Corr.*, 659 F.App'x 974, 982 (11th Cir. 2016) ("[T]o any extent Mendoza arguably wishes to raise a claim that his state post-conviction counsel was ineffective, such a claim would be futile because it is not cognizable."). Claim 27 is denied.

## I. Cumulative Prejudice

**Claim 28:**

Speer alleges that his conviction and sentence must be vacated due to the cumulative prejudicial effect of the errors in his case (Doc. 13 at 259.) The parties agree that the federal basis of this claim was addressed in state court. The claim, however, is meritless.

The United States Supreme Court has not specifically recognized the doctrine of cumulative error as an independent basis for habeas relief. *See Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002) ("The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief."); *cf. Morris v. Sec'y Dep't of Corr.*, 677

F.3d 1117, 1132 n.3 (11th Cir. 2012) (refusing to decide whether "under the current state of Supreme Court precedent, cumulative error claims reviewed through the lens of AEDPA can ever succeed in showing that the state court's decision on the merits was contrary to or an unreasonable application of clearly established law").

The Ninth Circuit has held that in some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may nonetheless prejudice a defendant to such a degree that his conviction must be overturned. *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002), *overruled on other grounds by Slack v. McDaniel*, 529 U.S. 473 (2000). Here, however, the Court has not identified any constitutional errors arising during Speer's trial. Therefore, "[b]ecause there is no single constitutional error in this case, there is nothing to accumulate to [the] level of a constitutional violation." *Id.*; *see Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005); *Morris*, 677 F.3d at 1132 & n.3. "If there are no errors, there is no need to consider their cumulative effect." *McGill*, 16 F.4th at 685.

Because Supreme Court precedent does not recognize the doctrine of cumulative error, and because this Court has determined that no prejudice resulted from the errors alleged by Speer, the claim of cumulative prejudice is meritless.

**J.      Systemic Challenges**

**Claim 29:**

Speer raises a series of "systemic claims" consisting primarily of challenges to capital punishment in general and Arizona's death penalty statute in particular. The claims are meritless or non-cognizable.[32]

A.      Speer alleges that Arizona's capital-sentencing scheme violates the Eighth and Fourteenth Amendments because it does not sufficiently channel the sentencer's discretion. (Doc. 13 at 262.) The Arizona Supreme Court's denial of this claim, *Speer*, 221 Ariz. at 466, 212 P.3d at 804, was neither contrary to nor an unreasonable application of

---

[32] Speer lists the individual claims encompassed by Claim 29 as (A) through (O). The Court follows that format in addressing the claims.

1    clearly-established federal law.

2          Arizona's death penalty scheme allows only certain, statutorily defined aggravating

3    factors to be considered in determining eligibility for the death penalty. "The presence of

4    aggravating circumstances serves the purpose of limiting the class of death-eligible

5    defendants, and the Eighth Amendment does not require that these aggravating

6    circumstances be further refined or weighed by [the sentencer]." *Blystone v. Pennsylvania*,

7    494 U.S. 299, 306–07 (1990). The Ninth Circuit and the United States Supreme Court have

8    upheld Arizona's death penalty statute against allegations that particular aggravating

9    factors do not adequately narrow the sentencer's discretion. *See Jeffers*, 497 U.S. 764, 774–

10   77 (1990); *Walton*, 497 U.S. at 639, 649–56; *Woratzeck*, 97 F.3d at 335.  Claim 29(A) is

11   denied.

12         B.    Speer alleges that the death penalty is irrationally and arbitrarily imposed and

13   serves no purpose that is not adequately addressed by life in prison. (Doc. 13 at 265.) The

14   Arizona Supreme Court's denial of this claim, *Speer*, 221 Ariz. at 466, 212 P.3d at 804,

15   was neither contrary to nor an unreasonable application of clearly-established federal law.

16   *See Walton*, 497 U.S. at 655–56; *Smith v. Stewart*, 140 F.3d 1263, 1272 (9th Cir. 1998); *see

17   also Andriano v. Shinn*, No. CV-16-01159-PHX-SRB, 2021 WL 184546, at *81 (D. Ariz.

18   Jan. 19, 2021); *Roseberry v. Ryan*, No. 15-CV-1507-PHX-NVW, 2019 WL 3556932 at

19   *37 (D. Ariz. August 5, 2019). Speer "simply fails to provide any clearly established

20   authority in support of his contention." *Roybal v. Davis*, 148 F.Supp.3d 958, 1111 (S.D.

21   Cal. 2015). Claim 29(B) is denied.

22         C.    Speer alleges that Arizona's capital-sentencing scheme unconstitutionally

23   limits full consideration of mitigation by requiring the defendant to prove mitigating

24   circumstances by a preponderance of the evidence. (Doc. 13 at 266.) The Arizona Supreme

25   Court's denial of this claim, *Speer*, 221 Ariz. at 466, 212 P.3d at 804, was neither contrary

26   to nor an unreasonable application of clearly-established federal law. The Supreme Court

27   has specifically rejected the argument that the Arizona statute is unconstitutional because

28   it imposes on defendants the burden of establishing, by a preponderance of the evidence,

1    the existence of mitigating circumstances sufficiently substantial to call for leniency.

2    *Walton*, 497 U.S. at 649–51. The Court has subsequently reaffirmed that the reasoning in

3    *Walton* still controls regarding burdens of persuasion. *See Marsh*, 548 U.S. at 173 (holding

4    that "a state death penalty statute may place the burden on the defendant to prove that

5    mitigating circumstances outweigh aggravating circumstances"). Once the government has

6    properly carried its burden of establishing death eligibility, "it [does] not offend the

7    Constitution to put the burden on [defendant] to prove any mitigating factor by a

8    preponderance of the evidence." *United States v. Mitchell*, 502 F.3d 931, 993 (9th Cir.

9    2007) (citations omitted). Claim 29(C) is denied.

10        D.    Speer alleges that the (F)(6) "especially heinous, cruel or depraved"

11   aggravating factor is unconstitutionally vague and overbroad. (Doc. 13 at 267.) The

12   Arizona Supreme Court's denial of this claim, *Speer*, 221 Ariz. at 466, 212 P.3d at 804,

13   was neither contrary to nor an unreasonable application of clearly-established federal law.

14        The United States Supreme Court and the Ninth Circuit have upheld Arizona's death

15   penalty statute against allegations that particular aggravating factors, including the (F)(6)

16   factor, do not adequately narrow the sentencer's discretion. *See Jeffers*, 497 U.S. at 774–

17   77; *Walton*, 497 U.S. at 652–56. In *Walton* the Supreme Court held that the "especially

18   heinous, cruel or depraved" aggravating circumstance was facially vague but the vagueness

19   was remedied by the Arizona Supreme Court's clarification of the factor's meaning. 497

20   U.S. at 654; *see also Smith v. Ryan*, 823 F.3d 1270, 1294–95 (9th Cir. 2016). Speer argues

21   that *Walton* no longer controls after Arizona switched to jury sentencing in capital cases.

22   (Doc. 13 at 270.) This is unpersuasive. "There is no clearly established federal law holding

23   that jury instructions based on the Arizona Supreme Court's narrowing construction are

24   inadequate." *Dixon v. Ryan*, No. CV-14-258-PHX-DJH, 2016 WL 1045355, at *45 (D.

25   Ariz. Mar. 16, 2016), *aff'd*, 932 F.3d 789 (9th Cir. 2019). Claim 29(D) is denied.

26        E.    Speer alleges that the trial court's jury instructions improperly limited the

27   mitigation evidence the jury could consider. (Doc. 13 at 271.) The court instructed the jury

28   that "Evidence is irrelevant and should not be considered by you individually if it is mere

1   sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling."
2   (EIR 752 at 9.) The Arizona Supreme Court's denial of this claim, *Speer*, 221 Ariz. at 466,
3   212 P.3d at 804, was a reasonable application of clearly-established federal law. "[F]ederal
4   courts have consistently held that jury instructions admonishing the jury to base its penalty
5   determination on mitigating or aggravating evidence, not on sympathy for the defendant,
6   pass constitutional muster." *Mayfield v. Woodford*, 270 F.3d 915, 923 (9th Cir. 2001)
7   (citing *Victor v. Nebraska*, 511 U.S. 1, 13 (1994); *Johnson v. Texas*, 509 U.S. 350, 371–72
8   (1993); *California v. Brown*, 479 U.S. 538, 542–43 (1987)). Claim 29(E) is denied.

9       F.      Speer alleges that the death penalty is cruel and unusual punishment "under
10   any circumstances." (Doc. 13 at 273.) He does not indicate how the Arizona Supreme
11   Court's denial of this claim, *Speer*, 221 Ariz. at 466, 212 P.3d at 804, conflicts with or
12   unreasonably applies clearly-established federal law, which holds that the death penalty
13   does not constitute cruel and unusual punishment.  *See Gregg v. Georgia*, 428 U.S. 153,
14   169 (1976); *see also Glossip v. Gross*, 576 U.S. 863, 881 (2015) ("[W]e have time and
15   again reaffirmed that capital punishment is not per se unconstitutional."); *Roper v.
16   Simmons*, 543 U.S. 551, 568–69 (2005) (noting that the death penalty is constitutional when
17   applied to a narrow category of crimes and offenders). Claim 29(F) is denied.

18       G.      Speer alleges that Arizona's capital-sentencing scheme violates the Eighth
19   and Fourteenth Amendments because it affords the prosecutor unbridled discretion to seek
20   the death penalty. (Doc. 13 at 276.) The Arizona Supreme Court's denial of this claim,
21   *Speer*, 221 Ariz. at 466, 212 P.3d at 804, was neither contrary to nor an unreasonable
22   application of clearly-established federal law.

23       The Supreme Court has held that prosecutors have wide discretion in making the
24   decision whether to seek the death penalty. *See McCleskey*, 481 U.S. at 296–97; *Gregg*,
25   428 U.S. at 199 (holding that pre-sentencing decisions by actors in the criminal justice
26   system that may remove an accused from consideration for the death penalty are not
27   unconstitutional). In *Smith* the Ninth Circuit rejected the argument that Arizona's death
28   penalty statute is constitutionally infirm because "the prosecutor can decide whether to

1    seek the death penalty." 140 F.3d at 1272. Claim 29(G) is denied.

2        H.      Speer alleges that Arizona's capital-sentencing scheme discriminates against

3    poor, young male defendants. (Doc. 13 at 276.) The Arizona Supreme Court reasonably

4    applied clearly-established federal law in denying this claim. *Speer*, 221 Ariz. at 466, 212

5    P.3d at 804. "[A] defendant who alleges an equal protection violation has the burden of

6    proving 'the existence of purposeful discrimination'" and must demonstrate that such

7    discrimination had an effect on him. *McCleskey*, 481 U.S. at 292 (quoting *Whitus v.*

8    *Georgia*, 385 U.S. 545, 550 (1967)). Therefore, to prevail on this claim, Speer "must prove

9    that the decisionmakers in his case acted with discriminatory purpose." *Id.* He does not

10   attempt to meet this burden, offering no evidence specific to his case that would support

11   an inference that sex, race, economic status, or the race of his victims played a part in his

12   sentence. *See Richmond v. Lewis*, 948 F.2d 1473, 1490–91 (1990) (holding that statistical

13   evidence that Arizona's death penalty is discriminatorily imposed based on race, sex, and

14   socioeconomic background is insufficient to prove decisionmakers in petitioner's case

15   acted with discriminatory purpose), *vacated on other grounds*, 986 F.2d 1583 (9th Cir.

16   1993). Claim 29(H) is denied.

17       I.      Speer alleges that the absence of proportionality review of death sentences

18   by Arizona courts violates his constitutional rights. (Doc. 13 at 278.) The Arizona Supreme

19   Court's denial of this claim, *Speer*, 221 Ariz. at 466, 212 P.3d at 804, was neither contrary

20   to nor an unreasonable application of clearly-established federal law. As noted above, there

21   is no federal constitutional right to proportionality review of a death sentence. *McCleskey*,

22   481 U.S. at 306 (citing *Pulley*, 465 U.S. at 43); *see Allen*, 395 F.3d at 1018–19. The Ninth

23   Circuit has explained that the "substantive right to be free from a disproportionate

24   sentence" is protected by the application of "adequately narrowed aggravating

25   circumstance[s]." *Ceja v. Stewart*, 97 F.3d 1246, 1252 (9th Cir. 1996). Claim 29(I) is

26   denied.

27       J.      Speer alleges that Arizona's death penalty scheme is unconstitutional

28   because it does not require the State to prove beyond a reasonable doubt that death is the

1  appropriate sentence. (Doc. 13 at 279.) The Arizona Supreme Court's denial of this claim,

2  *Speer*, 221 Ariz. at 24, 212 P.3d at 805, was neither contrary to nor an unreasonable

3  application of clearly-established federal law.

4      The Constitution does not require a death penalty statute to set forth specific

5  standards for a capital sentencer to follow in its consideration of aggravating and mitigating

6  circumstances. *See Zant*, 462 U.S. at 875 n.13 (1983) (explaining that "specific standards

7  for balancing aggravating against mitigating circumstances are not constitutionally

8  required"); *see also Tuilaepa*, 512 U.S. at 979–80 ("A capital sentencer need not be

9  instructed how to weigh any particular fact in the capital sentencing decision."). In *Kansas*

10 *v. Marsh*, the Supreme Court explained:

> In aggregate, our precedents confer upon defendants the right to present
> sentencers with information relevant to the sentencing decision and oblige
> sentencers to consider that information in determining the appropriate
> sentence.  The thrust of our mitigation jurisprudence ends here.  "[W]e have
> never held that a specific method for balancing mitigating and aggravating
> factors in a capital sentencing proceeding is constitutionally required."

15 548 U.S. 163, 175 (2006) (quoting *Franklin*, 487 U.S. at 179).

16     Thus the Constitution does not require the capital sentencer to find that the

17 aggravating circumstances outweigh mitigation beyond a reasonable doubt.  *See Smith*, 140

18 F.3d at 1272 (rejecting claim based on failure to apply beyond a reasonable doubt standard

19 at sentencing); *Williams v. Calderon*, 52 F.3d 1465, 1485 (9th Cir. 1995) ("[T]he failure of

20 the statute to require a specific finding that death is beyond a reasonable doubt the

21 appropriate penalty does not render it unconstitutional."); *McGill*, No. CV-12-01149-PHX-

22 JJT, 2019 WL 160732, at *28 ("There is no Supreme Court authority requiring a jury to be

23 instructed on a burden of proof in the sentencing phase of a capital case."). Claim 29(J) is

24 denied.

25     K.      Speer alleges that Arizona's capital sentencing scheme is unconstitutional

26 because it requires a death sentence whenever one aggravating factor and no mitigating

27 circumstances are found. (Doc. 13 at 281.) The Arizona Supreme Court's denial of this

28 claim, *Speer*, 221 Ariz. at 466, 212 P.3d at 804, was a reasonable application of clearly-

established federal law. The Supreme Court has rejected the contention that Arizona's death penalty statute is impermissibly mandatory. *See Walton*, 497 U.S. at 651–52; *Marsh*, 548 U.S. at 173–74. Claim 29(K) is denied.

L. Speer alleges that Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments because it does not provide objective standards to guide the sentencer in weighing aggravating factors against mitigating circumstances. (Doc. 13 at 283.) The Arizona Supreme Court's denial of this claim, *Speer*, 221 Ariz. at 466, 212 P.3d at 804, was neither contrary to nor an unreasonable application of clearly-established federal law.

The United States Supreme Court has held that in a capital case "the sentencer may be given 'unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty.'" *Tuilaepa*, 512 U.S. at 979–80 (quoting *Zant*, 462 U.S. at 875); *see Franklin*, 487 U.S. at 179 (noting that the Court has never held that a specific method for balancing mitigating and aggravating factors is constitutionally required). Accordingly, a capital sentencer "need not be instructed how to weigh any particular fact in the capital sentencing decision." *Id.* at 979. Claim 29(L) is denied.

M. Speer alleges that he will be denied a fair clemency process in violation of the Eighth and Fourteenth Amendments. (Doc. 13 at 283.) This claim is not cognizable on federal habeas review. Habeas relief may only be granted on claims that a prisoner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Speer's challenge to state clemency procedures and proceedings does not represent an attack on his detention and thus does not constitute a proper ground for relief. *See Franzen v. Brinkman*, 877 F.2d 26, 26 (9th Cir. 1989) (per curiam); *see also Woratzeck v. Stewart*, 118 F.3d 648, 653 (9th Cir. 1997). Claim 29(M) is denied.

N. Speer alleges that his right to be free from cruel and unusual punishment would be violated if the State executed him after he has spent 15 years in jail and on death row. (Doc. 13 at 284.) This claim is meritless.

"The Supreme Court has never held that execution after a long tenure on death row is cruel and unusual punishment." *Allen v. Ornoski*, 435 F.3d 946, 958 (9th Cir. 2006); *see Lackey v. Texas*, 514 U.S. 1045 (1995) (mem.) (Stevens, J. & Breyer, J., discussing denial of certiorari and noting the claim has not been addressed); *Thompson v. McNeil*, 556 U.S. 1114 (2009) (mem.) (Stevens, J. & Breyer, J., dissenting from denial of certiorari; Thomas, J., concurring, discussing *Lackey* issue); *see also Knight v. Florida*, 528 U.S. 990 (1999) (Thomas, J., concurring in denial of certiorari) ("I am unaware of any support in the American constitutional tradition or in this Court's precedent for the proposition that a defendant can avail himself of the panoply of appellate and collateral procedures and then complain when his execution is delayed.").

Circuit courts have consistently held that prolonged incarceration under a sentence of death does not violate the Eighth Amendment. *See McKenzie v. Day*, 57 F.3d 1493, 1493–94 (9th Cir. 1995) (en banc); *White v. Johnson*, 79 F.3d 432, 438 (5th Cir. 1996); *Stafford v. Ward*, 59 F.3d 1025, 1028 (10th Cir. 1995). Claim 29(N) is denied.

O.     Speer alleges that execution by lethal injection is cruel and unusual punishment. (Doc. 13 at 287.) The Arizona Supreme Court denied the claim on direct appeal, *Speer*, 221 Ariz. at 466, 212 P.3d at 804, and the state court denied it during the PCR proceedings. These rulings were not contrary to or unreasonable applications of clearly-established federal law. *See, e.g.*, *Baze v. Rees*, 553 U.S. 35 (2008). The Ninth Circuit has concluded that Arizona's lethal injection protocol does not violate the Eighth Amendment. *Dickens v. Brewer*, 631 F.3d 1139 (9th Cir. 2011).

In addition, prior to execution, Speer may present this claim in a separate civil rights action under 42 U.S.C. § 1983. *See Hill v. McDonough*, 547 U.S. 573, 579–80, (2006) (recognizing that a challenge to the State's execution method may be brought in a § 1983 action); *Nance v. Ward*, 142 S. Ct. 2214, 2223 (2022). Claim 29(O) is denied.

## IV.    EVIDENTIARY DEVELOPMENT

Speer requests evidentiary development with respect to his claims of ineffective assistance of trial counsel (Claims 1–7, 14–19), appellate counsel (Claim 26), and PCR

counsel (Claim 27); prosecutorial misconduct (Claim 13); juror misconduct (Claim 25); and cumulative prejudice (Claim 28). (Doc. 23.) He seeks discovery, an evidentiary hearing, and expansion of the record under Rules 6, 7, and 8 of the Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254. (*Id.*)

### A.      Exhausted Claims

Claim 7 and portions of Claim 14, alleging ineffective assistance of trial counsel, were raised and denied on the merits in state court. As set forth above, this Court found that the PCR court's denial of the claims was not unreasonable under 28 U.S.C. § 2254(d). Because they did not satisfy § 2254(d)(1) or (2) based on the state court record, the Court is precluded from considering new evidence in support of the claims. *Pinholster*, 563 U.S. at 181; *Gulbrandson*, 738 F.3d at 993–94 & n.6.

### B.      Unexhausted Claims

The remaining claims for which Speer seeks evidentiary development were not presented in state court. Therefore, the Court's "'discretion . . . to consider new evidence' . . . is instead cabined by the requirement in § 2254(e)(2) that the petitioner must have attempted 'to develop the factual basis of [the] claim in State court.'" *Stokley v. Ryan*, 659 F.3d 802, 808 (9th Cir. 2011) (quoting *Pinholster*, 563 U.S. at 186).

Under § 2254(e)(2), a federal court may not hold an evidentiary hearing unless it first determines that the petitioner exercised diligence in trying to develop the factual basis of the claim in state court. *See Williams (Michael) v. Taylor*, 529 U.S. 420, 432 (2000). If the failure to develop a claim's factual basis is attributable to the petitioner, the court may hold a hearing only if the claim relies on (1) "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable" or (2) "a factual predicate that could not have been previously discovered through the exercise of due diligence." 28 U.S.C. § 2254(e)(2). In addition, "the facts underlying the claim [must] be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the [petitioner] guilty of the underlying offense." *Id.*

Section 2254(e)(2) limits a petitioner's ability to present new evidence through a Rule 7 motion to the same extent that it limits the availability of an evidentiary hearing. *See Cooper–Smith*, 397 F.3d 1236, 1241 (9th Cir. 2005), *overruled on other grounds by Daire v. Lattimore*, 812 F.3d 766 (9th Cir. 2016); *Holland v. Jackson*, 542 U.S. 649, 652–53 (2004) (per curiam). Accordingly, a petitioner who seeks to introduce new affidavits and other documents never presented in state court must demonstrate diligence in developing the factual basis in state court or satisfy the requirements of § 2254(e)(2).

Speer contends that the failure to develop the factual basis of these claims resulted from the ineffective assistance of PCR counsel. (*See, e.g.*, Doc. 23 at 22.) This argument is foreclosed by the Supreme Court's recent decision in *Ramirez*, which held that "under § 2254(e)(2), a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel." *Ramirez*, 142 S. Ct. at 1734. According to *Ramirez*, a petitioner is at fault when PCR counsel is negligent in developing the record, and therefore "a federal court may order an evidentiary or otherwise expand the state-court record only if the prisoner can satisfy § 2254(e)(2)'s stringent requirements." *Id.* at 1735.

Speer does not attempt to meet those standards. The claims for which he seeks evidentiary development do not rely on a new, retroactive rule of constitutional law. Nor do they rely on a factual predicate that could not have been discovered previously through due diligence. The evidence Speer seeks to develop, consisting largely of additional information from his defense team and from family members, existed at the time of the state court proceedings, so there is no new factual predicate under § 2254(e)(2).

Speer is not entitled to evidentiary development.

## V.      CERTIFICATE OF APPEALABILITY

Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, a petitioner cannot take an appeal unless a certificate of appealability ("COA") has been issued by an appropriate judicial officer. Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district judge must either issue or deny a certificate of appealability when

it enters a final order adverse to the applicant. If a certificate is issued, the court must state the specific issue or issues that satisfy 28 U.S.C. § 2253(c)(2).

Under § 2253(c)(2), a certificate of appealability may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack*, 529 U.S. at 484 (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a certificate of appealability will issue only if reasonable jurists could debate whether the petition states a valid claim of the denial of a constitutional right and whether the court's procedural ruling was correct. *Id.*

The Court finds that reasonable jurists could debate its resolution of Claim 7, alleging that trial counsel performed ineffectively by failing to move to vacate his conviction and sentence after the same prosecutor presented a conflicting theory of the crime at Womble's trial, and Claim 8, alleging that Speer's due process rights were violated when the trial court failed to suppress the jail recordings. The Court also finds that reasonable jurists could debate its resolution of Claim 14, alleging ineffective assistance of counsel at sentencing. *See Browning v. Baker*, 875 F.3d 444, 471 (finding district court errs by separating a petitioner's arguments into particular instances of counsel's conduct for purposes of issuing a COA); *see also Montiel v. Chappell*, NO. 15-99000, 2022 WL 3132416, *1 (9th Cir. August 5, 2022) (same).

## VI.    CONCLUSION

The Court has considered Speer's claims and determined that none establish that he is entitled to habeas relief.

Based on the foregoing,

**IT IS HEREBY ORDERED denying** Speer's Petition for Writ of Habeas Corpus (Doc. 13). The Clerk of Court shall enter judgment accordingly.

1
2

**IT IS FURTHER ORDERED denying** Speer's request for evidentiary development. (Doc. 23.)

3
4

**IT IS FURTHER ORDERED** granting a certificate of appealability with respect to Claims 7, 8, and 14.

5
6
7

**IT IS FURTHER ORDERED** that the Clerk of Court forward a courtesy copy of this Order to the Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007-3329.

8
9

Dated this 14th day of March, 2023.

10
11

G. Murray Snow
Chief United States District Judge

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28